SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Robert L. Lakind, Esquire
    Arnold Lakind, Esquire
    Steven Blader, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
By: Moshe Maimon, Esquire
    Danielle Disporto, Esquire
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys For Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio, <br><br> Plaintiff, <br> vs. <br><br> AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, <br><br> Defendants. | Civil Action No. <br><br><br> **COMPLAINT** <br> **AND JURY DEMAND** |

612920.2

Plaintiff, MARY ANN SIVOLELLA ("Plaintiff Sivolella"), whose street address is 55 Sheffield Drive, Forked River, New Jersey 08731, brings this action on behalf of, and for the benefit of, the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/Intermediate Government Bond Index Portfolio (collectively, the "AXA Funds"), and sues Defendant, AXA Equitable Life Insurance Company and Defendant, AXA Equitable Funds Management Group, LLC (both Defendants' principal place of business is located at 1290 Avenue of the Americas, New York, New York 10104), alleges:

## I.    NATURE OF ACTION

1.      This action is a derivative action brought by Plaintiff Sivolella, for the benefit of, and on behalf of, the AXA Funds, pursuant to the Investment Company Act of 1940 ("ICA") § 36(b).

2.      ICA § 36(b), 15 U.S.C. § 80a-35(b), provides that an investment manager to a mutual fund acts in a fiduciary capacity when it charges a mutual fund fees for its advisory services, and thus authorizes a security holder of a mutual fund to sue the adviser to such fund to recover any compensation received by the adviser in breach of its fiduciary duties.

3.      The EQ Advisors Trust ("Advisors Trust") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq.*, comprised of various mutual funds,[1] including the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-

---

[1]      A "series" trust, is a type of trust that contains multiple different mutual funds. The Advisors Trust is a series trust.

Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, and the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the AXA Funds).

4.    Plaintiff Sivolella, from at least April 1, 2010, through to the present (i.e., continues to be) a security holder of each of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, and the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the AXA Funds).

5.    AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC[2], serve as the investment manager/adviser to each of the AXA Funds, and are sued in this derivative Complaint based on their misconduct related to their wrongful receipt of fees in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

6.    AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, charged, and continues to charge, each of the AXA Funds investment advisory fees for alleged investment management services.[3] These fees are paid from the AXA Funds' assets and thus are borne by the Funds' investors.

7.    In addition to having AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, as their investment adviser/manager, each AXA Fund also has a

---

[2]    AXA Equitable Funds Management Group, LLC, is occasionally referred to as "Funds Management Group unit" within the AXA Funds' public filings.

[3]    The term "investment advisory services" and "investment management services" are used interchangeably in this Complaint.

sub-adviser (or in some cases sub-advisers) that perform all, or substantially all, of the investment management services required by each AXA Fund.

8.     AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, have contracted with these sub-advisers, and such sub-contracts require the sub-advisers to perform all, or substantially all, of the investment management services that are needed by each AXA Fund.

9.     AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, collect from each of the AXA Funds a "management fee" for their alleged investment management services.  They retain the bulk of that investment management fee, and pay a fraction of that fee to each of the AXA Funds' sub-advisers, which are the actual entities that provide all, or substantially all, of the investment management services to each AXA Fund.  As an example of the significance of the fee retained by AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, for the EQ/Intermediate Government Bond Index Portfolio, in 2010, the Defendants retained an investment management fee that was 17.5 times (1750%) the amount that was paid to the fund's sub-adviser.

10.     Plaintiff Sivolella, who has owned shares in the AXA Funds since April 1, 2010, through the present (i.e., continues to be a shareholder), alleges that the investment management fees charged to each of the AXA Funds, by AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, were in breach of these Defendants' fiduciary duties under ICA § 36(b), 15 U.S.C. §80a-35(b).

11.     Plaintiff Sivolella brings this action derivatively pursuant to ICA § 36(b), 15 U.S.C. §80a-35(b), on behalf of all of the AXA Funds.

12.     Plaintiff Sivolella, seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the AXA Funds, the actual damages resulting from the breaches of fiduciary duties by AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, including the amount of compensation and payments received from the AXA Funds and/or, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), rescission of the contracts, that resulted in these breaches, due to AXA Equitable Life Insurance Company's and AXA Equitable Funds Management Group, LLC 's, violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

13.     Plaintiff Sivolella seeks a recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

14.     Most of Plaintiff's allegations below are based on statements contained in (i) Securities Exchange Commission ("SEC") filings for the AXA funds, that AXA Equitable Life Insurance Company filed on each fund's behalf and (ii) agreements that AXA Equitable Life Insurance Company has entered into with each fund's subadviser(s) (these agreements are also filed by AXA Equitable Life Insurance Company with the SEC).

15.     Many of the statements relied upon below come from AXA Equitable Life Insurance Company's Advisors Trust February 3, 2011 N-1A SEC filing ("February N-1A") and AXA Equitable Life Insurance Company's Advisors Trust April 28, 2011 N-1A SEC filing ("April N-1A"). Both SEC filings were filed by AXA Equitable Life Insurance Company on behalf of the AXA Funds/Advisors Trust and generally contain the same material information. A portion of the February N-1A filing, known as the prospectus, has an effective date of April 24, 2011, and the other portion, known as the Statement of Additional Information ("SAI"), has an effective date of May 1,

2011 ("May 1, 2011 SAI"). The April N-1A has an effective date of May 1, 2011 (both the prospectus and SAI contained in this filing have a May 1, 2011 effective date).[4]

16.     On information on belief, the statements that are contained in (i) any SEC filing relied upon below, and (ii) any sub-advisory agreement entered into between AXA Equitable Life Insurance Company and a sub-adviser (these agreements are also filed with the SEC), relied upon below, represent/reflect the conduct/actions of AXA Equitable Life Insurance Company and AXA Funds Management, LLC, for the entire time period that Plaintiff is permitted to seek a recovery under ICA § 36(b)(3), 15 U.S.C. §80a-35(b)(3).

## II.     THE PARTIES

### A.     Plaintiff

17.     Plaintiff Sivolella resides at 55 Sheffield Drive, Forked River, New Jersey 08731, and from at least April 1, 2010 through to the present is, and continues to be, a security holder of each of the AXA Funds.

### B.     Defendants

18.     Defendant, AXA Equitable Life Insurance Company is a New York corporation engaged in the business of, among other things, serving as the investment adviser to the AXA Funds. Its principal place of business is 1290 Avenue of the Americas, New York, New York 10104. This Defendant received an investment management fee from each of the AXA Funds.

---

[4]     On June 17, 2011, AXA Equitable Life Insurance Company, on behalf of a specific share class of the AXA Funds, filed an N-1A filing, that may take effect on August 16, 2011. This N-1A filing, which is not yet effective, does not contain any statements, with respect to the AXA Funds (except for the EQ/Intermediate Government Bond Index; see footnote 4), that are materially different from the statements that are contained in the April N-1A filing.

19.    Defendant, AXA Equitable Funds Management Group, LLC, is a New York corporation engaged in the business of, among other things, serving as the investment adviser to the AXA Funds. Its principal place of business is also 1290 Avenue of the Americas, New York, New York 10104. This Defendant received an investment management fee from each of the AXA Funds.

20.    The relevant SEC filings provide conflicting information on whether AXA Equitable Life Insurance Company or AXA Equitable Funds Management, LLC, serves as the investment manager/adviser for the AXA Funds. The prospectus portion of both the February and April N-1A filings state that AXA Equitable Life Insurance Company is the investment manager to the AXA Funds. The SAI potion of the February and April N1-A state that "AXA Equitable, through its AXA Funds Management Group unit, currently serves as the investment manager" for each of the AXA Funds. Thus, although Plaintiff Sivolella sues both AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, individually, both entities are collectively referred to herein as "AXA Equitable" for the remainder of the Complaint.

## III.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

22.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43.

23.    No pre-suit demand on the Boards of the AXA Funds is required, as the demand requirement under Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under ICA § 36(b), 15 U.S.C. § 80a-35(b).

IV.   **BACKGROUND INFORMATION ABOUT THE INVESTMENT MANAGEMENT INDUSTRY AND THE PURPOSE OF ICA § 36(b), 15 U.S.C. § 80a-35(b)**

24.    A mutual fund is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).

25.    Congress recognized as early as 1935 that because "a typical [mutual] fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor." S. Rep. No. 91-184, p. 5 (1969).  Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.*

26.    As a result, Congress enacted the ICA in 1940 recognizing that:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interest of [shareholders] . . . or when the investment companies . . . are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994).  Accordingly, the ICA was designed to regulate and curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Assoc.*, *L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund*, 464 U.S. at 536), and to create standards of care applicable to investment advisers and their affiliates, such as AXA Equitable.

27.    By the 1960s, it had become clear to Congress that investment advisers to equity mutual funds were charging those funds excessive fees, particularly by not taking economies of scale into account.

