# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio, | Civil Action No. 11-4194 |
| | Oral Argument Requested |
| | Document Filed Electronically |
| Plaintiff, | |
| vs. | |
| AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, | |
| Defendants. | |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULES 12(b)(1) AND 12(b)(6)

Blank Rome LLP
  Jonathan M. Korn
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
(609) 750-7700 (Phone)
(609) 750-7701 (Fax)

Milbank, Tweed, Hadley & McCloy LLP
  James N. Benedict (*pro hac vice*)
  Sean M. Murphy (*pro hac vice*)
  Andrea G. Hood
  Will Gross
1 Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000 (Phone)
(212) 530-5219 (Fax)

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT BACKGROUND ................................................................................... 2

I.     PLAINTIFF'S VARIABLE ANNUITY INVESTMENT ..................................... 2

II.    PLAINTIFF'S ALLEGATIONS ........................................................... 8

ARGUMENT ........................................................................................................ 9

I.     PLAINTIFF LACKS STANDING TO BRING A SECTION 36(b) CLAIM ......................................................................................... 9

    A.    Plaintiff Has The Burden of Establishing Standing As A Threshold Matter. ................................................................. 10

    B.    Plaintiff Must Be A "Security Holder" Of The Funds To Have Standing. ...................................................................... 11

    C.    Plaintiff Has Failed To Adequately Allege Standing. ............................ 12

    D.    Plaintiff Is Not A "Security Holder" Of The Funds. ............................... 13

        1.    The Funds Are Owned By Separate Account A And Not By Plaintiff. ........................................................... 13

        2.    A Variable Annuity Is Like A "Fund of Funds" And Shareholders Of Funds Of Funds Are Not "Security Holders" Under Section 36(b). ................................... 17

II.    PLAINTIFF'S ALLEGATIONS ARE CONCLUSORY AND FAIL TO SUPPORT A PLAUSIBLE CLAIM THAT THE FUNDS' FEES WERE EXCESSIVE. ............................................................................... 18

CONCLUSION ................................................................................................... 22

- i -

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Corp. Soc'y v. Valley Forge Ins. Co.*,
    No. 10-3560, 2011 U.S. App. LEXIS 8261 (3d Cir. 2011) ....................................................2

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009).................................................................................................2, 12, 19

*Common Cause of Penn. v. Commonwealth of Penn.*,
    558 F.3d 249 (3d Cir. 2009)............................................................................................11

*Cunningham v. RRB*,
    392 F.3d 567 (3d Cir. 2004)............................................................................................10

*Curran v. Principal Mgmt. Corp.*,
    No. 09-433, 2010 U.S. Dist. LEXIS 83730 (S.D. Iowa June 8, 2010) .............................16, 17

*Curran v. Principal Mgmt. Corp.*,
    No. 09-433, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) ............................................. passim

*Forsythe v. Sun Life Fin., Inc.*,
    417 F. Supp. 2d 100 (D. Mass. 2006) .......................................................................12

*Garland v. Enter. Leasing Co. of Phila.*,
    No. 99-4013, 1999 WL 1077075 (E.D. Pa. Nov. 24, 1999) ....................................................12

*Green v. Nuveen Advisory Corp.*,
    186 F.R.D. 486 (N.D. Ill. 1999), *aff'd*, 295 F.3d 738 (7th Cir. 2002), *cert. denied*, 537
    U.S. 1088 (U.S. 2002)............................................................................................12

*Green v. Potter*,
    687 F. Supp. 2d 502 (D.N.J. 2009) .......................................................................2

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
    No. 04-4885 (SWK), 2005 U.S. Dist. LEXIS 24263 (S.D.N.Y. Oct. 19, 2005) ....................12

*In re Am. Funds Fee Litigs.*,
    No. CV 04-5593 (GAF), 2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16, 2005)..............12

*In re Bayside Prison Litig.*,
    190 F. Supp. 2d 755 (D.N.J. 2002) .......................................................................2

*In re Merck Co.*,
    No. 05-1151 (SRC), 2006 U.S. Dist. LEXIS 2345 (D.N.J. Jan. 20, 2006)..............................3

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) ........................................................12

*In re Smith Barney Transfer Agent Litig.*,
    05 Civ. 7583, Mem. & Order (Sept. 22, 2011) ...................................10, 11

*Kasilag v. Hartford Inv. Fin. Servs.*,
    No. 11-1083 (D.N.J. filed Feb. 25, 2011) ..................................................21

*Kauffman v. Dreyfus Fund, Inc.*,
    434 F.2d 727 (3d Cir. 1970) ......................................................................11

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
    652 F. Supp. 2d 576 (E.D. Pa. 2009) ..........................................................4

*Music Sales Ltd. v. Charles Dumont & Son, Inc.*,
    No. 09-1443 (RMB/JS), 2009 U.S. Dist. LEXIS 97534 (D.N.J. Oct. 19, 2009) ...................10

*Pension Benefit Guar. Corp. v. White Consol. Indus.*,
    998 F.2d 1192 (3d Cir. 1993) ......................................................................2

*Phila. Marine Trade Ass'n-Int'l Longshoremen's Ass'n Pension Fund v. Comm'r*,
    523 F.3d 140 (3d Cir. 2008) ......................................................................11

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) ......................................................................12

*Pope v. East Brunswick Bd. of Educ.*,
    12 F.3d 1244 (3d Cir. 1993) ......................................................................16

*Pryor v. NCAA*,
    288 F.3d 548 (3d Cir. 2002) ........................................................................4

*Santomenno ex rel. John Hancock v. John Hancock Life Ins. Co. (U.S.A.)*,
    No. 2:10-01655, 2011 U.S. Dist. LEXIS 55317 (D.N.J. May 23, 2011) ................12

*Southworth v. Hartford Inv. Fin. Servs.*,
    No. 10-878 (D. Del. filed Oct. 14, 2010) ..................................................21

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (U.S. 1998) ............................................................................10

*United States v. Cheeseman*,
    600 F.3d 270 (3d Cir. 2010) ......................................................................16

*Young v. Nationwide Life Ins. Co.*,
    2 F. Supp. 2d 914 (1998) ....................................................................15, 16

