SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Robert L. Lakind, Esquire
    Arnold Lakind, Esquire
    Steven Blader, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
By: Moshe Maimon, Esquire
    Danielle Disporto, Esquire
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys For Plaintiffs

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio; MARY ANN SIVOLELLA for the use and benefit of the EQ Advisors Trust; MARY ANN SIVOLELLA, individually and on behalf of any person or entity that is a party to a variable annuity contract issued by/sold by AXA Equitable Life Insurance Company, which offered the ability to invest in, and resulted in an investment in, the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the | **Civil Action No. 3:11-cv-04194-PGS-DEA**<br><br><br>**AMENDED COMPLAINT AND JURY DEMAND** |

624377 5

EQ/Large Cap Value PLUS Portfolio, the
EQ/Global Multi-Sector Equity Portfolio,
the EQ/Mid Cap Value PLUS Portfolio, the
EQ/GAMCO Small Company Value, or the
EQ/Intermediate Government Bond Index
Portfolio; and MARY ANN SIVOLELLA,
individually and on behalf of any person or
that paid investment management fees to
either AXA Equitable Life Insurance
Company or AXA Equitable Funds
Management Group, LLC, on account of
investments in, the EQ/Common Stock
Index Portfolio, the EQ/Equity Growth
PLUS Portfolio, the EQ/Equity 500 Index
Portfolio, the EQ/Large Cap Value PLUS
Portfolio, the EQ/Global Multi-Sector
Equity Portfolio, the EQ/Mid Cap Value
PLUS Portfolio, the EQ/GAMCO Small
Company Value, or the EQ/Intermediate
Government Bond Index Portfolio


      Plaintiffs,

vs.

AXA Equitable Life Insurance Company
and AXA Equitable Funds Management
Group, LLC,

      Defendants.

Plaintiff, MARY ANN SIVOLELLA ("Plaintiff Sivolella"), whose street address is 55

Sheffield Drive, Forked River, New Jersey 08731, brings this action on behalf of, and for the benefit

of, the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity

500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity

Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio

624377 5

2

and the EQ/Intermediate Government Bond Index Portfolio (collectively, the "AXA Funds"); PLAINTIFF SIVOLELLA brings this action on behalf of, and for the benefit of, the EQ Advisors Trust on account of investment management fees charged to the AXA Funds; PLAINTIFF SIVOLELLA, bring this action individually and on behalf of any person or entity that is a party to a variable annuity contract with AXA Equitable Life Insurance Company, which offered the ability to invest in, and resulted in an investment in any AXA Fund; and PLAINTIFF SIVOLELLA also brings this action individually and on behalf of any person or entity that paid to AXA Equitable Life Insurance Company or AXA Equitable Funds Management Group, LLC, any investment management fees on their investments into any AXA Fund, and sues Defendant, AXA Equitable Life Insurance Company and Defendant, AXA Equitable Funds Management Group, LLC, (both Defendants' principal place of business is located at 1290 Avenue of the Americas, New York, New York 10104), alleges:

## I.  NATURE OF ACTION - INVESTMENT COMPANY ACT §  36(b), 15 U.S.C. § 80a-35(b) CLAIM

1.      This action is a derivative action brought by Plaintiff Sivolella, for the benefit of, and on behalf of the AXA Funds, or alternatively, the EQ Advisors Trust, pursuant to the Investment Company Act of 1940 ("ICA") § 36(b)

2.      ICA §  36(b), 15 U.S.C. § 80a-35(b), provides that an investment manager to a registered investment company (more commonly known as a mutual fund) acts in a fiduciary capacity when it charges fees to the registered investment company. Thus, this statute authorizes security holders of the registered investment company to sue the investment adviser for compensation it receives for its advisory services that is in breach of its fiduciary duties.  This statute also authorizes a security holder of a registered investment company to sue any affiliated person of

such adviser, who also has a fiduciary duty concerning compensation or payments received from such registered investment company, for a breach of fiduciary duty.

3.     The EQ Advisors Trust ("Advisors Trust") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq*., comprised of various mutual funds/portfolios, including the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, and the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the AXA Funds).  Each of the AXA Funds has its own investment objective/goals.

4.     Certain registered investment companies are organized as series trusts, which is a single registered investment company that contains within it numerous portfolios/mutual funds. Each portfolio/mutual fund within a series trust has its own investment strategy.  The Advisors Trust is a series trust.  The AXA Funds are 8 out of the 64 mutual funds/portfolios contained within the Advisors Trust.

5.     AXA Equitable Life Insurance Company provides conflicting disclosures as to whether the security it issues, on account of an investment into an AXA Fund, is a share of the AXA Fund, or a share of the Advisors Trust that corresponds to the AXA Fund in which the investor invests.

6.     Plaintiff Sivolella, from at least April 1, 2010, through to the present (i.e., continues to be) is a security holder in the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO

Small Company Value Portfolio, and the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the AXA Funds).

7.    Alternatively,  if the Advisors Trust (*i.e.*, the registered legal entity that contains the AXA Funds) issues shares of the Advisors Trust that correspond to each AXA Fund, then Plaintiff Sivolella, from April 1, 2010, through to the present (*i.e.*, continues to be) is a security holder in the Advisors Trust.

8.    According to the Defendants, when  Plaintiff Sivolella (or any other investor) invested her money in any AXA Fund, shares of that AXA Fund, (or in the alternative, shares of the Advisors Trust that correspond to that specific AXA Fund)[1], are issued to Separate Account A and she  received  a  "unit"  of  Separate  Account  A.    According  to  the  Defendants,  these  units "corresponded to her selected investments, including the Funds. ...  Therefore, ... the overall value of Plaintiff's units of Separate Account A 'increase[d] or decrease[d] as though [Plaintiff] had invested in the corresponding portfolio's shares directly'...."  (quotations and bracketed text in the original).

9.    Thus, Plaintiff Sivollela is, and has been since from at least April 1, 2010, a security holder of the AXA Funds, or in the alternative, the Advisors Trust.  Furthermore, she is the payer of the investment management fees that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charge to, and receive from, the AXA Funds.

10.    AXA Equitable Funds Management Group, LLC, is the investment adviser to the Advisors Trust.  AXA Equitable Life Insurance Company and AXA Equitable Funds Management

---

[1]With respect to the first sentence of this paragraph, Defendants have not acknowledged whether they issues shares of the AXA Funds or the Advisors Trust as a consequence of investments into the AXA Funds)

Group, LLC, make inconsistent disclosures as to whether AXA Equitable Life Insurance Company or AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the AXA Funds. However, AXA Equitable Funds Management Group, LLC, is a wholly owned subsidiary of AXA Equitable Life Insurance Company. Thus, AXA Equitable Life Insurance Company is an affiliated person (as defined in the ICA) of AXA Equitable Funds Management Group, LLC. AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, are both registered with the Securities and Exchange Commission ("SEC") as investment advisers. Given these conflicting disclosures, two derivative claims are brought herein. One claim is brought on behalf of the AXA Funds and, in the alternative, one claim is brought on behalf of the Advisors Trust.

11.     AXA Equitable Funds Management Group, LLC[2], in its capacity as the investment adviser to the AXA Funds and the Advisors Trust, is sued in this derivative Amended Complaint based on its misconduct related to its wrongful receipt of investment management fees paid by the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

12.     AXA Equitable Life Insurance Company is the investment adviser to the AXA Funds, which are contained in the Advisors Trust. Thus, AXA Equitable Life Insurance Company, which owes a fiduciary obligation to the AXA Funds/Advisors Trust, on account of serving as their investment advisor and as an affiliated person of AXA Equitable Funds Management Group, LLC, (which is its subsidiary), is sued in this derivative complaint based on its misconduct related to its wrongful receipt of investment management fees paid by the AXA Funds/Advisors Trust in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

---

[2]     AXA Equitable Funds Management Group, LLC, is occasionally referred to as "Funds Management Group unit" within the AXA Funds' public filings.

13.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged, and continue to charge, the AXA Funds and Advisors Trust, investment advisory fees for alleged investment management services.[3]  These fees are paid from the AXA Funds'/Advisors Trust's assets and thus are borne by Plaintiff Sivolella and the other investors.

14.    In addition to having AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, as their investment adviser/manager, each AXA Fund also has a sub-adviser (or in some cases sub-advisers) that, with minor exceptions, perform all of the investment management services for each AXA Fund.

15.    AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, have contracted with these sub-advisers, and such sub-contracts require the sub-advisers to perform, with minor exceptions, all of the investment management services that are needed by each AXA Fund.

16.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, collects from the Advisors Trust, through  each of the AXA Funds, a "management fee" for their alleged investment management services to each AXA Fund.  They retain the bulk of that investment management fee, and remit a much smaller fee[4] to each of the AXA Funds' sub-

---

[3]    The term "investment advisory services" and "investment management services" are used interchangeably in this Complaint.

[4]    However, in the case of the EQ GAMCO/Small Company Value Portfolio, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, investment management fee only exceeds the sub-adviser's fee by 103%.  However, as explained below, in light of the Defendants' minimal investment management services, as compared to the sub-advisers' investment management services, it is unclear why the Defendants' investment management fees are not, in all cases, with respect to all of the AXA Funds, significantly below that of the sub-advisers.  Further, with respect to the remaining funds, the Defendants' investment management fees exceeds that of the sub-advisers by a minimum of 245% , up to a maximum of 1649%, and this translates into the Defendants receiving a greater fee (than that of

advisers, which are the entities that provide, with minor exceptions, all of the investment management services to each AXA Fund.  As an example of the significance of the fee retained by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for the EQ/Intermediate Government Bond Index Portfolio, in 2010, the Defendants retained an investment management fee that was 1649%  greater the amount that was paid to that AXA Fund's sub-adviser.

17.    Pursuant to the "Funds' [Investment] Management Agreement" (a copy of which AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, filed with the Court on October 17, 2011 (Docket No. 11-5)), and is hereinafter referred to as the "IMA")[5] AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, as the AXA Funds' investment manager, allege/claim, they perform, for their  investment management fees, the following services:

> Subject always to the direction and control of the Trustees of the Trust, Manager [*i.e., AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC*] will have (i) overall supervisory responsibility for the general management and investment of each Portfolio's assets; (ii) full discretion to select new or additional Advisers [*i.e., sub-adviser*] for each Portfolio [*i.e., AXA Fund*]; (iii) full discretion to enter into and materially modify existing Advisory Agreements [*i.e., sub-advisory agreements*] with Advisers; (iv) full discretion to terminate and replace any Adviser; and (v) full investment discretion to make all determinations with respect to the investment of a Portfolio's assets **not then managed by an Adviser.** In connection with Manager's responsibilities herein, Manager will assess each Portfolio's investment focus and will seek to implement decisions with respect to the allocation and reallocation of each Portfolio's assets among one or more current or additional Advisers from time to time, as the Manager deems appropriate, to enable each Portfolio to achieve its investment goals. In addition, Manager will monitor compliance of each Adviser

---

the sub-advisers) by approximately $46million.

[5]Through the inclusion of the text of the IMA, which the Defendants filed with this Court, Plaintiff is in no way conceding that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, actually provide the alleged services contained in it.

with the investment objectives, policies and restrictions of any Portfolio or Portfolios (or portions of any Portfolio) under the management of such Adviser, and review and report to the Trustees of the Trust on the performance of each Adviser. Manager will furnish, or cause the appropriate Adviser(s) to furnish, to the Trust such statistical information, with respect to the investments that a Portfolio (or portions of any Portfolio) may hold or contemplate purchasing, as the Trust may reasonably request. On Manager's own initiative, Manager will apprise, or cause the appropriate Adviser(s) to apprise, the Trust of important developments materially affecting each Portfolio (or any portion of a Portfolio that they advise) and will furnish the Trust, from time to time, with such information as may be appropriate for this purpose. Further, Manager agrees to furnish, or cause the appropriate Adviser(s) to furnish, to the Trustees of the Trust such periodic and special reports as the Trustees of the Trust may reasonably request. In addition, Manager agrees to cause the appropriate Adviser(s) to furnish to third-party data reporting services all currently available standardized performance information and other customary data.

(Emphasis added)

18.     Thus the services AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, allegedly provide to the AXA Funds pursuant to the IMA are all predominantly oversight/supervisory services.

19.     AXA Equitable Life Insurance Company has even represented on its website that AXA Equitable Funds Management Group, LLC,  "provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [9]   Further, while it alleges it is providing oversight services, these services are also presumably limited because, according to the sub-advisory agreements, it is the Fund's sub-adviser who "formulate and implement a continuous investment program for [each Fund]", which is the core investment management service needed for a mutual fund.

---

[9]     *See* "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html

20.     Further, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's supervisory role is also presumably limited given that the Advisors Trust's Board is charged with the substantial supervision of the Funds.  According to the May 1, 2011 SAI, "the Trust's Board is responsible for the overall management of the Trust and the Portfolios, including general supervision and review of the Portfolios' investment activities and their conformity with federal and state law as well as the stated policies of the Portfolios. The Board elects the officers of the Trust who are responsible for administering the Trust's day-to-day operations."

21.     If AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC, performed all of the alleged services listed in the IMA at ¶17 for each AXA Fund, if the fees charged for these alleged services were the product of arm's length bargaining, they should have been, for each AXA Fund, a fraction of the fees charged by each  Fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.

22.     Thus, a comparison of (A) the fees paid to the AXA Fund's sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged minor amount of  investment management services (especially as compared to the sub-advisers' investment management services), reflects that a substantial portion of the investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their investment management services were so disproportionately large that they bore no reasonable relationship to the services

it rendered and could not have been the product of an arm's-length bargaining and thus in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b) occurred.

23.     Plaintiff Sivolella, who is a current security holder in the AXA Funds or, in the event Defendants issues shares of the Advisors Trust, the Advisors Trust, and has been since April 1, 2010, through the present, on account of investments into the AXA Funds, alleges that the investment management fees charged by AXA Equitable Funds Management Group, LLC, and/or AXA Equitable Life Insurance Company, for their alleged investment management services to each of the AXA Funds, were in breach of these Defendants' fiduciary duties under ICA § 36(b), 15 U.S.C. §80a-35(b).

24.     Plaintiff Sivolella brings this action derivatively pursuant to ICA § 36(b), 15 U.S.C. §80a-35(b), on behalf of the AXA Funds.

25.     Alternatively, if AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, issues shares of the Advisors Trust that correspond to investments into the AXA Funds, Plaintiff Sivolella brings this action derivatively pursuant to ICA § 36(b), 15 U.S.C. §80a-35(b), on behalf of the Advisors Trust.

