## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

### Civil Action No. 3:11-cv-04194-PGS-DEA

MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio; MARY ANN SIVOLELLA for the use and benefit of the EQ Advisors Trust; MARY ANN SIVOLELLA, individually and on behalf of any person or entity that is a party to a variable annuity contract issued by/sold by AXA Equitable Life Insurance Company, which offered the ability to invest in, and resulted in an investment in, the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, or the EQ/Intermediate Government Bond Index Portfolio; and MARY ANN SIVOLELLA, individually and on behalf of any person or that paid investment management fees to either AXA Equitable Life Insurance Company or AXA Equitable Funds Management Group, LLC, on account of investments in, the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, or the EQ/Intermediate Government Bond Index Portfolio,  Plaintiffs, vs. AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, Defendants.

---

## PLAINTIFFS' BRIEF IN OPPOSITI0N TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

---

SZAFERMAN, LAKIND,
  BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys for Plaintiffs

On the Brief:
Arnold C. Lakind, Esq., Robert L. Lakind, Esq., Moshe Maimon, Esq., Mark A. Fisher, Esq., and Danielle Disporto, Esq.

633639.1

# TABLE OF CONTENTS

Preliminary Statement ............................................................... 1

    A.    The Nature of the Excessive Fee Claim  ............................... 1

    B.    Relevant Law ....................................................................... 5

Argument ................................................................................... 8

    Point I ................................................................................ 8

        PLAINTIFF HAS STATUTORY STANDING TO BRING
        AN ICA § 36(b) CLAIM BECAUSE SHE BEARS ALL
        RISK OF INVESTMENT PERFORMANCE AND THE
        FEES PAID ARE DRAWN FROM HER FUNDS

        A.    Plaintiff is a "Security Holder" Because She
               Possesses All of the Indicia of Ownership of
               the Underlying AXA Funds ....................................... 9

        B.    State Law Is Irrelevant To the Standing
               Analysis .................................................................. 22

        C.    AXA's Cases Do Not Support Its Argument
               Or Are In Conflict With Third Circuit
               Jurisprudence ......................................................... 23

    Point II .............................................................................. 27

        ICA §47(b) CREATES A PRIVATE RIGHT OF ACTION
        TO ENFORCE ICA §26(f)

    Point III ............................................................................. 36

        PLAINTIFF HAS BROUGHT A VALID UNJUST
        ENRICHMENT CLAIM

Conclusion ............................................................................... 39

633639.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alexander v. Sandoval, 532 U.S. 275 (2001) .................................................. 31, 32

In re Am. Mut. Funds Fees Litig., No. 5593,
 2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16, 2005) .......................... 24

Archawski v. Hanioti, 350 U.S. 532 (1956) ...................................................... 39

Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc.,
 916 F. Supp. 1343 (D.N.J.,1996) ...................................................... 32

C.H. Sanders Co., Inc. v. BHAP Housing Develop. Fund Inc.,
 903 F.2d 114 (2nd Cir. 1990) ...................................................... 36

Curran v. Principal Mgmt. Corp., No. 00433,
 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) ................................................ 25

Daily Income Fund v. Fox, 464 U.S. 523 (1984) .................................................. 22

Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1972) ................................... 9, 19, 22

HFG Co. v. Pioneer Pub'g Co., 162 F.2d 536 (7th Cir. 1947) ............................... 20

In re Franklin National Bank Securities Litigation,
 574 F.2d 622 (1st Cir. 1978) ................................................ 20, 33

J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.,
 534 U.S. 124 (2001) ...................................................... 12

Jones v. Harris Assoc., 130 S. Ct. 1418 (2010) ............................... 5, 12, 16, 19, 21

Kauffman v. Drefyus Fund, Inc., 434 F.2d 727 (3d Cir. 1970) ............................. 24

Kusner v. First Penn. Corp., 531 F.2d 1234 (3d Cir. 1976) ................................... 37

Levy v. Alliance Capital Mgmt. L.P.,
 189 F.3d 461 (2nd Cir. Aug. 20, 1999) ................................................ 10, 28

633639.1

Mathers Fund, Inc. v. Colwell Co., 564 F.2d 780 (7th Cir. 1977) ........................ 32

Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861 (2nd Cir. 1990) ................... 10

Mills v. Electric Automobile-Lite Co., 396 U.S. 375 (1970) ................................ 30

In re Mut. Funds Inv. Litig., 519 F.Supp.2d 580 (D.Md. 2007) ............................ 5

Norman v. Salomon Smith Barney, Inc.,
        350 F. Supp. 2d 382 (S.D. N.Y. 2004) ....................................................... 38

Olmstead v. Pruco Life Insurance Co., 283 F.3d 429 (2d Cir. 2002) .............. 30, 33

Prudential Insurance Co. of America v. S.E.C.,
        326 F.2d 383 (3d Cir. 1964) ........................................................... 8, 17, 35

Reves v. Ernst & Young, 494 U.S. 56 (1990) ................................................... 9, 13

Santomenno v. John Hancock Life Ins. Co.,
        2011 WL 2038769, (D.N.J. May 23, 2011),
        appeal docketed, No. 11-2520, (3d Cir. June 8, 2010) ............................... 24

Securities and Exchange Commission v.
        Capital Gains Research Bureau, Inc.,
        375 U.S. 180 (1963) .................................................................................. 26

Silber v. Mabon, 957 F.2d 697 (9th Cir. 1992) .................................................. 20

Smith v. Oppenheimer Funds Distributing, No. 7394,
        2011 WL 4565587 (S.D.N.Y. June 6, 2011) ............................................. 34

Steinberg v. Janus Capital Mgmt.,
        2011 WL 6118599 (4th Cir. Dec. 2, 2011) ................................................ 34

Tarlov v. Paine Webber Cashfund, Inc., 559 F. Supp. 429 (Conn.1983) .............. 32

In re The Pittsburgh and Lake Erie Railroad Co.
        Securities and Anti-Trust Litigation,
        543 F.2d 1058 (3d Cir. 1976) ............................................................... 20, 23

Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11 (1979) ............... 31, 32

633639.1

United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975) ........................ 8

Young v. Nationwide Life Insurance company,
    2 F. Supp. 2d 914 (S.D. Tx. 1998) ........................................................... 9, 16

## FEDERAL STATUTES

ICA § 3(c) .............................................................................................. 12

ICA § 8 ............................................................................................... 12, 14

ICA § 26(f) ...................................................................................... *passim*

ICA § 30(b)(2) ...................................................................................... 14

ICA § 36(b) ..................................................................................... *passim*

ICA § 47(b) ..................................................................................... *passim*

## CODE OF FEDERAL REGULATIONS

17 C.F.R. § 240.14a-7 ........................................................................... 15

17 C.F.R. § 270.8b-16 ........................................................................... 12

17 C.F.R. § 270.30e-1 ........................................................................... 14

## FEDERAL RULES OF CIVIL PROCEDURE

Fed.R.Civ.P. 12(b) ................................................................................. 1

Fed.R.Civ.P. 23.1 ................................................................................. 20

## STATE CASES

In re Triarc Comp. Inc., 791 A.2d 872 (Del. Ch. 2001) ......................................... 37

## STATE STATUTES

N.Y. Ins. Law § 4240(a)(12) ................................................................. 22

633639.1

This brief is submitted in opposition to Defendants AXA Equitable Life Insurance Company's ("AXA Ins. Co.") and AXA Equitable Funds Management Group, LLC's ("AXA FMG") (collectively "AXA"[1]) motion to dismiss Mary Ann Sivolello's Amended Complaint ("AC") pursuant to FED R. CIV. P. 12(b)(1) and (6).

