NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARY ANN SIVOLELLA, *for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio.*,<br><br>Plaintiff,<br><br>v.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY and AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC,<br><br>Defendant. | Civil Action No. 11-4194 (PGS)<br><br>**MEMORANDUM & ORDER** |

SHERIDAN, U.S.D.J.

      This action is brought by Plaintiff Mary Ann Sivolella on behalf of eight mutual funds[1] (collectively, the "AXA Funds"), EQ Advisors Trust (the entity that contains the AXA Funds), and any person or entity that paid to Defendants, AXA Equitable Life Insurance Company ("AXA Equitable") and AXA Equitable Funds Management Group, LLC (collectively "AXA"), any investment management fees on their investments into any AXA Fund. Plaintiff's claims are for excessive management fees pursuant to the

---

[1] EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/Intermediate Government Bond Index Portfolio.

1

Investment Company Act of 1940 ("ICA") § 36(b), and unjust enrichment. Defendants move to dismiss. For the following reasons, Defendant's motion is denied in part and granted in part.

## I.     FACTUAL BACKGROUND

### A.     The Excessive Fees Allegation

The Amended Complaint ("AC") alleges the following. AXA serves as the investment adviser to the AXA Funds, each of which is advised by a sub-adviser. AC ¶¶ 82-83. AXA has entered into contracts with the sub-advisers pursuant to which the latter, with minor exceptions, perform all of the investment management services for the AXA Funds. AC ¶ 84. AXA's role is generally limited to providing supervisory input. AXA charges the AXA Funds an investment management fee, which is deducted from the fund balance and thus reduces the value of Plaintiff's investment. AC ¶¶ 6, 77-85. AXA remits a portion of the investment management fees that it collects to each funds' respective sub-adviser. AC ¶¶ 84-85. Despite the alleged disparity between the services performed by AXA and the services performed by the sub-advisers, AXA retains most of the fees. *See e.g.*, AC ¶¶ 85-86, 150.

### B.     Plaintiff's Variable Annuity Contract

Plaintiff purchased a certificate under a group variable annuity contract issued by AXA Equitable. *See* AC ¶ 49. A variable annuity is "a contract between an investor and an insurance company," pursuant to which the insurance company "promises to make periodic payments to the contract owner or beneficiary, starting immediately or at some future time." *See* Joint SEC/NASD Report on Examination Findings Regarding Broker-Dealer Sales of Variable Insurance Products, at 5 (June 2004), *available at*

http://www.sec.gov ("SEC/NASD Report").  The insurance company typically places premiums paid by a variable annuity investor in a segregated account (referred to as a "separate account") owned by the insurance company.  *See id.*  The separate account then invests in the securities markets or in underlying mutual funds.  *Id.*  Under the terms of the variable annuity contract, the value of the benefits under the contract will generally reflect the performance of the investments in the separate account.  *See* SEC/NASD Report at 5.

Here, Plaintiff enrolled in the EQUI-VEST Deferred Variable Annuity Program (the "EQUI-VEST Program"), a variable annuity program offered by her employer, Newark School System.  *See* Ex. A[2] (Plaintiff's Certificate, dated March 26, 1999 (together with the applicable policy, the "Certificate"); Ex. B (EQUI-VEST Annuity Enrollment Application, dated March 22, 1999 ("Enrollment Form")).[3]  Plaintiff's employer offered the program to its employees in connection with a group annuity contract that it had entered into with AXA Equitable.  In connection with her participation in the EQUI-VEST Program, Plaintiff received a "Certificate" that set forth in substance the benefits to which she was entitled.  The Certificate provides that in exchange for Plaintiff's contributions to the EQUI-VEST Program, Plaintiff was entitled to receive a "variable annuity benefit."  Certificate at 12-15.

