SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Robert L. Lakind, Esquire
    Arnold Lakind, Esquire
    Steven Blader, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
By: Moshe Maimon, Esquire
    Danielle Disporto, Esquire
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys For Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio; MARY ANN SIVOLELLA for the use and benefit of the EQ Advisors Trust; MARY ANN SIVOLELLA, individually and on behalf of any person or entity that is a party to a variable annuity contract issued by/sold by AXA Equitable Life Insurance Company, which offered the ability to invest in, and resulted in an investment in, the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the | **Civil Action No. 3:11-cv-04194-PGS-DEA**<br><br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

712552.1

EQ/Large Cap Value PLUS Portfolio, the
EQ/Global Multi-Sector Equity Portfolio, the
EQ/Mid Cap Value PLUS Portfolio, the
EQ/GAMCO Small Company Value, or the
EQ/Intermediate Government Bond Index
Portfolio; and MARY ANN SIVOLELLA,
individually and on behalf of any person or
that paid investment management fees to
either AXA Equitable Life Insurance
Company or AXA Equitable Funds
Management Group, LLC, on account of
investments in, the EQ/Common Stock
Index Portfolio, the EQ/Equity Growth
PLUS Portfolio, the EQ/Equity 500 Index
Portfolio, the EQ/Large Cap Value PLUS
Portfolio, the EQ/Global Multi-Sector Equity
Portfolio, the EQ/Mid Cap Value PLUS
Portfolio, the EQ/GAMCO Small Company
Value, or the EQ/Intermediate Government
Bond Index Portfolio

     Plaintiffs,

vs.

AXA Equitable Life Insurance Company and
AXA Equitable Funds Management Group,
LLC,

     Defendants.

Plaintiff, MARY ANN SIVOLELLA ("Plaintiff Sivolella"), whose street address is 55

Sheffield Drive, Forked River, New Jersey 08731, brings this action on behalf of, and for the benefit

of, the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity

500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity

Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio

712552.1

and the EQ/Intermediate Government Bond Index Portfolio (collectively, the "AXA Funds");
PLAINTIFF SIVOLELLA brings this action on behalf of, and for the benefit of, the EQ Advisors
Trust on account of investment management fees charged to the AXA Funds; PLAINTIFF
SIVOLELLA,  bring this action individually and on behalf of any person or entity that is a party to
a variable annuity contract with AXA Equitable Life Insurance Company, which offered the ability
to invest in, and resulted in an investment in any AXA Fund; and PLAINTIFF SIVOLELLA also
brings this action individually and on behalf of any person or entity that paid to AXA Equitable Life
Insurance Company or AXA Equitable Funds Management Group, LLC, any investment
management fees on their investments into any AXA Fund, and sues Defendant, AXA Equitable Life
Insurance Company and Defendant, AXA Equitable Funds Management Group, LLC, (both
Defendants' principal place of business is located at 1290 Avenue of the Americas, New York, New
York 10104), alleges:

## I.     NATURE OF ACTION - INVESTMENT COMPANY ACT § 36(b), 15 U.S.C. § 80a-35(b) CLAIM

1.      This action is a derivative action brought by Plaintiff Sivolella, for the benefit of, and
on behalf of the AXA Funds, or alternatively, the EQ Advisors Trust, pursuant to the Investment
Company Act of 1940 ("ICA") § 36(b)

2.      ICA § 36(b), 15 U.S.C. § 80a-35(b), provides that an investment manager to a
registered investment company (more commonly known as a mutual fund) acts in a fiduciary
capacity when it charges fees to the registered investment company. Thus, this statute authorizes
security holders of the registered investment company to sue the investment adviser for
compensation it receives for its advisory services that is in breach of its fiduciary duties. This statute
also authorizes a security holder of a registered investment company to sue any affiliated person of

712552.1

such adviser, who also has a fiduciary duty concerning compensation or payments received from such registered investment company, for a breach of fiduciary duty.

3.     The EQ Advisors Trust ("Advisors Trust") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq*., comprised of various mutual funds/portfolios, including the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, and the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the AXA Funds). Each of the AXA Funds has its own investment objective/goals.

4.     Certain registered investment companies are organized as series trusts, which is a single registered investment company that contains within it numerous portfolios/mutual funds. Each portfolio/mutual fund within a series trust has its own investment strategy. The Advisors Trust is a series trust. The AXA Funds are 8 out of the 64 mutual funds/portfolios contained within the Advisors Trust.

5.     AXA Equitable Life Insurance Company provides conflicting disclosures as to whether the security it issues, on account of an investment into an AXA Fund, is a share of the AXA Fund, or a share of the Advisors Trust that corresponds to the AXA Fund in which the investor invests.

6.     Plaintiff Sivolella, from at least April 1, 2010, through to the present (i.e., continues to be) is a security holder in the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO

712552.1

Small Company Value Portfolio, and the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the AXA Funds).

7.     Alternatively, if the Advisors Trust (*i.e.*, the registered legal entity that contains the AXA Funds) issues shares of the Advisors Trust that correspond to each AXA Fund, then Plaintiff Sivolella, from April 1, 2010, through to the present (*i.e.*, continues to be) is a security holder in the Advisors Trust.

8.     According to the Defendants, when Plaintiff Sivolella (or any other investor) invested her money in any AXA Fund, shares of that AXA Fund, (or in the alternative, shares of the Advisors Trust that correspond to that specific AXA Fund)[1], are issued to Separate Account A and she received a "unit" of Separate Account A.   According to the Defendants, these units "corresponded to her selected investments, including the Funds. ...   Therefore, ... the overall value of Plaintiff's units of Separate Account A 'increase[d] or decrease[d] as though [Plaintiff] had invested in the corresponding portfolio's shares directly'...." (quotations and bracketed text in the original).

9.     Thus, Plaintiff Sivollela is, and has been since from at least April 1, 2010, a security holder of the AXA Funds, or in the alternative, the Advisors Trust.  Furthermore, she is the payer of the investment management fees that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charge to, and receive from, the AXA Funds.

10.     AXA Equitable Funds Management Group, LLC, is the investment adviser to the Advisors Trust.  AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, make inconsistent disclosures as to whether AXA Equitable Life Insurance Company

---

[1]With respect to the first sentence of this paragraph, Defendants have not acknowledged whether they issues shares of the AXA Funds or the Advisors Trust as a consequence of investments into the AXA Funds)

712552.1

or AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the AXA Funds. However, AXA Equitable Funds Management Group, LLC, is a wholly owned subsidiary of AXA Equitable Life Insurance Company. Thus, AXA Equitable Life Insurance Company is an affiliated person (as defined in the ICA) of AXA Equitable Funds Management Group, LLC. AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, are both registered with the Securities and Exchange Commission ("SEC") as investment advisers. Given these conflicting disclosures, two derivative claims are brought herein. One claim is brought on behalf of the AXA Funds and, in the alternative, one claim is brought on behalf of the Advisors Trust.

11.      AXA Equitable Funds Management Group, LLC[2], in its capacity as the investment adviser to the AXA Funds and the Advisors Trust, is sued in this derivative Amended Complaint based on its misconduct related to its wrongful receipt of investment management fees paid by the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

12.      AXA Equitable Life Insurance Company is the investment adviser to the AXA Funds, which are contained in the Advisors Trust. Thus, AXA Equitable Life Insurance Company, which owes a fiduciary obligation to the AXA Funds/Advisors Trust, on account of serving as their investment advisor and as an affiliated person of AXA Equitable Funds Management Group, LLC, (which is its subsidiary), is sued in this derivative complaint based on its misconduct related to its wrongful receipt of investment management fees paid by the AXA Funds/Advisors Trust in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

13.      AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management

---

[2]      AXA Equitable Funds Management Group, LLC, is occasionally referred to as "Funds Management Group unit" within the AXA Funds' public filings.

712552.1

Group, LLC, charged, and continue to charge, the AXA Funds and Advisors Trust, investment advisory fees for alleged investment management services.[3]  These fees are paid from the AXA Funds'/Advisors Trust's assets and thus are borne by Plaintiff Sivolella and the other investors.

14.    In addition to having AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, as their investment adviser/manager, each AXA Fund also has a sub-adviser (or in some cases sub-advisers) that, with minor exceptions, perform all of the investment management services for each AXA Fund.

15.    AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, have contracted with these sub-advisers, and such sub-contracts require the sub-advisers to perform, with minor exceptions, all of the investment management services that are needed by each AXA Fund.

16.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, collects from the Advisors Trust, through each of the AXA Funds, a "management fee" for their alleged investment management services to each AXA Fund.  They retain the bulk of that investment management fee, and remit a much smaller fee[4] to each of the AXA Funds' sub-advisers,

---

[3]    The term "investment advisory services" and "investment management services" are used interchangeably in this Complaint.

[4]    However, in the case of the EQ GAMCO/Small Company Value Portfolio, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, investment management fee only exceeds the sub-adviser's fee by 103%.  However, as explained below, in light of the Defendants' minimal investment management services, as compared to the sub-advisers' investment management services, it is unclear why the Defendants' investment management fees are not, in all cases, with respect to all of the AXA Funds, significantly below that of the sub-advisers.  Further, with respect to the remaining funds, the Defendants' investment management fees exceeds that of the sub-advisers by a minimum of 245% , up to a maximum of 1649%, and this translates into the Defendants receiving a greater fee (than that of the sub-advisers) by approximately $46million.

which are the entities that provide, with minor exceptions, all of the investment management services to each AXA Fund.  As an example of the significance of the fee retained by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for the EQ/Intermediate Government Bond Index Portfolio, in 2010, the Defendants retained an investment management fee that was 1649% greater the amount that was paid to that AXA Fund's sub-adviser.

17.    Pursuant to the "Funds' [Investment] Management Agreement" (a copy of which AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, filed with the Court on October 17, 2011 (Docket No. 11-5)), and is hereinafter referred to as the "IMA")[5] AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, as the AXA Funds' investment manager, allege/claim, they perform, for their  investment management fees, the following services:

> Subject always to the direction and control of the Trustees of the Trust, Manager [*i.e., AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC*] will have (i) overall supervisory responsibility for the general management and investment of each Portfolio's assets; (ii) full discretion to select new or additional Advisers [*i.e., sub-adviser*] for each Portfolio [*i.e., AXA Fund*]; (iii) full discretion to enter into and materially modify existing Advisory Agreements [*i.e., sub-advisory agreements*] with Advisers; (iv) full discretion to terminate and replace any Adviser; and (v) full investment discretion to make all determinations with respect to the investment of a Portfolio's assets **not then managed by an Adviser.** In connection with Manager's responsibilities herein, Manager will assess each Portfolio's investment focus and will seek to implement decisions with respect to the allocation and reallocation of each Portfolio's assets among one or more current or additional Advisers from time to time, as the Manager deems appropriate, to enable each Portfolio to achieve its investment goals. In addition, Manager will monitor compliance of each Adviser with the investment objectives, policies and restrictions of any Portfolio or Portfolios (or portions of any Portfolio) under the management of such Adviser, and review and report to the Trustees of the Trust on the performance of each Adviser. Manager will furnish, or cause the appropriate Adviser(s) to furnish, to the Trust such statistical information, with respect to the investments that a Portfolio (or portions of any Portfolio) may hold or contemplate

---

[5]Through the inclusion of the text of the IMA, which the Defendants filed with this Court, Plaintiff is in no way conceding that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, actually provide the alleged services contained in it.

712552.1

purchasing, as the Trust may reasonably request. On Manager's own initiative, Manager will apprise, or cause the appropriate Adviser(s) to apprise, the Trust of important developments materially affecting each Portfolio (or any portion of a Portfolio that they advise) and will furnish the Trust, from time to time, with such information as may be appropriate for this purpose. Further, Manager agrees to furnish, or cause the appropriate Adviser(s) to furnish, to the Trustees of the Trust such periodic and special reports as the Trustees of the Trust may reasonably request. In addition, Manager agrees to cause the appropriate Adviser(s) to furnish to third-party data reporting services all currently available standardized performance information and other customary data.

(Emphasis added)

18.     Thus the services AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, allegedly provide to the AXA Funds pursuant to the IMA are all predominantly oversight/supervisory services.

19.     AXA Equitable Life Insurance Company has even represented on its website that AXA Equitable Funds Management Group, LLC, "provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [9]   Further, while it alleges it is providing oversight services, these services are also presumably limited because, according to the sub-advisory agreements, it is the Fund's sub-adviser who "formulate and implement a continuous investment program for [each Fund]", which is the core investment management service needed for a mutual fund.

20.     Further, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's supervisory role is also presumably limited given that the Advisors Trust's Board is charged with the substantial supervision of the Funds.  According to the May 1,

---

[9]     *See* "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html

9

2011 SAI, "the Trust's Board is responsible for the overall management of the Trust and the Portfolios, including general supervision and review of the Portfolios' investment activities and their conformity with federal and state law as well as the stated policies of the Portfolios. The Board elects the officers of the Trust who are responsible for administering the Trust's day-to-day operations."

21.    If AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC, performed all of the alleged services listed in the IMA at ¶17 for each AXA Fund, if the fees charged for these alleged services were the product of arm's length bargaining, they should have been, for each AXA Fund, a fraction of the fees charged by each Fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.

22.    Thus, a comparison of (A) the fees paid to the AXA Fund's sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged minor amount of investment management services (especially as compared to the sub-advisers' investment management services), reflects that a substantial portion of the investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their investment management services were so disproportionately large that they bore no reasonable relationship to the services it rendered and could not have been the product of an arm's-length bargaining and thus in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b) occurred.

23.    Plaintiff Sivolella, who is a current security holder in the AXA Funds or, in the event Defendants issues shares of the Advisors Trust, the Advisors Trust, and has been since April 1,

712552.1

2010, through the present, on account of investments into the AXA Funds, alleges that the

investment management fees charged by AXA Equitable Funds Management Group, LLC, and/or

AXA Equitable Life Insurance Company, for their alleged investment management services to each

of the AXA Funds, were in breach of these Defendants' fiduciary duties under ICA § 36(b), 15

U.S.C. §80a-35(b).

24.     Plaintiff Sivolella brings this action derivatively pursuant to ICA § 36(b), 15 U.S.C.

§80a-35(b), on behalf of the AXA Funds.

25.     Alternatively, if AXA Equitable Life Insurance Company and/or AXA Equitable

Funds Management Group, LLC, issues shares of the Advisors Trust that correspond to investments

into the AXA Funds, Plaintiff Sivolella brings this action derivatively pursuant to ICA § 36(b), 15

U.S.C. §80a-35(b), on behalf of the Advisors Trust.

26.     Plaintiff Sivolella, seeks pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on

behalf of the AXA Funds, or in the alternative the Advisors Trust, the actual damages resulting from

the breaches of fiduciary duties by AXA Equitable Life Insurance Company and/or AXA Equitable

Funds Management Group, LLC, which includes a substantial amount of the compensation and

payments received by these Defendants for alleged investment management services to the AXA

Funds, and/or, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), rescission of the contracts, that

resulted in these breaches, due to AXA Equitable Life Insurance Company's and/or AXA Equitable

Funds Management Group, LLC 's, violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

27.     Plaintiff Sivolella, with respect to her claims for a violation of ICA § 36(b), 15

U.S.C. § 80a-35(b), seeks a recovery from the earliest date permitted by the statute through the latest

date permitted by the statute.

712552.1

28.     Most of Plaintiff's allegations below are based on statements contained in (i) SEC filings for the Advisors Trust, that AXA Equitable Life Insurance Company filed on behalf of each AXA Fund and (ii) agreements that AXA Equitable Life Insurance Company entered into with each AXA Funds' subadviser(s), on the Funds' behalf (these agreements are also filed by AXA Equitable Life Insurance Company with the SEC).

29.     Many of the statements relied upon below come from AXA Equitable Life Insurance Company's Advisors Trust February 3, 2011 N-1A SEC filing ("February N-1A") and AXA Equitable Life Insurance Company's Advisors Trust April 28, 2011 N-1A SEC filing ("April N-1A").  Both SEC filings were filed by AXA Equitable Life Insurance Company on behalf of the AXA Funds/Advisors Trust and generally contain the same material information.  A portion of the February N-1A filing, known as the prospectus, has an effective date of April 24, 2011, and the other portion, known as the Statement of Additional Information ("SAI"), has an effective date of May 1, 2011 ("May 1, 2011 SAI").  The April N-1A has an effective date of May 1, 2011 (both the prospectus and SAI contained in this filing have a May 1, 2011 effective date).[10]

30.     On information on belief, the statements that are contained in (i) any SEC filing relied upon below, and (ii) any sub-advisory agreement entered into between AXA Equitable Life Insurance Company and a sub-adviser (these agreements are also filed with the SEC) relied upon below, represent/reflect the conduct/actions of AXA Equitable Life Insurance Company and AXA

---

[10]     On August 16, 2011, AXA Equitable Life Insurance Company, on behalf of a specific share class of the AXA Funds, filed an N-1A filing, that may take effect on August 16, 2011.  This N-1A filing, which is not yet effective, does not contain any statements, with respect to the AXA Funds (except for the EQ/Intermediate Government Bond Index; *see* footnote 4 *infra*), that are materially different from the statements that are contained in the April N-1A filing.

712552.1

Equitable Funds Management Group, LLC, for the entire time period that Plaintiff is permitted to seek a recovery under ICA § 36(b)(3), 15 U.S.C. §80a-35(b)(3).

## II.     NATURE OF ACTION - VIOLATION OF ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2); RELIEF SOUGHT UNDER ICA § 47(b), 15 U.S.C. § 80a-46(b)

31.    Defendant AXA Equitable Life Insurance Company issues/sells variable annuity contracts to persons and/or entities (on information and belief these are both group and individual annuity contracts).  Investments into the AXA Funds (which are contained within the Advisors Trust) were made through/on account of such contracts.  These variable annuity contracts are hereinafter referred to as the "AXA Variable Annuity Contracts."

32.    Through the AXA Variable Annuity Contracts, investments can be made into the following mutual funds/portfolios: EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, or the EQ/Intermediate Government Bond Index Portfolio (*i.e.*, the AXA Funds).

33.    All of the AXA Variable Annuity Contracts, through which investments into the AXA Funds were made, were funded by Separate Account A, which is a registered separate account under the ICA.  AXA Equitable Life Insurance Company is the sponsor of Separate Account A.

34.    Under ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2), it is unlawful for any registered separate account funding variable insurance contracts, or for the sponsoring insurance company of such account, to sell any such contract, unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company.

712552.1

35.     In light of the minimal/limited investment management services provided by AXA Equitable Life Insurance Company to the AXA Funds, investments into any one of the Funds results in the charging by AXA Equitable Life Insurance Company of excessive/unreasonable investment management fees.  These fees are deducted under the AXA Variable Annuity Contracts.

36.     A comparison of (A) the fees paid to the AXA Funds' sub-advisers for performing, with minor exceptions, all of the investment management services, and (B) the fees paid to AXA Equitable Life Insurance Company for its alleged minimal investment management services, reflects that a substantial portion of the investment management fees paid to AXA Equitable Life Insurance Company for its investment management services were, so disproportionately large that they bore no reasonable relationship to the services they rendered and could not have been the product of an arm's-length bargaining and thus, in the aggregate, the fees and charges deducted under the AXA Variable Annuity Contracts were unreasonable in relation to the services rendered, the expenses incurred and the risks assumed by AXA Equitable Life Insurance Company.

37.     Under ICA § 47(b), 15 U.S.C. § 80a-46(b), any party to such unlawful contract has an express right to bring an action for equitable relief, including rescission of such contract, or its unlawful portions thereof, and restitution.

38.     Plaintiff Sivolella is a party to a AXA Variable Annuity Contract under which she was charged, and continues to be charged, unreasonable investment management fees (in light of the minimal investment management services provided by AXA Equitable Life Insurance Company that were predominantly supervisory in nature) on account of investments into the AXA Funds.  Plaintiff Sivolella seeks recovery for such excessive and unreasonable investment management fees.

39.     All parties to an AXA Variable Annuity Contract that were charged, under such

712552.1

contracts, excessive/unreasonable management fees on account of their investments into the AXA Funds, in violation of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2), that seek rescission of their contract, or its unlawful portions thereof, and restitution are referred to as the AXA Variable Annuity Contract Class.  Plaintiff Sivolella is a member of the AXA Variable Annuity Contract Class.

