Jonathan M. Korn
BLANK ROME LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
(609) 750-7700
Korn@BlankRome.com

James N. Benedict (*pro hac vice*)
Sean M. Murphy (*pro hac vice*)
Robert C. Hora (*pro hac vice*)
Andrea G. Hood (*pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

*Attorneys for Defendants*
*AXA Equitable Life Insurance Company and*
*AXA Equitable Funds Management Group, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio,<br><br>Plaintiff,<br><br>vs.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY and AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC,<br><br>Defendants. | Civil Action No. 3:11-cv-04194 (PGS)<br><br>and<br><br>Civil Action No. 3:13-cv-00312 (PGS) |
| GLENN D. SANFORD, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC<br><br>Defendant. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>ORAL ARGUMENT REQUESTED<br><br>FILED ELECTRONICALLY |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

SUMMARY OF MATERIAL FACTS................................................................... 4

    A.    The Parties .............................................................................................. 4

    B.    The Funds' Contracts With FMG ........................................................... 6

    C.    The Independent Trustees' Annual Approval Of The Funds' Fees ...................... 6

        1.    The Independent Trustees Are Independent And Exceptionally
            Well-Qualified ............................................................................ 7

        2.    The Board's Structure And Review Process Is Robust ............................ 9

        3.    The Independent Trustees Considered Extensive Information
            Relating To Each *Gartenberg* Factor ........................................... 9

    D.    The Broad Array Of Services FMG Provides To The Funds ............................. 13

        1.    Investment Management Services ......................................................... 13

        2.    Administrative Services ....................................................................... 14

    E.    The Array Of Services Provided By FMG's Parent Company........................... 15

    F.    The Services The Subadvisers And Subadministrator Provide To FMG ............ 16

    G.    FMG Assumes Substantial Risks Associated With The Funds ........................... 17

    H.    The Fees Paid By The Funds ................................................................... 18

ARGUMENT................................................................................................... 19

I.    PLAINTIFFS FACE A HEAVY BURDEN TO PROVE THE FEES WERE "SO
    DISPROPORTIONATELY LARGE" THAT THEY BEAR "NO REASONABLE
    RELATIONSHIP TO THE SERVICES RENDERED." .................................. 19

II.    PLAINTIFFS' HAVE NOT MET THEIR BURDEN OF OVERCOMING THE
    INDEPENDENT TRUSTEES' BUSINESS JUDGMENT UNDER *JONES'*
    DEMANDING STANDARD .................................................................. 21

III. THE INDEPENDENT TRUSTEES' CONSIDERATION OF EACH OF THE *GARTENBERG* FACTORS WARRANTS CONSIDERABLE DEFERENCE BY THIS COURT ............................................................................................. 23

    A. The Independent Trustees' Determinations Regarding The "Nature and Quality" Of Services Should Not Be Second-Guessed........................................ 24

        1. The Independent Trustees Considered Extensive Information Regarding The Services Performed For The Funds................................. 24

        2. Plaintiffs Ignore All Of The Services Provided By AXA, Which The Independent Trustees Considered In Exercising Their Business Judgment.................................................................................... 26

    B. The Independent Trustees' Consideration of Economies of Scale Is Entitled To Substantial Deference ........................................................ 28

    C. The Independent Trustees' Consideration of Comparative Fees Should Not Be Second-Guessed ....................................................................... 30

    D. FMG's Profit Margins Were Considered By The Independent Trustees, And Are Well Within Normal Ranges.................................................. 31

    E. The "Fall-Out Benefits" Raised By Plaintiffs Were Disclosed To The Independent Trustees, And Do Not Warrant A Trial............................................ 34

CONCLUSION.................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Mut. Funds Fee Litig.*,
  No. 04-5593, 2009 U.S. Dist. LEXIS 120597 (C.D. Cal. Dec. 28, 2009) ...................... *passim*

*Bellikoff v. Eaton Vance Corp.*,
  481 F.3d 110 (2d Cir. 2007) .................................................................................................17

*Benak v. Alliance Capital Mgmt. L.P.*,
  No. 01-5734, 2004 U.S. Dist. LEXIS 12231 (D.N.J. Feb. 9, 2004) .......................................27

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..............................................................................................................19

*Gallus v. Am. Express Fin. Corp.*,
  No. 04-4498, 2010 U.S. Dist. LEXIS 131264 (D. Minn. Dec. 10, 2010) ...............................22

*Gallus v. Ameriprise Fin., Inc.*,
  497 F. Supp. 2d 974 (D. Minn. 2007) ........................................................................... *passim*

*Gallus v. Ameriprise Fin., Inc.*,
  561 F.3d 816 (8th Cir. 2009) .................................................................................................22

*Gallus v. Ameriprise Fin., Inc.*,
  675 F.3d 1173 (8th Cir. 2012) .........................................................................................20, 22

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  528 F. Supp. 1038 (S.D.N.Y. 1981) ............................................................................. *passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  573 F. Supp. 1293 (S.D.N.Y. 1983) ....................................................................................10, 20

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982) ......................................................................................... *passim*

*GE v. Joiner*,
  522 U.S. 136 (1997) ..............................................................................................................25

*Green v. Fund Asset Mgmt., L.P.*,
  286 F.3d 682 (3d Cir. 2002) ...................................................................................................1

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008) ..............................................................................28, 29

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010)..................................................................................... *passim*

*Kalish v. Franklin Advisers, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990)..................................................20, 32, 33

*Kaucher v. Cnty. of Bucks*,
    455 F.3d 418 (3d Cir. 2006).......................................................................19, 20

*Krinsk v. Fund Asset Mgmt., Inc.*,
    715 F. Supp. 472 (S.D.N.Y. 1988)....................................................................20

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989)........................................................................33, 35

*Meyer v. Oppenheimer Mgmt. Corp.*,
    707 F. Supp. 1394 (S.D.N.Y. 1988)..................................................................32

*Meyer v. Oppenheimer Mgmt. Corp.*,
    715 F. Supp. 574 (S.D.N.Y. 1989)....................................................................20

*Orson, Inc. v. Miramax Film Corp.*,
    79 F.3d 1358 (3d Cir. 1996).............................................................................20

*Sanford v. AXA Equitable Funds Mgmt. Grp., LLC*,
    No. 13-00312 (D.N.J. Jan. 15, 2013) ................................................................3

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    663 F. Supp. 962 (S.D.N.Y. 1987)..................................................20, 22, 25, 32

*Sivolella v. AXA Equitable Funds Mgmt.Grp., LLC*,
    No. 11-04194, 2013 U.S. Dist. LEXIS 115197 (D.N.J. Aug. 15, 2014) ................21

*Strougo v. BEA Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002).........................................................21, 31

**Statutes**

15 U.S.C. § 80a-2(19) ................................................................................................6

15 U.S.C. § 80a-6(c) .................................................................................................4

15 U.S.C. § 80a-15(c) ..............................................................................................12

15 U.S.C. § 80a-35(b) ................................................................................................1

15 U.S.C. § 80a-35(b)(1) .........................................................................................20

15 U.S.C. § 80a-35(b)(1)-(3) ....................................................................................1

15 U.S.C. § 80b-1 ........................................................................................................6

Sarbanes-Oxley Act of 2002 ..................................................................................14

**Rules**

17 C.F.R. § 270.12b-1 ......................................................................................18, 35

17 C.F.R. § 270.38a-1 ......................................................................................14, 17

Fed. R. Civ. P. 56(a) ...............................................................................................19

**Other Authorities**

2 Clifford E. Kirsch, *Mutual Funds and Exchange Traded Funds Regulation* § 42
    (3d ed. 2013) .......................................................................................................17

EQ Advisors Trust and EQ Financial Consultants, Inc., ICA Release No. 23128
    (April 24, 1998), 1998 SEC LEXIS 953 ............................................................4

IM Guidance Update No. 2014-03 (Feb. 2014), *available at*
    http://www.sec.gov/divisions/investment/guidance/im-guidance-2014-03.pdf
    (last accessed Jan. 8, 2015) ................................................................................4

Investment Company Institute, *The Differences Between Mutual Funds and
Hedge Funds* (Apr. 2007), *available at* http://www.ici.org/files/faqs_hedge
    (last accessed Jan. 20, 2015) ............................................................................16

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 .................29, 33

SEC Staff, Study on Investment Advisers and Broker-Dealers (Jan. 2011),
    *available at* http://www.sec.gov/news/studies/2011/913studyfinal.pdf ..................5

## PRELIMINARY STATEMENT

This case involves a single legal claim:  Plaintiffs allege that the Defendants violated Section 36(b) of the Investment Company Act of 1940 (the "ICA") by charging excessive management and administrative fees to twelve mutual funds.  Section 36(b) provides that investment advisers have "a fiduciary duty with respect to the receipt of compensation for services" rendered to mutual funds (*i.e.*, the fees the funds pay to the adviser) and permits mutual fund shareholders to assert a claim against investment advisers for alleged breaches of that duty. 15 U.S.C. § 80a-35(b).  Importantly, the Third Circuit has recognized that Section 36(b) authorizes only a very narrow and streamlined cause of action.[1]  The ICA specifically provides that in a Section 36(b) case, the plaintiff has the burden of proof, and the court must give appropriate consideration to the approval of the challenged fees by a fund's board of trustees.  15 U.S.C. § 80a-35(b)(1)-(3).

Plaintiffs' burden under Section 36(b) is a heavy one.  The United States Supreme Court has held that to prove a breach of fiduciary duty under Section 36(b), the challenged fee must be "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (adopting standard established by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)).  This is an extremely high bar. No plaintiff has ever won a Section 36(b) case.

