# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, et al.<br><br>    Plaintiffs,<br><br>vs<br><br>AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, et al.,<br><br>    Defendants. | **Civ. A. No. 3:11-cv-04194-PGS-DEA**<br><br>R E C E I V E D<br><br>NOV 2 4 2015<br><br>AT 8:30_____M<br>WILLIAM T. WALSH<br>CLERK |
| GLENN D. SANFORD, et al.<br><br>    Plaintiffs,<br><br>vs.<br><br>AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, et al.,<br><br>    Defendants. | **Civ. A. No. 3:13-cv-00312-PGS-DEA**<br><br>Judge: Hon. Douglas E. Arpert<br><br>Final Pretrial Conference<br>November 23, 2015, 10:00 AM<br><br>Trial Date:  January 11, 2016<br><br>Filed Electronically<br><br>[~~PROPOSED~~] JOINT<br>**FINAL PRETRIAL ORDER** |

This matter having come before the Court for a Pretrial Conference before the Honorable Douglas E. Arpert, U.S.M.J., pursuant to *Fed. R. Civ. P.* 16; and Arnold Lakind, Robert Lakind and Daniel Sweetser of Szaferman, Lakind, Blader & Blumstein, P.C. having appeared for plaintiffs ("Plaintiffs")[1]; and Sean M.

---

[1] Plaintiffs bring this action with respect to the following twelve portfolios (the "Funds"), each of which is a separate portfolio within the EQ Advisors Trust ("EQAT"): (1) EQ/GAMCO Small Company Value Portfolio; (2) EQ/PIMCO Ultra Short Bond Portfolio; (3) EQ/T. Rowe Price Growth Stock Portfolio; (4) EQ/Equity Growth PLUS Portfolio; (5) EQ/Global Bond PLUS Portfolio; (6) EQ/Global Multi-Sector Equity Portfolio; (7) EQ/Large Cap Value PLUS Portfolio; (8) EQ/Mid Cap Value PLUS Portfolio; (9) EQ/Common Stock Index Portfolio; (10)

Murphy and Robert C. Hora of Milbank, Tweed, Hadley & McCloy LLP, and Jonathan Korn of Blank Rome having appeared for defendants AXA Equitable Life Insurance Company ("AXA") and AXA Equitable Funds Management Group, LLC ("FMG") (together with AXA, "Defendants"); the following Final Pretrial Order is hereby entered:

## 1.    JURISDICTION (set forth specifically).

This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-43. The parties agree that venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b).

✳

## 2.    PENDING/CONTEMPLATED MOTIONS (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar.  Also, set forth the nature of the motion and the return date.  If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).

### For Plaintiffs:

Plaintiffs have no pending motions. Plaintiffs contemplate moving *in limine* to bar the following evidence expected to be offered at trial:

1.    Plaintiffs will move to bar the expert testimony of defense expert, William Holder, C.P.A., on the same bases argued in their previous motion *in limine*:  that the testimony of this expert is inadmissible (1) because that testimony does not satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and (2) because Mr. Holder was not the author of the opinions in his report. Plaintiffs' *Daubert* motion was originally filed on January 23, 2015. The Court determined that it would resolve this motion at trial.

2.    Plaintiffs will move to bar the admission of all evidence relating to distribution expenses, marketing expenses and transfer agency expenses if such evidence will be offered because these expenses are irrelevant.

---

EQ/Core Bond Index Portfolio; (11) EQ/Equity Index 500 Portfolio; and (12) EQ/Intermediate Government Bond Index Portfolio.

✳ All in limine / Daubert Motions must be filed/reinstated by Dec. 11, 2015.

3.     Defendants objected to a number of Plaintiffs' Interrogatories and Requests for Production of Documents on the ground that the information and documents sought were not discoverable because such discovery was not relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs will move to bar the introduction of any proffered evidence responsive to the Interrogatories and Document Requests that was not produced in discovery based on Defendants' objection on these grounds.

4.     Defendants and the Board of Trustees of the EQ Advisors Trust ("EQAT") invoked the attorney client privilege with regard to a number of Plaintiffs' inquiries at depositions and in written discovery addressed to the care and conscientiousness of the Board.  Plaintiffs will move to bar the introduction of any evidence offered by Defendants addressed to the care and conscientiousness of the EQAT Board.

5.     Counsel to the Defendants communicated with and provided documents to the EQAT Board in connection with this litigation.  Although counsel to Defendants is not counsel to the EQAT Board, Defendants have refused to disclose these communications or provide the documents related to these communications to Plaintiffs.  Plaintiffs intend to subpoena these documents for trial and to question a number of witnesses with regard to communications between counsel to Defendants and the EQAT Board.  If Defendants intend to object to these inquiries, Plaintiffs will seek a ruling that testimony about these communications and documents must be provided at trial.

6.     Plaintiffs will move to bar any evidence introduced by the defense with regard to documents produced on and after October 26, 2015 (Bates stamped above AXA1264195) due to the untimeliness of such productions.

7.     Plaintiffs will move to bar defense expert Russell Wermers from opining on the performance of Plaintiffs' Funds because his opinion: (a) relies on methodologies not used or accepted in the industry, (b) contradicts defense experts' prior opinions and (c) was not presented to or relied on by the EQAT Board.

8.     Plaintiffs will move to bar the defense expert testimony offered by Marianne K. Smythe, Esq. with regard to all issues in her report other than her opinion with regard to the level of expertise of the members of the EQAT Board. The grounds for Plaintiffs' motion are: (a) Ms. Smythe lacks the expertise to render an opinion on any other issue addressed in her report; (b)  Ms. Smythe's opinion that the

Board was careful and conscientiousness is based upon her assessment of the expertise of the Board members which is not a subject appropriate for expert testimony; (c) Ms. Smythe's opinions constitute improper legal conclusions and are *ipse dixit* based on unsupported factual assertions derived from improper and unreliable inferences and (d) Ms. Smythe's opinion does not satisfy the requirements of *Daubert*.

9.      Plaintiffs will move to bar the Lipper fee comparison reports in their entirety. If the Lipper reports are deemed admissible, Plaintiffs will move to limit the scope/purpose of this evidence under Evid. Rule 105.

**For Defendants:**

Defendants have no pending motions.  Defendants intend to file the following motions:[2]

1.      Defendants' Motion to Strike Expert Opinions Offered by Kent E. Barrett. [Dkt. No. 99 (*Sivolella*); Dkt. No. 50 (*Sanford*)]

As set forth in greater detail in Defendants' previously filed Motion to Strike, Defendants seek to strike the expert testimony offered by Mr. Barrett and preclude Mr. Barrett from offering opinion testimony concerning:

   a.     Defendants' profitability accounting and reporting, on the grounds that Mr. Barrett's opinions:  (i) constitute improper legal conclusions that he is not qualified to provide; (ii) are unreliable because Mr. Barrett does not identify any accounting irregularity regarding Defendants' profitability calculations; (iii) are unsupported by any accepted accounting practice; and (iv) rely on calculations that improperly exclude subadvisory / sub-administrative fees and expenses allocated to FMG from AXA;

   b.     Investment management or administrative services provided by Defendants, and which of these services Defendants delegated to the Funds' Subadvisers and/or the Subadministrator, on the grounds that this topic is not a proper grounds of expert testimony and Mr. Barrett: (i) has no expertise relevant to determining what services Defendants provide; (ii) conducted no investigation to support his opinion aside

---

[2]  The first four of Defendants' motions described herein was previously filed with the Court and has been fully briefed by the Parties.  Pursuant to Judge Sheridan's Order dated July 24, 2015, the Court administratively terminated these motions and stated that the Court would address them "at the time of trial." [Dkt. No. 167 (*Sivolella*); Dkt. No. 117 (*Sanford*).]

from reading certain contracts; (iii) is not qualified to interpret contracts; and (iv) disregarded evidence that contradicted his opinions;

c.    Purported "fall-out benefits" that accrued to Defendants (or their affiliates), on the grounds that: (i) his opinion is based on an improper legal conclusion, which he is not qualified to provide, that certain revenues constitute "fall-out benefits"; (ii) his calculations are unreliable because they are based on speculative assumptions about choices made by investors in the Funds to allocate money among the various investment options available within AXA's insurance products; and (iii) Mr. Barrett's calculations are unreliable and irrelevant because they are not limited to the Funds at issue here; and

d.    Purported "economies of scale," on the grounds that Mr. Barrett has no relevant expertise and failed to conduct the threshold analysis required to determine whether FMG realized any economies of scale in managing or administering the Funds. Thus, any opinions offered by Mr. Barrett on this topic lack foundation and are unreliable.

2.    <u>Defendants' Motion to Strike the Expert Opinions Offered by Phillip Goldstein.</u> [Dkt. No. 100 (*Sivolella*); Dkt. No. 51 (*Sanford*)]

As set forth in greater detail in Defendants' previously filed Motion to Strike, Defendants seek to strike the expert testimony offered by Mr. Goldstein and preclude Mr. Goldstein from offering opinion testimony concerning:

a.    The care and conscientiousness exercised by the statutorily independent trustees of EQAT, on the grounds that Mr. Goldstein's opinions (i) constitute improper legal conclusions that Mr. Goldstein is not qualified to provide, and (ii) are ipse dixit based on unsupported factual assertions derived from improper and unreliable inferences;

b.    A narrative of selected facts, as such testimony is (i) beyond the scope of permissible expert testimony, and (ii) premised on subjective relevance and credibility determinations regarding the available evidence;

c.    The services provided to the Funds by Defendants, on the grounds that Mr. Goldstein's opinion is unreliable because (i) it lacks foundation and is not a proper subject of expert testimony, and (ii) is based on a selective review of available evidence;

d.  Defendants' expense allocation methodology, on the grounds that (i) Mr. Goldstein is not an accounting expert and thus is not qualified to opine on this topic, and (ii) his opinion on this topic rests entirely on *ipse dixit*;

e.  The "independence" of external counsel to the Funds or the Independent Trustees, on the grounds that it is unreliable because Mr. Goldstein (i) lacks support for these opinions, and (ii) identifies no conflicts concerning counsel's independence;

f.  The Independent Trustees' response to purportedly "poor" fund performance, on the grounds that Mr. Goldstein's opinion lacks foundation;

g.  The Independent Trustees' consideration of purported "fall out benefits," on the grounds that: (i) Mr. Goldstein lacks the necessary qualifications and expertise; (ii) such testimony is unreliable because he failed to review most materials provided to the Board; and (iii) his opinions concerning what the Trustees "should have done" regarding the consideration of fall out benefits lacks any support in the law, or industry custom and practice;

h.  The Trustees' consideration of purported "economies of scale," on the grounds that (i) Mr. Goldstein is not an economist and thus is not qualified to offer opinions on this topic; and (ii) he failed to conduct the threshold analysis required to determine whether FMG realized any economies of scale.  Thus, any opinions offered by Mr. Goldstein on this topic lack foundation and are unreliable;

i.  Whether the investment management and administrative fees paid by the Funds to FMG bear a "reasonable relationship" to the services that Defendants provide to the Funds, on the grounds that: (i) such testimony constitutes an improper conclusion on the ultimate legal question in this case; (ii) Mr. Goldstein does not reference any relevant data concerning the fees on which he opines; and (iii) this opinion is based on Mr. Goldstein's unsupported assumptions; and

j.  Evidence neither cited nor considered by Mr. Goldstein in his expert reports.

6

3.        <u>Defendants' Motion to Strike the Expert Opinions Offered by Steve</u> <u>Pomerantz.</u> [Dkt. No. 99 (*Sivolella*); Dkt. No. 52 (*Sanford*)]

As set forth in greater detail in Defendants' previously filed Motion to Strike, Defendants seek to strike the expert testimony offered by Dr. Pomerantz from offering opinion testimony concerning:

      a.      The services that Defendants perform for the Funds, as compared to the services Defendants purportedly delegate to the Subadvisers and Subadministrator, on the grounds that this is not a proper subject of expert testimony and Dr. Pomerantz: (i) lacks expertise on this topic; (ii) based his opinions on subjective determinations of relevance and credibility, legal issues that are reserved for the Court; (iii) improperly based his conclusions on his subjective interpretation of various contracts, but lacks any qualification to offer legal conclusions concerning contractual interpretation; and (iv) failed to support his opinions by reference to, or analysis of, reliable data;

      b.      The services the Independent Trustees purportedly "should have performed," on the grounds that such opinions are unreliable because Dr. Pomerantz's opinions on this topic (i) are supported only by his own ipse dixit, and (ii) are based on unsupported assumptions concerning the services Defendants' perform;

      c.      Defendants' profitability, on the grounds that Dr. Pomerantz: (i) lacks accounting experience or education, and thus is not qualified to offer an opinion on this topic because profitability cannot be calculated absent consideration of expenses that Dr. Pomerantz improperly ignores; (ii) employs unreliable calculations because he fails to explain or cite relevant data to support them; and (iii) ignores numerous expenses of Defendants, including allocated expenses and subadvisory expenses;

      d.      Purported "economies of scale," on the grounds that Dr. Pomerantz failed to conduct the analysis required to determine whether Defendants realize any economies of scale. Thus, any opinions offered by Dr. Pomerantz on this topic are unreliable. Dr. Pomerantz's opinions on the topic are also unreliable because he: (i) ignores Defendants' total costs, including changes to those costs over time; (ii) failed to conduct an analysis of Defendants' per unit costs; and (iii)

ignores means by which Defendants' shared potential economies of scale;

e.     Defendants' purported "fall-out benefits," on the grounds that Dr. Pomerantz's opinion is: (i) based on an improper legal conclusion that he is not qualified to provide; and (ii) improperly relies on Mr. Barrett's flawed calculations; and

f.     Plaintiffs' purported damages, on the grounds that his calculations (i) lack foundation and (ii) employ an inappropriate "cost-plus" approach to damages.

4.     Defendants' Motion to Strike the Expert Opinions Offered by Richard W. Kopcke and Francis M. Vitagliano. [Dkt. No. 102 (*Sivolella*); Dkt. No. 53 (*Sanford*)]

As set forth in greater detail in Defendants' previously filed Motion to Strike, Defendants seek to strike the expert testimony of Messrs. Kopcke and Vitagliano and to preclude either of them from offering opinion testimony concerning:

a.     Defendants' investment management fees, on the grounds that Messrs. Kopcke and Vitagliano's opinions are (i) improper legal conclusions that they are not qualified to provide, and (ii) based on improper and unreliable assertions that Messrs. Kopcke and Vitagliano did not investigate;

b.     Defendants' administration fees, on the grounds that Messrs. Kopcke and Vitagliano's opinions are (i) improper legal conclusions that they are not qualified to provide, and (ii) based on improper and unreliable assertions that are supported only by Messrs. Kopcke and Vitagliano's ipse dixit;

c.     Investment management or administrative services provided by Defendants, and which of these services Defendants delegated to the Funds' Subadvisers and the Subadministrator, on the grounds that this is not a proper subject of expert testimony and Messrs. Kopcke and Vitagliano: (i) have no expertise relevant to determining what services Defendants provide; (ii) conducted no investigation to support their opinion aside from reading certain contracts; (iii) are not qualified to interpret contracts, a legal analysis reserved for the Court; and (iv) disregarded evidence that contradicted their opinions;

8

      d.     What represents an "arm's length fee" or "reasonable fee" for the investment management and administrative services provided by Defendants, on the grounds that: (i) Messrs. Kopcke and Vitagliano lack the expertise to opine on these issues; (ii) these opinions constitute improper legal conclusions that Messrs. Kopcke and Vitagliano are not qualified to provide; (iii) their calculations are not supported by any data; and (iv) they rely on their own ipse dixit and unfounded assumptions concerning the services Defendants actually provide to the Funds;

      e.     The sharing of potential economies of scale, on the grounds that Messrs. Kopcke and Vitagliano failed to conduct the threshold analysis required to determine whether Defendants realize any economies of scale in managing or administering the Funds. Thus, any opinions offered by Messrs. Kopcke and Vitagliano on this topic lack foundation and are unreliable; and

      f.     Any topic because Messrs. Kopcke and Vitagliano co-signed their expert reports without disclosing the division of work, in violation of Federal Rule of Civil Procedure 26.

