## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, et al.<br><br>       Plaintiffs,<br>vs.<br><br>AXA EQUITABLE FUNDS<br>MANAGEMENT GROUP, LLC,<br>et al.,<br><br>       Defendants. | **Civ. A. No. 3:11-cv-04194-PGS-DEA** |
| GLENN D. SANFORD, et al.<br><br>       Plaintiffs,<br><br>vs.<br><br>AXA EQUITABLE FUNDS<br>MANAGEMENT GROUP, LLC,<br>et al.,<br><br>       Defendants. | **Civ. A. No. 3:13-cv-00312-PGS-DEA**<br><br><br>**Trial Date: January 6, 2016** |

## PLAINTIFFS' TRIAL BRIEF

SZAFERMAN LAKIND,
  BLUMSTEIN & BLADER, P.C.
Arnold C. Lakind, Esq.
101 Grovers Mill Rd, Suite 200
Lawrenceville, NJ 08648
Telephone: (609) 275-0400
Fax: (609) 275-4511
alakind@szaferman.com
**ATTORNEYS FOR PLAINTIFFS**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    The Management and Mutual Fund Service Agreements . . . . . . . . . . 7

    C.    FMG's Role and the Variable Annuity Contracts . . . . . . . . . . . . . . . . 8

    D.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    FMG HAS VIOLATED § 36(b) OF THE ICA BY CHARGING
    EXCESSIVE INVESTMENT MANAGEMENT AND
    ADMINISTRATIVE FEES THAT COULD NOT HAVE BEEN
    THE PRODUCT OF AN ARM'S LENGTH BARGAIN . . . . . . . . . . . . . . . 10

    A.    The Framework of a § 36(b) Analysis . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    The Investment Company Act . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    *Jones v. Harris*, 559 U.S. 335 (2010) . . . . . . . . . . . . . . . . . . . 10

    B.    The Analysis of a § 36(b) Claim Involving a Sub-Advisor
        Requires an Evaluation of the Fees Paid To and Services
        Performed by the Principal Adviser . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.    FMG's Fees Are Inconsistent With Its Fiduciary
        Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.    Care and Conscientiousness of the Board . . . . . . . . . . . . . . . 17

            a.    The Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

b.    The Board Was Not "Fully Informed" or
"Careful and Conscientious" . . . . . . . . . . . . . . . . . . . . . . 19

2.    Nature and Quality of Services . . . . . . . . . . . . . . . . . . . . . . . . . 23

a.    Nature of Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

(i)    Number of FMG Employees . . . . . . . . . . . . . . . . 24

(ii)    FMG's Annual Expenses . . . . . . . . . . . . . . . . . . . 25

(iii)    FMG's Representations . . . . . . . . . . . . . . . . . . . . 25

(iv)    The Various Contracts . . . . . . . . . . . . . . . . . . . . . 26

(v)    Examples of Work . . . . . . . . . . . . . . . . . . . . . . . . 28

(vi)    Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . 28

b.    Quality of Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3.    The Profitability of the Fund to the Adviser . . . . . . . . . . . . . . 30

4.    Fall-out Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5.    Comparative Fee Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

6.    Economies of Scale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

7.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# **Table of Authorities**

**Page**

*Am. Chemicals & Equip., Inc. 401(K) Ret. Plan v.*
*Principal Mgmt. Corp.*,
No. 4:14-CV-00044-JAJ, 2014 WL 5426908
(S.D. Iowa Sept. 10, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Edmonson v. Lincoln Nat'l Life Ins.*,
725 F.3d 406 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Galfand v. Chestnutt Corp.*,
545 F.2d 807 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 32

*Gallus v. Ameriprise Financial,* Inc.,
467 F. Supp. 2d 974 (D.Minn. 2007)
rev'd, 561 F.3d 816 (8th Cir.) (2009)
vacated 559 U.S. 1046 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
528 F. Supp. 1038 (S.D. N.Y. 1981),
*aff'd,* 694 F. 2d 923 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 32

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
694 F. 2d 923 (2d Cir. 1982)
*cert. den.* 461 U.S. 906 (1983) . . . . . . . . . . . . . . . . . . . . . . 12, 18, 23, 38

*Geddes v. Anaconda Copper Mining Co.*,
254 U.S. 590, 41 S. Ct. 209,
65 L.Ed. 425 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . 33, 37

*In re American Mu. Funds Fee Litig.*,
No. CV-04-5593, 2009 WL 5215755
(C.D. Cal., Dec. 28, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Smith Barney Fund Mgmt. LLC*
        *and Citigroup Global Mkts., Inc.*,
        File No. 3-11935 (May 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jones v. Harris Assoc., L.P.*,
        559 U.S. 335  (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kalish v. Franklin Advisers, Inc.*,
        742 F. Supp. 1222 (S.D. N.Y.)
        *aff'd*, 928 F.2d 590 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Kasilag v. Hartford Inv. Fin. Serv., LLC*,
        C.A. No. 1083, 2012 WL 6568409
        (D.N.J. Dec. 17, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Krinsk v. Fund Asset Mgmt., Inc.*,
        715 F. Supp. 472 (S.D.N.Y. 1988)
        *aff'd*, 875 F.2d 404 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Krinsk v. Fund Asset Management, Inc.*,
        875 F.2d 404 (2d Cir.)
        *cert. den.* 493 U.S. 919 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Operating Local 649 Trust Fund v.*
        *Smith Barney Fund Management, LLC*,
        595 F.3d 86 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 32

*Pepper v. Litton,*
        308 U.S. 295 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Pfeiffer v. Bjurman, Barry & Associates,*
        No.  93 Civ.  9741, 2006 WL 497776
        (S.D. N.Y. Mar.  2, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
        663 F. Supp. 962 (S.D.N.Y. 1987)
        *aff'd,* 835 F.2d 45 (2d Cir. 1987)
        *cert. den.* 485 U.S. 1034 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Tanzer v. Huffines,*
        314 F. Supp. 189 (D. Del. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*The R.W. Grand Lodge of F. & A.M. of Pennsylvania v.*
        *Salomon Bros. All Cap Value Fund,*
        425 F. App'x 25 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 37

## Federal Statutes

15 U.S.C. § 80a-2(a)(20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Investment Company Act,
        15 U.S.C. § 80a-35(b),
        also cited as §36(b) of the Investment Company Act . . . . . . . . . . . . . . . *passim*

## Other Authorities

The Restatement (Third) Trusts, § 38 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Uniform Trust Act, § 708 (2010 rev.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

"Practical Guidance for Directors on the Oversight of Sub-advisers,"
        Mutual Fund Directors Forum (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

G. Bogert and G. Bogert, the *Law of Trusts and Trustees*
        § 543 (2d ed. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## PRELIMINARY STATEMENT

This trial brief is submitted on behalf of Plaintiffs, Mary Ann Sivolella, Glenn D. Sanford, William R. Tucker, Brian D. Sanchez, Robert Cusack, Mary T. Cusack and Patricia F. Lynn, in support of their claim that AXA Equitable Funds Management Group, LLC ("FMG") and AXA Equitable Life Insurance Company ("AXA") failed to fulfill their fiduciary duty under §36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b), (the "Act")[1] because they charged excessive advisory and administrative fees to the Plaintiffs' mutual funds (the "Funds").

