Jonathan M. Korn
BLANK ROME LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
(609) 750-7700
Korn@BlankRome.com

James N. Benedict (*pro hac vice*)
Sean M. Murphy (*pro hac vice*)
Robert C. Hora (*pro hac vice*)
Andrea G. Hood (*pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
(212) 530-5000

*Attorneys for Defendants AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio,<br><br>                              Plaintiff,<br><br>vs.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY and AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC,<br><br>                              Defendants. | Civil Action No. 3:11-cv-04194 (PGS)<br><br>and<br><br>Civil Action No. 3:13-cv-00312 (PGS)<br><br><br>**DEFENDANTS' PRE-TRIAL BRIEF**<br><br><br>FILED ELECTRONICALLY |
| GLENN D. SANFORD, *et al.*,<br><br>                              Plaintiffs,<br><br>vs.<br><br>AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC,<br><br>                              Defendant. | |

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ..............................................................1

STATEMENT OF FACTS ....................................................................4

ARGUMENT .......................................................................................4

I.  PLAINTIFFS BEAR THE HEAVY BURDEN OF PROVING THAT
    THE FUNDS' FEES ARE DISPROPORTIONATE TO THE
    SERVICES RENDERED ...............................................................4

II. THE INDEPENDENT TRUSTEES' APPROVAL OF THE FUNDS'
    FEES WARRANTS CONSIDERABLE DEFERENCE...............................7

    A.  The Board Consists Of A Supermajority Of Independent And
        Well-Qualified Trustees ........................................................8

    B.  The Board's Structure And Review Process Is Robust......................11

    C.  The Independent Trustees Considered Extensive Information
        Relating To Each *Gartenberg* Factor...................................12

    D.  The Trustees Have Demonstrated A Pattern Of "Push-Pull"
        With Defendants, Including Negotiation Of Fee Reductions. ............15

III. THE INDEPENDENT TRUSTEES' CONSIDERATION OF EACH
     OF THE *GARTENBERG* FACTORS WARRANTS
     CONSIDERABLE DEFERENCE.................................................18

    A.  The Independent Trustees' Determinations Regarding The
        "Nature and Quality" Of Services Should Not Be Second-
        Guessed ..............................................................................18

    B.  The Independent Trustees' Consideration Of Economies Of
        Scale Is Entitled To Substantial Deference.........................................26

    C.  The Independent Trustees' Consideration Of Comparative Fees
        Should Not Be Second-Guessed ........................................................30

D.    FMG's Profit Margins Were Considered By The Independent Trustees And Are Well Within Normal Ranges ..................................33

E.    Any Potential "Fall-Out Benefits" Were Considered By The Independent Trustees...........................................................................36

IV.   PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW BECAUSE THEY CHALLENGE ONLY A PORTION OF THE FUNDS' FEES. .......38

CONCLUSION ...................................................................................39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Mut. Funds Fee Litig.*,
No. 04-5593, 2009 U.S. Dist. LEXIS 120597 (C.D. Cal. Dec. 28,
2009), *aff'd*, 448 F. App'x 716 (9th Cir. 2011) ............................................*passim*

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006) .................................................................11, 25, 32

*Benak v. Alliance Capital Mgmt. L.P.*,
No. 01-5734, 2004 U.S. Dist. LEXIS 12231 (D.N.J. Feb. 9, 2004).............24, 39

*In re Evangelist*,
760 F.2d 27 (1st Cir. 1985)..................................................................................39

*In re Franklin Mut. Funds Fee Ligit.*,
478 F. Supp. 2d 677 (D.N.J. 2007)....................................................................24

*Gallus v. Ameriprise Fin., Inc.*,
497 F. Supp. 2d 974 (D. Minn. 2007).........................................................*passim*

*In re Gartenberg*,
636 F.2d 16 (2d Cir. 1980) ................................................................................39

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
694 F.2d 923 (2d Cir. 1982) ......................................................................*passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir.
1982) ...........................................................................................................*passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
573 F. Supp. 1293 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir.
1984) ..................................................................................................................5, 37

*Halebian v. Berv*,
869 F. Supp. 2d 420 (S.D.N.Y. 2012), *aff'd,* 548 F. App'x 641 (2d
Cir. 2013) ...........................................................................................................11

*Hoffman v. UBS-AG,*
   591 F. Supp. 2d 522 (S.D.N.Y. 2008) ........................................................27, 29

*Jones v. Harris,*
   611 F. App'x 359, 360-61 (7th Cir. 2015)........................................................26

*Jones v. Harris Assocs. L.P.,*
   559 U.S. 335 (2010)..................................................................................*passim*

*Jones v. Harris Assocs. L.P.,*
   No. 04-8305, 2007 U.S. Dist. LEXIS 13352 (N.D. Ill. Feb. 27,
   2007) ...............................................................................................................18

*Kalish v. Franklin Advisers, Inc.,*
   742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir.
   1991) ..........................................................................................................*passim*

*Krantz v. Prudential Invs. Fund Mgmt. LLC,*
   77 F. Supp. 2d 559 (D.N.J. 1999), *aff'd*, 305 F.3d 140 (3d Cir.
   2002) ...............................................................................................................10

*Krinsk v. Fund Asset Mgmt., Inc.,*
   715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2D 404 (2d Cir.
   1989) ..........................................................................................................*passim*

*Meyer v. Oppenheimer Mgmt. Corp.,*
   707 F. Supp. 1394 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir.
   1990) ...............................................................................................................34

*Meyer v. Oppenheimer Mgmt. Corp.,*
   715 F. Supp. 574 (S.D.N.Y. 1989) ...................................................................5

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
   248 F.3d 321 (4th Cir. 2001) ...........................................................................25

*In re Mut. Funds Inv. Litig.,*
   590 F. Supp. 2d 741 (D. Md. 2008)..................................................................39

*Redus-Tarchis v. N.Y. Life Inv. Mgmt. LLC,*
   No. 14-7991, 2015 U.S. Dist. LEXIS 146007 (D.N.J. Oct. 28,
   2015) ......................................................................................................14, 17, 24

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir.
    1987) ...................................................................................................*passim*

*Strougo v. BEA Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002) ...............................................32

## Statutes

15 U.S.C. § 80a-2(a) ............................................................................8, 10

15 U.S.C. § 80a-35(b) ....................................................................*passim*

## Other Authorities

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897
    (1970) .........................................................................................*passim*

## PRELIMINARY STATEMENT

Plaintiffs are mutual fund investors in twelve Funds[1] who, after responding to newspaper advertisements run by counsel, brought a claim for excessive fees under Section 36(b) of the Investment Company Act of 1940 ("ICA").  To prevail at trial, Plaintiffs will be required to do what no plaintiff in the 45-year history of Section 36(b) has ever done:  prove by a preponderance of evidence that Defendants breached their fiduciary duty under Section 36(b) by charging fees to the Funds that could not possibly have been the product of arm's length bargaining.  Plaintiffs bear the burden of proof on this issue, which courts have called a "very high hurdle to overcome."[2]  The evidence at trial will establish that the Funds' fees come nowhere close to being disproportionately large.  In fact, the fees charged by Defendants fall squarely in line with fees found to not be excessive in previous trials under Section 36(b), all of which were affirmed on appeal.

The starting point for analysis under Section 36(b) is the approval of the fees at issue by the Independent Trustees who sit on the Funds' Board.  Here, there is

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in Defendants' Proposed Findings of Facts and Conclusions of Law, dated December 30, 2015 (filed contemporaneously herewith).

