1              UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
2

3    _____
     MARY ANN SIVOLELLA, et al,
4                    PLAINTIFFS

5       Vs.                          CIVIL NO.
                                     11-4194 (PGS)
6    AXA EQUITABLE LIFE INS. CO.,
     et al,
7                    DEFENDANTS
     _____
8    GLENN D. SANFORD, et al,
                     PLAINTIFFS
9

10      Vs.                          CIVIL NO.
                                     13-312 (PGS)
11   AXA EQUITABLE FUNDS
     MANAGEMENT GROUP,
12                   DEFENDANT
     _____

13

14                         **JANUARY 29, 2016**
                           CLARKSON S. FISHER COURTHOUSE
15                         402 EAST STATE STREET
                           TRENTON, NEW JERSEY  08608

16

17   B E F O R E:        THE HONORABLE PETER G. SHERIDAN
                         U.S. DISTRICT COURT JUDGE
18                       DISTRICT OF NEW JERSEY

19

20
     **TRIAL - DAY 12**
21

22

23                         Certified as true and correct as required
                           by Title 28, U.S.C. Section 753
24                         /S/ Francis J. Gable
                           FRANCIS J. GABLE, C.S.R., R.M.R.
25                         OFFICIAL U.S. REPORTER
                           (856) 889-4761


                    *United States District Court*
                       *Trenton, New Jersey*

```
 1

 2   A P P E A R A N C E S:

 3
         SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, PC
 4       BY:  ARNOLD C. LAKIND, ESQUIRE
              DANIEL S. SWEETSER, ESQUIRE
 5            ROBERT L. LAKIND, ESQUIRE
              CHRISTOPHER S. KWELTY, ESQUIRE
 6            CHRISTOPHER S. MYLES, ESQUIRE
         FOR THE PLAINTIFFS
 7

 8
         BLANK ROME, LLP
 9       BY:  JONATHAN M. KORN, ESQUIRE
         FOR THE DEFENDANTS
10

11
         MILBANK, TWEED, HADLEY & McCLOY, LLP
12       BY:  SEAN M. MURPHY, ESQUIRE
              ROBERT C. HORA, ESQUIRE
13            JAMES N. BENEDICT, ESQUIRE
         FOR THE DEFENDANTS
14

15   ALSO PRESENT:  PATRICIA LOUIE, ESQUIRE
                    MANAGING DIRECTOR & ASSOCIATE GENERAL COUNSEL
16                  AXA EQUITABLE LIFE INSURANCE CO.

17

18

19

20

21

22

23

24

25
```

*United States District Court*
*Trenton, New Jersey*

1                          I N D E X

2

STEVE POMERANTZ                                        1955
3    DIRECT EXAMINATION OF STEVE POMERANTZ, Ph.D.,       1956
     CONTINUED BY MR. SWEETSER
4    CROSS-EXAMINATION OF STEVE POMERANTZ PH.D. BY MR.   1985
     MURPHY
5    REDIRECT EXAMINATION OF STEVE POMERANTZ, PH.D.,     2048
     BY MR. SWEETSER

6

7

8                       E X H I B I T S

9

10   plaintiff's Exhibit 151-J was marked into          1981
     evidence
11   Plaintiff's Exhibit 151-K was marked into          1984
     evidence
12   Defendant's Exhibits 1886 and 1886.1 were marked   2011
     into evidence
13   Plaintiff's Exhibit 151-I was marked into          2060
     evidence

14

15

16

17

18

19

20

21

22

23

24

25


                    *United States District Court*
                      *Trenton, New Jersey*

1        THE COURT:  Good afternoon.  Please be seated.

2        All right.  So, I might as well go through the

3   schedule for the remainder of the trial.  So, next week we'll

4   meet on Tuesday at 12:00, plus the 4th and the 5th; and I

00:00   5   believe the Friday the 5th will be the plaintiff's last day.

6   Then the defendants will have the 8th, 9th, 10th, 11th, 18th

7   and 19th, 22nd and 23rd; eight days.  Mr. Benedict wanted to

8   add four more days on there, but I don't think so.

9        MR. MURPHY:  I'll put his head in a vice this

00:01   10   afternoon.

11        THE COURT:  Exactly.  So, that was what was

12   originally contemplated, so I don't see why we should -- and

13   it's the best I can do getting you all in in one timeframe as

14   we could.  Any objections to that?

00:01   15        MR. KORN:  I just want to confirm, Tuesday the 2nd,

16   your Honor, are we starting 10:30 or noon?

17        THE COURT:  12:00.  And then the 4th and the 5th.

18   All right?

19        Mr. Sweetser?

00:01   20        MR. SWEETSER:  Your Honor, plaintiffs call Dr.

21   Pomerantz back to the stand.

22        (STEVE POMERANTZ, Ph.D., previously sworn, resumes

23   witness stand.)

24        THE COURT:  Good morning, Mr. Pomerantz.  You're

00:02   25   still under oath.

Pomerantz - Direct - Sweetser

1        THE WITNESS:  Yes.

2  (DIRECT EXAMINATION OF STEVE POMERANTZ, Ph.D., CONTINUED BY

3  MR. SWEETSER:)

4  Q.   Dr. Pomerantz, is one of the opinions that you provided

00:02        5  in this case taking an allocation of fallout benefits

6  calculated by Mr. Barrett and allocating them to the

7  individual funds?

8  A.   Yes.

9  Q.   I'm going to show you what's been marked as P-151-L and

00:02        10  ask you if you recognize that document.

11  A.   Yes.

12  Q.   Would you please tell the Court what P-151-L is.

13  A.   This is a chart I prepared that allocates the defined

14  fallout benefit to the respective subject funds.

00:03        15        MR. MURPHY:  Just objection, your Honor; you know,

16  as we discussed yesterday, Mr. Pomerantz as I understand the

17  ruling is --

18        THE COURT:  I found he wasn't qualified to testify

19  on fallout benefits.

00:03        20        MR. SWEETSER:  Your Honor, this is the allocation

21  which counsel expressly said he didn't have a problem with him

22  doing allocating to the individual funds.  It's nothing other

23  than taking a number of a document which is already in

24  evidence, which I'm going to be informing the Court about in a

00:03        25  moment, and allocating to the funds.  It's a simple

Pomerantz - Direct - Sweetser

1      mathematical calculation.

2              THE COURT:  Denied.

3              MR. SWEETSER:  Denied, we can't put this evidence

4      in?

00:03    5              THE COURT:  Yes.  I didn't find him qualified to

6      talk about fallout benefits.  I haven't heard -- I said that

7      you could renew the application, but I haven't heard since

8      that time any qualifications that would allow Mr. Pomerantz to

9      discuss fallout benefits.  So, when you say putting numbers on

00:04   10      a page, someone has to calculate what that number is, and if

11     he's thinking that some number represents fallout benefits he

12     doesn't have to qualifications to do that.

13             MR. SWEETSER:  And he's not thinking that, your

14     Honor.

00:04   15             THE COURT:  So it's denied.

16             MR. SWEETSER:  Okay.

17     BY MR. SWEETSER:

18     Q.   I'm going to show you what's been marked into evidence as

19     P-197-A and ask if you recognize this document.

00:04   20     A.   Yes.

21     Q.   Can you please tell the Court what P-197-A is.

22     A.   This is an exhibit prepared by Mr. Barrett that

23     identifies the fallout benefits for years 2000 to 2012.

24     Q.   And did you do any calculation with respect to the

00:05   25     information on P-197-A as it relates to the plaintiffs' funds?

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1          MR. MURPHY:  Objection, your Honor.  My

2   understanding is he's just end-running your denial.  He's

3   showing him the starting point of the analysis he just tried

4   to do and trying to get in the calculation of fallout

5   benefits.

6          MR. SWEETSER:  Our Honor, the calculation of fallout

7   benefits is already in evidence.  All he did for the Court's

8   assistance was to take the big number calculated by Mr.

9   Barrett, and just do the mathematical calculation to the

10  funds.  That's all he's done, that's all this exhibit is.

11         THE COURT:  Go ahead, Mr. Murphy.

12         MR. MURPHY:  So, your Honor, if he's --

13         THE COURT:  Someone has to help me refresh my

14  recollection; I don't remember Mr. Barrett talking about

15  fallout benefits.

16         MR. MURPHY:  I believe he did, I think he did offer

17  a chart into evidence that calculated fallout benefits.

18  Again, he didn't say they were fallout benefits, he said he's

19  not offering an opinion they are fallout benefits.  What he

20  did is use the methodology that kind of replicated -- he

21  believes replicated the analysis that was done in 2005 or 2006

22  and just used that math to come up with a new number for later

23  years.  He wasn't testifying it was a fallout benefit, he just

24  did some math.

25         THE COURT:  Oh, I remember that now.  So he couldn't

1959

Pomerantz - Direct - Sweetser

1    state whether they were fallout benefits or not, but he

2    thought it was something that might be something like a

3    fallout benefit.

4              MR. MURPHY:  That's -- well, I don't think he even

00:06   5    said that last part, your Honor.  I asked him pretty clearly,

6    are you an expert on fallout benefit, no; are you offering an

7    opinion these are fallout benefits, no, was the trial

8    testimony.  And now Mr. Pomerantz wants to take that and say

9    well, that's the fallout benefit, I'm then going to take that

00:06   10   fallout benefit and say how much of that fallout benefit is a

11   attributable to each fund.  So it's just building on hearsay

12   and it's precluded under this Court's prior ruling on his

13   expertise.

14             MR. SWEETSER:  Your Honor, Dr. Pomerantz is doing no

00:07   15   such thing.  All he's doing is taking the information, which

16   is a summary of the number which is in evidence as 197-A, and

17   taking --

18             THE COURT:  A summary of a number; what is the

19   number?

00:07   20             MR. SWEETSER:  The number -- what's the specific

21   number?

22             THE COURT:  What does it represent, the number

23   represent?

24             MR. SWEETSER:  It represents Mr. Barrett's testimony

00:07   25   on the general account and product wrapper calculations that

*United States District Court*
*Trenton, New Jersey*

1960

Pomerantz - Direct - Sweetser

1　he tried to assimilate to what the defendant was doing when it

2　actually was reporting that number to the Board.  What he did

3　was project it out, because as your Honor will recall they

4　stopped doing that in 2006; he projected it out to today's

00:07　5　numbers and comes up with essentially 800,000 for one year, a

6　million for each -- I'm sorry; a billion for each of the two

7　subsequent years.

8　　　　And all Dr. Pomerantz did and all this exhibit does

9　is take that number and break it down in a way that he'll

00:08　10　explain to the Court to the specific plaintiffs' funds,

11　because that's information presumably if the Court finds if

12　these are fallout benefits the Court would want to know how

13　that number could be allocated to each of the funds.

14　　　　It's nothing other than a mathematical calculation,

00:08　15　taking an exhibit that's in evidence from Mr. Barrett and

16　translating it into the breakdown to each of the 12 funds at

17　issue in this case.

18　　　　MR. MURPHY:  Your Honor, I'm sympathetic to Mr.

19　Sweetser's position.  I think I understand what he wants to do

00:08　20　is just do some math, and perhaps I can talk to him for a

21　minute and work out some sort of compromise to get the math

22　that he needs in evidence.

23　　　　But what he's offering into evidence at 151-L is a

24　fallout benefit analysis for each of the funds, it then labels

00:08　25　the fallout benefit and has a number attached to it.  I mean

1961

Pomerantz - Direct - Sweetser

1   it goes far beyond what he's permitted to testify to.

2        If he wants to say I took a billion dollars which

3   Mr. Barrett calculated is the product wrapper and general

4   account and did some math and here are the numbers, I think I

5   would allow that.

6        MR. SWEETSER:  That's all he seeks to do.  If

7   counsel's concern is the labeling on this document of a

8   fallout benefit, I certainly have no objection if counsel has

9   a substitute word that he would like to use there to putting

10  that in there to avoid this conflict.

11       MR. MURPHY:  So is what --

12       THE COURT:  I don't see why it's relevant.  So far

13  we haven't had any testimony or substantial testimony about

14  what a fallout benefit is, and I've ruled that Mr. Pomerantz

15  can't testify as to fallout benefits because he really doesn't

16  possess any expertise in that field; and now you want me to

17  accept numbers that might be, which I would say is

18  speculative, representing fallout benefits.  I don't

19  understand why that's even relevant at this timeframe.

20       MR. SWEETSER:  Let me address your Honor's concern.

21  So fallout benefits are one of the *Gartenberg* factors.  As

22  your Honor may recall, I questioned Mr. Joenk extensively on

23  this issue, among other things, inquiring as to why for

24  several years FMG reported to the Board the product wrapper

25  fees and the general account spread; not only reported that as

00:09

00:09

00:09

00:09

00:10

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1  a fallout benefit, but specifically attached the dollar value

2  for each.  And then they stopped doing that, which plaintiffs

3  have obviously a serious concern about.  They classified it as

4  a fallout benefit for a substantial period of time and they

5  stopped doing it and stop reporting it to the Board.

6          So that's the significance of the two items that are

7  in Mr. Barrett's calculation of -- that's set forth in 197-A.

8  And again, with respect to what Dr. Pomerantz did, the Court

9  is -- it's obviously plaintiffs' position is that the Court is

10 required -- the law requires each fund to be reviewed

11 individually.  And all we did to assist the Court in the event

12 that the Court finds, which we believe we've established

13 yesterday as a matter of law, that these two items, the

14 product wrapper fees and the general account are fallout

15 benefits; all this document does, all that Dr. Pomerantz did

16 was take Mr. Barrett's calculation, and again, allocate to

17 each of the funds so your Honor can know how this allocation

18 translates to each of the funds at issue.

19         MR. MURPHY:  Again, your Honor, so I believe he said

20 he asked Mr. Joenk about fallout benefits, and my recollection

21 was that you, your Honor, asked Mr. Joenk a question, you

22 turned to him and said, are these fallout benefits; and he

23 said absolutely not, and explained why the general account

24 definitely wasn't and then explained product wrapper.  So the

25 only testimony to date is that they're not fallout benefits.

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1      Again, this witness has been precluded from

2  testifying about it, and if it goes in, as with many of Mr.

3  Pomerantz's calculations, there's a lot of numbers on here

4  that I have to unpack; and I have eight days.  I have a lot of

00:12      5  problems with some of these numbers, he just rounds up Mr.

6  Barrett's numbers with a precise number and says, oh why don't

7  we just call at a billion, just call it a billion, don't worry

8  about the exact number.

9      So it's just going to consume trial testimony that I

00:12    10  think is totally unnecessary and there's no foundation for at

11  this point.

12      MR. SWEETSER:  Your Honor, first of all, he rounded

13  down, so he benefited the defendant in what he did; he rounded

14  down, he doesn't round up.  And on the chance that the Court

00:12    15  might reject Mr. Joenk's testimony about his self-serving

16  opinion that these are not fallout benefits that they have

17  continuously reported as fallout benefits, and even after they

18  stopped reporting the dollar number from the Court, the Court

19  may recall there's voluminous evidence that shows that they

00:12    20  mentioned that it is a fallout benefit, then they changed the

21  wording to it's possibly a fallout benefit; it's up to your

22  Honor to decide from the evidence whether or not it's a

23  fallout benefit.

24      But again, in the event that your Honor does decide

00:12    25  that the product wrapper and/or general account fees are

1  fallout benefits, this is a document again which I would think

2  would be helpful to the Court because it takes Mr. Barrett's

3  calculation of those two numbers which they stopped reporting

4  in 2005/2006, he does the exact same calculation, he testified

00:13    5  about how he did that; this document's in evidence, and all it

6  does again is just translate that number to each of the funds

7  so when your Honor's reviewing each of the funds on an

8  individual basis you will have this information available to

9  him.

00:13   10        THE COURT:  The original request was that I -- what

11  was your request that I do?  Allow Dr. Pomerantz to discuss

12  fallout fees?

13        MR. SWEETSER:  Not at all.  Just to explain what he

14  did in P-151-L, just to explain to the Court essentially what

00:13   15  I just explained to the Court; that he took Mr. Barrett's

16  number, rounded them down, and just attributed the number to

17  each of the funds based upon allocation that he will discuss

18  with the Court if your Honor permits the testimony.

19        MR. MURPHY:  I can tell your Honor's tiring of this

00:14   20  issue, and if -- perhaps a compromise just to facilitate --

21        THE COURT:  Oh no.  I'm denying the application.  It

22  seems to me that -- I don't know if this came up in the

23  testimony, but when Mr. Barrett was testifying about this, in

24  my mind I was thinking that well, he's not saying it's a

00:14   25  fallout benefit, but I thought -- and I can't remember from

Pomerantz - Direct - Sweetser

1    where, but I do believe that from the discussions amongst
2    counsel and what was presented to the Court, that there was
3    going to be testimony at some time in the future about fallout
4    benefits that would match up or be a proffer of evidence --
00:14    5    we'd allow the evidence in by Mr. Barrett because it would all
6    be connected later in time with more information about fallout
7    benefits.

8         But I denied Dr. Pomerantz to testify on that,
9    because I didn't feel he had an expertise, and now we're just
00:15    10    trying to augment really iffy material from Mr. Barrett based
11    on what I thought was a proffer that there would be future
12    fallout benefit testimony, and there's none.  So, I don't see
13    why I'm getting into this.  So I'm denying the application.

14         MR. SWEETSER:  And your Honor, I understand that.
00:15    15    On that point, however, I would just point out as far as
16    future testimony about this, it would seem that your Honor's
17    ruling precluding Dr. Pomerantz from discussing this yesterday
18    would preclude any witness from discussing this yesterday.  My
19    understanding of the Court's ruling yesterday is that --

00:15    20         THE COURT:  The evidence yesterday dealt with Dr.
21    Pomerantz.  There's been no proffer by anyone from your team
22    that there will be other evidence to support fallout benefits.
23    So, if there's no testimony that's going to be forthcoming,
24    then what am I hooking up in the future; there's nothing
00:16    25    there.  There's no way the connect it all up.

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1    MR. SWEETSER:  And again, your Honor, I know it's

2 been, you know, an enormous record that's before the Court and

3 the Court may not recall, but there is a multitude of board

4 materials every single year, fallout benefits are reported to

5 the Board.

6    THE COURT:  I know that.

7    MR. SWEETSER:  Okay.  And your Honor will recall

8 that for several years these fallout benefits that are

9 calculated -- that were calculated by Mr. Barrett were

10 reported by a number and then the defendants stopped reporting

11 them.

12    THE COURT:  I recall that.

13    MR. SWEETSER:  Then, your Honor, also on the record

14 are documents where FMG is reporting these benefits, first of

15 all, as a fallout benefit, and then after that as a possible

16 fallout benefit.  So there is --

17    THE COURT:  The testimony was, Mr. Sweetser, what I

18 recall from Mr. Joenk was, I don't know whoever made them

19 fallout benefits, they don't represent fallout benefits to me,

20 and the burden of proof in this case is upon the plaintiffs,

21 and you haven't shown any evidence.  So I don't understand why

22 I'd let it in this at this time.

23    MR. MURPHY:  Your Honor, just one addition to that.

24 Mr. Joenk said I have a strong suspicion as to why they were

25 removed, and Mr. Sweetser didn't purposely ask the question.

Pomerantz - Direct - Sweetser

1    And again, he's got the burden of proof to lay a foundation,

2    he could have asked the question, I think Mr. Joenk said twice

3    I have a strong suspicion why they were removed and he didn't

4    ask the question.

00:17    5        MR. SWEETSER:  Your Honor, on that point I don't

6    really particularly care why Mr. Joenk removed them, because

7    the fact is -- and your Honor, I'm talking about beyond the

8    testimony.  I mean certainly Mr. Joenk isn't going to stand up

9    and say these are absolutely fallout benefits and I didn't

00:17   10   report a billion dollars of fallout benefits every year

11   intentionally.

12       But again, all I'm going to do is remind the Court

13   that putting aside his testimony, you know, the plaintiffs in

14   this case have a difficult burden of having to put in their

00:18   15   case through defense witnesses which is difficult.  All that

16   being said, the documents tell the story; the documents reveal

17   these fallout benefits; the documents acknowledge FMG's

18   position that at one point in time they are fallout benefits,

19   and now they're possibly fallout benefits.

00:18   20       And again, the ultimate resolution of whether or not

21   they're fallout benefits or not based upon what they are will

22   be up to your Honor.  That's why we believe this will be

23   helpful to the Court.

24       THE COURT:  Believe what?

00:18   25       MR. SWEETSER:  We believe that the allocation --

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1    first of all, the calculation done by Mr. Barrett of the two

2    biggest fallout benefits here, first, which is already in

3    evidence; and Dr. Pomerantz's simple mathematic calculation

4    allocating those to the individual funds at issue for the

00:18   5    Court to analyze, if the Court determines that these are

6    fallout benefits, will be of assistance to the Court.  That's

7    all this document is.

8            THE COURT:  All right.  So my ruling is as follows,

9    in my view the plaintiff has the burden of proof to show what

00:19  10    a fallout benefit is.  And to date, the plaintiffs have not

11    shown what a fallout benefit is in this case.  The plaintiffs

12    also are not proffering that other people or witnesses will

13    demonstrate what a fallout benefit is.

14            As such, I don't see how putting in a mathematical

00:19  15    sheet showing what the possible fallout benefits would be per

16    each fund makes any sense at all.  So, I'm denying the

17    application.  Go on to the next area.

18            MR. SWEETSER:  Thank you.

19    BY MR. SWEETSER:

00:19  20    Q.  I'd like to show you what's been marked as 151-J.  Dr.

21    Pomerantz, were you requested to provide any damages analysis

22    in this case?

23    A.  Yes.

24    Q.  Can you please tell the Court what P-151-J is?

00:20  25    A.  P-151-J is a damage calculation that I performed for the

1    subject funds, for the three years identified, 2010 through

2    2012.

3    Q.   And this document says it's based on a 39 percent profit

4    margin.

00:20    5    A.   Yes.

6    Q.   Correct?  Why did you use a 39 percent profit margin?

7    A.   There are two surveys, one conducted by Lipper and one

8    conducted by Strategic Insight, that aggregate the information

9    available from public mutual fund companies, and report in

00:21    10   their survey a pre-tax margin, across not just each individual

11   complex, but also for the group as a whole.  And they offer 39

12   percent as the average profit margin of that group.

13   Q.   I'm going to show you what's been marked into evidence as

14   P-164.

00:22    15       Do you have P-164?

16   A.   Yes.

17   Q.   Is this the -- first of all, what is Strategic Insights?

18   A.   Strategic Insight is like I said a third-party

19   organization that collects information from mutual fund

00:22    20   companies, maintains databases of aggregate information, both

21   pertaining to investments as well as the businesses, and

22   serves as a -- I guess just a clearing house for a variety of

23   mutual fund business information.

24   Q.   Do you know if FMG provides Strategic Insight information

00:22    25   to the Board?

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1   A.   Yes, everybody does.

2   Q.   I'm going to direct your attention to page 441 of P-164,

3   Bates ending 9079.  Do you have that document?

4   A.   Yes.

00:23   5   Q.   Are on that page?  Okay.  If you look down the left-hand

6   column about two-thirds of the way down the page, is that the

7   information -- or at least I think you said you relied on

8   Lipper as well as Strategic Insight; is that correct?

9   A.   Lipper also has a survey that's pretty much the same as

00:23   10  Strategic Insight.

11  Q.   Okay.  And down at the bottom where it says in 2012; do

12  you see that?

13  A.   Yes.

14  Q.   And it's bolded?

00:23   15  A.   Yes.

16  Q.   It says in 2012 the average pre-tax operating margin for

17  the public companies was 39 percent, slightly lower than the

18  40 percent posted the year prior; is that correct?

19  A.   Yes.

00:23   20  Q.   Okay.  Now, when it says public companies, to what

21  companies does this survey apply?

22  A.   I mean the survey applies to the industry, the

23  information is only publicly available for public companies.

24  Q.   Okay.  When you say the industry, what industry are you

00:24   25  referring to?

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1   A.   The mutual fund industry.

2   Q.   Okay.  So, you've told us the basis for why you use the

3   39 percent profit margin.  Now, can you explain to the Court

4   -- let's start with the top chart or the top table that you

5   have on P-151-J.  Can you tell the Court what it is to -- what

6   it is you did to calculate the numbers that are set forth in

7   this chart.

8        MR. MURPHY:  Just, your Honor, as I understand this

9   document --

10       THE COURT:  So you're looking at 164?

11       MR. MURPHY:  Sorry; I think he switched back to

12  151-J just now.

13       Am I correct, Mr. Sweetser?

14       MR. SWEETSER:  Yes, 151-J.

15       MR. MURPHY:  So 151-J purports to be a damage

16  calculation based on a 39 percent profit margin that I believe

17  Mr. Pomerantz calculated.  So he's calculating a profit

18  manager.  My client's been unable to replicate that number by

19  using his results to determine how he got to a 39 percent

20  profit margin.  It's very clear he's including major

21  categories of expenses like sub-advisory fees and variable

22  expenses, but excluding -- sorry, variable expenses and

23  sub-advisory fees, but there's all kinds of adjustments,

24  accounting adjustments like offsets to revenues and fee

25  waivers, and we cannot figure out how he got these numbers.

Pomerantz - Direct - Sweetser

1       Essentially what he's doing is I've calculated what

2  it means to have a 39 -- a hypothetical 39 percent profit

3  margin.  That would be squarely within Mr. Barrett's realm of

4  expertise, but as I objected to yesterday, Mr. Pomerantz has

00:25     5  no accounting expertise, he has no accounting degrees; he's

6  never written any accounting articles that have been peer

7  reviewed, and has no basis to go through a financial statement

8  and contact a profit margin as an accountant would.  They

9  could have had Mr. Barrett do that and they chose not to do

00:26    10  that.

11       THE COURT:  Mr. Sweetser?

12       MR. SWEETSER:  Your Honor, I'm not exactly sure like

13  there was a question that he's objecting to, he's objecting to

14  even this document being discussed at all.  Counsel had a full

00:26    15  opportunity -- this was in Dr. Pomerantz's report.  Counsel

16  deposed Dr. Pomerantz for several hours on whatever subject

17  matter he wanted to depose him on.  Dr. Pomerantz has a Ph.D.

18  in mathematics from Berkley, he can certainly calculate a

19  profit margin, and he was about to explain before I was

00:26    20  interrupted how it is he did his calculation.

21       To the extent that the defendant can't figure it out

22  or has issues with the way that he calculated the profit

23  margin, they're certainly welcome to address that on

24  cross-examination.  But it's certainly something within his

00:27    25  realm of expertise to look at numbers and calculate a profit

1    margin based on those numbers.

2            MR. MURPHY:  Your Honor, I did read his report, I

3    did depose him and then I immediately moved to strike because

4    he didn't have expertise as an accountant.  I'm not sure what

00:27    5    else I can do.  As I understand the discussions we had

6    yesterday and the testimony Mr. Pomerantz gave about his lack

7    of accounting experience, he's calculating a profit -- that's

8    what accountants do, that's the core of what they do; right?

9            So I don't understand why Mr. Barrett couldn't have

00:27    10   done it, and I don't see what expertise Mr. Pomerantz has to

11   calculate a profit margin that again is going to consume trial

12   time because we can't even create how he got there.

13           THE COURT:  I just gave everybody enough time for

14   time on trial, so this idea that your objections are based on

00:27    15   the amount of time we have, doesn't ring with me at the

16   present time.

17           But generally, with regard to P-151-J, my

18   recollection from yesterday was that I allowed Mr. Pomerantz

19   to testify based on his experience in the industry, with both

00:28    20   sub-advisors and companies like FMG, which are advisors, and

21   he seemed to have substantial experience in that regard.  And

22   he is a mathematician, so -- and it's really not math that

23   he's doing here, it's what is the appropriate formula that you

24   would use to determine what the margins are and the profit is,

00:28    25   which seems more like an accountant type of calculation.

Pomerantz - Direct - Sweetser

1      But here, based on Mr. Pomerantz's experience in the

2  industry with regard to sub-advisors and advisors and

3  companies like FMG, I think he's qualified to make this type

4  of an opinion as to the damages.  So, I'll allow it.

5      MR. SWEETSER:  Thank you, your Honor.

6  BY MR. SWEETSER:

7  Q.  Dr. Pomerantz, again, getting to the top table on the

8  first page of P-151-J, will you please walk the Court through

9  the process that you used in order to calculate these figures.

10 A.  The data used to create these numbers is based upon

11 what's offered in the profitability reports.

12 Q.  So just to be clear on that so the Court's clear, we were

13 discussing yesterday it's 52-B, the landscapes?

14 A.  Yes.

15     MR. SWEETSER:  Does your Honor need a copy of that

16 or do you recall 52-B?

17     Tc:  No, you can just go through this.

18     MR. SWEETSER:  Okay.

19 BY MR. SWEETSER:

20 Q.  So it's based on the landscapes that FMG itself prepares?

21 A.  Yes.  And the relationship between revenue and margin is

22 a very simple formula.

23 Q.  Can you tell the Court what that formula is?

24 A.  And that formula is that the margin is equal to the

25 revenue minus the cost, as a quantity, divided by the revenue.

Pomerantz - Direct - Sweetser

1   So, just as an example, if the revenue is 10 and the cost is

2   3, then 10 minus 3 is 7, divided by 10 is 70 percent.

3   Q.   So that's the basic formula that you used to calculate

4   the numbers that are set forth in 151-J?

5   A.   Yes.

6   Q.   So again, understanding that's the formula, can you

7   continue please to walk the Court through what you did.

8   A.   So that's a formula that relates revenue to margin.  The

9   formula that -- the application of that to this problem is to

10  utilize 39 percent as the target margin, and to calculate what

11  should the revenue be, in order for that formula to produce a

12  39 percent value as the margin.

13       I don't need to look at what the actual revenue is,

14  even though that's on the report, I get to that at the second

15  step; but the first step is to calculate what revenue would

16  produce a value of 39 percent based on the cost assigned to

17  the product.  And for the cost I exclude the sub-advisory

18  expense, and I similarly subtract that number from the

19  revenue.

20       So I'm just looking at FMG's business, I'm not

21  looking at the sub-advisor, I take that number out of revenue

22  and I take that number out of cost.

23  Q.   And explain to the Court why you did that.

24  A.   Because that's not FMG's business, FMG's business is as

25  we discussed the oversight of those sub-advisors and the

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1    creation of the product, and they do have costs that are

2    associated with the 50 employees who are performing a variety

3    of functions, and that's the cost for FMG to run their

4    business.  I'm not looking at the revenue of the sub-advisor,

00:32    5    I'm not looking at the cost of the sub-advisor, including

6    those numbers actually just serves to artificially lower the

7    margin that is being earned on FMG's revenue and FMG's

8    service.

9    Q.   Okay.  What I'd like to do --

00:32    10           MR. SWEETSER:  Chris, can I ask you to show the

11   witness 52-B?

12   Q.   Just so we're crystal clear on what you did and what

13   costs you used.

14           So, Dr. Pomerantz, if you would, let's find the Core

00:33    15   Bond Index Fund and let's walk the Court through the numbers

16   that you used to calculate your 39 percent profit margin and

17   the damages attributable to that; okay?  I've got that on

18   Bates ending 4211, and it's about three-quarters the way

19   across the page.

00:34    20           THE COURT:  What page are you on?

21           MR. SWEETSER:  Bates ending 4211, your Honor.  The

22   Core Bond Index, two-thirds across the page.

23   Q.   Dr. Pomerantz, do you have that?

24   A.   Yes.

00:34    25   Q.   Okay.  So again, can you please explain to the Court the

Pomerantz - Direct - Sweetser

1    numbers that you used to do your calculation on P-151-J.

2    A.   So, the revenue that I'm concerned with is the 22.1

3    million, but I subtract from that the 1.06 million, and that

4    is FMG's revenue, for its service.

00:34    5    Q.   All right.  So when you say the revenue that you're

6    concerned with, the revenue -- the investment management fee

7    that's discussed in this top chart is under the bolded

8    revenues; right?  And it's the first item, management fees;

9    right?

00:35    10   A.   Yes.

11   Q.   Then you go all the way across and you get to the 21 --

12   $22.1 million that you were just speaking about.

13   A.   Yes.

14   Q.   Okay.  Then can you please tell the Court what expense

00:35    15   you subtracted from that before you -- in order to do your

16   profit margin calculation?

17   A.   Well, okay, as I said the sub-advisory fee is the 1.06

18   million.

19   Q.   So now we're going a little bit further down the page

00:35    20   under variable expenses, and that's bolded?

21   A.   Yes.

22   Q.   And then it says the first item there is sub-advisor

23   fees, and then you just go all the way across under that same

24   column with the 22.1 million in investment management fees and

00:35    25   there's 1.06 million in the sub-advisory fee; is that correct?

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Direct - Sweetser

1  A.   Yes.

2  Q.   Okay.  So you excluded that; and then what did you do?

3  A.   So what I -- what I need to know is what are their costs

4  of running the fund, and their cost is what we've called the

00:36  5  total direct expense.

6  Q.   Okay.  And that's about halfway down the page?

7  A.   Which is about halfway down the page for Core Bond Index,

8  that's approximately $864,000.

9  Q.   And then what did you do?

00:36  10  A.   And I calculate their margin by taking the revenue, which

11  is approximately 21 million, subtracting the direct expense,

12  and then dividing by the revenue, and if you do that you will

13  not get 39 percent; you'll get what their actual profit margin

14  is.  But what I want to know is what revenue value will

00:37  15  actually produce 39 percent in that formula.

16  Q.   Okay.

17  A.   And then I saw for what that revenue is, just following

18  the formula.  And then from the -- and then once I have that

19  number I subtract it from what their actual 21 million of

00:37  20  revenue is, to produce the damage number that is on 151-J.

21  Q.   And the numbers listed here are, pursuant to that

22  formula, the amount of money that would be paid back to the

23  funds if the Court applied a 39 percent margin applying your

24  methodology; is that correct?

00:37  25  A.   Yes.


*United States District Court*
*Trenton, New Jersey*

1979

Pomerantz - Direct - Sweetser

1    Q.   Now, let me ask you something about the direct expenses

2    that you were just mentioning.  I see under that there's

3    administration and compliance discussed, did you use -- did

4    you subtract the entire total direct expense or just the

00:38   5    management aspect of the direct expenses?

6    A.   To -- for the -- to calculate the management -- to do

7    this calculation for the advisory fee I'm just looking at the

8    management fee revenue and the sub-advisory fee revenue.

9    Q.   Now, did you employ the same methodology for all three

00:38   10   years at issue in this chart?

11   A.   Yes.

12   Q.   And would that same methodology apply to the years since

13   2012 when you did this calculation?

14   A.   I mean that's the methodology that I would use for any

00:38   15   year.

16   Q.   And then at the bottom it says, subject funds, bolded,

17   and then there are numbers listed there; can you please tell

18   the Court what those bolded numbers are at the bottom of the

19   chart?

00:39   20   A.   The bolded numbers are the totals for each of the

21   respective years.

22   Q.   So, this is what would be paid back to the funds in the

23   event that the Court applied a 39 percent profit margin; is

24   that correct?

00:39   25   A.   Yes.

Pomerantz - Direct - Sweetser

1    Q.   Can you please tell the Court what the bottom chart on

2    this page is?

3    A.   The bottom chart does the same calculation, but for the

4    administrative fee, but similarly eliminates the -- the

00:39    5    sub-administrator payment.

6    Q.   So, the sub-administrator being JP Morgan, you eliminated

7    its --

8    A.   Yes.

9    Q.   The payment to JP Morgan?

00:39    10   A.   Yes.  I would eliminate that as a revenue item and as a

11   cost.

12   Q.   And why would you do that?

13   A.   For the same reasons that -- those numbers belong to JP

14   Morgan, it's what -- it's their business, doesn't have to do

00:39    15   with FMG's business, and it artificially lowers the margin if

16   you do include them.

17   Q.   What expenses did you include in calculating the

18   administration profit margin at 39 percent?

19   A.   Well, there you're looking at third-party administrative

00:40    20   charges, there's a line item for fixed and variable, as

21   basically being payments made to the sub-advisor.

22   Q.   If we flip the page of P-151-J, can you please tell the

23   Court what that chart is?

24   A.   This chart just combines -- just combines the two.

00:40    25   Q.   The two prior charts?

Pomerantz - Direct - Sweetser

1  A.   Yes.

2  Q.   And then at the very bottom you've got, subject funds,

3  not bolded this time, but you've got for example for 2012,

4  $147.2 million; do you see that?

00:41      5  A.   Yes.

6  Q.   If the Court applied a 39 percent profit margin to both

7  the investment management fees and administration fees

8  collected from plaintiffs' funds, is that the total amount of

9  damages for that year?

00:41     10  A.   Yes.

11  Q.   And again the same process could be applied for

12  subsequent years; correct?

13  A.   Yes.

14         MR. SWEETSER:  Your Honor, I move P-151-J into

00:41     15  evidence.

16         THE COURT:  Any objections?

17         MR. MURPHY:  No objection.

18         THE COURT:  All right.  So P-151-J is admitted.

19         (Plaintiff's Exhibit 151-J was marked into

00:41     20  evidence.)

21  BY MR. SWEETSER:

22  Q.   Dr. Pomerantz, I'm now going to show you what's been

23  marked as P-151-K.  Dr. Pomerantz, do you have that?

24  A.   Yes.

00:42     25  Q.   Okay.  P-151-K is comprised of three pages; did you

Pomerantz - Direct - Sweetser

1    prepare this document?

2    A.   Yes.

3    Q.   Can you please tell the Court generally what it is?  And

4    then I'm going to ask you some specific questions about it.

00:42    5    A.   Well, each page corresponds to a different year, 2010,

6    2011 and 2012.  2012, if we look at that page, there are

7    columns and the columns just identify different target

8    margins.  What we were talking about on 151-J was assuming a

9    39 percent profit margin.  What I've done on 151-K is the same

00:43    10   calculation, same methodology, only here I don't have a target

11   margin of 39 percent, I have target margins of 50, 60, 70, 80

12   and 90 percent.

13   Q.   Why did you use those target margins?

14   A.   Just to give a sense of what the excess fee is, being

00:43    15   paid by the investors at a range of different margins.

16   Q.   Was this just to give the Court options in the event that

17   the Court determine another profit margin should apply, or did

18   you take this from some Lipper or Strategic Insight data?

19   Like how did you come up with these ranges?

00:43    20   A.   Primarily to illustrate to the Court what the damages

21   would be at different margins.  As I understand it, it's

22   ultimately the Court's decision of what is an appropriate

23   margin.

24   Q.   Okay.  And again, at the very bottom next to subject

00:44    25   funds, you've got totals.  So at that total for all the funds

1  combined is the number that the Court would award if the Court

2  deemed the profit margin to be applicable to this case; is

3  that correct?

4  A.  Yes.

00:44   5  Q.  Now, is this for both the management and administration

6  fees, or is it only for the management fees?

7  A.  This is just for the investment management fee.

8  Q.  And again, presumably if the Court wanted a range of

9  profit margins to apply to a damage calculation, the Court

00:44   10  could do it the same way that you've discussed, you prepared

11  this and the prior exhibit; correct?

12  A.  Yes.

13  Q.  Now, for 2012, if FMG were paid half the fees that it

14  received, have you calculated what profit margin that would

00:44   15  fall into?

16        THE COURT:  Could you repeat that question?

17        MR. SWEETSER:  Sure, your Honor, maybe to

18  crystallize this; Chris, can I have 151-A, please.

19        THE WITNESS:  I have it.

00:45   20        MR. SWEETSER:  Does your Honor have it?

21        THE COURT:  I have it.

22        MR. SWEETSER:  Thank you.

23  BY MR. SWEETSER:

24  Q.  Dr. Pomerantz, my question to you is this, if you look at

00:46   25  the bottom of 151-A which is already in evidence, you've got

Pomerantz - Direct - Sweetser

1   the total amount of fees paid just for the subject funds in

2   this case, to be $124.6 million; do you see that?

3   A.   Yes.

4   Q.   Half of that is $62.3 million; right?

5   A.   Yes.

6   Q.   My question to you is if FMG was paid $62.3 million, half

7   of what it was paid in 2012, what profit margin would that

8   fall into?

9   A.   Well, you can tell from P-151-K that that would be

10  approximately 80 percent.

11          MR. SWEETSER:  Your Honor, move P-151-K into

12  evidence.

13          THE COURT:  Any objections?

14          MR. MURPHY:  No, your Honor.

15          THE COURT:  So, admitted.

16          MR. SWEETSER:  Thank you, your Honor.

17          (Plaintiff's Exhibit 151-K was marked into

18  evidence.)

19          MR. SWEETSER:  That concludes plaintiff's direct of

20  Dr. Pomerantz.

21          THE COURT:  All right.  Cross?

22          MR. MURPHY:  Yes, your Honor.

23          THE COURT:  So, Mr. Murphy, if it's going to take a

24  while to set up, we can break and come back?

25          MR. MURPHY:  It's up you, your Honor, I'm ready, but

00:46
00:46
00:46
00:46
00:47

1    now's a good as time as any but if you want to just go a half

2    hour or something it's up you, I can go for a half hour if

3    you'd rather break then, if you want to break now --

4           THE COURT:  Let's go for a half hour and then we'll

5    break.

6           MR. MURPHY:  Okay.

7    (CROSS-EXAMINATION OF STEVE POMERANTZ PH.D. BY MR. MURPHY:)

8    Q.  Good afternoon, Mr. Pomerantz.  You're a professional

9    expert; that's correct?

10   A.  Yes.

11   Q.  And about 90 percent of your income is from acting as an

12   expert witness?

13   A.  Yes.

14   Q.  And you understand this is a Section 36(b) case?

15   A.  Yes.

16   Q.  And how many times have you been retained as an expert in

17   a 36(b) case against a mutual fund advisor?

18   A.  As a testifying expert?  Two dozen.

19   Q.  Okay.  All for the plaintiff?

20   A.  Yes.

21   Q.  And you've had your deposition taken in a case against

22   Harris Associates?

23   A.  Yes.

24   Q.  Waddell & Reed?

25   A.  Yes.

*00:47* (line 5)
*00:48* (line 10)
*00:48* (line 15)
*00:48* (line 20)
*00:48* (line 25)

Pomerantz - Cross - Murphy

1  Q.   American Century?

2  A.   Yes.

3  Q.   Fiduciary?

4  A.   Yes.

00:48      5  Q.   Janus?

6  A.   Yes.

7  Q.   Franklin?

8  A.   Yes.

9  Q.   Federated?

00:48      10  A.   Yes.

11  Q.   Artisan?

12  A.   Yes.

13  Q.   Hartford?

14  A.   Yes.

00:48      15  Q.   Russell?

16  A.   Yes.

17  Q.   Principle --

18  A.   No, not in Russell.

19  Q.   Fair enough; I think we're meeting in a week or two.

00:48      20  Principal?

21  A.   That's happening during this trial in my mind.

22  Q.   Principal?

23  A.   Yes.

24  Q.   And where you were deposed those were all under oath;

00:49      25  correct?

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    A.   Yes.

2    Q.   So let's talk about your opinions in this case.  Your

3    opinion is that FMG's really not doing anything; correct?

4    A.   I think my opinion is that the bulk of the services are

5    being performed by the sub-advisor, and that FMG's

6    compensation is not commensurate with the services that it

7    provides.

8    Q.   But when you testified at your deposition I asked you

9    what is your understanding of the split of services, you said

10   FMG is not really doing anything; is that correct?

11   A.   If those were my words that's accurate.

12   Q.   And you believe that FMG is just hiring managers,

13   monitoring them and then acting as a conduit to the Board;

14   correct?

15   A.   I'm sorry; hiring managers?

16   Q.   Hiring managers, monitoring managers and being a conduit

17   to the Board; that was what you said at your deposition?

18   A.   And a couple of other services that I could identify.

19   Q.   So the only other services that you could identify were

20   they probably provide some office space and some coffee cups

21   to sub-advisors when they come to visit FMG's office; is that

22   the only other thing you could identify?

23   A.   I mean they're responsible for printing a prospectus.

24   Q.   You didn't list that in your deposition, did you?

25   A.   You know, Sean, I can probably if I thought about it give

Pomerantz - Cross - Murphy

1    you a long list --

2            THE COURT:  Wait; you have to answer the question.

3    The question was, Mr. Murphy?

4            MR. MURPHY:  Why don't we just play clip 140.

00:50    5            (Portion of videotaped deposition played of Steve

6    Pomerantz.)

7            Q:  Other than the hiring --

8            (Portion of videotaped deposition stopped.)

9            MR. SWEETSER:  Your Honor, I object.  I don't know

00:50   10   what the question is that presumably this is intended to test

11   his credibility --

12           THE COURT:  Frank, can you repeat the question that

13   was asked by Mr. Murphy?

14           (Question read back by the reporter.)

00:51   15           MR. MURPHY:  So, your Honor, he's now saying I could

16   provide a whole bunch of services; I asked him at his

17   deposition -- I can impeach him with a prior inconsistent

18   statement from his deposition under 801(d)(1)(A).

19           THE COURT:  You may.

00:51   20           MR. MURPHY:  Can I play clip 140, which is AXA

21   transcript page 9.

22           (Portion of videotaped deposition played of Steve

23   Pomerantz.)

24           Q:  Other than hiring, firing and monitoring of

00:51   25           managers, and being a conduit to the Board, are they

Pomerantz - Cross - Murphy

1     responsible for any other services?

2     A:  There might be some ancillary de minumus

3     services that they perform.

4     Q:  And what ancillary de minimus services are you

00:51   5     aware of?

6     A:  They will make presentations to the Board.

7     Q:  Anything else you can think of?

8     A:  Nothing significant.

9     Q:  Anything insignificant?

00:52   10     A:  They probably provide some office space and

11     coffee cubs to sub-advisors who come in to visit

12     their office.

13     Q:  Anything other than office space and coffee cups

14     to sub-advisors?

00:52   15     A:  Nothing significant that I can think of.

16     Q:  Anything insignificant that you can think of?

17     A:  No.

18     (Portion of videotaped deposition concluded.)

19 BY MR. MURPHY:

00:52   20 Q.  Were you asked those questions and gave those answers,

21 Mr. Pomerantz?

22 A.  I think you should play the seven and a half hours of

23 other deposition testimony.

24 Q.  Answer the question --

00:52   25 A.  It contains other things that I discussed --

Pomerantz - Cross - Murphy

1          THE COURT:  Mr. Pomerantz, you have to answer the

2     question, sir.  Okay?  Do you understand that?

3          THE WITNESS:  Yes.

4          THE COURT:  All right.  Thank you.

00:52     5     BY MR. MURPHY:

6     Q.   Were you asked those questions and gave those answers at

7     your deposition, Mr. Pomerantz?

8     A.   The tape speaks for itself.

9     Q.   Is that a yes?

00:53     10    A.   If the tape is accurate, then yes.

11    Q.   In terms of FMG's research of hiring new managers, you

12    believe that FMG uses the Sunday business section of the New

13    York Times; correct?

14          MR. SWEETSER:  Your Honor, I object.  This is

00:53     15    outside the scope of any opinion he was permitted to testify

16    to.  I wasn't permitted to probe with him hiring of

17    sub-advisors, and there have been no sub-advisors hired for

18    the plaintiffs' funds in the years in question.  But this

19    wasn't an opinion that he gave.

00:53     20          THE COURT:  All right, overruled.

21          You may answer the question.

22    BY MR. MURPHY:

23    Q.   I'll repeat the question, Mr. Pomerantz.  In terms of

24    FMG's research to identify new sub-advisors, you believe they

00:53     25    use the Sunday business section of the New York Times and just

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1   identify well-known managers; is that correct?

2   A.   I believe FMG performs due diligence, there's been

3   evidence of other due diligence that they performed.  I don't

4   doubt they read the Sunday paper, but I would say that there

00:54   5   are plenty of other things that they do as part of their due

6   diligence.

7          MR. MURPHY:  If you could play clip 61, which is AXA

8   transcript 194, starting at line 12.

9          (Portion of videotaped deposition played of Steve

00:54   10   Pomerantz.)

11          Q:  Do you know FMG does when it researches new

12          managers?

13          A:  I could not give you an exhaustive list of the

14          things that they do.  It seems like they just open

00:54   15          up the Sunday business section of the New York Times

16          basically and identify well-known managers.

17          (Portion of videotaped deposition concluded.)

18   BY MR. MURPHY:

19   Q.   Were you asked those questions and gave those answers,

00:54   20   Mr. Pomerantz?

21   A.   Yes.

22   Q.   And you understand that FMG does a volatility overlay

23   over some of the funds?

24   A.   They do something that they call a volatility overlay,

00:55   25   but I mean -- you're going to have to define that if you want

United States District Court
Trenton, New Jersey

Pomerantz - Cross - Murphy

1    me to agree that that's what they do.

2    Q.    So you don't know if there's -- if FMG offers a

3    volatility overlay over two of the funds?

4    A.    They -- they -- as I testified yesterday, I believe that

5    they meddle with the funds, and exercise something that they

6    call an ATM strategy.

7    Q.    Okay.  And you believe a secretary could do that work;

8    correct?

9    A.    I -- to the extent that anything's being done I think a

10   computer could probably do it very very easily.

11   Q.    And you said a computer and a secretary is all that's

12   needed; correct?

13   A.    In point of fact, when I was at Weiss, Peck and Greer we

14   had clients for whom we had overlay strategies similar to what

15   you're discussing, and in point of fact my secretary was

16   responsible for running a report at the end of every day that

17   would basically instruct me, and other members of the firm

18   about what was needed to be done as part of that "overlay

19   strategy."

20            MR. MURPHY:  Can you play clip 67, which is AXA page

21   216, line 13.

22            (Portion of videotaped deposition played of Steve

23   Pomerantz.)

24            Q:  Do you recall reviewing testimony that it was in

25            fact a manual process by FMG to measure volatility?

Pomerantz - Cross - Murphy

1      A:  Okay, any process that could be done manually is

2           absolutely meaningless.  The calculations that are

3           being discussed here are incredibly complicated,

4           incredibly complicated, and have to be done by a

00:56     5           computer.  Anything, anything that could be done

6           manually is either something that can be done by a

7           secretary, or something that does not need to be

8           done and most likely shouldn't be done.  And as I

9           said, this testimony is incredibly vague in terms of

00:56    10          what it is that's really happening.  So, my opinions

11          are based upon looking at the annual reports, seeing

12          what's actually happening; I have seen communication

13          between AXA and the sub-advisors about what it is

14          they want people to do.  You know, when he says it

00:57    15          is a manual process, I don't think anybody at this

16          table knows what it is referring to.

17          (Portion of videotaped deposition concluded.)

18   BY MR. MURPHY:

19   Q.  Were you asked those questions and gave that answer at

00:57    20   your deposition, Mr. Pomerantz?

21   A.  Yes.

22   Q.  And your opinion is that FMG doesn't play any role in the

23   pricing of securities; is that correct?

24   A.  Well, that's primarily an administrative task.  I think

00:57    25   if there were conflicts or difficult securities, FMG is

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    ultimately responsible.  So somebody at FMG would have to

2    intervene if there were a conflict or something difficult.

3           MR. MURPHY:  If you could play clip 54, which is AXA

4    transcript 162, line 5.

00:57    5           (Portion of videotaped deposition played of Steve

6    Pomerantz.)

7           Q:  Does FMG play any role in the pricing of

8               securities?

9           A:  No, they would delegate that responsibility to

00:58   10               ultimately the sub-administrator/sub-advisor.

11           (Portion of videotaped deposition concluded.)

12    BY MR. MURPHY:

13    Q.   Did you give that answer at your deposition?

14    A.   Yes, if I -- the securities held by these funds are all

00:58   15    public bonds, public stocks, I didn't see anything that was

16    controversial, I didn't see anything that wouldn't be

17    processed by a sub-administrator or a sub-advisor as just the

18    normal course of business.

19    Q.   So you went in and looked at -- for example, how many

00:58   20    securities does a Core Bond fund have?

21    A.   The funds hold thousands of securities.

22    Q.   Right.  The Core Bond has 3,500 securities?

23    A.   It might.

24    Q.   And is your testimony that you went in and looked at

00:58   25    those 3,500 and you think they're all just pull the number off

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    the tape, is that your testimony?

2    A.   I don't think there's anything in that annual report that

3    is out of the ordinary or complicated.

4    Q.   And your position is that even -- even if AXA hadn't

00:58    5    delegated all the responsibility for pricing securities,

6    there's no one at AXA that could even price the securities;

7    right?

8    A.   Well, as I said, it can happen that there arises a

9    conflict just in terms of the industry.  It can -- it can

00:59    10    happen that a conflict arises or uncertainty arises, or

11    there's a difficulty that's involved; and ultimately FMG is

12    responsible for resolving that dilemma.

13        So if something like that happens, and I don't know --

14    I have no evidence that that has happened, but if it happens,

00:59    15    then FMG would have to be responsible.

16    Q.   But my question was, you believe that nobody at AXA is

17    even in a position to determine the value of the securities;

18    correct?

19    A.   I don't think -- I don't think any of the employees --

00:59    20    any of the 50 employees, I don't believe any of them is

21    capable.  They would be responsible for making a decision, but

22    it's not like any of them are traders in any of the markets

23    that understand a difficult situation.  They'll make the

24    decision and they'll make it as best as they can, but it's not

01:00    25    like somebody at FMG is going to build a model to evaluate

*United States District Court*
*Trenton, New Jersey*

*1996*

Pomerantz - Cross - Murphy

1    some complicated security that befuddles the

2    sub-administrator.

3              MR. MURPHY:  Can we play clip 172, which is AXA

4    transcript 180, at line 2, for the record?

01:00    5              (Portion of videotaped deposition played of Steve

6              Pomerantz.)

7              Q:  I'll read it into the record again:  Question,

8              if there's a security that's difficult to price, who

9              makes the determination to your knowledge about how

01:00   10             to price it?  Answer:  AXA does.

11             Do you believe that testimony is false?

12             A:  I don't know what how means, okay?  Is it AXA's

13             responsibility?  Are they the ones who are legally

14             responsible for the actual value of the security

01:00   15             that's listed?  Yes, it's their legal

16             responsibility.  Does AXA price the security?  You

17             know, maybe I'm using a term of art that you're not

18             familiar with; okay?  But to say that someone prices

19             a security means that they are the ones who put

01:01   20             forth the investigation and the analysis to

21             determine what is the fair value of the security.

22             That is not something that AXA is doing.

23             Q:  What don't you understand about the word how in

24             that sentence?

01:01   25             A:  I don't believe that AXA is in the position to

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1      determine that the value of the security.  So, you

2      know, I guess it depends how you define the word

3      how.  But if AXA -- I mean if the way that AXA does

4      it is by deferring to the sub-advisor, then yes,

01:01    5      that's how AXA does it, AXA does it by deferring it

6      to the sub-advisor.

7      (Portion of videotaped deposition concluded.)

8  BY MR. MURPHY:

9  Q.   Was that your testimony, that AXA you said "I don't

01:01  10  believe that AXA's in a position to determine the value of the

11  security", was that your testimony?

12  A.   Yes.

13  Q.   And did you investigate, for example, Ken Kozlowski, the

14  portfolio manager's funds, did you look at his bio?

01:02  15  A.   Yes.

16  Q.   And you think he's not in a position to value securities?

17  A.   The valuation of a security that really requires

18  valuation requires a team of people, requires computer

19  systems; no individual is going to make that determination.

01:02  20  There's nobody, there's not a single individual who is going

21  to make that determination.  They're going to rely upon

22  pricing models and systems and third-party intelligence.  I

23  don't disagree that he might ultimately be responsible, but

24  he's not the one who's actually going through the process of

01:02  25  determining a valuation.

*United States District Court*
*Trenton, New Jersey*

*1998*

Pomerantz - Cross - Murphy

1   Q.   And in fact, FMG has a valuation committee with five

2   people that sit on it?

3   A.   Yes.

4   Q.   And they meet every day?

01:02   5   A.   I don't know how often they meet.

6   Q.   Well, did you do any investigation into that?

7   A.   I've never been to their offices so I don't know what

8   they're doing.

9   Q.   Did you read any deposition testimony about it?

01:03   10   A.   I know that they have a valuation committee.

11   Q.   And you can't -- you can't tell me whether the five

12   people in the valuation committee are capable of making

13   pricing decisions; correct?

14   A.   The pricing decisions that would need to be made by AXA

01:03   15   as I just testified require significant allocation to systems,

16   pricing models, computer models; I haven't seen those

17   resources inside FMG itself to do that.  So, I don't deny

18   there's a pricing committee and five people can sit and make a

19   decision, and I understand that they make the decision, it's

01:03   20   their responsibility, but they're not people who are actually

21   designing a model and developing a price for a security.

22          MR. MURPHY:  Could I get clip 58, which is AXA

23   transcript 186, line 13?

24          (Portion of videotaped deposition played of Steve

01:03   25   Pomerantz.)

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    Q:  My question was, do you have an opinion as to

2    whether the five people that sit on the valuation

3    committee, are capable of making pricing decisions?

4    A:  I don't know what you mean by capable, I don't

01:04    5    know what you mean by decisions.  In other words,

6    can they arbitrate between --

7    Mr. Sweetser:  Stop, stop, stop, stop.  If you let

8    Sean know you don't understand the question he'll

9    rephrase it if he wants to.

01:04    10   Q:  Well, what don't you understand about the word

11   capable?

12   A:  I don't know what capable means.  I mean capable

13   as if -- like if you asked me here's a security,

14   here's a security, Steve, here's a prospectus, are

01:04    15   you capable of telling me the fair value of that;

16   right?  Is that the question?  Well, no, there's --

17   I will have to defer the someone, I will have to

18   defer to the sub-advisor to tell me what the price

19   is.

01:04    20   Q:  And what don't you understand about the word

21   decisions?

22   A:  Have I not answered your question?

23   Q:  No, you said you don't -- let me read it back,

24   you said I don't know what you mean by capable.

01:04    25   A:  Yeah, I don't know what you mean by capable.

Pomerantz - Cross - Murphy

1          Q:  Can I just get a question out, Steve?  I don't

2          know what you mean by capable, I don't know what you

3          mean by decisions; my question is what don't you

4          understand about the word decisions?

01:05    5          (Portion of videotaped testimony stopped.)

6          MR. SWEETSER:  Your Honor, this is going far afield

7    of crossing on the question at issue talking about what is his

8    understanding of decisions is.  We're talking about his

9    understanding of what the valuation committee means, now

01:05   10   there's this colloquy going back and forth; you know, I object

11   to the use of the deposition to that extent.

12          MR. MURPHY:  Your Honor, it goes to credibility.

13   I'm asking him questions about what FMG does and he refused to

14   answer them at his deposition.  He said we don't do anything,

01:05   15   I asked him repeatedly do they do this, do they do that, and

16   he just played word games, he asked me 40 times what I meant

17   by the word blank and blank; it goes to credibility.

18          THE COURT:  Overruled.

19   BY MR. MURPHY:

01:05   20   Q.  Compliance, Mr. Pomerantz, your opinion is that all of

21   the compliance for the fund is done by JP Morgan; correct?

22   A.  JP Morgan as the sub-administrator performs a lot of

23   compliance --

24   Q.  I'm sorry --

01:06   25   A.  -- responsibilities.  There are other items that fall

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    under the rubric of compliance.

2    Q.   I'm sorry; you said a lot.  Isn't it -- isn't your

3    opinion that all compliance for the fund is done by JP Morgan?

4    A.   I -- I think you have to define what you mean by

01:06    5    compliance.

6              MR. MURPHY:  Can you play clip 81, which is AXA

7    transcript --

8              MR. SWEETSER:  Your Honor, I object.  The witness

9    has said he doesn't know what -- what he means by the word

01:06    10    compliance.  We had this issue on direct with regard to

11    compliance, he wasn't allowed to talk about compliance, and

12    now we're going to the videotape without even figuring out

13    what the word compliance means that he hasn't answered the

14    question to.

01:06    15              Again, I object.  This is a canned presentation,

16    they've got all these things up there, I can't find see what

17    going on, but this compliance issue's a clear one where again,

18    let's go to the videotape, he doesn't even understand what

19    the -- what Sean means by the question with respect to

01:06    20    compliance.

21              THE COURT:  Frank, what was the question?

22              (Question read back by the reporter.)

23              MR. MURPHY:  And your Honor, so I asked him this

24    exact same question at his deposition and he said yes, it

01:07    25    was -- JP Morgan did it all.  801(d)(1)(A) on a prior

Pomerantz - Cross - Murphy

1   inconsistent sworn statement is not limited to yes/no.  It's

2   if he gives an evasive answer and there's a very black and

3   white one at his deposition you're allowed to impeach him with

4   it.

01:07   5       MR. SWEETSER:  And your Honor, there is no white and

6   black answer here, he's asking Mr. Murphy what he means by the

7   word compliance.

8       MR. MURPHY:  Then he can redirect --

9       THE COURT:  Overruled.

01:07   10      MR. MURPHY:  Thank you, your Honor.

11      Clip 81, which is AXA transcript 251?

12      (Portion of videotaped deposition played of Steve

13  Pomerantz.)

14      Q:  And your understanding is that JP Morgan is

01:07   15          providing all of the compliance services.

16      A:  Yes.

17      (Portion of videotaped deposition concluded.)

18  BY MR. MURPHY:

19  Q.  And for that opinion -- I'm sorry; do you recall being

01:07   20  asked that question and giving that answer?

21  A.  I recall that three second clip of an eight hour

22  deposition.

23  Q.  Okay.  And in terms of your opinion about who's doing all

24  the compliance, you're not relying on sworn testimony from JP

01:08   25  Morgan and FMG for that; correct?

*United States District Court*
*Trenton, New Jersey*

*2003*

Pomerantz - Cross - Murphy

1    A.   I know how the business operates, I know what JP Morgan

2    is doing, I know what FMG is doing.  And, again, I think we

3    actually talked about this yesterday, there are lots of things

4    that fall under the rubric of compliance.

01:08    5    Q.   And you understand that FMG has 17 legal and compliance

6    professionals just at FMG, not including AXA?

7    A.   I don't recall if it was seven or 17.  But there was a

8    seven, yes, I recall something like that.

9    Q.   Do you know what those individuals do?

01:08   10    A.   No.

11    Q.   But you're sure they're not doing compliance?

12    A.   As I said Sean, probably for the sixth time, compliance

13    means lots of things.  There are some things that they're

14    incapable of doing, as part of what I understand compliance to

01:09   15    be.  There are probably a lot of things that they're doing

16    that fall under your definition.

17    Q.   And you're aware that there's a pretty broad set of laws

18    and regulations that govern mutual funds?

19    A.   Yes.

01:09   20    Q.   Do you know if mutual funds are one of the most heavily

21    regulated securities in the marketplace?

22    A.   I would say not heavily enough, but -- as evidenced by a

23    lot of failures, but I agree with you that they are regulated.

24    Q.   When you say there's a lot of failures, the compliance is

01:09   25    a pretty important function?

*United States District Court*
*Trenton, New Jersey*

1    A.    Insider trading is a failure; late trading is a failure

2    of compliance.

3    Q.    In fact, you wrote an article, didn't you, that said "no

4    issuer of securities is subject to more detailed regulation

01:09    5    than a mutual fund; is that correct?

6    A.    Yes.

7    Q.    I'm sorry?

8    A.    Yes.

9           MR. MURPHY:  Your Honor, I'm going to move to a new

01:09   10    topic, do you --

11          THE COURT:  Let's break here, and we'll come back at

12    quarter to 2:00.

13          MR. MURPHY:  Thank you, your Honor.

14          THE COURT:  All right, thank you.

01:10   15          (Recess.)

16          THE COURT:  Mr. Pomerantz, you may take the stand.

17          And Mr. Pomerantz, you're still under oath.

18          You may proceed, Mr. Murphy.

19          MR. MURPHY:  Thank you, your Honor.

01:59   20          Can I call up P-151-I?

21    BY MR. MURPHY:

22    Q.    And Mr. Pomerantz, let me know if you need it.  I only

23    just confirm this is your chart.  Would you like to see a hard

24    copy?

02:00   25    A.    No, I can --

Pomerantz - Cross - Murphy

1  Q.  I just want to understand, this is -- we spent a lot of
2  time on this yesterday so I don't want to dwell on it, but --
3  so the performance versus the benchmark here, you show loss, I
4  think everyone understands that the loss is kind of a -- not
5  necessarily a "loss", but it's the difference between how the
6  benchmark returned and the fund performed; correct?
7  A.  Yes.
8  Q.  And the benchmark -- the performance v. benchmark column,
9  that's against the funds kind of prospectus benchmark?
10 A.  For the most part it's the benchmark that's identified.
11 Q.  In P-74.
12 A.  Yes, yes.
13 Q.  And so what's the benchmark, for example, for the Large
14 Cap Value PLUS Fund; do you recall?
15 A.  For the PLUS Funds in most cases I think I used the -- it
16 would have been an underlying Russell or --
17 Q.  Is it the Russell Growth 1000?
18 A.  It's probably the Russell Value 1000; I think for one of
19 the PLUS Funds actually on that -- on that exhibit there are
20 actually two benchmarks that are identified that correspond to
21 funds for the volatility managed products, there are two
22 benchmarks and one is the Russell -- the appropriate Russell
23 category in this case, I guess it's the 1000 value, and there
24 also would have been kind of a customized index that FMG
25 created that's kind of a volatility adjustment.  And I think

02:00

02:00

02:01

02:01

02:02

*United States District Court*
*Trenton, New Jersey*

*2006*

Pomerantz - Cross - Murphy

1   in one case I think I would have used the volatility adjusted

2   benchmark they reference, and then in the other cases I was

3   using the Russell benchmark.

4   Q.   Right.  So what you did is there were two benchmarks, and

02:02   5   sometimes you used the prospectus benchmark and sometimes you

6   used a volatility benchmark; correct?

7   A.   I think in almost all cases I used the prospectus

8   benchmark.  In one example I believe the prospectus benchmark

9   offered the same exact performance as the Lipper peer group

02:02   10   benchmark, and so there I deferred to whatever the other

11   benchmark was.

12   Q.   So you didn't necessarily choose the prospectus

13   benchmark, you chose which of those two you thought might work

14   better; correct?

02:02   15   A.   No, I -- my preference was to choose the prospectus

16   benchmark, which I did in almost all cases, there were a

17   couple where the prospectus benchmark was the same as -- the

18   performance versus the prospectus was the same as the

19   performance versus the peer group, so I chose the other

02:03   20   benchmark to get more information about performance.

21   Q.   If it performed not as well.  You wouldn't use the

22   performance versus the prospectus benchmark if it was the same

23   as Lipper, to get more information you'd choose a much lower

24   benchmark; is that fair?

02:03   25   A.   No, it's not.  My selection criteria was to use the

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    Russell benchmark except in cases where the Russell return was

2    the same as the peer group, and then I would defer to the

3    other one and sometimes it would be higher and sometimes it

4    would be lower.

02:03   5    Q.   Okay.  So -- why don't we take an example.  So if we can

6    call up P-74, which is your source document.

7         So this is the -- this is the Lipper Large Cap Value,

8    so on this one, you see the funds' benchmark was the Russell

9    1000 Value; do you see that?

02:04   10   A.   Yes.

11   Q.   And the five year return was negative 3.59.

12   A.   Yes.

13   Q.   And that's the number you would use to calculate the

14   performance return versus the benchmark?

02:04   15   A.   In all cases -- or in most cases, I would use the

16   Russell; in this case I believe I used the alternative index

17   only because it was substantially different from the Russell,

18   which is virtually the same as the Lipper.

19   Q.   So, to just get some variety you thought you'd choose a

02:04   20   benchmark that had a much better return to compare the funds

21   to; is that fair?

22   A.   No, it's not, as I said a minute ago, I wasn't motivated

23   by the fact that the other index was better or worse, I just

24   thought it was different.

02:05   25   Q.   So -- and we can go through every one, but for every

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    single one you used the prospectus benchmark, except for this

2    one (indicating) where if you'd used the prospectus benchmark,

3    it would have eliminated about half the losses; correct?  If

4    you used the prospectus benchmark, half the losses that you

5    show on your chart of losses would be eliminated if you used

6    the prospectus benchmark like you did for every fund; correct?

7    A.   For that particular fund, yes.

8    Q.   Okay.  Let's go back to P --

9    A.   In fact you can interpret exactly what it would be by

10   just looking at the Lipper column for the Large Cap Value,

11   because the return of the benchmark used in that calculation

12   would be the same as the performance for the Russell

13   calculation.

14   Q.   Right.  So let's look at that.  Let's go back to P-151-J.

15            MR. MURPHY:  If you can blow up the -- sorry; that's

16   somehow damages.  I'm looking for I; sorry.

17            Pull up that again on the left.

18   BY MR. MURPHY:

19   Q.   So on this one, Large Cap Value PLUS, if you used Lipper

20   you show 551 million; correct?

21   A.   Yes.

22   Q.   And so if you used -- roughly that same number you would

23   have used the same number on the right; correct?

24   A.   Yes.

25   Q.   And on the right with this other benchmark, the only time

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1   you used this other non-prospectus benchmark you're able to

2   show 1.4 billion; right?  And if you had used the funds'

3   prospectus, it would have been about 591; correct?

4   A.   Around that, yes.

02:06   5   Q.   About 800,000?

6   A.   Yes.

7   Q.   About 25 percent of the total losses on the chart?

8   A.   Well, then the benchmark damages would be comparable to

9   the Lipper damages of about $2 billion.

02:06   10   Q.   And you're saying you intentionally on that one fund,

11   which is half of your losses, the 1.4 billion on 2.6, more

12   than half your losses, you just decided to get some variety

13   you wouldn't use the funds' benchmark.

14   A.   No, as I said, for that particular fund because the

02:07   15   Lipper number was the same as the benchmark, I wanted to see

16   what the performance was against another benchmark that FMG

17   had offered.  I didn't hide that information from you, it was

18   clear in my documents what I was doing.

19   Q.   Did you mention that yesterday when you said it compared

02:07   20   the fund versus the prospectus benchmark in your testimony?

21   A.   I don't think we spoke about at this at length yesterday.

22   Q.   Okay.  You didn't tell the Court yesterday that this was

23   a comparison of the fund's performance versus the prospectus

24   benchmark that FMG had chosen, you didn't say that yesterday?

02:07   25   A.   You know, I don't recall, and I think the testimony was

*United States District Court*
*Trenton, New Jersey*

*2010*

Pomerantz - Cross - Murphy

1    that I looked at a peer group and I looked at a benchmark, and

2    those benchmarks are what FMG defines on this report.

3    Q.   Mr. Pomerantz, you were here yesterday when I said some

4    of your prospectus benchmarks were wrong; did you do any

02:08    5    investigation last night to go back and look at the benchmarks

6    of these numbers?

7    A.   No.

8    Q.   If you -- if we can hand up what I believe are your work

9    papers for that chart, which are Defendant's Exhibit 1886 and

02:08    10    1886.1 --

11             MR. MURPHY:  If we can hand them out to everyone.

12             Your Honor, it's very small print, I apologize, but

13    these were the way they were produced.  We blew them up the

14    best we could.

02:08    15    BY MR. MURPHY:

16    Q.   Mr. Pomerantz, do these appear to be your work papers

17    that you used to calculate the "losses" on Exhibit P-151-I?

18    A.   Yes.

19             MR. MURPHY:  And your Honor, I would offer

02:09    20    Defendant's Exhibits 1886 and 1886.1 into evidence as the

21    backup for his chart.

22             THE COURT:  Any objection?

23             MR. SWEETSER:  No objection.

24             THE COURT:  So, Defendant's Exhibits 1886 and

02:09    25    1886.1 --

2011

Pomerantz - Cross - Murphy

1          MR. MURPHY:  Thank you, your Honor.

2          THE COURT:  -- are admitted.

3          (Defendant's Exhibits 1886 and 1886.1 were marked

4   into evidence.)

02:09   5   BY MR. MURPHY:

6   Q.   So, Mr. Pomerantz, looking at 1886 -- do you have that in

7   front of you?

8   A.   Yes.

9   Q.   I don't know if Marco can blow it up, but if you can read

02:09  10   the small print, the first one is the PIMCO Ultra Short Bond

11   Fund?

12   A.   Yes.

13   Q.   And to do the analysis of your benchmark returns from

14   May -- May 2012 backwards, you would get assets from May 2007

02:10  15   as a starting point?

16   A.   What I -- what I was doing was -- was recreating the

17   analysis that I mentioned yesterday in the annual reports that

18   talk about the growth of $10,000, and they produce like a line

19   graph that shows what the growth of $10,000 would be at the

02:10  20   funds returned, and also at the benchmark returns, or the

21   comparators' returns.

22          And on that graph that's in the annual report it

23   identifies two terminal values, and the values that I'm trying

24   to calculate here are the difference between those two

02:10  25   terminal values --

*United States District Court*
*Trenton, New Jersey*

2012

Pomerantz - Cross - Murphy

1    Q.   I don't mean to interrupt you, Mr. Pomerantz; my question

2    -- and please feel free if you need to keep with your answer,

3    but I just want to know if you were to do an analysis of how

4    the funds performed going back five years from May 2012, would

02:11    5    you want the starting assets -- I don't -- I think you were

6    answering what you're trying to do; I'm just saying if you

7    were trying to do it right, would you start with the assets

8    five years back on May 2007 and say that's the beginning

9    assets?

02:11    10           MR. SWEETSER:  Objection.

11           THE COURT:  Wait, I'm sorry; what's the objection?

12           MR. SWEETSER:  Form.  I just don't understand what

13    that question is.

14           THE COURT:  You don't understand it?  So you have to

02:11    15    rephrase it.

16    BY MR. MURPHY:

17    Q.   If you were to calculate the losses going back five years

18    from May 2007 doing the analysis you did in 151-I, would you

19    want to get the starting assets going back five years so you

02:11    20    could start with the amount of money in the fund?

21    A.   That's one way to do it.  I was restricted to doing the

22    calculations based upon the information that was being

23    provided to the Board as I knew it.  And I can actually walk

24    you through my analysis.

02:12    25    Q.   Well, why don't you just tell me, what's the starting

Pomerantz - Cross - Murphy

1    assets that you use for the PIMCO Ultra Short Fund?  Can you

2    tell like for the first -- I guess it would be the period

3    May -- May 2007 what the starting assets would be?

4    A.  Well, it makes an assumption that the starting value is

02:12    5    the 2.5 million that you have in bold.

6    Q.  So 2.5 billion, not million.

7    A.  Sorry, billion.

8    Q.  So you assumed the starting assets were 2.5 billion

9    around May 2007.

02:12    10    A.  Implicitly I make that assumption.

11    Q.  Okay.

12        MR. MURPHY:  And can we hand out Defendant's Exhibit

13    467.1.

14    Q.  So, do you have it, Mr. Pomerantz?

02:13    15    A.  Yes.

16    Q.  And this appear to be a prospectus for the EQAT Trust

17    date May 2010?  There's just some pages of it not the whole

18    500 pages, but do you recognize it?

19    A.  This might be the first time I'm seeing this document,

02:13    20    so --

21    Q.  I'm sorry.  You could go on -- you could go on the

22    Internet and download --

23    A.  Yeah, I agree, I mean if you represent this is the

24    prospectus, I mean -- is it from the prospectus or the annual

02:13    25    report?

Pomerantz - Cross - Murphy

1    Q.   It says prospectus on the first page.  Any reason to

2    think it's not what it purports to be?

3    A.   No.

4    Q.   And if you turn to the third page which has the Bates

02:13    5    number 5286, it has the PIMCO Ultra Short Bond Fund.

6    A.   Yes.

7           MR. MURPHY:  And can we highlight that, Marco, the

8    2007 number?

9    Q.   So this has -- you're looking for the assets for May

02:14    10    2007; correct?  To do your analysis, you started with 2.5

11    billion; is that correct?  Mr. Pomerantz?

12    A.   Yes.

13    Q.   And do you see the assets in that time period were around

14    700 million, 705.347?

02:14    15    A.   The 705, yeah, for Class I-A.

16    Q.   Okay.  So you used as a starting asset value 2.5 billion

17    for 2007 for this fund, but the prospectus says that the

18    assets under management were about a quarter of that.

19           MR. SWEETSER:  Your Honor, objection.  There's

02:14    20    multiple share classes which counsel is limiting his only

21    answer on to only one share class.  There's multiple share

22    classes with different values in the different share classes.

23           MR. MURPHY:  I'll rephrase.

24           THE COURT:  Rephrase, please.

02:15    25    BY MR. MURPHY:

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1  Q.   Mr. Pomerantz, do you see any multiple share classes in

2  here, or does this just say net assets?

3  A.   Well, this prospectus identifies -- this prospectus

4  identifies net assets for Class I-A and Class-I-B.

02:15   5  Q.   Right.  So let's just break that down.  The 705 is -- you

6  think it's Class A and you think Class B is what, 564 -- 584?

7  A.   I'm sorry; just one moment.

8       So, I'm sorry, this document identifies the assets

9  at -- for Class I-A and Class-I-B to be 1.2 billion.

02:16   10  Q.   Okay, let's accept that as true.  The assets around March

11  31 to December 31, 2007 were around -- call it even 1.3,

12  right, it's closer to 1.3 than 1.2?

13  A.   For these two classes.

14  Q.   And you use basically twice that amount for your starting

02:16   15  assets; correct?

16  A.   Well, first of all, I don't know that there aren't other

17  classes that would have a different prospectus that would have

18  different asset values, number one.

19  Q.   Well, let's assume these are the only two share

02:16   20  classes --

21       MR. SWEETSER:  Your Honor, let's not and say we did.

22  I mean he should be permitted to answer that question.

23  There's other share classes; it's pretty significant to this

24  line of questioning.

02:16   25       MR. MURPHY:  If there were other --

Pomerantz - Cross - Murphy

1                    THE COURT:  Can you rephrase your question?

2      BY MR. MURPHY:

3      Q.   If there were other share classes would those be listed

4      in the prospectus?

02:17     5      A.   It's a quite common for there to be multiple prospectuses

6      for a mutual fund.  And some share classes are in some and

7      some share classes are in another.

8      Q.   Do you have any reason to believe that the assets of this

9      fund were greater than 1.3 billion as you sit here today in

02:17    10      2007?

11      A.   Yeah, I have several reasons.  I mean first of all, as I

12      said, this is a prospectus, I don't know that there aren't

13      other prospectuses; also, the numbers that are in my

14      spreadsheet are not coming from this document, they're coming

02:17    15      from the profitability reports that identify the average

16      assets per year.

17      Q.   And you're aware that the only share classes that are at

18      issue in this lawsuit are the I-A and I-B shares?

19      A.   The analysis that I did is based on the assets -- the

02:17    20      average assets that are reported on the profitability reports.

21      Q.   So in fact those might have other share classes beyond

22      I-A and I-B that are not at issue in this lawsuit?

23      A.   They might.

24      Q.   Do you recall testifying about an average for equity and

02:18    25      bond index funds yesterday, Mr. Pomerantz?

*2017*

Pomerantz - Cross - Murphy

 1  A.   Yes.

 2  Q.   And I think you said that they were 12 and 13 basis

 3  points for -- 12 for bond and 13 for equity; is that correct?

 4  A.    It was either 11 and 12 or 12 and 13, it's the chart

02:18    5  that's in my report.

 6  Q.   And why don't I just show you the chart that's in your

 7  report that you were shown yesterday.

 8           MR. MURPHY:  It's P-152 at page 48.

 9           If you could blow up that chart.

02:18   10  Q.   So these are the numbers you're talking about, 12 basis

11  points for equity, and 11 basis points for bond?

12  A.   Yes.

13  Q.   And you reported it as an average fee; correct?

14  A.   Yes.

02:19   15  Q.   And I think you said you got that from the ICI Fact Book

16  dated 2013?

17  A.   Yes.

18           MR. MURPHY:  Can we hand the witness P-117, which is

19  the 2013 ICI Fact Book?  Give one to the judge and plaintiff

02:19   20  as well.

21           It's already in evidence, your Honor.

22  BY MR. MURPHY:

23  Q.   Do you have it, Mr. Pomerantz?

24  A.   Yes.

02:19   25  Q.   And if you go to page 79.

*United States District Court*
*Trenton, New Jersey*

2018

Pomerantz - Cross - Murphy

1    A.   Yes.

2    Q.   Page 79 has the numbers that you're talking about, the 12

3    -- this one's 12 and 13, I think you report them as 11 and 12?

4    A.   Is this the chart that's in my report?

02:20    5    Q.   No, you pulled the numbers out of this, you cite this

6    report, you cite this in your report, the 2013 Fact Book, and

7    I think you cite page 79; I'm assuming it's the 12 and 13

8    right there.

9    A.   Yes.

02:20    10    Q.   Index equity funds, and bond funds are right below it.

11    A.   Yes.

12    Q.   Okay.

13         MR. MURPHY:  And if you could blow up that footnote,

14    Marco.

02:20    15    Q.   It says:  Expense ratios are measured as asset weighted

16    averages, figure excludes mutual funds available as investment

17    choices in variable annuities, and mutual funds that invest

18    primarily in other mutual funds.

19         Do you see that?

02:20    20    A.   Yes.

21    Q.   So this -- this number excludes mutual funds like the

22    funds at issue here that are used in variable annuities;

23    correct?

24    A.   The data behind this, yes, as Morningstar says -- I'm

02:20    25    sorry; Lipper.

*United States District Court*
*Trenton, New Jersey*

*2019*

Pomerantz - Cross - Murphy

1    Q.   And you reported these as just an average, but it

2    actually says they're asset weighted average?

3    A.   I think that's an issue of semantics.  If you look at the

4    text right below the graph, the text says:  Similarly the

02:21    5    average expense ratio for index and actively managed bond

6    funds have fallen --

7    Q.   What's ambiguous about the note, expense ratios are

8    measured at an asset weighted average --

9    A.   I agree with that.

02:21    10   Q.   So it's an asset weighted average.  What is an asset

11   weighted average?

12   A.   Well, it would be an average of fees for some set of

13   mutual funds where funds that are larger would be given a

14   greater weight than funds that are smaller.

02:21    15              MR. MURPHY:  Can I get the ELMO, Marco?

16   Q.   So let's assume that we have these -- these are seven I

17   guess we'll call them funds.  And let's assume that these are

18   fees, one basis point, two basis points, so there's seven

19   funds, 1 charges one basis point, 2 charges two basis points,

02:22    20   3 charges basis points and so on; do you follow me?

21   A.   Yes.

22   Q.   So how would you calculate the asset weighted average

23   from these numbers?

24   A.   You couldn't.

02:22    25   Q.   Right.  You need to know the assets; correct?

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    A.   Yes.

2    Q.   And just explain to the judge, if most of the assets were

3    in the fund with a 1, and the funds with the 2 and 3 and 4 and

4    7, 8 and 10 basis points fee, if almost all the funds were in

02:22    5    the 1 what would be the asset weighted average?

6    A.   If all the assets -- yeah, if 99 percent of the assets

7    are in the 1 then you're going to get a one.

8    Q.   Even if 80 percent of the assets were in the 1 it might

9    be like 1.4 or something.

02:22    10   A.   Sure.

11   Q.   So if the fees are disproportionately concentrated in the

12   lowest cost funds, you'd have an asset weighted number that

13   wouldn't necessarily be representative of how many funds are

14   charging that; correct?

02:22    15   A.   Yeah, an asset weighted average will pay more attention

16   to big funds and will pay less attention to the mutual funds

17   that may have 2 or $3 million in them or a mutual fund with

18   $50 million, or a mutual fund with less than a million

19   dollars.  The fee being charged by a mutual fund with a

02:23    20   hundred million dollars in it would play virtually no role in

21   the analysis as opposed to it being treated the same as an FMG

22   fund.

23   Q.   Thank you.  And if we can go back to page 79 of P-117.

24   And down below it says:  Investor demand for index funds is

02:23    25   disproportionately concentrated in the very lowest cost funds.

*United States District Court*
*Trenton, New Jersey*

*2021*

Pomerantz - Cross - Murphy

1   What do you understand that statement to mean?

2   A.   I would really have to ask ICI what that means.  To say

3   investor demand, I think what's -- what's true is that larger

4   funds have lower fees and smaller funds have higher fees; as

02:24   5   to whether or not the fees are lower in response to demand or

6   whether it's a function of the breakpoints, that's -- that's,

7   you know, that's debate.

8   Q.   I think I got you.  You're talking about competition

9   which is not where I'm going; right?  We've debated that in

02:24   10   the past.  What I'm asking is just are there some really large

11   low fee funds in the marketplace is what I was asking.

12   A.   There are many many funds which fees below 10 basis

13   points, not just Vanguard and Fidelity, there are dozens of

14   funds that have less than 10 basis points fees.

02:24   15   Q.   But Vanguard -- you've testified Vanguard has about a

16   trillion dollars in assets and index funds that have very very

17   low fees; do you recall that?

18   A.   Fiduciary has more and they're cheaper.

19   Q.   Right.  So there's some really low cost big assets;

02:25   20   right?

21   A.   Yeah, as I said there are probably a dozen large funds

22   that have less than a 10 basis point charge.

23   Q.   Can you turn to the next page of this chart that you

24   relied on, page 80 in P-117.  Can we blow up that chart?

02:25   25       So this is the expense ratios, not just of index funds,

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    but it includes index funds and all other funds; is that

2    correct?

3    A.   Yeah, this is the whole universe they have.

4    Q.   Right.  So let's take equity funds; a bunch of the funds

02:25    5    here are equity funds; correct?

6         MR. SWEETSER:  Your Honor, I object.  Dr. Pomerantz

7    didn't give any opinion on expense ratios.  He spoke about the

8    investment management fee; expense ratios includes other fees

9    as well which he didn't opine on.  This is outside the scope

02:25    10   of his opinion in this case.

11        THE COURT:  All right.  Overruled.  I think it goes

12   to credibility.

13        MR. MURPHY:  And your Honor, just for clarity, the

14   11 and 12 basis points in the previous page are expense ratios

02:25    15   as well.

16   BY MR. MURPHY:

17   Q.   So, Mr. Pomerantz, a bunch of funds here are equity

18   funds; correct?

19   A.   On the chart?

02:26    20   Q.   No, I'm sorry; at issue in the case.

21   A.   At issue in the case?  I think three -- two of the funds

22   are actively managed equity funds, yes.

23   Q.   Sorry.  My question was, are a bunch of the funds here

24   equity funds.

02:26    25   A.   Yes.

*United States District Court*
*Trenton, New Jersey*

2023

Pomerantz - Cross - Murphy

1   Q.   Okay.  And so let's just take this first one.  What is

2   the 10th percentile mean, the 77, what would that reflect?

3   A.   That would mean that 10 percent of the mutual funds in

4   that category have a fee below 77 basis points.

02:26   5   Q.   So the lowest -- the lowest 10 percent of -- the cheapest

6   10 percent of funds in the industry equity funds, they have a

7   fee of 77 basis points or less.

8   A.   Yeah, if you look -- if you're looking at their total

9   expense ratio.

02:26   10   Q.   Right.  And that would be .77 percent.

11   A.   Again those numbers include -- it's a total expense ratio

12   and it also includes 12(b)(1) fees, it includes every fee that

13   is going to be disclosed.

14   Q.   Correct.  Just as -- just as FMG's total expense ratio

02:27   15   includes all those fees as well; correct?

16   A.   Yes.

17   Q.   And what's the median, the 133?

18   A.   That means that half of the funds in that category exceed

19   that number, and half are below that number.

02:27   20   Q.   So if there was 5,000 funds, the 2,500th fund, whatever

21   that fee is that would be what the median would be; correct?

22   A.   Technically no, but yes.

23   Q.   You're the Ph.D., tell me where I go wrong.  I'm just

24   trying to figure out what the numbers are.  Is it right or

02:27   25   wrong?

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    A.   For an even number it's not right, but in essence you're

2    right.

3    Q.   Okay.  So fair enough.  If it was 5,001, it would be the

4    2,500 or 2,501 --

02:27    5    A.   I don't know.  But yes.

6    Q.   And then what's -- what's the 90th percentile?

7    A.   That similarly means -- let's say 10 percent of the funds

8    in that category have a total expense ratio that exceeds that

9    value.

02:28    10   Q.   Okay.  And then what about -- there's your asset weighted

11   average, we know what that is; correct?

12   A.   Yes.

13   Q.   And what's the simple average?

14   A.   If there are 5,000 funds in that category, then we're

02:28    15   going just add up 5,000 numbers and divide by 5,000, and weigh

16   each fund equally.

17   Q.   And that number is 141 basis points or 1.41 percent;

18   correct?

19   A.   Yes.

02:28    20   Q.   So using a simple average, the total expense ratio -- I

21   mean none of the funds here have an expense ratio over 100; is

22   that correct?

23   A.   I don't know, but that's not a relevant comparison,

24   that's -- that's looking at the total fee.  My understanding

02:28    25   is that that's not what this case is about, it's not what my

1   analysis is about, my analysis is about the management fee.

2   That number is -- is altered by what the 12(b)(1) fee is, it's

3   altered by what the actual administrative fees are, what the

4   sub-advisory fees are; there's lots of components that go into

02:29   5   that number.

6   Q.   So you don't think it's appropriate to do an expense

7   ratio comparison.

8   A.   Well, that's another question; no, I don't think -- I

9   don't think fee comparisons are relevant at all.

02:29   10   Q.   Well, that's a different question.  Why don't we go back

11   to P-152 at page 48.

12         So you understand that this is a total expense ratio;

13   right?  That's where these numbers come from?

14   A.   Yes.

02:29   15   Q.   And these are a total expense ratio; correct?

16   A.   No, those are not the total expense ratios.  All right,

17   let's be clear.  I mean the middle column are index funds,

18   that's a total; the column on the right, the fee of the

19   subject fund -- the subject funds, have administrative fees,

02:29   20   12(b)(1)s, all of that.  So it's not the total right, that's

21   -- that's just the management fee is what I believe James was

22   referring to.

23         MR. MURPHY:  Can we go back to P-117, page 79?

24   Q.   And these are -- these are total expense ratios, too;

02:30   25   right?  They're not management fee or admin fee, you were

Pomerantz - Cross - Murphy

1    comparing the total expense ratio; correct?

2    A.   I'm sorry; what is your question?

3    Q.   These reflect the total expense ratios that you just said

4    you don't think the comparisons are appropriate to look at

02:30    5    total expense ratios, these are total expense ratios; correct?

6    It's not just management fee.

7    A.   The numbers on that chart are total expense ratios.

8    Q.   Okay.  And you're aware the Board was given information

9    from Lipper on management fees?

02:30    10   A.   Yes.

11   Q.   And on comparative fees; correct?

12   A.   I don't recall the detail, but yes, probably.

13   Q.   Is Lipper widely used by mutual fund boards for

14   comparative fee analysis?

02:30    15   A.   Yes.

16   Q.   And you would consider Lipper authoritative; correct?

17   A.   I mean I guess it depends like what -- what aspect of

18   Lipper you're asking about.

19   Q.   Well, did you testify in the Hartford case that you said,

02:31    20   I consider Lipper to be authoritative?

21   A.   Well, they are an authoritative source of data.

22   Q.   Okay.  Is Lipper considered to be independent?

23        MR. SWEETSER:  Objection, your Honor.

24   A.   I don't know that --

02:31    25        THE COURT:  Overruled.

Pomerantz - Cross - Murphy

1    A.   I don't know that I have an opinion on that.

2    Q.   Did you testify in the American Century case that

3    Lipper's considered to be independent?

4    A.   They're considered to be.

02:31    5         MR. MURPHY:  Can we hand out 151-A?  I think they

6    were shown probably today -- maybe I should ask; does anyone

7    need another copy, your Honor, of 151-A?

8         THE COURT:  I think I have it.  I don't know about

9    Mr. Pomerantz.

02:31    10        Do you have 151?

11        THE WITNESS:  I can read the screen, your Honor.

12        THE COURT:  Okay.

13        THE WITNESS:  So far.

14   BY MR. MURPHY:

02:32    15   Q.   And I believe you testified, Mr. Pomerantz, that these

16   numbers come from P-52-B; is that correct?  The landscape

17   chart?

18   A.   Yes.

19   Q.   And what you did -- again, I don't want to belabor this

02:32    20   because you talked about it, but you basically just took for

21   Common Stock, the total management fee and subtracted out the

22   sub-advisory fee to get the amount paid to FMG; correct?

23   A.   Yes.

24   Q.   So that's just the total management fee less the

02:32    25   sub-advisory fee.

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1  A.   Yes.

2  Q.   And you did the same thing for the administrative fee,

3  you took the total administrative fee and deducted the

4  sub-administration fee, and the column to left would be the

02:32   5  retained fee.

6  A.   Yes.

7  Q.   If we can look at P-52-B -- do you need a copy of that,

8  Mr. Pomerantz?

9  A.   I can read the screen.

02:33   10  Q.   If you can read that that's even easier because that's

11  what I'm using.  So Common Stock, the management fees were 16

12  million, and the sub-advisory fees were 2390?

13  A.   Yes.

14  Q.   And you deducted 16.6 minus 23 to get 14.261; correct?

02:33   15  A.   Yes.

16  Q.   And that's the amount paid to FMG.

17  A.   Yes.

18  Q.   And then what did you do with the $6 million of product

19  cap reimbursements?

02:33   20  A.   For this chart I ignored everything but the sub-advisory

21  fee.

22  Q.   And what are product cap reimbursements?

23  A.   They might be reimbursements, I don't know.

24  Q.   Well, let's assume AXA had to return $6 million under a

02:33   25  product cap reimbursement, return the fee paid, you'd want to

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1   reflect that in the amount paid to FMG; right?

2   A.   You know, I just was being consistent across all of the

3   funds, and I just take the management fee and I subtract the

4   sub-advisory fee.

02:34   5   Q.   Right.  You don't have much accounting experience;

6   correct?

7   A.   I -- as far as understanding these reports I do.

8   Q.   So, what's offset to revenue?

9   A.   It's what it says.

02:34   10   Q.   It's a deduction from revenue.

11   A.   That -- that's what it says, I don't know necessarily

12   where that money's going.

13   Q.   Well, how do you know from your experience reading these

14   charts if that's not some money that actually FMG isn't

02:34   15   keeping, if it's an offset to revenue?

16   A.   I think that you could -- if you wanted you could make

17   adjustments to this report based on -- I think the product cap

18   reimbursement that you're pointing to, I don't know that there

19   were any or many other funds that had a line item like that,

02:35   20   and you can certainly make adjustments based on that, but in

21   almost all of the funds that value is zero.  And I'm just as I

22   said taking the management fee and subtracting the

23   sub-advisory fee.

24        MR. MURPHY:  If you could -- can you move those

02:35   25   boxes out of the way, Marco?

Pomerantz - Cross - Murphy

1    Q.   The next one is the Core Bond, like what is it, like a

2    million 7 in that one, too?  Do you have it?  Sorry; 728,000?

3    Do you see that?  Another offset -- sorry; reimbursement.

4    A.   I don't know what those are reimbursements to.  I don't

02:35    5    know that those are coming out of -- it's not clear to me

6    where that money's coming from or where it's going or that it

7    has anything to do with the spread between the management fee

8    and the sub-advisory fee.

9         And in fact, the numbers that I have here are

02:36   10    reasonably close to what you would expect just coming off of

11    the fee schedules.  So -- if there's a permanent reimbursement

12    or adjustment then it should be reflected in the fee schedules

13    which are the items that are actually being negotiated.

14    Q.   If you could go to 203 of 52-B.

02:36   15         MR. MURPHY:  Do we have that, Marco?

16    Q.   So this is -- this is the T.Rowe Growth Fund, if you look

17    at page 203 of 52 -- P-52-B, here there's a column for fee

18    waivers, 116,000.  You didn't the account of the fee waivers

19    either when you did the math; correct?

02:36   20    A.   No, my analysis is looking at the management fee minus

21    the sub-advisory fee.

22    Q.   Well, if let's say -- let's say FMG's paid $3 million,

23    $3.1 million, and it gave a hundred -- never really collected

24    a hundred thousand of that because it waived its fee, don't

02:37   25    you think that would be a fair thing to reflect in the chart

Pomerantz - Cross - Murphy

1   in terms of the fee retained by FMG?

2   A.   I don't know the history of that 116,000, for all I know

3   it's a reimbursement back to the fund for an overcharge that

4   was deemed -- being done in a prior year.  So, I don't -- I

02:37   5   don't know the source of -- or the reasons behind that number.

6   And so I just look at the difference.

7   Q.   Okay.  P-151-J.  Do you recall this is the damage chart

8   you talked about earlier today?

9   A.   Yes.

02:37   10   Q.   And just to be clear, the 39 percent profit margin, that

11   excludes sub-advisory fees as an expense; correct?

12   A.   Yes.

13   Q.   And it excludes what we would call the AXA $49 million of

14   allocated costs; correct?

02:38   15   A.   Yes.

16   Q.   If you look at the bottom chart that's the damage

17   calculation for administrative fees.  So, this one, Mr.

18   Pomerantz, you calculated for the admin fees in 2012 that if

19   you allow FMG to calculate -- to capture some profit, 39

02:38   20   percent of profit after they pay all their costs, they get a

21   39 percent profit, if the funds -- if they return to the fund

22   $4.8 million; is that correct?

23   A.   Yes.

24   Q.   That would still allow them to cover their costs and earn

02:38   25   a little bit of extra money; correct?

Pomerantz - Cross - Murphy

1   A.   Yes.

2   Q.   Okay.  And if you go to 152-E, which we can put up on the

3   screen for ease, these are the charts we just looked at for

4   the amount of the admin fee retained -- I believe it's 152-E.

02:39      5          MR. MURPHY:  Yeah, 152-E -- P-151-E.  Can we

6   highlight the first one, Common Stock?

7   BY MR. MURPHY:

8   Q.   4.478; is that correct?

9   A.   Yes.

02:39     10   Q.   So that's -- that's the total fee that FMG got, 4.478;

11   right?  After they paid the sub-administrator fee, they --

12   they kept 4.478; right?

13   A.   Yes.

14   Q.   So -- let's write that down; 4.478.  And go back to the

02:40     15   damage chart to see how much are the damages.  So, the

16   damages, you think they should return 4.85 million of the fee,

17   and they'll still have a little bit of profit, but they only

18   received 4.478.  How can they return more than they kept by

19   400,000 and still earn a profit?

02:40     20   A.   I would have to check the calculations that I did, it

21   would appear that there's something wrong.

22   Q.   There would be an error in there somewhere; correct?

23   A.   Yes.

24   Q.   In fact, didn't we point out an error very similar to

02:40     25   this, a 12 percent margin in your expert report, and you

Pomerantz - Cross - Murphy

1    corrected it in your rebuttal report; correct?

2    A.   Yes.

3    Q.   And then you showed up with the incorrect chart again at

4    trial; correct?

02:40    5    A.   I mean I may have accidently pulled the original chart

6    rather than the corrected one.

7         MR. MURPHY:  If we can go to 151-K.

8    Q.   This was shown to you today.  So, on this one, this is

9    the same flavor of analysis; right?  This purports to be some

02:41    10   damages that would allow FMG to capture some margins?

11   A.   Yes.

12   Q.   And these are the same thing, you excluded FMG's -- or

13   sorry; AXA's allocated costs and sub-advisory fees?

14   A.   Yes.

02:41    15   Q.   And on these, so just help me read the chart; the 50

16   percent, they would get 18 -- they would return $18 million to

17   the funds on a 50 percent margin?

18   A.   Yes.

19   Q.   And then 60 it goes down a little bit, 70 it goes down a

02:41    20   little bit, 80 goes down a little bit; and then how does it

21   get to 90, how does it go in half when you just move the

22   margin 10 percent?

23   A.   Yeah, actually that's interesting, I asked myself the

24   same question when I did this and it's -- it's just in the

02:42    25   math basically.  It just the -- there's a big dollar movement

Pomerantz - Cross - Murphy

1   as margins move from the break-even, down to the 90, 80, 70

2   range and then it levels out very quickly.

3   Q.   And then how do you get to a negative number in Common

4   Stock of negative 53, that they earn -- they earned a 90

02:42   5   percent margin but it's a negative number?

6   A.   Well, in this case what that would mean is -- and if you

7   look at that you'll see that on that row, the zero would be

8   somewhere around 55 percent.  Right?  Because 50 percent is

9   1.3 million, 60 percent is minus 1.9 million, so zero is

02:42   10   somewhere around 55; so that particular fund actually has a 55

11   percent margin.

12   Q.   So your damages would be FMG is owed some money.

13   A.   Well --

14   Q.   Is that correct?

02:42   15   A.   Well, we would owe you money.

16   Q.   Correct.  Well, you're not the plaintiff, but someone

17   would owe FMG some money for the Common Stock Index Portfolio.

18   A.   Well, because this chart is calculating what the damages

19   would be at all of these different margin levels, and what

02:43   20   that row represents is that that particular fund is not

21   operating at a 90 or a 95 percent margin.

22   Q.   Are you the director of risk management at Gordon Asset

23   Management?

24   A.   Not anymore.

02:43   25   Q.   When were you -- when did you lose your -- well, how did

United States District Court
Trenton, New Jersey

Pomerantz - Cross - Murphy

1    you -- when did you stop being the director of risk management

2    at Gordon Asset Management?

3    A.   Around 2007.

4    Q.   Okay.  Gordon Asset Management, they managed funds of

02:43     5    funds; is that correct?

6    A.   Funds of hedge funds.

7    Q.   And they manage a fund called Ageis; is that correct?

8    A.   It's Aijed with a D.

9    Q.   And can you spell that for Mr. Gable?

02:44    10    A.   A-i-j-e-d.

11    Q.   And they have two or three other funds; is that correct?

12    A.   Well, we're talking about 2007?  I don't know anything

13    about the current, but 2007 I -- I believe there were two, I

14    believe there were two other funds.

02:44    15    Q.   And what were the names of those funds?

16    A.   There was a Gordon Associates and a Gordon Strategic.

17    Q.   And Gordon oversaw and monitored the underlying advisors

18    for that funds; is that fair?

19    A.   Gordon's responsibility is -- yes, that's one of -- one

02:44    20    of the things that Gordon has to do, right.

21    Q.   And all of the funds are managed by sub-advisors;

22    correct?  All of the assets I mean?

23    A.   Yes.

24    Q.   And Gordon does due diligence on those sub-advisors?

02:45    25    A.   Yes.

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    Q.   And the underlying sub-advisors for Gordon, they have

2    day-to-day investment management responsibility; correct?

3    A.   Yes.

4    Q.   And Gordon didn't retain any other day-to-day investment

02:45    5    management responsibilities; correct?

6    A.   Other than re-allocation and cash flow, I mean that's a

7    responsibility of Gordon's.

8    Q.   And they did due diligence on sub-advisors?

9    A.   Yes.

02:45    10   Q.   And what does Gordon charge for overseeing and monitoring

11   this collection of sub-advisors?

12   A.   The fee structure was different for the fund, but there

13   was a base fee of maybe a half to one percent depending on the

14   fund, and then there's a performance -- a performance fee as

02:45    15   well.

16   Q.   And one of the funds was a one percent; is that correct?

17   A.   There were three funds, I couldn't tell you the fee of

18   each one, but that's sounds about right.

19        MR. MURPHY:   Why don't we play clip 33, AXA

02:46    20   transcript 107.

21        MR. SWEETSER:   Your Honor, before we play any clips,

22   it's my understanding, and I may be wrong, but it's my

23   recollection in this case that the funds we're referring to

24   are hedge funds, which are not controlled by law which do not

02:46    25   have this fiduciary doesn't exist.  I would just like counsel

Pomerantz - Cross - Murphy

1    to clarify that, because if we're talking about apples and

2    oranges it may be misleading.  I may be go mistaken but I'd

3    like some clarification on this.

4         MR. MURPHY:  I think he testified it was exactly

02:46   5    what the responsibilities were.  He's overseeing sub-advisors

6    and he's charging a fee, that's exactly at issue in this case.

7         MR. SWEETSER:  Again, your Honor --

8         THE COURT:  You'll have to a chance to redirect, Mr.

9    Sweetser, so you may play the clip.

02:46   10        THE WITNESS:  Technically they're not called

11   sub-advisors, they're partnerships.

12   BY MR. MURPHY:

13   Q.  Well, you say that, Mr. Pomerantz, but you used the term

14   sub-advisor in your deposition; correct?

02:46   15   A.  That's because I'm using the language of the mutual fund

16   industry.

17   Q.  Okay.  So you called them sub-advisors, not me.

18   A.  I'm calling them that because that's the language that's

19   being used in this case; legally they are not sub-advisors,

02:47   20   they are partnerships.

21   Q.  And then just so I'm clear, is the fee on some of these

22   funds that you're overseeing sub-advisors for, where Gordon is

23   overseeing them, you charge one percent for some of them;

24   correct?

02:47   25   A.  Yes.

Pomerantz - Cross - Murphy

1  Q.  And then on top of that you charge 20 percent of the

2  returns if they're above some threshold?

3  A.  That sounds about right.  I don't know the exact numbers,

4  but that sounds about right.

02:47   5  Q.  So one percent is a hundred basis points; correct?

6  A.  Yes.

7  Q.  And that's higher than any of the funds that FMG charges

8  here for both FMG's fees and the sub-advisors; correct?

9  A.  It's a completely different business.

02:47  10  Q.  Is it correct?

11  A.  It's apples and oranges, but I mean yeah, I don't

12  disagree that the fee is one percent.

13  Q.  Do you recall talking about yesterday that you saw a

14  document that said FMG had delegated day-to-day investment

02:48  15  management functions; do you recall that?

16  A.  I'm sorry; this was a document in evidence, or that you

17  indicated?

18  Q.  I think -- you tell me, Mr. Pomerantz.  So you said

19  yesterday that you saw some documents that you helped inform

02:48  20  for your opinion that FMG had delegated day-to-day investment

21  management responsibility; do you recall that?

22  A.  Yes, I said that I had seen documents and I was referring

23  to the SAI.

24  Q.  And could investment management mean just the decisions

02:48  25  of what to buy and sell within the objectives of the fund?  Is

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    that a reasonable definition?

2    A.   I'm sorry; what is the question?

3    Q.   Investment management, you saw those words in the

4    document you relied on; correct?

02:48    5    A.   Yes.

6    Q.   And I want to know is a reasonable definition of

7    investment management there just the decisions of what to buy

8    and sell within the objectives of the fund.

9         MR. SWEETSER:  Your Honor, I object to what's in the

02:49    10   mind of the drafter that wrote it, I mean it says what it

11   says.  And as I understand counsel's question it has to do

12   with can he interpret what was in the mind of the person that

13   wrote it.

14        THE COURT:  Frank, can you just repeat the question,

02:49    15   please?

16        (Question read back by the reporter.)

17        THE COURT:  Overruled.  You may answer that

18   question.

19        THE WITNESS:  Are you asking me what the phrase --

02:49    20        THE COURT:  You don't understand it?

21        THE WITNESS:  I don't.  That's why I'm seeking

22   clarification.

23        THE COURT:  Can you rephrase, please?  What happened

24   to Mr. Murphy.

02:49    25        MR. MURPHY:  I'm just kneeling down.

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1          THE COURT:  I thought I lost you.

2          MR. MURPHY:  I fainted.

3          THE COURT:  Exactly.  Could you rephrase your

4   question?  Dr. Pomerantz doesn't seem to understand it.

02:49   5   BY MR. MURPHY:

6   Q.  So, my question was, could investment management as that

7   term is used, could that refer to the decisions of what to buy

8   and sell within the objectives of the fund?

9   A.   When you say as that term is used, I'm just seeking

02:50  10   clarification of in what context; in the context of the

11   sentence in that document or in a conversation, or in using

12   that phrase somewhere else?  I just want clarification or do

13   you want to ask me the intent of the author of the SAI?

14   Q.   Why don't I show you -- if we can hand out a deposition

02:50  15   from -- a page from a deposition in the Bennett case; you

16   testified in that case under oath?

17   A.   Is that Fidelity?

18   Q.   Yes.

19   A.   Yes.

02:50  20          MR. MURPHY:  Defendant's Exhibit 1894.1, if we can

21   get Mr. Sweetser one as well.

22          THE COURT:  What was the exhibit?

23          MR. MURPHY:  Sorry; 1894.1.

24   BY MR. MURPHY:

02:51  25   Q.  Do you recall testifying in this case, Mr. Pomerantz?

2041

Pomerantz - Cross - Murphy

1  A.  Yes.

2  Q.  And if you look at page 97, in your expert report you use

3  the term "investment management services"; do you recall that?

4  So, in your expert report you use those terms in that case;

5  correct?

6       MR. SWEETSER:  Your Honor, I object.  Counsel is

7  asking about a document that I understand his client prepared,

8  now he's asking about another case and a phrase that was used

9  in an expert report by Mr. Pomerantz has nothing to do with

10  FMG's meaning when it included that in the document that

11  counsel was asking about at the start of this line of

12  questioning.  It's completely inappropriate question and this

13  deposition has nothing to do with his answer with regard to

14  the content of what was in the document that counsel is asking

15  about.

16       MR. MURPHY:  Your Honor, may be heard on that?

17       THE COURT:  You may.

18       MR. MURPHY:  So, we drafted the document; Mr.

19  Sweetser doesn't want to hear about what my witnesses think

20  that mean.  He offers Mr. Pomerantz to interpret what he means

21  -- he thinks it means and he offered an opinion on it

22  yesterday.  Now, in another case he used these exact same

23  words in his report to mean something that -- we agree with

24  his definition, it means stock selection; I should be entitled

25  to impeach him on that.  This is exactly the statement he

United States District Court
Trenton, New Jersey

Pomerantz - Cross - Murphy

1    testified about yesterday.

2         THE COURT:  All right.  Overruled.

3    BY MR. MURPHY:

4    Q.  So, can you define that phrase for me, meaning investment

02:52   5    management services; correct?

6    A.  I stick by that definition; right?  If I say ultimately

7    the decisions of what to buy and what to sell subject to

8    constraints and objectives, that is investment management.

9    Q.  Okay, thank you.  And then you also talked about

02:52   10   proprietary funds; do you recall that?

11   A.  Yes.

12   Q.  And you said some of the sub-advisors have proprietary

13   funds?

14   A.  All but one.

02:52   15   Q.  And you actually pointed to some of those in your expert

16   report; correct?

17   A.  Yes.

18   Q.  Do you have P-151 there?  Your expert report?

19   A.  Yes.

02:53   20   Q.  It's page 66.

21        You'll be glad to know, Mr. Pomerantz, I don't have an

22   outline at this point so I must be almost done; if you can

23   just bear with me for five minutes.  Do you need it?  I can

24   hand it up.

02:53   25   A.  I'm successfully able to read up here.


*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    Q.   Okay, fair enough.   The one problem is it goes over two

2    pages, I want to do the Large Cap Value PLUS, then you have to

3    go to the next page to see the comparable fund, I think they

4    are kind of listed down below; right?

02:53    5    A.   Yes.

6            MR. MURPHY:   Do you have the next page, Marco?

7    Q.   So the next page would be -- so Large Cap Value PLUS, you

8    have the proprietary fund of Alliance Bernstein APGAX;

9    correct?

02:53   10    A.   Yes.

11   Q.   Which would make sense because Alliance Bernstein's a

12   sub-advisor to the Large Cap Value PLUS Fund?

13   A.   An affiliated sub-advisor.

14           MR. MURPHY:   And so can we hand Mr. Pomerantz

02:54   15   DX-1918, and hand that up to the Court and Mr. Sweetser

16   please?

17   Q.   So this is the prospectus for that fund; right?   You see

18   the ticker up in the left, APGAX, the same one that appeared

19   in your report?

02:54   20   A.   Yes.

21           MR. MURPHY:   And if you can go down, Marco, to the

22   fees and expenses part.

23   Q.   What's the management fee for the fund there?

24           THE COURT:   What page are you on?

02:54   25           MR. MURPHY:   Sorry; in the document it should be the

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    very first page, the kind of boxes down at the bottom.

2    Q.   What's the management fee on that proprietary fund?

3    A.   75.

4    Q.   And that -- that exceeds what the -- what FMG charges on

02:55    5    the fund that it oversees; correct?

6    A.   I mean I don't -- I don't know if we're comparing apples

7    to apples here, I mean I'm not sure --

8    Q.   You tell me, Mr. Pomerantz.  You said this is a

9    proprietary fund --

02:55    10        MR. SWEETSER:  Your Honor, may the witness tell him

11    before he interrupts him and asks him to tell him?  He was

12    answering the question and he interrupted and said you tell

13    me.  I'd appreciate if he can answer the question.

14        MR. MURPHY:  I apologize.  Go ahead, Mr. Pomerantz.

02:55    15        THE COURT:  You may answer.  I said he can answer.

16        MR. SWEETSER:  I appreciate that, your Honor.  With

17    respect to this document.  I see that it's dated October --

18        THE COURT:  Do you have another objection?

19        MR. SWEETSER:  I do, your Honor.  With respect to

02:55    20    the document I see that it's dated October 30, 2015; Dr.

21    Pomerantz wrote his report two years ago.  I don't know how

22    this document and what's going on a couple of months ago have

23    anything to do with an opinion that he rendered that was based

24    upon a report that he prepared two years ago.

02:55    25        THE COURT:  Well, we'll listen to the questions and

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1    then you can object.

2    BY MR. MURPHY:

3    Q.   Why don't I rephrase the question, Mr. Pomerantz.  You

4    testified that each of the sub-advisors, save one, has

02:56   5    proprietary funds; correct?

6    A.   Yes.

7    Q.   And you said the Board could just go out and hire the

8    sub-advisor directly and get the proprietary product; correct?

9    A.   They could.

02:56   10   Q.   That was your point, wasn't it?

11   A.   Yes.

12   Q.   And in fact, here's one of the funds, and it charges 75

13   basis points for a management fee; correct?

14   A.   Yeah, but this -- this is completely different.

02:56   15   Q.   Is that correct; Mr. Pomerantz?

16   A.   They charge 75 basis points, but I don't know what that

17   management fee is, I don't know what's being provided for

18   that, I don't know what were the result -- what were the

19   negotiations between the -- is this an Alliance Bernstein

02:56   20   fund?  If I could see -- yeah.  So I don't know what happened

21   between Alliance Bernstein the advisor and Alliance

22   Bernstein's board; I don't know what this fund is doing; I

23   don't know what the management fee is paying for; it's a

24   completely kind of business structure.  Alliance Bernstein --

02:57   25   the board of Alliance Bernstein has not gone out and hired a

Pomerantz - Cross - Murphy

1    sub-advisor, whereas FMG's Board has gone out and hired a

2    sub-advisor; these are two different business models.

3    Q.   Right, but I thought you said --

4    A.   So why would I compare the fee of two businesses that

02:57    5    have very different structures.

6    Q.   I thought your point was that this Board, the EQAT Board,

7    why should they hire FMG and then a sub-advisor when they

8    could go get the product directly from the proprietary

9    manager.

02:57    10   A.   But this is not the same product that -- that FMG offers

11   under this name.  I mean the Board of FMG could go to Alliance

12   Bernstein and omit FMG, they could go to Alliance Bernstein

13   and they could have an negotiation with them and they can buy

14   some product from them; I don't know if -- if this is the

02:57    15   product and if this is the product that they want to buy, that

16   conversation never happened.  So I don't know what fee would

17   be negotiated between the Board of FMG and Alliance Bernstein.

18   That number is a result of a negotiation between Alliance

19   Bernstein the advisor, and Alliance Bernstein the board.

02:58    20   Q.   But this is the fund you selected as a proprietary fund;

21   correct?

22   A.   I actually -- well, the purpose in my report was to

23   illustrate that the sub-advisors in question, actually have

24   funds that have delivered better returns than a corresponding

02:58    25   FMG fund.

*United States District Court*
*Trenton, New Jersey*

Pomerantz - Cross - Murphy

1   Q.   If you could go to P-509, it might be easier, Mr.

2   Pomerantz -- probably last question; just to call it up.

3   P-509 and it's page 5.

4        MR. MURPHY:  Just highlight that box Large Cap Value

02:58   5   PLUS on the right.  On the right; sorry.

6   Q.   So we just saw that the proprietary fund that you thought

7   was similar to this charges 75 basis points; FMG to oversee

8   Alliance Bernstein in its product, charges 50 basis points,

9   break points down to 35, about half of what -- 37 is the final

02:59   10   breakpoint is half of what Alliance Bernstein charges in their

11   proprietary product?

12   A.   I'm sorry, Sean -- Mr. Murphy, what is this that I'm

13   looking at?

14   Q.   It's a joint stipulated exhibit that both sides says

02:59   15   reflects the fee schedules of the funds at issue.

16   A.   And which fee schedule is this?

17   Q.   This is the Large Cap Value PLUS Fund; right?

18   A.   So that's the management fee.

19   Q.   Correct.  Which we just looked at was 75 for the

02:59   20   proprietary product.

21   A.   So it's a completely different product.

22   Q.   You said it was the proprietary fund and compared it to

23   this fund though.

24   A.   The point I made in my report was that there are other

02:59   25   products out there that are offering better performance.

*United States District Court*
*Trenton, New Jersey*

Redirect - Pomerantz - Sweetser

1    If -- if you want to go down your road and argue that the

2    Alliance Bernstein fund is more expensive, then I would

3    question why is the Board at FMG satisfied with a worse return

4    than what Alliance Bernstein is generating for their own

03:00    5    proprietary funds.

6              MR. MURPHY:  No more questions, your Honor.

7              THE COURT:  All right, thank you.

8              Redirect.

9    (REDIRECT EXAMINATION OF STEVE POMERANTZ, PH.D., BY MR.

03:00    10   SWEETSER:)

11   Q.  Mr. Pomerantz, counsel pointed out that you made an error

12   in 151-J; you acknowledge you made an error when you were

13   calculating the 39 percent profit margin?

14   A.  On the administrative section, yes.

03:00    15   Q.  Just in the administrative section, that's the only

16   section he was asking you about; right?

17   A.  Yes.

18   Q.  Now, the source for that was 151-E; right?  Can you get

19   that document please?

03:01    20             THE COURT:  What exhibit are you looking at?

21             MR. SWEETSER:  151-E, your Honor.

22             THE COURT:  Thank you.

23   A.  I'm sorry, Counselor, I have a stack of papers; can you

24   just tell me what that document is?

03:01    25   Q.  151-E, it's the comparison of FMG's administration fees

Redirect - Pomerantz - Sweetser

1    to sub-administration fees.

2              THE COURT:  Here you go.

3              THE WITNESS:  Thank you, your Honor.  Sorry.

4              THE COURT:  I didn't write on that, did I?

03:01   5      THE WITNESS:  Oh, no, there's a circle.

6              THE COURT:  Okay.

7    BY MR. SWEETSER:

8    Q.   Do you have that?

9    A.   Yes.

03:01   10   Q.   Just to confirm, there is no error in this document that

11   was pointed on; correct?

12   A.   Correct.

13   Q.   And at the end of the day in 2012, FMG was paid $39.3

14   million in administration fees; correct?

03:01   15   A.   Yes.

16   Q.   And at the same time JP Morgan, the sub-administration --

17   the sub-administrator was paid $3.4 million; right?

18   A.   Yes.

19   Q.   And that difference, those numbers are accurate; correct?

03:01   20   A.   Yes.

21   Q.   Counsel was asking you about the Lipper average index

22   fee, do you remember it was in the 12 or 13 percent range?

23             MR. MURPHY:  Objection, your Honor; there wasn't a

24   Lipper average, it was an ICI reported number.

03:02   25             MR. SWEETSER:  I'm sorry.

*United States District Court*
*Trenton, New Jersey*

Redirect - Pomerantz - Sweetser

1          THE WITNESS:  The ICI report but they cite Lipper as

2     the source.

3     BY MR. SWEETSER:

4     Q.   Regardless, with respect to counsel's questioning, I

03:02  5     understand that it's an asset weighted calculation; correct?

6     A.   Yes.

7     Q.   So, the smaller funds might be more, they may not be more

8     than what was reflected in that average; correct?

9     A.   Well, I mean we know that smaller funds have higher fees

03:02 10    then the average, and larger funds are smaller than the

11    average.

12    Q.   Well, your Honor may not know and I certainly don't

13    necessarily know, but it could be that -- I think counsel's

14    point was, for funds with lower -- with funds with lower

03:02 15    assets under management it could be a higher feet because it's

16    an asset weighted average; correct?

17    A.   Yes.

18    Q.   Let's tell the Court about what -- in the four index

19    funds in this case what the average assets under management

03:03 20    are.  So if you can go to 52-B, which you referred to

21    throughout the case.  For each of the four index funds, will

22    you tell the Court what the average assets under management

23    are in each of those four funds.

24    A.   This is as of 2012 --

03:03 25    Q.   So this is a few years -- a few years ago.

Redirect - Pomerantz - Sweetser

1    A.   Yes.

2    Q.   So for 2012 just if you would just tell the Court the

3    funds and the assets under management in each of those four

4    funds.

03:03    5    A.   Common Stock is 4.8 billion.

6    Q.   And again, that's the Common Stock Index Fund?

7    A.   Yes.

8    Q.   And that's 4.8 billion?

9    A.   Yes.

03:03    10   Q.   Okay.

11   A.   The Core Bond Index Fund is 6.4 billion.

12   Q.   Core Bond Index Fund 6.4; is that correct?

13   A.   Yes.

14   Q.   Okay.

03:04    15   A.   The Equity 500 Index Fund is 3.0 billion.

16   Q.   Three billion.  And the Intermediate Government Bond

17   Index Fund?

18   A.   Is 7.4 billion.

19   Q.   And that was back in 2012.

03:04    20   A.   Yes.

21   Q.   So the plaintiffs' four index funds are all multi-billion

22   dollar index funds; correct?

23   A.   Yes.

24   Q.   Counsel also pointed out to you that the ICI average did

03:04    25   not include variable annuities like variable annuities

*United States District Court*
*Trenton, New Jersey*

Redirect - Pomerantz - Sweetser

1   involved in this case; right?

2   A.   Yes.

3   Q.   And you acknowledged that fact.

4   A.   Yes.

03:04   5   Q.   Is there any difference in the investment management

6   services required to manage a variable annuity mutual fund as

7   opposed to a non-variable annuity mutual fund?

8   A.   No.

9   Q.   It's the exact same thing; right?

03:05   10   A.   Yes.

11   Q.   When counsel was asking about the fees involved in a

12   variable annuity mutual fund, I think at one point he started

13   asking about expense ratios and whether that included all the

14   fees and I think you said it includes all the fees; do you

03:05   15   remember that testimony?

16   A.   Vaguely.

17   Q.   Expense ratios generally include all of the fees that go

18   into what's charged to a mutual fund; is that correct?

19   A.   A total expense ratio includes everything, is three

03:05   20   components, there's investment, administration and

21   distribution.

22   Q.   Okay.  Now, that's not everything with a variable

23   annuity, is it.

24   A.   No.

03:05   25   Q.   Because with variable annuities you're aware there are

*United States District Court*
*Trenton, New Jersey*

Redirect - Pomerantz - Sweetser

1  contract level fees, insurance fees, what's been called as the

2  product wrapper; right?

3  A.  M & E?

4  Q.  I'm sorry?

03:05  5  A.  Typically called M & E.

6  Q.  Well, M & E but there's other ones that have been

7  discussed in the case which I don't want to get into, but I

8  just want to be clear and I want you to be clear with the

9  Court; when we talk about a expense ratio, it's those three

03:05  10  fees that are being referred to, it's not the -- you know, as

11  Mr. Mr. Barrett had testified, it's not the billion dollar in

12  contract level insurance fees that are included in that, it's

13  just the investment management, the investment administration

14  and the distribution fees.  Correct?

03:06  15  A.  Yes.

16  Q.  The contract level insurance fees are a whole another

17  ball game it's a whole another set of fees that FMG charges to

18  the contract holders; right?

19  A.  Yes.

03:06  20  Q.  Counsel was asking you about pricing and compliance and

21  your knowledge of that.  Can I have you look at Plaintiff's 46

22  in evidence.

23     Do you have Plaintiff's 46?  Can I direct your

24  attention to page 8 of this document.  Do you have that

03:07  25  section?

*United States District Court*
*Trenton, New Jersey*

Redirect - Pomerantz - Sweetser

1    A.   Yes.

2    Q.   Do you see the section called Pricing?

3    A.   Yes.

4    Q.   Will you explain to the Court what that document says

03:07   5    about who does the pricing for the plaintiffs' mutual funds

6    and the other funds in the EQAT complex?

7    A.   It says that:  Information should be provided to JP

8    Morgan no later than 4:00 p.m. every day; for securities in

9    which JP Morgan cannot obtain prices from an automated pricing

03:08  10    service, pre-approved by AXA Equitable, the sub-advisor is

11    responsible for arranging the provision of a daily current

12    price from an independent entity; JP Morgan will contact the

13    independent party identified on a daily basis.

14    Q.   Does that comport with your recollection and your

03:08  15    testimony that JP Morgan and/or the sub-advisors provide the

16    pricing information for the vast majority of the securities

17    involved in this case?

18    A.   Yes.

19    Q.   Counsel also was asking about compliance and the basis

03:08  20    for your understanding of that the compliance is delegated to

21    JP Morgan and the sub-advisors; can you please turn to page 10

22    of that very same document.

23    A.   Yes.

24    Q.   Would you please read that and tell the Court what that

03:08  25    document says about whether or not compliance services are

*United States District Court*
*Trenton, New Jersey*

1   delegated by FMG to others.

2   A.   There's a section for daily compliance that states:  That

3   JP Morgan fund administration will monitor holdings and

4   activity; JP Morgan will add an issue to a compliance log when

03:09   5   there are issues; JP Morgan will provide the compliance log to

6   the sub-advisors only when issues exist; a log will not be

7   sent when there are no issues; if JP Morgan detects a

8   violation a memo outlining the problem will be provided to the

9   sub-advisor.

03:09   10   Q.   First of all, that section's entitled Compliance;

11   correct?

12   A.   Yes.

13   Q.   And that section talks about daily, monthly and quarterly

14   compliance obligations by JP Morgan; correct?

03:09   15   A.   Yes.

16          MR. SWEETSER:  Nothing further.

17          THE COURT:  All right.  You may step down, Mr.

18   Pomerantz.  Thank you for coming today.  And yesterday.

19          (Witness excused. )

03:10   20          THE COURT:  Next witness?

21          MR. SWEETSER:  I'm sorry, your Honor, the next

22   witness is plaintiffs' expert Phil Goldstein who we scheduled

23   for Tuesday.

24          THE COURT:  So you're finished for today.

03:10   25          MR. SWEETSER:  Finished for today.

**1**          THE COURT:  All right.  Is there any other

**2**   information that you can could today?

**3**          MR. SWEETSER:  Yeah, I think, your Honor, we can

**4**   probably confirm the exhibits submitted into evidence; we have

03:10   **5**   the issue of the subpoena that we served on both FMG and the

**6**   Milbank firm which perhaps we can address today.

**7**          THE COURT:  All right.  So let's go over exhibits.

**8**   We didn't do yesterday either; right?  Are you ready?

**9**          MR. MURPHY:  Yes, your Honor.

03:11   **10**         THE COURT:  I don't think I went over the exhibits

**11**   yesterday; is that right?  So I'll start with 128 forward.

**12**         Are we already with that, Mr. Korn?  Mr. Murphy?

**13**         MR. MURPHY:  Yes, your Honor.

**14**         THE COURT:  I have 151-A; 151-E; did I say one?

03:12   **15**        MR. SWEETSER:  You were correct, your Honor.

**16**         THE COURT:  I have P-151-E; P-67; P-167; Defendant

**17**   2059.  I'm not sure about that actually.

**18**         MR. SWEETSER:  Your Honor, I didn't move that into

**19**   evidence, that was just for identification.

03:12   **20**        THE COURT:  All right.  Admitted P-151-J; admitted

**21**   P-151-K; admitted Defendant's Exhibits 1886 and 1886.1.

**22**   That's what I have.

**23**         MR. SWEETSER:  Your Honor, the only one I got as

**24**   missing is P-151-I.

03:13   **25**        THE COURT:  I know.  No one asked me to admit it, we

1    went right by it.

2        MR. SWEETSER:  Your Honor, I looked at the

3    transcript about this because there was an issue today, and my

4    understanding from the transcript is that I did request that

03:13   5    it be admitted and that you did admit it.  I can show it to

6    your Honor.

7        THE COURT:  I don't think I admitted it.

8        MR. MURPHY:  I don't think you admitted it.  You

9    said -- you asked me, your Honor, why wouldn't it be within my

03:13   10   discretion to admit it, and I reluctantly admitted it was

11   within your wide discretion, but I don't think you ever

12   admitted it, and we do have quite a number of objections to

13   that exhibit.

14       I would add to that, your Honor, that you recall

03:14   15   that the plaintiffs had -- you had requested -- we had

16   requested and you had ordered the plaintiffs to give us the

17   source documents for that chart.  They told us that the

18   documents Dr. Pomerantz relied on were really from one

19   document in 2008, two documents from 2009 and '10; and then

03:14   20   P-51 through P-54, two of those six documents, your Honor,

21   were -- were July 2014 and July 2015 Board materials that

22   didn't even exist until after Mr. Pomerantz created his

23   report.  They couldn't possibly have been the source data.

24   Mr. Pomerantz said that he used annual reports, none of these

03:14   25   documents are annual reports.  And we've been unable to match

1   up any of the asset data in his work papers to any of the

2   numbers that appear in these various source documents.

3        I would also note that we talked about his analysis

4   starting in 2007; the earliest document they produce is

03:15   5   documents that shows assets for 2008, so we still don't have a

6   source document for the beginning assets.  The document is not

7   reliable at all at this point.  I believe there are several

8   errors with it; it's labeled October 12th, not May 12th which

9   Mr. Pomerantz admitted was the case.  And if it does go back

03:15   10   May 12th, 2012 for five years, I would note that it goes backs

11   to May 2007; the relevant time period here is, you know, mid

12   2010 to 2014 and they're trying to put in these "losses" based

13   on faulty data with no source documentation for the bulk of

14   that period is not even an issue in the case.

03:15   15        MR. SWEETSER:  Your Honor, if I may, what counsel

16   forget to mention is he asked me this after the deposition,

17   and a year or so ago I gave him exactly what I gave him again

18   yesterday.  He's had the information, the documents go back to

19   the time period, the Court can obviously attach whatever

03:16   20   weight the Court wants to attach to it.

21        And your Honor, yesterday after I moved it in and

22   counsel objected and your Honor said, and I've got it right

23   here, it's page 1895 of the record, and you were telling Mr.

24   Murphy:  Let's just stick with the one issue for now Mr.

03:16   25   Murphy and we'll get to the others; so Mr. Murphy, with regard

1  to this chart I understand all of your criticisms of it, but I

2  can admit it into evidence and what weight I give to the chart

3  would be a little different nature.

4          So I interpreted that to mean that you admitted the

5  document.

6          THE COURT:  Well, I clearly have in my notes -- I

7  know I said that to Mr. Murphy, but I clearly have in my notes

8  that I didn't submit it into evidence, because you went on to

9  your next question.  So I just let it go.

10          MR. SWEETSER:  Well, your Honor --

11          THE COURT:  But at any rate, you're making that

12  motion at the present time.

13          MR. SWEETSER:  Correct, your Honor.

14          THE COURT:  So, my view is that I understand all of

15  Mr. Murphy's reasons, and quite frankly the chart itself, just

16  from my review of it, the dollar loss was really a comparison

17  of returns between a couple of different funds or against a

18  couple different benchmarks and a Lipper whatever it is; it's

19  a much different than the caption of it portrays.

20          At any rate -- and as I had indicated to Mr. Murphy,

21  I'll give it whatever weight I believe it really deserves, so

22  I'll admit 151-I.  And the reason I'm doing it, it represents

23  the work of Mr. -- Dr. Pomerantz, which we'll see how the

24  Court assesses that in terms of credibility and things of that

25  nature as we go through our determination.

1          MR. MURPHY:  Thank you, your Honor.

2          (Plaintiff's Exhibit 151-I was marked into

3    evidence.)

4          MR. SWEETSER:  Thank you, your Honor.

03:18    5          THE COURT:  All right.  Any other issues?

6          MR. SWEETSER:  Your Honor, and then the one other

7    order of business was again the Court's handling of the

8    subpoenas that were issued on the Milbank firm and FMG.  Just

9    to refresh the Court's recollection, subpoenas were issued

03:18    10   with respect to the creation of the summary charts that the

11   defendants include in the Board materials.  Ms. Louie at a

12   minimum during her testimony admitted that she still has an

13   e-mail from Mr. Benedict with changes to one of the three

14   charts; one of those changes -- the only one she could recall

03:18    15   as your Honor may recall would be a sentence was we do X, Y,

16   Z, and other things, and Mr. Benedict had suggested that

17   putting in something that embellished that description of the

18   services.  She didn't recall anything else that was in that

19   document.

03:19    20          Because it's a document that the Court has admitted

21   into evidence and because the documents that we are seeking go

22   to the creation of those documents, you know, we would request

23   that the Court at a minimum order the defendant and defense

24   counsel to at least provide to the Court for an in camera

03:19    25   inspection any documents that were exchanged between the

1   parties, any interoffice e-mails between the Milbank firm

2   going into the creation of these summary charts that again,

3   your Honor, are in evidence and were provided to the Board.

4           THE COURT:  Mr. Korn?

03:19   5           MR. KORN:  Your Honor, I just want to clarify one

6   thing; is that -- is that all that plaintiffs are seeking

7   right now, is that document -- those documents?  Are they

8   withdrawing their efforts to -- to call as witnesses Milbank

9   witnesses, and FMG witnesses on this issue?

03:19   10          MR. SWEETSER:  Your Honor, so first of all, it's not

11  one document, I don't know what other documents there are; it

12  would be whatever Milbank exchanged amongst themselves, you

13  know, with respect to input for the creation of the summary

14  charts.  However, we certainly don't want to burden the

03:20   15  Milbank firm by taking any depositions unless we deem it

16  necessary.

17          So again, I think the first thing to do is we'd like

18  to see the documents, or again at a minimum if your Honor's

19  not inclined to do that, have your Honor do an in camera

03:20   20  inspection.  If your Honor believes the plaintiffs are

21  entitled to the documents we'd like to see whatever there is,

22  and we certainly don't want to create anymore work for anyone

23  in this case, and if it's not necessary to take a deposition

24  then we don't do so.  But until we see the documents we can't

03:20   25  make a determination as to whether or not we want to take a

1    deposition.

2         MR. KORN:  Well, your Honor, the subpoenas that were

3    issued asked for more than a deposition, they asked for trial

4    testimony and they asked for documents.  We filed timely

03:20    5    objections to both of those subpoenas.  Frankly after the

6    testimony of both Mr. Joenk and Ms. Louie, I thought this

7    issue would have disappeared, because Mr. Joenk testified

8    explicitly with regard to the provision of the side-by-side

9    charts to the Board at the Board's request; Ms. Louie

03:20    10   testified in detail with regard to the fact that she created

11   the charts, she received some input from Milbank -- and that's

12   frankly a fact that plaintiffs have known about for a long

13   time.  They sent a request for admission, they were well aware

14   that Milbank was involved in reviewing these charts.

03:21    15        These are three documents out of thousands --

16   frankly hundreds of thousands of documents; are we going to

17   have this analysis with regard to every document that was

18   provided to the Board?  Just by the fact that litigation had

19   been filed doesn't mean that plaintiffs are entitled to an

03:21    20   inquiry with every document that Milbank reviewed that

21   eventually went to the Board.  I mean it's frankly to be

22   expected that if litigation has been filed putting an issue --

23   what the Board does that Milbank would be involved in the

24   process, and at least review the materials that it provided to

03:21    25   the Board.

1          This is nothing but a fishing expedition, it's a

2     waste of the Court's time and energy, and frankly we don't

3     believe there's -- it is appropriate in any regard that they

4     should be able to have discovery with respect to the creation

03:22     5     of these documents, because this document is no different than

6     thousands of documents that would have been --

7          THE COURT:  When you say the creation of the

8     document, what document -- can you just give me a reference as

9     to what document you're talking about?

03:22    10          MR. SWEETSER:  Certainly, your Honor.  After this

11     case was initiated, FMG's in-house counsel, with the admitted

12     input of the Milbank firm, including comments, created a

13     side-by-side chart.  It was called -- I'll call that one the

14     management side-by-side chart, because after we amended the

03:22    15     complaint they then created two other similar type documents.

16          It's a chart that has on one side FMG does X, and

17     then on the other side the sub-advisors, you know, do Y.  And

18     obviously in our view it is very self-serving document that

19     plays up what FMG does as opposed to the delegation of the

03:22    20     services to the sub-advisor.

21          A year later we amend the complaint to add our

22     administration claim, shortly thereafter there is an

23     administration chart, side-by-side chart created, again by the

24     in-house legal department.  Now, I heard what Ms. Louie said,

03:23    25     Ms. Louie said that that one, she doesn't recall Mr. Benedict

1   or anyone else in the Milbank firm having any input to.  But

2   that's contrary to requests for admissions that they responded

3   to saying that input and comment was made by the Milbank firm

4   with regard to all three charts.  And when I say three charts,

03:23   5   after they did the administration side-by-side chart they then

6   did another side-by-side chart which included the

7   administration services and the management service on one

8   chart.

9          So these are three separate side-by-side charts that

03:23   10   plaintiffs believe -- plaintiffs believe deliberately

11   understate the services delegated to FM -- to sub-advisors and

12   JP Morgan; that they admit in requests for admission they were

13   involved in the review and comment on.  We heard one comment,

14   the only comment that I know about is -- is exactly what we're

03:24   15   talking about.  I don't know if your Honor recalls Ms. Louie's

16   testimony and I don't recall specifically, but I do recall she

17   said was there was a description that was sent over to the

18   Milbank firm about a level of services, and Mr. Benedict

19   specifically said to add a word in to, you know, embellish and

03:24   20   increase the number of services.

21          And your Honor, given that these charts are provided

22   to the Board, given the involvement here, we're not asking for

23   every single document; I'm not exactly sure what Mr. Korn's

24   argument pertains to.  All we're asking about are documents

03:24   25   relating to the exchange of information between the FMG and

1    the Milbank firm, any internal e-mails by the Milbank firm

2    that go into the creation of these three documents to -- that

3    were given to the Board and we believe were relied on by the

4    Board, experts relied on them.  And again, we believe we're

5    entitled to know what input Milbank had in saying that the

6    services should be more -- you know, should be depicted as

7    being more than what they are.

8            MR. KORN:  Your Honor, the one thing I want to

9    continue to emphasize is that this was a document that was

10   created at the request of the Board.  It was not a document

11   created for the purposes of litigation.  There's nothing

12   unique or different about these side-by-side charts.

13           And I do want to clarify one thing also; with regard

14   to the request for admissions that indicated that Milbank was

15   involved in the creation of all three charts or reviewed all

16   three charts, we have confirmed that we were only asked to

17   comment or did comment only on that one chart.  So to the

18   extent that the request -- the response to the request for

19   admission was inaccurate with regard to the other two charts,

20   that was the case, we were only involved with regard to that

21   one chart.

22           THE COURT:  Was that the management chart?

23           MR. KORN:  That was the management charge.  And we

24   did provide comments and Ms. Louie testified to that fact

25   already.  And frankly --

1          THE COURT:  So that was her conversation with Mr.

2     Benedict I believe it was?

3          MR. SWEETSER:  Your Honor, I believe it was an

4     e-mail communication and she could recall one of -- I don't

03:26     5     remember; I think she said that there were multiple comments

6     that he said, she could remember the one.

7          MR. KORN:  Your Honor, the other point that I would

8     make here are these charts were exchanged in discovery, they

9     were exchanged prior to the depositions of the independent

03:26     10    trustees, questions could have been asked with regard to this.

11    This is -- you know, they tried to do this with regard to JP

12    Morgan earlier in the case, they're trying again to do with

13    regard to Milbank and FMG with regard to these documents.

14         THE COURT:  So if they were disclosed to the Board

03:26     15    and to others, what's the problem with the document itself?

16    Are they e-mails?  I don't understand the nature of it.

17         MR. KORN:  My understanding of what Mr. Sweetser is

18    looking for is that consistent with Ms. Louie's testimony

19    where she said that she had sent the side-by-side chart for

03:26     20    Mr. Benedict's review --

21         THE COURT:  We went through that.

22         MR. KORN:  Right.  What they're looking for is Mr.

23    Benedict's response with his suggested revisions to the chart;

24    that's what they're looking for which we believe that they're

03:27     25    not entitled to.

*United States District Court*
*Trenton, New Jersey*

         1              THE COURT:  All right.  And why don't you think

         2    they're entitled to that?

         3              MR. KORN:  Your Honor, they're not entitled to it

         4    because number one, it's something that could have been asked

03:27    5    for during the course of discovery; discovery is over.  This

         6    is a discovery request, that's all it is.

         7              THE COURT:  Oh, I see.

         8              MR. KORN:  And there's nothing here that frankly is

         9    relevant to the issues in this case.  As I said at the

03:27   10    beginning of my argument, you know, if we start going down the

        11    path that they're entitled to look at the creation of every

        12    document that was presented to the Board, then we're never

        13    going to end this case.

        14              MR. SWEETSER:  Your Honor --

03:27   15              THE COURT:  Don't threaten that.

        16              (Laughter.)

        17              MR. SWEETSER:  Your Honor, as I understand counsel's

        18    comments to the Board, we're talking about one document.  So I

        19    don't know what's being suggested about this taking up too

03:28   20    much of the Court's time or this being an never ending fishing

        21    expedition.  We're talking about one document, if Mr. Korn's

        22    comments are correct; number one.

        23              Number two, this goes to the heart of the matter; it

        24    goes to the misinformation that's provided to the Board of

03:28   25    Directors by the defendants in this case.  It goes to

1  counsel's suggestion that embellishing comments are included

2  in a description of their services.  We believe that the

3  evidence is going to show at the end of the day that again,

4  the vast majority of the substantive investment management and

03:28    5  administration services are delegated to others.

6        Your Honor's already heard plenty of evidence about

7  the disproportionate fees that they receive, and this is just

8  part of it.  You know, lawyers, what do you think about this;

9  oh, you know what, let's put in some good stuff here and

03:28   10  there.  I believe Ms. Louie's testimony was also -- I know

11  with regard to the one comment that I could recall that she

12  could recall that was included in the charts.

13        So these aren't comments that were not incorporated

14  into the charts, they were incorporated into the charts, and

03:28   15  we are entitled to know how these charts that are given to the

16  Board were created.  There's no citations in these charts,

17  none whatsoever, they're given to the Board, and again, you're

18  going to hear experts come in and testify -- that's how we

19  found out; we didn't even know during fact discovery, nor did

03:29   20  we have any reason to suspect that the Milbank firm is

21  consulted on telling FMG what it does, and consulting FMG on

22  what it should tell the Board about what it does.  We had no

23  reason to suspect that.

24        The second we found out we didn't want to jump to

03:29   25  any conclusions after the expert revealed that fact; we did a

1  request for admissions which we believe was the proper

2  procedure to follow; they admitted, we then made a request to

3  the Court to get that information; the request was denied as

4  being after discovery and we subpoenaed for here -- and as you

03:29    5  know, Judge Arpert did allow us to issue those subpoenas and

6  that's the subpoena that is before the Court right now.

7          MR. KORN:  Your Honor, I would also emphasize that

8  we have briefed this issue in the past, and these are

9  communications that are subject to the attorney/client

03:29   10  privilege.  You know, I don't want to create this -- you know,

11  something into a federal case here more than it already is.

12  And there is a willing to our part with regard to making sure

13  we don't waive the attorney/client privilege to produce the

14  communications that Ms. Louie talked about to Mr. Sweetser,

03:30   15  limited to those communications.

16          With the understanding, your Honor, that that's the

17  end of the inquiry.  I mean there is no basis here to, you

18  know, call as a trial witness, you know, Mr. Benedict or

19  anybody from the Milbank firm or anything arising out of that.

03:30   20  But with regard to that limited waiver of the attorney/client

21  privilege we are willing to, you know, end this issue and

22  produce those limited documents.

23          THE COURT:  So, I don't know what question you want

24  me to answer now.

03:30   25          MR. KORN:  Well, I think that -- I would think that

1  would resolve the issue, is that, you know, Mr. Sweetser wants

2  the documents that Ms. Louie testified to, we are willing to

3  provide those subject to, you know, making sure that the

4  attorney/client privilege would not be waived in that

03:30    5  instance.

6        THE COURT:  Oh, I see.  So with regard to if you

7  request Mr. Benedict to testify?

8        MR. KORN:  Well, right.  And frankly, you know,

9  there's a lot of case law out there, I don't need to go into

03:31    10  it right now, that information that you can get through fact

11  witnesses, you know, and you don't have to get to a law firm

12  that's the way you should go.  And so there's no reason why

13  Ms. Louie's testimony is not sufficient to educate plaintiff

14  on this issue.

03:31    15        THE COURT:  To me it seems that there's been more

16  than sufficient discovery, there's a ton of documents.  And I

17  actually kind of agreed with your point, Mr. Korn, that this

18  is, you know, an 11th hour discovery request by subpoena.  I

19  don't see why we would go through that.  And I don't see

03:31    20  where having any attorneys from Milbank testify would clear up

21  any of the issues that are before the Court.  So, my view is

22  if you wish to disclose the details of that one document or

23  two documents, whatever it is, from Milbank, and preserve your

24  right on lawyer/client privilege issues, I can understand

03:32    25  that.  So, Mr. Sweetser would have to come in with a

1   significant application for me to change that up.  So, if

2   that's a little bit of direction for you --

3         MR. KORN:  That's fine, your Honor, we'll proceed in

4   that direction, and we'll be able to get that to Mr. Sweetser

03:32    5   over the weekend.

6         THE COURT:  All right.  Thank you.

7         All right.  So have a good weekend.

8         (Counsel say thank you.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [2] - 2011:18, 2011:19
**$18** [1] - 2033:16
**$49** [1] - 2031:13
**$50** [1] - 2020:18
**$864,000** [1] - 1978:8

## '

**'10** [1] - 2057:19

## /

**/S** [1] - 1952:24

## 0

**08608** [1] - 1952:15

## 1

**1** [5] - 2019:19, 2020:3, 2020:5, 2020:7, 2020:8
**1.06** [3] - 1977:3, 1977:17, 1977:25
**1.2** [2] - 2015:9, 2015:12
**1.3** [4] - 2015:11, 2015:12, 2016:9, 2034:9
**1.4** [3] - 2009:2, 2009:11, 2020:9
**1.41** [1] - 2024:17
**1.9** [1] - 2034:9
**10** [13] - 1975:1, 1975:2, 2020:4, 2021:12, 2021:14, 2021:22, 2023:3, 2023:5, 2023:6, 2024:7, 2033:22, 2054:21
**100** [1] - 2024:21
**1000** [4] - 2005:17, 2005:18, 2005:23, 2007:9
**107** [1] - 2036:20
**10:30** [1] - 1955:16
**10th** [2] - 1955:6, 2023:2
**11** [4] - 2017:4, 2017:11, 2018:3, 2022:14
**11-4194** [1] - 1952:5

**116,000** [2] - 2030:18, 2031:2
**11th** [2] - 1955:6, 2070:18
**12** [15] - 1952:20, 1960:16, 1991:8, 2017:2, 2017:3, 2017:4, 2017:10, 2018:2, 2018:3, 2018:7, 2022:14, 2032:25, 2049:22
**12(b)(1** [2] - 2023:12, 2025:2
**12(b)(1)s** [1] - 2025:20
**124.6** [1] - 1984:2
**128** [1] - 2056:11
**12:00** [2] - 1955:4, 1955:17
**12th** [3] - 2058:8, 2058:10
**13** [8] - 1992:21, 1998:23, 2017:2, 2017:3, 2017:4, 2018:3, 2018:7, 2049:22
**13-312** [1] - 1952:10
**133** [1] - 2023:17
**14.261** [1] - 2028:14
**140** [2] - 1988:4, 1988:20
**141** [1] - 2024:17
**147.2** [1] - 1981:4
**151** [1] - 2027:10
**151-A** [5] - 1983:18, 1983:25, 2027:5, 2027:7, 2056:14
**151-E** [4] - 2048:18, 2048:21, 2048:25, 2056:14
**151-I** [4] - 1954:13, 2012:18, 2059:22, 2060:2
**151-J** [10] - 1954:10, 1968:20, 1971:12, 1971:14, 1971:15, 1975:4, 1978:20, 1981:19, 1982:8, 2048:12
**151-K** [4] - 1954:11, 1982:9, 1984:17, 2033:7
**151-L** [1] - 1960:23
**152-E** [3] - 2032:2, 2032:4, 2032:5
**16** [1] - 2028:11
**16.6** [1] - 2028:14
**162** [1] - 1994:4
**164** [1] - 1971:10
**17** [2] - 2003:5, 2003:7
**172** [1] - 1996:3

**18** [1] - 2033:16
**180** [1] - 1996:4
**186** [1] - 1998:23
**1886** [7] - 1954:12, 2010:9, 2010:20, 2010:24, 2011:3, 2011:6, 2056:21
**1886.1** [6] - 1954:12, 2010:10, 2010:20, 2010:25, 2011:3, 2056:21
**1894.1** [2] - 2040:20, 2040:23
**1895** [1] - 2058:23
**18th** [1] - 1955:6
**194** [1] - 1991:8
**1955** [1] - 1954:2
**1956** [1] - 1954:3
**197-A** [2] - 1959:16, 1962:7
**1981** [1] - 1954:10
**1984** [1] - 1954:11
**1985** [1] - 1954:4
**19th** [1] - 1955:7

## 2

**2** [5] - 1996:4, 2009:9, 2019:19, 2020:3, 2020:17
**2,500** [1] - 2024:4
**2,500th** [1] - 2023:20
**2,501** [1] - 2024:4
**2.5** [5] - 2013:5, 2013:6, 2013:8, 2014:10, 2014:16
**2.6** [1] - 2009:11
**20** [1] - 2038:1
**2000** [1] - 1957:23
**2005** [1] - 1958:21
**2005/2006** [1] - 1964:4
**2006** [2] - 1958:21, 1960:4
**2007** [15] - 2011:14, 2012:8, 2012:18, 2013:3, 2013:9, 2014:8, 2014:10, 2014:17, 2015:11, 2016:10, 2035:3, 2035:12, 2035:13, 2058:4, 2058:11
**2008** [2] - 2057:19, 2058:5
**2009** [1] - 2057:19
**2010** [4] - 1969:1, 1982:5, 2013:17, 2058:12
**2011** [2] - 1954:12, 1982:6

**2012** [18] - 1957:23, 1969:2, 1970:11, 1970:16, 1979:13, 1981:3, 1982:6, 1983:13, 1984:7, 2011:14, 2012:4, 2031:18, 2049:13, 2050:24, 2051:2, 2051:19, 2058:10
**2013** [3] - 2017:16, 2017:19, 2018:6
**2014** [2] - 2057:21, 2058:12
**2015** [2] - 2044:20, 2057:21
**2016** [1] - 1952:13
**203** [2] - 2030:14, 2030:17
**2048** [1] - 1954:5
**2059** [1] - 2056:17
**2060** [1] - 1954:13
**21** [3] - 1977:11, 1978:11, 1978:19
**216** [1] - 1992:21
**22.1** [3] - 1977:2, 1977:12, 1977:24
**22nd** [1] - 1955:7
**23** [1] - 2028:14
**2390** [1] - 2028:12
**23rd** [1] - 1955:7
**25** [1] - 2009:7
**251** [1] - 2002:11
**28** [1] - 1952:23
**29** [1] - 1952:13
**2:00** [1] - 2004:12
**2nd** [1] - 1955:15

## 3

**3** [6] - 1975:2, 2019:20, 2020:3, 2020:17, 2030:22
**3,500** [2] - 1994:22, 1994:25
**3.0** [1] - 2051:15
**3.1** [1] - 2030:23
**3.4** [1] - 2049:17
**3.59** [1] - 2007:11
**30** [1] - 2044:20
**31** [2] - 2015:11
**33** [1] - 2036:19
**35** [1] - 2047:9
**36(b** [2] - 1985:14, 1985:17
**37** [1] - 2047:9
**39** [25] - 1969:3, 1969:6, 1969:11, 1970:17, 1971:3, 1971:16, 1971:19,

**1972:2, 1975:10, 1975:12, 1975:16, 1976:16, 1978:13, 1978:15, 1978:23, 1979:23, 1980:18, 1981:6, 1982:9, 1982:11, 2031:10, 2031:19, 2031:21, 2048:13
**39.3** [1] - 2049:13

## 4

**4** [1] - 2020:3
**4.478** [5] - 2032:8, 2032:10, 2032:12, 2032:14, 2032:18
**4.8** [3] - 2031:22, 2051:5, 2051:8
**4.85** [1] - 2032:16
**40** [2] - 1970:18, 2000:16
**400,000** [1] - 2032:19
**402** [1] - 1952:14
**4211** [2] - 1976:18, 1976:21
**441** [1] - 1970:2
**46** [2] - 2053:21, 2053:23
**467.1** [1] - 2013:13
**48** [2] - 2017:8, 2025:11
**4:00** [1] - 2054:8
**4th** [2] - 1955:4, 1955:17

## 5

**5** [2] - 1994:4, 2047:3
**5,000** [4] - 2023:20, 2024:14, 2024:15
**5,001** [1] - 2024:3
**50** [7] - 1976:2, 1982:11, 1995:20, 2033:15, 2033:17, 2034:8, 2047:8
**500** [2] - 2013:18, 2051:15
**52** [1] - 2030:17
**52-B** [5] - 1974:13, 1974:16, 1976:11, 2030:14, 2050:20
**5286** [1] - 2014:5
**53** [1] - 2034:4
**54** [1] - 1994:3
**55** [3] - 2034:8, 2034:10
**551** [1] - 2008:20
**564** [1] - 2015:6

**58** [1] - 1998:22
**584** [1] - 2015:6
**591** [1] - 2009:3
**5th** [3] - 1955:4,
1955:5, 1955:17

---

**6**

**6** [2] - 2028:18,
2028:24
**6.4** [2] - 2051:11,
2051:12
**60** [3] - 1982:11,
2033:19, 2034:9
**61** [1] - 1991:7
**62.3** [2] - 1984:4,
1984:6
**66** [1] - 2042:20
**67** [1] - 1992:20

---

**7**

**7** [3] - 1975:2, 2020:4,
2030:2
**7.4** [1] - 2051:18
**70** [4] - 1975:2,
1982:11, 2033:19,
2034:1
**700** [1] - 2014:14
**705** [2] - 2014:15,
2015:5
**705.347** [1] - 2014:14
**728,000** [1] - 2030:2
**75** [5] - 2044:3,
2045:12, 2045:16,
2047:7, 2047:19
**753** [1] - 1952:23
**77** [4] - 2023:2,
2023:4, 2023:7,
2023:10
**79** [5] - 2017:25,
2018:2, 2018:7,
2020:23, 2025:23

---

**8**

**8** [2] - 2020:4, 2053:24
**80** [6] - 1982:11,
1984:10, 2020:8,
2021:24, 2033:20,
2034:1
**800,000** [2] - 1960:5,
2009:5
**801(d)(1)(A** [1] -
2001:25
**801(d)(1)(A)** [1] -
1988:18
**81** [2] - 2001:6,

**2002:11
**856** [1] - 1952:25
**889-4761** [1] - 1952:25
**8th** [1] - 1955:6

---

**9**

**9** [1] - 1988:21
**90** [6] - 1982:12,
1985:11, 2033:21,
2034:1, 2034:4,
2034:21
**9079** [1] - 1970:3
**90th** [1] - 2024:6
**95** [1] - 2034:21
**97** [1] - 2041:2
**99** [1] - 2020:6
**9th** [1] - 1955:6

---

**A**

**A-i-j-e-d** [1] - 2035:10
**able** [4] - 2009:1,
2042:25, 2063:4,
2071:4
**absolutely** [3] -
1962:23, 1967:9,
1993:2
**accept** [2] - 1961:17,
2015:10
**accidently** [1] - 2033:5
**account** [7] - 1959:25,
1961:4, 1961:25,
1962:14, 1962:23,
1963:25, 2030:18
**accountant** [3] -
1972:8, 1973:4,
1973:25
**accountants** [1] -
1973:8
**accounting** [6] -
1971:24, 1972:5,
1972:6, 1973:7,
2029:5
**accurate** [3] -
1987:11, 1990:10,
2049:19
**acknowledge** [2] -
1967:17, 2048:12
**acknowledged** [1] -
2052:3
**acting** [2] - 1985:11,
1987:13
**actively** [2] - 2019:5,
2022:22
**activity** [1] - 2055:4
**actual** [5] - 1975:13,
1978:13, 1978:19,
1996:14, 2025:3

**add** [6] - 1955:8,
2024:15, 2055:4,
2057:14, 2063:21,
2064:19
**addition** [1] - 1966:23
**address** [3] - 1961:20,
1972:23, 2056:6
**adjusted** [1] - 2006:1
**adjustment** [2] -
2005:25, 2030:12
**adjustments** [4] -
1971:23, 1971:24,
2029:17, 2029:20
**admin** [3] - 2025:25,
2031:18, 2032:4
**administration** [17] -
1979:3, 1980:18,
1981:7, 1983:5,
2028:4, 2048:25,
2049:1, 2049:14,
2049:16, 2052:20,
2053:13, 2055:3,
2063:22, 2063:23,
2064:5, 2064:7,
2068:5
**administrative** [10] -
1980:4, 1980:19,
1993:24, 2025:3,
2025:19, 2028:2,
2028:3, 2031:17,
2048:14, 2048:15
**administrator** [7] -
1980:5, 1980:6,
1994:17, 1996:2,
2000:22, 2032:11,
2049:17
**administrator/sub** [1]
- 1994:10
**admission** [3] -
2062:13, 2064:12,
2065:19
**admissions** [3] -
2064:2, 2065:14,
2069:1
**admit** [6] - 2056:25,
2057:5, 2057:10,
2059:2, 2059:22,
2064:12
**admitted** [16] -
1981:18, 1984:15,
2011:2, 2056:20,
2056:21, 2057:5,
2057:7, 2057:8,
2057:10, 2057:12,
2058:9, 2059:4,
2060:12, 2060:20,
2063:11, 2069:2
**Admitted** [1] - 2056:20
**advisor** [24] - 1975:21,
1976:4, 1976:5,

**1977:22, 1980:21,
1985:17, 1987:5,
1994:10, 1994:17,
1997:4, 1997:6,
1999:18, 2037:14,
2043:12, 2043:13,
2045:8, 2045:21,
2046:1, 2046:2,
2046:7, 2046:19,
2054:10, 2055:9,
2063:20
**advisors** [32] -
1973:20, 1974:2,
1975:25, 1987:21,
1989:11, 1989:14,
1990:17, 1990:24,
1993:13, 2035:17,
2035:21, 2035:24,
2036:1, 2036:8,
2036:11, 2037:5,
2037:11, 2037:17,
2037:19, 2037:22,
2038:8, 2042:12,
2045:4, 2046:23,
2054:15, 2054:21,
2055:6, 2063:17,
2064:11
**advisory** [18] -
1971:21, 1971:23,
1975:17, 1977:17,
1977:25, 1979:7,
1979:8, 2025:4,
2027:22, 2027:25,
2028:12, 2028:20,
2029:4, 2029:23,
2030:8, 2030:21,
2031:11, 2033:13
**affiliated** [1] - 2043:13
**afield** [1] - 2000:6
**afternoon** [3] -
1955:1, 1955:10,
1985:8
**Ageis** [1] - 2035:7
**aggregate** [2] -
1969:8, 1969:20
**ago** [6] - 2007:22,
2044:21, 2044:22,
2044:24, 2050:25,
2058:17
**agree** [5] - 1992:1,
2003:23, 2013:23,
2019:9, 2041:23
**agreed** [1] - 2070:17
**ahead** [2] - 1958:11,
2044:14
**Aijed** [1] - 2035:8
**al** [3] - 1952:3, 1952:6,
1952:8
**Alliance** [16] - 2043:8,
2043:11, 2045:19,

**2045:21, 2045:24,
2045:25, 2046:11,
2046:12, 2046:17,
2046:18, 2046:19,
2047:8, 2047:10,
2048:2, 2048:4
**allocate** [1] - 1962:16
**allocated** [3] -
1960:13, 2031:14,
2033:13
**allocates** [1] - 1956:13
**allocating** [4] -
1956:6, 1956:22,
1956:25, 1968:4
**allocation** [7] -
1956:5, 1956:20,
1962:17, 1964:17,
1967:25, 1998:15,
2036:6
**Allow** [1] - 1964:11
**allow** [8] - 1957:8,
1961:5, 1965:5,
1974:4, 2031:19,
2031:24, 2033:10,
2069:5
**allowed** [3] - 1973:18,
2001:11, 2002:3
**almost** [5] - 2006:7,
2006:16, 2020:4,
2029:21, 2042:22
**ALSO** [1] - 1953:15
**altered** [2] - 2025:2,
2025:3
**alternative** [1] -
2007:16
**ambiguous** [1] -
2019:7
**amend** [1] - 2063:21
**amended** [1] -
2063:14
**American** [2] - 1986:1,
2027:2
**amount** [10] - 1973:15,
1978:22, 1981:8,
1984:1, 2012:20,
2015:14, 2027:22,
2028:16, 2029:1,
2032:4
**analysis** [20] - 1958:3,
1958:21, 1960:24,
1968:21, 1996:20,
2011:13, 2011:17,
2012:3, 2012:18,
2012:24, 2014:10,
2016:19, 2020:21,
2025:1, 2026:14,
2030:20, 2033:9,
2058:3, 2062:17
**analyze** [1] - 1968:5
**ancillary** [2] - 1989:2,

1989:4

**ANN** [1] - 1952:3
**annual** [7] - 1993:11, 1995:2, 2011:17, 2011:22, 2013:24, 2057:24, 2057:25
**annuities** [5] - 2018:17, 2018:22, 2051:25, 2052:25
**annuity** [4] - 2052:6, 2052:7, 2052:12, 2052:23
**answer** [18] - 1988:2, 1990:1, 1990:21, 1993:19, 1994:13, 2000:14, 2002:2, 2002:6, 2002:20, 2012:2, 2014:21, 2015:22, 2039:17, 2041:13, 2044:13, 2044:15, 2069:24
**Answer** [2] - 1989:24, 1996:10
**answered** [2] - 1999:22, 2001:13
**answering** [2] - 2012:6, 2044:12
**answers** [3] - 1989:20, 1990:6, 1991:19
**APGAX** [2] - 2043:8, 2043:18
**apologize** [2] - 2010:12, 2044:14
**appear** [4] - 2010:16, 2013:16, 2032:21, 2058:2
**appeared** [1] - 2043:18
**apples** [4] - 2037:1, 2038:11, 2044:6, 2044:7
**applicable** [1] - 1983:2
**application** [6] - 1957:7, 1964:21, 1965:13, 1968:17, 1975:9, 2071:1
**applied** [4] - 1978:23, 1979:23, 1981:6, 1981:11
**applies** [1] - 1970:22
**apply** [4] - 1970:21, 1979:12, 1982:17, 1983:9
**applying** [1] - 1978:23
**appreciate** [2] - 2044:13, 2044:16
**appropriate** [6] - 1973:23, 1982:22, 2005:22, 2025:6,

2026:4, 2063:3
**approved** [1] - 2054:10
**arbitrate** [1] - 1999:6
**area** [1] - 1968:17
**argue** [4] - 2048:1
**argument** [2] - 2064:24, 2067:10
**arises** [3] - 1995:8, 1995:10
**arising** [1] - 2069:19
**ARNOLD** [1] - 1953:4
**Arpert** [1] - 2069:5
**arranging** [1] - 2054:11
**art** [1] - 1996:17
**article** [1] - 2004:3
**articles** [1] - 1972:6
**artificially** [2] - 1976:6, 1980:15
**Artisan** [1] - 1986:11
**aside** [1] - 1967:13
**aspect** [2] - 1979:5, 2026:17
**assesses** [1] - 2059:24
**asset** [15] - 2014:16, 2015:18, 2018:15, 2019:2, 2019:8, 2019:10, 2019:22, 2020:5, 2020:12, 2020:15, 2024:10, 2050:5, 2050:16, 2058:1
**Asset** [3] - 2034:22, 2035:2, 2035:4
**assets** [34] - 2011:14, 2012:5, 2012:7, 2012:9, 2012:19, 2013:1, 2013:3, 2013:8, 2014:9, 2014:13, 2014:18, 2015:2, 2015:4, 2015:8, 2015:10, 2015:15, 2016:8, 2016:16, 2016:19, 2016:20, 2019:25, 2020:2, 2020:6, 2020:8, 2021:16, 2021:19, 2035:22, 2050:15, 2050:19, 2050:22, 2051:3, 2058:5, 2058:6
**assigned** [1] - 1975:16
**assimilate** [1] - 1960:1
**assist** [1] - 1962:11
**assistance** [2] - 1958:3, 1968:6
**ASSOCIATE** [1] -

1953:15
**associated** [1] - 1976:2
**Associates** [2] - 1985:22, 2035:16
**assume** [4] - 2015:19, 2019:16, 2019:17, 2028:24
**assumed** [1] - 2013:8
**assuming** [2] - 1982:8, 2018:7
**assumption** [2] - 2013:4, 2013:10
**ATM** [1] - 1992:6
**attach** [2] - 2058:19, 2058:20
**attached** [2] - 1960:25, 1962:1
**attention** [4] - 1970:2, 2020:15, 2020:16, 2053:24
**attorney/client** [4] - 2069:9, 2069:13, 2069:20, 2070:4
**attorneys** [1] - 2070:20
**attributable** [2] - 1959:11, 1976:17
**attributed** [1] - 1964:16
**augment** [1] - 1965:10
**author** [1] - 2040:13
**authoritative** [3] - 2026:16, 2026:20, 2026:21
**automated** [1] - 2054:9
**available** [4] - 1964:8, 1969:9, 1970:23, 2018:16
**average** [28] - 1969:12, 1970:16, 2016:15, 2016:20, 2016:24, 2017:13, 2019:1, 2019:2, 2019:5, 2019:8, 2019:10, 2019:11, 2019:12, 2019:22, 2020:5, 2020:15, 2024:11, 2024:13, 2024:20, 2049:21, 2049:24, 2050:8, 2050:10, 2050:11, 2050:16, 2050:19, 2050:22, 2051:24
**averages** [1] - 2018:16
**avoid** [1] - 1961:10
**award** [1] - 1983:1
**aware** [6] - 1989:5, 2003:17, 2016:17, 2023:7, 2024:17,

2026:8, 2052:25, 2062:13
**AXA** [30] - 1952:6, 1952:10, 1953:16, 1988:20, 1991:7, 1992:20, 1993:13, 1994:3, 1995:4, 1995:6, 1995:16, 1996:3, 1996:10, 1996:16, 1996:22, 1996:25, 1997:3, 1997:5, 1997:9, 1998:14, 1998:22, 2001:6, 2002:11, 2003:6, 2028:24, 2031:13, 2036:19, 2054:10
**AXA's** [3] - 1996:12, 1997:10, 2033:13

---

# B

**backs** [1] - 2058:10
**backup** [1] - 2010:21
**backwards** [1] - 2011:14
**ball** [1] - 2053:17
**Barrett** [14] - 1956:6, 1957:22, 1958:9, 1958:14, 1960:15, 1961:3, 1964:23, 1965:5, 1965:10, 1966:9, 1968:1, 1972:9, 1973:9, 2053:11
**Barrett's** [7] - 1959:24, 1962:7, 1962:16, 1963:6, 1964:2, 1964:15, 1972:3
**base** [1] - 2036:13
**based** [19] - 1964:17, 1965:10, 1967:21, 1969:3, 1971:16, 1973:1, 1973:14, 1973:19, 1974:1, 1974:10, 1974:20, 1975:16, 1993:11, 2012:22, 2016:19, 2029:17, 2029:20, 2044:23, 2058:12
**basic** [1] - 1975:3
**basis** [27] - 1964:8, 1971:2, 1972:7, 2017:2, 2017:10, 2017:11, 2019:18, 2019:19, 2019:20, 2020:4, 2021:12, 2021:14, 2021:22, 2022:14, 2023:4, 2023:7, 2024:17,

2038:5, 2045:13, 2045:16, 2047:7, 2047:8, 2054:13, 2054:19, 2069:17
**Bates** [4] - 1970:3, 1976:18, 1976:21, 2014:4
**bear** [1] - 2042:23
**befuddles** [1] - 1996:1
**beginning** [3] - 2012:8, 2058:6, 2067:10
**behind** [2] - 2018:24, 2031:5
**belabor** [1] - 2027:19
**believes** [2] - 1958:21, 2061:20
**belong** [1] - 1980:13
**below** [7] - 2018:10, 2019:4, 2020:24, 2021:12, 2023:4, 2023:19, 2043:4
**benchmark** [41] - 2005:3, 2005:6, 2005:8, 2005:9, 2005:10, 2005:13, 2006:2, 2006:3, 2006:5, 2006:6, 2006:8, 2006:10, 2006:11, 2006:13, 2006:16, 2006:17, 2006:20, 2006:22, 2006:24, 2007:1, 2007:8, 2007:14, 2007:20, 2008:1, 2008:2, 2008:4, 2008:6, 2008:11, 2008:25, 2009:1, 2009:8, 2009:13, 2009:15, 2009:16, 2009:20, 2009:24, 2010:1, 2011:13, 2011:20
**benchmarks** [7] - 2005:20, 2005:22, 2006:4, 2010:2, 2010:4, 2010:5, 2059:18
**BENEDICT** [1] - 1953:13
**Benedict** [8] - 1955:7, 2060:13, 2060:16, 2063:25, 2064:18, 2066:2, 2069:18, 2070:7
**Benedict's** [2] - 2066:20, 2066:23
**benefit** [23] - 1956:14, 1958:23, 1959:3, 1959:6, 1959:9,

1959:10, 1960:24, 1960:25, 1961:8, 1961:14, 1962:1, 1962:4, 1963:20, 1963:21, 1963:23, 1964:25, 1965:12, 1966:15, 1966:16, 1968:10, 1968:11, 1968:13

**benefited** [1] - 1963:13

**benefits** [42] - 1956:5, 1956:19, 1957:6, 1957:9, 1957:11, 1957:23, 1958:5, 1958:7, 1958:15, 1958:17, 1958:18, 1958:19, 1959:1, 1959:7, 1960:12, 1961:15, 1961:18, 1961:21, 1962:15, 1962:20, 1962:22, 1962:25, 1963:16, 1963:17, 1964:1, 1965:4, 1965:7, 1965:22, 1966:4, 1966:8, 1966:14, 1966:19, 1967:9, 1967:10, 1967:17, 1967:18, 1967:19, 1967:21, 1968:2, 1968:6, 1968:15

**Bennett** [1] - 2040:15

**Berkley** [1] - 1972:18

**Bernstein** [14] - 2043:8, 2045:19, 2045:21, 2045:24, 2045:25, 2046:12, 2046:17, 2046:19, 2047:8, 2047:10, 2048:2, 2048:4

**Bernstein's** [2] - 2043:11, 2045:22

**best** [3] - 1955:13, 1995:24, 2010:14

**better** [5] - 2006:14, 2007:20, 2007:23, 2046:24, 2047:25

**between** [14] - 1974:21, 1993:13, 1999:6, 2005:5, 2011:24, 2030:7, 2045:19, 2045:21, 2046:17, 2046:18, 2059:17, 2060:25, 2061:1, 2064:25

**beyond** [3] - 1961:1, 1967:7, 2016:21

**big** [4] - 1958:8, 2020:16, 2021:19,

**biggest** [1] - 1968:2

**billion** [23] - 1960:6, 1961:2, 1963:7, 1967:10, 2009:2, 2009:9, 2009:11, 2013:6, 2013:7, 2013:8, 2014:11, 2014:16, 2015:9, 2016:9, 2051:5, 2051:8, 2051:11, 2051:15, 2051:16, 2051:18, 2051:21, 2053:11

**bio** [1] - 1997:14

**bit** [7] - 1977:19, 2031:25, 2032:17, 2033:19, 2033:20, 2071:2

**black** [2] - 2002:2, 2002:6

**BLADER** [1] - 1953:3

**blank** [2] - 2001:17

**BLANK** [1] - 1953:8

**blew** [1] - 2010:13

**blow** [5] - 2008:15, 2011:9, 2017:9, 2018:13, 2021:24

**BLUMSTEIN** [1] - 1953:3

**Board** [37] - 1960:2, 1961:24, 1962:5, 1966:5, 1966:25, 1987:13, 1987:17, 1988:25, 1989:6, 2012:23, 2026:8, 2045:7, 2046:1, 2046:6, 2046:11, 2046:17, 2048:3, 2057:21, 2060:11, 2061:3, 2062:9, 2062:18, 2062:21, 2062:23, 2062:25, 2064:22, 2065:3, 2065:4, 2065:10, 2066:14, 2067:12, 2067:18, 2067:24, 2068:16, 2068:17, 2068:22

**board** [4] - 1966:3, 2045:22, 2045:25, 2046:19

**Board's** [1] - 2062:9

**boards** [1] - 2026:13

**bold** [1] - 2013:5

**bolded** [7] - 1970:14, 1977:7, 1977:20, 1979:16, 1979:18, 1979:20, 1981:3

**Bond** [11] - 1976:15,

1976:22, 1978:7, 1994:20, 1994:22, 2011:10, 2014:5, 2030:1, 2051:11, 2051:12, 2051:16

**bond** [5] - 2016:25, 2017:3, 2017:11, 2018:10, 2019:5

**bonds** [1] - 1994:15

**Book** [3] - 2017:15, 2017:19, 2018:6

**bottom** [10] - 1970:11, 1979:16, 1979:18, 1980:1, 1980:3, 1981:2, 1982:24, 1983:25, 2031:16, 2044:1

**box** [1] - 2047:4

**boxes** [2] - 2029:25, 2044:1

**break** [9] - 1960:9, 1984:24, 1985:3, 1985:5, 2004:11, 2015:5, 2034:1, 2047:9

**break-even** [1] - 2034:1

**breakdown** [1] - 1960:16

**breakpoint** [1] - 2047:10

**breakpoints** [1] - 2021:6

**briefed** [1] - 2069:8

**broad** [1] - 2003:17

**build** [1] - 1995:25

**building** [1] - 1959:11

**bulk** [2] - 1987:4, 2058:13

**bunch** [4] - 1988:16, 2022:4, 2022:17, 2022:23

**burden** [5] - 1966:20, 1967:1, 1967:14, 1968:9, 2061:14

**business** [16] - 1969:23, 1975:20, 1975:24, 1976:4, 1980:14, 1980:15, 1990:12, 1990:25, 1991:15, 1994:18, 2003:1, 2038:9, 2045:24, 2046:2, 2060:7

**businesses** [2] - 1969:21, 2046:4

**buy** [6] - 2038:25, 2039:7, 2040:7, 2042:7, 2046:13, 2046:15

**BY** [42] - 1953:4, 1953:9, 1953:12, 1954:3, 1954:4, 1954:5, 1956:2, 1957:17, 1968:19, 1974:6, 1974:19, 1981:21, 1983:23, 1985:7, 1989:19, 1990:5, 1990:22, 1991:18, 1993:18, 1994:12, 1997:8, 2000:19, 2002:18, 2004:21, 2008:18, 2010:15, 2011:5, 2012:16, 2014:25, 2016:2, 2017:22, 2022:16, 2027:14, 2032:7, 2037:12, 2040:5, 2040:24, 2042:3, 2045:2, 2048:9, 2049:7, 2050:3

---

**C**

**C.S.R** [1] - 1952:24

**calculate** [18] - 1957:10, 1971:6, 1972:18, 1972:25, 1973:11, 1974:9, 1975:3, 1975:10, 1975:15, 1976:16, 1978:10, 1979:6, 2007:13, 2010:17, 2011:24, 2012:17, 2019:22, 2031:19

**calculated** [11] - 1956:6, 1958:8, 1958:17, 1961:3, 1966:9, 1971:17, 1972:1, 1972:22, 1983:14, 2031:18

**calculating** [5] - 1971:17, 1973:7, 1980:17, 2034:18, 2048:13

**calculation** [27] - 1957:1, 1957:24, 1958:4, 1958:6, 1958:9, 1960:14, 1962:7, 1962:16, 1964:3, 1964:4, 1968:1, 1968:3, 1968:25, 1971:16, 1972:20, 1973:25, 1977:1, 1977:16, 1979:7, 1979:13, 1980:3, 1982:10, 1983:9, 2008:11, 2008:13, 2031:17,

2050:5

**calculations** [5] - 1959:25, 1963:3, 1993:2, 2012:22, 2032:20

**camera** [2] - 2060:24, 2061:19

**canned** [1] - 2001:15

**cannot** [2] - 1971:25, 2054:9

**Cap** [9] - 2005:14, 2007:7, 2008:10, 2008:19, 2043:2, 2043:7, 2043:12, 2047:4, 2047:17

**cap** [4] - 2028:19, 2028:22, 2028:25, 2029:17

**capable** [11] - 1995:21, 1998:12, 1999:3, 1999:4, 1999:11, 1999:12, 1999:15, 1999:24, 1999:25, 2000:2

**caption** [1] - 2059:19

**capture** [2] - 2031:19, 2033:10

**care** [1] - 1967:6

**case** [48] - 1956:5, 1960:17, 1966:20, 1967:14, 1967:15, 1968:11, 1968:22, 1983:2, 1984:2, 1985:14, 1985:17, 1985:21, 1987:2, 2005:23, 2006:1, 2007:16, 2022:10, 2022:20, 2022:21, 2024:25, 2026:19, 2027:2, 2034:6, 2036:23, 2037:6, 2037:19, 2040:15, 2040:16, 2040:25, 2041:4, 2041:8, 2041:22, 2050:19, 2050:21, 2052:1, 2053:7, 2054:17, 2058:9, 2058:14, 2061:23, 2063:11, 2065:20, 2066:12, 2067:9, 2067:13, 2067:25, 2069:11, 2070:9

**cases** [7] - 2005:15, 2006:2, 2006:7, 2006:16, 2007:1, 2007:15

**cash** [1] - 2036:6

**categories** [1] - 1971:21

category [5] -
   2005:23, 2023:4,
   2023:18, 2024:8,
   2024:14
Century [2] - 1986:1,
   2027:2
certainly [9] - 1961:8,
   1967:8, 1972:18,
   1972:23, 1972:24,
   2029:20, 2050:12,
   2061:14, 2061:22
Certainly [1] - 2063:10
Certified [1] - 1952:23
chance [2] - 1963:14,
   2037:8
change [1] - 2071:1
changed [1] - 1963:20
changes [2] -
   2060:13, 2060:14
charge [6] - 2021:22,
   2036:10, 2037:23,
   2038:1, 2045:16,
   2065:23
charged [2] - 2020:19,
   2052:18
charges [11] -
   1980:20, 2019:19,
   2019:20, 2038:7,
   2044:4, 2045:12,
   2047:7, 2047:8,
   2047:10, 2053:17
charging [2] -
   2020:14, 2037:6
chart [51] - 1956:13,
   1958:17, 1971:4,
   1971:7, 1977:7,
   1979:10, 1979:19,
   1980:1, 1980:3,
   1980:23, 1980:24,
   2004:23, 2008:5,
   2009:7, 2010:9,
   2010:21, 2017:4,
   2017:6, 2017:9,
   2018:4, 2021:23,
   2021:24, 2022:19,
   2026:7, 2027:17,
   2028:20, 2030:25,
   2031:7, 2031:16,
   2032:15, 2033:3,
   2033:5, 2033:15,
   2034:18, 2057:17,
   2059:1, 2059:2,
   2059:15, 2063:13,
   2063:14, 2063:16,
   2063:23, 2064:5,
   2064:6, 2064:8,
   2065:17, 2065:21,
   2065:22, 2066:19,
   2066:23
charts [24] - 1980:25,

2029:14, 2032:3,
   2060:10, 2060:14,
   2061:2, 2061:14,
   2062:9, 2062:11,
   2062:14, 2064:4,
   2064:9, 2064:21,
   2065:12, 2065:15,
   2065:16, 2065:19,
   2066:8, 2068:12,
   2068:14, 2068:15,
   2068:16
cheaper [1] - 2021:18
cheapest [1] - 2023:5
check [1] - 2032:20
choices [1] - 2018:17
choose [4] - 2006:12,
   2006:15, 2006:23,
   2007:19
chose [3] - 1972:9,
   2006:13, 2006:19
chosen [1] - 2009:24
Chris [2] - 1976:10,
   1983:18
CHRISTOPHER [2] -
   1953:5, 1953:6
circle [1] - 2049:5
citations [1] - 2068:16
cite [4] - 2018:5,
   2018:6, 2018:7,
   2050:1
CIVIL [2] - 1952:5,
   1952:9
claim [1] - 2063:22
clarification [4] -
   2037:3, 2039:22,
   2040:10, 2040:12
clarify [3] - 2037:1,
   2061:5, 2065:13
clarity [1] - 2022:13
CLARKSON [1] -
   1952:14
Class [7] - 2014:15,
   2015:4, 2015:6,
   2015:9
class [1] - 2014:21
Class-I-B [2] - 2015:4,
   2015:9
classes [13] - 2014:20,
   2014:22, 2015:1,
   2015:13, 2015:17,
   2015:20, 2015:23,
   2016:3, 2016:6,
   2016:7, 2016:17,
   2016:21
classified [1] - 1962:3
clear [13] - 1971:20,
   1974:12, 1976:12,
   2001:17, 2009:18,
   2025:17, 2030:5,
   2031:10, 2037:21,

2053:8, 2070:20
clearing [1] - 1969:22
clearly [3] - 1959:5,
   2059:6, 2059:7
client [1] - 2041:7
client's [1] - 1971:18
clients [1] - 1992:14
clip [11] - 1988:4,
   1988:20, 1991:7,
   1992:20, 1994:3,
   1996:3, 1998:22,
   2001:6, 2002:21,
   2036:19, 2037:9
Clip [1] - 2002:11
clips [1] - 2036:21
close [1] - 2030:10
closer [1] - 2015:12
CO [2] - 1952:6,
   1953:16
coffee [3] - 1987:20,
   1989:11, 1989:13
collected [2] - 1981:8,
   2030:23
collection [1] -
   2036:11
collects [1] - 1969:19
colloquy [1] - 2000:10
column [8] - 1970:6,
   1977:24, 2005:8,
   2008:10, 2025:17,
   2025:18, 2028:4,
   2030:17
columns [2] - 1982:7
combined [1] - 1983:1
combines [2] -
   1980:24
coming [6] - 2016:14,
   2030:5, 2030:6,
   2030:10, 2055:18
commensurate [1] -
   1987:6
comment [2] - 2064:3,
   2064:13, 2064:14,
   2065:17, 2068:11
comments [7] -
   2063:12, 2065:24,
   2066:5, 2067:18,
   2067:22, 2068:1,
   2068:13
committee [6] -
   1998:1, 1998:10,
   1998:12, 1998:18,
   1999:3, 2000:9
Common [7] -
   2027:21, 2028:11,
   2032:6, 2034:3,
   2034:17, 2051:5,
   2051:6
common [1] - 2016:5
communication [2] -

1993:12, 2066:4
communications [3] -
   2069:9, 2069:14,
   2069:15
companies [8] -
   1969:9, 1969:20,
   1970:17, 1970:20,
   1970:21, 1970:23,
   1973:20, 1974:3
comparable [2] -
   2009:8, 2043:3
comparative [2] -
   2026:11, 2026:14
comparators' [1] -
   2011:21
compare [2] -
   2007:20, 2046:4
compared [2] -
   2009:19, 2047:22
comparing [2] -
   2026:1, 2044:6
comparison [5] -
   2009:23, 2024:23,
   2025:7, 2048:25,
   2059:16
comparisons [2] -
   2025:9, 2026:4
compensation [1] -
   1987:6
competition [1] -
   2021:8
complaint [2] -
   2063:15, 2063:21
completely [5] -
   2038:9, 2041:12,
   2045:14, 2045:24,
   2047:21
complex [2] -
   1969:11, 2054:6
Compliance [2] -
   2000:20, 2055:10
compliance [30] -
   1979:3, 2000:21,
   2000:23, 2001:1,
   2001:3, 2001:5,
   2001:10, 2001:11,
   2001:13, 2001:17,
   2001:20, 2002:7,
   2002:15, 2002:24,
   2003:4, 2003:5,
   2003:11, 2003:12,
   2003:14, 2003:24,
   2004:2, 2053:20,
   2054:19, 2054:20,
   2054:25, 2055:2,
   2055:4, 2055:5,
   2055:14
complicated [4] -
   1993:3, 1993:4,
   1995:3, 1996:1

components [2] -
   2025:4, 2052:20
comport [1] - 2054:14
comprised [1] -
   1981:25
compromise [2] -
   1960:21, 1964:20
computer [5] -
   1992:10, 1992:11,
   1993:5, 1997:18,
   1998:16
concentrated [2] -
   2020:11, 2020:25
concern [3] - 1961:7,
   1961:20, 1962:3
concerned [2] -
   1977:2, 1977:6
concluded [4] -
   1989:18, 1991:17,
   1993:17, 1994:11,
   1997:7, 2002:17
concludes [1] -
   1984:19
conclusions [1] -
   2068:25
conducted [2] -
   1969:7, 1969:8
conduit [3] - 1987:13,
   1987:16, 1988:25
confirm [4] - 1955:15,
   2004:23, 2049:10,
   2056:4
confirmed [1] -
   2065:16
conflict [4] - 1961:10,
   1994:2, 1995:9,
   1995:10
conflicts [1] - 1993:25
connect [1] - 1965:25
connected [1] -
   1965:6
consider [2] -
   2026:16, 2026:20
considered [3] -
   2026:22, 2027:3,
   2027:4
consistent [2] -
   2029:2, 2066:18
constraints [1] -
   2042:8
consulted [1] -
   2068:21
consulting [1] -
   2068:21
consume [1] - 1963:9,
   1973:11
contact [2] - 1972:8,
   2054:12
contains [1] - 1989:25
contemplated [1] -

1955:12
**content** [1] - 2041:14
**context** [2] - 2040:10
**continue** [2] - 1975:7,
2065:9
**CONTINUED** [2] -
1954:3, 1956:2
**continuously** [1] -
1963:17
**contract** [4] - 2053:1,
2053:12, 2053:16,
2053:18
**contrary** [1] - 2064:2
**controlled** [1] -
2036:24
**controversial** [1] -
1994:16
**conversation** [3] -
2040:11, 2046:16,
2066:1
**copy** [4] - 1974:15,
2004:24, 2027:7,
2028:7
**core** [1] - 1973:8
**Core** [8] - 1976:14,
1976:22, 1978:7,
1994:20, 1994:22,
2030:1, 2051:11,
2051:12
**Correct** [7] - 1969:6,
2023:14, 2034:16,
2047:19, 2049:12,
2053:14, 2059:13
**correct** [104] -
1952:23, 1970:8,
1970:18, 1971:13,
1977:25, 1978:24,
1979:24, 1981:12,
1983:3, 1983:11,
1985:9, 1986:25,
1987:3, 1987:10,
1987:14, 1990:13,
1991:1, 1992:8,
1992:12, 1993:23,
1995:18, 1998:13,
2000:21, 2002:25,
2004:5, 2005:6,
2006:6, 2006:14,
2008:3, 2008:6,
2008:20, 2008:23,
2009:3, 2014:10,
2014:11, 2015:15,
2017:3, 2017:13,
2018:23, 2019:25,
2020:14, 2022:2,
2022:5, 2022:18,
2023:15, 2023:21,
2024:11, 2024:18,
2024:22, 2025:15,
2026:1, 2026:5,

2026:11, 2026:16,
2027:16, 2027:22,
2028:14, 2029:6,
2030:19, 2031:11,
2031:14, 2031:22,
2031:25, 2032:8,
2032:22, 2033:1,
2033:4, 2034:14,
2035:5, 2035:7,
2035:11, 2035:22,
2036:2, 2036:5,
2036:16, 2037:14,
2037:24, 2038:5,
2038:8, 2038:10,
2039:4, 2041:5,
2042:5, 2042:16,
2043:9, 2044:5,
2045:5, 2045:8,
2045:13, 2045:15,
2046:21, 2049:11,
2049:14, 2049:19,
2050:5, 2050:8,
2050:16, 2051:12,
2051:22, 2052:18,
2055:11, 2055:14,
2056:15, 2067:22
**corrected** [2] - 2033:1,
2033:6
**correspond** [1] -
2005:20
**corresponding** [1] -
2046:24
**corresponds** [1] -
1982:5
**cost** [12] - 1974:25,
1975:1, 1975:16,
1975:17, 1975:22,
1976:3, 1976:5,
1978:4, 1980:11,
2020:12, 2020:25,
2021:19
**costs** [7] - 1976:1,
1976:13, 1978:3,
2031:14, 2031:20,
2031:24, 2033:13
**Counsel** [8] - 1972:14,
1972:15, 2041:6,
2049:21, 2051:24,
2053:20, 2054:19,
2071:8
**COUNSEL** [1] -
1953:15
**counsel** [13] -
1956:21, 1961:8,
1965:2, 2014:20,
2036:25, 2041:11,
2041:14, 2048:11,
2052:11, 2058:15,
2058:22, 2060:24,
2063:11

**counsel's** [6] - 1961:7,
2039:11, 2050:4,
2050:13, 2067:17,
2068:1
**Counselor** [1] -
2048:23
**couple** [5] - 1987:18,
2006:17, 2044:22,
2059:17, 2059:18
**course** [2] - 1994:18,
2067:5
**COURT** [108] - 1952:1,
1952:17, 1955:1,
1955:11, 1955:17,
1955:24, 1956:18,
1957:2, 1957:5,
1957:15, 1958:11,
1958:13, 1958:25,
1959:18, 1959:22,
1961:12, 1964:10,
1964:21, 1965:20,
1966:6, 1966:12,
1966:17, 1967:24,
1968:8, 1971:10,
1972:11, 1973:13,
1976:20, 1981:16,
1981:18, 1983:16,
1983:21, 1984:13,
1984:15, 1984:21,
1984:23, 1985:4,
1988:2, 1988:12,
1988:19, 1990:1,
1990:4, 1990:20,
2000:18, 2001:21,
2002:9, 2004:11,
2004:14, 2004:16,
2010:22, 2010:24,
2011:2, 2012:11,
2012:14, 2014:24,
2016:1, 2022:11,
2026:25, 2027:8,
2027:12, 2037:8,
2039:14, 2039:17,
2039:20, 2039:23,
2040:1, 2040:3,
2040:22, 2041:17,
2042:2, 2043:24,
2044:15, 2044:18,
2044:25, 2048:7,
2048:20, 2048:22,
2049:2, 2049:4,
2049:6, 2055:17,
2055:20, 2055:24,
2056:1, 2056:7,
2056:10, 2056:14,
2056:16, 2056:20,
2056:25, 2057:7,
2059:6, 2059:11,
2059:14, 2060:5,
2061:4, 2063:7,

2065:22, 2066:1,
2066:14, 2066:21,
2067:1, 2067:7,
2067:15, 2069:23,
2070:6, 2070:15,
2071:6
**Court** [66] - 1956:12,
1956:24, 1957:21,
1960:10, 1960:11,
1960:12, 1962:8,
1962:9, 1962:11,
1962:12, 1963:14,
1963:18, 1964:2,
1964:14, 1964:15,
1964:18, 1965:2,
1966:2, 1966:3,
1967:12, 1967:23,
1968:5, 1968:6,
1968:24, 1971:3,
1971:5, 1974:8,
1974:23, 1975:7,
1975:23, 1976:15,
1976:25, 1977:14,
1978:23, 1979:18,
1979:23, 1980:1,
1980:23, 1981:6,
1982:3, 1982:16,
1982:17, 1982:20,
1983:1, 1983:8,
1983:9, 2009:22,
2043:15, 2050:18,
2050:22, 2051:2,
2053:9, 2054:4,
2054:24, 2058:19,
2058:20, 2059:24,
2060:20, 2060:23,
2060:24, 2069:3,
2069:6, 2070:21
**Court's** [9] - 1958:7,
1959:12, 1965:19,
1974:12, 1982:22,
2060:7, 2060:9,
2063:2, 2067:20
**COURTHOUSE** [1] -
1952:14
**cover** [1] - 2031:24
**create** [4] - 1973:12,
1974:10, 2061:22,
2069:10
**created** [9] - 2005:25,
2057:22, 2062:10,
2063:12, 2063:15,
2063:23, 2065:10,
2065:11, 2068:16
**creation** [10] - 1976:1,
2060:10, 2060:22,
2061:2, 2061:13,
2063:4, 2063:7,
2065:2, 2065:15,
2067:11

**credibility** [5] -
1988:11, 2000:12,
2000:17, 2022:12,
2059:24
**criteria** [1] - 2006:25
**criticisms** [1] - 2059:1
**CROSS** [2] - 1954:4,
1985:7
**Cross** [1] - 1984:21
**cross** [1] - 1972:24
**CROSS-
EXAMINATION** [2] -
1954:4, 1985:7
**cross-examination** [1]
- 1972:24
**crossing** [1] - 2000:7
**crystal** [1] - 1976:12
**crystallize** [1] -
1983:18
**cubs** [1] - 1989:11
**cups** [2] - 1987:20,
1989:13
**current** [2] - 2035:13,
2054:11
**customized** [1] -
2005:24

---

## D

**daily** [4] - 2054:11,
2054:13, 2055:2,
2055:13
**damage** [7] - 1968:25,
1971:15, 1978:20,
1983:9, 2031:7,
2031:16, 2032:15
**damages** [13] -
1968:21, 1974:4,
1976:17, 1981:9,
1982:20, 2008:16,
2009:8, 2009:9,
2032:15, 2032:16,
2033:10, 2034:12,
2034:18
**DANIEL** [1] - 1953:4
**data** [7] - 1974:10,
1982:18, 2018:24,
2026:21, 2057:23,
2058:1, 2058:13
**databases** [1] -
1969:20
**date** [3] - 1962:25,
1968:10, 2013:17
**dated** [3] - 2017:16,
2044:17, 2044:20
**DAY** [1] - 1952:20
**day-to-day** [4] -
2036:2, 2036:4,
2038:14, 2038:20

**days** [3] - 1955:7, 1955:8, 1963:4
**de** [2] - 1989:2, 1989:4
**dealt** [1] - 1965:20
**debate** [1] - 2021:7
**debated** [1] - 2021:9
**December** [1] - 2015:11
**decide** [2] - 1963:22, 1963:24
**decided** [1] - 2009:12
**decision** [5] - 1982:22, 1995:21, 1995:24, 1998:19
**decisions** [12] - 1998:13, 1998:14, 1999:3, 1999:5, 1999:21, 2000:3, 2000:4, 2000:8, 2038:24, 2039:7, 2040:7, 2042:7
**deducted** [2] - 2028:3, 2028:14
**deduction** [1] - 2029:10
**deem** [1] - 2061:15
**deemed** [2] - 1983:2, 2031:4
**DEFENDANT** [1] - 1952:11
**Defendant** [1] - 2056:16
**defendant** [4] - 1960:1, 1963:13, 1972:21, 2060:23
**Defendant's** [8] - 1954:12, 2010:9, 2010:20, 2010:24, 2011:3, 2013:12, 2040:20, 2056:21
**DEFENDANTS** [3] - 1952:7, 1953:9, 1953:13
**defendants** [4] - 1955:6, 1966:10, 2060:11, 2067:25
**defense** [2] - 1967:15, 2060:23
**defer** [3] - 1999:17, 1999:18, 2007:2
**deferred** [1] - 2006:10
**deferring** [2] - 1997:4, 1997:5
**define** [4] - 1991:25, 1997:2, 2001:4, 2042:4
**defined** [1] - 1956:13
**defines** [1] - 2010:2
**definitely** [1] - 1962:24

**definition** [5] - 2003:16, 2039:1, 2039:6, 2041:24, 2042:6
**degrees** [1] - 1972:5
**delegate** [1] - 1994:9
**delegated** [7] - 1995:5, 2038:14, 2038:20, 2054:20, 2055:1, 2064:11, 2068:5
**delegation** [1] - 2063:19
**deliberately** [1] - 2064:10
**delivered** [1] - 2046:24
**demand** [3] - 2020:24, 2021:3, 2021:5
**demonstrate** [1] - 1958:13
**denial** [1] - 1958:2
**Denied** [2] - 1957:2, 1957:3
**denied** [3] - 1957:15, 1965:8, 2069:3
**deny** [1] - 1998:17
**denying** [3] - 1964:21, 1965:13, 1968:16
**department** [1] - 2063:24
**depicted** [1] - 2065:6
**depose** [2] - 1972:17, 1973:3
**deposed** [2] - 1972:16, 1986:24
**deposition** [39] - 1985:21, 1987:8, 1987:17, 1987:24, 1988:5, 1988:8, 1988:17, 1988:18, 1988:22, 1989:18, 1989:23, 1990:7, 1991:9, 1991:17, 1992:22, 1993:17, 1993:20, 1994:5, 1994:11, 1994:13, 1996:5, 1997:7, 1998:9, 1998:24, 2000:11, 2000:14, 2001:24, 2002:3, 2002:12, 2002:17, 2002:22, 2037:14, 2040:14, 2040:15, 2041:13, 2058:16, 2061:23, 2062:1, 2062:3
**depositions** [2] - 2061:15, 2066:9
**description** [3] -

2060:17, 2064:17, 2068:2
**deserves** [1] - 2059:21
**designing** [1] - 1998:21
**detail** [2] - 2026:12, 2062:10
**detailed** [1] - 2004:4
**details** [1] - 2070:22
**detects** [1] - 2055:7
**determination** [5] - 1996:9, 1997:19, 1997:21, 2059:25, 2061:25
**determine** [7] - 1971:19, 1973:24, 1982:17, 1995:17, 1996:21, 1997:1, 1997:10
**determines** [1] - 1968:5
**determining** [1] - 1997:25
**developing** [1] - 1998:21
**difference** [5] - 2005:5, 2011:24, 2031:6, 2049:19, 2052:5
**different** [24] - 1982:5, 1982:7, 1982:15, 1982:21, 2007:17, 2007:24, 2014:22, 2015:17, 2015:18, 2025:10, 2034:19, 2036:12, 2038:9, 2045:14, 2046:2, 2046:5, 2047:21, 2059:3, 2059:17, 2059:18, 2059:19, 2063:5, 2065:12
**difficult** [6] - 1967:14, 1967:15, 1993:25, 1994:2, 1995:23, 1996:8
**difficulty** [1] - 1995:11
**dilemma** [1] - 1995:12
**diligence** [5] - 1991:2, 1991:3, 1991:6, 2035:24, 2036:8
**DIRECT** [2] - 1954:3, 1956:2
**direct** [9] - 1970:2, 1978:5, 1978:11, 1979:1, 1979:4, 1979:5, 1984:19, 2001:10, 2053:23
**direction** [2] - 2071:2, 2071:4
**directly** [2] - 2045:8,

2046:8
**director** [2] - 2034:22, 2035:1
**DIRECTOR** [1] - 1953:15
**Directors** [1] - 2067:25
**disagree** [2] - 1997:23, 2038:12
**disappeared** [1] - 2062:7
**disclose** [1] - 2070:22
**disclosed** [2] - 2023:13, 2066:14
**discovery** [9] - 2063:4, 2066:8, 2067:5, 2067:6, 2068:19, 2069:4, 2070:16, 2070:18
**discretion** [2] - 2057:10, 2057:11
**discuss** [3] - 1957:9, 1964:11, 1964:17
**discussed** [9] - 1956:16, 1972:14, 1975:25, 1977:7, 1979:3, 1983:10, 1989:25, 1993:3, 2053:7
**discussing** [4] - 1965:17, 1965:18, 1974:13, 1992:15
**discussions** [2] - 1965:1, 1973:5
**disproportionate** [1] - 2068:7
**disproportionately** [2] - 2020:11, 2020:25
**distribution** [2] - 2052:21, 2053:14
**DISTRICT** [4] - 1952:1, 1952:1, 1952:17, 1952:18
**divide** [1] - 2024:15
**divided** [2] - 1974:25, 1975:2
**dividing** [1] - 1978:12
**document** [59] - 1956:10, 1956:23, 1957:19, 1961:7, 1962:15, 1964:1, 1968:7, 1969:3, 1970:3, 1971:9, 1972:14, 1982:1, 2007:6, 2013:19, 2015:8, 2016:14, 2038:14, 2038:16, 2039:4, 2040:11, 2041:7, 2041:10, 2041:14, 2041:18,

2043:25, 2044:17, 2044:20, 2044:22, 2048:19, 2048:24, 2049:10, 2053:24, 2054:4, 2054:22, 2054:25, 2057:19, 2058:4, 2058:6, 2059:5, 2060:19, 2060:20, 2061:7, 2061:11, 2062:17, 2062:20, 2063:5, 2063:8, 2063:9, 2063:18, 2064:23, 2065:9, 2065:10, 2066:15, 2067:12, 2067:18, 2067:21, 2070:22
**document's** [1] - 1964:5
**documentation** [1] - 1964:6
**documents** [36] - 1966:14, 1967:16, 1967:17, 2009:18, 2038:19, 2038:22, 2057:17, 2057:18, 2057:19, 2057:20, 2057:25, 2058:2, 2058:5, 2058:18, 2060:21, 2060:22, 2060:25, 2061:7, 2061:11, 2061:18, 2061:21, 2061:24, 2062:4, 2062:15, 2062:16, 2063:5, 2063:6, 2063:15, 2064:24, 2065:2, 2066:13, 2069:22, 2070:2, 2070:16, 2070:23
**dollar** [6] - 1962:1, 1963:18, 2033:25, 2051:22, 2053:11, 2059:16
**dollars** [5] - 1961:2, 1967:10, 2020:19, 2020:20, 2021:16
**done** [17] - 1958:10, 1958:21, 1968:1, 1973:10, 1982:9, 1992:9, 1992:18, 1993:1, 1993:4, 1993:5, 1993:6, 1993:8, 2000:21, 2001:3, 2031:4, 2042:22
**doubt** [1] - 1991:4
**down** [25] - 1960:9, 1963:13, 1963:14, 1964:16, 1970:5,

1970:6, 1970:11, 1977:19, 1978:6, 1978:7, 2015:5, 2020:24, 2032:14, 2033:19, 2033:20, 2034:1, 2039:25, 2043:4, 2043:21, 2044:1, 2047:9, 2048:1, 2055:17, 2067:10

**download** [1] - 2013:22

**dozen** [2] - 1985:18, 2021:21

**dozens** [1] - 2021:13

**Dr** [27] - 1955:20, 1956:4, 1959:14, 1960:8, 1962:8, 1962:15, 1964:11, 1965:8, 1965:17, 1965:20, 1968:3, 1968:20, 1972:15, 1972:16, 1972:17, 1974:7, 1976:14, 1976:23, 1981:22, 1981:23, 1983:24, 1984:20, 2022:6, 2040:4, 2044:20, 2057:18, 2059:23

**drafted** [1] - 2041:18

**drafter** [1] - 2039:10

**due** [5] - 1991:2, 1991:3, 1991:5, 2035:24, 2036:8

**during** [4] - 1986:21, 2060:12, 2067:5, 2068:19

**dwell** [1] - 2005:2

**DX-1918** [1] - 2043:15

---

**E**

---

**e-mail** [2] - 2060:13, 2066:4

**e-mails** [3] - 2061:1, 2065:1, 2066:16

**earliest** [1] - 2058:4

**earn** [3] - 2031:24, 2032:19, 2034:4

**earned** [2] - 1976:7, 2034:4

**ease** [1] - 2032:3

**easier** [2] - 2028:10, 2047:1

**easily** [1] - 1992:10

**EAST** [1] - 1952:14

**educate** [1] - 2070:13

**efforts** [1] - 2061:8

**eight** [3] - 1955:7,

1963:4, 2002:21

**either** [4] - 1993:6, 2017:4, 2030:19, 2056:8

**eliminate** [1] - 1980:10

**eliminated** [3] - 1980:6, 2008:3, 2008:5

**eliminates** [1] - 1980:4

**ELMO** [1] - 2019:15

**embellish** [1] - 2064:19

**embellished** [1] - 2060:17

**embellishing** [1] - 2068:1

**emphasize** [2] - 2065:9, 2069:7

**employ** [1] - 1979:9

**employees** [3] - 1976:2, 1995:19, 1995:20

**end** [7] - 1958:2, 1992:16, 2049:13, 2067:13, 2068:3, 2069:17, 2069:21

**end-running** [1] - 1958:2

**ending** [4] - 1970:3, 1976:18, 1976:21, 2067:20

**energy** [1] - 2063:2

**enormous** [1] - 1966:2

**entire** [1] - 1979:4

**entitled** [10] - 2041:24, 2055:10, 2061:21, 2062:19, 2065:5, 2066:25, 2067:2, 2067:3, 2067:11, 2068:15

**entity** [1] - 2054:12

**EQAT** [3] - 2013:16, 2046:6, 2054:6

**equal** [1] - 1974:24

**equally** [1] - 2024:16

**EQUITABLE** [3] - 1952:6, 1952:10, 1953:16

**Equitable** [1] - 2054:10

**Equity** [1] - 2051:15

**equity** [10] - 2016:24, 2017:3, 2017:11, 2018:10, 2022:4, 2022:5, 2022:17, 2022:22, 2022:24, 2023:6

**error** [5] - 2032:22,

2032:24, 2048:11, 2048:12, 2049:10

**errors** [1] - 2058:8

**ESQUIRE** [10] - 1953:4, 1953:4, 1953:5, 1953:5, 1953:6, 1953:9, 1953:12, 1953:12, 1953:13, 1953:15

**essence** [1] - 2024:1

**essentially** [2] - 1960:5, 1964:14

**Essentially** [1] - 1972:1

**established** [1] - 1962:12

**et** [3] - 1952:3, 1952:6, 1952:8

**evaluate** [1] - 1995:25

**evasive** [1] - 2002:2

**event** [4] - 1962:11, 1963:24, 1979:23, 1982:16

**eventually** [1] - 2062:21

**evidence** [44] - 1954:10, 1954:11, 1954:12, 1954:13, 1956:24, 1957:3, 1957:18, 1958:7, 1958:17, 1959:16, 1960:15, 1960:22, 1960:23, 1963:19, 1963:22, 1964:5, 1965:4, 1965:5, 1965:20, 1966:22, 1966:21, 1968:3, 1969:13, 1981:15, 1981:20, 1983:25, 1984:12, 1984:18, 1991:3, 1995:14, 2010:20, 2011:4, 2017:21, 2038:16, 2053:22, 2056:4, 2056:19, 2059:2, 2059:8, 2060:3, 2060:21, 2061:3, 2068:3, 2068:6

**evidenced** [1] - 2003:22

**exact** [7] - 1963:8, 1964:4, 2001:24, 2006:9, 2038:3, 2041:22, 2052:9

**exactly** [8] - 1972:12, 2008:9, 2037:4, 2037:6, 2041:25, 2058:17, 2064:14, 2064:23

**Exactly** [2] - 1955:11,

2040:3

**EXAMINATION** [6] - 1954:3, 1954:4, 1954:5, 1956:2, 1985:7, 2048:9

**examination** [1] - 1972:24

**example** [7] - 1975:1, 1981:3, 1994:19, 1997:13, 2005:13, 2006:8, 2007:5

**exceed** [1] - 2023:18

**exceeds** [2] - 2024:8, 2044:4

**except** [2] - 2007:1, 2008:1

**excess** [1] - 1982:14

**exchange** [1] - 2064:25

**exchanged** [4] - 2060:25, 2061:12, 2066:8, 2066:9

**exclude** [1] - 1975:17

**excluded** [2] - 1978:2, 2033:12

**excludes** [4] - 2018:16, 2018:21, 2031:11, 2031:13

**excluding** [1] - 1971:22

**excused** [1] - 2055:19

**exercise** [1] - 1992:5

**exhaustive** [1] - 1991:13

**Exhibit** [10] - 1954:10, 1954:11, 1954:13, 1981:19, 1984:17, 2010:9, 2010:17, 2013:12, 2040:20, 2060:2

**exhibit** [10] - 1957:22, 1958:10, 1960:8, 1960:15, 1983:11, 2005:19, 2040:22, 2047:14, 2048:20, 2057:13

**Exhibits** [5] - 1954:12, 2010:20, 2010:24, 2011:3, 2056:21

**exhibits** [3] - 2056:4, 2056:7, 2056:10

**exist** [3] - 2036:25, 2055:6, 2057:22

**expect** [1] - 2030:10

**expected** [1] - 2062:22

**expedition** [2] - 2063:1, 2067:21

**expense** [31] - 1975:18, 1977:14, 1978:5, 1978:11,

1979:4, 2019:5, 2019:7, 2021:25, 2022:7, 2022:8, 2022:14, 2023:9, 2023:11, 2023:14, 2024:8, 2024:20, 2024:21, 2025:6, 2025:12, 2025:15, 2025:16, 2025:24, 2026:1, 2026:3, 2026:5, 2026:7, 2031:11, 2052:13, 2052:19, 2053:9

**Expense** [2] - 2018:15, 2052:17

**expenses** [8] - 1971:21, 1971:22, 1977:20, 1979:1, 1979:5, 1980:17, 2043:22

**expensive** [1] - 2048:2

**experience** [6] - 1973:7, 1973:19, 1973:21, 1974:1, 2029:5, 2029:13

**expert** [13] - 1959:6, 1985:9, 1985:12, 1985:16, 1985:18, 2032:25, 2041:2, 2041:4, 2041:9, 2042:15, 2042:18, 2055:22, 2068:25

**expertise** [8] - 1959:13, 1961:16, 1965:9, 1972:4, 1972:5, 1972:25, 1973:4, 1973:10

**experts** [2] - 2065:4, 2068:18

**explain** [9] - 1960:10, 1964:13, 1964:14, 1971:3, 1972:19, 1975:23, 1976:25, 2020:2, 2054:4

**explained** [3] - 1962:23, 1962:24, 1964:15

**explicitly** [1] - 2062:8

**expressly** [1] - 1956:21

**extensively** [1] - 1961:22

**extent** [4] - 1972:21, 1992:9, 2000:11, 2065:18

**extra** [1] - 2031:25

---

**F**

---

**facilitate** [1] - 1964:20

**fact** [20] - 1967:7, 1992:13, 1992:15, 1992:25, 1998:1, 2004:3, 2007:23, 2008:9, 2016:21, 2030:9, 2032:24, 2045:12, 2052:3, 2062:10, 2062:12, 2062:18, 2065:24, 2068:19, 2068:25, 2070:10
**Fact** [3] - 2017:15, 2017:19, 2018:6
**factors** [1] - 1961:21
**failure** [2] - 2004:1
**failures** [2] - 2003:23, 2003:24
**fainted** [1] - 2040:2
**fair** [8] - 1996:21, 1999:15, 2006:24, 2007:21, 2024:3, 2030:25, 2035:18, 2043:1
**Fair** [1] - 1986:19
**fall** [5] - 1983:15, 1984:8, 2000:25, 2003:4, 2003:16
**fallen** [1] - 2019:6
**fallout** [65] - 1956:5, 1956:14, 1956:19, 1957:6, 1957:9, 1957:11, 1957:23, 1958:4, 1958:6, 1958:15, 1958:17, 1958:18, 1958:19, 1958:23, 1959:1, 1959:3, 1959:6, 1959:7, 1959:9, 1959:10, 1960:12, 1960:24, 1960:25, 1961:8, 1961:14, 1961:15, 1961:18, 1961:21, 1962:1, 1962:4, 1962:14, 1962:20, 1962:22, 1962:25, 1963:16, 1963:17, 1963:20, 1963:21, 1963:23, 1964:1, 1964:12, 1964:25, 1965:3, 1965:6, 1965:12, 1965:22, 1966:4, 1966:8, 1966:15, 1966:16, 1966:19, 1967:9, 1967:10, 1967:17, 1967:18, 1967:19, 1967:21, 1968:2, 1968:6, 1968:10, 1968:11, 1968:13, 1968:15

**false** [1] - 1996:11
**familiar** [1] - 1996:18
**far** [6] - 1961:1, 1961:12, 1965:15, 2000:6, 2027:13, 2029:7
**faulty** [1] - 2058:13
**federal** [1] - 2069:11
**Federated** [1] - 1986:9
**fee** [75] - 1971:24, 1977:6, 1977:17, 1977:25, 1979:7, 1979:8, 1980:4, 1982:14, 1983:7, 2017:13, 2020:4, 2020:19, 2021:11, 2022:8, 2023:4, 2023:7, 2023:12, 2023:21, 2024:24, 2025:1, 2025:2, 2025:9, 2025:18, 2025:21, 2025:25, 2026:6, 2026:14, 2027:21, 2027:22, 2027:24, 2027:25, 2028:2, 2028:3, 2028:4, 2028:5, 2028:21, 2028:25, 2029:3, 2029:4, 2029:22, 2029:23, 2030:7, 2030:8, 2030:11, 2030:12, 2030:17, 2030:18, 2030:20, 2030:21, 2030:24, 2031:1, 2032:4, 2032:10, 2032:11, 2032:16, 2036:12, 2036:13, 2036:14, 2036:17, 2037:6, 2037:21, 2038:12, 2043:23, 2044:2, 2045:13, 2045:17, 2045:23, 2046:4, 2046:16, 2047:15, 2047:16, 2047:18, 2049:22
**fees** [56] - 1961:25, 1962:14, 1963:25, 1964:12, 1971:21, 1971:23, 1977:8, 1977:23, 1977:24, 1981:7, 1983:6, 1983:13, 1984:1, 2019:12, 2019:18, 2020:11, 2021:4, 2021:5, 2021:12, 2021:14, 2021:17, 2022:8, 2023:12, 2023:15, 2025:3, 2025:4, 2025:19,

2026:9, 2026:11, 2028:11, 2028:12, 2031:11, 2031:17, 2031:18, 2033:13, 2038:8, 2043:22, 2048:25, 2049:1, 2049:14, 2050:9, 2052:11, 2052:14, 2052:17, 2053:1, 2053:10, 2053:12, 2053:14, 2053:16, 2053:17, 2068:7
**feet** [1] - 2050:15
**few** [2] - 2050:25
**Fidelity** [2] - 2021:13, 2040:17
**fiduciary** [1] - 2036:25
**Fiduciary** [2] - 1986:3, 2021:18
**field** [1] - 1961:16
**figure** [4] - 1971:25, 1972:21, 2018:16, 2023:24
**figures** [1] - 1974:9
**figuring** [1] - 2001:12
**filed** [3] - 2062:4, 2062:19, 2062:22
**final** [1] - 2047:9
**financial** [1] - 1972:7
**fine** [1] - 2071:3
**finished** [1] - 2055:24
**Finished** [1] - 2055:25
**firing** [1] - 1988:24
**firm** [14] - 1992:17, 2056:6, 2060:8, 2061:1, 2061:15, 2063:12, 2064:1, 2064:3, 2064:18, 2065:1, 2068:20, 2069:19, 2070:11
**first** [20] - 1963:12, 1966:14, 1968:1, 1968:2, 1969:17, 1974:8, 1975:15, 1977:8, 1977:22, 2011:10, 2013:2, 2013:19, 2014:1, 2015:16, 2016:11, 2023:1, 2032:6, 2044:1, 2061:10, 2061:17
**First** [1] - 2055:10
**FISHER** [1] - 1952:14
**fishing** [2] - 2063:1, 2067:20
**five** [11] - 1998:1, 1998:11, 1998:18, 1999:2, 2007:11, 2012:4, 2012:8, 2012:17, 2012:19,

2042:23, 2058:10
**fixed** [1] - 1980:20
**flavor** [1] - 2033:9
**flip** [1] - 1980:22
**flow** [1] - 2036:6
**FM** [1] - 2064:11
**FMG** [70] - 1961:24, 1966:14, 1969:24, 1973:20, 1974:3, 1974:20, 1976:3, 1983:13, 1984:6, 1987:10, 1987:12, 1990:12, 1991:2, 1991:11, 1991:22, 1992:2, 1992:25, 1993:22, 1993:25, 1994:1, 1994:7, 1995:11, 1995:15, 1995:25, 1998:1, 1998:17, 2000:13, 2002:25, 2003:2, 2003:5, 2003:6, 2005:24, 2009:16, 2009:24, 2010:2, 2020:21, 2027:22, 2028:16, 2029:1, 2029:14, 2031:1, 2031:19, 2032:10, 2033:10, 2034:12, 2034:17, 2038:7, 2038:14, 2038:20, 2044:4, 2046:7, 2046:10, 2046:11, 2046:12, 2046:17, 2046:25, 2047:7, 2048:3, 2049:13, 2053:17, 2055:1, 2056:5, 2060:8, 2061:9, 2063:16, 2063:19, 2064:25, 2066:13, 2068:21
**FMG's** [21] - 1967:17, 1975:20, 1975:24, 1976:7, 1977:4, 1980:15, 1987:3, 1987:5, 1987:21, 1990:11, 1990:24, 2023:14, 2030:22, 2033:12, 2038:8, 2041:10, 2046:1, 2048:25, 2063:11
**follow** [2] - 2019:20, 2069:2
**following** [1] - 1978:17
**follows** [1] - 1968:8
**footnote** [1] - 2018:13
**FOR** [3] - 1953:6, 1953:9, 1953:13
**forget** [1] - 2058:16

**Form** [1] - 2012:12
**formula** [12] - 1973:23, 1974:22, 1974:23, 1974:24, 1975:3, 1975:6, 1975:8, 1975:9, 1975:11, 1978:15, 1978:18, 1978:22
**forth** [5] - 1962:7, 1971:6, 1975:4, 1996:20, 2000:10
**forthcoming** [1] - 1965:23
**forward** [1] - 2056:11
**foundation** [2] - 1963:10, 1967:1
**four** [6] - 1955:8, 2050:18, 2050:21, 2050:23, 2051:3, 2051:21
**Francis** [1] - 1952:24
**FRANCIS** [1] - 1952:24
**Frank** [3] - 1988:12, 2001:21, 2039:14
**Franklin** [1] - 1986:7
**frankly** [8] - 2059:15, 2062:12, 2062:16, 2062:21, 2063:2, 2065:25, 2067:8, 2070:8
**Frankly** [1] - 2062:5
**free** [1] - 2012:2
**Friday** [1] - 1955:5
**front** [1] - 2011:7
**full** [1] - 1972:14
**function** [2] - 2003:25, 2021:6
**functions** [2] - 1976:3, 2038:15
**fund** [64] - 1959:11, 1962:10, 1968:16, 1969:9, 1969:19, 1969:23, 1971:1, 1978:4, 1985:17, 1994:20, 2000:21, 2001:3, 2004:5, 2005:6, 2008:6, 2008:7, 2009:10, 2009:14, 2009:20, 2012:20, 2014:17, 2016:6, 2016:9, 2020:3, 2020:17, 2020:18, 2020:19, 2020:22, 2023:20, 2024:16, 2025:19, 2026:13, 2031:3, 2031:21, 2034:10, 2034:20, 2035:7, 2036:12, 2036:14,

2037:15, 2038:25, 2039:8, 2040:8, 2043:3, 2043:8, 2043:17, 2043:23, 2044:2, 2044:5, 2044:9, 2045:20, 2045:22, 2046:20, 2046:25, 2047:6, 2047:22, 2047:23, 2048:2, 2052:6, 2052:7, 2052:12, 2052:18, 2055:3

**Fund** [13] - 1976:15, 2005:14, 2011:11, 2013:1, 2014:5, 2030:16, 2043:12, 2047:17, 2051:6, 2051:11, 2051:12, 2051:15, 2051:17

**fund's** [1] - 2009:23

**funds** [131] - 1956:7, 1956:14, 1956:22, 1956:25, 1957:25, 1958:10, 1960:10, 1960:13, 1960:16, 1960:24, 1962:17, 1962:18, 1964:6, 1964:7, 1964:17, 1968:4, 1969:1, 1978:23, 1979:16, 1979:22, 1981:2, 1981:8, 1982:25, 1984:1, 1990:18, 1991:23, 1992:3, 1992:5, 1994:14, 1994:21, 1997:14, 2003:18, 2003:20, 2005:9, 2005:21, 2007:20, 2011:20, 2012:4, 2016:25, 2018:10, 2018:16, 2018:17, 2018:18, 2018:21, 2018:22, 2019:6, 2019:13, 2019:14, 2019:17, 2019:19, 2020:3, 2020:4, 2020:12, 2020:13, 2020:16, 2020:24, 2020:25, 2021:4, 2021:11, 2021:12, 2021:14, 2021:16, 2021:21, 2021:25, 2022:1, 2022:4, 2022:5, 2022:17, 2022:18, 2022:21, 2022:22, 2022:23, 2022:24, 2023:3, 2023:6, 2023:18, 2023:20, 2024:7, 2024:14, 2024:21, 2025:17,

2025:19, 2029:3, 2029:19, 2029:21, 2031:21, 2033:17, 2035:4, 2035:5, 2035:6, 2035:11, 2035:14, 2035:15, 2035:18, 2035:21, 2036:16, 2036:17, 2036:23, 2036:24, 2037:22, 2038:7, 2042:10, 2042:13, 2045:5, 2045:12, 2046:24, 2047:15, 2048:5, 2050:7, 2050:9, 2050:10, 2050:14, 2050:19, 2050:21, 2050:23, 2051:3, 2051:4, 2051:21, 2051:22, 2054:5, 2054:6, 2059:17

**Funds** [3] - 2005:15, 2005:19, 2035:6

**FUNDS** [1] - 1952:10

**funds'** [3] - 2007:8, 2009:2, 2009:13

**future** [4] - 1965:3, 1965:11, 1965:16, 1965:24

---

## G

**GABLE** [1] - 1952:24
**Gable** [2] - 1952:24, 2035:9
**game** [1] - 2053:17
**games** [1] - 2000:16
**Gartenberg** [1] - 1961:21
**GENERAL** [1] - 1953:15
**general** [6] - 1959:25, 1961:3, 1961:25, 1962:14, 1962:23, 1963:25
**generally** [3] - 1973:17, 1982:3, 2052:17
**generating** [1] - 2048:4
**given** [7] - 2019:13, 2026:8, 2064:21, 2064:22, 2065:3, 2068:15, 2068:17
**glad** [1] - 2042:21
**GLENN** [1] - 1952:8
**Goldstein** [1] - 2055:22
**Gordon** [12] - 2034:22,

2035:2, 2035:4, 2035:16, 2035:17, 2035:20, 2035:24, 2036:1, 2036:4, 2036:10, 2037:22

**Gordon's** [2] - 2035:19, 2036:7
**govern** [1] - 2003:18
**Government** [1] - 2051:16
**graph** [3] - 2011:19, 2011:22, 2019:4
**greater** [2] - 2016:9, 2019:14
**Greer** [1] - 1992:13
**GROUP** [1] - 1952:11
**group** [6] - 1969:11, 1969:12, 2006:9, 2006:19, 2007:2, 2010:1
**growth** [2] - 2011:18, 2011:19
**Growth** [2] - 2005:17, 2030:16
**guess** [6] - 1969:22, 1997:2, 2005:23, 2013:2, 2019:17, 2026:17

---

## H

**HADLEY** [1] - 1953:11
**half** [16] - 1983:13, 1984:6, 1985:1, 1985:2, 1985:4, 1989:22, 2008:3, 2008:4, 2009:11, 2009:12, 2023:18, 2023:19, 2033:21, 2036:13, 2047:9, 2047:10
**Half** [1] - 1984:4
**halfway** [2] - 1978:6, 1978:7
**hand** [10] - 1970:5, 2010:8, 2010:11, 2013:12, 2017:18, 2027:5, 2040:14, 2042:24, 2043:14, 2043:15
**handling** [1] - 2060:7
**hard** [1] - 2004:23
**Harris** [1] - 1985:22
**Hartford** [2] - 1986:13, 2026:19
**head** [1] - 1955:9
**hear** [2] - 2041:19, 2068:18
**heard** [6] - 1957:6,

1957:7, 2041:16, 2063:24, 2064:13, 2068:6
**hearsay** [1] - 1959:11
**heart** [1] - 2067:23
**heavily** [2] - 2003:20, 2003:22
**hedge** [2] - 2035:6, 2036:24
**held** [1] - 1994:14
**help** [2] - 1958:13, 2033:15
**helped** [1] - 2038:19
**helpful** [2] - 1964:2, 1967:23
**hide** [1] - 2009:17
**higher** [5] - 2007:3, 2021:4, 2038:7, 2050:9, 2050:15
**highlight** [3] - 2014:7, 2032:6, 2047:4
**hire** [2] - 2045:7, 2046:7
**hired** [3] - 1990:17, 2045:25, 2046:1
**hiring** [6] - 1987:12, 1987:15, 1988:7, 1988:24, 1990:11, 1990:16
**Hiring** [1] - 1987:16
**history** [1] - 2031:2
**hold** [1] - 1994:21
**holders** [1] - 2053:18
**holdings** [1] - 2055:3
**Honor** [117] - 1955:16, 1955:20, 1956:15, 1956:20, 1957:14, 1958:1, 1958:6, 1958:12, 1959:5, 1959:14, 1960:3, 1960:18, 1961:22, 1962:17, 1962:19, 1962:21, 1963:12, 1963:22, 1963:24, 1964:18, 1965:14, 1966:1, 1966:7, 1966:13, 1966:23, 1967:5, 1967:7, 1967:22, 1971:8, 1972:12, 1973:2, 1974:5, 1974:15, 1976:21, 1981:14, 1983:17, 1983:20, 1984:11, 1984:14, 1984:16, 1984:22, 1984:25, 1988:9, 1988:15, 1990:14, 2000:6, 2000:12, 2001:8, 2001:23, 2002:5, 2002:10,

2004:9, 2004:13, 2004:19, 2010:12, 2010:19, 2011:1, 2014:19, 2015:21, 2017:21, 2022:6, 2022:13, 2026:23, 2027:7, 2027:11, 2036:21, 2037:7, 2039:9, 2041:6, 2041:16, 2044:10, 2044:16, 2044:19, 2048:6, 2048:21, 2049:3, 2049:23, 2050:12, 2055:21, 2056:3, 2056:9, 2056:13, 2056:15, 2056:18, 2056:23, 2057:2, 2057:6, 2057:9, 2057:14, 2057:20, 2058:15, 2058:21, 2058:22, 2059:10, 2059:13, 2060:1, 2060:4, 2060:6, 2060:15, 2061:3, 2061:5, 2061:10, 2061:19, 2061:20, 2062:2, 2063:10, 2064:15, 2064:21, 2065:8, 2066:3, 2066:7, 2067:3, 2067:14, 2067:17, 2069:7, 2069:16, 2071:3

**Honor's** [6] - 1961:20, 1964:7, 1964:19, 1965:16, 2061:18, 2068:6
**HONORABLE** [1] - 1952:17
**hooking** [1] - 1965:24
**HORA** [1] - 1953:12
**hour** [5] - 1985:2, 1985:4, 2002:21, 2070:18
**hours** [2] - 1972:16, 1989:22
**house** [3] - 1969:22, 2063:11, 2063:24
**hundred** [4] - 2020:20, 2030:23, 2030:24, 2038:5
**hundreds** [1] - 2062:16
**hypothetical** [1] - 1972:2

---

## I

**I-A** [1] - 2014:15
**IA** [4] - 2015:4, 2015:9,

1988:17, 2002:1
**IB** [2] - 2016:18, 2016:22
**ICI** [6] - 2017:15, 2017:19, 2021:2, 2049:24, 2050:1, 2051:24
**idea** [1] - 1973:14
**identification** [1] - 2056:19
**identified** [4] - 1969:1, 2005:10, 2005:20, 2054:13
**identifies** [5] - 1957:23, 2011:23, 2015:3, 2015:4, 2015:8
**identify** [8] - 1982:7, 1987:18, 1987:19, 1987:22, 1990:24, 1991:1, 1991:16, 2016:15
**iffy** [1] - 1965:10
**ignored** [1] - 2028:20
**illustrate** [2] - 1982:20, 2046:23
**immediately** [1] - 1973:3
**impeach** [3] - 1988:17, 2002:3, 2041:25
**Implicitly** [1] - 2013:10
**important** [1] - 2003:25
**in-house** [2] - 2063:11, 2063:24
**inaccurate** [1] - 2065:19
**inappropriate** [1] - 2041:12
**incapable** [1] - 2003:14
**inclined** [1] - 2061:19
**include** [6] - 1980:16, 1980:17, 2023:11, 2051:25, 2052:17, 2060:11
**included** [6] - 2041:10, 2052:13, 2053:12, 2064:6, 2068:1, 2068:12
**includes** [7] - 2022:1, 2022:8, 2023:12, 2023:15, 2052:14, 2052:19
**including** [4] - 1971:20, 1976:5, 2003:6, 2063:12
**income** [1] - 1985:11
**inconsistent** [2] -

1988:17, 2002:1
**incorporated** [2] - 2068:13, 2068:14
**incorrect** [1] - 2033:3
**increase** [1] - 2064:20
**incredibly** [3] - 1993:3, 1993:4, 1993:9
**independent** [5] - 2026:22, 2027:3, 2054:12, 2054:13, 2066:9
**Index** [10] - 1976:15, 1976:22, 1978:7, 2018:10, 2034:17, 2051:6, 2051:11, 2051:12, 2051:15, 2051:17
**index** [15] - 2005:24, 2007:16, 2007:23, 2016:25, 2019:5, 2020:24, 2021:16, 2021:25, 2022:1, 2025:17, 2049:21, 2050:18, 2050:21, 2051:21, 2051:22
**indicated** [3] - 2038:17, 2059:20, 2065:14
**indicating** [1] - 2008:2
**individual** [7] - 1956:7, 1956:22, 1964:8, 1968:4, 1969:10, 1997:19, 1997:20
**individually** [1] - 1962:11
**individuals** [1] - 2003:9
**industry** [9] - 1970:22, 1970:24, 1971:1, 1973:19, 1974:2, 1995:9, 2023:6, 2037:16
**inform** [1] - 2038:19
**Information** [1] - 2054:7
**information** [23] - 1957:25, 1959:15, 1960:11, 1964:8, 1965:6, 1969:8, 1969:19, 1969:20, 1969:23, 1969:24, 1970:7, 1970:23, 2006:20, 2006:23, 2009:17, 2012:22, 2026:8, 2054:16, 2056:2, 2058:18, 2064:25, 2069:3, 2070:10

**informing** [1] - 1956:24
**initiated** [1] - 2063:11
**input** [6] - 2061:13, 2062:11, 2063:12, 2064:1, 2064:3, 2065:5
**inquiring** [1] - 1961:23
**inquiry** [2] - 2062:20, 2069:17
**INS** [1] - 1952:6
**inside** [1] - 1998:17
**Insider** [1] - 2004:1
**Insight** [6] - 1969:8, 1969:18, 1969:24, 1970:8, 1970:10, 1982:18
**Insights** [1] - 1969:17
**insignificant** [1] - 1989:9, 1989:16
**inspection** [2] - 2060:25, 2061:20
**instance** [1] - 2070:5
**instruct** [1] - 1992:17
**INSURANCE** [1] - 1953:16
**insurance** [3] - 2053:1, 2053:12, 2053:16
**intelligence** [1] - 1997:22
**intended** [1] - 1988:10
**intent** [1] - 2040:13
**intentionally** [2] - 1967:11, 2009:10
**interesting** [1] - 2033:23
**Intermediate** [1] - 2051:16
**internal** [1] - 2065:1
**Internet** [1] - 2013:22
**interoffice** [1] - 2061:1
**interpret** [3] - 2008:9, 2039:12, 2041:20
**interpreted** [1] - 2059:4
**interrupt** [1] - 2012:1
**interrupted** [1] - 1972:20, 2044:12
**interrupts** [1] - 2044:11
**intervene** [1] - 1994:2
**invest** [1] - 2018:17
**investigate** [1] - 1997:13
**investigation** [3] - 1996:20, 1998:6, 2010:5
**investment** [21] - 1977:6, 1977:24,

1981:7, 1983:7, 2018:16, 2022:8, 2036:2, 2036:4, 2038:14, 2038:20, 2038:24, 2039:7, 2040:6, 2041:3, 2042:4, 2042:8, 2052:5, 2052:20, 2053:13, 2068:4
**Investment** [1] - 2039:3
**investments** [1] - 1969:21
**Investor** [1] - 2020:24
**investor** [1] - 2021:3
**investors** [1] - 1982:15
**involved** [1] - 1995:11, 2052:1, 2052:11, 2054:17, 2062:14, 2062:23, 2064:13, 2065:15, 2065:20
**involvement** [1] - 2064:22
**issue** [29] - 1960:17, 1961:23, 1962:18, 1964:20, 1968:4, 1979:10, 2000:7, 2001:10, 2016:18, 2016:22, 2018:22, 2019:3, 2022:20, 2022:21, 2037:6, 2047:15, 2055:4, 2056:5, 2057:3, 2058:14, 2058:24, 2061:9, 2062:7, 2062:22, 2069:5, 2069:8, 2069:21, 2070:1, 2070:14
**issue's** [1] - 2001:17
**issued** [3] - 2060:8, 2060:9, 2062:3
**issuer** [1] - 2004:4
**issues** [8] - 1972:22, 2055:5, 2055:6, 2055:7, 2060:5, 2067:9, 2070:21, 2070:24
**item** [5] - 1977:8, 1977:22, 1980:10, 1980:20, 2029:19
**items** [4] - 1962:6, 1962:13, 2000:25, 2030:13
**itself** [5] - 1974:20, 1990:8, 1998:17, 2059:15, 2066:15

**J**

**James** [1] - 2025:21
**JAMES** [1] - 1953:13
**JANUARY** [1] - 1952:13
**Janus** [1] - 1986:5
**JERSEY** [3] - 1952:1, 1952:15, 1952:18
**Joenk** [10] - 1961:22, 1962:20, 1962:21, 1966:18, 1966:24, 1967:2, 1967:6, 1967:8, 2062:6, 2062:7
**Joenk's** [1] - 1963:15
**joint** [1] - 2047:14
**JONATHAN** [1] - 1953:9
**JP** [23] - 1980:6, 1980:9, 1980:13, 2000:21, 2000:22, 2001:3, 2001:25, 2002:14, 2002:24, 2003:1, 2049:16, 2054:7, 2054:9, 2054:12, 2054:15, 2054:21, 2055:3, 2055:4, 2055:5, 2055:7, 2055:14, 2064:12, 2066:11
**Judge** [1] - 2069:5
**JUDGE** [2] - 1952:17
**judge** [2] - 2017:19, 2020:2
**July** [2] - 2057:21
**jump** [1] - 2068:24

**K**

**keep** [1] - 2012:2
**keeping** [1] - 2029:15
**Ken** [1] - 1997:13
**kept** [2] - 2032:12, 2032:18
**kind** [9] - 1958:20, 2005:4, 2005:9, 2005:24, 2005:25, 2043:4, 2044:1, 2045:24, 2070:17
**kinds** [1] - 1971:23
**kneeling** [1] - 2039:25
**knowledge** [2] - 1996:9, 2053:21
**known** [3] - 1991:1, 1991:16, 2062:12
**knows** [1] - 1993:16
**Korn** [3] - 2056:12,

2061:4, 2070:17
**KORN** [15] - 1953:9, 1955:15, 2061:5, 2062:2, 2065:8, 2065:23, 2066:7, 2066:17, 2066:22, 2067:3, 2067:8, 2069:7, 2069:25, 2070:8, 2071:3
**Korn's** [2] - 2064:23, 2067:21
**Kozlowski** [1] - 1997:13
**KWELTY** [1] - 1953:5

---

**L**

**labeled** [1] - 2058:8
**labeling** [1] - 1961:7
**labels** [1] - 1960:24
**lack** [1] - 1973:6
**LAKIND** [3] - 1953:3, 1953:4, 1953:5
**landscape** [1] - 2027:16
**landscapes** [2] - 1974:13, 1974:20
**language** [2] - 2037:15, 2037:18
**Large** [9] - 2005:13, 2007:7, 2008:10, 2008:19, 2043:2, 2043:7, 2043:12, 2047:4, 2047:17
**large** [2] - 2021:10, 2021:21
**larger** [3] - 2019:13, 2021:3, 2050:10
**last** [4] - 1955:5, 1959:5, 2010:5, 2047:2
**late** [1] - 2004:1
**Laughter** [1] - 2067:16
**law** [5] - 1962:10, 1962:13, 2036:24, 2070:9, 2070:11
**laws** [1] - 2003:17
**lawsuit** [2] - 2016:18, 2016:22
**lawyer/client** [1] - 2070:24
**lawyers** [1] - 2068:8
**lay** [1] - 1967:1
**least** [3] - 1970:7, 2060:24, 2062:24
**left** [4] - 1970:5, 2008:17, 2028:4, 2043:18
**left-hand** [1] - 1970:5

**legal** [3] - 1996:15, 2003:5, 2063:24
**legally** [2] - 1996:13, 2037:19
**length** [1] - 2009:21
**less** [6] - 2020:16, 2020:18, 2021:14, 2021:22, 2023:7, 2027:24
**level** [4] - 2053:1, 2053:12, 2053:16, 2064:18
**levels** [2] - 2034:2, 2034:19
**LIFE** [2] - 1952:6, 1953:16
**likely** [1] - 1993:8
**limited** [4] - 2002:1, 2069:15, 2069:20, 2069:22
**limiting** [1] - 2014:20
**line** [10] - 1980:20, 1991:8, 1992:21, 1994:4, 1996:4, 1998:23, 2011:18, 2015:24, 2029:19, 2041:11
**Lipper** [23] - 1969:7, 1970:8, 1970:9, 1982:18, 2006:9, 2006:23, 2007:7, 2007:18, 2008:10, 2008:19, 2009:9, 2009:15, 2018:25, 2026:9, 2026:13, 2026:16, 2026:18, 2026:20, 2026:22, 2049:21, 2049:24, 2050:1, 2059:18
**Lipper's** [1] - 2027:3
**list** [3] - 1987:24, 1988:1, 1991:13
**listed** [5] - 1978:21, 1979:17, 1996:15, 2016:3, 2043:4
**listen** [1] - 2044:25
**litigation** [3] - 2062:18, 2062:22, 2065:11
**LLP** [2] - 1953:8, 1953:11
**log** [3] - 2055:4, 2055:5, 2055:6
**look** [19] - 1970:5, 1972:25, 1975:13, 1982:6, 1983:24, 1997:14, 2008:14, 2010:5, 2019:3, 2023:8, 2026:4, 2028:7, 2030:16,

2031:6, 2031:16, 2034:7, 2041:2, 2053:21, 2067:11
**looked** [7] - 1994:19, 1994:24, 2010:1, 2032:3, 2047:19, 2057:2
**looking** [20] - 1971:10, 1975:20, 1975:21, 1976:4, 1976:5, 1979:7, 1980:19, 1993:11, 2008:10, 2008:16, 2011:6, 2014:9, 2023:8, 2024:24, 2030:20, 2047:13, 2048:20, 2066:18, 2066:22, 2066:24
**lose** [1] - 2034:25
**loss** [4] - 2005:3, 2005:4, 2005:5, 2059:16
**losses** [5] - 2008:3, 2008:4, 2008:5, 2009:7, 2009:11, 2009:12, 2010:17, 2012:17, 2058:12
**lost** [1] - 2040:1
**Louie** [8] - 2060:11, 2062:6, 2062:9, 2063:24, 2063:25, 2065:24, 2069:14, 2070:2
**LOUIE** [1] - 1953:15
**Louie's** [4] - 2064:15, 2066:18, 2068:10, 2070:13
**low** [3] - 2021:11, 2021:17, 2021:19
**lower** [8] - 1970:17, 1976:6, 2006:23, 2007:4, 2021:4, 2021:5, 2050:14
**lowers** [1] - 1980:15
**lowest** [4] - 2020:12, 2020:25, 2023:5

---

**M**

**mail** [2] - 2060:13, 2064:4
**mails** [3] - 2061:1, 2065:1, 2066:16
**maintains** [1] - 1969:20
**major** [1] - 1971:20
**majority** [2] - 2054:16, 2068:4
**manage** [2] - 2035:7,

2052:6
**managed** [5] - 2005:21, 2019:5, 2022:22, 2035:4, 2035:21
**MANAGEMENT** [1] - 1952:11
**Management** [3] - 2034:23, 2035:2, 2035:4
**management** [54] - 1977:6, 1977:8, 1977:24, 1979:5, 1979:6, 1979:8, 1981:7, 1983:5, 1983:6, 1983:7, 2014:18, 2022:8, 2025:1, 2025:21, 2025:25, 2026:6, 2026:9, 2027:21, 2027:24, 2028:11, 2029:3, 2029:22, 2030:7, 2030:20, 2034:22, 2035:1, 2036:2, 2036:5, 2038:15, 2038:21, 2038:24, 2039:3, 2039:7, 2040:6, 2041:3, 2042:5, 2042:8, 2043:23, 2044:2, 2045:13, 2045:17, 2045:23, 2047:18, 2050:15, 2050:19, 2050:22, 2051:3, 2052:5, 2053:13, 2063:14, 2064:7, 2065:22, 2065:23, 2068:4
**manager** [2] - 1971:18, 2046:9
**manager's** [1] - 1997:14
**managers** [9] - 1987:12, 1987:15, 1987:16, 1988:25, 1990:11, 1991:1, 1991:12, 1991:16
**MANAGING** [1] - 1953:15
**manual** [2] - 1992:25, 1993:15
**manually** [2] - 1993:1, 1993:6
**March** [1] - 2015:10
**Marco** [8] - 2011:9, 2014:7, 2018:14, 2019:15, 2029:25, 2030:15, 2043:6, 2043:21
**margin** [45] - 1969:4,

1969:6, 1969:10, 1969:12, 1970:16, 1971:3, 1971:16, 1971:20, 1972:3, 1972:8, 1972:19, 1972:23, 1973:1, 1973:11, 1974:21, 1974:24, 1975:8, 1975:10, 1975:12, 1976:7, 1976:16, 1977:16, 1978:10, 1978:13, 1978:23, 1979:23, 1980:15, 1980:18, 1981:6, 1982:9, 1982:11, 1982:17, 1982:23, 1983:2, 1983:14, 1984:7, 2031:10, 2032:25, 2033:17, 2033:22, 2034:5, 2034:11, 2034:19, 2034:21, 2048:13
**margins** [1] - 1973:24, 1982:8, 1982:11, 1982:13, 1982:15, 1982:21, 1983:9, 2033:10, 2034:1
**marked** [13] - 1954:10, 1954:11, 1954:12, 1954:13, 1956:9, 1957:18, 1968:20, 1969:13, 1981:19, 1981:23, 1984:17, 2011:3, 2060:2
**marketplace** [2] - 2003:21, 2021:11
**markets** [1] - 1995:22
**MARY** [1] - 1952:3
**match** [2] - 1965:4, 2057:25
**material** [1] - 1965:10
**materials** [4] - 1966:4, 2057:21, 2060:11, 2062:24
**math** [8] - 1958:22, 1958:24, 1960:20, 1960:21, 1961:4, 1973:22, 2030:19, 2033:25
**mathematic** [1] - 1968:3
**mathematical** [4] - 1957:1, 1958:9, 1960:14, 1968:14
**mathematician** [1] - 1973:22
**mathematics** [1] - 1972:18
**matter** [3] - 1962:13, 1972:17, 2067:23

*2084*

McCLOY [1] - 1953:11
mean [43] - 1960:25,
1967:8, 1970:22,
1979:14, 1987:23,
1991:25, 1997:3,
1999:4, 1999:5,
1999:12, 1999:24,
1999:25, 2000:2,
2000:3, 2001:4,
2012:1, 2013:23,
2013:24, 2015:22,
2016:11, 2021:1,
2023:2, 2023:3,
2024:21, 2025:17,
2026:17, 2033:5,
2034:6, 2035:22,
2036:6, 2038:11,
2038:24, 2039:10,
2041:20, 2041:23,
2044:6, 2044:7,
2046:11, 2050:9,
2059:4, 2062:19,
2062:21, 2069:17
meaning [2] -
2041:10, 2042:4
meaningless [1] -
1993:2
means [16] - 1972:2,
1996:12, 1996:19,
1999:12, 2000:9,
2001:9, 2001:13,
2001:19, 2002:6,
2003:13, 2021:2,
2023:18, 2024:7,
2041:20, 2041:21,
2041:24
meant [1] - 2000:16
measure [1] - 1992:25
measured [2] -
2018:15, 2019:8
meddle [1] - 1992:5
median [2] - 2023:17,
2023:21
meet [3] - 1955:4,
1998:4, 1998:5
meeting [1] - 1986:19
members [1] -
1992:17
memo [1] - 2055:8
mention [2] - 2009:19,
2058:16
mentioned [2] -
1963:20, 2011:17
mentioning [1] -
1979:2
methodology [6] -
1958:20, 1978:24,
1979:9, 1979:12,
1979:14, 1982:10
mid [1] - 2058:11

middle [1] - 2025:17
might [15] - 1955:2,
1959:2, 1961:17,
1963:15, 1989:2,
1994:23, 1997:23,
2006:13, 2013:19,
2016:21, 2016:23,
2020:8, 2028:23,
2047:1, 2050:7
Milbank [23] - 2056:6,
2060:8, 2061:1,
2061:8, 2061:12,
2061:15, 2062:11,
2062:14, 2062:20,
2062:23, 2063:12,
2064:1, 2064:3,
2064:18, 2065:1,
2065:5, 2065:14,
2066:13, 2068:20,
2069:19, 2070:20,
2070:23
MILBANK [1] -
1953:11
million [35] - 1960:6,
1977:3, 1977:12,
1977:18, 1977:24,
1977:25, 1978:11,
1978:19, 1981:4,
1984:2, 1984:4,
1984:6, 2008:20,
2013:5, 2013:6,
2014:14, 2020:17,
2020:18, 2020:20,
2028:12, 2028:18,
2028:24, 2030:2,
2030:22, 2030:23,
2031:13, 2031:22,
2032:16, 2033:16,
2034:9, 2049:14,
2049:17
mind [4] - 1964:24,
1986:21, 2039:10,
2039:12
minimum [3] -
2060:12, 2060:23,
2061:18
minimus [2] - 1989:2,
1989:4
minus [5] - 1974:25,
1975:2, 2028:14,
2030:20, 2034:9
minute [2] - 1960:21,
2007:22
minutes [1] - 2042:23
misinformation [1] -
2067:24
misleading [1] -
2037:2
missing [1] - 2056:24
mistaken [1] - 2037:2

model [2] - 1995:25,
1998:21
models [4] - 1997:22,
1998:16, 2046:2
moment [2] - 1956:25,
2015:7
money [7] - 1978:22,
2012:20, 2029:14,
2031:25, 2034:12,
2034:15, 2034:17
money's [2] - 2029:12,
2030:6
monitor [1] - 2055:3
monitored [1] -
2035:17
monitoring [4] -
1987:13, 1987:16,
1988:24, 2036:10
monthly [1] - 2055:13
months [1] - 2044:22
Morgan [23] - 1980:6,
1980:9, 1980:14,
2000:21, 2000:22,
2001:3, 2001:25,
2002:14, 2002:25,
2003:1, 2049:16,
2054:8, 2054:9,
2054:12, 2054:15,
2054:21, 2055:3,
2055:4, 2055:5,
2055:7, 2055:14,
2064:12, 2066:12
morning [1] - 1955:24
Morningstar [1] -
2018:24
most [6] - 1993:8,
2003:20, 2005:10,
2005:15, 2007:15,
2020:2
motion [1] - 2059:12
motivated [1] -
2007:22
move [7] - 1981:14,
1984:11, 2004:9,
2029:24, 2033:21,
2034:1, 2056:18
moved [2] - 1973:3,
2058:21
movement [1] -
2033:25
Mr [135] - 1955:7,
1955:19, 1955:24,
1956:6, 1956:16,
1957:8, 1957:22,
1958:8, 1958:11,
1958:14, 1959:8,
1959:24, 1960:15,
1960:18, 1961:3,
1961:14, 1961:22,
1962:7, 1962:16,

1962:20, 1962:21,
1963:2, 1963:5,
1963:15, 1964:2,
1964:15, 1964:23,
1965:5, 1965:10,
1966:9, 1966:17,
1966:18, 1966:24,
1966:25, 1967:2,
1967:6, 1967:8,
1968:1, 1971:13,
1971:17, 1972:3,
1972:4, 1972:9,
1972:11, 1973:6,
1973:9, 1973:10,
1973:18, 1974:1,
1984:23, 1985:8,
1988:3, 1988:13,
1989:21, 1990:1,
1990:7, 1990:23,
1991:20, 1993:20,
1999:7, 2000:20,
2002:6, 2004:16,
2004:17, 2004:18,
2004:22, 2010:3,
2010:16, 2011:6,
2012:1, 2013:14,
2014:11, 2015:1,
2016:25, 2017:23,
2022:17, 2027:9,
2027:15, 2028:8,
2031:17, 2035:9,
2037:8, 2037:13,
2038:18, 2039:24,
2040:21, 2040:25,
2041:9, 2041:18,
2041:20, 2042:21,
2043:14, 2043:15,
2044:8, 2044:14,
2045:3, 2045:15,
2047:1, 2047:12,
2048:11, 2053:11,
2055:17, 2056:12,
2057:22, 2057:24,
2058:9, 2058:23,
2058:24, 2058:25,
2059:7, 2059:15,
2059:20, 2059:23,
2060:13, 2060:16,
2061:4, 2062:6,
2062:7, 2063:25,
2064:18, 2064:23,
2066:1, 2066:17,
2066:20, 2066:22,
2067:21, 2069:14,
2069:18, 2070:1,
2070:7, 2070:17,
2070:25, 2071:4
MR [201] - 1954:3,
1954:4, 1954:5,
1955:9, 1955:15,
1955:20, 1956:3,

1956:15, 1956:20,
1957:3, 1957:13,
1957:16, 1957:17,
1958:1, 1958:6,
1958:12, 1958:16,
1959:4, 1959:14,
1959:20, 1959:24,
1960:18, 1961:6,
1961:11, 1961:20,
1962:19, 1963:12,
1964:13, 1964:19,
1965:14, 1966:1,
1966:7, 1966:13,
1966:23, 1967:5,
1967:25, 1968:18,
1968:19, 1971:8,
1971:11, 1971:14,
1971:15, 1972:12,
1973:2, 1974:5,
1974:6, 1974:15,
1974:18, 1974:19,
1976:10, 1976:21,
1981:14, 1981:17,
1981:21, 1983:17,
1983:20, 1983:22,
1983:23, 1984:11,
1984:14, 1984:16,
1984:19, 1984:22,
1984:25, 1985:6,
1985:7, 1988:4,
1988:9, 1988:15,
1988:20, 1989:19,
1990:5, 1990:14,
1990:22, 1991:7,
1991:18, 1992:20,
1993:18, 1994:3,
1994:12, 1996:3,
1997:8, 1998:22,
2000:6, 2000:12,
2000:19, 2001:6,
2001:8, 2001:23,
2002:5, 2002:8,
2002:10, 2002:18,
2004:9, 2004:13,
2004:19, 2004:21,
2008:15, 2008:18,
2010:11, 2010:15,
2010:19, 2010:23,
2011:1, 2011:5,
2012:10, 2012:12,
2012:16, 2013:12,
2014:7, 2014:19,
2014:23, 2014:25,
2015:21, 2015:25,
2016:2, 2017:8,
2017:18, 2017:22,
2018:13, 2019:15,
2022:6, 2022:13,
2022:16, 2025:23,
2026:23, 2027:5,
2027:14, 2029:24,

2030:15, 2032:5, 2032:7, 2033:7, 2036:19, 2036:21, 2037:4, 2037:7, 2037:12, 2039:9, 2039:25, 2040:2, 2040:5, 2040:20, 2040:23, 2040:24, 2041:6, 2041:16, 2041:18, 2042:3, 2043:6, 2043:14, 2043:21, 2043:25, 2044:10, 2044:14, 2044:16, 2044:19, 2045:2, 2047:4, 2048:6, 2048:9, 2048:21, 2049:7, 2049:23, 2049:25, 2050:3, 2055:16, 2055:21, 2055:25, 2056:3, 2056:9, 2056:13, 2056:15, 2056:18, 2056:23, 2057:2, 2057:8, 2058:15, 2059:10, 2059:13, 2060:1, 2060:4, 2060:6, 2061:5, 2061:10, 2062:2, 2063:10, 2065:8, 2065:23, 2066:3, 2066:7, 2066:17, 2066:22, 2067:3, 2067:8, 2067:14, 2067:17, 2069:7, 2069:25, 2070:8, 2071:3

**multi** [1] - 2051:21

**multi-billion** [1] - 2051:21

**multiple** [5] - 2014:20, 2014:21, 2015:1, 2016:5, 2066:5

**multitude** [1] - 1966:3

**MURPHY** [103] - 1953:12, 1954:4, 1955:9, 1956:15, 1958:1, 1958:12, 1958:16, 1959:4, 1960:18, 1961:11, 1962:19, 1964:19, 1966:23, 1971:8, 1971:11, 1971:15, 1973:2, 1981:17, 1984:14, 1984:22, 1984:25, 1985:6, 1985:7, 1988:4, 1988:15, 1988:20, 1989:19, 1990:5, 1990:22, 1991:7, 1991:18, 1992:20,

1993:18, 1994:3, 1994:12, 1996:3, 1997:8, 1998:22, 2000:12, 2000:19, 2001:6, 2001:23, 2002:8, 2002:10, 2002:18, 2004:9, 2004:13, 2004:19, 2004:21, 2008:15, 2008:18, 2010:11, 2010:15, 2010:19, 2011:1, 2011:5, 2012:16, 2013:12, 2014:7, 2014:23, 2014:25, 2015:25, 2016:2, 2017:8, 2017:18, 2017:22, 2018:13, 2019:15, 2022:13, 2022:16, 2025:23, 2027:5, 2027:14, 2029:24, 2030:15, 2032:5, 2032:7, 2033:7, 2036:19, 2037:4, 2037:12, 2039:25, 2040:2, 2040:5, 2040:20, 2040:23, 2040:24, 2041:16, 2041:18, 2042:3, 2043:6, 2043:14, 2043:21, 2043:25, 2044:14, 2045:2, 2047:4, 2048:6, 2049:23, 2056:9, 2056:13, 2057:8, 2060:1

**Murphy** [14] - 1958:11, 1984:23, 1988:3, 1988:13, 2002:6, 2004:18, 2039:24, 2047:12, 2056:12, 2058:24, 2058:25, 2059:7, 2059:20

**Murphy's** [1] - 2059:15

**must** [1] - 2042:22

**mutual** [26] - 1969:9, 1969:19, 1969:23, 1971:1, 1985:17, 2003:18, 2003:20, 2004:5, 2016:6, 2018:16, 2018:17, 2018:18, 2018:21, 2019:13, 2020:16, 2020:17, 2020:18, 2020:19, 2023:3, 2026:13, 2037:15, 2052:6, 2052:7, 2052:12, 2052:18, 2054:5

**MYLES** [1] - 1953:6

## N

**name** [1] - 2046:11

**names** [1] - 2035:15

**nature** [3] - 2059:3, 2059:25, 2066:16

**necessarily** [5] - 2005:5, 2006:12, 2020:13, 2029:11, 2050:13

**necessary** [2] - 2061:16, 2061:23

**need** [12] - 1974:15, 1975:13, 1978:3, 1993:7, 1998:14, 2004:22, 2012:2, 2019:25, 2027:7, 2028:7, 2042:23, 2070:9

**needed** [2] - 1992:12, 1992:18

**needs** [1] - 1960:22

**negative** [4] - 2007:11, 2034:3, 2034:4, 2034:6

**negotiated** [2] - 2030:13, 2046:17

**negotiation** [2] - 2046:13, 2046:18

**negotiations** [1] - 2045:19

**net** [2] - 2015:2, 2015:4

**never** [6] - 1972:6, 1998:7, 2030:23, 2046:16, 2067:12, 2067:20

**New** [3] - 1990:12, 1990:25, 1991:15

**NEW** [3] - 1952:1, 1952:15, 1952:18

**new** [5] - 1958:22, 1990:11, 1990:24, 1991:11, 2004:9

**next** [10] - 1955:3, 1968:17, 1982:24, 2021:23, 2030:1, 2043:3, 2043:6, 2043:7, 2055:21, 2059:9

**Next** [1] - 2055:20

**night** [1] - 2010:5

**NO** [2] - 1952:5, 1952:9

**nobody** [2] - 1995:16, 1997:20

**non** [2] - 2009:1,

2052:7

**non-prospectus** [1] - 2009:1

**non-variable** [1] - 2052:7

**none** [4] - 1965:12, 2024:21, 2057:24, 2068:17

**noon** [1] - 1955:16

**normal** [1] - 1994:18

**note** [3] - 2019:7, 2058:3, 2058:10

**notes** [2] - 2059:6, 2059:7

**Nothing** [3] - 1989:8, 1989:15, 2055:16

**nothing** [8] - 1956:22, 1960:14, 1965:24, 2041:9, 2041:13, 2063:1, 2065:11, 2067:8

**now's** [1] - 1985:1

**Number** [1] - 2067:23

**number** [54] - 1956:23, 1957:10, 1957:11, 1958:8, 1958:22, 1959:16, 1959:18, 1959:19, 1959:20, 1959:21, 1959:22, 1960:2, 1960:9, 1960:13, 1960:25, 1963:6, 1963:8, 1963:18, 1964:6, 1964:16, 1966:10, 1971:18, 1975:18, 1975:21, 1975:22, 1978:19, 1978:20, 1983:1, 1994:25, 2007:13, 2008:22, 2008:23, 2009:15, 2014:5, 2014:8, 2015:18, 2018:21, 2020:12, 2023:19, 2024:1, 2024:17, 2025:2, 2025:5, 2031:5, 2034:3, 2034:5, 2046:18, 2049:24, 2057:12, 2064:20, 2067:4, 2067:22

**numbers** [38] - 1957:9, 1960:5, 1961:4, 1961:17, 1963:3, 1963:5, 1963:6, 1964:3, 1971:6, 1971:25, 1972:25, 1973:1, 1974:10, 1975:4, 1976:6, 1976:15, 1977:1, 1978:21,

1979:17, 1979:18, 1979:20, 1980:13, 2010:6, 2016:13, 2017:10, 2018:2, 2018:5, 2019:23, 2023:11, 2023:24, 2024:15, 2025:13, 2026:7, 2027:16, 2030:9, 2038:3, 2049:19, 2058:2

## O

**oath** [4] - 1955:25, 1986:24, 2004:17, 2040:16

**object** [9] - 1988:9, 1990:14, 2000:10, 2001:8, 2001:15, 2022:6, 2039:9, 2041:6, 2045:1

**objected** [2] - 1972:4, 2058:22

**objecting** [2] - 1972:13

**Objection** [4] - 1958:1, 2012:10, 2026:23, 2049:23

**objection** [8] - 1956:15, 1961:8, 1981:17, 2010:22, 2010:23, 2012:11, 2014:19, 2044:18

**objections** [6] - 1955:14, 1973:14, 1981:16, 1984:13, 2057:12, 2062:5

**objectives** [4] - 2038:25, 2039:8, 2040:8, 2042:8

**obligations** [1] - 2055:14

**obtain** [1] - 2054:9

**obviously** [4] - 1962:3, 1962:9, 2058:19, 2063:18

**October** [3] - 2044:17, 2044:20, 2058:8

**OF** [8] - 1952:1, 1952:18, 1954:3, 1954:4, 1954:5, 1956:2, 1985:7, 2048:9

**offer** [3] - 1958:16, 1969:11, 2010:19

**offered** [4] - 1974:11, 2006:9, 2009:17, 2041:21

**offering** [4] - 1958:19, 1959:6, 1960:23,

2047:25

**offers** [3] - 1992:2, 2041:20, 2046:10

**office** [5] - 1987:20, 1987:21, 1989:10, 1989:12, 1989:13

**offices** [1] - 1998:7

**OFFICIAL** [1] - 1952:25

**offset** [3] - 2029:8, 2029:15, 2030:3

**offsets** [1] - 1971:24

**often** [1] - 1998:5

**omit** [1] - 2046:12

**once** [1] - 1978:18

**one** [84] - 1955:13, 1956:4, 1960:5, 1961:21, 1966:23, 1967:18, 1969:7, 1995:6, 1997:24, 2001:17, 2002:3, 2003:20, 2005:18, 2005:22, 2006:1, 2006:8, 2007:3, 2007:8, 2007:25, 2008:1, 2008:2, 2008:19, 2009:10, 2011:10, 2012:21, 2014:21, 2015:7, 2015:18, 2017:19, 2019:18, 2019:19, 2020:7, 2023:1, 2030:1, 2030:2, 2031:17, 2032:6, 2033:6, 2033:8, 2035:19, 2036:13, 2036:16, 2036:18, 2037:23, 2038:5, 2038:12, 2040:21, 2042:14, 2043:1, 2043:18, 2045:4, 2045:12, 2052:12, 2056:14, 2056:23, 2056:25, 2057:18, 2058:24, 2060:6, 2060:13, 2060:14, 2061:5, 2061:11, 2063:13, 2063:16, 2063:25, 2064:7, 2064:13, 2065:8, 2065:13, 2065:17, 2065:21, 2066:4, 2066:6, 2067:4, 2067:18, 2067:21, 2067:22, 2068:11, 2070:22

**one's** [1] - 2018:3

**ones** [3] - 1996:13, 1996:19, 2053:6

**open** [1] - 1991:14

**operates** [1] - 2003:1

**operating** [2] - 1970:16, 2034:21

**opine** [1] - 2022:9

**opinion** [20] - 1958:19, 1959:7, 1963:16, 1974:4, 1987:3, 1987:4, 1990:15, 1990:19, 1993:22, 1999:1, 2000:20, 2001:3, 2002:19, 2002:23, 2022:7, 2022:10, 2027:1, 2038:20, 2041:21, 2044:23

**opinions** [1] - 1956:4, 1987:2, 1993:10

**opportunity** [1] - 1972:15

**opposed** [3] - 2020:21, 2052:7, 2063:19

**options** [1] - 1982:16

**oranges** [2] - 2037:2, 2038:11

**order** [5] - 1974:9, 1975:11, 1977:15, 2060:7, 2060:23

**ordered** [2] - 2057:16

**ordinary** [1] - 1995:3

**organization** [1] - 1969:19

**original** [2] - 1964:10, 2033:5

**originally** [1] - 1955:12

**outline** [1] - 2042:22

**outlining** [1] - 2055:8

**outside** [2] - 1990:15, 2022:9

**overcharge** [1] - 2031:3

**overlay** [5] - 1991:22, 1991:24, 1992:3, 1992:14, 1992:18

**Overruled** [6] - 2000:18, 2002:9, 2022:11, 2026:25, 2039:17, 2042:2

**overruled** [1] - 1990:20

**oversaw** [1] - 2035:17

**oversee** [1] - 2047:7

**overseeing** [4] - 2036:10, 2037:5, 2037:22, 2037:23

**oversees** [1] - 2044:5

**oversight** [1] - 1975:25

**owe** [2] - 2034:15,

2034:17

**owed** [1] - 2034:12

**own** [1] - 2048:4

**P**

**P-117** [4] - 2017:18, 2020:23, 2021:24, 2025:23

**P-151** [1] - 2042:18

**P-151-E** [2] - 2032:5, 2056:16

**P-151-I** [3] - 2004:20, 2010:17, 2056:24

**P-151-J** [12] - 1968:24, 1968:25, 1971:5, 1973:17, 1974:8, 1977:1, 1980:22, 1981:14, 1981:18, 2008:14, 2031:7, 2056:20

**P-151-K** [5] - 1981:23, 1981:25, 1984:9, 1984:11, 2056:21

**P-151-L** [3] - 1956:9, 1956:12, 1964:14

**P-152** [2] - 2017:8, 2025:11

**P-164** [3] - 1969:14, 1969:15, 1970:2

**P-167** [1] - 2056:16

**P-197-A** [3] - 1957:19, 1957:21, 1957:25

**P-509** [2] - 2047:1, 2047:3

**P-51** [1] - 2057:20

**P-52-B** [3] - 2027:16, 2028:7, 2030:17

**P-54** [1] - 2057:20

**P-67** [1] - 2056:16

**P-74** [2] - 2005:11, 2007:6

**p.m** [1] - 2054:8

**Page** [1] - 2018:2

**page** [41] - 1957:10, 1970:2, 1970:5, 1970:6, 1974:8, 1976:19, 1976:20, 1976:22, 1977:19, 1978:6, 1978:7, 1980:2, 1980:22, 1982:5, 1982:6, 1988:21, 1992:20, 2014:1, 2014:4, 2017:8, 2017:25, 2018:7, 2020:23, 2021:23, 2021:24, 2022:14, 2025:11, 2025:23, 2030:17,

2040:15, 2041:2, 2042:20, 2043:3, 2043:6, 2043:7, 2043:24, 2044:1, 2047:3, 2053:24, 2054:21, 2058:23

**pages** [4] - 1981:25, 2013:17, 2013:18, 2043:2

**paid** [15] - 1978:22, 1979:22, 1982:15, 1983:13, 1984:1, 1984:6, 1984:7, 2027:22, 2028:16, 2028:25, 2029:1, 2030:22, 2032:11, 2049:13, 2049:17

**paper** [1] - 1991:4

**papers** [4] - 2010:9, 2010:16, 2048:23, 2058:1

**part** [8] - 1959:5, 1991:5, 1992:18, 2003:14, 2005:10, 2043:22, 2068:8, 2069:12

**particular** [4] - 2008:7, 2009:14, 2034:10, 2034:20

**particularly** [1] - 1967:6

**parties** [1] - 2061:1

**partnerships** [2] - 2037:11, 2037:20

**party** [4] - 1969:18, 1980:19, 1997:22, 2054:13

**past** [2] - 2021:10, 2069:8

**path** [1] - 2067:11

**PATRICIA** [1] - 1953:15

**pay** [3] - 2020:15, 2020:16, 2031:20

**paying** [1] - 2045:23

**payment** [2] - 1980:5, 1980:9

**payments** [1] - 1980:21

**PC** [1] - 1953:3

**Peck** [1] - 1992:13

**peer** [5] - 1972:6, 2006:9, 2006:19, 2007:2, 2010:1

**people** [8] - 1968:12, 1993:14, 1997:18, 1998:2, 1998:12, 1998:18, 1998:20, 1999:2

**per** [2] - 1968:15,

2016:16

**percent** [55] - 1969:3, 1969:6, 1969:12, 1970:17, 1970:18, 1971:3, 1971:16, 1971:19, 1972:2, 1975:2, 1975:10, 1975:12, 1975:16, 1976:16, 1978:13, 1978:15, 1978:23, 1979:23, 1980:18, 1981:6, 1982:9, 1982:11, 1982:12, 1984:10, 1985:11, 2009:7, 2020:6, 2020:8, 2023:3, 2023:5, 2023:6, 2023:10, 2024:7, 2024:17, 2031:10, 2031:20, 2031:21, 2032:25, 2033:16, 2033:17, 2033:22, 2034:5, 2034:8, 2034:9, 2034:11, 2034:21, 2036:13, 2036:16, 2037:23, 2038:1, 2038:5, 2038:12, 2048:13, 2049:22

**percentile** [2] - 2023:2, 2024:6

**perform** [1] - 1989:3

**performance** [14] - 2005:3, 2005:8, 2006:9, 2006:18, 2006:19, 2006:20, 2006:22, 2007:14, 2008:12, 2009:16, 2009:23, 2036:14, 2047:25

**performed** [6] - 1968:25, 1987:5, 1991:3, 2005:6, 2006:21, 2012:4

**performing** [1] - 1976:2

**performs** [2] - 1991:2, 2000:22

**perhaps** [3] - 1960:20, 1964:20, 2056:6

**period** [6] - 1962:4, 2013:2, 2014:13, 2058:11, 2058:14, 2058:19

**permanent** [1] - 2030:11

**permits** [1] - 1964:18

**permitted** [4] - 1961:1, 1990:15, 1990:16, 2015:22

**person** [1] - 2039:12
**pertaining** [1] - 1969:21
**pertains** [1] - 2064:24
**PETER** [1] - 1952:17
**PGS** [2] - 1952:5, 1952:10
**Ph.D** [5] - 1954:3, 1955:22, 1956:2, 1972:17, 2023:23
**PH.D** [4] - 1954:4, 1954:5, 1985:7, 2048:9
**Phil** [1] - 2055:22
**phrase** [4] - 2039:19, 2040:12, 2041:8, 2042:4
**PIMCO** [3] - 2011:10, 2013:1, 2014:5
**plaintiff** [5] - 1968:9, 1985:19, 2017:19, 2034:16, 2070:13
**Plaintiff's** [7] - 1954:11, 1954:13, 1981:19, 1984:17, 2053:21, 2053:23, 2060:2
**plaintiff's** [3] - 1954:10, 1955:5, 1984:19
**PLAINTIFFS** [3] - 1952:4, 1952:8, 1953:6
**plaintiffs** [14] - 1955:20, 1962:2, 1966:20, 1967:13, 1968:10, 1968:11, 2057:15, 2057:16, 2061:6, 2061:20, 2062:12, 2062:19, 2064:10
**plaintiffs'** [8] - 1957:25, 1960:10, 1962:9, 1981:8, 1990:18, 2051:21, 2054:5, 2055:22
**play** [14] - 1988:4, 1988:20, 1989:22, 1991:7, 1992:20, 1993:22, 1994:3, 1994:7, 1996:3, 2001:6, 2020:20, 2036:19, 2036:21, 2037:9
**played** [9] - 1988:5, 1988:22, 1991:9, 1992:22, 1994:5, 1996:5, 1998:24, 2000:16, 2002:12
**plays** [1] - 2063:19

**plenty** [2] - 1991:5, 2068:6
**PLUS** [9] - 2005:14, 2005:15, 2005:19, 2008:19, 2043:2, 2043:7, 2043:12, 2047:5, 2047:17
**plus** [1] - 1955:4
**point** [22] - 1958:3, 1963:11, 1965:15, 1967:5, 1967:18, 1992:13, 1992:15, 2011:15, 2019:18, 2019:19, 2021:22, 2032:24, 2042:22, 2045:10, 2046:6, 2047:24, 2050:14, 2052:12, 2058:7, 2066:7, 2070:17
**pointed** [4] - 2042:15, 2048:11, 2049:11, 2051:24
**pointing** [1] - 2029:18
**points** [19] - 2017:3, 2017:11, 2019:18, 2019:19, 2019:20, 2020:4, 2021:13, 2021:14, 2022:14, 2023:4, 2023:7, 2024:17, 2038:5, 2045:13, 2045:16, 2047:7, 2047:8, 2047:9
**POMERANTZ** [8] - 1954:2, 1954:3, 1954:4, 1954:5, 1955:22, 1956:2, 1985:7, 2048:9
**Pomerantz** [85] - 1955:21, 1955:24, 1956:4, 1956:16, 1957:8, 1959:8, 1959:14, 1960:8, 1961:14, 1962:8, 1962:15, 1964:11, 1965:8, 1965:17, 1965:21, 1968:21, 1971:17, 1972:4, 1972:16, 1972:17, 1973:6, 1973:10, 1973:18, 1974:7, 1976:14, 1976:23, 1981:22, 1981:23, 1983:24, 1984:20, 1985:8, 1988:6, 1988:23, 1989:21, 1990:1, 1990:7, 1990:23, 1991:10, 1991:20, 1992:23, 1993:20, 1994:6,

1996:6, 1998:25, 2000:20, 2002:13, 2004:16, 2004:17, 2004:22, 2010:3, 2010:16, 2011:6, 2012:1, 2013:14, 2014:11, 2015:1, 2016:25, 2017:23, 2022:6, 2022:17, 2027:9, 2027:15, 2028:8, 2031:18, 2037:13, 2038:18, 2040:4, 2040:25, 2041:9, 2041:20, 2042:21, 2043:14, 2044:8, 2044:14, 2044:21, 2045:3, 2045:15, 2047:2, 2048:11, 2055:18, 2057:18, 2057:22, 2057:24, 2058:9, 2059:23
**Pomerantz's** [4] - 1963:3, 1968:3, 1972:15, 1974:1
**portfolio** [1] - 1997:14
**Portfolio** [1] - 2034:17
**Portion** [16] - 1988:5, 1988:8, 1988:22, 1989:18, 1991:9, 1991:17, 1992:22, 1993:17, 1994:5, 1994:11, 1996:5, 1997:7, 1998:24, 2000:5, 2002:12, 2002:17
**portrays** [1] - 2059:19
**position** [8] - 1962:9, 1967:18, 1995:4, 1995:17, 1996:25, 1997:10, 1997:16
**possess** [1] - 1961:16
**possible** [2] - 1966:15, 1968:15
**possibly** [3] - 1963:21, 1967:19, 2057:23
**posted** [1] - 1970:18
**pre** [3] - 1969:10, 1970:16, 2054:10
**pre-approved** [1] - 2054:10
**pre-tax** [2] - 1969:10, 1970:16
**precise** [1] - 1963:6
**preclude** [1] - 1965:18
**precluded** [2] - 1959:12, 1963:1
**precluding** [1] - 1965:17

**preference** [1] - 2006:15
**prepare** [1] - 1982:1
**prepared** [5] - 1956:13, 1957:22, 1983:10, 2041:7, 2044:24
**prepares** [1] - 1974:20
**present** [2] - 1973:16, 2059:12
**PRESENT** [1] - 1953:15
**presentation** [1] - 2001:15
**presentations** [1] - 1989:6
**presented** [2] - 1965:2, 2067:12
**preserve** [1] - 2070:23
**presumably** [3] - 1960:11, 1983:8, 1988:10
**pretty** [5] - 1959:5, 1970:9, 2003:17, 2003:25, 2015:23
**previous** [1] - 2022:14
**previously** [1] - 1955:22
**price** [7] - 1995:6, 1996:8, 1996:10, 1996:16, 1998:21, 1999:18, 2054:12
**prices** [2] - 1996:18, 2054:9
**Pricing** [1] - 2054:2
**pricing** [13] - 1993:23, 1994:7, 1995:5, 1997:22, 1998:13, 1998:14, 1998:16, 1998:18, 1999:3, 2053:20, 2054:5, 2054:9, 2054:16
**Primarily** [1] - 1982:20
**primarily** [2] - 1993:24, 2018:18
**Principal** [2] - 1986:20, 1986:22
**Principle** [1] - 1986:17
**print** [2] - 2010:12, 2011:10
**printing** [1] - 1987:23
**privilege** [5] - 2069:10, 2069:13, 2069:21, 2070:4, 2070:24
**probe** [1] - 1990:16
**problem** [5] - 1956:21, 1975:9, 2043:1, 2055:8, 2066:15
**problems** [1] - 1963:5

**procedure** [1] - 2069:2
**proceed** [2] - 2004:18, 2071:3
**process** [7] - 1974:9, 1981:11, 1992:25, 1993:1, 1993:15, 1997:24, 2062:24
**processed** [1] - 1994:17
**produce** [8] - 1975:11, 1975:16, 1978:15, 1978:20, 2011:18, 2058:4, 2069:13, 2069:22
**produced** [1] - 2010:13
**product** [23] - 1952:25, 1961:3, 1961:24, 1962:14, 1962:24, 1963:25, 1975:17, 1976:1, 2028:18, 2028:22, 2028:25, 2029:17, 2045:8, 2046:8, 2046:10, 2046:14, 2046:15, 2047:8, 2047:11, 2047:20, 2047:21, 2053:2
**products** [2] - 2005:21, 2047:25
**professional** [1] - 1985:8
**professionals** [1] - 2003:6
**proffer** [3] - 1965:4, 1965:11, 1965:21
**proffering** [1] - 1968:12
**profit** [34] - 1969:3, 1969:6, 1969:12, 1971:3, 1971:16, 1971:17, 1971:20, 1972:2, 1972:8, 1972:19, 1972:22, 1972:25, 1973:7, 1973:11, 1973:24, 1976:16, 1977:16, 1978:13, 1979:23, 1980:18, 1981:6, 1982:9, 1982:17, 1983:2, 1983:9, 1983:14, 1984:7, 2031:10, 2031:19, 2031:20, 2031:21, 2032:17, 2032:19, 2048:13
**profitability** [3] - 1974:11, 2016:15, 2016:20
**project** [1] - 1960:3

projected [1] - 1960:4
proof [3] - 1966:20, 1967:1, 1968:9
proper [1] - 2069:1
proprietary [14] - 2042:10, 2042:12, 2043:8, 2044:2, 2044:9, 2045:5, 2045:8, 2046:8, 2046:20, 2047:6, 2047:11, 2047:20, 2047:22, 2048:5
prospectus [31] - 1987:23, 1999:14, 2005:9, 2006:5, 2006:7, 2006:8, 2006:12, 2006:15, 2006:17, 2006:18, 2006:22, 2008:1, 2008:2, 2008:4, 2008:6, 2009:1, 2009:3, 2009:20, 2009:23, 2010:4, 2013:16, 2013:24, 2014:1, 2014:17, 2015:3, 2015:17, 2016:4, 2016:12, 2043:17
prospectuses [2] - 2016:5, 2016:13
provide [9] - 1968:21, 1987:20, 1988:16, 1989:10, 2054:15, 2055:5, 2060:24, 2065:24, 2070:3
provided [10] - 1956:4, 2012:23, 2045:17, 2054:7, 2055:8, 2061:3, 2062:18, 2062:24, 2064:21, 2067:24
provides [2] - 1969:24, 1987:7
providing [1] - 2002:15
provision [2] - 2054:11, 2062:8
public [6] - 1969:9, 1970:17, 1970:20, 1970:23, 1994:15
publicly [1] - 1970:23
pull [1] - 1994:25
Pull [1] - 2008:17
pulled [2] - 2018:5, 2033:5
purports [3] - 1971:15, 2014:2, 2033:9
purpose [1] - 2046:22
purposely [1] -

1966:25
purposes [1] - 2065:11
pursuant [1] - 1978:21
put [7] - 1955:9, 1957:3, 1967:14, 1996:19, 2032:2, 2058:12, 2068:9
putting [6] - 1957:9, 1961:9, 1967:13, 1968:14, 2060:17, 2062:22

---

## Q

qualifications [2] - 1957:8, 1957:12
qualified [3] - 1956:18, 1957:5, 1974:3
quantity [1] - 1974:25
quarter [2] - 2004:12, 2014:18
quarterly [1] - 2055:13
quarters [1] - 1976:18
questioned [1] - 1961:22
questioning [3] - 2015:24, 2041:12, 2050:4
questions [9] - 1982:4, 1989:20, 1990:6, 1991:19, 1993:19, 2000:13, 2044:25, 2048:6, 2066:10
quickly [1] - 2034:2
quite [3] - 2016:5, 2057:12, 2059:15

---

## R

R.M.R [1] - 1952:24
range [4] - 1982:15, 1983:8, 2034:2, 2049:22
ranges [1] - 1982:19
rate [2] - 2059:11, 2059:20
rather [2] - 1985:3, 2033:6
ratio [13] - 2019:5, 2023:9, 2023:11, 2023:14, 2024:8, 2024:20, 2024:21, 2025:7, 2025:12, 2025:15, 2026:1, 2052:19, 2053:9
ratios [14] - 2018:15,

2019:7, 2021:25, 2022:7, 2022:8, 2022:14, 2025:16, 2025:24, 2026:3, 2026:5, 2026:7, 2052:13, 2052:17
re [1] - 2036:6
re-allocation [1] - 2036:6
read [15] - 1973:2, 1988:14, 1991:4, 1996:7, 1998:9, 1999:23, 2001:22, 2011:9, 2027:11, 2028:9, 2028:10, 2033:15, 2039:16, 2042:25, 2054:24
reading [1] - 2029:13
ready [2] - 1984:25, 2056:8
really [15] - 1961:15, 1965:10, 1967:6, 1973:22, 1987:3, 1987:10, 1993:10, 1997:17, 2021:2, 2021:10, 2021:19, 2030:23, 2057:18, 2059:16, 2059:21
realm [2] - 1972:3, 1972:25
reason [6] - 2014:1, 2016:8, 2059:22, 2068:20, 2068:23, 2070:12
reasonable [2] - 2039:1, 2039:6
reasonably [1] - 2030:10
reasons [4] - 1980:13, 2016:11, 2031:5, 2059:15
rebuttal [1] - 2033:1
receive [1] - 2068:7
received [3] - 1983:14, 2032:18, 2062:11
Recess [1] - 2004:15
recognize [3] - 1956:10, 1957:19, 2013:18
recollection [6] - 1958:14, 1962:20, 1973:18, 2036:23, 2054:14, 2060:9
record [5] - 1966:2, 1966:13, 1996:4, 1996:7, 2058:23
recreating [1] - 2011:16
redirect [2] - 2002:8, 2037:8

REDIRECT [2] - 1954:5, 2048:9
Redirect [1] - 2048:8
Reed [1] - 1985:24
refer [1] - 2040:7
reference [2] - 2006:2, 2063:8
referred [2] - 2050:20, 2053:10
referring [5] - 1970:25, 1993:16, 2025:22, 2036:23, 2038:22
reflect [4] - 2023:2, 2026:3, 2029:1, 2030:25
reflected [2] - 2030:12, 2050:8
reflects [1] - 2047:15
refresh [2] - 1958:13, 2060:9
refused [1] - 2000:13
regard [22] - 1973:17, 1973:21, 1974:2, 2001:10, 2041:13, 2058:25, 2062:8, 2062:10, 2062:17, 2063:3, 2064:4, 2065:13, 2065:19, 2065:20, 2066:10, 2066:11, 2066:13, 2068:11, 2069:12, 2069:20, 2070:6
Regardless [1] - 2050:4
regulated [2] - 2003:21, 2003:23
regulation [1] - 2004:4
regulations [1] - 2003:18
reimbursement [5] - 2028:25, 2029:18, 2030:3, 2030:11, 2031:3
reimbursements [4] - 2028:19, 2028:22, 2028:23, 2030:4
reject [1] - 1963:15
relates [2] - 1957:25, 1975:8
relating [1] - 2064:25
relationship [1] - 1974:21
relevant [6] - 1961:12, 1961:19, 2024:23, 2025:9, 2058:11, 2067:9
reliable [1] - 2058:7
relied [6] - 1970:7, 2021:24, 2039:4,

2057:18, 2065:3, 2065:4
reluctantly [1] - 2057:10
rely [1] - 1997:21
relying [1] - 2002:24
remainder [1] - 1955:3
remember [7] - 1958:14, 1958:25, 1964:25, 2049:22, 2052:15, 2066:5, 2066:6
remind [1] - 1967:12
removed [3] - 1966:25, 1967:3, 1967:6
rendered [1] - 2044:23
renew [1] - 1957:7
repeat [4] - 1983:16, 1988:12, 1990:23, 2039:14
repeatedly [1] - 2000:15
Rephrase [1] - 2014:24
rephrase [7] - 1999:9, 2012:15, 2014:23, 2016:1, 2039:23, 2040:3, 2045:3
replicate [1] - 1971:18
replicated [2] - 1958:20, 1958:21
report [32] - 1967:10, 1969:9, 1972:15, 1973:2, 1975:14, 1992:16, 1995:2, 2010:2, 2011:22, 2013:25, 2017:5, 2017:7, 2018:3, 2018:4, 2018:6, 2029:17, 2032:25, 2033:1, 2041:2, 2041:4, 2041:9, 2041:23, 2042:16, 2042:18, 2043:19, 2044:21, 2044:24, 2046:22, 2047:24, 2050:1, 2057:23
reported [9] - 1961:24, 1961:25, 1963:17, 1966:4, 1966:10, 2016:20, 2017:13, 2019:1, 2049:24
reporter [3] - 1988:14, 2001:22, 2039:16
REPORTER [1] - 1952:25
reporting [6] - 1960:2, 1962:5, 1963:18, 1964:3, 1966:10,

1966:14

**reports** [8] - 1974:11, 1993:11, 2011:17, 2016:15, 2016:20, 2029:7, 2057:24, 2057:25

**represent** [4] - 1959:22, 1959:23, 1966:19, 2013:23

**representative** [1] - 2020:13

**representing** [1] - 1961:18

**represents** [4] - 1957:11, 1959:24, 2034:20, 2059:22

**request** [16] - 1964:10, 1964:11, 2057:4, 2060:22, 2062:9, 2062:13, 2065:10, 2065:14, 2065:18, 2067:6, 2069:1, 2069:2, 2069:3, 2070:7, 2070:18

**requested** [3] - 1968:21, 2057:15, 2057:16

**requests** [2] - 2064:2, 2064:12

**require** [1] - 1998:15

**required** [3] - 1952:23, 1962:10, 2052:6

**requires** [4] - 1962:10, 1997:17, 1997:18

**research** [2] - 1990:11, 1990:24

**researches** [1] - 1991:11

**resolution** [1] - 1967:20

**resolve** [1] - 2070:1

**resolving** [1] - 1995:12

**resources** [1] - 1998:17

**respect** [9] - 1957:24, 1962:8, 2001:19, 2044:17, 2044:19, 2050:4, 2060:10, 2061:13, 2063:4

**respective** [2] - 1956:14, 1979:21

**responded** [1] - 2064:2

**response** [3] - 2021:5, 2065:18, 2066:23

**responsibilities** [3] - 2000:25, 2036:5, 2037:5

**responsibility** [9] -

1994:9, 1995:5, 1996:13, 1996:16, 1998:20, 2035:19, 2036:2, 2036:7, 2038:21

**responsible** [10] - 1987:23, 1989:1, 1992:16, 1994:1, 1995:12, 1995:15, 1995:21, 1996:14, 1997:23, 2054:11

**restricted** [1] - 2012:21

**result** [2] - 2045:18, 2046:18

**results** [1] - 1971:19

**resumes** [1] - 1955:22

**retain** [1] - 2036:4

**retained** [4] - 1985:16, 2028:5, 2031:1, 2032:4

**return** [12] - 2007:1, 2007:11, 2007:14, 2007:20, 2008:11, 2028:24, 2028:25, 2031:21, 2032:16, 2032:18, 2033:16, 2048:3

**returned** [2] - 2005:6, 2011:20

**returns** [6] - 2011:13, 2011:20, 2011:21, 2038:2, 2046:24, 2059:17

**reveal** [1] - 1967:16

**revealed** [1] - 2068:25

**revenue** [27] - 1974:21, 1974:25, 1975:1, 1975:8, 1975:11, 1975:13, 1975:15, 1975:19, 1975:21, 1976:4, 1976:7, 1977:2, 1977:4, 1977:5, 1977:6, 1978:10, 1978:12, 1978:14, 1978:17, 1978:20, 1979:8, 1980:10, 2029:8, 2029:10, 2029:15

**revenues** [2] - 1971:24, 1977:8

**review** [4] - 2059:16, 2062:24, 2064:13, 2066:20

**reviewed** [4] - 1962:10, 1972:7, 2062:20, 2065:15

**reviewing** [1] - 1964:7, 1992:24,

2062:14

**revisions** [1] - 2066:23

**ring** [1] - 1973:15

**risk** [2] - 2034:22, 2035:1

**road** [1] - 2048:1

**ROBERT** [2] - 1953:5, 1953:12

**role** [3] - 1993:22, 1994:7, 2020:20

**ROME** [1] - 1953:8

**roughly** [1] - 2008:22

**round** [1] - 1963:14

**rounded** [3] - 1963:12, 1963:13, 1964:16

**rounds** [1] - 1963:5

**row** [2] - 2034:7, 2034:20

**rubric** [2] - 2001:1, 2003:4

**ruled** [1] - 1961:14

**ruling** [5] - 1956:17, 1959:12, 1965:17, 1965:19, 1968:8

**run** [1] - 1976:3

**running** [3] - 1958:2, 1978:4, 1992:16

**Russell** [14] - 1986:15, 1986:18, 2005:16, 2005:17, 2005:18, 2005:22, 2006:3, 2007:1, 2007:8, 2007:16, 2007:17, 2008:12

---

## S

**SAI** [2] - 2038:23, 2040:13

**SANFORD** [1] - 1952:8

**satisfied** [1] - 2048:3

**save** [1] - 2045:4

**saw** [5] - 1978:17, 2038:13, 2038:19, 2039:3, 2047:6

**schedule** [2] - 1955:3, 2047:16

**scheduled** [1] - 2055:22

**schedules** [3] - 2030:11, 2030:12, 2047:15

**scope** [2] - 1990:15, 2022:9

**screen** [3] - 2027:11, 2028:9, 2032:3

**SEAN** [1] - 1953:12

**Sean** [5] - 1987:25, 1999:8, 2001:19, 2003:12, 2047:12

**seated** [1] - 1955:1

**second** [3] - 1975:14, 2002:21, 2068:24

**secretary** [4] - 1992:7, 1992:11, 1992:15, 1993:7

**Section** [2] - 1952:23, 1985:14

**section** [10] - 1990:12, 1990:25, 1991:15, 2048:14, 2048:15, 2048:16, 2053:25, 2054:2, 2055:2, 2055:13

**section's** [1] - 2055:10

**securities** [15] - 1993:23, 1993:25, 1994:8, 1994:14, 1994:20, 1994:21, 1994:22, 1995:5, 1995:6, 1995:17, 1997:16, 2003:21, 2004:4, 2054:8, 2054:16

**security** [12] - 1996:1, 1996:8, 1996:14, 1996:16, 1996:19, 1996:21, 1997:1, 1997:11, 1997:17, 1998:21, 1999:13, 1999:14

**see** [36] - 1955:12, 1961:12, 1965:12, 1968:14, 1970:12, 1973:10, 1979:2, 1981:4, 1984:2, 1994:15, 1994:16, 2001:16, 2004:23, 2007:8, 2007:9, 2009:15, 2014:13, 2015:1, 2018:19, 2030:3, 2032:15, 2034:7, 2043:3, 2043:17, 2044:17, 2044:20, 2045:20, 2054:2, 2059:23, 2061:18, 2061:21, 2061:24, 2067:7, 2070:6, 2070:19

**seeing** [2] - 1993:11, 2013:19

**seeking** [4] - 2039:21, 2040:9, 2060:21, 2061:6

**seeks** [1] - 1961:6

**seem** [2] - 1965:16, 2040:4

**selected** [1] - 2046:20

**selection** [2] - 2006:25, 2041:24

**self** [2] - 1963:15, 2063:18

**self-serving** [2] - 1963:15, 2063:18

**sell** [4] - 2038:25, 2039:8, 2040:8, 2042:7

**semantics** [1] - 2019:3

**sense** [3] - 1968:16, 1982:14, 2043:11

**sent** [4] - 2055:7, 2062:13, 2064:17, 2066:19

**sentence** [3] - 1996:24, 2040:11, 2060:15

**separate** [1] - 2064:9

**serious** [1] - 1962:3

**served** [1] - 2056:5

**serves** [2] - 1969:22, 1976:6

**service** [4] - 1976:8, 1977:4, 2054:10, 2064:7

**services** [23] - 1987:4, 1987:6, 1987:9, 1987:18, 1987:19, 1988:16, 1989:1, 1989:3, 1989:4, 2002:15, 2041:3, 2042:5, 2052:6, 2054:25, 2060:18, 2063:20, 2064:7, 2064:11, 2064:18, 2064:20, 2065:6, 2068:2, 2068:5

**serving** [2] - 1963:15, 2063:18

**set** [7] - 1962:7, 1971:6, 1975:4, 1984:24, 2003:17, 2019:12, 2053:17

**seven** [5] - 1989:22, 2003:7, 2003:8, 2019:16, 2019:18

**several** [5] - 1961:24, 1966:8, 1972:16, 2016:11, 2058:7

**share** [12] - 2014:20, 2014:21, 2014:22, 2015:1, 2015:19, 2015:23, 2016:3, 2016:6, 2016:7, 2016:17, 2016:21

**shares** [1] - 2016:18

**sheet** [1] - 1968:15

**SHERIDAN** [1] -

1952:17

**Short** [3] - 2011:10, 2013:1, 2014:5

**shortly** [1] - 2063:22

**show** [15] - 1956:9, 1957:18, 1968:9, 1968:20, 1969:13, 1976:10, 1981:22, 2005:3, 2008:5, 2008:20, 2009:2, 2017:6, 2040:14, 2057:5, 2068:3

**showed** [1] - 2033:3

**showing** [2] - 1958:3, 1968:15

**shown** [5] - 1966:21, 1968:11, 2017:7, 2027:6, 2033:8

**shows** [3] - 1963:19, 2011:19, 2058:5

**side** [20] - 2062:8, 2063:13, 2063:14, 2063:16, 2063:17, 2063:23, 2064:5, 2064:6, 2064:9, 2065:12, 2066:19

**side-by-side** [9] - 2062:8, 2063:13, 2063:14, 2063:23, 2064:5, 2064:6, 2064:9, 2065:12, 2066:19

**sides** [1] - 2047:14

**significance** [1] - 1962:6

**significant** [5] - 1989:8, 1989:15, 1998:15, 2015:23, 2071:1

**similar** [4] - 1992:14, 2032:24, 2047:7, 2063:15

**similarly** [3] - 1975:18, 1980:4, 2024:7

**Similarly** [1] - 2019:4

**simple** [5] - 1956:25, 1968:3, 1974:22, 2024:13, 2024:20

**single** [4] - 1966:4, 1997:20, 2008:1, 2064:23

**sit** [4] - 1998:2, 1998:18, 1999:2, 2016:9

**situation** [1] - 1995:23

**SIVOLELLA** [1] - 1952:3

**six** [1] - 2057:20

**sixth** [1] - 2003:12

**slightly** [1] - 1970:17

**small** [2] - 2010:12, 2011:10

**smaller** [5] - 2019:14, 2021:4, 2050:7, 2050:9, 2050:10

**someone** [4] - 1957:10, 1996:18, 1999:17, 2034:16

**Someone** [1] - 1958:13

**sometimes** [4] - 2006:5, 2007:3

**somewhere** [4] - 2032:22, 2034:8, 2034:10, 2040:12

**sorry** [26] - 1960:6, 1971:22, 1987:15, 2000:24, 2001:2, 2002:19, 2004:7, 2008:15, 2008:16, 2012:11, 2013:21, 2015:7, 2015:8, 2018:25, 2022:20, 2026:2, 2030:3, 2033:13, 2038:16, 2039:2, 2047:5, 2047:12, 2048:23, 2049:25, 2053:4, 2055:21

**Sorry** [7] - 1971:11, 2013:7, 2022:23, 2030:2, 2040:23, 2043:25, 2049:3

**sort** [1] - 1960:21

**sounds** [3] - 2036:18, 2038:3, 2038:4

**source** [10] - 2007:6, 2026:21, 2031:5, 2048:18, 2050:2, 2057:17, 2057:23, 2058:2, 2058:6, 2058:13

**space** [3] - 1987:20, 1989:10, 1989:13

**speaking** [1] - 1977:12

**speaks** [1] - 1990:8

**specific** [3] - 1959:20, 1960:10, 1982:4

**specifically** [3] - 1962:1, 2064:16, 2064:19

**speculative** [1] - 1961:18

**spell** [1] - 2035:9

**spent** [1] - 2005:1

**split** [1] - 1987:9

**spread** [2] - 1961:25, 2030:7

**spreadsheet** [1] - 

2016:14

**squarely** [1] - 1972:3

**stack** [1] - 2048:23

**stand** [4] - 1955:21, 1955:23, 1967:8, 2004:16

**start** [6] - 1971:4, 2012:7, 2012:20, 2041:11, 2056:11, 2067:10

**started** [2] - 2014:10, 2052:12

**starting** [13] - 1955:16, 1958:3, 1991:8, 2011:15, 2012:5, 2012:19, 2012:25, 2013:3, 2013:4, 2013:8, 2014:16, 2015:14, 2058:4

**STATE** [1] - 1952:14

**state** [1] - 1959:1

**statement** [5] - 1972:7, 1988:18, 2002:1, 2021:1, 2041:25

**states** [1] - 2055:2

**STATES** [1] - 1952:1

**step** [3] - 1975:15, 2055:17

**Steve** [10] - 1988:5, 1988:22, 1991:9, 1992:22, 1994:5, 1996:5, 1998:24, 1999:14, 2000:1, 2002:12

**STEVE** [8] - 1954:2, 1954:3, 1954:4, 1954:5, 1955:22, 1956:2, 1985:7, 2048:9

**stick** [2] - 2042:6, 2058:24

**still** [7] - 1955:25, 2004:17, 2031:24, 2032:17, 2032:19, 2058:5, 2060:12

**stipulated** [1] - 2047:14

**Stock** [7] - 2027:21, 2028:11, 2032:6, 2034:4, 2034:17, 2051:5, 2051:6

**stock** [1] - 2041:24

**stocks** [1] - 1994:15

**Stop** [1] - 1999:7

**stop** [5] - 1962:5, 1999:7, 2035:1

**stopped** [8] - 1960:4, 1962:2, 1962:5, 

1963:18, 1964:3, 1966:10, 1988:8, 2000:5

**story** [1] - 1967:16

**Strategic** [8] - 1969:8, 1969:17, 1969:18, 1969:24, 1970:8, 1970:10, 1982:18, 2035:16

**strategies** [1] - 1992:14

**strategy** [2] - 1992:6, 1992:19

**STREET** [1] - 1952:14

**strike** [1] - 1973:3

**strong** [2] - 1966:24, 1967:3

**structure** [2] - 2036:12, 2045:24

**structures** [1] - 2046:5

**stuff** [1] - 2068:9

**sub** [77] - 1971:21, 1971:23, 1973:20, 1974:2, 1975:17, 1975:21, 1975:25, 1976:4, 1976:5, 1977:17, 1977:22, 1977:25, 1979:8, 1980:5, 1980:6, 1980:21, 1987:5, 1987:21, 1989:11, 1989:14, 1990:17, 1990:24, 1993:13, 2035:21, 2035:24, 2036:1, 2036:8, 2036:11, 2037:5, 2037:11, 2037:17, 2037:19, 2037:22, 2038:8, 2042:12, 2045:4, 2046:23, 2054:15, 2054:21, 2055:6, 2063:17, 2064:11

**sub-administration**

[3] - 2028:4, 2049:1, 2049:16

**sub-administrator** [7] - 1980:5, 1980:6, 1994:17, 1996:2, 2000:22, 2032:11, 2049:17

**sub-administrator/ sub-advisor** [1] - 1994:10

**sub-advisor** [20] - 1975:21, 1976:4, 1976:5, 1977:22, 1980:21, 1987:5, 1994:17, 1997:4, 1997:6, 1999:18, 2037:14, 2043:12, 2043:13, 2045:8, 2046:1, 2046:2, 2046:7, 2054:10, 2055:9, 2063:20

**sub-advisors** [29] - 1973:20, 1974:2, 1975:25, 1987:21, 1989:11, 1989:14, 1990:17, 1990:24, 1993:13, 2035:21, 2035:24, 2036:1, 2036:8, 2036:11, 2037:5, 2037:11, 2037:17, 2037:19, 2037:22, 2038:8, 2042:12, 2045:4, 2046:23, 2054:15, 2054:21, 2055:6, 2063:17, 2064:11

**sub-advisory** [17] - 1971:21, 1971:23, 1975:17, 1977:17, 1977:25, 1979:8, 2025:4, 2027:22, 2027:25, 2028:12, 2028:20, 2029:4, 2029:23, 2030:8, 2030:21, 2031:11, 2033:13

**subject** [13] - 1956:14, 1969:1, 1972:16, 1979:16, 1981:2, 1982:24, 1984:1, 2004:4, 2025:19, 2042:7, 2069:9, 2070:3

**submit** [1] - 2059:8

**submitted** [1] - 2056:4

**subpoena** [3] - 2056:5, 2069:6, 2070:18

**subpoenaed** [1] - 2069:4

**subpoenas** [5] - 2060:8, 2060:9, 2062:2, 2062:5, 2069:5

**subsequent** [2] - 1960:7, 1981:12

**substantial** [3] - 1961:13, 1962:4, 1973:21

**substantially** [1] - 2007:17

**substantive** [1] - 2068:4

**substitute** [1] - 1961:9

**subtract** [5] - 1975:18, 1977:3, 1978:19, 1979:4, 2029:3

**subtracted** [2] - 1977:15, 2027:21

**subtracting** [2] - 1978:11, 2029:22

**successfully** [1] - 2042:25

**sufficient** [2] - 2070:13, 2070:16

**suggested** [3] - 2060:16, 2066:23, 2067:19

**suggestion** [1] - 2068:1

**summary** [5] - 1959:16, 1959:18, 2060:10, 2061:2, 2061:13

**Sunday** [4] - 1990:12, 1990:25, 1991:4, 1991:15

**support** [1] - 1965:22

**survey** [4] - 1969:10, 1970:9, 1970:21, 1970:22

**surveys** [1] - 1969:7

**suspect** [2] - 2068:20, 2068:23

**suspicion** [2] - 1966:24, 1967:3

**SWEETSER** [86] - 1953:4, 1954:3, 1954:5, 1955:20, 1956:3, 1956:20, 1957:3, 1957:13, 1957:16, 1957:17, 1958:6, 1959:14, 1959:20, 1959:24, 1961:6, 1961:20, 1963:12, 1964:13, 1965:14, 1966:1, 1966:7, 1966:13, 1967:5, 1967:25, 1968:18, 1968:19,

1971:14, 1972:12, 1974:5, 1974:6, 1974:15, 1974:18, 1974:19, 1976:10, 1976:21, 1981:14, 1981:21, 1983:17, 1983:20, 1983:22, 1983:23, 1984:11, 1984:16, 1984:19, 1988:9, 1990:14, 2000:6, 2001:8, 2002:5, 2010:23, 2012:10, 2012:12, 2014:19, 2015:21, 2022:6, 2026:23, 2036:21, 2037:7, 2039:9, 2041:6, 2044:10, 2044:16, 2044:19, 2048:10, 2048:21, 2049:7, 2049:25, 2050:3, 2055:16, 2055:21, 2055:25, 2056:3, 2056:15, 2056:18, 2056:23, 2057:2, 2058:15, 2059:10, 2059:13, 2060:4, 2060:6, 2061:10, 2063:10, 2066:3, 2067:14, 2067:17

**Sweetser** [15] - 1955:19, 1966:17, 1966:25, 1971:13, 1972:11, 1999:7, 2037:9, 2040:21, 2041:19, 2043:15, 2066:17, 2069:14, 2070:1, 2070:25, 2071:4

**Sweetser's** [1] - 1960:19

**switched** [1] - 1971:11

**sworn** [3] - 1955:22, 2002:1, 2002:24

**sympathetic** [1] - 1960:18

**systems** [3] - 1997:19, 1997:22, 1998:15

**SZAFERMAN** [1] - 1953:3

## T

**T.Rowe** [1] - 2030:16

**table** [3] - 1971:4, 1974:7, 1993:16

**talks** [1] - 2055:13

**tape** [3] - 1990:8, 1990:10, 1995:1

**target** [5] - 1975:10,

1982:7, 1982:10, 1982:11, 1982:13

**task** [1] - 1993:24

**tax** [2] - 1969:10, 1970:16

**Tc** [1] - 1974:17

**team** [2] - 1965:21, 1997:18

**Technically** [2] - 2023:22, 2037:10

**term** [5] - 1996:17, 2037:13, 2040:7, 2040:9, 2041:3

**terminal** [2] - 2011:23, 2011:25

**terms** [8] - 1990:11, 1990:23, 1993:9, 1995:9, 2002:23, 2031:1, 2041:4, 2059:24

**test** [1] - 1988:10

**testified** [15] - 1964:4, 1987:8, 1992:4, 1998:15, 2021:15, 2027:15, 2037:4, 2040:16, 2042:1, 2045:4, 2053:11, 2062:7, 2062:10, 2065:24, 2070:2

**testify** [11] - 1956:18, 1961:1, 1961:15, 1965:8, 1973:19, 1990:15, 2026:19, 2027:2, 2068:18, 2070:7, 2070:20

**testifying** [6] - 1958:23, 1963:2, 1964:23, 1985:18, 2016:24, 2040:25

**testimony** [39] - 1959:8, 1959:24, 1961:13, 1962:25, 1963:9, 1963:15, 1964:18, 1964:23, 1965:3, 1965:12, 1965:16, 1965:23, 1966:17, 1967:8, 1967:13, 1973:6, 1989:23, 1992:24, 1993:9, 1994:24, 1995:1, 1996:11, 1997:9, 1997:11, 1998:9, 2000:5, 2002:24, 2009:20, 2009:25, 2052:15, 2054:15, 2060:12, 2062:4, 2062:6, 2064:16, 2066:18, 2068:10, 2070:13

**text** [2] - 2019:4

**the** [1221] - 1955:2, 1955:3, 1955:4, 1955:5, 1955:6, 1955:13, 1955:15, 1955:17, 1955:21, 1956:4, 1956:6, 1956:12, 1956:13, 1956:14, 1956:16, 1956:20, 1956:22, 1956:24, 1956:25, 1957:7, 1957:21, 1957:23, 1957:24, 1957:25, 1958:3, 1958:4, 1958:6, 1958:7, 1958:8, 1958:9, 1958:20, 1958:21, 1959:7, 1959:9, 1959:15, 1959:16, 1959:18, 1959:20, 1959:22, 1959:25, 1960:1, 1960:2, 1960:6, 1960:10, 1960:11, 1960:12, 1960:13, 1960:16, 1960:21, 1960:24, 1960:25, 1961:3, 1961:4, 1961:7, 1961:21, 1961:24, 1961:25, 1962:1, 1962:5, 1962:6, 1962:8, 1962:9, 1962:10, 1962:11, 1962:12, 1962:13, 1962:14, 1962:17, 1962:18, 1962:23, 1962:24, 1963:8, 1963:13, 1963:14, 1963:18, 1963:20, 1963:22, 1963:24, 1963:25, 1964:2, 1964:4, 1964:6, 1964:7, 1964:14, 1964:15, 1964:16, 1964:17, 1964:18, 1964:21, 1964:22, 1965:1, 1965:2, 1965:3, 1965:5, 1965:13, 1965:19, 1965:24, 1965:25, 1966:2, 1966:3, 1966:5, 1966:10, 1966:13, 1966:20, 1966:25, 1967:1, 1967:2, 1967:4, 1967:7, 1967:12, 1967:13, 1967:16, 1967:17, 1967:20, 1967:23, 1967:25, 1968:1, 1968:4, 1968:5, 1968:6, 1968:9,

1968:10, 1968:15, 1968:16, 1968:17, 1968:24, 1968:25, 1969:1, 1969:8, 1969:11, 1969:12, 1969:17, 1969:21, 1969:25, 1970:5, 1970:6, 1970:9, 1970:11, 1970:16, 1970:17, 1970:18, 1970:22, 1970:24, 1971:2, 1971:3, 1971:4, 1971:5, 1971:6, 1972:21, 1972:22, 1973:5, 1973:6, 1973:8, 1973:15, 1973:19, 1973:23, 1973:24, 1974:1, 1974:4, 1974:7, 1974:8, 1974:9, 1974:11, 1974:12, 1974:13, 1974:20, 1974:21, 1974:23, 1974:24, 1974:25, 1975:1, 1975:3, 1975:4, 1975:6, 1975:7, 1975:9, 1975:10, 1975:11, 1975:12, 1975:13, 1975:14, 1975:15, 1975:16, 1975:17, 1975:18, 1975:21, 1975:23, 1975:25, 1976:1, 1976:2, 1976:3, 1976:4, 1976:5, 1976:6, 1976:10, 1976:14, 1976:15, 1976:17, 1976:18, 1976:19, 1976:22, 1976:25, 1977:2, 1977:3, 1977:5, 1977:6, 1977:7, 1977:8, 1977:11, 1977:14, 1977:17, 1977:19, 1977:22, 1977:23, 1977:24, 1977:25, 1978:4, 1978:6, 1978:7, 1978:10, 1978:11, 1978:12, 1978:18, 1978:20, 1978:21, 1978:22, 1978:23, 1979:1, 1979:4, 1979:5, 1979:6, 1979:7, 1979:8, 1979:9, 1979:12, 1979:14, 1979:16, 1979:18, 1979:20, 1979:22, 1979:23, 1980:1, 1980:3,

1980:4, 1980:6,
1980:13, 1980:15,
1980:17, 1980:21,
1980:22, 1980:24,
1981:2, 1981:6,
1981:7, 1981:8,
1981:11, 1982:3,
1982:7, 1982:9,
1982:14, 1982:15,
1982:16, 1982:17,
1982:20, 1982:22,
1982:24, 1982:25,
1983:1, 1983:2,
1983:5, 1983:6,
1983:7, 1983:8,
1983:9, 1983:10,
1983:11, 1983:13,
1983:25, 1984:1,
1985:19, 1987:4,
1987:5, 1987:6,
1987:9, 1987:13,
1987:17, 1987:19,
1987:22, 1988:2,
1988:7, 1988:10,
1988:12, 1988:14,
1988:25, 1989:6,
1989:22, 1989:24,
1990:1, 1990:10,
1990:12, 1990:15,
1990:18, 1990:21,
1990:23, 1990:25,
1991:4, 1991:13,
1991:15, 1991:23,
1992:3, 1992:5,
1992:9, 1992:16,
1992:17, 1993:11,
1993:13, 1993:22,
1994:7, 1994:10,
1994:14, 1994:17,
1994:25, 1995:1,
1995:3, 1995:5,
1995:6, 1995:9,
1995:17, 1995:19,
1995:20, 1995:22,
1995:23, 1996:1,
1996:4, 1996:7,
1996:9, 1996:13,
1996:14, 1996:16,
1996:19, 1996:20,
1996:21, 1996:23,
1996:25, 1997:1,
1997:2, 1997:3,
1997:4, 1997:6,
1997:10, 1997:13,
1997:24, 1998:11,
1998:12, 1998:19,
1999:2, 1999:8,
1999:10, 1999:15,
1999:16, 1999:17,
1999:18, 1999:20,
2000:4, 2000:7,

2000:9, 2000:11,
2000:17, 2000:21,
2000:22, 2001:1,
2001:3, 2001:9,
2001:12, 2001:13,
2001:18, 2001:19,
2001:21, 2001:22,
2002:6, 2002:15,
2002:24, 2003:1,
2003:4, 2003:12,
2003:20, 2003:21,
2003:24, 2004:16,
2005:3, 2005:4,
2005:5, 2005:6,
2005:8, 2005:9,
2005:10, 2005:13,
2005:15, 2005:17,
2005:18, 2005:19,
2005:21, 2005:22,
2005:23, 2006:1,
2006:2, 2006:3,
2006:5, 2006:7,
2006:8, 2006:9,
2006:10, 2006:12,
2006:15, 2006:17,
2006:18, 2006:19,
2006:21, 2006:22,
2006:25, 2007:1,
2007:2, 2007:7,
2007:8, 2007:11,
2007:13, 2007:14,
2007:15, 2007:16,
2007:17, 2007:18,
2007:20, 2007:23,
2008:1, 2008:2,
2008:3, 2008:4,
2008:6, 2008:10,
2008:11, 2008:12,
2008:15, 2008:17,
2008:23, 2008:25,
2009:2, 2009:7,
2009:8, 2009:9,
2009:11, 2009:13,
2009:14, 2009:15,
2009:16, 2009:20,
2009:22, 2009:23,
2009:25, 2010:5,
2010:13, 2010:17,
2010:20, 2011:10,
2011:13, 2011:16,
2011:17, 2011:18,
2011:19, 2011:20,
2011:22, 2011:23,
2011:24, 2012:4,
2012:5, 2012:7,
2012:8, 2012:11,
2012:17, 2012:18,
2012:19, 2012:20,
2012:21, 2012:22,
2012:23, 2012:25,
2013:1, 2013:2,

2013:3, 2013:4,
2013:5, 2013:8,
2013:16, 2013:17,
2013:19, 2013:21,
2013:23, 2013:24,
2014:1, 2014:4,
2014:5, 2014:7,
2014:9, 2014:13,
2014:17, 2014:22,
2015:8, 2015:19,
2016:4, 2016:8,
2016:13, 2016:15,
2016:17, 2016:18,
2016:19, 2016:20,
2017:4, 2017:6,
2017:10, 2017:15,
2017:18, 2017:19,
2018:2, 2018:4,
2018:5, 2018:6,
2018:7, 2018:21,
2019:3, 2019:4,
2019:7, 2019:15,
2019:22, 2019:25,
2020:2, 2020:3,
2020:4, 2020:5,
2020:6, 2020:7,
2020:8, 2020:11,
2020:16, 2020:21,
2020:25, 2021:5,
2021:6, 2021:10,
2021:11, 2021:23,
2021:25, 2022:3,
2022:4, 2022:7,
2022:9, 2022:13,
2022:14, 2022:19,
2022:20, 2022:21,
2022:23, 2023:2,
2023:3, 2023:5,
2023:6, 2023:17,
2023:18, 2023:20,
2023:21, 2023:23,
2023:24, 2024:3,
2024:6, 2024:7,
2024:13, 2024:20,
2024:21, 2024:24,
2025:1, 2025:2,
2025:3, 2025:16,
2025:17, 2025:18,
2025:19, 2025:20,
2025:21, 2026:1,
2026:3, 2026:4,
2026:8, 2026:12,
2026:19, 2027:2,
2027:11, 2027:21,
2027:22, 2027:24,
2028:2, 2028:3,
2028:4, 2028:9,
2028:11, 2028:12,
2028:16, 2028:18,
2028:20, 2028:25,
2029:1, 2029:2,

2029:3, 2029:17,
2029:21, 2029:22,
2029:25, 2030:1,
2030:7, 2030:8,
2030:9, 2030:11,
2030:12, 2030:13,
2030:16, 2030:18,
2030:19, 2030:20,
2030:21, 2030:25,
2031:1, 2031:2,
2031:3, 2031:5,
2031:6, 2031:7,
2031:10, 2031:13,
2031:16, 2031:18,
2031:21, 2032:2,
2032:3, 2032:4,
2032:6, 2032:10,
2032:11, 2032:14,
2032:15, 2032:16,
2032:20, 2033:3,
2033:5, 2033:6,
2033:9, 2033:12,
2033:15, 2033:17,
2033:21, 2033:23,
2033:24, 2033:25,
2034:1, 2034:7,
2034:16, 2034:17,
2034:18, 2034:22,
2035:1, 2035:13,
2035:15, 2035:17,
2035:20, 2035:21,
2035:22, 2036:1,
2036:12, 2036:13,
2036:16, 2036:17,
2036:23, 2037:5,
2037:9, 2037:13,
2037:15, 2037:18,
2037:21, 2038:1,
2038:3, 2038:7,
2038:8, 2038:12,
2038:23, 2038:24,
2038:25, 2039:2,
2039:3, 2039:7,
2039:8, 2039:9,
2039:10, 2039:12,
2039:14, 2039:16,
2039:19, 2040:7,
2040:8, 2040:10,
2040:13, 2040:15,
2040:22, 2041:3,
2041:10, 2041:11,
2041:14, 2041:18,
2041:25, 2042:7,
2042:12, 2043:2,
2043:3, 2043:6,
2043:7, 2043:8,
2043:12, 2043:15,
2043:17, 2043:18,
2043:21, 2043:23,
2043:25, 2044:1,
2044:2, 2044:4,

2044:5, 2044:10,
2044:12, 2044:13,
2044:20, 2044:25,
2045:3, 2045:4,
2045:7, 2045:8,
2045:12, 2045:18,
2045:19, 2045:21,
2045:23, 2045:25,
2046:4, 2046:6,
2046:8, 2046:10,
2046:11, 2046:14,
2046:15, 2046:17,
2046:19, 2046:20,
2046:22, 2046:23,
2047:5, 2047:6,
2047:9, 2047:15,
2047:17, 2047:18,
2047:19, 2047:22,
2048:1, 2048:3,
2048:13, 2048:14,
2048:15, 2048:18,
2048:25, 2049:13,
2049:16, 2049:17,
2049:21, 2049:22,
2050:2, 2050:7,
2050:10, 2050:18,
2050:19, 2050:21,
2050:22, 2051:2,
2051:3, 2051:6,
2051:16, 2051:21,
2051:24, 2052:5,
2052:9, 2052:11,
2052:13, 2052:14,
2052:17, 2053:1,
2053:7, 2053:8,
2053:10, 2053:11,
2053:13, 2053:14,
2053:18, 2054:2,
2054:4, 2054:5,
2054:6, 2054:10,
2054:11, 2054:12,
2054:15, 2054:16,
2054:19, 2054:20,
2054:21, 2054:24,
2055:5, 2055:6,
2055:8, 2055:21,
2056:4, 2056:5,
2056:10, 2056:23,
2057:2, 2057:4,
2057:15, 2057:16,
2057:17, 2057:23,
2058:1, 2058:4,
2058:6, 2058:9,
2058:11, 2058:13,
2058:14, 2058:16,
2058:18, 2058:19,
2058:20, 2058:23,
2058:24, 2058:25,
2059:2, 2059:4,
2059:12, 2059:15,
2059:16, 2059:19,

2059:22, 2059:23, 2060:6, 2060:7, 2060:8, 2060:9, 2060:10, 2060:11, 2060:13, 2060:14, 2060:17, 2060:20, 2060:21, 2060:22, 2060:23, 2060:24, 2060:25, 2061:1, 2061:2, 2061:3, 2061:13, 2061:14, 2061:17, 2061:18, 2061:20, 2061:21, 2061:24, 2062:2, 2062:5, 2062:8, 2062:9, 2062:10, 2062:11, 2062:18, 2062:21, 2062:23, 2062:24, 2062:25, 2063:2, 2063:4, 2063:7, 2063:11, 2063:12, 2063:13, 2063:14, 2063:17, 2063:19, 2063:20, 2063:21, 2063:23, 2064:1, 2064:3, 2064:5, 2064:6, 2064:7, 2064:11, 2064:13, 2064:14, 2064:17, 2064:20, 2064:22, 2064:25, 2065:1, 2065:2, 2065:3, 2065:5, 2065:8, 2065:10, 2065:11, 2065:14, 2065:15, 2065:17, 2065:18, 2065:19, 2065:20, 2065:22, 2065:23, 2066:6, 2066:7, 2066:9, 2066:12, 2066:14, 2066:15, 2066:16, 2066:19, 2066:23, 2067:5, 2067:9, 2067:10, 2067:11, 2067:12, 2067:18, 2067:20, 2067:23, 2067:24, 2067:25, 2068:2, 2068:3, 2068:4, 2068:7, 2068:11, 2068:12, 2068:14, 2068:15, 2068:17, 2068:20, 2068:22, 2068:25, 2069:1, 2069:3, 2069:6, 2069:8, 2069:9, 2069:13, 2069:16, 2069:17, 2069:19, 2069:20, 2070:1, 2070:2, 2070:3, 2070:12,

2070:21, 2070:22, 2071:5
**The** [39] - 1959:20, 1964:10, 1965:20, 1966:17, 1968:11, 1971:1, 1974:10, 1975:8, 1976:21, 1979:20, 1980:3, 1980:9, 1980:25, 1988:3, 1990:8, 1993:2, 1994:21, 1994:22, 1997:17, 1998:14, 2001:8, 2014:15, 2015:5, 2015:10, 2016:19, 2018:24, 2020:19, 2026:7, 2027:16, 2030:1, 2036:12, 2043:1, 2047:24, 2050:1, 2051:11, 2051:15, 2053:16, 2058:6, 2068:24
**themselves** [1] - 2061:12
**thereafter** [1] - 2063:22
**they've** [1] - 2001:16
**thinking** [3] - 1951:21, 1957:13, 1964:24
**thinks** [1] - 2041:21
**third** [4] - 1969:18, 1980:19, 1997:22, 2014:4
**third-party** [3] - 1969:18, 1980:19, 1997:22
**thirds** [2] - 1970:6, 1976:22
**thousand** [1] - 2030:24
**thousands** [4] - 1994:21, 2062:15, 2062:16, 2063:6
**threaten** [1] - 2067:15
**three** [18] - 1969:1, 1976:18, 1979:9, 1981:25, 2002:21, 2022:21, 2035:11, 2036:17, 2052:19, 2053:9, 2060:13, 2062:15, 2064:4, 2064:9, 2065:2, 2065:15, 2065:16
**Three** [1] - 2051:16
**three-quarters** [1] - 1976:18
**threshold** [1] - 2038:2
**throughout** [1] - 2050:21
**ticker** [1] - 2043:18

**timeframe** [2] - 1955:13, 1961:19
**timely** [1] - 2062:4
**tiring** [1] - 1964:19
**Title** [1] - 1952:23
**today** [10] - 2016:9, 2027:6, 2031:8, 2033:8, 2055:18, 2055:24, 2055:25, 2056:2, 2056:6, 2057:3
**today's** [1] - 1960:4
**ton** [1] - 2070:16
**took** [4] - 1961:2, 1964:15, 2027:20, 2028:3
**top** [5] - 1971:4, 1974:7, 1977:7, 2038:1
**topic** [1] - 2004:10
**total** [28] - 1978:5, 1979:4, 1981:8, 1982:25, 1984:1, 2009:7, 2023:8, 2023:11, 2023:14, 2024:8, 2024:20, 2024:24, 2025:12, 2025:15, 2025:16, 2025:18, 2025:20, 2025:24, 2026:1, 2026:3, 2026:5, 2026:7, 2027:21, 2027:24, 2028:3, 2032:10, 2052:19
**totally** [1] - 1963:10
**totals** [2] - 1979:20, 1982:25
**traders** [1] - 1995:22
**trading** [2] - 2004:1
**transcript** [10] - 1988:21, 1991:8, 1994:4, 1996:4, 1998:23, 2001:7, 2002:11, 2036:20, 2057:3, 2057:4
**translate** [1] - 1964:6
**translates** [1] - 1962:18
**translating** [1] - 1960:16
**treated** [1] - 2020:21
**TRENTON** [1] - 1952:15
**trial** [9] - 1955:3, 1959:7, 1963:9, 1973:11, 1973:14, 1986:21, 2033:4, 2062:3, 2069:18
**TRIAL** [1] - 1952:20
**tried** [3] - 1958:3,

1960:1, 2066:11
**trillion** [1] - 2021:16
**true** [3] - 1952:23, 2015:10, 2021:3
**Trust** [1] - 2013:16
**trustees** [1] - 2066:10
**trying** [8] - 1958:4, 1965:10, 2011:23, 2012:6, 2012:7, 2023:24, 2058:12, 2066:12
**Tuesday** [3] - 1955:4, 1955:15, 2055:23
**turn** [3] - 2014:4, 2021:23, 2054:21
**turned** [1] - 1962:22
**TWEED** [1] - 1953:11
**twice** [2] - 1967:2, 2015:14
**Two** [1] - 1985:18
**two** [37] - 1960:6, 1962:6, 1962:13, 1964:3, 1968:1, 1969:7, 1970:6, 1976:22, 1980:24, 1980:25, 1986:19, 1992:3, 2005:20, 2005:21, 2006:4, 2006:13, 2011:23, 2011:24, 2015:13, 2015:19, 2019:18, 2019:19, 2022:21, 2035:11, 2035:13, 2035:14, 2043:1, 2044:21, 2044:24, 2046:2, 2046:4, 2057:19, 2057:20, 2063:15, 2065:19, 2067:23, 2070:23
**two-thirds** [2] - 1970:6, 1976:22
**type** [3] - 1973:25, 1974:3, 2063:15
**Typically** [1] - 2053:5

**U**

**U.S** [2] - 1952:17, 1952:25
**U.S.C** [1] - 1952:23
**ultimate** [1] - 1967:20
**ultimately** [6] - 1982:22, 1994:1, 1994:10, 1995:11, 1997:23, 2042:6
**Ultra** [3] - 2011:10, 2013:1, 2014:5
**unable** [2] - 1971:18, 2057:25

**uncertainty** [1] - 1995:10
**under** [20] - 1955:25, 1959:12, 1977:7, 1977:20, 1977:23, 1979:2, 1986:24, 1988:18, 2001:1, 2003:4, 2003:16, 2004:17, 2014:18, 2028:24, 2040:16, 2046:11, 2050:15, 2050:19, 2050:22, 2051:3
**underlying** [3] - 2005:16, 2035:17, 2036:1
**understate** [1] - 2064:11
**unique** [1] - 2065:12
**UNITED** [1] - 1952:1
**universe** [1] - 2022:3
**unless** [1] - 2061:15
**unnecessary** [1] - 1963:10
**unpack** [1] - 1963:4
**up** [40] - 1958:22, 1960:5, 1963:5, 1963:14, 1963:21, 1964:22, 1965:4, 1965:24, 1965:25, 1967:8, 1967:22, 1982:19, 1984:24, 1984:25, 1985:2, 1991:15, 2001:16, 2004:20, 2007:6, 2008:15, 2008:17, 2010:8, 2010:13, 2011:9, 2017:9, 2018:13, 2021:24, 2024:15, 2032:2, 2033:3, 2042:24, 2042:25, 2043:15, 2043:18, 2047:2, 2058:1, 2063:19, 2067:19, 2070:20, 2071:1
**uses** [1] - 1990:12
**utilize** [1] - 1975:10

**V**

**vague** [1] - 1993:9
**Vaguely** [1] - 2052:16
**valuation** [8] - 1997:17, 1997:18, 1997:25, 1998:1, 1998:10, 1998:12, 1999:2, 2000:9
**value** [16] - 1962:1,

1975:12, 1975:16, 1978:14, 1995:17, 1996:14, 1996:21, 1997:1, 1997:10, 1997:16, 1999:15, 2005:23, 2013:4, 2014:16, 2024:9, 2029:21

**Value** [11] - 2005:14, 2005:18, 2007:7, 2007:9, 2008:10, 2008:19, 2043:2, 2043:7, 2043:12, 2047:4, 2047:17

**values** [5] - 2011:23, 2011:25, 2014:22, 2015:18

**Vanguard** [3] - 2021:13, 2021:15

**variable** [13] - 1971:21, 1971:22, 1977:20, 1980:20, 2018:17, 2018:22, 2051:25, 2052:6, 2052:7, 2052:12, 2052:22, 2052:25

**variety** [4] - 1969:22, 1976:2, 2007:19, 2009:12

**various** [1] - 2058:2

**vast** [2] - 2054:16, 2068:4

**versus** [7] - 2005:3, 2006:18, 2006:19, 2006:22, 2007:14, 2009:20, 2009:23

**vice** [1] - 1955:9

**videotape** [2] - 2001:12, 2001:18

**videotaped** [16] - 1988:5, 1988:8, 1988:22, 1989:18, 1991:9, 1991:17, 1992:22, 1993:17, 1994:5, 1994:11, 1996:5, 1997:7, 1998:24, 2000:5, 2002:12, 2002:17

**view** [4] - 1968:9, 2059:14, 2063:18, 2070:21

**violation** [1] - 2055:8

**virtually** [2] - 2007:18, 2020:20

**visit** [2] - 1987:21, 1989:11

**volatility** [8] - 1991:22, 1991:24, 1992:3, 1992:25, 2005:21, 2005:25, 2006:1,

2006:6

**voluminous** [1] - 1963:19

**Vs** [2] - 1952:5, 1952:9

---

# W

**Waddell** [1] - 1985:24

**Wait** [2] - 1988:2, 2012:11

**waive** [1] - 2069:13

**waived** [2] - 2030:24, 2070:4

**waiver** [1] - 2069:20

**waivers** [3] - 1971:25, 2030:18

**walk** [4] - 1974:8, 1975:7, 1976:15, 2012:23

**wants** [6] - 1959:8, 1960:19, 1961:2, 1999:9, 2058:20, 2070:1

**waste** [1] - 2063:2

**week** [2] - 1955:3, 1986:19

**weekend** [2] - 2071:5, 2071:7

**weigh** [1] - 2024:15

**weight** [4] - 2019:14, 2058:20, 2059:2, 2059:21

**weighted** [12] - 2018:15, 2019:2, 2019:8, 2019:10, 2019:11, 2019:22, 2020:5, 2020:12, 2020:15, 2024:10, 2050:5, 2050:16

**Weiss** [1] - 1992:13

**welcome** [1] - 1972:23

**well-known** [2] - 1991:1, 1991:16

**whatsoever** [1] - 2068:17

**whereas** [1] - 2046:1

**white** [2] - 2002:3, 2002:5

**whole** [6] - 1969:11, 1988:16, 2013:17, 2022:3, 2053:16, 2053:17

**wide** [1] - 2057:11

**widely** [1] - 2026:13

**willing** [3] - 2069:12, 2069:21, 2070:2

**wish** [1] - 2070:22

**withdrawing** [1] - 2061:8

**witness** [11] - 1955:23, 1963:1, 1965:18, 1976:11, 1985:12, 2001:8, 2017:18, 2044:10, 2055:20, 2055:22, 2069:18

**Witness** [1] - 2055:19

**WITNESS** [11] - 1956:1, 1983:19, 1990:3, 2027:11, 2027:13, 2037:10, 2039:19, 2039:21, 2049:3, 2049:5, 2050:1

**witnesses** [7] - 1967:15, 1968:12, 2041:19, 2061:8, 2061:9, 2070:11

**word** [12] - 1961:9, 1996:23, 1997:2, 1999:10, 1999:20, 2000:4, 2000:16, 2000:17, 2001:9, 2001:13, 2002:7, 2064:19

**wording** [1] - 1963:21

**words** [4] - 1987:11, 1999:5, 2039:3, 2041:23

**worry** [1] - 1963:7

**worse** [2] - 2007:23, 2048:3

**wrapper** [7] - 1959:25, 1961:3, 1961:24, 1962:14, 1962:24, 1963:25, 2053:2

**write** [2] - 2032:14, 2049:4

**written** [1] - 1972:6

**wrote** [4] - 2004:3, 2039:10, 2039:13, 2044:21

---

# Y

**year** [12] - 1960:5, 1966:4, 1967:10, 1970:18, 1979:15, 1981:9, 1982:5, 2007:11, 2016:16, 2031:4, 2058:17, 2063:21

**years** [20] - 1957:23, 1958:23, 1960:7, 1961:24, 1966:8, 1969:1, 1979:10, 1979:12, 1979:21, 1981:12, 1990:18, 2012:4, 2012:8,

2012:17, 2012:19, 2044:21, 2044:24, 2050:25, 2058:10

**yes/no** [1] - 2002:1

**yesterday** [30] - 1956:16, 1962:13, 1965:17, 1965:18, 1965:19, 1965:20, 1972:4, 1973:6, 1973:18, 1974:13, 1992:4, 2003:3, 2005:2, 2009:19, 2009:21, 2009:22, 2009:24, 2010:3, 2011:17, 2016:25, 2017:7, 2038:13, 2038:19, 2041:22, 2042:1, 2055:18, 2056:8, 2056:11, 2058:18, 2058:21

**York** [3] - 1990:13, 1990:25, 1991:15

---

# Z

**zero** [3] - 2029:21, 2034:7, 2034:9