28.     Thus, ICA § 36(b), 15 U.S.C. § 80a-35(b), was added to the ICA in 1970, (primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiff Sivolella), which created a federal cause of action for breach of fiduciary duty by investment advisers.  ICA § 36(b), 15 U.S.C. § 80a-35(b), – which imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services – states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  *An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation* or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

ICA § 36(b), 15 U.S.C. § 80a-35(b) (emphasis added).

29.     The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders."  Indeed, the goal of ICA § 36(b), 15 U.S.C. § 80a-35(b), is to empower shareholders to independently police whether investment advisers have fulfilled their fiduciary obligations.

30.     "The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and is "potentially incestuous."  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)

31.     Through ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent

check on an adviser's fulfillment of its fiduciary duties and receipt of unfair fees.  By enacting ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress provided shareholders with a means to redress breaches of the adviser's fiduciary duty to the funds it manages and distributes while leaving the "ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court."  S. Rep. 91-184, p. 6.

## V.    FACTORS GENERALLY RELEVANT TO AN ICA § 36(b), 15 U.S.C. § 80a-35(b) CLAIM

32.    ICA § 36(b), 15 U.S.C. § 80a-35(b), itself does not set forth a list of factors to be considered in determining whether an investment adviser, such as AXA Equitable, has breached its fiduciary duty with respect to its receipt of compensation for services paid by a mutual fund such as any of the AXA Funds.

33.    The test for determining whether fee compensation paid to AXA Equitable violates ICA § 36(b), 15 U.S.C. § 80a-35(b), is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928.

34.    If an adviser charges a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining" (*see Jones*, 130 S.Ct. at 1418 (quoting *Gartenberg*)), the adviser has violated ICA § 36(b), 15 U.S.C. § 80a-35(b).

35.    In the context of ICA § 36(b), 15 U.S.C. § 80a-35(b), litigation, courts have historically considered, *inter alia*, the following factors ("*Gartenberg* Factors"):

(1)    the nature and quality of services being paid for by the fund and its investors;

(2) whether the trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

(3) what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

(4) whether savings from economies of scale were passed to the funds and their investors or kept by the investment adviser; and

(5) the costs of providing investment management services and the profitability of providing those services to the funds.

36. As set forth below, an examination of the *Gartenberg* Factors demonstrates that the fees charged to the AXA Funds and their investors, breached and continue to breach AXA Equitable's fiduciary duty to the AXA Funds. Indeed, AXA Equitable's receipt of the excessive investment management fees were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's-length bargaining.

### A. THE NATURE AND QUALITY OF THE INVESTMENT MANAGEMENT SERVICES PERFORMED BY AXA EQUITABLE DOES NOT JUSTIFY AXA EQUITABLE'S MANAGEMENT FEE

37. AXA Equitable serves as the investment manager to each of the AXA Funds, and by serving in that capacity, receives a significant amount of annual compensation for the alleged investment management services it claims to provide to the AXA Funds.

38. The AXA Funds pay a monthly management fee to AXA Equitable based on a stated percentage of each of the AXA Fund's average daily net asset value. As such, the investment management fees are not based on the investment management services actually rendered by AXA Equitable or AXA Equitable's actual costs in providing those services to the AXA Funds.

39.     Rather than providing investment management services to the AXA Funds, AXA Equitable subcontracts with other investment advisers to provide these services, and does so at a fraction of AXA Equitable's investment management fee collected from each AXA Fund.

40.     With respect to the AXA Funds, AXA Equitable has subcontracted its investment management duties to, among others: (i) AllianceBernstein L.P. ("AllianceBernstein") pursuant to an Investment Advisory Agreement ("AllianceBernstein Agreement"); (ii) BlackRock Capital Management, Inc. ("BlackRock Capital") pursuant to an Investment Advisory Agreement ("BlackRock Capital Agreement"); (iii) BlackRock Investment Management, LLC ("BlackRock") pursuant to an Investment Advisory Agreement ("BlackRock Agreement"); (iv) Morgan Stanley Investment Management Inc. ("MSIM") pursuant to an Investment Advisory Agreement ("MSIM Agreement"); (v) GAMCO Asset Management, Inc. ("GAMCO") pursuant to an Investment Advisory Agreement ("GAMCO Agreement"); (vi) Wellington Management Company, LLP ("Wellington") pursuant to an Investment Advisory Agreement ("Wellington Agreement"); and (vii) SSgA Funds Management, Inc. ("SSgA") pursuant to an Investment Advisory Agreement ("SSgA Agreement") .

41.     The AllianceBernstein Agreement, the BlackRock Capital Agreement, the BlackRock Agreement, the MSIM Agreement, the GAMCO Agreement, the Wellington Agreement and the SSgA Agreement (hereinafter collectively referred to as the "Advisory Agreements") are entered into between AXA Equitable, on behalf of the AXA Funds, and the respective sub-adviser.

42.     Each of the AXA Funds has a sub-adviser, or in some cases, sub-advisers (which SEC filings occasionally refer to as "Adviser(s)") that are responsible for, and undertake all, or substantially all, of the investment management services required by each Fund.

43.     AllianceBernstein is the sub-adviser to the EQ/Common Stock Index Portfolio, the

EQ/Equity 500 Index Portfolio, and the EQ/Large Cap Value PLUS Portfolio.  BlackRock Capital

is a sub-adviser to the EQ/Equity Growth PLUS Portfolio.  BlackRock is a sub-adviser to the

EQ/Equity Growth PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, and the EQ/Mid

Cap Value PLUS Portfolio.  MSIM is a sub-adviser to the EQ/Global Multi-Sector Equity Portfolio.

GAMCO is the sub-adviser to the EQ/GAMCO Small Company Value Portfolio.  Wellington is a

sub-adviser to EQ/Mid Cap Value PLUS Portfolio.  SSgA is the sub-adviser to the EQ/Intermediate

Government Bond Index Portfolio. *See* the following table.

| AXA Fund | Adviser | Sub-Adviser(s) |
| --- | --- | --- |
| EQ/Common Stock Index Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Equity Growth PLUS Portfolio | AXA Equitable | BlackRock Capital *and* BlackRock |
| EQ/Equity 500 Index Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Large Cap Value PLUS Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Global Multi-Sector Equity Portfolio | AXA Equitable | MSIM *and* BlackRock |
| EQ/Mid Cap Value PLUS Portfolio | AXA Equitable | Wellington *and* BlackRock |
| EQ/GAMCO Small Company Value Portfolio | AXA Equitable | GAMCO |
| EQ/Intermediate Government Bond Index | AXA Equitable | SSgA |

44.     As demonstrated in detail below, despite the fact that the sub-adviser(s) for each of

the AXA Funds performed all, or substantially all, of the investment management services, each

AXA Fund was still charged by, and paid to, AXA Equitable a significant investment management

fee, which substantially exceeded the investment management fees that were paid to each fund's sub-

adviser(s).

45.     According to the April N-1A, "[AXA Equitable's] management responsibilities include the selection and monitoring of Advisers [i.e., the sub-advisers] for the Portfolios" and AXA Equitable has "responsibility to oversee Advisers and recommend their hiring, termination and replacement."

46.     AXA Equitable has even represented on its website that Defendant AXA Equitable Funds Management Group, LLC "provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [9]

47.     Thus, AXA Equitable selects the sub-advisers for the AXA Funds.  Other than AXA Equitable's initial involvement, it provides no, or minimal, services to the AXA Funds and it is the sub-advisers that provide the investment advisory services to the AXA Funds.

    (a)     **Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Are Specific To Each Fund**

        1.     **EQ/Common Stock Index Portfolio**

48.     AXA Equitable is the investment adviser to the EQ/Common Stock Index Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs all, or substantially all, of the investment management services for this fund.

49.     According to the February N-1A, with respect to the EQ/Common Stock Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [AllianceBernstein], which is responsible for the day-to-day management of the Portfolio's assets."

---

     [9]     *See* "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html

50.   With respect to this fund, the February N-1A and the April N-1A both state the following:

**Adviser: AllianceBernstein L.P. ('AllianceBernstein')**

**Portfolio Manager:** The member of the team that is primarily responsible for the management of the Portfolio is [listed is the name of an AllianceBernstein Senior Vice President]

51.   Under the terms of the AllianceBernstein Agreement between AXA Equitable and AllianceBernstein, with respect to the EQ/Common Stock Index Portfolio, AllianceBernstein has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

52.     Furthermore, under the terms of the AllianceBernstein Agreement, in connection with providing all, or substantially all, of the investment management services to the EQ/Common Stock Index Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

### 2.     EQ/Equity 500 Index Portfolio

53.     AXA Equitable is the investment adviser to the EQ/Equity 500 Index Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs all, or substantially all, of the investment management services for the fund.

54.     According to the February N-1A, with respect to the EQ/Equity 500 Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [AllianceBernstein], which is responsible for the day-to-day management of the Portfolio's assets."