STATUTES

15 U.S.C. § 80a-2(a)(9) ........................................................................................ 16

15 U.S.C. § 80a-3(c)(1)(A) and (B) ...................................................................... 16

15 U.S.C. § 80a-35(b) ..................................................................................... passim

26 U.S.C. § 817 ............................................................................................... 13, 15

26 U.S.C. § 817(d)(1) ............................................................................................ 15

N.Y. Ins. Law. § 4240(a)(12) ............................................................................ 4, 15

OTHER AUTHORITIES

C. Christopher Sprague, Variable Annuities & Variable Life Insurance Regulation § 7:1
("The Funding Vehicle") (Nov. 2010) ....................................................................... 7

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ..................................................................... 1

IRS Rev. Rul. 2003-91, 2003-3 I.R.B. 347 (Aug. 18, 2003) ........................................ 14

Joint SEC/NASD Report on Examination Findings Regarding Broker-Dealer Sales of
Variable Insurance Products (June 2004) .............................................................. 3

Merriam-Webster's Collegiate Dictionary 871-72 (1998) ........................................... 9

NASD Rule 2830(b)(11) ........................................................................................ 17

P.L. 98-369, Deficit Reduction Act of 1984, Conf. Comm. Rep., 98 H. Rpt. 861 ....................... 14

Defendants AXA Equitable Life Insurance Company ("AXA Equitable") and AXA

Equitable Funds Management Group, LLC ("AXA FMG") (together, "Defendants" or, in their

capacity as investment managers, "AXA") submit this memorandum of law in support of their

motion to dismiss Plaintiff's complaint, filed July 21, 2011 (the "Complaint"), pursuant to Rules

12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff purports to bring this action on behalf of eight mutual funds (the "Funds")  to

which Defendants allegedly charged excessive management fees in violation of Section 36(b) of

the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b) ("Investment Company Act").[1]

Section 36(b), however, expressly provides that a plaintiff must be a "security holder" of the

mutual funds at issue in order to bring a private right of action.  Here, Plaintiff is not a security

holder of the Funds.

In a Section 36(b) case, a plaintiff purchases shares in a mutual fund, and as a shareholder

has standing to pursue an excessive fee action derivatively on behalf of that fund.  *See* Section

36(b), 15 U.S.C. § 80a-35(b) (authorizing a "security holder" of an investment company to bring

an action "on behalf of such company").  In contrast, Plaintiff in this case owns no shares and

has no other title in the Funds.  Rather, Plaintiff owns a *certificate* under an insurance contract

(specifically, a *variable annuity*) sold by AXA Equitable.  She paid premiums to AXA Equitable

pursuant to the terms of the variable annuity contract, which were then placed in a separate

account owned by AXA Equitable.  AXA Equitable's separate account then invested in the

---

[1]  The Funds are the EQ/Common Stock Index Portfolio, EQ/Equity Growth PLUS Portfolio,
EQ/Equity 500 Index Portfolio, EQ/Large Cap Value PLUS Portfolio, EQ/Global Multi-Sector
Equity Portfolio, EQ/Mid Cap Value PLUS Portfolio, EQ/GAMCO Small Company Value
Portfolio, and EQ/Intermediate Government Bond Index Portfolio.  The Funds are "series funds"
that are offered through the "EQ Advisors Trust," a registered investment company (commonly
known as a mutual fund) under the Investment Company Act (the "EQ Trust").  *See infra* at 5.

Funds, but Plaintiff did not.  Because Plaintiff is not a security holder of any of the eight Funds, she lacks statutory standing to bring a Section 36(b) claim.

In addition to Plaintiff's lack of standing, the Complaint is defective because Plaintiff's allegations fail to comply with the pleading standard set forth by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ("*Iqbal*").  For example, the Complaint repeatedly alleges in a conclusory fashion that AXA provided effectively **_no_** services in exchange for the investment management fees it received from the Funds and, instead, delegated essentially "all or substantially all" of its responsibilities to sub-advisers.  These allegations are conclusory and flatly contradicted by the very documents Plaintiff relies on in her Complaint—documents which specifically identify the numerous services AXA was required to provide to the Funds.  However, because the Complaint must be dismissed as a threshold matter as a result of Plaintiff's lack of standing, the Court need not address whether the Complaint sufficiently pleads a claim under Section 36(b).

## **RELEVANT BACKGROUND**

### I.   **PLAINTIFF'S VARIABLE ANNUITY INVESTMENT**

Plaintiff in this case purchased a variable annuity issued by AXA Equitable.  *See* Ex. A[2] (Plaintiff's Certificate, dated March 26, 1999 (together with the applicable policy, the "Certificate")).[3]  As explained by the Securities and Exchange Commission (the "SEC"), a

---

[2]  Citations in the form of "Ex. __" are to the exhibits annexed to the Declaration of Jonathan M. Korn in Support of Defendants' Motion to Dismiss the Complaint.

[3]  The Court may consider the Certificate on a motion to dismiss because it is integral to Plaintiff's claim.  *See Green v. Potter*, 687 F. Supp. 2d 502, 509 n.5 (D.N.J. 2009) (a court may look to documents which are "essential to a plaintiff's claim"); *In re Bayside Prison Litig.*, 190 F. Supp. 2d 755, 760 (D.N.J. 2002) (a court may consider "matters integral to or upon which plaintiff's claim is based") (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993)); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (court may consider a document "if the plaintiff's claims are based on the document"); *Am.*

variable annuity is "a contract between an investor and an insurance company," pursuant to which the insurance company "promises to make periodic payments to the contract owner or beneficiary, starting immediately or at some future time." *See* Joint SEC/NASD Report on Examination Findings Regarding Broker-Dealer Sales of Variable Insurance Products, at 5 (June 2004), *available at* http://www.sec.gov.  The insurance company typically places premiums paid by a variable annuity investor in a segregated account (referred to as a "separate account") owned by the insurance company.  *See id.*  The separate account, in turn, invests in the securities markets or in underlying mutual funds, the performance of which can impact the value of the variable annuity paid to the contract holder.  *Id.*