26.     Plaintiff Sivolella, seeks pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the AXA Funds, or in the alternative the Advisors Trust, the actual damages resulting from the breaches of fiduciary duties by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, which includes a substantial amount of the compensation and payments received by these Defendants for alleged investment management services to the AXA Funds, and/or, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), rescission of the contracts, that resulted in these breaches, due to AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC 's, violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

27.     Plaintiff Sivolella, with respect to her claims for a violation of ICA § 36(b), 15 U.S.C. § 80a-35(b), seeks a recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

28.     Most of Plaintiff's allegations below are based on statements contained in (i) SEC filings for the Advisors Trust, that AXA Equitable Life Insurance Company filed on behalf of each AXA Fund and (ii) agreements that AXA Equitable Life Insurance Company entered into with each AXA Funds' subadviser(s), on the Funds' behalf (these agreements are also filed by AXA Equitable Life Insurance Company with the SEC).

29.     Many of the statements relied upon below come from AXA Equitable Life Insurance Company's Advisors Trust February 3, 2011 N-1A SEC filing ("February N-1A") and AXA Equitable Life Insurance Company's Advisors Trust April 28, 2011 N-1A SEC filing ("April N-1A"). Both SEC filings were filed by AXA Equitable Life Insurance Company on behalf of the AXA Funds/Advisors Trust and generally contain the same material information. A portion of the February N-1A filing, known as the prospectus, has an effective date of April 24, 2011, and the other portion, known as the Statement of Additional Information ("SAI"), has an effective date of May 1, 2011 ("May 1, 2011 SAI"). The April N-1A has an effective date of May 1, 2011 (both the prospectus and SAI contained in this filing have a May 1, 2011 effective date).[10]

30.     On information on belief, the statements that are contained in (i) any SEC filing

---

[10]     On August 16, 2011, AXA Equitable Life Insurance Company, on behalf of a specific share class of the AXA Funds, filed an N-1A filing, that may take effect on August 16, 2011. This N-1A filing, which is not yet effective, does not contain any statements, with respect to the AXA Funds (except for the EQ/Intermediate Government Bond Index; *see* footnote 4 *infra*), that are materially different from the statements that are contained in the April N-1A filing.

relied upon below, and (ii) any sub-advisory agreement entered into between AXA Equitable Life

Insurance Company and a sub-adviser (these agreements are also filed with the SEC) relied upon

below, represent/reflect the conduct/actions of AXA Equitable Life Insurance Company and AXA

Equitable Funds Management Group, LLC, for the entire time period that Plaintiff is permitted to

seek a recovery under ICA § 36(b)(3), 15 U.S.C. §80a-35(b)(3).

## II.   NATURE OF ACTION - VIOLATION OF ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2); RELIEF SOUGHT UNDER ICA §  47(b), 15 U.S.C. §  80a-46(b)

31.    Defendant AXA Equitable Life Insurance Company issues/sells variable annuity

contracts to persons and/or entities (on information and belief these are both group and individual

annuity contracts).  Investments into the AXA Funds (which are contained within the Advisors

Trust) were made through/on account of such contracts.  These variable annuity contracts are

hereinafter referred to as the "AXA Variable Annuity Contracts."

32.    Through the AXA Variable Annuity Contracts, investments can be made into the

following mutual funds/portfolios: EQ/Common Stock Index Portfolio, the EQ/Equity Growth

PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the

EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO

Small Company Value Portfolio, or the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the

AXA Funds).

33.    All of the AXA Variable Annuity Contracts, through which investments into the

AXA Funds were made, were funded by Separate Account A, which is a registered separate account

under the ICA.  AXA Equitable Life Insurance Company is the sponsor of Separate Account A.

34.    Under ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2), it is unlawful for any registered

separate account funding variable insurance contracts, or for the sponsoring insurance company of

such account, to sell any such contract, unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company.

35.    In light of the minimal/limited investment management services provided by AXA Equitable Life Insurance Company to the AXA Funds, investments into any one of the Funds results in the charging by AXA Equitable Life Insurance Company of excessive/unreasonable investment management fees.  These fees are deducted under the AXA Variable Annuity Contracts.

36.    A comparison of (A) the fees paid to the AXA Funds' sub-advisers for performing, with minor exceptions, all of the investment management services, and (B) the fees paid to AXA Equitable Life Insurance Company for its alleged minimal investment management services, reflects that a substantial portion of the investment management  fees paid to AXA Equitable Life Insurance Company for its investment management services were, so disproportionately large that they bore no reasonable relationship to the services they rendered and could not have been the product of an arm's-length bargaining and thus, in the aggregate, the fees and charges deducted under the AXA Variable Annuity Contracts were unreasonable in relation to the services rendered, the expenses incurred and the risks assumed by AXA Equitable Life Insurance Company.

37.    Under ICA § 47(b), 15 U.S.C. § 80a-46(b), any party to such unlawful contract has an express right to bring an action for equitable relief, including rescission of such contract, or its unlawful portions thereof, and restitution.

38.    Plaintiff Sivolella is a party to a AXA Variable Annuity Contract under which she was charged, and continues to be charged, unreasonable investment management fees (in light of the minimal investment management services provided by AXA Equitable Life Insurance Company

that were predominantly supervisory in nature) on account of investments into the AXA Funds. Plaintiff Sivolella seeks recovery for such excessive and unreasonable investment management fees.

39.     All parties to an AXA Variable Annuity Contract that were charged, under such contracts, excessive/unreasonable management fees on account of their investments into the AXA Funds, in violation of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2), that seek rescission of their contract, or its unlawful portions thereof, and restitution are referred to as the AXA Variable Annuity Contract Class.  Plaintiff Sivolella is a member of the AXA Variable Annuity Contract Class.

40.     Plaintiff Sivolella brings this action pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), on behalf of herself, and all members of the AXA Variable Annuity Contract Class, to recover a substantial portion of the investment management fees charged by Defendant AXA Equitable Life Insurance Company, which  were in violation of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2), under the AXA Variable Annuity Contracts.

41.     Pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), the AXA Variable Annuity Contract Class seeks rescission of any AXA Variable Annuity Contract, or portions thereof, in an amount equal to the excessive and unreasonable portion of the investment management fees that were charged by, and received from, AXA Equitable Life Insurance Company on account of the members of the AXA Variable Annuity Contract Class's investments into the AXA Funds.

42.     To the extent any of the unreasonable fees (i.e., the excessive investment management fees that were paid on account of the  AXA Variable Annuity Contract Class's investments into the AXA Funds) incurred under the AXA Variable Annuity Contracts, were paid to Defendant AXA Equitable Funds Management Group, LLC, the AXA Variable Annuity Contract Class, seeks restitution of the portion of the investment management fees received by AXA Equitable Funds Management Group, LLC, that were paid by the members of the AXA Variable

Annuity Contract Class, because AXA Equitable Funds Management Group, LLC, was unjustly enriched due to its collection of unreasonable fees in violation ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2).

43.     While a different legal standard applies in determining whether ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2) has been violated, the factual allegations that support Plaintiff's ICA § 36(b), 15 U.S.C. § 80a-35(b) claim, are also  relied upon to support Plaintiff's claim  that ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2) has been violated.  Thus, the allegations that support Plaintiff's claim that ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2) was violated are based on the same SEC filings and subadvisory agreements, relied upon to demonstrate that a violation of ICA § 36(b), 15 U.S.C. § 80a-35(b) occurred.  Further, on information and belief, any of the statements that are contained in (i) any SEC filing relied upon below, and (ii) any sub-advisory agreement entered into between AXA Equitable Life Insurance Company and a sub-adviser (these agreements are also filed with the SEC), represent/reflect the conduct and actions of AXA Equitable Life Insurance Company for the entire time period that Plaintiff is permitted to seek a recovery under ICA § 47, 15 U.S.C. §80a-46, for the violations of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2).

## III.     NATURE OF ACTION-UNJUST ENRICHMENT CLAIM

44.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC, were substantially enriched by their retention of a substantial portion of the investment management fees they charged the AXA Funds, since these funds' sub-advisers, with minor exceptions, perform all of the investment management services for these funds, but were paid much smaller fees than those paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC.

45.     A comparison of (A) the fees paid to the AXA Funds' sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged minimal investment management services (as compared to the sub-advisers' investment management services), reflects that a substantial portion of the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their investment management services were so disproportionately large that they bore no reasonable relationship to the services they rendered and could not have been the product of an arm's-length bargaining and thus clearly the Defendants were unjustly enriched on their receipt of a significant portion of the investment management fees they were paid on investments into the AXA Funds.

46.     Plaintiff Sivolella, individually, and on behalf of any person or entity that paid investment management fees to either AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, brings a claim for unjust enrichment against these Defendants on account of the fact that they were unjustly enriched due to their receipt of a substantial portion of the investment management fees paid to them on account of investments into the AXA Funds.  This class is hereinafter referred to as the Payer Class (which includes Plaintiff Sivolella).

47.     The Payer Class brings its unjust enrichment claim under Federal common law and seeks recovery from the earliest time permitted in equity.

48.     The factual allegations that support Plaintiff's ICA § 36(b), 15 U.S.C. § 80a-35(b) claim, are also relied upon to support Plaintiff's unjust enrichment claim against AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC.   Thus, the

allegations that  support Plaintiff's claim that Defendants AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC,  were unjustly enriched are based on the same SEC filings and subadvisory agreements, relied upon to demonstrate that a violation of ICA § 36(b), 15 U.S.C. §80a-35(b) occurred.  Further, on information and belief, any of the statements that are contained in (i) any SEC filing relied upon below, and (ii) any sub-advisory agreement entered into between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and a sub-adviser (these agreements are also filed with the SEC), represent/reflect the conduct and actions of AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC,  for the entire time period that Plaintiff is permitted to seek a recovery under ICA § 47, 15 U.S.C. §80a-46, for the violations of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2).

## IV.   THE PARTIES

### A.   Plaintiff

49.      Plaintiff Sivolella resides at 55 Sheffield Drive, Forked River, New Jersey 08731, and from at least April 1, 2010 through to the present is, and continues to be, a security holder of each of the AXA Funds, or in the alternative, the Advisors Trust.  Plaintiff Sivolella is also a party to an AXA Variable Annuity Contract and is the payer of investment management fees to  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on account of investments into the AXA Funds.

### B.   Defendants

50.      Defendant, AXA Equitable Life Insurance Company is a New York corporation engaged in the business of, among other things, serving as the investment adviser to the AXA Funds and as the issuer/seller of AXA Variable Annuity Contracts.  It is also the sponsor of Separate

Account A and its principal place of business is 1290 Avenue of the Americas, New York, New York 10104. This Defendant received investment management fees on account of Plaintiff Sivolella's (and other investors) investments into the AXA Funds.

51. Defendant, AXA Equitable Funds Management Group, LLC, is a New York corporation engaged in the business of, among other things, serving as the investment adviser to the Advisors Trust and the AXA Funds. Its principal place of business is also 1290 Avenue of the Americas, New York, New York 10104. This Defendant received investment management fees on account of Plaintiff Sivolella's (and other investors) investments into the AXA Funds. AXA Equitable Funds Management Group, LLC, is a wholly owned subsidiary of AXA Equitable Life Insurance Company.

52. The relevant SEC filings provide conflicting information on whether AXA Equitable Life Insurance Company or AXA Equitable Funds Management, LLC, serves as the investment manager/adviser for the AXA Funds. The prospectus portion of both the February and April N-1A filings state that AXA Equitable Life Insurance Company is the investment manager to the AXA Funds. The SAI potion of the February and April N-1A state that "AXA Equitable, through its AXA Funds Management Group unit, currently serves as the investment manager" for each of the AXA Funds.

## V.    JURISDICTION AND VENUE

53. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

54. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43.

55.     No pre-suit demand on the Boards of the AXA Funds or the EQ Advisors Trust is required, as the demand requirement under Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under ICA § 36(b), 15 U.S.C. § 80a-35(b).

## VI.   FACTORS RELEVANT TO VIOLATIONS OF ICA § 36(b), 15 U.S.C. § 80a-35(b) AND ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2)/RELIEF SOUGHT UNDER ICA §47(b), 15 U.S.C. §80-46(b) AND UNJUST ENRICHMENT

### A.     VIOLATION OF ICA § 36(b), 15 U.S.C. § 80a-35(b)

56.     A registered investment company  is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors."  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).

57.     A registered investment company is commonly known as a mutual fund.

58.     Congress recognized as early as 1935 that because "a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor."  S. Rep. No. 91-184, p. 5 (1969).  Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  *Id.*

59.     As a result, Congress enacted the ICA in 1940 recognizing that:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interest of [shareholders] . . . or when the investment companies . . . are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994).  Accordingly, the ICA was designed to regulate and curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Assoc.*, *L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund*, 464 U.S. at 536), and to create standards of care applicable to investment advisers and their affiliates, such as AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC.

60.     By the 1960s, it had become clear to Congress that investment advisers to registered investment companies/mutual funds were charging those funds excessive fees, particularly by not taking economies of scale into account.

61.     Thus, ICA § 36(b), 15 U.S.C. § 80a-35(b), was added to the ICA in 1970, (primarily to remedy excessive fees charged by a registered investment company, such as the one in which Plaintiff Sivolella owns shares on account of investments into the AXA Funds), which created a federal cause of action for breach of fiduciary duty by investment advisers.  ICA § 36(b), 15 U.S.C. § 80a-35(b), – which imposes a fiduciary duty on investment managers (and their affiliates/affiliated persons) with respect to the receipt of compensation for services – states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  ***An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation*** or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

ICA § 36(b), 15 U.S.C. § 80a-35(b) (emphasis added).

62.     The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders."  Indeed, the goal of ICA § 36(b), 15 U.S.C. § 80a-35(b), is to empower shareholders to independently police whether investment advisers have fulfilled their fiduciary obligations.

63.     "The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and is "potentially incestuous."  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)

64.     Through ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent check on an adviser's fulfillment of its fiduciary duties and receipt of unfair fees.  By enacting ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress provided shareholders with a means to redress breaches of the adviser's fiduciary duty to the funds it manages and distributes while leaving the "ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court."  S. Rep. 91-184, p. 6.