## PRELIMINARY STATEMENT

### A.    The Nature of the Excessive Fee Claim

Plaintiff Mary Ann Sivolella's Investment Company Act of 1940 ("ICA") claims arise out of excessive  management fees paid from her investments into the following mutual funds:  EQ/Common Stock Index Portfolio, EQ/Equity Growth PLUS Portfolio, EQ/Equity 500 Index Portfolio, EQ/Large Cap Value PLUS Portfolio, EQ/Global Multi-Sector Equity Portfolio, EQ/Mid Cap Value PLUS Portfolio, EQ/GAMCO Small Company Value Portfolio and EQ/Government Bond Index Portfolio (the "AXA Funds").  The issue before this Court is whether Congress intended that investors, such as Plaintiff, who are the only parties who bear the risk

---

[1] It is undisputed that either AXA Ins. Co. *or* AXA FMG, serve as the investment manager to these funds (Defense Brief "Db" 1).  However, in Securities and Exchange Commission ("SEC") filings, Defendants' make contradictory statements with regard to which Defendant is the investment manager for these funds (AC ¶ 52). The Defendants did not clarify this inconsistency in their motion and collectively referred to both entities as AXA (Db 1).  Unless otherwise noted, Plaintiff also refers to both Defendants collectively as AXA.

633552.1

of fund performance, may challenge these excessive fees under the ICA or whether those fees are, as a practical matter, immune from review.  For if fund investors lack standing to challenge the excessive fees charged by these AXA Funds, neither AXA nor anyone else has the incentive or standing to do so.

AXA serves as the investment adviser to the AXA Funds, each of which is advised by a sub-adviser (AC ¶¶ 82-3).  AXA has entered into contracts with the sub-advisers pursuant to which the latter, with minor exceptions, perform all of the investment management services for the AXA Funds (AC ¶ 84).  For example, under the sub-advisory agreement between AXA and GAMCO Asset Management, Inc. ("GAMCO"), in connection with the EQ/GAMCO Small Company Value Portfolio, GAMCO performed the following services:

(i)     obtain and evaluate...pertinent economic, statistical,...and other information affecting...the securities of which are included in each Portfolio [AXA Fund] or are under consideration for inclusion...;

(ii)    formulate and implement a continuous investment program for each Portfolio [AXA Fund];

(iii)   take whatever steps are necessary to implement the investment program for each Portfolio [AXA Fund] by arranging for the purchase and sale of securities or other investments,...;

(iv)    keep...[AXA Ins. Co. ] fully informed in writing...of all material facts concerning the investment...of the assets in each [AXA Fund]...;

(v)     in accordance with procedures and methods established by the Trustees of the Trust...provide assistance in determining the fair value of all

633552.1

securities...in each Portfolio [AXA Fund]...;

(vi)    provide...all material...performance information,...about accounts the Adviser [GAMCO] manages, if appropriate, which are relevant to each Portfolio [AXA Fund] that have investment objectives... substantially similar to those employed by the Adviser in managing each Portfolio that may be...necessary...to allow each Portfolio...to present information concerning the Adviser's prior performance in the Trust's Prospectus and SAI....

(AC ¶ 120; Declaration of Robert Lakind ("Dec. RL" ¶ 2 Ex. A § 3.B). Under a different section of this sub-advisory agreement, GAMCO also agreed to provide at its own expense:

(i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required for them to faithfully perform their duties under this Agreement; and (ii) administrative facilities...and all equipment ...for the efficient conduct of the Adviser's duties under this Agreement.

(AC ¶ 121; Dec. RL ¶ 2, Ex. A § 3. E). The terms of the agreements between AXA and the sub-advisers for the remaining AXA Funds are  materially identical to the GAMCO agreement (See AC ¶¶ 92, 93, 97, 98, 103-4, 109, 110, 115, 116, 126, 127, 131, 132).

In contrast to the comprehensive services performed by the sub-advisers, AXA's role is generally limited to providing supervisory input (Defense Exhibit ("D Ex.") F, pp. 449-50[2]). AXA, for its alleged investment management services, charges

_____

[2] Page citations to defense exhibits are to the page numbers inserted by the ECF system.

3

633552.1

the AXA Funds an investment management fee,[3] which is deducted from the fund balance and thus reduces the value of Plaintiff's investment; that is, Plaintiff pays the fee (AC ¶¶ 6; 77-85). AXA remits a portion of the investment management fees that it collects to each funds' respective sub-adviser (AC ¶¶ 84-5). Investors in the AXA Funds therefore pay both AXA's and the sub-advisers' investment management fees.

Although there is a large disparity between the minimal services performed by AXA and the extensive services performed by the sub-advisers, AXA retains the bulk of the investment management fees. For example, in 2010, the investment management fees AXA received from the AXA Funds exceeded, on average, the investment management fees paid to the sub-advisers by 496% (AC ¶¶85-6).

This lawsuit arises out of the claims of Ms. Sivolella that these fees are excessive and violate the ICA. No one, other than Ms. Sivolella and other investors who pay the fees, has the incentive to contest AXA's excessive charge and, as discussed below, Plaintiff has statutory standing to do so.

---

[3] In addition to the investment management fee, AXA charged the AXA Funds/their investors a host of other fees, including "Administrative fees", "Distribution fees", "Printing and mailing expenses", "Trustees' fees", "Professional fees", and "Miscellaneous fees." (Dec. RL ¶ 3, Ex. B)

4

## B.   Relevant Law

In view of the minimal services provided by AXA and the large fee that it charges, in comparison to the extensive services provided by the sub-advisers and the small fee which they collect, Plaintiff has filed a four count complaint alleging that AXA's investment management fees violate the ICA §§ 26(f)  and 36(b), and that these fees unjustly enrich AXA (AC ¶¶ 56-232).

*Counts I and II*: Under ICA § 36(b)[4] a security holder of a mutual fund can bring suit on its behalf  "for breach of fiduciary duty in respect of...compensation ...paid by such registered investment company [mutual fund] or by the security holders thereof" to the fund's investment adviser.  A fee violates ICA § 36(b) if it "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." Jones v. Harris Assoc., 130 S.Ct. 1418, 1426 (2010).  Plaintiff alleges that a large portion of AXA's investment management fee violates ICA § 36(b).[5]

---

[4]  15 U.S.C. § 80a-35c(b).

[5]  Mutual fund companies register the funds they sponsor as separate investment companies, or, alternatively, they register a single investment company and place within it several funds (a series trust). See In re Mut. Funds Inv. Litig., 519 F.Supp. 2d 580, 588 (D. Md. 2007). The AXA Funds are contained in the EQ Advisors Trust (Db1), which is a series trust (AC ¶ 4). While under the law AXA should be issuing shares of the trust, it makes conflicting disclosures as to whether, upon investments into an AXA Fund, it issues a share of the AXA Fund or a share of the EQ Advisors Trust (AC ¶ 5). Count I is brought on behalf of the

*Count III:* Plaintiff is a party to an AXA variable annuity contract and, by virtue of that contract, she acquired her security interest in the AXA Funds (Db2; 23; AC ¶ 32; 38).    Under that variable annuity contract, AXA Ins. Co. collected management fees from the assets in the AXA Funds  (Db1; 16; AC ¶35). These variable annuity contracts are funded by AXA Ins. Co.'s Separate Account A, a registered separate account (AC ¶ 33).

Under ICA § 26(f):

It shall be unlawful for any...separate account funding variable insurance contracts, or for the sponsoring insurance company...to sell...such contract- (A) unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses...incurred, and the risks assumed by the insurance company....

A large portion of the AXA Funds' investment management fees, which AXA charged under variable annuity contracts funded by Separate Account A, violated ICA § 26(f) (AC ¶¶ 77-225).  According to the SEC, "[a] violation of...26(f)... clearly give[s] rise to a cause of action under [ICA] Section 47(b)." (Dec. RL¶4 Ex. C, pp. 8-9).  Plaintiff, on behalf of all parties to AXA variable annuity contracts, invokes ICA § 47(b)(2) to seek rescission of those portions of the contracts that allowed AXA

---

AXA Funds, and Count II, an alternative to Count I, is brought on behalf of the EQ Advisors Trust (AC ¶¶6-7). AXA does not contest Plaintiff's standing because she invested in funds contained in a series trust. AXA drafted its brief as if it issues shares of the AXA Funds, as opposed to the trust, and thus Plaintiff assumes that to be correct.  The conclusions in this brief remain unchanged if AXA instead issues shares of the trust.

633552.1

to collect excessive investment management fees in violation of ICA § 26(f) (AC ¶ 279). As discussed below, no one other than an investor, such as Plaintiff, has the inventive to do so.