---

[2] Citations in the form of "Ex. __" are to the exhibits annexed to the Declaration of Jonathan M. Korn in Support of Defendants' Motion to Dismiss the Amended Complaint.
[3] These documents, which memorialize Plaintiff's variable annuity benefit with AXA Equitable, are considered on this motion to dismiss because they are essential to Plaintiff's claims.  *See e.g.*, *Green v. Potter*, 687 F. Supp. 2d 502, 509 n.5 (D.N.J. 2009).  A document is essential if it creates the rights or duties that are the basis for the Complaint.  *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Consistent with the typical structure of a variable annuity, AXA Equitable placed Plaintiff's contributions to the EQUI-VEST Program, along with contributions from other investors, in an account called "Separate Account A."  *See* AC ¶¶ 8, 31, 33, 218, 277; Certificate at 5.  Separate Account A, which is registered as a "unit investment trust" under the ICA, is used by AXA Equitable to maintain the structure required under the federal tax law to ensure treatment of variable contracts as "annuities" for tax purposes.  Ex. C (Prospectus for EQUI-VEST Employer-Sponsored Retirement Plans, dated May 1, 2011 ("EQUI-VEST Product Prospectus"), at 65).  The EQUI-VEST Product Prospectus states: "We [AXA Equitable] are the legal owner of all of the assets in Separate Account A and may withdraw any amounts that exceed our reserves and other liabilities with respect to variable investment options under our contracts."

As a participant in the EQUI-VEST Program, Plaintiff is permitted to allocate the contributions to her variable annuity certificate among a number of investment options, including the AXA Funds.  EQUI-VEST Product Prospectus at 1; *see* AC ¶¶ 31-33.  These investment options are "portfolios," the majority of which are offered through certain trusts created by AXA Equitable, including the EQ Trust.  See AC ¶¶ 3-4; Ex. D (Form N-1A, EQ Trust Prospectus, dated May 1, 2011 ("Trust Prospectus"), at 1).  The EQ Trust is a registered investment company under the ICA (also known as a mutual fund) and issues shares of beneficial interests that are divided among its various portfolios.  *See* AC ¶¶ 3-4; Trust Prospectus at 176.  The eight AXA Funds at issue in this case are offered through the EQ Trust and are among the portfolios that are available to Plaintiff as investment options in the EQUI-VEST Program.  *See* AC ¶¶ 3-4; EQUI-VEST Product Prospectus at 1; Trust Prospectus at 1.

The EQ Trust's Prospectus explains that "shares are currently sold only to insurance company separate accounts" and are "not sold directly to the general public." Trust's Prospectus at 30, 36, 40, 49-50, 54, 86, 102, 144. AXA Equitable caused Separate Account A to purchase shares of the EQ Trust corresponding to the Funds that Plaintiff selected as investment options. AC ¶ 33. Plaintiff was credited with "units" of Separate Account A that corresponded to her selected investments, including the AXA Funds. AC ¶ 8; EQUI-VEST Product Prospectus at 30 ("Each variable investment option invests in shares of a corresponding portfolio" and the "value in each variable investment option is measured by 'units.'"). The overall value of Plaintiff's units of Separate Account A fluctuated according to the value of the underlying securities. AC ¶ 8. However, the value of Plaintiff's units did not correspond directly to the Funds' investment performance. The value of Plaintiff's units of Separate Account A is reduced by certain "product level" fees that AXA Equitable charges, including, for example, charges for mortality and expense risks associated with the annuity. EQUI-VEST Product Prospectus at 30.