40.     Plaintiff Sivolella brings this action pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), on behalf of herself, and all members of the AXA Variable Annuity Contract Class, to recover a substantial portion of the investment management fees charged by Defendant AXA Equitable Life Insurance Company, which were in violation of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2), under the AXA Variable Annuity Contracts.

41.     Pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), the AXA Variable Annuity Contract Class seeks rescission of any AXA Variable Annuity Contract, or portions thereof, in an amount equal to the excessive and unreasonable portion of the investment management fees that were charged by, and received from, AXA Equitable Life Insurance Company on account of the members of the AXA Variable Annuity Contract Class's investments into the AXA Funds.

42.     To the extent any of the unreasonable fees (i.e., the excessive investment management fees that were paid on account of the  AXA Variable Annuity Contract Class's investments into the AXA Funds) incurred under the AXA Variable Annuity Contracts, were paid to Defendant AXA Equitable Funds Management Group, LLC, the AXA Variable Annuity Contract Class, seeks restitution of the portion of the investment management fees received by AXA Equitable Funds Management Group, LLC, that were paid by the members of the AXA Variable Annuity Contract Class, because AXA Equitable Funds Management Group, LLC, was unjustly

enriched due to its collection of unreasonable fees in violation ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2).

43. While a different legal standard applies in determining whether ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2) has been violated, the factual allegations that support Plaintiff's ICA § 36(b), 15 U.S.C. § 80a-35(b) claim, are also relied upon to support Plaintiff's claim that ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2) has been violated. Thus, the allegations that support Plaintiff's claim that ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2) was violated are based on the same SEC filings and subadvisory agreements, relied upon to demonstrate that a violation of ICA § 36(b), 15 U.S.C. § 80a-35(b) occurred. Further, on information and belief, any of the statements that are contained in (i) any SEC filing relied upon below, and (ii) any sub-advisory agreement entered into between AXA Equitable Life Insurance Company and a sub-adviser (these agreements are also filed with the SEC), represent/reflect the conduct and actions of AXA Equitable Life Insurance Company for the entire time period that Plaintiff is permitted to seek a recovery under ICA § 47, 15 U.S.C. §80a-46, for the violations of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2).

## III.   NATURE OF ACTION-UNJUST ENRICHMENT CLAIM

44. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC, were substantially enriched by their retention of a substantial portion of the investment management fees they charged the AXA Funds, since these funds' sub-advisers, with minor exceptions, perform all of the investment management services for these funds, but were paid much smaller fees than those paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC.

712552.1

45.     A comparison of (A) the fees paid to the AXA Funds' sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged minimal investment management services (as compared to the sub-advisers' investment management services), reflects that a substantial portion of the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their investment management services were so disproportionately large that they bore no reasonable relationship to the services they rendered and could not have been the product of an arm's-length bargaining and thus clearly the Defendants were unjustly enriched on their receipt of a significant portion of the investment management fees they were paid on investments into the AXA Funds.

46.     Plaintiff Sivolella, individually, and on behalf of any person or entity that paid investment management fees to either AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, brings a claim for unjust enrichment against these Defendants on account of the fact that they were unjustly enriched due to their receipt of a substantial portion of the investment management fees paid to them on account of investments into the AXA Funds.  This class is hereinafter referred to as the Payer Class (which includes Plaintiff Sivolella).

47.     The Payer Class brings its unjust enrichment claim under Federal common law and seeks recovery from the earliest time permitted in equity.

48.     The factual allegations that support Plaintiff's ICA § 36(b), 15 U.S.C. § 80a-35(b) claim, are also relied upon to support Plaintiff's unjust enrichment claim against AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC.  Thus, the allegations that

17

support Plaintiff's claim that Defendants AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, were unjustly enriched are based on the same SEC filings and subadvisory agreements, relied upon to demonstrate that a violation of ICA § 36(b), 15 U.S.C. §80a-35(b) occurred. Further, on information and belief, any of the statements that are contained in (i) any SEC filing relied upon below, and (ii) any sub-advisory agreement entered into between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and a sub-adviser (these agreements are also filed with the SEC), represent/reflect the conduct and actions of AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, for the entire time period that Plaintiff is permitted to seek a recovery under ICA § 47, 15 U.S.C. §80a-46, for the violations of ICA § 26(f)(2), 15 U.S.C. § 80a-26(f)(2).

## IV.   THE PARTIES

### A.   Plaintiff

49.   Plaintiff Sivolella resides at 55 Sheffield Drive, Forked River, New Jersey 08731, and from at least April 1, 2010 through to the present is, and continues to be, a security holder of each of the AXA Funds, or in the alternative, the Advisors Trust. Plaintiff Sivolella is also a party to an AXA Variable Annuity Contract and is the payer of investment management fees to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on account of investments into the AXA Funds.

### B.   Defendants

50.   Defendant, AXA Equitable Life Insurance Company is a New York corporation engaged in the business of, among other things, serving as the investment adviser to the AXA Funds and as the issuer/seller of AXA Variable Annuity Contracts. It is also the sponsor of Separate

712552.1

Account A and its principal place of business is 1290 Avenue of the Americas, New York, New York 10104. This Defendant received investment management fees on account of Plaintiff Sivolella's (and other investors) investments into the AXA Funds.

51.     Defendant, AXA Equitable Funds Management Group, LLC, is a New York corporation engaged in the business of, among other things, serving as the investment adviser to the Advisors Trust and the AXA Funds. Its principal place of business is also 1290 Avenue of the Americas, New York, New York 10104. This Defendant received investment management fees on account of Plaintiff Sivolella's (and other investors) investments into the AXA Funds.   AXA Equitable Funds Management Group, LLC, is a wholly owned subsidiary of AXA Equitable Life Insurance Company.

52.     The relevant SEC filings provide conflicting information on whether AXA Equitable Life Insurance Company or AXA Equitable Funds Management, LLC, serves as the investment manager/adviser for the AXA Funds. The prospectus portion of both the February and April N-1A filings state that AXA Equitable Life Insurance Company is the investment manager to the AXA Funds. The SAI potion of the February and April N-1A state that "AXA Equitable, through its AXA Funds Management Group unit, currently serves as the investment manager" for each of the AXA Funds.

**V.     JURISDICTION AND VENUE**

53.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

54.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43.

712552.1

55.    No pre-suit demand on the Boards of the AXA Funds or the EQ Advisors Trust is required, as the demand requirement under Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under ICA § 36(b), 15 U.S.C. § 80a-35(b).

**VI.    FACTORS RELEVANT TO VIOLATIONS OF ICA § 36(b), 15 U.S.C. § 80a-35(b) AND ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2)/RELIEF SOUGHT UNDER ICA §47(b), 15 U.S.C. §80-46(b) AND UNJUST ENRICHMENT**

**A.    VIOLATION OF ICA § 36(b), 15 U.S.C. § 80a-35(b)**

56.    A registered investment company is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).

57.    A registered investment company is commonly known as a mutual fund.

58.    Congress recognized as early as 1935 that because "a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor." S. Rep. No. 91-184, p. 5 (1969). Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.*

59.    As a result, Congress enacted the ICA in 1940 recognizing that:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interest of [shareholders] . . . or when the investment companies . . . are not subjected to adequate independent scrutiny.

712552.1

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994).  Accordingly, the ICA was designed to regulate and curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Assoc.*, *L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund*, 464 U.S. at 536), and to create standards of care applicable to investment advisers and their affiliates, such as AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC.

60.     By the 1960s, it had become clear to Congress that investment advisers to registered investment companies/mutual funds were charging those funds excessive fees, particularly by not taking economies of scale into account.

61.     Thus, ICA § 36(b), 15 U.S.C. § 80a-35(b), was added to the ICA in 1970, (primarily to remedy excessive fees charged by a registered investment company, such as the one in which Plaintiff Sivolella owns shares on account of investments into the AXA Funds), which created a federal cause of action for breach of fiduciary duty by investment advisers.  ICA § 36(b), 15 U.S.C. § 80a-35(b), – which imposes a fiduciary duty on investment managers (and their affiliates/affiliated persons) with respect to the receipt of compensation for services – states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. ***An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation*** or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

ICA § 36(b), 15 U.S.C. § 80a-35(b) (emphasis added).

712552.1

62.     The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders." Indeed, the goal of ICA § 36(b), 15 U.S.C. § 80a-35(b), is to empower shareholders to independently police whether investment advisers have fulfilled their fiduciary obligations.

63.     "The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and is "potentially incestuous." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)

64.     Through ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent check on an adviser's fulfillment of its fiduciary duties and receipt of unfair fees.  By enacting ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress provided shareholders with a means to redress breaches of the adviser's fiduciary duty to the funds it manages and distributes while leaving the "ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court." S. Rep. 91-184, p. 6.

65.     ICA § 36(b), 15 U.S.C. § 80a-35(b), itself does not set forth a list of factors to be considered in determining whether investment advisers, such as AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have breached their fiduciary duties with respect to their receipt of compensation for investment management services charged to, and paid by, the AXA Funds, or in the alternative, the Advisors Trust on account of investments into the AXA Funds.

66.     The test for determining whether fee compensation paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, violates ICA § 36(b), 15 U.S.C. § 80a-35(b), is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928.

67.     If an adviser charges a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining" (*see Jones*, 130 S.Ct. at 1418 (quoting *Gartenberg*)), the adviser has violated ICA § 36(b), 15 U.S.C. § 80a-35(b).

68.     In the context of  ICA § 36(b), 15 U.S.C. § 80a-35(b), litigation, courts have historically considered, *inter alia*, the following factors ("*Gartenberg* Factors"):

> (1)     the nature and quality of services being paid for by the fund and its investors;
>
> (2)     whether the trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;
>
> (3)     what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;
>
> (4)     whether savings from economies of scale were passed to the funds and their investors or kept by the investment adviser; and
>
> (5)     the costs of providing investment management services and the profitability of providing those services to the funds.

69.     As set forth below, an examination of the *Gartenberg* Factors demonstrates that the investment management fees charged to the AXA Funds, or in the alternative, the Advisors Trust, and their investors, breached and continue to breach AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, fiduciary duties to the Advisors Trust.

712552.1

Indeed, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, receipt of the excessive investment management fees were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's-length bargaining.

70.     Count I of this Amended Complaint alleges that a substantial portion of the investment management fees charged (and paid by Plaintiff Sivolella) on account of investments into the AXA Funds violated ICA § 36(b), 15 U.S.C. §80a-35(b).   Count II of this Amended Complaint, is substantively the same claim as Count I, with one difference. As stated above, AXA Equitable Life Insurance Company makes conflicting disclosures as to whether it, on account of investments into the AXA Funds, issues shares of the AXA Funds or shares of the Advisors Trust that correspond to investments in the AXA Funds.   Thus, Count I applies to the situation where AXA Equitable Life Insurance Company issues shares of the AXA Funds, while Count II, which is an alternative to Count I, applies if it is AXA Equitable Life Insurance Company's practice to issue shares of the Advisors Trust, that correspond to the AXA Funds (instead of shares of the AXA Funds).   These claims are based on an analysis of the *Gartenberg* Factors.[11]

---

[11] Because the underlying allegations of both Count I and Count II are based on the same operative facts, Plaintiff's ICA § 36(b), 15 U.S.C. §80a-35(b) allegations are drafted as if it is AXA Equitable Life Insurance Company's practice to issues shares of the AXA Funds, as opposed to shares of the Advisors Trust. However, in the event AXA Equitable Life Insurance Company issues shares of the Advisors Trust, the underlying factual allegations that support Count I, equally apply to Count II, with the distinction that AXA Equitable Life Insurance Company issues shares of the EQ Advisors Trust rather than issuing shares of the AXA Funds.

712552.1

**B.**    **Violation of  ICA 26 § (f)(2), 15 U.S.C. § 80a-26(f)(2)/ Recovery Sought Under ICA § 47(b), 15 U.S.C.  § 80a-46(b)**

71.    Count III of this Amended Complaint alleges that a substantial portion of the investment management fees charged to/paid by members of the AXA Variable Annuity Contract Class, on account of investments into the AXA Funds, violated ICA §  26(f)(2), 15 U.S.C. §80a-26(f)(2).  Recovery is sought under ICA § 47(b), 15 U.S.C.  § 80a-46(b).

72.    Under ICA §26(f)(2), 15 U.S.C. § 80a-26(f)(2), "[i]tshall be unlawful for any registered separate account funding variable insurance contracts, or for the sponsoring insurance company of such account, to sell any such contract-- (A) unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company...."

73.    While a different legal standard applies in determining whether ICA § 26(f)(2), 15 U.S.C. §80a-26(f)(2) and ICA § 36(b), 15 U.S.C. §80a-35(b), has been violated, the factual allegations alleged in this Amended Complaint that support Plaintiff's ICA § 36(b), 15 U.S.C. §80a-35(b) claim, including an analysis of the *Gartenberg* Factors, are relied upon to demonstrate that ICA § 26(f)(2), 15 U.S.C. §80a-26(f)(2) has been violated.

**C.**    **UNJUST ENRICHMENT**

74.    Count IV alleges that the AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  were unjustly enriched on account of their receipt of a substantial portion of the investment management fees charged to/paid by members of  the Payer Class on account of investments into the AXA Funds.  Such fees were in violation of both ICA § 36(b), 15 U.S.C. §80a-35(b), and ICA § 26(f)(2), 15 U.S.C. §80a-26(f)(2).

75.     In order to succeed on an unjust enrichment claim, three elements must be established. These elements are: (1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

76.     While a different legal standard applies in determining whether AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have been unjustly enriched, the factual allegations alleged in this Amended Complaint that support Plaintiff's ICA § 36(b), 15 U.S.C. §80a-35(b) claim, including an analysis of the *Gartenberg* Factors, also demonstrate that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have been unjustly enriched by receipt of a substantial portion of the investment management fees paid by the Payer Class to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on account of the Payer Class's investments into the AXA Funds.

## VII.   APPLICATION OF THE GARTENBERG FACTORS/ICA § 36(b), 15 U.S.C. §80a-35(b) CLAIM/§ 26(f)(2), 15 U.S.C. §80a-26(f)(2) VIOLATION-RECOVERY SOUGHT UNDER ICA § 47(b), 15 U.S.C. § 80a-46(b)/UNJUST ENRICHMENT

### A.   THE NATURE AND QUALITY OF THE INVESTMENT MANAGEMENT SERVICES PERFORMED BY AXA EQUITABLE LIFE INSURANCE COMPANY AND/OR AXA EQUITABLE FUNDS MANAGEMENT GROUP DOES NOT JUSTIFY THEIR INVESTMENT MANAGEMENT FEE

77.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment manager to each of the AXA Funds, and by serving in that capacity, receive a significant amount of annual compensation for the alleged investment management services they claim to provide to the AXA Funds (which are contained in the Advisors

712552.1

Trust).  Plaintiff, as a security holder in the AXA Funds (or the Advisors Trust) is the payer of that compensation as such fees are charged to Plaintiff, and other investors, on account of their investments in the AXA Funds.

78.    The AXA Funds pay a management fee to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, based on a stated percentage of each AXA Fund's asset value.  As such, the investment management fees are not based on the investment management services actually rendered by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, actual costs in providing those services to the AXA Funds.

79.    With respect to the AXA Funds, AXA Equitable Life Insurance Company has contracted with sub-advisers, and such sub-contracts require the sub-advisers to perform, with minor exceptions, all of the investment management services that are needed by each AXA Fund.  With respect to the investment management services the Defendants allege to provide for each AXA Fund, if the fees charged for these alleged services were the product of arm's length bargaining, they should have been,  for each AXA Fund, a fraction of the fees charged by each  Fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.  However, with respect to investment management fees, by comparison, on average, the Defendants' investment management fees exceed the sub-advisers investment management fees by 496%.

80.    With respect to the AXA Funds, AXA Equitable Life Insurance Company  has subcontracted its investment management duties to, among others: (i) AllianceBernstein L.P.

712552.1

("AllianceBernstein") pursuant to an Investment Advisory Agreement ("AllianceBernstein

Agreement"); (ii) BlackRock Capital Management, Inc. ("BlackRock Capital") pursuant to an

Investment Advisory Agreement ("BlackRock Capital Agreement"); (iii) BlackRock Investment

Management, LLC ("BlackRock") pursuant to an Investment Advisory Agreement ("BlackRock

Agreement"); (iv) Morgan Stanley Investment Management Inc. ("MSIM") pursuant to an

Investment Advisory Agreement ("MSIM Agreement"); (v) GAMCO Asset Management, Inc.

("GAMCO") pursuant to an Investment Advisory Agreement ("GAMCO Agreement"); (vi)

Wellington Management Company, LLP ("Wellington") pursuant to an Investment Advisory

Agreement ("Wellington Agreement"); and (vii) SSgA Funds Management, Inc. ("SSgA")

pursuant to an Investment Advisory Agreement ("SSgA Agreement") .

81.     The AllianceBernstein Agreement, the BlackRock Capital Agreement, the

BlackRock Agreement, the MSIM Agreement, the GAMCO Agreement, the Wellington

Agreement and the SSgA Agreement (hereinafter collectively referred to as the "Advisory

Agreements") are entered into between AXA Equitable Life Insurance Company on behalf of the

AXA Funds, and the respective sub-adviser.

82.     Each of the AXA Funds has a sub-adviser, or in some cases, sub-advisers (which

SEC filings occasionally refer to as "Adviser(s)") that are responsible for a substantial portion of

the core investment management services required by each Fund.

83.     AllianceBernstein is the sub-adviser to the EQ/Common Stock Index Portfolio,

the EQ/Equity 500 Index Portfolio, and the EQ/Large Cap Value PLUS Portfolio.  BlackRock

Capital is a sub-adviser to the EQ/Equity Growth PLUS Portfolio.  BlackRock is a sub-adviser to

the EQ/Equity Growth PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, and the

712552.1

EQ/Mid Cap Value PLUS Portfolio. MSIM is a sub-adviser to the EQ/Global Multi-Sector Equity Portfolio. GAMCO is the sub-adviser to the EQ/GAMCO Small Company Value Portfolio. Wellington is a sub-adviser to EQ/Mid Cap Value PLUS Portfolio. SSgA is the sub-adviser to the EQ/Intermediate Government Bond Index Portfolio. *See* the following table.

| AXA Fund | Adviser | Sub-Adviser(s) |
| --- | --- | --- |
| EQ/Common Stock Index Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Equity Growth PLUS Portfolio | AXA Equitable | BlackRock Capital *and* BlackRock |
| EQ/Equity 500 Index Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Large Cap Value PLUS Portfolio | AXA Equitable | AllianceBernstein |
| EQ/Global Multi-Sector Equity Portfolio | AXA Equitable | MSIM *and* BlackRock |
| EQ/Mid Cap Value PLUS Portfolio | AXA Equitable | Wellington *and* BlackRock |
| EQ/GAMCO Small Company Value Portfolio | AXA Equitable | GAMCO |
| EQ/Intermediate Government Bond Index | AXA Equitable | SSgA |

84.     As demonstrated in detail below, despite the fact that the sub-adviser(s) for each of the AXA Funds performed, with minor exceptions, all of the investment management services, each AXA Fund was still charged by, and paid to, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, a significant investment management fee, which substantially exceeded the investment management fees that were paid to each Fund's sub-adviser(s).