Plaintiffs, in fact, face a doubly heavy burden here.  The ICA makes the independent trustees who sit on a mutual fund's board primarily responsible for protecting the fund and its shareholders in dealings with the fund's adviser.  In *Jones*, the Supreme Court specifically

---

[1] *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682, 685 (3d Cir. 2002) ("§ 36(b) was intended to provide a very specific, narrow federal remedy . . . .").

instructed courts to give deference to a board's approval of fee arrangements "[w]here [the] board's process for negotiating and reviewing investment-adviser compensation is robust . . . ." *Jones*, 559 U.S. at 351.  The Supreme Court also explicitly held in *Jones* that if "the disinterested directors considered the relevant factors, their decision to approve a particular fee arrangement is entitled to considerable weight, even if a court might weigh the factors differently."  *Id.*  In sum, Section 36(b) does *not* call for "judicial second-guessing of informed board decisions."  *Id.* at 353.

Plaintiffs cannot clear the high hurdles erected by the Supreme Court to establish a breach of fiduciary duty under Section 36(b).  Here, the funds' independent trustees (the "Independent Trustees")—guided by experienced independent counsel and after rigorous consideration of each of the so-called "*Gartenberg* factors"[2]—concluded that Defendants' fees were reasonable in light of the services provided.  The combined investment management and administrative fees (including Defendant AXA Equitable Funds Management Group's ("FMG") fees and all subadvisory and subadministrator fees) for the funds were in all cases less than 1% of fund assets, and in some cases less than one half of 1%.  These fees are in line with industry medians.  In fact, several of the funds are among the least expensive funds when compared to similar mutual funds.

Plaintiffs baldly allege in their complaints that FMG's investment management and administrative fees are excessive because FMG purportedly delegated virtually "all" of the

---

[2] In applying the "so disproportionately large" standard, courts typically consider six factors referred to as the "*Gartenberg* factors":  (1) the nature and quality of services provided to the funds; (2) the independence and conscientiousness of the funds' trustees; (3) whether the adviser realized economies of scale in managing the funds and, if so, whether any such economies were adequately shared with the funds; (4) the fees charged to comparable mutual funds; (5) the profitability of the funds to the adviser; and (6) fall-out benefits (*i.e.*, indirect profits) to the adviser that would not occur but for the adviser's relationship with the funds.  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d at 928-29; *see also Jones*, 559 U.S. at 344 & n.5.

funds' investment management and administrative services to subcontractors, yet retained a majority of the fees.[3]  But the Independent Trustees were aware of the differences in services provided by FMG and its subcontractors when they evaluated and approved the funds' fees. Moreover, based on the discovery record, Plaintiffs cannot remotely meet their burden of establishing their naked allegation that FMG performs virtually no services for the funds.

In its dual role as the funds' investment manager and administrator, FMG is responsible for the funds' operations.  Discovery has confirmed that FMG provides an extensive and valuable set of services that is not delegated to third parties.  Among a host of other services, FMG sets and alters the funds' investment strategies; carefully selects, after extensive due diligence, a mix of subadvisers for the funds; manages a proprietary volatility strategy; actively monitors the performance of the subadvisers to ensure compliance with the funds' investment policies and guidelines; reports to the funds' board of trustees (the "Board"); and makes valuation judgments for hard-to-price securities for purposes of calculating the funds' net asset values on a daily basis.  FMG also retains ultimate contractual responsibility for managing and administering the funds, and assumes substantial legal, regulatory, and entrepreneurial risks related to those roles.

FMG's parent, AXA Equitable Life Insurance Company ("AXA"), also provides numerous services that directly benefit the funds and that are not provided by FMG personnel. These services include transfer agency services, tax advice, printing and publishing the funds' semi-annual and annual reports, preparing *ad hoc* reports on shareholder holdings, and preparing and printing brochures that are used to educate fund investors.  FMG also relies on AXA for

---

[3] *See, e.g.*, Am. Compl. ¶ 20, *Sanford v. AXA Equitable Funds Mgmt. Grp., LLC*, No. 13-00312 (D.N.J. Jan. 15, 2013), ECF No. 20 (alleging that subadvisers perform substantially "all" the investment management services to the funds); *id.* ¶ 199 (alleging subadministrator performs virtually "all" fund administrative services).

myriad services without which it could not operate, such as accounting, human resources, and information technology services.

Plaintiffs' only responses to these facts fall under the following rubrics, none of which raises a genuine issue of material fact for trial. Plaintiffs either: (1) do not or cannot dispute them; (2) ignore them; (3) purport to dispute them, but have no record support other than the *ipse dixit* statements of their experts; (4) misrepresent the record; or (5) raise quibbles that do not create a *genuine* issue of material fact. None of this warrants denial of summary judgment.

At bottom, Plaintiffs and their counsel broadly attack the adviser-subadviser management structure for mutual funds (often referred to as the "manager of managers" structure). But over nearly two decades, the SEC has approved as "necessary or appropriate in the public interest and consistent with the protection of investors," more than *two hundred* exemptive applications authorizing "manager of managers" arrangements without the usual requirement that shareholders approve a change in subadvisers.[4] There is nothing unusual about Defendants' business model or fee structure.

Given the demanding standard applicable to Plaintiffs' claims, Plaintiffs have not met their burden to set aside the Independent Trustees' business judgment.

## <u>SUMMARY OF MATERIAL FACTS</u>

### A.     The Parties.

Plaintiffs are investors in variable annuities sold by AXA. *See* Defendants' Statement Of Material Facts Not In Dispute In Support Of Their Motion For Summary Judgment ("<u>SMF</u>") ¶ 1.

---

[4] *See* 15 U.S.C. § 80a-6(c); IM Guidance Update No. 2014-03 (Feb. 2014), *available at* http://www.sec.gov/divisions/investment/guidance/im-guidance-2014-03.pdf (last accessed Jan. 8, 2015); *see also, e.g.*, EQ Advisors Trust and EQ Financial Consultants, Inc., ICA Release No. 23128 (April 24, 1998), 1998 SEC LEXIS 953 (order granting exemptive relief).

Plaintiffs elected to allocate contributions to their variable annuities to one or more of the twelve mutual funds at issue in this case (the "Funds").[5]  SMF ¶ 2.

A mutual fund "is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." *Jones*, 559 U.S. at 338 (alteration in original) (citation omitted).  A fund is typically externally managed; it is not an operating company and it has no employees in the traditional sense.  SMF ¶ 2 n.2.  Rather, it relies on service providers that are either affiliate organizations or independent contractors (*e.g.*, an investment adviser, administrator, and others) to invest fund assets and carry out other business activities.  SMF ¶ 2 n.2.  The ICA, which regulates mutual funds, requires a mutual fund to have a board of directors or trustees, which serves as the "watchdog" of the relationship between the fund and its service providers.  *See Jones*, 559 U.S. at 340.  The ICA entrusts the Independent Trustees with "a host of special responsibilities," including that "they must review and approve the contracts of the investment adviser annually, and a majority of these directors must approve an adviser's compensation."  *Id.* (internal citations and quotations omitted).

FMG is a registered investment adviser that currently serves as the investment manager and administrator for the Funds.[6]  SMF ¶¶ 4-5.  FMG is a wholly-owned subsidiary of AXA,[7] one the largest life insurance companies in the United States.  SMF ¶¶ 7-10.

---

[5] The Funds are the EQ/Common Stock Index Portfolio, EQ/Core Bond Index Portfolio, EQ/Equity 500 Index Portfolio, EQ/Equity Growth PLUS Portfolio, EQ/GAMCO Small Company Value Portfolio, EQ/Global Bond PLUS Portfolio, EQ/Global Multi-Sector Equity Portfolio, EQ/Intermediate Government Bond Portfolio, EQ/Large Cap Value PLUS Portfolio, EQ/Mid Cap Value PLUS Portfolio, EQ/PIMCO Ultra Short Bond Portfolio, and the EQ/T. Rowe Price Growth Stock Portfolio.  SMF ¶ 2.  The Funds are series of the EQ Advisors Trust ("EQAT" or the "Trust"), a registered investment company under the ICA.  SMF ¶ 3.

[6]  As an investment adviser registered with the U.S. Securities and Exchange Commission ("SEC"), FMG is subject to a complex regulatory structure.  *See, e.g.*, SEC Staff, Study on Investment Advisers and Broker-Dealers i, iii-iv (Jan. 2011), *available at* http://www.sec.gov/news/studies/2011/913studyfinal.pdf (noting that "investment advisers are

**B.      The Funds' Contracts With FMG.**

FMG provides management and administrative services to the Funds pursuant to, respectively, an Investment Management Agreement (the "Management Agreement") and a Mutual Funds Service Agreement (the "Administrative Agreement," and together with the Management Agreement, the "Agreements").  SMF ¶ 11.  Under the Agreements, FMG receives management and administrative fees, respectively, from the Funds.  SMF ¶ 12.  Although the Agreements permit FMG to subcontract certain of its management and administrative services to third parties, FMG has the overall responsibility for the Funds' management and administration. SMF ¶¶ 13-15.

**C.      The Independent Trustees' Annual Approval Of The Funds' Fees.**

It cannot be disputed that the Agreements, and the fees paid to FMG under the Agreements, are approved annually by the Board, which is comprised of an overwhelming majority of Independent Trustees.  SMF ¶¶ 16-17.  Although the ICA requires that only 50% of a fund's directors be independent or "disinterested," nine out of 10 (or 90%) of the trustees on the Funds' Board are, by statutory definition, independent of FMG.  SMF ¶ 17; 15 U.S.C. § 80a-2(19) (defining "interested person" for purposes of the ICA).

---

regulated *extensively*" by both federal and state regulators) (emphasis added); Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1, *et seq*.