5.     Defendants also intend to move to preclude Plaintiffs from introducing deposition testimony taken from a non-party, Harvey Rosen, in a separate action to which Defendants were not parties.

      a.     Plaintiffs intend to introduce selected portions of a deposition transcript of Mr. Harvey Rosen, taken in connection with an entirely separate legal proceeding. Defendants will move to preclude the introduction of this testimony.

      b.     Defendants object to Plaintiffs' use of Harvey Rosen's testimony on the grounds that it is hearsay that is not subject to the "former testimony" hearsay exception set forth in Rule 804(b)(1) of the Federal Rules of Evidence. Mr. Rosen is an employee of JPMorgan Chase Bank, N.A. ("JPMorgan") and a resident of Massachusetts. Mr. Rosen was deposed on February 4, 2015 in an entirely different action brought by Plaintiffs' counsel, to which Defendants are not parties— *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083 (D.N.J.). Federal Rule of Evidence 804(b)(1) provides that such testimony is not admissible unless it is "offered against a party who had – or, in a civil case, whose predecessor in interest had – an

opportunity and similar motive to develop it by direct, cross-, or redirect examination." Plaintiffs cannot meet this exception on its face. Neither Defendant is a party nor a predecessor in interest to any party in the *Kasilag* matter and thus neither had an opportunity to develop any testimony during Mr. Rosen's deposition by direct, cross, or redirect examination. Defendants and Plaintiffs also have no agreement to allow Mr. Rosen's deposition testimony in this matter.

## 3.   STIPULATION OF FACTS

The parties hereby agree and stipulate to the following undisputed facts at trial:[3]

### I.   General Background

1.   Plaintiffs are parties to variable annuity contracts with AXA Equitable Life Insurance Company ("AXA").[4]

2.   Variable annuity contract-holders contribute money to a variable annuity and then allocate those contributions to one or more investment options offered within the variable annuity.

3.   A mutual fund is a pool of stocks, bonds or other investments.

4.   Plaintiffs have allocated contributions to their variable annuities to one or more of the following twelve (12) mutual funds (the "Funds"):

  a) EQ/Common Stock Index Portfolio;

  b) EQ/Core Bond Index Portfolio;

  c) EQ/Equity 500 Index Portfolio;

---

[3] The Stipulated Facts set forth herein are without prejudice to any evidentiary objections to the relevance of any Stipulated Fact and/or motion by any party to this action.

[4] AXA was formerly known as The Equitable Life Assurance Society of the United States. As used herein, "AXA" refers to both AXA Equitable Life Insurance Company and The Equitable Life Assurance Society of the United States.

    d)  EQ/Equity Growth PLUS Portfolio;[5]
    e)  EQ/GAMCO Small Company Value Portfolio;

    f)  EQ/Global Bond PLUS Portfolio;

    g)  EQ/Global Multi-Sector Equity Portfolio;[6]

    h)  EQ/Intermediate Government Bond Index Portfolio;[7]

    i)  EQ/Large Cap Value PLUS Portfolio;[8]

    j)  EQ/Mid Cap Value PLUS Portfolio;[9]

    k)  EQ/PIMCO Ultra Short Bond Portfolio; and

    l)  EQ/T. Rowe Price Growth Stock Portfolio.

5.     The EQ Advisors Trust ("EQAT") is a Delaware statutory trust and is registered with the U.S. Securities and Exchange Commission ("SEC") as an investment company under the Investment Company Act of 1940 and its shares are registered with the SEC under the Securities Act of 1933.

6.     The EQAT is comprised of a number of mutual funds or portfolios.  As of May 1, 2010, the EQAT had 65 distinct portfolios, and as of May 1, 2015, EQAT had 86 distinct portfolios.

7.     Each Fund is a portfolio of EQAT.

---

[5] In 2014, the assets of the EQ/Equity Growth PLUS Portfolio were acquired by the EQ/Large Cap Growth PLUS Portfolio, which was renamed the AXA Large Cap Growth Managed Volatility Portfolio.

[6] In 2014, the EQ/Global Multi-Sector Equity Portfolio was renamed the AXA Global Equity Managed Volatility Portfolio.

[7] In 2012, the EQ/Intermediate Government Bond Index Portfolio was renamed the EQ/Intermediate Government Bond Portfolio.

[8] In 2014, the EQ/Large Cap Value PLUS Portfolio was renamed the AXA Large Cap Value Managed Volatility Portfolio.

[9] In 2014, the EQ/Mid Cap Value PLUS Portfolio was renamed the AXA Mid Cap Value Managed Volatility Portfolio.

8.      Plaintiff Sivolella allocated contributions to her variable annuity to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Intermediate Government Bond Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, and the EQ/Mid Cap Value PLUS Portfolio.

9.      Plaintiff Sanford allocated contributions to his variable annuity to the EQ/GAMCO Small Company Value Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Large Cap Value PLUS Portfolio, and the EQ/T. Rowe Price Growth Stock Portfolio.

10.     Plaintiffs Mary and Robert Cusack allocated contributions to their variable annuity to the EQ/Core Bond Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, and the EQ/Mid Cap Value PLUS Portfolio.

11.     Plaintiff Lynn allocated contributions to her variable annuity to the EQ/GAMCO Small Company Value Portfolio, the EQ/Global Bond PLUS Portfolio, the EQ/Mid Cap Value PLUS Portfolio, and the EQ/PIMCO Ultra Short Bond Portfolio.

12.     Plaintiff Sanchez allocated contributions to his variable annuity to the EQ/Global Multi-Sector Equity Portfolio and the EQ/Large Cap Value PLUS Portfolio.

13.     Plaintiff Tucker allocated contributions to his variable annuity to the EQ/GAMCO Small Company Value Portfolio and the EQ/T. Rowe Price Growth Stock Portfolio.

14.     AXA served as the Funds' investment manager and administrator from at least May 1, 2000 until May 1, 2011, when AXA Equitable Funds Management Group, LLC ("FMG," together with AXA, "Defendants") started serving as the Funds' investment manager and administrator.

15.     FMG is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940. Prior to May 1, 2011, AXA was registered with the SEC as an investment adviser under the Investment Advisers Act of 1940.

16.     FMG is currently a wholly-owned subsidiary of AXA.

12

17.    FMG was previously a business unit within AXA, and was established as a separate legal entity and wholly-owned subsidiary of AXA on February 11, 2011.

## II.    Investment Management Agreements

18.    On and after May 1, 2011, FMG had two Investment Management Agreements (as amended) with EQAT relating to the Funds ("FMG Investment Management Agreements"). One of the FMG Investment Management Agreements applies to three of the Funds (EQ/GAMCO Small Company Value, EQ/PIMCO Ultra Short Bond, and EQ/T. Rowe Price Growth Stock Portfolios) and the other FMG Investment Management Agreement applies to the other nine Funds (EQ/Common Stock Index, EQ/Core Bond Index, EQ/Equity 500 Index, EQ/Equity Growth PLUS, EQ/Global Bond PLUS, EQ/Global Multi-Sector Equity, EQ/Intermediate Government Bond Index, EQ/Large Cap Value PLUS, and EQ/Mid Cap Value PLUS Portfolios).

19.    Prior to May 1, 2011, AXA had two Investment Management Agreements with EQAT relating to the Funds ("AXA Investment Management Agreements, and together with the FMG Investment Management Agreements, the "Investment Management Agreements"). One of the AXA Investment Management Agreements applied to three of the Funds (EQ/GAMCO Small Company Value, EQ/PIMCO Ultra Short Bond, and EQ/T. Rowe Price Growth Stock Portfolios) and the other AXA Investment Management Agreement applied to the other nine Funds (EQ/Common Stock Index, EQ/Core Bond Index, EQ/Equity 500 Index, EQ/Equity Growth PLUS, EQ/Global Bond PLUS, EQ/Global Multi-Sector Equity, EQ/Intermediate Government Bond Index, EQ/Large Cap Value PLUS, and EQ/Mid Cap Value PLUS Portfolios).

20.    The Investment Management Agreements contain or contained the following fee schedules:

**1. EQ/Common Stock Index Portfolio**

| EQ/Common Stock Index Portfolio Fee Schedule Under Investment Management Agreements |
| --- |
| 2010 – 8/31/2011<br>0.350% (fee on all assets) |
| 9/1/2011 – 8/31/2012<br>0.350% on first $4 billion of assets<br>0.340% thereafter |

| |
|---|
| **9/1/2012 – 8/31/2013** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% thereafter |
| **9/1/2013 – 8/31/2015** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% on next $2 billion of assets |
| 0.320% thereafter |
| **9/1/2015** |
| 0.350% on first $2 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.320% on next $3 billion of assets |
| 0.310% on next $2 billion of assets |
| 0.300% thereafter |

**2. EQ/Core Bond Index Portfolio**

| **EQ/Core Bond Index Portfolio Fee Schedule Under Investment Management Agreements** |
|---|
| **2010 – 8/31/2011** |
| 0.350% (fee on all assets) |
| **9/1/2011 – 8/31/2012** |
| 0.350% on first $4 billion of assets |
| 0.340% thereafter |
| **9/1/2012 – 8/31/2013** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% thereafter |
| **9/1/2013 – 8/31/2015** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% on next $2 billion of assets |
| 0.320% thereafter |
| **9/1/2015** |
| 0.350% on first $2 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.320% on next $3 billion of assets |
| 0.310% on next $2 billion of assets |

| 0.300% thereafter |
|---|

### 3. EQ/Equity 500 Index Portfolio

| EQ/Equity 500 Index Portfolio Fee Schedule Under Investment Management Agreements |
|---|
| **2010 – 8/31/2011**<br>0.250% (fee on all assets) |
| **9/1/2011 – 8/31/2012**<br>0.250% on first $4 billion of assets<br>0.240% thereafter |
| **9/1/2012 – 8/31/2013**<br>0.250% on first $4 billion of assets<br>0.240% on next $4 billion of assets<br>0.230% thereafter |
| **9/1/2013 – 8/31/2015**<br>0.250% on first $4 billion of assets<br>0.240% on next $4 billion of assets<br>0.230% on next $2 billion of assets<br>0.220% thereafter |
| **9/1/2015**<br>0.250% on first $2 billion of assets<br>0.240% on next $4 billion of assets<br>0.220% on next $3 billion of assets<br>0.210% on next $2 billion of assets<br>0.200% thereafter |

### 4. EQ/Equity Growth PLUS Portfolio

| EQ/Equity Growth PLUS Portfolio Fee Schedule Under Investment Management Agreements |
|---|
| **2010 – 2014**<br>0.500% on first $2 billion of assets<br>0.450% on next $1 billion of assets<br>0.425% on next $3 billion of assets<br>0.400% on next $5 billion of assets<br>0.375% thereafter |

5. **EQ/GAMCO Small Company Value Portfolio**

| EQ/GAMCO Small Company Value Portfolio Fee Schedule Under Investment Management Agreements |
| --- |
| **2010 – 8/31/2012** 0.800% on first $400 million of assets 0.750% on next $400 million of assets 0.700% thereafter |
| **9/1/2012 – 2015** 0.750% on first $1 billion of assets 0.700% on next $1 billion of assets 0.675% on next $3 billion of assets 0.650% on next $5 billion of assets 0.625% thereafter |

6. **EQ/Global Bond PLUS Portfolio**

| EQ/Global Bond PLUS Portfolio Fee Schedule Under Investment Management Agreements |
| --- |
| **2010 – 8/31/2015** 0.550% on first $4 billion of assets 0.530% on next $4 billion of assets 0.510% thereafter |
| **9/1/2015** 0.550% on first $2 billion of assets 0.530% on next $4 billion of assets 0.510% on next $3 billion of assets 0.490% on next $2 billion of assets 0.480% thereafter |

7. **EQ/Global Multi-Sector Equity Portfolio**

| EQ/Global Multi-Sector Equity Portfolio Fee Schedule Under Investment Management Agreements |
| --- |
| **2010 – 2015** 0.750% on first $1 billion of assets 0.700% on next $1 billion of assets |

| 0.675% on next $3 billion of assets |
| 0.650% on next $5 billion of assets |
| 0.625% thereafter |

## 8. EQ/Intermediate Government Bond Index Portfolio

| EQ/Intermediate Government Bond Index Portfolio Fee Schedule Under Investment Management Agreements |
|---|
| **2010 – 8/31/2011** |
| 0.350% (fee on all assets) |
| **9/1/2011 – 8/31/2012** |
| 0.350% on first $4 billion of assets |
| 0.340% thereafter |
| **9/1/2012 – 8/31/2013** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% thereafter |
| **9/1/2013 – 8/31/2015** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% on next $2 billion of assets |
| 0.320% thereafter |
| **9/1/2015** |
| 0.350% on first $2 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.320% on next $3 billion of assets |
| 0.310% on next $2 billion of assets |
| 0.300% thereafter |

## 9. EQ/Large Cap Value PLUS Portfolio

| EQ/Large Cap Value PLUS Portfolio Fee Schedule Under Investment Management Agreements |
|---|
| **2010 – 2015** |
| 0.500% on first $2 billion of assets |
| 0.450% on next $1 billion of assets |
| 0.425% on next $3 billion of assets |
| 0.400% on next $5 billion of assets |
| 0.375% thereafter |

10. EQ/Mid Cap Value PLUS Portfolio

| EQ/Mid Cap Value PLUS Portfolio Fee Schedule Under Investment Management Agreements |
| --- |
| 2010 – 2015<br>0.550% on first $2 billion of assets<br>0.500% on next $1 billion of assets<br>0.475% on next $3 billion of assets<br>0.450% on next $5 billion of assets<br>0.425% thereafter |

11. EQ/PIMCO Ultra Short Bond Portfolio

| EQ/PIMCO Ultra Short Bond Portfolio Fee Schedule Under Investment Management Agreements |
| --- |
| 2010 – 2015<br>0.500% on first $750 million of assets<br>0.475% on next $750 million of assets<br>0.450% on next $1 billion of assets<br>0.430% on next $2.5 billion of assets<br>0.420% thereafter |

12. EQ/T. Rowe Price Growth Stock Portfolio

| EQ/T. Rowe Price Growth Stock Portfolio Fee Schedule Under Investment Management Agreements |
| --- |
| 2010 – 8/31/2012<br>0.800% on first $400 million of assets<br>0.750% on next $400 million of assets<br>0.700% thereafter |
| 9/1/2012 – 2015<br>0.750% on first $1 billion of assets<br>0.700% on next $1 billion of assets<br>0.675% on next $3 billion of assets<br>0.650% on next $5 billion of assets<br>0.625% thereafter |

### III.    Sub-Advisory Agreements

21.    For all years at issue in this action, Defendants contracted with third-parties called "Sub-Advisers".

22.    For all years at issue in this action, the Sub-Advisers were paid a subadvisory fee ("Sub-Advisory Fee") pursuant to the Investment Advisory Agreements.

### IV.    The Sub-Advisers

23.    From July 2010, to the date of these Stipulated Facts, the Sub-Adviser for the EQ/Common Stock Index Portfolio was AllianceBernstein, L.P.