Section 36(b) imposes a "fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [a] registered investment company [mutual fund]" to its "investment adviser." This statute requires a court, when assessing whether an investment adviser has fulfilled that duty, to consider "**whether or not under the circumstances the transaction carries the earmarks of an arm's length bargain**." *Jones v. Harris Assoc., L.P.,* 559 U.S. 335, 347 (2010) ("*Jones*") (emphasis in the original). This analysis in turn

---

[1] Prior to February 2011, FMG was a business unit of AXA Equitable Life Insurance Company. Thereafter, FMG became a wholly owned subsidiary of AXA and is now known as AXA Equitable Fund Management Group, LLC. AXA's liability derives from the fact that, for several years, FMG was a business unit of AXA.

1

requires that "all relevant circumstances be taken into account." *Id.* The credible evidence put forth at trial will demonstrate beyond question that FMG breached its fiduciary obligations to Plaintiffs  by charging exorbitant management and administration fees that could not possibly have been the product of an arm's length bargain.

**First,** the funds at issue are "sub-advised" funds.  The evidence will show that nearly all day-to-day investment advisory tasks have been delegated to a variety of sub-advisors, and the evidence will further show that the bulk of the administrative services have been delegated to a sub-administrator, JPMorgan Chase ("JPMorgan").

Although the sub-advisors did virtually all of the investment advisory work, FMG collected a grossly disproportionate fee for itself in comparison to the work it performed.  For example, with respect  to two of Plaintiffs' funds, the Core Bond Index and the Intermediate Government Bond Index, FMG collected a management fee that was **20 times greater** than the amount FMG paid to the sub-advisor to manage the two funds.

In addition, although JPMorgan provided virtually all of the needed administrative services for Plaintiffs' funds, FMG collected an administrative fee that was **10 times greater** than that of JPMorgan. Moreover, the evidence will show that the fee and services JPMorgan performed for Plaintiffs' funds as "sub-

administrator" were the same fee and services JPMorgan contracts to performed for many other mutual funds as the stand alone administrator.[2]

FMG's sub-contracting arrangement allowed FMG to annually extract between $300 and $500 million in fees for itself, using only 50 employees and incurring only $15 million in direct expenses.

**Second,** four of Plaintiffs largest funds are index tracking funds. For these funds, FMG retained a sub-advisor who simply purchased a set of investments identical to those assembled by independent third parties, such as Standard and Poor's. For "overseeing" the work of these sub-advisors, FMG charged a fee ranging between from 4 to 20 times greater than that paid to the subadvisor, **and** 3 times the national average fee incurred to provide all management services to an index fund. For example, in 2014, FMG paid the sub-advisor for the Core Bond Index Fund $1,194,221 to manage the fund; and kept $23,087,682 for itself to "manage the manager."

**Third,** the mutual funds at issue are part of a variable annuity sold by FMG's parent, AXA. A variable annuity is an investment product that pays periodic income to owners dependent upon the performance of underlying investments. AXA

---

[2]Neither the sub-advisors nor JPMorgan as the sub-administrator needed FMG's oversight. These sub-advisors and JPMorgan operate their own mutual funds without any oversight by another adviser.

collects fees for these variable annuities, which are in addition to the fees paid by mutual fund investors to FMG. AXA also receives revenue on Plaintiffs' investments in AXA's general account, separate and above the subject mutual fund fees. These two revenue sources are called "fall-out benefits," *Jones, id.* at 344, n.5,and generate between $500 million and $1 billion annually in additional compensation to AXA. The managers of conventional mutual funds do not enjoy additional benefits of this magnitude. While there is nothing inherently wrong with receiving fall-out benefits, FMG failed to fulfill its fiduciary duty to Plaintiffs because it unlawfully concealed their magnitude from the Funds' board.

**Fourth**, those who participate in pension plans or an employer's 401(k) plans are normally protected by a sophisticated intermediary, an independent plan sponsor or fiduciary, who negotiates fees with investment advisors. In contrast, small individual investors who purchase FMG managed mutual funds are on their own. Their only protection comes from the efforts of so called "independent trustees" on the mutual fund board who are required by statute to negotiate advisory and administrative fees on their behalf. The relationship between the board of a mutual fund and the investment adviser who establishes that fund is, in the words of the Supreme Court, fraught with potential conflicts. *Jones* at 338 to 39. It is thus incumbent upon an investment adviser to "fully inform" a board about all matters

that might impact the fee negotiation process and that the negotiation process be "robust." *Id.* at 349.

Plaintiffs will demonstrate that FMG withheld critical information from the Board, the Board's process was not robust, and the resulting fee paid to FMG lacked the indicia of the required "arm's length bargain." *Id.* at 347. By way of example, prior to 2007, FMG informed the Board that the value of the "fall-out benefits" attributable to its variable annuities and general account referenced above was $500 million dollars per year. Since 2007, FMG has concealed the magnitude of these "fall-out benefits." Years later, FMG began to acknowledge that these revenues are "potential fall-out benefits," but failed to provide the Board with any information about their value. Thus, while the Board was given tens of thousands of pages of information to review, much of it trivial, the Board was not informed that AXA received hundreds of millions of dollars in "fall-out" benefits per year during all years at issue in this action.

The evidence will show that FMG withheld other material information from the Board as well. It is undisputed in this action that the sub-advisors and JPMorgan were paid directly from fund assets, not FMG's assets. In an effort to report a lower and inaccurate profit margin to the Board, FMG treated those payments as an FMG expense.

FMG also inexplicably failed to provide the Board with a copy of its "Sub-Administration Agreement" with JPMorgan, thereby preventing the Board from determining whether the administration services FMG claimed to perform were in reality being performed by JPMorgan for a much lower fee.

AXA and FMG were parties to a "Shared Services Agreement" pursuant to which FMG paid AXA approximately $15 million per year to provide all personnel and resources needed to service the mutual funds. Using a flawed, arbitrary and inscrutable "cost allocation methodology," FMG assessed an additional $50 million per year of AXA's alleged cost to support FMG's business. Incredibly, FMG did not provide the Board with a copy of the Shared Services Agreement to fully inform the Board of broad scope of services and expenses that the $15 million covered. But for the failure of FMG to supply the Board with the Shared Services Agreement, the Board would have been able to compare the comprehensive services and expenses reimbursed under that Agreement with the purported support provided by FMG for $50 million under the cost allocation methodology and determined that the $50 million annual payment is duplicative.

Thus, the Board's fee review process was patently flawed.

## STATEMENT OF THE CASE

### A.    The Parties

Plaintiffs have, at varying times since 2010, invested in 12 mutual funds purportedly managed by Defendant, FMG (not all Plaintiffs invested in all funds). These funds, all sub-advised and all serviced by JPMorgan, fall into three categories.