[2] *See In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 U.S. Dist. LEXIS 120597, at *14 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011).

no question that the Board is composed of a supermajority of trustees who are completely independent of Defendants.  All of the Independent Trustees are well-qualified and experienced individuals, including the Lead Independent Trustee, a former partner at Simpson Thacher & Bartlett LLP who headed the firm's investment management group and whose practice focused on mutual funds.  Each year, the Independent Trustees reviewed best-in-class materials and considered all the relevant information—the same types of information that previous courts have found to be sufficient to support a Board's conclusion that the fees were fair.  The Board critically analyzed the information, asked probing questions and sought additional follow-up information.  The Independent Trustees also sought advice from independent legal counsel, independent accounting firms, and many other third-party experts having no affiliation with FMG.  Most importantly, the Independent Trustees repeatedly engaged in arm's length fee negotiations, bargaining for numerous fee concessions that reduced the Funds' fees.  Under Supreme Court precedent, the Independent Trustees' approval of the fees is "entitled to considerable weight, even if a court might weigh the factors differently," as Section 36(b) does *not* call for "judicial second-guessing of informed board decisions."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 351, 352 (2010).

Even if the law provided a basis for the Court to second-guess the Independent Trustees—and it does not—there are many other objective criteria that support the conclusion that the fees are well within the range of arm's length bargaining. Despite Plaintiffs' attempt to conjure a picture that these fees are in some way unusual, they clearly are not. Most notably, the total fees charged to the Funds are generally *below the average fees charged to similar mutual funds* (as selected by a leading independent firm) and, in fact, several of the Funds are among the least expensive funds in their peer groups. In addition:

- The Securities and Exchange Commission ("SEC") has blessed the manager-of-managers structure, and the use of subadvisers to perform stock selection is prevalent in the mutual fund industry;

- The amount of fees retained by Defendants after paying subcontractors is within the range of industry norms, and for some funds, Defendants are retaining less than average;

- The Funds' performance is not inconsistent with similar funds;

- The Board's structure, process for reviewing fees, and the information they receive are all based on published "best practices";

- The SEC, which uses asset management specialists, has repeatedly reviewed the Board's process and materials as part of its examinations (including as recently as 2014) and has never found any deficiencies;

- The profits Defendants earn are in line with industry averages;

- All of the Funds employ "breakpoints" in their fee schedules that reduce the fee rate as Funds grow in size (which courts have cited positively as a form of sharing economies of scale with funds); and

- Independent auditors are involved in the operation of the Funds, and the Independent Trustees retained an independent accounting firm (Ernst & Young) to review profitability information provided by Defendants.

Thus, the Independent Trustees' approval of the fees was well-founded and based on a range of objective criteria.  There is no basis for the Court to supplant the Board's decision to approve the fees, and Section 36(b) does not invite such second-guessing.

## STATEMENT OF FACTS

The relevant facts are set forth in Defendants' Proposed Findings of Facts and Conclusions of Law, filed contemporaneously herewith ("DFFCL").

## ARGUMENT

**I.   PLAINTIFFS BEAR THE HEAVY BURDEN OF PROVING THAT THE FUNDS' FEES ARE DISPROPORTIONATE TO THE SERVICES RENDERED.**

Section 36(b) imposes a fiduciary duty on an adviser to a mutual fund with respect to the receipt of compensation. 15 U.S.C. § 80a-35(b).  The Supreme Court has held that a breach of fiduciary duty requires a showing that the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346.  The statute specifically places the burden of proof on the plaintiff.  15 U.S.C. § 80a-35(b)(1); *see also Jones*, 559 U.S. at 347.  Courts have recognized that the "so disproportionately large" standard "establishes a very high

hurdle to overcome." *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS

120597, at *14.  In the seven previous cases to go to trial under Section 36(b), no

plaintiff has ever succeeded in proving that a fund's fees were excessive.[3]

In Section 36(b) cases, courts typically consider the six "*Gartenberg*

factors": (1) the nature and quality of services provided to the funds; (2) the

independence and conscientiousness of the funds' board of trustees; (3) whether

the adviser realized economies of scale in managing the funds and, if so, whether

any such economies were adequately shared with the funds; (4) the fees charged to

comparable mutual funds; (5) the profitability of the funds to the adviser; and (6)

fall-out benefits (*i.e.*, indirect profits) to the adviser that would not occur but for

the adviser's relationship with the funds.  *Gartenberg v. Merrill Lynch Asset*

*Mgmt.*, 694 F.2d 923, 928-29 (2d Cir. 1982); *Jones*, 559 U.S. at 344 & n.5.

The most important of the *Gartenberg* factors is the independence and

conscientiousness of the Funds' trustees.  *See Krinsk*, 875 F.2d at 412 ("The

---

[3] *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

expertise of the [independent trustees], whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined."); *Krinsk*, 715 F. Supp. at 501 ("The Court will not ignore a responsible decision by the [trustees], including a majority of the [independent trustees], to continue the fee structure as it stands."). Under the ICA, the independent trustees are the first line of defense in protecting the fund and its shareholders, and Section 36(b) instructs courts to give appropriate consideration to the board's approval of the challenged fees.  15 U.S.C. § 80a-35(b)(1)-(3); *see also Jones*, 559 U.S. at 351, 353.

Faced with the realization that the facts in this case are often very similar to the facts in previous cases where no violation of Section 36(b) was found, Plaintiffs argue that they have a "new" theory.  According to Plaintiffs, the same *Gartenberg* standard somehow changes or their burden of proof is somehow lowered because they allege that Defendants have hired third parties (*i.e.*, the subadvisers and the subadministrator) and their fees cover only the "oversight" of others.  Aside from being factually inaccurate (Defendants do far more than oversee the work of others), this supposedly novel theory has been pressed and rejected in previous cases.  *See In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *40-43, *133-34 (finding that administrative fees did not violate § 36(b) where the fund administrator subcontracts out to third-parties and "retained

over $154 million in 2008 to cover its oversight of third parties, which includes

monitoring, coordinating and assisting third party service providers"); *Kalish*, 742

F. Supp. at 1228-29 (rejecting § 36(b) claim alleging that adviser relied on third-

parties for security selection expertise leaving the adviser to provide mainly "a

back office type of function").  Thus, although Plaintiffs go to great lengths to

avoid the mountain of precedent that dooms their claim, there is nothing about this

case that would permit a departure from the legal standard unanimously affirmed

by the Supreme Court in *Jones*.

## II.     THE INDEPENDENT TRUSTEES' APPROVAL OF THE FUNDS' FEES WARRANTS CONSIDERABLE DEFERENCE.

As discussed above, Section 36(b) "does not call for judicial second-

guessing of informed board decisions."  *Jones*, 559 U.S. at 351-52.  Instead,

"[w]here a board's process for negotiating and reviewing investment-adviser

compensation is robust, a reviewing court should afford commensurate deference

to the outcome of the bargaining process."  *Id.*  Thus, if "the disinterested directors

considered the relevant factors, their decision to approve [the fees] is entitled to

considerable weight, even if a court might weigh the factors differently."  *Id.*

Congress expressly intended that the judiciary would defer to a fund's independent

trustees when it enacted Section 36(b).  *See* S. Rep. No. 91-184 (1969), *reprinted*

*in* 1970 U.S.C.C.A.N. 4897, 4903 (1970) ("Th[is] section is not intended to shift

the responsibility for managing a [mutual fund] in the best interest of its shareholders from the directors of such [mutual fund] to judiciary.").

There is no evidence that warrants usurping the role of the Independent Trustees and overturning their well-informed decision to approve the challenged fees. To the contrary, the evidence shows that the Independent Trustees were exceptionally well-qualified, independent of the Defendants, considered the relevant information, had a robust contract renewal process, and negotiated at arm's length with fund management. On such facts, the Independent Trustees' "decision to approve [the Funds' fees] is entitled to considerable weight, even if [the] court might weigh the factors differently." *Jones*, 559 U.S. at 351. Indeed, as discussed below, many aspects of the Board's deliberations are almost identical to the processes in previous Section 36(b) cases that were found to be the earmarks of an independent and diligent board.