55.     With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: AllianceBernstein L.P. ('AllianceBernstein')**
>
> **Portfolio Manager:** [Listed is the name of an AllianceBernstein Senior Vice-President].

56.     Under the terms of the AllianceBernstein Agreement between AXA Equitable and AllianceBernstein, with respect to the EQ/Equity 500 Index Portfolio, AllianceBernstein has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by

arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

57.    Furthermore, under the terms of the AllianceBernstein Agreement, in connection with providing all, or substantially all, of the investment management services to the EQ/Equity 500 Index Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

### 3.   EQ/Large Cap Value PLUS Portfolio

58.     AXA Equitable is the investment adviser to the EQ/Large Cap Value PLUS Portfolio,

however, the fund's sub-adviser, AllianceBernstein, performs all, or substantially all, of the

investment management services for this fund.

59.     According to the February N-1A, with respect to the EQ/Large Cap Value PLUS

Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below

[AllianceBernstein], which are responsible for the day-to-day management of the Portfolio's assets."

60.     With respect to this fund, the February N-1A and the April N-1A both state the

following:

> **Adviser: AllianceBernstein L.P. ('AllianceBernstein')**
>
> **Portfolio Managers:** The members of the team are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of three AllianceBernstein Vice Presidents and two AllianceBernstein Senior Portfolio Managers ].
>
> **Portfolio Manager:** The Index Allocation Portion of the Portfolio is managed by: [listed is the name of an AllianceBernstein Senior Vice President].

61.     The February N-1A and the April N-1A also provide that three AXA Equitable

employees are also listed as a "Portfolio Managers" for the EQ/Large Cap Value PLUS Portfolio.

Although the AXA Funds' SEC filings explain the services that are performed by AllianceBernstein

for the EQ/Large Cap Value PLUS Portfolio, there are no disclosures regarding the services

performed, if any, by these three AXA Equitable employees on behalf of this fund.

62.     Under the terms of the AllianceBernstein Agreement between AXA Equitable and

AllianceBernstein, with respect to the EQ/Large Cap Value PLUS Portfolio, AllianceBernstein has

to, among other things,: (i) formulate and implement a continuous investment program for the fund;

(ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

63.     Furthermore, under the terms of the AllianceBernstein Agreement, in connection with providing all, or substantially all, of the investment management services to the EQ/Large Cap Value PLUS Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

### 4.    EQ/Equity Growth PLUS Portfolio

64.    AXA Equitable serves as the investment adviser to the EQ/Equity Growth PLUS Portfolio, however, the fund's sub-advisers, BlackRock Capital and BlackRock, perform all, or substantially all, of the investment management services for this fund.

65.    According to the February N-1A, with respect to the EQ/Equity Growth PLUS Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [BlackRock Capital and BlackRock], which are responsible for the day-to-day management of the Portfolio's assets."

66.    With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: BlackRock Capital Management, Inc.**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of "BlackRock, Inc." (which is an affiliate of BlackRock Capital)].
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of BlackRock].

67.    The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as "Portfolio Managers" for the EQ/Equity Growth PLUS Portfolio. Although the AXA Funds' SEC filings explain the services that are performed by BlackRock Capital and BlackRock for the EQ/Equity Growth PLUS Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

68.     As stated above, both BlackRock Capital and BlackRock serve as the sub-advisers to the EQ/Equity Growth PLUS Portfolio.  The BlackRock Capital Agreement and the BlackRock Agreement entered into between AXA Equitable and BlackRock Capital and BlackRock, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Capital Agreement and the BlackRock Agreement, with respect to the EQ/Equity Growth PLUS Portfolio, BlackRock Capital and BlackRock have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock Capital and BlackRock manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock Capital and BlackRock in managing the fund, to allow the fund to present information concerning BlackRock Capital and BlackRock's prior performance in the fund's SEC filings.

69.     Furthermore, under the terms of the BlackRock Capital Agreement and the BlackRock Agreement, in connection with providing all, or substantially all, of the investment management services to the EQ/Equity Growth PLUS Portfolio, BlackRock Capital and BlackRock must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the BlackRock Capital Agreement and the BlackRock Agreement.

**5.      EQ/Global Multi-Sector Equity Portfolio**

70.     AXA Equitable serves as the investment adviser to the EQ/Global Multi-Sector Equity Portfolio, however, the fund's sub-advisers, BlackRock and MSIM, perform all, or substantially all, of the investment management services for this fund.

71.     According to the February N-1A, with respect to the EQ/Global Multi-Sector Equity Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [MSIM and BlackRock], which are responsible for the day-to-day management of the Portfolio's assets."

72.     With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: Morgan Stanley Investment Management Inc. ('MSIM')**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of Managing and Executive Directors of MSIM]
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**

**Portfolio Managers:** The Members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of BlackRock].

73.     The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as "Portfolio Managers" for the EQ/Global Multi-Sector Equity Portfolio. Although the AXA Funds' SEC filings explain the services that are performed by BlackRock and MSIM for the EQ/Global Multi-Sector Equity Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

74.     As stated above, both BlackRock and MSIM serve as the sub-advisers to the EQ/Global Multi-Sector Equity Portfolio.  The BlackRock Agreement and the MSIM Agreement entered into between AXA Equitable and BlackRock and MSIM, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Agreement and the MSIM Agreement, with respect to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request;

and (v) provide material performance information, records and supporting documentation about accounts BlackRock and MSIM manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock and MSIM in managing the fund, to allow the fund to present information concerning BlackRock and MSIM's prior performance in the fund's SEC filings.

75.     Furthermore, under the terms of the BlackRock Agreement and the MSIM Agreement, in connection with providing all, or substantially all, of the investment management services to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the BlackRock Agreement and the MSIM Agreement.

### 6.     EQ/GAMCO Small Company Value Portfolio

76.     AXA Equitable serves as the investment adviser to the EQ/GAMCO Small Company Value Portfolio, however, the fund's sub-adviser, GAMCO, performs all, or substantially all, of the investment management services for this fund.

77.     According to the February N-1A, with respect to the EQ/GAMCO Small Company Value Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [GAMCO], which is responsible for the day-to-day management of the Portfolio's assets."

78.     With respect to this fund, the February N-1A and the April N-1A both state the following:

**Adviser: GAMCO Asset Management, Inc. ('GAMCO')**

**Portfolio Manager:** [Listed is the name of GAMCO's Chief Executive Officer and Chief Investment Officer].

79.     Under the terms of the GAMCO Agreement between AXA Equitable and GAMCO, with respect to the EQ/GAMCO Small Company Value Portfolio, GAMCO has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request; and (v) provide material performance information, records and supporting documentation about accounts GAMCO manages, which have investment objectives, policies and strategies that are substantially similar to those employed by GAMCO in managing the fund, to allow the fund to present information concerning GAMCO's prior performance in the fund's SEC filings.

80.     Furthermore, under the terms of the GAMCO Agreement, in connection with providing all, or substantially all, of the investment management services to the EQ/GAMCO Small Company Value Portfolio, GAMCO must also provide the following at its own expense: (i) all

necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the GAMCO Agreement.

### 7.   EQ/Mid Cap Value PLUS Portfolio

81.   AXA Equitable serves as the investment adviser to the EQ/Mid Cap Value PLUS Portfolio, however, the fund's sub-advisers, BlackRock and Wellington, perform all, or substantially all, of the investment management services for this fund.

82.   According to the February N-1A, with respect to the EQ/Mid Cap Value PLUS Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [BlackRock and Wellington], which are responsible for the day-to-day management of the Portfolio's assets."

83.   With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: Wellington Management Company, LLP ('Wellington')**
>
> **Portfolio Managers:** The Active Allocated Portion of the Portfolio is management by: [listed is the name of a Wellington Senior Vice President]
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers:** The members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio is managed by: [listed are the names of Managing Directors of BlackRock]

84.   The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as "Portfolio Managers" for the EQ/Mid Cap Value PLUS Portfolio. Although the AXA Funds' SEC filings explain the services that are performed by BlackRock and

Wellington for the EQ/Mid Cap Value PLUS Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

85.     As stated above, both BlackRock and Wellington serve as the sub-advisers to the EQ/Mid Cap Value PLUS Portfolio.  The BlackRock Agreement and the Wellington Agreement entered into between AXA Equitable and BlackRock and Wellington, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Agreement and the Wellington Agreement, with respect to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock and Wellington manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock and Wellington in managing the fund, to allow the fund to present information concerning BlackRock and Wellington's prior performance in the fund's SEC filings.

86.     Furthermore, under the terms of the BlackRock Agreement and the Wellington Agreement, in connection with providing all, or substantially all, all of the investment management services to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the BlackRock Agreement and the Wellington Agreement.

## 8.     EQ/Intermediate Government Bond Index Portfolio

87.     AXA Equitable is the investment adviser to the EQ/Intermediate Government Bond Index Portfolio, however, the fund's sub-adviser, SSgA, performs all, or substantially all, of the investment management services for this fund.