Here, in or around March 1999, Plaintiff enrolled in the EQUI-VEST Deferred Variable Annuity Program (the "EQUI-VEST Program"), a variable annuity program offered by her employer, Newark School System ("Newark").   Ex. B (EQUI-VEST Annuity Enrollment Application, dated March 22, 1999 ("Enrollment Form")).   Newark offered the EQUI-VEST Program to its employees in connection with a group annuity contract that it had entered into with AXA Equitable.  Ex. A (Certificate at 3); Ex. B (Enrollment Form at 1).  In connection with her participation in the EQUI-VEST Program, Plaintiff received a "Certificate" that set forth in substance the benefits to which she, as a participant under Newark's group contract, was entitled. *See* Ex. A (Certificate).  The Certificate provides that in exchange for Plaintiff's contributions to

---

*Corp. Soc'y v. Valley Forge Ins. Co.*, No. 10-3560, 2011 U.S. App. LEXIS 8261, at *4 (3d Cir. 2011) (court may consider a document "if the plaintiff's claims are based on the document, *such as [the plaintiff]'s insurance policy*") (emphasis added); *In re Merck Co.*, No. 05-1151 (SRC), 2006 U.S. Dist. LEXIS 2345, *8 (D.N.J. Jan. 20, 2006) ("[A court is allowed] to consider documents that can be considered 'integral' to the referencing complaint [on a 12(b)(6) motion to dismiss].  Integral documents are defined as documents which create the rights or duties that are the basis for the Complaint.") (*citing Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

the EQUI-VEST Program, Plaintiff was entitled to receive a "variable annuity benefit."  Ex. A (Certificate at 12-15).

Consistent with the typical structure of a variable annuity, AXA Equitable placed Plaintiff's contributions to the EQUI-VEST Program (along with contributions from certain other permitted investors) in an account called "Separate Account A."  Ex. A (Certificate at 5). Separate Account A, which is registered as a "unit investment trust" under the Investment Company Act, is an account that AXA Equitable established in order to maintain the structure required under the federal tax law to ensure treatment of variable contracts as "annuities" for tax purposes, including the favorable deferred tax treatment afforded to holders of such contracts.[4] Ex. C (Prospectus for EQUI-VEST Employer-Sponsored Retirement Plans, dated May 1, 2011 ("EQUI-VEST Product Prospectus"), at 65).[5]  As disclosed in the relevant public filings, and as required under New York insurance law, AXA Equitable is the ***legal owner*** of all assets held in Separate Account A.  Ex. C (EQUI-VEST Product Prospectus at 65) ("We [*i.e.*, AXA Equitable] are the *legal owner* of all of the assets in Separate Account A and may withdraw any amounts that exceed our reserves and other liabilities with respect to variable investment options under our contracts.") (emphasis added); N.Y. Ins. Law § 4240(a)(12) ("Amounts allocated by the

---

[4]  *See infra* at 13-14 & note 10 (discussing Section 817 of the Internal Revenue Code, 26 U.S.C. § 817).

[5]  Plaintiff relies extensively throughout the Complaint on SEC filings relating to the Funds.  *See, e.g.*, Compl. n. 4 (relying on "AXA Funds' public filings"); ¶ 14 (allegations are based on unspecified "Securities Exchange Commission ('SEC') filings for the AXA funds"); ¶ 15 (specifically citing the Trust's Form N-1A, which includes the Trust's Prospectus and Statement of Additional Information); ¶ 93 (quoting from the Trust's Annual Report, dated December 31, 2010).  Thus, these documents are properly considered on a motion to dismiss. *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578 (E.D. Pa. 2009) ("[I]t is well-established that a court may consider public documents filed with the SEC when deciding a motion to dismiss . . . .") (citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)); *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002) ("[D]ocuments whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered [on a 12(b)(6) motion to dismiss].").

insurer to separate accounts *shall be owned by the insurer*, [and] the assets therein *shall be the property of the insurer*.") (emphasis added).

As a participant in the EQUI-VEST Program, Plaintiff is permitted to allocate the contributions to her variable annuity certificate among a number of investment options offered in the EQUI-VEST Program.  Ex. C (EQUI-VEST Product Prospectus at 1).  These investment options are "portfolios," the majority of which are offered through certain trusts created by AXA Equitable, including the EQ Trust.  Ex. D (Form N-1A, EQ Trust Prospectus, dated May 1, 2011 ("Trust's Prospectus"), at 1).  The EQ Trust is a registered investment company (commonly known as a mutual fund) under the Investment Company Act and issues shares of beneficial interests that are divided among its various portfolios.  Ex. D (Trust's Prospectus at 176).  Each portfolio has its own broad investment objective and is designed to meet different investment goals.  Ex. D (Trust's Prospectus at 1).  The eight Funds at issue in this case are offered through the EQ Trust and are among the portfolios that are available to Plaintiff as investment options in the EQUI-VEST Program.  Ex. C (EQUI-VEST Product Prospectus at 1); Ex. D (Trust's Prospectus at 1).

Plaintiff, however, did not "purchase" or otherwise become the owner of any shares of the Funds by virtue of having selected them as variable investment options.  As explained in the Trust's Prospectus, the Funds' "shares are currently ***sold only to insurance company separate accounts*** in connection with Contracts issued by [AXA Equitable], AXA Life and Annuity Company, other affiliated or unaffiliated insurance companies and The AXA Equitable 401(k) Plan" and are "***not sold directly to the general public***."  Ex. D (Trust's Prospectus at 30, 36, 40, 49-50, 54, 86, 102, 144 (emphasis added)).  Accordingly, Plaintiff did not purchase shares of the Funds, nor does she have any title or legal ownership in them.  Instead, AXA Equitable caused

*Separate Account A* to purchase shares in the portfolios that Plaintiff selected as investment options, including the Funds.  Plaintiff only received "units" of Separate Account A that corresponded to her selected investments, including the Funds.[6]  Ex. C (EQUI-VEST Product Prospectus at 30).  Therefore, while the overall value of Plaintiff's units of Separate Account A "increase[d] or decrease[d] ***as though*** *[Plaintiff] had invested in the corresponding portfolio's shares directly*," Plaintiff at no point in time *owned* any shares of the Funds.  Ex. C (EQUI-VEST Product Prospectus at 30).  In addition, the value of Plaintiff's units does not correspond directly to the Funds' investment performance.  Unlike shares of mutual funds, the value of Plaintiff's units of Separate Accounts A is reduced by certain fees that AXA Equitable charges, including, for example, charges for mortality and expense risks associated with the annuity.  Ex. C (EQUI-VEST Product Prospectus at 30).