65.     ICA § 36(b), 15 U.S.C. § 80a-35(b), itself does not set forth a list of factors to be considered in determining whether investment advisers, such as AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have breached their fiduciary duties with respect to their receipt of compensation for investment management services charged to, and paid by, the AXA Funds, or in the alternative, the Advisors Trust on account of investments into the AXA Funds.

66.     The test for determining whether fee compensation paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, violates ICA § 36(b), 15 U.S.C. § 80a-35(b), is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928.

67.     If an adviser charges a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining" (*see Jones*, 130 S.Ct. at 1418 (quoting *Gartenberg*)), the adviser has violated ICA § 36(b), 15 U.S.C. § 80a-35(b).

68.     In the context of  ICA § 36(b), 15 U.S.C. § 80a-35(b), litigation, courts have historically considered, *inter alia*, the following factors ("*Gartenberg* Factors"):

> (1)     the nature and quality of services being paid for by the fund and its investors;
>
> (2)     whether the trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;
>
> (3)     what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;
>
> (4)     whether savings from economies of scale were passed to the funds and their investors or kept by the investment adviser; and
>
> (5)     the costs of providing investment management services and the profitability of providing those services to the funds.

69.     As set forth below, an examination of the *Gartenberg* Factors demonstrates that the investment management fees charged to the AXA Funds, or in the alternative, the Advisors Trust, and their investors, breached and continue to breach AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, fiduciary duties to the Advisors Trust.

Indeed, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, receipt of the excessive investment management fees were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's-length bargaining.

70.    Count I of this Amended Complaint alleges that a substantial portion of the investment management fees charged (and paid by Plaintiff Sivolella) on account of investments into the AXA Funds violated ICA § 36(b), 15 U.S.C. §80a-35(b).  Count II of this Amended Complaint, is substantively the same claim as Count I, with one difference. As stated above, AXA Equitable Life Insurance Company makes conflicting disclosures as to whether it, on account of investments into the AXA Funds, issues shares of the AXA Funds or shares of the Advisors Trust that correspond to investments in the AXA Funds.  Thus, Count I applies to the situation where AXA Equitable Life Insurance Company issues shares of the AXA Funds, while Count II, which is an alternative to Count I, applies if it is AXA Equitable Life Insurance Company's practice to issue shares of the Advisors Trust, that correspond to the AXA Funds (instead of shares of the AXA Funds).  These claims are based on an analysis of the *Gartenberg* Factors.[11]

---

[11] Because the underlying allegations of both Count I and Count II are based on the same operative facts, Plaintiff's ICA § 36(b), 15 U.S.C. §80a-35(b) allegations are drafted as if it is AXA Equitable Life Insurance Company's practice to issues shares of the AXA Funds, as opposed to shares of the Advisors Trust. However, in the event AXA Equitable Life Insurance Company issues shares of the Advisors Trust, the underlying factual allegations that support Count I, equally apply to Count II, with the distinction that AXA Equitable Life Insurance Company issues shares of the EQ Advisors Trust rather than issuing shares of the AXA Funds.

**B.** **Violation of  ICA 26 § (f)(2), 15 U.S.C. § 80a-26(f)(2)/ Recovery Sought Under ICA § 47(b), 15 U.S.C.  § 80a-46(b)**

71.    Count III of this Amended Complaint alleges that a substantial portion of the investment management fees charged to/paid by members of the AXA Variable Annuity Contract Class, on account of investments into the AXA Funds, violated ICA §   26(f)(2), 15 U.S.C. §80a-26(f)(2).  Recovery is sought under ICA § 47(b), 15 U.S.C.  § 80a-46(b).

72.    Under ICA §26(f)(2), 15 U.S.C. § 80a-26(f)(2), "[i]tshall be unlawful for any registered separate account funding variable insurance contracts, or for the sponsoring insurance company of such account, to sell any such contract-- (A) unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company...."

73.    While a different legal standard applies in determining whether ICA § 26(f)(2), 15 U.S.C. §80a-26(f)(2) and ICA § 36(b), 15 U.S.C. §80a-35(b), has been violated, the factual allegations alleged in this Amended Complaint that support Plaintiff's ICA § 36(b), 15 U.S.C. §80a-35(b) claim, including an analysis of the *Gartenberg* Factors, are relied upon to demonstrate that ICA § 26(f)(2), 15 U.S.C. §80a-26(f)(2) has been violated.

**C.**    **UNJUST ENRICHMENT**

74.    Count IV alleges that the AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  were unjustly enriched on account of their receipt of a substantial portion of the investment management fees charged to/paid by members of  the Payer Class on account of investments into the AXA Funds.  Such fees were in violation of both ICA § 36(b), 15 U.S.C. §80a-35(b), and ICA § 26(f)(2), 15 U.S.C. §80a-26(f)(2).

75.     In order to succeed on an unjust enrichment claim, three elements must be established. These elements are: (1) a benefit conferred on the  defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

76.     While a different legal standard applies in determining whether AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have been unjustly enriched, the factual allegations alleged in this Amended Complaint that support Plaintiff's  ICA § 36(b), 15 U.S.C. §80a-35(b) claim, including an analysis of the *Gartenberg* Factors, also demonstrate that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have been unjustly enriched by receipt of a substantial portion of  the investment management fees paid by the Payer Class to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on account of the Payer Class's investments into the AXA Funds.

**VII.     APPLICATION OF THE GARTENBERG FACTORS/ICA § 36(b), 15 U.S.C. §80a-35(b) CLAIM/§ 26(f)(2), 15 U.S.C. §80a-26(f)(2) VIOLATION-RECOVERY SOUGHT UNDER ICA § 47(b), 15 U.S.C.  § 80a-46(b)/UNJUST ENRICHMENT**

**A.     THE NATURE AND QUALITY OF THE INVESTMENT MANAGEMENT SERVICES PERFORMED BY AXA EQUITABLE LIFE INSURANCE COMPANY AND/OR AXA EQUITABLE FUNDS MANAGEMENT GROUP DOES NOT JUSTIFY THEIR INVESTMENT MANAGEMENT FEE**

77.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment manager to each of the AXA Funds, and by serving in that capacity, receive a significant amount of annual compensation for the alleged investment management services they claim to provide to the AXA Funds (which are contained in the Advisors

Trust).  Plaintiff, as a security holder in the AXA Funds (or the Advisors Trust) is the payer of that compensation as such fees are charged to Plaintiff, and other investors, on account of their investments in the AXA Funds.

78.    The AXA Funds pay a management fee to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  based on a stated percentage of each AXA Fund's asset value.  As such, the investment management fees are not based on the investment management services actually rendered by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, actual costs in providing those services to the AXA Funds.

79.    With respect to the AXA Funds, AXA Equitable Life Insurance Company has contracted with sub-advisers, and such  sub-contracts require the sub-advisers to perform, with minor exceptions, all of the investment management services that are needed by each AXA Fund. With respect to the investment management services the Defendants allege to provide for each AXA Fund, if the fees charged for these alleged services were the product of arm's length bargaining, they should have been,  for each AXA Fund, a fraction of the fees charged by each  Fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.   However, with respect to investment management  fees, by comparison, on average, the Defendants' investment management fees exceed the sub-advisers investment management fees by 496%.

80.    With respect to the AXA Funds, AXA Equitable Life Insurance Company  has subcontracted its investment management duties to, among others: (i) AllianceBernstein L.P. ("AllianceBernstein") pursuant to an Investment Advisory Agreement ("AllianceBernstein

Agreement"); (ii) BlackRock Capital Management, Inc. ("BlackRock Capital") pursuant to an Investment Advisory Agreement ("BlackRock Capital Agreement"); (iii) BlackRock Investment Management, LLC ("BlackRock") pursuant to an Investment Advisory Agreement ("BlackRock Agreement"); (iv) Morgan Stanley Investment Management Inc. ("MSIM") pursuant to an Investment Advisory Agreement ("MSIM Agreement"); (v) GAMCO Asset Management, Inc. ("GAMCO") pursuant to an Investment Advisory Agreement ("GAMCO Agreement"); (vi) Wellington Management Company, LLP ("Wellington") pursuant to an Investment Advisory Agreement ("Wellington Agreement"); and (vii) SSgA Funds Management, Inc. ("SSgA") pursuant to an Investment Advisory Agreement ("SSgA Agreement") .

81.     The AllianceBernstein Agreement, the BlackRock Capital Agreement, the BlackRock Agreement, the MSIM Agreement, the GAMCO Agreement, the Wellington Agreement and the SSgA Agreement (hereinafter collectively referred to as the "Advisory Agreements") are entered into between AXA Equitable Life Insurance Company on behalf of the AXA Funds, and the respective sub-adviser.

82.     Each of the AXA Funds has a sub-adviser, or in some cases, sub-advisers (which SEC filings occasionally refer to as "Adviser(s)") that are responsible for a substantial portion of the core investment management services required by each Fund.

83.     AllianceBernstein is the sub-adviser to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio, and the EQ/Large Cap Value PLUS Portfolio.  BlackRock Capital is a sub-adviser to the EQ/Equity Growth PLUS Portfolio.  BlackRock is a sub-adviser to the EQ/Equity Growth PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, and the EQ/Mid Cap Value PLUS Portfolio.  MSIM is a sub-adviser to the EQ/Global Multi-Sector Equity Portfolio.  GAMCO is the sub-adviser to the EQ/GAMCO Small Company Value

Portfolio.  Wellington is a sub-adviser to EQ/Mid Cap Value PLUS Portfolio.  SSgA is the sub-adviser to the EQ/Intermediate Government Bond Index Portfolio. *See* the following table.

| AXA Fund | Adviser | Sub-Adviser(s) |
|---|---|---|
| EQ/Common Stock Index Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Equity Growth PLUS Portfolio | AXA Equitable | BlackRock Capital *and* BlackRock |
| EQ/Equity 500 Index Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Large Cap Value PLUS Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Global Multi-Sector Equity Portfolio | AXA Equitable | MSIM *and* BlackRock |
| EQ/Mid Cap Value PLUS Portfolio | AXA Equitable | Wellington *and* BlackRock |
| EQ/GAMCO Small Company Value Portfolio | AXA Equitable | GAMCO |
| EQ/Intermediate Government Bond Index | AXA Equitable | SSgA |

84.     As demonstrated in detail below, despite the fact that the sub-adviser(s) for each of the AXA Funds performed, with minor exceptions, all of the investment management services, each AXA Fund was still charged by, and paid to, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, a significant investment management fee, which substantially exceeded the investment management fees that were paid to each Fund's sub-adviser(s).

85.     The table below reflects the total investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,  LLC, for their alleged investment management services to each AXA Fund, and the total investment management fees paid to each AXA Fund's sub-adviser(s), for their investment management

services to each AXA Fund, for year ended December 31, 2010.

| AXA Fund | Advisor Agreement(s) | Net Paid AXA Equitable | Net Paid Sub-Adviser | Difference | Percent AXA Equitable's Fee Greater Than Sub-Adviser(s) |
|---|---|---|---|---|---|
| EQ/Common Stock Index Portfolio | Alliance-Bernstein | $14,520,160 | $2,421,062 | $12,099,098 | 599% |
| EQ/Equity 500 Index Portfolio | Alliance-Bernstein | $5,874,892 | $1,028,713 | $4,846,179 | 571% |
| EQ/Large Cap Value PLUS Portfolio | Alliance-Bernstein | $12,309,013 | $4,816,204 | $7,492,809 | 255% |
| EQ/Equity Growth PLUS Portfolio | BlackRock Capital and BlackRock | $6,673,982 | $2,385,935 | $4,288,047 | 279% |
| EQ/GAMCO Small Company Value Portfolio | GAMCO | $6,157,668 | $5,925,175 | $232,493 | 103% |
| EQ/Mid Cap Value PLUS Portfolio | BlackRock and Wellington | $7,704,381 | $2,841,598 | $4,862,783 | 271% |
| EQ/Global Multi-Sector Equity Portfolio | BlackRock and MSIM | $12,325,271 | $5,016,325 | $7,308,946 | 245% |

| EQ/Intermediate Government Bond Index Portfolio | SSgAS | $6,020,420 | $364,906 | $5,655,514 | 1649% |
| **TOTALS** | | **$71,585,787** | **$24,799,918** | **$46,785,869** | **288%** |

**The total investment management fee, with respect to all of the AXA Funds, paid in 2010, equals $96,385,705 (i.e., AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group LLC,'s investment management fee + the Sub-advisers investment management fee).**

86.     Thus, in 2010, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, investment management fees, on average, exceeded the fees paid to each Fund's sub-adviser by approximately 496%.  Further, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, received, in total, approximately 300% more in investment management fees than were paid to the AXA Funds' sub-advisers.

87.     AXA Equitable Life Insurance Company has even represented on its website that AXA Equitable Funds Management Group, LLC, "provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [9]   Further, while it alleges it is providing oversight services for its fee, these services are also presumably limited because, according to the sub-advisory agreements, it is the Fund's sub-advisers who "formulate and implement a continuous investment program for [each Fund]", which is the core investment management service needed for a mutual fund.

---

[9]     *See* "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html

88.     Below, lists the services provided by the AXA Funds' sub-advisers.

**(a)     Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Are Specific To Each Fund**

**1.     EQ/Common Stock Index Portfolio**

89.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Common Stock Index Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs, with minor exceptions, all of the investment management services for this fund.

90.     According to the February N-1A, with respect to the EQ/Common Stock Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [AllianceBernstein], which is responsible for the day-to-day management of the Portfolio's assets."

91.     With respect to this fund, the February N-1A and the April N-1A both state the following:

**Adviser: AllianceBernstein L.P. ('AllianceBernstein')**

**Portfolio Manager:** The member of the team that is primarily responsible for the management of the Portfolio is [listed is the name of an AllianceBernstein Senior Vice President]

92.     Under the terms of the AllianceBernstein Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  and AllianceBernstein, with respect to the EQ/Common Stock Index Portfolio, AllianceBernstein has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing

directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

93.     Furthermore, under the terms of the AllianceBernstein Agreement, in connection with performing, with minor exceptions,  all of the investment management services to the EQ/Common Stock Index Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

## 2.     EQ/Equity 500 Index Portfolio

94.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Equity 500 Index Portfolio,

however, the fund's sub-adviser, AllianceBernstein, performs, with minor exceptions, all of the investment management services for the fund.

95.   According to the February N-1A, with respect to the EQ/Equity 500 Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [AllianceBernstein], which is responsible for the day-to-day management of the Portfolio's assets."