*Count IV:* According to the SEC, ICA § 47(b)(3)(B) "permits recovery for unjust enrichment" (Dec. RL ¶ 4 Ex. C p.9). While the sub-advisers to the AXA Funds performed most of the investment management services for these funds, AXA's investment management fees which were paid by Plaintiff, greatly exceeded the sub-advisers' fees. Plaintiff therefore brings a claim for unjust enrichment on behalf of all persons who paid AXA's excessive investment management fees.

*                    *                    *

Plaintiff supports her claims with detailed allegations, which are largely based on AXA's SEC filings (AC ¶¶ 28-9; 43;48; 77-232). AXA does not contest the truth of Plaintiff's allegations that ICA §§ 26(f) and 36(b) were violated; nor does AXA dispute that it was unjustly enriched. Nor does AXA identify any party, other than investors who paid the excessive fee or would have an incentive to challenge it.

Rather, AXA claims that Ms. Sivolella's ICA § 36(b) claims in Counts I and II fail because she is not a "security holder" of the AXA Funds. AXA claims that, notwithstanding the SEC's contrary position, Count III fails because there is no private right of action under ICA § 47(b) for violations of ICA § 26(f). Finally, AXA asserts that Plaintiff's unjust enrichment claim, Count IV, which is brought under

7

federal common law, fails because it is brought under *state* law.  These arguments are

without merit.

## ARGUMENT

### POINT I

**PLAINTIFF HAS STATUTORY STANDING TO BRING AN ICA § 36(b) CLAIM BECAUSE SHE BEARS ALL RISK OF INVESTMENT PERFORMANCE AND THE FEES PAID ARE DRAWN FROM HER FUNDS**

ICA§ 36(b) provides that:

> [F]or purposes of this subsection, the investment advisor of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation . . . An action may be brought under this subsection by . . . a security holder of such registered investment company on behalf of such company. . ..

The resolution of whether Plaintiff is, under ICA § 36(b), a "security holder"

of the AXA Funds should be informed by three principles. First, the ICA  "must be

broadly construed in order to insure the investing public a full measure of protection,"

Prudential Ins. Co. of Am. v. S.E.C., 326 F.2d 383, 386 (3d Cir. 1964) ("Prudential").

Second,  "the mere fact that the investment program in the case at bar is under the

aegis of an insurance company ought not to negate compliance with [the ICA]." Id.

at 388.  Third, the meaning of the term "security holder" is dependent upon the

economic reality of the transaction, not its form.   United Hous. Found., Inc. v.

8

633552.1

Forman, 421 U.S. 837, 848 (1975).[6]

Given these principles, it is apparent that an investor in a mutual fund through a variable annuity contract is an equitable owner of the mutual fund and therefore a "security holder" as that term is used in ICA § 36(b). As a result, courts have long held that the equitable owner of an investment is the holder of that investment even if the investment is titled in another's name. See, e.g., Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1971); Young v. Nationwide Life Insurance company, 2 F. Supp. 2d 914 (S.D. Tx. 1998).

### A.   Plaintiff is a "Security Holder" Because She Possesses All of the Indicia of Ownership of the Underlying AXA Funds

#### 1.   Plaintiff Possesses Nearly All of the Indicia of Ownership of Each AXA Fund

"In searching for the "meaning and scope of the word 'security' . . . the emphasis should be an economic reality." United Hous.. Found., 421 U.S. at 848. See also Reves v. Ernst & Young, 494 U.S. 56,61 (1990). Measured by this test, Plaintiff "is a security holder of the AXA Funds" (AC¶ 4; 6-7) because she possesses all of the indicia of ownership of those funds. First, Plaintiff and similarly situated investors are responsible for and, in fact, paid all of the challenged fees. Documents which AXA distributes to the investing public confirm that investors hold shares of

---

[6] While this case arises under the Securities Act of 1933, that statute contains a definition of "security" that is nearly identical to the ICA definition.

633552.1

the AXA Fund and pay the management fees.  (See Defendants' Prospectus D Ex. D,

p. 424).  Second, Plaintiff and other investors bear the full risk of poor investment

performance:

> Each variable investment option invests in shares of a corresponding portfolio
> [AXA Fund]. Your value in each variable investment options is measured by
> 'units.'  The value of your 'units' will increase or decrease as though you had
> invested in the corresponding portfolio's shares directly.  Your value, however,
> will be reduced by the amount of fees and charges that we deduct under the
> contract.[7]

(D Ex. C, p. 416).

Third, as a consequence of her purchase, Plaintiff has the right to instruct AXA

how to vote her shares, which is one of the rights associated with being a security

holder.  While AXA claims it has the "'right to vote on... 'matters'... requiring a

shareholders' vote" (Db17), Defendant's SEC filings contradict this assertion: "[w]e

will give contract owners[8] the opportunity to instruct us how to vote the number of

---

[7]  AXA claims Plaintiff lacks standing to pursue her ICA § 36(b) claims
because "the Funds' investment performance" is also reduced by  "'product level'
fees that AXA Equitable charges...." (Db7).  AXA's argument is flawed. First, all of
these additional fees are charged by AXA, the investment adviser to the funds, and
fall within the ambit of ICA § 36(b).  See Levy v. Alliance Capital Mgmt. L.P., 189
F.3d 461 (2d Cir. 1999) and Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861 (2nd
Cir. 1990).  Thus, AXA is illogically claiming that Plaintiff is not a security holder
of the AXA Funds because AXA charges her additional fees that are subject to ICA
§ 36(b). Second, while the additional fees diminish Plaintiff's returns, they do not
impair her indicia of ownership.

[8]  AXA's N-4 filings identify the investor as the "contract owner."  This SEC
document contains the following definition:

633552.1

shares attributable to their contracts if a shareholder vote is taken" (D Ex. C p. 419). Once a contract owner gives voting instructions, AXA must follow them. Furthermore, Plaintiff not only controls how her shares are voted, but also controls how AXA votes its own shares: "[AXA] will also vote any shares that we are entitled to vote directly because of amounts we have in a portfolio in the same proportions that contract owners vote" (D Ex. C p. 419).

Fourth, assets held in a separate account are immune from claims of AXA's creditors. (D Ex. C p. 417). However, investment in funds within a separate account are vulnerable to claims of the investor's creditors. Thus as a matter of property and creditor law, Plaintiff is deemed to be the holder of those assets.

Finally, when Plaintiff decides to withdraw her investment in the AXA Funds, she, not AXA, pays the taxes on that investment (See Dec. RL ¶6, Ex. E e.g. "No tax until you make withdrawals from your contract." and "you are not taxed on contract earnings until you receive a distribution from your contract").[9]

_____

> *Contractowner Account.* The term "contract owner account" means any account of a contractowner, participant, annuitant or beneficiary to which (net) purchase payments under a variable annuity contract are added and from which administrative or transaction charges may be subtracted.

Dec. RL ¶ 5 Ex. D.

[9] AXA's argument that Plaintiff's security holder status is impacted because she can defer, but not eliminate, her taxes (Db15) is flawed. First, this argument is premised on the portion of the legislative history to a tax statute, which was not

633552.1

## 2.    The Structure of ICA § 36(b) and The Statutory Definition of Security Holder

ICA § 36(b) creates a fiduciary duty to security holders.  If that duty is breached, the fiduciary is liable to the "security holder" for damages which may "not exceed the amount of compensation or payments received from such investment company or the security holder thereof."  ICA § 36(b)(3).  Here, the compensation is received from Plaintiff's investment in the funds.  It makes no sense to limit standing to enforce ICA § 36(b) to AXA or any other entity that did not pay the excessive compensation.