### C.     Procedural History

On July 21, 2011, Plaintiff filed a complaint against Defendants alleging that AXA charges excessive management fees to the Funds in violation of Section 36(b) of the ICA. In response, Defendants filed a motion to dismiss the complaint for lack of statutory standing. On November 4, 2011, Plaintiff filed the Amended Complaint, in which Plaintiff re-asserts her claim for excessive fees and asserts two new claims: (1) a claim under Sections 26(f) and 47(b) of the Investment Company Act, which alleges that because AXA allegedly charges excessive management fees, the fees charged under

Plaintiff's variable annuity contract are, in the aggregate, unreasonable, AC ¶¶ 31-43, 272-79; and (2) a claim for unjust enrichment, AC ¶¶ 44-48, 280-86.  By letter dated May 16, 2012, Plaintiff's counsel voluntarily dismissed Count III of the Amended Complaint, the 26(f) and 47(b) claim, in light of the Third Circuit Court of Appeals decision, *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 677 F.3d 178 (3d Cir. 2012), which affirmed the dismissal of a claim under the ICA where plaintiffs contended, as in this matter, that a private right of action existed under ICA § 47(b) for a violation of ICA § 26(f).  Counts I and II, the excessive fees claims, and Count IV, the unjust enrichment claim, remain.

## II.     DISCUSSION

### A.  Standard of Review

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn there from, and to view them in the light most favorable to the non-moving party.  *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim.  *Iqbal*, 129 S. Ct. at 1950.  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149, 121 S.Ct. 1091 (2001).  While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald

assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 129 S. Ct. at 1949; *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted); *see also Iqbal*, 129 S. Ct. at 1949-50.

### B.  Statutory Standing to Assert the Excessive Fees Claims

AXA does not contest the truth of Plaintiff's allegations that Section 36(b) was violated, nor does it dispute that it was unjustly enriched. Rather, AXA claims that Plaintiff cannot pursue her claims because she is not a "security holder" under the ICA, and therefore does not have statutory standing. For a federal court to have subject-matter jurisdiction over an action, the plaintiff must have standing to bring the action in the first instance. As a general matter, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). The question at issue here

7

involves statutory standing. "Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Graden v. Conexant Systems Inc.*, 496 F.3d 291, 295 (3d Cir. 2007) (emphasis in original). A plaintiff's statutory standing is a threshold question that implicates the Court's subject matter jurisdiction to hear this action. *See United States v. $487,825.00 in U.S. Currency*, 484 F.3d 662, 664 (3d Cir. 2007). Plaintiff, as the party invoking the jurisdiction of this Court, bears the burden of establishing that she has standing. *Common Cause of Penn. v. Commonwealth of Penn.*, 558 F.3d 249, 257 (3d Cir. 2009).

Section 36(b) of the ICA provides that investment advisers have a "fiduciary duty with respect to the receipt of compensation for services" that they provide to mutual funds. 15 U.S.C. § 80a-35(b). However, Section 36(b) limits those who may pursue a claim, stating that an action may be brought only "by the [SEC], or by a security holder on behalf of" a mutual fund that is allegedly charged excessive fees. *Id.* The term "security holder" is not defined in the ICA. In the Amended Complaint, Plaintiff asserts that she is a "security holder" of the Funds (or in the alternative, the EQ Trust). AC ¶¶ 6, 7. Defendants argue, however, that the Complaint contains few, if any, facts to support Plaintiff's allegation.

The Defendants' basic position is that the term "security holder," as used in Section 36(b), refers to the legal or record owner of a security. Plaintiff's position is that the term refers to the equitable or beneficial owner of a security. In support of Defendants' position, they primarily point to the statutory text. However, here the statutory text is ambiguous, as the term "security holder" is undefined.

8

The purpose that underlies the ICA, and particularly Section 36(b) is to "create[] protections for mutual fund shareholders." *Jones v. Harris Assocs. L.P.*, 130 S.Ct. 1418, 1422 (2010). The ICA "must be broadly construed in order to insure the investing public a full measure of protection." *Prudential Ins. Co. of Am. v. S.E.C.*, 326 F.2d 383, 386 (3d Cir. 1964). Congress intentionally drafted the statutory definition in general terms in order to control situations regardless of the legal form or structure of the investment. *Id.* at 287-88. In analyzing the nearly identical definition of "security holder" under the Securities Exchange Act, the United States Supreme Court, in light of the broad definition of the term "security," said, "we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation." *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990). The Court added:

> The Court will consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities.'