85.     The table below reflects the total investment management fees paid to AXA

712552.1

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged investment management services to each AXA Fund, and the total investment management fees paid to each AXA Fund's sub-adviser(s), for their investment management services to each AXA Fund, for year ended December 31, 2010.

| AXA Fund | Advisor Agreement(s) | Net Paid AXA Equitable | Net Paid Sub-Adviser | Difference | Percent AXA Equitable's Fee Greater Than Sub-Adviser(s) |
|---|---|---|---|---|---|
| EQ/Common Stock Index Portfolio | Alliance-Bernstein | $14,520,160 | $2,421,062 | $12,099,098 | 599% |
| EQ/Equity 500 Index Portfolio | Alliance-Bernstein | $5,874,892 | $1,028,713 | $4,846,179 | 571% |
| EQ/Large Cap Value PLUS Portfolio | Alliance-Bernstein | $12,309,013 | $4,816,204 | $7,492,809 | 255% |
| EQ/Equity Growth PLUS Portfolio | BlackRock Capital and BlackRock | $6,673,982 | $2,385,935 | $4,288,047 | 279% |
| EQ/GAMCO Small Company Value Portfolio | GAMCO | $6,157,668 | $5,925,175 | $232,493 | 103% |

712552.1

| | | | | | |
|---|---|---|---|---|---|
| EQ/Mid Cap Value PLUS Portfolio | BlackRock and Wellington | $7,704,381 | $2,841,598 | $4,862,783 | 271% |
| EQ/Global Multi-Sector Equity Portfolio | BlackRock and MSIM | $12,325,271 | $5,016,325 | $7,308,946 | 245% |
| EQ/Intermed iate Government Bond Index Portfolio | SSgAS | $6,020,420 | $364,906 | $5,655,514 | 1649% |
| **TOTALS** | | **$71,585,787** | **$24,799,918** | **$46,785,869** | **288%** |

**The total investment management fee, with respect to all of the AXA Funds, paid in 2010, equals $96,385,705 (i.e., AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group LLC,'s investment management fee + the Sub-advisers investment management fee).**

86.     Thus, in 2010, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, investment management fees, on average, exceeded the fees paid to each Fund's sub-adviser by approximately 496%.  Further, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, received, in total, approximately 300% more in investment management fees than were paid to the AXA Funds' sub-advisers.

87.     AXA Equitable Life Insurance Company has even represented on its website that AXA Equitable Funds Management Group, LLC, "provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life

31

insurance." [9]    Further, while it alleges it is providing oversight services for its fee, these services are also presumably limited because, according to the sub-advisory agreements, it is the Fund's sub-advisers who "formulate and implement a continuous investment program for [each Fund]", which is the core investment management service needed for a mutual fund.

88.    Below, lists the services provided by the AXA Funds' sub-advisers.

(a)    **Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Are Specific To Each Fund**

1.    **EQ/Common Stock Index Portfolio**

89.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Common Stock Index Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs, with minor exceptions, all of the investment management services for this fund.

90.    According to the February N-1A, with respect to the EQ/Common Stock Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [AllianceBernstein], which is responsible for the day-to-day management of the Portfolio's assets."

91.    With respect to this fund, the February N-1A and the April N-1A both state the following:

**Adviser: AllianceBernstein L.P. ('AllianceBernstein')**

---

[9]    *See* "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html

712552.1

**Portfolio Manager:** The member of the team that is primarily responsible for the management of the Portfolio is [listed is the name of an AllianceBernstein Senior Vice President]

92.     Under the terms of the AllianceBernstein Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  and AllianceBernstein, with respect to the EQ/Common Stock Index Portfolio, AllianceBernstein has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

93.     Furthermore, under the terms of the AllianceBernstein Agreement, in connection

712552.1

with performing, with minor exceptions, all of the investment management services to the EQ/Common Stock Index Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

### 2.    EQ/Equity 500 Index Portfolio

94.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Equity 500 Index Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs, with minor exceptions, all of the investment management services for the fund.

95.    According to the February N-1A, with respect to the EQ/Equity 500 Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [AllianceBernstein], which is responsible for the day-to-day management of the Portfolio's assets."

96.    With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: AllianceBernstein L.P. ('AllianceBernstein')**
>
> **Portfolio Manager:** [Listed is the name of an AllianceBernstein Senior Vice-President].

97.    Under the terms of the AllianceBernstein Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and AllianceBernstein, with respect to the EQ/Equity 500 Index Portfolio, AllianceBernstein has to,

712552.1

among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts AllianceBernstein manages, which have investment objectives, policies and strategies that are substantially similar to those employed by AllianceBernstein in managing the fund, to allow the fund to present information concerning AllianceBernstein's prior performance in the fund's SEC filings.

98.     Furthermore, under the terms of the AllianceBernstein Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Equity 500 Index Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out

712552.1

the services it is required to perform under the AllianceBernstein Agreement.

### 3.   EQ/Large Cap Value PLUS Portfolio

99.   AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Large Cap Value PLUS Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs, with minor exceptions, all of the investment management services for this fund.

100.   According to the February N-1A, with respect to the EQ/Large Cap Value PLUS Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [AllianceBernstein], which are responsible for the day-to-day management of the Portfolio's assets."

101.   With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: AllianceBernstein L.P. ('AllianceBernstein')**
>
> **Portfolio Managers:** The members of the team are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of three AllianceBernstein Vice Presidents and two AllianceBernstein Senior Portfolio Managers ].
>
> **Portfolio Manager:** The Index Allocation Portion of the Portfolio is managed by: [listed is the name of an AllianceBernstein Senior Vice President].

102.   The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as a "Portfolio Managers" for the EQ/Large Cap Value PLUS Portfolio. Although the AXA Funds' SEC filings explain the services that are performed by AllianceBernstein for the EQ/Large Cap Value PLUS Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of

712552.1

this fund.

103.    Under the terms of the AllianceBernstein Agreement between AXA Equitable

Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and

AllianceBernstein, with respect to the EQ/Large Cap Value PLUS Portfolio, AllianceBernstein

has to, among other things,: (i) formulate and implement a continuous investment program for

the fund; (ii) take "whatever" steps are necessary to implement the investment program for the

fund by arranging for the purchase and sale of securities and other investments, including issuing

directives to the administrator of the trust as necessary for the appropriate implementation of the

investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and

financial data with respect to the securities that are included in the fund or those that are under

consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company

and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing

basis, of all material facts concerning the investment and reinvestment of the assets of the fund

and to make presentations of other information that either the Board or AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically

request; and (v) provide material performance information, records and supporting

documentation about accounts AllianceBernstein manages, which have investment objectives,

policies and strategies that are substantially similar to those employed by AllianceBernstein in

managing the fund, to allow the fund to present information concerning AllianceBernstein's prior

performance in the fund's SEC filings.

104.    Furthermore, under the terms of the AllianceBernstein Agreement, in connection

with performing , with minor exceptions, all of the investment management services to the

EQ/Large Cap Value PLUS Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

### 4.    EQ/Equity Growth PLUS Portfolio

105.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Equity Growth PLUS Portfolio, however, the fund's sub-advisers, BlackRock Capital and BlackRock, perform, with minor exceptions, all of the investment management services for this fund.

106.    According to the February N-1A, with respect to the EQ/Equity Growth PLUS Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [BlackRock Capital and  BlackRock], which are responsible for the day-to-day management of the Portfolio's assets."

107.    With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: BlackRock Capital Management, Inc.**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of "BlackRock, Inc." (which is an affiliate of BlackRock Capital)].
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of BlackRock].

38

712552.1

108.     The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as "Portfolio Managers" for the EQ/Equity Growth PLUS Portfolio. Although the AXA Funds' SEC filings explain the services that are performed by BlackRock Capital and BlackRock for the EQ/Equity Growth PLUS Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

109.     As stated above, both BlackRock Capital and BlackRock serve as the sub-advisers to the EQ/Equity Growth PLUS Portfolio.  The BlackRock Capital Agreement and the BlackRock Agreement entered into between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and BlackRock Capital and BlackRock, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Capital Agreement and the BlackRock Agreement, with respect to the EQ/Equity Growth PLUS Portfolio, BlackRock Capital and BlackRock have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts

712552.1

concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock Capital and BlackRock manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock Capital and BlackRock in managing the fund, to allow the fund to present information concerning BlackRock Capital and BlackRock's prior performance in the fund's SEC filings.

110.    Furthermore, under the terms of the BlackRock Capital Agreement and the BlackRock Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Equity Growth PLUS Portfolio, BlackRock Capital and BlackRock must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the BlackRock Capital Agreement and the BlackRock Agreement.

### 5.    EQ/Global Multi-Sector Equity Portfolio

111.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the EQ/Global Multi-Sector Equity Portfolio, however, the fund's sub-advisers, BlackRock and MSIM, perform, with minor exceptions, all of the investment management services for this fund.

112.    According to the February N-1A, with respect to the EQ/Global Multi-Sector

712552.1

Equity Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [MSIM and BlackRock], which are responsible for the day-to-day management of the Portfolio's assets."

113.    With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: Morgan Stanley Investment Management Inc. ('MSIM')**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of Managing and Executive Directors of MSIM]
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers:** The Members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of BlackRock].

114.    The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as "Portfolio Managers" for the EQ/Global Multi-Sector Equity Portfolio.  Although the AXA Funds' SEC filings explain the services that are performed by BlackRock and MSIM for the EQ/Global Multi-Sector Equity Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

115.    As stated above, both BlackRock and MSIM serve as the sub-advisers to the EQ/Global Multi-Sector Equity Portfolio.  The BlackRock Agreement and the MSIM Agreement entered into between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and BlackRock and MSIM, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Agreement and the MSIM Agreement, with

712552.1

respect to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock and MSIM manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock and MSIM in managing the fund, to allow the fund to present information concerning BlackRock and MSIM's prior performance in the fund's SEC filings.

116.    Furthermore, under the terms of the BlackRock Agreement and the MSIM Agreement, in connection with performing, with minor exceptions,  all of the investment management services to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in

712552.1

the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all

equipment necessary for it to carry out the services it is required to perform under the BlackRock

Agreement and the MSIM Agreement.

### 6.    EQ/GAMCO Small Company Value Portfolio

117.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, serve as the investment adviser to the EQ/GAMCO Small Company

Value Portfolio, however, the fund's sub-adviser, GAMCO, performs, with minor exceptions,

all, of the investment management services for this fund.

118.    According to the February N-1A, with respect to the EQ/GAMCO Small

Company Value Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed

below [GAMCO], which is responsible for the day-to-day management of the Portfolio's assets."

119.    With respect to this fund, the February N-1A and the April N-1A both state the

following:

> **Adviser: GAMCO Asset Management, Inc. ('GAMCO')**

> **Portfolio Manager:** [Listed is the name of GAMCO's Chief Executive Officer
> and Chief Investment Officer].

120.    Under the terms of the GAMCO Agreement between AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, and GAMCO, with

respect to the EQ/GAMCO Small Company Value Portfolio, GAMCO has to, among other

things,: (i) formulate and implement a continuous investment program for the fund; (ii) take

"whatever" steps are necessary to implement the investment program for the fund by arranging

for the purchase and sale of securities and other investments, including issuing directives to the

administrator of the trust as necessary for the appropriate implementation of the investment

712552.1

program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts GAMCO manages, which have investment objectives, policies and strategies that are substantially similar to those employed by GAMCO in managing the fund, to allow the fund to present information concerning GAMCO's prior performance in the fund's SEC filings.

121.    Furthermore, under the terms of the GAMCO Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/GAMCO Small Company Value Portfolio, GAMCO must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the GAMCO Agreement.

### 7.    EQ/Mid Cap Value PLUS Portfolio

122.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serve as the investment adviser to the EQ/Mid Cap Value PLUS

712552.1

Portfolio, however, the fund's sub-advisers, BlackRock and Wellington, perform, with minor exceptions, all of the investment management services for this fund.

123.    According to the February N-1A, with respect to the EQ/Mid Cap Value PLUS Portfolio, "AXA Equitable is responsible for overseeing the Advisers listed below [BlackRock and Wellington], which are responsible for the day-to-day management of the Portfolio's assets."

124.    With respect to this fund, the February N-1A and the April N-1A both state the following:

> **Adviser: Wellington Management Company, LLP ('Wellington')**
>
> **Portfolio Managers:** The Active Allocated Portion of the Portfolio is management by: [listed is the name of a Wellington Senior Vice President]
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers:** The members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio is managed by:  [listed are the names of Managing Directors of BlackRock]

125.    The February N-1A and the April N-1A also provide that three AXA Equitable employees are also listed as "Portfolio Managers" for the EQ/Mid Cap Value PLUS Portfolio. Although the AXA Funds' SEC filings explain the services that are performed by BlackRock and Wellington for the EQ/Mid Cap Value PLUS Portfolio, there are no disclosures regarding the services performed, if any, by these three AXA Equitable employees on behalf of this fund.

126.    As stated above, both BlackRock and Wellington serve as the sub-advisers to the EQ/Mid Cap Value PLUS Portfolio.  The BlackRock Agreement and the Wellington Agreement entered into between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and BlackRock and Wellington, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the

712552.1

fund. Specifically, under the terms of the BlackRock Agreement and the Wellington Agreement, with respect to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock and Wellington manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock and Wellington in managing the fund, to allow the fund to present information concerning BlackRock and Wellington's prior performance in the fund's SEC filings.

127. Furthermore, under the terms of the BlackRock Agreement and the Wellington Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington must also provide the following at their own expense: (i) all necessary facilities and personnel,

including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the BlackRock Agreement and the Wellington Agreement.

### 8.   EQ/Intermediate Government Bond Index Portfolio

128.   AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the EQ/Intermediate Government Bond Index Portfolio, however, the fund's sub-adviser, SSgA, performs, with minor exceptions, all of the investment management services for this fund.

129.   According to the February N-1A, with respect to the EQ/Intermediate Government Bond Index Portfolio, "AXA Equitable is responsible for overseeing the Adviser listed below [SSgA], which is responsible for the day-to-day management of the Portfolio's assets."

130.   With respect to this fund, the February N-1A and the April N-1A both state the following:

**Adviser: SSgA Funds Management, Inc. ('SSgA FM')**

**Portfolio Manager:** The members that are jointly and primarily responsible for the management of the Portfolio are: [listed is the name of a Managing Director of SSgA  and one of its Vice Presidents][5]

131.   Under the terms of the SSgA Agreement between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and SSgA, with respect to the

---

[5]   On August 16, 2011, AXA Equitable filed another N-1A filing, which contains disclosure related to the EQ/Intermediate Government Bond Index Portfolio.  This filing states that with respect to this fund, Defendant AXA Equitable Funds Management Group, LLC, manages the fund's "ETF [exchange traded funds] investments."  This statement is not in the February or April N-1A filings.

712552.1

EQ/Intermediate Government Bond Index Portfolio, SSgA has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts SSgA manages, which have investment objectives, policies and strategies that are substantially similar to those employed by SSgA in managing the fund, to allow the fund to present information concerning SSgA's prior performance in the fund's SEC filings.

132.    Furthermore, under the terms of the SSgA Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Intermediate Government Bond Index Portfolio, SSgA must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all

712552.1

administrative facilities, including bookkeeping, and all equipment necessary for it to carry out

the services it is required to perform under the SSgA Agreement.

**(b)** **Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Apply Equally To All Funds**

133.    The May 1, 2011 SAI provides that AXA Equitable (as the investment manager to

the AXA Funds) has "entered into one or more Advisory Agreements on behalf of each

Portfolio", which "obligate the Advisers [*i.e.*, the sub-advisers] to": (i) "make investment

decisions on behalf of their respective Portfolios (or portions thereof) [i.e., each of the AXA

Funds]"; (ii) "place all orders for the purchase and sale of investments for their respective

Portfolios (or portions thereof) with brokers or dealers selected by [AXA Equitable] and/or the

Advisers"; and (iii) "perform certain related administrative functions in connection therewith."

134.    The Advisors Trust Annual report, with respect to the AXA Funds' Annual

Report dated December 31, 2010 ("December 31, 2010 Annual Report"), further provides that

each sub-adviser: (i) "independently chooses and maintains a portfolio of securities for the

Portfolio and each is responsible for investing a specific allocated portion of the Portfolio's

assets" and (ii) is obligated pursuant to the Advisory Agreements to "continually furnish

investment programs for the Portfolio."

135.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC's, fee schedule varies for each of the AXA Funds.  Each Fund (through

the Advisors Trust)  pays an investment management fee to AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC, which then subcontract with

AllianceBernstein, BlackRock Capital, BlackRock, MSIM, Wellington, GAMCO and SSgA at a

fraction of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee.

136.    In 2010 alone, AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, were paid $71,585,787 in investment management fees from the AXA Funds at issue in this Amended Complaint for allegedly providing minimal management services that were predominately supervisory in nature to the Funds, while the sub-advisers collectively were paid $24,799,918 in investment management fees, despite the fact that the sub-advisers performed, with minor exceptions, all of the investment management services to the AXA Funds (*see* Table,¶85).  This is a clear breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fiduciary duties and a violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).[6]

137.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Common Stock Index Portfolio by 599%.  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Equity 500 Index Portfolio by 571%.  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the

---

[6]    On information and belief, with respect to each of the AXA Funds, for the 2011 calendar year, the amount of investment management fees that will be paid to AXA Equitable and the investment management fees that will be paid to each Fund's sub-adviser(s), will not be materially different than the 2010 values.

712552.1

investment management fee paid to the sub-adviser of the EQ/Large Cap Value PLUS Portfolio by 255%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Equity Growth Plus Portfolio by 279%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/GAMCO Small Company Value Portfolio by 103%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value PLUS Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value Plus Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Global Multi-Sector Equity Portfolio by 245%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Intermediate Government Bond Index Portfolio by 1649%. The average amount (in percentage terms) by which AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC's, investment management fee exceeds that of the Funds' sub-adviser(s) is 496% (*see* Table ¶85)

138.    Pursuant to th IMA (a copy of which AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, filed with the Court on October 17, 2011

712552.1

(Docket No. 11-5))[7], AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, as the AXA Funds' investment manager, allege/claim, they perform, for their investment management fees, the following services:

> Subject always to the direction and control of the Trustees of the Trust, Manager [*i.e., AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC*] will have (i) overall supervisory responsibility for the general management and investment of each Portfolio's assets; (ii) full discretion to select new or additional Advisers [*i.e., sub-adviser*] for each Portfolio [*i.e., AXA Fund*]; (iii) full discretion to enter into and materially modify existing Advisory Agreements [*i.e., sub-advisory agreements*] with Advisers; (iv) full discretion to terminate and replace any Adviser; and (v) full investment discretion to make all determinations with respect to the investment of a Portfolio's assets not then managed by an Adviser. In connection with Manager's responsibilities herein, Manager will assess each Portfolio's investment focus and will seek to implement decisions with respect to the allocation and reallocation of each Portfolio's assets among one or more current or additional Advisers from time to time, as the Manager deems appropriate, to enable each Portfolio to achieve its investment goals. In addition, Manager will monitor compliance of each Adviser with the investment objectives, policies and restrictions of any Portfolio or Portfolios (or portions of any Portfolio) under the management of such Adviser, and review and report to the Trustees of the Trust on the performance of each Adviser. Manager will furnish, or cause the appropriate Adviser(s) to furnish, to the Trust such statistical information, with respect to the investments that a Portfolio (or portions of any Portfolio) may hold or contemplate purchasing, as the Trust may reasonably request. On Manager's own initiative, Manager will apprise, or cause the appropriate Adviser(s) to apprise, the Trust of important developments materially affecting each Portfolio (or any portion of a Portfolio that they advise) and will furnish the Trust, from time to time, with such information as may be appropriate for this purpose. Further, Manager agrees to furnish, or cause the appropriate Adviser(s) to furnish, to the Trustees of the Trust such periodic and special reports as the Trustees of the Trust may reasonably request. In addition, Manager agrees to cause the appropriate Adviser(s) to furnish to third-party data reporting services all currently available standardized performance information and other customary data.

---

[7]Through the inclusion of the text of the IMA, which the Defendants filed with this Court, Plaintiff is in no way conceding that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, actually provide the alleged services contained in it.

712552.1

139.    Thus the services AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC, allegedly provide to the AXA Funds pursuant to the IMA are all predominantly oversight/supervisory services.

140.    AXA Equitable Life Insurance Company has even represented on its website that AXA Equitable Funds Management Group, LLC, "provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [9]   Further, while it alleges it is providing oversight services, these services are also presumably limited because, according to the sub-advisory agreements, it is the Fund's sub-adviser who "formulate and implement a continuous investment program for [each Fund]", which is the core investment management service needed for a mutual fund.

141.    Further, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, supervisory role is also presumably limited given that the Advisors Trust's Board is charged with the substantial supervision of the Funds.  According to the May 1, 2011 SAI, "the Trust's Board is responsible for the overall management of the Trust and the Portfolios, including general supervision and review of the Portfolios' investment activities and their conformity with federal and state law as well as the stated policies of the Portfolios. The Board elects the officers of the Trust who are responsible for administering the Trust's day-to-day operations."