[7] "FMG," as used herein, includes its predecessor, AXA Funds Management Group, which was a business unit of AXA created in 1999.  SMF ¶ 7 n.4.  Prior to May 1, 2011, AXA was the counterparty to the Funds' management and administrative contracts (discussed *infra* § B), but provided a number of services under those contracts through AXA Funds Management Group. SMF ¶ 7 n.4.

1.       *The Independent Trustees Are Independent And Exceptionally Well-Qualified.*

It is uncontroverted that the Independent Trustees are preeminent individuals in their respective fields.  Since 2010, the Independent Trustees have included:

| NAME | BACKGROUND |
|---|---|
| Gary Schpero (Lead Independent Trustee since 2011) | Former Partner of Simpson, Thacher & Bartlett LLP (Managing Partner of Investment Management and Investment Company Practice Group); Trustee of three Blackstone funds. |
| David Fox (Lead Independent Trustee until 2011) | Former CEO of The Northern Trust Company; former Chairman of Chicago Stock Exchange; former Director of the Federal Reserve Bank of Chicago; former Director of Miami Corp.; former Director of USG Corp. |
| Theodossios Athanassiades | Former Vice Chairman, President and COO of Metropolitan Life Insurance Company; former Director of Atlantic Bank of New York. |
| Jettie Edwards | Former Partner and Consultant of Syrus Associates (business and marketing consulting firm); former Director of Old Mutual Funds. |
| William Kearns, Jr. | President of W.M. Kearns & Co., Inc. (private investment company); Chairman, Keefe Ventures, LLC; former Vice Chairman, Keefe Managers, Inc. (money management firm). |
| Christopher Komisarjevsky | Former CEO and President of Burson-Marsteller Worldwide (public relations firm); former CEO and President of Burson-Marsteller U.S.A.; former Senior Counselor for APCO Worldwide (communications consulting firm). |
| Harvey Rosenthal | Former President and COO of Melville Corporation; former CEO of CVS (Division of Melville Corporation); former Director of LoJack Corporation. |
| Kenneth Walker | Former President of subsidiary of T. Rowe Price Associates (investment advisory firm); former Partner of Capital Management Corp. (investment advisory firm). |

| Caroline Williams | Former Managing Director of Donaldson, Lufkin & Jenrette (investment bank); former CFO and Chief Investment Officer ("CIO") of Nathan Cummings Foundation (overseeing the outsourcing of management of a $400 million investment portfolio); former Director of Hearst-Argyle Television; former Director of Playcore, Inc.; former Director of Morse Shoe, Inc. |
|---|---|

SMF ¶ 18.[8]  None of the Independent Trustees is affiliated with the Defendants.  SMF ¶ 20.

It is beyond dispute that the Independent Trustees are nominated by the Board's Nominating and Compensation Committee, which is comprised solely of Independent Trustees. SMF ¶ 21.  Upon election, new trustees receive extensive training.  SMF ¶ 22.  The Independent Trustees have their own independent and experienced mutual fund counsel from the firm Bingham McCutchen LLP ("Bingham").[9]  SMF ¶ 23.  Bingham provides the Trustees with advice concerning their fiduciary duties, and assists the Independent Trustees with their deliberation and approval of the Funds' management and administrative fee agreements. SMF ¶ 23.

---

[8] In 2014, the Board added two additional Independent Trustees:  Donald E. Foley (former Chairman and CEO of Wilmington Trust Corporation and former Treasurer and Director of Tax of ITT Corporation) and H. Thomas McMeekin (former CIO of SunAmerica Financial Group and United Guaranty Financial Group, former Senior Managing Director of AIG Asset Management, and former Managing Director of Prudential Investment Management, Inc.). SMF ¶ 19.

[9] Effective November 24, 2014, a number of lawyers from Bingham, including counsel to the Independent Trustees, joined Morgan, Lewis & Bockius LLP.  *See* http://www.morganlewis.com/news/PR_MLwelcomesNewLawyers_24nov2014 (last visited Jan. 20, 2015).

### 2. *The Board's Structure And Review Process Is Robust.*

The Independent Trustees' review of the Funds' fees was a robust, continuous process involving numerous Board meetings and dozens of hours of preparation and review of materials. SMF ¶¶ 24-67.

With respect to meetings, the Board has numerous regularly scheduled meetings each year, each lasting at least two days, in addition to special and telephonic meetings convened throughout the year as circumstances require.  SMF ¶¶ 29-30.  It cannot be disputed that in the 2011-2012 Board cycle, for example, the Board held *fourteen* separate meetings, five of which spanned at least two days.  SMF ¶ 31.  Additionally, the Board's Audit Committee, Nominating and Compensation Committee, and two Investment Performance Committees, each of which is comprised exclusively of Independent Trustees, met numerous times.  SMF ¶ 32.

At the annual Board meeting each July, the Board votes on whether to approve the Agreements, and the fees paid to FMG thereunder.  SMF ¶ 33.  This approval is based on the culmination of a full year's work, involving extensive review of materials received and work done at prior meetings.  SMF ¶ 34.  The material considered by the Independent Trustees, described in more detail below, is thorough—for the July 2013 contract renewal meeting alone, the Board received several thousand pages of materials relating to the Funds, the *Gartenberg* factors, and the Funds' fees.  SMF ¶ 52; *see also* SMF ¶¶ 36-67.

### 3. *The Independent Trustees Considered Extensive Information Relating To Each Gartenberg Factor.*

Plaintiffs cannot legitimately dispute that the Independent Trustees receive extensive information throughout the year relevant to their consideration of the Agreements, including detailed information on each *Gartenberg* factor.  SMF ¶¶ 36-50; *see also* Declaration of Andrea G. Hood In Support of Defendants' Motion For Summary Judgment, dated Jan. 23, 2015 ("Hood

<u>Decl</u>.") Ex. 78 ("Index of Materials Responsive To '*Gartenberg*' Factors" (identifying the dozens of documents the Board receives related to each *Gartenberg* factor)).  Among many other materials, the Independent Trustees receive extensive information regarding the nature and quality of FMG's and the subadvisers' services and personnel (SMF ¶¶ 38, 40-41); the scope of FMG's and the subadministrator's administrative services (SMF ¶¶ 39, 42-43); the Funds' performance (SMF ¶ 44); potential economies of scale (SMF ¶ 45);[10] potential fall-out benefits (SMF ¶ 49);[11] FMG's costs and profitability from managing and administering the Funds (SMF ¶ 48); and the effectiveness of the Funds' compliance program (SMF ¶ 38).

It is also beyond dispute that the Independent Trustees receive extensive data concerning the Funds' performance and fees from independent third parties, such as Lipper, Inc. SMF ¶¶ 44, 47.  This includes information regarding the Funds' performance, fees, and operating expenses as compared to similar mutual funds.  SMF ¶¶ 44, 47.  The Independent Trustees also review a memorandum from Trust counsel and a separate memorandum from their independent counsel regarding the Trustees' responsibilities with respect to approval of the Agreements. SMF ¶¶ 36, 62.  In addition, prior to approving the Funds' fees, the Independent Trustees meet

---

[10] Economies of scale occur when the average cost of producing a good or service decreases, on a per unit basis, as the level of output increases.  *See In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 U.S. Dist. LEXIS 120597, at *77 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011).

[11] Fall-out benefits are indirect benefits that an investment manager or its affiliates would not have received "*but for* the existence of the Fund[s]."  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142 (quoting *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 495 (S.D.N.Y. 1988)).  Brokerage commissions earned by an affiliate of an investment adviser from the purchase or sale of fund securities, for example, may amount to a fall-out benefit.  *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1313-15 (S.D.N.Y. 1983) (noting that "the Court has grave doubts that substantial fall-out benefits would be allocable as an offset to the operating costs of a money market fund, even if they could be accurately quantified").

with their counsel in executive sessions outside the presence of FMG to discuss the Funds' fees, and participate in numerous question-and-answer sessions with FMG representatives.  SMF ¶ 35.

The Independent Trustees considered each *Gartenberg* factor before they approved the Funds' fees.  SMF ¶¶ 54-61.  During the Board meetings, the Independent Trustees—guided by their independent counsel, who are experts in the ICA—evaluated, among other things:

1. **Nature and Quality of Services.**  The Independent Trustees evaluated FMG's and the subadvisers' services, experience, and personnel.  They also reviewed long- and short-term performance data for the Funds, and considered the level of subadvisory fees paid to the subadvisers and management fees retained by FMG in light of the respective services provided by those entities.  SMF ¶¶ 55, 56.

2. **Economies of Scale.**  The Independent Trustees considered whether any potential economies of scale existed, and if they did, whether they were shared equitably with Fund shareholders through breakpoints[12] or through other means, such as fee waivers.  SMF ¶ 57.

3. **Comparative Fees.**  The Independent Trustees considered extensive information comparing the management and administrative fees and total expenses for each Fund to similar funds, including information compiled by Lipper, a leading independent industry organization.  The Independent Trustees also took into account, among other things, fee waivers by FMG.  SMF ¶ 58; *see also* SMF ¶ 47.

4. **Profitability.**  The Independent Trustees considered the profitability of the Agreements to FMG, taking into account compensation flowing to FMG, both directly and indirectly.  They also reviewed profitability on a fund-by-fund basis, as well as FMG's overall profitability compared to other investment advisers for which data was available.  SMF ¶ 59.

5. **Fall-out Benefits.**  The Independent Trustees evaluated the extent to which FMG or AXA may derive ancillary benefits from the Funds' operations, including from subadvisory fees and brokerage commissions received by affiliates.  SMF ¶ 60.