24.    From January 2012 to the date of these Stipulated Facts, the Sub-Adviser for the EQ/Core Bond Index Portfolio was SSgA Funds Management, Inc.

25.    From July 2010 to the date of these Stipulated Facts, the Sub-Adviser for the EQ/Equity 500 Index Portfolio was AllianceBernstein, L.P.

26.    From July 2010 to June 20, 2014 (when the EQ/Equity Growth PLUS Portfolio was acquired by the EQ/Large Cap Growth PLUS Portfolio), the Sub-Adviser for the active sleeve of the EQ/Equity Growth PLUS Portfolio was BlackRock Capital Management, Inc. and the Sub-Adviser for the index sleeve was BlackRock Investment Management, LLC.

27.    From July 2010 to the date of these Stipulated Facts, the Sub-Adviser for the EQ/GAMCO Small Company Value Portfolio was GAMCO Asset Management, Inc.

28.    From January 2012 to the date of these Stipulated Facts, the Sub-Adviser for the active sleeve of the EQ/Global Bond PLUS Portfolio was First International Advisors, LLC & Wells Capital Management, Inc. and the Sub-Adviser for the index sleeve was BlackRock Investment Management, LLC.

29.    From July 2010 to July 2013, the Sub-Adviser for the active sleeve of the EQ/Global Multi-Sector Equity Portfolio was Morgan Stanley Investment Management, Inc. and the Sub-Adviser for the index sleeve was BlackRock Investment Management, LLC.  From July 2013 to the date of these Stipulated Facts, the Sub-Adviser for one active sleeve of the EQ/Global Multi-Sector Equity

19

Portfolio was Morgan Stanley Investment Management, Inc., the Sub-Adviser for the second active sleeve was OppenheimerFunds, Inc., and the Sub-Adviser for the index sleeve was BlackRock Investment Management, LLC.

30.     From July 2010 to the date of these Stipulated Facts, the Sub-Adviser for the EQ/Intermediate Government Bond Index Portfolio was SSgA Funds Management, Inc.

31.     From July 2010 to July 2013, the Sub-Adviser for the active and index sleeves of the EQ/Large Cap Value PLUS Portfolio was AllianceBernstein, L.P. From July 2013 to May 2014, the Sub-Adviser for the index sleeve and one active sleeve of the EQ/Large Cap Value PLUS Portfolio was AllianceBernstein L.P., the Sub-Adviser for the second active sleeve was BlackRock Investment Management, LLC, and FMG managed ETFs in the Portfolio's ETF sleeve. From May 2014 to the date of these Stipulated Facts, the Sub-Adviser for the index sleeve and one active sleeve of the EQ/Large Cap Value PLUS Portfolio was AllianceBernstein L.P., the Sub-Adviser for the second active sleeve was BlackRock Investment Management, LLC, the Sub-Adviser for the third active sleeve was Massachusetts Financial Services Company d/b/a MFS Investment Management, and FMG managed ETFs in the Portfolio's ETF sleeve.

32.     From July 2010 to June 2013, the Sub-Adviser for the index sleeve of the EQ/Mid Cap Value PLUS Portfolio was BlackRock Investment Management, LLC, the Sub-Adviser for the active sleeve was Wellington Management Company, LLP, and AXA (until May 1, 2011) and FMG (from May 1, 2011 forward) managed ETFs in the Portfolio's ETF sleeve. From June 2013 to the date of these Stipulated Facts, the Sub-Adviser for the index sleeve of the EQ/Mid Cap Value PLUS Portfolio was BlackRock Investment Management, LLC, the Sub-Adviser for one active sleeve was Wellington Management Company LLP, the Sub-Adviser for the second active sleeve was Diamond Hill Capital Management, LLC, and FMG managed ETFs in the Portfolio's ETF sleeve.

33.     From January 2012 to the date of these Stipulated Facts, the Sub-Adviser for the EQ/PIMCO Ultra Short Bond Portfolio was Pacific Investment Management Company, LLC.

34.     From January 2012 to the date of these Stipulated Facts, the Sub-Adviser for the EQ/T. Rowe Price Growth Stock Portfolio was T. Rowe Price Associates, Inc.

## V.    Administrative Agreement

35.    On and after May 1, 2011, FMG had a Mutual Funds Service Agreement ("FMG Administrative Agreement") with EQAT relating to the Funds.  The FMG Administrative Agreement was amended and restated as of April 1, 2015.

36.    From May 1, 2000 to May 1, 2011, AXA had a Mutual Funds Service Agreement with EQAT relating to the Funds ("AXA Administrative Agreement" and together with FMG Administrative Agreement, the "Administrative Agreements").

37.    The Administrative Agreements contain or contained the following fee schedules:

1.  **For the Single-Advised Portfolios (EQ/Common Stock Index Portfolio, EQ/Core Bond Index Portfolio, EQ/Equity 500 Index Portfolio, EQ/GAMCO Small Company Value Portfolio, EQ/Intermediate Government Bond Index Portfolio, EQ/PIMCO Ultra Short Bond Portfolio, EQ/T. Rowe Price Growth Stock Portfolio)**

| Single-Advised Portfolios<br>Fee Schedule Under Administrative Agreement |
| --- |
| **2010 – 8/31/2013** |
| 0.120% on first $3 billion of assets |
| 0.110% on next $3 billion of assets |
| 0.105% on next $4 billion of assets |
| 0.100% on the next $20 billion of assets |
| 0.0975% thereafter based on aggregate average daily net assets of the Portfolios |
| Plus $30,000 per Portfolio |
| **9/1/2013 – 8/31/2014** |
| 0.120% on first $3 billion of assets |
| 0.110% on next $3 billion of assets |
| 0.105% on next $4 billion of assets |
| 0.100% on the next $20 billion of assets |
| 0.0975% thereafter based on aggregate average daily net assets of the Single-Advised Portfolios |
| Plus $30,000 for each Portfolio with average net assets of less than $5 billion. |

| 9/1/2014 – 2015 |
| --- |
| Greater of $30,000 per Portfolio or,<br>0.120% of first $3 billion of assets<br>0.110% of next $3 billion of assets<br>0.105% of next $4 billion of assets<br>0.100% of next $20 billion of assets<br>0.0975% of next $10 billion of assets<br>0.0950% thereafter based on aggregate average daily net assets of the Single-Advised Portfolios |

2. **For the Multi-Subadvised/Hybrid Portfolios (EQ/Equity Growth PLUS Portfolio, EQ/Global Bond PLUS Portfolio, EQ/Global Multi-Sector Equity Portfolio, EQ/Large Cap Value PLUS Portfolio, EQ/Mid Cap Value PLUS Portfolio)**

| Multi-Subadvised/"Hybrid" Portfolios<br>Fee Schedule Under Administrative Agreement |
| --- |
| **5/1/2009 – 7/31/2010**<br>0.150% of each Portfolio's average daily net assets<br>Plus $35,000 per Portfolio<br>Plus $35,000 for each allocated portion of the Portfolio |
| **8/1/2010 – 8/31/2013**<br>0.150% on first $20 billion of assets<br>0.125% on next $5 billion of assets<br>0.100% thereafter based on aggregate average daily net assets of the Hybrid Portfolios<br>Plus $32,500 per Portfolio<br>Plus $32,500 for each allocated portion of the Portfolio[10] |
| **9/1/2013 – 8/31/2014**<br>0.150% on first $20 billion of assets<br>0.110% on next $5 billion of assets<br>0.100% thereafter based on aggregate average daily net assets of the Hybrid Portfolios<br>Plus $32,500 for each Portfolio with average net assets of less than $5 billion |
| **9/1/2014 – 8/31/2015**<br>Greater of $32,500 per Portfolio or,<br>0.150% on first $15 billion of assets |

---

[10] From September 1, 2012 to August 31, 2013, the $32,500 fee for each allocated portion of the Portfolios only applied to Portfolios for which separate custodial services were provided.

| |
|---|
| 0.110% of next $5 billion of assets<br>0.100% thereafter based on aggregate average daily net assets of the<br>Hybrid Portfolios |
| **9/1/2015**<br>Greater of $32,500 per Portfolio or,<br>0.150% on first $14 billion of assets<br>0.110% on next $6 billion of assets<br>0.100% on next $5 billion of assets<br>0.0975% thereafter based on aggregate average daily net assets of the<br>Hybrid Portfolios |

## VI.    Sub-Administration Agreement

38.    On and after May 1, 2011, FMG contracted with JPMorgan Chase Bank N.A. ("JPMorgan") as a sub-administrator.

39.    From May 1, 2000 to May 1, 2011, AXA contracted with Chase Global Funds Services Company as a sub-administrator (together with JPMorgan, the "Sub-Administrator").

40.    Defendants entered into Mutual Funds Sub-Administration Agreements ("Sub-Administration Agreements") with the Sub-Administrator.  The Sub-Administration Agreement between FMG and JPMorgan was amended and restated as of April 1, 2015.

41.    For all years at issue in this action, the Sub-Administrator was paid a sub-administration fee ("Sub-Administration Fee") pursuant to the Sub-Administration Agreements.

## VII.   Sub-Advisory Fees

42.    The amount of the Sub-Advisory Fees, which are calculated at an annual rate and paid at the end of each calendar month, were determined pursuant to the following schedules:

23

1. **EQ/Common Stock Index Portfolio**

| Fee Schedule Under Subadvisory Agreement (AllianceBernstein L.P.) |
|---|
| **2010 – 2014**<br>0.050% on all assets |

2. **EQ/Core Bond Index Portfolio**

| Fee Schedule Under Subadvisory Agreement (SSgA Funds Management, Inc.) |
|---|
| **2010 – 2014**<br>0.020% on first $2 billion of assets<br>0.015% thereafter |

3. **EQ/Equity 500 Index Portfolio**

| Fee Schedule Under Subadvisory Agreement (AllianceBernstein L.P.) |
|---|
| **2010 – 2014**<br>0.050% on first $1 billion of assets<br>0.030% thereafter |

4. **EQ/Equity Growth PLUS Portfolio**

| Fee Schedule Under Subadvisory Agreement (BlackRock Investment Management LLC) (fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser)[11] |
|---|
| **2010 – 2014**<br>**Index Allocated Portion**<br>0.075% on first $5 billion of assets<br>0.055% on next $5 billion of assets<br>0.050% thereafter |

---

[11] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

| 2010 – 2014 |
| --- |
| **Active Allocated Portion**[12] |
| 0.400% on first $100 million of assets |
| 0.375% on next $200 million of assets |
| 0.350% on next $200 million of assets |
| 0.325% on next $500 million of assets |
| 0.300% thereafter |

## 5. EQ/GAMCO Small Company Value Portfolio

| Fee Schedule Under Subadvisory Agreement (GAMCO Asset Management, Inc.) |
| --- |
| **2010 – 2014** |
| 0.400% on first $1 billion of assets |
| 0.300% thereafter |

## 6. EQ/Global Bond PLUS Portfolio

| Fee Schedule Under Subadvisory Agreement (BlackRock Investment Management LLC) (fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser) |
| --- |
| **2011 – 2014** |
| 0.020% on all assets |

| Fee Schedule Under Subadvisory Agreement (Wells Capital Management Inc. and First International Advisors) (fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser) |
| --- |
| **2010 – 2014** |
| 0.300% on first $100 million of assets |

---

[12] The Active Allocated Portion of this Portfolio was subadvised by BlackRock Capital Management, Inc.

| 0.200% on next $50 million of assets<br>0.150% thereafter |
| --- |

## 7. EQ/Global Multi-Sector Equity Portfolio

| **Fee Schedule Under Subadvisory Agreement (Morgan Stanley Investment Management, Inc.)** (fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser) |
| --- |
| **2010 – 2014**<br>1.000% on first $100 million of assets<br>0.800% on next $300 million of assets<br>0.600% on next $100 million of assets<br>0.400% thereafter |

| **Fee Schedule Under Subadvisory Agreement (BlackRock Investment Management LLC)** (fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser)[13] |
| --- |
| **2010 – 2014**<br>0.075% on first $5 billion of assets<br>0.055% on next $5 billion of assets<br>0.050% thereafter |

| **Fee Schedule Under Subadvisory Agreement (OppenheimerFunds, Inc.)** (fees based on the portion of the Portfolio's assets allocated to the Sub- |
| --- |

[13] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

| Adviser)[14] |
|---|
| **2013 -2014**<br>0.450% on first $50 million of assets<br>0.400% thereafter |

## 8. EQ/Intermediate Government Bond Index Portfolio

| **Fee Schedule Under Subadvisory Agreement**<br>**(SSgA Funds Management, Inc.)** |
|---|
| **2010 – 2014**<br>0.020% on first $2 billion of assets<br>0.015% thereafter |

## 9. EQ/Large Cap Value PLUS Portfolio

| **Fee Schedule Under Subadvisory Agreement**<br>**(AllianceBernstein L.P.)**<br>(fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser)[15] |
|---|
| **2010 – 2014**<br>**Active Allocated Portion**<br>0.490% on first $100 million of assets<br>0.300% on next $100 million of assets<br>0.250% thereafter |
| **July 2010 – 2014**<br>**Index Allocated Portion**<br>0.075% on first $5 billion of assets<br>0.055% on next $5 billion of assets<br>0.050% thereafter |

---

[14] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

[15] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

| Fee Schedule Under Subadvisory Agreement (BlackRock Investment Management LLC) (fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser)[16] |
| --- |
| **2013 – 2014**<br>0.400% on first $100 million of assets<br>0.375% on next $200 million of assets<br>0.350% on next $200 million of assets<br>0.325% on next $500 million of assets<br>0.300% thereafter |

| Fee Schedule Under Subadvisory Agreement (MFS Investment Management) (fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser)[17] |
| --- |
| **2014**<br>0.400% on first $300 million of assets<br>0.375% on next $300 million of assets<br>0.350%  thereafter |

## 10. EQ/Mid Cap Value PLUS Portfolio

| Fee Schedule Under Subadvisory Agreement (BlackRock Investment Management LLC) (fees based on the portion of the Portfolio's assets allocated to the Sub- |
| --- |

---

[16] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

[17] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

| Adviser)[18] |
| --- |
| **2010 – 2014**<br>0.075% on first $5 billion of assets<br>0.055% on next $5 billion of assets<br>0.050% thereafter |

| **Fee Schedule Under Subadvisory Agreement**<br>**(Wellington Management Company, LLP)**<br>(fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser) |
| --- |
| **2010 – 2014**<br>0.550% on first $150 million of assets<br>0.450% thereafter |

| **Fee Schedule Under Subadvisory Agreement**<br>**(Diamond Hill Capital Management LLC)**<br>(fees based on the portion of the Portfolio's assets allocated to the Sub-Adviser)[19] |
| --- |
| **2013 – 2014**<br>0.550% on first $50 million of assets<br>0.500% on next $50 million of assets<br>0.450% thereafter |

---

[18] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

[19] The portion of the Portfolio's assets allocated to the Sub-Adviser are aggregated with those of other portfolios or allocated portions that are managed by the Sub-Adviser and have the same investment strategy.