Four of the funds are index tracking funds, meaning that the subadvisors seek to duplicate the investments in a publicly available portfolio assembled by others: the EQ/Core Bond Index Portfolio, the EQ/Intermediate Government Bond Index Portfolio, the EQ/Common Stock Index Portfolio and the EQ/Equity 500 Index Portfolio. Five of the funds have an index and an actively managed component: the EQ/Equity Growth PLUS Portfolio, the EQ/Global Bond PLUS Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio and the EQ/Mid Cap Value PLUS Portfolio. Three of the funds are actively managed meaning that the investments were selected by subadvisors with no effort to duplicate an existing publicly available portfolio: the EQ/GAMCO Small Company Value Portfolio, the EQ/PIMCO Ultra Short Bond Portfolio and the EQ/T. Rowe Price Growth Stock Portfolio. These 12 Funds, along with some 78 others, are held within a Delaware statutory trust known as the "EQ Advisers Trust" (the "EQAT") which is one of five trusts managed by FMG.[3] The five trusts in turn are

---

[3]The number of funds in the EQAT varies from year to year because FMG discontinues some funds, adds others and consolidates still others.

overseen by a single board of trustees whose role was to negotiate fees with FMG.

## B.   The Management and Mutual Fund Service Agreements

A mutual fund consists of a portfolio of securities which are derivatively owned by fund investors. *Jones,* 559 U.S. at 338.  Mutual funds, also called investment companies,  are created by an investment manager.  The manager or its affiliates may enter into one or more contracts with the mutual fund, among them an agreement to manage fund assets (a management or advisory agreement), an agreement to administer the fund (an administrative agreement), an agreement to market the fund (a distribution agreement), and an agreement to implement transfers of investor shares and to perform similar tasks (a transfer agency agreement).

FMG and its predecessor, AXA Funds Management Group, LLC, have entered into an "Investment Management Agreement" with the EQAT pursuant to which it purports to manage all 90 EQAT funds for a management, or advisory, fee.  FMG has also entered into a Mutual Funds Service Agreement (the "Administrative Agreement") pursuant to which it purports to provide administrative services to the EQAT for an additional fee.

## C.   FMG's Role and the Variable Annuity Contracts

As noted above, the relationship here differs from that of the typical mutual fund.  The labor intensive work which is the essence of the advisory function - day to day investment management - is handled by sub-advisors;  administrative services

are performed by JPMorgan.  FMG's parent, AXA, also derives income from its

variable annuities, and sells insurance to mutual fund owners to protect them from

various risks, such as depreciation in a funds' value.  In consideration for these

services, AXA charges its own fees and, at times, insurance premiums.  These "fall-

out benefits" (which AXA calls its "product wrapper" or "separate account

revenues") along with income earned on Fund owners' assets invested in AXA's

"general account" have, in recent years, enriched AXA by $1 billion annually.  This

is not in itself improper but it is a factor that the EQAT Board should have been –

but was not – aware of when it approved FMG's fees.

### D.    Summary of Argument

The Supreme Court, in *Jones*, held that, in a § 36(b) case, a Court is to

consider  "all of the surrounding circumstances," *Jones* at 344.   Although no § 36(b)

case involving a sub-advised fund has been tried, a number of Courts have examined

fee arrangements in which an investment adviser, such as FMG, collects a large fee,

but delegates much of the work to others.  That practice has been universally

condemned, one Court describing it as a "garden variety" fiduciary breach.

As discussed in the argument that follows, the fees that FMG collected cannot,

given the limited services it performed, the abysmal performance of many (but not

all) of the Funds, and the magnitude of the "fall-out benefits" which accrued to

AXA,  be justified when "all of the surrounding circumstances" are considered.

Thus, FMG's fees lack the "earmarks of an arm's length bargain," *Jones* at 347, and

FMG must disgorge its profits.

## ARGUMENT

### FMG HAS VIOLATED § 36(b) OF THE ICA BY CHARGING EXCESSIVE INVESTMENT MANAGEMENT AND ADMINISTRATIVE FEES THAT COULD NOT HAVE BEEN THE PRODUCT OF AN ARM'S LENGTH BARGAIN

**A.** **The Framework of a § 36(b) Analysis**

    **1.** **The Investment Company Act**

ICA § 36(b) provides in pertinent part that:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser . . .. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser. . . for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

    **2.** ***Jones v Harris*, 559 U.S. 335 (2010)**

In 2010, the Supreme Court decided *Jones v. Harris Assoc., L.P.,* 559 U.S.

335, which governs Plaintiffs' § 36(b) breach of fiduciary duty claim.  The *Jones*

Court observed that "the forces of arm's-length bargaining do not work in the mutual

fund industry in the same manner as they do in other sectors of the American

economy." *Id.* at 338 (quotations omitted).   Because the relationship between a fund

and its investment adviser is "fraught with potential conflicts of interest," Congress,

concerned about the "potential for abuse," decided to "include provisions in the ICA

to protect mutual fund shareholders." *Id.* at 338-39.   Those provisions include

"impos[ition] upon advisers [of] a 'fiduciary duty' with respect to compensation

received from a mutual fund . . .." *Id.* at 340.   To determine whether that fiduciary

duty has been fulfilled, the Court held that a fiduciary's

> **dealings with the corporation are subject to rigorous scrutiny. . .**
> **The essence of the test is whether or not under all the**
> **circumstances the transaction carries the earmarks of an arm's**
> **length bargain**. If it does not, equity will set it aside." *Id.*, at
> 306–307[, 60 S. Ct. 238] (emphasis added; footnote omitted); see also
> *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599, 41 S.
> Ct. 209, 65 L.Ed. 425 (1921) (standard of fiduciary duty for
> interested directors).
>
> We believe that this formulation expresses the meaning of the phrase
> "fiduciary duty" in § 36(b), 84 Stat. 1429.   (Emphasis in original).

*Id.* at 346 to 47 (quoting *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)).

In order to assess whether or not a transaction "carries the earmarks of an

arm's length bargain," the *Jones* Court adopted a test which had both procedural and

substantive components. *Id.* at 351. The procedural component of the analysis

requires an assessment of the process employed by a fund board to approve a fee,

which in turn determines the level of deference, if any, to be afforded to board

decisions.  If a board is well-informed and careful and conscientious, a court should

not find a fiduciary breach unless the resulting fee is disproportionately large in comparison to the services rendered. If a board's process is deficient, a court must undertake a more robust review. *Id.* at 346 and 351. As discussed below, the decisions of the EQAT Board to approve the fees for each of the 12 Funds at issue in this matter are entitled to no deference.

The substantive component of the analysis anticipates consideration of, among other evidence, the six *Gartenberg*[4] factors, named after the case in which they were first described. *Jones* at 345, n. 5. These include: (1) the nature and quality of the services provided to the fund; (2) the profitability of the fund to the adviser; (3) any fall-out (ancillary) financial benefits; (4) comparative fee structure; (5) economies of scale; and (6) the care and conscientiousness of the Board which approves the fee. *Jones*, 559 U.S. at 344 to 45 and n. 5.

As discussed below, under any standard of review, FMG's fees are excessive and lack the "earmarks of an arm's length bargain." *Jones, id.* at 347.