### A. The Board Consists Of A Supermajority Of Independent And Well-Qualified Trustees.

The Funds' Board is comprised of a supermajority of trustees who are independent of FMG and AXA. In fact, all but one of the Trustees on the Board is, by statutory definition, independent. *See* 15 U.S.C. § 80a-2(a)(19). Although the ICA only requires that a majority of a fund board be independent (*id.* § 80a-10(a)), the Board has been comprised of at least 87.5% Independent Trustees since 2010.

*See In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *145 ("[E]ach board was comprised of a supermajority of Unaffiliated Directors.").

Each of the Independent Trustees is exceptionally well-qualified, well-educated and their backgrounds include extensive experience in accounting, financial services, and investment advisory businesses. *See Krinsk*, 715 F. Supp. at 502 (independent trustees had "extensive business experience in finance and investments" and were "highly qualified"); *Kalish*, 742 F. Supp. at 1242 (same); *Schuyt*, 663 F. Supp. at 980 (same). Additionally, upon being elected to the Board, each of the Independent Trustees received extensive orientation materials and comprehensive training relating to the Funds and their role on the Board. *See In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *90 (noting the directors "receive substantial . . . educational materials" and "training").

The Independent Trustees are also advised by experienced mutual fund lawyers from the firm of Morgan, Lewis & Bockius LLP—a firm that represents numerous investment companies and independent directors of mutual funds. Morgan Lewis is independent of AXA and FMG; certifies its independence on an annual basis; attends every Board meeting; advises the Independent Trustees with respect to their fiduciary duties; and advises the Independent Trustees in connection with their deliberation and approval of the Funds' agreements. *See Kalish*, 742. F. Supp. at 1242, 1249 ("An important element of the independent

director's informed state is the advice they received from their independent counsel."); *Schuyt*, 663 F. Supp. at 982 (same); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *145 (same); *Gartenberg*, 528 F. Supp. at 1064 (same).

In addition, the Independent Trustees also rely upon other consultants and independent experts.  For instance, the Independent Trustees retained Ernst & Young to assess FMG's cost allocation methodology used to estimate the profitability of managing each Fund, despite that FMG's own auditor (PricewaterhouseCoopers LLP, "PwC") had separately reviewed the methodologies.  *Kalish*, 742 F. Supp. at 1248-49 (independent directors "performed their responsibilities in a conscientious and careful manner" where, among other things, they "commissioned a report from" "independent" and "formidable accountants" relating to cost allocation).

Plaintiffs do not challenge the Independent Trustees' qualifications.  With respect to independence, individual directors are presumed independent under the express terms of the ICA, and Plaintiffs bear the burden of overcoming that presumption.  15 U.S.C. § 80a-2(a)(9).  Plaintiffs' only attempt to overcome that presumption is to demonstrate that the Independent Trustees received compensation for their services.  The Third Circuit has rejected this as a matter of law.  *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 561-64

(D.N.J. 1999) (director compensation of up to $270,000 insufficient to compromise independence under Section 36(b)), *aff'd*, 305 F.3d 140 (3d Cir. 2002); *see also Halebian v. Berv*, 869 F. Supp. 2d 420, 450-51 & n.30 (S.D.N.Y. 2012), *aff'd,* 548 F. App'x 641 (2d Cir. 2013); *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006).

### B.   The Board's Structure And Review Process Is Robust.

The Board's structure and the process by which the Independent Trustees review the Funds' fees is robust and conforms to industry best practices.  The Independent Trustees have elected a Lead Independent Trustee, who plays a major role in coordinating the activities of the Independent Trustees, acting as the spokesperson for the Independent Trustees and as liaison with FMG.  The Board also has adopted a committee structure that assists the Independent Trustees in acting with care and conscientiousness in approving the Funds' fees.  The Board's Committees include a Governance Committee, Audit Committee, and two Investment Committees, each of which is comprised entirely of Independent Trustees and meets frequently.  *See In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *145 (committees "allowed the Unaffiliated Directors to effectively review and analyze the information provided to them").

The Board meets frequently throughout the year, and more frequently than most mutual fund complexes.  The Board has five regularly scheduled in-person

meetings each year that are held for at least two days each.  The meetings include four quarterly meetings and the annual contract renewal meeting in July.  The Board also schedules special meetings and telephonic meetings between regularly scheduled meetings.  All told, the Board often meets a dozen times or more each year.  The Independent Trustees also regularly confer with each other and with counsel throughout the year, and meet independently outside the presence of FMG.  All of these meetings lead up to the annual July meeting, where the Independent Trustees vote on whether to approve the Funds' fees, but in doing so consider all the information they receive throughout the year.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *92-94 (boards "met at least quarterly" and "view the renewal of . . . agreements as a year-long process").

### C.   The Independent Trustees Considered Extensive Information Relating To Each *Gartenberg* Factor.

The Independent Trustees considered all the relevant information when they approved the Funds' fees, including information relating to each of the *Gartenberg* factors.  For example:

- Comparative Fees: Information on how the Funds' fees compare to a peer group of similar funds as selected by Lipper, an independent and highly regarded expert on mutual fund fee comparisons.

- Nature & Quality of Services: Written materials and oral presentations on the services provided by the adviser and subcontractors, and detailed performance information on each Fund as provided by Lipper.

- Profitability: The profitability of each Fund as well as FMG's profitability overall, including comparisons to competitors.

- Fall-Out Benefits: A description of any *conceivable* benefit that FMG enjoys as a result of the Funds, even though few if any of them qualify as fall-out benefits under the law.

- Economies of Scale: Information on costs and assets of each fund, and detailed presentations on the extent to which any economies of scale are shared with the Funds through breakpoints and other means.

*See, e.g.*, *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *146 ("Each year, the directors received voluminous materials relevant to the *Gartenberg* factors and other information relevant to their deliberations.").

The Independent Trustees also relied on a plethora of other information provided by independent third-party experts.  For example, the Board received information from:  Lipper (comparative fee, performance and profitability information); Morningstar (comparative performance information); Strategic Insight (data on subadvised funds); Ernst & Young (cost allocation methodology); SEC (current issues at SEC's Division of Investment Management); Management Practice, Inc. (overview of MPI's services to fund trustees); Independent Directors Council (current issues for fund trustees); ICI Mutual Insurance Company (litigation trends); The Center for Audit Quality (industry accounting issues); and Adviser Compliance Associates (valuation practices and procedures).  The Board's reliance on outside consultants is further evidence of the robustness of the Board's process.  *See Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 983 (D. Minn.

2007) (granting summary judgment for adviser where board "sought the advice of independent counsel and consultants"); *Redus-Tarchis v. N.Y. Life Inv. Mgmt. LLC*, No. 14-7991, 2015 U.S. Dist. LEXIS 146007, at *35 (D.N.J. Oct. 28, 2015) (board's use of independent consultants "contradict Plaintiffs' claims that the Board did not exercise independence or conscientiousness").

The facts here are remarkably similar to *Gallus*, as well as many of the prior Section 36(b) cases resolved in favor of the adviser after trial.  In *Gallus*, the court deferred to the business judgment of the independent trustees because it found that the board had reviewed and considered substantial information on each *Gartenberg* factor prior to approving the challenged fees.  There, as here, the board received and reviewed "information regarding the services provided to the Funds" and "the personnel providing those services."  *Gallus*, 497 F. Supp. 2d at 976.  Similarly, there, as here, the board received detailed information about "the investment performance of the Funds"; "the profitability of the contracts to Defendants, including detailed information about Defendants' expenses"; and "benefits accruing to Defendants in addition to fees."  *Id.*  Likewise, as here, the board in *Gallus* received "third-party industry consultant . . . comparison[s] of the Funds' fees to those of a pool of the Funds' competitors."  *Id.*; *see also id.* at 980-83.