88.     According to the February N-1A, with respect to the EQ/Intermediate Government Bond Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [SSgA], which is responsible for the day-to-day management of the Portfolio's assets."

89.     With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: SSgA Funds Management, Inc. ('SSgA FM')**
>
> **Portfolio Manager:** The members that are jointly and primarily responsible for the management of the Portfolio are: [listed is the name of a Managing Director of SSgA and one of its Vice Presidents][4]

---

[4] On June 17, 2011, AXA Equitable filed another N-1A filing, which contains disclosure related to the EQ/Intermediate Government Bond Index Portfolio. This filing is not yet effective, and if it does take effect, such effective date will not be until August 16, 2011. This filing states

90.     Under the terms of the SSgA Agreement between AXA Equitable and SSgA, with respect to the EQ/Intermediate Government Bond Index Portfolio, SSgA has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

91.     Furthermore, under the terms of the SSgA Agreement, in connection with providing all, or substantially all, of the investment management services to the EQ/Intermediate Government Bond Index Portfolio, SSgA must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including

---

that with respect to this fund, Defendant AXA Equitable Funds Management Group, LLC, manages the fund's "ETF [exchange traded funds] investments." This statement is not in the February or April N-1A filings.

bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the SSgA Agreement.

**(b)** **Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Apply Equally To All Funds**

92.    The May 1, 2011 SAI provides that AXA Equitable (as the investment manager to the AXA Funds) has "entered into one or more Advisory Agreements on behalf of each Portfolio", which "obligate the Advisers [*i.e.*, the sub-advisers] to": (i) "make investment decisions on behalf of their respective Portfolios (or portions thereof) [i.e., each of the AXA Funds]"; (ii) "place all orders for the purchase and sale of investments for their respective Portfolios (or portions thereof) with brokers or dealers selected by [AXA Equitable] and/or the Advisers"; and (iii) "perform certain related administrative functions in connection therewith."

93.    The AXA Funds' Annual Report dated December 31, 2010 ("December 31, 2010 Annual Report") further provides that each sub-adviser: (i) "independently chooses and maintains a portfolio of securities for the Portfolio and each is responsible for investing a specific allocated portion of the Portfolio's assets" and (ii) is obligated pursuant to the Advisory Agreements to "continually furnish investment programs for the Portfolio."

94.    AXA Equitable's fee schedule varies for each of the AXA Funds.  Each Fund pays an investment management fee to AXA Equitable, which then subcontracts with AllianceBernstein, BlackRock Capital, BlackRock, MSIM, Wellington, GAMCO and SSgA at a fraction of AXA Equitable's investment management fee.

95.     All, or substantially all, of the portfolio management and investment management services required by the AXA Funds are performed by AllianceBernstein, BlackRock Capital, BlackRock, MSIM, Wellington, GAMCO and SSgA, at their own expense.

96.     Further evidence that AllianceBernstein performs all, or substantially all, of the investment management/advisory services for the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Large Cap Value PLUS Portfolio is demonstrated by the fact that when Vanguard Group, Inc. ("Vanguard") retains AllianceBernstein as its investment advisor for the Vanguard funds, Vanguard does not get paid.   Although AllianceBernstein provides Vanguard with substantially similar services as it provides for the AXA Funds, Vanguard does not charge any investment advisory/management fee, much less one that is 7.0 times greater than the fee paid to AllianceBernstein for the EQ/Common Stock Index Portfolio.

97.     Similarly, further evidence that Wellington performs substantially all, or substantially all, of the management/advisory services for the EQ/Mid Cap Value PLUS Portfolio is demonstrated by the fact that when Vanguard also retains Wellington as its investment advisor for the Vanguard funds, Vanguard does not get paid.   Although Wellington provides Vanguard with substantially similar services as it provides for the AXA Funds, unlike AXA Equitable, Vanguard does not charge any investment advisory/management fee.

98.     In 2010 alone, AXA Equitable was paid a total of $96,385,705 in investment management fees from the AXA Funds at issue in this Complaint.   (*see* Table ¶150).   Of that sum, AXA Equitable paid AllianceBernstein, BlackRock Capital, BlackRock, MSIM, Wellington, GAMCO and SSgA $24,799,918 for their sub-advisory services, retaining $71,585,787 for itself despite the fact that the sub-advisers performed all, or substantially all, of the investment

management services to the AXA Funds. *Id.* This is a clear breach of AXA Equitable's fiduciary duties and a violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).[5]

99.     AXA Equitable's investment management fees, which ranged from 204% times (for the EQ/GAMCO Small Company Value Portfolio) to 1750% times (for the EQ/Intermediate Government Bond Index Portfolio) that of the investment management fees that were charged by each AXA Fund's sub-adviser(s) who had the actual investment responsibility, were disproportional to the services rendered.

100.     On information and belief, the fee practices associated with the AXA Equitable's excessive fees, have been ongoing for the entire time period applicable to Plaintiff's claims.

101.     As the sub-advisers to the AXA Funds rendered all, or substantially all, of the investment management services to these funds, the investment management fees that were charged, and retained, by AXA Equitable, which significantly exceeded the fees that were paid to the AXA Funds' sub-adviser(s), were so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining and therefore were in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

102.     The nature and quality of the investment management services performed by AXA Equitable were either non-existent or minimal because all, or substantially all, of these services were performed by each Fund's sub-adviser.  Thus, all, or substantially all, of the portion of the

---

[5]     On information and belief, with respect to each of the AXA Funds, for the 2011 calendar year, the amount of investment management fees that will be paid to AXA Equitable and the investment management fees that will be paid to each Fund's sub-adviser(s), will not be materially different than the 2010 values.

investment management fees that AXA Equitable charged each of the AXA Funds, but did not pay to these funds' sub-advisers, were so disproportionately large that they bore no reasonable relationship to services rendered and could not have been the product of arm's-length bargaining.

103.    Plaintiff Sivolella, on behalf of the AXA Funds, is entitled to recover all, or substantially all, of the portion of the investment management fees that AXA Equitable charged, but did not pay to the sub-advisers, since AXA Equitable's charging and receipt of such fees are/were in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

> **B.     THE ECONOMIES OF SCALE ENJOYED IN CONNECTION WITH THE INVESTMENT MANAGEMENT SERVICES WERE NOT PASSED ON TO THE PLAINTIFF AND OTHER SHAREHOLDERS OF THE AXA FUNDS AS REQUIRED BY ICA § 36(b), 15 U.S.C. § 80a-35(b), BUT WERE KEPT BY AXA EQUITABLE IN VIOLATION OF ITS FIDUCIARY DUTIES**

104.    The legislative history of ICA § 36(b), 15 U.S.C. § 80a-35(b), recognizes that an investment adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

*S. Rep. No. 91-184*, at 5-6 (1969), as reprinted in *1970 U.S. Code Cong. & Ad. News*, at 4901-02.

105.   The amount of the compensation received by the investment adviser should be evaluated in context with the economies of scale realized by a fund. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets. The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

*Unconventional Success: A Fundamental Approach to Personal Investment*, David Swensen, Free Press (2005), p. 238. "The intrinsic characteristics of the mutual-fund...suggest that economies of scale should lead to lower fees as assets under management [i.e., the amount people invest in a fund] increase." *Id.* at 237. Economies of scale with respect to a mutual fund exist, and are available to be passed along to the fund's investors, because "investment management efforts...do not increase along with portfolio size." *Id.* at 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.*

106.   On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur on both the fund complex and portfolio level for various costs incurred. Morever, fixed costs are spread over more assets as a fund grows in size.

107.   Indeed, investment management organizations can realize economies of scale from increased assets within a particular mutual fund and from increased total assets in all mutual funds under management.

108.   As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and is charged a fee of 75 basis points (100 basis points = 1%; 1 basis point equals 1/100th of a percent), the fee equals $375,000 per year.  A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000).  Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

109.   As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale.  In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund.  In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale.  Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added because of a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

110.   The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.  *See SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses* (Dec. 2000), at 30-31;  GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member,*

*Committee on Commerce, House of Representatives* (June 2000) ("GAO Report"), at 9. The GAO has estimated as much as 64% of mutual fund asset growth has been the result of market appreciation rather than additional purchases of new shares of a fund. *Id.*

111.    Economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients. *See John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,* 26 J. CORP. L. 610, at 621 n. 62 (2001) (the "Freeman & Brown Study") (citing Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 BUS. LAW 107 (1993))

112.    As fund portfolios grow, they quickly create economies of scale and eventually the incremental cost of servicing additional assets approaches zero. As the GAO confirms, it is possible for the adviser to service the additional assets with zero additional costs. *See* GAO Report, at 9 (noting that growth from portfolio appreciation is unaccompanied by costs).