The following chart sets forth the relationship between Plaintiff, Newark, AXA Equitable, Separate Account A, the EQ Trust, and the Funds.

---

[6]  Specifically, as explained in the EQUI-VEST Product Prospectus, "[e]ach variable investment option invests in shares of a corresponding portfolio" and the "value in each variable investment option is measured by 'units.'"  Ex. C (EQUI-VEST Product Prospectus at 30) (emphasis added).



    The organizational structure depicted above is consistent with industry practice and, as noted, is required by law in order for life insurance companies to maintain the tax-deferred status of most variable annuities they offer.[7]

---

[7] *See* C. Christopher Sprague, Variable Annuities & Variable Life Insurance Regulation § 7:1 ("The Funding Vehicle") (Nov. 2010) ("The vast majority of variable products are offered through a two-tier structure comparable to that used by master-feeder funds.  Specifically, an open-end management investment company sells its shares to one or more insurance company separate accounts that are registered under the Investment Company Act as unit investment trusts.").

## II.     PLAINTIFF'S ALLEGATIONS

Plaintiff purports to bring this action as a derivative action on behalf of the Funds,

alleging that Defendants charged excessive management fees to the Funds in violation of Section

36(b) of the Investment Company Act.  Compl. ¶¶ 1, 10-11.  Plaintiff alleges, in a conclusory

fashion, that she is a "security holder" of each of the Funds.  Compl. ¶¶ 4, 17.

Defendants have served or currently serve as investment manager for the Funds.  Compl.

¶ 5.  AXA and the EQ Trust enter into management agreements that set forth the services that

AXA is required to provide to the Funds and the fees that the Funds pay to AXA in exchange for

those services ("Management Agreements").  Compl. ¶¶ 6, 9, 169; *see also* Ex. E (Form N-1A,

EQ Trust Statement of Additional Information, dated May 1, 2011, at 64-66).  AXA also has

retained sub-advisers to perform certain services for the Funds ("Sub-Advisers").  Compl. ¶ 7.

The bulk of Plaintiff's Complaint recites the list of services provided by these Sub-Advisers,

which generally include stock selection, research, and trading of securities in each Fund's

portfolio.  *See, e.g.,* Compl. ¶¶ 40-91.

Other than paying lip-service to certain factors that courts typically focus on in assessing

claims under Section 36(b), the crux of Plaintiff's claim is the repeated allegation that AXA

collects a management fee from the Funds even though the Sub-Advisers "perform all, or

substantially all" of the services for the Funds.  *See, e.g.,* Compl. ¶¶ 6-9.  According to the

Complaint, therefore, Defendants' services to the Funds "were either non-existent or minimal."

*See, e.g.,* Compl. ¶ 102.

Most of Plaintiff's allegations purport to be based upon statements contained in SEC

filings related to the Funds, including the agreements with the Sub-Advisers.  *See e.g.,* Compl. ¶

14.  However, these filings and agreements actually confirm that AXA provides numerous

services to the Funds that are not delegated to the Sub-Advisers.  *See, e.g.,* Ex. D (Trust's

Prospectus at 176).  For example, under the Management Agreement, and as described in the

Trust's Prospectus, AXA is required to perform a litany of services to the Funds, including but

not limited to, supervising the Sub-Advisers, monitoring compliance with investment objectives,

reporting to the Trust's Board of Trustees, and preparing numerous public filings related to the

Funds.  *See* Ex. F (Management Agreement § B, May 1, 2011);[8] Ex. D (Trust's Prospectus at

176); *see infra* at 19-21.

## ARGUMENT

### I.  PLAINTIFF LACKS STANDING TO BRING A SECTION 36(b) CLAIM.

Section 36(b) expressly provides that in order to bring a claim under the statute, the

plaintiff must be a "security holder" of the funds at issue.  15 U.S.C. § 80a-35(b).  Although the

term "security holder" is not defined in the Investment Company Act, a "holder" is typically

defined as an "owner" of a security or as a person enjoying the "incidents of ownership or

possession" of a security, such as the privilege of voting or receiving dividends.  *See Curran v.*

*Principal Mgmt. Corp.*, No. 09-433, 2011 WL 223872, at *4 (S.D. Iowa Jan. 24, 2011); *see also*

Merriam-Webster's Collegiate Dictionary 871-72 (1998) (defining "holder" as "a person that

holds [as] owner").  Here, Plaintiff is neither an "owner" of the Funds nor does she enjoy any

incidents of ownership.

Plaintiff fails to adequately allege any facts to support her claim that she is a "security

holder" of the Funds.  In fact, the very documents relied on in the Complaint, as well as relevant

legal authority, make clear that Plaintiff is not and cannot be an "owner" or "security holder" of

the Funds.  Accordingly, Plaintiff lacks standing to bring this Section 36(b) claim, and the Court

---

[8]  The Management Agreement is filed with the SEC and is listed as an exhibit to the Trust's N-1A, dated June 17, 2011, which Plaintiff cites and relies on in the Complaint.  *See* Compl. ¶ 14 & n.4; Ex. G (Form N-1A, EQ Trust, filed June 17, 2011, at C-4).  Again, this Court may properly consider these SEC filings on a motion to dismiss.  *See supra* note 5.

therefore lacks subject matter jurisdiction to adjudicate this action.  Accordingly, the Complaint

should be dismissed with prejudice in its entirety.

> **A.**     **Plaintiff Has The Burden of Establishing Standing As A Threshold**
> **Matter.**

Whether Plaintiff has statutory standing under Section 36(b) is a threshold question that

implicates the Court's subject matter jurisdiction to hear this action.  *See Music Sales Ltd. v.*

*Charles Dumont & Son, Inc.*, No. 09-1443 (RMB/JS), 2009 U.S. Dist. LEXIS 97534, at *6-7

(D.N.J. Oct. 19, 2009) ("A federal court lacks subject-matter jurisdiction over an action when the

plaintiff cannot establish statutory standing.") (citing *United States v. $ 487,825.00 in U.S.*

*Currency*, 484 F.3d 662, 664 (3d Cir. 2007)).  This issue must be resolved at the outset of this

case.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (U.S. 1998) ("The requirement

that jurisdiction be established as a threshold matter 'springs from the nature and limits of the

judicial power of the United States' and is 'inflexible and without exception.'") (citation

omitted); *Cunningham v. RRB*, 392 F.3d 567, 570 (3d Cir. 2004) ("We must resolve the

threshold jurisdictional issue before reaching the merits of [plaintiff]'s petition") (*citing Steel*

*Co.*).