96.   With respect to this fund, the February N-1A and the April N-1A both state the following:

**Adviser: AllianceBernstein L.P. ('AllianceBernstein')**

**Portfolio Manager:** [Listed is the name of an AllianceBernstein Senior Vice-President].

97.   Under the terms of the AllianceBernstein Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and AllianceBernstein, with respect to the EQ/Equity 500 Index Portfolio, AllianceBernstein has to, among other things,:  (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund

and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

98.     Furthermore, under the terms of the AllianceBernstein Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Equity 500 Index Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

### 3.     EQ/Large Cap Value PLUS Portfolio

99.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Large Cap Value PLUS Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs, with minor exceptions, all of the investment management services for this fund.

100.     According to the February N-1A, with respect to the EQ/Large Cap Value PLUS Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [AllianceBernstein], which are responsible for the day-to-day management of the Portfolio's assets."

101.    With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: AllianceBernstein L.P. ('AllianceBernstein')**
>
> **Portfolio Managers:** The members of the team are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of three AllianceBernstein Vice Presidents and two AllianceBernstein Senior Portfolio Managers ].
>
> **Portfolio Manager:** The Index Allocation Portion of the Portfolio is managed by: [listed is the name of an AllianceBernstein Senior Vice President].

102.    The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as a "Portfolio Managers" for the EQ/Large Cap Value PLUS Portfolio.  Although the AXA Funds' SEC filings explain the services that are performed by AllianceBernstein for the EQ/Large Cap Value PLUS Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

103.    Under the terms of the AllianceBernstein Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and AllianceBernstein, with respect to the EQ/Large Cap Value PLUS Portfolio, AllianceBernstein has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company

and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing

basis, of all material facts concerning the investment and reinvestment of the assets of the fund

and to make presentations of other information that either the Board or AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically

request; and (v) provide material performance information, records and supporting

documentation about accounts AllianceBernstein manages, which have investment objectives,

policies and strategies that are substantially similar to those employed by AllianceBernstein in

managing the fund, to allow the fund to present information concerning AllianceBernstein's

prior performance in the fund's SEC filings.

104.    Furthermore, under the terms of the AllianceBernstein Agreement, in connection

with performing , with minor exceptions, all of the investment management services to the

EQ/Large Cap Value PLUS Portfolio, AllianceBernstein must also provide the following at its

own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of

any personnel required to perform the services listed in the subadvisory agreement and (ii) all

administrative facilities, including bookkeeping, and all equipment necessary for it to carry out

the services it is required to perform under the AllianceBernstein Agreement.

### 4.     EQ/Equity Growth PLUS Portfolio

105.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, serve as the investment adviser to the EQ/Equity Growth PLUS

Portfolio, however, the fund's sub-advisers, BlackRock Capital and BlackRock, perform, with

minor exceptions,  all of the investment management services for this fund.

106.    According to the February N-1A, with respect to the EQ/Equity Growth PLUS

Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [BlackRock

Capital and  BlackRock], which are responsible for the day-to-day management of the

Portfolio's assets."

107.    With respect to this fund, the February N-1A and the April N-1A both state the

following:

> **Adviser: BlackRock Capital Management, Inc.**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of "BlackRock, Inc." (which is an affiliate of BlackRock Capital)].
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of BlackRock].

108.    The February N-1A and the April N-1A also provide that three AXA Equitable

employees are also listed as "Portfolio Managers" for the EQ/Equity Growth PLUS Portfolio.

Although the AXA Funds' SEC filings explain the services that are performed by BlackRock

Capital and BlackRock for the EQ/Equity Growth PLUS Portfolio, there are no disclosures

regarding the services performed, if any, by these three AXA Equitable employees on behalf of

this fund.

109.    As stated above, both BlackRock Capital and BlackRock serve as the sub-

advisers to the EQ/Equity Growth PLUS Portfolio.  The BlackRock Capital Agreement and the

BlackRock Agreement entered into between AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC, and BlackRock Capital and BlackRock,

respectively, on behalf of this fund, contain the same material terms regarding the services that

each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock

Capital Agreement and the BlackRock Agreement, with respect to the EQ/Equity Growth PLUS

Portfolio, BlackRock Capital and BlackRock have to, among other things,: (i) formulate and

implement a continuous investment program for the fund; (ii) take "whatever" steps are

necessary to implement the investment program for the fund by arranging for the purchase and

sale of securities and other investments, including issuing directives to the administrator of the

trust as necessary for the appropriate implementation of the investment program of the fund; (iii)

obtain and evaluate the necessary economic, statistical and financial data with respect to the

securities that are included in the fund or those that are under consideration for inclusion; (iv)

keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts

concerning the investment and reinvestment of the assets of the fund and to make presentations

of other information that either the Board or AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide

material performance information, records and supporting documentation about accounts

BlackRock Capital and BlackRock manage, which have investment objectives, policies and

strategies that are substantially similar to those employed by BlackRock Capital and BlackRock

in managing the fund, to allow the fund to present information concerning BlackRock Capital

and BlackRock's prior performance in the fund's SEC filings.

     110.    Furthermore, under the terms of the BlackRock Capital Agreement and the

BlackRock Agreement, in connection with performing, with minor exceptions, all of the

investment management services to the EQ/Equity Growth PLUS Portfolio, BlackRock Capital

and BlackRock must also provide the following at their own expense: (i) all necessary facilities

and personnel, including salaries, expenses and fees of any personnel required to perform the

services listed in the subadvisory agreement and (ii) all administrative facilities, including

bookkeeping, and all equipment necessary for it to carry out the services it is required to perform

under the BlackRock Capital Agreement and the BlackRock Agreement.

### 5.    EQ/Global Multi-Sector Equity Portfolio

111.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, serves as the investment adviser to the EQ/Global Multi-Sector

Equity Portfolio, however, the fund's sub-advisers, BlackRock and MSIM, perform, with minor

exceptions, all of the investment management services for this fund.

112.    According to the February N-1A, with respect to the EQ/Global Multi-Sector

Equity Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below

[MSIM and BlackRock], which are responsible for the day-to-day management of the Portfolio's

assets."

113.    With respect to this fund, the February N-1A and the April N-1A both state the

following:

>   **Adviser: Morgan Stanley Investment Management Inc. ('MSIM')**
>
>   **Portfolio Managers**: The members of the team that are jointly and primarily
>   responsible for the management of the Active Allocated Portion of the Portfolio
>   are: [listed are the names of Managing and Executive Directors of MSIM]
>
>   **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
>   **Portfolio Managers:** The Members of the team that are jointly and primarily
>   responsible for the management of the Index Allocated Portion of the Portfolio
>   are: [listed are the names of Managing Directors of BlackRock].

114.    The February N-1A and the April N-1A also provide that three AXA Equitable

employees are also listed as "Portfolio Managers" for the EQ/Global Multi-Sector Equity

Portfolio.  Although the AXA Funds' SEC filings explain the services that are performed by

BlackRock and MSIM for the EQ/Global Multi-Sector Equity Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

115.    As stated above, both BlackRock and MSIM serve as the sub-advisers to the EQ/Global Multi-Sector Equity Portfolio.  The BlackRock Agreement and the MSIM Agreement entered into between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and BlackRock and MSIM, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Agreement and the MSIM Agreement, with respect to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock and MSIM manage, which have investment

objectives, policies and strategies that are substantially similar to those employed by BlackRock and MSIM in managing the fund, to allow the fund to present information concerning BlackRock and MSIM's prior performance in the fund's SEC filings.

116.    Furthermore, under the terms of the BlackRock Agreement and the MSIM Agreement, in connection with performing, with minor exceptions,  all of the investment management services to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the BlackRock Agreement and the MSIM Agreement.

### 6.    EQ/GAMCO Small Company Value Portfolio

117.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/GAMCO Small Company Value Portfolio, however, the fund's sub-adviser, GAMCO, performs, with minor exceptions, all, of the investment management services for this fund.

118.    According to the February N-1A, with respect to the EQ/GAMCO Small Company Value Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [GAMCO], which is responsible for the day-to-day management of the Portfolio's assets."

119.    With respect to this fund, the February N-1A and the April N-1A both state the following:

**Adviser: GAMCO Asset Management, Inc. ('GAMCO')**

**Portfolio Manager:** [Listed is the name of GAMCO's Chief Executive Officer

and Chief Investment Officer].

120.    Under the terms of the GAMCO Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and GAMCO, with respect to the EQ/GAMCO Small Company Value Portfolio, GAMCO has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts GAMCO manages, which have investment objectives, policies and strategies that are substantially similar to those employed by GAMCO in managing the fund, to allow the fund to present information concerning GAMCO's prior performance in the fund's SEC filings.

121.    Furthermore, under the terms of the GAMCO Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/GAMCO Small Company Value Portfolio, GAMCO must also provide the following at its

own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the GAMCO Agreement.

### 7.     EQ/Mid Cap Value PLUS Portfolio

122.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Mid Cap Value PLUS Portfolio, however, the fund's sub-advisers, BlackRock and Wellington, perform, with minor exceptions, all of the investment management services for this fund.

123.    According to the February N-1A, with respect to the EQ/Mid Cap Value PLUS Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [BlackRock and Wellington], which are responsible for the day-to-day management of the Portfolio's assets."

124.    With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: Wellington Management Company, LLP ('Wellington')**
>
> **Portfolio Managers:** The Active Allocated Portion of the Portfolio is management by: [listed is the name of a Wellington Senior Vice President]
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers:** The members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio is managed by: [listed are the names of Managing Directors of BlackRock]

125.    The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as "Portfolio Managers" for the EQ/Mid Cap Value PLUS Portfolio. Although the AXA Funds' SEC filings explain the services that are performed by BlackRock

and Wellington for the EQ/Mid Cap Value PLUS Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

126.    As stated above, both BlackRock and Wellington serve as the sub-advisers to the EQ/Mid Cap Value PLUS Portfolio.  The BlackRock Agreement and the Wellington Agreement entered into between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and BlackRock and Wellington, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Agreement and the Wellington Agreement, with respect to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock and Wellington manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock

and Wellington in managing the fund, to allow the fund to present information concerning

BlackRock and Wellington's prior performance in the fund's SEC filings.

127.   Furthermore, under the terms of the BlackRock Agreement and the Wellington

Agreement, in connection with performing, with minor exceptions,  all of the investment

management services to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington

must also provide the following at their own expense: (i) all necessary facilities and personnel,

including salaries, expenses and fees of any personnel required to perform the services listed in

the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all

equipment necessary for it to carry out the services it is required to perform under the BlackRock

Agreement and the Wellington Agreement.

### 8.      EQ/Intermediate Government Bond Index Portfolio

128.   AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, serves as the investment adviser to the EQ/Intermediate Government

Bond Index Portfolio, however, the fund's sub-adviser, SSgA, performs, with minor exceptions,

all of the investment management services for this fund.

129.   According to the February N-1A, with respect to the EQ/Intermediate

Government Bond Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser

listed below [SSgA], which is responsible for the day-to-day management of the Portfolio's

assets."

130.    With respect to this fund, the February N-1A and the April N-1A both state the

following:

> **Adviser: SSgA Funds Management, Inc. ('SSgA FM')**
>
> **Portfolio Manager:** The members that are jointly and primarily responsible for

the management of the Portfolio are: [listed is the name of a Managing Director of SSgA  and one of its Vice Presidents][5]

131.    Under the terms of the SSgA Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and SSgA, with respect to the EQ/Intermediate Government Bond Index Portfolio, SSgA has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts SSgA manages, which have investment objectives, policies and strategies that are substantially similar to those employed by SSgA in managing the fund, to allow the fund to present information concerning SSgA's prior performance in the fund's SEC

---

[5]      On August 16, 2011, AXA Equitable filed another N-1A filing, which contains disclosure related to the EQ/Intermediate Government Bond Index Portfolio.  This filing states that with respect to this fund, Defendant AXA Equitable Funds Management Group, LLC, manages the fund's "ETF [exchange traded funds] investments."  This statement is not in the February or April N-1A filings.

filings.

132.     Furthermore, under the terms of the SSgA Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Intermediate Government Bond Index Portfolio, SSgA must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the SSgA Agreement.

**(b)     Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Apply Equally To All Funds**

133.     The May 1, 2011 SAI provides that AXA Equitable (as the investment manager to the AXA Funds) has "entered into one or more Advisory Agreements on behalf of each Portfolio", which "obligate the Advisers [*i.e.*, the sub-advisers] to": (i) "make investment decisions on behalf of their respective Portfolios (or portions thereof) [i.e., each of the AXA Funds]"; (ii) "place all orders for the purchase and sale of investments for their respective Portfolios (or portions thereof) with brokers or dealers selected by [AXA Equitable] and/or the Advisers"; and (iii) "perform certain related administrative functions in connection therewith."

134.     The Advisors Trust Annual report, with respect to the  AXA Funds' Annual Report dated December 31, 2010 ("December 31, 2010 Annual Report"), further provides that each sub-adviser: (i) "independently chooses and maintains a portfolio of securities for the Portfolio and each is responsible for investing a specific allocated portion of the Portfolio's assets" and (ii) is obligated pursuant to the Advisory Agreements to "continually furnish investment programs for the Portfolio."

135.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fee schedule varies for each of the AXA Funds.  Each Fund (through the Advisors Trust)  pays an investment management fee to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, which then subcontract with AllianceBernstein, BlackRock Capital, BlackRock, MSIM, Wellington, GAMCO and SSgA at a fraction of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee.

136.    In 2010 alone, AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, were paid $71,585,787 in investment management fees from the AXA Funds at issue in this Amended Complaint for allegedly providing minimal management services that were predominately supervisory in nature to the Funds, while the sub-advisers collectively were paid $24,799,918 in investment management fees, despite the fact that the sub-advisers performed, with minor exceptions, all of the investment management services to the AXA Funds (*see* Table,¶85).  This is a clear breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fiduciary duties and a violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).[6]

137.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Common Stock Index Portfolio by 599%.  AXA Equitable

---

[6]    On information and belief, with respect to each of the AXA Funds, for the 2011 calendar year, the amount of investment management fees that will be paid to AXA Equitable and the investment management fees that will be paid to each Fund's sub-adviser(s), will not be materially different than the 2010 values.

Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Equity 500 Index Portfolio by 571%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Large Cap Value PLUS Portfolio by 255%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Equity Growth Plus Portfolio by 279%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/GAMCO Small Company Value Portfolio by 103%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value PLUS Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value Plus Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Global Multi-Sector Equity Portfolio by 245%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Intermediate Government Bond Index Portfolio by 1649%. The average amount (in percentage terms) by which AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC's, investment

management fee exceeds that of the Funds' sub-adviser(s) is 496% (*see* Table ¶85)

138.    Pursuant to th IMA (a copy of which AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, filed with the Court on October 17, 2011 (Docket No. 11-5))[7], AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, as the AXA Funds' investment manager, allege/claim, they perform, for their  investment management fees, the following services:

> Subject always to the direction and control of the Trustees of the Trust, Manager [*i.e., AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC*] will have (i) overall supervisory responsibility for the general management and investment of each Portfolio's assets; (ii) full discretion to select new or additional Advisers [*i.e., sub-adviser*] for each Portfolio [*i.e., AXA Fund*]; (iii) full discretion to enter into and materially modify existing Advisory Agreements [*i.e., sub-advisory agreements*] with Advisers; (iv) full discretion to terminate and replace any Adviser; and (v) full investment discretion to make all determinations with respect to the investment of a Portfolio's assets not then managed by an Adviser. In connection with Manager's responsibilities herein, Manager will assess each Portfolio's investment focus and will seek to implement decisions with respect to the allocation and reallocation of each Portfolio's assets among one or more current or additional Advisers from time to time, as the Manager deems appropriate, to enable each Portfolio to achieve its investment goals. In addition, Manager will monitor compliance of each Adviser with the investment objectives, policies and restrictions of any Portfolio or Portfolios (or portions of any Portfolio) under the management of such Adviser, and review and report to the Trustees of the Trust on the performance of each Adviser. Manager will furnish, or cause the appropriate Adviser(s) to furnish, to the Trust such statistical information, with respect to the investments that a Portfolio (or portions of any Portfolio) may hold or contemplate purchasing, as the Trust may reasonably request. On Manager's own initiative, Manager will apprise, or cause the appropriate Adviser(s) to apprise, the Trust of important developments materially affecting each Portfolio (or any portion of a Portfolio that they advise) and will furnish the Trust, from time to time, with such information as may be appropriate for this purpose. Further, Manager agrees to furnish, or cause the appropriate Adviser(s) to furnish, to the Trustees of the Trust such periodic and special reports as the Trustees of the Trust may reasonably request. In addition, Manager agrees to cause the appropriate Adviser(s) to furnish to third-party data reporting services all currently

---

[7]Through the inclusion of the text of the IMA, which the Defendants filed with this Court, Plaintiff is in no way conceding that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, actually provide the alleged services contained in it.

available standardized performance information and other customary data.

139.     Thus the services AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, allegedly provide to the AXA Funds pursuant to the IMA are all predominantly oversight/supervisory services.

140.     AXA Equitable Life Insurance Company has even represented on its website that AXA Equitable Funds Management Group, LLC, "provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [9]   Further, while it alleges it is providing oversight services, these services are also presumably limited because, according to the sub-advisory agreements, it is the Fund's sub-adviser who "formulate and implement a continuous investment program for [each Fund]", which is the core investment management service needed for a mutual fund.

141.     Further, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, supervisory role is also presumably limited given that the Advisors Trust's Board is charged with the substantial supervision of the Funds.  According to the May 1, 2011 SAI, "the Trust's Board is responsible for the overall management of the Trust and the Portfolios, including general supervision and review of the Portfolios' investment activities and their conformity with federal and state law as well as the stated policies of the Portfolios. The Board elects the officers of the Trust who are responsible for administering the Trust's day-to-

---

[9]     *See* "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html

day operations."

142.    If AXA Equitable Life Insurance Company and/or AXA Equitable  Funds

Management Group, LLC, performed all of the alleged services listed in the IMA at ¶138, for

each AXA Fund, if the fees charged for these alleged services were the product of arm's length

bargaining, they should have been, for each AXA Fund, much smaller than the fees charged by

each  Fund's sub-adviser(s), in light of the substantial investment management services the sub-

advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.

However, on average AXA Equitable Life Insurance Company's and/or AXA Equitable Funds

Management Group, LLC's, investment management fee was 496% times greater than the fee

paid to the sub-advisers, and in all cases, their investment management fees charged to each

AXA Funds exceeded the fee paid to the sub-advisers (and in most cases that excess is

significant and up to 1649%).

143.    By comparison to the services AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC, claims to provide, all of the sub-advisory

agreements, as stated above, require the following investment management services from the

sub-advisers (all at their own expense): (i) formulate and implement a continuous investment

program for the fund; (ii) take "whatever" steps are necessary to implement the investment

program for the fund by arranging for the purchase and sale of securities and other investments,

including issuing directives to the administrator of the trust as necessary for the appropriate

implementation of the investment program of the fund; (iii) obtain and evaluate the necessary

economic, statistical and financial data with respect to the securities that are included in the fund

or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in

writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts the sub-adviser manages, which have investment objectives, policies and strategies that are substantially similar to those employed by the sub-adviser in managing the particular AXA Fund, to allow the AXA Fund to present information concerning the sub-adviser's prior performance in the fund's SEC filings.

144.    Thus, a comparison of (A) the fees paid to the AXA Fund's sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged minor amount of investment management services, reflects that a substantial portion of the investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their investment management services were so disproportionately large that they bore no reasonable relationship to the services they rendered and could not have been the product of an arm's-length bargaining and thus in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

145.    On information and belief, the fee practices associated with the AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, excessive fees have been ongoing for the entire time period applicable to Plaintiff's claims.

146.    In light of the foregoing, the nature and quality of the investment management services performed by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were minimal because with minor exceptions, all of the services

needed for each AXA Fund were provided by each AXA Fund's sub-adviser.

147.    Plaintiff Sivolella, on behalf of the AXA Funds and/or the Advisors Trust, is entitled to recover a substantial portion of the investment management fees received (continued to be received) by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, in breach of their fiduciaries duty under ICA § 36(b), 15 U.S.C. § 80a-35(b) to the AXA Funds and/or Advisors Trust.

**B.      THE ECONOMIES OF SCALE ENJOYED IN CONNECTION WITH THE INVESTMENT MANAGEMENT SERVICES WERE NOT PASSED ON TO THE PLAINTIFF AND OTHER SECURITY HOLDERS OF THE AXA FUNDS AS REQUIRED BY ICA §  36(b), 15 U.S.C. § 80a-35(b), BUT WERE KEPT BY AXA EQUITABLE LIFE INSURANCE COMPANY AND AXA EQUITABLE FUNDS MANAGEMENT GROUP LLC, IN VIOLATION OF THEIR FIDUCIARY DUTIES**

148.    The  legislative  history  of ICA § 36(b), 15 U.S.C. § 80a-35(b),  recognizes  that an  investment  adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on  the part of some fund managers  to reduce  their effective charges as the fund  grows in size.  Accordingly, the best industry practice will  provide  a guide.

*S. Rep. No. 91-184*, at 5-6 (1969), as reprinted in *1970 U.S. Code Cong. & Ad. News*, at 4901-02.

149.    The amount of the compensation received by the investment adviser should be evaluated in context with the economies of scale realized by a fund.  Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase

proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

*Unconventional Success: A Fundamental Approach to Personal Investment*, David Swensen, Free Press (2005), p. 238. "The intrinsic characteristics of the mutual-fund...suggest that economies of scale should lead to lower fees as assets under management [i.e., the amount people invest in a fund] increase." *Id.* at 237. Economies of scale with respect to a mutual fund exist, and are available to be passed along to the fund's investors, because "investment management efforts...do not increase along with portfolio size." *Id.* at 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.*

150.    On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur on both the fund complex and portfolio level for various costs incurred. Moreover, fixed costs are spread over more assets as a fund grows in size.

151.    Indeed, investment management organizations can realize economies of scale from increased assets within a particular mutual fund and from increased total assets in all mutual funds under management.

152.    As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and is charged a fee of 75 basis points (100 basis points = 1%; 1 basis point equals 1/100th of a percent), the fee equals $375,000 per year. A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of

three million seven hundred and fifty thousand dollars ($3,750,000).  Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

153.    As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale.  In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund.  In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale.  Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added because of a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

154.    The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.  *See SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses* (Dec. 2000), at 30-31;  GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000) ("GAO Report"), at 9.  The GAO has estimated as much as 64% of mutual fund asset growth has been the result of market appreciation rather than additional purchases of new shares of a fund.  *Id.*

155.    Economies of scale exist not only fund by fund but also exist with respect to an

entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients. *See John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,* 26 J. CORP. L. 610, at 621 n. 62 (2001) (the "Freeman & Brown Study") (citing Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 BUS. LAW 107 (1993))

156.    As fund portfolios grow, they quickly create economies of scale and eventually the incremental cost of servicing additional assets approaches zero.  As the GAO confirms, it is possible for the adviser to service the additional assets with zero additional costs.  *See* GAO Report, at 9 (noting that growth from portfolio appreciation is unaccompanied by costs).

157.    Although significant economies of scale exist for each of the AXA Funds, the associated cost savings largely have been appropriated for the benefit of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, rather than being shared with the AXA Funds of their investors.  The economies-of-scale benefits that have been captured and misappropriated by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, can and have generated huge unreasonable and excessive, undeserved profits for AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, in breach of their fiduciary duties  with respect to such compensation.

158.    Management fees received by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, are paid as a varying percentage of assets under management.  Some of the AXA Funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase.  The fees vary based on the amount of assets under management, and are reduced as the total amount of

assets under management increase.  *See* the following table.

## AXA FUNDS' FEE BREAKPOINT SCHEDULE
### ("M" refers to "Million" and "B" refers to "Billion")

| AXA Fund | Investment Advisory Agreement(s) | AXA Equitable 's Fee Schedule (annual rate based on average daily net assets) | Sub-Advisor Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|---|
| EQ/Common Stock Index Portfolio | AllianceBernstein | All Assets – 0.350% | All Assets – 0.050% |
| EQ/Equity 500 Index Portfolio | AllianceBernstein | All Assets – 0.250% | First $1 billion – 0.050% Over $1B – 0.030% |
| EQ/Large Cap Value PLUS Portfolio | AllianceBernstein | First $2 billion – 0.500% Next $1 billion – 0.450% Next $3 billion – 0.425% Next $5 billion – 0.400% Thereafter – 0.375% | First $100 million – 0.490% Next $100 million – 0.300% Over $200M – 0.250% |
| EQ/ Intermediate Government Bond Index Portfolio | SSgA | All Assets – 0.350% | First $2 billion – 0.02% Over $2B – 0.015% |
| EQ/Equity Growth PLUS Portfolio | BlackRock Capital | First $2 billion – 0.500% Next $1 billion – 0.450% Next $3 billion – 0.425% Next $5 billion – 0.400% Thereafter – 0.375% | First $100 million – 0.400% $100M to $300M– 0.375% $300M to $500M – 0.350% $500M to $1B – 0.325% Over $1B – 0.300% |
| EQ/Equity Growth PLUS Portfolio | BlackRock | First $2 billion – 0.500% Next $1 billion – 0.450% Next $3 billion – 0.425% Next $5 billion – 0.400% Thereafter – 0.375% | First $5 billion – 0.075% $5B to $10B – 0.055% Over $10B – 0.050% |

| EQ/GAMCO Small Company Value Portfolio | GAMCO | First $400 million – 0.800%<br>Next $400 million – 0.750%<br>Thereafter – 0.700% | First $1 billion – 0.400%<br>Over $1B – 0.300% |
|---|---|---|---|
| EQ/Mid Cap Value PLUS Portfolio | BlackRock | First $2 billion – 0.550%<br>Next $1 billion – 0.500%<br>Next $3 billion – 0.475%<br>Next $5 billion – 0.450%<br>Thereafter – 0.425% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
| EQ/Mid Cap Value PLUS Portfolio | Wellington | First $2 billion – 0.550%<br>Next $1 billion – 0.500%<br>Next $3 billion – 0.475%<br>Next $5 billion – 0.450%<br>Thereafter – 0.425% | First $150 million – 0.550%<br>Over $150M – 0.450% |
| EQ/Global Multi-Sector Equity Portfolio | BlackRock | First $1 billion – 0.750%<br>Next $1 billion – 0.700%<br>Next $3 billion – 0.675%<br>Next $5 billion – 0.650%<br>Thereafter – 0.625% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
| EQ/Global Multi-Sector Equity Portfolio | MSIM | First $1 billion – 0.750%<br>Next $1 billion – 0.700%<br>Next $3 billion – 0.675%<br>Next $5 billion – 0.650%<br>Thereafter – 0.625% | First $100 million – 1.00%<br>$100M to $400M – 0.800%<br>$400M to $500M – 0.600%<br>Over $500M – 0.400% |

159.    This fee structure, known as "breakpoints," implicitly recognizes the economies

of scale and gives the appearance that the AXA Funds share in those benefits. A fee breakpoint

has been explained as follows:

> Many funds employ a declining rate structure in which the
> percentage fee rate decreases in steps or at designated breakpoints
> as assets increase.   The declining rate schedule reflects the
> expectation  that  costs  efficiencies or scale economies will be
> realized in the management and administration of the fund's
> portfolio and operations as the fund grows.

*See Freeman & Brown Study*, at 620, n. 59.

160.    Economies of scale can be passed on to and shared with the mutual funds as  assets increase if management fee breakpoints are installed at higher asset levels (but at asset levels that are reachable), or if lower asset based investment advisory fees are adopted  by  the management company in response to increases in the overall level of assets under management.

161.    The benefits achieved by the AXA Funds' economies of scale can and should have been shared with their security holders by reducing the management fees that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charge the security holders of the AXA Funds.

162.    In the case of AXA Funds, however, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has failed to share any meaningful savings with the AXA Funds or their investors.  While AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for five of the AXA Funds at issue, had investment management fee breakpoints installed, (*see* Table ¶158)  these breakpoints are generally meaningless, because as a practical matter, they did not pass on the economies of scale. The mere existence of breakpoints does not mean that economies of scale are adequately passed along, they are only meaningful if a breakpoint is, and can be feasibly, reached.

163.    Indeed, the breakpoints are designed by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to benefit themselves rather than  the AXA Funds and investments into them.  The initial breakpoints are set too high, the breakpoints are spaced too far apart, and the reductions made at breakpoints are far too small, thereby depriving Plaintiff Sivolella, and the other security holders of the AXA Funds, of the benefits of

the economies of scale created by the contribution of their capital to the AXA Funds.