Defendants maintain that Separate Account A is the "security holder" (Db14)

---

incorporated into that statute. Second, the legislative history to a tax statute is not determinative of security holder status because  "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."   J.E.M. AgSupply, Inc. v. Pioneer Hi-Bred Int'l., Inc., 534 U.S. 124, 143-144 (2001).  Congress' intent in adopting ICA § 36(b) was to "create[ ] protections for mutual fund shareholders..." Jones,  130 S.Ct. at 1422 (2010).  As "[n]early one half of all long term mutual fund assets...are held in tax advantaged accounts, such as...variable annuities", (Dec. RL ¶ 7 Ex. F), acceptance of AXA's argument would deny standing to the very persons that ICA § 36(b) was intended to protect.  Third,  AXA's reliance on a piece of legislative history is also problematic because it assumes that AXA Funds are "not publically available...." (Db15).  AXA's SEC filings contradict this notion. AXA files prospectuses on behalf of the AXA Funds, and under ICA §§ 3(c)(i) and 8, and 17 C.F.R. § 270.8b-16, only mutual funds whose shares are publicly available are required to file prospectuses with the SEC.  As of December 31, 2010, the public had invested approximately $36 billion in the EO Advisors Trust. (Dec. RL ¶ 8 Ex. G). Finally, Plaintiff, not AXA, bears the ultimate tax burden on her investment.

12

or, alternatively, that AXA Equitable is the "security holder" (Db5). However, the Separate Account has no economic stake in the transaction. Only Plaintiff does. Nor can AXA Equitable be considered the "security holder" under ICA § 36(b) -- it is the wrongdoer. Defendants' argument is one of form over substance.

The Supreme Court, analyzing the nearly identical definition of "security holder" under the Securities Exchange Act observed that

> In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" Congress therefore did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.

Reves, 494 U.S. at 60-61. Continuing the Court wrote:

> In discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation.

Id. at 61. Moreover,

> The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities". . ..

Id. at 66.

13

Given these objectives, it makes no sense to broadly construe the word security," and limit the reach of "holders" to those who lack any economic interest in the transaction.

### 3.   The SEC and AXA Treat Plaintiff as a Security Holder in the AXA Funds

Consistent with SEC's requirements, AXA treats investors, such as Ms. Sivolella, as "security holders of the AXA Funds." Thus, under 17 C.F.R. § 270.30e-1, a mutual fund must "transmit to each **stockholder of record,** at least semi-annually, a report...." (emphasis added). Pursuant to ICA § 8, this report must include financial information about the mutual fund. Further, ICA § 30(b)(2) states that "[e]very registered investment company shall file with the Commission...copies of every... communication containing financial statements and transmitted to...such company's **security holders**...." (emphasis added).

In compliance with these provisions, AXA (1) provided Plaintiff with the financial statements for the AXA Funds and (2) certified to the SEC it provided her with this information. For example, AXA mailed Plaintiff a copy of the semi-annual report for the EQ Advisors Trust (and each fund within such trust, i.e., the AXA Funds) for the period ended June 30, 2010 (Dec. RL ¶ 9 Ex. H). Subsequently, on September 8, 2010, AXA filed Form N-30b-2 with the SEC, in which it confirmed it "sent to contract owners the semi-annual reports, for the period ended June 30, 2010,

633552.1

for the...("[AXA] Funds")..." (Dec. RL ¶ 10, Ex. I).

In a related context (tender offers), the SEC has ruled that "security holder means both record holders and beneficial owners. . .." SEC Release No. 6653, fn. 35 (July 11, 1986)(Dec. RL ¶ 11, Ex. J).  Consistent with this release and pursuant to the Securities Exchange Act of 1934, the SEC has promulgated, 17 C.F.R. 240.14a-7 which categorized beneficial holders as security holders:

> "[i]f the registrant . . . intends to make a proxy solicitation in connection with a security holder meeting or action by consent . . . upon the written request by any record or beneficial holder of securities of the class entitled to vote at the meeting . . .

### 4. Under Relevant Case Law, Plaintiff Is The Security Holder of The AXA Fund Regardless of the Fact That The Mutual Fund Shares Are Titled in AXA's Name And Held in AXA's Account

Relying on New York Insurance Law, AXA argues that Plaintiff is not a security holder of the AXA Funds because she does not hold "title" to the funds and also does "not hold legal title to the Separate Account...." (Db1, 19). This argument is flawed for several reasons.

### a. Title Status is Irrelevant

In order to prosecute a claim under ICA § 36(b), a plaintiff need only be a "security holder"; there is no requirement that a plaintiff be the title holder.  AXA acknowledges that Plaintiff is a holder of shares in the mutual funds in which she invests.  Thus, its prospectus includes a table which "describes the fees...you pay if

633552.1

you buy and **hold** shares of the [i.e. AXA Fund]" (D Ex. D p. 424).

Moreover, Plaintiff lacks but one indicia of ownership, nominal title to the funds in which she has invested. Given the purpose that underlies ICA § 36(b), Jones, 130 S.Ct. at 1422 (to "create protections for mutual fund shareholders..."), it makes no sense to deprive Plaintiff of statutory standing and confer it on AXA, who does not pay the fees, has no incentive to contest their magnitude, and is the very person from whom investors need protection.

In a related setting, dealing with constitutional standing of a variable annuity investor to bring an ICA § 36(a) claim, this Court wrote:

> While technically Plaintiffs [the participants] do not have a legal interest in the investments at issue [the underlying mutual funds] it is clear that the total value of their insurance policy would rise and fall with the value of the underlying investment options they chose . . . a breach of fiduciary duty, as contemplated in the ICA would have a direct impact upon the policyholder. As Plaintiffs point out, they are actually the **only** persons with standing because their alleged injuries are the most direct. . . If Plaintiff does not have standing to bring ICA claims, then no person does. The Court therefore holds that Plaintiffs do have standing.

Young, 2 F. Supp. 2d at 926. (Emphasis in original).

Thus, there is no logical basis to equate "security holder" with title holder.

### b. Security Holder Status Depends Upon the Identity of the Person at Risk on the Investment

In assessing the meaning of the phrase "security holder," a court is to be guided by the Third Circuit Court of Appeals admonition that, under the ICA, the substance

633552.1

of an investment must prevail over its form:

> Furthermore, a study of the legislative history of the Act shows that Congress intentionally drafted the statutory definitions in general terms in order to control such situations regardless of the legal form or structure of the investment enterprise.

*          *          *

> The Investment Company Act of 1940 contains significant safeguards for the **protection of those who, like the purchasers of variable annuities, invest in 'securities.'** These safeguards, characterized by the Commission as insuring 'corporate democracy,'...and the regulation of fees....

Prudential, 326 F.2d at 387-88.  (emphasis added).  Thus, the Third Circuit has

observed that the "purchasers of variable annuities" invest in "securities."   In

reaching this conclusion, the Court noted that the entirety of the risk of the investment

lies with the investor, not the owner of the segregated account that holds the

investors' investments.  Id. at 387.

In Prudential, an insurer argued that a provision of the ICA did not apply to its

investment fund, because the fund was *not* separable from the insurance company.

Rejecting this contention, the Third Circuit held:

> [T]he Investment Fund is a completely segregated account, devoted to investing in securities. The cash for these investments is derived from payments made by the purchaser of the variable annuity contract. ... Thus, the fund is separable from the insurance company which, as the Supreme Court noted in VALIC, 'guarantee(s) nothing to the annuitant except an interest in a portfolio of common stocks or other equities- an interest that has a ceiling but no floor.' The restricted interest of the annuitant is perhaps best expressed in the Court's pithy observation that he 'gets only a pro rata share of what the portfolio of equity interests reflects- which may be a lot, a little, or nothing.'

17

Id. at 387 (internal citations omitted). Separate Account A, like the Investment Fund in Prudential, is a "segregated account" that guarantees nothing to the annuitant but does afford the annuitant (Plaintiff) the opportunity to earn a return or suffer a loss. The investment by the annuitant here, like the investment by the annuitant in Prudential, is an "invest[ment] in securities." See id.

Other courts have reached the same conclusion in analogous situations. It is common practice in the securities industry for a brokerage company to purchase shares of stock or a mutual fund on behalf of an investor, and then title the shares in the company's name, rather than the investor's name. The investor's ownership is then evidenced by a book entry; title however lies with the broker. The SEC describes this practice as "street name":

> When you buy securities through a brokerage firm, most firms will automatically put your securities into 'street name.' This means your brokerage firm will hold your securities in its name...and not in your name, but your firm will keep records showing you as the real or 'beneficial owner.' You will not get a certificate, but will receive an account statement from your broker on at least a quarterly...basis showing your holdings.