*Id.* at 66. Given the above, it seems to make little sense to broadly construe the word "security," and limit the reach of "holders" to entities that lack any economic interest or stake in the transaction. Here, it would make no sense to limit standing to enforce ICA § 36(b) to AXA or any other entity that did not pay the allegedly excessive compensation. Neither Separate Account A nor the EQ Trust – the two entities AXA suggests are the "security holders" – has any economic stake in the transactions.

On the other hand, Plaintiff and similarly situated investors are responsible for and paid all of the challenged fees. Plaintiff and other investors bear the full risk of poor investment performance. Plaintiff and other investors have the right to instruct AXA how

9

to vote their shares.[4]  Assets held in a separate account are immune from claims of AXA's creditors, while being vulnerable to claims of the investors' creditors.  And when Plaintiff decides to withdraw her investment in the AXA Funds, she, not AXA, pays the taxes on that investment.  Given that, Plaintiff has all of the economic stake in these transactions.

Defendants cite *Curran v. Principal Mgmt. Corp.*, No, 00433, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011), as the "most analogous" case to the matter before this Court.  In *Curran*, the Court held that, for the purposes of Section 36(b), an investor in a "fund of funds" is not a "security holder" in the mutual funds invested in by the fund of funds.  *Curran* is distinguishable for a number of reasons, most notably, that in *Curran*, plaintiffs did not have standing with respect to the underlying funds because they "d[id] not enjoy any of the incidents of ownership or possession of any security in the Underlying Funds because they d[id] not have the privilege of voting, they d[id] not receive dividends and they d[id] not receive liquidations with regard to the Underlying Funds."  *Id.* at *4 (internal quotation marks omitted).  As previously stated, here, Plaintiff has the right to instruct AXA how to vote, dividends enhance the value of her investments, and when she withdraws her investment in the AXA Funds, she will receive those proceeds, as well as any dividends.

---

[4] The EQUI-VEST Product Prospectus says that when a shareholder vote is required on certain matters affecting the Funds, AXA Equitable votes the shares.  At 65-67.  However, Plaintiff points out that AXA's SEC filings say that variable annuity contract owners will have the opportunity to instruct AXA how to vote the number of shares attributable to their contracts.  Plaintiffs' allegations are accepted as true on this motion to dismiss.

For the reasons stated above, Defendants' motion to dismiss the excessive fees claims is denied.

### C.     Unjust Enrichment

Plaintiff asserts an unjust enrichment claim under the federal common law. Plaintiff's claim is premised on the fact that, while the sub-advisers to the AXA Funds performed most of the investment management services for these funds, AXA's investment management fees, which were paid by Plaintiff, greatly exceeded the sub-advisers' fees and were excessive.  However, Plaintiff has not shown that this Court should allow its claim to proceed.  The Third Circuit has held that federal common law causes of action are warranted when they are "necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in the large by Congress." *Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1017-1018 (3d Cir. 1997) (quoting *Plucinski v. I.A.M. Nat'l Pension Fund*, 875 F.2d 1052, 1056 (3d Cir. 1989)).  Furthermore, the Court has held that district courts "should not easily fashion" additional claims "under the guise of federal common law."  *Id.* (quoting *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 239 (3d Cir. 1994)).  Because Plaintiff brings a claim under ICA § 36(b), the federal common law "unjust enrichment" claim is dismissed, as it is not needed to fill in interstices of the ICA.

## ORDER

**IT IS** on this 21st day of September, 2012:

**ORDERED** that Defendants' motion to dismiss Counts I and II is hereby DENIED (ECF No. 19); and it is further

**ORDERED** that Defendants' motion to dismiss Count IV is hereby GRANTED (ECF No. 19).

<u>*s/Peter G. Sheridan*</u>
PETER G. SHERIDAN, U.S.D.J.