142.    If AXA Equitable Life Insurance Company and/or AXA Equitable  Funds

---

[9]       See "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html

712552.1

Management Group, LLC, performed all of the alleged services listed in the IMA at ¶138, for each AXA Fund, if the fees charged for these alleged services were the product of arm's length bargaining, they should have been, for each AXA Fund, much smaller than the fees charged by each Fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements. However, on average AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, investment management fee was 496% times greater than the fee paid to the sub-advisers, and in all cases, their investment management fees charged to each AXA Funds exceeded the fee paid to the sub-advisers (and in most cases that excess is significant and up to 1649%).

143.    By comparison to the services AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, claims to provide, all of the sub-advisory agreements, as stated above, require the following investment management services from the sub-advisers (all at their own expense): (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of

712552.1

the assets of the fund and to make presentations of other information that either the Board or AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts the sub-adviser manages, which have investment objectives, policies and strategies that are substantially similar to those employed by the sub-adviser in managing the particular AXA Fund, to allow the AXA Fund to present information concerning the sub-adviser's prior performance in the fund's SEC filings.

144. Thus, a comparison of (A) the fees paid to the AXA Fund's sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged minor amount of investment management services, reflects that a substantial portion of the investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their investment management services were so disproportionately large that they bore no reasonable relationship to the services they rendered and could not have been the product of an arm's-length bargaining and thus in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

145. On information and belief, the fee practices associated with the AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, excessive fees have been ongoing for the entire time period applicable to Plaintiff's claims.

146. In light of the foregoing, the nature and quality of the investment management services performed by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were minimal because with minor exceptions, all of the services

needed for each AXA Fund were provided by each AXA Fund's sub-adviser.

147.    Plaintiff Sivolella, on behalf of the AXA Funds and/or the Advisors Trust, is entitled to recover a substantial portion of the investment management fees received (continued to be received) by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, in breach of their fiduciaries duty under ICA § 36(b), 15 U.S.C. § 80a-35(b) to the AXA Funds and/or Advisors Trust.

**B.    THE ECONOMIES OF SCALE ENJOYED IN CONNECTION WITH THE INVESTMENT MANAGEMENT SERVICES WERE NOT PASSED ON TO THE PLAINTIFF AND OTHER SECURITY HOLDERS OF THE AXA FUNDS AS REQUIRED BY ICA §  36(b), 15 U.S.C. § 80a-35(b), BUT WERE KEPT BY AXA EQUITABLE LIFE INSURANCE COMPANY AND AXA EQUITABLE FUNDS MANAGEMENT GROUP LLC, IN VIOLATION OF THEIR FIDUCIARY DUTIES**

148.    The legislative history of ICA § 36(b), 15 U.S.C. § 80a-35(b), recognizes that an investment adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

*S. Rep. No. 91-184*, at 5-6 (1969), as reprinted in *1970 U.S. Code Cong. & Ad. News*, at 4901-02.

149.    The amount of the compensation received by the investment adviser should be evaluated in context with the economies of scale realized by a fund. Economies of scale are created when assets under management increase more quickly than the cost of advising and

712552.1

managing those assets.  The work required to operate a mutual fund does not increase

proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most
> expensive) input into portfolio management, do not increase along
> with portfolio size.  A portfolio manager can invest $5 billion nearly
> as easily as $1 billion and $20 billion nearly as easily as $10 billion.
> (Size may impair performance, but it imposes little logistical
> challenge.)

*Unconventional Success: A Fundamental Approach to Personal Investment*, David Swensen, Free

Press (2005), p. 238.  "The intrinsic characteristics of the mutual-fund...suggest that economies of

scale should lead to lower fees as assets under management [i.e., the amount people invest in a fund]

increase." *Id.* at 237.  Economies of scale with respect to a mutual fund exist, and are available to

be passed along to the fund's investors, because "investment management efforts...do not increase

along with portfolio size." *Id.* at 238.  Therefore, "[a]s scale increases, fees as a percentage of assets

ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.*

150.    On a per share basis, it does not cost more to manage additional assets in a

growing fund because economies of scale occur on both the fund complex and portfolio level for

various costs incurred.  Moreover, fixed costs are spread over more assets as a fund grows in

size.

151.    Indeed, investment management organizations can realize economies of scale

from increased assets within a particular mutual fund and from increased total assets in all

mutual funds under management.

152.    As an example, if a fund has fifty million dollars ($50,000,000) of assets under

management and is charged a fee of 75 basis points (100 basis points = 1%; 1 basis point equals

1/100th of a percent), the fee equals $375,000 per year.  A comparable mutual fund with five

hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000). Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

153.    As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale. In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund. In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale. Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added because of a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

154.    The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services. *See SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses* (Dec. 2000), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000) ("GAO Report"), at 9. The GAO has estimated as much as 64% of mutual fund asset growth has been

the result of market appreciation rather than additional purchases of new shares of a fund. *Id.*

155.   Economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients. *See John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,* 26 J. CORP. L. 610, at 621 n. 62 (2001) (the "Freeman & Brown Study") (citing Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 BUS. LAW 107 (1993))

156.   As fund portfolios grow, they quickly create economies of scale and eventually the incremental cost of servicing additional assets approaches zero. As the GAO confirms, it is possible for the adviser to service the additional assets with zero additional costs. *See* GAO Report, at 9 (noting that growth from portfolio appreciation is unaccompanied by costs).

157.   Although significant economies of scale exist for each of the AXA Funds, the associated cost savings largely have been appropriated for the benefit of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, rather than being shared with the AXA Funds of their investors. The economies-of-scale benefits that have been captured and misappropriated by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, can and have generated huge unreasonable and excessive, undeserved profits for AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, in breach of their fiduciary duties with respect to such compensation.

158.   Management fees received by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, are paid as a varying percentage of assets under management. Some of the AXA Funds employ a declining rate structure in which the percentage

fee rate decreases in steps or at designated breakpoints as assets increase.  The fees vary based on the amount of assets under management, and are reduced as the total amount of assets under management increase.  *See* the following table.

### AXA FUNDS' FEE BREAKPOINT SCHEDULE
#### ("M" refers to "Million" and "B" refers to "Billion")

| AXA Fund | Investment Advisory Agreement(s) | AXA Equitable 's Fee Schedule (annual rate based on average daily net assets) | Sub-Advisor Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|---|
| EQ/Common Stock Index Portfolio | AllianceBernstein | All Assets – 0.350% | All Assets – 0.050% |
| EQ/Equity 500 Index Portfolio | AllianceBernstein | All Assets – 0.250% | First $1 billion – 0.050% Over $1B – 0.030% |
| EQ/Large Cap Value PLUS Portfolio | AllianceBernstein | First $2 billion – 0.500% Next $1 billion – 0.450% Next $3 billion – 0.425% Next $5 billion – 0.400% Thereafter – 0.375% | First $100 million – 0.490% Next $100 million – 0.300% Over $200M – 0.250% |
| EQ/ Intermediate Government Bond Index Portfolio | SSgA | All Assets – 0.350% | First $2 billion – 0.02% Over $2B – 0.015% |
| EQ/Equity Growth PLUS Portfolio | BlackRock Capital | First $2 billion – 0.500% Next $1 billion – 0.450% Next $3 billion – 0.425% Next $5 billion – 0.400% Thereafter – 0.375% | First $100 million – 0.400% $100M to $300M– 0.375% $300M to $500M – 0.350% $500M to $1B – 0.325% Over $1B – 0.300% |

712552.1

| EQ/Equity Growth PLUS Portfolio | BlackRock | First $2 billion – 0.500%<br>Next $1 billion – 0.450%<br>Next $3 billion – 0.425%<br>Next $5 billion – 0.400%<br>Thereafter – 0.375% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
|---|---|---|---|
| EQ/GAMCO Small Company Value Portfolio | GAMCO | First $400 million – 0.800%<br>Next $400 million – 0.750%<br>Thereafter – 0.700% | First $1 billion – 0.400%<br>Over $1B – 0.300% |
| EQ/Mid Cap Value PLUS Portfolio | BlackRock | First $2 billion – 0.550%<br>Next $1 billion – 0.500%<br>Next $3 billion – 0.475%<br>Next $5 billion – 0.450%<br>Thereafter – 0.425% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
| EQ/Mid Cap Value PLUS Portfolio | Wellington | First $2 billion – 0.550%<br>Next $1 billion – 0.500%<br>Next $3 billion – 0.475%<br>Next $5 billion – 0.450%<br>Thereafter – 0.425% | First $150 million – 0.550%<br>Over $150M – 0.450% |
| EQ/Global Multi-Sector Equity Portfolio | BlackRock | First $1 billion – 0.750%<br>Next $1 billion – 0.700%<br>Next $3 billion – 0.675%<br>Next $5 billion – 0.650%<br>Thereafter – 0.625% | First $5 billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
| EQ/Global Multi-Sector Equity Portfolio | MSIM | First $1 billion – 0.750%<br>Next $1 billion – 0.700%<br>Next $3 billion – 0.675%<br>Next $5 billion – 0.650%<br>Thereafter – 0.625% | First $100 million – 1.00%<br>$100M to $400M – 0.800%<br>$400M to $500M – 0.600%<br>Over $500M – 0.400% |

159.    This fee structure, known as "breakpoints," implicitly recognizes the economies of scale and gives the appearance that the AXA Funds share in those benefits. A fee breakpoint has been explained as follows:

712552.1

> Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

*See Freeman & Brown Study*, at 620, n. 59.

160.   Economies of scale can be passed on to and shared with the mutual funds as assets increase if management fee breakpoints are installed at higher asset levels (but at asset levels that are reachable), or if lower asset based investment advisory fees are adopted by the management company in response to increases in the overall level of assets under management.

161.   The benefits achieved by the AXA Funds' economies of scale can and should have been shared with their security holders by reducing the management fees that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charge the security holders of the AXA Funds.

162.   In the case of AXA Funds, however, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has failed to share any meaningful savings with the AXA Funds or their investors. While AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for five of the AXA Funds at issue, had investment management fee breakpoints installed, (*see* Table ¶158) these breakpoints are generally meaningless, because as a practical matter, they did not pass on the economies of scale. The mere existence of breakpoints does not mean that economies of scale are adequately passed along, they are only meaningful if a breakpoint is, and can be feasibly, reached.

163.   Indeed, the breakpoints are designed by AXA Equitable Life Insurance Company

62

712552.1

and/or AXA Equitable Funds Management Group, LLC, to benefit themselves rather than the

AXA Funds and investments into them.  The initial breakpoints are set too high, the breakpoints

are spaced too far apart, and the reductions made at breakpoints are far too small, thereby

depriving Plaintiff Sivolella, and the other security holders of the AXA Funds, of the benefits of

the economies of scale created by the contribution of their capital to the AXA Funds.

164.    For instance, AXA Equitable Life Insurance Company and/or AXA Equitable

Funds Management Group, LLC, has negotiated a breakpoint schedule with AllianceBernstein,

the sub-adviser for the EQ/Large Cap Value PLUS Portfolio, by which AllianceBernstein grants

fee reductions to the Defendants at levels starting at $100 million in assets under management.

*See* Table ¶158.  Conversely, the breakpoint schedule that AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC, charges to this AXA Fund

(and the breakpoint schedule that is applicable to Plaintiff) does not even start until $2 billion.

AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,

LLC, has also negotiated a breakpoint schedule with Wellington, the sub-adviser for the EQ/Mid

Cap Value PLUS Portfolio, by which Wellington grants fee reductions at levels starting at $150

million in assets under management.  However, the breakpoint schedule that AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, charges to this fund

does not even start until $2 billion.  Similarly, AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC, has also negotiated a breakpoint schedule with

BlackRock Capital, the sub-adviser for the EQ/Equity Growth PLUS Portfolio, by which

BlackRock Capital grants fee reductions at levels starting at $100 million in assets under

management.  However, the breakpoint schedule that AXA Equitable Life Insurance Company

712552.1

and/or AXA Equitable Funds Management Group, LLC, charges to this Fund does not even start until $2 billion. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has also negotiated a breakpoint schedule with MSIM, the sub-adviser for the EQ/Global Multi-Sector Equity Portfolio, by which MSIM grants fee reductions at levels starting at $100 million in assets under management.  However, the breakpoint schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charges to this AXA Fund does not even start until $1 billion.  Therefore, if AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, management fee breakpoints were negotiated at arms-length, they would be no higher than $150 million.

165.    Even if AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, performed all of  the investment management services it claims to have provided for the AXA Funds, a large portion of those services are fixed in costs, which would result in lower breakpoints than those of the sub-advisers.

166.    In addition, the lack of investment management fee breakpoints for the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, further illustrate that the economies-of-scale savings were not passed to these funds and their investors. The investment advisory fees charged to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio, and the EQ/Intermediate Government Bond Index Portfolio, contain no breakpoints for increases in assets under management.

167.    Indeed, the .35% investment advisory fee (or 35 basis points) for the EQ/Common

712552.1

Stock Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, and the .25%

investment management fee (or 25 basis points) for the EQ/Equity 500 Index Portfolio coupled

with the lack of breakpoints, prevents these funds from ever realizing any economies of scale

generated by their large size.  The lack of breakpoints is in striking contrast with the prevailing

practice in the mutual fund industry.

168.     The degree of economies of scale that could be generated by, and then extended

to, the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the

EQ/Intermediate Government Bond Index Portfolio, through a different fee structure has not

been adequately considered by the Board of each of these funds.  This absence of fee breakpoints

for these three funds should have been a red flag to the Board of these funds that AXA Equitable

Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were taking

the benefits of economies of scale rather than passing them on to these funds.

169.     Morever, as assets under management have grown, the management fees paid to

AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,

LLC, have grown dramatically, despite the economies of scale realized by AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC.  AXA Equitable

Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, has not shared

with the Plaintiff, and the AXA Funds the economies of scale it has gained from that growth.

170.     For example, for six of the AXA Funds (the EQ/Common Stock Index Portfolio,

the EQ/Equity 500 Index Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid

Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the

EQ/Intermediate Government Bond Index Portfolio), from 2009 through 2010, the management

712552.1

fees for these funds increased significantly as their assets under management have grown, thereby confirming that the economies-of-scale savings realized from each fund's asset increase were not shared with Plaintiff Sivolella and the AXA Funds.

171.     Given that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, provided (allegedly) minimal investment management services to the AXA Funds (especially when compared to the sub-advisers investment management services), any economies-of-scale-benefits enjoyed by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, have not been, and could not have been, adequately shared with the AXA Funds, as required by § 36(b), 15 U.S.C. § 80a-35(b), in breach of AXA Equitable  Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, fiduciary duty to the AXA Funds with respect to such compensation.

## C.     THE AXA FUNDS' BOARD OF TRUSTEES WAS NOT ACTING INDEPENDENTLY AND CONSCIENTIOUSLY IN APPROVING THE INVESTMENT MANAGEMENT AGREEMENT

172.     In *Jones*, the Supreme Court adopted a fiduciary duty standard for ICA § 36(b), 15 U.S.C. § 80a-35(b), that requires both a fair outcome and good faith in the negotiation process. 130 S.Ct. at 1427.  Fund directors have a fiduciary duty to mutual funds and to their shareholders (who individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's length.

173.     Congress has fortified fund directors' oversight responsibilities by adopting ICA § 15(c), 15 U.S.C. § 80a-15(c), which requires directors to be adequately informed of the terms of any investment management contracts.

174.    ICA § 15(c), 15 U.S.C. § 80a-15(c), requires investment advisers to furnish documents and other information so that fund directors can make informed and independent decisions when evaluating investment advisory contracts. This section also gives directors the authority to demand such information from advisers. *Id.*

175.    When AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, start a new mutual fund, they not only contract to provide all the services each fund needs, they also nominate and elect the members of the fund's board (including all "independent"[10] board members).

176.    Each of the AXA Funds is governed by a Board of Trustees.  The Board of each AXA Fund is currently is comprised of the same 8 Trustees.  One of the Trustees is considered to be an "interested" board member, while the remaining seven are classified as "disinterested" board members.

177.    The 8 individuals that serve as the Board of Trustees to each of the AXA Funds, also simultaneously serve on the Boards of 56 other AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, sponsored funds.

178.    Public disclosure for all of the Board members, except for one, reveals that they are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component.  For the fiscal year ending December 31, 2010, according to publicly-available information, the Board members for the AXA Funds received total compensation in the following amounts:

---

[10]    "Independent" board members are those who are not "interested persons" as defined under the 1940 Act. *See* ICA § 2(a)(19), 15 U.S.C. § 80a-2(a)(19).

712552.1

| | |
|---|---|
| Theodossios Athanassiades | $215,000 |
| Jettie M. Edwards | $240,625 |
| David W. Fox | $245,000 |
| William M. Kearns, Jr. | $215,000 |
| Christopher P.A. Komisarjevsky | $226,250 |
| Harvey Rosenthal | $215,000 |
| Gary S. Schpero | $215,000 |
| Steven J. Joenk | $000,000 |

179.     Steven M. Joenk is the "interested" director by virtue of his current position as an

AXA Equitable Life Insurance Company executive, and presumably, he is compensated

separately for his services as an executive.

180.     As detailed below, the Board failed to act conscientiously by continuing to

approve a substantial portion of the investment management fees that AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to, and

received from, the Plaintiff/ the AXA Funds, but did not pay to the sub-advisers of the AXA

Funds.  The fee-setting process undertaken by the Board lacked the requisite integrity, care and

good faith and was, therefore, defective.

181.     The Board has a separate and distinct fiduciary duty to each AXA Fund to enter

into serious and substantive negotiations with respect to all fees charged by AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC.  *See* Am. Bar.

Ass'n, *Fund Director's Guidebook* (2d ed. 2003), at 10 ("Although there are areas of common

interest among the funds, the directors must exercise their specific board responsibilities on a

fund-by-fund basis.").  Correspondingly, AXA Equitable Life Insurance Company and/or AXA

Equitable Funds Management Group, LLC, has a reciprocal fiduciary duty to each mutual fund

under its management to assure that the fees it charges for services rendered are reasonably

related to the services provided and correspond to fees that would be charged in an arm's length

712552.1

negotiation.

182.    Annually, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, must obtain the approval of the Trustees for the investment management fee it seeks to charge each AXA Fund.

183.    The seven independent or "non-interested" Trustees are supposed to be "watchdogs" for the AXA Funds' shareholders.  However, since the same Trustees are charged with, at a minimum, 56 other AXA sponsored funds, regardless of the dedication, sophistication, and the individual educational and business qualifications of the independent members of the Board of Trustees of the AXA Funds, some of whom are otherwise fully employed in demanding positions of responsibility, the amount of documentation that must be reviewed for each meeting would be daunting if the Trustees were to look at each fund individually.

184.    Furthermore, even if statutorily "non-interested," the Trustees are in all practical respects dominated and unduly influenced by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, in reviewing the fees paid by the AXA Funds and their shareholders. The Trustees' continuation in the role of an independent Trustee from year-to-year, and the compensation they earn, is at least partially dependent on the continued good will and support of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

185.    The Board does not hold separate meetings for each mutual fund.  Instead, upon information and belief, the Board's practice has been to consider all funds at one time.  The Board approved the investment management fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, requested, with respect to each of the

AXA Funds, over a two day period.  During this same two day period, the same 8 individuals that compose the Board of each of the AXA Funds also approved, at a minimum, the investment management fees for an additional 56 AXA sponsored funds.

186.     A truly independent board of trustees acting conscientiously would not have tolerated the investment management fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, if they had obtained adequate information regarding, among other things: (1) the magnitude of the sub-advisers' investment management services and their fees; (2) the amount/type of investment management services AXA Life Insurance Company and/or AXA Equitable Funds Management Group provided for their fee; (3) the economies of scale enjoyed by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC; and (4) the profitability of the AXA Funds to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

187.     The Board failed to act conscientiously  by continuing to approve a substantial portion of the investment management fees that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to the AXA Funds, but did not pay to the sub-advisers of each of the AXA Funds.