After considering each *Gartenberg* factor and the materials provided to them in advance of each meeting, the Independent Trustees concluded that the compensation under the Agreements was fair and reasonable.  SMF ¶ 67.  Based on the testimony of the Independent

---

[12] Breakpoints are "scheduled reductions in the rate of the advisory fee as net assets under management increase."  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *23.

Trustees and the materials they received during the Section 15(c) process,[13] there can be no question that before the Independent Trustees approved the Funds' fees, they were specifically aware of the differences in services provided by FMG and its subcontractors, as well as the amount of fees retained by FMG.  SMF ¶¶ 55, 63-64; *see also* Hood Decl. Ex. 132, Rosenthal Tr. 167:2-169:6 (considered differences in services when approving fees); Hood Decl. Ex. 133, Schpero Tr. 215:3-216:17 (Board has "extensive discussions about the services being provided by FMG" and FMG's services and subadvisers' services are "two different services").

The Independent Trustees' independence and conscientiousness in these fee negotiations are underscored by numerous examples of active arm's-length bargaining with FMG.  Most notably, the Independent Trustees have negotiated for and obtained fee concessions from FMG on a number of occasions, including through the implementation of new and additional breakpoints, fee waivers, and adjustments to management and administrative fees.  SMF ¶¶ 24-27; *see also* SMF ¶ 28.  Moreover, the Independent Trustees have routinely demonstrated their independence and diligence by requiring FMG to provide additional information to assist their fee review—including new performance metrics, and additional information relating to Fund expenses and investment risk.  SMF ¶ 53.

---

[13] The "15(c) process" refers to the process pursuant to which FMG and others, including Trust counsel and the Independent Trustees' counsel, provide documents and information to the Board in connection with the Board's review and evaluation of the Funds' Agreements, as required pursuant to Section 15(c) of the ICA.  15 U.S.C. § 80a-15(c) ("It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.").

**D.      The Broad Array Of Services FMG Provides To The Funds.**

1.      *Investment Management Services.*

In approving the Management Agreement, the Independent Trustees considered a host of investment management services provided directly to the Funds by FMG.  SMF ¶¶ 55, 63.  These include, but are not limited to:

- Establishing the Funds' asset classes, investment strategies, and risk profiles; developing a hybrid investment structure that uses multiple strategies for certain Funds; and determining, monitoring and adjusting the asset allocations for the four Funds with multiple subadvisers (SMF ¶¶ 69-70, 73);[14]

- Researching, selecting, and making recommendations to the Independent Trustees to replace subadvisers from a broad universe of potential subadvisers, and managing the transition process when subadvisers are appointed, terminated, or replaced (SMF ¶¶ 71-72);

- Monitoring the Funds' subadvisers to confirm their compliance with the Funds' investment strategies and policies, for any changes that may impact the Funds or the subadvisers' operations or overall business continuity, for their adherence to legal and compliance procedures, for any litigation enforcement or regulatory matters relating to the subadvisers, and with respect to the subadvisers' brokerage practices and trading quality (SMF ¶ 74);

- Conducting on-site due diligence meetings with the Funds' subadvisers and potential subadvisers, and having regular meetings, teleconferences and email correspondence with such subadvisers (SMF ¶ 75);

- Monitoring the Funds' performance (SMF ¶ 76);

- Selecting investments for portions of the Funds that are allocated for ETFs and developing and executing a proprietary, patented volatility management strategy (the "ATM Strategy") that adjusts certain Funds' equity exposure when volatility measures trigger thresholds established by FMG (SMF ¶¶ 77-78);

- Coordinating the Funds' 15(c) process, including preparing numerous reports and other materials that are provided to the Funds' Board in connection with the Board's annual review and approval of the Agreements (SMF ¶ 79);

---

[14] Since 2013, the Funds with multiple subadvisers have included, at various times, the EQ/Equity Growth PLUS, EQ/Global Bond PLUS, EQ/Global Multi-Sector Equity, EQ/Large Cap Value PLUS, and EQ/Mid Cap Value PLUS Portfolios.  SMF ¶ 73 n.25.

- Implementing and executing the Funds' mandatory compliance program and providing the Funds' Chief Compliance Officer (SMF ¶ 80);[15]

- Providing the Trust with personnel, including the Trust's officers, office facilities, and equipment—and also providing certifications required by the Sarbanes-Oxley Act of 2002 for certain Trust regulatory filings (SMF ¶ 82);

- Staffing the Funds' Valuation Committee and, through the Committee, determining the fair values of certain of the Funds' portfolio holdings and preparing and providing to the Board quarterly valuation reports for the Funds (SMF ¶ 83);[16] and

- Coordinating the Funds' regulatory examinations, including responses to inquiries from regulatory agencies relating to the Funds' operation, and coordinating litigation relating to the Funds (SMF ¶ 81).

    2.    *Administrative Services.*

In approving the Funds' administrative fees, the Independent Trustees also considered an array of administrative services FMG provides directly to the Funds.  SMF ¶ 64.  Those services include, but are not limited to:

- Preparing, filing with the SEC, and distributing to shareholders, as required, the Funds' registration statement, prospectus and statement of additional information (and updates and supplements thereto), annual and semi-annual shareholder reports, and proxy materials (SMF ¶ 86);

- Preparing and submitting filings required by various other regulatory entities (*e.g.*, the Commodity Futures Trading Commission, National Futures Association, and Internal Revenue Service) (SMF ¶ 87);

- Preparing and reviewing certain materials for meetings of the Board, its Committees, and the Funds' shareholders, and preparing minutes of those meetings (SMF ¶ 88);

---

[15] Rule 38a-1 of the ICA governs the "Compliance Procedures and Practices" of mutual funds.  It requires that funds adopt and implement written policies and procedures that are reasonably designed to prevent violations of the federal securities laws; review such policies and procedures at least annually for their adequacy and effectiveness; and that the fund's chief compliance officer provide an annual written report to the board.  17 C.F.R. § 270.38a-1(a).

[16] In 2012 alone, the Valuation Committee met more than *450 times* to determine fair values for portfolio holdings.  SMF ¶ 84.

- Preparing the Trust's budget, monitoring expense projections for the Trust, monitoring actual expenses for the Trust, establishing and reviewing accruals for the Trust, and reviewing and certifying the Funds' financial statements (SMF ¶ 89);

- Managing, with the Funds' independent auditor, the process relating to the Funds' annual audit, including coordinating communications and data collection (SMF ¶ 92);

- Supervising, monitoring and coordinating activities among the Funds' subadministrator, custodian, transfer agent, transition brokers, proxy solicitors, pricing vendors, and independent auditor (SMF ¶ 93);

- Overseeing the subadministrator's daily calculation of the Funds' net asset value ("NAV") and monitoring and correcting NAV errors (SMF ¶ 90);

- Calculating, paying, and distributing the Funds' dividends and capital distributions (SMF ¶ 91); and

- Providing certain compliance-related administrative services (SMF ¶ 94).

**E.      The Array Of Services Provided By FMG's Parent Company.**

In exercising their business judgment to approve the Funds' fees, the Independent Trustees considered not only services rendered to the Funds by FMG, but also services rendered by FMG's parent, AXA.  SMF ¶ 61.  In addition to FMG's services, AXA provides a number of services related to the management and administration of the Funds.  These services include transfer agency and tax services, printing the Funds' semi-annual and annual reports, preparing *ad hoc* reports on shareholder holdings, and preparing and printing brochures that are used to educate fund investors.  SMF ¶ 95.  AXA also provides a host of essential services without which FMG could not operate, such as accounting, human resources, information technology (including managing FMG's phone and computer systems), cash management, accounts payable, and travel services.  SMF ¶ 96.

- 15 -

**F.      The Services The Subadvisers And Subadministrator Provide To FMG.**

Mutual funds are "among the most strictly regulated financial products"[17] in the world,

and require a vast infrastructure to service.  SMF ¶ 106.  These non-portfolio management and

administrative responsibilities are largely retained by FMG and AXA.  *See* SMF ¶¶ 68-96.

To assist FMG in providing portfolio management services to the Funds, FMG has

entered into Investment Advisory Agreements with the Funds' subadvisers (the "Subadvisory

Agreements"), which are considered and approved annually by the Board.  SMF ¶¶ 98-102.

As part of their services to FMG, the subadvisers select and trade the securities held in their

allocated portion of the Funds' portfolios, perform certain compliance monitoring tasks, and

perform some reporting to the Funds' Board.  SMF ¶ 103.  The Subadvisory Agreements

expressly provide that the subadvisers perform these services "subject always" to FMG's

"supervision and control."  SMF ¶ 104.  In addition, the subadvisers must comply with any

instructions, limitations or restrictions *placed by FMG* on investments of the Fund's assets (*e.g.*,

instructions relating to new investment strategies and execution of the ATM strategy).

SMF ¶ 105.

To assist FMG in performing administrative services for the Funds, FMG also has

entered into a Mutual Funds Subadministration Agreement (the "Subadministration Agreement")

with JPMorgan Chase Bank, N.A. (the "Subadministrator").  SMF ¶¶ 107-108.  The

Subadministrator's main responsibilities include assisting in the calculation of the Funds' NAV;

preparing the first draft of the Funds' financial statements for FMG's review; maintaining certain

of the Funds' books and records; and providing certain compliance support to FMG.

SMF ¶¶ 109-110.  Similar to the Subadvisory Agreements, the Subadministration Agreement

---

[17] *See* Investment Company Institute, *The Differences Between Mutual Funds and Hedge Funds*
(Apr. 2007), *available at* http://www.ici.org/files/faqs_hedge (last accessed Jan. 20, 2015).

expressly provides that the Subadministrator's provision of these services is "[s]ubject to the control, direction and supervision of [FMG]."  SMF ¶ 111.