**11. EQ/PIMCO Ultra Short Bond Portfolio**

| Fee Schedule Under Subadvisory Agreement (Pacific Investment Management Company LLC) |
|---|
| **2010 – 2014** |
| 0.150% on all assets |

**12. EQ/T. Rowe Price Growth Stock Portfolio**

| Fee Schedule Under Subadvisory Agreement (T. Rowe Price Associates, Inc.) |
|---|
| **2010 – 2014** |
| 0.400% on first $250 million of assets |
| 0.375% on next $250 million of assets |
| 0.350% on next $500 million of assets |
| 0.350% fee on all assets once assets exceed $1 billion |

43.    The Sub-Advisory Fees paid to the Sub-Adviser with respect to the EQ/Common Stock Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $2,421,062 | $2,449,890 | $2,390,873 | $2,625,765 | $2,832,443 | $12,720,033 |

44.    The Sub-Advisory Fees paid to the Sub-Adviser with respect to the EQ/Core Bond Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $921,872 | $1,125,066 | $1,060,703 | $1,194,221 | $1,355,503 | $5,657,365 |

45.    The Sub-Advisory Fees paid to the Sub-Adviser with respect to the EQ/Equity 500 Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $1,028,713 | $1,076,679 | $1,109,128 | $1,275,835 | $1,438,523 | $5,928,878 |

30

46.    The Sub-Advisory Fees paid to the Sub-Advisers with respect to the EQ/Equity Growth PLUS Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $2,385,935 | $2,405,695 | $2,150,730 | $1,485,340 | $356,852 | $8,784,552 |

47.    The Sub-Advisory Fees paid to the Sub-Adviser with respect to the EQ/GAMCO Small Company Value Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $5,925,175 | $7,225,765 | $7,480,437 | $9,196,650 | $10,028,593 | $39,856,620 |

48.    The Sub-Advisory Fees paid to the Sub-Advisers with respect to the EQ/Global Bond PLUS Fund from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $956,144 | $992,944 | $637,460 | $463,539 | $372,513 | $3,422,600 |

49.    The Sub-Advisory Fees paid to the Sub-Advisers with respect to the EQ/Global Multi-Sector Equity Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $5,016,325 | $5,078,750 | $4,675,472 | $5,200,176 | $5,514,057 | $25,484,780 |

50.    The Sub-Advisory Fees paid to the Sub-Adviser with respect to the EQ/Intermediate Government Bond Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $364,906 | $426,437 | $1,202,720 | $1,247,383 | $1,280,777 | $4,522,223 |

51.    The Sub-Advisory Fees paid to the Sub-Advisers with respect to the EQ/Large Cap Value PLUS Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $4,816,204 | $4,542,377 | $4,124,604 | $5,756,966 | $9,082,261 | $28,322,411 |

52.    The Sub-Advisory Fees paid to the Sub-Advisers with respect to the EQ/Mid Cap Value PLUS Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $2,841,598 | $3,230,044 | $2,978,533 | $3,690,923 | $4,112,725 | $16,853,823 |

53.    The Sub-Advisory Fees paid to the Sub-Adviser with respect to the EQ/PIMCO Ultra Short Bond Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|------|------|------|------|------|-------|
| $4,218,396 | $5,232,548 | $4,963,499 | $4,094,348 | $3,080,987 | $21,589,778 |

54.    The Sub-Advisory Fees paid to the Sub-Adviser with respect to the EQ/T. Rowe Price Growth Stock Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|------|------|------|------|------|-------|
| $2,361,687 | $2,806,118 | $3,136,555 | $2,647,404 | $2,242,946 | $13,194,710 |

## VIII. Sub-Administrative Fees

55.    The amount of the Sub-Administrative Fees were determined pursuant to the fee schedules set forth below:

> 1. **For the EQ/Common Stock Index Portfolio, EQ/Core Bond Index Portfolio, EQ/Equity 500 Index Portfolio, EQ/GAMCO Small Company Value Portfolio, EQ/Intermediate Government Bond Index Portfolio, EQ/PIMCO Ultra Short Bond Portfolio, EQ/T. Rowe Price Growth Stock Portfolio**

| Fee Schedule Under Sub-Administration Agreements 2010-2015 | |
|---|---|
| **Charges Based on AUM** | 0.0150% on first $3 billion of assets<br>0.0125%% on next $3 billion of assets<br>0.0100% on next $4 billion of assets<br>0.0075% on next $10 billion of assets |
| **Annual Fixed Charge** | $15,000 for Portfolios with assets less than $100 million<br>$20,000 for Portfolios with assets greater than $100 million |

**2. For the EQ/Equity Growth PLUS Portfolio, EQ/Global Bond PLUS Portfolio, EQ/Global Multi-Sector Portfolio, EQ/Large Cap Value PLUS Portfolio, EQ/Mid Cap Value PLUS Portfolio**

| Fee Schedule Under Sub-Administration Agreements 2010-2015 | |
| --- | --- |
| **Charges Based on AUM** | 0.0150% on first $3 billion of assets<br>0.0125% on next $3 billion of assets<br>0.0100% on next $4 billion of assets<br>0.0075% on next $10 billion of assets |
| **Annual Fixed Charge** | Composite fee $2,000<br>Per sleeve fee $25,000 |

56.   The fees paid to the Sub-Administrator with respect to the EQ/Common Stock Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
| --- | --- | --- | --- | --- | --- |
| $415,018 | $416,791 | $405,492 | $439,049 | $468,276 | $2,144,626 |

57.   The fees paid to the Sub-Administrator with respect to the EQ/Core Bond Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
| --- | --- | --- | --- | --- | --- |
| $466,801 | $573,526 | $536,341 | $601,994 | $682,325 | $2,860,987 |

58.   The fees paid to the Sub-Administrator with respect to the EQ/Equity 500 Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
| --- | --- | --- | --- | --- | --- |
| $245,347 | $256,658 | $264,299 | $306,131 | $346,674 | $1,419,109 |

59.   The fees paid to the Sub-Administrator with respect to the EQ/Equity Growth PLUS Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
| --- | --- | --- | --- | --- | --- |
| $199,876 | $194,455 | $181,200 | $141,463 | $45,687 | $762,681 |

60.   The fees paid to the Sub-Administrator with respect to the EQ/GAMCO Small Company Value Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
| --- | --- | --- | --- | --- | --- |

| | | | | | |
|---|---|---|---|---|---|
| $153,899 | $188,057 | $194,142 | $237,986 | $258,164 | $1,032,248 |

61.    The fees paid to the Sub-Administrator with respect to the EQ/Global Bond PLUS Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $158,936 | $163,813 | $115,672 | $94,840 | $77,340 | $610,601 |

62.    The fees paid to the Sub-Administrator with respect to the EQ/Global Multi-Sector Equity Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $274,546 | $268,694 | $246,385 | $272,800 | $292,546 | $1,354,971 |

63.    The fees paid to the Sub-Administrator with respect to the EQ/Intermediate Government Bond Index Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $168,857 | $197,862 | $612,627 | $630,419 | $642,921 | $2,252,686 |

64.    The fees paid to the Sub-Administrator with respect to the EQ/Large Cap Value PLUS Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $347,237 | $322,431 | $292,308 | $397,702 | $569,825 | $1,929,503 |

65.    The fees paid to the Sub-Administrator with respect to the EQ/Mid Cap Value PLUS Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $233,506 | $227,900 | $212,177 | $252,512 | $288,753 | $1,214,848 |

66.    The fees paid to the Sub-Administrator with respect to the EQ/PIMCO Ultra Short Bond Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|
| $249,451 | $302,548 | $286,771 | $237,980 | $182,553 | $1,259,303 |

67.    The fees paid to the Sub-Administrator with respect to the EQ/T. Rowe Price Growth Stock Portfolio from 2010 to 2014 were:

| 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|

34

| | | | | | |
|---|---|---|---|---|---|
| $70,829 | $81,292 | $90,808 | $81,439 | $71,801 | $396,169 |

## IX.     The EQAT Board

68.     With one exception,[20] the trustees on the EQAT Board are not employed by
FMG or AXA.

69.     Since July 2010, the trustees on the EQAT Board who are not employed by
FMG or AXA have included:

| NAME | TIME PERIOD |
|---|---|
| Theodossios Athanassiades | March 2000 to February 2014 |
| Jettie Edwards | March 1997 to March 2015 |
| Donald E. Foley | January 2014 to date of Stipulated Facts |
| David Fox | May 2000 to December 2012 |
| William Kearns, Jr. | March 1997 to December 2014 |
| Christopher Komisarjevsky | March 1997 to date of Stipulated Facts |
| H. Thomas McMeekin | January 2014 to date of Stipulated Facts |
| Harvey Rosenthal | March 1997 to date of Stipulated Facts |
| Gary Schpero | May 2000 to date of Stipulated Facts |
| Kenneth Walker | January 2012 to date of Stipulated Facts |
| Caroline Williams | January 2012 to date of Stipulated Facts |

70.     Morgan, Lewis & Bockius LLP[21] is legal counsel to the trustees on the
EQAT Board who are not employed by FMG or AXA.

71.     The Board has five regularly scheduled meetings each year, including four
quarterly meetings and an annual contract renewal meeting in July.

72.     K&L Gates LLP is legal counsel to the EQAT.

---

[20] The one exception is Steven M. Joenk.

[21]  The attorneys from Morgan, Lewis, & Bockius LLP who are counsel to the trustees on the
EQAT Board who are not employed by FMG or AXA were formerly affiliated with the law firm
Bingham McCutchen, LLP, which ceased operations in late November 2014.

4.     **PLAINTIFFS' CONTESTED FACTS (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).**

A.     **Plaintiffs intend to prove the following contested facts with regard to liability:**

      1.     Plaintiffs intend to prove the following facts pertaining to liability set forth in **Exhibit A**, attached hereto.  Attached as **Exhibit A-1** hereto are tables referenced in Exhibit A.

B.     **Plaintiffs intend to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).**

      1.     Plaintiffs intend to prove the following facts pertaining to damages, also set forth in **Exhibit A**, attached hereto.  Attached as **Exhibit A-1** hereto are tables referenced in Exhibit A.

5.     **DEFENDANTS' CONTESTED FACTS (State separately for each defendant.  See instructions above).**

A.     **Defendants intend to prove the following contested facts with regard to liability:**

      1.     Defendants intend to prove the following facts pertaining to liability set forth in **Exhibit B**, attached hereto.

B.     **Defendants intend to prove the following contested facts with regard to damages (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).**

      1.     Defendants intend to prove the following facts pertaining to damages, also set forth in **Exhibit B**, attached hereto.

6.    **PLAINTIFFS' WITNESSES (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).**

   a. **On liability, plaintiffs intend to call the following witnesses who will testify in accordance with the following summaries:**

1.    **Alwi Chan**: Mr. Chan is a Senior Vice President of Defendant FMG and a Vice President of Defendant AXA Equitable Life Insurance Company, and will be called as a hostile witness pursuant to Evid. Rule 611(c)(2). Mr. Chan will testify to the nature of Defendants' investment management business, including but not limited to: the investment management services provided by FMG, the FMG employees who provide investment management services, the trusts/funds that FMG manages, the investment management services performed by Sub-Advisors, Sub-Advisory fees, the process for hiring, firing and monitoring Sub-Advisors, fund guidelines, fund performance and his separate work for AXA Equitable Life Insurance Company.

2.    **Mary Cusack**: Ms. Cusack is a Plaintiff and a security holder in the following funds: the Core Bond Index Fund, the Large Cap Value PLUS Fund and the Mid Cap Value PLUS Fund.  She will testify regarding her general knowledge of the funds and fees, the harms that shareholders and the funds have suffered due to the Defendants' actions, her experience as an investor in the mutual funds operated by Defendants and her desire to protect the other shareholders of the funds.

3.    **Robert Cusack:** Mr. Cusack is a Plaintiff and a security holder in the following funds: the Core Bond Index Fund, the Large Cap Value PLUS Fund and the Mid Cap Value PLUS Fund. He will testify regarding: his general knowledge of the funds and fees, the harms that shareholders and the funds have suffered due to the Defendants' actions, his experience as an investor in the mutual funds operated by Defendants and his desire to protect the other shareholders of the funds.

4.    **Patricia Lynn:** Ms. Lynn is a Plaintiff in this case and is a security holder in the following funds: the PIMCO Ultra Short Bond Fund, the Global Bond PLUS Fund, the Mid Cap Value PLUS Fund and the GAMCO Small Company Value Fund. She will testify regarding: her general knowledge of the funds and fees, the harms that shareholders and the funds have suffered due to the Defendants'

actions, her experience as an investor in the mutual funds operated by Defendants and her desire to protect the other shareholders of the funds.

5.  **Brian Sanchez:** Mr. Sanchez is a Plaintiff in this case and is a security holder in the following funds: the Global Multi-Sector Equity Fund and the Large Cap Value PLUS Fund. Mr. Sanchez will testify regarding: his general knowledge of the funds and fees, the harms that shareholders and the funds have suffered due to the Defendants' actions, his experience as an investor in the mutual funds operated by Defendants and his desire to protect the other shareholders of the funds.

6.  **Glenn Sanford:**  Mr. Sanford is a Plaintiff in this case and is a security holder in the following funds:  the Large Cap Value PLUS Fund, the Global Multi-Sector Equity Fund, the T.Rowe Price Growth Stock Fund and the GAMCO Small Company Value Fund. Mr. Sanford will testify regarding: his general knowledge of the funds and fees, the harms that shareholders and the funds have suffered due to the Defendants' actions, his experience as an investor in the mutual funds operated by Defendants and his desire to protect the other shareholders of the funds.

7.  **Mary Ann Sivolella:** Ms. Sivolella is a Plaintiff in this case and is a security holder in the following funds: the Large Cap Value PLUS Fund, the Mid Cap Value PLUS Fund, the Equity Growth PLUS Fund, the Common Stock Fund, the Equity 500 Index Fund, the Intermediate Government Bond Fund, the Global Multi-Sector Equity Fund, and the GAMCO Small Company Value Fund.  Ms. Sivolella will testify regarding: her general knowledge of the funds and fees, the harms that shareholders and the funds have suffered due to the Defendants' actions, her experience as an investor in the mutual funds operated by Defendants and her desire to protect the other shareholders of the funds.

8.  **William Tucker**:  Mr. Tucker is a Plaintiff in this case and is a security holder in the following funds: the T. Rowe Price Growth Stock Fund and the GAMCO Small Company Value Fund. Mr. Tucker will testify regarding: his general knowledge of the funds and fees, the harms that shareholders and the funds have suffered due to the Defendants' actions, his experience as an investor in the mutual funds operated by Defendants and his desire to protect the other shareholders of the funds.

9.     **Steven Joenk:** Mr. Joenk is CEO of Defendant, FMG, a Senior Vice President of Defendant AXA Equitable Life Insurance Company, and Director on the EQAT Board. Mr. Joenk will be called as a hostile witness pursuant to Evid. Rule 611(c)(2).  It is anticipated that Mr. Joenk will testify to the nature of Defendants' business including but not limited to FMG's investment management and administration contracts, the investment management and administration services provided by FMG, the FMG employees who provide investment management and administration services, the trusts/funds that FMG manages and to which FMG provides administration services, the services performed by Sub-Advisors, Sub-Advisory contracts, the services performed by the Sub-Administrator, the Sub-Administration contacts, FMG's expenses, FMG's shared services contract with AXA Equitable Life Insurance Company, FMG's involvement in the 15(c) process, the information FMG provided to the EQAT Board, the EQAT Board's involvement in the 15(c) process, FMG's interaction with the EQAT Board, FMG's exchange of information with the EQAT Board, FMG's fees, Sub-Advisory fees, Sub-Administration fees, and other fees paid by the trust/funds, his role on the Board, and FMG's services to AXA Equitable Life Insurance Company.