**B.     The Analysis of a § 36(b) Claim Involving a Sub-Advisor Requires an Evaluation of the Fees Paid To and Services Performed by the Principal Adviser**

*Jones* and other ICA § 36(b) cases that have been tried to date did not involve sub-advised funds. Fees charged in connection with sub-advised funds implicate

---

[4]*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982) *cert. den.* 461 U.S. 906 (1983).

concerns in addition to those that apply to a conventional mutual fund.  This is so because § 36(b) explicitly requires a focus on compensation "to such investment adviser," as distinct from sum of the fee paid to the adviser and sub-advisor.   Here the EQAT pays each sub-advisor and in addition pays FMG.  Thus, the focus must be on the fees paid and services performed by FMG.

When an investment adviser delegates substantial work to a sub-advisor but continues to collect a significant fee for itself, it has committed a "garden variety breach of fiduciary duty" under the ICA by failing to return the savings to investors. *The R.W. Grand Lodge of F. & A.M. of Pennsylvania v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25, 30 (2d Cir. 2011).  *See also, e.g., Kasilag v. Hartford Inv. Fin. Serv., LLC*, No. 1083, 2012 WL 6568409, p. *3 (D.N.J. Dec. 17, 2012) (plaintiffs stated a claim when they alleged that the investment manager delegated advisory tasks to others but charged fund shareholders "an average of three times what it cost to provide its investment advisory services");  *Am. Chemicals & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*, No. 4:14-CV-00044-JAJ, 2014 WL 5426908, at *1 (S.D. Iowa Sept. 10, 2014); *cf Operating Local 649 Trust Fund v. Smith Barney Fund Management, LLC*, 595 F. 3d 86, 93 (2d Cir. 2010) (adviser "had an obligation to negotiate the best possible arrangement for the funds"); *Pfeiffer v. Bjurman, Barry & Associates*, No.  93 Civ.  9741, 2006 WL 497776, *4-5 (S.D. N.Y. Mar.  2, 2006) (§ 36(b) imposes a duty "with respect to those payments that accrue to

an adviser or its affiliate" because of Congress's "stated desire to prevent investment

advisers from profiting from their power over funds' disbursements").

  As noted above, in *Jones, id.* at 347, the Supreme Court instructed trial courts

to consider whether the fee "under all the circumstances carries the earmarks of an

arm's length bargain."  One such circumstance is whether the savings which result

from a delegation are equitably shared with investors.  *See, e.g. The R.W. Grand*

*Lodge of F. & A.M. of Pennsylvania v. Salomon Bros. All Cap Value Fund*, 425 Fed.

App'x at 30.  There, the plaintiffs alleged that the defendants caused the Salomon

Smith Barney ("SSB") mutual funds to negotiate a contract with a Salomon affiliate

to act as a transfer agent who in turn subcontracted that work out to a third party.

> Rather than pass the resulting savings on to investors in the form of lower
> fees, SSB's affiliate kept the windfall, permitting Defendants to profit at the
> expense of the SSB Funds and their investors.

*Id.* 30.  In the Court's view, this was a "garden variety breach of fiduciary duty," *id.*

because shareholders were

> ". . . . being grossly overcharged for transfer agent services" and the
> "[investment adviser] was reaping the benefits."  In effect, "the Fund investors
> . . . were at the mercy of a faithless fiduciary.

425 Fed. App'x. 30.  (citation omitted). Thus, in those circumstances in which all or

part of the fiduciary's functions are delegated,  the savings achieved belong to the

fund investors.

  Similarly, in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp.

1038, 1040 and 1047 (S.D. N.Y. 1981), *aff'd*, 694 F. 2d 923 (2d Cir. 1982), the

court noted that an investment adviser must act with an "eye single to the best

interests of the beneficiaries." *Id.* at 1047.  While the specific issue discussed here

was not addressed in that case, the Court warned that an "investment adviser may not

sell his office for personal gain." *Id.* at 1047.  By delegating much of the advisory

and administrative work and collecting a large fee for itself, FMG has sold part of its

office for "personal gain."

These conclusions are consistent with common law principles.  The "fiduciary

duty standard" incorporated into § 36(b) takes its meaning in part from trust law.

*Jones* at 347.  The Restatement (Third) Trusts, § 38, comment (c)(1) (2001),

addresses fiduciary compensation in the context of a delegation of duties; it requires

that compensation be evaluated in comparison to the services which the fiduciary

retains:

> Even proper expenses of this type [paid to an agent] may affect what is
> appropriate compensation for a trustee under a typical § 38(1)
> "reasonable compensation" standard.

Likewise, in the comment to the Uniform Trust Act, § 708 (2010 rev.), the reporter

notes that, "a downward adjustment of fees may be appropriate if a trustee has

delegated significant duties to agents, such as delegation of investment authority to

outside managers."

Industry publications recognize that, in a § 36(b) case, separate consideration

be given to the fees and services of the adviser/administrator and the sub-advisor/sub-administrator. A report of the Task Force Report of the Independent Directors' Council, entitled "Board Oversight of Sub-advisors" provides:

> As part of its evaluation of the subadvisory fee, the Board likely will also consider the fees paid to the principal adviser in light of the services performed by the principal adviser versus those that are delegated to the subadvisor.

https://www.idc.org/pdf/idc_10_subadvisers.pdf, p. 11 (last visited December 24, 2015). *See also* "Practical Guidance for Directors on the Oversight of Sub-advisers" (2009) at p. 9, a publication of the Mutual Fund Directors Forum, warning that

> Fund Directors should be mindful that the adviser itself, rather than the fund, may benefit when the adviser negotiates a lower sub-advisory fee.

mfdf.org/images/Newsroom/Sub-AdviserGuidelines.pdf, p. 9 (last visited December 16, 2015).

While FMG generally collected an excessive 90% of the administrative fees for all of the Funds, the percentage of the advisory fees which it received varied. Plaintiffs will <u>not</u> contend that FMG's management compensation with regard to every Fund is equally egregious. The Core Bond Index Fund is illustrative of such an excess. In one year, FMG's management fee for the Core Bond Index was 95.12% of the total fee, or $26,435,680; the sub-advisory fee was less than $1,400,000. In contrast, FMG's management fee for the T.Rowe Price Growth Stock Fund was $2,417,703 approximately equal to the sub-advisor's fee. One might

expect that a sub-advisory fee for an actively managed fund would grow in proportion to fund size as the sub-advisor must evaluate and select from a larger number of potential investments.  Unlike the labor intensive work of a sub-advisor, the management tasks, principally selecting and monitoring a sub-advisor,  require few resources and are roughly the same for each Fund.  Yet the management fee FMG received on the Core Bond Index Fund was $22,000,000 more than the management fee FMG received on the T.Rowe Price Stock Fund and 20 times more than the sub-advisor's fee.  FMG's management services were no greater, and certainly not 10 times greater than the services it performed on behalf of the actively managed T.Rowe Price Fund.

Thus, the fees paid by the EQAT to FMG on the Core Bond Index were, given the nature of FMG's work, disproportionately large when compared  to the services it rendered; it was incumbent upon FMG to pass any savings attributable to the hiring of a sub-advisor on to the owners of the Core Bond Index which failed to do.

## C.   FMG's Fees Are Inconsistent With Its Fiduciary Responsibilities

FMG may argue that the large portion of the fee that it received was warranted because the EQAT Board was well-informed and the Board correctly applied the *Gartenberg* factors.  FMG errs.  Before turning to an examination of the substantive inquiry, this brief addresses the flaws in the Board's procedures.