Just as in *Gallus*, the Independent Trustees here considered each and every one of these items before approving the Funds' fees.  And as in *Gallus*, the

Independent Trustees' consideration of such information supports that the Trustees were "fully informed" and that their approval of the fees should be given considerable deference.  *See also Krinsk*, 715 F. Supp. at 502 (independent trustees were "fully informed" where they received "a wealth of information pertinent to an evaluation of the advisory fee," including "exhaustive information on such subjects as the Fund's performance and expense ratios" and "comparative information on other funds"); *Gartenberg*, 528 F. Supp. at 1059-60 ("[a]n impressive amount of documentary material was furnished to the Trustees," including "profitability statements" and "data comparing the Fund's advisory fee, performance and operating expenses and expense ratios with those of other funds"); *see also In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *146 ("The information provided to the Unaffiliated Directors was similar to that found in past cases to have been more than sufficient to permit the directors to make informed and knowledgeable decisions in approving the fees at issue.").

### D.    The Trustees Have Demonstrated A Pattern Of "Push-Pull" With Defendants, Including Negotiation Of Fee Reductions.

As documented in the Board minutes for many years, there has been extensive "push and pull" between the Independent Trustees and Defendants on numerous issues, including fee levels.  For example, the Independent Trustees repeatedly asked questions about the information they were provided, and frequently demanded that FMG provide additional information.  *Schuyt*, 663 F.

Supp. at 984 (finding "that the independent directors not only carefully analyzed and debated the information they were given, but also actively questioned the Adviser and requested additional information when they needed it").

The Independent Trustees have also actively negotiated the Funds' fees many times over the years.  Among other things, the Independent Trustees have successfully negotiated for:

- Implementation of new and/or lower breakpoints for the Funds' fee schedules as assets increase.  For example, breakpoints were added to the management fee schedules for four Funds in 2011, 2012 and 2013 and for two additional Funds in 2012, and breakpoints were lowered and additional breakpoints were added to the management fee schedules for five of the Funds in 2015.  Likewise, breakpoints were added to the administrative fee schedules for eight Funds in 2014, for four Funds in 2010 and 2013, and for three Funds in 2014 and 2015.

- Base fee reductions in the management and administrative fees.  For example, base management fees were reduced between 2007 and 2009 for nine of the Funds; and the administrative fees were reduced for all Funds in both 2013 and 2014.

- Waivers for portions of certain Funds' fees.  For example, voluntary management fee waivers were implemented in 2012 and 2013 for the EQ/T. Rowe Price Growth Stock Fund and for four other Funds in 2015.

The minutes of the Board meetings expressly reflect that changes to the Funds' fee structure were implemented as a result of the Independent Trustees' firm advocacy on behalf of the Funds.  For instance, the minutes of the July 2011 Board meeting state that "the Trustees expressed concern with the lack of breakpoints in the fee structure for the [index] Portfolios" and, "at the request of

- 16 -

the Independent Trustees," FMG was therefore proposing the implementation of breakpoints for those Funds. *See* Hood Decl. Ex. 3, Board Minutes (July 2011), at D_AXA0172602;[4] *see also* Hood Decl. Ex. 4, Board Minutes (July 2012), at D_AXA0172754; Hood Decl. Ex. 5, Board Minutes (July 2013), at D_AXA1184133; Hood Decl. Ex. 6, Board Minutes (July 2014), at D_AXA1209738. Thus, as in *Schuyt*, this "is not a case where a contract was rubber-stamped by docile individuals; this is a case where competent, aggressive individuals analyzed the facts and actively bargained" on behalf of the Funds. *Schuyt*, 663 F. Supp. at 986.[5]

---

[4] References herein to "Hood Decl. Ex. __" are to Exhibits attached to the Declaration of Andrea G. Hood, filed contemporaneously herewith.

[5] Plaintiffs quibble with the manner in which the Board material was presented or suggest the Board should have exercised its business judgment differently, but their allegations are directly belied by the record or have been rejected in previous cases. For example, Plaintiffs criticize the Board for not soliciting proposals from unaffiliated investment managers and administrators. Plaintiffs' Contested Facts Regarding Liability (submitted to Court via email on Nov. 19, 2015), Exhibit A ("PCFL"), ¶ 174. This theory has been rejected. *See Redus-Tarchis*, 2015 U.S. Dist. LEXIS 146007, at *33 (plaintiffs' claim that "the [b]oard did not solicit proposals from other potential advisers or attempt to contract directly with the subadvisers or [the sub-administrator]" was "insufficient"). Plaintiffs also assert that the Board had a duty to "secure *the best deal* it could for the Funds." PCFL ¶ 154 (emphasis added). The law is clear, however, that it is not enough for Plaintiffs to assert "that a better bargain was possible." *Gartenberg*, 528 F. Supp. at 1047; *Krinsk*, 875 F.2d at 409 (rejecting plaintiff's argument "that the trustees had a duty to negotiate for the Fund the 'best deal' possible"). Plaintiffs also contend the Board should have retained consultants on a range of issues, including to evaluate the cost allocation methodology used to estimate the Funds' profitability. (PCFL ¶¶ 157, 169, 171.) But the board minutes reflect that the Independent Trustees did retain independent consultants, including to review the

III.   **THE INDEPENDENT TRUSTEES' CONSIDERATION OF EACH OF THE *GARTENBERG* FACTORS WARRANTS CONSIDERABLE DEFERENCE.**

Plaintiffs cannot meet the heavy burden required to overcome the

Independent Trustees' reasonable business judgment on any *Gartenberg* factor.

A.   **The Independent Trustees' Determinations Regarding The "Nature and Quality" Of Services Should Not Be Second-Guessed.**

The Independent Trustees received and considered voluminous data

reflecting what the shareholders receive in return for FMG's management fees—

including detailed descriptions of the services retained by FMG and those

delegated to the subadvisers and subadministrator.  These included lengthy written

and oral presentations from personnel providing those services, as well as a

summary "side by side" chart laying out the services provided by each entity.

---

cost allocation methodology.  *See* Hood Decl. Ex. 2, Board Minutes (Jan. 28, 2000), at D_AXA0255490-91; Hood Decl. Ex. 1, Board Minutes (Jan. 24, 2000), at D_AXA0255507.  Importantly, even if Plaintiffs did prove that *additional* relevant information could have been provided to the Board, that still would not be a basis for second-guessing the Independent Trustees' decisions.  *Gartenberg*, 694 F.2d at 933 (failure to "disclose to the [f]und's trustees relevant cost information and potential benefits" does not support violation of § 36(b) because trustees "were aware of or could obtain the essential facts needed to negotiate a reasonable fee"); *Schuyt*, 663 F. Supp. at 983-84 (finding insignificant that directors could have been given additional reports because "the directors already had ample information before them"); *Jones v. Harris Assocs. L.P.*, No. 04-8305, 2007 U.S. Dist. LEXIS 13352, at *26-27 (N.D. Ill. Feb. 27, 2007) ("Plaintiffs must demonstrate that the flaws they find in what transpired would have made a legally significant difference.").