113.    Although significant economies of scale exist for each of the AXA Funds, the associated cost savings largely have been appropriated for the benefit of AXA Equitable rather than being shared with the AXA Funds. The economies-of-scale benefits that have been captured and misappropriated by AXA Equitable can and have generated huge unreasonable and excessive, undeserved profits for AXA Equitable in breach of its fiduciary duty to the AXA Funds with respect to such compensation.

114.    Management fees received by AXA Equitable are paid as a varying percentage of assets under management. Some of the AXA Funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. The fees vary

based on the amount of assets under management, and are reduced as the total amount of assets under management increase.  *See* the following table.

**AXA FUNDS' FEE BREAKPOINT SCHEDULE**
**("M" refers to "Million" and "B" refers to "Billion")**

| AXA Fund | Investment Advisory Agreement(s) | AXA Equitable's Fee Schedule (annual rate based on average daily net assets) | Sub-Advisor Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|---|
| EQ/Common Stock Index Portfolio | AllianceBernstein | All Assets – 0.350% | All Assets – 0.050% |
| EQ/Equity 500 Index Portfolio | AllianceBernstein | All Assets – 0.2500% | First $1 billion – 0.050%<br>Over $1B – 0.030% |
| EQ/Large Cap Value PLUS Portfolio | AllianceBernstein | First $2 billion – 0.500%<br>Next $1 billion – 0.450%<br>Next $3 billion – 0.425%<br>Next $5 billion – 0.400%<br>Thereafter – 0.375% | First $100 million – 0.490%<br>Next $100 million – 0.300%<br>Over $200M – 0.250% |
| EQ/ Intermediate Government Bond Index Portfolio | SSgA | All Assets – 0.350% | First $2 billion – 0.02%<br>Over $2B – 0.015% |
| EQ/Equity Growth PLUS Portfolio | BlackRock Capital | First $2 billion – 0.500%<br>Next $1 billion – 0.450%<br>Next $3 billion – 0.425%<br>Next $5 billion – 0.400%<br>Thereafter – 0.375% | First $100 million – 0.400%<br>$100M to $300M – 0.375%<br>$300M to $500M – 0.350%<br>$500M to $1B – 0.325%<br>Over $1B – 0.300% |
| EQ/Equity Growth PLUS Portfolio | BlackRock | First $2 billion – 0.500%<br>Next $1 billion – 0.450%<br>Next $3 billion – 0.425%<br>Next $5 billion – 0.400%<br>Thereafter – 0.375% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |

| EQ/GAMCO Small Company Value Portfolio | GAMCO | First $400 million – 0.800%<br>Next $400 million – 0.750%<br>Thereafter – 0.700% | First $1 billion – 0.400%<br>Over $1B – 0.300% |
|---|---|---|---|
| EQ/Mid Cap Value PLUS Portfolio | BlackRock | First $2 billion – 0.550%<br>Next $1 billion – 0.500%<br>Next $3 billion – 0.475%<br>Next $5 billion – 0.450%<br>Thereafter – 0.425% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
| EQ/Mid Cap Value PLUS Portfolio | Wellington | First $2 billion – 0.550%<br>Next $1 billion – 0.500%<br>Next $3 billion – 0.475%<br>Next $5 billion – 0.450%<br>Thereafter – 0.425% | First $150 million – 0.550%<br>Over $150M – 0.450% |
| EQ/Global Multi-Sector Equity Portfolio | BlackRock | First $1 billion – 0.750%<br>Next $1 billion – 0.700%<br>Next $3 billion – 0.675%<br>Next $5 billion – 0.650%<br>Thereafter – 0.625% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
| EQ/Global Multi-Sector Equity Portfolio | MSIM | First $1 billion – 0.750%<br>Next $1 billion – 0.700%<br>Next $3 billion – 0.675%<br>Next $5 billion – 0.650%<br>Thereafter – 0.625% | First $100 million – 1.00%<br>$100M to $400M – 0.800%<br>$400M to $500M – 0.600%<br>Over $500M – 0.400% |

115. This fee structure, known as "breakpoints," implicitly recognizes the economies of scale and gives the appearance that the AXA Funds share in those benefits. A fee breakpoint has been explained as follows:

> Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

*See Freeman & Brown Study*, at 620, n. 59.

116.    Economies of scale can be passed on to and shared with the mutual funds as assets increase if management fee breakpoints are installed at higher asset levels (but at asset levels that are reachable), or if lower asset based investment advisory fees are adopted by the management company in response to increases in the overall level of assets under management.

117.    The benefits achieved by the AXA Funds' economies of scale can and should have been shared with mutual funds and their shareholders by reducing and/or eliminating the management fees and other costs charged to the AXA Funds by AXA Equitable.

118.    In the case of the AXA Funds, however, AXA Equitable has failed to share any meaningful savings with the AXA Funds.  While AXA Equitable, for five of the AXA Funds at issue, had investment management fee breakpoints installed, (*see* Table ¶114) these breakpoints are meaningless, because as a practical matter, they did not pass on any of the economies of scale to Plaintiff Sivolella and the other shareholders of the AXA Funds.  The mere existence of breakpoints does not mean that economies of scale are adequately passed on to shareholders of the AXA Funds, unless the breakpoints are reached.

119.    Indeed, the breakpoints are designed by AXA Equitable to benefit itself rather than the AXA Funds.  The initial breakpoints are set too high, the breakpoints are spaced too far apart, and the reductions made at breakpoints are far too small, thereby depriving Plaintiff Sivolella, and the other shareholders of the AXA Funds, of the benefits of the economies of scale created by the contribution of their capital to the AXA Funds.

120.    For instance, AXA Equitable has negotiated a breakpoint schedule with

AllianceBernstein, the sub-adviser for the EQ/Large Cap Value PLUS Portfolio, by which AllianceBernstein grants fee reductions to AXA Equitable at levels starting at $100 million in assets under management. *See* Table ¶114. On the other hand, the breakpoint schedule that AXA Equitable charges to this fund (and the breakpoint schedule that is applicable to Plaintiffs) does not even start until $2 billion. *Id.* AXA Equitable has also negotiated a breakpoint schedule with Wellington, the sub-adviser for the EQ/Mid Cap Value PLUS Portfolio, by which Wellington grants fee reductions at levels starting at $150 million in assets under management. *Id.* On the other hand, the breakpoint schedule that AXA Equitable charges to this fund does not even start until $2 billion. *Id.* Similarly, AXA Equitable has also negotiated a breakpoint schedule with BlackRock Capital, the sub-adviser for the EQ/Equity Growth PLUS Portfolio, by which BlackRock Capital grants fee reductions at levels starting at $100 million in assets under management. *Id.* On the other hand, the breakpoint schedule that AXA Equitable charges to this fund does not even start until $2 billion. *Id.* AXA Equitable has also negotiated a breakpoint schedule with MSIM, the sub-adviser for the EQ/Global Multi-Sector Equity Portfolio, by which MSIM grants fee reductions at levels starting at $100 million in assets under management. *Id.* On the other hand, the breakpoint schedule that AXA Equitable charges to this fund does not even start until $1 billion. *Id.* Therefore, if AXA Equitable's management fee breakpoints were negotiated at arms-length, they would be no higher than $150 million.

121.    Even if AXA Equitable performed investment management services for the AXA Funds, a large portion of those services are fixed in costs, which would result in lower breakpoints than those of the sub-advisers.

122.    In addition, the lack of investment management fee breakpoints for the EQ/Common

Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, further illustrate that the economies-of-scale savings were not passed to these funds and their investors. The investment advisory fees charged to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio, and the EQ/Intermediate Government Bond Index Portfolio, contain no breakpoints for increases in assets under management.

123.     Indeed, the .35% investment advisory fee (or 35 basis points) for the EQ/Common Stock Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, and the .25% investment management fee (or 25 basis points) for the EQ/Equity 500 Index Portfolio coupled with the lack of breakpoints, prevents these funds from ever realizing any economies of scale generated by their large size.  The lack of breakpoints is in striking contrast with the prevailing practice in the mutual fund industry.

124.     The degree of economies of scale that could be generated by, and then extended to, the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, through a different fee structure has not been adequately considered by the Board of each of these funds.  This absence of fee breakpoints for these three funds should have been a red flag to the Board of these funds that AXA Equitable is taking the benefits of economies of scale rather than passing them on to these funds.

125.     Morever, as assets under management have grown, the management fees paid to AXA Equitable have grown dramatically, despite the economies of scale realized by AXA Equitable. AXA Equitable has not shared with the Plaintiff, and the other shareholders of the AXA Funds, the economies of scale it has gained from that growth.

126.     For example, for six of the AXA Funds (the EQ/Common Stock Index Portfolio, the

EQ/Equity 500 Index Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value

PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/Intermediate

Government Bond Index Portfolio), from 2009 through 2010, the management fees for these funds

increased significantly as their assets under management have grown, thereby confirming that the

economies-of-scale savings realized from each Fund's asset increase were not shared with Plaintiff

Sivolella and the other shareholders of these funds.