The importance of establishing standing at the outset of a case was made abundantly clear

in a recent decision in *In re Smith Barney Transfer Agent Litigation*.  There, in what the court

described as "a cautionary lesson for securities litigators," after six years of litigation, it was

revealed that the lead plaintiff had never purchased any of the securities at issue in the litigation,

and therefore never had standing to assert Section 36(b) and securities fraud claims.  *In re Smith*

*Barney Transfer Agent Litig.*, 05. Civ. 7583, Mem. & Order (Sept. 22, 2011) (Dkt. No. 176).

The court admonished that this "startling revelation" after "six years of hard-fought and costly

litigation" was of "seismic" importance, had resulted in "a six-year detour and frolic," and had

caused "[s]ubstantial judicial and client resources [to be] diverted to adjudicate a claim that the Lead Plaintiff never had." *Id*. at 4-6. To avoid what could otherwise be a "considerable waste of time and resources," standing is always "a threshold question" that must be resolved as early as possible in every case. *Id*. at 4, 5.

Plaintiff, as the party invoking the federal jurisdiction of this Court, bears the burden of establishing that she has standing. *Common Cause of Penn. v. Commonwealth of Penn.*, 558 F.3d 249, 257 (3d Cir. 2009). Congress specifically mandated that only "security holders" have a private right of action under Section 36(b). *See, e.g.*, *Phila. Marine Trade Ass'n-Int'l Longshoremen's Ass'n Pension Fund v. Comm'r*, 523 F.3d 140, 143-44 (3d Cir. 2008) ("Statutory standing asks whether Congress has accorded *this injured plaintiff* the right to sue the defendant to redress *his injury*.") (emphasis added) (internal quotations omitted). Plaintiff has not and cannot meet her burden of establishing that she is a "security holder."

### B. Plaintiff Must Be A "Security Holder" Of The Funds To Have Standing.

Section 36(b) of the Investment Company Act provides that investment advisers have a "fiduciary duty with respect to the receipt of compensation for services" that they provide to mutual funds. 15 U.S.C. § 80a-35(b). However, Section 36(b) includes express limits on who may pursue a claim, stating that an action may be brought only "by the [SEC], or by a *security holder* on behalf of" a mutual fund that is allegedly charged excessive fees. *Id*. (emphasis added).

As the Third Circuit has held, "one who does not own shares" in the mutual funds at issue is "not qualified to bring a derivative action" on behalf of those funds. *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 735 (3d Cir. 1970). Accordingly, courts have not hesitated to dismiss Section 36(b) claims where the plaintiff does not own shares in the funds at issue. *See*

*Santomenno ex rel. John Hancock v. John Hancock Life Ins. Co. (U.S.A.)*, No. 2:10-01655, 2011 U.S. Dist. LEXIS 55317, at *15 (D.N.J. May 23, 2011); *Curran v. Principal Mgmt. Corp.*, No. 09-433 (CFB), 2011 WL 223872 (S.D. Iowa Jan. 24, 2011); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04-4885 (SWK), 2005 U.S. Dist. LEXIS 24263, at *33 (S.D.N.Y. Oct. 19, 2005); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607-608 (S.D.N.Y. 2006); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 117 (D. Mass. 2006); *In re Am. Funds Fee Litigs.*, No. CV 04-5593 (GAF), 2005 U.S. Dist. LEXIS 41884, at *9 (C.D. Cal. Dec. 16, 2005); *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 493 (N.D. Ill. 1999), *aff'd*, 295 F.3d 738 (7th Cir. 2002), *cert. denied*, 537 U.S. 1088 (U.S. 2002).

## C. Plaintiff Has Failed To Adequately Allege Standing.

In the Complaint, Plaintiff makes the bare-bones and conclusory allegation that she is a "security holder" of the Funds.[9]  But Plaintiff's attempt to label herself a "security holder," without further "factual enhancement," is unavailing.  *Iqbal*, 129 S. Ct. at 1949 ("naked assertion[s]" devoid of "further factual enhancement" are not sufficient, and "[a] pleading that offers 'labels and conclusions' . . . will not do").  The Court "is only required to accept [Plaintiff's] pleaded facts, not her conclusions of law." *Garland v. Enter. Leasing Co. of Phila.*, No. 99-4013, 1999 WL 1077075, at *1 (E.D. Pa. Nov. 24, 1999) (allegation that defendant was a "debt collector" was a legal conclusion and insufficient to state a claim); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (plaintiff must "provide the grounds of his

---

[9]  Compl. ¶ 4 ("Plaintiff Sivolella, from at least April 1, 2010, through to the present (i.e., continues to be) a security holder of each of the [Funds]."); ¶ 17 ("Plaintiff Sivolella . . . from at least April 1, 2010 through to the present is, and continues to be, a security holder of each of the [Funds]."); *see also* Compl. ¶¶ 1, 11 (Plaintiff purports to bring this action as "a derivative action" on behalf of the Funds).

entitle[ment] to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (internal quotations omitted).

Here, the Complaint contains **_no_** facts to support the conclusory allegation that Plaintiff is a "security holder" of the Funds.  Moreover, as set forth below, the very documents Plaintiff relies on in the Complaint flatly contradict her allegation.

> **D.      Plaintiff Is Not A "Security Holder" Of The Funds.**

> 1.      The Funds Are Owned By Separate Account A And Not By Plaintiff.

The Trust's publicly filed documents make clear that Plaintiff cannot be a security holder of the Funds.  The Trust's Prospectus expressly states that, unlike ordinary retail mutual funds, the Funds' "shares are currently **_sold only to insurance company separate accounts_** in connection with Contracts issued by [AXA Equitable], AXA Life and Annuity Company, other affiliated or unaffiliated insurance companies and The AXA Equitable 401(k) Plan," and are "**_not sold directly to the general public_**."  *See supra* at 5.  Likewise, the summary prospectuses for the Funds explain that the Funds are not available to the general public and are, instead, "intended for use in connection with a variable contract as defined in Section 817(d) of the Internal Revenue Code . . . ."  Ex. H (Summary Prospectuses, dated May 1, 2011, at 1).