164.    For instance, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has negotiated a breakpoint schedule with AllianceBernstein, the sub-adviser for the EQ/Large Cap Value PLUS Portfolio, by which AllianceBernstein grants fee reductions to the Defendants at levels starting at $100 million in assets under management. *See* Table ¶158.  Conversely, the breakpoint schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charges to this AXA Fund (and the breakpoint schedule that is applicable to Plaintiff) does not even start until $2 billion. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has also negotiated a breakpoint schedule with Wellington, the sub-adviser for the EQ/Mid Cap Value PLUS Portfolio, by which Wellington grants fee reductions at levels starting at $150 million in assets under management.  However, the breakpoint schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charges to this fund does not even start until $2 billion.  Similarly, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has also negotiated a breakpoint schedule with BlackRock Capital, the sub-adviser for the EQ/Equity Growth PLUS Portfolio, by which BlackRock Capital grants fee reductions at levels starting at $100 million in assets under management.  However, the breakpoint schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charges to this Fund does not even start until $2 billion. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has also negotiated a breakpoint schedule with MSIM, the sub-adviser for the EQ/Global Multi-Sector Equity Portfolio, by which MSIM grants fee reductions at levels starting at $100 million in assets under management.  However, the breakpoint schedule

that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charges to this AXA Fund does not even start until $1 billion.  Therefore, if AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, management fee breakpoints were negotiated at arms-length, they would be no higher than $150 million.

165.     Even if AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, performed all of  the investment management services it claims to have provided for the AXA Funds, a large portion of those services are fixed in costs, which would result in lower breakpoints than those of the sub-advisers.

166.     In addition, the lack of investment management fee breakpoints for the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, further illustrate that the economies-of-scale savings were not passed to these funds and their investors. The investment advisory fees charged to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio, and the EQ/Intermediate Government Bond Index Portfolio, contain no breakpoints for increases in assets under management.

167.     Indeed, the .35% investment advisory fee (or 35 basis points) for the EQ/Common Stock Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, and the .25% investment management fee (or 25 basis points) for the EQ/Equity 500 Index Portfolio coupled with the lack of breakpoints, prevents these funds from ever realizing any economies of scale generated by their large size.  The lack of breakpoints is in striking contrast with the prevailing practice in the mutual fund industry.

168.     The degree of economies of scale that could be generated by, and then extended

to, the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, through a different fee structure has not been adequately considered by the Board of each of these funds.  This absence of fee breakpoints for these three funds should have been a red flag to the Board of these funds that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were taking the benefits of economies of scale rather than passing them on to these funds.

169.    Moreover, as assets under management have grown, the management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have grown dramatically, despite the economies of scale realized by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has not shared with the Plaintiff, and the AXA Funds the economies of scale it has gained from that growth.

170.    For example, for six of the AXA Funds (the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/Intermediate Government Bond Index Portfolio), from 2009 through 2010, the management fees for these funds increased significantly as their assets under management have grown, thereby confirming that the economies-of-scale savings realized from each fund's asset increase were not shared with Plaintiff Sivolella and the AXA Funds.

171.    Given that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, provided (allegedly) minimal investment management services to the AXA Funds (especially when compared to the sub-advisers investment management services), any economies-of-scale-benefits enjoyed by AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC, have not been, and could not have been, adequately shared with the AXA Funds, as required by § 36(b), 15 U.S.C. § 80a-35(b), in breach of AXA Equitable  Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, fiduciary duty to the AXA Funds with respect to such compensation.

### C.   THE AXA FUNDS' BOARD OF TRUSTEES WAS NOT ACTING INDEPENDENTLY AND CONSCIENTIOUSLY IN APPROVING THE INVESTMENT MANAGEMENT AGREEMENT

172.    In *Jones*, the Supreme Court adopted a fiduciary duty standard for ICA § 36(b), 15  U.S.C. § 80a-35(b), that requires both a fair outcome and good faith in the negotiation process. 130 S.Ct. at 1427.  Fund directors have a fiduciary duty to mutual funds and to their shareholders (who individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's length.

173.    Congress has fortified fund directors' oversight responsibilities by adopting ICA § 15(c), 15 U.S.C. § 80a-15(c), which requires directors to be adequately informed of the terms of any investment management contracts.

174.    ICA § 15(c), 15 U.S.C. § 80a-15(c), requires investment advisers to furnish documents and other information so that fund directors can make informed and independent decisions when evaluating investment advisory contracts. This section also gives directors the authority to demand such information from advisers.  *Id.*

175.    When AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, start a new mutual fund, they not only contract to provide all the services each fund needs, they also nominate and elect the members of the fund's board

(including all "independent"[10] board members).

176.     Each of the AXA Funds is governed by a Board of Trustees.  The Board of each AXA Fund is currently is comprised of the same 8 Trustees.  One of the Trustees is considered to be an "interested" board member, while the remaining seven are classified as "disinterested" board members.

177.     The 8 individuals that serve as the Board of Trustees to each of the AXA Funds, also simultaneously serve on the Boards of 56 other AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, sponsored funds.

178.     Public disclosure for all of the Board members, except for one, reveals that they are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component.  For the fiscal year ending December 31, 2010, according to publicly-available information, the Board members for the AXA Funds received total compensation in the following amounts:

| | |
|---|---|
| Theodossios Athanassiades | $215,000 |
| Jettie M. Edwards | $240,625 |
| David W. Fox | $245,000 |
| William M. Kearns, Jr. | $215,000 |
| Christopher P.A. Komisarjevsky | $226,250 |
| Harvey Rosenthal | $215,000 |
| Gary S. Schpero | $215,000 |
| Steven J. Joenk | $000,000 |

179.     Steven M. Joenk is the "interested" director by virtue of his current position as an AXA Equitable Life Insurance Company executive, and presumably, he is compensated separately for his services as an executive.

---

[10]     "Independent" board members are those who are not "interested persons" as defined under the 1940 Act.  *See* ICA § 2(a)(19), 15 U.S.C. § 80a-2(a)(19).

180.     As detailed below, the Board failed to act conscientiously by continuing to approve a substantial portion of the investment management fees that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to, and received from, the Plaintiff/ the AXA Funds, but did not pay to the sub-advisers of the AXA Funds.  The fee-setting process undertaken by the Board lacked the requisite integrity, care and good faith and was, therefore, defective.

181.     The Board has a separate and distinct fiduciary duty to each AXA Fund to enter into serious and substantive negotiations with respect to all fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.  *See* Am. Bar. Ass'n, *Fund Director's Guidebook* (2d ed. 2003), at 10 ("Although there are areas of common interest among the funds, the directors must exercise their specific board responsibilities on a fund-by-fund basis.").  Correspondingly, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has a reciprocal fiduciary duty to each mutual fund under its management to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond to fees that would be charged in an arm's length negotiation.

182.     Annually, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, must obtain the approval of the Trustees for the investment management fee it seeks to charge each AXA Fund.

183.     The seven independent or "non-interested" Trustees are supposed to be "watchdogs" for the AXA Funds' shareholders.  However, since the same Trustees are charged with, at a minimum, 56 other AXA sponsored funds, regardless of the dedication, sophistication, and the individual educational and business qualifications of the independent members of the

Board of Trustees of the AXA Funds, some of whom are otherwise fully employed in demanding positions of responsibility, the amount of documentation that must be reviewed for each meeting would be daunting if the Trustees were to look at each fund individually.

184.     Furthermore, even if statutorily "non-interested," the Trustees are in all practical respects dominated and unduly influenced by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, in reviewing the fees paid by the AXA Funds and their shareholders. The Trustees' continuation in the role of an independent Trustee from year-to-year, and the compensation they earn, is at least partially dependent on the continued good will and support of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

185.     The Board does not hold separate meetings for each mutual fund.  Instead, upon information and belief, the Board's practice has been to consider all funds at one time.  The Board approved the investment management fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, requested, with respect to each of the AXA Funds, over a two day period.  During this same two day period, the same 8 individuals that compose the Board of each of the AXA Funds also approved, at a minimum, the investment management fees for an additional 56 AXA sponsored funds.

186.     A truly independent board of trustees acting conscientiously would not have tolerated the investment management fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, if they had obtained adequate information regarding, among other things: (1) the magnitude of the sub-advisers' investment management services and their fees; (2) the amount/type of investment management services AXA Life Insurance Company and/or AXA Equitable Funds Management Group provided for

their fee;  (3) the economies of scale enjoyed by AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC; and (4) the profitability of the AXA Funds to

AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,

LLC.

187.    The Board failed to act conscientiously  by continuing to approve a substantial

portion of the investment management fees that AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC, charged to the AXA Funds, but did not pay to

the sub-advisers of each of the AXA Funds.

188.    The Advisory Agreements, which were accessible to the Board, reveal that the

sub-advisers rendered, with minor exceptions,  all of the investment management services for the

AXA Funds.  Thus, the Board was not acting conscientiously when it approved investment

management fees for AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, that were at a minimum 103%, and at a maximum 1649%, of the fees

that were paid to the AXA Funds' sub-advisers (and on average AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee

was 496% greater than the fee paid to the AXA Funds' sub-advisers).

189.    In light of the fact that the documents which revealed that the sub-advisers to

AXA Funds performed, with minor exceptions, all of the investment management services for

these funds, were publically available, the Board knew, or should have known, that it was

approving a grossly excessive investment management fee for AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC .

190.    The Board therefore violated its fiduciary responsibilities when it approved a

substantial portion of the investment management fees AXA Equitable Life Insurance Company

and/or AXA Equitable Funds Management Group, LLC, charged to the AXA Funds, but did not pay to the AXA Funds' sub-advisers.

191.     As further evidence that the Board was not acting conscientiously when it approved AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fees, with respect to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, it failed to require AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to install breakpoints with respect to its investment advisory fees, which is in striking contrast with the prevailing practice in the mutual fund industry.

192.     When AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, proposed a fee structure to the Board of Trustees with respect to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, that lacked breakpoints, that should have been a red flag to the Board that AXA Equitable was not passing on economies-of-scale savings to these two funds.

193.     As a result of the foregoing acts, the Board did not  act conscientiously and fulfill its fiduciary duty when it approved a substantial portion of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fees, with respect to each of the AXA Funds. The Board's lack of conscientiousness resulted in fees that constitute a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fiduciary duty under ICA § 36(b), 15  U.S.C. § 80a-35(b), to the AXA Funds with respect to such compensation.

### D.     THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT

### MANAGEMENT SERVICES DID NOT JUSTIFY AXA EQUITABLE'S EXCESSIVE FEE

194.    "The 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See Freeman & Brown Study,* at 627-28.  The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.

195.    Following discovery, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, true profitability can be determined on either an incremental basis or a full-cost basis.  AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, in light of the services they provide, incremental costs of providing those management services to the Plaintiff, and other shareholders of the AXA Funds, should be nominal while the additional fees received by them are unreasonable and grossly excessive. This is especially true because the sub-advisers to the AXA Funds perform the substantial investment management service they are responsible for at their own expense, but are compensated with much lower investment management fees  than are AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

196.    The table in Paragraphs 85 and 158 show the investment management fee schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to each of the AXA Funds as compared to the fee schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, pays the sub-advisers to whom they delegate, with minor exceptions, all of the investment management services needed by the AXA Funds.  These percentages translate into substantial fees when applied to the AXA Funds' assets.

197.     In 2010 alone, AXA Equitable Life Insurance Company and/or AXA Equitable

Funds Management Group, LLC, were paid $71,585,787 in investment management fees from

the AXA Funds at issue in this Amended Complaint for providing minimal management services

that were predominately supervisory in nature to the Funds, while the sub-advisers collectively

were paid $24,799,918 in investment management fees, despite the fact that the sub-advisers,

with minor exceptions, performed all of the investment management services to the AXA Funds.

*Id*. On average, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds

Management Group, LLC,  fees exceed the sub-advisers' fees by 496%.

198.     "[F]und managers ... routinely add a hefty 'premium' or 'monitoring fee' to the sub-

advisers' charge.  True, the sub-adviser may charge only 30 bps for its investment advice, but the

manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium'

before passing along the advisory charge to fund shareholders."  *See* John P. Freeman, Stewart L.

Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*,

61 OKLA. L. REV. 83, 113, n. 104 (2008).  Indeed, "overall fee levels for sub-advised funds are

substantially higher than for funds managed in-house."  *Id.* at 118.  As demonstrated above, AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, is

padding the bill by over $46 million dollars in fiscal year 2010 alone, for providing limited

investment management services that are supervisory in nature to the AXA Funds.

199.     Despite delegating, with minor exceptions, all of their investment management duties

to sub-advisers, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management

Group, LLC, receive an investment management fee that in all cases exceeds the fees paid to the

Funds' sub-adviser(s).  *See* Table ¶85.

200.     Put another way, the true cost of investment management services should generally

correlate to the fees (or at most minimally exceed) charged by AllianceBernstein, BlackRock Capital, BlackRock, MSIM, GAMCO, Wellington and SSgA.

201.     This sub-contracting arrangement led to fees that were substantially disproportionate to the services actually rendered and to enormous profits to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

202.     A substantial portion of these markups resulted in fees that could not be the product of negotiations conducted at arm's length and therefore constitute a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fiduciary duty to the AXA Funds with respect to the receipt of such compensation.

203.     Since the AXA Funds' sub-advisers were providing, with minor exceptions, all of the investment management services at their own expense to the AXA Funds, and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were providing minimal investment management services to the AXA Funds that were predominantly supervisory in nature, these Defendants were incurring only minimal expenses, and therefore a substantial portion of the fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to the AXA Funds that it did not pay to the sub-advisers were almost entirely in the form of profit to them and thus were necessarily so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

**E.     COMPARATIVE FEE STRUCTURES DEMONSTRATE THAT AXA EQUITABLE LIFE INSURANCE COMPANY AND/OR AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, CHARGED TO, AND RECEIVED FROM, THE AXA FUNDS EXCESSIVE INVESTMENT MANAGEMENT FEES THAT BREACHED THEIR FIDUCIARY DUTY**

204.     An analysis of the fees paid by AXA Equitable Life Insurance Company and/or AXA

Equitable Funds Management Group, LLC's, to the AXA Funds' sub-advisers demonstrates that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, are charging investment advisory fees to the AXA Funds that are much higher than what would have been charged had the fees been bargained for at arms-length. Thus, almost all of the fees that Defendants charge and receive from, the AXA Funds that are in excess of the fees Defendants pay to the AXA Funds' sub-advisers, violate their fiduciary duty with respect to the receipt of compensation.