(Dec. RL ¶ 12 Ex. K). This practice is, of course, widespread and well known in the investment industry. [10] Like the vast majority of mutual fund investors, Plaintiff's

---

[10] As reported in the Investment Company Institute's ("ICI") 2007 submission to the SEC (AXA is a member of the ICI), the practice of "street naming" is widespread in the mutual fund industry:

Mutual funds also have a significant portion of their shares held in street name.

633552.1

shares are not titled in her name; they are titled in AXA's name and held in AXA's account.

In <u>Jones</u>, the Supreme Court noted that under ICA § 36(b), Congress "granted individual investors a private right of action...." 130 S.Ct. at 1423. Thus, were the Court to accept AXA's title argument, <u>Jones</u> would only permit those who titled mutual funds in their own names to prosecute ICA § 36(b) claims. It would inexplicably deprive a much larger group of identically situated investors from availing themselves of the protection afforded by ICA § 36(b).

Several Courts of Appeal have, in securities litigation, rejected the argument AXA advances here. These courts have found that the equitable owner of a security, not the title owner, is the shareholder or "security holder."

For example, in <u>Drachman v. Harvey</u>, 453 F.2d 722, the Second Circuit examined the issue of "whether shareholders who held stock in 'street name' ...have standing to maintain a derivative action for violations of § 10(b) [of the Securities Exchange Act of 1934]...when state law... would require as a prerequisite to standing that derivative plaintiffs be 'registered' or 'record' owners...." <u>Id.</u> at 724. The Court

---

For mutual funds sold via sales forces (either proprietary or non-proprietary), shares held in street name ranged from 78 percent to 100 percent of total fund shares, with a median of 80 percent....

Dec. RL ¶13, Ex. L p. 5.

19                                                                         633552.1

recognized that plaintiffs would only possess statutory standing if they satisfied the

requirement of FED.R.CIV. PRO. 23.1, which limits derivative action to shareholders.

Id. at 726-727.  This rule, the Circuit Court acknowledged, requires that "plaintiff

[be] a shareholder..." Id. at 726, fn. 7.  Ruling that FED. R. CIV. PRO. 23.1 "confers

standing upon beneficial shareholders...." id. at 727, the Court found that the identity

of the title holder of the shares was irrelevant because

> it seems unreasonable to think that the [Federal] Rule contemplates the right
> to proceed in a Federal court by one in whose name the stock has been issued
> merely because such stock is recorded but who as a matter of fact owns nothing
> and at the same time deny such right to one who owns all the **equitable and
> beneficial interest in the stock merely because it was not issued in his name
> and therefore not of record.** That is precisely the situation with which we are
> confronted.  HFG Co. v. Pioneer Pub'g Co., 162 F.2d 536, 540 (7th Cir. 1947)

Id. at 730 (emphasis added).  See also, Silber v. Mabon, 957 F.2d 697 (9th Cir. 1992):

> [M]ost publicly traded stock is held in the 'street name' of brokerage houses
> for the benefit of their customers. Only brokerage houses or other 'record
> owners' appear on official corporate transfer records. The actual interest in the
> stock **and consequently, the interest in any lawsuit relating to the stock) is
> that of the beneficial owner.**

Id. at 699 (emphasis added).  See also In re Franklin Nat. Bank Securities Litigation,

574 F.2d 626 (2d Cir. 1978).

　　　Five years after Drachman, the Third Circuit adopted the Second Circuit's

holding in In re The Pittsburgh and Lake Erie Railroad Co. Securities and Anti-Trust

Litig. 543 F.2d 1058 (3d Cir. 1976) ("Pittsburgh").  There, a parent company pledged

633552.1

the stock of its subsidiary to plaintiff, Irving Trust. Plaintiff sued the parent for "violations of federal securities laws," which resulted in a settlement challenged by Irving Trust. Id. at 1061. The District Court held that plaintiff lacked standing to challenge the settlement because the subsidiary's stock was not titled in Irving's name. Id. at 1063. The Third Circuit Court of Appeals reversed. It acknowledged that FED. R. CIV. PRO. 23.1 was controlling, and that it required that "the plaintiff (1) must be a stockholder...," id. at 1065, but found this requirement was satisfied:

> It is the general rule, as well as the generally preferred view, that a pledgee of stock, whether or not that stock has been registered in the pledgee's name on the books of the corporation, has the same right to protect his stockholder's equity as does a pledgor.. ... Moreover, situations will arise, as in this case, where the pledgor is the principal alleged wrongdoer. In such situations the interests of the pledgor and of the pledgee substantially conflict. A rule that would condition the pledgee's derivative suit rights upon the willingness of the pledgor to assert them would tend to aggravate the potential for harm implicit in that conflict. **In short, the only federal rule consistent with sound public policy is one which recognizes that the equitable interest of a pledgee of stock is sufficient to confer standing in a Rule 23.1 derivative action.**

Id. at 1067 (emphasis added).

The concerns articulated by the Third Circuit in Pittsburgh are applicable here as well. AXA is the investment manger to the AXA Funds, comparable to  the "pledgor" of shares; AXA is also alleged to be the "principal wrongdoer." Thus, if the Court were to  accept AXA's argument, then the only way a recovery for AXA's ICA § 36(b) violations could be realized would be if AXA were to sue itself.  Given the purpose of  ICA § 36(b), see Jones,  130 S.Ct. at 1422, it makes no sense to

21

deprive Plaintiff of standing while conferring it exclusively on AXA, the party charged with wrongdoing.[11]

Based on the logic of the cases cited above and the language of ICA § 36(b), Plaintiff, as the beneficial owner, is a security holder.

## B.    State Law Is Irrelevant To the Standing Analysis

AXA's title/standing argument is also flawed because it is premised on state law, specifically, N.Y. Ins. Law § 4240(a)(12), which provides that "amounts allocated by the insurer...to separate accounts shall be owned by the insurer...." (Db6). However, Federal law, not state law, controls the standing analysis.

In Drachman, the defendants' claimed that a state law (California) was determinative of whether plaintiffs had standing to pursue their Federal securities law claims. Drachman, 453 F.2d at 726. California law required "that derivative plaintiffs be 'registered' or 'record' owners' [of the shares]," id at 724, and thus, "California law, if applied, would bar this suit." Id. at 728. However, the Second Circuit Court of

---

[11]    The cases cited above use the term "shareholder," while ICA § 36(b) uses the term "security holder." These terms have been used interchangeably by the Supreme Court. See e.g. Daily Income Fund v. Fox, 464 U.S. 523 (1984) and Jones, two Supreme Court cases that focused exclusively on  ICA § 36(b).  By way of example, the Court in Daily Income Fund, stated that "the fiduciary duty imposed on advisers by § 36(b) is owed to the company itself as well as its **shareholders.** " Id. at fn. 11 (emphasis added). . In Jones, the Supreme Court stated:  "[w]e consider in this case what a mutual fund **shareholder** must prove in order to show that a mutual fund investment adviser" violated ICA § 36(b). Id. at 1422 (emphasis added). AXA also uses this term (Db2).

633552.1

Appeals held that state law was irrelevant for purposes of determining standing under a federal securities law because "Federal law must be consulted to decide whether there is standing to sue..." Id. at 727.

The Third Circuit Court of Appeals adopted this view in Pittsburgh, 543 F.2d at 1066:

> The [Second Circuit] court held that federal law controlled the standing issue and that the federal rule recognizing equitable stock interests was controlling. Judge Moore reasoned that just as it would be intolerable to permit the vagaries of state law to define securities for the purpose of federal substantive legal requirements, it would be intolerable to permit the vagaries of state law to introduce a lack of uniformity into the federal law of remedies for violations of those legal requirements.
>
> Any doubt as to the propriety of the Second Circuit's approach in federalizing the law of standing to assert a federal law cause of action derivatively was removed by the decision in Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co., supra, ....

Thus, federal law (under which Plaintiff has standing) applies to the exclusion of New York state law.