188.     The Advisory Agreements, which were accessible to the Board, reveal that the sub-advisers rendered, with minor exceptions,  all of the investment management services for the AXA Funds.  Thus, the Board was not acting conscientiously when it approved investment management fees for AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, that were at a minimum 103%, and at a maximum 1649%, of the fees

that were paid to the AXA Funds' sub-advisers (and on average AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee was 496% greater than the fee paid to the AXA Funds' sub-advisers).

189.     In light of the fact that the documents which revealed that the sub-advisers to AXA Funds performed, with minor exceptions, all of the investment management services for these funds, were publically available, the Board knew, or should have known, that it was approving a grossly excessive investment management fee for AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC .

190.     The Board therefore violated its fiduciary responsibilities when it approved a substantial portion of the investment management fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to the AXA Funds, but did not pay to the AXA Funds' sub-advisers.

191.     As further evidence that the Board was not acting conscientiously when it approved AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fees, with respect to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate Government Bond Index Portfolio, it failed to require AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to install breakpoints with respect to its investment advisory fees, which is in striking contrast with the prevailing practice in the mutual fund industry.

192.     When AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, proposed a fee structure to the Board of Trustees with respect to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio and the EQ/Intermediate

712552.1

Government Bond Index Portfolio, that lacked breakpoints, that should have been a red flag to the Board that AXA Equitable was not passing on economies-of-scale savings to these two funds.

193.   As a result of the foregoing acts, the Board did not act conscientiously and fulfill its fiduciary duty when it approved a substantial portion of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fees, with respect to each of the AXA Funds. The Board's lack of conscientiousness resulted in fees that constitute a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fiduciary duty under ICA § 36(b), 15 U.S.C. § 80a-35(b), to the AXA Funds with respect to such compensation.

**D.    THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT SERVICES DID NOT JUSTIFY AXA EQUITABLE'S EXCESSIVE FEE**

194.   "The 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See Freeman & Brown Study*, at 627-28. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.

195.   Following discovery, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, true profitability can be determined on either an incremental basis or a full-cost basis. AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's, in light of the services they provide, incremental costs of providing those management services to the Plaintiff, and other shareholders of the AXA Funds, should be nominal while the additional fees received by them are unreasonable and grossly excessive. This is especially true because the sub-advisers to the AXA Funds perform the

substantial investment management service they are responsible for at their own expense, but are compensated with much lower investment management fees  than are AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

196.     The table in Paragraphs 85 and 158 show the investment management fee schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to each of the AXA Funds as compared to the fee schedule that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, pays the sub-advisers to whom they delegate, with minor exceptions, all of the investment management services needed by the AXA Funds.  These percentages translate into substantial fees when applied to the AXA Funds' assets.

197.     In 2010 alone, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were paid $71,585,787 in investment management fees from the AXA Funds at issue in this Amended Complaint for providing minimal management services that were predominately supervisory in nature to the Funds, while the sub-advisers collectively were paid $24,799,918 in investment management fees, despite the fact that the sub-advisers, with minor exceptions, performed all of the investment management services to the AXA Funds. *Id.* On average, AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC,  fees exceed the sub-advisers' fees by 496%.

198.     "[F]und managers ... routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory charge to fund shareholders." *See* John P. Freeman, Stewart L.

712552.1

Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 OKLA. L. REV. 83, 113, n. 104 (2008). Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house." *Id.* at 118. As demonstrated above, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, is padding the bill by over $46 million dollars in fiscal year 2010 alone, for providing limited investment management services that are supervisory in nature to the AXA Funds.

199.     Despite delegating, with minor exceptions, all of their investment management duties to sub-advisers, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, receive an investment management fee that in all cases exceeds the fees paid to the Funds' sub-adviser(s). *See* Table ¶85.

200.     Put another way, the true cost of investment management services should generally correlate to the fees (or at most minimally exceed) charged by AllianceBernstein, BlackRock Capital, BlackRock, MSIM, GAMCO, Wellington and SSgA.

201.     This sub-contracting arrangement led to fees that were substantially disproportionate to the services actually rendered and to enormous profits to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

202.     A substantial portion of these markups resulted in fees that could not be the product of negotiations conducted at arm's length and therefore constitute a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, fiduciary duty to the AXA Funds with respect to the receipt of such compensation.

203.     Since the AXA Funds' sub-advisers were providing, with minor exceptions, all of the investment management services at their own expense to the AXA Funds, and AXA Equitable Life

Insurance Company and/or AXA Equitable Funds Management Group, LLC, were providing minimal investment management services to the AXA Funds that were predominantly supervisory in nature, these Defendants were incurring only minimal expenses, and therefore a substantial portion of the fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to the AXA Funds that it did not pay to the sub-advisers were almost entirely in the form of profit to them and thus were necessarily so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

**E.      COMPARATIVE FEE STRUCTURES DEMONSTRATE THAT AXA EQUITABLE LIFE INSURANCE COMPANY AND/OR AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, CHARGED TO, AND RECEIVED FROM, THE AXA FUNDS EXCESSIVE INVESTMENT MANAGEMENT FEES THAT BREACHED THEIR FIDUCIARY DUTY**

204.     An analysis of the fees paid by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, to the AXA Funds' sub-advisers demonstrates that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, are charging investment advisory fees to the AXA Funds that are much higher than what would have been charged had the fees been bargained for at arms-length. Thus, almost all of the fees that Defendants charge and receive from, the AXA Funds that are in excess of the fees Defendants pay to the AXA Funds' sub-advisers, violate their fiduciary duty with respect to the receipt of compensation.

205.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, hired sub-advisers for all of the AXA Funds that assumed the obligation of providing, with minor exceptions, all of the investment advisory services to their designated funds. As each

712552.1

sub-adviser is a for-profit investment management company that negotiated its fee with AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC , the fees they charge provide a benchmark of the cost of the investment advisory services provided to the AXA Funds, presumably including a comfortable profit margin.  Compared to the fees charged by the sub-advisers who actually perform, with minor exceptions, all of the advisory services to the AXA Funds, the additional fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for their alleged investment management services to the AXA Funds are unjustified and excessive.

206.    While Plaintiff does not challenge the fees paid to the sub-advisers of the AXA Funds, those rates do provide a measure of how much should be charged for the investment advisory services that the AXA Funds require.  Indeed, the fees charged by each of the AXA Fund's sub-adviser is indicative of the fees the AXA Funds should pay for the investment management services.

207.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charge far more than the sub-advisers they hire for the AXA Funds, even though the sub-advisers assume, with minor exceptions, all of the investment management obligations of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

208.    For example, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, 's investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Common Stock Index Portfolio by 599%.  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Equity 500 Index Portfolio by 571%.  AXA Equitable Life Insurance Company

76

712552.1

and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Large Cap Value PLUS Portfolio by 255%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Equity Growth Plus Portfolio by 279%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/GAMCO Small Company Value Portfolio by 103%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value PLUS Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Mid Cap Value Plus Portfolio by 271%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Global Multi-Sector Equity Portfolio by 245%. AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Intermediate Government Bond Index Portfolio by 1649%.

209.     Thus, even if AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, provided the services it alleges to provide, their fees should not exceed the fees charged by the AXA Funds' subadvisers, who pursuant to their sub-advisory

agreements are charged with providing, with minor exceptions, all of the investment management services needed for each AXA Fund.

210.    Since AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC's, investment management fees charged to Plaintiff Sivolella/ the AXA Funds and retained by them, were in far excess of the sub-adviser fee amounts, a substantial portion of the investment management fees received by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, were necessarily so disproportionately large that they bore no reasonable relationship to services rendered and could not have been the product of arm's-length bargaining and thus were in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b) .

211.    The investment management fee of the AXA Funds, are deducted/charged through AXA Variable Annuity Contracts, and members of the AXA Variable Annuity Contract Class are the payers of those fees.

212.    Under ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2) it is "unlawful for any registered separate account funding variable insurance contracts, or for the sponsoring insurance company of such account, to sell any such contract-- (A) unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company

**F.    ADDITIONAL ALLEGATIONS FOR VARIABLE ANNUITY CONTRACT CLASS' CLAIM THAT INVESTMENT MANAGEMENT FEES CHARGED ON INVESTMENTS IN THE AXA FUNDS THROUGH AXA EQUITABLE ANNUITY CONTRACTS VIOLATED ICA § 26(f), 15 U.S.C. § 80a-26(f)**

213.    The investment management fee of the AXA Funds, are deducted under

AXA Variable Annuity Contracts, and members of the AXA Variable Annuity Contract Class are the payers of those fees.

214.   Under ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2) it is "unlawful for any registered separate account funding variable insurance contracts, or for the sponsoring insurance company of such account, to sell any such contract-- (A) unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company...."

215.   For purposes of ICA §26(f)(2), 15 U.S.C. §80a-26(f)(2), "the fees and charges deducted under the contract shall include all fees and charges imposed for any purpose and in any manner." ICA §26(f)(3), 15 U.S.C. §80a-26(f)(3).

216.   Where a contract violates, in whole or part, a provision of the ICA, 15 U.S.C. §80a-1 et seq., it is unenforceable. ICA §47(b), 15 U.S.C. §80a-46(b).

217.   Under ICA §47(b), 15 U.S.C. §80a-46(b), any party to such unlawful contract, has an express right to bring an action for equitable relief, including rescission of that contract, or its unlawful portions, and restitution.

218.   Separate Account A is a registered separate account which funds the AXA Equitable Variable Annuity Contracts.  Plaintiff Sivolella, and all members of the AXA Equitable Variable Annuity Contract Class are parties to an AXA Equitable Variable Annuity Contract and the payers of the investment management fees AXA Equitable Life Insurance Company charges on investments into the AXA Funds.  They were charged these fees under the AXA Equitable Variable Annuity Contracts.

219.   As explained above, each of the AXA Funds has as its investment manager,

712552.1

AXA Equitable Life Insurance Company, as well as a sub-adviser (or sub-advisers).  AXA
Equitable Life Insurance Company's investment management fee, on investments into the AXA
Funds, substantially exceeds the investment management fee that is charged by the
sub-adviser(s).

220.    As described above, pursuant to the terms of their sub-advisory agreements,
the sub-advisers, were responsible for providing, with minor exceptions, all of the investment
management services to the AXA Funds.  As compared to the services required under the
sub-advisory agreements, the services AXA Equitable Life Insurance Company alleges it
provides (to the extent it actually provides them) were minimal and predominantly supervisory in
nature.   Further, the fees that AXA Equitable Life Insurance Company charged for its alleged
minimal investment management services substantially exceeded the fees that would be the
product of an arm's length bargaining for these services.   If the fees AXA Equitable Life
Insurance Company charged for its alleged investment management services to the AXA Funds
were the product of arm's length bargaining, such fees would be much smaller than the
investment management fees that are charged by the funds' sub-advisers.  However, on average
AXA Equitable Life Insurance Company's investment management fee exceeded the
sub-advisers investment management fee by 496%.  Thus, a  substantial portion of the
investment management fees that AXA Equitable Life Insurance Company charged each of the
AXA Funds, but did not pay to these funds' sub-advisers, were excessive and unreasonable in
light of the services this Defendant provided, and thus the fees and charges deducted under the
AXA Variable Annuity Contracts were unreasonable in the aggregate.

221.    Pursuant to the terms of the sub-advisory agreements,  the sub-advisers were not

712552.1

only responsible for providing, with minor exceptions, all of the investment management services to the AXA Funds (for substantially smaller fees than were paid to AXA Equitable Life Insurance Company), but for paying all of the expenses incurred to provide these services. Thus, as the investment management services AXA Equitable Life Insurance Company provided, as compared to the sub-advisers, were significantly less, the expenses it should have incurred in connection with its investment management services, were, or should have been, much smaller than the expenses incurred by the sub-advisers. Given that (A) the investment management expenses that AXA Equitable Life Insurance Company should have incurred in connection with the minimal investment management services it allegedly provided to the AXA Funds, as compared to the expenses incurred by the sub-advisers, and (B) AXA Equitable Life Insurance Company charged a substantially larger investment management fee than the AXA Funds' sub-advisers, the investment management fees received by AXA Equitable Life Insurance Company were mostly in the form of profit to it, as opposed to being used to pay for any expenses incurred by it. Thus, given the magnitude of AXA Equitable Life Insurance Company's investment management fees, and the minimal expenses AXA Equitable Life Insurance Company incurred, or should have incurred, in connection with providing minimal investment management services, the fees and charges deducted under the AXA Variable Annuity Contracts were unreasonable in the aggregate.

222.   AXA Equitable Life Insurance Company was not assuming any risk in connection with its receipt of substantial investment management fees on investments in the AXA Funds. Therefore, the fees and charges deducted under the AXA Variable Annuity Contracts were unreasonable in the aggregate.

712552.1

223.     In light of the foregoing, the fees and charges deducted under the AXA Variable Annuity Contracts, in the aggregate, were unreasonable in relation to the services rendered, the expenses incurred, and the risks assumed by AXA Equitable Life Insurance Company.

224.     On information and belief the practices summarized herein have been ongoing for the entire time period applicable to members of the AXA Variable Annuity Contract Class' claim.

225.     Pursuant to ICA §47(b), 15 U.S.C. §80-46(b), members of the AXA Variable Annuity Contract Class (which includes Plaintiff Sivolella) are entitled to rescission of the AXA Variable Annuity Contracts, or portions thereof, under which AXA Equitable Life Insurance Company charged the portion of the investment management fees, on investments into AXA Funds, complained herein (i.e., a substantial portion of the AXA Funds' investment management fees that were paid to and retained by AXA Equitable Life Insurance Company) because such fees were in violation of ICA §26(f)(2), 15 U.S.C. § 80a-26(f)(2). Further, they seek restitution of those unreasonable investment management fees and charges imposed and collected by AXA Equitable Life Insurance Company under the unenforceable provisions of the AXA Variable Annuity Contracts.

## G.     ADDITIONAL ALLEGATIONS FOR UNJUST ENRICHMENT CLAIM

226.     Members of the Payer Class are the payers of the investment managements fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC, charges on investments into the AXA Funds.

227.     In order to succeed on an unjust enrichment claim, three elements must be established. These elements are: (1) a benefit conferred on the defendant by the plaintiff; (2) an

appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by

the defendant of the benefit under such circumstances as to make it inequitable for the defendant

to retain the benefit without payment of its value.

228.    Members of the Payer Class conferred a significant benefit upon AXA Equitable

Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, because a

substantial portion of the investment management fees that the Payer Class paid to AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on

account of investments into the AXA Funds, that were retained by AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC, as discussed above, were

greatly excessive in light of the minimal services these Defendants allegedly provided, or

alternatively,  the portion of fees complained about were not used to provide any services.

229.    The fees for the alleged investment management services provided by AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to

the AXA Funds, if both the fees and expenses for such services were the products of an arm's

length negotiation, would be much smaller than the fees that were paid to the sub-advisers.

However, the investment management fees the Payer Class paid, and were  retained by these

Defendants, on average, exceeded the investment management fees paid to the AXA Funds'

sub-advisers by 496%.

230.    AXA Equitable Life Insurance Company and/or AXA Equitable Funds

Management Group, LLC, knew, or had an appreciation, of this benefit because it knew that for a

substantial portion of the investment management fees paid by the Payer Class, and that AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,

retained, such fees were greatly excessive in light of the minimal investment management services these Defendants provided (and the expenses they incurred in providing such minimal services) to the AXA Funds  and/or they were not providing any investment management services to the AXA Funds for such fees.

231.    Given that a substantial portion of the investment management fees that were paid to  AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, by the Payer Class (and not remitted to the sub-advisers),  were, with respect to the AXA Funds,  greatly excessive in light of the minimal services these Defendants provided for such fees (and the expenses incurred in providing such minimal services) and/or this portion of fees were not used to provide any services to the AXA Funds, it would be inequitable for AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, to retain such fees and thus members of the Payer Class seek restitution of such fees because AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC, have been unjustly enriched by their receipt of such fees.

232.    Members of the AXA Variable Annuity Contract Class unjust enrichment claim is brought under Federal common law.

## VIII.   CLASS ALLEGATIONS FOR CLAIMS (A) FOR VIOLATION OF ICA 26(f), 15 U.S.C. 80a-26(f) AND (B) UNJUST ENRICHMENT CLAIM.

233.    Plaintiff Sivolella brings this action individually and on behalf of any person that was a party to a variable annuity contract issued/sold by Defendant AXA Equitable Life Insurance Company where such contract offered for investment, and resulted in investment, in any AXA Fund.  This class is composed of persons who invested in any AXA Fund and paid

712552.1

investment management fees to AXA Equitable Life Insurance Company under a AXA Variable Annuity Contract, and they seek recovery of a substantial portion of those fees as they were in violation of ICA §26(f), 18 U.S.C. § 80a-26(f). This class is known as the AXA Variable Annuity Contract Class, which includes Plaintiff Sivolella. The Class period for these claims begin on the earliest date on which each such claim would be timely.

234.    Plaintiff Sivolella also brings this action individually and on behalf of any person that paid investment management fees to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, on account of investments into any AXA Fund. This class is known as the Payer Class and it seeks recovery of a substantial portion of the investment management fees that were paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, because such fees unjustly enriched these Defendants since for the portion of the fees that this class seeks recovery for no services were rendered and/or the fees were substantially disproportionate to the actual minimal services rendered. The Class period for these claims begin on the earliest date on which each such claim would be timely.

235.    On information and belief, the AXA Equitable Variable Annuity Class and the Payer Class are generally composed of the same members.

236.    Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Classes are any judge, justice or judicial officer presiding over this matter and the members of their judicial staff.

237.    It is believed that the proposed Classes are so numerous that individual joinder of

712552.1

all of their members would be impracticable.  The total number of Class members, of each Class, is believed to be, at a minimum, at least 200 individuals.

238.    There are questions of law and fact common to the AXA Variable Annuity Contract Class, in determining whether, given the substantial investment management fees AXA Equitable Life Insurance Company charged on investments into the AXA Funds, and the services provided by the funds' sub-advisers,  the fees and charges deducted by AXA Equitable Life Insurance Company under the AXA Variable Annuity Contracts were reasonable, in the aggregate, in relation to the services rendered, expenses incurred and risks it assumed.

239.    There are questions of law and fact common to the Payer Class, in determining whether, given the substantial investment management fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged on investments into the AXA Funds, and the services provided by the funds' sub-advisers, the fees charged by AXA Equitable Life Insurance Company and/or AXA Funds Management Group, LLC, which members of this class were the payers of, unjustly enriched these Defendants.

240.    The claims and defenses of the representative party is typical of the claims and defenses of each of the Classes.  The representative party has  no interests that are antagonistic to the claims of the Classes, and understands that this matter cannot be settled without the Court's approval.

241.    The representative party will fairly and adequately protect the interests of the Classes, and is committed to a vigorous prosecution of this case.

242.    The prosecution of separate actions by individual members of each Class would create a risk of inconsistent or varying adjudications with respect to individual members of the

712552.1

Classes that would establish incompatible standards of conduct for the Defendants.

243.     The parties opposing the Classes have acted on grounds generally applicable to each Class thereby making appropriate final injunctive relief or corresponding declaratory relief.

244.     The questions of law or fact common to the members of each of the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

245.     The Defendants were obligated to treat the members of each Class similarly. Individual proceedings, therefore, would pose the risk of inconsistent adjudications.

246.     Since the damages suffered by each member of the Classes may be relatively small, the expense and burden of individual litigation makes it impractical for class members to separately seek redress.

247.     The Classes suffered, and will continue to suffer, harm as a result of Defendants' conduct.

248.     A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of each of the Classes is impractical.

249.     Even if the individual members of each Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigations would proceed.

250.     Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.

251.     The class action device allows a single court to provide the benefits of unitary

712552.1

adjudication, judicial economy, and the fair and equitable handling of all claims of the members of each Class.

252.     Conducting this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the individual members of each Class.  For many, if not most, of the members of each Class, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.