FMG's use of subadvisers and a subadministrator is anything but unique:  employing these entities is a common practice in the investment management industry.  Hood Decl. Ex. 117, James Report ¶¶ 27-28.  The use of subadvisers, for instance, provides important benefits to fund investors, such as allowing a manager to utilize the skills and reputation of recognized investment managers in a particular investment field or asset class.  Hood Decl. Ex. 117, James Report ¶ 29.  In addition, managers may use multiple subadvisers to diversify investment styles and strategies, preserve adaptability, and offer breadth and customization to investors.  *See* Hood Decl. Ex. 117, James Report ¶ 29; *see also* 2 Clifford E. Kirsch, *Mutual Funds and Exchange Traded Funds Regulation* § 42 (3d ed. 2013).

### G.     FMG Assumes Substantial Risks Associated With The Funds.

Prior to approving the Funds' fees, the Independent Trustees also considered that FMG's roles as fund sponsor, investment manager, and administrator subject FMG and AXA to significant reputational, legal, regulatory, entrepreneurial, and operational risks.  SMF ¶ 65. These include, among other things, strategic risks, operational and compliance risks, and risks associated with fund disclosures, fund management, pricing, and operational errors.[18]  SMF ¶ 66. These risks are particularly heightened by the fact that FMG—not the subadvisers or Subadministrator—employs the chief compliance officer mandated by ICA Rule 38a-1, 17

---

[18] *See, e.g.*, *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) (noting that ICA § 42, 15 U.S.C. § 80a-41, "explicitly provides for enforcement of all ICA provisions by the SEC through investigations and civil suits for injunctions and penalties").

C.F.R. § 270.38a-1(a)(4), and bears ultimate responsibility for the management and administration of the Funds under the Agreements.[19]  SMF ¶¶ 14-15.

### H.    The Fees Paid By The Funds.

As set forth in the chart below, nothing about the Funds' fees is out of the ordinary.  All of the Funds' total expense ratios (less the Rule 12b-1 fees paid by the Funds)[20] are less than 1%, and a number of them are less than one half of 1% of Fund assets.  SMF ¶¶ 120-122.  For 2013, for instance, nine of the twelve Funds had total expenses that were at or below the median of total expenses for peer funds, and the other three were near the median.  SMF ¶¶ 120, 123.  Additionally, a number of the Funds had expense ratios that were among the lowest in their respective peer groups.  SMF ¶ 124.

A comparison of the Funds' expenses to peer funds is set forth in the chart below:

| FUND | FUND'S TOTAL EXPENSE RATIO (2013) | MEDIAN TOTAL EXPENSE RATIO FOR PEER FUNDS (2013) |
| --- | --- | --- |
| EQ/Common Stock Index Portfolio | 0.470% | 0.763% |
| EQ/Core Bond Index Portfolio | 0.470% | 0.641% |

---

[19] Hood Decl. Ex. 16 (Management Agreement) § 2.B ("Subject always to the direction and control of the Trustees of the Trust, Manager will have . . . overall supervisory responsibility for the general management and investment of each Portfolio's assets."); *id.* Ex. 17 (Administrative Agreement) ¶ 4(a) ("FMG LLC shall have general responsibility for the oversight of the Trust's administrative operations and shall perform the following services:  (i) Trust Administration, (ii) Compliance Services, and (iii) Trust Accounting."); *id.* Ex. 119 (Smythe Report) at 20 ("AXA FMG is *the* investment adviser to the Trust and, therefore, is responsible for the Trust.").

[20] A mutual fund's "total expense ratio" represents the fund's total fees and other expenses as a percentage of the fund's assets.  Rule 12b-1 fees are fees that mutual funds may pay for certain distribution-related services, such as "advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature."  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *121 (quoting 17 C.F.R. § 270.12b-1(a)(2)).  Rule 12b-1 fees are excluded so that differences in distribution and marketing costs across funds do not affect expense ratio comparisons.  Hood Decl. Ex. 117, James Report, ¶ 72(b); *see also* SMF ¶ 120 n.37.

| | | |
|---|---|---|
| EQ/Intermediate Government Bond Index Portfolio | 0.470% | 0.538% |
| EQ/GAMCO Small Company Value Portfolio | 0.850% | 0.909% |
| EQ/PIMCO Ultra Short Bond Portfolio | 0.590% | 0.590% |
| EQ Equity 500 Index Portfolio | 0.380% | 0.277% |
| EQ/T. Rowe Price Growth Stock Portfolio | 0.850% | 0.776% |
| EQ/Equity Growth PLUS Portfolio | 0.690% | 0.776% |
| EQ/Global Bond PLUS Portfolio | 0.750% | 0.715% |
| EQ/Large Cap Value PLUS Portfolio | 0.660% | 0.730% |
| EQ/Mid Cap Value PLUS Portfolio | 0.740% | 0.885% |
| EQ/Global Multi-Sector Equity Portfolio | 0.940% | 0.966% |

SMF ¶ 120.  There is nothing unusual about the fees approved by the Independent Trustees and

paid by the Funds.

## ARGUMENT

**I.      PLAINTIFFS FACE A HEAVY BURDEN TO PROVE THE FEES WERE "SO DISPROPORTIONATELY LARGE" THAT THEY BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES RENDERED."**

Summary judgment is warranted where "the movant shows there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986); *Kaucher v. Cnty. of Bucks*,

455 F.3d 418, 422-23 (3d Cir. 2006).  Because Plaintiffs bear the burden of persuasion at trial,

summary judgment should be granted when Plaintiffs' evidence fails to raise a *genuine* dispute

of *material* fact.[21]  *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996) (nonmovant

"may not rest on allegations in pleadings, but must counter with specific facts which demonstrate

that there exists a genuine issue for trial"); *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974,

978 (D. Minn. 2007) (granting summary judgment for defendants in Section 36(b) case).

The ICA specifically places the burden of proof on the plaintiff in a Section 36(b) case.

15 U.S.C. § 80a-35(b)(1); *see also Jones*, 559 U.S. at 347.  The Supreme Court has explicitly

held that a fee violates Section 36(b) only if it is "so disproportionately large that it bears no

reasonable relationship to the services rendered and could not have been the product of arm's

length bargaining."  *Jones*, 559 U.S. at 346 (affirming the *Gartenberg* standard).  Courts have

recognized that this standard "establishes a very high hurdle to overcome."  *In re Am. Mut.*

*Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *14.  In fact, no plaintiff has ever succeeded

in proving that a fund's fees are "so disproportionately large" under Section 36(b).[22]  *See also*

*Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173 (8th Cir. 2012) (affirming summary judgment for

---

[21] A factual dispute is "genuine" only if there is "a *sufficient evidentiary basis* on which a reasonable jury could find for the non-moving party."  *Kaucher*, 455 F.3d at 423 (emphasis added).  A factual dispute is "material" only if it might "affect the outcome of the suit under governing law."  *Id*.

[22] Seven Section 36(b) cases have gone to trial, and the courts ruled in favor of the defendants in each of them.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 Fed. App'x 716 (9th Cir. 2011); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038 (S.D.N.Y.), *aff'd*, 694 F.2d 923 (2d Cir. 1981).

defendants on Section 36(b) claim); *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373 (S.D.N.Y.

2002) (granting summary judgment for defendants on a Section 36(b) claim).[23]

## II.   PLAINTIFFS' HAVE NOT MET THEIR BURDEN OF OVERCOMING THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT UNDER *JONES'* DEMANDING STANDARD.

Plaintiffs face an even higher burden here because the challenged management and

administrative fees were approved by an independent board pursuant to a robust process that

included the review of extensive information pertinent to each *Gartenberg* factor.  As noted

above, and as the Supreme Court explained in *Jones,* "[w]here a board's process for negotiating

and reviewing investment-adviser compensation is robust, a reviewing court should afford

commensurate deference to the outcome of the bargaining process."  *Jones*, 559 U.S. at 351.

There are no *genuine* issues of *material* fact that warrant usurping the role of the

Independent Trustees, and overturning their decision to approve the challenged fees.  These

individuals were exceptionally well-qualified, and their contract approval process was thorough.

As noted above and discussed in more detail in Section III below, it is uncontroverted that the

Board met frequently, considered each *Gartenberg* factor, and reviewed voluminous materials

regarding these factors.  *See* SMF ¶¶ 29-67.

The Independent Trustees also demonstrated their independence from FMG by actively

negotiating at arm's-length with fund management.[24]  Among other things, it cannot legitimately

be contested that the Independent Trustees have:  (1) successfully negotiated for the

implementation of breakpoints for Funds that did not previously have breakpoints in their

---

[23] Under the Court's August 15, 2013 order granting Defendants' motion to strike Plaintiffs' jury demand, any trial in this case—which Defendants respectfully suggest should not occur for the reasons stated herein—would be a bench trial.  *See Sivolella v. AXA Equitable Funds Mgmt.Grp., LLC*, No. 11-04194, 2013 U.S. Dist. LEXIS 115197 (D.N.J. Aug. 15, 2014), ECF No. 66 (adopting Magistrate Judge's Report & Recommendation).

[24] *See supra* Summary of Facts, § C(3).

management fee schedules; (2) added breakpoints for various other Funds, which reduce the

Funds' fees as asset levels increase; (3) obtained waivers for portions of the Funds' management

and administrative fees at current asset levels; and (4) downwardly adjusted the Funds' existing

management and administrative fees through breakpoints or reductions in flat fees.  SMF ¶¶ 24-

27.  The Independent Trustees have also demanded on many occasions that FMG include

additional information in the materials they consider each year in approving the fees.  SMF ¶ 53;

*Schuyt*, 663 F. Supp. at 984 (giving weight to evidence "that the independent directors not only

carefully analyzed and debated the information they were given, but also actively questioned the

Adviser and requested additional information when they needed it").