10.    **Patricia Louie:** Ms. Louie is a Senior Vice President and Corporate Counsel of FMG, and will be called as a hostile witness pursuant to Evid. Rule 611(c)(2). Ms. Louie will testify to the nature of Defendants' business including but not limited to FMG's investment management and administration contracts, the investment management and administration services provided by FMG, the FMG employees who provide investment management and administration services, the trusts/funds that FMG manages and to which FMG provides administration services, the services performed by Sub-Advisors, Sub-Advisory contracts, the services performed by the Sub-Administrator, the Sub-Administration contacts, FMG's expenses, FMG's shared services contract with AXA Equitable Life Insurance Company, FMG's involvement in the 15(c) process, the EQAT Board's involvement in the EQAT process, FMG's interaction with the EQAT Board, FMG's and AXA Equitable's representation by Fund legal counsel, K&L Gates, FMG's exchange of information with the EQAT Board, FMG's fees, Sub-Advisory fees, Sub-Administration fees, other fees paid by the trust/funds and FMG's services to AXA Equitable Life Insurance Company.

11.    **Xavier Poutas:** Mr. Poutas is an Assistant Vice President of FMG and will be called as a hostile witness pursuant to Evid. Rule 611(c)(2). Mr. Poutas will testify to the nature of Defendants' investment management business, including but not limited to: the investment management services provided by FMG, the FMG

employees who provide investment management services, the trusts/funds that FMG manages, the investment management services performed by Sub-Advisors, Sub-Advisory fees, the process for hiring and monitoring Sub-Advisors, fund guidelines, fund performance, FMG's and the Sub-Advisors use of Exchange Traded Funds ("ETFs") and the ATM Strategy for certain funds, and his work for AXA Equitable Life Insurance Company.

12.    **Brian Walsh:** Mr. Walsh is a Senior Vice President and Lead Director of FMG and Vice President of AXA Equitable Life Insurance Company, and will be called as a hostile witness pursuant to Evid. Rule 611(c)(2). Mr. Walsh will testify to the nature of Defendants' business including but not limited to FMG's investment management and administration contracts, the investment management and administration services provided by FMG, the FMG employees who provide investment management and administration services, the trusts/funds that FMG manages and to which FMG provides administration services, the services performed by Sub-Advisors, Sub-Advisory contracts, the services performed by the Sub-Administrator, the Sub-Administration contacts, FMG's expenses, FMG's shared services contract with AXA Equitable Life Insurance Company, FMG's involvement in the 15(c) process, the EQAT Board's involvement in the EQAT process, FMG's interaction with the EQAT Board, FMG's exchange of information with the EQAT Board, FMG's fees, Sub-Advisory fees, Sub-Administration fees, the manner in which the Sub-advisors and the Sub-Administrator are paid, other fees paid by the trust/funds and FMG's services to AXA Equitable Life Insurance Company.

13.    **Jettie Edwards:** Ms. Edwards is a former Director of the EQ Advisors Trust ("EQAT Board"). Portions of her video deposition testimony will be admitted by agreement of the parties under Evid. Rule 804(b)(1). Ms. Edwards will testify about her involvement with the EQAT Board, Board compensation, the Board's interactions with and oversight of FMG, Board processes including the 15(c) process, her knowledge of Defendants' business including but not limited to FMG's investment management and administration contracts, the investment management and administration services provided by FMG, the FMG employees who provide investment management and administration services, the trusts/funds that FMG manages and to which FMG provides administration services, the services performed by Sub-Advisors, Sub-Advisory contracts, the services performed by the Sub-Administrator, the Sub-Administration contacts, FMG's expenses, FMG's shared services contract with AXA Equitable Life Insurance Company, FMG's involvement in the 15(c) process, the EQAT Board's involvement in the 15(c) process, FMG's interaction with the EQAT Board,

FMG's exchange of information with the EQAT Board, FMG's fees, Sub-Advisory fees, Sub-Administration fees, other fees paid by the trust/funds.

14.   **Harvey Rosenthal:** Harvey Rosenthal is a Director on the EQAT Board whose deposition testimony will be admitted by agreement of the parties under Evid. Rule 804(b)(1). Mr. Rosenthal will testify about his involvement with the EQAT Board, Board member compensation, the Board's interactions with and oversight of FMG, Board processes including the 15(c) process, his knowledge of Defendants' business including but not limited to FMG's investment management and administration contracts, the investment management and administration services provided by FMG, the FMG employees who provide investment management and administration services, the trusts/funds that FMG manages and to which FMG provides administration services, the services performed by Sub-Advisors, Sub-Advisory contracts, the services performed by the Sub-Administrator, the Sub-Administration contacts, FMG's expenses, FMG's shared services contract with AXA Equitable Life Insurance Company, FMG's involvement in the 15(c) process, the EQAT Board's involvement in the 15(c) process, FMG's interaction with the EQAT Board, FMG's exchange of information with the EQAT Board, FMG's fees, Sub-Advisory fees, Sub-Administration fees, and other fees paid by the trust/funds.

15.   **Gary Schpero:** Gary Schpero is the Lead Director of the EQAT Board, whose deposition testimony will be admitted by agreement of the parties under Evid. Rule 804(b)(1). Mr. Schpero will testify about his involvement with the EQAT Board, Board member compensation, the Board's interactions with and oversight of FMG, Board processes including the 15(c) process, his knowledge of Defendants' business including but not limited to FMG's investment management and administration contracts, the investment management and administration services provided by FMG, the FMG employees who provide investment management and administration services, the trusts/funds that FMG manages and to which FMG provides administration services, the services performed by Sub-Advisors, Sub-Advisory contracts, the services performed by the Sub-Administrator, the Sub-Administration contracts, FMG's expenses, FMG's shared services contract with AXA Equitable Life Insurance Company, FMG's involvement in the 15(c) process, the EQAT Board's involvement in the 15(c) process, FMG's interaction with the EQAT Board, FMG's exchange of information with the EQAT Board, FMG's fees, Sub-Advisory fees, Sub-Administration fees, and other fees paid by the trust/funds.

16.    **Russell Warren:** Mr. Warren is an employee of JPMorgan Chase Bank, N.A. ("JPMorgan") whose deposition testimony will be admitted by agreement of the parties under Evid. Rule 804(b)(1). Mr. Warren will testify to JPMorgan's Sub-Administration Agreement with FMG, its fund accounting and administrative services under the Sub-Administration Agreement, its fees and the manner in which it is paid, JPMorgan's expenses, JPMorgan's interaction with FMG and the EQAT Board, JPMorgan's profit and other contractual services that JPMorgan provides to Defendants.

17.    **Harvey Rosen:** Mr. Rosen is an Executive Director of JPMorgan Chase Bank, N.A. ("JPMorgan") and Global Head of Fund Accounting which provides mutual fund accounting and mutual fund administrative services. Mr. Rosen will testify to JPMorgan's Sub-Administration Agreement with FMG, its fund accounting and administrative services under the Sub-Administration Agreement, its fees and the manner in which it is paid, JPMorgan's expenses, JPMorgan's interaction with FMG and the EQAT Board, JPMorgan's profit and the services that JPMorgan provides to Defendants.

18.    **Martin Jennings:** Mr. Jennings is a partner with PricewaterhouseCoopers, LLP, ("PwC") whose deposition testimony will be admitted by agreement of the parties under Evid. Rule 804(b)(1). Mr. Jennings will testify to PwC's services to Defendants' and/or the EQAT Board, Defendant's revenue, profit and expenses attributable to the Investment Management and Administration Agreements, PwC's interaction with Defendants and the EQAT Board and the financials that PwC's prepares for Defendants.

19.    **A Corporate Representative of BlackRock, Inc. and/or BlackRock, Investment Management, LLC:** A corporate representative BlackRock, Inc. and/or BlackRock, Investment Management, LLC (collectively "BlackRock") will be subpoenaed to testify to BlackRock's services, fees, expenses, profitability (including that reported in BLK00001 produced in discovery) relating to its Sub-Advisory Agreements with FMG for the Global Multi-Sector Equity Fund.

  **b. On damages, plaintiffs intend to call the following witnesses who will testify in accordance with the following summaries:**

Given the nature of this case, portions of the testimony of most liability witnesses identified above will generally relate to the issue of damages. The basis for Plaintiffs damages and the quantum of Plaintiffs' damages, however, are based on the opinions Plaintiffs' experts identified below.

**C.    Defendants object to the following witnesses for the reasons stated:**

      1.    **Harvey Rosen:**  Defendants object to Plaintiffs' use of Harvey Rosen's deposition testimony, provided in the action *Kasilag v. Hartford Investment Financial Serv's, LLC*, No. 11-1083 (D.N.J.), as inadmissible hearsay that is not subject to the former testimony hearsay exception in Rule 804(b)(1) of the Federal Rules of Evidence. Mr. Rosen is an employee of JPMorgan Chase Bank, N.A. ("JPMorgan") and a resident of Massachusetts.  Mr. Rosen was deposed on February 4, 2015 in an entirely different action brought by Plaintiffs' counsel, to which Defendants are not parties—*Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083 (D.N.J.).  Federal Rule of Evidence 804(b)(1) provides that such testimony is not admissible unless it is "offered against a party who had - or, in a civil case, whose predecessor in interest had - an opportunity and similar motive to develop it by direct, cross-, or redirect examination."  Plaintiffs cannot meet this exception on its face.  Neither Defendant is a party nor a predecessor in interest to any party in the *Kasilag* matter and thus neither had an opportunity to develop any testimony during Mr. Rosen's deposition by direct, cross, or redirect examination. Defendants and Plaintiffs also have no agreement to allow Mr. Rosen's deposition testimony in this matter.

**7.    DEFENDANTS' WITNESSES (See instructions above).**

**A.    On liability, defendants intend to call the following witnesses who will testify in accordance with the following summaries:**

1.    **Steven M. Joenk**
Address:  AXA Equitable Funds Management Group, LLC
1290 Avenue of the Americas, 16th Floor
New York, New York 10104

      Steven M. Joenk serves as Chairman, President, and Chief Executive Officer of the EQ Advisors Trust ("EQAT"). He is a Managing Director of AXA, and Chief Executive Officer, Chairman and President of FMG, with responsibility for directing all strategic and financial activities of FMG.

      Mr. Joenk will testify regarding the characteristics of the Funds and AXA's variable annuity products through which they are offered as investment options.  He will testify generally regarding the nature and quality of FMG's investment

management services, including the Funds' investment strategies and restructurings; research, monitoring, and due diligence on subadvisers; asset allocation for Funds with multiple subadvisers; monitoring fund performance; direct portfolio management services; Board governance; compliance; legal and regulatory; valuation; provision of personnel, equipment, and facilities to EQAT; and establishing new funds. He will further testify regarding the nature and quality of FMG's administrative services, including shareholder reporting and regulatory filings; Board governance and shareholder meetings; fund accounting; calculating and distributing the Funds' dividends and capital distributions; overseeing the Subadministrator's calculation of the Funds' net asset values ("NAV") and correcting errors; supervising and coordinating the Funds' annual audit; supervising and coordinating activities of the Funds' service providers; and compliance-related administrative services. He will also testify regarding the services performed on behalf of FMG by the Subadvisers and the Subadministrator.

Mr. Joenk will testify regarding the benefits of the "manager-of-managers" structure and the administrator/sub-administrator structure used by Defendants in connection with their management and administration of the Funds. He will testify to the various risks incurred by FMG in serving as investment manager and administrator of the Funds. He will testify regarding the services provided to the Funds by FMG's parent company AXA and the risks to which AXA is exposed as sponsor of the Funds. He will testify regarding the Funds' investment management and administrative fees, comparisons of the Funds' investment management and administrative services fees, total expense ratios, the "spread" between the fees paid to FMG and the Subadvisers and Subadministrator, respectively, and component fee "spreads" to peer funds. He will testify regarding the scope of the Shared Services Agreement ("SSA") between FMG and AXA. He will testify to FMG's interaction with and reliance on AXA. He will testify regarding FMG's methodology for allocating costs to the Funds, the profitability realized by FMG from the management and administration of the Funds, and profitability comparisons between FMG and other investment managers. Mr. Joenk will testify to FMG's potential economies of scale and methods of sharing potential economies of scale. He will testify regarding FMG's realization of fall-out benefits, if any, from managing the Funds. He will testify regarding the independence and conscientiousness of the Independent Trustees. He will also testify regarding the annual contract renewal process mandated by Section 15(c) of the ICA, including the preparation and dissemination by FMG of voluminous reports, presentations, and other materials to the Independent Trustees. In addition, Mr. Joenk may testify regarding Plaintiffs' alleged damages.

The above summary is not an exhaustive synopsis of all facts to which Mr. Joenk may testify.

2.  **James D. Kelly**
    Address:  AXA Equitable Funds Management Group, LLC
    1290 Avenue of the Americas, 16th Floor
    New York, New York 10104

James D. Kelly serves as the Controller of EQAT and is a member of the EQAT Valuation Committee.  He is a Senior Director of AXA and Vice President of FMG.  Mr. Kelly is responsible for daily administrative operations and reporting for EQAT.  Mr. Kelly works in FMG's Fund Administration Group.

Mr. Kelly will testify regarding the nature and quality of FMG's fund administration services, including financial reporting, tax matters, shareholder reporting and regulatory filings; Board governance and shareholder meetings; fund accounting; calculating and distributing the Funds' dividends and capital distributions; overseeing the calculation of the Funds' NAV; managing and coordinating the Funds' annual audit; managing and coordinating activities of the Funds' service providers; and the risks that FMG bears as administrator to EQAT. He will also testify regarding the nature and quality of FMG's valuation services and the functions performed by the Valuation Committee.  Mr. Kelly will also testify to the nature of administrative services performed by the Subadministrator on behalf of FMG.  He will also testify to the Fund Administration Group's reliance on and interaction with AXA.  In addition, he will testify regarding information provided to the Board regarding FMG's fund administration services.

The above summary is not an exhaustive synopsis of all facts to which Mr. Kelly may testify.

3.  **Kenneth T. Kozlowski**
    Address:  AXA Equitable Funds Management Group, LLC
    1290 Avenue of the Americas, 16th Floor
    New York, New York 10104

Kenneth T. Kozlowski is a Managing Director of AXA and Executive Vice President and Chief Investment Officer of FMG.  He is the head of the Investment Management Services unit within FMG.

Mr. Kozlowski will testify to the nature and quality of investment management services that FMG provides to the Funds, including the Funds' investment strategies and restructurings; researching, selecting, monitoring, and

performing due diligence on subadvisers; asset allocation for Funds with multiple subadvisers; monitoring and evaluating fund performance; direct portfolio management services; Board governance; valuation; and establishing new funds. Mr. Kozlowski will also testify regarding the uses and benefits of the Funds' ETF sleeves managed by FMG and FMG's proprietary volatility management overlays (the "ATM Strategy") utilized by certain of the Funds. Mr. Kozlowski will also testify to the performance of the Funds, and changes that have been made to the Funds over time. He will further testify regarding materials and presentations furnished to the Board relating to investment management services and the Funds' performance. Mr. Kozlowski will also provide testimony regarding the nature of the services performed by the Subadvisers on behalf of FMG. He will also testify regarding this Investment Management Services unit's reliance on and interaction with AXA.

The above summary is not an exhaustive synopsis of all facts to which Mr. Kozlowski may testify.

**4.     Patricia Louie, Esq.**
Address:  AXA Equitable Funds Management Group, LLC
1290 Avenue of the Americas, 16th Floor
New York, New York 10104

Patricia Louie serves as Vice President and Secretary of EQAT. She is a Managing Director and Associate General Counsel of AXA and an Executive Vice President and General Counsel of FMG. Ms. Louie is the head of the Law Department's Funds Management Group, which is responsible for all legal and compliance activities relating to AXA's proprietary asset management activities.