### 1.   Care and Conscientiousness of the Board

### a.    The Law

In the words of *Jones*, fund boards are charged with the responsibility to be

"independent watchdogs" for the shareholders. *Jones*, 559 U.S. at 348-49.   To

assure that shareholders are protected, the Court articulated a test that anticipated a

calibrated level of deference depending upon the "extent of care and

conscientiousness with which [the board performs] their duties." *Id.* at 349.   That

test entails an examination of three factors:

> [T]he expertise of the independent trustees of a fund, whether they are
> fully informed about all facts bearing on the [investment adviser's]
> services and fees, and the extent of care and conscientiousness with
> which they perform their duties . . . .

*Jones*, at 349.  The Board fails this test.

The *Jones* Court repeatedly emphasized that a Board must have complete

information.  Thus, the Court  wrote that greater deference is afforded to a board that

is "**fully** informed," *id.* at 348, has been furnished with "**all** information," *id.*, is

"**fully** informed about all facts bearing upon the [investment adviser's] service and

fee," *id.* at 349, and employs a "**robust**" process for both "negotiating and

reviewing" investment adviser compensation. *Id.* at 351.  (Emphasis added).

The disclosure must be full and encompass areas in which there is even a

"possible conflict" with the investment adviser.  Under the Investment Company Act

an investment adviser is 'under a duty of full disclosure of

> information to . . . unaffiliated directors in **every area** where there was **even a  possible conflict of interest** between their interests and the interest of the fund.'

*Galfand v. Chestnutt Corp.*, 545 F.2d at 811.  Finally, if any withheld information "**might have** hampered the board's ability to function as an independent check upon management," the Court must take a "more rigorous look at the outcome." *Jones,* 559 U.S. at 351-52.  (Emphasis added).

When a board is fully informed and employs a robust process, a fee will not be found excessive unless it is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  Conversely, when a board is not well informed or the process is less "robust," the Court should **not** give "considerable weight" to the Board's decision and "the court must take a more rigorous look at the outcome . . .." *Id.* at 351 to 52.

It was incumbent upon FMG to reduce its fees when it delegated management and administrative tasks.  See Point I(B).  By failing to do so, its fees were disproportionately large compared to the services rendered (see Point I(C)(2) to (6).  Even were they not, this Court must take a more "rigorous look at the outcome" because the Board's process was flawed.

> b.   **The Board Was Not "Fully Informed" or "Careful and Conscientious**

While FMG posted thousands of pages of material for the Board on line, it omitted significant information in areas where there were "conflicts of interest" that "might have" hampered the Board's ability to be an "independent check upon management."

**Fall-Out Benefits:**  Plaintiffs' and Defendants' experts disagree as to whether the product wrapper and general account payments were "fall-out benefits" and disagree  as to their value.  FMG previously treated these payments as "fall-out benefits," and more recently described them as "potential fall-out benefits."  Prior to 2007, FMG provided the value of both categories of fall-out benefits to the Board but, after 2006, ceased doing so.   While the parties dispute the current value of these "fall-out benefits," there is no conceivable basis for FMG's failure, when these payments were characterized as "fall-out benefits" and later when characterized as "potential fall-out benefits," to apprize the Board of their estimated value in order to permit the Board to assess their significance and determine how best to use this information in its negotiations.

**Shared Services Agreement.**  FMG did not disclose the existence of the Shared Services Agreement to the Board.  Given the amount at issue and the discrepancy in values (between $15 to $16 million in the Shared Services Agreement and approximately $50 million in "allocated" costs), a "fully informed" Board should

have been apprized of the Shared Services Agreement to allow it to make an independent assessment of whether a cost allocation was warranted and, if so, in what amount.

**Administrative Services Agreement.**   Although FMG delegated most administrative services to JPMorgan Chase, FMG did not disclose the existence of the delegation agreement.   Thus, the Board could not assess which services were contractually required from FMG and which were required from JPMorgan for its smaller fee.

**AXA's Cost Allocation Methodology:**   The Board's assessment of FMG's profits was inadequate because of the Board's (1) unquestioned acceptance of the allocation methodology of AXA's expenses (roughly $50 million) which made FMG look less profitable than it actually was; (2) failure to understand the nature of services performed by FMG in comparison to those performed by others; (3) failure to reconcile the fees paid under the Shared Services Agreement with the much larger expense allocation that FMG presented to the board; (4) failure to understand the basis of the allocation that was made; (5) failure to inquire as to why the allocated amount was not included in FMG's audited financial statements;  (6) failure to consider alternative methods that could be used to compute an expense allocation; and (7) failure to investigate the enormity of FMG's profit in light of its services.

**Management Services**.   In a number of documents, FMG reported that day-

to-day investment management and administration were performed by each of the sub-advisors and JPMorgan.   Several Board members were unaware of this, believing that day-to-day investment management and administration were instead provided by FMG.  A "fully informed" Board would have understood the scope of services performed by FMG and others.

**Economies of Scale**  While the Board was provided with some information on economies of scale, it was not shown any (1) information to allow it to conclude that economies of scale were passed on to shareholders; (2) data to assist it to assess where a fee breakpoint (asset value after which fees are reduced) should be set; (3) analyses showing the impact of setting fee breakpoints at different levels on FMG's profits; or (4) data on how expenses change for each fund as assets grow.

**Improper Classification of Sub-advisory Fees.**  The Funds paid the fees of the sub-advisors.  The Board was led to believe that FMG paid those fees and FMG treated those expenses as its own in order to reduce its reported profit margin.

**Failure to Use Consultants:**    The Board did not have its own consultants available to (1) verify the validity of AXA's expense allocation methodology; (2) assess the reasonableness of the allocated expenses; (3) reconcile the fact that AXA allocated $50 million in expenses to the EQAT with the $15 million paid for the same services pursuant to the Shared Services Agreement; (4) advise the Board on the nature and significance of the  services rendered by FMG and those rendered by

the sub-advisors; and (5) assess the reasonableness of FMG's fees, its retention and its profit. The Board excused its inability to understand AXA's expense allocation by the fact that the allocation had been endorsed by the Board's auditor, PriceWaterhouse Coopers ("PWC").  However, according to PWC's Rule 30(b)(6) witness, Martin Jennings, PWC made no effort to evaluate or review AXA's expense allocation in the last 15 years.  In fact, according to the auditor, the allocation should be driven by the time devoted to servicing the Funds not by assets managed.

**Failure to Receive Advice on Significance of Fee Retention:**  The Board was not made aware of the legal principles applicable to evaluating fees in the context of a delegation of advisory and administrative services.

The EQAT Board was not "fully informed" with regard to issues in which its interests were adverse to those of FMG and the absence of this information "might have hampered" the Board's ability to function as a "watchdog" for Fund shareholders. *Jones* at 348-49.  The Board's process was not "robust," *Jones* 559 U.S. at 350, and its decision to approve FMG's fees is entitled to no deference.  As set forth below, FMG's fees, under any standard of review, cannot be justified by the *Gartenberg* factors.