The testimony at trial from FMG employees will describe the extensive management and administrative services that FMG provides to the Funds. (*See, e.g.*, DFFCL ¶¶ 113-133, 150-172.)  This evidence will make clear that operating mutual funds—heavily regulated securities often with millions of individual shareholders—is far from the overly simple endeavor that Plaintiffs portray.  For example, Defendants:  devise each Fund's investment guidelines; monitor and restructure Funds as appropriate in light of market conditions; directly manage portions of some Funds' portfolios; allocate, monitor and reallocate assets across Funds with multiple advisers; research, select, monitor, and replace subadvisers for each Fund; handle a huge volume of reports required to be sent to shareholders on a regular basis, including prospectuses, semi-annual and annual reports, and ERISA and privacy notices; oversee subscription and redemption activity; maintain the Funds' compliance program; engage in extensive compliance testing at both the subadviser and portfolio level; prepare and file numerous SEC and other regulatory filings; coordinate shareholder activity; determine "fair values" for hard-to-price securities held by the Funds; closely monitor the Funds' performance on a daily, monthly, quarterly and annual basis through a variety of different means and metrics; manage the transition process when subadvisers are appointed, terminated or replaced; prepare extensive materials provided to the Board in connection with the Board's annual review of the Funds' fees; provide legal support for regulatory

examinations relating to the Funds; prepare the Funds' budget; and determine the Funds' dividend and capital gain distributions, among many other services without which the Funds could not operate.

The Funds' fees also must compensate for a variety of risks borne by FMG. The development and management of mutual funds requires a high degree of knowledge, sophistication, and judgment and may subject investment managers and their affiliates to substantial financial exposure. Some funds fail; others remain unprofitable for years. Overall, an investment manager bears substantially greater financial and legal risks in managing a mutual fund than the subcontractors with whom they contract—risks that result from a highly regulated environment, potential legal liability of investment managers, expense limitation undertakings, volatility of fee revenues as a result of being asset-based, and the variability and unpredictability of shareholder-adviser relationships, which are terminable at will through simple redemption procedures. These risks must be considered in evaluating whether the Funds' fees violate Section 36(b). *Schuyt*, 663 F. Supp. at 968 (considering entrepreneurial risks borne by investment manager in Section 36(b) case).

In the face of the extensive services retained by FMG, Plaintiffs proceed on two deeply flawed theories in an attempt to minimize the significance of these

services.  Both of these theories were expressly rejected in *Gartenberg*, the seminal

case that established the relevant standard adopted by the Supreme Court in *Jones*.

First, Plaintiffs claim the *contractual* language of FMG's agreements with

the subadvisers or subadministrator could be construed as covering some of the

services, or that the Board "could have" performed these services itself.  While

factually inaccurate in many respects, the theory fails as a matter of law—the

relevant inquiry under an equitable remedy is who is *actually* providing the

services.  *Gartenberg* is directly on point.  There, the court rejected the plaintiff's

argument that the services provided by the adviser were "wastefully duplicating"

services that the fund's transfer agent already was *contractually* obligated to

provide.  *Gartenberg*, 694 F.2d at 931-32.  The court found that regardless of the

third party's legal obligation to perform the services, the evidence demonstrated

that most of the services were *actually* being performed by the adviser and its

affiliates.  *Id.*; *see also Schuyt*, 663 F. Supp. at 973 n.36, 976 n.43 (rejecting

plaintiff's argument that certain services should be ignored where evidence showed

that third party provided shareholder services under "separate contract" but "the

[a]dviser dealt with many shareholder concerns that [the third-party] did not").[6]

---

[6] Plaintiffs argue that FMG delegates the important work, and all of the other work
retained by FMG is less valuable or merely qualifies as oversight.  Even if
Plaintiffs were correct—and they are not—this does not establish a violation of
Section 36(b).  *See In re Am. Mut. Funds Fee Litig.*, 2009 LEXIS 120597, at *40-
43, *133-34 (administrative fees did not violate § 36(b) where the fund

Second, Plaintiffs claim that FMG's activities cannot be extensive because they are performed exclusively by FMG's approximately 50-60 employees.[7]  This is a preposterous assertion, and the evidence at trial will establish otherwise.  The uncontroverted record will establish that FMG relies extensively on AXA, its parent organization, for a range of support and provision of many services directly to the Funds and its shareholders.  The law requires consideration of the services provided by AXA, which has *thousands of employees*.[8]  *Gartenberg* is again directly on point:

> Proceeding on the ***erroneous theory*** that only the administrative costs ***incurred by the Manager itself*** may be considered, appellants ignore the heavy costs incurred by other Merrill Lynch affiliates in processing the increased volume of purchases and redemptions of Fund shares which were under

administrator "subcontracts out to a third party" and retained $154 million in one year "to cover its oversight of third parties, which includes monitoring, coordinating and assisting third party service providers"); *Kalish*, 742 F. Supp. at 1228-29 (rejecting § 36(b) claim based on allegations that adviser was providing a mere "back office type of function" because such functions are important to the operation of the fund).

[7] Focusing only on the number of employees ignores the costly technology, systems and infrastructure to operate a mutual fund with millions of shareholders.

[8] Plaintiffs argue that AXA's extensive services somehow do not exist because of an intercompany agreement known as the Shared Services Agreement.  Plaintiffs misread that Agreement, which (1) was entered into to comply with insurance laws, (2) was never intended to cover all of the services provided by AXA, (3) had no impact on the scope of services provided to the Funds or how costs were allocated when calculating the profitability of the Funds, and (4) did not even exist for much of the relevant period for this litigation.  In any event, the law is clear that contractual language is irrelevant if the evidence establishes the services are actually being provided.  *Gartenberg*, 694 F.2d at 931-32.

> the Manager's guidance.  Since the Manager and Broker were divisions of one economic unit, the district court was entitled to deduct these costs in calculating the Manager's net profits.  ***To limit consideration to the Manager's own administrative expenses would be to exalt form over substance and disregard the expressed Congressional intent that "all the facts in connection with the determination and receipt of such compensation" be considered***.

*Gartenberg*, 694 F.2d at 931 (emphasis added); *see also Gartenberg*, 528 F. Supp. at 1049 ("Nothing in Section 36(b) obligates this Court, in assessing the fairness of the investment advisory compensation, to restrict its vision only to those services performed directly by [the investment manager].  Indeed, the statute recognizes that in order to properly assess the fairness of advisory compensation, the courts cannot be strictly bound by corporate structure and ignore closely related entities whose functions intimately impinge on one another.").

The Independent Trustees also considered the *quality* of the management and administrative services provided to the Funds.  In contrast, Plaintiffs largely ignore the quality of these services, instead focusing almost exclusively on the Funds' *performance* (*i.e.*, the quality of the Funds' portfolio management services), which ironically is the one aspect of the Funds' operations for which the subadvisers are primarily responsible.  (*See* PCFL ¶¶ 73-86 (titled "Quality of FMG's Services (Performance)").  Because Plaintiffs ignore the quality of the non-portfolio management services provided to the Funds—including the extensive compliance-related work required for the Funds and the substantial shareholder

services and transaction processing work required for the Funds' millions of investors—their Section 36(b) claim could be rejected on this basis alone. *Benak v. Alliance Capital Mgmt. L.P.*, No. 01-5734, 2004 U.S. Dist. LEXIS 12231, at *25 (D.N.J. Feb. 9, 2004) ("[U]nder § 36(b) it is the *overall* nature and quality of the services provided by the investment adviser that is at issue—*not merely some small percentage of those services*.") (emphasis added); *Schuyt*, 663 F. Supp. at 975-76 (considering non-portfolio management services such as "shareholder services," "fund accounting" and "meeting legal and regulatory requirements"); *id.* ("The evidence indicates that [the adviser] handled 360,000 inquiries in 1980 and 760,000 inquiries in 1981 relating solely to [the fund]. . . .  [I]t is clear that many . . . employees were required to deal with these phone calls."); *Kalish*, 742 F. Supp. at 1228 ("[F]unds make available a number of shareholder services [covering] a wide range of functions centering around the opening of accounts, redeeming of shares, maintenance of records, and furnishing of information."); *id.* (recognizing that fund managers "must also insure compliance with federal securities regulations and comparable regulations of the 50 states").