127.     Given that no, or minimal, investment management services were provided by AXA

Equitable to the AXA Funds, any economies-of-scale-benefits enjoyed by AXA Equitable have not

been, and could not have been, adequately shared with the AXA Funds, as required by § 36(b), 15

U.S.C. § 80a-35(b), in breach of AXA Equitable's fiduciary duty to the AXA Funds with respect to

such compensation.

<b>C.     THE AXA FUNDS' BOARD OF TRUSTEES WAS NOT ACTING<br>INDEPENDENTLY AND CONSCIENTIOUSLY IN APPROVING THE<br>INVESTMENT MANAGEMENT AGREEMENT</b>

128.     In *Jones*, the Supreme Court adopted a fiduciary duty standard for ICA § 36(b), 15

U.S.C. § 80a-35(b), that requires both a fair outcome and good faith in the negotiation process. 130

S.Ct. at 1427.  Fund directors have a fiduciary duty to mutual funds and to their shareholders (who

individually have no power to negotiate such fees for the funds) to negotiate fees that are both

beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's length.

129.     Congress has fortified fund directors' oversight responsibilities by adopting ICA §

15(c), 15 U.S.C. § 80a-15(c), which requires directors to be adequately informed of the terms of any

investment management contracts.

130.     ICA § 15(c), 15 U.S.C. § 80a-15(c), requires investment advisers to furnish

documents and other information so that fund directors can make informed and independent decisions when evaluating investment advisory contracts. This section also gives directors the authority to demand such information from advisers. *Id.*

131.     When AXA Equitable and/or its affiliates start a new mutual fund, they not only contract to provide all the services each fund needs, they also nominate and elect the members of the fund's board (including all "independent"[6] board members).

132.     Each of the AXA Funds is governed by a Board of Trustees. The Board of each AXA Fund is currently is comprised of the same 8 Trustees.  One of the Trustees is considered to be an "interested" board member, while the remaining seven are classified as "disinterested" board members.

133.     The 8 individuals that serve as the Board of Trustees to each of the AXA Funds, also simultaneously serve on the Boards of 56 other AXA Equitable sponsored funds.

134.     Public disclosure for all of the Board members, except for one, reveals that they are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component.  For the fiscal year ending December 31, 2010, according to publicly-available information, the Board members for the AXA Funds received total compensation in the following amounts:

| | |
|---|---|
| Theodossios Athanassiades | $215,000 |
| Jettie M. Edwards | $240,625 |
| David W. Fox | $245,000 |
| William M. Kearns, Jr. | $215,000 |
| Christopher P.A. Komisarjevsky | $226,250 |
| Harvey Rosenthal | $215,000 |

---

[6]     "Independent" board members are those who are not "interested persons" as defined under the 1940 Act. *See* ICA § 2(a)(19), 15 U.S.C. § 80a-2(a)(19).

| | |
|---|---|
| Gary S. Schpero | $215,000 |
| Steven J. Joenk | $000,000 |

135.    Steven M. Joenk is the "interested" director by virtue of his current position as an AXA Equitable executive, and presumably, he is compensated separately for his services as an executive.

136.    As detailed below, the Trustees did not act with sufficient care and conscientiousness in approving AXA Equitable's investment management fees.  The fee-setting process undertaken by the Board lacked the requisite integrity, care and good faith and was, therefore, defective.

137.    The Board has a separate and distinct fiduciary duty to each AXA Fund to enter into serious and substantive negotiations with respect to all fees charged by AXA Equitable.  *See* Am. Bar. Ass'n, *Fund Director's Guidebook* (2d ed. 2003), at 10 ("Although there are areas of common interest among the funds, the directors must exercise their specific board responsibilities on a fund-by-fund basis.").  Correspondingly, AXA Equitable has a reciprocal fiduciary duty to each mutual fund under its management to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond to fees that would be charged in an arm's length negotiation.

138.    Annually, AXA Equitable must obtain the approval of the Trustees for the investment management fee it seeks to charge each AXA Fund.

139.    The seven independent or "non-interested" Trustees are supposed to be "watchdogs" for the AXA Funds' shareholders.  However, since the same Trustees are charged with, at a minimum, 56 other AXA sponsored funds, regardless of the dedication, sophistication, and the individual educational and business qualifications of the independent members of the Board of Trustees of the AXA Funds, some of whom are otherwise fully employed in demanding positions

of responsibility, the amount of documentation that must be reviewed for each meeting would be daunting if the Trustees were to look at each fund individually.

140.    Furthermore, even if statutorily "non-interested," the Trustees are in all practical respects dominated and unduly influenced by AXA Equitable in reviewing the fees paid by the AXA Funds and their shareholders. The Trustees' continuation in the role of an independent Trustee from year-to-year, and the compensation they earn, is at least partially dependent on the continued good will and support of AXA Equitable.

141.    The Board does not hold separate meetings for each mutual fund.  Instead, upon information and belief, the Board's practice has been to consider all funds at one time.  The Board approved the investment management fees AXA Equitable requested, with respect to each of the AXA Funds, over a two day period.  During this same two day period, the same 8 individuals that compose the Board of each of the AXA Funds also approved, at a minimum, the investment management fees for an additional 56 AXA sponsored funds.

142.    The Board failed to act conscientiously by continuing to approve all, or substantially all, of the portion of the investment management fees that AXA Equitable charged to the AXA Funds, but did not pay to the sub-advisers of each of the AXA Funds.

143.    The Advisory Agreements, which were accessible to the Board, reveal that the sub-advisers rendered all, or substantially all, of the investment management services for the AXA Funds.  Thus, the Board was not acting conscientiously when it approved investment management fees for AXA Equitable that were at a minimum 204%, and at a maximum 1750%, of the fees that were paid to the AXA Funds' sub-advisers.  In light of the fact that the documents which revealed that the sub-advisers to AXA Funds performed all, or substantially all, of the investment

management services for these funds, were publically available, the Board knew, or should have known, that it was approving a grossly excessive investment management fee for AXA Equitable. The Board therefore violated its fiduciary responsibilities when it approved all, or substantially all, of the portion of the investment management fees AXA Equitable charged to the AXA Funds, but did not pay to the sub-advisers.

144.    As further evidence that the Board was not acting conscientiously when it approved AXA Equitable's fees, with respect to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, it failed to require AXA Equitable to install breakpoints with respect to its investment advisory fee, which is in striking contrast with the prevailing practice in the mutual fund industry.  When AXA Equitable proposed a fee structure to the Board of Trustees with respect to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, that lacked breakpoints, that should have been a red flag to the Board that AXA Equitable was not passing on economies-of-scale savings to these two funds.

145.    As further evidence that the Board was not acting conscientiously when it approved AXA Equitable's advisory fees, in 2010 the Board approved an increase of AXA Equitable's advisory fees for the EQ/Large Cap Value PLUS Portfolio, despite the fact that  net assets decreased for this fund from the previous year.  This increase that it approved was such that, between 2009 and 2010,  the advisory fees, which are based upon a percentage of assets under management, *actually* went up in real dollars. This fact is even more egregious given that, during this same time period, the EQ/Large Cap Value PLUS Portfolio lost value and this fund's performance actually declined.

146.    As a result of the foregoing acts, the Board did not  act conscientiously and fulfill its

fiduciary duty when it approved AXA Equitable's investment management fees, with respect to each of the AXA Funds. The Board's lack of conscientiousness resulted in fees that constitute a breach of AXA Equitable's fiduciary duty under ICA § 36(b), 15 U.S.C. § 80a-35(b), to the AXA Funds with respect to such compensation.

### D. THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT SERVICES DID NOT JUSTIFY AXA EQUITABLE'S EXCESSIVE FEE

147.     "The 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See Freeman & Brown Study,* at 627-28. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.

148.     Following discovery, AXA Equitable's true profitability can be determined on either an incremental basis or a full-cost basis. AXA Equitable's incremental costs of providing management services to the Plaintiff, and other shareholders of the AXA Funds, is believed to be nominal while the additional fees received by AXA Equitable are unreasonable and grossly excessive given that the nature, quality, and level of the services remain the same in breach of AXA Equitable's fiduciary duty to the AXA Funds with respect to such compensation. .

149.     The table in paragraph 113 shows the investment management fee schedule that AXA Equitable charges to each of the AXA Funds as compared to the fee schedule that AXA Equitable pays its sub-advisers to whom it delegates all, or substantially all, of the investment management duties. These percentages translate into substantial fees when applied to fund assets in the hundreds of millions, or even billions, of dollars.