Section 817 of the Internal Revenue Code (the "Code") generally governs the favorable tax treatment afforded to variable annuities.  *See* 26 U.S.C. § 817.  As expressed in the legislative history of Section 817, Congress specifically intended that a variable annuity would only qualify for favorable tax treatment if the mutual funds offered through the variable annuity were *not* publicly available for direct purchase by investors:

> [T]he conference agreement allows any diversified fund to
> be used as the basis of variable contracts so long as all
> shares of the funds are owned by one or more segregated
> asset accounts of insurance companies, but *only if access to*

> *the fund is available exclusively through the purchase of a*
> *variable contract from an insurance company*. . . .  [T]he
> conferees intend that the standards be designed to deny
> annuity or life insurance treatment for investments that are
> publicly available to investors and investments which are
> made, in effect, at the direction of the investor.

*See* P.L. 98-369, Deficit Reduction Act of 1984, Conf. Comm. Rep., 98 H. Rpt. 861 (emphasis
added).

Consistent with this, the IRS has ruled that, for federal income tax purposes, variable
annuity holders are not owners of the underlying funds in which their variable annuities are
invested.  *See, e.g.*, IRS Rev. Rul. 2003-91, 2003-3 I.R.B. 347 (Aug. 18, 2003) ("[T]he ability to
allocate premiums and transfer funds among Sub-accounts alone does not indicate that [the
variable annuity holder] has control over either Separate Account or Sub-account assets
sufficient to be treated as the owner of those assets," and therefore the variable annuity holder
"*will not be considered to be the owner, for federal income tax purposes, of the assets that fund*
*the variable contract*") (emphasis added).

Here, Plaintiff never purchased any shares of the Funds.  Rather, as explained above,
(i) the Funds are among a number of investment options available to Plaintiff as a participant in
the EQUI-VEST Program, which was offered to Plaintiff pursuant to a group annuity contract
between Newark and AXA Equitable, (ii) AXA Equitable placed Plaintiff's contributions to that
Program in Separate Account A, consistent with requirements under federal tax law, (iii)
Separate Account A purchased pro rata shares of the investment options selected by Plaintiff,
(iv) Plaintiff, in turn, received "units" of Separate Account A that corresponded to the investment
options she selected, and (v) "the value of [Plaintiff's] units increase[d] or decrease[d] ***as though***
*[Plaintiff] had invested in the corresponding portfolio's shares directly*," but Plaintiff *did not*
invest in the Funds directly and the value of Plaintiff's Separate Account A units did not directly

correspond to the Funds' investment performance because the value of those units was reduced by certain fees AXA Equitable charges for the annuity product. *See supra* at 4-6.

Accordingly, while Plaintiff received certain "units" of Separate Account A, the value of which was derivative, in part, of the performance of the Funds, Plaintiff did not actually own shares of the Funds. This distinction is critical, and deprives Plaintiff of standing. The assets in Separate Account A, including shares of the Funds, were and are owned by AXA Equitable: As disclosed in the EQUI-VEST Product Prospectus, AXA Equitable is "the *legal owner* of all of the assets in Separate Account A."[10] *See supra* at 4. Consistent with AXA Equitable's ownership rights, any dividends issued by the Funds are reinvested by Separate Account A, and are not distributed to Plaintiff. *See* Ex. C (EQUI-VEST Product Prospectus at 65). In addition, when a shareholder vote is required on certain matters affecting the Funds, AXA Equitable votes the shares. *See* Ex. C (EQUI-VEST Product Prospectus at 67) ("As the owner of the shares of the [EQ Trust] we have the right to vote on certain matters involving the [Funds]," such as "the election of trustees," "the formal approval of independent auditors selected for [the Trust]," and "any other matters . . . requiring a shareholders' vote under the [Investment Company Act].").

Thus, Plaintiff is not a "security holder" of the Funds. *See Young v. Nationwide Life Ins. Co.*, 2 F. Supp. 2d 914 (1998) (variable insurance policy owners "do not directly invest" in the

---

[10]   As noted above, AXA Equitable is required by law to structure its variable annuities business in this way in order for most of its variable annuities to qualify for favorable tax treatment. Pursuant to Section 817 of the Code, in order for a "variable contract" to qualify as a tax-deferred investment, the contract must require that the amounts received under the contract (*e.g.*, Plaintiff's contributions) be allocated to an account, such as Separate Account A, that "pursuant to State law or regulation, is segregated from the general asset accounts of the company."  26 U.S.C. § 817(d)(1). In turn, under New York insurance law, AXA Equitable is required to own all assets held by the Separate Account: "Amounts allocated by the insurer to separate accounts shall be owned by the insurer, the assets therein shall be the property of the insurer, and no insurer by reason of such accounts shall be or hold itself out to be a trustee."  N.Y. Ins. Law § 4240(a)(12).

mutual funds at issue and "technically Plaintiffs do not have a legal interest" in the funds).[11]   The

fact that the value of Plaintiff's variable annuity units may increase or decrease based on the

performance of the underlying Funds is of no legal significance for purposes of the standing

analysis.  *Curran*, 2011 WL 223872, at *3 (the fact that the "fortunes" of plaintiffs "are

interwoven with and completely dependent upon the efforts and success of the investments in the

funds" is not enough to confer statutory standing under Section 36(b)).  Congress used the term

"security holder" in Section 36(b) and chose not to use the term "beneficial owner" or any more

expansive concept of ownership.  Significantly, Congress expressly used the term "beneficial

ownership" in other sections of the Investment Company Act.  *See, e.g.*, 15 U.S.C. § 80a-

3(c)(1)(A) and (B) (using "beneficial ownership" for purposes of identifying entities that do not

qualify as an "investment company" under the Act); *id.* § 80a-2(a)(9) (using "beneficially own"

for purposes of defining "control" under the Act).  "Congress must be presumed to know the

meanings of the words and phrases it uses in drafting statutes," and "[w]hen it refers to [one

term] in one section of the Act but omits in another, the statute should normally be construed to

give effect to the distinction Congress makes thereby."  *See Pope v. East Brunswick Bd. of

Educ.*, 12 F.3d 1244, 1249 (3d Cir. 1993).[12]

---

[11]   In *Young*, plaintiffs were found to have Article III standing, but the issue of whether the
plaintiffs had statutory standing as "security holders" was not addressed as there was no Section
36(b) claim at issue.  *See Curran v. Principal Mgmt. Corp.*, No. 09-433, 2010 U.S. Dist. LEXIS
83730, at *n.2 (S.D. Iowa June 8, 2010) (distinguishing between Article III standing and
statutory standing under Section 36(b)).