205.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  hired sub-advisers for all of the AXA Funds that assumed the obligation of providing, with minor exceptions, all of the investment advisory services to their designated funds.  As each sub-adviser is a for-profit investment management company that negotiated its fee with AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC , the fees they charge provide a benchmark of the cost of the investment advisory services provided to the AXA Funds, presumably including a comfortable profit margin.  Compared to the fees charged by the sub-advisers who actually perform, with minor exceptions, all of the advisory services to the AXA Funds, the additional fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged investment management services to the AXA Funds are unjustified and excessive.

206.     While Plaintiff does not challenge the fees paid to the sub-advisers of the AXA Funds, those rates do provide a measure of how much should be charged for the investment advisory services that the AXA Funds require.  Indeed, the fees charged by each of the AXA Fund's sub-adviser is indicative of the fees the AXA Funds should pay for the investment management services.

207.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management

Group, LLC, charge far more than the sub-advisers they hire for the AXA Funds, even though the sub-advisers assume, with minor exceptions, all of the investment management obligations of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

208.     For example, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, 's investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Common Stock Index Portfolio by 599%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Equity 500 Index Portfolio by 571%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Large Cap Value PLUS Portfolio by 255%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Equity Growth Plus Portfolio by 279%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/GAMCO Small Company Value Portfolio by 103%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value PLUS Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value Plus Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management

Group, LLC's, investment management fee exceeds the investment management fee paid to the

sub-advisers of the EQ/Global Multi-Sector Equity Portfolio by 245%.  AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment

management fee exceeds the investment management fee paid to the sub-adviser of the

EQ/Intermediate Government Bond Index Portfolio by 1649%.

209.     Thus, even if AXA Equitable Life Insurance Company and/or AXA Equitable

Funds Management Group, LLC's, provided the services it alleges to provide, their fees should

not exceed the fees charged by the AXA Funds' subadvisers, who pursuant to their sub-advisory

agreements are charged with providing, with minor exceptions, all of the  investment

management services needed for each AXA Fund.

210.     Since AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC's, investment management fees charged to Plaintiff Sivolella/ the

AXA Funds and retained by them, were in far excess of the sub-adviser fee amounts, a

substantial portion of the investment management fees received by AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, were necessarily so

disproportionately large that they bore no reasonable relationship to services rendered and could

not have been the product of arm's-length bargaining and thus were in violation of ICA § 36(b),

15  U.S.C. § 80a-35(b) .

211.     The investment management fee of the AXA Funds, are deducted/charged

through AXA Variable Annuity Contracts, and members of the AXA Variable Annuity Contract

Class are the payers of those fees.

212.     Under ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2) it is "unlawful for any registered

separate account funding variable insurance contracts, or for the sponsoring insurance company

of such account, to sell any such contract-- (A) unless the fees and charges deducted under the

contract, in the aggregate, are reasonable in relation to the services rendered, the expenses

expected to be incurred, and the risks assumed by the insurance company

**F.   ADDITIONAL ALLEGATIONS FOR VARIABLE ANNUITY CONTRACT CLASS' CLAIM THAT INVESTMENT MANAGEMENT FEES CHARGED ON INVESTMENTS IN THE AXA FUNDS THROUGH AXA EQUITABLE ANNUITY CONTRACTS VIOLATED ICA § 26(f), 15 U.S.C. § 80a-26(f)**

213.    The investment management fee of the AXA Funds, are deducted under

AXA Variable Annuity Contracts, and members of the AXA Variable Annuity Contract Class

are the payers of those fees.

214.    Under ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2) it is "unlawful for any registered

separate account funding variable insurance contracts, or for the sponsoring insurance company

of such account, to sell any such contract-- (A) unless the fees and charges deducted under the

contract, in the aggregate, are reasonable in relation to the services rendered, the expenses

expected to be incurred, and the risks assumed by the insurance company...."

215.    For purposes of ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2), "the fees and charges

deducted under the contract shall include all fees and charges imposed for any purpose and in

any manner." ICA §26(f)(3), 15 U.S.C. §80a-26(f)(3).

216.    Where a contract violates, in whole or part, a provision of the ICA, 15 U.S.C.

§80a-1 et seq., it is unenforceable. ICA §47(b), 15 U.S.C. §80a-46(b).

217.    Under ICA §47(b), 15 U.S.C. §80a-46(b), any party to such unlawful contract,

has an express right to bring an action for equitable relief, including rescission of that contract,

or its unlawful portions, and restitution.

218.    Separate Account A is a registered separate account which funds the AXA

Equitable Variable Annuity Contracts.  Plaintiff Sivolella, and all members of the AXA Equitable Variable Annuity Contract Class are parties to an AXA Equitable Variable Annuity Contract and the payers of the investment management fees AXA Equitable Life Insurance Company charges on investments into the AXA Funds.  They were charged these fees under the AXA Equitable Variable Annuity Contracts.

219.    As explained above, each of the AXA Funds has as its investment manager, AXA Equitable Life Insurance Company, as well as a sub-adviser (or sub-advisers).  AXA Equitable Life Insurance Company's investment management fee, on investments into the AXA Funds, substantially exceeds the investment management fee that is charged by the sub-adviser(s).

220.    As described above, pursuant to the terms of their sub-advisory agreements, the sub-advisers, were responsible for providing, with minor exceptions, all of the investment management services to the AXA Funds.  As compared to the services required under the sub-advisory agreements, the services AXA Equitable Life Insurance Company alleges it provides (to the extent it actually provides them) were minimal and predominantly supervisory in nature.  Further, the fees that AXA Equitable Life Insurance Company charged for its alleged minimal investment management services substantially exceeded the fees that would be the product of an arm's length bargaining for these services.   If the fees AXA Equitable Life Insurance Company charged for its alleged investment management services to the AXA Funds were the product of arm's length bargaining, such fees would be much smaller than the investment management fees that are charged by the funds' sub-advisers.  However, on average AXA Equitable Life Insurance Company's investment management fee exceeded the sub-advisers investment management fee by 496%.  Thus, a  substantial portion of the

investment management fees that AXA Equitable Life Insurance Company charged each of the AXA Funds, but did not pay to these funds' sub-advisers, were excessive and unreasonable in light of the services this Defendant provided, and thus the fees and charges deducted under the AXA Variable Annuity Contracts were unreasonable in the aggregate.

221.    Pursuant to the terms of the sub-advisory agreements,  the sub-advisers were not only responsible for providing, with minor exceptions, all of the investment management services to the AXA Funds (for substantially smaller fees than were paid to AXA Equitable Life Insurance Company), but for paying all of the expenses incurred to provide these services.  Thus, as the investment management services AXA Equitable Life Insurance Company provided, as compared to the sub-advisers, were significantly less, the expenses it should have incurred in connection with its investment management services, were, or should have been, much smaller than the expenses incurred by the sub-advisers.  Given that (A) the investment management expenses that AXA Equitable Life Insurance Company should have incurred in connection with the minimal investment management services it allegedly provided to the AXA Funds, as compared to the expenses incurred by the sub-advisers, and (B) AXA Equitable Life Insurance Company charged a substantially larger investment management fee than the AXA Funds' sub-advisers, the investment management fees received by AXA Equitable Life Insurance Company were mostly in the form of profit to it, as opposed to being used to pay for any expenses incurred by it.  Thus, given the magnitude of AXA Equitable Life Insurance Company's investment management fees, and the minimal expenses AXA Equitable Life Insurance Company incurred, or should have incurred, in connection with providing minimal investment management services, the fees and charges deducted under the AXA Variable Annuity Contracts were unreasonable in the aggregate.

222.     AXA Equitable Life Insurance Company was not assuming any risk in connection with its receipt of substantial investment management fees on investments in the AXA Funds. Therefore, the fees and charges deducted under the AXA Variable Annuity Contracts were unreasonable in the aggregate.

223.     In light of the foregoing,  the fees and charges deducted under the AXA Variable Annuity Contracts, in the aggregate, were unreasonable in relation to the services rendered, the expenses incurred, and the risks assumed by AXA Equitable Life Insurance Company.

224.     On information and belief the practices summarized herein have been ongoing for the entire time period applicable to members of the AXA Variable Annuity Contract Class' claim.

225.     Pursuant to ICA §47(b), 15 U.S.C. §80-46(b), members of the AXA Variable Annuity  Contract Class (which includes Plaintiff Sivolella) are entitled to rescission of  the AXA Variable Annuity Contracts, or portions thereof,  under  which AXA Equitable Life Insurance Company charged the portion of the investment management fees, on investments into AXA Funds, complained herein (i.e., a substantial portion of the AXA Funds' investment management fees that were paid to and retained by AXA Equitable Life Insurance Company) because such fees were in violation of ICA §26(f)(2), 15 U.S.C. § 80a-26(f)(2).  Further, they seek restitution of those unreasonable investment management fees and charges imposed and collected by  AXA Equitable Life Insurance Company under the unenforceable provisions of the AXA Variable Annuity Contracts.

**G.     ADDITIONAL ALLEGATIONS FOR UNJUST ENRICHMENT CLAIM**

226.     Members of the Payer Class are the payers of the investment managements fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC,

charges on investments into the AXA Funds.

227.     In order to succeed on an unjust enrichment claim, three elements must be established.  These elements are: (1) a benefit conferred on the  defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

228.     Members of the Payer Class conferred a significant benefit upon AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, because a substantial portion of the investment management fees that the Payer Class paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on account of investments into the AXA Funds, that were retained by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, as discussed above, were greatly excessive in light of the minimal services these Defendants allegedly provided, or alternatively,  the portion of fees complained about were not used to provide any services.

229.     The fees for the alleged investment management services provided by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to the AXA Funds, if both the fees and expenses for such services were the products of an arm's length negotiation, would be much smaller than the fees that were paid to the sub-advisers. However, the investment management fees the Payer Class paid, and were  retained by these Defendants, on average, exceeded the investment management fees paid to the AXA Funds' sub-advisers by 496%.

230.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, knew, or had an appreciation, of this benefit because it knew that for

a substantial portion of the investment management fees paid by the Payer Class, and that AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,

retained, such fees were greatly excessive in light of the minimal investment management

services these Defendants provided (and the expenses they incurred in providing such minimal

services) to the AXA Funds  and/or they were not providing any investment management

services to the AXA Funds for such fees.

231.     Given that a substantial portion of the investment management fees that were paid

to  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,

LLC, by the Payer Class (and not remitted to the sub-advisers),  were, with respect to the AXA

Funds,  greatly excessive in light of the minimal services these Defendants provided for such

fees (and the expenses incurred in providing such minimal services) and/or this portion of fees

were not used to provide any services to the AXA Funds, it would be inequitable for AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to

retain such fees and thus members of the Payer Class seek restitution of such fees because AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC, have been

unjustly enriched by their receipt of such fees.

232.     Members of the AXA Variable Annuity Contract Class unjust enrichment claim

is brought under Federal common law.

**VIII.   CLASS ALLEGATIONS FOR CLAIMS (A) FOR VIOLATION OF ICA 26(f), 15
       U.S.C. 80a-26(f) AND (B) UNJUST ENRICHMENT CLAIM.**

233.     Plaintiff Sivolella brings this action individually and on behalf of any

person that was a party to a variable annuity contract issued/sold by Defendant AXA Equitable

Life Insurance Company where such contract offered for investment, and resulted in investment, in any AXA Fund.  This class is composed of persons who invested in any AXA Fund and paid investment management fees to AXA Equitable Life Insurance Company  under a AXA Variable Annuity Contract, and they seek recovery of a substantial portion of those fees as they were in violation of ICA §26(f), 18 U.S.C. § 80a-26(f).  This class is known as the AXA Variable Annuity Contract Class, which includes Plaintiff Sivolella. The Class period for these claims begin on the earliest date on which each such claim would be timely.

234.    Plaintiff Sivolella also brings this action individually and on behalf of any person that paid investment management fees to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on account of investments into any AXA Fund.  This class is known as the Payer Class and it seeks recovery of a substantial portion of the investment management fees that were paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, because such fees unjustly enriched these Defendants since for the portion of the fees that this class seeks recovery for no services were rendered and/or the fees were substantially disproportionate to the actual minimal services rendered.  The Class period for these claims begin on the earliest date on which each such claim would be timely.

235.    On information and belief, the AXA Equitable Variable Annuity Class and the Payer Class are generally composed of the same members.

236.    Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Classes are any judge, justice or judicial officer presiding over this matter and the members of their judicial staff.

237.     It is believed that the proposed Classes are so numerous that individual joinder of all of their members would be impracticable.  The total number of Class members, of each Class, is believed to be, at a minimum, at least 200 individuals.

238.     There are questions of law and fact common to the AXA Variable Annuity Contract Class, in determining whether, given the substantial investment management fees AXA Equitable Life Insurance Company charged on investments into the AXA Funds, and the services provided by the funds' sub-advisers,  the fees and charges deducted by AXA Equitable Life Insurance Company under the AXA Variable Annuity Contracts were reasonable, in the aggregate, in relation to the services rendered, expenses incurred and risks it assumed.

239.     There are questions of law and fact common to the Payer Class, in determining whether, given the substantial investment management fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged on investments into the AXA Funds, and the services provided by the funds' sub-advisers, the fees charged by AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC, which members of this class were the payers of, unjustly enriched these Defendants.

240.     The claims and defenses of the representative party is typical of the claims and defenses of each of the Classes.  The representative party has  no interests that are antagonistic to the claims of the Classes, and understands that this matter cannot be settled without the Court's approval.

241.     The representative party will fairly and adequately protect the interests of the Classes, and is committed to a vigorous prosecution of this case.

242.     The prosecution of separate actions by individual members of each Class would create a risk of inconsistent or varying adjudications with respect to individual members of the

Classes that would establish incompatible standards of conduct for the Defendants.

243.    The parties opposing the Classes have acted on grounds generally applicable to each Class thereby making appropriate final injunctive relief or corresponding declaratory relief.

244.    The questions of law or fact common to the members of each of the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

245.    The Defendants were obligated to treat the members of each Class similarly. Individual proceedings, therefore, would pose the risk of inconsistent adjudications.

246.    Since the damages suffered by each member of the Classes may be relatively small, the expense and burden of individual litigation makes it impractical for class members to separately seek redress.

247.    The Classes suffered, and will continue to suffer, harm as a result of Defendants' conduct.

248.    A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of each of the Classes is impractical.

249.    Even if the individual members of each Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigations would proceed.

250.    Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.

251.    The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all claims of the members

of each Class.