### C.   AXA's Cases Do Not Support Its Argument Or Are In Conflict With Third Circuit Jurisprudence

None of the cases AXA relies upon support its argument -- that title is determinative of "security holder" status. Rather the cases AXA string cites stand for the proposition that "courts have not hesitated to dismiss Section 36(b) claims where the plaintiff does not own shares in the funds at issue" (Db12). This proposition is inapplicable here.

633552.1

Several of the cases cited by Defendants dismissed complaints where a plaintiff never had any economic interest in the funds identified in the complaint. See, e.g., In re Am Mut. Funds Fees Litigs., No. 5593, 2005 U.S.Dist. Lexis 41884, *8 (C.D. Cal. Dec. 16, 2005) ("Plaintiffs cannot bring derivative claims on behalf of any of the ten funds in which they own no interest"). The remaining cases are distinguishable because there the plaintiff had sold her shares in the funds on whose behalf she sued. See e.g. Santomenno v. John Hancock Life Ins. Co., 2011 WL 2038769 (D.N.J. May 23, 2011), appeal docketed, No. 11-2520, 3d Cir. (June 8, 2010). Here, Plaintiff's monies remain invested in the AXA Funds.

AXA cites Kauffman v. Drefyus Fund, Inc., 434 F.2d 727, 735 (3d Cir. 1970) for the proposition that one who does not own shares in a mutual fund lacks standing to bring a claim on its behalf (Db12). Kauffman, however, supports Plaintiff's position. There, Plaintiff, a shareholder of four mutual funds, filed a complaint against 65 other mutual funds. Id. at 731. The Court, relying on the text of Fed. R. Civ. Pro. 23.1, held that the plaintiff could not bring suit on behalf of the 65 mutual funds in which he had no interest at all but, that, "there is no doubt that appellee may litigate derivative actions in behalf of the four funds in which he holds shares." Id. at 734.

Here Plaintiff has confined her claims to mutual funds in which she invested and in which AXA admits she holds shares: "[t]he...table describes the fees...**you**

24                                                                                                          633552.1

pay if **you buy** and **hold** shares of the Portfolio [AXA Fund]." (D Ex. p. 424 emphasis added). Plaintiff thus may litigate actions on behalf of the funds in which she is invested.

Curran v. Principal Mgmt. Corp., No. 00433, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011), is distinguishable as well. Curran involved "[A] 'fund of funds' [which] is a registered investment company (mutual fund) that invests in other registered investment companies [the Underlying Funds]...." (Db18). Here the AXA Funds are not a fund of funds, they are traditional mutual funds. Further, in Curran, plaintiffs did not have standing with respect to the "underlying funds" because they "'do not enjoy any of the incidents of ownership or possession' of any security in the Underlying Funds because they 'do not have the privilege of voting, they do not receive dividends and they do not receive liquidations with regard to the Underlying Funds.'" Id. at *4. Here, Ms. Sivolella has the privilege of voting, dividends enhance the value of her investments and, when she withdraws her investment in the AXA Funds, she will receive those proceeds, as well as any dividends (D Ex. p. 417).

Moreover, the unreported Curran decision, as construed by AXA, is inconsistent with the Third Circuit Court of Appeals decision in Prudential. Curran, as AXA notes, was based on the Court's conclusion that "it was of no significance that 'the fortunes of the [fund of funds] shareholders [were] interwoven and completely dependent upon the efforts and success of investments in the underlying

25                                                          633552.1

funds'" (Db19).    This  observation  cannot  be  reconciled  with   Third  Circuit jurisprudence.

In <u>Prudential</u>, the Court rejected an argument that was substantively indistinguishable from AXA's argument here. Prudential, an insurance company, had established an Investment Fund and sold shares of the fund to investors.  <u>Id</u>. at 384. Prudential claimed that, as an insurance company, it did not have to register its fund with the SEC because:

> [t]he Act [ICA] only regulates identifiable business entities with some sort of internal organization, and **that it [Prudential] is the only such entity involved in this program.** ... [T]he 'fund' referred to in the Act means a mutual fund..., but not Prudential's Investment Fund.

<u>Id.</u> at 386  (emphasis added).   The SEC disagreed, finding the fund was required to be registered.

The manner in which the Court analyzed the issue is informative.  The Court reasoned that:  (1) the ICA is to be broadly construed to protect those whose assets are at risk; (2) the form of a transaction must yield to its substance to accomplish the salutary goals of the ICA; and (3) the ICA's definitions were drafted generally to encompass all situations (there an annuity) in which an investor is at risk:

> [W]e start with the premise that securities legislation must be **broadly construed**.... <u>Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180 (1963)

*     *     *     *

633552.1

...Mr. Justice Brennan has...observed, the regulatory provisions of the Act 'are of particular relevance to situations where the investor is committing his funds to the hands of others on an equity basis, with the view that the funds will be invested in securities and his fortunes will depend on the success of the investment.' VALIC, 359 U.S. at 79, 79 S.Ct. at 626, 3 L.Ed.2d 640 (concurring opinion). **Furthermore, a study of the legislative history of the Act shows that Congress intentionally drafted the statutory definitions in general terms in order to control such situations regardless of the legal form or structure of the investment enterprise.**

*    *    *    *

The Investment Company Act of 1940 contains significant safeguards for the protection of those who, like the purchasers of variable annuities, invest in 'securities.' These safeguards, characterized by the Commission as insuring 'corporate democracy,'...**and the regulation of fees**.... See VALIC, 359 U.S. at 79, 79 S.Ct. at 626, 3 L.Ed.2d 640. **The mere fact that the investment program in the case at bar is under the aegis of an insurance company ought not to negate compliance with these controls in the absence of compelling circumstances.**

Id. at 386-88 (emphasis added).

Thus, based on the structure of ICA § 36(b)," the policies that underlie the ICA, and the character of Plaintiff's interest, she is a "security holder" in the AXA Funds as that term is used in ICA § 36(b),.

**POINT II**

**ICA §47(b) CREATES A PRIVATE RIGHT OF ACTION TO ENFORCE ICA §26(f)**

Plaintiff claims that AXA's excessive investment management fees, which she paid through her AXA variable annuity contract, violated ICA § 26(f). This statute provides in part as follows:

27

> It shall be unlawful for any...separate account funding variable insurance contracts, or for the sponsoring insurance company...to sell...such contract- (A) unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered....

Contrary to AXA's assertion (Db20-3), Plaintiff does not allege or claim that there

is a private right of action under ICA § 26(f). Rather, that statute is a predicate to a

claim under ICA § 47(b), which provides, in part, that:

> (1) A contract that is made, or whose performance involves a **violation of this subchapter...is unenforceable by either party**...

> (2) To the extent that a contract described in paragraph (1) has been performed, a court may **not deny rescission at the instance of any party**....

(emphasis added). Thus, in Count III, Ms. Sivolella seeks recovery of the fees that

violate ICA § 26(f)[12], pursuant to ICA § 47(b).

The question before the Court is therefore whether ICA § 26(f), which, unlike

---

[12]   In fn. 18 of its brief AXA suggests that Count III is deficient because it focuses on one component of AXA's fees: investment management fees. This is a factual argument and is unsound. If a fee that AXA charges for a specific service is unreasonable, the total fees are unreasonable in the aggregate. The protections of ICA § 26(f) would be eviscerated if AXA's argument is accepted. AXA could charge unreasonable fees-no matter how grossly excessive-as long as the fee was limited to one of many categories. Cf., Levy v. Alliance Capital Mgmt. L.P., 189 F.3d 461 (2d Cir. 1999) ("payments of each type must be examined for reasonableness separately, not aggregated"). AXA's argument also contradicts the text of the ICA, as § 26(b)(3) specifically provides that "all fees...imposed for any manner...shall be considered." In addition, ICA § 47(b)(3), protects "the lawful portion of the contract."   AXA's argument is inconsistent with the legislative history of ICA § 26(f), which states that "aggregate charges...includes all fees...including... investment advisory [fees]....(Dec. RL¶ 14 Ex. M). See also AC ¶¶ 220-22, explaining why the elements of ICA § 26(f) are satisfied with respect to AXA's investment management fee.