253.     Each Class may be certified under Fed. R. Civ. P.  23(b)(1), (2) and/or (3).

712552.1

IX.   **DEFENDANT AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC'S ADMINISTRATIVE FEES ALSO VIOLATED ICA § 36(b), 15 U.S.C. § 80a-35(b)[11]**

A.   **BACKGROUND** [12]

**NOTE: THE ALLEGATIONS IN THIS SECTION VI ARE BASED ON MATERIALS PRODUCED IN DISCOVERY. AT THE DEFENDANT'S REQUEST, VARIOUS PORTIONS OF THIS SECTION VI HAVE BEEN REDACTED ON ACCOUNT OF ITS BELIEF THAT SUCH SECTIONS CONTAIN CONFIDENTIAL INFORMATION. PLAINTIFFS HAVE NO OBJECTION TO THE CONFIDENTIAL TREATMENT OF THE REDACTED INFORMATION. THEREFORE, AN UNREDACTED COPY OF THIS SECOND AMENDED COMPLAINT IS BEING MAILED TO THE COURT, AND PROVIDED TO THE DEFENDANT.**

254.   In addition to the Investment Management Agreement between AXA Equitable

Funds Management Group, LLC, and the Advisors Trust/AXA Funds, on May 1, 2011,

Defendant AXA Equitable Funds Management Group, LLC, entered into the "Mutual Funds

Service Agreement" with the Advisors Trust/AXA Funds (the "AXA Mutual Funds Service

Agreement").

255.   Under the AXA Mutual Funds Service Agreement, AXA Equitable

---

[11]Section IX, and Counts V and VI of this pleading are added to Plaintiff's previously filed Complaint by way of amendment. Defendants' motion to dismiss Counts I and II was denied. Count III was withdrawn by Plaintiff and Count IV was dismissed. Thus, there are four Counts in the Second Amended Complaint (Counts I and II and Counts V and VI). Pursuant to the parties' agreement, none of the other allegations and Counts in the previously filed Complaint have been modified by this amendment, and thus the Answer to those allegations and Counts remains unchanged. Furthermore, as noted above, SEC filings provide conflicting disclosures as to whether the security that is issued to Plaintiff on account of her investment is a share of the AXA Fund or a share of the Advisors Trust. Thus, the only distinction between Counts V and VI is Count V is brought on behalf of the AXA Funds and, in the alternative, Count VI is brought on behalf of the Advisors Trust. The allegations in this Section IX apply equally to both Counts V and VI.

[12]In April of 2011, AXA Equitable Funds Management Group, LLC, was created as a separate legal entity and, in May of 2011, a new Mutual Funds Service Agreement was executed.

712552.1

Funds Management Group, LLC, was to provide, what it describes generally as "administrative services." Further, it refers to the fees it receives under this agreement as its "administrative fees."

256. The AXA Mutual Funds Service Agreement is separate from the Investment Management Agreement.

257. Furthermore, the fees AXA Equitable Funds Management Group, LLC, charges pursuant to the AXA Mutual Funds Service Agreement for its alleged services are separate, independent, and in addition to, its investment management fees.

258. AXA Equitable Funds Management Group, LLC, as explained below, has delegated, with minor exceptions, all of the services it contracted to provide under the AXA Mutual Funds Service Agreement to JP Morgan Chase Bank, N.A. ("JP Morgan"). JP Morgan provided those services for a fraction (approximately 1/10th) of the fees that AXA Equitable Funds Management Group, LLC, charged the AXA Funds.

259. Plaintiff pays AXA Equitable Funds Management Group, LLC's, administrative fees. AXA Equitable Funds Management Group, LLC, uses a small portion of these fees to pay JP Morgan for its administrative services.

260. JP Morgan is a for profit entity and its fees were negotiated through an arm's length transaction. There is an inverse relationship between JP Morgan's administrative fees and AXA Equitable Funds Management Group, LLC's administrative fees; the lower JP Morgan's fees are, the larger amount of the administrative fees AXA Equitable Funds Management Group, LLC retains.

261. In 2011, AXA Equitable Funds Management Group, LLC, charged the AXA

712552.1

Funds, the following administrative fees under the AXA Mutual Funds Service Agreement:

| Fund | Fee |
|------|-----|
| EQ/Common Stock Index Portfolio | $5,019,997 |
| EQ/Equity Growth PLUS Portfolio | $2,726,023 |
| EQ/Equity 500 Index Portfolio | $3,006,915 |
| EQ/Global Multi-Sector Equity Portfolio | $3,667,702 |
| EQ/GAMCO Small Company Value Portfolio | $2,144,262 |
| EQ/Large Cap Value PLUS Portfolio | $5,087,636 |
| EQ/Intermediate Government Bond Index Portfolio | $2,266,813 |
| EQ/Mid Cap Value PLUS Portfolio | $2,914,750 |

262.    The administrative fees AXA Equitable Funds Management Group, LLC, charged the AXA Funds in 2012 have not yet been provided to Plaintiffs. However, on information and belief, the fees were the same in 2012.

263.    **REDACTED**

712552.1

services.

264.        **REDACTED**

| ADMINISTRATION PROFITABILITY (2010) |
| --- |

**REDACTED**

712552.1

| ADMINISTRATION PROFITABILITY (2010) (continued) |
| --- |

**REDACTED**

**B.     THE NATURE AND QUALITY OF THE SERVICES UNDER THE AXA MUTUAL FUNDS SERVICE AGREEMENT DID NOT JUSTIFY AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC'S ADMINISTRATIVE FEES**

265.    The AXA Mutual Fund Services Agreement, dated May 1, 2011, between AXA Equitable Funds Management Group, LLC, and the Advisors Trust/AXA Funds, states, in Section 4(a), that AXA Equitable Funds Management Group, LLC,  will provide the following services, on behalf of the Advisors Trust/AXA Funds: "(i) Trust Administration, (ii) Compliance Services, and (iii) Trust Accounting."

266.    Pursuant to Section 4(c) of the AXA Mutual Funds Service Agreement, AXA Equitable Funds Management Group, LLC, "is hereby authorized to retain third parties and is hereby separately authorized to delegate some or all of its duties and obligations hereunder to

712552.1

such person or persons."

267.      AXA Equitable Funds Management Group, LLC, then proceeded to, immediately,

on May 1, 2011, delegate with minor exceptions, all of its obligations under the AXA Mutual

Funds Service Agreement to JP Morgan.

268.      Pursuant to Section 4(a) the "Mutual Funds Sub-Administration Agreement"

between AXA and JP Morgan, (the "JP Morgan Mutual Funds Service Agreement"), JP Morgan

provided the following services on behalf of the Advisors Trust/AXA Funds: "(i) Trust Sub-

Administration, (ii) Compliance Services; and (iii) Trust Accounting."

269.      Section 4(a) of the AXA Mutual Funds Service Agreement states that "a detailed

description of each of the above services is contained in Schedules B and C, respectively, of this

Agreement."  Section 4(a) of the JP Morgan Mutual Funds Service Agreement states that "a

general description of each of the above services is contained in Schedules B and C, respectively

of this Agreement."  Beside comparing Sections 4(a) of each  agreement, a comparison of

Schedules B and C of each agreement confirms that AXA Equitable Funds Management Group,

LLC, with minor exceptions, delegated to JP Morgan all of its duties under the AXA Mutual

Funds Service Agreement. This is also confirmed by a comparison of AXA Equitable Funds

Management Group, LLC's, costs and other disclosures.

## COMPARISON OF TERMS OF ADMINISTRATIVE AGREEMENTS

| AXA<br>Financial and Tax Reporting | JP Morgan<br>Financial and Tax Reporting |
|---|---|
| "Prepare management reports and Board of Trustees materials, such as unaudited financial statements and summaries of dividends and distributions." (Schedule B, Sec. II. A)[13] | "Prepare management reports and Board of Trustees materials, such as unaudited financial statements and summaries of dividends and distributions." (Schedule B, Sec I.A) |
| "Report Trust performance to outside services as directed by Trust management." (Schedule B, Sec. II. B) | "Report Trust performance to outside services as directed by Trust management." (Schedule B, Sec. I. B) |
| "Calculate dividend and capital gain distributions in accordance with distribution policies detailed in the Trust's prospectus(es) or Board resolutions. Assist Trust management in making final determinations of distribution amounts." (Schedule B, Sec. II. C) | "Calculate dividend and capital gain distributions in accordance with distribution policies detailed in the Trust's prospectus(es) or Board resolutions. Assist Trust management in making final determinations of distribution amounts." (Schedule B, Sec. I. C) |
| "Estimate and recommend year-end dividend and capital gain distributions necessary for each Portfolio to avoid the excise tax on undistributed income of a regulated investment company ("RIC") under Section 4982 of the Internal Revenue Code of 1986, as amended (the "Code")." (Schedule B, Sec. II. D) | "Estimate and recommend year-end dividend and capital gain distributions necessary to avoid the excise tax on undistributed income of a regulated investment company ("RIC") under Section 4982 of the Internal Revenue Code of 1986, as amended (the "Code") regarding minimum distribution requirements." (Schedule B, Sec. I. D) |

---

[13]Schedule B, Section I, of AXA Equitable Funds Management Group, LLC's Mutual Funds Service Agreement contains a "General" section which states it will: "A. Coordinate and manage the work relationships among all service providers to the Trust. B. Perform Trust operational management, including development of control procedures and monitor the performance of all service vendors to the Trust. C. Subject to the supervision of the Board of Trustees as required, propose and carry out policies, particularly in the area of operational problem inquiry and resolution, such as potential/actual compliance violations, valuation of complex securities or those trading in problematic markets, and Trust share valuation errors." This "General" section is not in JP Morgan's agreement.

712552.1

| AXA<br>Financial and Tax Reporting | JP Morgan<br>Financial and Tax Reporting |
|---|---|
| "The Trust will advise FMG LLC [AXA Equitable Funds Management Group, LLC]of the declaration of any dividend or distribution and the record and payable date thereof at least five (5) days prior to the record date; and FMG LLC will make appropriate credits to each shareholder's account."  (Schedule B, Sec. II. E) | "Calculate dividend and capital gain distributions...." (Schedule B, Sec I. C)<br><br>"Accounting for dividends and interest received and distributions made by the Trust." (Schedule C, Sec I. C.) |
| "Working with the Trust's independent public accountants and other appropriate persons, prepare and file the Trust's Federal tax return on Form 1120-RIC (or any similar Form), along with all state and local tax returns where applicable. Prepare and file Federal Excise Tax Return (Form 8613) (or any similar Form). Will obtain all information concerning foreign tax filings prepared and filed in foreign jurisdictions necessary for FMG LLC to perform its obligations under this Agreement." (Schedule B, Sec II. F) | "Working with the Trust's public accountants or other professionals, prepare and file Trust's Federal tax return on Form 1120-RIC along with New York State and New York City tax returns, as applicable. Prepare and file Federal Excise Tax Return (Form 8613). Preparation of all other applicable state tax returns will be completed as directed by the Trust's public accountant or FMG LLC."  (Schedule B, Sec. II. E). |
| "Prepare for review by appropriate persons and file Trust's Form N-SAR with the SEC." (Schedule B, Sec II. G) | "Prepare for filing Form N-SAR and Item 1 of Forms N-CSR and N-Q. Send such data to the Fund's or FMG LLC's selected printer for Edgarization (formatting) and filing with the SEC." (Schedule B, Sec I. F)<br><br>"Prepare and coordinate printing of Trust's semi-annual and annual reports to shareholders." (Schedule B, Sec. I. G)<br><br>(N-SAR is a semi-annual report for a mutual fund/registered investment company; an N-CSR is the annual report for a mutual fund/registered investment company and the N-Q is the quarterly report for a mutual fund/registered investment company.) |

712552.1

| AXA<br>**Financial and Tax Reporting** | JP Morgan<br>**Financial and Tax Reporting** |
|---|---|
| "Prepare and coordinate printing of Trust's semi-annual and annual reports to shareholders and file such reports with the appropriate regulatory agencies. Notwithstanding the foregoing, **FMG LLC shall not** be responsible for preparing the 'President's Letters' or the 'Management's discussion of each Portfolio's performance' but shall review the text of the 'President's Letters' and 'Management's discussion of which Portfolio's performance' (which shall also be subject to review by the Trust's legal counsel)." (Schedule B, Sec. II. H) | "Prepare and coordinate printing of Trust's semi-annual and annual reports to shareholders." (Schedule B, Sec. I. G) |
| "Prepare for review and approval by the Trust's officers financial information for the Trust's semi-annual and annual reports, proxy statements and other communications required or otherwise sent to the Trust's shareholders (and their contractowners) and arrange, if requested, for the printing and dissemination of such reports and communications." (Schedule B, Sec. II. I) | "Prepare and coordinate printing of Trust's semi-annual and annual reports to shareholders." (Schedule B, Sec. I. G)<br><br>"Provide financial information for Trust proxies and prospectuses including expense table." (Schedule B, Sec. I. J) |
| "Provide financial information for Trust proxies and prospectuses including expense table." (Schedule B, Sec. II. J) | "Provide financial information for Trust proxies and prospectuses including expense table." (Schedule B, Sec. I. J) |
| "File copies of financial reports to shareholders with the SEC under Rule 30b2-1." (Schedule B, Sec. II. K) | N/A |

712552.1

| AXA<br>Financial and Tax Reporting | JP Morgan<br>Financial and Tax Reporting |
|---|---|
| "Notify the separate accounts as to what portion, if any, of the distributions made by the Trust during the prior fiscal year were exempt-interest dividends under Section 852(b)(5)(A) of the Code." (Schedule B, Sec. II. L) | "Provide to FMG LLC or the Trust's transfer agent, the portion, if any, of the distributions made by the Trust's Funds during the prior calendar year that were exempt-interest dividends under Section 852 (b)(5)(A) of the Code And/or were capital gain distributions under Section 852(b)(3)(A) of the Code. Provide Form 1099 recharacterizations, when necessary, and supplemental information for applicable Funds." (Schedule B, Sec. I. H) |
| "Provide Form 1099-MISC to persons other than corporations (i.e., Trustees) to whom the Trust paid more than $600 during the year." (Schedule B, Sec. II. M) | "Provide Form 1099-MISC to persons other than corporations (i.e., Trustees) to whom the Trust paid more than $600 during the year." (Schedule B, Sec. I) |

712552.1

| AXA-Portfolio Compliance | JP Morgan-Fund Compliance |
|---|---|
| FMG LLC shall provide the following compliance services in conjunction with each Adviser's [ **the Sub-Adviser's]** obligations pursuant to its Investment Advisory Agreement with the Trust and all applicable laws.<br><br>Monitor and periodically test each Portfolio's compliance with investment restrictions (e.g., issuer or industry diversification, etc.) listed in the current prospectus(es) and Statement(s) of Additional Information." | Assist with monitoring and periodically testing each Fund's compliance with investment restrictions (e.g., issuer or industry diversification, etc.) listed in the current prospectus(es) and Statement(s) of Additional Information, although primary responsibility for such compliance shall remain with the Trust's **investment advisers** [i.e., the Sub-Advisers] or FMG LLC." |
| Monitor and periodically test, including on required quarterly testing dates, each Portfolio's compliance with the requirements of Section 851 of the Code and applicable Treasury Regulations for qualification as a RIC. | Assist with monitoring and periodically testing each Investment Trust's compliance with the requirements of Section 851 of the Code and applicable Treasury Regulations for qualification as a RIC, although primary responsibility for such compliance shall remain with the Trust's **investment advisers** or FMG LLC. |
| Monitor and periodically test, including on required quarterly testing dates, each Portfolio's compliance with the requirements of Section 817(h) of the Code and applicable Treasury Regulations. | Assist with monitoring and periodically testing, including on required quarterly testing dates, each Fund's compliance with the requirements of Section 817(h) of the Code and applicable Treasury Regulations, although a primary responsibility for such compliance shall remain with the Trust's **investment advisers** or FMG LLC. |
| Monitor each investment adviser's compliance with Board directives such as "Approved Issuers Listings for Repurchase Agreements", Rule 17a-7, Rule 17e-1 and Rule 12d-3 procedures.<br><br>(Schedule B, Sec. III A to D) | Assist with monitoring investment manager's compliance with Board directives such as "Approved Issuers Listings for Repurchase Agreements", Rule 17a-7, and Rule 12d-3 procedures, although primary responsibility for such compliance shall remain with the Trust's **investment advisers** or FMG LLC.<br>(Schedule B, Sec. II. A to D) |

712552.1

| AXA-Portfolio Compliance | JP Morgan Portfolio Compliance |
|---|---|
| "Mail quarterly requests for 'Securities Transaction Reports' to the Trust's Trustees and Officers and "access persons" under the terms of the Trust's Code of Ethics and SEC regulations" (Schedule B, Sec. III. E) | "Mail quarterly requests for 'Securities Transaction Reports' to the Trust's Trustees and Officers and "access persons" under the terms of the Trust's Code of Ethics and SEC regulations." (Schedule B, II. E) |
| "Prepare, distribute, and utilize in compliance training sessions, comprehensive compliance materials, including compliance manuals and checklists, subject to review and comment by the Trust's legal counsel and develop or assist in developing guidelines and procedures to improve overall compliance by the Trust and its various agents." (Schedule B, Sec. III. F) | N/A |

| AXA-Regulatory Affairs and Corporate Governance | JP Morgan-Regulatory Affairs and Corporate Governance |
|---|---|
| "Prepare, review and file post-effective amendments to the Trust's registration statement and supplements as needed with respect to the currently existing Portfolios only." (Schedule B, Sec. IV. A) | N/A |
| "Prepare and file proxy materials and administer shareholder meetings." (Schedule B, Sec. IV. B) | N/A |
| "Prepare agenda, collect background information and prepare all Board materials for Board meetings and distribute such materials to all necessary parties." (Schedule B, Sec. IV. C) | "Provide support with respect to collection of quarterly materials for Board meetings." (Schedule B, Sec. III. A)<br><br>[Prior to October 1, 2012, each Board member received "an annual fee of $230,000..." Effective October 1, 2012, that amount was increased to $250,000.] |

712552.1

| AXA-Regulatory Affairs and Corporate Governance | JP Morgan-Regulatory Affairs and Corporate Governance |
|---|---|
| "Prepare minutes, and follow up on matters related to FMG LLC's responsibilities under this Agreement that are raised at all Board meetings." (Schedule B, Sec. IV. D) | N/A |
| "In coordination with the Manager, make reports and recommendations to the Board concerning the performance of each of the investment advisers and other service providers for the Trust, as the Board may reasonably request." (Schedule B, Sec. IV. E) | [Sub-Advisers make reports to the Boards.] |
| "Prepare and file with the SEC Rule 24f-2 Notices (and all similar state filings, if required by the states). FMG LLC shall not be responsible for preparing any legal opinions required in connection with Rule 24f-2 Notices."  (Schedule B, Sec. IV. F) | "Prepare Rule 24f-2 Notices and file with the SEC." (Schedule B, Sec. III. C) |
| "Review and monitor the fidelity bond and errors and omissions insurance coverage and the submission of any related regulatory filings" (Schedule B, Sec. IV. G) | N/A |
| "Prepare and update documents, such as charter document, by-laws, and foreign qualification filings." (Schedule B, Sec. IV. H) | N/A |
| "Provide support and counsel with respect to routine regulatory examinations or investigations of the Trust and work closely with the Trust's legal counsel in response to any non-routine regulatory matters. Also, coordinate all communications and data collection with regard to any regulatory examinations and yearly audits by independent accountants." (Schedule B, Sec. IV. I). | "Provide support with respect to routine regulatory examinations or investigations of the Trust." (Schedule B, Sec. III. B)

"Coordinate all communications and data collection with regard to any regulatory examinations and yearly audits by independent accountants." (Schedule B, Sec. IV. C) |
| "Maintain general corporate calendar." (Schedule B, Sec. IV. J). | N/A |

712552.1

| AXA-Regulatory Affairs and Corporate Governance | JP Morgan-Regulatory Affairs and Corporate Governance |
|---|---|
| "Assist with preparations for, attend and prepare minutes of shareholder meetings." (Schedule B, Sec. IV. K) | N/A |
| "When requested provide consultation on regulatory matters relating to portfolio management, Trust operations and any potential changes in each Portfolio's investment policies, operations or structure." (Schedule B, Sec. IV. L) | N/A |
| "Maintain continuing awareness of significant emerging regulatory and legislative developments which may affect each Portfolio; update the Board and the Manager on those developments and provide related planning assistance where reasonably requested or appropriate." (Schedule B, Sec. IV. M). | The Board and the Advisors Trust each have of their own attorneys. |
| N/A | "Prepare and distribute updates to the Trust's compliance manual." (Schedule B, Sec. III. D). |