The summary judgment decision in *Gallus v. Ameriprise Financial, Inc.*, 497 F. Supp. 2d

974 (D. Minn. 2007) is directly on point here.  *Gallus* is the only summary judgment decision in

a Section 36(b) case since *Jones*.[25]  In granting summary judgment for defendants, the court

deferred to the business judgment of the independent trustees because it found that the board had

reviewed and considered substantial information on each *Gartenberg* factor prior to approving

the challenged fees.  There, as here, the board received and reviewed "information regarding the

services provided to the Funds" and "the personnel providing those services."  *Gallus*, 497 F.

Supp. 2d at 976.  Similarly, there, as here, the board received detailed information about "the

---

[25] *Gallus* has a remarkable procedural history that underscores the substantial deference afforded
to a board's decision to approve a fee.  In *Gallus*, the Eighth Circuit originally reversed the
district court's decision granting summary judgment.  *See Gallus v. Ameriprise Fin., Inc.*, 561
F.3d 816 (8th Cir. 2009).  After the Supreme Court issued its decision in *Jones*, however, the
case was remanded back to the district court, which reinstated its earlier decision verbatim.  *See
Gallus v. Am. Express Fin. Corp.*, No. 04-4498, 2010 U.S. Dist. LEXIS 131264, at *5-6 (D.
Minn. Dec. 10, 2010).  On the subsequent appeal of this reinstated order, the Eighth Circuit
*affirmed* the very same decision that it had previously reversed.  *Gallus v. Ameriprise Fin., Inc.*,
675 F.3d 1173 (8th Cir. 2012).  The Eighth Circuit did so, among other things, because of *Jones*
and the substantial deference it instructs courts to apply where the board's approval process is
robust and the disinterested directors "considered the relevant factors."  *Id.* at 1178-79 (quoting
*Jones*, 559 U.S. at 351).

investment performance of the Funds"; "the profitability of the contracts to Defendants, including detailed information about Defendants' expenses"; and "benefits accruing to Defendants in addition to fees."  *Id.*  Likewise, as here, the board in *Gallus* received "third-party industry consultant . . . comparison[s] of the Funds' fees to those of a pool of the Funds' competitors."  *Id*; *see also id.* at 980-83.  Just as in *Gallus*, the Independent Trustees here considered each and every one of these items before approving the Funds' fees.

Under the facts of this case—which include the Independent Trustees' consideration of extensive materials on each *Gartenberg* factor and numerous instances of arm's-length negotiation with FMG—there is no genuine issue of material fact on any issue that would permit the Court to substitute its business judgment for that of the Independent Trustees.[26]  *See Gallus*, 497 F. Supp. 2d at 976.

## III.  THE INDEPENDENT TRUSTEES' CONSIDERATION OF EACH OF THE *GARTENBERG* FACTORS WARRANTS CONSIDERABLE DEFERENCE BY THIS COURT.

Plaintiffs cannot meet the heavy burden required to overcome the Independent Trustees' reasonable business judgment on any single *Gartenberg* factor.[27]

---

[26] Plaintiffs cannot reasonably dispute that the Section 15(c) process followed by the Independent Trustees was robust.  Plaintiffs, through Mr. Goldstein (their so-called "board" expert), seek to prove their case by quibbling with aspects of the fee negotiation process that Plaintiffs believe should have been handled differently, or by suggesting additional information they believe the Independent Trustees should have considered.  But Plaintiffs' "expert" admitted that he *did not even read* the extensive materials provided to and considered by the Independent Trustees in approving the Funds' fees, or the minutes of the Board meetings.  Hood Decl. Ex. 123, Goldstein Tr. 234:7-9, 46:7-47:25, 48:24-49:21; *see also* Mem. In Supp. Of Defs.' Mot. To Strike The Expert Opinions Offered by Philip Goldstein, dated January 23, 2015.  He also admitted at his deposition that he is not aware of any legal requirement or industry custom and practice that the Board failed to follow in approving FMG's fees.  *See* Hood Decl. Ex. 123, Goldstein Tr. 357:5-360:5.  In addition, he admitted that he lacks familiarity with the customs and practices of mutual fund boards that use a subadvisory structure, calling into question his qualifications to opine in this area at all.  Hood Decl. Ex. 123, Goldstein Tr. 214:20-215:7, 219:20-220:4.

[27] Note 2, *supra*, lists the *Gartenberg* factors.

A. **The Independent Trustees' Determinations Regarding The "Nature and Quality" Of Services Should Not Be Second-Guessed.**

1. **The Independent Trustees Considered Extensive Information Regarding The Services Performed For The Funds.**

Just as in *Gallus*, it is uncontroverted that the Independent Trustees here received and considered voluminous data reflecting what the shareholders receive in return for FMG's management fees—including detailed descriptions of the services provided by FMG and subadvisers; the personnel providing those services; reports of the Funds' net investment performance relative to benchmarks and to other funds; overviews of strategic initiatives relating to the Funds; reviews of portfolio trading activity; reports on investments in ETFs; and compliance information, including compliance with the Funds' investment restrictions and policies, FMG's code of ethics, and anti-money laundering procedures.  SMF ¶¶ 36-50; Hood Decl. Ex. 78 ("Index of Materials Responsive To '*Gartenberg*' Factors") (identifying documents the Board receives related to each *Gartenberg* factor).

It is likewise beyond dispute that the Independent Trustees received and considered extensive information regarding what shareholders receive in return for FMG's administrative fees.  SMF ¶ 39; *see also* Hood Decl. Ex. 60, FMG 15(c) Response (June 11, 2013), at D_AXA0264123-24 (describing FMG's administrative services); Hood Decl. Ex. 65, Presentation to Board, "Manager vs. Administrator" (July 2013), D_AXA0280998-102 (describing FMG's administrative services provided to Funds and personnel).  This included information regarding the services performed by the Subadministrator.  SMF ¶¶ 42-43; *see also* Hood Decl. Ex. 133, Schpero Tr. 56:20-21 (Lead Independent Trustee testifying that the Board "periodically [has] meetings with [the Subadministrator].").

In approving the Funds' fees, the Independent Trustees specifically took into account the array of essential investment management and administrative services that FMG provides

- 24 -

directly to the Funds.  *See supra*, Summary of Facts § D.  There is no basis to second-guess the Independent Trustees' determination of the value and importance of these services.  *See Gallus*, 497 F. Supp. 2d at 980 (granting summary judgment for defendants where board received virtually identical information as set forth above on nature and quality of services).

Plaintiffs ignore the uncontroverted factual testimony, and rely on expert testimony that FMG is supposedly not actually performing extensive services for the Funds.  For example, Plaintiffs' experts assert that the Subadministrator prepares management reports and materials provided to the Board.  Hood Decl. Ex. 118, Pomerantz Report at 6.  However, the Subadministrator's representative unequivocally testified that the Subadministrator does *not* prepare management reports or Board materials.  Hood Decl. Ex. 136, Warren Tr. 262:11-14 (Subadministrator representative testifying:  "Q. Am I correct that [the Subadministrator] does not prepare management reports? . . . A. That's true."), 263:17-19 ("Q.  Does [the Subadministrator] prepare board of trustee materials?  A. No, we do not.").

Plaintiffs cannot overcome their burden of proof with unsupported speculation by their experts that others are performing the same or similar services as FMG.  For example, in *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, the court rejected the same argument:

> Plaintiff attempts to argue that State Street Bank, rather than the Adviser, performed shareholder services.  This argument is not supported by the evidence.  While it is certainly true that State Street Bank performed the functions of taking in new accounts, holding portfolio securities, and answering routine questions, the Adviser dealt with many shareholder concerns that the bank did not.

663 F. Supp. at 978 n.43.  The *ipse dixit* statements of Plaintiffs' experts are not evidence.  *GE v. Joiner*, 522 U.S. 136, 146 (1997) (nothing in Federal Rules of Evidence "requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

Plaintiffs, through their experts, also claim that many of the services provided by FMG *could have been* provided by subadvisers or the Subadministrator because the contracts with those entities are worded broadly enough to cover those services.  This approach also fails as a matter of law.  For example, in *Gartenberg*, the court rejected the argument that services provided by the adviser were "wastefully duplicating" the services the fund's transfer agent was contractually obligated to provide.  The court found that regardless of the transfer agent's legal obligation to perform the services, the evidence demonstrated that most of the services were actually being performed by the adviser and its affiliates.  *See Gartenberg*, 694 F.2d at 931.

The Independent Trustees expressly considered the respective services provided by FMG and Funds' subcontractors, and determined that the fees paid to FMG were fair and reasonable.  Their independent judgment should not be second-guessed.

> **2.    Plaintiffs Ignore All Of The Services Provided By AXA, Which The Independent Trustees Considered In Exercising Their Business Judgment.**

As noted above, the record makes clear that AXA provides numerous services that are essential to FMG's ability to manage and administer the Funds.  *See supra*, Summary of Facts § E.  As Plaintiffs' own expert acknowledges, FMG is not "self-sufficient" and relies on AXA for "essentially everything."  Hood Decl. Ex. 116, Barrett Rebuttal Report at 31-32.  There can be no question that these services directly benefit the Funds and their shareholders.