Ms. Louie will testify regarding the nature and quality of FMG's management services, including Board governance, Board process, and legal and regulatory services. She will also testify regarding the nature and quality of FMG's administrative services, including shareholder reporting and regulatory filings, facilitating Board governance and shareholder meetings, negotiating contractual arrangements and coordinating audits and third-party service providers. She will further testify regarding FMG's various agreements with EQAT and service providers, including the Investment Management Agreements between FMG and EQAT, the Mutual Funds Service Agreement between FMG and EQAT, the Advisory Agreements between FMG and the Subadvisers, and the Subadministration Agreement between FMG and the Subadministrator. She will also testify regarding the independence and conscientiousness of the Independent Trustees. She will testify regarding the annual contract renewal process mandated

46

by Section 15(c) of the ICA, including the preparation and dissemination by FMG of voluminous reports, presentations, and other materials to the Board. She will further testify regarding the role of counsel for EQAT and the Independent Trustees. She will testify regarding the risks that FMG bears as investment manager to EQAT. She will also testify to FMG legal department's interaction with and reliance upon AXA. In addition, she will testify about the information provided to the Board regarding FMG's legal services.

The above summary is not an exhaustive synopsis of all facts to which Ms. Louie may testify.

5.   **Joseph J. Paolo**
     Address:  AXA Equitable Funds Management Group, LLC
     1290 Avenue of the Americas, 16th Floor
     New York, New York 10104

Joseph J. Paolo is a Lead Director of AXA, a Senior Vice President and the Chief Compliance Officer of FMG, and Chief Compliance Officer and Anti-Money Laundering Compliance Officer of EQAT. As Chief Compliance Officer, Mr. Paolo oversees FMG's dedicated compliance unit.

Mr. Paolo will testify regarding the nature and quality of the compliance-related services that FMG provides to the Funds, including the development and execution of EQAT's mandatory compliance program and FMG's compliance program. He will also testify regarding FMG's daily and monthly compliance testing of Subadvisers, quarterly compliance reviews for the purpose of reporting to the EQAT Board, the Annual Assessment of the Trust's Compliance Program furnished to the Board, ETF review and monitoring, code of ethics and conflict management, anti-money laundering oversight, and regulatory filings and audits. He will further testify to the due diligence FMG performs on Subadvisers and potential subadvisers, the Subadministrator, and other of the Funds' service providers. He will also testify to the valuation services that FMG performs. In addition, Mr. Paolo will testify to the risks that FMG bears as EQAT's manager and administrator. Mr. Paolo will further testify to the nature of administrative compliance services performed by the Subadministrator on FMG's behalf, as well as FMG's use of outside consultants. He will also testify regarding FMG's compliance unit's reliance on and interaction with AXA. In addition, he will testify regarding information provided to the Board regarding FMG's compliance services.

The above summary is not an exhaustive synopsis of all facts to which Mr. Paolo may testify.

6.   **Brian E. Walsh**
     Address:  AXA Equitable Funds Management Group, LLC
     1290 Avenue of the Americas, 16th Floor
     New York, New York 10104

Brian Walsh serves as Chief Financial Officer and Treasurer of EQAT and is a member of the Valuation Committee.  He is a Lead Director of AXA and Senior Vice President and Lead Director of FMG.  He is responsible for the coordination of EQAT's audits, financial statements and ongoing oversight of EQAT's accounting matters.

Mr. Walsh will testify regarding the nature and quality of FMG's administrative services, including financial reporting, tax matters, shareholder reporting and regulatory filings; Board governance and shareholder meetings; fund accounting; calculating and distributing the Funds' dividends and capital distributions; overseeing the calculation of the Funds' NAV; managing and coordinating the Funds' annual audit; managing and coordinating activities of the Funds' service providers; and the risks that FMG bears as administrator to EQAT. He will also testify regarding the nature and quality of FMG's valuation services and the functions performed by the Valuation Committee.  Mr. Walsh will further testify to the nature of administrative services performed by the Subadministrator on behalf of FMG.  He will also testify to the Fund Administration Group's reliance on and interaction with AXA.  In addition, he will testify regarding information provided to the Board regarding FMG's fund administration services.

The above summary is not an exhaustive synopsis of all facts to which Mr. Walsh may testify.

7.   **H. Thomas McMeekin**
     Address:  495 Bow Line Drive
               Naples, Florida 34103

H. Thomas McMeekin has served as an Independent Trustee of the EQAT Board of Trustees ("EQAT Board") since January 1, 2014.  Mr. McMeekin is currently a Co-Chair of the Board's Investment Committee.  Mr. McMeekin has a background in the financial services industry, has held senior management positions with insurance companies, and has multiple years of service on public and private company boards and organizations.

If called, Mr. McMeekin will testify regarding the independence and conscientiousness of the Independent Trustees, particularly with regard to the

48

experience and qualifications of the Independent Trustees, the negotiations between the Independent Trustees and FMG, and the Board process and preparation for Board meetings. He will testify to the amount and type of information the Board receives and considers in renewing the Funds' contracts, including information relating to the nature and quality of FMG's services, FMG's potential realization of economies of scale, profitability from management of the Funds, fee comparisons with other investment advisers, and fall-out benefits. Mr. McMeekin will also testify regarding the Board's consideration of the services performed by FMG, the Subadvisers and Subadministrator, respectively, the "spread" between the management fee and subadvisory fees, and the risks FMG bears as a manager-of-managers and as the administrator of the Funds. He will also testify regarding the conclusions reached by the Board with respect to the reasonableness of the management and administrative fees charged to the Funds by FMG.

The above summary is not an exhaustive synopsis of all facts to which Mr. McMeekin may testify.

**8.    Gary S. Schpero**
        Address: 28 Rowayton Avenue
                     Rowayton, Connecticut 06853

Gary S. Schpero is the Lead Independent Trustee of the Board of Trustees of the EQ Advisers Trust. Mr. Schpero has experience as the managing director of the investment management practice group at a large international law firm, Simpson Thacher & Bartlett LLP, and multiple years of service as a Trustee of the Trust.

Mr. Schpero will testify regarding the independence and conscientiousness of the Independent Trustees, particularly with regard to the experience and qualifications of the Independent Trustees, the negotiations between the Independent Trustees and FMG, and the Board process and preparation for Board meetings. He will testify to the amount and type of information the Board receives and considers in renewing the Funds' contracts, including information relating to the nature and quality of FMG's services, FMG's potential realization of economies of scale, profitability from management of the Funds, fee comparisons with other investment advisers, and fall-out benefits. Mr. Schpero will testify regarding the Board's consideration of the services performed by FMG and the subadvisers and sub-administrator, the "spread" between the management fee and subadvisory fees, and the risks FMG bears as a manager-of-managers and as the administrator of the Funds. He will also testify regarding the conclusions reached by the Board with regard to the reasonableness of the management and administrative fees charged to the Funds by FMG.

The above summary is not an exhaustive synopsis of all facts to which Mr. Schpero may testify.

6.   **Caroline L. Williams**
     <u>Address</u>:   296 Sharon Road
                       Robbinsville, New Jersey 08691

Caroline L. Williams is an Independent Trustee of the EQAT Board, and has held this position from January 2012 to the present. Ms. Williams is currently the Chair of the Board's Audit Committee. Ms. Williams has a background in the financial services industry and has senior management experience with an investment banking firm and multiple years of service on the boards of public and private companies and organizations.

If called, Ms. Williams will testify regarding the independence and conscientiousness of the Independent Trustees, particularly with respect to the experience and qualifications of the Independent Trustees, the negotiations between the Independent Trustees and FMG, and the Board process and preparation for Board meetings. She will testify to the amount and type of information the Board receives and considers in renewing the Funds' contracts, including information relating to the nature and quality of FMG's services, FMG's potential realization of economies of scale, profitability from management of the Funds, fee comparisons with other investment advisers, and fall-out benefits. Ms. Williams will testify regarding the Board's consideration of the services performed by FMG, the Subadvisers and the Subadministrator. She will also testify regarding the "spread" between the management fee and subadvisory fees, and the risks FMG bears as a manager-of-managers and as the administrator of the Funds. She will also testify regarding the conclusions reached by the Board with regard to the reasonableness of the management and administrative fees charged to the Funds by FMG.

The above summary is not an exhaustive synopsis of all facts to which Ms. Williams may testify.

7.   **William T. MacGregor, Esq.**
     <u>Address</u>:   UBS Global Asset Management Inc.
                       1285 Avenue of the Americas
                       New York, New York 10019

Mr. Macgregor is a former employee of Defendants, who was a member of FMG's Legal group.

50

If called, Mr. MacGregor will testify regarding the process for Board meetings.

The above summary is not an exhaustive synopsis of all facts to which Mr. MacGregor may testify.

8.    **Jettie M. Edwards**

Ms. Edwards is an Independent Trustee of the Board of Trustees of EQAT, whose deposition testimony will be admitted under Fed. R. Evid. 804(b)(1). Ms. Edwards is a former partner and consultant of Syrus Associates (a business and marketing consulting firm) and a former director of Old Mutual Funds.

Ms. Edwards will testify regarding the independence and conscientiousness of the Independent Trustees, particularly with regard to the experience and qualifications of the Independent Trustees, the negotiations between the Independent Trustees and FMG, and the Board process and preparation for Board meetings. She will testify to the amount and type of information the Board receives and considers in renewing the Funds' contracts, including information relating to the nature and quality of FMG's services, FMG's potential realization of economies of scale, profitability from management of the Funds, fee comparisons with other investment advisers, and fall-out benefits. Ms. Edwards will testify regarding the Board's consideration of the services performed by FMG and the subadvisers and sub-administrator, respectively. She will also testify regarding the conclusions reached by the Board with regard to the reasonableness of the management and administrative fees charged to the Funds by FMG.

9.    **Harvey Rosenthal**

Mr. Rosenthal is an Independent Trustee of the Board of Trustees of EQAT, whose deposition testimony will be admitted under Fed. R. Evid. 804(b)(1). Mr. Rosenthal is Former President and COO of Melville Corporation; former CEO of the CVS Division of Melville Corporation.

Mr. Rosenthal will testify regarding the independence and conscientiousness of the Independent Trustees, particularly with regard to the experience and qualifications of the Independent Trustees, the negotiations between the Independent Trustees and FMG, and the Board process and preparation for Board meetings. He will testify to the amount and type of information the Board receives and considers in renewing the Funds' contracts, including information relating to the nature and quality of FMG's services, FMG's potential realization of economies of scale, profitability from management of the Funds, fee comparisons with other

investment advisers, and fall-out benefits. Mr. Rosenthal will testify regarding the Board's consideration of the services performed by FMG and the subadvisers and sub-administrator, respectively. He will also testify regarding the "spread" between the management fee and subadvisory fees. He will also testify regarding the conclusions reached by the Board with regard to the reasonableness of the management and administrative fees charged to the Funds by FMG.

10. **Russell Warren**

Mr. Warren is an employee of JPMorgan Chase Bank, N.A. ("JPMorgan") whose deposition testimony will be admitted under Fed. R. Evid. 804(b)(1). Mr. Warren will testify regarding his understanding of the administrative services provided to the EQAT funds by Defendants and JP Morgan, respectively.

11. **Martin Jennings**

Mr. Jennings is a partner with PricewaterhouseCoopers, LLP, ("PwC") whose deposition testimony will be admitted by agreement of the parties under Fed. R. Evid. 804(b)(1). Mr. Jennings will testify regarding FMG's cost allocation methodology used to assess FMG's profitability and PwC's involvement in the development of that methodology. He will also testify as to audit and tax services provided to EQAT by PwC.

12. **Joseph Wiggins**

Mr. Wiggins is a partner with PwC whose deposition testimony will be admitted under Evid. Rule 804(b)(1). Mr. Wiggins will testify regarding FMG's cost allocation methodology used to assess FMG's profitability and PwC's involvement in the development of that methodology, and cost allocation methodologies more generally.

13. **Edward Steinborn**

Mr. Steinborn is an employee of Wellington Management Company, LLP ("Wellington") whose deposition testimony will be admitted under Fed. R. Evid. 804(b)(1). Mr. Steinborn will testify regarding Wellington's revenues and expenses relating to its subadvisory services generally, and with respect to EQAT specifically. Mr. Steinborn will also testify as to the profitability to Wellington of its subadvisory fees.

14.     **Francis M. Vitagliano**

Mr. Vitagliano is one of Plaintiffs' expert witnesses, and co-authored two expert reports with Richard Kopcke, Ph.D. Plaintiffs do not intend to call Mr. Vitagliano as a witness. If called, Mr. Vitagliano will testify regarding the bases for his conclusions, assumptions he made in arriving at those conclusions, his lack of experience regarding the topics on which he offers opinions, and his refusal to provide information concerning the methodology used to arrive at certain conclusions.

15.     **Plaintiffs Mary Ann Sivolella, Glenn D. Sanford, Patricia F. Lynn, William R. Tucker, Brian A. Sanchez, Mary T. Cusack and Robert Cusack.**

Defendants may call Plaintiffs in this action as hostile witnesses pursuant to Fed. R. Evid. 611(c)(2), or by designation, to testify regarding their respective purchases of variable annuity contracts; their decisions to allocate contributions to the Funds; their knowledge of the fees and performance of the Funds; their receipt of documents disclosing the fees charged to the Funds and other information about the Funds; their knowledge of the management and administrative services provided to the Funds; their knowledge of the claims asserted against Defendants; and the circumstances surrounding the filing of the complaints in this action, and their respective involvement therewith.

16.     **Other witnesses identified prior to trial, including any witnesses named by Plaintiffs.**

**B.      On damages, defendants intend to call the following witnesses who will testify in accordance with the following summaries:**

1.     Defendants do not have an affirmative claim for damages. In defense of Plaintiffs' claim for damages, Defendants intend to rely upon the cross-examination of Plaintiffs' witnesses and the direct examinations of Dr. Christopher M. James and of Mr. Steven M. Joenk and Defendants' other liability witnesses, respectively.

**C.      Plaintiffs object to the following witnesses for the reasons stated:**

1.     Plaintiffs object to the testimony of Thomas McMeekin and Caroline Williams for the following reasons:

a. The witnesses were not identified in Defendants' Rule 26(a) Disclosures and therefore, their testimony should be barred.

b. The witnesses were added to the EQAT Board of Trustees during the course of the litigation: Mr. McMeekin in January 2014 and Ms. Williams in January 2012. Defendants' Rule 26(a) Disclosures stated the following regarding the Trustees:

> The following Independent Trustees are reasonably likely to have discoverable information relevant to disputed facts alleged in the pleadings [Gary Schpero, Jettie Edwards, Harvey Rosenthal, and Christopher Komisarjefsky]. Each Independent Trustee can be contacted through the undersigned counsel for Defendants, who will coordinate with counsel for the Independent Trustees. Defendants specifically object to plaintiffs deposing all of the Independent Trustees on the grounds, among others, that any discoverable information can be obtained through the depositions of a small number of Independent Trustees.

Based on the foregoing disclosure by Defendants, Plaintiffs deposed Mr. Schpero, Ms. Edwards and Mr. Rosenthal. Mr. Schpero is the Lead Trustee and was produced as the EQAT Board's 30(b)(6) witness. Given Defendants' objection and instruction to Plaintiffs regarding the Trustees, Defendants are barred from proffering the testimony of these two additional Trustees.

2.    Plaintiffs object to Defendants calling Plaintiffs' expert, Francis Vitagliano to testify for the defense. If Defendants are permitted to call Mr. Vitagliano, Plaintiffs' counsel will arrange for his live testimony in Court during Defendants' case in chief. Thus, the defense is not permitted to read in his deposition under Evid. Rule 804(b)(1).