### 2.   Nature and Quality of Services

#### a.   Nature of Services

Plaintiffs will demonstrate at trial that FMG received a disproportionate fee

compared to the services it rendered.   As discussed in Point I(B), the compensation paid to FMG by the Core Bond Index, as well as other index funds, was disproportionate to the services rendered when compared to the compensation paid to FMG by its other FMG-managed funds for the same or more extensive services. Plaintiffs will also demonstrate that FMG's fees, which have generated more than $100 million dollars in revenue to FMG annually on the twelve Funds, were not warranted when compared to the fees and work of the sub-advisors and JPMorgan. Plaintiffs' will prove that FMG's services were not substantial based upon (1) records demonstrating the number of employees who service the EQAT; (2) records of the direct costs incurred by FMG to do so; (3) review of various representations made by  FMG; (4)  a comparison of the descriptions of services in the advisory and administrative contracts with the services provided by the sub-advisors and JP Morgan pursuant to their contracts;  (5)  examples of the work performed by each; and (6) expert testimony.  Some of this evidence is summarized below.

### (i)    Number of FMG Employees

FMG devotes some 50 employees, of which only ten are investment advisory employees, to service the roughly 90 mutual funds in the EQAT.  By way of comparison, JPMorgan has more than 125 employees devoted to administrative work for the EQAT as a whole, but earns one-tenth of the fee the EQAT pays to FMG.

Defendants have argued that AXA's other employees also service the EQAT.

Plaintiffs will demonstrate that this is in large part inaccurate and, insofar as AXA

employees provide services, they are not investment advisory or administrative

services.  Rather, they are distribution services provided under separate agreements

for which investors pay additional fees.  Given FMG's small labor force, it is

apparent that FMG has delegated almost all of the advisory and administrative

functions to others.

### (ii)    FMG's Annual Expenses

AXA and FMG are parties to a Shared Services Agreement.  Pursuant to this

Agreement, FMG pays roughly $15 to $16 million to AXA annually for the

reimbursement of all direct and indirect expenses relating to FMG's use of AXA's

> personnel, property and services reasonably necessary for [FMG's]
> management, administrative and other non-insurance related functions.  The
> services to be furnished may include, without limitation, management,
> corporate finance, strategic planning, administration, office and general
> supplies, financial, treasury and cash management, printing, actuarial,
> accounting, tax, auditing, legal and regulatory, human resources, corporate and
> financial communications, public relations, advertising, marketing, risk
> management, technology and corporate services.

Thus, FMG's direct expenses ($15 million) are small compared to the fees that FMG

charges to the EQAT (over $400 million).[5]

---

[5]Notwithstanding the language of the Shared Services Agreement, Defendants
claim that AXA provided, on an annual basis, some $50 million in un-reimbursed
(and undocumented) services to the EQAT as a whole.  As Plaintiffs' experts will
testify and the documentary evidence will show, all of these services were already
paid for under the Shared Services Agreement and others fell under FMG's
Distribution Agreements.

### (iii)   FMG's Representations

Under the Investment Company Act, an "investment adviser" is

(A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company **regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities** or other property shall be purchased or sold by such company, and (B) any other person who pursuant to contract with a person described in clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A) . . ..

15 U.S.C. § 80a-2(a)(20), (emphasis added).

The evidence will overwhelmingly support Plaintiffs' contention that nearly the entirety of FMG's advisory responsibilities was delegated to sub-advisors. FMG has repeatedly acknowledged in public filings and internal documents that "day-to-day investment management of the AXA Equitable sponsored funds" has been delegated to various "sub-advisors." In 2011, FMG assured the EQAT Board they need not worry about conflicts of interest because the sub-advisors "rather than FMG, LLC make the investment decisions." FMG has acknowledged that it has "also delegated the day-to-day . . . fund administration functions to JPMorgan."

Plaintiffs' experts will testify, consistent with the statutory definition, that research, stock selection and trading are the essence of the day-to-day work of an investment adviser. Although that work is done by the sub-advisors, not FMG, the latter retains a disproportionate share of the fees.

### (iv)   The Various Contracts

Plaintiffs will demonstrate that a large portion of the services which FMG contracted to provide were subcontracted to and performed by sub-advisors and JPMorgan in accordance with their sub-contracts.

This is not to say FMG did nothing, but it is clear that its fee was not warranted by the tasks it performed.  Thus, FMG contracted to select and monitor sub-advisors, as well as some other tasks described in ¶ 109 of the Pretrial Order. Some of these tasks, however, were performed infrequently (establishing and altering the Funds' asset class, structuring funds, selecting sub-advisors); others, selecting Exchange Traded Fund ("ETF") investments, were inconsequential (prior to 2013 only one Fund had ETFs, and in 2013, FMG added a second fund, for which ETFs comprise ½ of one percent of fund assets; the index funds did not have ETFs). The remaining services are neither expensive nor labor intensive.  Few of these services impact the index tracking funds, including the Core Bond Index,  and none require more work on behalf of the index tracking funds than actively managed funds.

FMG notes, at ¶ 109,  that, among other services it develops and  manages an "ATM"  volatility strategy.   However, (1)  only four of the twelve Funds have a volatility management strategy - executed by a sub-advisor, BlackRock, not FMG;[6]

---

[6]See Pretrial Order, ¶ 109, n.  42.

1947557.2                                        27

(2) that strategy helped only AXA because it reduced AXA's financial exposure to losses on certain guarantees associated with its variable annuities; and (3) that strategy hurt investors.[7]  As a consequence of the implementation of the strategy, FMG was fined $20 million by the State of New York.

### (v)    Examples of Work

In the course of trial, Plaintiffs will offer examples of work FMG claims to have performed which in fact was done by others.

### (vi)    Expert Testimony

Two of Plaintiffs' experts assessed the value of the services performed by FMG.  Steven Pomerantz, Ph. D., compared the services performed by FMG with

---

[7]The SEC has expressed a concern that such strategies benefit the variable annuity company rather than investors:

> In the staff's view, this use of managed volatility strategies at the fund level in connection with contracts that provide living benefits may, in some cases, result in limited benefits to contract owners who have already paid for protections against market loss, particularly to the extent that they limit upside earning potential.  For example, if an underlying equity fund is changed to add a managed volatility component after a contract owner has allocated contract value to that fund, the staff generally believes that insurers should consider whether adding downside protection is redundant with the living benefits contract owners may have already purchased and/or suppresses the potential for gains that may have motivated the original equity investments.

http://www.sec.gov/News/Speech/Detail/Speech/1370543436709  (last visited Dec.  23, 2015).

those of the sub-advisors and JPMorgan and concluded that FMG's services warranted a fee that is much less than that charged by the sub-advisors.  Another of Plaintiffs' experts, Richard Kopcke, Ph. D. and Francis Vitagliano, examined FMG's organizational structure, the various agreements, FMG's fee schedules and other discovery and concluded that FMG's investment advisory and administrative fees bear no reasonable relationship to the services performed.