Nor does the Funds' performance provide support for Plaintiffs' claim. Courts in Section 36(b) cases have been "wary about attaching too much significance to a fund's financial performance." *In re Franklin Mut. Funds Fee Ligit.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007); *Redus-Tarchis*, 2015 U.S. Dist.

LEXIS 146007, at *20-21 ("Underperformance is not a *Gartenberg* factor" and allegations about "performance are of minimal support."); *Amron*, 464 F.3d at 344 ("[A]llegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive.") (quotation omitted).  As the Fourth Circuit explained, "While performance may be marginally helpful in evaluating the services which a fund offers . . . [e]ven the most knowledgeable advisers do not always perform up to expectations, and investments themselves involve quite different magnitudes of risk."  *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327-28 (4th Cir. 2001).

In any event, the evidence at trial will show that the Independent Trustees considered a wealth of information concerning the performance of the Funds, including essentially all of the same information that Plaintiffs rely on for their assertion that the Funds had "poor" performance.  The evidence at trial also will establish that the Plaintiffs' performance arguments are baseless.  Notably, Plaintiffs take no issue with the performance for three of the Funds—the EQ/GAMCO Small Company Value, the EQ/T. Rowe Price Growth Stock, and the EQ/Common Stock Index Portfolios.  (PCFL ¶ 73.)  Four of the other Funds are index funds, the sole goal of which is to track or match (not beat) a designated benchmark.  These four Funds tracked their respective benchmarks near perfectly and, as such, the quality of their performance cannot be considered anything other

than excellent.  The evidence at trial will establish that each of the other Funds also performed as expected, if not better.  Significantly, in the Seventh Circuit's recent decision on remand in *Jones*, the Court of Appeals affirmed summary judgment in favor of the adviser where (1) the funds at issue performed "as well as, if not better than, comparable funds" and (2) the "fees were in line with those charged by advisers for other comparable funds."  *Jones*, 611 F. App'x 359, 360-61 (7th Cir. 2015).  The Seventh Circuit explained that those two factors alone "jointly suffice" under the Supreme Court's "so disproportionately large" standard.  *Id.*  Here too, the Funds performed at least "as well as, if not better than, comparable funds" and, as discussed below, the Funds' fees are consistent with those charged to comparable funds.  *See infra* Section III.C.

The Independent Trustees considered the respective services provided by FMG and FMG's subcontractors and determined that the Funds' fees were fair and reasonable.  Their independent judgment should not be second-guessed.

### B.    The Independent Trustees' Consideration Of Economies Of Scale Is Entitled To Substantial Deference.

Economies of scale occur when the "long run average total cost falls as the quantity of output increases."  N. Gregory Mankiw, *Principles of Microeconomics*, 283 (3d ed. 2003).  In other words, economies of scale exist when it costs less to produce each unit as the number of units produced increases.  *See, e.g.*, *Kalish*, 742 F. Supp. at 1237 ("The concept of 'economies of scale' assumes that as a mutual

fund increases in size, its operational costs decrease proportionally.").  Here, the Independent Trustees received and considered information relating to potential economies of scale realized by FMG and the extent to which any such economies were shared with the Funds.  *See Gallus*, 497 F. Supp. 2d at 977, 982 (disinterested directors considered economies of scale).

Plaintiffs cannot meet their burden of overcoming the business judgment of the Independent Trustees on the economies of scale factor.  Indeed, on the threshold issue of whether economies of scale *even existed*, Plaintiffs fall well short of meeting their burden of proof.  Courts have consistently found that the plaintiff must show that the *per-unit cost* of servicing a fund decreased as the fund's assets grew.  *Krinsk*, 715 F. Supp. at 496 (plaintiff "fail[ed] to demonstrate that the per-unit cost of Fund transactions . . . decreases as the number of units increases"); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *77 ("Economies of scale exist when long-run average production costs (costs per unit) decrease as output quantity increases."); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (dismissing Section 36(b) complaint that failed to allege "whether the costs per investor increased or decreased as the assets under management grew").

This is an exacting test that no plaintiff has ever met at trial.  It is not sufficient for a plaintiff to merely show that "expenses . . . declined at a time when

the Fund size grew." *Krinsk*, 715 F. Supp. at 496 (explaining that this "does not

establish that such a decline was necessarily due to economies of scale").[9]  Instead,

to meet its burden, a plaintiff must provide a "detailed analysis of each element of

a transaction . . . over an extended period of time, over different levels of activities,

to determine whether or not there are economies of scale."  *Id.* (quotation omitted).

Plaintiffs cannot establish economies of scale exist here.  First, some of their

experts admit that economies of scale either are non-existent or are "not

technically" economies of scale.[10]  This is not surprising as some of the Funds are

tiny in comparison to the large funds in past Section 36(b) cases.[11]  Moreover, to

the extent these experts analyze economies of scale, their analyses fail for the exact

same reasons plaintiffs in previous cases have failed.  First, Plaintiffs fail to adduce

evidence that the *per unit* cost of performing fund work declined as the Funds grew

---

[9] *See also Krinsk*, 875 F.2d at 411 ("[T]o show economies of scale, plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased.  [Plaintiff] offered no such evidence.") (citations omitted); *Kalish*, 742 F. Supp. at 1240.

[10] Hood Decl. Ex. 7, Dep. Tr. of K. Barrett (Oct. 15, 2014) ("Barrett Tr.") 77:6-78:9; *see also* Hood Decl. Ex. 10, Expert Report of K. Barrett (June 11, 2014), at 55-58 (finding that the "economies of scale benefits are limited" and that decline in costs "would not, strictly speaking, be considered economies of scale benefits").

[11] For example, the EQ/Global Bond PLUS Fund had approximately $320 million in assets under management ("AUM") in 2014; in contrast, the fund in *Gartenberg* had over *$19 billion* in AUM.  *See Gartenberg*, 528 F. Supp. at 1040.  Likewise, the *twelve* Funds here had a total AUM of $42 billion in 2014; in contrast, the *eight* Funds in the *American Funds* case had a total AUM of *$710.5 billion*.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *19-20.

in size.[12]  Without such information, "there is no way to determine whether any

economy of scale even existed."  *Hoffman*, 591 F. Supp. 2d at 540.  Second,

Plaintiffs fail to meet their burden of proving that economies of scale exist because

they did not analyze *total* costs.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist.

LEXIS 120597, at *77 ("To determine whether economies of scale exist involves

an examination of how *total* costs change with the level of output.  Thus, relying

on a subset of costs in an economies of scale analysis may yield incorrect results.")

(emphasis added).  In their purported economies of scale analyses, Plaintiffs

considered only FMG's *direct* costs and ignored the estimated $49 million in costs

incurred by AXA in servicing the Funds.[13]

Finally, even if economies of scale existed, they were clearly shared.

Section 36(b) does not require an investment adviser to pass on *all* benefits of

economies of scale to the funds.  Rather, the Court should consider the extent to

which any such economies of scale were shared *equitably* with the fund.  1970

U.S.C.C.A.N. at 4901 ("[T]his bill recognizes that investors should *share equitably*

. . . in the economies.") (emphasis added).  Here, FMG shares any potential

economies of scale with the Funds through, among other things, breakpoints in the

---

[12] Plaintiffs' experts admit that they have conducted no *per unit cost* analyses.
Hood Decl. Ex. 8, Dep. Tr. of R. Kopcke (Nov. 24, 2014) ("Kopcke Tr.") 265:15-
19 ("We don't do costs per unit [analyses] . . . .").

[13] *See* Hood Decl. Ex. 7, Barrett Tr. 68:24-69:7; Hood Decl. Ex. 8, Kopcke Tr.
242:2-6; Hood Decl. Ex. 9, Dep. Tr. of S. Pomerantz (Nov. 14, 2014) 295:6-21.