150.     AXA Equitable has collected investment management fees of approximately $6

million per year for its smallest funds (while paying those sub-advisers approximately $1 million or less, per year) to over $17 million per year for the largest funds (while paying those sub-advisers approximately $5 million, or less, per year). *See* the following table:

## 2010 AXA FUNDS AXA EQUITABLE'S FEES RETAINED AFTER PAYMENT TO SUB-ADVISERS

| AXA Fund | Advisor Agreement(s) | Net Paid AXA Equitable | Net Paid Sub-Adviser | Difference | Percent Retained by AXA Equitable |
|---|---|---|---|---|---|
| EQ/Common Stock Index Portfolio | AllianceBernstein | $16,941,222 | $2,421,062 | $14,520,160 | 85.71% |
| EQ/Equity 500 Index Portfolio | AllianceBernstein | $6,903,605 | $1,028,713 | $5,874,892 | 85.10% |
| EQ/Large Cap Value PLUS Portfolio | AllianceBernstein | $17,125,217 | $4,816,204 | $12,309,013 | 71.88% |
| EQ/Equity Growth PLUS Portfolio | BlackRock Capital and BlackRock | $9,059,917 | $2,385,935 | $6,673,982 | 73.66% |
| EQ/GAMCO Small Company Value Portfolio | GAMCO | $12,082,843 | $5,925,175 | $6,157,668 | 50.96% |
| EQ/Mid Cap Value PLUS Portfolio | BlackRock and Wellington | $10,545,979 | $2,841,598 | $7,704,381 | 73.06% |
| EQ/Global Multi-Sector Equity Portfolio | BlackRock and MSIM | $17,341,596 | $5,016,325 | $12,325,271 | 71.07% |

| EQ/Intermediate Government Bond Index Portfolio | SSgA | $6,385,326 | $364,906 | $6,020,420 | 94.29% |
|---|---|---|---|---|---|
| **TOTALS** | | **$96,385,705** | **$24,799,918** | **$71,585,787** | **74.27%** |

151.     "[F]und managers ... routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory charge to fund shareholders."  *See* John P. Freeman, Stewart L. Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 OKLA. L. REV. 83, 113, n. 104 (2008).  Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house."  *Id.* at 118.  As demonstrated above, AXA Equitable is padding the bill by over $71 million dollars in fiscal year 2010 alone, for providing few, if any, additional services to the AXA Funds.

152.     Despite delegating all or substantially all of its investment management duties to sub-advisers and performing little, if any additional work, AXA Equitable retains up to 94% of these investment management fees, resulting in exorbitant profits. *See* Table ¶150.

153.     Put another way, the true cost of investment management services should correlate to the fees charged by AllianceBernstein, BlackRock Capital, BlackRock, MSIM, GAMCO, Wellington and SSgA.

154.     This sub-contracting arrangement led to fees that were disproportionate to the services actually rendered and to enormous profits to AXA Equitable for little or no work performed by AXA Equitable – as the AXA Funds' investment manager/adviser.

155.    These markups could not be the product of negotiations conducted at arm's length and therefore constitute a breach of AXA Equitable's fiduciary duty to the AXA Funds with respect to the receipt of such compensation.

156.    Since the AXA Funds' sub-advisers were providing all, or substantially all, of the investment management services at their own expense to the AXA Funds, and AXA Equitable was providing no, or minimal, investment management services to the AXA Funds, AXA Equitable was incurring only minimal fees, and therefore the portion of the fees AXA Equitable charged to the AXA Funds that it did not pay to the sub-advisers were all in the form of profit to AXA Equitable and thus were necessarily so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

>    **E.    COMPARATIVE FEE STRUCTURES CHARGED TO OTHER MUTUAL FUND COMPLEXES FOR SIMILAR INVESTMENT MANAGEMENT SERVICES DEMONSTRATE THAT AXA EQUITABLE HAS CHARGED THE AXA FUNDS EXCESSIVE FEES THAT BREACHED AXA EQUITABLE'S FIDUCIARY DUTY**

157.    An analysis of the fees paid by AXA Equitable's sub-advisers and the investment management fees charged by AXA Equitable's competitors to mutual funds comparable to the AXA Funds demonstrate that AXA Equitable is charging investment advisory fees to the AXA Funds that are much higher than what would have been charged had the fees been bargained for at arms-length. Thus, all, or most, of the fees that AXA Equitable charges the AXA Funds that are in excess of the fees AXA Equitable pays to the AXA Funds' sub-advisers violate AXA Equitable's fiduciary duty with respect to the receipt of compensation.  The following relevant comparative fee structures establish that AXA Equitable is charging advisory fees to the AXA Funds that are so disproportionately large that they bear no reasonable relationship to the services rendered and could

not have been the product of arm's length bargaining.

### 1.    Fee Structure of AXA Equitable's Sub-Advisers

158.    AXA Equitable hired sub-advisers for all of the AXA Funds that assumed the obligation of providing all, or substantially all, of the substantive investment advisory services to their designated funds.  As each sub-adviser is a for-profit investment management company that negotiated its fee with AXA Equitable, the fees they charge provide a benchmark of the cost of the investment advisory services provided to the AXA Funds, presumably including a comfortable profit margin.  Compared to the fees charged by the sub-advisers who actually perform the substantive advisory services to the AXA Funds, the additional fees charged by AXA Equitable for the little, if any, investment management services to the AXA Funds are excessive.

159.    While Plaintiff does not challenge the fees paid to the sub-advisers of the AXA Funds, those rates do provide a measure of how much should be charged for the investment advisory services that the AXA Funds require.  Indeed, the fees charged by each of the AXA Fund's sub-adviser is indicative of the fees the AXA Funds should pay for the investment management services. *See* Table ¶150.  AXA Equitable charges far more than the sub-advisers they hire for the AXA Funds ( 204% to 1750% more), even though the sub-advisers assume the obligations of AXA Equitable to provide investment advisory services to the AXA Funds. *Id.*

160.    Since AXA Equitable's investment management fees charged to Plaintiff Sivolella, and the other shareholders of the AXA Funds, and collected by AXA Equitable, were far in excess of the sub-adviser fee amounts, the investment management fees received by AXA Equitable were necessarily so disproportionately large that they bore no reasonable relationship to services rendered and could not have been the product of arm's-length bargaining.

**2.     Fees Charged to Other Mutual Fund Complexes For Similar Investment Management Services By the AXA Funds' Sub-Advisers**

161.     Other investment advisers who offer services to funds similar to the AXA Funds charge substantially less than AXA Equitable's investment management fee.  On information and belief, the investment management services provided by these other advisers are the same or substantially similar to the investment management services that are needed by each of the AXA Funds.  Indeed, the fee structure imposed by AXA Equitable on the AXA Funds far exceeded the fees that would be paid as a result of arm's-length bargaining.   Thus, AXA Equitable's fees were so disproportionately large that they bore no reasonable relationship to services rendered and could not have been the product of arm's-length bargaining.

162.     For example, AllianceBernstein, the sub-adviser to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Large Cap Value PLUS Portfolio, and Wellington, the sub-adviser to the EQ/Mid-Cap Value PLUS Portfolio, have been engaged by Vanguard to provide investment advisory services to a number of the Vanguard mutual funds.  The investment management services for Vanguard's actively managed funds are provided by external managers, such as AllianceBernstein and Wellington, who enter into contracts with Vanguard, to provide investment advisory services, for a negotiated fee and earn a reasonable profit for their services.

163.     Wellington provides investment management services to, among other funds, the Vanguard Capital Value Fund, which is classified as a mid value fund.  Shareholders of this Vanguard fund pay significantly lower investment management fees than the EQ/Mid Cap Value PLUS Portfolio, which is also classified as a mid value fund. AllianceBernstein and Wellington provide management services to the Vanguard Windsor Fund, which is classified as a large value

fund. Shareholders of this Vanguard fund pay significantly lower investment management fees than the EQ/Large Cap Value PLUS Portfolio, which is also classified as a large value fund.

164.     The following table contains a side-by-side comparison of the management fee schedules for the EQ/Large Cap Value PLUS Portfolio, including the fees that AllianceBernstein charges for providing substantially similar advisory services to the AXA Funds, with the fee schedules charged to the comparable Vanguard fund:

| AXA Fund | AXA Equitable's Fee Schedule (annual rate based on average daily net assets) | AllianceBernstein's Fee for Providing Sub-Advisory Services to the AXA Funds | Vanguard Fund (comparable investment classification) | Most Recent Fee Schedule for Vanguard Fund (annual rate based on average daily net asset) |
|---|---|---|---|---|
| EQ/Large Cap Value PLUS Portfolio (Large Value) | Up to $2 billion – 0.500%<br>Next $1 billion – 0.450%<br>Next $3 billion – 0.425%<br>Next $5 billion – 0.400%<br>Thereafter – 0.375% | First $100 million – 0.490%<br>Next $100 million – 0.300%<br>Over $200M – 0.250% | Vanguard Windsor Fund (Large Value) | For the six-months ended April 30, 2011, investment advisory fee represented:<br><br>**Annual rate of 0.13% of the fund's average net assets** |

165.     Had the Vanguard investment management fee of 13 basis points been applicable to the EQ/Large Cap Value PLUS Portfolio, this fund would have saved millions of dollars in 2010 alone. For example, the first breakpoint that AXA Equitable charges to the EQ/Large Cap Value PLUS Portfolio for AXA Equitable's investment advisory services does not occur until the fund has $3 billion in assets, and is equal to 45 basis points, which is almost 3.5 times greater than the advisory fee schedule for Vanguard's comparable large value fund at 13 basis points. *See* Table ¶164.