[12]   *See also United States v. Cheeseman*, 600 F.3d 270, 281 (3d Cir. 2010) (citing *Pope*) ("In
essence, [Defendant] invites the Court to read into § 924(d)(1) a willfulness requirement . . . .
We reject this argument.  'Congress [is] presumed to know the meanings of the words and
phrases it uses in drafting statutes.'  . . . Congress included a willful mens rea in another clause
of 924(d)(1).  Therefore, if Congress intended the first clause of § 924(d)(1) to also contain a
heightened scienter, it would have used the term willful instead of knowing.").

2.      A Variable Annuity Is Like A "Fund of Funds" And Shareholders
Of Funds Of Funds Are Not "Security Holders" Under Section
36(b).

No court has ever specifically addressed whether, for purposes of Section 36(b), an

owner of a variable annuity is a "security holder" of the underlying funds which impact the value

of the annuity.  The most analogous case is *Curran v. Principal Mgmt. Corp.*, No. 09-433 (CFB),

2011 WL 223872 (S.D. Iowa Jan. 24, 2011).

In *Curran*, plaintiffs were shareholders of so-called "funds of funds."[13]  These

shareholders brought an action under Section 36(b) challenging the fees charged to the

underlying funds in which the funds of funds invested (the "Underlying Funds").  *Curran*, 2011

WL 22382, at *1.  The defendants moved to dismiss, arguing that the shareholders lacked

statutory standing because they only owned shares of the funds of funds and were not "security

holders" of the Underlying Funds.  *Id.*  The court initially rejected the defendants' argument and

held that Section 36(b) creates a private right of action even for persons "who possess an interest

in a mutual fund that is acquired through a fund of funds."  *Curran*, 2010 U.S. Dist. LEXIS

83730, at *24-25.  However, on defendants' motion for reconsideration, the court reversed itself

and found that this holding was "clearly erroneous."  *Curran*, 2011 WL 223872, at *1.

Specifically, the court held that the shareholders of the funds of funds were not "security

holders" of the Underlying Funds and that it was of no significance that "the 'fortunes' of the

[funds of funds] shareholders [were] interwoven with and completely dependent upon the efforts

and success of the investments in the Underlying Funds."  *Id.* at *4.  Accordingly, the court

dismissed the plaintiffs' Section 36(b) claims as to the Underlying Funds.  *Id.*

---

[13]  A "fund of funds" is a registered investment company (*i.e.*, a mutual fund) that invests in
other registered investment companies (*i.e.*, other mutual funds).  *See* NASD Rule 2830(b)(11),
*available at* http://finra.complinet.com.

The same result is required here.  The structure of a fund of funds is analogous to the structure of a variable annuity's whose value is derivative of underlying mutual funds:  A registered unit investment trust (here, Separate Account A, which is analogous to the fund of funds in *Curran*) invests in other registered investment companies (here, the Funds, which are analogous to the Underlying Funds in *Curran*).  *See supra* note 7.  Likewise, the shareholder in a fund of funds is in a position analogous to Plaintiff's:  In a fund of funds, the shareholders only own shares of the fund of funds and do not own shares of the underlying funds directly.  In fact, the lack of standing is even more pronounced in this case than in *Curran* because Plaintiff here does not hold legal title to the Separate Account which made the investment in the Funds (unlike *Curran*, where the plaintiffs were security holders of the funds of funds).[14]

As such, like the plaintiffs in *Curran*, Plaintiff is not a "security holder" of the Funds and therefore lacks statutory standing to assert a Section 36(b) claim.

## II.   PLAINTIFF'S ALLEGATIONS ARE CONCLUSORY AND FAIL TO SUPPORT A PLAUSIBLE CLAIM THAT THE FUNDS' FEES WERE EXCESSIVE.

Plaintiff's Complaint contains numerous conclusory allegations.  For example, Plaintiff repeatedly alleges in a conclusory fashion that AXA provided effectively *no* services in exchange for the investment management fees paid by the Funds and that "all or substantially all" of the services were instead provided by the Funds' Sub-Advisers.[15]  However, the very

---

[14]  Plaintiff is also further removed from any direct ownership in the underlying Funds than the plaintiffs in *Curran* because Plaintiff did not even directly purchase a variable annuity from AXA Equitable.  Instead, Plaintiff was only a "certificate holder" under a group annuity contract between AXA Equitable and Newark.  *See supra* at 3-6.

[15]  *See, e.g.*, Compl. ¶ 39 ("Rather than providing investment management services to the AXA Funds, [AXA] subcontracts with other investment advisers to provide these services . . . ."); ¶ 40 ("[AXA] has subcontracted its investment management duties to [the Sub-Advisers]"); ¶ 47 ("[I]t is the [Sub-Advisers] that provide the investment advisory services to the [Funds]."); Compl. ¶¶ 7-9, 39, 42, 44, 48, 52-53, 57-58, 63-64, 69-70, 75-76, 80-81, 86-87, 91, 95-98, 101-102, 143, 149, 152, 156, 158, 173 (repeatedly alleging in a conclusory fashion that the Sub-Advisers

documents relied on in the Complaint plainly show that AXA did, in fact, provide numerous

services to the Funds that were not delegated to the Sub-Advisers.  As such, Plaintiff's

allegations are flatly contradicted by the documents Plaintiff relies on and fail to support any

"plausible" claim that the fees charged to the Funds were excessive.  *See Iqbal*, 129 S. Ct. at

1949-51.