252.     Conducting this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the individual members of each Class.  For many, if not most, of the members of each Class, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.

253.     Each Class may be certified under Fed. R. Civ. P.  23(b)(1), (2) and/or (3).

## IX.   DERIVATIVE ALLEGATIONS FOR CLAIM PURSUANT TO ICA §  36(b), 15 U.S.C. § 80a-35(b)

254.     Plaintiff Sivolella brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of, each of the AXA Funds to recover substantially all, of the investment management fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to, and collected from, the AXA Funds, but did not pay to these funds' sub-advisers.

255.     Plaintiff Sivolella brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of the Advisors Trust to recover substantially all of the investment management fees AXA Equitable charged to, and collected from the Advisors Trust/AXA Funds, but did not pay to the AXA Funds' sub-advisers.

## COUNT I

**Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The  AXA Excessive Investment Management Fees Charged By Defendant AXA Equitable Life Insurance Company and/or Defendant AXA Equitable Funds Management Group, LLC,**

**AXA Funds**

256.     Plaintiff Sivolella incorporates by reference the allegations in the previous paragraphs of this Amended Complaint.

257.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, had a fiduciary duty to the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

258.     As set forth in section VII of this Amended Complaint substantially all of the fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  for investment management and/or advisory services that they retained and did not pay to the AXA Funds' sub-advisers, represent a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, fiduciary duties to the AXA Funds with respect to such compensation because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

259.     This Count is brought by Plaintiff Sivolella derivatively on behalf of the AXA Funds against AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  pursuant to ICA § 36(b), 15 U.S.C.  §80a-35(b), for breach of

fiduciary duties with respect to the receipt of compensation.

260.     By reason of the conduct described herein, AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC,  violated ICA § 36(b), 15

U.S.C.  §80a-35(b).  As a direct, proximate and foreseeable result of these breaches of fiduciary

duties in AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management

Group, LLC's,  role as investment adviser to the AXA Funds and the AXA Funds' investors, the

AXA Funds and their security have sustained many millions of dollars in damages.

261.     In charging and receiving inappropriate and unlawful compensation, and in

failing to put the interests of Plaintiff Sivolella, and the other security holders of the AXA Funds,

ahead of their own interests, AXA Equitable Life Insurance Company and/or AXA Equitable

Funds Management Group, LLC,  breached, and continues to breach, their statutory fiduciary

duties to Plaintiff Sivolella, and the other security holders of the AXA Funds, in violation of ICA

§ 36(b), 15 U.S.C.  §80a-35(b).

262.     Plaintiff Sivolella, seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3),

on behalf of the AXA Funds, the actual damages resulting from the breach of fiduciary duties by

AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,

LLC,  up to, and including, substantially all of the compensation and payments received from the

AXA Funds that were not paid to the AXA Funds' sub-advisers.  Plaintiff seeks recovery from

the earliest date permitted by the statute through the latest date permitted by the statute.

263.     Alternatively, Plaintiff seeks rescission of the contracts/agreements and restitution

of substantially all of the investment management fees paid to AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC,  pursuant thereto (excluding

those fees that were paid to the AXA Funds' sub-advisers). See ICA § 47(b), 15 U.S.C. §

80a-46(b).  When a violation of the ICA has occurred, a court may order that the agreements between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and the AXA Funds that provided for the payment of excessive fees, on behalf of the AXA Funds, be rescinded, thereby requiring restitution of the excessive investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, by the AXA Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## COUNT II

**Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The  AXA Excessive Investment Management Fees Charged By Defendant AXA Equitable Life Insurance Company and Defendant AXA Equitable Funds Management Group, LLC,**

**Advisors Trust**

264.    Plaintiff Sivolella incorporates by reference the allegations in the previous paragraphs of this Amended Complaint.

265.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, had a fiduciary duty to the Advisors Trust,  the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, from the Advisors Trust, in their capacity as the investment advisor and/or affiliated person to the Advisors Trust/AXA Funds

266.    As set forth in section VII of this Amended Complaint substantially all of the fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for investment management and/or advisory services that they retained and did not pay to the AXA Funds' sub-advisers, represent a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, fiduciary duties to the Advisors Trust, which contained the AXA Funds, because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

267.    This Count is brought by Plaintiff Sivolella derivatively on behalf of the Advisors Trust, which contains the AXA Funds, against AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC,  pursuant to ICA § 36(b), 15 U.S.C.

§80a-35(b), for breach of fiduciary duties with respect to the receipt of compensation.

268.     By reason of the conduct described herein, AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC,  violated ICA § 36(b), 15

U.S.C.  §80a-35(b).  As a direct, proximate and foreseeable result of these breaches of fiduciary

duties to the AXA Funds, the Advisors Trust and the AXA Funds'/EQ Advisors Trust's security

holders, these persons/entities have sustained many millions of dollars in damages.

269.     In charging and receiving inappropriate and unlawful compensation, and in

failing to put the interests of Plaintiff Sivolella, and the other security holders of the Advisors

Trust, ahead of their own interests, AXA Equitable Life Insurance Company and/or AXA

Equitable Funds Management Group, LLC,  has breached, and continues to breach, their

statutory fiduciary duties to Plaintiff Sivolella, and the other security holders of the Advisors

Trust, that invested in the AXA Funds, in violation of ICA § 36(b), 15 U.S.C.  §80a-35(b).

270.     Plaintiff Sivolella, seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3),

on behalf of the Advisors Trust, the actual damages resulting from the breach of fiduciary duties

by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,

LLC, up to, and including, substantially all of the investment management fees, that AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,

received from the Advisors Trust, on account of alleged investment management services to the

AXA Funds, but did not pay to the AXA Funds' sub-advisers.   Plaintiff seeks recovery from the

earliest date permitted by the statute through the latest date permitted by the statute.

271.     Alternatively, Plaintiff seeks rescission of the contracts/agreements and restitution

of substantially all of the investment management fees paid to AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC, pursuant thereto (excluding those fees that were paid to the AXA Funds' sub-advisers). See ICA § 47(b), 15 U.S.C. § 80a-46(b).  When a violation of the ICA has occurred, a court may order that the agreements between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and/or the Advisors Trust that provided for the payment of excessive fees, on behalf of the AXA Funds and/or the Advisors Trust, be rescinded, thereby requiring restitution of the excessive investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, by the AXA Funds, through the Advisors Trust, from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## COUNT III

**Recession of Part of AXA Variable Annuity Contracts, Pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), That are In Violation of ICA § 26(f), 15 U.S.C. § 80a-26(f)**

272.    Plaintiff incorporate by reference the allegations in the previous paragraphs of this Amended Complaint.

273.    Under ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2), it is "unlawful for any registered separate account funding variable insurance contracts, or for the sponsoring insurance company of such account, to sell any such contract-- (A) unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company...."

274.    Where a contract violates, in whole or part, a provision of the ICA, 15 U.S.C. §80a-1 et seq., it is unenforceable. ICA §47(b), 15 U.S.C. §80a-46(b).

275.    Under ICA §47(b), 15 U.S.C. §80a-46(b), any party to such unlawful contract, has an express right to bring an action for equitable relief, including rescission of that contract, or its unlawful portions, and restitution.

276.    The investment management fees of the AXA Funds are deducted/charged under AXA Variable Annuity Contracts, and members of the AXA Variable Annuity Contract Class are the payers of those fees.

277.    Separate Account A is a registered separate account which funds the AXA Equitable Variable Annuity Contracts.  Plaintiff Sivolella, and all members of the AXA Equitable Variable Annuity Contract Class are parties to an AXA Equitable Variable Annuity Contract, and are the payers of the investment management fees AXA Equitable Life Insurance Company charges on investments into the AXA Funds.

278.     As set forth in section VII of this Amended Complaint, as a substantial portion of the investment management fees that AXA Equitable Life Insurance Company charged, and retained, on investments into the AXA Funds, were unreasonable, in light of (A) the services allegedly provided by AXA Equitable Life Insurance Company for such fees, (B) the expenses incurred by AXA Equitable Life Insurance Company in performing such alleged minimal investment management services in exchange for its receipt of investment management fees and (C) the risks assumed by AXA Equitable Life Insurance Company (no risks were assumed in connection with receipt of the investment management fees).   Thus, as a consequence of the fact that a substantial portion of the investment management fees AXA Equitable Life Insurance Company charged under its AXA Variable Annuity Contracts, on investments into the AXA Funds, were unreasonable in relation to the services provided for such fees, the expenses incurred for providing such services and the risks assumed by AXA Equitable Life Insurance Company, the fees and charges deducted the under the AXA Variable Annuity Contracts, in the aggregate, were unreasonable in relation to the services rendered, the expenses incurred and the risks assumed by AXA Equitable Life Insurance Company.

279.     Pursuant to ICA §47(b), 15 U.S.C. §80-46(b),  members of the AXA Variable Annuity  Contract Class (which includes Plaintiff Sivolella) demand  rescission of  the AXA Variable Annuity Contracts, or portions thereof,  under  which AXA Equitable Life Insurance Company charged the portion of the investment management fees, on investments into AXA Funds, complained of in this Amended Complaint (i.e., a substantial portion of the AXA Funds' investment management fees that were paid to and retained by AXA Equitable Life Insurance Company) because such fees were in violation of ICA §26(f)(2), 15 U.S.C. § 80a-26(f)(2). Further, they seek restitution of those unreasonable investment management fees and charges

imposed and collected by  AXA Equitable Life Insurance Company under the unenforceable

provisions of the AXA Variable Annuity Contracts.

## COUNT IV

## Payer Class Is Entitled To Restitution On Account of Defendant AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC, Unjust Enrichment

280.    Plaintiff incorporates by reference the allegations in the previous paragraphs of this Amended Complaint.

281.    ICA § 47(b)(3), 15 U.S.C. § 80a-46(b)(3), permits claims for restitution on account of a party being unjustly enriched.

282.    Members of the Payer Class are the payers of the investment managements fees that AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC, charges on account of investments into the AXA Funds.  AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, receipt of a substantial portion of the investment management fees paid to these Defendants by the members of the Payer Class, on account of investments into the AXA Funds, resulted in these Defendants being unjustly enriched.

283.    A substantial portion of the investment management fees that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged and retained by these Defendants, on account of investments into the AXA Funds, were unreasonable and disproportionate, in light of the minimal investment management services provided by AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, for such fees.

284.    Members of the Payer Class paid the fees complained of herein and thus conferred a significant benefit upon AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, because a substantial portion of the investment management fees they paid to these Defendants on account of their investments in the AXA Funds, were retained by AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, and were not used to provide any investment management services, or alternatively, such fees were greatly excessive in light of the minimal investment services these Defendants allegedly provided to the Funds.

285.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, knew, or had an appreciation of the fact, that they were in receipt of this benefit given that, for a substantial portion of the investment management fees these Defendants received, on account of the Payer Class's investments into the AXA Funds, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were not providing any services for such fees or, alternatively, such fees were greatly excessive in light of the minimal investment management services these Defendants allegedly provided to the Funds.

286.     Given that a substantial portion of the investment management fees that were paid to  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, by the Payer Class (and not remitted to the sub-advisers),  were, with respect to the AXA Funds,  greatly excessive in light of the minimal services these Defendants provided for such fees (and the expenses incurred in providing such minimal services) and/or this portion of fees were not used to provide any services to the AXA Funds, it would be inequitable for AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to retain such fees and thus members of the Payer Class seek restitution of such fees because AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC, have been

unjustly enriched by their receipt of such fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demand judgment as follows:

A.      An order declaring that AXA Equitable Life Insurance Company and/or AXA

Equitable Funds Management, LLC, violated and continued to violate ICA § 36(b), 15 U.S.C.

§80-35(b), through the receipt of fees from the AXA Funds/Advisors Trust that breach

Defendants' fiduciary duty with respect to the receipt of compensation;

B.      An order awarding compensatory damages to Plaintiff Sivolella on behalf of the

security holders of the AXA Funds and/or Advisors Trust, in an amount sufficient to restore

them to the position that they would have been in had the wrongs alleged herein not been

committed, including repayment of all unlawful and/or excessive fees paid to them by the AXA

Funds or their security holders from one year prior to the commencement of this action through

the latest date permitted by the statute;

C.      An order rescinding the agreements between AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC, and the AXA Funds/Advisor

Trust, which provide for the fees/compensation complained of herein, pursuant to ICA § 47(b),

15 U.S.C. § 80a-46(b), including restitution of substantially all, of the investment management

fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management, LLC, that exceeded the fees that were paid to these funds' sub-advisers,  by the

AXA Funds/Advisors Trust, from a period commencing one year prior to the commencement of

this action through the date of the trial of this case;

D.      An order declaring that AXA Equitable Life Insurance Company violated and

continues to violate ICA § 26(f), 15 U.S.C. §80-26(f), through the receipt of excessive and

unreasonable investment management fees;

E.      An order rescinding the agreements, or a portion of such agreements, between

AXA Equitable Life Insurance Company and the AXA Equitable Variable Annuity Contract

Class, which provide for the fees/compensation complained of herein, pursuant to ICA § 47(b),

15 U.S.C. § 80a-46(b), including restitution of substantially all of the investment management

fees paid to AXA Equitable Life Insurance Company, that exceeded the fees that were paid to

the AXA Funds' sub-advisers;

F.      An order declaring that AXA Equitable Life Insurance Company and/or AXA

Equitable Funds Management Group, LLC, were unjustly enriched by the Payer Class on

account of the payment of certain investment management fees;

G.      An order requiring that AXA Equitable Life Insurance Company and/or AXA

Equitable Funds Management Group, LLC, make restitution of substantially all of the

investment management fees they charged to the Payer Class on investments into the AXA

Funds, but did not pay to these funds' sub-advisers;

H.      Award interest, costs, attorney fees, fees for expert witnesses and such other relief

as it deems just;

I.      Plaintiff Sivolella reserves the right to seek punitive damages where applicable;

and

J.      Such other and further relief as may be just and proper under the circumstances


**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.


Szaferman, Lakind,
Blumstein & Blader, P.C.

Dated: November 4, 2011                    <u>s/ Robert L.  Lakind</u>
Robert L. Lakind
Arnold Lakind
Steven Blader
101 Grovers Mill Road
Lawrenceville, NJ 08648


Levy, Phillips & Konigsberg

Dated: November 4, 2011                    <u>s/Moshe Maimon</u>
Moshe Maimon
Danielle Disporto
800 Third Avenue
New York, NY, 10022