633552.1

other provisions of the ICA, does not confine enforcement powers to the SEC, is among the provisions of the ICA that may be enforced by those afforded rights under ICA § 47(b). The starting point for the analysis of this issue must, of course, be the language of ICA § 47(b), which is consistent with the notion that it extends a private right of action to enforce ICA § 26(f). First, ICA § 47(b) refers to "a violation of this subchapter" which suggests that this section is intended to be all encompassing; not limited to specified provisions. Second, insofar as ICA § 47(b) renders certain contracts "unenforceable by either party" or allows "rescission at the instance of any party," "or allows recovery for unjust enrichment," it is apparent this section confers a private right of action. The SEC is not a "party" to contracts that violate the ICA, investors are. The SEC sustains no loss if an insurance company is "unjustly enriched" by an unlawful contract, investors do.

Plaintiff's argument, that ICA § 47(b) creates a private right of action for specified types of redress for a violation of any provision of the ICA, which does not, by its terms, confine enforcement powers to the SEC, is supported by case law as well. Thus, the Supreme Court has found that the substantially similarly worded contract-voiding provisions in § 215 of the Investment Advisors Act (the "IAA") and § 29(b) of the Securities and Exchange Act of 1934 ("1934 Act") extend private rights of action. Moreover, other Courts have found that a private right of action exists under ICA § 47(b). Finally, this position is consistent with the SEC's amicus

633552.1

brief in <u>Olmstead v. Pruco Life Ins. Co.</u>, 283 F.3d 429 (2d Cir. 2002) and, by

implication, the Third Circuit's decision in <u>Prudential</u>.

ICA § 47(b) is nearly identical in its text to other federal securities laws, which

the Supreme Court has held create a private right of action. In <u>Mills v. Electric

Auto-Lite Co.</u>, 396 U.S. 375 (1970), the plaintiff sued to set aside a corporate merger

claiming that the proxy materials violated § 14(a) of the 1934 Act. <u>Id.</u> at 377.

Section 14(a), like ICA § 26(f), does not contain a private right of action, it merely

prescribes certain conduct as unlawful. Thus, the plaintiff in <u>Mills</u> sought to employ

§ 29(b) of the 1934 Act to enforce rights under §14(a). <u>Id.</u> at 386-88. The former

provision, like ICA § 47, stated that:

> Every contract made in violation of any provisions of this chapter or of any
> rule or regulation thereunder . . . shall be void (1) as regards the rights of any
> person who, in violation of such provision, rule or regulations . . . .

<u>Id.</u> at 388, fn 8. The Supreme Court observed that § 29(b) of the 1934 Act has

> counterparts in the...**Investment Company Act**, and the [IAA], as rendering
> the contract merely voidable at the option of the innocent party. (Citations
> omitted). This interpretation is eminently sensible. **The interests of the victim
> are sufficiently protected by giving him the right to rescind** . . . .

(<u>Id.</u> at 387-88; emphasis added).   The ICA counterpart, which the <u>Mills</u> Court

expressly cited, was § 47(b), the section Plaintiff invokes here. <u>Id.</u> at 388, fn. 10.

Since <u>Mills</u> recognized that § 29(b) of the 1934 Act would allow a suit based upon

a violation of a different provision of the Act (one that is silent on rights and

633552.1

remedies), ICA § 47(b) should likewise be construed to permit a suit based upon a violation of ICA § 26(f).

Several years later, the Supreme Court decided <u>Transamerica Mortg. Advisors, Inc. v. Lewis</u>, 444 U.S. 11, 19 (1979), analyzing the implications of § 215 of the IAA. Substantially identical to § 47(b) of the ICA, section 215(a) provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void." Section 215(b) of the IAA further provides:

> (b) Every contract made in violation of any provision of this subchapter...the performance of which involves the violation of...any provision of this subchapter...shall be void (1) as regards the rights of any person who, in violation of any such provision...shall have made or engaged in the performance of any such contract....

The Supreme Court held that a plaintiff could employ IAA § 215 to sue for equitable relief predicated upon a contract that violated another provision of the IAA. <u>Transamerica</u>, 444 U.S. at 19.

Clearly where a statute is construed to create a private right of action, a similarly worded statute, should be similarly construed. <u>Alexander v. Sandoval</u>, 532 U.S. 275, 279-80 (2001)(internal citations omitted). ICA § 47(b) was amended in 1980, P.L.96-477, 1980 H.R. 7554 (1980) (Dec. RL ¶ 15 Ex. N), after the Supreme Court's decisions in <u>Mills</u> and <u>Transamerica</u>. The 1980 amendments of the ICA substantially tracked IAA § 215, which had been previously construed by the

31                                                                                          633552.1

Supreme Court to provide a private right of action. Transamerica, 444 U.S. at 19.
Thus, the Court's reasoning in Sandoval, 532 U.S. at 280-84, that similarly worded
statutes should be similarly construed especially when the statute at issue was
amended after a provision is judicially construed, supports Plaintiff's position here.
See Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc., 916 F.Supp. 1343, 1349
(D.N.J. 1996) (citing Transamerica as recognizing a private right of action under ICA
§ 47(b) to sue on the basis of a violation of another provision of the ICA).

The District Court of New Jersey, and other Courts have held that a private
right of action exists under ICA § 47(b),(See, e.g. Blatt, 916 F.Supp. at 1349;
Mathers Fund, Inc. v. Colwell Co. 564 F.2d 780, 783 (7th Cir. 1977); and
Tarlov v. Paine Webber Cashfund, Inc., 559 F.Supp. 429, 438 (D. Conn. 1983).

The SEC concurs. With respect to the specific question of whether ICA §
47(b) creates a private right of action to enforce ICA § 26(f), the SEC, in an *amicus*
brief to the Second Circuit, stated:

> The SEC submitted this brief in response to the Court's request that it address
> 'whether Section[] 26...provide[s] a private right[] of action.' ... We believe,
> however, that the most appropriate remedy of a violation of the
> requirements...[of ICA §26] is the express remedy set forth in Section 47(b) of
> the ICA....
>
>       *        *        *        *
>
> Moreover, Congress was aware of Transamerica at the time it amended [ICA
> §47(b)] in 1980 - the legislative history of the bill containing the amendment
> expressly cites the case in discussing private rights of action. See H.R. Section
> 96-1341 at 28 n. 6. Indeed given the explicit langauage in ICA 47(b)(2) that
> creates a presumption in favor of rescission, the remedy under the current

32

version of Section 47(b) should be viewed as an express right rather than an implied one.

        \*       \*       \*       \*

A violation of...26(f)...give[s] rise to a cause of action under [ICA §] 47(b).

(Dec. RL¶4 Ex. C, pp.1;8-9)[13]

All of AXA's cases are distinguishable because the (1) the ICA statute alleged to contain a private right of action was not ICA § 47(b) see e.g, In re Franklin Mut. Funds Fee Litig., 388 F. Supp. 2d 451 (D.N.J. 2005); or (2) the court found the predicate statute was not violated. For example, in Santomenno, plaintiffs brought a claim under ICA § 47(b) to recover fees that violated ICA § 26(f). The District Court dismissed plaintiff's **ICA § 36(b)** claim because she had sold her shares, and then dismissed her ICA § 47(b) claim, which alleged a predicate violation of ICA § 26(f), "[b]ecause the Court has already dismissed Plaintiff's Section 36(b) claim, the only other cause of action under the ICA, the Section 47(b) claim would seem to fail also." Id. at 15-16. While the District Court misread ICA § 36(b) as the predicate violation for plaintiff's ICA § 47(b) claim, the Court's analysis does not support Defendants' argument here.[14]

---

[13]   Contrary to AXA's assertion, in Olmstead the Court declined to rule on whether ICA § 47(b) creates a private right of action for violations of ICA § 26(f) "[b]ecause the plaintiffs' make no claim under § 47(b)...." 283 F.3d at 436,  Fn 5.).

[14]   On a motion to dismiss, it would be premature  for the Court to decide whether or not there has been a violation of ICA § 26(f).