712552.1

| AXA-Administration | JP Morgan-General Administration |
|---|---|
| "Furnish appropriate officers for the Trust, subject to Board approval." (Schedule B, Sec. V. A) | N/A |
| "Prepare, propose and monitor the Trust budget, including prepare Trust, portfolio or class expense projections, establish accruals and review on a periodic basis, including expenses based on a percentage of average daily net assets (e.g., management, advisory and administrative fees) and expenses based on actual charges annualized and accrued daily (audit fees, registration fees, directors' fees, etc.)." (Schedule B, Sec. V. B). | "Prepare Trust, Fund or class expense projections, establish accruals and review on a periodic basis, including expenses based on a percentage of average daily net assets (e.g., management, advisory and administrative fees) and expenses based on actual charges annualized and accrued daily (audit fees, registration fees, trustees' fees, etc.)." (Schedule B, Sec. IV. A)<br><br>(AXA uses the terms Portfolio and Funds interchangeably) |
| "For new Portfolios and classes, obtain Employer or Taxpayer Identification Number and CUSIP numbers, as necessary. Estimate organizational costs and expenses and monitor against actual disbursements." (Schedule B, Sec. V. C) | "For new Funds and classes, obtain Employer or Taxpayer Identification Number and CUSIP numbers, as necessary. Estimate expenses and monitor against actual disbursements." (Schedule B, Sec. IV. B) |
| "Arrange for and monitor, if directed by the appropriate Trust officers, the payment of the Trust's and each Portfolio's or class' expenses (pursuant to the Trust's Rule 18f-3 Plan)." | N/A |

712552.1

| AXA-General Description | JP Morgan-General Description |
|---|---|
| "Maintenance of the books and records for the Trust's assets, including records of all securities transactions." (Schedule C, Sec. I. A) | "Maintenance of the books and records for the Trust's assets, including records of all securities transactions." (Schedule C, Sec. I. A) |
| "Calculation of each Portfolio's or class' net asset value in accordance with the Trust's prospectus, and after the Portfolio or class meets eligibility requirements, transmission to NASDAQ and to such other entities as directed by the Trust." (Schedule C, Sec. I. B) | "Calculation of each Fund's or class's Net Asset Value in accordance with the Trust's Prospectus." (Schedule C, Sec. I. B) |
| "Accounting for dividends and interest received and distributions made by the Trust." (Schedule C, Sec. I. C) | "Accounting for dividends and interest received and distributions made by the Trust." (Schedule C, Sec. I. C) |
| "Coordination with the Trust's independent auditors with respect to the annual audit and as otherwise requested by the Trust." (Schedule C, Sec. I. D) | "Coordinate with the Trust's independent auditors with respect to the annual audit, and as otherwise requested by the Trust." (Schedule C, Sec. I. D) |
| "Consult with the Trust's officers, independent public accountants and other appropriate persons in establishing the accounting policies of the Trust." (Schedule C, Sec. I. E). | "Coordinate with the Trust's independent auditors with respect to the annual audit, and as otherwise requested by the Trust." (Schedule C, Sec. I. D)" <br><br> "Maintenance of the books and records for the Trust's assets...."(Schedule C, Sec. I. A) |
| " As mutually agreed upon, FMG LLC [AXA] will provide domestic and/or international reports." (Schedule C, Sec. I. F) | "As mutually agreed upon, J.P. Morgan will provide domestic and/or international reports." (Schedule C, Sec. I. E). |

712552.1

270.     As the above charts reflect, which reproduce the terms in Schedules B and C of the AXA and JP Morgan Mutual Fund Services Agreements, AXA Equitable Funds Management Group, LLC, has delegated, with minor exceptions, all of the services it is required to perform under the AXA Administrative Agreement, including, but not limited to delegating to JP Morgan the responsibility to maintain "the books and records for the Trust's assets...."(Schedule C, Sec. I. A)[14]

271.     As noted above, Section 4(a) of the AXA Mutual Funds Service Agreement lists the services to be provided as "Trust Administration," "Compliance Services," and "Trust Account." Similarly, Section 4(a) of the JP Morgan Mutual Funds Service Agreement lists the services to be: "Trust Sub-Administration," "Compliance Services," and "Trust Account."

272.     As the above chart reflects, regarding "Fund Compliance Services," JP Morgan is responsible for "assist[ing]" AXA Equitable Funds Management Group, LLC, in monitoring that the AXA Funds are in compliance with (a) the "current prospectus(es) and Statements of Additional Information" for the AXA Funds; (b) "Section 817(h) of the [Internal Revenue] Code and applicable Treasury Regulations;" and (c) "Board directives such as 'Approved Listings for Repurchase Agreements,' Rule 17-a-7 and Rule 12d-3 procedures," "although primary responsibility for...compliance [of items listed in a, b, and c] shall remain with

---

[14]Additionally, "JPMorgan Chase Bank ("Chase"), 4 New York Plaza, Floor 15, New York, New York 10004-2413 serves as custodian of the Trust's portfolio securities and other assets. Under the terms of the custody agreement between the Trust and Chase, Chase maintains cash, securities and other assets of the Portfolios. Chase is also required, upon the order of the Trust, to deliver securities held by Chase, and to make payments for securities purchased by the Trust. Chase has also entered into sub-custodian agreements with a number of foreign banks and clearing agencies, pursuant to which portfolio securities purchased outside the United States are maintained in the custody of these entities."

712552.1

the Trust's **investment advisers** [i.e., the Sub-Advisers] or FMG LLC."

273.    The sub-advisory agreements state, that in managing the AXA Funds, the sub-advisers must:

In furnishing services hereunder, the Adviser [i.e., the Sub-Adviser] shall be subject to, and shall perform in accordance with the following: (i) the Trust's Agreement and Declaration of Trust, as the same may be hereafter modified and/or amended from time to time ("Trust Declaration"); (ii) the By-Laws of the Trust, as the same may be hereafter modified and/or amended from time to time ("By-Laws"); (iii) the currently effective Prospectus and Statement of Additional Information of the Trust filed with the SEC and delivered to the Adviser, as the same may be hereafter modified, amended and/or supplemented ("Prospectus and SAI"); (iv) the Investment Company Act and the Advisers Act and the rules under each, and all other federal and state laws or regulations applicable to the Trust and the Portfolios; (v) the Trust's Compliance Manual and other policies and procedures adopted from time to time by the Board of Trustees of the Trust; and (vi) the written instructions of the Manager.

274.    Furthermore, the sub-advisers are also required to make reports to the Board of Trustees.

275.    AXA Equitable Funds Management Group, LLC, has explicitly stated it "has contracted with JPMorgan Investors Services Co. ('JPMorgan Services') to provide the Trust with certain administrative services, including monitoring portfolio compliance and administrative services."

276.    AXA Equitable Funds Management Group, LLC, has also stated:

Please note that FMG LLC [AXA] serves as the fund administrator for the AXA Equitable-sponsored mutual funds.  FMG LLC has delegated the day-to-day accounting and administration to JP Morgan Investor Services, Co ('JPMIS') and in that capacity, JPMIS maintains applicable records.

277.    JP Morgan provides these services at its own expense as Section 4(b) of the JP Morgan Mutual Funds Service Agreement, required it to: "(i)provide office facilities with respect to the provision of the services contemplated herein (which may be in the

712552.1

offices of J.P. Morgan or a corporate affiliate of J.P. Morgan); (ii) provide...personnel sufficient

for provision of the services contemplated herein;  (iii) furnish equipment and other materials,

which are necessary or desirable for provision of the services contemplated herein; and (iv) keep

records relating to the services contemplated herein in such form and manner as J.P. Morgan may

deem appropriate or advisable."

278.     In addition to JP Morgan's services, the Advisors Trust's "Board is responsible

for the overall management of the Trust and the Portfolios, including general supervision and

review of the Portfolios' investment activities and their conformity with federal and state law as

well as the stated policies of the Portfolios."  As noted above, prior to October 1, 2012 each

Board member received "an annual fee of $230,000..."  Effective October 1, 2012, that amount

was increased to $250,000.

279.     Thus, in addition to JP Morgan, the sub-advisers were providing administrative

services, and for their compensation, so should have the Board members.

280.     In light of the foregoing, the nature and quality of AXA Equitable Funds

Management Group, LLC's, administrative services under the AXA Mutual Funds Service

Agreement were minimal because it delegated, with minor exceptions, all of those services to JP

Morgan.

281.     In light of AXA Equitable Funds Management Group, LLC's, delegation, with

minor exceptions, of all of the administrative services it was to provide under the AXA Mutual

Funds Service Agreement, and which were delegated for a fraction of the fee that Defendant

charged, AXA Equitable Funds Management Group, LLC's, administrative fees under the AXA

Mutual Funds Service Agreement were so disproportionately large that they bore no reasonable

relationship to the services rendered by the Defendant and could not have been a product of

arm's length bargaining and thus are  in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

**C.     COMPARATIVE FEE STRUCTURE DEMONSTRATES THAT AXA
          EQUITABLE FUNDS MANAGEMENT GROUP, LLC'S, FEES UNDER
          THE AXA MUTUAL FUND SERVICE AGREEMENT WERE EXCESSIVE
          AND IN VIOLATION OF ICA § 36(b), 15 U.S.C.§ 80a-35(b)**

282.    A comparison of AXA Equitable Funds Management Group, LLC's fees to JP

Morgan's fees, in light of the services JP Morgan provides, demonstrates that AXA Equitable

Funds Management Group, LLC's administrative fees under the AXA Mutual Fund Service

Agreement were so disproportionate to the services rendered that they could not have been the

product of arm's length bargaining.

283.    With respect to (a) the EQ/Common Stock Index Portfolio, (b) the EQ/GAMCO

Small Company Value Portfolio, (c) the EQ/Equity 500 Index Portfolio and (d) the

EQ/Intermediate Government Bond Index Portfolio, AXA Equitable Funds Management Group,

LLC's, Mutual Fund Service Agreement  provided for the following fees:

| | |
|---|---|
| First $3 Billion in Fund Assets | 12bps |
| Next $3 Billion in Fund Assets | 11bps |
| Next $4 Billion in Fund Assets | 10.5bps |
| Next $20 Billion in Fund Assets | 10bps |
| Thereafter | 9.75bps |

Plus a $30,000 fixed fee per Portfolio

284.    With respect to the (a) the EQ/Global Multi-Sector Equity Portfolio, (b) the

EQ/Equity Growth PLUS Portfolio, (c) the EQ/Large Cap Value PLUS Portfolio and (d) the

EQ/Mid Cap Value PLUS Portfolio, AXA Equitable Funds Management Group, LLC's Mutual

712552.1

Fund Service Agreement provided for the following fees:

| First $20 Billion in Assets | 15bps |
| Next $5 Billion in Assets | 12.5bps |
| Thereafter | 10bps |

Plus a fixed fee of $32,500 for each allocated portion of the Portfolio (these funds each have two portions).

285.   JP Morgan's fees on all of the AXA Funds were as follows:

| First $3 Billion in Assets | 1.50bps |
| Next $3 Billion in Assets | 1.25bp |
| Next $4 Billion in Assets | 1.00bp |
| Next $10 Billion in Assets | 0.75bp |

Plus an Annual Fixed Charge on (a) non Multi-Managed Portfolios[15] of $15,000 on assets less than $100 million and $20,000 on assets in excess of $100 million and on (b) Multi-Managed Portfolios[16] a composite fee of $2,000 plus $25,000 for each sleeve portion of the Portfolio (Multi Managed Portfolios have two "sleeves.") The fee schedule listed in this paragraph 285 is the fee schedule listed in the agreement JP Morgan entered into with AXA Equitable Funds Management Group, LLC, on May 1, 2011 (i.e., the JP Morgan Mutual Funds Service Agreement).  This is the same fee schedule that JP Morgan had in effect, with respect to the AXA Funds, on November 1, 2004 under a prior agreement.

---

[15]The non Multi-Managed Portfolios are (a) the EQ/Common Stock Index Portfolio, (b) the EQ/Equity 500 Index Portfolio, (c) the EQ/GAMCO Small Company Value Portfolio, and (d) the EQ/Intermediate Government Bond Index Portfolio.

[16]The Multi-Managed Portfolios are the (a) the EQ/Global Multi-Sector Equity Portfolio, (b) the EQ/Large Cap Value PLUS Portfolio, (c) the EQ/Mid Cap Value PLUS Portfolio and (d) the EQ/Equity Growth PLUS Portfolio.

712552.1

286.    As demonstrated above at paragraph 264, the expenses AXA Equitable Funds Management Group, LLC, incurred to allegedly provide the services under the AXA Mutual Funds Service Agreement were minimal (especially when compared to the fees it charges for these services).

287.    As stated by AXA Equitable Funds Management Group, LLC, among other things, it "delegated the day-to-day accounting and administration to JP Morgan Investor Services...." (*See also* Section VI. B)

288.    The administrative fees AXA Equitable Funds Management Group, LLC, receives under the AXA Mutual Fund Service Agreement fees are approximately ten times (i.e., AXA's 12 bps v. JP Morgan's 1.50 bp), and with respect to some of the AXA Funds, this spread between the Defendant's and JP Morgan's fees, is even greater. Furthermore, in exchange for its fee, not only does JP Morgan provide the administrative services, but also bears the costs to: "(i) provide office facilities with respect to the provision of the services contemplated herein (which may be in the offices of J.P. Morgan or a corporate affiliate of J.P. Morgan); (ii) provide...personnel sufficient for provision of the services contemplated herein; [and] (iii) furnish equipment and other materials, which are necessary or desirable for provision of the services contemplated herein...."

289.    JP Morgan, a for profit company, employing its fee schedule, performed, with minor exceptions, all of the administrative services under the AXA Mutual Funds Service Agreement. It has performed these services, for these fees, since 2004, under an earlier version of its agreement with AXA Equitable Funds Management Group, LLC.

290.    JP Morgan is paid its fee by AXA Equitable Funds Management Group, LLC.

Even after that payment, AXA Equitable Funds Management Group, LLC's, role as administrator is still highly profitable to it.

291.    In light of the above,  the fees that would have been charged for the services under the AXA Mutual Funds Service Agreement, if they were the product of arm's length bargaining would have been approximately equal to, and no more than slightly greater than, the fees that were paid to JP Morgan.

292.    Since the amount of administrative fees AXA Equitable Funds Management Group, LLC, charged to the Plaintiffs and the AXA Funds, were so far in excess of JP Morgan's administrative fees, a substantial portion of the fees AXA Equitable Funds Management Group, LLC, received under the AXA Mutual Funds Service Agreement were necessarily so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining and thus were in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

**D.    THE COSTS AND PROFITABILITY OF PROVIDING ADMINISTRATIVE SERVICES UNDER THE AXA MUTUAL FUNDS SERVICE AGREEMENT DID NOT JUSTIFY AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC'S, FEES UNDER THAT AGREEMENT**

293.    In light of the delegation of the tasks described above, the fact JP Morgan, generally, charged an administrative fee that was approximately 1/10th, of AXA Equitable Funds Management Group, LLC's, administrative fee under the AXA Mutual Fund Service Agreement, AXA Equitable Funds Management Group, LLC, role as administrator under the AXA Mutual Fund Service Agreement was highly profitable for it.

294.    As stated at paragraph 264,  service as the administrator is highly profitable for AXA Equitable Funds Management Group, LLC.   As the table in that paragraph reveals,

712552.1

REDACTED

REDACTED

295.

REDACTED

296.     Despite delegating, with minor exceptions all of the administrative services under the AXA Mutual Funds Service Agreement to JP Morgan, AXA Equitable Funds Management Group, LLC's, fees greatly exceeded JP Morgan's fees.

---

[17]Further, Plaintiffs believe that the Defendant should produce more detailed profitability charts than were provided to the Board.

712552.1

297.     Since JP Morgan, with minor exceptions, was the delegee of all of the administrative services, which JP Morgan performed at its own expense, a very large portion of the administrative fees AXA Equitable Funds Management Group, LLC, charged the AXA Funds under the AXA Mutual Funds Service Agreement and that it did not pay to JP Morgan, was in the form of a large profit to the Defendant and was so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

**E.      THE AXA FUNDS' BOARD OF TRUSTEES WAS NOT ACTING INDEPENDENTLY, CONSCIENTIOUSLY AND/OR FULLY INFORMED IN APPROVING THE FEE PROVISION OF THE AXA MUTUAL FUNDS SERVICE AGREEMENT**

298.     Plaintiff incorporates by reference paragraphs 172 to 185 of this Complaint.[18]

299.     When the Board approved AXA Equitable Funds Management Group, LLC's administrative fees under the AXA Mutual Fund Service Agreement, the Board could have obtained these services for a fee that was approximately equal to, or slightly greater, than the fee charged by JP Morgan, which was a fraction of the Defendant's fee.

300.     According to AXA Equitable Funds Management Group, LLC, to "the best of Defendants' present knowledge, information, and belief, the EQAT Board [i.e., the Board to the Advisors Trust] has not considered or solicited:...a bid from any other entity to enter into an agreement to perform any of the services referred to in the Mutual Fund Services Agreement."

301.     On May 1, 2011, AXA Equitable Funds Management Group, LLC, entered into the AXA Mutual Funds Service Agreement.  On that same day, the Defendant entered into the JP

---

[18]In an updated disclosure, Defendant has disclosed that each Board member earned $230,000 prior to October 1, 2012 and $250,000 thereafter.

712552.1

Morgan Mutual Funds Service Agreement with JP Morgan.

302.     In a June 27, 2011 letter to the Board, AXA Equitable Funds Management Group, LLC, stated the following:

> At the July 12-13, 2011 meeting of the Board of Trustees ("Board") of EQ Advisors Trust ("Trust"), the Board will be asked to approve the continuance of the Mutual Funds Service Agreement ("Agreement") between the Trust and AXA Equitable Funds Management Group, LLC ("FMG LLC") for an additional one-year period.
>
> Pursuant to the Agreement between the Trust and FMG LLC, the services provided by FMG LLC include fund administration, fund compliance, and fund accounting and legal administration, all of which are reasonably necessary for the operations of the Trust. ... **Under the Agreement, FMG LLC may delegate some or all of these functions to another party. ....**

(Emphasis added).

303.     While AXA Equitable Funds Management Group, LLC's letter, states that it may delegate its functions under the AXA Mutual Funds Service Agreement, nowhere in this June 27, 2011, letter, does AXA Equitable Funds Management Group, LLC, state that, more than a month earlier, on May 1, 2011, it entered into an agreement with JP Morgan pursuant to which, for a fraction (i.e., AXA's 12 bps fee v. JP Morgan's 1.50bps fee, see above Section IX. C) of AXA Equitable Funds Management Group, LLC's fees, JP Morgan agreed to undertake, with minor exceptions, all of the services the Defendant had contracted to provide for under the AXA Mutual Funds Service Agreement.

304.     Also on June 27, 2011, in addition to a letter from AXA Equitable Funds Management Group, LLC, the Board received a letter from the law firm of K&L Gates, which in part discussed the approval process of the AXA Mutual Funds Service Agreement.  In this letter K&L Gates informed the Board that AXA Equitable Funds Management Group, LLC, had entered into an administrative agreement with JP Morgan, but made no reference to the fee

712552.1

schedule that was contained in that agreement. Pursuant to Defendant's agreement with JP

Morgan, AXA Equitable Funds Management Group, LLC, delegated to JP Morgan, with minor

exceptions, all of its obligations under the Mutual Funds Service Agreement for a fee that was

approximately 1/10th of the fee it was paid.

305. Within the Board materials for the July 12-13, 2011 meeting, following a copy of

these letters (the K&L Gates letter precedes AXA Equitable Funds Management Group, LLC's

letter) is a copy of an amendment to the May 1, 2011, AXA Mutual Funds Service Agreement, a

copy of the agreement itself, followed by a resolution of the Board approving the terms of the

AXA Mutual Funds Service Agreement.

306. The data contained in paragraph 264 regarding the profitability and expenses

incurred by AXA Equitable Funds Management Group, LLC, in serving as the administrator to

each of the AXA Funds, are copies of charts that were provided to the Board, with respect to its

July 12 to 13, 2011, meeting. These charts were provided to the Board in "Book II, A.