Plaintiffs' experts admit that the services provided by AXA benefit the Funds, but ignore the value of the services.  *See infra* at 29, 32-33 & n.30 (citing testimony by Plaintiffs' experts admitting they ignored AXA's services and the cost of those services); Hood Decl. Ex. 121, Barrett Tr. 254:23-255:13 (admitting that Funds benefit from AXA's services).[28]  Plaintiffs'

---

[28] *See also* Hood Decl. Ex. 130, Pomerantz Tr. 293:17-295:21 (admitting his analysis ignores AXA's costs); Hood Decl. Ex. 123, Goldstein Tr. 232:11-16 (admitting that he did no

experts omit these services in all of their analyses based upon a clear misreading of *Gartenberg*.

For example, Plaintiffs' expert Kent Barrett gave the following reason in his report for excluding

AXA's costs (estimated at $49 million) of providing services to the Funds:

> If the relevant profitability to examine under the *Gartenberg* Standard is that of just FMG as the investment manager, then the profitability analysis should not include expenses of FMG's parent company, AXA Equitable.

Hood Decl. Ex. 115, Barrett Report at 38 n.55; SMF ¶ 97 (AXA's estimated costs).  But

*Gartenberg* held exactly the opposite.  There, the court held that it was improper to ignore

services provided by affiliates of the adviser:

> Proceeding on the erroneous theory that only the administrative costs incurred by the Manager itself may be considered, appellants ignore the heavy costs incurred by other Merrill Lynch affiliates in processing the increased volume of purchases and redemptions of Fund shares which were under the Manager's guidance.  Since the Manager and Broker were divisions of one economic unit, the district court was entitled to deduct these costs in calculating the Manager's net profits.  *To limit consideration to the Manager's own administrative expenses would be to exalt form over substance and disregard the expressed Congressional intent that "all the facts in connection with the determination and receipt of such compensation" be considered.*

*Gartenberg*, 694 F.2d at 931 (emphasis added).

Plaintiffs' decision to ignore the services provided by AXA—services which *were*

considered by the Independent Trustees in approving the Funds' fees—is a fundamental flaw in

their case and, on this basis alone, the Court should grant summary judgment.  *See id.*; *Benak v.*

*Alliance Capital Mgmt. L.P.*, No. 01-5734, 2004 U.S. Dist. LEXIS 12231, at *25 (D.N.J. Feb. 9,

2004) ("[U]nder § 36(b) it is the *overall* nature and quality of the services provided by the

investment adviser that is at issue—not merely some small percentage of those services.").

---

investigation to determine full scope of AXA's services), 237:20-25 (admitting he did no investigation into full scope of AXA's costs).

**B.    The Independent Trustees' Consideration of Economies of Scale Is Entitled To Substantial Deference.**

Plaintiffs have not remotely met their burden of overcoming the business judgment of the Independent Trustees on *Gartenberg*'s economies of scale factor.  The Independent Trustees received and considered extensive information relating to potential economies of scale realized by FMG and the extent to which any such economies of scale were shared with the Funds.  This includes "Fund Economics" presentations that describe how expenses change as Fund assets increase and "Economies of Scale" presentations that analyze the impact of the Funds' breakpoints.  SMF ¶ 45.  This is on all fours with *Gallus*, where the court granted summary judgment for defendants where disinterested directors considered economies of scale and approved fee schedules with breakpoints.  *See Gallus*, 497 F. Supp. 2d at 977, 982.

Further, Plaintiffs have not proved that economies of scale *even existed*.  Courts in Section 36(b) cases have consistently found that for a plaintiff to meet its burden of proving that the adviser realized economies of scale, the plaintiff must show that the *per-unit cost* of servicing a fund decreased as the fund's assets grew.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *77 ("Economies of scale exist when long-run average production costs (*costs per unit*) decrease as output quantity increases.") (emphasis added); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (dismissing Section 36(b) complaint that failed to allege "the actual transaction costs at issue and whether the *costs per investor* increased or decreased as the assets under management grew") (emphasis added).  Plaintiffs have adduced no evidence that the *per-unit* cost of performing fund work declined as the Funds grew in size.[29]  Without such

_____

[29] Plaintiffs' experts admit that they have conducted no *per unit cost* analyses.  Hood Decl. Ex. 126, Kopcke Tr. 265:15-19 ("We don't do costs per unit [analyses] . . . ."); Hood Decl. Ex. 134, Vitagliano Tr. 277:14-279:10 (admitting that he had no understanding of, and undertook no investigation of, FMG's actual costs in providing management and administrative services and

information "there is no way to determine whether any economy of scale even existed."

*Hoffman*, 591 F. Supp. at 540.

Plaintiffs also fail to meet their burden of proving that economies of scale exist for the independent reason that they ignore *total* costs.  In their purported economies of scale analyses, Plaintiffs considered only FMG's *direct* costs and ignored the estimated $49 million in costs incurred by AXA in servicing the Funds.  Hood Decl. Ex. 121, Barrett Tr. 68:24-69:7 (admitting that his economies of scale analysis merely "focused on a subset of costs at FMG, the [$]15 million, not the [$]49 million coming from AXA Equitable"); Hood Decl. Ex. 126, Kopcke Tr. 242:2-6 (admitting that Messrs. Kopcke and Vitagliano ignored AXA's costs for "all purposes" of their report); Hood Decl. Ex. 130, Pomerantz Tr. 295:6-21 (admitting that his economies of scale analysis ignored AXA's costs).  This is insufficient as a matter of law.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *77 ("To determine whether economies of scale exist involves an examination of how total costs change with the level of output.  Thus, relying on a subset of costs in an economies of scale analysis may yield incorrect results.").

Finally, even if they could prove that economies of scale exist, Plaintiffs have not shown that any such economies were not adequately shared.  Section 36(b) does not require an investment adviser to pass on *all* benefits of economies of scale to the funds.  Rather, it requires only that any such economies of scale be shared *equitably* with the fund.  S. Rep. No. 91-184 at 15 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901 ("[T]his bill recognizes that investors should *share equitably* . . . in the economies.").  Here, as noted, FMG shares any potential economies of scale with the Funds through, among other things, breakpoints in the Funds' fee schedules, expense caps, fee waivers, base fee reductions, and reinvestment in services—all of

merely "estimated" those costs); Hood Decl. Ex. 121, Barrett Tr. 66:23-67:22, 221:16-222:2 (admitting he conducted no analysis of why ratio of expenses to assets move up or down).

which the Independent Trustees' considered in approving FMG's fees.  SMF ¶¶ 112-119; *see also In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *139-40 ("Economies of scale can be shared with fund shareholders in a number of ways, including breakpoints, fee reductions and waivers, offering low fees from inception, or making additional investments to enhance shareholder services." ) (internal citations omitted).  Indeed, between 2010 to 2013, FMG's breakpoints alone resulted in $18 million in management fee savings and $18.6 million in administrative fee savings to the Funds.  Hood Decl. Ex. 117, James Report ¶¶ 103, 106 & Ex. 9.  Accordingly, Plaintiffs have not met their burden of proving that any economies of scale were not adequately shared with the Funds.  *See Gallus*, 497 F. Supp. 2d at 974 (granting summary judgment where defendants shared $12.7 million through breakpoints and plaintiffs did not establish why breakpoints were insufficient).

### C.    The Independent Trustees' Consideration of Comparative Fees Should Not Be Second-Guessed.

Plaintiffs likewise cannot overcome the substantial deference that should be afforded to the Independent Trustees' consideration of comparative fees.  As in *Gallus*, it is undisputed that the Independent Trustees received detailed data from Lipper, an independent third party, comparing the Funds' fees to relevant peer groups—competitor mutual funds that pursue the same or similar investment objectives.  SMF ¶ 47; *Gallus*, 497 F. Supp. 2d at 982-83 (granting summary judgment in favor of defendants where Board considered Lipper comparative fee data); *see also In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *71-72 ("Lipper . . . is a recognized industry-leading third-party source for mutual fund industry data," including comparative fee data).  Plaintiffs have pointed to no inaccuracies regarding the Lipper data reviewed by the Independent Trustees, and nothing in that data suggests that the Funds' fees are so disproportionately excessive that they could not have been the product of arm's-length

- 30 -

negotiation.  *See* SMF ¶¶ 47, 120.  That data shows that most of the Funds' expenses are below the expenses for peer funds and, in a number of instances, well below the median.  *See supra* Summary of Material Facts § H; SMF ¶¶ 120-124; *see Strougo*, 188 F. Supp. 2d at 384 (granting summary judgment where the fund's fees were "within the range of fees and expenses for similar funds").

> ### D.      FMG's Profit Margins Were Considered By The Independent Trustees, And Are Well Within Normal Ranges.

As in *Gallus*, prior to approving the Funds' fees, the Independent Trustees considered information regarding the profitability of the Funds' management and administrative agreements to FMG, and how that profitability compared to other investment advisers.  It cannot be disputed that the Independent Trustees reviewed, among other things, documents detailing FMG's management fee revenues, direct and variable management expenses, the amount of fees paid to the subadvisers, and estimated management fee profitability before and after including allocated corporate expenses.  SMF ¶ 48; *see also* Hood Decl. Ex. 77 (profitability reports provided to Board).  They also reviewed documents detailing, among other things, FMG's administrative fee revenues, direct administrative and variable administrative expenses, the amount of fees paid to the Subadministrator, and estimated administrative fee profitability.  SMF ¶ 48; *see also* Hood Decl. Ex. 77 (profitability reports provided to Board).  Just as in *Gallus*, the Independent Trustees' evaluation of *Gartenberg*'s profitability factor should not be second-guessed.  *See Gallus*, 497 F. Supp. 2d at 981 (granting summary judgment dismissing Section 36(b) claim where defendants "provided detailed reports on its profitability to the Board.").