**7.    EXPERT WITESSES (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).**

**A. Plaintiffs' expert witnesses are:**

1.    **Kent Barrett, CPA:**  Mr. Barrett will provide expert testimony consistent with his reports dated June 11, 2014 and September 19, 2014. Mr. Barrett's testimony will include his opinions on FMG's investment management and administration profit margins, FMG's genuine expenses, the misleading information FMG provides to the EQAT Board, the grossly overstated expenses

FMG presents to the Board, the grossly understated profit FMG presents to the EQAT Board, the proper treatment of the sub-advisory and sub-administration fees, and the flaws in FMG's expense allocation methodology.  Mr. Barrett has also quantified – using FMG's own method -- the "fallout benefits" to FMG and AXA Equitable from the variable annuity insurance products through which Plaintiffs' Funds are sold, that Defendants stopped reporting to the Board in or about 2006. Mr. Barrett will also offer opinions on economies of scale, and he will address the flaws with certain Defense experts' opinions as detailed in his rebuttal report.

2.    **Phillip Goldstein:** Mr. Goldstein will provide testimony consistent with the opinions in his initial and rebuttal reports. His opinions include EQAT Board's lack of diligence in reviewing and approving the subject agreements, its lack of care and understanding of  basic information  needed to evaluate FMG's fees; its lack of independence from Defendants, procedures the Board should have employed, and flaws with certain Defense experts' opinions as detailed in his rebuttal report.

3.    **Richard Kopcke, Ph. D.:**  Dr. Kopcke will provide expert testimony consistent with his reports dated June 11, 2014 and September 19, 2014. Dr. Kopcke will offer testimony that the investment management and administration fees FMG receives from the Subject Funds do not reflect an "arm's length" fee, and that FMG's fees far exceed the fees that could have been negotiated by the EQAT for Plaintiffs' Funds with an independent investment manager or administrator. Dr. Kopcke will testify that arm's length fee for FMG's management services is .25 bps and an arm's length fee for its administration services is .5 bps.  He will also offer testimony regarding any economies of scale and his opinion that FMG does not fairly share economies of scale with Plaintiffs' Funds. Dr. Kopcke will also address flaws with certain Defense experts' opinions as detailed in his rebuttal report.

4.    **Steven Pomerantz, Ph.D. :**  Dr. Pomerantz will provide testimony consistent with the opinions in his initial and rebuttal reports. His testimony will include his opinions on: the level of services provided by FMG, the value of FMG's services, the poor performance of Plaintiffs' Funds, the impact of FMG's poor performance on Plaintiffs' Funds, how FMG's fees compare and greatly exceed other investment advisors/service providers and industry averages, FMG's real expenses and true profit margin, industry average profit margins, how FMG's profit margins greatly exceed other those of other investment advisors/service providers and industry averages, how FMG's profit and profit margin are excessive

in comparison to the 39% to 43% industry profit margin average, how FMG's fees are most comparable if a comparison must be made to those of index fund managers, economies of scale and the failure of FMG to fairly share economies of scale with the funds, "fall-out" benefits, the detrimental impact of excessive fee on retirement accounts, the damages suffered by Plaintiffs and will also address flaws with certain Defense experts' opinions as detailed in his rebuttal report.

**B.    Defendants' objections to the qualifications of plaintiffs' expert are:**

1.    **Kent E. Barrett, CPA**: Defendants object to the qualifications of Plaintiffs' expert Kent E. Barrett on the grounds that he lacks the qualifications to offer legal conclusions (which in any event are the province of the Court), yet he offers several opinions that are expressly based upon his understanding of certain legal standards or his interpretation of contracts. In the area of profitability, Mr. Barrett repeatedly invokes "the *Gartenberg* Standard," "Section 36(b) of the 1940 Act," "FMG's fiduciary duty," and other legal standards in connection with his opinions regarding how FMG reports profitability to the Board, how it accounts for subadvisory fees, and the allocation to FMG of a share of AXA's expenses. Mr. Barrett admitted at his deposition that he relied on his interpretation of *Gartenberg* in forming profitability opinions. In the area of services, Mr. Barrett expressly relies upon his interpretation of contracts including the "Management Agreement," "Administration Agreement," the "Sub-Administration Agreement," and the "Service Level Document" in connection with his opinion as to what services FMG itself performs and what services it delegates to others. In the area of fall-out benefits, Mr. Barrett offers a bald legal conclusion, referencing "the *Gartenberg* factors," that certain wrapper and general account profits constitute fall-out benefits.

2.    **Philip Goldstein**: Defendants object to the qualifications of Plaintiffs' expert Phillip Goldstein on the grounds that he lacks the qualifications to offer legal opinions (which in any event are the province of the Court), FMG's accounting practices, and economies of scale, all of which are topics with respect to which he lacks specialized knowledge. Mr. Goldstein's legal opinions include (i) his conclusion that the Board "did not exercise sufficient care and conscientiousness" in approving FMG's fees (which mimics the language of one of the Gartenberg factors), (ii) his conclusion that insurance wrapper fees are fall-out benefits (a legal determination), and (iii) his conclusion that FMG's fees "are so disproportionately large that they bear no reason able relationship to the actual services rendered . . . and could not have been the product of arm's-length bargaining" (which represents an opinion on the ultimate legal issue in this case).

As to accounting matters, Mr. Goldstein opines that FMG's expense allocation
methodology is improper even though he admittedly has no accounting expertise.
Mr. Goldstein's lack of accounting expertise also means he is not qualified to
opine on purported fall-out benefits.  Mr. Goldstein admittedly is not an economist
or an expert in economies of scale, and therefore is not qualified to offer opinions
on economies of scale.

3.    **Richard W. Kopcke, Ph.D.**:  Defendants object to the qualifications of
Plaintiffs' expert Richard W. Kopcke, Ph.D. on the grounds that he offers legal
conclusions and opinions relating to mutual fund management, administration, and
governance with respect to which he lacks specialized knowledge.  As to legal
questions (which in any event are the province of the Court), Dr. Kopcke opines
"[a]gainst the Gartenberg framework" that FMG's management and administration
fees are "grossly excessive" in language that is couched in the precise language
used in Section 36(b) case law.  Dr. Kopcke's opinion regarding the services that
FMG, the Subadvisers, and the Subadministrator each perform also is an
unqualified legal opinion, because it is based on his interpretation of the
Management, Administrative, Subadvisory, and Subadministration Agreements at
issue in this case.  As to mutual fund management, administration, and governance,
Dr. Kopcke offers opinions regarding such matters as staffing, salaries and
benefits, and the role of a mutual fund board, yet he has no specialized knowledge
on these topics, having never worked for a mutual fund investment adviser,
participated in the management and administration of a mutual fund, served on a
mutual fund board, or worked as a human resources professional.

4.    **Steven Pomerantz, Ph.D.**:  Defendants object to the qualifications of
Plaintiffs' expert Steve Pomerantz, Ph.D., on the grounds that he lacks specialized
knowledge regarding many of the topics upon which he opines.  Dr. Pomerantz
lacks the qualifications to offer legal conclusions (which in any event are the
province of the Court), yet he offers opinions on:  (i) the breakdown in services
among FMG, the subadvisers, and the sub-administrator based upon his legal
interpretation of the service agreements at issue in this case; (ii) the role and
responsibilities of FMG and the Board, which are defined in large part by
applicable legal standards; (iii) FMG's purported realization of "fall-out benefits,"
based upon his legal conclusion as to what constitutes a fall-out benefit; and (iv)
Plaintiffs' purported damages, which (if any) would be defined by Section 36(b)
and related law.  Dr. Pomerantz also lacks specialized knowledge regarding the
role and responsibilities of mutual fund boards, yet he purports to opine that the
Board should have performed the investment management and administrative tasks
that (according to Dr. Pomerantz) FMG performs.  Dr. Pomerantz also lacks any

specialized knowledge relating to the role of an adviser and administrator with respect to subadvised mutual funds, yet he summarily concludes that the subadvisers and sub-administrator perform virtually all of the management and administrative functions pertaining to the Funds. Dr. Pomerantz admittedly has no specialized knowledge as an accountant, yet he inappropriately purports to opine on the propriety of FMG accounting for subadvisory and sub-administrative fees as a business expense. Dr. Pomerantz also purports to calculate what he argues is FMG's true profitability (based upon a crude "revenue minus expenses divided by revenue" formula), even though he lacks the accounting qualifications to determine the proper method for calculating profitability, or to perform the actual calculations. Dr. Pomerantz also has no qualifications as an economist, yet he purports (i) to opine that FMG realizes economies of scale (a determination that requires a specialized analysis relating to costs per unit of production), and (ii) to then calculate those purported economies of scale. Finally, even though Dr. Pomerantz lacks specialized knowledge as an accountant or an economist, he purports to lay out various "approaches to measuring the amount of damages in this case," which amount to nothing more than back-of-the-envelope calculations that a lay person could perform.

As explained *supra* at Section 2.B, Defendants intend to re-file *in limine* motions seeking to strike the expert testimony offered by Plaintiffs' experts. The aforementioned *in limine* motions include arguments based on the qualifications of Plaintiffs' experts, which are incorporated by reference herein, as well as the failure of Plaintiffs' experts' opinions to satisfy the fit and reliability requirements under the governing standard set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See also, e.g., Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000); *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

**C.    Defendants' expert witnesses are:**

**1.    William W. Holder**
        Address:  University of Southern California
        Leventhal School of Accounting
        Los Angeles, California 90089-0441

William W. Holder is currently the Dean of the Leventhal School of Accounting and holds the Alan Casden Dean's Chair of Accountancy at the University of Southern California. His academic research and publications focus on the topics of financial accounting, financial reporting and auditing.

Mr. Holder was retained by Defendants to develop independent opinions based on his perspective as an accounting expert. Mr. Holder analyzed and opined on the appropriateness of treating subadvisory and subadministration fees incurred by FMG as expenses of FMG and on the reasonableness of the methodology used by FMG to allocate costs to the 12 funds at issue in this litigation for the purposes of reporting FMG's profitability with respect to those funds to the Board.

Mr. Holder will testify regarding the methodologies by which FMG reported profitability from its management and administration of the Funds to the Board, specifically that it is appropriate and consistent with Generally Accepted Accounting Principles ("GAAP") to treat subadviser and subadministration fees as expenses; that it is reasonable to include AXA's allocated expenses in the calculation of FMG's profitability; and that FMG's methodology for allocating expenses to the EQAT funds for the purposes of determining FMG's fund-by-fund profitability is reasonable. Mr. Holder will also testify regarding the opinions of Plaintiffs' accounting expert, Mr. Kent E. Barrett and may testify, in addition to the above opinions, that FMG's fund profitability presentations to the Board are complete and transparent, that FMG's treatment of deferred acquisition costs is reasonable in calculating profitability, and concerning the calculation of purported "fall-out benefits" from general account spread and product wrapper revenues. He may also respond to these and other topics as they are presented in the expert testimony of Steve Pomerantz, Phillip Goldstein, and Richard W. Kopcke and Francis M. Vitagliano.

The above summary is not an exhaustive synopsis of all those matters to which Mr. Holder may testify.

**2.    Christopher M. James, Ph.D.**
        Address: Department of Finance, Insurance and Real Estate
        University of Florida, College of Business
        Gainesville, Florida 32611

Christopher M. James, Ph.D. is a Professor of Finance and Economics at the University of Florida. His academic research is in the areas of financial institutions, securities pricing, and corporate finance.

Dr. James will testify regarding the benefits of the manager-of-managers structure to the Funds' investors, such as: (1) access to specialized subadvisers; (2) the ability to choose from a wide-ranging and diverse set of portfolios; (3) the structure's inherent flexibility and adaptability; (4) the ease of fund customization provided by the structure; and (5) the ability to diversify investments. Dr. James

will also testify regarding the large number of risks that FMG assumes as the Funds' investment manager and administrator. He will testify to how the fees charged to the Funds are consistent with the fees charged to other similarly styled funds, and how the regulation and competition within the mutual fund industry ensure that fees and expenses remain at competitive levels. Dr. James will also discuss economies of scale within the mutual fund industry and how FMG shares the benefits of any potential economies of scale with the Funds. Dr. James will also address Plaintiffs' purported damages, including the damages calculations performed by Plaintiffs' expert Steve Pomerantz, and Dr. Pomerantz's analysis of purported fall-out benefits. Dr. James may also respond to these and other topics as they are presented in the expert testimony of Dr. Pomerantz, Richard W. Kopcke and Francis M. Vitagliano, and Kent E. Barrett.

The above summary is not an exhaustive synopsis of all those matters to which Mr. James may testify.

**3.  Marianne K. Smythe**
     Address: 4807 Wellington Drive
     Chevy Chase, Maryland 20815

Marianne K. Smythe was the Director of the U.S. Securities and Exchange Commission's Division of Investment Management from 1990 to 1993, and served in various other senior capacities at the SEC. Ms. Smythe was also a partner at Wilmer Cutler & Pickering LLP. Her legal practice included representation of, among other things, independent boards of directors of mutual funds.

Ms. Smythe was retained by Defendants to assess the Board's 15(c) process and its consistency with the expectations, customs, and practice in the investment company community.

Ms. Smythe will testify regarding the Independent Trustees' qualifications, experience, and independence. She will testify regarding the quality of FMG's 15(c) process. She will testify to the quality of materials and disclosures FMG provides to the Board, including with respect to the nature and quality of FMG's services, FMG's potential realization of economies of scale, profitability from management of the Funds, fee comparisons with other investment advisers, and fall-out benefits. She will testify to the extent to which the Independent Trustees exercised their independence and conscientiousness, and the consistency of the Board's governance process with best practices in the investment company community. She may also respond to these and other topics as they are presented in

the expert testimony of Phillip Goldstein, Steve Pomerantz, Kent E. Barrett, and Richard W. Kopcke and Francis M. Vitagliano.

The above summary is not an exhaustive synopsis of all those matters to which Ms. Smythe may testify.

**4.     Russell R. Wermers, Ph.D.**
Address:  Department of Finance
Robert H. Smith School of Business
University of Maryland
College Park, Maryland 20742-1815

Russell R. Wermers is a Professor of Finance at the Smith School of Business, University of Maryland at College Park.  Much of his academic research is focused on the study of securities trading, securities markets, and portfolio management.

Mr. Wermers was retained by Defendants to address the investment management services provided by FMG for Funds.

Mr. Wermers will testify regarding the performance of the Funds.  He will also testify, from the perspective of industry practice, as to the benefits of FMG's portfolio management services, including the quality and extent of FMG's Subadviser selection and oversight processes.  Mr. Wermers will also testify to the general characteristics and features of mutual funds and variable annuity products. He will also testify to FMG's enhancements and introduction of innovative products and services to the Funds, including offering active and passive components, implementing and executing the ATM Strategy, and FMG's use of ETFs, including within dedicated ETF "sleeves" of certain of the Funds.  He will also testify regarding FMG's changes to the strategies, objectives, benchmarks, and Subadvisers of certain of the Funds over time.  He will testify to the quality of FMG's portfolio management-related services with regard to the Funds' performance during the relevant time period.  He will testify to the extensive infrastructure required in order to service and administer mutual funds.  He will further testify, in relation to industry practice, to the services performed by the Subadvisers on behalf of FMG.  He may also respond to these topics as they are presented in the expert testimony of Steve Pomerantz, Kent E. Barrett, Phillip Goldstein, and Richard W. Kopcke and Francis M. Vitagliano.

The above summary is not an exhaustive synopsis of all those matters to which Mr. Wermers may testify.

**D.      Plaintiffs' objections to the qualifications of defendants' expert are:**

      See Section 2 above regarding Plaintiffs' objections to and intention to move *in limine* to strike the testimony of Messrs. Holder and Wermers, and Ms. Smythe.

**9.      PLAINTIFFS' EXHIBITS (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial.  Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived.  All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).**

**A.      Plaintiffs intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):**

      *See* Plaintiffs' Exhibit List with Defense Objections, attached hereto as **Exhibit C.**

**B.      Defendants object to the introduction of plaintiffs' exhibits (set forth number of an exhibit and grounds for objection):**

      *See* above Plaintiffs' Exhibit List with Defense Objections, attached hereto as **Exhibit C.**

**10.     DEFENDANTS' EXHIBITS (See instructions above).**

**A.      Defendants intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):**

      *See* Defendants' Exhibit List with Plaintiffs' Objections, attached hereto as **Exhibit D.**

      Defendants reserve the right to supplement the attached exhibit list with additional documents, including but not limited to documents for rebuttal purposes. Defendants have anticipated some rebuttal documents on this exhibit list.  The inclusion of these documents is not an admission that the documents are relevant or admissible or a representation that Defendants will move them into evidence. Defendants also reserve the right to supplement the exhibit list with demonstrative exhibits to be used at trial.  Defendants further reserve the right to sub-divide large

exhibits for the convenience of the Court and the witnesses at trial. In addition, Defendants reserve the right to use documents on Plaintiffs' exhibit list.

**B.     Plaintiffs object to the introduction of defendants' exhibits (set forth number of an exhibit and grounds for objection):**

*See* above Defendants' Exhibit List with Plaintiffs' Objections, attached hereto as **Exhibit D**.

**(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial.  If counsel desires to display exhibits to the jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).**

The Parties' current Joint Exhibit List is attached hereto as Exhibit E.

11.    **PLAINTIFFS' LEGAL ISSUES**

a.     Is the magnitude of the management and administrative fees and other compensation received by FMG from the Plaintiffs' Funds during the period at issue consistent with the fiduciary duty owed by FMG pursuant to § 36(b) of the Investment Company Act?

b.     Is the magnitude of the management and administrative fees and other compensation received by FMG from the Plaintiffs' Funds during the period at issue the product of an arm's length negotiation?

c.     Is the magnitude of the management and administrative fees and other compensation received by FMG from the Plaintiffs' Funds during the period at issue disproportionate to the services rendered?

d.     Are the management and/or administrative fees retained by FMG in violation of the fiduciary duty owed by FMG pursuant to § 36(b) of the Investment Company Act?

e.     Did FMG's management and/or administrative fees attributable to Plaintiffs' Funds violate the law?

f.      If FMG's compensation is found to be a breach of fiduciary duty or otherwise in violation of law, what is the proper measure of damages and other relief to be awarded to the Plaintiffs Funds?

g.      Did the EQAT Board apply the proper standard when it reviewed and approved the subject fees?

h.      Is the EQAT Board's approval of the subject fees entitled to any deference given the facts of this case?

## 12.     DEFENDANTS' LEGAL ISSUES

a.      Do Plaintiffs lack standing to sue under Section §36(b) of the ICA because they do not own any shares in the Funds, and thus are not "security[ies] holder[s]" as required by Section 36(b)?[22]

b.      Are the investment management and administrative fees paid by the Funds to Defendants "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining, *see Jones v. Harris*, 559 U.S. 335, 346 (adopting standard established by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928-29 (2d Cir. 1982)), where Defendants performed extensive management and administrative services to the Funds, provided the Funds' independent trustees with ample information concerning each *Gartenberg* factor, and the independent trustees regularly negotiated for alterations to the Funds' fees before approving the fees charged by Defendants each year?

c.      Have Plaintiffs satisfied their burden of proof with respect to any of the *Gartenberg* factors: (1) the nature and quality of services provided to the funds; (2) the independence and conscientiousness of the funds' directors; (3) whether economies of scale were realized and, if so, whether such benefits were adequately shared with the funds; (4) the fees charged to comparable mutual funds; (5) the profitability of the funds to the adviser; and (6) fall-out benefits (*i.e.*, indirect profits) that would not occur but for the adviser's relationship with the funds? *Gartenberg*, 694 F.2d at 928-29; *see also Jones*, 559 U.S. at 344 n.5.

---

[22] The Court ruled on this issue in connection with Defendants' motion to dismiss. Defendants include this issue herein for the purposes of preservation on any appeal.

d.      May Plaintiffs base their claim on the Funds' performance, where the Funds' Board of Trustees considered the Funds' undisputed performance data prior to approving the Funds' fees? *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 980 (D. Minn. 2007).

e.      Was the process used by the statutorily disinterested trustees "robust" and thus subject to judicial "deference" because the disinterested trustees exercised sufficient care and conscientiousness in their review and approval of Defendants' compensation under the Investment Management and Administration Agreements, respectively, when the trustees reviewed and considered materials containing detailed, fund-by-fund information relating to each *Gartenberg* factor, participated in presentations made by Defendants, and engaged in negotiations regarding the fees that benefitted the Funds? *See Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 350 (2010).

f.      Have Plaintiffs met their burden of proof regarding the *existence* of any potential economies of scale concerning any Fund, where Plaintiffs failed to analyze whether the pre-unit cost of servicing each Fund decreased as assets under management for that Fund increased? *See In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 U.S. Dist. LEXIS 120597, at *77 (C.D. Cal. Dec. 28, 2009); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 496 (S.D.N.Y. 1988).

g.      Have Defendants adequately shared any potential benefits from economies of scale with investors in the Funds, where Defendants implemented multiple mechanisms for sharing potential fee economies, including breakpoints (which courts have recognized as a form of sharing), fee waivers, and reinvestments in the Funds? *Gartenberg*, 528 F. Supp. at 1054; *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *139-40.

h.      Have Plaintiffs adduced any evidence of breach of fiduciary duty by Defendants with respect to Defendants' receipt of compensation where the fees charged to the Funds fall within the range of fees charged by comparable funds?

i.      May Plaintiffs artificially disaggregate FMG's unitary investment management and administrative fees for the purposes of challenging isolated, artificially constructed portions of those fees (*i.e.*, the amounts left over after FMG pays its subadvisers and sub-administrator)? S. Rep. No. 91-184 (1969), at 13, *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910 (1970) (under Section 36(b) a court must "look at *all the facts* . . . , including *all services* rendered to the fund or its

shareholders and *all compensation and payments received*") (emphasis added); *see also Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1052 (S.D.N.Y. 1981) (holding that it is "***entirely proper*** for the fiduciary to consider the ***totality of values*** placed at the disposal of the shareholders in appraising the fairness of compensation, ***or else form would be substituted for substance***") (emphasis added), *aff'd*, 694 F.2d 923 (2d Cir. 1982). In other words, can whether a fee is excessive hinge on the mere difference between whether a manager/administrator performs all of its services in-house or instead utilizes third parties to assist with some services, where the ultimate fee charged to investors is in line with competitor funds?

j.      Have Plaintiffs shown any breach of fiduciary duty by Defendants with respect to Defendants' receipt of compensation where Defendants' profitability for each Fund is within the range of profitability that has been found acceptable by courts in other Section 36(b) cases? *See, e.g., Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (pre-tax margins up to 89%), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987) (pre-tax margins up to 77.3% and post-tax margins up to 38.6%); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *135-37 (pre-tax margins ranged from 30% to 52%); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1236, 1250 (S.D.N.Y. 1990) (post-tax margin up to 37.8% "neither requires nor supports a finding [of excessiveness]"); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 502-03 & n.61 (S.D.N.Y. 1988) (margins as high as 33% were "well within the realm of reasonableness").

k.      Should expenses incurred by AXA (Defendants' parent company) in connection with providing services for the benefit of FMG and the Funds be allocated for purposes of calculating FMG's profitability with respect to each Fund? *See, e.g., Gartenberg*, 694 F.2d at 931; *see also Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 978 n.49 (S.D.N.Y. 1987) (considering in Section 36(b) case "all costs that are directly associated with each product as well as an equitable share of indirect and corporate administrative expense")

l.      Did any indirect benefits (*i.e.*, "fall-out benefits") accrue to Defendants or their affiliates that "would not have occurred *but for* the existence of" the Funds? *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *53 (emphasis in original) (quoting *Krinsk*, 715 F. Supp. at 495).

**13.   CHOICE OF LAW:**
**(If there is any issue as to what state's law is applicable to any count of the**
**complaint, set forth the choice of law question.  This issue shall be separately**
**briefed in accordance with an order to be entered herewith).**

Federal substantive law applies under Section 36(b) of the Investment Company
Act of 1940.

**14.   MISCELLANEOUS (Set forth any other matters which require action**
**by, or should be brought to the attention of the Court).**

1.     If the defense offers the Summary Charts that were prepared post- litigation
by Defendants' in house counsel, Patricia Louie and attorneys from the Milbank
Tweed Firm, Plaintiffs intend to (i) subpoena all documents related to the those
communications and (ii) examine Ms. Louie and each attorney from the Milbank
firm involved in the preparation of the Summary Charts. This matter was the
subject of an *in limine* motion filed by Plaintiffs. Plaintiffs' anticipate that the
defense will object to the subpoena and their attorneys being examined at trial on
this topic based on the attorney/client privilege. Plaintiffs believe the
attorney/client privilege is not applicable given legal counsel's admitted
involvement in the preparation of the Summary Charts.

    a.  Defendants intend to offer the summary charts at trial.  Plaintiffs'
        contemplated subpoena, however, is improper.  A trial subpoena
        cannot be used to obtain evidence that could have been obtained
        during the discovery period.  Therefore, federal courts in the Third
        Circuit routinely quash such subpoenas. *See, e.g., Puritan Inv. Corp.*
        *v. ASLL Corp.*, No. 97-1580, 1997 WL 793569, at *2 (E.D. Pa. Dec.
        9, 1997).  Here, Plaintiffs could have obtained the evidence they now
        seek prior to the close of discovery nearly 18 months ago.  In fact, this
        Court, in denying Plaintiffs' request to reopen discovery on the
        summary charts, found no excuse for Plaintiffs' failure to pursue
        evidence concerning the summary charts during the discovery
        period.  *See* Mem. Op. and Order (Arpert, Mag.), ECF No. 174.  Even
        if the subpoena is not quashed, communications between Milbank and
        Ms. Louie are protected by privilege.

2.     Plaintiffs may seek to elicit testimony from Board members about
conversations with and documents provided by counsel to FMG and counsel to the
Independent Trustees.  Plaintiffs believe that the Board will assert an

*[handwritten margin note: Plaintiffs must submit the proposed subpoena(s) to the Court to review by Dec. 4, 2015. Any objections must be filed by Dec. 11, 2015.]*

attorney/client privilege and that FMG will assert that it can avail itself of the attorney/client privilege under the common interest doctrine. Plaintiffs believe that the fiduciary exception to the attorney/client privilege bars the Board from asserting this privilege and that any privilege the Board has was waived because information was disclosed in the presence of non-clients. Plaintiffs further believe that the common interest doctrine is not available to FMG.

*To be fixed by plaintiffs an ... in limine motion per para 2 above.*

    a. It is unclear what information/testimony Plaintiffs have in mind. However, courts in Section 36(b) actions have long held that a common interest privilege exists between the investment adviser and a mutual fund's trustees regarding communications about defense of the litigation. *See Strougo v. BEA Assocs.*, 199 F.R.D. 515, 525 (S.D.N.Y. 2001); *Bennett v. Fidelity Mgmt. & Research Co., et al.*, Civ. No. 04-116510 MLW, Tr. of Mot. Hr'g 38-39, July 19, 2007 (Dkt. No. 90). Moreover, the time to challenge privilege objections has long since passed, and Plaintiffs are bound by the terms of the Joint Stipulation and Proposed Order Regarding Privilege Issues, entered by this Court on February 6, 2014.

*To be determined by Judge Sheridan*

3.     The Parties believe that Opening Statements will greatly assist the Court in understanding the evidence and request that the Court permit each party to present an Opening Statement limited to 90 minutes.

4.     For employees of Defendants that Plaintiffs' call in their direct case, will the Court permit Defendants to examine those witnesses on matters that are part of Defendants' direct case? If so, how will the Court handle re-direct/cross-examination of those witnesses by Plaintiffs, including Plaintiffs' use of exhibits not identified in the Joint Pre-Trial Order to cross-examine the witness?

*yes* 5.     Does the Court approve the Parties' proposed schedule for exchanging designations of deposition testimony?

*yes* 6.     Does the Court approve the Parties' proposed deadlines for submitting (i) proposed findings of fact and conclusions of law, and (ii) pretrial briefs?

7.     ~~What is the briefing schedule applicable to Plaintiffs' anticipated motions not previously filed with the Court?~~ *see above.*

8.     ~~Should the Parties provide the Court with a disc including electronic copies of their respective trial exhibits, in lieu of paper copies?~~

9.    How will stipulated facts be introduced into evidence?

10.   What post-trial submissions does the Court want the Parties to submit, and when?

11.   Would the Court like to be provided with videotaped deposition testimony and transcripts, in advance of trial?

12.   Does the Court want the parties to read in designated testimony / show designated videotaped testimony, or would the Court prefer that the parties simply submit the designated portions of the transcripts/videotapes?

13.   Will the Court permit Defendants to amend their exhibit list to add exhibits to be used in their direct case after the Pre-Trial Conference despite Plaintiffs' objection?

14.   Will the Court permit Defendants "to sub-divide large exhibits for the convenience of the Court and the witnesses at trial" despite Plaintiffs' multiple objections to these "large exhibits" and Defendants' failure to expressly identify in their exhibit list the specific portions of the large exhibits they propose to "sub-divide" at trial?

*To be decided by Judge Sheridan during pretrial conference and/or trial.*

**15.    JURY TRIALS – Not later than _____.**

*To be filed by Defendants as din in limine per motion para 2.*

**A.    Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.**

**B.    Counsel for each party shall submit to the Judge, with a copy to opposing counsel, written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.**

**C.     Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.**

Not Applicable

**16.    NON-JURY TRIALS – Not later than** <u>December 30, 2015 at 7:00 P.M.</u>**:**

**A.     Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B with citation to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.**

**B.     Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law. There is reserved to counsel the right to submit additional proposed findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.**

**17.    TRIAL COUNSEL (List the names of trial counsel for all parties).**

a.     <u>Counsel for Plaintiffs</u>: Arnold Lakind, Robert Lakind, Robert Stevens and Daniel Sweetser, Szaferman, Lakind, Blader & Blumstein, P.C.

b.     <u>Counsel for Defendants</u>:

    i.   James N. Benedict, Sean M. Murphy, Robert C. Hora, James C. Cavoli, and Andrea G. Hood, Milbank, Tweed, Hadley & McCloy LLP, New York, New York; and

    ii.  Jonathan M. Korn, Blank Rome LLP, Princeton, New Jersey.

**18.    BIFURCATION (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).**

**The issues of liability and damages SHALL / <u>SHALL NOT</u> be tried separately.**

70

The Parties agree that the issues of liability and damages SHALL NOT be tried separately

## 19.    ESTIMATED LENGTH OF TRIAL

_____ DAYS FOR LIABILITY

**and**

_____ DAYS FOR DAMAGES.

Plaintiffs estimate that their entire case (liability and damages) will be presented in 8 full trial days.

Defendants estimate that their entire case (liability and damages will be presented in approximately 8 to 10 full trial days.

**AMENDMENTS TO THIS PRETIRAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.**

/s/ Daniel S. Sweetser
**DANIEL S. SWEETSER, ESQ.**
     **(Attorney for Plaintiff)**

/s/ Jonathan M. Korn
**JONATHAN M. KORN, ESQ.**
**(Attorney for Defendants)**

**Hon. Douglas E. Arpert, USMJ**

DATED:  _November 23, 2015_ .

**(EXHIBIT LIST TO FOLLOW)**

# Exhibit A

## To The Parties' Proposed Joint Pre-Trial Order