### b.   Quality of Services

The most important element to assess adviser quality is fund performance. *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. at 1229 (S.D. N.Y.) *aff'd*, 928 F.2d 590 (2d Cir. 1990).  A few of the Funds performed in line with their peers. However, based on Defendants' own measures, the testimony of Plaintiff's experts, and the testimony of Defendants' board practices experts (if called), Plaintiffs will demonstrate that, for the most part, the Funds, particularly the index tracking funds, performed poorly:  generating returns less than those of comparable funds and below their FMG selected benchmarks.  The Core Bond Index, the Fund on which FMG retained 95% of the total fee (more than $26 million), performed worse than all but 5% of competing funds in several years.

In contrast, the performance of investment advisers in litigated matters has been superior.  *See e.g. Gallus v. Ameriprise Financial,* Inc., 467 F. Supp. 2d 974, 977 (D.Minn. 2007) rev'd 561 F.3d 816 (8th Cir.) (2009) vacated 559 U.S. 1046

(2010) (investment returns exceeded peers); *Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404, 409 (2d Cir.) *cert. den.* 493 U.S. 919 (1989) (fund ranked 3rd out of 56 funds); *Kalish*, 742 F. Supp. 1222, 1230 (S.D.N.Y.), *aff'd*, 928 F.2d 590 (2d Cir. 1990) ("the fund had the highest total return of them all"); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 976 (S.D.N.Y. 1987) *aff'd* 835 F.2d 45 (2d Cir. 1987) *cert. den.* 485 U.S. 1034 (1988) ("fund was one of the best performers"); *In re American Mu,. Funds Fee Litig.*, No. CV-04-5593, 2009 WL 5215755 at p. *20 to 21 (C.D. Col., Dec. 28, 2009) (most funds out performed benchmark).

### 3.    The Profitability of the Fund to the Adviser

FMG's extracted enormous advisory and a large administrative profit.  Thus, FMG's 50 employees generated advisory profits from the EQAT that ranged between $216 and $300 million per year and an administrative profit that ranged between $80 and $130 million per year.   The EQ Core Bond Index was among the most profitable of FMG's funds, with management profit ranging between $15 and $25.8 million annually and FMG's administrative profit ranging between $4 and $7 million.

FMG's profit margin was also excessive.  Plaintiffs' expert concluded that FMG's profit margin on the Investment Management Agreement and Administrative Agreement were 98% and 93% respectively.   Strategic Insights, the EQAT Board's consultant, reported that, in 2012, the average pre-tax profit margin for other mutual

fund advisers was 39%.  Lipper, another consultant,  reported the average profit margin as 40%.

To the extent that Defendants may argue that FMG's profit margin is consistent with that of others, it errs.  First, the cases upon which Defendants will likely rely to support that argument; (1) pre-dated *Jones*; (2) involved funds that performed well (see  pp. 29 to 30); (3) were not sub-advised; (4) had no measurable fall-out benefits, let alone nearly $1 billion in fall-out benefits; and (5) had profit margins well below the profit margin of many of the 12 Funds.

Two issues are implicated in the profit analysis and will be the subject of expert testimony.  **First,** for purposes of calculating its profit margin, was it appropriate for FMG to treat payments made by the Funds to the sub-advisors and to JPMorgan as an FMG expense?  Plaintiffs experts say it was not; Defendants experts disagree.  The Securities and Exchange Commission ("SEC") and the Courts have sided with Plaintiffs.  In a related context, the SEC criticized Smith Barney' effort to disguise its excess fee by including expenses of a sub-administrator as its own:

> Because virtually all of the work was to be done by First Data [i.e., comparable to a Sub-Advisor], the 33% profit margin figure was itself misleading.  The margin was based on an analysis that treated sub-TA payments [i.e., equivalent of the sub-advisor's fee] to First Data as expenses of CTB [i.e., FMG's equivalent].  The economic reality would have been more accurately portrayed by deducting payments to First Data from revenue - not treating them as expenses of CTB [i.e., FMG's equivalent].  CTB is essentially a pass-through for those payments.

*In re Smith Barney Fund Mgmt. LLC and Citigroup Global Mkts., Inc.*, File No.

3-11935 (May 31, 2005), at p. 14. (http://www.sec.gov/litigation/admin/34-51761.pdf (last visited June 5, 2015)). In the SEC's view, the methodology employed by FMG is "materially misleading . . . ." *Id.* at 12. By treating sub-advisor's expenses in this fashion, an adviser is "placing its interest in making a profit ahead of the interests of the mutual funds it serves [rather than fulfilling their duty to] act in the best interests of the mutual funds they advise and their shareholders." *Id.* at 2.

In *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 490 (S.D.N.Y. 1988) *aff'd*, 875 F.2d 404 (2d Cir. 1989), the court disallowed any consideration of fees paid to others for the purpose of calculating the adviser's profitability:

> [The] 12b-1 payments are neither a revenue nor an expense to Merrill Lynch. Through Merrill Lynch, the Fund pays these monies to the financial consultants for services to shareholders and for selling Fund shares ... The 12b-1 payments have no place in a study of profitability to Merrill Lynch.

As a matter of law, it is incumbent upon a fiduciary, such as FMG, to act in the best interests of shareholders. *Operating Local 649*, 595 F. 3d at 93; *Gartenberg v. Merrill Lynch Asset Mgmt.*, 528 F. Supp. 1038, 1047 (S.D. N.Y. 1981), *aff'd.*, 694 F. 2d 923 (2d Cir. 1982) (an investment adviser must act with an "eye single to the best interests of the beneficiaries"). A mutual fund manager "owe[s] a duty of 'uncompromising fidelity' and 'undivided loyalty' to the interests of its owners." *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 809-811 (2d Cir. 1976). Thus, even were

the issue debatable – which it is not – it was incumbent upon FMG to treat fees paid

to sub-advisors and JPMorgan by the Funds in the manner most favorable to

investors, i.e. not to FMG.

The **second** issue, which impacts both the absolute profit and profit margin,

derives from FMG's practice of allocating more than $50 million in AXA's "costs"

to the EQAT for the sole purpose of computing the profitability it reports to the

Board.  Plaintiffs' experts will testify that nearly all of AXA's "allocated" costs are

defrayed by the $15 to $16  million paid under the Shared Services Agreement.

Even were that not the case, FMG's allocation methodology is arbitrary and

incompatible with its fiduciary obligations.

### 4.    Fall-out Benefits

"'Fall-out' benefits are those benefits, other than the advisory fees, that flow

to the adviser or its affiliates as a result of the adviser's relationship with the fund."

*Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 539 n. 30 (S.D.N.Y. 2008).  As discussed

above, all purchasers of FMG Funds pay "product wrapper" or "separate account

annual expenses" on their variable annuities.  In addition, AXA earns money on

investments made by Fund owners in AXA's general account.

Plaintiffs' experts will opine that this compensation is a "fall-out benefit."

This opinion is confirmed by the fact that, prior to 2006, FMG reported this

compensation, generally more than $500 million each year, as "fall-out benefits."

Beginning in 2007, FMG's Board presentation ceased disclosing this value and, in 2011, FMG began to characterize product wrapper fees and general account revenues as "potential fall-out benefits" - but never reported either amount to the Board.

Defendants' Chief Executive Officer, Steven Joenk, acknowledged that the insurance "products don't exist without investment options." Moreover, FMG charges significant "distribution fees" to the Funds which its uses for marketing. Since many Fund purchasers place part of their savings in AXA's general account and all compensate AXA for their variable annuities, AXA receives revenue as a result of marketing costs paid by Plaintiffs.

Plaintiffs' experts have opined that both product wrapper and the general account fees are fall-out benefits and are worth approximately $1 billion annually. Defendants' expert valued these fall-out benefits to be worth between $500 million and $800 million. Whoever is correct, AXA is better off having received these revenues than other mutual fund advisers who do not.

In addition to these fall-out benefits, FMG derives a benefit from its "ATM volatility overlay," which applies to four funds. This overlay hedges against downside risk and concomitantly suppresses upside growth. Many fund owners purchase insurance against downside risk as part of their variable annuity. Thus, the volatility overlay offers no value to those investors; it only reduces AXA's exposure

to downside risk on guarantees it sold to variable annuity holders.  This practice is, as the New York Insurance  Superintendent found, inappropriate.

### 5.      Comparative Fee Structure

The Supreme Court warned in *Jones*, 559 U.S. at 350-51, that Courts should be wary of fee comparisons:

> By the same token, courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length . . . ("Competition between money market funds for shareholder business does not support an inference that competition therefore also exist between [investment advisers] for fund business . . ..)

The Court will hear evidence from Plaintiffs, Defendants and their experts about comparative fees.   However, all fee comparisons are suspect because (1) there is no assurance of competition among mutual fund advisers, *Jones*, *id.*; (2) there may be differences between the services provided to the comparative funds and those provided to the Plaintiffs' Funds; (3) there may be different efficiencies in the provision of services which warrant different fees;[8] (4) the integrity of the process

_____

[8]Several of the funds at issue have at least 60% of their assets managed to track an index:  the Equity  Growth PLUS Fund, the Global Multi-Sector Equity Fund, the Large Cap Value PLUS Fund, the Mid Cap Value PLUS Fund and the Global Bond PLUS Fund.  Therefore, these funds should be compared to funds with index components which are generally lower priced funds.

used to select the comparison funds may be in question;[9] (5) the comparative funds

may not be of similar size;[10] (6) the parties dispute whether to use a mean, median or

weighted average for comparison purposes; and (7) Plaintiffs' Funds, which generate

fall-out benefits, should pay lower fees than those which do not.

Plaintiffs rely upon two categories of evidence to demonstrate the

excessiveness of FMG's fees in comparison to others.  First, the Investment

Company Institute, the industry's lobbying arm, has estimated the comparative fees

of equity index and bond index funds as .13%, and .12% respectively.  Defendants'

fees significantly exceed those amounts.

Second, Plaintiffs' expert, Steven Pomerantz, Ph. D., will testify that the most

appropriate way to determine whether a fee is excessive is to measure the fee against

the services performed.  Both he and Plaintiffs' other experts have undertaken this

evaluation and found FMG's fees to be grossly excessive.  Moreover, as Dr.

Pomerantz will explain, FMG's fees for nearly all funds should be compared to the

average fee for an index tracking fund since FMG has delegated security selection to

---

[9]Plaintiffs' expert,  Dr.  Richard Kopcke, found that the Defense expert's chose
higher cost, rather than lower cost, more widely held funds for comparison.

[10] By way of example, FMG compares the fees of the EQ Common Stock Index
Fund to other index funds.  Of the 52 funds from which the median is computed,
only 4 are as large as the EQ Common Stock Index Fund.  One fund has $59.3
million in assets; the EQ Common Stock Index has $4.782 billion in assets.  The
former would be expected to have much higher costs.

the sub-advisors for all Funds, leaving FMG to perform the same services for all Funds that an adviser performs for an index tracking fund.

### 6.    Economies of Scale

An economy of scale is defined as a "decline in a product's per-unit production cost resulting from increased output, [often] due to increased production facilities; savings resulting from the greater efficiency of large-scale processes." *Hoffman v. UBS-AG*, 591 F. Supp. 2d at 540.  Over the years, the EQAT's  assets under management have grown; FMG's revenues have grown at the same pace; its costs have remained constant because they are fixed by the Shard Services Agreement.  FMG has, as Plaintiffs' experts will testify, experienced economies of scale.

Moreover, the concept of economies of scale, as defined above, is intended to assure that Fund shareholders receive the "savings resulting from . . . greater efficiency." *Id.*  By delegating  advisory and administrative work to others, FMG was relieved of the need to incur costs to evaluate, select and trade individual securities and to perform a host of other labor intensive management and administrative tasks.  As a result, FMG is able to service the Funds at minimal cost and extraordinary profits.  By failing to share those profits with investors, FMG has violated its fiduciary duty.  *The R.W. Grange Lodge*, 425 F. App'x at 30.

1947557.2

### 7.    Summary

FMG collected a disproportionate share of the total fee, given the insignificant services it performed.  FMG's fees cannot be justified because they are disproportionate to the services rendered; the Board process was flawed, and FMG's fees are not warranted by any *Gartenberg* factor.  A fee arrangement in which the Funds  paid FMG several times more than it paid the sub-advisors and JPMorgan, when the former did significantly less work, lacks the earmarks of an "arm's length" bargain.

## D.    Damages

Under the ICA, Plaintiffs have the burden to show that a challenged fee could not have been the product of a hypothetical arm's-length transaction. *Jones*, 559 U.S. at 347.  Once a plaintiff demonstrates that a transaction does not carry "the earmarks of an arm's length bargain . . ., equity will set it aside." *Id.* at 346 (citation omitted).  If a fee paid to an investment adviser has been set aside, the adviser must disgorge ill-gotten gains. *Tanzer v. Huffines*, 314 F. Supp. 189, 196 (D. Del. 1970);  *Cf. Edmonson v. Lincoln Nat'l  Life Ins.*, 725 F. 3d 406 (3d Cir.  2013); G. Bogert and G. Bogert, the Law of Trusts and Trustees § 543 at 218 (2d ed. 1978).

Defendant may argue that a court should not involve itself in rate setting.

However, if the Court were not to set an unlawful fee aside, § 36(b) would become a nullity and FMG, and any other fund adviser could violate the law without impunity.  FMG must disgorge its profit in an amount to be proved at trial.

## CONCLUSION

On January 27, 2004, the United States Senate held a hearing captioned "Oversight Hearing on Mutual Funds: Hidden Fees, Misgovernance and Other Practices that Harm Investors," S. Hrg. 108-461, January 27, 2004. Committee Chair, Republican Senator Peter Fitzgerald, characterized the mutual fund industry as

> indeed the world's largest skimming operation, a . . . trough from which fund managers . . . are steadily siphoning off an excessive slice of the Nation's savings.

https://www.gpo.gov/fdsys/pkg/CHRG-108shrg92686/html/CHRG-108shrg92686.htm (last visited Dec. 24, 2014). Senator Fitzgerald was exaggerating. There are many good and honest mutual fund advisors: Vanguard, Fidelity and others. However given the services performed by FMG's small cadre of employees at minimal costs (in contrast to the work of the sub-advisors and JPMorgan) and the enormity of FMG's profits, it has failed to fulfill the fiduciary duty established by § 36(b).

Respectfully submitted,

**SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.**

s/Arnold C. Lakind
Arnold C. Lakind