Funds' fee schedules, expense caps, fee waivers, base fee reductions, pricing the
Funds to scale at inception, and reinvestment in services—all of which the
Independent Trustees considered in approving FMG's fees. *See In re Am. Mut.
Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *139-40 ("Economies of scale
can be shared with fund shareholders in a number of ways, including breakpoints,
fee reductions and waivers, offering low fees from inception, or making additional
investments to enhance shareholder services."); *Gartenberg*, 528 F. Supp. at 1054
(fee schedules "[c]learly . . . take account of any economies of scale" when fee
"diminish[es] progressively").  Indeed, between 2010 and 2015, FMG's
breakpoints in the Funds' management and administrative fees resulted in $68.8
million in savings to the Funds, and since inception the Funds' fee waivers have
resulted in over $8 million in savings.  Plaintiffs have adduced no evidence that
this level of sharing was insufficient.  *See Gallus*, 497 F. Supp. 2d at 974 (plaintiffs
failed to establish why $12.7 million in breakpoint savings was insufficient).

### C.   The Independent Trustees' Consideration Of Comparative Fees Should Not Be Second-Guessed.

Plaintiffs likewise cannot overcome the substantial deference that should be
afforded to the Independent Trustees' consideration of comparative fees.  It is
undisputed that the Independent Trustees received detailed data from Lipper, an
independent third party, comparing the Funds' fees to relevant peer groups.
*Gallus*, 497 F. Supp. 2d at 982-83 (board considered Lipper comparative fee data);

*In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *71-72

("Lipper . . . is a recognized industry-leading third-party source for mutual fund

industry data.").  This data strongly supports that the Funds' fees were within the

range of fees that would be produced by arm's-length bargaining.  Indeed, that data

shows that most of the Funds' total expenses are below the expenses for peer funds

and, in a number of instances, well below the median and/or average:

| Funds' Total Expense Ratios Compared To Lipper Peer Group Funds (as of 12/31/2012) | | | |
|---|---|---|---|
| Fund | Fund's Total Expense Ratio | Average for Peer Funds | Median for Peer Funds |
| EQ/Common Stock Index Fund | 0.720 | 0.979 | 0.942 |
| EQ/Core Bond Index Fund | 0.720 | 0.837 | 0.804 |
| EQ/Equity 500 Index Fund | 0.630 | 0.503 | 0.518 |
| EQ/Equity Growth PLUS Fund | 0.940 | 0.986 | 0.995 |
| EQ/GAMCO Small Company Value Fund | 1.100 | 1.149 | 1.118 |
| EQ/Global Bond PLUS Fund | 1.000 | 0.952 | 0.956 |
| EQ/Global Multi-Sector Equity Fund | 1.190 | 1.158 | 1.190 |
| EQ/Intermediate Government Bond Index Fund | 0.720 | 0.755 | 0.741 |
| EQ/Large Cap Value PLUS Fund | 0.910 | 0.986 | 0.971 |
| EQ/Mid Cap Value PLUS Fund | 0.990 | 1.087 | 1.093 |
| EQ/PIMCO Ultra Short Bond Fund | 0.840 | 0.799 | 0.814 |
| EQ/T. Rowe Price Growth Stock Fund | 1.100 | 0.986 | 0.995 |

As the Seventh Circuit found in *Jones*, the Funds' low comparative fees (combined

with a Fund performing consistently with peers) shows, as a matter of law, that the

Funds' fees are not excessive.  *Jones*, 611 F. App'x at 360-61 (holding that those

two facts alone "jointly suffice under the Supreme Court's standard" in *Jones*); *see*

*also Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) (granting summary judgment where fees were "within the range of fees and expenses for similar funds").[14]

Rather than offer any meaningful dispute that the Funds' fees are lower than most comparable funds, Plaintiffs seek to compare the portion of the management fees "retained" by FMG to the fee paid by subadvisers, and the ratio of those fees to each other.  This comparison fails as a matter of law under Supreme Court precedent, because it is beyond reasonable dispute that the services provided by FMG and the subadvisers are entirely different.  *Jones*, 559 U.S. at 349-350 & n.8 (explaining that "courts must be wary of inapt comparisons" of the fees for retail funds and the fees charged for other products because "there may be significant differences" between the services for retail funds and these products).  Moreover, even if this were a relevant comparison, the percentage of the fee that FMG retains in relation to subadvisers is in line with industry averages across a large number of managers who use subadvisers.

---

[14] Plaintiffs argue that the Funds' fees should be compared to the asset-weighted average fee for index funds, despite that most of the Funds are actively managed. This type of fee comparison is "disproportionately concentrated in the lowest-cost funds" and has been rejected by numerous courts.  *Amron*, 464 F.3d at 345 (comparison to funds known to have low costs "raises little suspicion"); *Kalish*, 742 F. Supp. at 1250 ("[t]he Vanguard comparison is seriously flawed" as Vanguard is known for having the lowest fees in the industry.); *see also Amron*, 464 F.3d at 345 (rejecting allegations that fund's expense ratio exceeded industry mean without information "on the distribution of fees").

**D.**   **FMG's Profit Margins Were Considered By The Independent Trustees And Are Well Within Normal Ranges.**

While profitability is a relevant consideration, Plaintiffs cannot establish a violation of Section 36(b) by alleging that FMG "just plain made too much money." *Kalish*, 742 F. Supp. at 1237; *Krinsk*, 875 F.2d at 410 (holding that high profitability alone does not support a finding that the fee is excessive); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *134-36 (Section 36(b) "does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."). Congress explicitly recognized that the "investment adviser is entitled to make a profit." 1970 U.S.C.C.A.N. at 4902.

Here, prior to approving the Funds' fees, the Independent Trustees considered extensive information regarding the profitability of the Funds' management and administrative agreements to FMG, and how FMG's profitability compared to other investment advisers. *See Gallus*, 497 F. Supp. 2d at 981 (relying on the fact that defendants "provided detailed reports on its profitability to the Board" in granting summary judgment to adviser). Board minutes reflect that the Independent Trustees repeatedly questioned the cost allocation methodologies used to prepare the profitability data, and the Board engaged Ernst & Young to independently verify that the methodology was reasonable.

There is no basis to second guess the Board's judgment that the profits earned by FMG were reasonable. From 2011 to 2014, FMG's pre-tax profit

- 33 -

margins ranged from 12% to 32%, including distribution expenses, and 55% to 57%, excluding distribution expenses. These profit margins are well within the range of margins that courts have found to be reasonable in previous Section 36(b) cases. *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (pre-tax margins up to 89%, including certain distribution expenses), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Schuyt*, 663 F. Supp. at 979 (pre-tax margins up to 77.3% and post-tax margins up to 38.6%, including certain distribution expenses); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *135-37 (excluding distribution expenses, pre-tax margins ranging from 36% to 52%; including distribution expenses, pre-tax margins ranged from 42% to 48%); *Kalish*, 742 F. Supp. at 1250 (post-tax margin up to 37.8% "neither requires nor supports a finding [of excessiveness]"). These profit margins are also consistent with (and, in some years, well below) the median profitability of other investment advisers. *In re Am. Mut. Funds Fee Litig.*, 2009 LEXIS 120597, at *137 ("The Defendants' profitability was also comparable to or less than other similarly structured investment advisers.").

Courts in Section 36(b) cases have recognized that the method by which shared costs are allocated in profitability calculations is "an art rather than a science" and there can be more than one reasonable way to allocate costs. *Krinsk*, 715 F. Supp. at 489. Seizing on this, Plaintiffs argue that the profit margins in this

case should be calculated differently, and their experts have calculated alternative profit margins that are much higher than those noted above.  However, Plaintiffs' alternative profit margins are deeply flawed for two reasons.  First, Plaintiffs' expert calculated these margins by excluding the substantial costs incurred by AXA in providing services to the Funds, but that is contrary to the express holding in *Gartenberg* that such services cannot be ignored.  *Gartenberg*, 694 F.2d at 931; *Gartenberg*, 528 F. Supp. at 1049 (Section 36(b) "recognizes that in order to properly assess the fairness of advisory compensation, the courts cannot be strictly bound by corporate structure and ignore closely related entities whose functions intimately impinge on one another."); *Schuyt*, 663 F. Supp. at 979 n.49 (considering "*all* costs that are directly associated with each product as well as an equitable share of indirect and corporate administrative expense") (emphasis added).

Second, Plaintiffs' alternative profit margins ignore the fees that FMG pays the subadvisers and subadministrator, arguing these payments are not truly costs of FMG.  There is no basis for excluding these costs from a profitability analysis. FMG is contractually obligated to pay these fees, and they are treated as a cost in FMG's audited financial statements.  Plaintiffs' experts can find no accounting authority supporting their suggested treatment of subcontracting fees, and they admit these payments are treated as costs under GAAP.  Two major accounting

firms, PwC and Ernst & Young, found the methodology to be reasonable.  There is simply no basis to ignore these substantial costs borne by FMG.

### E.   Any Potential "Fall-Out Benefits" Were Considered By The Independent Trustees.

Courts have defined "fall-out benefits" as profits to the adviser or its affiliates that "would not have occurred *but for* the existence of the Fund."  *Krinsk*, 715 F. Supp. at 495; *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142 (same).  Here, Plaintiffs cannot overcome the reasonable business judgment of the Independent Trustees regarding potential "fall-out benefits" that may accrue to FMG and AXA.  The Independent Trustees received detailed information on possible fall-out benefits relating to the Funds.  As a matter of law, the Independent Trustees' evaluation of potential fall-out benefits should be afforded substantial deference.  *See Gallus*, 497 F. Supp. 2d at 982 (granting summary judgment in favor of defendants where "the Board considered the reports . . . that expressly addressed the fall-out benefits").

Plaintiffs attempt to make much of certain revenues ("product wrapper fees" and a "general account spread") earned by AXA in connection with its sale of variable annuities.  PCFL ¶¶ 123-33.  However, AXA's variable annuity revenue does not qualify as a fall-out benefit because AXA could earn these revenues even if the Funds did not exist.  For starters, these revenue streams existed even before the existence of any of the EQAT funds, and in some instances many years before

the Funds existed.  In addition to the Funds, Plaintiffs and other variable annuity

contract holders are free to allocate their contributions to their variable annuities

to:  (1) other mutual funds in EQAT; (2) other mutual funds that are not even

managed by or affiliated with FMG; and/or (3) a separate "general account"

(which is not a mutual fund and which provides a guaranteed rate of return).

Given that AXA could earn the product revenues by using other investment

options, the revenues fail to meet the "but for" test to qualify as fall-out benefits.

*Krinsk*, 715 F. Supp. at 495.  In any event, the Independent Trustees were apprised

of AXA's variable annuity revenue when exercising their business judgment to

approve FMG's fees.  *See Krinsk*, 715 F. Supp. at 495 (rejecting plaintiff's fall-out

benefit arguments where trustees received "the total profits within which such

[fall-out] benefits presumably exist").

       In addition to failing the "but for" test, Plaintiffs cannot meet their burden of

appropriately quantifying the amount of revenue that is attributable to the Funds.

*In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142-43 ("The

burden of proof is on plaintiff to quantify the fall-out benefits and demonstrate the

appropriate share for allocation of said benefits as an offset to costs.").  Critically,

Plaintiffs ignore that a substantial portion of this revenue must be attributed to

AXA's entrepreneurial activities with respect to the variable annuities, as well as

non-EQAT funds managed by FMG.  PCFL ¶¶ 132-33; *Gartenberg*, 573 F. Supp.

at 1314-15 ("Obviously, [the affiliated broker] is entitled to allocate a substantial portion of the net fall-out benefits to itself as compensation for its own entrepreneurial skill."); *Krinsk*, 715 F. Supp. at 494-95 (rejecting plaintiff's argument that *all* profits associated with cash management account should be treated as fall-out benefit). Thus, even if the product wrapper and general account spread qualified as fall-out benefits as a matter of law (and they do not), Plaintiffs cannot meet their burden of quantifying the amount of those revenues attributable to the Funds.

## IV.   PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW BECAUSE THEY CHALLENGE ONLY A PORTION OF THE FUNDS' FEES.[15]

Plaintiffs' theory is that the portion of the Funds' fees that were *retained* by FMG after paying its subcontractors is excessive relative to the services that *FMG provides directly* to the Funds. Plaintiffs' theory misconstrues the required inquiry under Section 36(b). Nothing in Section 36(b) permits the artificial disaggregation of unitary fees for the purpose of challenging only an isolated portion of the fee relative to only a subset of the services provided. To the contrary, Section 36(b) requires consideration of "*all services* rendered . . . and *all compensation and*

---

[15] Plaintiffs' claims also fail as a matter of law for lack of standing. A separate account owned by AXA is the legal owner of shares of the Funds. Plaintiffs therefore are not "security holders" and, thus, lack standing. *See* 15 U.S.C. § 80a-35(b) (authorizing a "security holder" of an investment company to bring an action "on behalf of such company"); DFFCL ¶ 7. Although the Court has already ruled on this argument, Defendants include it herein for purposes of preservation for appeal.

*payments received*."  1970 U.S.C.C.A.N. at 4910 (emphasis added); *Gartenberg*, 528 F. Supp. at 1052 (considering "the *totality of the values* placed at the disposal of the shareholders in appraising the fairness of compensation") (emphasis added); *Benak*, 2004 U.S. Dist. LEXIS 12231, at \*25 ("[U]nder § 36(b) it is the *overall* nature and quality of the services provided by the investment adviser that is at issue—not merely some small percentage of those services.").  Indeed, given that fund "investors purchase a bundle of services," *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at \*82, it makes no sense that Section 36(b) would permit a claim for a mere slice of the total fee paid for that bundle.  Because Plaintiffs' "retained fee" theory artificially unbundles the Funds' fees and fails to account for the full package of services provided (*i.e.*, including those provided by FMG's subcontractors), Plaintiffs' claims fail as a matter of law.[16]

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the Court should dismiss Plaintiffs' Complaints and enter judgment for the Defendants.

---

[16] Defendants note that Plaintiffs' damages theories, which are based on profit "disgorgement" and proposed alternative fees with no nexus to the actual services provided, also fail as a matter of law.  *In re Gartenberg*, 636 F.2d 16, 18 (2d Cir. 1980) ("[T]he excessive portion of the fee must be returned."); *In re Evangelist*, 760 F.2d 27, 29 (1st Cir. 1985) ("[T]he remedy Congress created" under Section 36(b) was the "payment of any excess fee to the company. . . ."); *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 760 n.20 (D. Md. 2008) (Section 36(b) requires a "*quantum meruit* award to the advisers" for portion of fees appropriately earned); 15 U.S.C. § 80a-35(b)(3) (a plaintiff may only recover "actual damages").

Dated:  December 30, 2015

BLANK ROME LLP

By: /s/ Jonathan M. Korn
    Jonathan M. Korn
    301 Carnegie Center, 3rd Floor
    Princeton, NJ 08540
    (609) 750-7707

MILBANK, TWEED, HADLEY &
McCLOY LLP
    James N. Benedict (*pro hac vice*)
    Sean M. Murphy (*pro hac vice*)
    Robert C. Hora (*pro hac vice*)
    Andrea G. Hood (*pro hac vice*)
    28 Liberty Street
    New York, NY 10005
    (212) 530-5000

*Attorneys for Defendants AXA Equitable*
*Life Insurance Company and AXA Equitable*
*Funds Management Group, LLC*