166.    The following table contains a side-by-side comparison of the management fee schedules for the EQ/Mid Cap Value PLUS Portfolio, including the fees that Wellington charges for providing substantially similar advisory services to the AXA Funds, with the fee schedules charged to the comparable Vanguard fund:

| AXA Fund | AXA Equitable's Fee Schedule (annual rate based on average daily net assets) | Wellington's Fee for Providing Sub-Advisory Services to the AXA Funds | Vanguard Fund (comparable investment classification) | Most Recent Fee Schedule for Vanguard Fund (annual rate based on average daily net asset) |
|---|---|---|---|---|
| EQ/Mid Cap Value PLUS Portfolio (Mid Value) | Up to $2 billion – 0.550%<br>Next $1 billion – 0.500%<br>Next $3 billion – 0.475%<br>Next $5 billion – 0.450%<br>Thereafter – 0.425% | First $150 million – 0.550%<br>Over $150M – 0.450% | Vanguard Capital Value Fund (Mid Value) | For the 6 months ended March 31, 2011, investment advisory fee represented:<br><br>**Annual rate of 0.22% of the fund's average net assets** |

167.    Had the Vanguard investment management fee of 22 basis points been applicable to the EQ/Mid Cap Value PLUS Portfolio, this fund would have saved millions of dollars in 2010 alone.  For example, the first breakpoint that AXA Equitable charges to the EQ/Mid Cap Value PLUS Portfolio for AXA Equitable's investment advisory services does not occur until the fund has $3 billion in assets, and is equal to 50 basis points, which is more than two times greater than the advisory fee schedule for Vanguard's comparable large value fund at 22 basis points.  *See* Table ¶166.

168.    The Vanguard fees set forth in the above tables (¶¶164,166) are appropriate fee comparisons for the fees AXA Equitable *should have been* charging Plaintiff, and the other

shareholders of the EQ/Large Cap Value PLUS Portfolio and the EQ/Mid Cap Value PLUS Portfolio, for investment management services. As evidenced by the following table, the services provided by AllianceBernstein and Wellington to the Vanguard Funds are substantially comparable to the investment management services that were provided to the AXA Funds.

| Investment Advisor | Funds | Investment Management Services Performed by Investment Advisor |
|---|---|---|
| AXA Equitable | AXA Funds | (a) manage the investment and reinvestment of the assets of the fund; (b) formulate and implement a continuous investment program for each Fund; (c) implement the investment program for the Portfolio by arranging for the purchase and sale of securities for the Funds; and (d) render regular reports to the Board of Trustees. |
| AllianceBernstein | Vanguard Funds | (a) manage the investment and reinvestment of the assets of the fund; (b) continuously review, supervise and administer an investment program for the fund; (c) determine the securities to be purchased or sold for the fund; (d) provide the fund with records concerning AllianceBernstein's activities; and (e) render regular reports to the Board of Trustees |
| Wellington | Vanguard Funds | (a) manage the investment and reinvestment of the assets of the fund; (b) continuously review, supervise and administer an investment program for the fund; (c) determine the securities to be purchased or sold for the fund; (d) provide the fund with records concerning AllianceBernstein's activities; and (e) render regular reports to the Board of Trustees |

169.   The terms of the advisory agreements that Alliance Bernstein and Wellington entered into with the Vanguard Funds are substantially similar to the terms of the sub-advisory agreements at issue in this case. With respect to AXA Equitable's alleged investment management services contained in the investment management agreement between AXA Equitable and the Advisors Trust (cited to in the above table) on behalf of the AXA Funds, Plaintiff, and the other shareholders of the

AXA Funds, are not contending that AXA Equitable actually performed these services. Rather, AXA Equitable's services listed in the investment management agreement are, in fact, actually provided by the AXA Funds' sub-advisers, pursuant to the agreements AXA Equitable has entered into with these sub-advisers, and there is, little, if no, work left to be done by AXA Equitable.

## VI.   DERIVATIVE ALLEGATION FOR CLAIM PURSUANT TO ICA § 36(b), 15 U.S.C. § 80a-35(b)

170.    Plaintiff Sivolella brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of, each of the AXA Funds to recover all, or substantially all, of the investment management fees AXA Equitable charged the AXA Funds, but did not pay to these funds' sub-advisers.

## COUNT I

**Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The AXA Excessive Investment Management Fees Charged By Defendant AXA Equitable Life Insurance Company and Defendant AXA Equitable Funds Management Group, LLC (i.e., AXA Equitable)**

171.    Plaintiff Sivolella incorporates by reference the allegations in the previous paragraphs of this Complaint.

172.    Defendants AXA Equitable had a fiduciary duty to the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to AXA Equitable.

173.    All, or substantially all, of the fees charged by AXA Equitable for investment management and/or advisory services that exceeded the amount of fees paid to the AXA Funds' sub-advisers, by AXA Equitable, represent a breach of AXA Equitable's fiduciary duties to the AXA Funds with respect to such compensation because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

174.    This Count is brought by Plaintiff Sivolella derivatively on behalf of the AXA Funds against AXA Equitable pursuant to ICA § 36(b), 15 U.S.C. §80-35(b), for breach of fiduciary duties with respect to the receipt of compensation.

175.    By reason of the conduct described herein, AXA Equitable violated ICA § 36(b), 15 U.S.C. §80-35(b). As a direct, proximate and foreseeable result of these breaches of fiduciary duties in AXA Equitable's role as investment adviser to the AXA Funds and the AXA Funds' investors, the AXA Funds and their shareholders have sustained many millions of dollars in damages.

176.    In charging and receiving inappropriate and unlawful compensation, and in failing

to put the interests of Plaintiff Sivolella, and the other shareholders of the AXA Funds, ahead of their own interests, AXA Equitable has breached, and continues to breach, its statutory fiduciary duty to Plaintiff Sivolella, and the other shareholders of the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. §80-35(b).

177.    Plaintiff Sivolella, seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the AXA Funds, the actual damages resulting from the breach of fiduciary duties by AXA Equitable, up to, and including, the amount of compensation and payments received from the AXA Funds.  Plaintiff seeks recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

178.    Alternatively, Plaintiff seeks rescission of the contracts/agreements and restitution of all fees paid pursuant thereto. *See* ICA § 47(b), 15 U.S.C. § 80a-46(b).  When a violation of the ICA has occurred, a court may order that the agreements between AXA Equitable and the Advisors Trust/the AXA Funds within that trust, that provided for the payment of excessive fees, on behalf of the AXA Funds, be rescinded, thereby requiring restitution of the excessive investment management fees paid to AXA Equitable by the AXA Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment as follows:

A.    An order declaring that AXA Equitable violated and continues to violate ICA § 36(b), 15 U.S.C. §80-35(b), through the receipt of fees from the AXA Funds that breach Defendants' fiduciary duty with respect to the receipt of compensation;

B.    An order preliminarily and permanently enjoining AXA Equitable from further violations of the ICA;

C.    An order awarding compensatory damages to Plaintiff Sivolella on behalf of the shareholders of the AXA Funds, in an amount sufficient to restore them to the position that they would have been in had the wrongs alleged herein not been committed, including repayment of all unlawful and/or excessive fees paid to them by the AXA Funds or their security holders from one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law; Plaintiff Sivolella reserves the right to seek punitive damages where applicable;

D.    An order rescinding the agreements between AXA Equitable and the AXA Funds/Advisor Trust, which provide for the fees/compensation complained of herein, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), including restitution of all, or substantially all, of the investment management fees paid to AXA Equitable, that exceeded the fees that were paid to these funds' sub-advisers, by the AXA Funds from a period commencing one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent

permitted by law;

E.      Award interest, costs, attorney fees and such other relief as it deems just; and

F.      Such other and further relief as may be just and proper under the circumstances

## JURY DEMAND

Plaintiff, on behalf of the AXA Funds, demands a trial by jury on all claims so triable.

Szaferman, Lakind,
Blumstein & Blader, P.C.

Dated: July 21, 2011                    s/ Robert L.  Lakind

Robert L. Lakind
Arnold Lakind
Steven Blader
101 Grovers Mill Road
Lawrenceville, NJ 08648


Levy, Phillips & Konigsberg

Dated: July 21, 2011                    s/Moshe Maimon
Moshe Maimon
Danielle Disporto
800 Third Avenue
New York, NY, 10022