Plaintiff's Complaint breezily concludes that the Sub-Advisers provided "all or

substantially all" of the Funds' investment management services.[16]  The Complaint, however,

contains no specific factual allegations regarding the services provided by AXA.  Instead,

Plaintiff offers the mere conclusion, unsupported by any factual allegations, that "[AXA] selects

the [Sub-Advisers]" and that "[o]ther than [AXA's] *initial involvement*, it provides no, or

minimal, services to the [Funds] . . . ."  *See* Compl. ¶¶ 45-47 (emphasis added).

These allegations are merely conclusions, rather than allegations of fact, and they are

directly contradicted by the very documents on which Plaintiff purports to rely.  For example, the

Trust's Prospectus clearly shows that AXA was required to provide numerous services to the

Funds that it did not delegate to the Sub-Advisers.  Specifically, the Trust's Prospectus states that

AXA:

- "[P]lays an active role in monitoring" each Fund with "portfolio analytics
  systems" that evaluate the Funds' "performance, style, risk levels, diversification
  and other criteria";

- "[D]etermines the asset allocation range" for certain Funds and "ensure[s] that the
  asset allocations are consistent with the guidelines that have been approved by the
  [Funds' Board of Trustees]";

---

perform "all or substantially all" of the investment management services).  Although Defendants
focus in this motion on Plaintiff's conclusory allegations that AXA provided essentially no
services to the Funds—allegations that are flatly contradicted by the documents cited in the
Complaint—Defendants neither concede nor intend to suggest that the other allegations in the
Complaint satisfy the pleading standard set forth by the Supreme Court in *Iqbal*.

[16] *See supra* note 15.

- Selects the underlying ETFs (*i.e.*, exchange-traded funds) for certain of the Funds;

- "[D]evelop[s] and oversee[s] the proprietary research model used to manage the equity exposure of" certain Funds;

- "[M]onitors each [Sub-Adviser's] portfolio management team to determine whether its investment activities remain consistent with the [Funds'] investment style and objectives";

- "[M]onitors significant changes that may impact the [Sub-Advisers'] overall business," "continuity in the [Sub-Advisers'] operations and changes in investment personnel and senior management";

- "Performs due diligence reviews with each [Sub-Adviser] no less frequently than annually";

- "[O]btains detailed, comprehensive information concerning [the Funds'] and [the Sub-Advisers'] performance and [the Funds'] operations that is used to supervise and monitor the [Sub-Advisers]"; and

- Assembles a "team [that] is responsible for conducting ongoing investment reviews with each [Sub-Adviser] and for developing the criteria by which [the Funds'] performance is measured."

Ex. D, Trust's Prospectus at 176.

Likewise, the Funds' Management Agreement provides that AXA is required to:

- Maintain overall supervisory responsibility for the management and investment of the Funds' assets;

- Monitor the Funds' investment performance;

- Provide the Funds' Board of Trustees with the numerous reports and other materials and information reviewed by the Trustees in connection with the 15(c) process and any other materials the Trustees request;

- Report to the Board of Trustees on developments affecting each Fund;

- Report to the Board of Trustees on the performance of each [Sub-Adviser];

- Prepare the numerous disclosure documents required in order for the Funds to comply with their many statutory and regulatory requirements, including the Funds' registration statements, prospectuses, prospectus supplements, SAIs, all

- 20 -

> annual, semi-annual, and periodic reports, and all notices and proxy solicitation materials;

- Select and monitor the Sub-Advisers, including their compliance with the Funds' investment objectives, policies and restrictions; and

- Review the performance of each Sub-Adviser and, when necessary, terminate and find replacements for the Sub-Advisers.

Ex. F (Management Agreement § B).  Plaintiff's Complaint does not mention any of these services.

Although the Complaint's conclusory allegations that AXA provided essentially no services are flatly contradicted by the very documents Plaintiff relies on in the Complaint, the Court need not reach this issue because the Complaint must be dismissed for lack of standing. However, it bears noting that Judge Bumb of this Court recently granted in part a motion to dismiss a complaint with nearly identical conclusory allegations.[17]

---

[17]  *See Southworth v. Hartford Inv. Fin. Servs.*, No. 10-878 (D. Del. filed Oct. 14, 2010) and *Kasilag v. Hartford Inv. Fin. Servs.*, No. 11-1083 (D.N.J. filed Feb. 25, 2011).  In *Southworth* and *Kasilag* (the latter of which was filed by the same law firms that are counsel to Plaintiff in this case), the plaintiffs alleged that Hartford Investment Financial Services, LLC ("Hartford") charged the funds at issue excessive fees in violation of Section 36(b).  Like Plaintiff here, the plaintiffs in these cases alleged that Hartford had delegated all, or "virtually" all, of the investment advisory services to the funds' sub-advisers for a "fraction" of the overall investment management fee.  *See, e.g., Kasilag*, Am. Compl., filed Mar. 4, 2011 (Dkt. No. 3) ¶¶ 49, 63, 68, 157; *Southworth*, Compl., filed Oct. 14, 2010 (Dkt. No. 1) ¶¶ 19, 47, 110.  Hartford moved to dismiss, arguing, among other things, that plaintiffs' allegations that Hartford provided essentially no services were conclusory and contradicted by the very documents that plaintiffs relied on in the complaints.  *See Kasilag*, Mem. of Law In Sup. of Def.'s Motion to Dismiss, filed May 12, 2011 (Dkt. No. 10) at 16-19.  The Court accepted Hartford's argument and granted in part its motion to dismiss.  *Kasilag*, Order, filed Sept. 13, 2011 (Dkt. No. 32).  *See also Southworth*, Order, filed Sept. 13, 2011 (Dkt. No. 41).  Judge Bumb found that other allegations in the *Southworth* and *Kasilag* complaints were not conclusory, but those same allegations are not made here.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Complaint with prejudice.


Dated:  October 17, 2011

BLANK ROME LLP

By:  /s/ Jonathan M. Korn
     Jonathan M. Korn
     301 Carnegie Center, 3rd Floor
     Princeton, NJ 08540

MILBANK, TWEED, HADLEY & MᶜCLOY LLP

     James N. Benedict (*pro hac vice*)
     Sean M. Murphy (*pro hac vice*)
     Andrea G. Hood
     Will Gross
     1 Chase Manhattan Plaza
     New York, NY  10005-1413
     (212) 530-5000

     *Attorneys for Defendants*