633552.1

In <u>Steinberg v. Janus Capital Mgmt., LLC</u>, No. 10-1207 2011 WL 6118599 (4th Cir. Dec. 2, 2011), the plaintiff alleged a predicate violation of ICA § 36(b) and sought "flight damages." "Flight damages...are not damages in the context of Section 36(b)." <u>Id.</u> at 4. As ICA § 36(b) "expressly provides a limited damages remedy," the Court reasoned that "Plaintiffs are not entitled to rescission under Section 36(b)." <u>Id.</u> at * 6. Thus, these cases merely hold that, if there is no predicate violation, ICA §47(b) does not itself provide a plaintiff with standing.

In <u>Smith v. Oppenheimer Funds Distrib., Inc.</u>, No. 7387, 2011 WL 4565587 (S.D.N.Y. June 6, 2011), the court read ICA § 47(b) to be a standing provision and indicated that it could be used to bring an action under ICA § 36(b), but ruled that an action under ICA § 36 (a) was foreclosed because that provision could only, by its terms, be enforced by the SEC. <u>Smith</u> appears to be correct insofar as the Court ruled that ICA § 47(b) may not be used to bring a suit under a statute that confines the right to sue to the SEC. However, ICA § 26 does not confine standing to the SEC.

<u>Smith</u>, <u>Steinberg</u> and <u>Santomenno</u>, it is respectfully submitted, erred insofar as they might be interpreted to require that the predicate statute contain rights-creating language in order to be enforceable under ICA § 47(b) for the following three reasons. First, this interpretation ignores the language of ICA § 47 that makes any contract which violates the ICA unenforceable; it is not limited by its terms to those provisions of the ICA which contain rights-creating language. A Court should not

34

infer a limitation in a statute which Congress did not adopt.

Second, the decisions of the unreported cases cannot be reconciled with the Supreme Court's opinions in <u>Mills</u> and <u>Transamerica</u>, which allow suits under similarly worded counterparts to ICA § 47(b) predicated on statutes that are not "rights-creating."  Third, ICA § 47(b) contains its own rights creating language and nothing more is required.  For if a predicate statute must itself contain rights-creating language, then ICA § 47(b) becomes superfluous, since a victimized investor could sue under the predicate statute.

In sum, ICA § 47(b) permits suits for limited equitable relief for a violation of any provision of the ICA, other than those which, by their terms, confine enforcement authority to the government, <u>e.g.</u> ICA § 36(a).  ICA § 47(b) is not necessary to allow a security holder to sue under any provision of the ICA which contains its own rights creating language, <u>e.g.</u> ICA § 36(b); standing is already provided in the rights-creating provision.  However, if a provision of the ICA is silent as to who may enforce it, such as ICA § 26(f), a plaintiff mayt invoke ICA § 47(b).

In light of : (1) other courts holdings that a private right of action exists under ICA § 47(b); (2) the SEC's brief in <u>Olmstead,</u>; (3) the Third Circuit's holding in <u>Prudential</u>, 326 F.2d at 388, that the ICA

> contains significant safeguards for the protection of those who, like the purchasers of variable annuities, invest in 'securities.' These safeguards, characterized by the...,'regulation of fees.... See <u>VALIC</u>, 359 U.S. at 79.

35

and (4) the Supreme Court's holdings in <u>Mills</u>, and <u>Transamerica</u>, a private right of action exists under ICA § 47(b) for violations of ICA § 26(f).[15]

## POINT III

## PLAINTIFF HAS BROUGHT A VALID UNJUST ENRICHMENT CLAIM

In Count IV, Plaintiff, on behalf of all persons who paid AXA's investment management fees, brings a claim for unjust enrichment. This claim is premised on the fact that, while the sub-advisers to the AXA Funds performed most of the investment management services for these funds, AXA's investment management fees, which were paid by Plaintiff, greatly exceeded the sub-advisers' fees and were excessive.

AXA argues that, if this Court dismisses Plaintiff's statutory claims, it must dismiss the unjust enrichment claim because it is an ancillary state claim. However, Plaintiff has pled the unjust enrichment claim under the Federal common law (AC ¶ 232) (Plaintiff's "unjust enrichment claim is brought under Federal common law"). A claim for unjust enrichment exists under the federal common law. <u>See</u>, <u>C.H. Sanders Co., Inc. v. BHAP Housing Develop. Fund Inc.</u>, 903 F.2d 114, 118 (2d Cir. 1990) "Restitution for unjust enrichment is not provided by federal statute. Its availability is part of the federal common law relating to statutory violations"), and

---

[15] The Third Circuit, in <u>Santomenno</u>, will hear oral argument on whether ICA § 47(b) confers a private right of action for a violation of ICA § 26(f) on February 9, 2012

633552.1

the ICA specifically recognizes this claim.  See, ICA § 47(b)(3)(B)  and SEC's amicus brief in Olmsted stating: "47(b)(3)(B), which expressly permits recovery for unjust enrichment."  (Dec. RL ¶ 4 Ex. C p.9).  Further, ICA § 44 (Jurisdiction of Offenses and Suits) confers jurisdiction over this claim on the Court.

AXA also argues Plaintiff's unjust enrichment claim fails because she "plead it directly, rather than derivatively on behalf of the Funds" (Db26).  If the Court rules in favor of AXA on Plaintiff's ICA § 36(b) claim and finds she is not a security holder of the AXA Funds, then it follows that Plaintiff's cause of action for unjust enrichment is proper as a direct claim.  Since she will not be a shareholder of the AXA Funds, Plaintiff's loss is not secondary, but rather, separate and distinct from that sustained by the security holders of the AXA Funds.  Plaintiff directly paid for services that were not provided and has her own claim, not a derivative claim.  Cf. Kusner v. First Penn. Corp., 531 F.2d 1234, 1239 (3d Cir. 1976) ("[i]f the purchasers can prove that they parted with that consideration as a result of material misrepresentations in a prospectus, they may recover in a direct action whether or not their interest in the corporation would support a derivative suit").[16]  In re Triarc Comp., Inc., 791 A.2d 872, 878 (Del. Ch. 2001), cited to by AXA, also supports

_____

[16] AXA misrepresented in a prospectus that its fees are in compliance with ICA § 26(f):  "AXA...represents that its fees and charges deducted under the contracts...in the aggregate...are reasonable in relation to the services rendered...." (Dec. RL¶ 6 Ex. E)

633552.1

Plaintiff's position: "[t]o set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders....'" If the Court finds Plaintiff is not a shareholder of the funds, her injury, paying excessive compensation to AXA, is "distinct from that suffered by...shareholders," because she is not a shareholder.

AXA's final argument, that it was "not ... 'unjustly enriched' by...receipt of management fees because they were paid pursuant to the Funds' Management Agreements" (see Db27), is unavailing. See Norman v. Salomon Smith Barney, Inc., 350 F. Supp. 2d 382, 390 (S.D. N.Y. 2004) and Restatement (Third) of Restitution & Unjust Enrichment § 32 (2011) ("A person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from the recipient ... if restitution is required by the policy of the underlying prohibition"). As Plaintiff alleges, the fees AXA charged violated both ICA §§ 26(f) and 36(b), such fees were thus charged pursuant to illegal or unenforceable contracts.

Moreover, Plaintiff was not a party to the Management Agreement, so her rights are not addressed under the contract. See Db28 (agreement between EQ Advisors Trust and AXA). Nonetheless, Ms. Sivolella's money was used to pay the excessive investment management fees to AXA, and she has a right to recover the excessive fees. In equity, "quasi-contractual rights [are] created to prevent unjust

633552.1

enrichment." <u>Archawski v. Hanioti,</u> 350 U.S. 532, 536 (1956). Defendants have been unjustly enriched by unlawful exactions from Plaintiff.

For these reasons, Plaintiff may maintain a direct claim against Defendants stemming from their unjust enrichment.

## CONCLUSION

For the above reasons, Plaintiff submits that the Court should deny AXA's motion to dismiss.[17]

Respectfully submitted,

Dated: February 2, 2012

<u>/s/ Robert Lakind</u>
Szaferman, Lakind, Blumstein
& Blader, P.C
101 Grovers Mill Road
Lawrenceville, NJ 08648
Phone: 609-275-0400

---

[17] To the extent the Court dismisses Plaintiff's Complaint on account of any deficiencies, she requests leave to amend her complaint.

633552.1