Investment Management Profitability Analysis." Those charts were also provided in to the Board

at its July 13 to 14, 2010, meeting in "Book II, A. Investment Management Profitability

Analysis." At the 2012 meeting, which is the first annual Board meeting to occur after the

commencement of this litigation, that meetings' "Book II. A. Investment Profitability Analysis"

does not contain copies of the charts that were provided in 2010 and 2011.

307. The Board was not conscientious when it approved AXA Equitable Funds

Management Group, LLC's, fees under the AXA Mutual Fund Service Agreement because it

either knew or should have known that it could have received these services for a fee that was

approximately equal to, or slightly greater than, JP Morgan's fees. JP Morgan's May 1, 2011, fee

115

712552.1

schedule was the same fee schedule included in its 2004 agreement.

308.    As a result of the foregoing action and/or inaction, the Board was either not fully informed and/or it did not act conscientiously to fulfill its fiduciary duty when it approved a substantial portion of AXA Equitable Funds Management Group, LLC's administrative fees under the AXA Mutual Funds Service Agreement.  The Board's actions resulted in fees that constitute a breach of fiduciary duty under  ICA § 36(b), 15 U.S.C. § 80a-35(b).

**F.    THE ECONOMIES OF SCALE REALIZED IN CONNECTION WITH THE ADMINISTRATIVE FEES WERE NOT PASSED ON TO PLAINTIFF AND THE OTHER SECURITY HOLDERS OF THE AXA FUNDS AS REQUIRED BY ICA § 36(b), 15 U.S.C. § 80a-35(b), BUT WERE KEPT BY AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, IN VIOLATION OF ITS FIDUCIARY DUTIES**

309.    The below chart compares  the break-point schedule in the AXA Mutual Funds Service Agreement with the breakpoint schedule in the JP Morgan Mutual Funds Service Agreement for the AXA Funds that are non Multi-Managed (see fn 15 for a list of the funds that are non Multi-Managed):

| AXA | JP Morgan |
|---|---|
| 12 bps on first $3 Billion of Fund Assets | 1.50 bp on first $3 Billion in Fund Assets |
| 11 bps on next $3 Billion of Fund Assets | 1.25 bp on next $3 Billion in Fund Assets |
| 10.5 bps on next $4 Billion of Fund Assets | 1.00 bp on next $4 Billion in Fund Assets |
| 10 bps on next $20 Billion of Fund Assets | .75 bp on next $10 Billion in Fund Assets |
| 9.75 bps thereafter | N/A |

310.    The below chart compares  the break-point schedule in the AXA Mutual Funds Service Agreement with the breakpoint schedule in the JP Morgan Mutual Funds Service Agreement for the AXA Funds that are Multi-Managed (see fn 16 for a list of the funds that are Multi-Managed):

116

712552.1

| AXA | JP Morgan |
|---|---|
| 15 bps on first $20 Billion of Fund Assets | 1.50 bp on first $3 Billion in Fund Assets |
| 12.5 bps on next $5 Billion of Fund Assets | 1.25 bp on next $3 Billion in Fund Assets |
| 10 bps thereafter | 1.00 bp on next $4 Billion in Fund Assets |
| N/A | .75 bp on next $10 Billion in Fund Assets |

311.     Given that AXA Equitable Funds Management Group, LLC's initial breakpoint

fee (i.e., 12 bps on non Multi-Managed funds) is approximately 10 times greater than JP

Morgan's initial breakpoint fee, in light of JP Morgan's services, AXA Equitable Funds

Management Group, LLC's, initial breakpoint fee is set too high, as are the remaining breakpoint

fees.

312.     In addition to AXA Equitable Funds Management Group, LLC's, breakpoint fees

themselves being too high, the Defendant's breakpoints are also set too far apart as each

subsequent breakpoint occurs at an asset value that is much higher than where JP Morgan's

subsequent breakpoints occur (with the exception of the Defendant's first breakpoint for the non

Multi Managed Funds).

313.     JP Morgan, a for profit company, employing its break point schedule, made a

profit performing, with minor exceptions, all of the administrative services under the AXA

Mutual Funds Service Agreement.

314.     All of the economies of scale that incur on account of JP Morgan's

breakpoint schedule, which was set through an arm's length transaction, are only shared with

AXA Equitable Funds Management Group, LLC.

315.     JP Morgan's breakpoint schedule was not included in AXA Equitable Funds

Management Group, LLC's, June 27, 2011, letter to the Board.

712552.1

316.     At the 2012 Board meeting a slide was presented to the Board which showed AXA Equitable Funds Management Group, LLC's, breakpoint schedule, but not JP Morgan's breakpoint schedule.

## X.   DERIVATIVE ALLEGATIONS FOR CLAIM PURSUANT TO ICA § 36(b), 15 U.S.C. § 80a-35(b)

317.     Plaintiff Sivolella brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of, each of the AXA Funds to recover substantially all, of the investment management fees AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, charged to, and collected from, the AXA Funds, but did not pay to these funds' sub-advisers.

318.     Plaintiff Sivolella brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of the Advisors Trust to recover substantially all of the investment management fees AXA Equitable charged to, and collected from the Advisors Trust/AXA Funds, but did not pay to the AXA Funds' sub-advisers.

319.     Plaintiff Sivolella brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of, each of the AXA Funds to recover substantially all of the administrative fees that AXA Equitable Funds Management Group, LLC, charged to, and collected from, the AXA Funds, but did not pay to JP Morgan.

320.     Plaintiff Sivolella brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of the Advisors Trust to recover substantially all of the administrative fees AXA Equitable Funds Management Group, LLC, charged to, and collected from the Advisors Trust/AXA Funds, but did not pay to JP Morgan.

712552.1

## COUNT I

### Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The AXA Excessive Investment Management Fees Charged By Defendant AXA Equitable Life Insurance Company and/or Defendant AXA Equitable Funds Management Group, LLC,

### AXA Funds

321.   Plaintiff Sivolella incorporates by reference the allegations in the previous paragraphs of this Complaint.

322.   AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, had a fiduciary duty to the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC.

323.   As set forth in section VII of this Amended Complaint substantially all of the fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  for investment management and/or advisory services that they retained and did not pay to the AXA Funds' sub-advisers, represent a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, fiduciary duties to the AXA Funds with respect to such compensation because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

324.   This Count is brought by Plaintiff Sivolella derivatively on behalf of the AXA Funds against AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  pursuant to ICA § 36(b), 15 U.S.C. §80a-35(b), for breach of

712552.1

fiduciary duties with respect to the receipt of compensation.

325.     By reason of the conduct described herein, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  violated ICA § 36(b), 15 U.S.C. §80a-35(b).  As a direct, proximate and foreseeable result of these breaches of fiduciary duties in AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC's,  role as investment adviser to the AXA Funds and the AXA Funds' investors, the AXA Funds and their security have sustained many millions of dollars in damages.

326.     In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of Plaintiff Sivolella, and the other security holders of the AXA Funds, ahead of their own interests, AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  breached, and continues to breach, their statutory fiduciary duties to Plaintiff Sivolella, and the other security holders of the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. §80a-35(b).

327.     Plaintiff Sivolella, seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the AXA Funds, the actual damages resulting from the breach of fiduciary duties by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  up to, and including, substantially all of the compensation and payments received from the AXA Funds that were not paid to the AXA Funds' sub-advisers.  Plaintiff seeks recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

328.     Alternatively, Plaintiff seeks rescission of the contracts/agreements and restitution of substantially all of the investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,  pursuant thereto (excluding

712552.1

those fees that were paid to the AXA Funds' sub-advisers). See ICA § 47(b), 15 U.S.C. § 80a-46(b).  When a violation of the ICA has occurred, a court may order that the agreements between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and the AXA Funds that provided for the payment of excessive fees, on behalf of the AXA Funds, be rescinded, thereby requiring restitution of the excessive investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, by the AXA Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## COUNT II

**Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The  AXA Excessive Investment Management Fees Charged By Defendant AXA Equitable Life Insurance Company and Defendant AXA Equitable Funds Management Group, LLC,**

**Advisors Trust**

329.     Plaintiff Sivolella incorporates by reference the allegations in the previous paragraphs of this Complaint.

330.     AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, had a fiduciary duty to the Advisors Trust,  the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, from the Advisors Trust, in their capacity as the investment advisor and/or affiliated person to the Advisors Trust/AXA Funds

331.     As set forth in section VII of this Amended Complaint substantially all of the fees charged by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, for investment management and/or advisory services that they retained and did not pay to the AXA Funds' sub-advisers, represent a breach of AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, fiduciary duties to the Advisors Trust, which contained the AXA Funds, because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

332.     This Count is brought by Plaintiff Sivolella derivatively on behalf of the Advisors Trust, which contains the AXA Funds, against AXA Equitable Life Insurance Company and/or

712552.1

AXA Equitable Funds Management Group, LLC,  pursuant to ICA § 36(b), 15 U.S.C.

§80a-35(b), for breach of fiduciary duties with respect to the receipt of compensation.

333.     By reason of the conduct described herein, AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC,  violated ICA § 36(b), 15

U.S.C.  §80a-35(b).  As a direct, proximate and foreseeable result of these breaches of fiduciary

duties to the AXA Funds, the Advisors Trust and the AXA Funds'/EQ Advisors Trust's security

holders, these persons/entities have sustained many millions of dollars in damages.

334.     In charging and receiving inappropriate and unlawful compensation, and in failing

to put the interests of Plaintiff Sivolella, and the other security holders of the Advisors Trust,

ahead of their own interests, AXA Equitable Life Insurance Company and/or AXA Equitable

Funds Management Group, LLC,  has breached, and continues to breach, their statutory fiduciary

duties to Plaintiff Sivolella, and the other security holders of the Advisors Trust, that invested in

the AXA Funds, in violation of ICA § 36(b), 15 U.S.C.  §80a-35(b).

335.     Plaintiff Sivolella, seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3),

on behalf of the Advisors Trust, the actual damages resulting from the breach of fiduciary duties

by AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group,

LLC, up to, and including, substantially all of the investment management fees, that AXA

Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC,

received from the Advisors Trust, on account of alleged investment management services to the

AXA Funds, but did not pay to the AXA Funds' sub-advisers.   Plaintiff seeks recovery from the

earliest date permitted by the statute through the latest date permitted by the statute.

336.     Alternatively, Plaintiff seeks rescission of the contracts/agreements and restitution

712552.1

of substantially all of the investment management fees paid to AXA Equitable Life Insurance

Company and/or AXA Equitable Funds Management Group, LLC, pursuant thereto (excluding

those fees that were paid to the AXA Funds' sub-advisers). See ICA § 47(b), 15 U.S.C. §

80a-46(b).  When a violation of the ICA has occurred, a court may order that the agreements

between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management

Group, LLC, and/or the Advisors Trust that provided for the payment of excessive fees, on behalf

of the AXA Funds and/or the Advisors Trust, be rescinded, thereby requiring restitution of the

excessive investment management fees paid to AXA Equitable Life Insurance Company and/or

AXA Equitable Funds Management Group, LLC, by the AXA Funds, through the Advisors

Trust, from one year prior to the commencement of this action through the date of trial, together

with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items

as may be allowed to the maximum permitted by law.

712552.1

## COUNT III

**Recession of Part of AXA Variable Annuity Contracts, Pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), That are In Violation of ICA § 26(f), 15 U.S.C. § 80a-26(f)**

**[THIS COUNT WAS WITHDRAWN BY PLAINTIFF.]**

712552.1

## COUNT IV

**Payer Class Is Entitled To Restitution On Account of Defendant AXA Equitable Life Insurance Company's and/or AXA Equitable Funds Management Group, LLC, Unjust Enrichment**

**[THIS COUNT WAS DISMISSED.]**

712552.1

**COUNT V**

**Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The Excessive Administrative Fees Charged By AXA Equitable Funds Management Group, LLC, Under the AXA Mutual Funds Service Agreement**

**AXA Funds**

337.     Plaintiff Sivolella incorporates by reference the allegations in the previous paragraphs of this Complaint.

338.     AXA Equitable Funds Management Group, LLC, the investment advisor to the AXA Funds, had a fiduciary duty to the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to AXA Equitable Funds Management Group, LLC.

339.     The fees under the AXA Mutual Funds Service Agreement should have been approximately equal to, and no more than slightly greater than, the fees that were paid to JP Morgan under the JP Morgan Mutual Funds Service Agreement.

340.     As set forth in Section IX of the Complaint, substantially all of the fees charged by AXA Equitable Funds Management Group, LLC, under the AXA Mutual Funds Service Agreement represent a breach of AXA Equitable Funds Management Group, LLC's, fiduciary duties to the AXA Funds with respect to such compensation because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

341.     This Count is brought by Plaintiff Sivolella derivatively on behalf of the respective AXA Funds against AXA Equitable Funds Management Group, LLC,  pursuant to ICA § 36(b), 15 U.S.C.  § 80a-35(b), for breach of fiduciary duties with respect to the receipt of

712552.1

compensation.

342.   By reason of the conduct described herein, AXA Equitable Funds Management Group, LLC, violated ICA § 36(b), 15 U.S.C. § 80a-35(b).  As a direct, proximate and foreseeable result of these breaches of fiduciary duties in AXA Equitable Funds Management Group, LLC's, role as administrator to the AXA Funds and the AXA Funds' investors, the AXA Funds and their security holders have sustained millions of dollars in damages.

343.   In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of Plaintiff Sivolella, and the other security holders of the AXA Funds, ahead of its own interests, AXA Equitable Funds Management Group, LLC, breached, and continues to breach, its statutory fiduciary duties to Plaintiff Sivolella and the other security holders of the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

344.   Plaintiff Sivolella seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the AXA Funds, the actual damages resulting from the breach of fiduciary duties by AXA Equitable Funds Management Group, LLC, up to, and including, substantially all of the compensation and payments it received from the AXA Funds under the AXA Mutual Funds Service Agreement, but did not pay to JP Morgan. Plaintiff seeks recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

345.   Alternatively, Plaintiff seek rescission of the AXA Mutual Funds Service Agreement and restitution of substantially all of the compensation paid to AXA Equitable Funds Management Group, LLC, pursuant thereto (excluding those fees that were paid to JP Morgan). See ICA § 47(b), 15 U.S.C. § 80a-46(b).  When a violation of the ICA has occurred, a court may order that the agreement between AXA Equitable Funds Management Group, LLC, and the AXA

712552.1

Funds that provided for the payment of excessive fees, on behalf of the AXA Funds, be

rescinded, thereby requiring restitution of the excessive administrative fees paid to AXA

Equitable Funds Management Group, LLC, under the AXA Mutual Funds Service Agreement, by

the AXA Funds from one year prior to the commencement of this action through the date of trial,

together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such

other items as may be allowed to the maximum permitted by law.

712552.1

## COUNT VI

**Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The Excessive Administrative Fees Charged By AXA Equitable Funds Management Group, LLC, Under the AXA Mutual Funds Service Agreement**

### Advisors Trust

346.     Plaintiff Sivolella incorporates by reference the allegations in the previous paragraphs of this Complaint.

347.     AXA Equitable Funds Management Group, LLC, had a fiduciary duty to the Advisors Trust, the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made to AXA Equitable Funds Management Group, LLC, from the Advisors Trust, in its capacity as the investment advisor.

348.     The fees under the AXA Mutual Funds Service Agreement should have been approximately equal to, and no more than slightly greater than, the fees that were paid to JP Morgan under the JP Morgan Mutual Funds Service Agreement.

349.     As set forth in Section IX of the Complaint, substantially all of the fees charged by AXA Equitable Funds Management Group, LLC, under the AXA Mutual Funds Service Agreement represent a breach of AXA Equitable Funds Management Group, LLC's, fiduciary duties to the Advisors Trust with respect to such compensation because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

350.     This Count is brought by Plaintiff Sivolella derivatively on behalf of the Advisors Trust, which contains the AXA Funds, against AXA Equitable Funds Management Group, LLC, pursuant to ICA § 36(b), 15 U.S.C.  § 80a-35(b), for breach of fiduciary duties with respect to the

712552.1

receipt of compensation.

351.    By reason of the conduct described herein, AXA Equitable Funds Management Group, LLC,  violated ICA § 36(b), 15 U.S.C.  § 80a-35(b).  As a direct, proximate and foreseeable result of these breaches of fiduciary duties to the AXA Funds, the Advisors Trust and the AXA Funds'/Advisors Trust's security holders, these persons/entities have sustained millions of dollars in damages.

352.    In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of Plaintiff Sivolella and the other security holders of the Advisors Trust, ahead of its own interests, AXA Equitable Funds Management Group, LLC,  has breached, and continues to breach, its statutory fiduciary duties to Plaintiff Sivolella, and the other security holders of the Advisors Trust, that invested in the AXA Funds, in violation of ICA § 36(b), 15 U.S.C.  § 80a-35(b).

353.    Plaintiff Sivolella seeks, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the Advisors Trust, the actual damages resulting from the breach of fiduciary duties by AXA Equitable Funds Management Group, LLC, up to, and including, substantially all of the compensation and payments it received from the Advisors Trust under the AXA Mutual Funds Service Agreement, but did not pay to JP Morgan. Plaintiff seeks recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

354.    Alternatively, Plaintiff seeks rescission of the AXA Mutual Funds Service Agreement and restitution of substantially all of the compensation paid to AXA Equitable Funds Management Group, LLC, pursuant thereto (excluding those fees that were paid to JP Morgan). *See* ICA § 47(b), 15 U.S.C. § 80a-46(b).  When a violation of the ICA has occurred, a court may

712552.1

order that the agreement between AXA Equitable Funds Management Group, LLC, and the Advisors Trust that provided for the payment of excessive fees, on behalf of the Advisors Trust, be rescinded, thereby requiring restitution of the excessive administrative fees under the AXA Mutual Funds Services Agreement that were paid to AXA Equitable Funds Management Group, LLC, by the Advisors Trust, from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

712552.1

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demand judgment as follows:

A.     An order declaring that AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management, LLC, violated and continued to violate ICA § 36(b), 15 U.S.C. §80-35(b), through the receipt of fees from the AXA Funds/Advisors Trust that breach Defendants' fiduciary duty with respect to the receipt of compensation;

B.     An order awarding compensatory damages to Plaintiff Sivolella on behalf of the security holders of the AXA Funds and/or Advisors Trust, in an amount sufficient to restore them to the position that they would have been in had the wrongs alleged herein not been committed, including repayment of all unlawful and/or excessive fees paid to them by the AXA Funds or their security holders from one year prior to the commencement of this action through the latest date permitted by the statute;

C.     An order rescinding the agreements between AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, and the AXA Funds/Advisor Trust, which provide for the fees/compensation complained of herein, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), including restitution of (i) substantially all, of the investment management fees paid to AXA Equitable Life Insurance Company and/or AXA Equitable Funds Management Group, LLC, that exceeded the fees that were paid to these funds' sub-advisers,  by the AXA Funds/Advisors Trust, from a period commencing one year prior to the commencement of this action through the date of the trial of this case and (ii) restitution of substantially all, of the administrative fees paid to AXA Equitable Funds Management, LLC, that exceeded the fees that were paid to JP Morgan, by the AXA Funds/Advisors Trust, from a period commencing one year

712552.1

prior to the commencement of this action through the date of the trial of this case;

       D.       Award interest, costs, attorney fees, fees for expert witnesses and such other relief as it deems just;

       E.       Plaintiff Sivolella reserves the right to seek punitive damages where applicable; and

       F.       Such other and further relief as may be just and proper under the circumstances

## JURY DEMAND

    Plaintiff demands a trial by jury on all claims so triable.


                         Szaferman, Lakind,
                         Blumstein & Blader, P.C.

Dated: April 15, 2013          s/ Robert L.  Lakind
                         Robert L. Lakind
                         Arnold Lakind
                         Steven Blader
                         101 Grovers Mill Road
                         Lawrenceville, NJ 08648


                         Levy, Phillips & Konigsberg

Dated: April 15, 2013          s/Moshe Maimon
                         Moshe Maimon
                         Danielle Disporto
                         800 Third Avenue
                         New York, NY, 10022

712552.1