Here, FMG's pre-tax profit margins range from 32% to 77% on the management fee and 64% to 81% on the administrative fee, excluding distribution expenses.  SMF ¶ 125.  These profit margins are within the range of margins that courts have found to be reasonable in

previous Section 36(b) cases (many of which were calculated on a post-tax basis and included certain distribution expenses, lowering profitability).[30]  *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (pre-tax margins up to 89%, including certain distribution expenses); *Schuyt*, 663 F. Supp. at 979 (pre-tax margins up to 77.3% and post-tax margins up to 38.6%, including "sales promotion" expenses); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *135-37 (excluding distribution expenses, pre-tax margins ranging from 36% to 52%; including distribution expenses, pre-tax margins ranged from 42% to 48%); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1236, 1250 (S.D.N.Y. 1990) (post-tax margin up to 37.8% "neither requires nor supports a finding [of excessiveness]").

Plaintiffs' experts calculated different profit margins, but all of those profit margins are calculated using only a subset of costs (again improperly ignoring AXA's costs in servicing the Funds).[31]  Hood Decl., Ex. 121, Barrett Tr. 142:6-144:3 (conceding his profitability calculations excluded AXA's costs).  As discussed above, this exact approach to calculating profitability (*i.e.*, ignoring costs incurred by an affiliate) was specifically rejected in *Gartenberg*.  *See, e.g.*, *Gartenberg*, 694 F.2d at 931; *see also Schuyt*, 663 F. Supp. at 978 n.49 (considering in Section 36(b) case "all costs that are directly associated with each product as well as an equitable share

---

[30] Defendants' overall pre-tax profitability for the EQAT funds, which ranged from 12.44% to 24.91% from 2010 to 2012, is also consistent with overall profit margins in other Section 36(b) cases.  Hood Decl. Ex. 77, EQAT Total Profitability (July 2013), at D_AXA0264137; Hood Decl. Ex. 43, EQAT Total Profitability (July 2012), D_AXA0154539; *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *135 (overall pre-tax profit margin from operating the American Funds mutual fund complex ranged from 30% to 35%).

[31] Notably, Plaintiffs' expert conceded that, though he ignored them, it would have been appropriate to consider AXA's costs in the funds' profitability calculations.  Hood Decl. Ex. 121, Barrett Tr. 164:13-165:15 ("[T]o quantify the total profitability from the investment management agreement, total profitability associated with providing the investment management services, you would include all of [AXA's] costs . . . .").

of indirect and corporate administrative expense").[32]  Moreover, just as in *Gallus*, "[a]lthough Plaintiffs suggest that the Board should have had different information than what the Board was provided," Plaintiffs' experts "do not point to any authority detailing requirements for the presentation of profitability data."  *Gallus*, 497 F. Supp. 2d at 981.

The Independent Trustees made a determination, based on a wealth of information, that FMG's profitability was reasonable.  SMF ¶ 59.  Plaintiffs cannot establish a violation of Section 36(b) by alleging that FMG "just plain made too much money."[33]  *Kalish*, 742 F. Supp. at 1237; *see also Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 410 (2d Cir. 1989) (holding that high profitability alone does not support a finding that the fee is excessive); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *135-36 (Section 36(b) "does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit.").

---

[32] Plaintiffs' expert, Mr. Barrett, also claims that subadvisory fees should not be treated as an expense for the purpose of profitability calculations, but instead as a deduction from revenue; yet, Mr. Barrett conceded both in his report and at his deposition that FMG's treatment of subadvisory fees is *consistent* with standard accounting practices.  Hood Decl. Ex. 116, Barrett Rebuttal Report at 24 ("I agree that for external accounting and financial reporting under GAAP, subadvised fees are generally reported as expenses."); *see also* Hood Decl. Ex. 121, Barrett Tr. 187:14-17.  In any event, the Independent Trustees, as noted above, were well aware of the structure and amount of fees paid to the subadvisers and Subadministrator, and could treat those fees however they saw fit.

[33] Plaintiffs' expert, Mr. Pomerantz, using what he calls a "mark-up method", opines that FMG should have received fees equivalent to a subset of its costs, plus a variety of proposed profit margins.  *See* Hood Decl. Ex. 118, Pomerantz Report at 46-47, 49 & Exs. 13, 15.  But consistent with the legislative history of Section 36(b), courts have uniformly rejected such a "cost-plus" approach.  *See, e.g.*, *Kalish*, 742 F. Supp. at 1226-27; *see also* S. Rep. No. 91-184, at 6 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902 ("[T]he investment adviser is entitled to make a profit.  *Nothing in this Bill is intended to imply otherwise or suggest that a 'cost-plus' type of contract would be required.*") (emphasis added).

**E.     The "Fall-Out Benefits" Raised By Plaintiffs Were Disclosed To The Independent Trustees, And Do Not Warrant A Trial.**

Plaintiffs likewise cannot overcome the reasonable business judgment of the Independent Trustees regarding potential "fall-out benefits" that may accrue to FMG and AXA.  Just as with the other *Gartenberg* factors, the Independent Trustees received detailed information on possible fall-out benefits relating to the Funds.  It is beyond dispute that the Independent Trustees considered, among other things, that AllianceBernstein, an affiliate of the Manager, served as the Adviser to certain Funds; that Sanford C. Bernstein & Co., LLC, a registered broker-dealer, is an affiliate of FMG and may receive brokerage commissions in connection with the purchase and sale of portfolio securities; and that the performance of certain Funds may impact, positively or negatively, AXA's ability to hedge the risks associated with guarantees provided in its variable insurance products.  SMF ¶ 60.  As a matter of law, the Independent Trustees' evaluation of potential fall-out benefits should be afforded substantial deference.  *See Gallus*, 497 F. Supp. 2d at 982 (granting summary judgment in favor of defendants where "the Board considered the reports that Defendants provided to them that expressly addressed the fall-out benefits when negotiating fees with Defendants").

Plaintiffs, through their experts, attempt to make much of the revenues earned by AXA in connection with its sale of variable annuities, characterizing that revenue as a fall-out benefit of significant proportions.  *See* Hood Decl. Ex. 118, Pomerantz Report at 73-77.  However, AXA's variable annuity revenue would still be earned even if the Funds did not exist—there are literally dozens of other mutual funds that are also offered in each variable annuity that investors are free to select, including funds that are not even managed or affiliated with FMG.  SMF ¶ 128.  This ancillary revenue fails the "but for" test, and is therefore not a fall-out benefit as a matter of law. *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142 (quoting *Krinsk*, 715 F.

Supp. at 495).  In any event, the Independent Trustees were apprised of AXA's variable annuity

revenue when exercising their discretion to approve FMG's fees.[34]

Plaintiffs further claim that the Funds' administrative fees and Rule 12b-1 fees are "fall-

out benefits" of FMG's management fees.  These are not "indirect" profits realized by FMG but,

rather, *direct* revenues received by FMG and its affiliates.  As a matter of law, these fees are not

fall-out benefits.  *Krinsk*, 875 F.2d at 411 ("[F]loat benefits and free credit balances are

generated *directly* by the money market fund and cannot be characterized as fall-out revenue.")

(emphasis added).  No court has ever found that the fees paid directly by a fund at issue to its

investment adviser qualify as "fall-out benefits."  Moreover, it is incontrovertible that the

Independent Trustees approved each of the fees.  SMF ¶ 16.

The other purported fall-out benefits Plaintiffs claim existed fail to raise a genuine issue

of material fact because:  (1) they are *de minimis* or Plaintiffs fail to quantify them, and (2) they

were all disclosed to and approved by the Board.[35]  *See* Hood Decl. Ex. 130, Pomerantz Tr.

332:19-333:18 (Plaintiffs' expert conceding he has not quantified the "dividend received

deduction" or any benefits of the volatility overlay/ATM strategy, among other things); Hood

Decl. Ex. 117, James Report ¶¶ 157-58 (in 2013, the total brokerage commissions paid by the

Funds to AXA affiliate Sanford C. Bernstein, which were disclosed to the Independent Trustees,

amounted to just $14,000).  None of the purported fall-out benefits identified by Plaintiffs'

---

[34] A number of years ago (and well before the relevant time period in this litigation), FMG gave
an annual profitability presentation to the Board containing a slide that referred to variable
annuity product revenues (namely, product wrapper fees and general account spread) as "fall-out
benefits."  SMF ¶ 129.  FMG did not include the slide in the annual presentation in later years,
but continued to disclose to the Board that product wrapper fees and general account revenues
"could conceivably" be fall-out benefits, and the Board continued to receive financial
information every year concerning product revenue and general account revenue.  SMF ¶ 130.

[35] Plaintiffs have the burden to "quantify the fall-out benefits and demonstrate the appropriate
share for allocation of said benefits as an *offset to costs*."  *In re Am. Mut. Funds Fee Litig.*, 2009
U.S. Dist. LEXIS 120597, at *142 (emphasis added).

experts raise a triable issue of fact that could support the Court substituting its business judgment for that of the Board.

## **CONCLUSION**

For the foregoing reasons, pursuant to *Jones* and *Gallus*, the judgment of the Funds' Independent Trustees should not be second-guessed.  Defendants' motion for summary judgment should be granted.

Dated:  January 23, 2015

BLANK ROME LLP

By:  /s/ Jonathan M. Korn
     Jonathan M. Korn
     301 Carnegie Center, 3rd Floor
     Princeton, NJ 08540
     (609) 750-7707

MILBANK, TWEED, HADLEY & M$^{\text{C}}$CLOY LLP
     James N. Benedict (*pro hac vice*)
     Sean M. Murphy (*pro hac vice*)
     Robert C. Hora (*pro hac vice*)
     Andrea G. Hood (*pro hac vice*)
     1 Chase Manhattan Plaza
     New York, NY  10005-1413
     (212) 530-5000

*Attorneys for Defendants AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC*