```
 1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
 2


 3   _____
     MARY ANN SIVOLELLA, et al,
 4                    PLAINTIFFS

 5      Vs.                              CIVIL NO.
                                         11-4194 (PGS)
 6   AXA EQUITABLE LIFE INS. CO.,
     et al,
 7                    DEFENDANTS
     _____
 8   GLENN D. SANFORD, et al,
                      PLAINTIFFS
 9
        Vs.                              CIVIL NO.
10                                       13-312 (PGS)
     AXA EQUITABLE FUNDS
11   MANAGEMENT GROUP,
                      DEFENDANT
12   _____


13

14                               FEBRUARY 19, 2016
                                 CLARKSON S. FISHER COURTHOUSE
                                 402 EAST STATE STREET
15                               TRENTON, NEW JERSEY  08608


16

17   B E F O R E:       THE HONORABLE PETER G. SHERIDAN
                        U.S. DISTRICT COURT JUDGE
18                      DISTRICT OF NEW JERSEY


19


20
     TRIAL - DAY 21
21


22

23                               Certified as true and correct as required
                                 by Title 28, U.S.C. Section 753
24                               /S/ Francis J. Gable
                                 FRANCIS J. GABLE, C.S.R., R.M.R.
25                               OFFICIAL U.S. REPORTER
                                 (856) 889-4761
```

*United States District Court*
*Trenton, New Jersey*

```
 1

 2   A P P E A R A N C E S:

 3
         SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, PC
 4       BY:  ARNOLD C. LAKIND, ESQUIRE
              DANIEL S. SWEETSER, ESQUIRE
 5            ROBERT L. LAKIND, ESQUIRE
              MARK A. FISHER, ESQUIRE
 6            CHRISTOPHER S. KWELTY, ESQUIRE
              CHRISTOPHER S. MYLES, ESQUIRE
 7       FOR THE PLAINTIFFS

 8

 9       BLANK ROME, LLP
         BY:  JONATHAN M. KORN, ESQUIRE
10       FOR THE DEFENDANTS

11

12       MILBANK, TWEED, HADLEY & McCLOY, LLP
         BY:  SEAN M. MURPHY, ESQUIRE
13            ROBERT C. HORA, ESQUIRE
              JAMES N. BENEDICT, ESQUIRE
14            BENJAMIN REED, ESQUIRE
         FOR THE DEFENDANTS
15

16   ALSO PRESENT:  PATRICIA LOUIE, ESQUIRE
                     MANAGING DIRECTOR & ASSOCIATE GENERAL COUNSEL
17                   AXA EQUITABLE LIFE INSURANCE CO.

18

19

20

21

22

23

24

25
```

1                    I N D E X

2    GARY SCHPERO                                            3524
     DIRECT EXAMINATION OF GARY SCHPERO CONTINUED BY         3524
3    MR. BENEDICT

4

5

6                    E X H I B I T S

     Defendant's Exhibit 389.2 was marked into               3524
7    evidence on trial day 20; was erroneously
     transcribed as 398.2
8    Defendant's Exhibit 138.3 was marked into               3527
     evidence
9    Defendant's Exhibit 142.2 was marked into               3533
     evidence
10   Defendant's Exhibit 144.18 was marked into              3534
     evidence
11   Defendant's Exhibit 143.7 was marked into               3536
     evidence
12   Defendant's Exhibits 138.9 and 138.10 were marked       3559
     into evidence
13   Defendant's Exhibit 144.15 was marked into              3571
     evidence
14   Defendant's Exhibit 142.11 was marked into              3625
     evidence
15   Defendant's Exhibit 144.19 was marked into              3625
     evidence
16   Defendant's Exhibit 142.7 was marked into               3626
     evidence
17   Defendant's Exhibit 144.16 was marked into              3629
     evidence
18   Defendant's Exhibit 457.1 was marked into               3647
     evidence
19

20

21

22

23

24

25

1          THE COURT:  Good morning.  Any applications before

2     we start?

3          MR. A. LAKIND:  Yes, your Honor, if I might.  There

4     are I think two open issues that were left open from

5     yesterday.  One, we've gone a long way to resolving, and that

6     is when Mr. Benedict moved into evidence 1811 and 1812, which

7     are the large loose leafs, I had a conversation with Mr.

8     Benedict this morning and raised the following three issues

9     and two have of them have been resolved.

10          The first is the long sheets that I received were

11    blurred, and he indicated he would get me more legible copies,

12    so that part is resolved.  The second, I said I would have no

13    objection to those documents going in as evidence of what Mr.

14    Schpero viewed as important, but that I do object to the

15    evidence going in for the truth of what is in there.  And I

16    think there is agreement with regard to these exhibits on

17    that.

18          Which I believe leaves the following issue.  We

19    certainly have no objection to admitting 1812 and 18 -- excuse

20    me; 1811 and 1812 as something Mr. Schpero deemed important

21    and reviewed, but insofar as there is testimony that it should

22    be admitted as a reflection of the Board's consideration and

23    deliberation, we have not been able to cross-examine the Board

24    because they're not in court.  So insofar as it represents the

25    thinking of the Board as a whole, we would object to its

1  admission as evidence of that.  And that's where we have our

2  dispute, your Honor.

3          THE COURT:  All right.  Mr. Benedict, would you like

4  to be heard?

00:01  5          MR. BENEDICT:  Yes, your Honor.  Mr. Schpero

6  appeared at his deposition as a 30(b)(6) witness on behalf of

7  all of the independent trustees of the EQAT Trust.  In

8  connection with preparation of the two exhibits, Mr. Schpero

9  testified yesterday that he met on two different occasions

00:02  10  with the entire Board, to collectively put together the

11  documents in that binder, working with counsel.  And I would

12  offer them as information concerning the collection of

13  documents selected by all of the independent trustees as being

14  the most important documents in their view on the *Gartenberg*

00:02  15  factors on a factor by factor basis.  So I think it's a

16  collection of thinking of the entire Board and not just Mr.

17  Schpero.

18          THE COURT:  All right.  Do you wish to reply, Mr.

19  Lakind?

00:02  20          MR. A. LAKIND:  Yes.  Notwithstanding counsel's

21  description, it remains hearsay because the Board members

22  aren't here.  Insofar as --

23          THE COURT:  Mr. Schpero was here and he said he put

24  it together, he relied on it; why doesn't it just go in on

00:03  25  that basis; this is what I relied on?

1          MR. A. LAKIND:  I have no objection to that.  That's

2     what I said at the outset, if it's going in as what Mr.

3     Schpero relied on, that's fine.  I think they want it to be

4     reflective of what the Board relied on.

00:03     5          THE COURT:  Do you object to that, Mr. Benedict?

6          MR. BENEDICT:  I think it should go in as the

7     collection of documents selected by the independent trustees

8     of the EQAT Trust.  Mr. Schpero puts together -- after having

9     met with the entire Board twice.  It's the collective views of

00:03    10     the Board and not just Mr. Schpero's.

11          THE COURT:  Well, my view is I'll admit the

12     documents.  It seems to me that Mr. Schpero's testimony was

13     that he was the 30(b)(6) witness, he brought the information

14     to the deposition with him in preparation for the deposition,

00:03    15     so I recall that.  And I do understand that he said he went

16     over this with the Board.

17          I don't see what difference it makes to tell you the

18     truth.  If the documents go in as what Mr. Schpero as the lead

19     director, independent director, put together for purposes of

00:04    20     his deposition, I think that's sufficient.

21          MR. BENEDICT:  Thank you, your Honor

22          MR. A. LAKIND:  Your Honor, the only other issue --

23     and I don't think it needs resolution, is Mr. Schpero

24     testified that he received two memos from Bingham describing

00:04    25     the Board material, which was a bit of a surprise to us.  Mr.

1    Benedict has indicated he doesn't have those memos.  So today

2    we've served a subpoena on Bingham in an effort to get them

3    and I suspect that will come up next week.

4              THE COURT:  All right.

00:05    5              MR. BENEDICT:  May I be heard on that issue as well,

6    your Honor?

7              THE COURT:  You may.

8              MR. BENEDICT:  There was a lot of controversy

9    between plaintiffs and counsel for the independent trustees in

00:05   10    the fall of 2013 over production of attorney/client privilege

11    matters.  They had a meet and confer, and the net result of

12    that was a stipulation that was signed by all counsel, it was

13    negotiated between Morgan Lewis as counsel for the independent

14    trustees and the plaintiffs.

00:05   15              And it was signed -- the stipulation was signed the

16    morning of Mr. Schpero's deposition and it was so ordered by

17    this court, Judge Arpert, on February 5th, 2014, and in this

18    document expressly plaintiffs agreed not to seek -- this is

19    paragraph 1, and I quote, "plaintiffs agree not to seek

00:05   20    privileged communications from the independent trustees on any

21    theory."  In exchange for that, they were being permitted by

22    this stip to ask questions at any deposition about any advice

23    that independent counsel or any other counsel gave to the

24    independent trustees.  It was a quid pro quo.

00:06   25              And then paragraph 2 is very explicit as well:

1   "Plaintiffs agree not to seek the production of e-mail or

2   other writings between the independent trustees and their

3   counsel, or trust counsel, or a privilege log of those

4   communications as long as the independent trustees and trust

00:06      5   counsel do not provide such writings to defendants or their

6   counsel."  No such writings were given to defendants or their

7   counsel.

8          This issue comes up expressly during the course of

9   Mr. Schpero's deposition, which is more than two years ago;

00:06      10  it's on January 30, 2014.  Mr. Lakind -- and the reference

11  here is to precise documents that they're seeking here today,

12  which we do not have.  "Mr. Lakind:  I would ask counsel to

13  provide me with those documents that were excluded and

14  considered by the Board, because I think they are within the

00:07      15  realm of our stipulation."  This is pages 19 and 20 of Mr.

16  Schpero's transcript.

17         "Mr. Boch:  I think actually they are within the

18  realm of the stipulation, you agreed not to ask for those

19  documents.  Those are documents protected by the stipulation."

00:07      20  "Mr. Lakind:  The documents that were reviewed by the Board, I

21  don't think they are."  "Mr. Boch:  We think they are

22  privileged documents to begin with, and under the stipulation

23  you agreed not to seek copies of those documents.  You can ask

24  him all you like about what the document is, what he

00:07      25  understands what it is."  "Mr. Lakind:  I will do that."

*United States District Court*
*Trenton, New Jersey*

1          If there was any issues they should have been

2     resolved two years ago during the scope of the fact discovery

3     period.  We're now finishing our seventh week of trial, and

4     they're seeking these documents now; I don't think that's

00:08  5     appropriate, your Honor.

6          THE COURT:  So, the documents you're talking about

7     are the ones that Mr. Lakind asked for yesterday?

8          MR. BENEDICT:  That's correct.  And these were

9     specifically asked --

00:08  10          THE COURT:  They were identified in that --

11          MR. BENEDICT:  I'm sorry, your Honor?

12          THE COURT:  Were they identified at that time?

13          MR. BENEDICT:  Yes.

14          MR. A. LAKIND:  Your Honor, with all due respect, I

00:08  15     do not believe these -- we didn't even know about the specific

16     document at that time.  Be that as it may, we read the

17     stipulation much differently.  Secondly, once evidence is

18     admitted in court, it has somewhat different implications.

19     But suffice it to say, if it would be okay with your Honor if

00:08  20     we can just proceed with the testimony --

21          THE COURT:  I think we should get through the trial

22     here today.

23          MR. A. LAKIND:  Yes.

24          THE COURT:  I'll look at it this evening if I need

00:08  25     to.

*United States District Court*
*Trenton, New Jersey*

1          MR. A. LAKIND:  That will be our hope, your Honor.

2     Thank you.

3          MR. BENEDICT:  Could I hand a copy of the joint

4     stipulation to the Court?

00:08   5          THE COURT:  Sure.  Just give it to Fee there and

6     that will be great.

7          Does that take care of all the applications this

8     morning?

9          MR. A. LAKIND:  From plaintiffs' perspective it

00:09  10     does, your Honor.

11          THE COURT:  Mr. Benedict, does that take care of all

12     your --

13          MR. BENEDICT:  Yes.

14          MR. HORA:  Your Honor, this is Robert Hora for the

00:09  15     defendants.  There's one more than minor housekeeping issue,

16     which happily there's no disagreement among the parties about.

17     Yesterday Mr. Benedict had marked Defendant's Exhibit 389.2,

18     and that was admitted in evidence; it's the table of contents

19     to the 2002 -- 2012 trustees reference manual.  It was

00:09  20     erroneously identified in the transcript as 389.2.  We'd just

21     like to correct that.

22          THE COURT:  So, it's defendant's exhibit?

23          MR. HORA:  Yes, Defendant's Exhibit 389.2.

24          THE COURT:  Any objections?

00:09  25          MR. A. LAKIND:  No, your Honor.

3524

Schpero - Direct - Benedict

1          THE COURT:  So, Frank, you can correct the

2    transcript.

3          (Defendant's Exhibit 389.2 was marked into evidence

4    on trial day 20; was erroneously transcribed as 398.2.)

00:10    5          THE COURT:  Mr. Benedict?

6          MR. BENEDICT:  Thank you, your Honor.  Defendants

7    recall Mr. Schpero.

8          (GARY SCHPERO, previously sworn, resumes witness

9    stand.)

00:10   10          THE COURT:  So, Mr. Schpero, you're still under

11   oath.

12          MR. BENEDICT:  May I proceed, your Honor?

13          THE COURT:  You may.

14   (DIRECT EXAMINATION OF GARY SCHPERO CONTINUED BY MR.

00:-06  15   BENEDICT:)

16   Q.  Mr. Schpero, when we left off yesterday, I believe you

17   were describing that you received memorandum from both -- in

18   addition to Morgan Lewis you received memorandum today from

19   K&L Gates and FMG concerning your fiduciary duties as a

00:11   20   director; do you recall that?

21   A.  I do.

22   Q.  And I think we entered the K&L Gates memo into evidence.

23   I'd like to turn now to the FMG memoranda, and I'd ask you to

24   turn to tab 12 of the booklet in front of you.

00:11   25          MR. BENEDICT:  And this, your Honor, is Defendant's

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1  Exhibit 138.3.

2       THE COURT:  If I can just make one point before we

3  begin the questioning; yesterday, Mr. Schpero had a document,

4  and it was in one of the books I think, but it had the

00:12   5  *Gartenberg* factors listed on top, and then underneath it it

6  had the exhibits that referenced that.

7       MR. BENEDICT:  Yes, your Honor.

8       THE COURT:  So when you're doing findings of fact

9  and conclusions of law, that would be a very good way of doing

00:12   10  it, because I could go to each document that you're relying

11  on.  I want it to be equal for both sides, so if you can take

12  look at that, Mr. Lakind --

13       MR. A. LAKIND:  I will.  Thank you, your Honor.

14       MR. BENEDICT:  We also, with that in mind, your

00:12   15  Honor, have prepared a demonstrative of that exact document

16  that actually attaches to the demonstrative the precise

17  documents that are -- are referenced in the index.  We thought

18  that would be very convenient for the Court to have them right

19  there, and you wouldn't have to chase them down by looking at

00:13   20  various tabs and various materials.  I don't have that in

21  front of me right now, we will introduce that through Ms.

22  Louie.

23       THE COURT:  Okay, thank you.

24  BY MR. BENEDICT:

00:13   25  Q.  Mr. Schpero, turning to Defendant's Exhibit 138.3, do you

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    recognize this document?

2    A.   Yeah; this is under tab 12?

3    Q.   Under tab 12, yes.

4    A.   Yes, I do.

00:13   5    Q.   And what is it?

6    A.   This is a memo that was delivered in the spring of 2013

7    by FMG to the Board in advance of the June Board meeting, as

8    indicated previewing materials for the upcoming meeting.

9    Q.   And would you just generally describe that document for

00:13   10   the Court.

11   A.   Yeah, it -- it looks to summarize some recent litigation

12   in the 36(b) arena.  It, again, summarizes the *Gartenberg*

13   factors, and again in summary form it summarizes at least some

14   of the key information that's going to be provided to the

00:14   15   Board at the June and July meetings.  And it also has two

16   appendices that summarize judicial considerations with respect

17   to analyzing fund profitability, and with respect to analyzing

18   economies of scale.

19   Q.   Did you find this document helpful?

00:14   20   A.   I believe I did.

21   Q.   And why is that?

22   A.   It's -- again, as part of the process I described

23   yesterday, it's -- it's one of the lead -- at least this year,

24   was one of the lead efforts to get the Board back into the

00:15   25   formal process.  So it reminded the Board of the key documents

3527

Schpero - Direct - Benedict

1  that we would be receiving, and it provided a -- as I said a

2  summary of at least some of the considerations with respect to

3  two of the *Gartenberg* factors.

4         MR. BENEDICT:  Defendants offer Defendant's Exhibit

00:15   5  138.3.  And I will note for the record that the document is

6  included within Board materials that are already entered into

7  evidence.

8         THE COURT:  Okay.

9         MR. A. LAKIND:  No objection, your Honor.

00:15  10         THE COURT:  All right.  So admitted.

11         (Defendant's Exhibit 138.3 was marked into

12  evidence.)

13  BY MR. BENEDICT:

14  Q.   Mr. Schpero, have the individual Board members or your

00:15  15  independent counsel requested additional information from

16  management from time to time, prior to voting on a contract

17  proposal?

18  A.   Have they?

19  Q.   Have they?

00:16  20  A.   Yes.

21  Q.   I'd like you to turn to tab 13 of the booklet in front of

22  you, which is Defendant's Exhibit 144.18.  Do you recognize

23  this document, Mr. Schpero?

24  A.   Yes, I do.

00:16  25  Q.   And what is it?

3528

Schpero - Direct - Benedict

1    A.   This includes data that is fund by fund presented as well

2    as aggregate, in particular with respect to the spread, which

3    is the portion of the fee that FMG retains after payment to

4    the -- to the sub-advisor.  And it also as part of that it has

00:17    5    comparisons to some of the industry data that's been made

6    available.  I think it's for better or worse often referred to

7    as the Gary charts.

8    Q.   You requested that information?

9    A.   Yeah, this -- I early on in joining the Board had thought

00:17   10    it was important that we would receive information very

11    specific to the amount of fee that FMG was retaining, and so

12    those charts have evolved over the years, but this was

13    generated quite -- quite a long time ago.

14    Q.   And do you find those charts to be helpful?

00:17   15    A.   I do.

16    Q.   And why is that?

17    A.   Well, one of the key considerations in proving these

18    contractual relationships is proving the fee that FMG receives

19    and recognizing that that fee is -- is reflective of services

00:18   20    it provides separate and apart from the services that the

21    sub-advisor provides.  And the spread is -- is certainly an

22    important way to examine what that -- at least the fee portion

23    of what those services -- let me restate that.  It's a helpful

24    way -- it's a critical way to examine the fee that FMG

00:18   25    receives, and in turn obviously we then examine what those

*United States District Court*
*Trenton, New Jersey*

3529

Schpero - Direct - Benedict

1    services are corrected connected with.

2    Q.   Can you recall any other specific examples of additional

3    information or materials that had been requested by other

4    members of the Board from time to time?

00:18    5    A.   Yeah, again -- and my role as lead trustee and as a

6    conduit requests come in all the time.  There are charts that

7    because they've been around for a long time, get referred to

8    by trustees' names, so there is a Harvey chart, which is a

9    chart that as I recall breaks out performance by quartile of

00:19    10   all of the kind of -- in aggregate as well as specific of all

11   of the portfolios for each Board meeting, and it's obviously

12   Mr. Rosenthal.

13       And there's a Jettie chart, which is named after Ms.

14   Edwards, which is a chart that we see at every Board meeting

00:19    15   having to do with cash flow, and the amount of asset -- of

16   cash that is flowing into the funds from the fund of funds

17   that FMG also manages.

18   Q.   Do you believe you've always had sufficient information

19   before voting to approve a proposed contract?

00:19    20   A.   Yes, I do.

21   Q.   And how do you know if you have all the information you

22   need before you vote on a proposal?

23   A.   At the end of the day I think that's a reflection of my

24   and the other trustees' judgment.  In terms of my judgment

00:20    25   it's reflecting a number of things; one is working very

United States District Court
Trenton, New Jersey

3530

Schpero - Direct - Benedict

1  closely with our independent counsel, who as I testified is

2  very experienced on these matters, and getting the benefit of

3  her views as to the appropriate documentation we should

4  receive.  Another factor is my own personal experience; I've

00:20  5  been on the Board for 15 years, but I also have practiced in

6  this area for almost 22 years, so I certainly believe I'm very

7  familiar with what the appropriate documentation is.

8       And I also think that it's critical that I look to and

9  rely on my other trustees, each of whom -- independent

00:20  10  trustees; each of whom bring their own backgrounds and areas

11  of expertise and areas of interest.  And certainly at the end

12  of this process we're not done with the process in July,

13  unless all of the independent trustees are comfortable that

14  we've received all the appropriate documentation.

00:21  15  Q.  Let me shift gears here if I may, Mr. Schpero, and turn

16  to nature and quality of management services.  You previously

17  testified that you receive information regarding the nature

18  and quality of management services that FMG provides to the

19  funds; correct?

00:21  20  A.  Yes.

21  Q.  Let me mark --

22       MR. BENEDICT:  Mr. Reed, would you please hand up to

23  the Court and to the witness Defendant's Exhibit 142.2?

24  Q.  Mr. Schpero --

00:21  25  A.  Just give me one moment.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1  Q.  No problem.

2  A.  Okay.

3  Q.  Mr. Schpero, do you recognize this document?

4  A.  Yes, I do.

00:22  5  Q.  And what is it?

6  A.  This is the document that I referred to yesterday, I

7  guess I just called it the FMG memo or book, but this is a

8  document that we receive every year from FMG as part of the

9  15(c) process.

00:22  10  Q.  And did you refer to this document yesterday as the main

11  FMG document?

12  A.  I may have.

13  Q.  And is it also sometimes referred to as the FMG response

14  memo?

00:22  15  A.  I'm not certain that's how it's referred to.

16  Q.  Okay.  Would you please describe this document for the

17  Court?

18  A.  Yeah.  There's -- there's an extensive memorandum at the

19  beginning that is FMG's presentation on their various services

00:23  20  and roles as investment manager and administrator, as well as

21  distributor.  And then there are many exhibits that -- I don't

22  know if you want me to flip through them, but obviously cover

23  everything from profitability to performance, to a lot of the

24  relevant specific FMG documentation about the services they

00:23  25  provide, their Form ADV, their registration statement with all

3532

Schpero - Direct - Benedict

1 the disclosure connected with that; the schedule of the fees

2 that they receive; schedule of the sub-advisory fees that are

3 paid out; all of the expense limitation arrangements that

4 they've agreed to with the Board; their financial statements,

00:24    5 and I'm sure there's more, but that's some of the basic

6 materials.

7 Q.   Is this one of the documents that's prepared by FMG in

8 response to the memorandum we discussed yesterday afternoon,

9 which is Defendant's Exhibit 409, which was the memorandum

00:24    10 from your independent counsel to FMG requesting certain

11 information --

12 A.   Yes, it is.

13 Q.   -- for the 15(c) proceedings?  And do you find this

14 document helpful?

00:24    15 A.   Yes, I do.

16 Q.   And why is that?

17 A.   Well, it's a critical component in understanding and

18 reviewing FMG's various roles; and certainly in terms of

19 reviewing the nature and quality of the services, as well as a

00:24    20 number of the other factors that we review, there is important

21 data in this -- throughout this booklet.

22 Q.   Thank you.  Would you also turn to tab 15 of the booklet

23 in front of you, which is Defendant's Exhibit 143.7?

24 A.   I'm sorry; back in the other book?

00:25    25 Q.   Yes.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1            MR. BENEDICT:  Your Honor, before I forget,

2    defendants offer exhibit 142.2 into evidence.  I will note

3    that this is part of a collection of Board materials that's

4    already in evidence.  This is just --

00:25    5            THE COURT:  I understand that.  Do you have an

6    objection -- we have been admitting them anyway since the

7    beginning of the trial.

8            MR. BENEDICT:  Correct.

9            THE COURT:  So we might as well keep with our

00:25   10    practice.

11            MR. BENEDICT:  I'll just note for the record that

12    the entire document is also entered into evidence as

13    Plaintiff's Exhibit 26.  I would have used that document this

14    morning, but I didn't have any extra copies of it.

00:25   15            THE COURT:  All right.  So do you object?

16            MR. A. LAKIND:  No, your Honor, as long as I know it

17    was provided in discovery.  I know what your Honor's other

18    rulings were, so we do have an objection in general, but not a

19    forcible one at this point.

00:26   20            THE COURT:  Okay.  So 142.2 is admitted.

21            (Defendant's Exhibit 142.2 was marked into

22    evidence.)

23            MR. A. LAKIND:  Excuse me, your Honor; 144.18, Jim,

24    is that in evidence yet?

00:26   25            MR. BENEDICT:  No.  My colleague, Mr. Murphy, just

3534

Schpero - Direct - Benedict

1   reminded me I forgot to move in 144.18.  I would also move

2   that into the evidence, the Gary charts.

3            MR. A. LAKIND:  No objection, your Honor.

4            THE COURT:  Admitted.

00:26    5            (Defendant's Exhibit 144.18 was marked into

6   evidence.)

7            THE COURT:  So, why do they call them Gary charts?

8   BY MR. BENEDICT:

9   Q.   Mr. Schpero, why do they call these the Gary charts?

00:26   10   A.   I think it's simply because going back -- so I joined the

11   Board in 2000, but certainly within a few years of joining the

12   Board I raised this issue on behalf of the Board.  I wasn't

13   the lead trustee, I really raised it as an independent

14   individual trustee.

00:26   15            THE COURT:  So they named it after you?

16            THE WITNESS:  They named it after me.

17            THE COURT:  Wow.

18            THE WITNESS:  Yeah.  Actually kind of annoying

19   chart.

00:27   20            THE COURT:  All right, thank you.

21   BY MR. BENEDICT:

22   Q.   Turning now if you will please to Defendant's Exhibit

23   143.7.  Mr. Schpero, do you recognize this document?

24   A.   So -- I'm sorry; this is under tab 15?

00:27   25   Q.   Yes.

*United States District Court*
*Trenton, New Jersey*

3535

Schpero - Direct - Benedict

1   A.   Yes, I do.

2   Q.   And what is it?

3   A.   This is -- this is the supplemental information that FMG

4   delivers with respect to its role as actual day-to-day

00:27   5   portfolio manager.  So what I'm referring to there is where

6   they have responsibility for the fund of funds, where they're

7   actually making the investment -- the actual specific

8   investment decision on the fund of funds that they sponsor and

9   manage, as well as where they have responsibility with respect

00:27   10   to ETF, the exchange trade -- exchange traded funds section of

11   some of the portfolios where they have specific

12   responsibility.

13        And what they've done here is -- and what they do is

14   they deliver documentation including, as you can see in the

00:28   15   second half of the booklet, it's in questionnaire form because

16   I think this very much mirrors the same kind of questionnaire

17   that each of the sub-advisors have to provide in response in

18   explaining the services they provide as sub-advisors, FMG

19   provides that with respect to their -- their role as I just

00:28   20   described.

21   Q.   Do you find this document helpful?

22   A.   Yes, I do.

23   Q.   And why is that?

24   A.   Well, one of the many things we are -- we are analyzing

00:28   25   and reviewing each year is FMG's role as specific portfolio

3536

Schpero - Direct - Benedict

1   manager for certain of the funds and for certain of the

2   portions of the funds.  And so this provides the essential

3   information that allows us to make the ultimate determinations

4   that we engage in.

00:29    5        MR. BENEDICT:  Your Honor, defendants offer 143.7.

6        THE COURT:  Any objections?

7        MR. A. LAKIND:  No, your Honor.

8        THE COURT:  All right, admitted.

9        (Defendant's Exhibit 143.7 was marked into

00:29  10  evidence.)

11  BY MR. BENEDICT:

12  Q.   Mr. Schpero, I'd like you now to turn to tab 16 of the

13  booklet in front of you, which is Defendant's Exhibit 142.10.

14  Do you recognize this document?

00:29  15  A.   Yeah, just give me one minute, please.

16  Q.   Certainly.

17        (Witness reviewing.)

18  A.   Okay, yes, I recognize it.

19  Q.   What is it?

00:30  20  A.   This is a chart that FMG provided to the Board, in this

21  case in 20 -- in connection with the 2013 July Board meeting,

22  summarizing the services provided by FMG as investment

23  manager, and separately summarizing the services provided

24  under the -- by the sub-advisor under their contractual

00:30  25  relationships.

*United States District Court*
*Trenton, New Jersey*

3537

Schpero - Direct - Benedict

1   Q.   And do you find this document helpful?

2   A.   I do.

3   Q.   And why is that?

4   A.   Well, it's -- it's kind of a nice executive summary

00:30   5   format of -- of the services that each -- each entity provide.

6   As I testified a few minutes ago, it is imperative that the

7   Board understand each of the services and the fees that are

8   being paid in connection with the services, so this is

9   certainly one format that helps to examine that.

00:31   10   Q.   Do you know how this summary chart concerning manager and

11   sub-advisor services came to be developed?

12   A.   I have -- yeah, I understand, I believe I understand the

13   generation of it.

14   Q.   And what is that understanding?

00:31   15   A.   Well, the -- after the complaint was filed, the Board

16   certainly was very attentive to the issue and spent

17   significant time with our counsel, and has worked deliberately

18   to monitor the complaint and the allegations.  I think in

19   particular -- and I don't know if it was -- I'm not going to

00:31   20   be able to keep track of which year the complaint was, but I

21   know that in connection -- the complaint I know was in July,

22   actually take it back, the complaint was in July of 2011; and

23   I know that in connection with the next contract review, so

24   the complaint was brought after our July contract review.

00:32   25        But I know that in connection with the next contract

3538

Schpero - Direct - Benedict

1   review, I had become the lead trustee in October of 2011, and

2   in working with my counsel and the Board working with our

3   counsel, because these are certainly all decisions made with

4   all of the independent trustees involved, we thought it would

00:32   5   be appropriate to ask FMG in connection with the next July

6   review to make sure they were responsive to the allegations

7   that were in the complaint.  There were obviously serious

8   allegations we, thought it was appropriate in connection with

9   that July and June -- June and July really contract review

00:32   10   that they responded to the various issues rather specifically.

11   And in connection with that FMG prepared this chart as part of

12   the response.

13   Q.   And was the side-by-side chart necessary for you to

14   understand the services performed by FMG and the sub-advisors

00:33   15   for the Trust?

16   A.   No, it was not.  It summarized what -- certainly what I

17   and I believe the other trustees were very much aware of.

18        MR. BENEDICT:  Let me just note for the record, your

19   Honor, that the side-by-side chart is annexed as Exhibit 4 to

00:33   20   Defendant's Exhibit 142.2, the FMG memo we just put into

21   evidence.

22        THE COURT:  All right.

23   Q.   Generally speaking, Mr. Schpero, what types of services

24   does FMG perform for the Trust in exchange for the management

00:33   25   fee?

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    A.    There's a -- there's a list of services, I guess I'll

2    summarize a few things.   They -- they have a significant role

3    in supervising the sub-advisors; they go through an important

4    diligence process in recommending sub-advisors to the -- to

00:34    5    the Board; they monitor those sub-advisors in every respect;

6    and certainly in terms of performance they engage in

7    significant analytics of the performance of the sub-advisors,

8    and do that -- as I understand do that weekly, although the

9    board obviously receives the material at quarterly Board

00:34    10    meetings; they engage in diligence sessions and visits with

11    the sub-advisors; and I believe there are at least monthly

12    calls, perhaps more often.

13        In addition to -- and they will often come to the Board

14    with recommendations as to changes to the sub-advisors,

00:34    15    changes to the teams that work within the sub-advisors, or

16    replacements when they are replacing sub-advisors, they will

17    engage in the due diligence process of coming up with a list

18    of other possible sub-advisors, and ultimately making a

19    recommendation to the Board.

00:35    20        In addition to those roles, they engage in other roles;

21    they're engaged in the governance process, so that -- dealing

22    with the Board; code of ethics issues; the education programs

23    that you described -- or that I described earlier in response

24    to a question from you are part of what they do; they're

00:35    25    monitoring a determination of the independence of the Board as

*United States District Court*
*Trenton, New Jersey*

3540

Schpero - Direct - Benedict

1   part of their responsibilities; they provide the chief

2   compliance officer, and as investment manager are engaged in

3   dealing on a day-to-day basis with important substantive

4   compliance issues that arise from 80 portfolios and many more

00:35   5   sleeves because many portfolios are broken up.

6        They provide the valuation committee that engages in

7   the daily valuation of many securities that have trading

8   issues associated with them.  Those would be some of the

9   examples that come to mind.

00:36   10  Q.   Thank you.  I'd like you, Mr. Schpero, to refer back to

11  Defendant's Exhibit 142.10, which is the side-by-side summary

12  chart you have in front of you.

13  A.   Yeah.

14  Q.   Would you just briefly review for the Court the various

00:36   15  headings of the types of services that FMG provides to the

16  Trust.

17  A.   Yeah.  So, first is Board of Trustees; I think this

18  references some of the items I just referred to in terms of

19  corporate board governance; alerting the Board as to material

00:36   20  developments; informing the Board of developments with respect

21  to litigation or SEC or enforcement matters --

22        MR. A. LAKIND:  Excuse me, your Honor, sorry to

23  interrupt, but if he needs this chart to refresh his

24  recollection, which I don't think he does because he

00:37   25  testified.  Simply repeating what he said by reading the

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    chart, I'm not sure why that is admissible evidence reading a

2    chart that's already in evidence.

3              THE COURT:  So, what was the question, Frank?

4              (Question read back by the reporter.)

00:37    5              THE COURT:  Sustained.  We have a chart.  You might

6    want to ask him to review the chart to see if there's any

7    duties that he didn't mention when he was going through it

8    originally.

9    BY MR. BENEDICT:

00:37    10   Q.   In reviewing Defendant's Exhibit 142.10, Mr. Schpero,

11   does this refresh your recollection to any additional services

12   or types of services that FMG provides to the Trust that you

13   didn't mention in your earlier answer?

14   A.   Yeah.  I mean I want to be careful, I will readily admit

00:38    15   there are a lot of services that are provided, and -- and

16   sitting here today many months from a July meeting or even at

17   the last Board meeting, this is -- this is helpful in

18   reminding me.

19             So, as I just mentioned, even under Board of Trustees,

00:38    20   keeping the Board updated on litigation and regulatory

21   matters; I didn't mention strategic initiatives; in terms of

22   restructuring the portfolios, continually monitoring the

23   portfolios for changes that might be appropriate.

24             The investment process; I did mention a lot of the

00:38    25   overview, but I did not mention -- although I guess I did in

3542

Schpero - Direct - Benedict

1    response to your earlier question, but FMG in addition to

2    supervising extensively the sub-advisors and providing much of

3    that information to the Board, also as we -- as I've noted

4    manages the day-to-day portfolios with respect of the fund of

00:39    5    funds and the ETFs.

6            Just flipping through for other kind of big picture

7    items.  Operations; they provide all of the appropriate

8    offices and facilities required for their role; they negotiate

9    the contractual arrangements with the sub-advisors; let's see

00:39    10   if there's -- monitoring brokerage execution is another

11   important role, where they monitor that and deliver

12   significant amounts of information to the Board in

13   presentations in that connection; oversight of the actual

14   sub-advisors compliance program would be another item I did

00:39    15   not mention; again, I'm not going to try to mention each one

16   of these.

17           Compliance, I think I covered the gist of that.  Legal,

18   they provide the legal counsel for substantive legal issues;

19   they coordinate and manage the outside law firms that they

00:40    20   work with; they coordinate the regulatory exams when the SEC

21   comes in, SEC can be in for I believe months at a time and

22   that's all handled by FMG.  They deal with -- there's very

23   significant exemptive relief that the funds have gotten in

24   different categories, the failure to satisfy any of that

00:40    25   exemptive relief can be virtually catastrophic in regard the

Schpero - Direct - Benedict

1   SEC regulatory concerns, and they monitor compliance laws for

2   all of those issues.

3       And they have a communications function which I did not

4   mention, where they deliver information about the funds to --

00:40   5   and strategic initiatives and other matters of that source,

6   where they're the focal point for delivering the information

7   to the distributor and other relevant groups.

8   Q.   Thank you, Mr. Schpero.  To the best of your knowledge,

9   does this summary chart accurately describe the services

00:41   10   provided by FMG and the sub-advisors to the Trust?

11   A.   Yes, I believe it does.

12   Q.   Switching gears a little bit, have there been significant

13   changes to some of the funds over the years?

14   A.   Yes, there have.

00:41   15   Q.   And could you give me some examples of some of the types

16   of changes that have been made to the funds over the years?

17   A.   Yeah, there have been many, so again, I can -- I'll just

18   try to briefly summarize what's occurred.  But going all the

19   way back the 2008/2009 with the financial crisis, as a

00:41   20   response to that the Board working with FMG approved many

21   changes to the funds.  So many of the funds that are in place

22   today, including a number of the at-issue funds, look very

23   different than they did before 2008/2009, where they were

24   restructured to create what I call hybrid or pactive funds,

00:42   25   with active portfolios and index managed portfolios, those

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    were all significant changes that began in 2008.

2    Q.   When you say restructured, what does that mean, Mr.

3    Schpero?

4              MR. A. LAKIND:  Your Honor, the time at issue here

5    is 2010 forward; I was just wondering why these questions

6    would be relevant.

7              THE COURT:  Denied.

8    BY MR. BENEDICT:

9    Q.   You mentioned restructuring, what does that mean, Mr.

10   Schpero?

11   A.   Yeah, so -- so an active fund that would have been in

12   place in 2008 or 2009, as I said today might look very

13   different because FMG would have -- might have proposed, and

14   certainly a number of these cases did, that the fund be

15   restructured by perhaps retaining -- sorry; replacing the

16   active manager.  But at a minimum, restructuring it by

17   entering into new sub-advisory agreements with other parties

18   where typically in hybrid structures it would change, so that

19   60 or 70 percent of the fund would be passive managed, managed

20   to match the index, and then perhaps 20 percent of the fund

21   might have been left as an active portfolio.  So that's a

22   significant change to the fund itself.  So that would be one

23   change.

24             Remind me of your general question; sorry.

25   Q.   My question was what types of changes have been made to

Schpero - Direct - Benedict

1  the funds over the years?

2  A.   Yeah.

3  Q.   You mentioned reorganizations, what other types --

4  A.   Reorganizations --

00:43    5        THE COURT:  Let's stick, as Mr. Lakind said, in the

6  timeframe in question, which is what, 2010 through --

7        THE WITNESS:  Sure.

8        MR. BENEDICT:  Yes.

9        MR. A. LAKIND:  And if it can be the funds at issue;

00:43   10  I would object to anything beyond the funds at issue.

11        THE COURT:  Well, we haven't gotten to that problem

12  yet.

13        Do you understand the question?

14        THE WITNESS:  I understand Mr. Benedict's question,

00:44   15  I understand your point, yes.

16        THE COURT:  So just keep it within those five years.

17        THE WITNESS:  Sure.  So, other changes from -- since

18  2010 would be -- would be many changes to the fee

19  arrangements.  There have been lots of negotiations that have

00:44   20  occurred over those years where -- and I'm sorry I'm going to

21  be general at the moment, but I think many of these, if not

22  all of them, are applicable to the at-issue funds.

23        But there have been additional breakpoints added to

24  the management fees, to the administrative fees; there have

00:44   25  been reductions in the management fees; so even where

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   breakpoints might have been moved to lower levels so that the

2   effective fee to the investor was less, there have been -- the

3   Board has negotiated expense caps in place for a number of the

4   funds; reductions in the expense caps in funds, again, which

5   would be beneficial to the investor, so this is a lower total

6   expense ratio that the investor is incurring.

7        There have certainly been any number of changes in

8   investment personnel as a result of displeasure at FMG and the

9   Board level, where, you know, changes don't necessarily

10  involve replacing an investment manager, although that

11  certainly has happened over this period, meaning replacing the

12  entire sub-advisor, but changes can also happen where there's

13  unhappiness with the team at a particular sub-advisor, and

14  where the Board has pushed hard and ensured that there have

15  been changed at particular sub-advisors where performance has

16  been a concern or an issue.  Those would be some of the

17  changes that I guess immediately come to mind.

18  Q.   Thank you, Mr. Schpero.  I'd ask you now to look at

19  Plaintiff's Exhibit 373.  I'm going to hand it up to you, Mr.

20  Schpero.

21       (Witness reviewing.)

22       THE COURT:  You may proceed.

23       MR. BENEDICT:  I was just giving the witness a

24  chance to look at the document, your Honor.

25       THE COURT:  Oh, okay.

Schpero - Direct - Benedict

1   A.   Okay.

2   Q.   Mr. Schpero, do you recognize this document?

3   A.   Yes, I do.

4   Q.   And what is it?

00:47   5   A.   This is a summary from 2010 through December 2013, of --

6   with respect to the at-issue funds.  A summary of kind of key

7   data, as well as including fee information, as well as some of

8   the changes that have occurred in different categories over

9   that period.

00:47   10   Q.   Thank you, Mr. Schpero.

11           MR. BENEDICT:  This particular document, your Honor,

12   has been the subject of a lot of testimony, and I'm just going

13   to move on.  I just wanted the witness to mark it for

14   identification, it's in evidence.

00:47   15           THE COURT:  All right.

16   Q.   Now, Mr. Schpero, all these changes that you have managed

17   -- or you mentioned in the funds over the years, have all

18   these been approved by the Board?

19   A.   Yes, they have.

00:48   20   Q.   Mr. Schpero, switching gears again, does FMG's parent,

21   AXA Equitable, provide any services to FMG and the Trust in

22   connection with the management of the funds?

23   A.   I'm sorry; I should just put this aside for the moment?

24   Q.   Yes, we're done with that.

00:48   25   A.   Could you ask the question again?

3548

Schpero - Direct - Benedict

1   Q.   Certainly.  Does FMG's parent, AXA Equitable, provide any

2   services to FMG and/or the Trust in connection with the

3   management of the EQAT Funds?

4   A.   Yes, it does.

00:48    5   Q.   Would you please describe for the Court some of the

6   services that AXA Equitable as opposed to FMG provides to the

7   Trust?

8   A.   Yeah.  Well, I think -- I think your question if I

9   understood it have been services to FMG or the Trust; is that

00:49    10   correct?

11   Q.   That's correct.

12   A.   So, because in my mind I think what this reflects is the

13   fact that FMG is a -- was a division, but of course now is a

14   subsidiary of a large corporate structure, and so it and the

00:49    15   fund get the benefit of that.  And so there are services that

16   I -- that I'm going to refer to that I think either FMG gets

17   the benefit of in connection with their role as investment

18   manager, or the fund ultimately gets the benefit directly or

19   indirectly.

00:49    20       So the kinds of things that I guess come to mind would

21   be all of the corporate services that are essential to FMG

22   doing what it does.  So at the AXA level there is a major

23   legal department, treasury, human resources; these are all

24   things that are situated at AXA, but are critical to what FMG

00:50    25   does and therefore critical to the fund.  There is a whole

*United States District Court*
*Trenton, New Jersey*

3549

Schpero - Direct - Benedict

1  processing -- I think much of this is technology, but there's

2  a significant tech -- sorry; processing role where AXA as

3  effectively as its role as transfer agent of the funds, is

4  responsible for moving all of the assets in and out of the

00:50  5  funds on a daily basis through the separate account, that is

6  the center place for investing in the funds.  So every

7  investment decision that an investor makes results in either

8  purchases or redemptions, and all of that has to move through

9  a center place, and that is -- and AXA has that

00:50  10  responsibility.  So that would be another part of services are

11  coming from the AXA level.

12  Q.   Let me turn your attention to tab 18 in the binder in

13  front of you, which is Defendant's Exhibit 153.  And I'd ask

14  you, Mr. Schpero, to turn to page 4 of that exhibit, which

00:51  15  ends the Bate stamp 4808.

16  A.   This is, I'm sorry, 18?

17  Q.   This is tab 18, Defendant's Exhibit 153, and ask you to

18  turn to page 4.

19  A.   Yes, I see it.

00:51  20  Q.   Do you recognize this document?

21  A.   I do.

22  Q.   And what is it?

23  A.   This is a -- this was provided to the Board in July 2013,

24  but this is a summary presentation of support provided by AXA

00:52  25  Equitable to FMG and directly or indirectly to the funds.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   Q.   And is this presentation or something very similar

2   presented to the Board each year?

3   A.   I guess I don't -- I don't remember that it's been every

4   year, I'm not sure I can answer that.

00:52   5   Q.   Thank you.  And do you find this document helpful?

6   A.   I do.

7   Q.   And why is that?

8   A.   Well, it further expands on the point you just asked me

9   about, which is ensuring that the Board understand the

00:52   10   services that are being -- and support that's being provided

11   by AXA, which is also critical to helping understand the

12   cost -- the profitability studies that are done, and in

13   particular the allocation of costs that are made from AXA to

14   FMG in those profitability studies.

00:53   15   Q.   Okay.  Yesterday, Mr. Schpero, you mentioned I believe in

16   connection with the quarterly meetings of the Board the

17   Board's role in monitoring performance of the various

18   portfolios; do you recall that?

19   A.   Yes, I do.

00:53   20   Q.   And how does the Board go about monitoring --

21   A.   I can put this book away a second?

22   Q.   Yes, you may.

23   A.   Sorry.  Got limited room here.

24        Sorry.

00:53   25   Q.   Let me repeat the question.  How does the Board go about

*United States District Court*
*Trenton, New Jersey*

3551

Schpero - Direct - Benedict

1  monitoring and reviewing fund performance?

2  A.   Well, that is something that is a heavy part of our role,

3  and it's at every Board meeting.  So at every Board meeting we

4  have, a significant part of the Board meeting is devoted to

00:54   5  presentations from FMG and discussions obviously with FMG,

6  starting at the aggregate level, where we look at what's

7  happened over the past quarter or past year, in terms of

8  aggregate economic issues; and then looking at dashboard type

9  materials that are presented, so that we get an overview of

00:54   10  how each portfolio is doing, how each sector is doing, the

11  index funds versus pactive versus the fund of funds, the

12  different types of funds that have been structured; and then

13  as part of that we also have received -- and we've received

14  this certainly ahead of the Board meeting, but we received

00:55   15  very specific data that compares the performance of each fund

16  and each sleeve to benchmarks, comparative benchmarks, as well

17  to Lipper peer groups.  And that's for periods of time up

18  through the most recent -- or meeting in September it might be

19  through June 30 or whatever's a relevant period that it can be

00:55   20  updated to.  So we have all that presented.

21       We have discussions with the key investment personnel

22  at FMG where they walk us through their analysis of these.  We

23  also have very detailed presentations on each fund; there's

24  usually five or six pages that walk us through the analysis of

00:55   25  each fund in terms of performance analyses that FMG conducts.

*United States District Court*
*Trenton, New Jersey*

3552

Schpero - Direct - Benedict

1    And then of course from that we then work through a special

2    review list that is created at the Board's request that

3    identifies funds where we have particular concerns, and we get

4    updates on performance of those -- of those funds; and then we

00:56    5    usually break out -- in recent years through this investment

6    committee process, we break out into the investment committees

7    and usually meet with four or five or six sub-advisors through

8    pretty much a good part of the first day or second day of our

9    Board meetings, and then we usually regroup; and when we

00:56    10   regroup there's an effort by each chair of each investment

11   committee along with FMG personnel to summarize for the rest

12   of the independent trustees what we've learned at these

13   sessions with the sub-advisors.

14   Q.   Thank you.  How important to you as a trustee is fund

00:56    15   performance in your review of the funds' fees?

16   A.   In review of?  I'm sorry.

17   Q.   In reviewing the fees, how important is performance?

18   A.   Well, whether we're reviewing the fees or not performance

19   is extremely significant, it's what ultimately the investor is

00:57    20   going to see.

21   Q.   Let me turn your attention to tab 19 in the binder in

22   front of you, Mr. Schpero, which is Defendant's Exhibit 138.9.

23   A.   Sorry; 19?

24   Q.   Yeah, tab 19.

00:57    25   A.   Yeah.

3553

Schpero - Direct - Benedict

1   Q.   Exhibit -- Defendant's Exhibit 138.9.

2   A.   Yes.

3   Q.   Do you recognize the document, Mr. Schpero?

4   A.   I do, it's one of the ones I left out in my summary.

00:57   5   Q.   And what is it?

6   A.   So, this is what's called the report card; and do you

7   want me to describe what that means?

8   Q.   Yes, I'd appreciate that, please.

9   A.   So, in addition to the dashboard that I referred to,

00:58   10   which gives actual performance for each fund so you can see

11   how they're doing over the last 12 months, three years, five

12   years, et cetera, we also receive in advance of each Board

13   meeting this report card which is an effort by FMG to update

14   the Board on its views based on the service that it's

00:58   15   providing on each of these categories.

16        So, how the fund is performing; the processes that the

17   investment personnel engage in; organizational issues;

18   investment fit, and developments with respect to cash flow.

19   It's just another executive summary that is available.

00:58   20   Q.   And what does the legend in color on the right-hand side

21   of this document indicate?

22   A.   So this is a rating process that reflects FMG's, not

23   necessarily the Board's views certainly, but it reflects FMG's

24   views as to whether -- in each of these categories, one as you

00:59   25   can see would be exceeds expectations, and it goes all the way

United States District Court
Trenton, New Jersey

3554

Schpero - Direct - Benedict

1   down to number 5, where the recommendation from FMG at least

2   would be it's time to potentially replace a sub-advisor or

3   take other significant action.

4   Q.   And do you find this document helpful?

00:59   5   A.   Yes, I do.

6   Q.   And why is that?

7   A.   Again, I think as I said early on, it's critical in the

8   independent trustees carrying out our responsibilities to do

9   this in an effective and efficient way.  This is a very

00:59   10   effective executive summary that helps to -- which is just

11   another data point that helps alert us to areas that we ought

12   to be more devoting more or less focus to.

13          THE COURT:  So, on that document in the lower

14   right-hand corner, it says, ratings reflect manager's

01:00   15   opinions; so that means no numbers is what?

16          THE WITNESS:  I think this is just -- making it

17   absolutely clear, that this is just reflecting FMG's opinions.

18          THE COURT:  Okay.

19          THE WITNESS:  Certainly not -- whether I or any

01:00   20   other independent trustee agree with these numbers, we've had

21   often debates about these numbers with FMG, but this is their

22   -- their perspective.

23          THE COURT:  All right.  So, do you receive this each

24   month or each quarter?

01:00   25          THE WITNESS:  We receive this in advance of each

3555

Schpero - Direct - Benedict

1   Board meeting.  With the exception, your Honor, of -- I

2   believe of the July meeting, since that's right after June and

3   that's devoted to contract review.  Although I think we get

4   it, but it's probably not updated for July.

01:00   5          THE COURT:  All right, thank you.

6          MR. BENEDICT:  May I proceed, your Honor?

7          THE COURT:  You may.

8   BY MR. BENEDICT:

9   Q.   Mr. Schpero, would you turn now to tab 20 in the binder

01:01   10  in front of you, which is Defendant's Exhibit 138.10.  Do you

11  recognize this document?

12  A.   Yes, I do.

13  Q.   And what is it?

14  A.   So, I've referred I think several times to the special

01:01   15  review list, and this is one -- this is the list as of a

16  particular date, which is how we see this.  We see the review

17  list before -- in advance of each Board meeting, it's updated

18  in advance of each quarterly Board meeting.  Do you want me to

19  further explain it or --

01:01   20  Q.   Well, how does a document get on the special review list?

21  A.   How does?

22  Q.   How does a fund get on the special review list?

23  A.   This is a list that FMG prepares, so again, it reflects

24  their view; it is reviewed with the Board extensively.  There

01:02   25  are certainly -- having said what I just said, there are

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    certainly cases where funds have been added at the direction

2    of the Board, where the Board has felt that funds that were

3    not on here should be on here; and when funds on are here we

4    engage in extensive discussions at each Board meeting.

01:02   5    Q.   So what is the purpose of the special review list?

6    A.   Yeah, it is to -- to identify funds that have particular

7    issues that are considered problematic.  It doesn't

8    necessarily have to be performance; it could be an investment

9    manager where there has been a significant announcement with

01:03  10    respect to their operations; where there's been major news

11    about major personnel leaving, so there's organization issues;

12    or it could be specific to performance; there's lots of

13    different reasons.  But the idea is to put on funds and then

14    monitor them where there are issues of some significance.

01:03  15    Q.   Do you find the document helpful?

16    A.   Yes, I do.

17    Q.   And why is that?

18    A.   It's -- I think it's, again, another helpful summary

19    point that allows us to be particularly -- our responsibility

01:03  20    is with respect to every fund, clearly, but at any particular

21    point in time some funds are going to be more problematic or

22    raise more issues than others, and this is another -- another

23    mechanism to make sure that the Board stays focused on those

24    funds that might have particular issues being raised at a

01:04  25    particular time.

*United States District Court*
*Trenton, New Jersey*

3557

Schpero - Direct - Benedict

1          THE COURT:  So, if you look at that sheet, 138.10 --

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Next to let's say EQ/Lord Abbett Large

4  Cap Core, there's the parentheses 7?

01:04    5          THE WITNESS:  Yes.

6          THE COURT:  Do you know what 7 is?

7          THE WITNESS:  I sure do; that is the number of

8  quarters that it has been -- that that fund has been listed on

9  the special review list.

01:04    10          THE COURT:  So it's seven quarters ago; so it's like

11  two years.

12          THE WITNESS:  Correct.

13          THE COURT:  So if you go down to Morgan Value, that

14  only has four; so this would be it's only been on there for a

01:04    15  year?

16          THE WITNESS:  That's correct.

17          THE COURT:  And you go from the highest to the

18  lowest, is that what happens?

19          THE WITNESS:  Yeah, it looks to do that, I think

01:04    20  that's probably right.  I can't say for certain it's always

21  presented that way but --

22          THE COURT:  It doesn't really matter.

23          THE WITNESS:  Yeah, but the structure is that

24  there's usually -- in this case there are no deletions.  If

01:05    25  you look at the two pages, you've got a section that's

3558

Schpero - Direct - Benedict

1    continuations, you've got a section that's called additions,

2    so you can see that Large Cap Growth PLUS, that was an

3    addition so it's just got the number 1 next to it on the

4    second page, down near the bottom.  And then periodically

01:05    5    there are deletions, where it's been determined that things

6    have been fixed or there's been a substantive change that

7    addresses the issue.

8           THE COURT:  So why would you have like the first

9    one, the EQ/Lord Abbett, why would it be on there for seven

01:05    10   quarters?

11          THE WITNESS:  Would you mind if I just read the

12   paragraph a second?  I might be able to --

13          THE COURT:  Okay.

14          THE WITNESS:  -- be helpful.  Obviously this is from

01:05    15   2013, but let me just see what it says a moment.

16          (Witness reviewing.)

17          THE WITNESS:  I'm not sure this is going to be that

18   helpful to me, but each of these are going to be specific, in

19   this case the summary -- and I can't recall the specifics

01:06    20   certainly, but the summary here is pointing out that despite

21   under-performance in two particular years, that since

22   inception the portfolio has beaten its benchmark; and more

23   over it's been ahead of its peer group since 2010, so for

24   three years.

01:06    25          So -- and then it had a bad year in 2011; in 2012 it

3559

Schpero - Direct - Benedict

1    looks like it trailed the index, but it exceeded its peers, so

2    it's had a mix of issues.  And so the goal is -- typically

3    what happens is once a fund goes on the list, we're not going

4    to agree to take it off and FMG is not going to recommend

5    taking it off unless there's real proof that it has turned

6    around.  It doesn't necessarily mean that it's going to

7    require any immediate change, but it means that we ought to be

8    looking at it closely, it means that when the sub-advisor

9    comes in -- so in this case, Lord Abbett came in, we would

10   have spent very significant time with them trying to surface

11   what the problems have been, how are they trying to correct

12   it, it would get that kind of attention.

13              THE COURT:  Okay, thank you.

14              MR. BENEDICT:  May I proceed, your Honor?

15              THE COURT:  You may.

16              MR. BENEDICT:  Defendants offer Exhibits 138.9 and

17   138.10 into evidence.

18              THE COURT:  Any objections?

19              MR. A. LAKIND:  No objection, your Honor.

20              THE COURT:  All right, both are admitted.

21              (Defendant's Exhibits 138.9 and 138.10 were marked

22   into evidence.)

23   BY MR. BENEDICT:

24   Q.   Mr. Schpero, has the Board taken any actions to address

25   subpar fund performance?

*United States District Court*
*Trenton, New Jersey*

3560

Schpero - Direct - Benedict

1   A.   Yes, it has.

2   Q.   And what actions has it taken over the years?

3   A.   Again, I would tell you it's been a whole mix of things.

4   There have been cases where -- well, first of all, if it's

01:08   5   subpar we are meeting more frequently with the sub-advisor,

6   that's --

7          MR. A. LAKIND:  Your Honor, I don't mean to

8   interrupt, but if the witness could confined his answer to

9   funds in particular --

01:08   10          THE COURT:  That would be helpful.  Could we go

11   through the ones that are at issue first, Mr. Benedict?

12          MR. BENEDICT:  Yes.

13   BY MR. BENEDICT:

14   Q.   To the extent you can recall with the 12 at-issue funds,

01:08   15   what actions has the fund taken to address subpar performance?

16   And I can refer you back if you like to Plaintiff's Exhibit

17   373, which has a chart of all of the at-issue funds.

18   A.   I'm sorry; are you waiting to see what I say?

19          MR. A. LAKIND:  Yeah, I think that would be okay

01:08   20   before your recollection is refreshed.

21          THE COURT:  I'm not sure what the issue is.  Mr.

22   Schpero, do you need to look at the document to refresh your

23   recollection?

24          THE WITNESS:  I'm just trying to think if I can give

01:09   25   specific examples for you.  I mean I guess I can cite the --

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1          THE COURT:  It doesn't matter, if you need the

2   document --

3          THE WITNESS:  Yeah, it would be helpful, there's a

4   lot of funds.

01:09    5          THE COURT:  So you could provide that document to

6   him?

7          MR. BENEDICT:  Yes.

8          THE COURT:  Plaintiff's Exhibit 373.

9   BY MR. BENEDICT:

01:09   10   Q.  Specifically with respect to the 12 at-issue funds, do

11   you know whether any of the 12 at-issue funds have what you

12   called subpar performance?  I mean originally to just broadly

13   get the types of actions that the Board has taken, but the

14   Court would like to focus on the specific at-issue funds.

01:09   15   A.  Well, first I would point out that a number of these

16   funds because of subpar performance went through significant

17   changes in 2009.

18   Q.  Okay.

19   A.  2008, 2009.  So a number of these funds were converted

01:10   20   from active funds to pactive funds, and certainly a major

21   contributor of that was -- was performance that was

22   problematic.

23          In addition, I believe that T.Rowe Price -- I know we

24   made a number of changes with respect to that fund, where

01:10   25   we -- I'm not sure where it's going to show up on this chart,

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    but I'm quite certain that we lowered the expense cap in that

2    fund, and I believe ultimately lowered its fee -- I guess if I

3    look at the chart a second I'll be able to remember the

4    specifics.  (Witness reviewing.)

01:11    5          Yeah, T.Rowe Price Growth Stock, we decreased the fee

6    in September of '12, from 80 to 75 basis points; I believe we

7    also reduced the expense cap in that case; I mean we've made a

8    number of changes in the fee arrangements, but I'm not going

9    to be able to represent to you that they were always in

01:12   10    response to performance issues.  There would be any number of

11    reasons we might have changed the arrangements and trying to

12    recreate that right now is very difficult.

13    Q.   Fine, let me move on.  Mr. Schpero, am I correct that

14    fund performance is generally presented to the Board net of

01:12   15    fees?  Performance data?

16    A.   Fund performance is presented net of fees for the

17    portfolio.  I believe that if you were to look specifically at

18    sleeve performance, which we also look at, I believe that is

19    gross of fees.

01:12   20    Q.   Are separate account and other insurance product related

21    fees generally included in the calculation of fund performance

22    as it's presented to the Board?

23    A.   No, it's not.

24    Q.   And why is that?

01:13   25    A.   Well, the Board's responsibility is -- was with respect

*United States District Court*
*Trenton, New Jersey*

*3563*

Schpero - Direct - Benedict

1    to the specific EQAT Funds.  Our responsibility under the

2    Investment Company Act is in reviewing the management and

3    sub-advisory contracts, the administrative contracts for those

4    funds, and in doing that we look at the performance of those

01:13    5    funds.  The costs that are in place for the insurance products

6    that are outside of that, are really not the Board's

7    responsibility.

8         And so, we certainly -- while we're aware that there

9    are significant costs at what I believe are called the wrapper

01:13   10    level of the insurance product, that is not presented to us at

11    the performance level.  I would note that if you look at the

12    prospectus for any of these funds, the performance does not

13    show -- is not net of those costs; in fact, that would be

14    inconsistent I believe with SEC requirements, and would also

01:14   15    be inconsistent with what I know of industry practice.

16    Q.   Let me turn now to sub-advisors.  Does the Management

17    Agreement between FMG and the Trust as investment advisor,

18    allow FMG to subcontract out some of the management functions?

19    A.   Yes, it does.

01:14   20    Q.   And why is that?

21    A.   Why does the --

22    Q.   Does the trust agreement with FMG permit FMG to

23    subcontract out to sub-advisors some of the work?

24    A.   Well, I think that's -- that's consistent with the nature

01:14   25    of this complex.  What has been -- what is and has been

*United States District Court*
*Trenton, New Jersey*

*3564*

Schpero - Direct - Benedict

1    marketed to AXA's ultimate clients is a fund complex that is a

2    fund of funds structure, where investors have the opportunity

3    to invest in a wide breadth of different kinds of fund

4    products, and get the benefit of expert portfolio management

01:15    5    by lots of different sub-advisors.

6    Q.   And who's ultimately responsible for performing the

7    sub-advisory functions?

8    A.   For performing the sub-advisory --

9    Q.   Yeah, who ultimately does the Board look to being

01:15    10    responsible.

11    A.   Well, I'm not sure I understand your question.  I mean

12    contractually the contract is between the fund and the

13    investment manager, so I guess I would tell -- I shouldn't say

14    I guess; I will tell you that if there's a problem at any

01:15    15    level of these funds, whether it's at the portfolio -- whether

16    it's at the sub-advisory level or at the FMG level, wherever

17    it is contractually we're going to look to FMG.

18    Q.   In your view does the sub-advisory fund structure or

19    manager of managers structure that you've mentioned, provide

01:16    20    any benefits to fund investors?

21    A.   Bear with me one second.  Give me that again, please.

22    Q.   Yeah, sure.  In your view, does the sub-advisory or

23    manager of managers structure provide any benefits to fund

24    shareholders?

01:16    25    A.   I believe it does.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    Q.   And would you please explain?

2    A.   Yeah.  I think the -- I think there's a very attractive

3    aspect to these funds, in that you've got an expert manager,

4    FMG, with highly qualified personnel, who are involved in the

5    analysis and selection and overview of all of these different

6    sub-advisors.  And I think that results in the kind of very

7    active movement you see with these funds, including all the

8    at-issue funds, where there are many changes over the years.

9         And I would -- I would compare this to fund complexes

10   that I represented for many years and am very familiar with,

11   where typically -- I shouldn't say typically, but many fund

12   complexes run by many of the major sponsors in the country,

13   are singular sponsored events.

14          So, you take a name, the T.Rowe Price funds; T.Rowe

15   Price is the -- and I didn't represent them so I'm not being

16   specific to them, but I'm using them as an example.  But the

17   T.Rowe Price funds or the Fidelity funds, if you're on the

18   board of those funds, you are only going to see the investment

19   personnel of those funds, and you're going to see a -- I'll be

20   general now and move away from any specifics; but often you'll

21   see a senior investment officer, and they will come to the

22   board meetings and they will talk about their employees.

23        And the reality is that there's an inherent conflict

24   there.  And it puts -- you know, it is very difficult for the

25   Board to examine performance in that case.  You obviously

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    still go to Lipper and other outside providers to get

2    information, but the reality is that there's a real

3    disinclination in that situation on behalf of the sponsor to

4    make major changes in the investment personnel, no matter

5    what's happening with respect to performance.

6         Here, I think it's very attractive for the investor,

7    because here you have an investment manager, who for most of

8    the funds has no relationship with the underlying

9    sub-advisors, whose goal is top performance or appropriate

10   performance, and therefore, is going to carefully monitor the

11   sub-advisors and is not going to be hesitant if they think

12   it's appropriate to recommend to the independent trustees a

13   change.  Because it's certainly not -- it's not affecting FMG

14   other than it's potentially beneficial to the investors.  So I

15   think that's an important...

16   Q.   Generally speaking, Mr. Schpero, what services do the

17   sub-advisors provide to the funds?

18   A.   I think I'd list three or four:  They engage in research

19   for determining the specific securities to invest in; they

20   engage -- they make the investment decisions for the

21   securities -- for the investment portfolio they have

22   responsibility for; so research, investment decision, the

23   actual execution of the trade, those would be the three areas.

24   And they have a responsibility to communicate that information

25   back to FMG.

3567

Schpero - Direct - Benedict

1   Q.   We talked briefly this morning about information that FMG

2   provides to the Board concerning sub-advisory services; do the

3   sub-advisors themselves provide information to the Board

4   concerning the services they're performing on behalf of the

01:20    5   Trust?

6   A.   Ask me one more time please?

7   Q.   Sure.  Do the sub-advisors themselves provide -- provide

8   the Board with information concerning their services?

9   A.   Yes, as part of the 15(c) process, I think you're asking,

01:20   10   yes.

11   Q.   Do I understand that a questionnaire is sent out by FMG

12   to each sub-advisor every year?

13   A.   That's correct.  Each sub-advisor, as I think I mentioned

14   early on, fills out a questionnaire and attaches to that all

01:20   15   the appropriate documentation that reviews the services that

16   they provide.

17   Q.   And do each of the sub-advisors respond to the

18   questionnaire?

19   A.   Yes, they do.

01:20   20   Q.   And is that information provided to the Board as part of

21   the 15(c) process?

22   A.   Correct.

23   Q.   And is that -- is that information largely in Book 2 do I

24   understand?

01:20   25   A.   I'm not going to remember what book it's in, because

*United States District Court*
*Trenton, New Jersey*

3568

Schpero - Direct - Benedict

1    usually I will see it in the Diligent on line.

2  Q.  Thank you.  Let me turn your attention, Mr. Schpero, to

3    tab 22.  This is a new book.

4  A.  Can I give up the old one?

01:21    5  Q.  You can give up the old one if you like.

6         MR. BENEDICT:  For the record, this is -- behind tab

7    22 is Defendant's Exhibit 144.15.

8         THE WITNESS:  Your Honor, I can use a bathroom break

9    at some point.

01:21   10         THE COURT:  Okay, we can break now.

11         So, we'll break -- do you want to break for lunch at

12    this time, is that good?

13         MR. BENEDICT:  Whatever your Honor would prefer.

14         THE COURT:  So we'll be back at 10 to 1:00.

01:21   15         So, you may step down.

16         THE WITNESS: Thank you.

17         (Luncheon recess.)

18         THE COURT:  Mr. Schpero, you're still under oath.

19         THE WITNESS:  Yes, sir.

02:09   20         THE COURT:  Mr. Benedict, you may continue.

21         MR. BENEDICT:  Thank you, your Honor.

22  BY MR. BENEDICT:

23  Q.  Mr. Schpero, would you please turn to tab 22 in the

24    binder in front of you?  This is Defendant's Exhibit 144.15.

02:09   25  A.  Sorry; tab?

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   Q.   Tab 22.  That should be at the front of the new binder.

2        THE COURT:  It looks like this (indicating).

3   A.   Okay.

4   Q.   Do you recognize this document?

5   A.   Yes, I do.

6   Q.   What is it?

7   A.   This is a summary -- I referenced this earlier in my

8   testimony; this is a summary prepared by FMG as part of the

9   15(c) materials.  In this case I can't tell what Board

10  meeting, but this is a sub-advisory summary.

11  Q.   Would you please describe the document for the Court?

12  A.   Yeah, this reflects an effort by FMG to go through really

13  the voluminous documentation that is received from all of the

14  sub-advisors as part of the annual 15(c) process where they

15  fill out a questionnaire and then attach -- often attach many

16  of their key documents, registration statements, ADV and

17  financial information, compliance documents and other; and FMG

18  then works through that and tries to summarize some of the key

19  documentation and any issues that they identify.

20  Q.   And do you find that document helpful?

21  A.   Yes, I do.

22  Q.   And why is that?

23  A.   Well, as I stated early in my testimony, this is the kind

24  of information where it is helpful to have the -- have others

25  who have particular expertise.  So, for example, among other

*United States District Court*
*Trenton, New Jersey*

3570

Schpero - Direct - Benedict

1    things this lists legal and regulatory matters and other

2    issues that are identified in the sub-advisory responses, and

3    it's helpful to have FMG as well as our counsel review all of

4    that and give summaries of some of that data.

02:11    5    Q.   Am I correct that you mentioned yesterday that your

6    independent counsel also provides a memorandum to you,

7    summarizing sub-advisory information?

8    A.   That's -- yes, that's correct.

9    Q.   Now, you previously mentioned, Mr. Schpero, that

02:12    10   sub-advisors make presentations at Board and Board committee

11   meetings?

12   A.   Yes.

13   Q.   And how frequently does each sub-advisor present?

14   A.   Well, the Board has set up, the independent trustees -- I

02:12    15   should clarify, whenever I talked about the Board I'm talking

16   about the independent trustees.

17        THE COURT:  All right, thank you.

18   A.   So, the Board has set up a calendar exercising, you know,

19   our judgment as to what we think is an appropriate schedule.

02:12    20   So I can remember the specifics, I think we try to make sure

21   we see any -- FMG and its affiliates typically once a year,

22   again, specific with respect to where they are managing the

23   actual portfolio, sub-advisors, I think that the general

24   requirement is that we see them within at least 18 months.

02:13    25        But, if your Honor, for example, somebody on the special

3571
Schpero - Direct - Benedict

1  review list, it would be rare that we would go 18 months, we

2  would typically see them more often.  And there have been

3  sub-advisors that have been problematic that we've seen a

4  couple times in a year, it just depends on the circumstances.

02:13    5  Q.   And do the trustees have an opportunity to question the

6  sub-advisors at these meetings with them?

7  A.   Quite extensively, yes.

8         MR. BENEDICT:  Defendants offer DX-144.15 into

9  evidence.  It's already part of the Board materials.

02:13   10         MR. A. LAKIND:  No objection.

11         THE COURT:  All right, admitted again.

12         (Defendant's Exhibit 144.15 was marked into

13  evidence.)

14  BY MR. BENEDICT:

02:13   15  Q.   Mr. Schpero, plaintiffs have asserted that FMG delegates

16  to the sub-advisors the day-to-day investment management of

17  the funds; do you agree with that?

18  A.   I do not.

19  Q.   And why is that?

02:13   20  A.   Well, I would point out I think this is -- we're using

21  words that have no definition, so I think they can be used in

22  lots of different ways.  But in my mind day-to-day -- you said

23  day-to-day investment management of the fund?

24  Q.   Yes.

02:14   25  A.   So yes, the sub-advisors are involved in the day-to-day

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   portfolio selection process that we discussed, but FMG also is

2   heavily involved on a day-to-day basis in providing the

3   various services they provided under the investment management

4   contract.  As an example, valuation on a daily basis generally

02:14   5   is occurring, there are lots of things that are happening

6   daily.  So I think that is a term for which there is no

7   definition and can be quite ambiguous in its meaning.

8   Q.   Mr. Goldstein has asserted that the Board exhibited a

9   fundamental misunderstanding of FMG's role because

02:14   10  substantially all of FMG's services are performed by

11  sub-advisor firms; do you agree?

12  A.   I strongly disagree.

13  Q.   And why is that?

14  A.   Well, I think I've already testified there are very

02:15   15  substantial services that are provided by FMG, and I think

16  they're very much to the benefit of the investors.

17  Q.   Does the Board review and approve the sub-advisory

18  agreements each year?

19  A.   Yes, it does.

02:15   20  Q.   And do you approve the fees to be paid by the funds'

21  sub-advisors as well?

22  A.   That's --

23  Q.   Fees to be paid to the sub-advisors as well?

24  A.   That's correct.

02:15   25  Q.   And who pays the sub-advisors?

3573

Schpero - Direct - Benedict

1    A.   Well, I guess I have come to understand that the actual

2    cash flow payment is a payment to FMG of its portion of the

3    fee, and a payment to the sub-advisor of its portion.

4    Q.   And who has a legal obligation to pay the sub-advisor?

02:15    5    A.   Yeah, the legal --

6              MR. A. LAKIND:  Objection.  This witness is here as

7    a trustee, not as an attorney or an expert.

8              THE COURT:  Frank, can you repeat the question?

9              (Question read back by the reporter.)

02:16    10             THE COURT:  Do you wish to be heard on that?

11             MR. BENEDICT:  I'll rephrase.

12             THE COURT:  Why don't you rephrase it.

13   BY MR. BENEDICT:

14   Q.   Under the Management Agreement, Mr. Schpero, who pays the

02:16    15   sub-advisors?

16   A.   Under the Management Agreement my understanding is that

17   the manager FMG is responsible for payments to the

18   sub-advisor.  It's coming out of the manager's fee.

19   Q.   Do you receive information regarding the amount of the

02:16    20   management fee that's retained by FMG after payment of the

21   sub-advisors?

22   A.   Yeah, that -- that's the amount that is as I've suggested

23   is unfortunately called the Gary chart.

24   Q.   The spread that we talked --

02:16    25   A.   The spread, yes.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    Q.   And is the amount retained by FMG important to you?

2    A.   It's very important.

3    Q.   And why is that?

4    A.   Well, again, I think that our responsibility is to

02:17    5    understand and on behalf of the investors ensure that each of

6    the service providers is providing real services for

7    appropriate fees, for fair and reasonable fees.  And the only

8    way to analyze the fee that FMG is retaining is to be

9    clearly very much aware of what that fee is.

02:17    10    Q.   And do you believe that the amount of fee that's retained

11    by FMG is fair relative to the services FMG provides to the

12    Trust?

13    A.   Yes, I do.

14    Q.   And why is that?

02:17    15    A.   Well, I think that's -- I think that's what we as

16    independent trustees are charged to do every July, that's the

17    finding that we make, and we make that finding based on a very

18    significant and conscientious analysis, ultimately exercising

19    our business judgment.  But we do that upon receipt at the

02:17    20    request of our counsel and the Board of all the data that we

21    think is appropriate to review that satisfy all the *Gartenberg*

22    factors and more as far as I'm concerned.

23         And we have a Board that I think is extremely focused

24    on the ultimate goal here, which is to make sure the fee is

02:18    25    fair and reasonable, and in the exercise of our business

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    judgment is -- is going to be satisfactory for the investor.

2    Q.   And do you also consider the difference between the

3    amount of the management fee retained by FMG and the amount of

4    the fees paid to the sub-advisors when you approve the

02:18    5    Management Agreement?  Do you look at both what FMG keeps and

6    what FMG pays of the total fee --

7    A.   Yeah, I think I just answered that, but yes.

8    Q.   Mr. Goldstein has asserted that the Board was not

9    conscientious because it didn't consider alternative

02:19    10   investment advisors other than FMG.

11         THE COURT:  There's an objection; hold on.

12         MR. A. LAKIND:  It's a leading question, your Honor.

13         THE COURT:  All right.  Denied.

14         You may answer the question.

02:19    15        THE WITNESS:  Could you ask it again, please?

16   BY MR. BENEDICT:

17   Q.   Sure.  Mr. Goldstein has asserted that the Board was not

18   conscientious because it did not consider alternative

19   investment managers other than FMG; do you agree with him?

02:19    20   A.   I do not.

21   Q.   And why is that?

22   A.   Well, I would start by saying that if there was cause to

23   consider alternative investment managers, we would do that in

24   a second.  But number one, as you just asked me, we have been

02:19    25   able to make the finding every year that we think the fee is

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   fair and reasonable, and as part of that we have reviewed all

2   of the different factors, including what we believe are very

3   high quality services that are provided by FMG.  So, there's

4   been no reason to do that.

02:19   5       I would also say that the reality of a complex like

6   this is these are -- these are assets that have come in

7   through AXA, and so there is an expectation I believe on

8   behalf of the investors that they're going to -- that what has

9   been marketed by AXA is going to be sponsored by AXA and AXA's

02:20   10  going to play the -- provide the service that has been -- that

11  has been disclosed to investors.

12      But I'll go back to my first point; if there was ever a

13  stage where the Board felt that FMG was failing in its

14  responsibilities, we would certainly be looking at

02:20   15  alternatives.

16  Q.  Mr. Schpero, do you consider risks assumed by FMG as part

17  of your evaluation of the value of FMG's services to the

18  funds?

19  A.  Yes, we do.  Or I do.

02:20   20  Q.  And what types of risks do you believe FMG assumes as

21  investment manager of the funds?

22  A.  I think there are a number.  I guess I'd -- let me just

23  think about that.  I think I'd categorize them in two ways:

24  There are what I'd call entrepreneurial risks in starting up

02:21   25  the fund and in sponsoring the funds; there are significant

3577

Schpero - Direct - Benedict

1   costs involved with that and risk; there is no guarantee that

2   any of these funds are going to be successful, or they're

3   going to achieve -- or they're going to reach an asset level

4   where AXA or FMG is able to do anything other than continue to

02:21   5   reimburse the funds under the various expense caps that are

6   put in place to make the fund viable at the early stage; so I

7   think there are significant risks in connection with that.

8       And then equally importantly there are several what I

9   guess I'd call enterprise risks, where FMG as the manager is

02:21   10   the party that's going be looked to if there are regulatory

11   problems, if there are legal problems, if there are

12   operational or compliance or reputational problems; I mean if

13   there's a problem with this fund, the party that is going to

14   be identified as the entity that is at risk is FMG.

02:22   15       And I will tell you as an independent trustee, if

16   there's a problem with this fund, contract or no contract, the

17   party that I'm going to look to to make the fund whole will be

18   FMG.

19   Q.   Are they enterprise risks as you have characterized them

02:22   20   significant in your view?

21   A.   I believe they are.

22   Q.   And would you please explain why?

23   A.   Yeah, I mean there have been significant cases over the

24   years that I am familiar with or examples I guess I can say of

02:22   25   where the sponsors of funds, because of major compliance

*United States District Court*
*Trenton, New Jersey*

*3578*

Schpero - Direct - Benedict

1    problems, regulatory problems, market problems, the context of

2    money market funds, have put -- have had to put tens of

3    millions and some cases I believe hundreds of millions of

4    dollars back into funds.  And the party that is -- you know,

02:23      5    that I would expect to look to in all those cases is going to

6    be the manager, as opposed to the sub-advisors who are

7    secondarily in the contract, and who in many cases the

8    sub-advisors do not have the financial viability.  That's why

9    AXA and FMG are such a critical party here, we're talking

02:23     10    about major assets available if we need to go after them.

11    Q.   And are you provided by FMG with information each year in

12    connection with the 15(c) process concerning these and other

13    risks?

14    A.   Ask that again, please?

02:23     15    Q.   Are you provided information each year concerning these

16    various risks as part of the 15(c) process?

17    A.   Yes, we are, there's certainly discussions about them.

18    Q.   All right.  Let me shift gears, if I may, Mr. Schpero --

19         THE COURT:  I'm sorry; Mr. Schpero, so you talked

02:23     20    about these risks, entrepreneurial and enterprise risks, but

21    aren't those some of those risks passed on to the

22    sub-advisors?  So it minimizes the risk to FMG?

23         THE WITNESS:  I guess a couple things.  I think -- I

24    think the entrepreneurial are generally not; I think the

02:24     25    sub-advisor does not expect -- my understanding is --

*United States District Court*
*Trenton, New Jersey*

3579

Schpero - Direct - Benedict

1          THE COURT:  On the start-up, okay.

2          THE WITNESS:  Yeah, all the start-up and all the

3     expense caps, the reimbursements, none of that as I understand

4     it typically would come out of the sub-advisors' hide.  I

02:24    5     think all of that is borne by the sponsor, which is FMG.

6          On the -- on the enterprise risk, I think -- I

7     think, your Honor, certainly there could be cases where a

8     sub-advisor has a significant compliance problem and certainly

9     in the first case everybody's going to look to the

02:24   10     sub-advisor.  But a few things, first of all, there are -- the

11     nature of this complex is FMG is always looking for

12     sub-advisors that are new, that are unusual, many of those we

13     see this with a -- with their questionnaires, some of them

14     don't even -- you know, have minimal assets, their financial

02:25   15     statements are very limited what we can get, they're often

16     unaudited, so if there's a significant problem and you can

17     have a fund that grows significantly in assets, conceptually

18     the sub-advisor may be on the hook, but if there's an in

19     ability to pay it the Board is going to be looking to FMG; and

02:25   20     reputationally it's going to be AXA and FMG's name which is

21     going to be everywhere.  And I would argue the regulators are

22     going to look to FMG, because that's the party that has the

23     direct contract relationship, and that's where the significant

24     money's going to be.

02:25   25          THE COURT:  So, if FMG is undertaking that type of

Schpero - Direct - Benedict

1   risk, how does the Board secure that risk in some fashion?

2          THE WITNESS:  I don't think as a practical matter

3   there's a way to secure it, but I think -- I think that goes

4   to lot to the relationship that develops between the Board and

02:26    5   FMG.  I think that's why that relationship, albeit always at

6   arm's length is an important relationship.

7          I'll give you an example.  When this suit was

8   brought, there is a D & O policy, and there's deductible for a

9   million and a half dollars.  Now, the initial assumption I

02:26   10   believe -- the premium for that D & O is split between the

11   fund and FMG, because both are covered by the policy.  And

12   pursuant to industry practice and analysis and whatnot,

13   there's some percentage split; I think the higher percentage

14   of that premium is paid for by the fund.

02:26   15          But when the suit was brought the Board analyzed the

16   suit with our counsel, and even though I think the initial

17   assumption was that the deductible would be borne the same

18   way, so most of it would be borne by the fund, we went to FMG

19   and we said we don't think that -- we don't want that, we just

02:26   20   don't think the investors should bear that; this is a lawsuit,

21   it's over your fees; we're certainly comfortable with your

22   fees, but we think the costs of this are not something we want

23   the investors to bear and we want you to eat that amount.  And

24   they did.  So, you know, we could have had an argument, but in

02:27   25   the end they agreed to it.

*3581*

Schpero - Direct - Benedict

**1**          But I think it's a matter of part of the diligence

**2** process that we always go through.  We are certainly very

**3** familiar with who FMG is owned by, and the size and reputation

**4** of this major global insurance company.  And I certainly am

02:27   **5** very comfortable that whatever the problem is, as lead

**6** trustee, if I turn to AXA and FMG, that the fund will be made

**7** whole if circumstances require it.

**8**          THE COURT:  All right, thank you.

**9**          MR. BENEDICT:  May I proceed, your Honor?

02:27   **10**          THE COURT:  You may.

**11** BY MR. BENEDICT:

**12** Q.   Let me shift gears, if I may, Mr. Schpero, to nature and

**13** quality of administrative services.  Now, you've previously

**14** testified that you receive information regarding the nature

02:28   **15** and quality of the administrative services that FMG provides

**16** to the fund; correct?

**17** A.   Yes.

**18** Q.   Would you please describe for the Court the types of

**19** services FMG performs in exchange for the administrative fee

02:28   **20** it receives from the Trust?

**21** A.   Yeah.  It's, again, a long list, I'll give you a sense

**22** for some of the things that come to mind.  There is the whole

**23** accounting and financial arena, with budgetary statements and

**24** financial statements, and all of the tax reporting and all of

02:28   **25** that information; there is the day-to-day compliance that I

*United States District Court*
*Trenton, New Jersey*

3582

Schpero - Direct - Benedict

1   would call the clerical compliance that is ongoing on a

2   day-to-day basis; there is the preparation of the registration

3   statements, and the updates of the registration statements,

4   and proxy statements; there's the preparation of all the Board

02:29   5   materials and the provision of the officers of the fund for

6   the preparation of minutes and things of that sort; there is

7   preparation -- FMG as I understand it does their own analysis

8   of all of the -- kind of re-does all of the performance

9   information, so that they are not relying and the Board is not

02:29   10   relying exclusively on the sub-advisors performance analysis;

11   and so all of that is done at the administrative level.  Those

12   would be some of the examples that I could remember.

13   Q.   Mr. Schpero, would you please turn to tab 24 in your

14   binder, which is Defendant's Exhibit 142.11.

02:30   15           THE COURT:  So, Mr. Schpero, if I can just go back

16   to the risks that you talked about before --

17           THE WITNESS:  Sure.

18           THE COURT:  So, before that we had been talking

19   about the spread, and, you know, when you look at it, it looks

02:30   20   like it's very sizeable; like why does the sub-advisor get

21   such a small number compared to what FMG seems to be

22   retaining.  So, the thought comes to mind as what the

23   plaintiffs are saying is, well, it seems to be excessive;

24   right?

02:30   25           So when you're looking at this spread, you said you

3583

Schpero - Direct - Benedict

1    thought it was reasonable under the circumstances, but you

2    didn't give any reasons for why you thought it was reasonable.

3    So, if it's that large, what are the underlying factors that

4    you look at that justify to make it reasonable in your mind?

02:30    5            THE WITNESS:  Sure.  So we look specifically at that

6    spread, we take a particular portfolio and you look at the fee

7    that is being received by FMG for its service, and I believe

8    my obligation, the Board's obligation is to fully examine all

9    aspects of that.

02:31   10            So what do we look at; we look at the nature and

11   quality of all the services, we examine very carefully all of

12   the services that FMG provides for that spread; we take into

13   account all of the other aspects of that, including what we

14   just talked about in terms of more than just the direct

02:31   15   services, but the conceptual types of risks that are involved,

16   I think more than just conceptual; we look very importantly to

17   comparative information, so we look at what -- both with

18   respect to the fund in total, the full expense ratio and with

19   respect to the spread, what does that look like against other

02:31   20   peers that are providing similar services.  To the extent you

21   can't, a lot of this is very difficult looking at -- in coming

22   up with a true apples-to-apples comparison, but to the best we

23   can, we look at how those fees compare to fees in other we

24   believe comparable funds.  So we look at -- we look at that.

02:32   25            We look carefully at -- in doing that we certainly

*United States District Court*
*Trenton, New Jersey*

3584

Schpero - Direct - Benedict

 1    look at whether there are economies of scale being achieved,

 2    and that's why we negotiated breakpoints over time, that's why

 3    in times we've reduced fees; and we certainly look at

 4    profitability, again, another important factor of what the

 5    profitability is for each fund -- this is fund by fund, not

 6    for the aggregate, but our obligation is to look at it fund by

 7    fund; and -- and obviously we look at the performance of the

 8    fund, but that's just -- that's another one of the factor we

 9    look at; but we look at all those things and we examine the

10    nature of the service.  And one thing I think we're careful to

11    do, is we understand these are two different service

12    providers, and they're providing two very different services.

13         So, I'm a little -- I don't -- I personally don't get

14    into an analysis of why, you know, this fee versus the

15    sub-advisory fee, I think you have to look at them in

16    isolation.  The question that I believe I am responsible for

17    asking -- for answering, is the fee, the specific spread that

18    FMG gets, in the exercise of my business judgment, with my

19    understanding of all of these factors and all of these data

20    points, fair and reasonable for its service.  The fact that

21    FMG is able, which they are often able to negotiate a

22    third-party relationship with sub-advisors, who may for their

23    own reasons be willing to accept a particular fee in a

24    particular case where they have their own large organizations,

25    their own economies, where I would argue they're providing a

Schpero - Direct - Benedict

1    very different service, in many cases fairly limited services.

2    You look at an index fund, managing an index fund, a

3    day-to-day investment management of an index fund, those fees

4    can be quite -- can be quite low.

02:34    5        But I don't think that that necessarily -- I shouldn't

6    say that I don't know; but that is a different service

7    involved than what FMG is being paid for for all of the other

8    services in running that fund.  Whether it's an index fund or

9    an active fund run by Gabelli, those are two different fees

02:34   10   there.  You know, there it's an interesting comparison, but

11   the active manager I would argue is typically going to get a

12   more -- a higher fee than the index manager, but that's the

13   relevant comparison.

14       I think -- I don't see comparing what Gabelli receives

02:34   15   or what the index manager receives as the sub-advisor to what

16   FMG does because they're very different services.  I think

17   what's more important is what is FMG getting paid for, how

18   does that compare to others in the industry for that.  And

19   then importantly, I would note another thing, at the end of

02:34   20   the day what is the investor bearing.  So particularly since

21   doing -- these comparisons are very difficult, I said we look

22   at FMG's spread versus other spreads, but as I'll probably

23   have an opportunity to testify at some point, there are real

24   limitations in looking at peers, because it's very hard to

02:35   25   tell what are others really getting paid for.

Schpero - Direct - Benedict

1          And so I will tell you that a critical part of my

2    analysis is what does the big picture look like.  You know,

3    I'm a fiduciary here, I am concerned about the investors; what

4    is the total expense ratio that the investor is bearing in

02:35    5    that fund; how does that compare to all the other funds.  And

6    that's another critical part of what I look at in trying to

7    get to the ultimate judgment.

8          THE COURT:  Okay, thank you.

9          MR. BENEDICT:  May I proceed, your Honor?

02:35    10         THE COURT:  You may.

11   BY MR. BENEDICT:

12   Q.   Mr. Schpero, please turn to tab 24, which is Defendant's

13   Exhibit 142.11.

14   A.   Okay.

02:36    15   Q.   Do you recognize this document?

16   A.   Yes, I do.

17   Q.   And what is it?

18   A.   This is a chart that was presented to the Board at the

19   July 2013 Board meeting, that compares the services provided

02:36    20   by FMG as administrator, lists those services, and then

21   separately lists the services of JP Morgan as the -- as the

22   sub-administrator.

23   Q.   And do you find this document helpful?

24   A.   Yes, I think it's helpful.

02:36    25   Q.   And why is that?

*United States District Court*
*Trenton, New Jersey*

3587

Schpero - Direct - Benedict

1   A.   Again, I think it's good executive summary; there are

2   clearly lots of services involved on the administration end.

3   And I think just as earlier you asked me to give you some

4   examples, certainly this isn't something you can memorize, but

02:37   5   I think this is a helpful recitation of some of the key

6   administrative services that are provided by the two parties.

7   Q.   To the best of your knowledge, does this chart accurately

8   describe the services provided by FMG as administrator as

9   opposed to JP Morgan Chase as sub-administrator?

02:37   10   A.   Yes, I believe it does.

11   Q.   What's the genesis of this chart?

12   A.   I think it's pretty similar to -- I think my answer's

13   going to be pretty similar to the question you asked me

14   earlier with respect to the chart comparing the manager and

02:37   15   the sub-advisors.  In this litigation there was a subsequent

16   amendment to the complaint, where the administration

17   arrangements were also challenged, maybe a year or two later,

18   I don't know the specific dates; and once -- and obviously the

19   Board has continued as I testified earlier to be monitoring

02:38   20   this litigation, so we certainly had discussions about this

21   development.

22        And again, we thought that it would be appropriate at

23   the next July meeting to ask management to -- in the same way

24   that we did with respect to the allegations on the management

02:38   25   and sub-advisory arrangements, we asked management at the next

*United States District Court*
*Trenton, New Jersey*

3588

Schpero - Direct - Benedict

1    July meeting to make sure that they were particularly

2    responsive to the allegations that were being made with

3    respect to the administration services, and I believe that

4    this was part of their response to our request.

02:38    5    Q.   Do you recall whether you specifically requested a

6    side-by-side chart similar to what had been provided with the

7    management and sub-advisory?

8    A.   I don't recall whether I specifically asked for that or

9    not.

02:38    10   Q.   Mr. Schpero, was this side-by-side chart necessary for

11   you to understand the administrative services performed by FMG

12   and JP Morgan?

13   A.   No.  You know, I've been on the Board a long time and I'm

14   certainly -- have been and continue to be very familiar with

02:39    15   the two service providers and what they do, but I think,

16   again, we always benefit from new approaches to presenting

17   information, and I think this was a helpful executive summary.

18   Q.   Generally speaking, what services does JP Morgan provide

19   to the funds as sub-administrator?

02:39    20   A.   As sub-administrator, I think the specific things that

21   come to my mind is -- is net asset value in particular,

22   they're responsible for calculating the net asset value of

23   each portfolio, as well as I believe the sleeves; they -- they

24   keep I think -- at least a part, if not most -- certainly a

02:39    25   part of the books and records of the fund that are required to

*United States District Court*
*Trenton, New Jersey*

3589

Schpero - Direct - Benedict

1   be maintained; and they are involved in -- I think they work

2   closely with FMG, but they're involved in preparing parts of

3   the financial statements of the funds; and I think they have

4   some technology involving some portions of the compliance

02:40   5   program.

6   Q.   And who's ultimately responsible for performing the

7   administrative services on behalf of the Trust?

8   A.   FMG is the direct contractor with the fund.

9   Q.   Now, plaintiffs have asserted that FMG also delegates to

02:40   10   JP Morgan as sub-administrator the day-to-day administration

11   of the funds; do you agree with that?

12   A.   I do not.

13   Q.   And why is that?

14   A.   Again, I think we're dealing with the ambiguity of the

02:40   15   language, but -- but if one were to go down -- you're not

16   going to want me to take the time to, but if you were to go

17   down this whole list of services provided by FMG, they are

18   day-to-day as well.  You know, each provides a different list

19   of services, and each of them for the most part are required

02:41   20   for the day-to-day management of these funds.  Obviously some

21   things are weekly, some are quarterly, but I think the spirit

22   of it is that each side provides some aspects of the

23   day-to-day administration of the fund.

24   Q.   Does the Board approve the administration -- excuse me;

02:41   25   does the Board approve the Sub-Administration Agreement

*United States District Court*
*Trenton, New Jersey*

3590

Schpero - Direct - Benedict

1  between FMG and JP Morgan Chase?

2  A.  No, it does not.

3  Q.  And why not?

4  A.  My understanding is that that's -- a sub-administration

5  contract with a non-affiliate, there's no requirement or

6  particular practice where that would be presented to the Board

7  for approval.

8  Q.  Before the complaint was filed in this action, was the

9  Board aware that FMG had entered into a sub-administration

10  contract with JP Morgan Chase?

11  A.  Yes.

12  Q.  And are you familiar with that agreement?

13  A.  I am -- I'm familiar with it now, yes.

14  Q.  Have you read it?

15  A.  I have read it, yes.

16  Q.  And when did you read that?

17  A.  So in connection with -- I guess it was in connection

18  with the amendment to the complaint, and maybe the discovery

19  afterwards -- I guess it would have come up during the --

20  during my deposition or one of the prior depositions of one of

21  the independent trustees, we were alerted to the fact that

22  there was an issue with respect to the -- the form of the

23  sub-administration contract.  And so I and the rest of the

24  Board read it at that time and discussed with it our counsel.

25  Q.  And does the Sub-Administration Agreement between FMG and

*3591*

Schpero - Direct - Benedict

1    JP Morgan accurately describe the services performed by JP

2    Morgan for the funds?

3    A.   I think it does now.

4    Q.   And did it at the time?

02:43    5    A.   Certainly the contract that I saw after my deposition or

6    around the time of my deposition did not accurately describe

7    it.

8    Q.   And you -- you mentioned that it does now; what are you

9    referring to, Mr. Schpero?

02:43    10   A.   Well, in the -- I'm pretty certain of my dates, but I

11   think it was in the spring of 2015 -- no, I think -- I'm

12   sorry; I think it was probably the spring of 2014, there came

13   a time where FMG had set up what are called the 1290 Funds,

14   which are a series of retail funds, and in connection with

02:43    15   that there was an opportunity, because these were brand new

16   funds, to put in place all new contracts.

17          And so at the Board -- certainly one reason was at the

18   Board's urging, although I suspect FMG wanted to do this

19   otherwise, the -- the contractual arrangements were changed to

02:44    20   I think appropriately reflect what the administrator does and

21   what the sub-administrator does.  So that was in -- if I've

22   got my dates right, I believe it was spring of 2014 or -- or

23   summer of 2014.  And then last spring there was an opportunity

24   to then have the contracts for the EQAT Funds mirror what was

02:44    25   done in the 1290 Funds, so that the sub-administration

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   contract was amended to appropriately reflect the services

2   being provided by the sub-administrator.

3   Q.   Do you understand why the Sub-Administration Agreement

4   had not been amended earlier?

02:44   5   A.   I've certainly been given an explanation, yes.

6   Q.   And what is that explanation?

7            MR. A. LAKIND:  Your Honor, that would be hearsay.

8            THE COURT:  Yes, sustained.

9            MR. BENEDICT:  Okay.

02:44   10  BY MR. BENEDICT:

11  Q.   Mr. Schpero, does JP Morgan ever present to the Board at

12  Board or committee meetings?

13  A.   I'm sorry?

14  Q.   Does JP Morgan Chase ever make presentations to either

02:45   15  the full Board or to Board at its various committee meetings?

16  A.   Yes, we've had quite a number of them over the years.

17  Q.   And how often has JP Morgan presented?

18  A.   I'm not going to be able to tell you that, but I would

19  think we typically see them once or twice a year.

02:45   20  Q.   And why has JP Morgan been asked to make presentations to

21  the Board?

22  A.   I think there's several reasons; one is we certainly know

23  that they're providing services as sub-administrator, and even

24  if we're not required to approve that contract we certainly

02:45   25  want to make sure we know what they're doing and we understand

United States District Court
Trenton, New Jersey

3593

Schpero - Direct - Benedict

1  the quality of what they're providing.

2      And I will also acknowledge to you that we've had a

3  number of occasions where we've been very troubled by the

4  quality of the services provided by the sub-administrator, and

02:45  5  so we've asked -- we the Board have asked to meet with the

6  sub-administrator to get to the bottom of some of the issues

7  and ensure that we didn't have continuing problems.

8  Q.  Does the Board have an opportunity to ask questions to JP

9  Morgan at these meetings?

02:46  10  A.  We do, and we ask many questions.

11  Q.  Now, does the Board consider the differences in services

12  performed by FMG and JP Morgan when it approves FMG's

13  Administrative Agreement with EQAT?

14  A.  Yes, we do.

02:46  15  Q.  And do you receive information regarding the amount of

16  the administrative fee retained by FMG?

17  A.  Yeah, we see that each year.

18  Q.  And do you consider that information when determining

19  whether to approve the Administration Agreement with FMG?

02:46  20  A.  That is correct.

21  Q.  Mr. Schpero, you mentioned several times over the last

22  day or so that you consider comparative fee information in

23  connection with your decision concerning whether to approve

24  the management fees?

02:47  25  A.  Yes.

Schpero - Direct - Benedict

1          THE COURT:  Are you on a new topic?

2          MR. BENEDICT:  Yes, I am, your Honor.

3          THE COURT:  If I can just go back to the

4     administrative fees, so when was the first time that you

02:47   5     learned JP Morgan was a sub-advisor -- or a sub-administrator?

6          THE WITNESS:  I've always known they were the

7     sub-administrator.

8          THE COURT:  And when was the first time you learned

9     that there was a sub-administrator contract?

02:47   10         THE WITNESS:  I've always known there was a

11    sub-administrator contract.  We just had not received --

12    because there was no requirement for the Board to approve it,

13    we never -- it was never delivered to us as something for us

14    to review and approve.

02:47   15         THE COURT:  All right.  So then you knew the scope

16    of the services that JP Morgan was providing for the

17    administrative function?

18         THE WITNESS:  That's correct.

19         THE COURT:  All right, thank you.

02:47   20         MR. BENEDICT:  May I proceed, your Honor?

21         THE COURT:  You may.

22    BY MR. BENEDICT:

23    Q.   Let me shift gears, Mr. Schpero, to comparative fees.

24    You've mentioned several times that you consider comparative

02:48   25    fee information in assessing the fairness of the management

*United States District Court*
*Trenton, New Jersey*

3595

Schpero - Direct - Benedict

1  and administrative fees; correct?

2  A.   Yeah.   And are you asking about -- I'm sorry; comparative

3  fee, not performance, yes.

4  Q.   Yes, comparative fees.

02:48   5  A.   Yes.

6  Q.   Is comparative fee information helpful to you in your

7  consideration of the fairness of FMG's fees?

8  A.   Yes, it is.

9  Q.   And why is that?

02:48   10  A.   Well, it's -- it's one of the specifically mentioned

11  *Gartenberg* factors, and I think it's -- I think the courts

12  have made it a factor because it's -- it's certainly -- you

13  know, examining these arrangements and these fees, you know,

14  there's no science to this.   And so I think it is clearly

02:48   15  helpful to the Board to be able to get a sense for what the

16  industry is doing, and in particular what other peers are

17  doing.   And so getting the benefit of that information and

18  being able to compare it as we do our examination is certainly

19  an important step.

02:49   20  Q.   And generally speaking, how do FMG's management fees

21  compare to other funds in their respective Lipper peer groups?

22        MR. A. LAKIND:   Your Honor, objection; I think the

23  witness should confine his answer to the 12 funds at issue if

24  possible.

02:49   25        MR. BENEDICT:   Okay.

*United States District Court*
*Trenton, New Jersey*

3596

Schpero - Direct - Benedict

1          THE COURT:  So, if you could just restate your

2    question.

3    BY MR. BENEDICT:

4    Q.   Paying particular attention, Mr. Schpero, to the 12 funds

02:49    5    at issue here, generally speaking, how do FMG's management

6    fees compare to other funds in their respective Lipper peer

7    groups?

8    A.   I think it's within a reasonable range.

9    Q.   Are you familiar with the term, total expense ratio?

02:49    10   You've mentioned that a couple of times.

11   A.   Yes, I am.

12   Q.   And what is total expense ratio?

13   A.   So that is the total expenses that's always done on a

14   percentage basis point -- percentage test.  So, for example,

02:50    15   if management fees are 50 basis points, the total expense

16   ratio may be 80 basis points or 90, so -- but what that

17   reflects is that all of the expenses the funds bears; the

18   management, administrative, distribution, accounting, legal,

19   all of the expenses.  And is -- it's what the investor

02:50    20   ultimately is bearing in that fund.

21   Q.   Do you consider total expense ratio information

22   important?

23   A.   Certainly do.

24   Q.   And why is that?

02:50    25   A.   I think I just said, it is the ultimate test for what the

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    investor is bearing.

2    Q.   Are different services provided by different investment

3    advisors under various contracts within the industry?

4    A.   Yes, they are.

02:50    5    Q.   And do you consider how a fund's expense ratio compares

6    to its peers when considering the management fee proposal?

7    A.   That's correct.

8    Q.   And generally speaking, how do the expense ratios of the

9    funds at issue here compare to their respective peer groups?

02:51    10   A.   Again, you know, every fund is different, but I think

11   it's within a reasonable range.

12   Q.   Do you consider comparative administrative fee

13   information?

14   A.   Comparative administrative fee, yes.

02:51    15   Q.   Are there problems comparing administrative fees within

16   the industry?

17   A.   Yeah, I mean -- if you don't mind I think can I answer

18   this and the expense -- and the management fee is the same

19   point.  I mean there is difficulty in comparing fees.  And

02:51    20   that's why I think the expense ratio is always an important

21   factor to look at, because in a particular fund, even though

22   Lipper -- the Lipper analysis we see combines management and

23   administrative contracts together, they're not separated out;

24   so you're looking at a total fee.

02:52    25        And of course, every fund sponsor is structured

Schpero - Direct - Benedict

1   differently.  There are some funds where their administrative

2   fees are part of the management fees; maybe more importantly

3   there are many funds where some of the management but more

4   particularly some of the administrative fees are broken out

02:52   5   separately and not part of those contracts.  So you can have a

6   fund where in one case the manager receives all of the

7   management administrative fees for X, and another fund where a

8   lot of those same services are broken out separately outside

9   of the management and administrative contract.  And as a

02:52   10   result there are inherent limitations in only looking at the

11   management and administrative fee comparisons.

12        Because there may be a fund where the sponsor is

13   collecting a lot of additional fees, but they've got, for

14   example, a separate accounting fee even though, for example,

02:53   15   in FMG's case the accounting service is part of the

16   administrative contract.  So, from the Board's perspective

17   that's why we have felt -- or I have certainly felt it was

18   very important to look at the total expense ratio, because

19   there everything is included and we're getting the benefit of

02:53   20   seeing what is the total comparisons, certainly apples to

21   apples at that level and what are the investors bearing at

22   that level.

23   Q.   Thank you.  Mr. Schpero, would you please turn to tab 27

24   in the binder in front of you, which is Defendant's Exhibit

02:53   25   144.19.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    A.   27?

2    Q.   27.   Defendant's Exhibit 144.19.   And particularly pages

3    430 to page 444 of that document.

4    A.   Okay.

02:54   5    Q.   Do you recognize the document?

6    A.   I do.

7    Q.   And what is it?

8    A.   So this is a presentation that was made to the Board that

9    is an effort to try to summarize administrative fees in other

02:54   10   complexes.

11   Q.   Would you just generally describe this document for the

12   Court?

13   A.   Yeah, I think -- again, as I said a minute ago, I think

14   it's difficult to get administrative fees; Lipper in

02:55   15   particular does not break out -- does not break out the

16   administrative fee in their analysis, they as I said aggregate

17   that for each complex.   And so FMG at the -- at the Board's

18   direction has made an effort to gather this information from

19   -- I believe this is all from public documentation, basically

02:55   20   public filings by other managers, where there's an effort to

21   try to get their specific fee information so that we do have

22   some comparative fee information to be looking at.

23   Q.   Do you find this document helpful in your analysis?

24   A.   I do.

02:55   25   Q.   And why is that?

3600

Schpero - Direct - Benedict

1  A.   For the same reason that I -- that I discussed with you

2  on the management contract, I think -- I think, you know, an

3  important factor to look at is what are the charges that

4  others for similar -- for presumably somewhat similar

02:56    5  services -- again, it's hard to discern with any -- in any

6  definitive way, but as best you can what appears to be the

7  fees for comparable type services elsewhere in the industry is

8  certainly a consideration that we take into account in

9  exercising our judgment.

02:56   10  Q.   And generally speaking, how do the at-issue funds'

11  administrative fees compare to other fund complexes in the

12  industry?

13  A.   Again, I think it's within a reasonable range.

14  Q.   Mr. Schpero, I'm going to shift gears you on again --

02:56   15        THE COURT:  Before you go off this chart; so if you

16  look at page 431, start there --

17        THE WITNESS:  Yeah.

18        THE COURT:  So, you said you look at Lipper --

19        THE WITNESS:  Lipper, yeah.

02:56   20        THE COURT:  And sometimes you look at whatever FMG

21  puts together?  So by looking at the administrator fee, how do

22  you know who put that fee together, or how it got there,

23  whether it's Lipper or whether it's FMG?

24        THE WITNESS:  Yeah.  So I believe, your Honor -- I'm

02:57   25  pretty certain on my recollection on this, we obviously see a

Schpero - Direct - Benedict

1    lot of documentation; but I believe that administrative fees,

2    Lipper does not break that out, so that FMG would have had to

3    have prepared this through searching public -- public filings

4    by these various managers.

02:57   5          THE COURT:  Okay.  Public documents; so it would be

6    like listed in some report that's filed with the SEC?

7          THE WITNESS:  Yeah, I mean those would all be

8    public -- you know, I think they typically would -- I think

9    where they find them -- and I'm not sure it's always required

02:57   10   to be this specific, which is why I think there's a limit to

11   how many places they can -- you don't necessarily find it for

12   every fund.  But I think many funds do provide this

13   information in their statement of additional information.

14         You got a prospectus and a statement of additional

02:58   15   information; any investors gets the prospectus when they

16   invest in a fund, and any investor can request a statement of

17   additional information.  They're both filed as part of the

18   registration statement with the SEC.  So, I believe FMG has

19   personnel who go through and try to sift through public

02:58   20   filings, they're available to investors, in order to give us

21   data that we can use in this process.

22         THE COURT:  Okay.

23         MR. BENEDICT:  May I proceed, your Honor?

24         THE COURT:  You may.

02:58   25   BY MR. BENEDICT:

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    Q.   Mr. Schpero, you mentioned several times that you

2    consider FMG's profitability in connection with your review of

3    the management agreement; is that correct?

4    A.   That's correct.

02:58    5    Q.   And is that an important consideration for you?

6    A.   Yes, it's -- again, it's another explicit *Gartenberg*

7    factor and so we certainly look at it.

8    Q.   And why is it important?  Other than it's required by

9    *Gartenberg*, are there any other reasons?

02:58    10   A.   Well, you know, ultimately we are engaged in a process

11   where we are expected to exercise our reasonable business

12   judgment in examining all factors that contribute to allowing

13   us to decide whether the fee is fair and reasonable, whether

14   there should be negotiations to change the fee, and so the

02:59    15   question is how do you get to that -- how do you go through

16   that process.

17        And you try to access everything that you can think of

18   or that the courts or others have suggested that's going to be

19   helpful in allowing you to make that determination in good

02:59    20   faith.  And -- and looking at profitability data and having a

21   sense for -- again, understanding inherent limitations in any

22   of this, but looking at profitability data and getting a sense

23   for what the advisor or affiliated administrator is actually

24   -- what their actual pre-tax income is, is another data point

03:00    25   that I think is helpful in examining whether the fee is

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   reasonable, fair and reasonable.  It's one data point, but

2   it's certainly another one that we look closely at.

3   Q.   Mr. Schpero, would you please turn to tab 28 in the

4   binder in front of you.  This is Defendant's Exhibit 142.7.

03:00   5   A.   Just give my a second; it's somewhat small type.

6   Q.   It's not much better blown up on the screen either.

7   A.   Okay.

8   Q.   Do you recognize this document?

9   A.   Yes, I do.

03:01   10   Q.   And what is it?

11   A.   So this is the -- this is part of the profitability study

12   that is delivered annually, in this case July of 2013, to the

13   Board as part of the 15(c) process in this particular -- I

14   guess I've got a series of pages so I'm -- let me stop there

03:01   15   and I'll answer your questions.

16   Q.   Taking a look at the first page, what is the first page?

17   A.   So this is -- this is the aggregate presentation we see

18   each year, both profitability for -- for FMG in total, and

19   then we also see it on a fund-by-fund basis.

03:01   20   Q.   And if you look at the 12 pages that follow, are these

21   the profitability reports for the 12 funds at issue in this

22   litigation?

23        (Witness reviewing.)

24   A.   It appears to be.

03:02   25   Q.   Do you find this presentation helpful, Mr. Schpero?

Schpero - Direct - Benedict

1  A.   I do.

2  Q.   And why is that?

3  A.   I guess -- you know, as I indicated I think profitability

4  is another factor we look at, and I think this is a --

03:02    5  certainly a best efforts approach to presenting profitability

6  for the manager with respect to each fund.

7  Q.   And how does FMG's pre-tax profit margin compare with

8  other investment managers in the industry?

9          MR. A. LAKIND:   Objection; foundation.

03:02   10          THE COURT:   Frank, can you repeat the question?

11          (Question read back by the reporter.)

12          THE COURT:   Overruled.   You may answer the question.

13          THE WITNESS:   Sorry; I think again, like with the

14  other fees in my responses I will tell you it's within a

03:03   15  reasonable range of what we've seen.

16  BY MR. BENEDICT:

17  Q.   And how are you able --

18  A.   Again, I want to be careful because it's fund by fund,

19  and there are some cases where it's on the higher end and

03:03   20  others where it's not, so it's a fund-by-fund analysis that we

21  go through.

22  Q.   And how is it that you as a trustee are able to compare

23  FMG's profitability with other investment managers in the

24  industry?

03:03   25  A.   We receive data from a number of sources, I believe

Schpero - Direct - Benedict

1   from -- I believe Lipper, and Strategic Insight, and I believe

2   may be even Management Practice, but each of them do studies

3   or periodically do studies where they look at the

4   profitability of other investment managers based on publicly

03:04   5   available information.

6        I mean this is clearly an area where there's lot of

7   confidential information, so you can't easily access the

8   profitability of another manager for a particular portfolio.

9   But there is an effort by some of the outside parties to try

03:04   10   to at least get a hold of, again, what's available for

11   publicly traded investment managers and we do get to see that.

12   Q.   Does FMG for profitability presentation purposes treat

13   sub-advisory and sub-administration fees as expenses or as

14   reductions to revenue in its profitability reports to the

03:04   15   Board?

16   A.   Well, these are expenses reflected in this profitability

17   study.

18   Q.   And why does FMG present those fees as expenses in the

19   reports?

03:05   20   A.   Well, I guess I'd make a few points:  Number one is this

21   is has it's always been presented to the Board; I would also

22   note that my understanding is this is part of the methodology

23   that was reviewed by two independent accounting firms going

24   back to 2000, this was part of -- this has consistently done

03:05   25   since then; and I also understand from discussing this with

*3606*

Schpero - Direct - Benedict

1    our independent counsel that this is consistent with industry

2    practice.

3    Q.   Has the Board ever asked FMG to show sub-advisory fees as

4    reductions to revenue?

03:05    5    A.   It has not.

6    Q.   And why not?

7    A.   I think probably for the three reasons I just gave you.

8    Q.   Do you consider, Mr. Schpero, distribution expenses when

9    you review the fairness of FMG's management or administrative

03:05    10    fees?

11    A.   We do not.

12    Q.   And why not?

13    A.   It's been made very clear to the Board by our counsel and

14    really by the -- I think SEC pronouncements, that distribution

03:06    15    expenses are not to be taken into account, in analyzing

16    profitability with respect to your 15(c) analysis.

17    Q.   Does the Board receive information about distribution

18    expenses and distribution profitability as part of the 15(c)

19    process?

03:06    20    A.   It does, yes.

21    Q.   And why is that?

22    A.   I think -- I think there's probably a few reasons; I

23    think the main reason is you have to keep in mind that the

24    15(c) meeting is more than just a 15(c) meeting, it's our

03:06    25    annual meeting that approves all of the different key

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    procedures and arrangements.  One of those arrangements is the

2    12(b)(1) plan, which is the distribution plan that the fund

3    enters into, and so I think it's fairly standard practice to

4    show it in profitability study because you need to see that

03:07   5    for the 12(b)(1) plan the distribution costs associated with

6    that.  It's always shown -- certainly at FMG it's always been

7    shown at the bottom of the page, because the understanding is

8    that we are not to take that into account in examining

9    profitability, but I think that's a primary reason.

03:07  10        I would also just say, again, going to the point I made

11   earlier, that there are *Gartenberg* factors and then there's

12   kind of the Board wanting to know and examine everything else;

13   I think it's perfectly reasonable that we -- that we would be

14   aware of the total picture, and the total picture certainly

03:07  15   includes distribution costs.  But we are constantly reminded

16   that in examining profitability for purposes of 15(c) we need

17   to look above the line, we cannot look below the line.

18        THE COURT:  Why is that?

19        THE WITNESS:  Why does the SEC take that position?

03:08  20        THE COURT:  Yes, like what --

21        THE WITNESS:  I'm --

22   Q.  You're putting a lawyer hat back on?

23   A.  Yeah.  You're testing me; I feel like I'm back at my bar

24   exam.  But I think it's a long-held position -- I think their

03:08  25   concern -- I think I'm going to get this right --

Schpero - Direct - Benedict

1          THE COURT:  All right.  It might just go to policy.

2          THE WITNESS:  Yeah, I think the policy is that they

3    don't believe that the investor should be bearing the expenses

4    of selling the fund, other than on the fully disclosed basis

03:08   5    of either a sales load, in other words, a fee up front, or in

6    accordance with this very specific regulatory structure where

7    the Board has to approve and the shareholders have to approve

8    what's called a 12(b)(1) plan.

9          And so the concern is beyond that if the management

03:08  10    fee is allowed to include distribution, then you are

11    indirectly violating that policy.  So I think it's a way to

12    ensure that you are not having the manager indirectly bear

13    expenses that they can't bear but for a fully disclosed plan.

14          THE COURT:  Thank you.

03:09  15          MR. BENEDICT:  May I proceed, your Honor?

16          THE COURT:  You may.

17    BY MR. BENEDICT:

18    Q.  Is it custom and practice in the mutual fund industry to

19    provide a fund board with profitability data, both inclusive

03:09  20    and exclusive of distribution expenses?

21    A.  Yes, it is.

22    Q.  Mr. Schpero, does the Board receive and consider

23    information about profitability of the sub-advisors when it

24    reviews FMG's management contracts?

03:09  25    A.  I think only with respect to the affiliated sub-advisor,

3609

Schpero - Direct - Benedict

1    so that would be Alliance.

2    Q.   And why doesn't the Board get sub-advisor profitability

3    information for non-affiliated sub-advisors?

4    A.   We've discussed this extensively and certainly discussed

03:10    5    this extensively with current counsel and prior counsel, and

6    our understanding and the reason we're comfortable with this

7    is that where you have a manager at -- on an arm's-length

8    basis negotiating with an unrelated sub-advisor, that that

9    really helps to eliminate the inherent conflict involved that

03:10    10   would require seeing profitability.

11        It is in FMG's interest to negotiate as low as fee as

12   they can with the sub-advisor.  And so that's obviously a

13   different situation than where FMG is receiving its fee, and

14   where clearly we need to see all information possible.  I

03:11    15   think it also stems from -- at least in part from just what

16   had been at least in the early years of the fund some real

17   difficulty getting that information from a number of the

18   sub-advisors who were very reluctant to deliver their

19   profitability information.  And again, they're not sponsors of

03:11    20   the fund, so there's less leverage with respect to that.

21   Q.   Is that still the case today, being very difficult to

22   get --

23   A.   I don't know that, I don't know that.  Because I think in

24   the end we were comfortable with the first point I made to

03:11    25   you.

United States District Court
Trenton, New Jersey

Schpero - Direct - Benedict

1  Q.  Shifting gears, does FMG include allocated expenses from

2  AXA Equitable in its profitability reports to the Board?

3  A.  Yes, it does.

4  Q.  And why does it do so?

03:11  5  A.  I think that again is very much consistent with industry

6  practice.  I think that it reflects the fact that -- is

7  intended to reflect the fact as I discussed earlier today,

8  there are significant costs that are incurred elsewhere in the

9  organization that are directly related to the services being

03:12  10  provided by FMG, and the fact that FMG is just a subsidiary of

11  this entity shouldn't cut off an analysis of those other costs

12  and have them not be a part of the profitability study.

13  Q.  I hate to do this to you, but would you go back to book

14  number 1, and I'm going to ask you to turn to back to tab 18

03:12  15  which is Defendant's Exhibit 153.  Mr. Schpero, I'll ask you

16  to specifically turn to page 15 of this exhibit.

17  A.  Hang on a second here.

18  Q.  Okay.

19  A.  I'm sorry?

03:13  20  Q.  Tab 18, page 15.  It's what is sometimes referred to as

21  the ABC chart.

22  A.  Okay, I'm there.

23  Q.  Do you recognize this document?

24  A.  Yes, I do.

03:13  25  Q.  And what is it?

Schpero - Direct - Benedict

1  A.   This is part of a detailed presentation that FMG makes to

2  the Board each year.  That is showing the process by which

3  expenses at the AXA level are allocated down to the specific

4  funds dealing with the very issue that you were just asking me

03:14  5  about.

6  Q.   And do you find this presentation helpful?

7  A.   Yes, I do.

8  Q.   And why is that?

9  A.   Well, it's certainly important that we understand this --

03:14  10  this process and the methodology, and we each year have

11  extensive presentations; it's a complicated process and

12  methodology, but we have extensive presentations and we -- and

13  we review it in deal with it with FMG.

14  Q.   Is this particular presentation provided to the Board

03:14  15  each year in connection with the 15(c) process?

16  A.   I believe it is.

17  Q.   When was the allocation methodology utilized here

18  developed?

19  A.   It was developed -- I joined the Board in -- I believe in

03:15  20  the spring of 2000, and -- and it was in January or so of 2000

21  that presentations were made to the Board just before I joined

22  that I've seen the minutes of some of that, where the

23  methodology was first presented to the Board.

24  Q.   And do you know how that methodology was developed?

03:15  25  A.   Yeah, my -- again, I've read -- I've certainly read the

United States District Court
Trenton, New Jersey

Schpero - Direct - Benedict

1    minutes summarizing that process, and it involved FMG --

2            MR. A. LAKIND:  Excuse me, your Honor; objection.  I

3    understand the minutes are in evidence, but what the witness

4    learned is hearsay.

03:15   5            THE COURT:  Learned; overruled.  He can testify to

6    this, he's just explaining the chart.  We have been through

7    this a number of times.

8            THE WITNESS:  Give me the question again please?

9    BY MR. BENEDICT:

03:15   10   Q.   Do you know how the methodology was developed, Mr.

11   Schpero?

12   A.   Yeah, FMG worked with two independent accounting firms,

13   Pricewaterhouse, which were the fund independent accountants,

14   and the independent trustees also retained Ernst & Young, and

03:16   15   both those firms -- both those firms worked with FMG in coming

16   up with this methodology and ultimately reporting to the Board

17   on this.

18   Q.   And what conclusions, if any, did PwC and Ernst & Young

19   come to after doing their study?

03:16   20   A.   I believe the minutes show that they found that this was

21   a reasonable methodology, and that it was -- clearly there are

22   lots of methodologies, but this was one reasonable methodology

23   and that it was consistent with practices by others out there.

24   Q.   Has the Board ever considered hiring another consultant

03:16   25   to re-review the cost allocation methodology since it was

Schpero - Direct - Benedict

1 implemented?

2 A.   The only time we've had a specific discussion that I

3 recall was in the spring of 2015.

4 Q.   And what do you recall of that discussion?

03:17   5 A.   Well, that was -- I mean I guess I need to describe to

6 you what was going on then.  This was part of what we thought

7 was an important process of monitoring this litigation, and in

8 working with our counsel we felt that another important

9 turning point in this long process was when the expert reports

03:17   10 were delivered by both the plaintiffs and the defendants, and

11 we obviously received copies and reviewed those and reviewed

12 them with our counsel.  And that was an appropriate time.

13      We also met with experts at that time the defendant's

14 experts, and in the context of those discussions and meetings

03:18   15 we had -- the Board had discussions with our counsel as to

16 whether any of this called for the Board deciding to bring in

17 an outside consultant to again look at this.

18 Q.   And did the Board in fact do so?

19 A.   No, our judgment was that there was no reason to at this

03:18   20 time.

21 Q.   And why is that?

22 A.   Obviously an exercise of our business judgment.  I think

23 it reflected a number of factors; it was the fact that we

24 understood that this is an area that is much more art than

03:18   25 science; that there are lots of methodologies available; that

Schpero - Direct - Benedict

1    two major independent accounting firms looked at this at its

2    commencement; that it's been consistently presented to us over

3    the years, we've seen that in lots of different ways; and it

4    also reflected our review of the expert reports and our

03:18    5    opportunity to meet specifically with defendant's experts and

6    discuss this; and it also reflected the fact that periodically

7    over the years the Board has asked Pw, the independent

8    accountants, fairly discrete opportunities, but has asked them

9    periodically whether this methodology continued to be

03:19    10    consistent with what they saw, you know, as one of the

11    methodologies in the industry.

12        MR. A. LAKIND:  Your Honor, objection as to what PwC

13    said.  That's would be here, it's a professional opinion, they

14    should be here to --

03:19    15        THE COURT:  I'll strike the answer.  Can you

16    rephrase the question somehow?

17        You can indicate what you did as a result of hearing

18    Pricewaterhouse's explanation.

19        THE WITNESS:  Yeah, I would just note as a result of

03:19    20    hearing their explanation that would -- that was certainly for

21    me, I can only testify for myself, but for me that was another

22    reason why it was my judgment in 2015 that there was no reason

23    to go through the expense and effort of retaining another firm

24    at that point.

03:19    25    BY MR. BENEDICT:

3615

Schpero - Direct - Benedict

1    Q.   Mr. Goldstein has criticized members of the Board for not

2    being able to explain the details of the cost allocation

3    methodology; do you believe that criticism is fair?

4    A.   Do I believe?

03:20    5    Q.   The criticism was fair?

6    A.   No, I don't.

7    Q.   And why is that?

8    A.   Well, I'll give you a few answers.  First of all, this is

9    complicated material, and it's going to be more complicated

03:20    10   for some trustees than others.  There's a reason why we have a

11   diversified Board; if we wanted everybody to be accounting

12   experts we'd be doing a disservice to our investors in terms

13   of all of the other needs we need to satisfy in terms of

14   expertise on this Board.

03:20    15        But I think all of us are very diligent in examining

16   this, and we certainly have people that I identified I think

17   yesterday I guess it was, who have particular accounting and

18   financial backgrounds.  But I would -- I would tell you that I

19   believe all of us at the end of a July Board meeting after a

03:20    20   lot of time spent reviewing this methodology and having

21   chances to ask questions of management, have a sufficient

22   understanding of the methodology and how it works in order to

23   go ahead and make the findings we do.

24   Q.   Plaintiffs and their experts have been particularly harsh

03:21    25   in their criticism of Jettie Edwards as a trustee.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   A.   Can I put this aside for a minute --

2   Q.   You certainly may.

3   A.   Okay.

4   Q.   I'm sorry; I'll repeat the question.  Plaintiffs and

03:21   5   their experts have been particularly harsh in their criticism

6   of Jettie Edwards; how many years did you serve on the EQAT

7   Board with Jettie Edwards?

8   A.   From the spring of 2000 until she retired, which was in

9   the last 12 months or so.

03:21   10        THE COURT:  Before you go on to this, can I go back

11   to this expense allocation chart?

12             THE WITNESS:  Do you want me to pull it out or --

13             THE COURT:  No, you don't need to.

14             THE WITNESS:  Sure.

03:22   15        THE COURT:  What I don't understand is I see these

16   AXA Equitable expenses that are allocated on that chart, but

17   how do you know that those expenses are reasonable for the

18   funds to pay or FMG to pay?  How do you determine that?

19             THE WITNESS:  I think that goes back to the answer I

03:22   20   gave earlier today, which is that there are lots of materials

21   that we receive where we are going to be inherently dependent

22   on the manager of.  And we're -- I think that each of us as

23   trustees need to decide whether we are comfortable in relying

24   on the manager.  And there are lots of options if we're not,

03:23   25   and lots of approaches, including bringing in outside

3617

Schpero - Direct - Benedict

1    accountants or others, or not serving on the Board.

2           But I will tell you, your Honor, that having, you

3    know, been on the Board 15 years, having seen the quality of

4    the service, the transparency with which things are addressed,

03:23    5    the extent to which anything that we've ever asked to be

6    delivered is delivered immediately, the kinds of records we've

7    gotten from Pw and others on areas that they are involved

8    with, the meetings with internal auditors of AXA on what they

9    see when they come in on surprise audits of FMG, and my

03:23    10   understanding that it is industry practice not to bring in

11   outside accountants to try to audit this kind of information;

12   in recognition of the fact that -- that, you know, that this

13   is -- again, there are lots of approaches, that it's more art

14   than science, but I would -- I would tell you those would all

03:24    15   be my reasons.

16          At the end it's my judgment that I am comfortable

17   believing that we don't have fraud going on here.  And if I

18   thought we had fraud we'd have a lot bigger issues than what

19   we're addressing in this courtroom.

03:24    20          THE COURT:  Thank you.

21   BY MR. BENEDICT:

22   Q.   Just a point of clarification, Mr. Schpero, the allocated

23   expenses that we're talking about, the allocated expenses from

24   AXA Equitable to FMG, these are expenses paid by AXA

03:24    25   Equitable; correct?

*United States District Court*
*Trenton, New Jersey*

3618

Schpero - Direct - Benedict

1  A.   Yes, these are -- these are all expenses paid by AXA

2  Equitable, and what I think we're talking about is in FMG

3  profitability statement none of these are expenses borne by

4  the fund.  And I think another critical thing from my

03:24   5  perspective, your Honor, just going to your question is, they

6  all are -- starting with audited financial information at the

7  top, and they are all using a methodology that -- that has

8  been in my view blessed by two major independent accounting

9  firms.

03:25   10       THE COURT:  You have Pricewaterhouse --

11       THE WITNESS:  And Ernst & Young.  Ernst & Young was

12  brought on by the independent trustees in 2000 specifically to

13  review this methodology.

14       THE COURT:  I mean the methodology is okay, but

03:25   15  there's these expenses and they're AXA's expenses, but no

16  one's ever explained to me how you know that the AXA expenses

17  are truthful.

18       THE WITNESS:  My view is that's much more -- again,

19  I think that the nature of the approval process that the Board

03:25   20  goes through is such that I guess that's going to be a

21  question for lots of material we see.  I think that we do in

22  our judgment, consistent I believe with best practices in the

23  industry, go to outside providers in lots of areas.  This is

24  one where I don't think there's any practice of having some

03:26   25  kind of independent audit of your manager's profitability.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1          THE COURT:  Okay, thank you.

2    BY MR. BENEDICT:

3    Q.   In terms of Jettie Edwards for a second, Mr. Schpero, you

4    served with her on the Board, what did you say, 13 years?

03:26    5    A.   Something like that, yeah.

6    Q.   And do you have personal knowledge of her performance as

7    a trustee?

8    A.   Yes, I do.

9    Q.   And what's your opinion concerning her competence as a

03:26   10    trustee?

11    A.   I thought she was an absolutely superb trustee.

12    Q.   Did she have good experience and qualifications?

13    A.   Excellent.

14    Q.   And was she conscientious?

03:26   15    A.   There was nobody more conscientious on the Board.

16    Q.   Did she regularly attend Board meetings?

17    A.   I believe she never missed a meeting.  She came from

18    California.

19    Q.   Did she come prepared to those meetings?

03:26   20    A.   Extremely.

21    Q.   And did she request additional materials from time to

22    time from FMG?

23    A.   She was a trustee who often asked for additional

24    materials.

03:26   25    Q.   Do you believe she knew and understand the issues that

*United States District Court*
*Trenton, New Jersey*

3620

Schpero - Direct - Benedict

1    were presented to the Board?

2    A.   Absolutely.

3    Q.   Did she press management for concessions?

4    A.   She was one of the most aggressive to do that.

03:27   5    Q.   And did she substantive contribute to the discussions of

6    the Board?

7    A.   Yes, sir.

8    Q.   Mr. Schpero, are you generally aware of the magnitude of

9    the expenses that are allocated from AXA to FMG in the

03:27   10   profitability reports?

11   A.   Yes, I believe I am.

12   Q.   And do you think the magnitude of the allocated expenses

13   is unreasonable?

14        MR. A. LAKIND:  Your Honor, objection; that calls

03:27   15   for an expert opinion, it's an accounting question not a

16   question for a trustee.

17        THE COURT:  The trustees need to review that and

18   make their own judgment on that.  So I'll allow that question.

19        MR. A. LAKIND:  Thank you, your Honor.

03:27   20   BY MR. BENEDICT:

21   Q.   Do you believe the magnitude of the allocated expenses is

22   unreasonable?

23   A.   No, I do not.

24   Q.   And why not?

03:27   25   A.   Again, I think we've had a lot of opportunity over the

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    years to discuss with both FMG and AXA personnel the services

2    that are provided; we understand the fact that FMG is a -- is

3    a small subsidiary in a very large corporation, and there are

4    as a result going to be significant costs from elsewhere in

03:28    5    the entity that are -- that are going to be appropriate --

6    appropriately allocated.  And so -- and again, relying on all

7    the different factors that I just discussed with your Honor, I

8    am -- I'm certainly personally comfortable with -- with that

9    information.

03:28    10   Q.   And does FMG also show the Board management and

11   administrative profitability without allocated expenses?

12   A.   Yes, we -- we -- I forget the name of it, but we

13   certainly see -- there's a term that we see sometimes on the

14   charts, but we certainly -- I believe we see separate from the

03:29    15   profitability study, you can certainly see in the

16   profitability sudden itself pretty easily what the numbers are

17   without allocation, but at the end of the day you start with

18   the spread which is the ultimate number without any

19   allocation.

03:29    20   Q.   Shifting gears, are you familiar with a document called

21   the Shared Services Agreement?

22   A.   Yes, I am.

23   Q.   What is that agreement?

24   A.   That my understanding is -- that's an agreement that was

03:29    25   required by insurance -- for insurance regulatory purposes to

Schpero - Direct - Benedict

1   be entered into at the time -- I guess it was in 2011, 2012,

2   when FMG as a division was moved and restructured to be a

3   subsidiary of AXA.

4   Q.   And did management furnish this document to the

03:29   5   independent trustees in connection with their approval of the

6   management and administrative contracts?

7   A.   It did not.

8   Q.   And do you know why not?

9   A.   Well, it -- I'll stand by my statement it did not.

03:30   10   Q.   And why not?

11   A.   I believe they didn't present it because this was an

12   internal arrangement between FMG and AXA.

13   Q.   Were you troubled once you learned of the document not

14   having received it?

03:30   15   A.   No, I'm not troubled by it.

16   Q.   And why is that?

17   A.   Well, once I learned about it, once the Board learned

18   about it we certainly had discussions joined by our counsel

19   with FMG and their counsel, but given what I've learn is that

03:30   20   it essentially is a sharing arrangement that's intended to

21   keep in place the arrangement that was already there.  So in

22   other words, there were direct expenses of probably around 14

23   million, $15 million that were being borne by FMG as a

24   division of AXA, and once it became a subsidiary there was

03:31   25   apparently a insurance requirement that there be an agreement

*United States District Court*
*Trenton, New Jersey*

3623

Schpero - Direct - Benedict

1    that reflected a sharing so that FMG passed back to AXA the

2    cash flow that reflected the sharing of all the personnel and

3    services that were originally in the division's place.

4    Q.   The original 14 million.

03:31    5    A.   The original 14 million.

6    Q.   Now, plaintiffs have contended that under the Shared

7    Services Agreement FMG reimburses AXA for all of the expenses

8    that it incurs on behalf of the funds; do you understand that

9    to be the case?

03:31    10   A.   I do not.

11   Q.   And why not?

12   A.   Well, as I said, I've certainly come to an understanding

13   that I'm comfortable with that -- that this was simply a

14   regulatory driven document that is dealing with -- with an

03:31    15   amount that was already in place.  So these you can see there

16   were direct expenses of 14 million being borne by the

17   division, now under the shareholder servicing agreement

18   they're being transferred from the subsidiary to AXA; those

19   are clearly different fees and for different services than the

03:32    20   issue I think we were just discussing, which is costs that are

21   otherwise being borne elsewhere at AXA.

22   Q.   So does the Shared Services Agreement have any impact on

23   the calculation of FMG's profitability as those -- that

24   profitability is presented to the Board?

03:32    25   A.   I don't believe it does.

3624

Schpero - Direct - Benedict

1  Q.  Does the Board receive information concerning the profit

2  or revenue per employee of FMG?

3  A.  I'm sorry; ask that again please?

4  Q.  Yeah.  Does the Board receive any information concerning

03:32    5  the profit per employee or revenue per employee of FMG?

6  A.  No, it does not.

7  Q.  Plaintiffs have asserted that a careful Board would have

8  viewed per employee revenue and profitability numbers; do you

9  agree with that?

03:33   10  A.  I do not.

11  Q.  And why is that?

12  A.  Well, I think -- primarily because I think it would be

13  ignoring the fact that there are other significant costs that

14  are incurred elsewhere at AXA.  So you would be -- if you went

03:33   15  through what I think is a pretty simple arithmetic, so it's

16  not aware of what that might look like, but if you only looked

17  at the employees at FMG as the only cost, you would be

18  ignoring the fact that there are other significant costs

19  elsewhere in the AXA structure that are part of the

03:33   20  profitability study.  So I think it would be misleading to do

21  that.

22  Q.  Are you aware of any --

23       THE WITNESS:  Your Honor, I can use a five minute

24  break.

03:33   25       THE COURT:  Sure, let's take a break.  We will be

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    back out at quarter to 3:00.  Okay.

2              (Recess.)

3              THE COURT:  Good afternoon.  Please be seated.

4              Mr. Schpero, you're still under oath.

04:04    5              Mr. Benedict, you may proceed.

6              MR. BENEDICT:  Thank you, your Honor.  I'd just like

7    to offer at this time three exhibits we recently talked about;

8    that's Defendant's Exhibits 142.11, 144.19 --

9              THE COURT:  One second.

04:04    10             MR. BENEDICT:  And 142.7.

11             THE COURT:  So 142.11, any objections, Mr. Lakind?

12             MR. A. LAKIND:  No, your Honor.

13             THE COURT:  Admitted.

14             (Defendant's Exhibit 142.11 was marked into

04:04    15   evidence.)

16             THE COURT:  And then 144.19?

17             MR. BENEDICT:  That's correct, your Honor.

18             THE COURT:  Mr. Lakind, any objection?

19             MR. A. LAKIND:  No, your Honor.

04:04    20             THE COURT:  All right, admitted.

21             (Defendant's Exhibit 144.19 was marked into

22   evidence.)

23             THE COURT:  And what was the last one?

24             MR. BENEDICT:  142.7.

04:05    25             THE COURT:  Any objection?

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1          MR. A. LAKIND:  No objection, your Honor.

2          THE COURT:  All right, admitted.

3          (Defendant's Exhibit 142.7 was marked into

4     evidence.)

04:05    5     BY MR. BENEDICT:

6     Q.  Okay.  Mr. Schpero, I'd like to start with economies of

7     scale, something we talked about.  Are you familiar with the

8     term economies of scale?

9     A.  Yes, I am.

04:05   10     Q.  In your own words, what does economies of scale mean?

11     A.  I think the concept is that as assets increase in a fund,

12     there is an assumption that at some point as assets increase

13     the costs don't increase at the same level, and therefore some

14     economies that are being achieved on behalf -- or should be

04:05   15     achieved on behalf -- or could be achieved on behalf of

16     investors.

17     Q.  And are economies of scale in the mutual fund industry

18     difficult to precisely measure?

19     A.  That's certainly my understanding.

04:06   20     Q.  And do you consider as a trustee the potential for

21     economies of scale in connection with approving the management

22     and administrative contracts?

23     A.  Yes, I do.

24     Q.  Is it an important consideration for you?

04:06   25     A.  It's one of the factors that we certainly take into

*United States District Court*
*Trenton, New Jersey*

*3627*

Schpero - Direct - Benedict

1   account.

2   Q.   And does FMG provide the Board with information that is

3   relevant to your consideration of economies of scale?

4   A.   Yes, they do.

04:06    5   Q.   And can you give us some examples of the types of

6   information you're provided that aid you in your consideration

7   of economies of scale?

8   A.   Yeah, they give us data concerning breakpoints for each

9   fund; they give us information on the actual effective fee

04:06   10   levels, so that taking into account the breakpoints, what are

11   of the actual effective fees at different asset sizes; we

12   receive comparative data with respect to that kind of

13   information so we can see breakpoints and effective fees

14   for -- for other funds; we see expense cap information and

04:07   15   expense limitations, which are also I think very relevant to

16   the question of trying to take into account economies of

17   scale; we see industry studies that -- or at least industry

18   discussions of economies of scale in the industry and

19   perceptions as to what's happening here; we see information

04:07   20   about added services that FMG and others provide over time

21   which also impacts the economies of scale discussion; those

22   would be some of the things that I think we receive.

23   Q.   Would you please turn your attention, Mr. Schpero, to tab

24   29 in your binder.  This is Defendant's Exhibit 144.16.

04:08   25   A.   Okay.

*United States District Court*
*Trenton, New Jersey*

*3628*

Schpero - Direct - Benedict

1   Q.   Do you recognize this document?

2   A.   I do.

3   Q.   What is it?

4   A.   This would be one of the presentations that the Board has

04:08   5   received.  This appears to be done as a set of slides that we

6   would have seen at a Board meeting; I'm sure one of the July

7   meetings that covers different aspects of economies of scale

8   presented by FMG.

9   Q.   Would you just generally describe this document for the

04:08   10   Court?

11   A.   Yeah, I think it does some of the things I just

12   mentioned, it lists -- just flipping through it, it mentions

13   the different ways that economies of scale can be -- can be

14   shared by the investment manager with the fund; different ways

04:09   15   that works into the structure as I mentioned, expense cap,

16   things of that sort; it also has some industry -- well,

17   specific fund information on breakpoints and then I believe

18   there's also some comparative data on expense ratios; what

19   happens at different effective fee levels for assets and funds

04:09   20   generally; and then it goes into specific breakpoints for each

21   of the specific funds and goes on from there.

22   Q.   And do you find this document helpful to you in your

23   consideration of the fees?

24   A.   I do.

04:10   25   Q.   And why is that?

*United States District Court*
*Trenton, New Jersey*

3629

Schpero - Direct - Benedict

1   A.   I think it's a good example.  I mean every year the way

2   the Board approaches this I should say, every year we receive

3   different information, sometimes it's the same, but often it's

4   new information that's come out during the year on

04:10   5   developments and particular areas of focus, economies of scale

6   is certainly one of them.  Often we ask for additional

7   information, so I'm not going to profess that this is the same

8   as what we might have seen the year before or the year after,

9   but I think it's a good example of the kind of information we

04:10   10   receive on this particular factor.

11           MR. BENEDICT:  Your Honor, defendants offer 144.16.

12           THE COURT:  Any objections?

13           MR. A. LAKIND:  No, your Honor.

14           THE COURT:  All right, admitted.

04:10   15           (Defendant's Exhibit 144.16 was marked into

16   evidence.)

17   BY MR. BENEDICT:

18   Q.   Mr. Schpero, do you believe the information that's been

19   provided to you concerning economies of scale has been

04:10   20   sufficient to allow you to make a reasonable business judgment

21   considering whether or not to approve fee agreements?

22   A.   I do.

23   Q.   And do you believe FMG has shared potential economies of

24   scale with fund investors?

04:11   25   A.   Yes, I do.

3630

Schpero - Direct - Benedict

1   Q.   And how has it done so?

2           MR. A. LAKIND:  Excuse me; objection.  If the

3   witness can confine his testimony to the 12 particular funds,

4   because

04:11   5   this --

6           THE COURT:  All right.  Can you rephrase your

7   question with that caveat?

8           MR. BENEDICT:  Sure.

9   BY MR. BENEDICT:

04:11   10   Q.   Focusing specifically on the 12 at-issue funds here, has

11   FMG shared any potential economies of scale with fund

12   investors?

13   A.   Yeah, I mean I would point out in the first case for I

14   believe each of the funds there are breakpoints -- each of the

04:11   15   at-issue funds when I say funds that's what I'll mean now with

16   this answer; but for each of the at-issue funds there are

17   breakpoints in place; for a number of those funds there are

18   expense cap -- I don't know that's it's for all without having

19   it in front of me, but I believe for a number of them there

04:11   20   are expense caps in place; and I think for probably virtually

21   all I think the record would show that the Board has

22   negotiated with certainly economies of scale being one of the

23   factors in mind, that we have negotiated over the last four or

24   five years a number of changes in the fee structures where we

04:12   25   have added breakpoints, and where we have reduced the fee at

Schpero - Direct - Benedict

1    various breakpoint levels, both with respect to the management

2    contract and the administrative contract.

3    Q.   You mentioned expense cap; what is an expense cap?

4    A.   So, an expense cap is where an investment manager, either

04:12   5    on its own or on discussion with the board, or ultimately the

6    board would approve any of these caps, imposes a limitation on

7    the total expense ratio.  So let's assume that the total

8    expense ratio, including the management fee and administrative

9    fee and other fees, at a particular current asset level, let's

04:12   10   say the fund is $500 million, and perhaps the actual expense

11   ratio is -- I'll make up a number, 110 basis points; the

12   expense cap that FMG in discussions with the Board may have

13   put in place might be 90 basis points or 80 basis points in

14   order to make the fund competitive with the market, in order

04:13   15   to reflect sensitivities that the Board may have about the

16   particular fee at a particular asset level, there could be

17   lots of reasons, but that would be -- it would result in an

18   expense cap and that of course is fund by fund.

19   Q.   You also mentioned breakpoints; what's a breakpoint?

04:13   20   A.   So that, again, is in recognition of the concept of

21   economies of scale.  So at different asset levels under a

22   typical breakpoint structure, not always but often at

23   different asset levels, the fee will reduce.  So you might

24   have -- and this is true of all of the at-issue funds, but you

04:13   25   may have a fee of -- you know, I'll make up an number; an

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    investment manager fee of 50 basis points for assets up to a

2    billion dollars, and then you will have another breakpoint a

3    billion dollars later.  So if assets grow by another billion

4    dollars, the fee on the -- is then reduced to 45 basis points

04:14    5    on the incremental additional amount; and then it might be

6    reduced to 40 basis points on the next billion or two billion,

7    all subject to negotiation and discussion and comparison to

8    other fees in the appropriate universe.

9    Q.   The net result of that would be that the effective fee

04:14    10    declines as the assets grow larger --

11    A.   Yeah.  So you would look -- so the ultimate question is

12    what's the effective fee, which is the combination of all

13    those numbers.  And so we always see what the effective fee is

14    at the current asset level, and that's clearly the most

04:14    15    important thing for us to be looking at.

16    Q.   Who determines what the breakpoints in the funds will be?

17    A.   The Board ultimately does.

18    Q.   And what considerations go into setting breakpoints?

19    A.   I think it's some of the items I just mentioned, I think

04:15    20    there's a lot of factors; certainly it's -- first of all, it's

21    part and parcel with determining whether the fee is fair and

22    reasonable, because the breakpoints result in an effective fee

23    at an asset level, and the question is are we comfortable as

24    independent trustees in the exercise of our judgment with

04:15    25    where that fee is ending up at a particular -- at current

*United States District Court*
*Trenton, New Jersey*

3633

Schpero - Direct - Benedict

1   assets levels of the fund, that's what we're generally looking

2   at.  But in -- I'm sorry; I've lost my train of thought as to

3   what the original question was.

4   Q.   What considerations go into setting breakpoints.

04:15   5   A.   Yeah, so other considerations are comparative data,

6   again, looking at what peers are charging at various asset

7   levels; another consideration is, again, trying to take into

8   account the fact that we, you know, inherently believe there

9   are some economies that are likely increased -- developing

04:16   10   over time, and so I think the Board is trying -- certainly

11   tries to recognize that as we look at fees and other factors,

12   profitability and everything else, in deciding what we think

13   is an appropriate breakpoint level.

14   Q.   Do sub-advisory fees also have breakpoints?

04:16   15   A.   Yes, they -- when I say yes, they often do.

16   Q.   And are they the same breakpoints as the breakpoints in

17   the management fee schedule?

18   A.   Typically not.

19   Q.   And why do they differ?

04:16   20   A.   I think it's a reflection of two separate negotiations;

21   you've got a sub-advisory fee arrangement, which as I

22   testified earlier is for specific services that that

23   sub-advisor is providing, and those fees are negotiated in the

24   first case between FMG and the sub-advisor, although at the

04:16   25   end of the day the independent trustees certainly have to

*United States District Court*
*Trenton, New Jersey*

3634

Schpero - Direct - Benedict

1   review and approve them; and then you have the fees that the

2   -- at the manager level, manager level, and those are going to

3   be -- the breakpoints, I'm sorry, at the manager level, and

4   those are going to be separately negotiated and they reflect

04:17   5   in the end the service the manager is -- is providing.

6          So really from the Board's perspective the question is

7   what is the effective fee that the manager in its spread is

8   receiving at a particular asset level, and I think that is the

9   key consideration that -- or certainly one of the key

04:17   10  considerations that we examine.

11         And sorry; just to make the point; they're for two

12  different services, I think that's the key part that from our

13  perspective we're always keeping in mind.

14  Q.   Different fee schedules, different services.

04:17   15  A.   Correct.

16  Q.   Has FMG also made improvements to shareholder services

17  over the years?

18  A.   Yes, it has.

19  Q.   Can you give me some examples --

04:17   20  A.   Actually, I mean I think they've made improvements to the

21  fund; I don't know that I would categorize it specifically as

22  shareholder --

23  Q.   Okay.

24  A.   Let me even restate it; I believe they've made

04:18   25  improvements in the services they provide or additions to the

Schpero - Direct - Benedict

1   services they provide.

2   Q.   Can you give me some examples?

3   A.   Yeah.  I'll just start with the fact that in recent years

4   they've had to provide a chief compliance officer and a

04:18   5   compliance system that is vastly different than what was in

6   place certainly when I joined the Board.  The SEC in response

7   to a lot of regulatory developments in the last six, seven

8   years, has imposed a very -- a much more rigorous compliance

9   regime that requires a chief compliance officer, that requires

04:18   10   the Board to be approving the compensation of that chief

11   compliance officer, and requires a very rigorous annual review

12   of the compliance system that was not in place before.

13       They've also put in place a volatility overlay with

14   respect to the funds that I think is another feature that's

04:19   15   been added to them, and developed comparative indexes in order

16   to -- to understand the performance of those funds.

17   Q.   Does the fee schedule for the administrative fees paid by

18   the funds to FMG also include breakpoints?

19   A.   Yes, it does.

04:19   20   Q.   And plaintiffs have criticized the Board because it has

21   not engaged a consultant to assess the extent to which

22   economies of scale benefits are passed on to investors and

23   where specific breakpoints would be appropriate; do you agree

24   that a consultant should have been hired by the Board?

04:19   25   A.   I do not.

Schpero - Direct - Benedict

1   Q.   And why is that?

2   A.   I think that we receive a very significant amount of

3   data; I think with that data we are able to exercise a

4   reasonable business judgment in -- in determining and

04:19   5   negotiating fees that we think are fair and reasonable and

6   that reflect -- or make an effort at reflecting economies of

7   scale over time.  And I think what we do based on guidance

8   from our very experienced counsel is totally consistent with

9   what the industry practice is on this.

04:20   10   Q.   Let me shift, Mr. Schpero, to fallout benefits.  Are you

11   familiar with the term fallout benefits?

12   A.   Yes, I am.  Should I close this up book up for a moment?

13   Q.   You may.

14   A.   Okay.

04:20   15   Q.   What are fallout benefits as that term is used in the

16   mutual fund industry?

17   A.   They are other benefits that are received by the manager

18   or its affiliates in connection with managing the fund.  I

19   think usually there's a -- as it's been explained to us by our

04:20   20   counsel, there's a but-for test; are these -- are these

21   benefits that would not be received but for the manager's

22   relationship to the fund.

23   Q.   And does FMG provide the Board with information that's

24   relative to your consideration of fallout benefits?

04:21   25   A.   Yes, it does.

Schpero - Direct - Benedict

1   Q.   Do you think FMG recognizes any fallout benefits from its

2   management and administration of the funds?

3   A.   Yes, I think there are a number of items that have been

4   identified to the Board that we discuss.

04:21   5   Q.   Can you give me a couple of examples?

6   A.   Yeah, I think -- yeah, the definition would include

7   things like the administrative contract; it would include the

8   distribution compensation that's received under the 12(b)(1)

9   plan; fallout benefits would include all of the arrangements

04:21   10   with Alliance Bernstein as a sub-advisor; fallout benefits

11   would include the brokerage that's received by affiliated

12   brokers, I think particularly there's affiliates of Alliance

13   that sometimes execute trades; fallout benefits -- there are

14   tax credits that are received by AXA, and those are also

04:22   15   deemed to be fallout benefits; those would be a few of the

16   examples that I could at least at this point remember.

17   Q.   Are you familiar with the term, product wrapper fees?

18   A.   Yes, I am.

19   Q.   And what are they?

04:22   20   A.   So those are the fees that AXA -- we discussed that

21   earlier in the context of your question on performance; but

22   those are the fees that AXA receives at the insurance level

23   for mark -- for selling and marketing and making available the

24   annuities and various insurance products that are at the upper

04:22   25   level before the funding is received for these particular --

Schpero - Direct - Benedict

1   this particular mutual fund complex.

2   Q.   And have you considered whether revenues from variable

3   annuity product wrapper fees constitute fallout benefits?

4   A.   We've discussed that subject with our counsel, I think

5   there's been some discussion of that in some of the

6   memorandums we receive or references to it.  I don't believe

7   that -- based on discussions with counsel, I don't believe

8   that the wrapper fees meet the but-for test.  And I believe

9   that view based on discussions with counsel is consistent with

10  the industry.

11  Q.   Would you just explain to the Court why you don't believe

12  that product wrapper fees meet the but-for test?

13  A.   Yeah, I don't -- I don't -- my understanding is I don't

14  think that -- that, you know, but for the existence of the

15  funds or the management of the funds by FMG, the wrapper fees

16  wouldn't be received.  In other words, there are other funds

17  that are available, non-FMG funds, non-AXA funds, that can be

18  purchased.  So it is not -- it's not a requirement if you're

19  going to be investing in the insurance products that you can

20  only buy FMG funds.  So I don't see it satisfying the but-for

21  test.

22  Q.   So whether or not the EQAT Funds existed, AXA would still

23  receive product wrapper fees; is that --

24  A.   That's my understanding, that's correct.

25  Q.   Are you aware of something called the general account?

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1   A.   I am.

2   Q.   And what is that?

3   A.   I believe that's an investment income -- income

4   alternative to the funds.  So when you invest in the insurance

04:24   5   products you have an option -- or at least some investors have

6   an option of having their investments directed to a fixed

7   income account made available by AXA separate and apart from

8   the -- from the EQAT Funds.

9   Q.   And have you considered whether revenues from the general

04:24   10   account are fallout benefits?

11   A.   We've discussed that.

12   Q.   And do you believe that they are?

13   A.   I don't believe -- for the same reasons I don't believe

14   they are, I don't believe they meet the but-for test.

04:25   15   Q.   Have you sought and/or received the advice of your

16   independent counsel on this issue as well?

17   A.   I have.

18        MR. A. LAKIND:  Objection, your Honor; hearsay.

19        THE COURT:  Well, he can answer that question.

04:25   20        I didn't hear your answer.

21        THE WITNESS:  I have.

22        THE COURT:  Okay, thank you.

23   BY MR. BENEDICT:

24   Q.   Does the Board receive information from AXA concerning

04:25   25   the amount of revenues AXA receives from variable annuity

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1  product wrapper fees and the general account?

2  A.   Yeah, I think, you know, we've always received AXA's

3  financial statements as part of the 15(c) process, and we're

4  certainly aware they're very significant fees that are

04:25  5  received by AXA, both with respect to the wrapper and the

6  general -- and with respect to the general account fixed

7  income investments.

8  Q.   Let me shift gears again, Mr. Schpero.  Have you voted

9  each year to approve the management agreement between FMG and

04:26  10  the funds?

11  A.   Yes, I have.

12  Q.   And why have you voted to approve the agreement?

13  A.   Well, it's obviously a very extensive process, but at the

14  end of the day I have approved it because I have concluded

04:26  15  that the -- the fees and the contract itself are fair and

16  reasonable, and that it's in the best interest of the

17  shareholders.  I've done that based on a careful -- you know,

18  on the exercise of my business judgment, and each of the

19  trustees I'm sure weighs different factors, but I have

04:26  20  weighted all of the factors that we've been discussing for the

21  last two days for each fund each time we go through this, as

22  we -- as I think I have testified.

23       Certainly before we vote there are often negotiations

24  that results in judgments to fees when we think that's

04:27  25  appropriate, but by the time we get to the vote process I

3641

Schpero - Direct - Benedict

1  certainly have been very comfortable that the fees and

2  arrangements are fair and reasonable and in the best interest

3  of our shareholders, or investors.

4  Q.   And have you considered all of the *Gartenberg* factors at

04:27      5  the time you voted for the fees approvals?

6  A.   Yeah, and as I've testified I think you can argue that

7  *Gartenberg* is almost too narrow; I've considered all factors

8  and all data that we receive in making that judgment.

9  Q.   Who prepares the minutes for the EQAT Board meetings?

04:27     10  A.   The secretary of the fund, Ms. Louie.

11  Q.   And are the minutes circulated in draft to the Board

12  prior to being finalized?

13  A.   They are.

14  Q.   And do the independent trustees have an opportunity to

04:27     15  suggest revisions?

16  A.   Yes, they do.

17  Q.   And do the independent trustees from time to time suggest

18  revisions to the minutes?

19  A.   They do.  And I should note because it's important our

04:28     20  independent counsel also reviews the minutes as well, the

21  draft minutes, and comments on them.

22  Q.   And do you believe the minutes once finally -- once

23  finalized, accurately describe the discussions and actions

24  taken by the Board?

04:28     25  A.   I do.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1  Q.   Are the factors considered by the Board in approving the

2  management fee agreement generally described in the minutes

3  for each of the July meetings?

4  A.   I believe they are, yes.

04:28  5  Q.   Are each of the *Gartenberg* factors discussed at those

6  meetings?

7  A.   I'm sorry; are you referring to the minutes or --

8  Q.   No, in the meetings generally, in July meetings.

9  A.   In the meetings every one of the factors is discussed at

04:28  10  great length, yes.

11  Q.   Are the funds also required each year to describe in --

12  A.   Sorry; your Honor, do you mind if just put candy in my

13  mouth?  It's getting a little dry.

14        THE COURT:  You may.

15        THE WITNESS:  Thank you.

16        MR. BENEDICT:  We're almost to the end, Mr. --

17        THE WITNESS:  I'm all right, I just need to --

18        THE COURT:  They've promised that before.

19        THE WITNESS:  You've heard this before.

04:29  20        MR. BENEDICT:  I promise.  I'm still batting a

21  thousand, your Honor.

22        MR. MURPHY:  First at bat.

23        MR. BENEDICT:  I got that.

24  BY MR. BENEDICT:

04:29  25  Q.   Let me rephrase the question, Mr. Schpero.  Are the funds

Schpero - Direct - Benedict

1    required each year to describe in the annual report for the

2    fund the factors considered by the Board in approving the

3    management fee?

4    A.   Yes, I think that's a relatively recent requirement, but

04:29    5    certainly in recent years that is required by SEC rule.

6    Q.   Let me turn your attention to tab 30 of your binder.

7    This is Defendant's Exhibit 457.1.

8    A.   Okay.

9    Q.   Do you recognize this document?

04:30    10   A.   Yes, I do.

11   Q.   And what is it?

12   A.   This is the fund's annual report for the year ending

13   2014.

14   Q.   And I'd like you to --

04:30    15   A.   I'm sorry; the cover says that, but what you're really

16   asking is to look at the -- is the required shareholder

17   disclosure, or investor disclosure, concerning the July Board

18   meeting.

19   Q.   And does that begin at page 1363, which is Bates ending

04:30    20   Bates number 7862?

21   A.   Yeah.  I mean I think before that it lists all of the

22   relevant funds and portfolios, but the actual text begins on

23   1363.

24   Q.   Would you generally describe this document for the Court?

04:31    25   A.   I assume you want be me to be pretty general --

Schpero - Direct - Benedict

1  Q.   I'd like you to be very general.

2  A.   But this as required by the SEC, reviews -- it certainly

3  summarizes I think right up at the start the *Gartenberg*

4  factors that were examined --

04:31  5  Q.   Are you referring now to the top of page 1663, Bates

6  7862?

7  A.   Yes, I am, that first paragraph appears to list the

8  various factors, that the Board looked at.  And then I believe

9  the next paragraph kind of in summary fashion, the paragraphs

04:31  10  list generally some of the key information that was supplied,

11  including the Lipper information; and then basically it

12  reviews factor by factor and summarizes factor by factor the

13  Board's determination.

14       So starting on 1364 it reviews the information that the

04:32  15  Board received and the analysis that the Board entered into

16  with respect to the nature, quality and extent of services,

17  that was received both with respect to the manager and the

18  sub-advisors.

19  Q.   Would you turn to 1365?

04:32  20  A.   Yeah.  And that would -- that then begins the discussion

21  that the Board had reviewing the investment performance of

22  each portfolio, focusing in particular on comparison both to

23  benchmarks as well as to peer groups, and that goes on -- as

24  you can see it's broken out by what I'd call sectors of funds,

04:32  25  so there's a fund of funds section, and passive portfolios, et

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    cetera.

2    Q.   Let me just stop you for a minute, Mr. Schpero.  Do I

3    understand that this is an in-depth written description of the

4    factors considered and determinations made on a

04:33    5    factor-by-factor basis with the Board for each of the 80 plus

6    funds in the EQAT Trust?

7    A.   That is correct.

8    Q.   Let me turn your attention to page 1377.

9    A.   Yes.  And so the next factor that's being discussed here

04:33   10    is expenses, and in particular using the Lipper data or

11    referencing the Lipper data, comparative expenses, and

12    similarly it will go through each -- each fund.

13    Q.   And would you turn to 1382?

14    A.   1382 begins the discussion at the end of the page of

04:34   15    profitability and cost, and the analysis that the Board went

16    through in terms of the information that was looked at for

17    that purpose.  And then following that is a section that

18    discusses the Board's analysis with respect to economies of

19    scale.

04:34   20    Q.   That's on 1383?

21    A.   83, that's correct.  And then on 1384 there's a section

22    on fallout benefits, and the analysis that was entered into

23    there.

24    Q.   And you mentioned these disclosures are required by SEC

04:34   25    rules and regulations?

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    A.    That is correct.

2    Q.    And is this report prepared subject to the same sanctions

3    that apply to other books and records of the fund?

4    A.    That is correct.

04:34    5    Q.    Does the Board have an opportunity to review and approve

6    the accuracy of these factors discussions prior to publicly

7    filing the annual report?

8    A.    Yes, the independent trustees get a draft of this, and

9    certainly importantly our counsel get a draft and everybody

04:35    10    has an opportunity to comment on this.

11    Q.    And when does that review generally occur?

12    A.    I'm not going to be able to get more specific; I mean

13    it's certainly with sufficient time so that all relevant

14    parties have an opportunity to comment on this.

04:35    15    Q.    And do you believe the descriptions of the Board's

16    evaluation of the factors accurately describes the Board's

17    deliberations?

18    A.    Yes, I do.

19    Q.    Have you voted each year to approve the Administration

04:35    20    Agreement between the fund and FMG?

21         THE COURT:  Before you go into that, Mr. Schpero, I

22    mean I haven't read this report, so it talks about the

23    advisory agreements, but does this also relate to the

24    sub-advisory agreements?

04:35    25         THE WITNESS:  Yes, it does.  It relates to both the

Schpero - Direct - Benedict

1    investment manager and the investment advisor.

2           THE COURT:  Okay, thank you.

3           MR. BENEDICT:  Your Honor, defendants move 457.1

4    into evidence.

04:36   5           THE COURT:  Any objection?

6           MR. A. LAKIND:  No objection, your Honor.

7           THE COURT:  All right, admitted.

8           (Defendant's Exhibit 457.1 was marked into

9    evidence.)

04:36   10   BY MR. BENEDICT:

11   Q.   Mr. Schpero, have you also voted each year to approve the

12   Administration Agreement between the fund and FMG?

13   A.   Yes, I have.

14   Q.   And why is that?

04:36   15   A.   For the same analysis that I and each of the trustees,

16   but I'll speak to myself, have found upon review of lots of

17   materials, lots of relevant materials that the fees after --

18   after appropriate negotiations and changes where we think that

19   is called for are fair and reasonable.  And that's based on

04:37   20   extensive review of -- of all of the kinds of factors we have

21   been discussing, running the gamut from comparative data to --

22   to profitability, to understanding and reviewing carefully the

23   nature and quality of services and examining the -- in

24   particular the quality of the service, and who the entity is

04:37   25   that's providing them.

3648
Schpero - Direct - Benedict

1    Q.   Thank you.  Let me turn your attention back to tab 29.

2    A.   We're going backwards.

3    Q.   Going backwards.  It's our last exhibit, though.

4    Defendant's Exhibit 144.16.

04:37    5    A.   Okay.

6    Q.   And let me turn your attention specifically to pages 184

7    and 185 of that exhibit.

8          MR. A. LAKIND:  Excuse me; can I just have a minute

9    to find that exhibit?

04:38   10          MR. BENEDICT:  Certainly.

11          THE COURT:  What's the Bates page you are looking

12    at, Mr. Benedict?

13          MR. BENEDICT:  184 is Bates 727, and 185 is Bates

14    ending 728.

04:38   15          THE COURT:  Thank you.

16          MR. A. LAKIND:  Thank you.

17    BY MR. BENEDICT:

18    Q.   Mr. Schpero, do you recognize this document?

19    A.   Yes, I do.

04:38   20    Q.   What is it?

21    A.   This is a presentation the Board got; I'm not sure which

22    meeting, I don't see the date, it would have been in

23    connection with one of the July reviews.  And it shows the

24    economies that have been achieved in terms of savings for the

04:39   25    investor over a period from 2007 to 2012 in the aggregate.

United States District Court
Trenton, New Jersey

3649

Schpero - Direct - Benedict

1          MR. A. LAKIND:  Your Honor, sorry to interrupt; but

2     if the witness could confine his testimony to the 12 funds.

3          MR. BENEDICT:  This particular fund chart is not

4     directed to the 12 funds, but the EQAT Trust at large, showing

04:39    5     the aggregate savings that the Board has achieved on behalf of

6     the shareholders.

7          MR. A. LAKIND:  Then I object on relevance grounds.

8          MR. BENEDICT:  It's totally relevant.

9          THE COURT:  Overruled.  He may testify.  We've gone

04:39   10     through this report a little bit before, so he may testify.

11     BY MR. BENEDICT:

12     Q.   Mr. Schpero, would you please explain these two charts to

13     the Court?

14     A.   Yeah, this is showing over a period indicated, what has

04:40   15     happened in terms of the actual effective aggregate fee that

16     is received by FMG; and if you compare -- what you can do in

17     looking at the first chart, which is on page 184, but if you

18     look at the top black line, that's what the fee would have

19     been without taking into account any of the restructurings

04:40   20     that have occurred at that point, all of which would have been

21     approved and had the involvement of the Board; without taking

22     into account any breakpoints that were in place with respect

23     to any of the fees; and without taking into account -- the

24     blue would be any of the expense reimbursements or waivers.

04:40   25     Q.   Now, is that top black line more or less at 62 basis

Schpero - Direct - Benedict

1  points?

2  A.   That's -- that's correct.

3  Q.   Okay.  You may continue.  I'm sorry.

4  A.   And so it's showing what it could -- would have been

04:41  5  without any of these changes that have occurred over this

6  period, versus what the bottom black line is what the actual

7  effective fee was over this period.  And so the differential,

8  if you aggregate the restructuring impact, the impact of

9  breakpoints, during this period and the impact of waivers that

04:41  10  have been negotiated with FMG over this period, is 17 and a

11  half basis points; or put in real dollars and cents, if you

12  look at page 185, it's almost $150 million to the benefit of

13  the investor.

14  Q.   And this is over the six-year period?

04:41  15  A.   That's correct.

16      THE COURT:  Could you explain to me what

17  restructuring impact is?

18      THE WITNESS:  Yeah.  So, I mentioned earlier that

19  really starting in 2008, but really continuing right up until

04:42  20  very recent years, there have been a lot of changes to the

21  funds, and I think this is an important service that FMG

22  provides.  They are -- they often come to the Board, sometimes

23  in response to concerns we have, but often in response to

24  their own views about either the sub-advisors or how the funds

04:42  25  are doing or performance or the market, and suggest changes.

3651

Schpero - Direct - Benedict

1            And many of these changes, particularly as we moved

2    into funds that have much bigger components of passives -- so

3    remember I mentioned earlier today that often the

4    restructurings have involved moving from funds that had a

5    single active manager to funds that were what I'll call a

6    hybrid, where there's maybe two or three sleeves; so perhaps

7    20 percent is managed by an active manager and often 60 or 70

8    percent is run by an index manager.  When those funds are

9    restructured there's been a very significant reduction in the

10   expense ratio, because there's a significant reduction often

11   in the investment management fee.  Just given the nature of

12   the way the fund is being run.

13            THE COURT:  So, if the fund was restructured, and

14   let's say you have three sleeves or something --

15            THE WITNESS:  Yeah.

16            THE COURT:  So you might have three separate

17   sub-advisors?

18            THE WITNESS:  Correct.

19            THE COURT:  Would the fee to the sub-advisors be

20   considered part of the restructuring impact?  Is that what's

21   being looked at there?

22            THE WITNESS:  I think what this is showing is the

23   total management fee, the actual management fee.  So whatever

24   happened to the sub-advisor is built into the total management

25   fee.  But it's showing the impact from the investor's

*United States District Court*
*Trenton, New Jersey*

3652

Schpero - Direct - Benedict

1    perspective; the red is showing that there has been -- from

2    the investor's perspective there has been a reduction in the

3    total management fee of that amount.

4           THE COURT:  So, FMG may have had additional costs to

04:44  5    restructure the fund.  I'm trying to figure out what that

6    number is, or how you get at that number.

7           THE WITNESS:  I think what it's showing is -- you

8    know, it's aggregating any number of funds where the fund

9    structure was changed, and the result of the change in the

04:44  10   structure was that the management fee went from X to something

11   less than X.

12          THE COURT:  Oh, I see.

13          THE WITNESS:  And so whatever that reduction is is

14   in that red.

04:44  15          THE COURT:  So, if they had like an expense cap,

16   that could be one of those items that they put in there or

17   something of that nature?

18          THE WITNESS:  Expense cap actually is going to be a

19   separate one, so let's separate that, because the expense cap

04:45  20   is the blue.  So the red is solely -- if you take a fund --

21   let me just give you what I think is a representative example.

22   If you take a fund that was -- that had an active manager, and

23   let's -- let's assume that the management fee was total

24   management fee, including the sub-advisory fee, was 70 basis

04:45  25   points; when that fund was restructured to be what I'll call a

Schpero - Direct - Benedict

1    pactive or a hybrid fund, or as you said it had two or three

2    sleeves, often a big part of that is now an index sleeve, and

3    often the result of that restructuring is the investment

4    management fee number I just gave was --

04:45    5             THE COURT:  70.

6             THE WITNESS:  70.  So the investment management fee

7    may now be -- the total fee may now be 50 basis points.  That

8    20 basis points savings for the investor because that's who's

9    benefited, is in that red.  Separate from that, throughout

04:46    10   this -- over this period, there have been reimbursements by

11   AXA to keep the expense cap at certain levels; that's in the

12   blue.

13            THE COURT:  So why do you call that an investment?

14            THE WITNESS:  I think they call it an investment

04:46    15   because they end up either waiving or reimbursing the fund,

16   often reimbursing the fund, paying the sub-advisor out of

17   their own pocket, not infrequently, but at the end of the

18   day --

19            THE COURT:  So they paid money into the fund.

04:46    20            THE WITNESS:  They haven't paid it into the fund,

21   but they may have paid it to the sub-advisor, even though

22   they're not receiving the fee.  I think that would be one way

23   in which -- they could be just waiving their own fee; you

24   know, they're due to get a spread of 30 basis points, they may

04:47    25   be getting none of that because there's an expense cap.  They

Schpero - Direct - Benedict

1   may have to even reimburse the -- sorry; pay the sub-advisor

2   out of their own pocket.  There are lots of scenarios that may

3   apply, but any of them result in FMG receiving less than they

4   were contractually obliged to receive.

04:47   5           THE COURT:  Okay.

6           THE WITNESS:  And those are usually -- I mean

7   they're always as a result of approvals by the independent

8   trustee, often as a result of negotiations with the Board, or

9   for one reason or another during the 15(c) process or

04:47   10  otherwise the Board believed that there should be expense caps

11  in place.

12           MR. BENEDICT:  May I proceed, your Honor?

13           THE COURT:  You may proceed.

14  BY MR. BENEDICT:

04:47   15  Q.  So, do I understand using the specific charts in front of

16  us, that but for these various actions taken by the Board,

17  that the management/advisory fee would have been 62 basis

18  points, and as a result of these actions it's more or less 44

19  basis points?

04:48   20  A.  That's correct.

21  Q.  And that in 2012 that differential between 62 basis

22  points and 45 basis points, resulted in a net savings to

23  investors in the Trust of $148 million?

24  A.  Yeah.  On the second page I believe the savings are 148

04:48   25  million, correct.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1  Q.   Shifting gears -- this is the last leg.  Mr. Schpero,

2  when did you become aware of this lawsuit?

3  A.   I'll just put this aside.  I became aware of this lawsuit

4  in -- it was shortly after the July 2011 Board meeting.

04:49  5  Q.   And that was at or about the time the lawsuit was filed?

6  A.   I believe I learned within probably 24 hours.

7  Q.   And have you received the various complaints that have

8  been filed in this lawsuit over the last few years?

9  A.   Yes, I have.

04:49  10  Q.   And have you read them?

11  A.   Yes, I have.

12  Q.   And are you familiar with the allegations of those

13  complaints?

14  A.   Yes, I am.

04:49  15  Q.   Do you agree with those allegations?

16  A.   I certainly do not.

17  Q.   And would you please explain to the Court why you

18  disagree with the allegations?

19  A.   Yeah, I -- I obviously have been intimately involved in

04:49  20  the Board process throughout this period, as I have testified

21  for two days now, I believe that I'm very comfortable with the

22  findings certainly that I and the Board have made, where we

23  have found that after negotiation and discussion that the

24  fees, all of the fees at issue are fair and reasonable; I

04:50  25  believe these contracts are in the best interest of the

Schpero - Direct - Benedict

1    shareholders; I think we've worked very hard and diligently

2    with -- with terrific counsel, who has vast experience in the

3    area to ensure that we are always engaging in the best

4    practice, we are -- that's really consistently been the test

04:50    5    that I as the lead trustee have applied, is ensuring with our

6    counsel that what we are doing is -- is consistent with

7    anything that's out there that is best practice.

8         And so I -- I think the process that this Board has

9    engaged in that has allowed us to exercise our business

04:50    10   judgment, has been of the highest quality.  We've received

11   significant amounts of information, much of it from outside

12   providers; it's allowed us to consistently focus on what I

13   think is the real test, which is are we acting -- are we able

14   to make findings that are in the interest of the shareholders

04:51    15   and the best interest of the shareholders.

16        We have a Board that is very talented, that is very

17   diversified, that brings lots of expertise to the table; and I

18   think it's enabled us to make the findings that we have.  And

19   it's a Board that has -- I think very aware in contrast with

04:51    20   the allegations in the complaint, but very aware of the

21   services that are provided by FMG as investment manager; very

22   aware of the services that FMG as administrator provides; very

23   aware of what the sub-advisor and the sub-administrators do;

24   and then taking all of that into account as well as all of the

04:51    25   other data we receive, we do what I think is the only

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    reasonable thing we can do, is exercise our business judgment

2    in making an assessment, fund by fund in each case every year.

3        And I would lastly emphasize that while there's lots of

4    information here and lots of data, I think it's very important

04:52    5    for the Court the understand that this is an all-year process;

6    this is not a matter of stepping into this in July and

7    spending three days examining this.  This is a Board that's

8    spending 12 months on these matters, and then obviously

9    looking at key information in the June and July meetings.

04:52   10        MR. BENEDICT:  I have no further questions for this

11   witness.

12        THE COURT:  All right.  So cross, do you want to

13   wait until Monday?

14        MR. A. LAKIND:  I think that probably would be the

04:52   15   prudent thing to do if that's okay with your Honor.

16        THE COURT:  Sure.  I have a few questions for you

17   now.

18        THE WITNESS:  Sure.

19        THE COURT:  I looked at your Board -- and I can't

04:52   20   find my exhibit where I have all the Board members on it, but,

21   you know, I didn't see any person -- and I might be wrong on

22   this, so correct me if I am.  But I didn't see any like person

23   that was a regulator type person; someone that would have

24   overseen the industry and know requirements that government

04:53   25   mandates.  Do you have such a person?

Schpero - Direct - Benedict

1          THE WITNESS:  I think that would be me.

2          THE COURT:  Oh, you've never worked for government.

3          THE WITNESS:  No, but I think what you're getting at

4    is do we have somebody on the Board who has experience in the

04:53    5    regulatory regime.  I spent 22 years working with the SEC,

6    weekly, I mean my -- the nature of my practice was working

7    with SEC examiners, working with the person who headed the

8    division of investment management, representing investment

9    managers in this industry.

04:53   10          And so -- and what did I do; I mean part of my

11   practice was setting up compliance programs for investment

12   managers, doing audits of compliance programs for investment

13   managers; so I think that's an expertise that I very much

14   bring to the table.  In fact, the typical regulator that

04:54   15   you're describing was my competitor.  And what I mean by that

16   is, for example, a friend of mine was Barry Barbash; Barry

17   Barbash was a partner at Shearman & Sterling who did exactly

18   what I did.  At some point in his career he opted to go spend

19   three years as the regulator you just described; he became the

04:54   20   head of division of investment management, he came back and

21   his practice was, again, exactly what the two of us do.

22          So the people who provide that role at the highest

23   levels at the SEC are exactly the people with my practice

24   background.  So I think that's what I'm -- that's what I bring

04:54   25   to the table.  It's pretty -- I have to tell you it's pretty

1   rare to see somebody who actually served in the SEC on a fund

2   board, that's been my experience.

3         And of course, the other point I would make to you

4   is that's exactly why we have independent counsel who

04:54   5   similarly has that kind of expertise, and who actually -- and

6   I believe this is the case with Morgan Lewis; but the large

7   firms often have a number of practitioners who have been in

8   and out of the regulators, and therefore able to bring that

9   additional capability.

04:55   10         THE COURT:  All right.  The other issue I had, and

11   it might be a little rough, but I'll just ask it anyway; what

12   comes across to us folks is that, you know, it looks like it's

13   a Wall Street deal.  You have investment bankers, you have the

14   lawyers that deal with the investment bankers, you have the

04:55   15   accountants that deal with the investment bankers, so you all

16   come from the same kind of perspective.  And do you think that

17   adequately represents, you know, a fair deal for the investors

18   who live all over the country?

19         THE WITNESS:  So, help me on your question; when you

04:55   20   say -- are you looking at the Board again or --

21         THE COURT:  I'm looking at the Board, who is on the

22   Board, and it just seems like it's all Wall Street type.  So

23   there's no cross -- I don't know; there's not a lot of people

24   that with different viewpoints.

04:56   25         THE WITNESS:  I mean I guess I would -- it's

Schpero - Direct - Benedict

1  interesting, because I guess it's all a matter of perspective

2  obviously.

3          THE COURT:  Yeah, right.  What I'm just trying to

4  figure out is how are we protecting the investor; because

04:56  5  that's what you're supposed to be doing and that's what the

6  *Gartenberg* factors go to.

7          THE WITNESS:  And that is my obligation.

8          THE COURT:  Right.

9          THE WITNESS:  And I guess I'd make a couple of

04:56  10  points.  First of all, I do think it's a pretty diversified

11  Board.  I look at somebody like Mr. Komisarjevsky, who's the

12  head of our governance committee; he's not a Wall Street

13  person at all.  He's a -- you know, he was the head of a large

14  public relations firm, but he really has no background in the

04:57  15  financial world.

16          And in fact, it's interesting that you raise it from

17  that perspective, because I've always thought that Chris was

18  in many ways one of the more helpful trustees, because he does

19  look at things from a very different perspective.  But I think

04:57  20  that's what's good about the Board.  You know, I think that

21  having that different perspective, I certainly agree with you

22  is important.

23          I would tell you that Ms. Edwards is about as far

24  from a Wall Street person as you can get.  Her background --

04:57  25  you know, she worked with consulting firm, I don't think any

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    of them were in New York, I could be wrong there; but her --

2    you know, her focus was -- I think as I recall, at least in

3    part she had a number of jobs helping consulting firms,

4    pension funds, figure out how you analyze and examine

04:57    5    investment managers; so really looking at it from the

6    perspective of the buyer, which is I think what you're getting

7    at.  So I think that's another person who plays kind of a

8    different role from what, you know, may have just described.

9         THE COURT:  Well, what brought me to these questions

04:58    10    was we had one witness who considered himself to be an

11    activist; he didn't really explain what an activist was, but I

12    kind of took that as he has an interest in the industry, he's

13    on some boards in the industry now, but he may have come from

14    like a consumer advocacy perspective.  And do you have anyone

04:58    15    like that on your Board?

16         THE WITNESS:  We don't have a Mr. Goldstein on the

17    Board, I won't certainly represent that to you.  I can only

18    represent to you what I see, and what I see are eight men and

19    women who I have lived with for a long time, and who none of

04:59    20    them need to do this; this isn't their living, this is

21    something they do that they find interesting, that they bring

22    different areas of expertise in.  And I see tremendous

23    integrity.  I see only an interest in looking out for the

24    investors.  I see only people who are interested in an

04:59    25    arm's-length relationship; none of these are people who are

*3662*

Schpero - Direct - Benedict

1    socializing with FMG and AXA.  There's -- you know, this is a

2    very professional relationship, it's always been that way.

3             And it's a demanding Board.  I mean there have been

4    times where we've had difficult relationships with FMG because

04:59   5    it is so demanding, because we are so demanding.  And there

6    have been good years and bad years from that perspective.  And

7    I think that's reflective of the Board and I think it's

8    reflective of me quite frankly; I don't need to do this, you

9    know, and do something where I'm basically just trying to get

04:59  10    in bed with managers.  There's no reason I would do that.

11             I have only one interest, and that is having spent

12    many years learning this industry and understanding the

13    fiduciary duties of the Board, I saw this as a great

14    opportunity to be an independent trustee, and to be as good an

05:00  15    independent trustee as I thought I could be.  And I think I've

16    done that.

17             THE COURT:  So my last question was, and I think

18    you've kind of answered it, but I was going to say what is the

19    relationship of the Board to FMG?  Because they provide all

05:00  20    the documents to you, and you seem like a very decent fellow,

21    Mr. Joenk seems like a very decent fellow, so is it just a

22    cozy relationship or how does that work?

23             THE WITNESS:  It is not a cozy relationship, and

24    that's the point I was making a minute ago.  You know, we are

05:00  25    very aware that that's the last thing that you want in place.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    It is an arm's-length relationship, it is a professional

2    relationship.  I will tell you we try not to make it an

3    adversarial relationship because as you know that could be

4    self-defeating.  And there have been points where it's been

05:01    5    adversarial, and that -- you know, it's not a matter of

6    pointing blame, but where the Board thinks things have not

7    been done properly, we have dealt with it in that way, and

8    there are times where there are strains as a result.

9            And we try to be thoughtful about how we negotiate.

05:01    10    So there are times where -- as I think I mentioned on day one,

11    where rather than the whole Board asking Mr. Joenk to come in,

12    I'm asked to go meet with him, particularly if there are

13    things where we are going to be critical and we don't want

14    to -- you know, we are purposely not trying to embarrass

05:01    15    anybody; there are members of his team where sometimes we've

16    had issues and we want to make that clear, but I don't want to

17    do that in front of everybody.

18            But this is not -- you know, we have lots of

19    executive sessions, we are very careful about the purpose of

05:01    20    those sessions.  We invite him in periodically because we

21    think it's important to have negotiations or discussions to

22    make sure we understand things that are developing at AXA that

23    maybe all of his team don't know, but the Board should know;

24    but that's very different from developing any kind of

05:02    25    relationship that -- that anybody could categorize as cozy.

3664

Schpero - Direct - Benedict

1    That's a far cry from what we've developed.

2         THE COURT:  So when I first became involved in the

3    case and I was looking at the trustees, and I saw that Mr.

4    Joenk was the chairman of your Board, that seemed odd to me;

5    because you would think that the relationship between FMG and

6    the Board should be at arm's length, but then if he's chairman

7    of the Board how does that work, you know.  So what do you

8    think about that?

9         THE WITNESS:  So, I think that's a very fair

10   question.  I will tell you that I think the industry has

11   been -- has addressed that for many years.  And there's two

12   ways you address it; you either have a lead independent

13   trustee, which we do, and others have an independent chair.

14   Both of those I think the regulators clearly consider

15   perfectly appropriate and best practice approaches.

16         I don't mean to demean in any way Mr. Joenk, because

17   he plays an important role, but in my mind his role is as --

18   as FMG.  I mean there's a reason for the last two days that I

19   told you that when I talk about the Board, I'm really not

20   talking about Mr. Joenk.

21         THE COURT:  No, I understand that.

22         THE WITNESS:  Mr. Joenk is chairman, sits there and

23   runs the meeting, and certainly that makes sense; there are

24   real efficiencies in that, because it's FMG that needs to

25   provide all the information.

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1          But the independent trustees, I should be very clear

2    to you, run this Board.  There is nothing that happens at the

3    Board session that's we don't bless; we without hesitation say

4    we don't want certain people, we want to change things.  On

05:03    5    night one before day two I could call Mr. Joenk and tell him,

6    you know, we're changing half of the next day; the calendar is

7    only run on the basis of what we decide at the end of the --

8    at the end of the day.

9          THE COURT:  So, Mr. Goldstein --

05:04   10          THE WITNESS:  And the last point on that, I'm sorry;

11   I will tell you, again, we wouldn't -- it wouldn't be

12   structured that way if it wasn't considered totally consistent

13   with best practice.  But I think that's only because we have

14   an independent lead trustee, who really plays effectively a

05:04   15   chairman role.

16          THE COURT:  So, Mr. Goldstein, that was the --

17          THE WITNESS:  Yeah.

18          THE COURT:  So he indicated during his testimony

19   that you should go out and bid the work for the manager.  What

05:04   20   do you think about that?

21          THE WITNESS:  Yeah, I don't -- I don't -- I don't

22   think that's a realistic suggestion.  As I may have testified

23   earlier in the day, if -- if I did not think that we were

24   receiving -- I should tell you, I believe we are receiving the

05:05   25   highest quality of service.  Every day?  Of course not, none

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    of us -- I'm not perfect every day, none of us are.  There are

2    failures from time to time.

3              THE COURT:  Exactly.

4              THE WITNESS:  And some of them can be troubling.

05:05    5    But looking at the big picture and having been on this Board

6    for a lot of years, I think we are dealing with a high quality

7    provider, and certainly based on my own experience in the

8    industry looking at others.

9              But if there was ever a point where that was not the

05:05    10   case, where there was significant turnover of personnel, where

11   there were major compliance failures, where there was just an

12   obvious suggestion that this was not getting the attention

13   that this complex deserved, then those discussions would

14   begin.  But to do that just because it would be nice to try to

05:05    15   have somebody else bid for it, I don't think it's -- I don't

16   think -- with all due respect I don't think it's real world,

17   in terms of what you would do with a complex like this.

18             As I said earlier, think about this complex; it's

19   been set up by AXA for its investors.  It's been structured in

05:06    20   a way that's attempting to bring to investors the best of all

21   of the sub-advisors out there.  People who are investing in it

22   are buying AXA products, they're not investing just directly

23   in their funds, they're buying AXA annuity and insurance

24   products.  None of that in any way precludes the Board from at

05:06    25   any point saying that's fine, you know what, we are so unhappy

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1      with FMG it's time at least to go to bid.

2            But in the absence of some level of real discomfort

3      with the quality of the service, or a sense that -- you know,

4      we look at comparative fee data and they are so outside the

05:06    5      zone and they fail on so many other fronts, you know, that

6      clearly it would be our obligation to do it.  There's really

7      no basis for doing that, and there's really no practice in the

8      industry of doing that.  Fidelity boards don't go out and bid

9      the Fidelity funds to see if T.Rowe Price or PIMCO or somebody

05:07    10     else want to manage all of the PIMCO funds -- or all of the

11     Fidelity funds, sorry, in my example.  Any board will tell you

12     that if faced with real -- real lapses in quality, they're

13     going to threaten, and if need be they will do that.  But

14     that's going to be an extraordinary rare case.

05:07    15            THE COURT:  All right.  So, you know, I don't have

16     them all in front of me, but a lot of the documents that we

17     looked at over the last -- well, for me it seems like

18     forever --

19            THE WITNESS:  It's feeling that way for me.

05:07    20            THE COURT:  It may have been only been like six

21     weeks.  At any rate, a lot of them were for 2013 and 2014; so

22     was there a change in your practice before that time?  Because

23     the case goes back the 2010.  Or was the same methodology used

24     throughout the five-year period?

05:08    25            THE WITNESS:  Yeah, I think -- I'd make a couple of

*United States District Court*
*Trenton, New Jersey*

3668

Schpero - Direct - Benedict

1    points.  Certainly the basics have not changed, but I will

2    also tell you that I think we would be a bad board if every

3    year we didn't change some things.  So -- you know, so, for

4    example, I became the lead trustee in September/October of

05:08    5    2011; I had not been the lead trustee for 10 years.  I've

6    spent a lot of time in the industry, I had my own views and

7    thoughts on things.  If I thought they were really in

8    important, I got them in place.

9         So there were certain things over the years, like

05:08    10    the Gary chart, that happened 10 years ago or whenever it was.

11    But when I became the lead trustee I certainly did things

12    differently than Mr. Fox.  Similarly, our counsel passed away

13    in -- I guess it was 2010; Ms. Copenhefer joined the Board;

14    there's no question that Morgan Lewis brought ideas to us.

05:09    15    But even before that I could tell you that particularly

16    because I had been -- you know, I was the one member of the

17    Board who had lots of experience on the issues you were

18    mentioning, the kind of regulatory and compliance issues; I

19    would often meet with -- with the partner from Sullivan and

05:09    20    Worcester over the years, and there were many changes over the

21    years at their suggestion, again, reflecting industry

22    developments, reflecting best practices.

23         So I don't -- I don't think there's been any

24    arbitrary cutoff where suddenly the Board at some point became

05:09    25    more activist or things changed.  I do think every year we try

Schpero - Direct - Benedict

1    to do more and we try to get better, and lawsuit or no lawsuit

2    that's what a good board does.

3              THE COURT:  All right.  And it seemed odd to me,

4    but, you know, I'm not very familiar with the mutual fund

05:09   5    industry.  But generally, most industries would have some type

6    of program at some college or university where you would keep

7    industry statistics, and that would be kind of, you know,

8    here's the place where we find out about everything this

9    industry does, sales; does the mutual fund industry have

05:10   10   anything like that?

11             THE WITNESS:  Absolutely.

12             THE COURT:  They do?

13             THE WITNESS:  Yeah, the Investment Company Institute

14   is a phenomenal organization.

05:10   15             THE COURT:  But no one ever talks about that, they

16   talk about Lipper.  But if there was a source that was

17   academic as opposed to -- I don't know what the Board is, but

18   it seems like it's some kind of entrepreneurial enterprise;

19   does that make a difference to you?

05:10   20             THE WITNESS:  I mean I don't -- I don't make the

21   distinction -- I think it's important that we look to outside

22   consultants where it's our judgment that that could be

23   helpful.  And obviously you need to be thoughtful as to who

24   and how you do that.  I believe -- I mean I've worked with

05:11   25   Lipper for many years, and as I testified earlier this in

Schpero - Direct - Benedict

1   process I do believe they are the premiere provider of

2   analysis of fee type information, and that they are

3   extraordinarily independent.  I have seen any number of

4   investment managers try respectfully to convince Lipper to

05:11   5   present things differently, and they won't do it.

6       They are -- you know, they pride themselves -- the

7   only way they can be hired by as many funds and relied upon by

8   as many independent directors complexes as they are, is

9   because they know that that these kinds of suits are going to

05:11   10   arise and it's imperative that they be viewed as a truly

11   independent consultant that provides top service.  But I will

12   tell you the Investment Company Institute, I don't -- I

13   haven't been here for six weeks so I don't know what's come up

14   and what hasn't, but they're a major provider of information,

05:12   15   in particular of that kind of aggregate information certainly.

16       And this Independent Directors Council, which I

17   think has probably been around for five or six years at least,

18   is really I think a tremendous service to independent

19   directors and trustees, with constant flows of information.  I

05:12   20   attended a three-day conference they had in Chicago this past

21   fall, and with panels on every possible subject, and with the

22   leaders of the industry, and sometime with academics; and, you

23   know, I think -- I think there's a constant effort to make

24   sure that -- that independent trustees are fully aware of best

05:12   25   practices; they get to see what other independent trustees are

Schpero - Direct - Benedict

1    doing at other complexes, and I think that's a critical part

2    of allowing us to do what I think is a good job.

3                THE COURT:  But if you just take your profitability

4    reports that we looked at, I mean obviously I'm not an

05:13    5    accountant, but I know when people go through them I can kind

6    of follow what they're doing, but how is that is ever

7    disclosed to the investor?  You know, because if I understand

8    AXA's deal, it's usually being sold to teachers or fire

9    people, Mr. Santiago -- was that his --

05:13    10               MR. A. LAKIND:  Sanchez, your Honor.

11               THE COURT:  He was a police officer; right?  So it's

12   some normal regular folks.  And how would they ever know

13   whether or not -- you know, how would they know the

14   reasonableness of what is being offered to them?  And if you

05:13    15   have this lawsuit going by a couple of them, there might be a

16   lot of those investors out there that don't get it.  What do

17   you think about that?

18               THE WITNESS:  Yeah, that's a very good question.  I

19   think -- I think the real key point for an investor is what

05:14    20   his -- and this is where the SEC is so important in the

21   disclosure obligations that they have imposed, I mean what

22   you're talking about is what does the investor know; right?

23   And the SEC has mandated very rigorous disclosure in what used

24   to be documents that looked like this (indicating); and they

05:14    25   realize that nobody read that, so they require now very

Schpero - Direct - Benedict

1    summary short prospectuses, that within the first few pages

2    give all of the essential expense information.

3           And, you know, what is important to the investor --

4    yes, we see profitability, but that goes to the *Gartenberg*

05:14    5    factors and the analysis that we're required to make.  But

6    really the investor is interested in what their -- they're

7    paying; right?  FMG's fee is part of that, but their ultimate

8    question is what -- if I'm an investor, I certainly invest in

9    mutual funds, what am I -- what am I paying, what is my

05:15    10    expense ratio; am I paying 60 basis points, 70 basis points.

11    And I have the ability, if I don't -- if I don't like that, if

12    I don't think that the particular fund structure is attractive

13    enough to justify that, or the manager is good enough to

14    justify that, I can go elsewhere.  And that's the whole I

05:15    15    think purpose of the regulatory and disclosure regime that the

16    regulators have put in place.

17           I think what's relevant for me as an investor in a

18    fund, or anybody in this room is what -- you know, what is the

19    performance of that fund, and what is the expense ratio; and

05:15    20    what are the services provided.  And if I don't like it I can

21    go elsewhere.  I've got a thousand choices.  But that's what

22    the SEC has decided is really relevant to the investor.  And I

23    think that's -- I think that's fully disclosed, it's right up

24    on the first two pages of the document any investor receives.

05:15    25           THE COURT:  All right.  So with regard to fallout

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    benefits, I mean I understand the but-for test, but that's a

2    pretty -- there's a lot of discretion in that rule as to if

3    one and then but for this and then this occurs.  If you had

4    five people together, maybe five judges, we could disagree on

05:16    5    probably different items, you know.

6           But isn't there like a manual or something that

7    would say, this is a fallout benefit, this is a fallout

8    benefit, give you the rationale, and then you could decide if

9    that rationale applies to the expenses you have?  Is there any

05:16    10   place you would look either in from a governmental agency or

11   from an academic viewpoint to figure that out?  Or is it all

12   done by whatever your counsel thinks?

13          THE WITNESS:  Well, ultimately it's done by our

14   judgment; right?  It's done -- we had get lots of guidance and

05:17    15   we need to exercise judgment.  But I think you've identified

16   the reality -- part of the reality of this process, which is

17   there -- particularly in some of these areas, like fallout

18   benefits, or economies of scale, there isn't a lot of

19   guidance.  I mean I've read *Gartenberg*, I've read the other

05:17    20   cases, there's very little guidance on this.  And the SEC has

21   certainly imposed -- has made available almost no guidance on

22   these kinds of issues.  They relied on the courts.

23          And so I think at the end of the day the Board has

24   to exercise its judgment.  And I think what it comes down to

05:17    25   is the quality of our process, and the knowledge of the

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    directors, and trustees, and the guidance we receive from our

2    professionals.  And I think that's -- I think that's what the

3    courts have pointed to at the end of the day, is -- you know,

4    is the process a good one; is this a conscientious board; is

05:18    5    it an independent board; are they exercising reasonable

6    business judgment.  And I think that's what we work very hard

7    to do.

8                THE COURT:  So, the plaintiffs have -- I forget the

9    guy's name, he was from the Federal Reserve, that was his

05:18    10    prior experience, he was an economist; Dr. Kopne?

11                MR. MURPHY:  Kopcke.

12                THE COURT:  So, he said, well, I looked in at AXA,

13    from, you know, the moon, so it's this real huge shot, and he

14    was just looking down, and he kind of funneled in with his

05:18    15    laser beam as to these costs.  And he said that the

16    profitability of FMG was enormous, but he didn't know anything

17    about fallout benefits; and he didn't say that the allocations

18    were wrong, he just said it was enormous, and from an economic

19    standpoint you wouldn't have costs that high.  That was his

05:19    20    viewpoint.

21                And I mean he was someone that was on the Federal

22    Reserve; they look at banks, they look at insurance companies

23    all the time, so you would think he would have some knowledge

24    as what might go on in the industry, at least from that very

05:19    25    high perspective.  What do you think about that?

3675

Schpero - Direct - Benedict

1          THE WITNESS:  Well, I've read tried as hard as I

2     could to read all of the expert reports, and there are lots of

3     viewpoints expressed.  And I think that reflects the fact that

4     in many of these areas -- sorry; I don't mean to trivialize

05:19   5     it, but in many of these areas it is more art than science.

6     There are lots of options and approaches.

7          And I don't know what to do with that other than

8     what we do, which is we try to take into account all of this

9     information.  We try to -- each of us tries I think to weigh

05:20  10     everything and decide what's more important and what's less.

11     You know, it's why as I said earlier I think there's certain

12     markers that for me are very helpful.  You know, we talked

13     about the fact, what does the investor pay; the investor pays

14     the total expense ratio.

05:20  15          And so going back to the discussion I had earlier in

16     the day, you know, we can look at all of this comparative fee

17     information, but you can also have experts who may have

18     already testified about how the comparative fee information,

19     no matter how good Lipper is, has real limitations in it.

05:20  20     Well, there's one think that doesn't have -- doesn't have the

21     kind of limitations we're discussing, and that is, what's the

22     total expense ratio look like.  What's the bottom line number

23     of, you know, basis points or dollars out of $100 that an

24     investor is paying.  So, you know, there are certain things

05:20  25     that I think you can't help to weigh more heavily than others.

Schpero - Direct - Benedict

1          THE COURT:  So what I was thinking or what's been on

2     my mind is that Dr. Kopcke, he had a big picture of this, and

3     I was wondering if the Board, because it's enmeshed in all of

4     these reports that you get each month, are just looking at it

05:21     5     from a very small insulated position.  And so I was wondering

6     whether the Board had, or somebody was looking at it from that

7     big picture perspective.

8          THE WITNESS:  I like to think we are.  I mean

9     everybody, you know, has their own perspective I guess in the

05:21     10     end.  I think there's a reason why we get not just fund by

11     fund, but we make sure we do get all the aggregate information

12     that allows us to kind of step back and try to look at the

13     bigger picture.  Yes, we have to do a fund-by-fund analysis,

14     but as you've seen everything we get we also see it in the

05:22     15     aggregate, which allows us to step back.

16          And, you know, I think -- I think the critical

17     component here is -- is, you know, examining the actual

18     services that are provided; you know, and this is not a matter

19     of us just looking at a chart and saying oh, that must be what

05:22     20     they do.  I think it's important at each Board meeting we are

21     working with the people who actually are doing the service.

22     Yes, sometimes they present about what they do, but more often

23     they are presenting what they do.

24          And so, you know, in terms of being able to form a

05:22     25     judgment about -- and I said I think this is a very high

*United States District Court*
*Trenton, New Jersey*

Schpero - Direct - Benedict

1    quality operation -- and I'll acknowledge a high quality

2    operation, you know, in my mind it might be appropriate to

3    have a somewhat higher fee; I mean that's going to be part of

4    the analysis that's going to enter into my mind.  But how do I

05:23    5    decide it's a high quality operation.  Well, we see these

6    people at every meeting, and we see what they do and we see

7    the product of what they do.  I think those are the critical

8    components.

9         But you're right, I think it's always important to

05:23    10    step back.  I think we do that.  I think it's part of the role

11    of a director or trustee to keep that perspective.  You know,

12    getting lost in the weeds -- I think one of my problems

13    with -- with some of the suggestions in the expert reports was

14    a suggestion that the Board should be in the weeds, that

05:23    15    somehow, you know, you can eliminate FMG and the Board can do

16    everything; well, that's --

17         THE COURT:  I didn't hear that one.

18         THE WITNESS:  Well, it's in there, and that bears no

19    relationship to the reality.  The Board -- you know, the Board

05:23    20    should not be involved in day-to-day, it should be in a

21    position to do what you just said, which is to be at a high

22    level, looking at -- examining all of this and being able to

23    exercise a reasonable judgment.  And making sure that there's

24    a process in place that ensures that we don't get caught at

05:24    25    the level you just described.

3678

Schpero - Direct - Benedict

1          THE COURT:  Okay, thank you.

2          THE WITNESS:  Thank you.

3          THE COURT:  All right.

4          MR. BENEDICT:  Thank you, your Honor.

05:24   5          THE COURT:  We'll reconvene on Monday, 10:30.  See

6   you then.

7          (Counsel say thank you.)

8          (Proceedings concluded for the day.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Trenton, New Jersey*

**$**

**$100** [1] - 3675:23
**$148** [1] - 3654:23
**$15** [1] - 3622:23
**$150** [1] - 3650:12
**$500** [1] - 3631:10

**'**

**'12** [1] - 3562:6

**/**

**/S** [1] - 3514:24

**0**

**08608** [1] - 3514:15

**1**

**1** [3] - 3520:19, 3558:3, 3610:14
**10** [3] - 3568:14, 3668:5, 3668:10
**10:30** [1] - 3678:5
**11-4194** [1] - 3514:5
**110** [1] - 3631:11
**12** [17] - 3524:24, 3526:2, 3526:3, 3553:11, 3560:14, 3561:10, 3561:11, 3595:23, 3596:4, 3603:20, 3603:21, 3616:9, 3630:3, 3630:10, 3649:2, 3649:4, 3657:8
**12(b)(1** [4] - 3607:2, 3607:5, 3608:8, 3637:8
**1290** [2] - 3591:13, 3591:25
**13** [2] - 3527:21, 3619:4
**13-312** [1] - 3514:10
**1363** [2] - 3643:19, 3643:23
**1364** [1] - 3644:14
**1365** [1] - 3644:19
**1377** [1] - 3645:8
**138.10** [5] - 3516:12, 3555:10, 3557:1, 3559:17, 3559:21
**138.3** [5] - 3516:8, 3525:1, 3525:25,

3527:5, 3527:11
**138.9** [5] - 3516:12, 3552:22, 3553:1, 3559:16, 3559:21
**1382** [2] - 3645:13, 3645:14
**1383** [1] - 3645:20
**1384** [1] - 3645:21
**14** [4] - 3622:22, 3623:4, 3623:5, 3623:16
**142.10** [3] - 3536:13, 3540:11, 3541:10
**142.11** [6] - 3516:14, 3582:14, 3586:13, 3625:8, 3625:11, 3625:14
**142.2** [6] - 3516:9, 3530:23, 3533:2, 3533:20, 3533:21, 3538:20
**142.7** [5] - 3516:16, 3603:4, 3625:10, 3625:24, 3626:3
**143.7** [5] - 3516:11, 3532:23, 3534:23, 3536:5, 3536:9
**144.15** [4] - 3516:13, 3568:7, 3568:24, 3571:12
**144.16** [5] - 3516:17, 3627:24, 3629:11, 3629:15, 3648:4
**144.18** [5] - 3516:10, 3527:22, 3533:23, 3534:1, 3534:5
**144.19** [6] - 3516:15, 3598:25, 3599:2, 3625:8, 3625:16, 3625:21
**148** [1] - 3654:24
**15** [6] - 3530:5, 3532:22, 3534:24, 3610:16, 3610:20, 3617:3
**15(c** [17] - 3531:9, 3532:13, 3567:9, 3567:21, 3569:9, 3569:14, 3578:12, 3578:16, 3603:13, 3606:16, 3606:18, 3606:24, 3607:16, 3611:15, 3640:3, 3654:9
**153** [1] - 3549:13, 3549:17, 3610:15
**16** [1] - 3536:12
**1663** [1] - 3644:5
**17** [1] - 3650:10
**18** [8] - 3517:19,

3549:12, 3549:16, 3549:17, 3570:24, 3571:1, 3610:14, 3610:20
**1811** [2] - 3517:6, 3517:20
**1812** [3] - 3517:6, 3517:19, 3517:20
**184** [3] - 3648:6, 3648:13, 3649:17
**185** [3] - 3648:7, 3648:13, 3650:12
**19** [5] - 3514:13, 3521:15, 3552:21, 3552:23, 3552:24
**1:00** [1] - 3568:14

**2**

**2** [2] - 3520:25, 3567:23
**20** [8] - 3516:7, 3521:15, 3524:4, 3536:21, 3544:20, 3555:9, 3651:7, 3653:8
**2000** [6] - 3534:11, 3605:24, 3611:20, 3616:8, 3618:12
**2002** [1] - 3523:19
**2007** [1] - 3648:25
**2008** [4] - 3544:1, 3544:12, 3561:19, 3650:19
**2008/2009** [2] - 3543:19, 3543:23
**2009** [3] - 3544:12, 3561:17, 3561:19
**2010** [7] - 3544:5, 3545:6, 3545:18, 3547:5, 3558:23, 3667:23, 3668:13
**2011** [6] - 3537:22, 3538:1, 3558:25, 3622:1, 3655:4, 3668:5
**2012** [5] - 3523:19, 3558:25, 3622:1, 3648:25, 3654:21
**2013** [9] - 3520:10, 3526:6, 3536:21, 3547:5, 3549:23, 3558:15, 3586:19, 3603:12, 3667:21
**2014** [3] - 3520:17, 3521:10, 3591:12, 3591:22, 3591:23, 3643:13, 3667:21
**2015** [3] - 3591:11,

3613:3, 3614:22
**2016** [1] - 3514:13
**21** [1] - 3514:20
**22** [6] - 3530:6, 3568:3, 3568:7, 3568:23, 3569:1, 3658:5
**24** [3] - 3582:13, 3586:12, 3655:6
**26** [1] - 3533:13
**27** [3] - 3598:23, 3599:1, 3599:2
**28** [2] - 3514:23, 3603:3
**29** [2] - 3627:24, 3648:1

**3**

**30** [4] - 3521:10, 3551:19, 3643:6, 3653:24
**30(b)(6** [2] - 3518:6, 3519:13
**3524** [3] - 3516:2, 3516:2, 3516:6
**3527** [1] - 3516:8
**3533** [1] - 3516:9
**3534** [1] - 3516:10
**3536** [1] - 3516:11
**3559** [1] - 3516:12
**3571** [1] - 3516:13
**36(b** [1] - 3526:12
**3625** [2] - 3516:14, 3516:15
**3626** [1] - 3516:16
**3629** [1] - 3516:17
**3647** [1] - 3516:18
**373** [3] - 3546:19, 3560:17, 3561:8
**389.2** [5] - 3516:6, 3523:17, 3523:20, 3523:23, 3524:3
**398.2** [2] - 3516:7, 3524:4
**3:00** [1] - 3625:1

**4**

**4** [3] - 3538:19, 3549:14, 3549:18
**40** [1] - 3632:6
**402** [1] - 3514:14
**409** [1] - 3532:9
**430** [1] - 3599:3
**431** [1] - 3600:16
**44** [1] - 3654:18
**444** [1] - 3599:3

**45** [2] - 3632:4, 3654:22
**457.1** [4] - 3516:18, 3643:7, 3647:3, 3647:8
**4808** [1] - 3549:15

**5**

**5** [1] - 3554:1
**50** [3] - 3596:15, 3632:1, 3653:7
**5th** [1] - 3520:17

**6**

**60** [3] - 3544:19, 3651:7, 3672:10
**62** [3] - 3649:25, 3654:17, 3654:21

**7**

**7** [2] - 3557:4, 3557:6
**70** [6] - 3544:19, 3651:7, 3652:24, 3653:5, 3653:6, 3672:10
**727** [1] - 3648:13
**728** [1] - 3648:14
**75** [1] - 3562:6
**753** [1] - 3514:23
**7862** [2] - 3643:20, 3644:6

**8**

**80** [5] - 3540:4, 3562:6, 3596:16, 3631:13, 3645:5
**83** [1] - 3645:21
**856** [1] - 3514:25
**889-4761** [1] - 3514:25

**9**

**90** [2] - 3596:16, 3631:13

**A**

**Abbett** [3] - 3557:3, 3558:9, 3559:9
**ABC** [1] - 3610:21
**ability** [2] - 3579:19, 3672:11

**able** [21] - 3517:23, 3537:20, 3558:12, 3562:3, 3562:9, 3575:25, 3577:4, 3584:21, 3592:18, 3595:15, 3595:18, 3604:17, 3604:22, 3615:2, 3636:3, 3646:12, 3656:13, 3659:8, 3676:24, 3677:22

**absence** [1] - 3667:2

**Absolutely** [2] - 3620:2, 3669:11

**absolutely** [2] - 3554:17, 3619:11

**academic** [2] - 3669:17, 3673:11

**academics** [1] - 3670:22

**accept** [1] - 3584:23

**access** [2] - 3602:17, 3605:7

**accordance** [1] - 3608:6

**account** [20] - 3549:5, 3562:20, 3583:13, 3600:8, 3606:15, 3607:8, 3627:1, 3627:10, 3627:16, 3633:8, 3638:25, 3639:7, 3639:10, 3640:1, 3640:6, 3649:19, 3649:22, 3649:23, 3656:24, 3675:8

**accountant** [1] - 3671:5

**accountants** [5] - 3612:13, 3614:8, 3617:1, 3617:11, 3659:15

**accounting** [11] - 3581:23, 3596:18, 3598:14, 3598:15, 3605:23, 3612:12, 3614:1, 3615:11, 3615:17, 3618:8, 3620:15

**accuracy** [1] - 3646:6

**accurately** [6] - 3543:9, 3587:7, 3591:1, 3591:6, 3641:23, 3646:16

**achieve** [1] - 3577:3

**achieved** [6] - 3584:1, 3626:14, 3626:15, 3648:24, 3649:5

**acknowledge** [2] - 3593:2, 3677:1

**Act** [1] - 3563:2

**acting** [1] - 3656:13

**action** [2] - 3554:3, 3590:8

**actions** [7] - 3559:24, 3560:2, 3560:15, 3561:13, 3641:23, 3654:16, 3654:18

**active** [11] - 3543:25, 3544:11, 3544:16, 3544:21, 3561:20, 3565:7, 3585:9, 3585:11, 3651:5, 3651:7, 3652:22

**activist** [3] - 3661:11, 3668:25

**actual** [16] - 3535:4, 3535:7, 3542:13, 3553:10, 3566:23, 3570:23, 3573:1, 3602:24, 3627:9, 3627:11, 3631:10, 3643:22, 3649:15, 3650:6, 3651:23, 3676:17

**added** [5] - 3545:23, 3556:1, 3627:20, 3630:25, 3635:15

**addition** [7] - 3524:18, 3539:13, 3539:20, 3542:1, 3553:9, 3558:3, 3561:23

**additional** [14] - 3527:15, 3529:2, 3541:11, 3545:23, 3598:13, 3601:13, 3601:14, 3601:17, 3619:21, 3619:23, 3629:6, 3632:5, 3652:4, 3659:9

**additions** [2] - 3558:1, 3634:25

**address** [3] - 3559:24, 3560:15, 3664:12

**addressed** [2] - 3617:4, 3664:11

**addresses** [1] - 3558:7

**addressing** [1] - 3617:19

**adequately** [1] - 3659:17

**administration** [12] - 3587:2, 3587:16, 3588:3, 3589:10, 3589:23, 3589:24, 3590:4, 3590:9, 3591:24, 3591:25, 3605:13, 3637:2

**Administration** [6] -

3589:25, 3590:25, 3592:3, 3593:19, 3646:19, 3647:12

**administrative** [37] - 3545:24, 3563:3, 3581:13, 3581:15, 3581:19, 3582:11, 3587:6, 3588:11, 3589:7, 3593:16, 3594:4, 3594:17, 3595:1, 3596:18, 3597:12, 3597:14, 3597:15, 3597:23, 3598:1, 3598:4, 3598:7, 3598:9, 3598:11, 3598:16, 3599:9, 3599:14, 3599:16, 3600:11, 3601:1, 3606:9, 3621:11, 3622:6, 3626:22, 3631:2, 3631:8, 3635:17, 3637:7

**Administrative** [1] - 3593:13

**administrator** [21] - 3531:20, 3586:20, 3586:22, 3587:8, 3587:9, 3588:19, 3588:20, 3589:10, 3591:20, 3591:21, 3592:2, 3592:23, 3593:4, 3593:6, 3594:5, 3594:7, 3594:9, 3594:11, 3600:21, 3602:23, 3656:22

**administrators** [1] - 3656:23

**admissible** [1] - 3541:1

**admission** [1] - 3518:1

**admit** [2] - 3519:11, 3541:14

**Admitted** [2] - 3534:4, 3625:13

**admitted** [12] - 3517:22, 3522:18, 3523:18, 3527:10, 3533:20, 3536:8, 3559:20, 3571:11, 3625:20, 3626:2, 3629:14, 3647:7

**admitting** [2] - 3517:19, 3533:6

**ADV** [2] - 3531:25, 3569:16

**advance** [5] - 3526:7, 3553:12, 3554:25,

3555:17, 3555:18

**adversarial** [2] - 3663:3, 3663:5

**advice** [2] - 3520:22, 3639:15

**advisor** [38] - 3528:4, 3528:21, 3536:24, 3537:11, 3546:12, 3546:13, 3554:2, 3559:8, 3560:5, 3563:17, 3567:12, 3567:13, 3570:13, 3572:11, 3573:3, 3573:4, 3573:18, 3578:25, 3579:8, 3579:10, 3579:18, 3582:20, 3585:15, 3594:5, 3602:23, 3608:25, 3609:2, 3609:8, 3609:12, 3633:23, 3633:24, 3637:10, 3647:1, 3651:24, 3653:16, 3653:21, 3654:1, 3656:23

**advisors** [59] - 3535:17, 3535:18, 3538:14, 3539:3, 3539:4, 3539:5, 3539:7, 3539:11, 3539:14, 3539:15, 3539:16, 3539:18, 3542:2, 3542:9, 3542:14, 3543:10, 3546:15, 3552:7, 3552:13, 3563:16, 3563:23, 3564:5, 3565:6, 3566:9, 3566:11, 3566:17, 3567:3, 3567:7, 3567:17, 3569:14, 3570:10, 3570:23, 3571:3, 3571:6, 3571:16, 3571:25, 3572:21, 3572:23, 3572:25, 3573:15, 3573:21, 3575:4, 3575:10, 3578:6, 3578:8, 3578:22, 3579:12, 3582:10, 3584:22, 3587:15, 3597:3, 3608:23, 3609:3, 3609:18, 3644:18, 3650:24, 3651:17, 3651:19, 3666:21

**advisors'** [1] - 3579:4

**advisory** [23] - 3532:2, 3544:17, 3563:3, 3564:7, 3564:8,

3564:16, 3564:18, 3564:22, 3567:2, 3569:10, 3570:2, 3570:7, 3572:17, 3584:15, 3587:25, 3588:7, 3605:13, 3606:3, 3633:14, 3633:21, 3646:23, 3646:24, 3652:24

**advocacy** [1] - 3661:14

**affecting** [1] - 3566:13

**affiliate** [1] - 3590:5

**affiliated** [4] - 3602:23, 3608:25, 3609:3, 3637:11

**affiliates** [3] - 3570:21, 3636:18, 3637:12

**afternoon** [2] - 3532:8, 3625:3

**afterwards** [1] - 3590:19

**agency** [1] - 3673:10

**agent** [1] - 3549:3

**aggregate** [14] - 3528:2, 3529:10, 3551:6, 3551:8, 3584:6, 3599:16, 3603:17, 3648:25, 3649:5, 3649:15, 3650:8, 3670:15, 3676:11, 3676:15

**aggregating** [1] - 3652:8

**aggressive** [1] - 3620:4

**ago** [8] - 3521:9, 3522:2, 3528:13, 3537:6, 3557:10, 3599:13, 3662:24, 3668:10

**agree** [12] - 3520:19, 3521:1, 3554:20, 3559:4, 3571:17, 3572:11, 3575:19, 3589:11, 3624:9, 3635:23, 3655:15, 3660:21

**agreed** [5] - 3520:18, 3521:18, 3521:23, 3532:4, 3580:25

**Agreement** [14] - 3563:17, 3573:14, 3573:16, 3575:5, 3589:25, 3590:25, 3592:3, 3593:13, 3593:19, 3621:21, 3623:7, 3623:22, 3646:20, 3647:12

3564:16, 3564:18, 3564:22, 3567:2, 3569:10, 3570:2, 3570:7, 3572:17, 3584:15, 3587:25, 3588:7, 3606:3, 3633:14, 3633:21, 3646:24, 3652:24

agreement [11] - 3517:16, 3563:22, 3590:12, 3602:3, 3621:23, 3621:24, 3622:25, 3623:17, 3640:9, 3640:12, 3642:2

agreements [5] - 3544:17, 3572:18, 3629:21, 3646:23, 3646:24

ahead [3] - 3551:14, 3558:23, 3615:23

aid [1] - 3627:6

al [3] - 3514:3, 3514:6, 3514:8

albeit [1] - 3580:5

alert [1] - 3554:11

alerted [1] - 3590:21

alerting [1] - 3540:19

all-year [1] - 3657:5

allegations [9] - 3537:18, 3538:6, 3538:8, 3587:24, 3588:2, 3655:12, 3655:15, 3655:18, 3656:20

Alliance [3] - 3609:1, 3637:10, 3637:12

allocated [10] - 3610:1, 3611:3, 3616:16, 3617:22, 3617:23, 3620:9, 3620:12, 3620:21, 3621:6, 3621:11

allocation [7] - 3550:13, 3611:17, 3612:25, 3615:2, 3616:11, 3621:17, 3621:19

allocations [1] - 3674:17

allow [3] - 3563:18, 3620:18, 3629:20

allowed [3] - 3608:10, 3656:9, 3656:12

allowing [3] - 3602:12, 3602:19, 3671:2

allows [4] - 3536:3, 3556:19, 3676:12, 3676:15

almost [5] - 3530:6, 3641:7, 3642:16, 3650:12, 3673:21

ALSO [1] - 3515:16

alternative [4] - 3575:9, 3575:18, 3575:23, 3639:4

alternatives [1] - 3576:15

ambiguity [1] - 3589:14

ambiguous [1] - 3572:7

amended [2] - 3592:1, 3592:4

amendment [2] - 3587:16, 3590:18

amount [15] - 3528:11, 3529:15, 3573:19, 3573:22, 3574:1, 3574:10, 3575:3, 3580:23, 3593:15, 3623:15, 3632:5, 3636:2, 3639:25, 3652:3

amounts [2] - 3542:12, 3656:11

analyses [1] - 3551:25

analysis [24] - 3551:22, 3551:24, 3565:5, 3574:18, 3580:12, 3582:7, 3582:10, 3584:14, 3586:2, 3597:22, 3599:16, 3599:23, 3604:20, 3606:16, 3610:11, 3644:15, 3645:15, 3645:18, 3645:22, 3647:15, 3670:2, 3672:5, 3676:13, 3677:4

analytics [1] - 3539:7

analyze [2] - 3574:8, 3661:4

analyzed [1] - 3580:15

analyzing [4] - 3526:17, 3535:24, 3606:15

ANN [1] - 3514:3

annexed [1] - 3538:19

announcement [1] - 3556:9

annoying [1] - 3534:18

annual [6] - 3569:14, 3606:25, 3635:11, 3643:1, 3643:12, 3646:7

annually [1] - 3603:12

annuities [1] - 3637:24

annuity [3] - 3638:3, 3639:25, 3666:23

answer [13] - 3541:13, 3550:4, 3560:8, 3575:14, 3595:23, 3597:17, 3603:15, 3604:12, 3614:15, 3616:19, 3630:16,

3639:19, 3639:20

answer's [1] - 3587:12

answered [2] - 3575:7, 3662:18

answering [1] - 3584:17

answers [1] - 3615:8

anyway [2] - 3533:6, 3659:11

apart [2] - 3528:20, 3639:7

appeared [1] - 3518:6

appendices [1] - 3526:16

apples [4] - 3583:22, 3598:20, 3598:21

apples-to-apples [1] - 3583:22

applicable [1] - 3545:22

applications [2] - 3517:1, 3523:7

applied [1] - 3656:5

applies [1] - 3673:9

apply [2] - 3646:3, 3654:3

appreciate [1] - 3553:8

approach [1] - 3604:5

approaches [6] - 3588:16, 3616:25, 3617:13, 3629:2, 3664:15, 3675:6

appropriate [24] - 3522:5, 3530:3, 3530:7, 3530:14, 3538:5, 3538:8, 3541:23, 3542:7, 3566:9, 3566:12, 3567:15, 3570:19, 3574:7, 3574:21, 3587:22, 3613:12, 3621:5, 3632:8, 3633:13, 3635:23, 3640:25, 3647:18, 3664:15, 3677:2

appropriately [3] - 3591:20, 3592:1, 3621:6

approval [3] - 3590:7, 3618:19, 3622:5

approvals [2] - 3641:5, 3654:7

approve [21] - 3529:19, 3572:17, 3572:20, 3575:4, 3589:24, 3589:25, 3592:24, 3593:19, 3593:23, 3594:12, 3594:14, 3608:7,

3629:21, 3631:6, 3634:1, 3640:9, 3640:12, 3646:5, 3646:19, 3647:11

approved [4] - 3543:20, 3547:18, 3640:14, 3649:21

approves [2] - 3593:12, 3606:25

approving [4] - 3626:21, 3635:10, 3642:1, 3643:2

arbitrary [1] - 3668:24

area [4] - 3530:6, 3605:6, 3613:24, 3656:3

areas [11] - 3530:10, 3530:11, 3554:11, 3566:23, 3617:7, 3618:23, 3629:5, 3661:22, 3673:17, 3675:4, 3675:5

arena [2] - 3526:12, 3581:23

argue [4] - 3579:21, 3584:25, 3585:11, 3641:6

argument [1] - 3580:24

arise [2] - 3540:4, 3670:10

arithmetic [1] - 3624:15

arm's [5] - 3580:6, 3609:7, 3661:25, 3663:1, 3664:6

arm's-length [3] - 3609:7, 3661:25, 3663:1

ARNOLD [1] - 3515:4

Arpert [1] - 3520:17

arrangement [4] - 3622:12, 3622:20, 3622:21, 3633:21

arrangements [13] - 3532:3, 3542:9, 3545:19, 3562:8, 3562:11, 3587:17, 3587:25, 3591:19, 3595:13, 3607:1, 3637:9, 3641:2

art [3] - 3613:24, 3617:13, 3675:5

aside [3] - 3547:23, 3616:1, 3655:3

aspect [1] - 3565:3

aspects [4] - 3583:9, 3583:13, 3589:22, 3628:7

asserted [6] -

3571:15, 3572:8, 3575:8, 3575:17, 3589:9, 3624:7

assess [1] - 3635:21

assessing [1] - 3594:25

assessment [1] - 3657:2

asset [13] - 3529:15, 3577:3, 3588:21, 3588:22, 3627:11, 3631:9, 3631:16, 3631:21, 3631:23, 3632:14, 3632:23, 3633:6, 3634:8

assets [12] - 3549:4, 3576:6, 3578:10, 3579:14, 3579:17, 3626:11, 3626:12, 3628:19, 3632:1, 3632:3, 3632:10, 3633:1

ASSOCIATE [1] - 3515:16

associated [2] - 3540:8, 3607:5

assume [3] - 3631:7, 3643:25, 3652:23

assumed [1] - 3576:16

assumes [1] - 3576:20

assumption [2] - 3580:9, 3580:17, 3626:12

at-issue [14] - 3543:22, 3545:22, 3547:6, 3560:14, 3560:17, 3561:10, 3561:11, 3561:14, 3565:8, 3600:10, 3630:10, 3630:15, 3630:16, 3631:24

attach [2] - 3569:15

attaches [2] - 3525:16, 3567:14

attempting [1] - 3666:20

attend [1] - 3619:16

attended [1] - 3670:20

attention [11] - 3549:12, 3552:21, 3559:12, 3568:2, 3596:4, 3627:23, 3643:6, 3645:8, 3648:1, 3648:6, 3666:12

attentive [1] - 3537:16

attorney [1] - 3573:7

attorney/client [1] - 3520:10

attractive [3] - 3565:2,

3566:6, 3672:12
**audit** [2] - 3617:11,
3618:25
**audited** [1] - 3618:6
**auditors** [1] - 3617:8
**audits** [2] - 3617:9,
3658:12
**available** [11] -
3528:6, 3553:19,
3578:10, 3601:20,
3605:5, 3605:10,
3613:25, 3637:23,
3638:17, 3639:7,
3673:21
**aware** [18] - 3538:17,
3563:8, 3574:9,
3590:9, 3607:14,
3620:8, 3624:16,
3624:22, 3638:25,
3640:4, 3655:2,
3655:3, 3656:19,
3656:20, 3656:22,
3656:23, 3662:25,
3670:24
**AXA** [56] - 3514:6,
3514:10, 3515:17,
3547:21, 3548:1,
3548:6, 3548:22,
3548:24, 3549:2,
3549:9, 3549:11,
3549:24, 3550:11,
3550:13, 3576:7,
3576:9, 3577:4,
3578:9, 3579:20,
3581:6, 3610:2,
3611:3, 3616:16,
3617:8, 3617:24,
3618:1, 3618:16,
3620:9, 3621:1,
3622:3, 3622:12,
3622:24, 3623:1,
3623:7, 3623:18,
3623:21, 3624:14,
3624:19, 3637:14,
3637:20, 3637:22,
3638:17, 3638:22,
3639:7, 3639:24,
3639:25, 3640:5,
3653:11, 3662:1,
3663:22, 3666:19,
3666:22, 3666:23,
3674:12
**AXA's** [5] - 3564:1,
3576:9, 3618:15,
3640:2, 3671:8

---

**B**

---

**background** [3] -
3658:24, 3660:14,

3660:24
**backgrounds** [2] -
3530:10, 3615:18
**backwards** [1] -
3648:2, 3648:3
**bad** [3] - 3558:25,
3662:6, 3668:2
**bankers** [3] - 3659:13,
3659:14, 3659:15
**banks** [1] - 3674:22
**bar** [1] - 3607:23
**Barbash** [2] - 3658:16,
3658:17
**Barry** [2] - 3658:16
**based** [9] - 3553:14,
3574:17, 3605:4,
3636:7, 3638:7,
3638:9, 3640:17,
3647:19, 3666:7
**basic** [1] - 3532:5
**basics** [1] - 3668:1
**basis** [36] - 3518:15,
3518:25, 3540:3,
3549:5, 3562:6,
3572:2, 3572:4,
3582:2, 3596:14,
3596:15, 3596:16,
3603:19, 3608:4,
3609:8, 3631:11,
3631:13, 3632:1,
3632:4, 3632:6,
3645:5, 3649:25,
3650:11, 3652:24,
3653:7, 3653:8,
3653:24, 3654:17,
3654:19, 3654:21,
3654:22, 3665:7,
3667:7, 3672:10,
3675:23
**bat** [1] - 3642:22
**Bate** [1] - 3549:15
**Bates** [6] - 3643:19,
3643:20, 3644:5,
3648:11, 3648:13
**bathroom** [1] - 3568:8
**batting** [1] - 3642:20
**beam** [1] - 3674:15
**Bear** [1] - 3564:21
**bear** [4] - 3580:20,
3580:23, 3608:12,
3608:13
**bearing** [6] - 3585:20,
3586:4, 3596:20,
3597:1, 3598:21,
3608:3
**bears** [2] - 3596:17,
3677:18
**beaten** [1] - 3558:22
**became** [7] - 3622:24,
3655:3, 3658:19,

3664:2, 3668:4,
3668:11, 3668:24
**become** [2] - 3538:1,
3655:2
**bed** [1] - 3662:10
**began** [1] - 3544:1
**begin** [4] - 3521:22,
3525:3, 3643:19,
3666:14
**beginning** [2] -
3531:19, 3533:7
**begins** [3] - 3643:22,
3644:20, 3645:14
**behalf** [12] - 3518:6,
3534:12, 3566:3,
3567:4, 3574:5,
3576:8, 3589:7,
3623:8, 3626:14,
3626:15, 3649:5
**behind** [1] - 3568:6
**below** [1] - 3607:17
**benchmark** [1] -
3558:22
**benchmarks** [3] -
3551:16, 3644:23
**BENEDICT** [101] -
3515:13, 3516:3,
3518:5, 3519:6,
3519:21, 3520:5,
3520:8, 3522:8,
3522:11, 3522:13,
3523:3, 3523:13,
3524:6, 3524:12,
3524:15, 3524:25,
3525:7, 3525:14,
3525:24, 3527:4,
3527:13, 3530:22,
3533:1, 3533:8,
3533:11, 3533:25,
3534:8, 3534:21,
3536:5, 3536:11,
3538:18, 3541:9,
3544:8, 3545:8,
3546:23, 3547:11,
3555:6, 3555:8,
3559:14, 3559:16,
3559:23, 3560:12,
3560:13, 3561:7,
3561:9, 3568:6,
3568:13, 3568:21,
3568:22, 3571:8,
3571:14, 3573:11,
3573:13, 3575:16,
3581:9, 3581:11,
3586:9, 3586:11,
3592:9, 3592:10,
3594:2, 3594:20,
3594:22, 3595:25,
3596:3, 3601:23,
3601:25, 3604:16,

3608:15, 3608:17,
3612:9, 3614:25,
3617:21, 3619:2,
3620:20, 3625:6,
3625:10, 3625:17,
3625:24, 3626:5,
3629:11, 3629:17,
3630:8, 3630:9,
3639:23, 3642:16,
3642:20, 3642:23,
3642:24, 3647:3,
3647:10, 3648:10,
3648:13, 3648:17,
3649:3, 3649:8,
3649:11, 3654:12,
3654:14, 3657:10,
3678:4
**Benedict** [12] -
3517:6, 3517:8,
3518:3, 3519:5,
3520:1, 3523:11,
3523:17, 3524:5,
3560:11, 3568:20,
3625:5, 3648:12
**Benedict's** [1] -
3545:14
**beneficial** [2] -
3546:5, 3566:14
**benefit** [12] - 3530:2,
3548:15, 3548:17,
3548:18, 3564:4,
3572:16, 3588:16,
3595:17, 3598:19,
3650:12, 3673:7,
3673:8
**benefited** [1] - 3653:9
**benefits** [20] -
3564:20, 3564:23,
3635:22, 3636:10,
3636:11, 3636:15,
3636:17, 3636:21,
3636:24, 3637:1,
3637:9, 3637:10,
3637:13, 3637:15,
3638:3, 3639:10,
3645:22, 3673:1,
3673:18, 3674:17
**BENJAMIN** [1] -
3515:14
**Bernstein** [1] -
3637:10
**best** [17] - 3543:8,
3583:22, 3587:7,
3600:6, 3604:5,
3618:22, 3640:16,
3641:2, 3655:25,
3656:3, 3656:7,
3656:15, 3664:15,
3665:13, 3666:20,
3668:22, 3670:24

**better** [3] - 3528:6,
3603:6, 3669:1
**between** [17] - 3520:9,
3520:13, 3521:2,
3563:17, 3564:12,
3575:2, 3580:4,
3580:10, 3590:1,
3590:25, 3622:12,
3633:24, 3640:9,
3646:20, 3647:12,
3654:21, 3664:5
**beyond** [2] - 3545:10,
3608:9
**bid** [4] - 3665:19,
3666:15, 3667:1,
3667:8
**big** [6] - 3542:6,
3586:2, 3653:2,
3666:5, 3676:2,
3676:7
**bigger** [3] - 3617:18,
3651:2, 3676:13
**billion** [5] - 3632:2,
3632:3, 3632:6
**binder** [11] - 3518:11,
3549:12, 3552:21,
3555:9, 3568:24,
3569:1, 3582:14,
3598:24, 3603:4,
3627:24, 3643:6
**Bingham** [2] -
3519:24, 3520:2
**bit** [3] - 3519:25,
3543:12, 3649:10
**black** [3] - 3649:18,
3649:25, 3650:6
**BLADER** [1] - 3515:3
**blame** [1] - 3663:6
**BLANK** [1] - 3515:9
**bless** [1] - 3665:3
**blessed** [1] - 3618:8
**blown** [1] - 3603:6
**blue** [3] - 3649:24,
3652:20, 3653:12
**BLUMSTEIN** [1] -
3515:3
**blurred** [1] - 3517:11
**board** [13] - 3539:9,
3540:19, 3565:18,
3565:22, 3608:19,
3631:5, 3631:6,
3659:2, 3667:11,
3668:2, 3669:2,
3674:4, 3674:5
**Board** [246] - 3517:23,
3517:25, 3518:10,
3518:16, 3518:21,
3519:4, 3519:9,
3519:10, 3519:16,
3519:25, 3521:14,

3521:20, 3526:7, 3526:15, 3526:24, 3526:25, 3527:6, 3527:14, 3528:9, 3529:4, 3529:11, 3529:14, 3530:5, 3532:4, 3533:3, 3534:11, 3534:12, 3536:20, 3536:21, 3537:7, 3537:15, 3538:2, 3539:5, 3539:9, 3539:13, 3539:19, 3539:22, 3539:25, 3540:17, 3540:19, 3540:20, 3541:17, 3541:19, 3541:20, 3542:3, 3542:12, 3543:20, 3546:3, 3546:9, 3546:14, 3547:18, 3549:23, 3550:2, 3550:9, 3550:16, 3550:20, 3550:25, 3551:3, 3551:4, 3551:14, 3552:9, 3553:12, 3553:14, 3555:1, 3555:17, 3555:18, 3555:24, 3556:2, 3556:4, 3556:23, 3559:24, 3561:13, 3562:14, 3562:22, 3564:9, 3565:25, 3567:2, 3567:3, 3567:8, 3567:20, 3569:9, 3570:10, 3570:14, 3570:15, 3570:18, 3571:9, 3572:8, 3572:17, 3574:20, 3574:23, 3575:8, 3575:17, 3576:13, 3579:19, 3580:1, 3580:4, 3580:15, 3582:4, 3582:9, 3586:18, 3586:19, 3587:19, 3588:13, 3589:24, 3589:25, 3590:6, 3590:9, 3590:24, 3591:17, 3592:11, 3592:12, 3592:15, 3592:21, 3593:5, 3593:8, 3593:11, 3594:12, 3595:15, 3599:8, 3603:13, 3605:15, 3605:21, 3606:3, 3606:13, 3606:17, 3607:12, 3608:7, 3608:22, 3609:2, 3610:2, 3611:2, 3611:14, 3611:19,

3611:21, 3611:23, 3612:16, 3612:24, 3613:15, 3613:16, 3613:18, 3614:7, 3615:1, 3615:11, 3615:14, 3615:19, 3616:7, 3617:1, 3617:3, 3618:19, 3619:4, 3619:15, 3619:16, 3620:1, 3620:6, 3621:10, 3622:17, 3623:24, 3624:1, 3624:4, 3624:7, 3627:2, 3628:4, 3628:6, 3629:2, 3630:21, 3631:12, 3631:15, 3632:17, 3633:10, 3635:6, 3635:10, 3635:20, 3635:24, 3636:23, 3637:4, 3639:24, 3641:9, 3641:11, 3641:24, 3642:1, 3643:2, 3643:17, 3644:8, 3644:15, 3644:21, 3645:5, 3645:15, 3646:5, 3648:21, 3649:5, 3649:21, 3650:22, 3654:8, 3654:10, 3654:16, 3655:4, 3655:20, 3655:22, 3656:8, 3656:16, 3656:19, 3657:7, 3657:19, 3657:20, 3658:4, 3659:20, 3659:21, 3659:22, 3660:11, 3660:20, 3661:15, 3661:17, 3662:3, 3662:7, 3662:13, 3662:19, 3663:6, 3663:11, 3663:23, 3664:4, 3664:6, 3664:7, 3664:19, 3665:2, 3665:3, 3666:5, 3666:24, 3668:13, 3668:17, 3668:24, 3669:17, 3673:23, 3676:3, 3676:6, 3676:20, 3677:14, 3677:15, 3677:19

**Board's** [15] - 3517:22, 3550:17, 3552:2, 3553:23, 3562:25, 3563:6, 3583:8, 3591:18, 3598:16, 3599:17, 3634:6, 3644:13, 3645:18, 3646:15,

3646:16
**boards** [2] - 3661:13, 3667:8
**Boch** [2] - 3521:17, 3521:21
**Book** [1] - 3567:23
**book** [7] - 3531:7, 3532:24, 3550:21, 3567:25, 3568:3, 3610:13, 3636:12
**booklet** [6] - 3524:24, 3527:21, 3532:21, 3532:22, 3535:15, 3536:13
**books** [3] - 3525:4, 3588:25, 3646:3
**borne** [7] - 3579:5, 3580:17, 3580:18, 3618:3, 3622:23, 3623:16, 3623:21
**bottom** [5] - 3558:4, 3593:6, 3607:7, 3650:6, 3675:22
**brand** [1] - 3591:15
**breadth** [1] - 3564:3
**break** [11] - 3552:5, 3552:6, 3568:8, 3568:10, 3568:11, 3599:15, 3601:2, 3624:24, 3624:25
**breakpoint** [5] - 3631:1, 3631:19, 3631:22, 3632:2, 3633:13
**breakpoints** [24] - 3545:23, 3546:1, 3584:2, 3627:8, 3627:10, 3627:13, 3628:17, 3628:20, 3630:14, 3630:17, 3630:25, 3631:19, 3632:16, 3632:18, 3632:22, 3633:4, 3633:14, 3633:16, 3634:3, 3635:18, 3635:23, 3649:22, 3650:9
**breaks** [1] - 3529:9
**briefly** [3] - 3540:14, 3543:18, 3567:1
**bring** [8] - 3530:10, 3613:16, 3617:10, 3658:14, 3658:24, 3659:8, 3661:21, 3666:20
**bringing** [1] - 3616:25
**brings** [1] - 3656:17
**broadly** [1] - 3561:12
**broken** [4] - 3540:5, 3598:4, 3598:8,

3644:24
**brokerage** [2] - 3542:10, 3583:17
**brokers** [1] - 3637:12
**brought** [7] - 3519:13, 3537:24, 3580:8, 3580:15, 3618:12, 3661:9, 3668:14
**budgetary** [1] - 3581:23
**built** [1] - 3651:24
**business** [11] - 3574:19, 3574:25, 3584:18, 3602:11, 3613:22, 3629:20, 3636:4, 3640:18, 3656:9, 3657:1, 3674:6
**but-for** [6] - 3636:20, 3638:8, 3638:12, 3638:20, 3639:14, 3673:1
**buy** [1] - 3638:20
**buyer** [1] - 3661:6
**buying** [2] - 3666:22, 3666:23
**BY** [42] - 3515:4, 3515:9, 3515:12, 3516:2, 3524:14, 3525:24, 3527:13, 3534:8, 3534:21, 3536:11, 3541:9, 3544:8, 3555:8, 3559:23, 3560:13, 3561:9, 3568:22, 3571:14, 3573:13, 3575:16, 3581:11, 3586:11, 3592:10, 3594:22, 3596:3, 3601:25, 3604:16, 3608:17, 3612:9, 3614:25, 3617:21, 3619:2, 3620:20, 3626:5, 3629:17, 3630:9, 3639:23, 3642:24, 3647:10, 3648:17, 3649:11, 3654:14

---

**C**

**C.S.R** [1] - 3514:24
**calculating** [1] - 3588:22
**calculation** [2] - 3562:21, 3623:23
**calendar** [2] - 3570:18, 3665:6
**California** [1] - 3619:18

**candy** [1] - 3642:12
**cannot** [1] - 3607:17
**cap** [15] - 3562:1, 3562:7, 3627:14, 3628:15, 3630:18, 3631:3, 3631:4, 3631:12, 3631:18, 3652:15, 3652:18, 3652:19, 3653:11, 3653:25
**Cap** [2] - 3557:4, 3558:2
**capability** [1] - 3659:9
**caps** [7] - 3546:3, 3546:4, 3577:5, 3579:3, 3630:20, 3631:6, 3654:10
**card** [2] - 3553:6, 3553:13
**care** [2] - 3523:7, 3523:11
**career** [1] - 3658:18
**careful** [6] - 3541:14, 3584:10, 3604:18, 3624:7, 3640:17, 3663:19
**carefully** [4] - 3566:10, 3583:11, 3583:25, 3647:22
**carrying** [1] - 3554:8
**case** [22] - 3536:21, 3557:24, 3558:19, 3559:9, 3562:7, 3565:25, 3569:9, 3579:9, 3584:24, 3598:6, 3598:15, 3603:12, 3609:21, 3623:9, 3630:13, 3633:24, 3657:2, 3659:6, 3664:3, 3666:10, 3667:14, 3667:23
**cases** [11] - 3544:14, 3556:1, 3560:4, 3577:23, 3578:3, 3578:5, 3578:7, 3579:7, 3585:1, 3604:19, 3673:20
**cash** [5] - 3529:15, 3529:16, 3553:18, 3573:2, 3623:2
**catastrophic** [1] - 3542:25
**categories** [4] - 3542:24, 3547:8, 3553:15, 3553:24
**categorize** [3] - 3576:23, 3634:21, 3663:25
**caught** [1] - 3677:24

caveat [1] - 3630:7
center [2] - 3549:6, 3549:9
cents [1] - 3650:11
certain [13] - 3531:15, 3532:10, 3536:1, 3557:20, 3562:1, 3591:10, 3600:25, 3653:11, 3665:4, 3668:9, 3675:11, 3675:24
certainly [86] - 3517:19, 3528:21, 3530:6, 3530:11, 3532:18, 3534:11, 3537:9, 3537:16, 3538:3, 3538:16, 3539:6, 3544:14, 3546:7, 3546:11, 3551:14, 3553:23, 3555:25, 3556:1, 3558:20, 3561:20, 3563:8, 3566:13, 3576:14, 3578:17, 3579:7, 3579:8, 3580:21, 3581:2, 3581:4, 3583:25, 3584:3, 3587:4, 3587:20, 3588:14, 3588:24, 3591:17, 3592:5, 3592:22, 3592:24, 3595:12, 3595:18, 3598:17, 3598:20, 3600:8, 3602:7, 3603:2, 3604:5, 3607:6, 3607:14, 3609:4, 3611:9, 3611:25, 3614:20, 3615:16, 3616:2, 3621:8, 3621:13, 3621:14, 3621:15, 3622:18, 3623:12, 3626:19, 3626:25, 3629:6, 3630:22, 3632:20, 3633:10, 3633:25, 3634:9, 3635:6, 3640:4, 3641:1, 3643:5, 3644:2, 3646:9, 3646:13, 3655:16, 3655:22, 3660:21, 3661:17, 3664:23, 3666:7, 3668:11, 3670:15, 3672:8, 3673:21
Certainly [8] - 3536:16, 3548:1, 3554:19, 3591:5, 3596:23, 3640:23, 3648:10, 3668:1

Certified [1] - 3514:23
cetera [2] - 3553:12, 3645:1
chair [2] - 3552:10, 3664:13
chairman [4] - 3664:4, 3664:6, 3664:22, 3665:15
challenged [1] - 3587:17
chance [1] - 3546:24
chances [1] - 3615:21
change [11] - 3544:18, 3544:22, 3544:23, 3558:6, 3559:7, 3566:13, 3602:14, 3652:9, 3665:4, 3667:22, 3668:3
changed [6] - 3546:15, 3562:11, 3591:19, 3652:9, 3668:1, 3668:25
changes [28] - 3539:14, 3539:15, 3541:23, 3543:13, 3543:16, 3543:21, 3544:1, 3544:25, 3545:17, 3545:18, 3546:7, 3546:9, 3546:12, 3546:17, 3547:8, 3547:16, 3561:17, 3561:24, 3562:8, 3565:8, 3566:4, 3630:24, 3647:18, 3650:5, 3650:20, 3650:25, 3651:1, 3668:20
changing [1] - 3665:6
characterized [1] - 3577:19
charged [1] - 3574:16
charges [1] - 3600:3
charging [1] - 3633:6
chart [36] - 3529:8, 3529:9, 3529:13, 3529:14, 3534:19, 3536:20, 3537:10, 3538:11, 3538:13, 3538:19, 3540:12, 3540:23, 3541:1, 3541:2, 3541:5, 3541:6, 3543:9, 3560:17, 3561:25, 3562:3, 3573:23, 3586:18, 3587:7, 3587:11, 3587:14, 3588:6, 3588:10, 3600:15, 3610:21, 3612:6, 3616:11, 3616:16, 3649:3, collectively [1] -

3649:17, 3668:10, 3676:19
charts [10] - 3528:7, 3528:12, 3528:14, 3529:6, 3534:2, 3534:7, 3534:9, 3621:14, 3649:12, 3654:15
Chase [4] - 3587:9, 3590:1, 3590:10, 3592:14
chase [1] - 3525:19
Chicago [1] - 3670:20
chief [4] - 3540:1, 3635:4, 3635:9, 3635:10
choices [1] - 3672:21
Chris [1] - 3660:17
CHRISTOPHER [2] - 3515:6, 3515:6
circulated [1] - 3641:11
circumstances [3] - 3571:4, 3581:7, 3583:1
cite [1] - 3560:25
CIVIL [2] - 3514:5, 3514:9
clarification [1] - 3617:22
clarify [1] - 3570:15
CLARKSON [1] - 3514:14
clear [4] - 3554:17, 3606:13, 3663:16, 3665:1
clearly [11] - 3556:20, 3574:9, 3587:2, 3595:14, 3605:6, 3609:14, 3612:21, 3623:19, 3632:14, 3664:14, 3667:6
clerical [1] - 3582:1
clients [1] - 3564:1
close [1] - 3636:12
closely [4] - 3530:1, 3559:8, 3589:2, 3603:2
CO [2] - 3514:6, 3515:17
code [1] - 3539:22
colleague [1] - 3533:25
collecting [1] - 3598:13
collection [4] - 3518:12, 3518:16, 3519:7, 3533:3
collective [1] - 3519:9
collectively [1] -

3518:10
college [1] - 3669:6
color [1] - 3553:20
combination [1] - 3632:12
combines [1] - 3597:22
comfortable [12] - 3530:13, 3580:21, 3581:5, 3609:6, 3609:24, 3616:23, 3617:16, 3621:8, 3623:13, 3632:23, 3641:1, 3655:21
coming [5] - 3539:17, 3549:11, 3573:18, 3583:21, 3612:15
commencement [1] - 3614:2
comment [2] - 3646:10, 3646:14
comments [1] - 3641:21
committee [7] - 3540:6, 3552:6, 3552:11, 3570:10, 3592:12, 3592:15, 3660:12
committees [1] - 3552:6
communicate [1] - 3566:24
communications [3] - 3520:20, 3521:4, 3543:3
companies [1] - 3674:22
company [1] - 3581:4
Company [3] - 3563:2, 3669:13, 3670:12
comparable [2] - 3583:24, 3600:7
comparative [19] - 3551:16, 3583:17, 3593:22, 3594:23, 3594:24, 3595:2, 3595:4, 3595:6, 3597:12, 3599:22, 3627:12, 3628:18, 3633:5, 3635:15, 3645:11, 3647:21, 3667:4, 3675:16, 3675:18
Comparative [1] - 3597:14
compare [12] - 3565:9, 3583:23, 3585:18, 3585:6, 3595:18, 3595:21, 3596:6, 3597:9, 3600:11,

3604:7, 3604:22, 3649:16
compared [1] - 3582:21
compares [3] - 3551:15, 3586:19, 3597:5
comparing [4] - 3585:14, 3587:14, 3597:15, 3597:19
comparison [3] - 3583:22, 3585:10, 3585:13, 3632:7, 3644:22
comparisons [4] - 3528:5, 3585:21, 3598:11, 3598:20
compensation [2] - 3635:10, 3637:8
competence [1] - 3619:9
competitive [1] - 3631:14
competitor [1] - 3658:15
complaint [11] - 3537:15, 3537:18, 3537:20, 3537:21, 3537:22, 3537:24, 3538:7, 3587:16, 3590:8, 3590:18, 3656:20
complaints [2] - 3655:7, 3655:13
complex [9] - 3563:25, 3564:1, 3576:5, 3579:11, 3599:17, 3638:1, 3666:13, 3666:17, 3666:18
complexes [6] - 3565:9, 3565:12, 3599:10, 3600:11, 3670:8, 3671:1
Compliance [1] - 3542:17
compliance [21] - 3540:2, 3540:4, 3542:14, 3543:1, 3569:17, 3577:12, 3577:25, 3579:8, 3581:25, 3582:1, 3589:4, 3635:4, 3635:5, 3635:8, 3635:9, 3635:11, 3635:12, 3658:11, 3658:12, 3666:11, 3668:18
complicated [3] - 3611:11, 3615:9

component [2] -
3532:17, 3676:17
components [2] -
3651:2, 3677:8
concept [2] - 3626:11,
3631:20
conceptual [2] -
3583:15, 3583:16
conceptually [1] -
3579:17
concern [3] - 3546:16,
3607:25, 3608:9
concerned [2] -
3574:22, 3586:3
concerning [16] -
3518:12, 3524:19,
3537:10, 3567:2,
3567:4, 3567:8,
3578:12, 3578:15,
3593:23, 3619:9,
3624:1, 3624:4,
3627:8, 3629:19,
3639:24, 3643:17
concerns [3] - 3543:1,
3552:3, 3650:23
concessions [1] -
3620:3
concluded [2] -
3640:14, 3678:8
conclusions [2] -
3525:9, 3612:18
conducts [1] -
3551:25
conduit [1] - 3529:6
confer [1] - 3520:11
conference [1] -
3670:20
confidential [1] -
3605:7
confine [3] - 3595:23,
3630:3, 3649:2
confined [1] - 3560:8
conflict [2] - 3565:23,
3609:9
connected [2] -
3529:1, 3532:1
connection [26] -
3518:8, 3536:21,
3537:8, 3537:21,
3537:23, 3537:25,
3538:5, 3538:8,
3538:11, 3542:13,
3547:22, 3548:2,
3548:17, 3550:16,
3577:7, 3578:12,
3590:17, 3591:14,
3593:23, 3602:2,
3611:15, 3622:5,
3626:21, 3636:18,
3648:23

conscientious [6] -
3574:18, 3575:9,
3575:18, 3619:14,
3619:15, 3674:4
consider [17] - 3575:2,
3575:9, 3575:18,
3575:23, 3576:16,
3593:11, 3593:18,
3593:22, 3594:24,
3596:21, 3597:5,
3597:12, 3602:2,
3606:8, 3608:22,
3626:20, 3664:14
consideration [11] -
3517:22, 3595:7,
3600:8, 3602:5,
3626:24, 3627:3,
3627:6, 3628:23,
3633:7, 3634:9,
3636:24
considerations [7] -
3526:16, 3527:2,
3528:17, 3632:18,
3633:4, 3633:5,
3634:10
considered [13] -
3521:14, 3556:7,
3612:24, 3638:2,
3639:9, 3641:4,
3641:7, 3642:1,
3643:2, 3645:4,
3651:20, 3661:10,
3665:12
considering [2] -
3597:6, 3629:21
consistent [10] -
3563:24, 3606:1,
3610:5, 3612:23,
3614:10, 3618:22,
3636:8, 3638:9,
3656:6, 3665:12
consistently [4] -
3605:24, 3614:2,
3656:4, 3656:12
constant [2] -
3670:19, 3670:23
constantly [1] -
3607:15
constitute [1] - 3638:3
consultant [5] -
3612:24, 3613:17,
3635:21, 3635:24,
3670:11
consultants [1] -
3669:22
consulting [2] -
3660:25, 3661:3
consumer [1] -
3661:14
contended [1] -

3623:6
contents [1] - 3523:18
context [3] - 3578:1,
3613:14, 3637:21
continually [1] -
3541:22
continuations [1] -
3558:1
continue [4] -
3568:20, 3577:4,
3588:14, 3650:3
continued [2] -
3587:19, 3614:9
CONTINUED [2] -
3516:2, 3524:14
continuing [2] -
3593:7, 3650:19
contract [28] -
3527:16, 3529:19,
3537:23, 3537:24,
3537:25, 3538:9,
3555:3, 3564:12,
3572:4, 3577:16,
3578:7, 3579:23,
3590:5, 3590:10,
3590:23, 3591:5,
3592:1, 3592:24,
3594:9, 3594:11,
3598:9, 3598:16,
3600:2, 3631:2,
3637:7, 3640:15
contractor [1] -
3589:8
contracts [11] -
3563:3, 3591:16,
3591:24, 3597:3,
3597:23, 3598:5,
3608:24, 3622:6,
3626:22, 3655:25
contractual [4] -
3528:18, 3536:24,
3542:9, 3591:19
contractually [3] -
3564:12, 3564:17,
3654:4
contrast [1] - 3656:19
contribute [2] -
3602:12, 3620:5
contributor [1] -
3561:21
controversy [1] -
3520:8
convenient [1] -
3525:18
conversation [1] -
3517:7
converted [1] -
3561:19
convince [1] - 3670:4
coordinate [2] -

3542:19, 3542:20
Copenhefer [1] -
3668:13
copies [4] - 3517:11,
3521:23, 3533:14,
3613:11
copy [1] - 3523:3
Core [1] - 3557:4
corner [1] - 3554:14
corporate [3] -
3540:19, 3548:14,
3548:21
corporation [1] -
3621:3
correct [33] - 3514:23,
3522:8, 3523:21,
3524:1, 3530:19,
3548:10, 3548:11,
3557:16, 3559:11,
3562:13, 3567:13,
3570:5, 3570:8,
3572:24, 3581:16,
3593:20, 3594:18,
3595:1, 3597:7,
3602:3, 3602:4,
3617:25, 3625:17,
3638:24, 3645:7,
3645:21, 3646:1,
3646:4, 3650:2,
3650:15, 3654:20,
3654:25, 3657:22
Correct [5] - 3533:8,
3557:12, 3567:22,
3634:15, 3651:18
corrected [1] - 3529:1
cost [5] - 3550:12,
3612:25, 3615:2,
3624:17, 3645:15
costs [18] - 3550:13,
3563:5, 3563:9,
3563:13, 3577:1,
3580:22, 3607:5,
3607:15, 3610:8,
3610:11, 3621:4,
3623:20, 3624:13,
3624:18, 3626:13,
3652:4, 3674:15,
3674:19
Council [1] - 3670:16
counsel [46] -
3518:11, 3520:9,
3520:12, 3520:13,
3520:23, 3521:3,
3521:5, 3521:6,
3521:7, 3521:12,
3527:15, 3530:1,
3532:10, 3537:17,
3538:2, 3538:3,
3542:18, 3570:3,
3570:6, 3574:20,

3580:16, 3590:24,
3606:1, 3606:13,
3609:5, 3613:8,
3613:12, 3613:15,
3622:18, 3622:19,
3636:8, 3636:20,
3638:4, 3638:7,
3638:9, 3639:16,
3641:20, 3646:9,
3656:2, 3656:6,
3659:4, 3668:12,
3673:12
Counsel [1] - 3678:7
COUNSEL [1] -
3515:16
counsel's [1] -
3518:20
country [2] - 3565:12,
3659:18
couple [7] - 3571:4,
3578:23, 3596:10,
3637:5, 3660:9,
3667:25, 3671:15
course [7] - 3521:8,
3548:13, 3552:1,
3597:25, 3631:18,
3659:3, 3665:25
COURT [192] - 3514:1,
3514:17, 3517:1,
3518:3, 3518:18,
3518:23, 3519:5,
3519:11, 3520:4,
3520:7, 3522:6,
3522:10, 3522:12,
3522:21, 3522:24,
3523:5, 3523:11,
3523:22, 3523:24,
3524:1, 3524:5,
3524:10, 3524:13,
3525:2, 3525:8,
3525:23, 3527:8,
3527:10, 3533:5,
3533:9, 3533:15,
3533:20, 3534:4,
3534:7, 3534:15,
3534:17, 3534:20,
3536:6, 3536:8,
3538:22, 3541:3,
3541:5, 3544:7,
3545:5, 3545:11,
3545:16, 3546:22,
3546:25, 3547:15,
3554:13, 3554:18,
3554:23, 3555:5,
3555:7, 3557:1,
3557:3, 3557:6,
3557:10, 3557:13,
3557:17, 3557:22,
3558:8, 3558:13,
3559:13, 3559:15,

3559:18, 3559:20,
3560:10, 3560:21,
3561:1, 3561:5,
3561:8, 3568:10,
3568:14, 3568:18,
3568:20, 3569:2,
3570:17, 3571:11,
3573:8, 3573:10,
3573:12, 3575:11,
3575:13, 3578:19,
3579:1, 3579:25,
3581:8, 3581:10,
3582:15, 3582:18,
3586:8, 3586:10,
3592:8, 3594:1,
3594:3, 3594:8,
3594:15, 3594:19,
3594:21, 3596:1,
3600:15, 3600:18,
3600:20, 3601:5,
3601:22, 3601:24,
3604:10, 3604:12,
3607:18, 3607:20,
3608:1, 3608:14,
3608:16, 3612:5,
3614:15, 3616:10,
3616:13, 3616:15,
3617:20, 3618:10,
3618:14, 3619:1,
3620:17, 3624:25,
3625:3, 3625:9,
3625:11, 3625:13,
3625:16, 3625:18,
3625:20, 3625:23,
3625:25, 3626:2,
3629:12, 3629:14,
3630:6, 3639:19,
3639:22, 3642:14,
3642:18, 3646:21,
3647:2, 3647:5,
3647:7, 3648:11,
3648:15, 3649:9,
3650:16, 3651:13,
3651:16, 3651:19,
3652:4, 3652:12,
3652:15, 3653:5,
3653:13, 3653:19,
3654:5, 3654:13,
3657:12, 3657:16,
3657:19, 3658:2,
3659:10, 3659:21,
3660:3, 3660:8,
3661:9, 3662:17,
3664:2, 3664:21,
3665:9, 3665:16,
3665:18, 3666:3,
3667:15, 3667:20,
3669:3, 3669:12,
3669:15, 3671:3,
3671:11, 3672:25,
3674:8, 3674:12,

3676:1, 3677:17,
3678:1, 3678:3,
3678:5
**Court** [17] - 3523:4,
3525:18, 3526:10,
3530:23, 3531:17,
3540:14, 3548:5,
3561:14, 3569:11,
3581:18, 3599:12,
3628:10, 3638:11,
3643:24, 3649:13,
3655:17, 3657:5
**court** [3] - 3517:24,
3520:17, 3522:18
**COURTHOUSE** [1] -
3514:14
**courtroom** [1] -
3617:19
**courts** [4] - 3595:11,
3602:18, 3673:22,
3674:3
**cover** [2] - 3531:22,
3643:15
**covered** [2] - 3542:17,
3580:11
**covers** [1] - 3628:7
**cozy** [3] - 3662:22,
3662:23, 3663:25
**create** [1] - 3543:24
**created** [1] - 3552:2
**credits** [1] - 3637:14
**crisis** [1] - 3543:19
**critical** [15] - 3528:24,
3530:8, 3532:17,
3548:24, 3548:25,
3550:11, 3554:7,
3578:9, 3586:1,
3586:6, 3618:4,
3663:13, 3671:1,
3676:16, 3677:7
**criticism** [4] - 3615:3,
3615:5, 3615:25,
3616:5
**criticized** [2] - 3615:1,
3635:20
**cross** [3] - 3517:23,
3657:12, 3659:23
**cross-examine** [1] -
3517:23
**cry** [1] - 3664:1
**current** [4] - 3609:5,
3631:9, 3632:14,
3632:25
**custom** [1] - 3608:18
**cut** [1] - 3610:11
**cutoff** [1] - 3668:24

# D

**daily** [4] - 3540:7,
3549:5, 3572:4,
3572:6
**DANIEL** [1] - 3515:4
**dashboard** [2] -
3551:8, 3553:9
**data** [30] - 3528:1,
3528:5, 3532:21,
3547:7, 3551:15,
3554:11, 3562:15,
3570:4, 3574:20,
3584:19, 3601:21,
3602:20, 3602:22,
3602:24, 3603:1,
3604:25, 3608:19,
3627:8, 3627:12,
3628:18, 3633:5,
3636:3, 3641:8,
3645:10, 3645:11,
3647:21, 3656:25,
3657:4, 3667:4
**date** [2] - 3555:16,
3648:22
**dates** [3] - 3587:18,
3591:10, 3591:22
**DAY** [1] - 3514:20
**day-to-day** [16] -
3535:4, 3540:3,
3542:4, 3571:16,
3571:22, 3571:23,
3571:25, 3572:2,
3581:25, 3582:2,
3585:3, 3589:10,
3589:18, 3589:20,
3589:23, 3677:20
**days** [4] - 3640:21,
3655:21, 3657:7,
3664:18
**deal** [7] - 3542:22,
3611:13, 3659:13,
3659:14, 3659:15,
3659:17, 3671:8
**dealing** [6] - 3539:21,
3540:3, 3589:14,
3611:4, 3623:14,
3666:6
**dealt** [1] - 3663:7
**debates** [1] - 3554:21
**December** [1] - 3547:5
**decent** [2] - 3662:20,
3662:21
**decide** [6] - 3602:13,
3616:23, 3665:7,
3673:8, 3675:10,
3677:5
**decided** [1] - 3672:22
**deciding** [2] -

3613:16, 3633:12
**decision** [4] - 3535:8,
3549:7, 3566:22,
3593:23
**decisions** [2] -
3538:3, 3566:20
**declines** [1] - 3632:10
**decreased** [1] -
3562:5
**deductible** [2] -
3580:8, 3580:17
**deemed** [2] - 3517:20,
3637:15
**defeating** [1] - 3663:4
**DEFENDANT** [1] -
3514:11
**Defendant's** [55] -
3516:6, 3516:8,
3516:9, 3516:10,
3516:11, 3516:12,
3516:13, 3516:14,
3516:15, 3516:16,
3516:17, 3516:18,
3523:17, 3523:23,
3524:3, 3524:25,
3525:25, 3527:4,
3527:11, 3527:22,
3530:23, 3532:9,
3532:23, 3533:21,
3534:5, 3534:22,
3536:9, 3536:13,
3538:20, 3540:11,
3541:10, 3549:13,
3549:17, 3552:22,
3553:1, 3555:10,
3559:21, 3568:7,
3568:24, 3571:12,
3582:14, 3586:12,
3598:24, 3599:2,
3603:4, 3610:15,
3625:8, 3625:14,
3625:21, 3626:3,
3627:24, 3629:15,
3643:7, 3647:8,
3648:4
**defendant's** [3] -
3523:22, 3613:13,
3614:5
**defendants** [8] -
3521:5, 3521:6,
3523:15, 3533:2,
3536:5, 3613:10,
3629:11, 3647:3
**Defendants** [4] -
3524:6, 3527:4,
3559:16, 3571:8
**DEFENDANTS** [3] -
3514:7, 3515:10,
3515:14
**definition** [3] -

3571:21, 3572:7,
3637:6
**definitive** [1] - 3600:6
**delegates** [2] -
3571:15, 3589:9
**deletions** [2] -
3557:24, 3558:5
**deliberately** [1] -
3537:17
**deliberation** [1] -
3517:23
**deliberations** [1] -
3646:17
**deliver** [4] - 3535:14,
3542:11, 3543:4,
3609:18
**delivered** [6] - 3526:6,
3594:13, 3603:12,
3613:10, 3617:6
**delivering** [1] - 3543:6
**delivers** [1] - 3535:4
**demanding** [3] -
3662:3, 3662:5
**demean** [1] - 3664:16
**demonstrative** [2] -
3525:15, 3525:16
**Denied** [2] - 3544:7,
3575:13
**department** [1] -
3548:23
**dependent** [1] -
3616:21
**deposition** [10] -
3518:6, 3519:14,
3519:20, 3520:16,
3520:22, 3521:9,
3590:20, 3591:5,
3591:6
**depositions** [1] -
3590:20
**depth** [1] - 3645:3
**describe** [17] - 3526:9,
3531:16, 3543:9,
3548:5, 3553:7,
3569:11, 3581:18,
3587:8, 3591:1,
3591:6, 3599:11,
3613:5, 3628:9,
3641:23, 3642:11,
3643:1, 3643:24
**described** [8] -
3526:22, 3535:20,
3539:23, 3642:2,
3658:19, 3661:8,
3677:25
**describes** [1] -
3646:16
**describing** [3] -
3519:24, 3524:17,
3658:15

description [2] - 3518:21, 3645:3
descriptions [1] - 3646:15
deserved [1] - 3666:13
despite [1] - 3558:20
detailed [2] - 3551:23, 3611:1
details [1] - 3615:2
determination [3] - 3539:25, 3602:19, 3644:13
determinations [2] - 3536:3, 3645:4
determine [1] - 3616:18
determined [1] - 3558:5
determines [1] - 3632:16
determining [4] - 3566:19, 3593:18, 3632:21, 3636:4
developed [7] - 3537:11, 3611:18, 3611:19, 3611:24, 3612:10, 3635:15, 3664:1
developing [3] - 3633:9, 3663:22, 3663:24
development [1] - 3587:21
developments [6] - 3540:20, 3553:18, 3629:5, 3635:7, 3668:22
develops [1] - 3580:4
devoted [2] - 3551:4, 3555:3
devoting [1] - 3554:12
differ [1] - 3633:19
difference [3] - 3519:17, 3575:2, 3669:19
differences [1] - 3593:11
different [48] - 3518:9, 3522:18, 3542:24, 3543:23, 3544:13, 3547:8, 3551:12, 3556:13, 3564:3, 3564:5, 3565:5, 3571:22, 3576:2, 3584:11, 3584:12, 3585:1, 3585:6, 3585:9, 3585:16, 3589:18, 3597:2, 3597:10, 3606:25,

3609:13, 3614:3, 3621:7, 3623:19, 3627:11, 3628:7, 3628:13, 3628:14, 3628:19, 3629:3, 3631:21, 3631:23, 3634:12, 3634:14, 3635:5, 3640:19, 3659:24, 3660:19, 3660:21, 3661:8, 3661:22, 3663:24, 3673:5
Different [1] - 3634:14
differential [2] - 3650:7, 3654:21
differently [4] - 3522:17, 3598:1, 3668:12, 3670:5
difficult [8] - 3562:12, 3565:24, 3583:21, 3585:21, 3599:14, 3609:21, 3626:18, 3662:4
difficulty [2] - 3597:19, 3609:17
diligence [4] - 3539:4, 3539:10, 3539:17, 3581:1
diligent [1] - 3615:15
Diligent [1] - 3568:1
diligently [1] - 3656:1
direct [5] - 3579:23, 3583:14, 3589:8, 3622:22, 3623:16
DIRECT [2] - 3516:2, 3524:14
directed [2] - 3639:6, 3649:4
direction [2] - 3556:1, 3599:18
directly [4] - 3548:18, 3549:25, 3610:9, 3666:22
DIRECTOR [1] - 3515:16
director [4] - 3519:19, 3524:20, 3677:11
directors [3] - 3670:8, 3670:19, 3674:1
Directors [1] - 3670:16
disagree [3] - 3572:12, 3655:18, 3673:4
disagreement [1] - 3523:16
discern [1] - 3600:5
disclosed [5] - 3576:11, 3608:4, 3608:13, 3671:7,

3672:23
disclosure [6] - 3532:1, 3643:17, 3671:21, 3671:23, 3672:15
disclosures [1] - 3645:24
discomfort [1] - 3667:2
discovery [3] - 3522:2, 3533:17, 3590:18
discrete [1] - 3614:8
discretion [1] - 3673:2
discuss [3] - 3614:6, 3621:1, 3637:4
discussed [14] - 3532:8, 3572:1, 3590:24, 3600:1, 3609:4, 3610:7, 3621:7, 3637:20, 3638:4, 3639:11, 3642:5, 3642:9, 3645:9
discusses [1] - 3645:18
discussing [5] - 3605:25, 3623:20, 3640:20, 3647:21, 3675:21
discussion [10] - 3613:2, 3613:4, 3627:21, 3631:5, 3632:7, 3638:5, 3644:20, 3645:14, 3655:23, 3675:15
discussions [17] - 3551:5, 3551:21, 3556:4, 3578:17, 3587:20, 3613:14, 3613:15, 3620:5, 3622:18, 3627:18, 3631:12, 3638:7, 3638:9, 3641:23, 3646:6, 3663:21, 3666:13
disinclination [1] - 3566:3
displeasure [1] - 3546:8
dispute [1] - 3518:2
disservice [1] - 3615:12
distinction [1] - 3669:21
distribution [11] - 3596:18, 3606:8, 3606:14, 3606:17, 3606:18, 3607:2, 3607:5, 3607:15,

3608:10, 3608:20, 3637:8
distributor [2] - 3531:21, 3543:7
DISTRICT [4] - 3514:1, 3514:1, 3514:17, 3514:18
diversified [3] - 3615:11, 3656:17, 3660:10
division [6] - 3548:13, 3622:2, 3622:24, 3623:17, 3658:8, 3658:20
division's [1] - 3623:3
document [61] - 3520:18, 3521:24, 3522:16, 3525:3, 3525:10, 3525:15, 3526:1, 3526:9, 3526:19, 3527:5, 3527:23, 3531:3, 3531:6, 3531:8, 3531:10, 3531:11, 3531:16, 3532:14, 3533:12, 3533:13, 3534:23, 3535:21, 3536:14, 3537:1, 3546:24, 3547:2, 3547:11, 3549:20, 3550:5, 3553:3, 3553:21, 3554:4, 3554:13, 3555:11, 3555:20, 3556:15, 3560:22, 3561:2, 3561:5, 3569:4, 3569:11, 3569:20, 3586:15, 3586:23, 3599:3, 3599:5, 3599:11, 3599:23, 3603:8, 3610:23, 3621:20, 3622:4, 3622:13, 3623:14, 3628:1, 3628:9, 3628:22, 3643:9, 3643:24, 3648:18, 3672:24
documentation [10] - 3530:3, 3530:7, 3530:14, 3531:24, 3535:14, 3567:15, 3569:13, 3569:19, 3599:19, 3601:1
documents [25] - 3517:13, 3518:10, 3518:13, 3518:14, 3519:7, 3519:12, 3519:18, 3521:11, 3521:13, 3521:19, 3521:20, 3521:22,

3521:23, 3522:4, 3522:6, 3525:17, 3526:25, 3532:7, 3569:16, 3569:17, 3601:5, 3662:20, 3667:16, 3671:24
dollars [7] - 3578:4, 3580:9, 3632:2, 3632:3, 3632:4, 3650:11, 3675:23
done [16] - 3530:12, 3535:13, 3547:24, 3550:12, 3582:11, 3591:25, 3596:13, 3605:24, 3628:5, 3630:1, 3640:17, 3662:16, 3663:7, 3673:12, 3673:13, 3673:14
down [10] - 3525:19, 3554:1, 3557:13, 3558:4, 3568:15, 3589:15, 3589:17, 3611:3, 3673:24, 3674:14
Dr [2] - 3674:10, 3676:2
draft [4] - 3641:11, 3641:21, 3646:8, 3646:9
driven [1] - 3623:14
dry [1] - 3642:13
due [4] - 3522:14, 3539:17, 3653:24, 3666:16
during [8] - 3521:8, 3522:2, 3590:19, 3590:20, 3629:4, 3650:9, 3654:9, 3665:18
duties [3] - 3524:19, 3541:7, 3662:13
DX-144.15 [1] - 3571:8

E

e-mail [1] - 3521:1
early [6] - 3528:9, 3554:7, 3567:14, 3569:23, 3577:6, 3609:16
easily [2] - 3605:7, 3621:16
EAST [1] - 3514:14
eat [1] - 3580:23
economic [2] - 3551:8, 3674:18
economies [28] - 3526:18, 3584:1,

**employee** [4] - 3624:2, 3624:5, 3624:8
**employees** [2] - 3565:22, 3624:17
**enabled** [1] - 3656:18
**end** [22] - 3529:23, 3530:11, 3580:25, 3585:19, 3587:2, 3604:19, 3609:24, 3615:19, 3617:16, 3621:17, 3633:25, 3634:5, 3640:14, 3642:16, 3645:14, 3653:15, 3653:17, 3665:7, 3665:8, 3673:23, 3674:3, 3676:10
**ending** [4] - 3632:25, 3643:12, 3643:19, 3648:14
**ends** [1] - 3549:15
**enforcement** [1] - 3540:21
**engage** [9] - 3536:4, 3539:6, 3539:10, 3539:17, 3539:20, 3553:17, 3556:4, 3566:18, 3566:20
**engaged** [5] - 3539:21, 3540:2, 3602:10, 3635:21, 3656:9
**engages** [1] - 3540:6
**engaging** [1] - 3656:3
**enmeshed** [1] - 3676:3
**enormous** [2] - 3674:16, 3674:18
**ensure** [4] - 3574:5, 3593:7, 3608:12, 3656:3
**ensured** [1] - 3546:14
**ensures** [1] - 3574:24
**ensuring** [2] - 3550:9, 3656:5
**enter** [1] - 3677:4
**entered** [7] - 3524:22, 3527:6, 3533:12, 3590:9, 3622:1, 3644:15, 3645:22
**entering** [1] - 3544:17
**enterprise** [5] - 3577:9, 3577:19, 3578:20, 3579:6, 3669:18
**enters** [1] - 3607:3
**entire** [5] - 3518:10, 3518:16, 3519:9, 3533:12, 3546:12
**entity** [5] - 3537:5,

3577:14, 3610:11, 3621:5, 3647:24
**entrepreneurial** [4] - 3576:24, 3578:20, 3578:24, 3669:18
**EQ/Lord** [2] - 3557:3, 3558:9
**EQAT** [12] - 3518:7, 3519:8, 3548:3, 3563:1, 3591:24, 3593:13, 3616:6, 3638:22, 3639:8, 3641:9, 3645:6, 3649:4
**equal** [1] - 3525:11
**equally** [1] - 3577:8
**EQUITABLE** [3] - 3514:6, 3514:10, 3515:17
**Equitable** [9] - 3547:21, 3548:1, 3548:6, 3549:25, 3610:2, 3616:16, 3617:24, 3617:25, 3618:2
**Ernst** [4] - 3612:14, 3612:18, 3618:11
**erroneously** [3] - 3516:7, 3523:20, 3524:4
**ESQUIRE** [12] - 3515:4, 3515:4, 3515:5, 3515:5, 3515:6, 3515:6, 3515:9, 3515:12, 3515:13, 3515:13, 3515:14, 3515:16
**essential** [3] - 3536:2, 3548:21, 3672:2
**essentially** [1] - 3622:20
**et** [5] - 3514:3, 3514:6, 3514:8, 3553:12, 3644:25
**ETF** [1] - 3535:10
**ETFs** [1] - 3542:5
**ethics** [1] - 3539:22
**evaluation** [2] - 3576:17, 3646:16
**evening** [1] - 3522:24
**events** [1] - 3565:13
**everywhere** [1] - 3579:21
**evidence** [45] - 3516:7, 3516:8, 3516:9, 3516:10, 3516:11, 3516:12, 3516:13, 3516:14, 3516:15, 3516:16, 3516:17, 3516:18,

3517:6, 3517:13, 3517:15, 3518:1, 3522:17, 3523:18, 3524:3, 3524:22, 3527:7, 3527:12, 3533:2, 3533:4, 3533:12, 3533:22, 3533:24, 3534:2, 3534:6, 3536:10, 3538:21, 3541:1, 3541:2, 3547:14, 3559:17, 3559:22, 3571:9, 3571:13, 3612:3, 3625:15, 3625:22, 3626:4, 3629:16, 3647:4, 3647:9
**evolved** [1] - 3528:12
**exact** [1] - 3525:15
**Exactly** [1] - 3666:3
**exactly** [4] - 3658:17, 3658:21, 3658:23, 3659:4
**exam** [1] - 3607:24
**examination** [1] - 3595:18
**EXAMINATION** [2] - 3516:2, 3524:14
**examine** [12] - 3517:23, 3528:22, 3528:24, 3528:25, 3537:9, 3565:25, 3583:8, 3583:11, 3584:9, 3607:12, 3634:10, 3661:4
**examined** [1] - 3644:4
**examiners** [1] - 3658:7
**examining** [10] - 3595:13, 3602:12, 3602:25, 3607:8, 3607:16, 3615:15, 3647:23, 3657:7, 3676:17, 3677:22
**example** [14] - 3565:16, 3569:25, 3570:25, 3572:4, 3580:7, 3596:14, 3598:14, 3629:1, 3629:9, 3652:21, 3658:16, 3667:11, 3668:4
**examples** [12] - 3529:2, 3540:9, 3543:15, 3560:25, 3577:24, 3582:12, 3587:4, 3627:5, 3634:19, 3635:2, 3637:5, 3637:16
**exams** [1] - 3542:20

**exceeded** [1] - 3559:1
**exceeds** [1] - 3553:25
**Excellent** [1] - 3619:13
**exception** [1] - 3555:1
**excessive** [1] - 3582:23
**exchange** [5] - 3520:21, 3535:10, 3538:24, 3581:19
**excluded** [1] - 3521:13
**exclusive** [1] - 3608:20
**exclusively** [1] - 3582:10
**excuse** [2] - 3517:19, 3589:24
**Excuse** [5] - 3533:23, 3540:22, 3612:2, 3630:2, 3648:8
**execute** [1] - 3637:13
**execution** [2] - 3542:10, 3566:23
**executive** [6] - 3537:4, 3553:19, 3554:10, 3587:1, 3588:17, 3663:19
**exemptive** [2] - 3542:23, 3542:25
**exercise** [12] - 3574:25, 3584:18, 3602:11, 3613:22, 3632:24, 3636:3, 3640:18, 3656:9, 3657:1, 3673:15, 3673:24, 3677:23
**exercising** [4] - 3570:18, 3574:18, 3600:9, 3674:5
**Exhibit** [58] - 3516:6, 3516:8, 3516:9, 3516:10, 3516:11, 3516:13, 3516:14, 3516:15, 3516:16, 3516:17, 3516:18, 3523:17, 3523:23, 3524:3, 3525:1, 3525:25, 3527:4, 3527:11, 3527:22, 3530:23, 3532:9, 3532:23, 3533:13, 3533:21, 3534:5, 3534:22, 3536:9, 3536:13, 3538:19, 3538:20, 3540:11, 3541:10, 3546:19, 3549:13, 3549:17, 3552:22, 3553:1, 3555:10, 3560:16,

3561:8, 3568:7, 3568:24, 3571:12, 3582:14, 3586:13, 3598:24, 3599:2, 3603:4, 3610:15, 3625:14, 3625:21, 3626:3, 3627:24, 3629:15, 3643:7, 3647:8, 3648:4

**exhibit** [8] - 3523:22, 3533:2, 3549:14, 3610:16, 3648:3, 3648:7, 3648:9, 3657:20

**exhibited** [1] - 3572:8

**Exhibits** [2] - 3516:12, 3559:16, 3559:21, 3625:8

**exhibits** [5] - 3517:16, 3518:8, 3525:6, 3531:21, 3625:7

**existed** [1] - 3638:22

**existence** [1] - 3638:14

**expands** [1] - 3550:8

**expect** [2] - 3578:5, 3578:25

**expectation** [1] - 3576:7

**expectations** [1] - 3553:25

**expected** [1] - 3602:11

**expense** [47] - 3532:3, 3546:3, 3546:4, 3546:6, 3562:1, 3562:7, 3577:5, 3579:3, 3583:18, 3586:4, 3596:9, 3596:12, 3596:15, 3596:21, 3597:5, 3597:8, 3597:18, 3597:20, 3598:18, 3614:23, 3616:11, 3627:14, 3627:15, 3628:15, 3628:18, 3630:18, 3630:20, 3631:3, 3631:4, 3631:7, 3631:8, 3631:10, 3631:12, 3631:18, 3649:24, 3651:10, 3652:15, 3653:25, 3654:10, 3672:2, 3672:10, 3672:19, 3675:14, 3675:22

**Expense** [1] - 3652:18

**expenses** [34] - 3596:13, 3596:17, 3596:19, 3605:13,

3605:16, 3605:18, 3606:8, 3606:15, 3606:18, 3608:3, 3608:13, 3608:20, 3610:1, 3611:3, 3616:16, 3616:17, 3617:23, 3617:24, 3618:1, 3618:3, 3618:15, 3618:16, 3620:9, 3620:12, 3620:21, 3621:11, 3622:22, 3623:7, 3623:16, 3645:10, 3645:11, 3673:9

**experience** [8] - 3530:4, 3619:12, 3656:2, 3658:4, 3659:2, 3666:7, 3668:17, 3674:10

**experienced** [2] - 3530:2, 3636:8

**expert** [8] - 3564:4, 3565:3, 3573:7, 3613:9, 3614:4, 3620:15, 3675:2, 3677:13

**expertise** [7] - 3530:11, 3569:25, 3615:14, 3656:17, 3658:13, 3659:5, 3661:22

**experts** [7] - 3613:13, 3613:14, 3614:5, 3615:12, 3615:24, 3616:5, 3675:17

**explain** [9] - 3555:19, 3565:1, 3577:22, 3615:2, 3638:11, 3649:12, 3650:16, 3655:17, 3661:11

**explained** [2] - 3618:16, 3636:19

**explaining** [2] - 3535:18, 3612:6

**explanation** [4] - 3592:5, 3592:6, 3614:18, 3614:20

**explicit** [2] - 3520:25, 3602:6

**expressed** [1] - 3675:3

**expressly** [2] - 3520:18, 3521:8

**extensive** [6] - 3531:18, 3556:4, 3611:11, 3611:12, 3640:13, 3647:20

**extensively** [5] - 3542:2, 3555:24, 3571:7, 3609:4,

3609:5

**extent** [5] - 3560:14, 3583:20, 3617:5, 3635:21, 3644:16

**extra** [1] - 3533:14

**extraordinarily** [1] - 3670:3

**extraordinary** [1] - 3667:14

**Extremely** [1] - 3619:20

**extremely** [2] - 3552:19, 3574:23

# F

**faced** [1] - 3667:12

**facilities** [1] - 3542:8

**fact** [22] - 3522:2, 3525:8, 3548:13, 3563:13, 3584:20, 3590:21, 3610:6, 3610:7, 3610:10, 3613:18, 3613:23, 3614:6, 3617:12, 3621:2, 3624:13, 3624:18, 3633:8, 3635:3, 3658:14, 3660:16, 3675:3, 3675:13

**factor** [18] - 3518:15, 3530:4, 3584:4, 3584:8, 3595:12, 3597:21, 3600:3, 3602:7, 3604:4, 3629:10, 3644:12, 3645:5, 3645:9

**factor-by-factor** [1] - 3645:5

**factors** [34] - 3518:15, 3525:5, 3526:13, 3527:3, 3532:20, 3574:22, 3576:2, 3583:3, 3584:19, 3595:11, 3602:12, 3607:11, 3613:23, 3621:7, 3626:25, 3630:23, 3632:20, 3633:11, 3640:19, 3640:20, 3641:4, 3641:7, 3642:1, 3642:5, 3642:9, 3643:2, 3644:4, 3644:8, 3645:4, 3646:6, 3646:16, 3647:20, 3660:6, 3672:5

**fail** [1] - 3667:5

**failing** [1] - 3576:13

**failure** [1] - 3542:24

**failures** [2] - 3666:2, 3666:11

**fair** [17] - 3574:7, 3574:11, 3574:25, 3576:1, 3584:20, 3602:13, 3603:1, 3615:3, 3615:5, 3632:21, 3636:5, 3640:15, 3641:2, 3647:19, 3655:24, 3659:17, 3664:9

**fairly** [3] - 3585:1, 3607:3, 3614:9

**fairness** [3] - 3594:25, 3595:7, 3606:9

**faith** [1] - 3602:20

**fall** [2] - 3520:10, 3670:21

**fallout** [17] - 3636:10, 3636:11, 3636:15, 3636:24, 3637:1, 3637:9, 3637:10, 3637:13, 3637:15, 3638:3, 3639:10, 3645:22, 3672:25, 3673:7, 3673:17, 3674:17

**familiar** [14] - 3530:7, 3565:10, 3577:24, 3581:3, 3588:14, 3590:12, 3590:13, 3596:9, 3621:20, 3626:7, 3636:11, 3637:17, 3655:12, 3669:4

**far** [3] - 3574:22, 3660:23, 3664:1

**fashion** [2] - 3580:1, 3644:9

**feature** [1] - 3635:14

**FEBRUARY** [1] - 3514:13

**February** [1] - 3520:17

**Federal** [2] - 3674:9, 3674:21

**Fee** [1] - 3523:5

**fee** [104] - 3528:3, 3528:11, 3528:18, 3528:19, 3528:22, 3528:24, 3538:25, 3545:18, 3546:2, 3547:7, 3562:2, 3562:5, 3562:8, 3573:3, 3573:18, 3573:20, 3574:8, 3574:9, 3574:10, 3574:24, 3575:3, 3575:6, 3575:25, 3581:19, 3583:6, 3584:14, 3584:15,

3584:17, 3584:23, 3585:12, 3593:16, 3593:22, 3594:25, 3595:3, 3595:6, 3597:6, 3597:12, 3597:14, 3597:18, 3597:24, 3598:11, 3598:14, 3599:16, 3599:21, 3599:22, 3600:21, 3600:22, 3602:13, 3602:14, 3602:25, 3608:5, 3608:10, 3609:11, 3609:13, 3627:9, 3628:19, 3629:21, 3630:24, 3630:25, 3631:8, 3631:9, 3631:16, 3631:23, 3631:25, 3632:1, 3632:4, 3632:9, 3632:12, 3632:13, 3632:21, 3632:22, 3632:25, 3633:17, 3633:21, 3634:7, 3634:14, 3635:17, 3642:2, 3643:3, 3649:15, 3649:18, 3650:7, 3651:11, 3651:19, 3651:23, 3651:25, 3652:3, 3652:10, 3652:23, 3652:24, 3653:4, 3653:6, 3653:7, 3653:22, 3653:23, 3654:17, 3667:4, 3670:2, 3672:7, 3675:16, 3675:18, 3677:3

**fees** [81] - 3532:1, 3532:2, 3537:7, 3545:24, 3545:25, 3552:15, 3552:17, 3552:18, 3562:15, 3562:16, 3562:19, 3562:21, 3572:20, 3574:7, 3575:4, 3580:21, 3580:22, 3583:23, 3584:3, 3585:3, 3585:9, 3593:24, 3594:4, 3594:23, 3595:1, 3595:4, 3595:7, 3595:13, 3595:20, 3596:6, 3596:15, 3597:15, 3597:19, 3598:2, 3598:4, 3598:7, 3598:13, 3599:9, 3599:14, 3600:7, 3600:11, 3601:1, 3604:14, 3605:13, 3605:18,

3606:3, 3606:10,
3623:19, 3627:11,
3627:13, 3628:23,
3631:9, 3632:8,
3633:11, 3633:14,
3633:23, 3634:1,
3635:17, 3636:5,
3637:17, 3637:20,
3637:22, 3638:3,
3638:8, 3638:12,
3638:15, 3638:23,
3640:1, 3640:4,
3640:15, 3640:24,
3641:1, 3641:5,
3647:17, 3649:23,
3655:24

**Fees** [1] - 3572:23

**fellow** [2] - 3662:20,
3662:21

**felt** [5] - 3556:2,
3576:13, 3598:17,
3613:8

**few** [11] - 3534:11,
3537:6, 3539:2,
3579:10, 3605:20,
3606:22, 3615:8,
3637:15, 3655:8,
3657:16, 3672:1

**Fidelity** [4] - 3565:17,
3667:8, 3667:9,
3667:11

**fiduciary** [3] -
3524:19, 3586:3,
3662:13

**figure** [4] - 3652:5,
3660:4, 3661:4,
3673:11

**filed** [6] - 3537:15,
3590:8, 3601:6,
3601:17, 3655:5,
3655:8

**filing** [1] - 3646:7

**filings** [3] - 3599:20,
3601:3, 3601:20

**fill** [1] - 3569:15

**fills** [1] - 3567:14

**finalized** [2] - 3641:12,
3641:23

**finally** [1] - 3641:22

**financial** [12] - 3532:4,
3543:19, 3569:17,
3578:8, 3579:14,
3581:23, 3581:24,
3589:3, 3615:18,
3618:6, 3640:3,
3660:15

**findings** [5] - 3525:8,
3615:23, 3655:22,
3656:14, 3656:18

**Fine** [1] - 3562:13

**fine** [2] - 3519:3,
3666:25

**finishing** [1] - 3522:3

**fire** [1] - 3671:8

**firm** [3] - 3614:23,
3660:14, 3660:25

**firms** [10] - 3542:19,
3572:11, 3605:23,
3612:12, 3612:15,
3614:1, 3618:9,
3659:7, 3661:3

**First** [3] - 3615:8,
3642:22, 3660:10

**first** [24] - 3517:10,
3540:17, 3552:8,
3558:8, 3560:4,
3560:11, 3561:15,
3576:12, 3579:9,
3579:10, 3594:4,
3594:8, 3603:16,
3609:24, 3611:23,
3630:13, 3632:20,
3633:24, 3644:7,
3649:17, 3664:2,
3672:1, 3672:24

**FISHER** [2] - 3514:14,
3515:5

**fit** [1] - 3553:18

**five** [10] - 3545:16,
3551:24, 3552:7,
3553:11, 3624:23,
3630:24, 3667:24,
3670:17, 3673:4

**five-year** [1] - 3667:24

**fixed** [3] - 3558:6,
3639:6, 3640:6

**flip** [1] - 3531:22

**flipping** [2] - 3542:6,
3628:12

**flow** [4] - 3529:15,
3553:18, 3573:2,
3623:2

**flowing** [1] - 3529:16

**flows** [1] - 3670:19

**FMG** [201] - 3524:19,
3524:23, 3526:7,
3528:3, 3528:11,
3528:18, 3528:24,
3529:17, 3530:18,
3531:7, 3531:8,
3531:11, 3531:13,
3531:24, 3532:7,
3532:10, 3535:3,
3535:18, 3536:20,
3536:22, 3538:5,
3538:11, 3538:14,
3538:20, 3538:24,
3540:15, 3541:12,
3542:1, 3542:22,
3543:10, 3543:20,

3544:13, 3546:8,
3547:21, 3548:2,
3548:6, 3548:9,
3548:13, 3548:16,
3548:21, 3548:24,
3549:25, 3550:14,
3551:5, 3551:22,
3551:25, 3552:11,
3553:13, 3554:1,
3554:21, 3555:23,
3559:4, 3563:17,
3563:18, 3563:22,
3564:16, 3564:17,
3565:4, 3566:13,
3566:25, 3567:1,
3567:11, 3569:8,
3569:12, 3569:17,
3570:3, 3570:21,
3571:15, 3572:1,
3572:15, 3573:2,
3573:17, 3573:20,
3574:1, 3574:8,
3574:11, 3575:3,
3575:5, 3575:6,
3575:10, 3575:19,
3576:3, 3576:13,
3576:16, 3576:20,
3577:4, 3577:9,
3577:14, 3577:18,
3578:9, 3578:11,
3578:22, 3579:5,
3579:11, 3579:19,
3579:22, 3579:25,
3580:5, 3580:11,
3580:18, 3581:3,
3581:6, 3581:15,
3581:19, 3582:7,
3582:21, 3583:7,
3583:12, 3584:18,
3584:21, 3585:7,
3585:16, 3585:17,
3586:20, 3587:8,
3588:11, 3589:2,
3589:8, 3589:9,
3589:17, 3590:1,
3590:9, 3590:25,
3591:13, 3591:18,
3593:12, 3593:16,
3593:19, 3599:17,
3600:20, 3600:23,
3601:2, 3601:18,
3603:18, 3605:12,
3605:18, 3606:3,
3607:6, 3609:13,
3610:1, 3610:10,
3611:1, 3611:13,
3612:1, 3612:12,
3612:15, 3616:18,
3617:9, 3617:24,
3618:2, 3619:22,
3620:9, 3621:1,

3621:2, 3621:10,
3622:2, 3622:12,
3622:19, 3622:23,
3623:1, 3623:7,
3624:2, 3624:5,
3624:17, 3627:2,
3627:20, 3628:8,
3629:23, 3630:11,
3631:12, 3633:24,
3634:16, 3635:18,
3636:23, 3637:1,
3638:15, 3638:17,
3638:20, 3640:9,
3646:20, 3647:12,
3649:16, 3650:10,
3650:21, 3652:4,
3654:3, 3656:21,
3656:22, 3662:1,
3662:4, 3662:19,
3664:5, 3664:18,
3664:24, 3667:1,
3674:16, 3677:15

**FMG's** [26] - 3531:19,
3532:18, 3535:25,
3547:20, 3548:1,
3553:22, 3553:23,
3554:17, 3572:9,
3572:10, 3576:17,
3579:20, 3585:22,
3593:12, 3595:7,
3595:20, 3596:5,
3598:15, 3602:2,
3604:7, 3604:23,
3606:9, 3608:24,
3609:11, 3623:23,
3672:7

**focal** [1] - 3543:6

**focus** [5] - 3554:12,
3561:14, 3629:5,
3656:12, 3661:2

**focused** [2] - 3556:23,
3574:23

**Focusing** [1] -
3630:10

**focusing** [1] - 3644:22

**folks** [2] - 3659:12,
3671:12

**follow** [2] - 3603:20,
3671:6

**following** [3] - 3517:8,
3517:18, 3645:17

**FOR** [3] - 3515:7,
3515:10, 3515:14

**forcible** [1] - 3533:19

**forever** [1] - 3667:10

**forget** [3] - 3533:1,
3621:12, 3674:8

**forgot** [1] - 3534:1

**form** [4] - 3526:13,
3535:15, 3590:22,

3676:24

**Form** [1] - 3531:25

**formal** [1] - 3526:25

**format** [2] - 3537:5,
3537:9

**forward** [1] - 3544:5

**foundation** [1] -
3604:9

**four** [4] - 3552:7,
3557:14, 3566:18,
3630:23

**Fox** [1] - 3668:12

**Francis** [1] - 3514:24

**FRANCIS** [1] -
3514:24

**Frank** [4] - 3524:1,
3541:3, 3573:8,
3604:10

**frankly** [1] - 3662:8

**fraud** [2] - 3617:17,
3617:18

**frequently** [2] -
3560:5, 3570:13

**friend** [1] - 3658:16

**front** [18] - 3524:24,
3525:21, 3527:21,
3532:23, 3536:13,
3540:12, 3549:13,
3552:22, 3555:10,
3568:24, 3569:1,
3598:24, 3603:4,
3608:5, 3630:19,
3654:15, 3663:17,
3667:16

**fronts** [1] - 3667:5

**full** [2] - 3583:18,
3592:15

**fully** [5] - 3583:8,
3608:4, 3608:13,
3670:24, 3672:23

**function** [2] - 3543:3,
3594:17

**functions** [2] -
3563:18, 3564:7

**fund** [147] - 3526:17,
3528:1, 3529:16,
3535:6, 3535:8,
3542:4, 3544:11,
3544:14, 3544:19,
3544:20, 3544:22,
3548:15, 3548:18,
3548:25, 3551:1,
3551:11, 3551:15,
3551:23, 3551:25,
3552:14, 3553:10,
3553:16, 3555:22,
3556:20, 3557:8,
3559:3, 3559:25,
3560:15, 3561:24,
3562:2, 3562:14,

3562:21, 3564:1,
3564:2, 3564:3,
3564:12, 3564:18,
3564:20, 3564:23,
3565:9, 3565:11,
3571:23, 3576:25,
3577:6, 3577:13,
3577:16, 3577:17,
3579:17, 3580:11,
3580:14, 3580:18,
3581:6, 3581:16,
3582:5, 3583:18,
3584:5, 3584:6,
3584:7, 3584:8,
3585:2, 3585:3,
3585:8, 3585:9,
3586:5, 3588:25,
3589:8, 3589:23,
3596:20, 3597:10,
3597:21, 3597:25,
3598:6, 3598:7,
3598:12, 3600:11,
3601:12, 3601:16,
3603:19, 3604:6,
3604:18, 3604:20,
3607:2, 3608:4,
3608:18, 3608:19,
3609:16, 3609:20,
3612:13, 3618:4,
3626:11, 3626:17,
3627:9, 3628:14,
3628:17, 3629:24,
3630:11, 3631:10,
3631:14, 3631:18,
3633:1, 3634:21,
3636:16, 3636:18,
3636:22, 3638:1,
3640:21, 3641:10,
3643:2, 3644:25,
3645:12, 3646:3,
3646:20, 3647:12,
3649:3, 3651:12,
3651:13, 3652:5,
3652:8, 3652:20,
3652:22, 3652:25,
3653:1, 3653:15,
3653:16, 3653:19,
3653:20, 3657:2,
3659:1, 3669:4,
3669:9, 3672:12,
3672:18, 3672:19,
3676:10, 3676:11,
3676:13
**Fund** [1] - 3562:16
**fund's** [2] - 3597:5,
3643:12
**fund-by-fund** [3] -
3603:19, 3604:20,
3676:13
**fundamental** [1] -
3572:9

**funding** [1] - 3637:25
**FUNDS** [1] - 3514:10
**Funds** [7] - 3548:3,
3563:1, 3591:13,
3591:24, 3591:25,
3638:22, 3639:8
**funds** [145] - 3529:16,
3530:19, 3535:6,
3535:8, 3535:10,
3536:1, 3536:2,
3542:5, 3542:23,
3543:4, 3543:13,
3543:16, 3543:21,
3543:22, 3543:24,
3545:1, 3545:9,
3545:10, 3545:22,
3546:4, 3547:6,
3547:17, 3547:22,
3549:3, 3549:5,
3549:6, 3549:25,
3551:11, 3551:12,
3552:3, 3552:4,
3556:1, 3556:2,
3556:3, 3556:6,
3556:13, 3556:21,
3556:24, 3560:9,
3560:14, 3560:17,
3561:4, 3561:10,
3561:11, 3561:14,
3561:16, 3561:19,
3561:20, 3563:4,
3563:5, 3563:12,
3564:2, 3564:15,
3565:3, 3565:7,
3565:8, 3565:14,
3565:17, 3565:18,
3565:19, 3566:8,
3566:17, 3571:17,
3576:18, 3576:21,
3576:25, 3577:2,
3577:5, 3577:25,
3578:2, 3578:4,
3583:24, 3586:5,
3588:19, 3589:3,
3589:11, 3589:20,
3591:2, 3591:14,
3591:16, 3595:21,
3595:23, 3596:4,
3596:6, 3596:17,
3597:9, 3598:1,
3598:3, 3601:12,
3603:21, 3611:4,
3616:18, 3623:8,
3627:14, 3628:19,
3628:21, 3630:3,
3630:10, 3630:14,
3630:15, 3630:16,
3630:17, 3631:24,
3632:16, 3635:14,
3635:16, 3635:18,
3637:2, 3638:15,

3638:16, 3638:17,
3638:20, 3639:4,
3640:10, 3642:11,
3642:25, 3643:22,
3644:24, 3644:25,
3645:6, 3649:2,
3649:4, 3650:21,
3650:24, 3651:2,
3651:4, 3651:5,
3651:8, 3652:8,
3661:4, 3666:23,
3667:9, 3667:10,
3667:11, 3670:7,
3672:9
**funds'** [3] - 3552:15,
3572:20, 3600:10
**funneled** [1] - 3674:14
**furnish** [1] - 3622:4

# G

**Gabelli** [2] - 3585:9,
3585:14
**GABLE** [1] - 3514:24
**Gable** [1] - 3514:24
**gamut** [1] - 3647:21
**Gartenberg** [16] -
3518:14, 3525:5,
3526:12, 3527:3,
3574:21, 3595:11,
3602:6, 3602:9,
3607:11, 3641:4,
3641:7, 3642:5,
3644:3, 3660:6,
3672:4, 3673:19
**Gary** [6] - 3528:7,
3534:2, 3534:7,
3534:9, 3573:23,
3668:10
**GARY** [4] - 3516:2,
3516:2, 3524:8,
3524:14
**Gates** [2] - 3524:19,
3524:22
**gather** [1] - 3599:18
**gears** [11] - 3530:15,
3543:12, 3547:20,
3578:18, 3581:12,
3594:23, 3600:14,
3610:1, 3621:20,
3640:8, 3655:1
**general** [12] - 3533:18,
3544:24, 3545:21,
3565:20, 3573:23,
3638:25, 3639:9,
3640:1, 3640:6,
3643:25, 3644:1
**GENERAL** [1] -
3515:16
**generally** [20] -

3526:9, 3562:14,
3562:21, 3572:4,
3578:24, 3595:20,
3596:5, 3597:8,
3599:11, 3600:10,
3620:8, 3628:9,
3628:20, 3633:1,
3642:2, 3642:8,
3643:24, 3644:10,
3646:11, 3669:5
**Generally** [3] -
3538:23, 3566:16,
3588:18
**generated** [1] -
3528:13
**generation** [1] -
3537:13
**genesis** [1] - 3587:11
**gist** [1] - 3542:17
**given** [4] - 3521:6,
3592:5, 3622:19,
3651:11
**GLENN** [1] - 3514:8
**global** [1] - 3581:4
**goal** [3] - 3559:2,
3566:9, 3574:24
**Goldstein** [7] -
3572:8, 3575:8,
3575:17, 3615:1,
3661:16, 3665:9,
3665:16
**governance** [3] -
3539:21, 3540:19,
3660:12
**government** [2] -
3657:24, 3658:2
**governmental** [1] -
3673:10
**great** [3] - 3523:6,
3642:10, 3662:13
**gross** [1] - 3562:19
**grounds** [1] - 3649:7
**GROUP** [1] - 3514:11
**group** [1] - 3558:23
**groups** [6] - 3543:7,
3551:17, 3595:21,
3596:7, 3597:9,
3644:23
**grow** [2] - 3632:3,
3632:10
**grows** [1] - 3579:17
**Growth** [2] - 3558:2,
3562:5
**guarantee** [1] - 3577:1
**guess** [29] - 3531:7,
3539:1, 3541:25,
3546:17, 3548:20,
3550:3, 3560:25,
3562:2, 3564:13,
3564:14, 3573:1,

3576:22, 3577:9,
3577:24, 3578:23,
3590:17, 3590:19,
3603:14, 3604:3,
3605:20, 3613:5,
3615:17, 3618:20,
3622:1, 3659:25,
3660:1, 3660:9,
3668:13, 3676:9
**guidance** [6] - 3636:7,
3673:14, 3673:19,
3673:20, 3673:21,
3674:1

# H

**HADLEY** [1] - 3515:12
**half** [4] - 3535:15,
3580:9, 3650:11,
3665:6
**hand** [5] - 3523:3,
3530:22, 3546:19,
3553:20, 3554:14
**handled** [1] - 3542:22
**Hang** [1] - 3610:17
**happily** [1] - 3523:16
**hard** [6] - 3546:14,
3585:24, 3600:5,
3656:1, 3674:6,
3675:1
**harsh** [2] - 3615:24,
3616:5
**Harvey** [1] - 3529:8
**hat** [1] - 3607:22
**hate** [1] - 3610:13
**head** [3] - 3658:20,
3660:12, 3660:13
**headed** [1] - 3658:7
**headings** [1] -
3540:15
**hear** [2] - 3639:20,
3677:17
**heard** [4] - 3518:4,
3520:5, 3573:10,
3642:19
**hearing** [2] - 3614:17,
3614:20
**hearsay** [4] - 3518:21,
3592:7, 3612:4,
3639:18
**heavily** [2] - 3572:2,
3675:25
**heavy** [1] - 3551:2
**held** [1] - 3607:24
**help** [2] - 3659:19,
3675:25
**helpful** [33] - 3526:19,
3528:14, 3528:23,
3532:14, 3535:21,

3537:1, 3541:17, 3550:5, 3554:4, 3556:15, 3556:18, 3558:14, 3558:18, 3560:10, 3561:3, 3569:20, 3569:24, 3570:3, 3586:23, 3586:24, 3587:5, 3588:17, 3595:6, 3595:15, 3599:23, 3602:19, 3602:25, 3603:25, 3611:6, 3628:22, 3660:18, 3669:23, 3675:12

**helping** [2] - 3550:11, 3661:3

**helps** [4] - 3537:9, 3554:10, 3554:11, 3609:9

**hesitant** [1] - 3566:11

**hesitation** [1] - 3665:3

**hide** [1] - 3579:4

**high** [8] - 3576:3, 3666:6, 3674:19, 3674:25, 3676:25, 3677:1, 3677:5, 3677:21

**higher** [4] - 3580:13, 3585:12, 3604:19, 3677:3

**highest** [4] - 3557:17, 3656:10, 3658:22, 3665:25

**highly** [1] - 3565:4

**himself** [1] - 3661:10

**hired** [2] - 3635:24, 3670:7

**hiring** [1] - 3612:24

**hold** [2] - 3575:11, 3605:10

**Honor** [77] - 3517:3, 3518:2, 3518:5, 3519:21, 3519:22, 3520:6, 3522:5, 3522:11, 3522:14, 3522:19, 3523:1, 3523:10, 3523:14, 3523:25, 3524:6, 3524:12, 3524:25, 3525:7, 3525:13, 3525:15, 3527:9, 3533:1, 3533:16, 3533:23, 3534:3, 3536:5, 3536:7, 3538:19, 3540:22, 3544:4, 3546:24, 3547:11, 3555:1, 3555:6, 3559:14, 3559:19, 3560:7, 3568:8, 3568:13,

3568:21, 3570:25, 3575:12, 3579:7, 3581:9, 3586:9, 3592:7, 3594:2, 3594:20, 3595:22, 3600:24, 3601:23, 3608:15, 3612:2, 3614:12, 3617:2, 3618:5, 3620:14, 3620:19, 3621:7, 3624:23, 3625:6, 3625:12, 3625:17, 3625:19, 3626:1, 3629:11, 3629:13, 3639:18, 3642:12, 3642:21, 3647:3, 3647:6, 3649:1, 3654:12, 3657:15, 3671:10, 3678:4

**Honor's** [1] - 3533:17

**HONORABLE** [1] - 3514:17

**hook** [1] - 3579:18

**hope** [1] - 3523:1

**HORA** [3] - 3515:13, 3523:14, 3523:23

**Hora** [1] - 3523:14

**hours** [1] - 3655:6

**housekeeping** [1] - 3523:15

**huge** [1] - 3674:13

**human** [1] - 3548:23

**hundreds** [1] - 3578:3

**hybrid** [4] - 3543:24, 3544:18, 3651:6, 3653:1

## I

**idea** [1] - 3556:13

**ideas** [1] - 3668:14

**identification** [1] - 3547:14

**identified** [8] - 3522:10, 3522:12, 3523:20, 3570:2, 3577:14, 3615:16, 3637:4, 3673:15

**identifies** [1] - 3552:3

**identify** [2] - 3556:6, 3569:19

**ignoring** [2] - 3624:13, 3624:18

**immediate** [1] - 3559:7

**immediately** [2] - 3546:17, 3617:6

**impact** [7] - 3623:22, 3650:8, 3650:9,

3650:17, 3651:20, 3651:25

**impacts** [1] - 3627:21

**imperative** [1] - 3537:6, 3670:10

**implemented** [1] - 3613:1

**implications** [1] - 3522:18

**important** [41] - 3517:14, 3517:20, 3518:14, 3528:10, 3528:22, 3532:20, 3539:3, 3540:3, 3542:11, 3552:14, 3552:17, 3574:1, 3574:2, 3580:6, 3584:4, 3585:17, 3595:19, 3596:22, 3597:20, 3598:18, 3600:3, 3602:5, 3602:8, 3611:9, 3613:7, 3613:8, 3626:24, 3632:15, 3641:19, 3650:21, 3657:4, 3660:22, 3663:21, 3664:17, 3668:8, 3669:21, 3671:20, 3672:3, 3675:10, 3676:20, 3677:9

**important..** [1] - 3566:15

**importantly** [5] - 3577:8, 3583:16, 3585:19, 3598:2, 3646:9

**imposed** [3] - 3635:8, 3671:21, 3673:21

**imposes** [1] - 3631:6

**improvements** [3] - 3634:16, 3634:20, 3634:25

**in-depth** [1] - 3645:3

**inception** [1] - 3558:22

**include** [7] - 3608:10, 3610:1, 3635:18, 3637:6, 3637:7, 3637:9, 3637:11

**included** [3] - 3527:6, 3562:21, 3598:19

**includes** [2] - 3528:1, 3607:15

**including** [10] - 3535:14, 3543:22, 3547:7, 3565:7, 3576:2, 3583:13, 3616:25, 3631:8, 3644:11, 3652:24

**inclusive** [1] - 3608:19

**income** [5] - 3602:24, 3639:3, 3639:7, 3640:7

**inconsistent** [2] - 3563:14, 3563:15

**increase** [3] - 3626:11, 3626:12, 3626:13

**increased** [1] - 3633:9

**incremental** [1] - 3632:5

**incurred** [2] - 3610:8, 3624:14

**incurring** [1] - 3546:6

**incurs** [1] - 3623:8

**independence** [1] - 3539:25

**independent** [61] - 3518:7, 3518:13, 3519:7, 3519:19, 3520:9, 3520:13, 3520:20, 3520:23, 3520:24, 3521:2, 3521:4, 3527:15, 3530:1, 3530:9, 3530:13, 3532:10, 3534:13, 3538:4, 3552:12, 3554:8, 3554:20, 3566:12, 3570:6, 3570:14, 3570:16, 3574:16, 3577:15, 3590:21, 3605:23, 3606:1, 3612:12, 3612:13, 3612:14, 3614:1, 3614:7, 3618:8, 3618:12, 3618:25, 3622:5, 3632:24, 3633:25, 3639:16, 3641:14, 3641:17, 3641:20, 3646:8, 3654:7, 3659:4, 3662:14, 3662:15, 3664:12, 3664:13, 3665:1, 3665:14, 3670:3, 3670:8, 3670:11, 3670:18, 3670:24, 3670:25, 3674:5

**Independent** [1] - 3670:16

**index** [13] - 3525:17, 3543:25, 3544:20, 3551:11, 3559:1, 3585:2, 3585:3, 3585:8, 3585:12, 3585:15, 3651:8, 3653:2

**indexes** [1] - 3635:15

**indicate** [2] - 3553:21,

3614:17

**indicated** [6] - 3517:11, 3520:1, 3526:8, 3604:3, 3649:14, 3665:18

**indicating** [1] - 3671:24

**indicating)** [1] - 3569:2

**indirectly** [4] - 3548:19, 3549:25, 3608:11, 3608:12

**individual** [2] - 3527:14, 3534:14

**industries** [1] - 3669:5

**industry** [41] - 3528:5, 3563:15, 3580:12, 3585:18, 3595:16, 3597:3, 3597:16, 3600:7, 3600:12, 3604:8, 3604:24, 3606:1, 3608:18, 3610:5, 3614:11, 3617:10, 3618:23, 3626:17, 3627:17, 3627:18, 3628:16, 3636:9, 3636:16, 3638:10, 3657:24, 3658:9, 3661:12, 3661:13, 3662:12, 3664:10, 3666:8, 3667:8, 3668:6, 3668:21, 3669:5, 3669:7, 3669:9, 3670:22, 3674:24

**information** [95] - 3518:12, 3519:13, 3526:14, 3527:15, 3528:8, 3528:10, 3529:3, 3529:18, 3529:21, 3530:17, 3532:11, 3535:3, 3536:3, 3542:3, 3542:12, 3543:4, 3543:6, 3547:7, 3566:2, 3566:24, 3567:1, 3567:3, 3567:8, 3567:20, 3567:23, 3569:17, 3569:24, 3570:7, 3573:19, 3578:11, 3578:15, 3581:14, 3581:25, 3582:9, 3583:17, 3588:17, 3593:15, 3593:18, 3593:22, 3594:25, 3595:6, 3595:17, 3596:21, 3597:13, 3599:18, 3599:21, 3599:22, 3601:13,

3601:15, 3601:17,
3605:5, 3605:7,
3606:17, 3608:23,
3609:3, 3609:14,
3609:17, 3609:19,
3617:11, 3618:6,
3621:9, 3624:1,
3624:4, 3627:2,
3627:6, 3627:9,
3627:13, 3627:14,
3627:19, 3628:17,
3629:3, 3629:4,
3629:7, 3629:9,
3629:18, 3636:23,
3639:24, 3644:10,
3644:11, 3644:14,
3645:16, 3656:11,
3657:4, 3657:9,
3664:25, 3670:2,
3670:14, 3670:15,
3670:19, 3672:2,
3675:9, 3675:17,
3675:18, 3676:17
**informing** [1] -
3540:20
**infrequently** [1] -
3653:17
**inherent** [4] - 3565:23,
3598:10, 3602:21,
3609:9
**inherently** [2] -
3616:21, 3633:8
**initial** [2] - 3580:9,
3580:16
**initiatives** [2] -
3541:21, 3543:5
**INS** [1] - 3514:6
**Insight** [1] - 3605:1
**insofar** [2] - 3517:21,
3517:24
**Insofar** [1] - 3518:22
**Institute** [2] - 3669:13,
3670:12
**insulated** [1] - 3676:5
**INSURANCE** [1] -
3515:17
**insurance** [13] -
3562:20, 3563:5,
3563:10, 3581:4,
3621:25, 3622:25,
3637:22, 3637:24,
3638:19, 3639:4,
3666:23, 3674:22
**integrity** [1] - 3661:23
**intended** [2] - 3610:7,
3622:20
**interest** [10] - 3530:11,
3609:11, 3640:16,
3641:2, 3655:25,
3656:14, 3656:15,

3661:12, 3661:23,
3662:11
**interested** [2] -
3661:24, 3672:6
**interesting** [4] -
3585:10, 3660:1,
3660:16, 3661:21
**internal** [2] - 3617:8,
3622:12
**interrupt** [3] -
3540:23, 3560:8,
3649:1
**intimately** [1] -
3655:19
**introduce** [1] -
3525:21
**invest** [5] - 3564:3,
3566:19, 3601:16,
3639:4, 3672:8
**investing** [4] - 3549:6,
3638:19, 3666:21,
3666:22
**investment** [62] -
3531:20, 3535:7,
3535:8, 3536:22,
3540:2, 3541:24,
3546:8, 3546:10,
3548:17, 3549:7,
3551:21, 3552:5,
3552:6, 3552:10,
3553:17, 3553:18,
3556:8, 3563:17,
3564:13, 3565:18,
3565:21, 3566:4,
3566:7, 3566:20,
3566:21, 3566:22,
3571:16, 3571:23,
3572:3, 3575:10,
3575:19, 3575:23,
3576:21, 3585:3,
3597:2, 3604:8,
3604:23, 3605:4,
3605:11, 3628:14,
3631:4, 3632:1,
3639:3, 3644:21,
3647:1, 3651:11,
3653:3, 3653:6,
3653:13, 3653:14,
3656:21, 3658:8,
3658:11, 3658:12,
3658:20, 3659:13,
3659:14, 3659:15,
3661:5, 3670:4
**Investment** [3] -
3563:2, 3669:13,
3670:12
**investments** [2] -
3639:6, 3640:7
**investor** [30] - 3546:2,
3546:5, 3546:6,

3549:7, 3552:19,
3566:6, 3575:1,
3585:20, 3586:4,
3596:19, 3597:1,
3601:16, 3608:3,
3643:17, 3648:25,
3650:13, 3653:8,
3660:4, 3671:7,
3671:19, 3671:22,
3672:3, 3672:6,
3672:8, 3672:17,
3672:22, 3672:24,
3675:13, 3675:24
**investor's** [2] -
3651:25, 3652:2
**investors** [26] -
3564:2, 3564:20,
3566:14, 3572:16,
3574:5, 3576:8,
3576:11, 3580:20,
3580:23, 3586:3,
3598:21, 3601:15,
3601:20, 3615:12,
3626:16, 3629:24,
3630:12, 3635:22,
3639:5, 3641:3,
3654:23, 3659:17,
3661:24, 3666:19,
3666:20, 3671:16
**invite** [1] - 3663:20
**involve** [1] - 3546:10
**involved** [17] - 3538:4,
3565:4, 3571:25,
3572:2, 3577:1,
3583:15, 3585:7,
3587:2, 3589:1,
3589:2, 3609:9,
3612:1, 3617:7,
3651:4, 3655:19,
3664:2, 3677:20
**involvement** [1] -
3649:21
**involving** [1] - 3589:4
**isolation** [1] - 3584:16
**issue** [38] - 3517:18,
3519:22, 3520:5,
3521:8, 3523:15,
3534:12, 3537:16,
3543:22, 3544:4,
3545:9, 3545:10,
3545:22, 3546:16,
3547:6, 3558:7,
3560:11, 3560:14,
3560:17, 3560:21,
3561:10, 3561:11,
3561:14, 3565:8,
3590:22, 3595:23,
3596:5, 3597:9,
3600:10, 3603:21,
3611:4, 3623:20,

3630:10, 3630:15,
3630:16, 3631:24,
3639:16, 3655:24,
3659:10
**issues** [27] - 3517:4,
3517:8, 3522:1,
3538:10, 3539:22,
3540:4, 3540:8,
3542:18, 3543:2,
3551:8, 3553:17,
3556:7, 3556:11,
3556:14, 3556:22,
3556:24, 3559:2,
3562:10, 3569:19,
3570:2, 3593:6,
3617:18, 3619:25,
3663:16, 3668:17,
3668:18, 3673:22
**item** [1] - 3542:14
**items** [6] - 3540:18,
3542:7, 3632:19,
3637:3, 3652:16,
3673:5
**itself** [3] - 3544:22,
3621:16, 3640:15

--------

## J

**JAMES** [1] - 3515:13
**January** [2] - 3521:10,
3611:20
**JERSEY** [3] - 3514:1,
3514:15, 3514:18
**Jettie** [5] - 3529:13,
3615:25, 3616:6,
3616:7, 3619:3
**Jim** [1] - 3533:23
**job** [1] - 3671:2
**jobs** [1] - 3661:3
**Joenk** [7] - 3662:21,
3663:11, 3664:4,
3664:16, 3664:20,
3664:22, 3665:5
**joined** [6] - 3534:10,
3611:19, 3611:21,
3622:18, 3635:6,
3668:13
**joining** [2] - 3528:9,
3534:11
**joint** [1] - 3523:3
**JONATHAN** [1] -
3515:9
**JP** [17] - 3586:21,
3587:9, 3588:12,
3588:18, 3589:10,
3590:1, 3590:10,
3591:1, 3592:11,
3592:14, 3592:17,
3592:20, 3593:8,

3593:12, 3594:5,
3594:16
**JUDGE** [1] - 3514:17
**Judge** [1] - 3520:17
**judges** [1] - 3673:4
**judgment** [29] -
3529:24, 3570:19,
3574:19, 3575:1,
3584:18, 3586:7,
3600:9, 3602:12,
3613:19, 3613:22,
3614:22, 3617:16,
3618:22, 3620:18,
3629:20, 3632:24,
3636:4, 3640:18,
3641:8, 3656:10,
3657:1, 3669:22,
3673:14, 3673:15,
3673:24, 3674:6,
3676:25, 3677:23
**judgments** [1] -
3640:24
**judicial** [1] - 3526:16
**July** [27] - 3526:15,
3530:12, 3536:21,
3537:21, 3537:22,
3537:24, 3538:5,
3538:9, 3541:16,
3549:23, 3555:2,
3555:4, 3574:16,
3586:19, 3587:23,
3588:1, 3603:12,
3615:19, 3628:6,
3642:3, 3642:8,
3643:17, 3648:23,
3655:4, 3657:6,
3657:9
**June** [7] - 3526:7,
3526:15, 3538:9,
3551:19, 3555:2,
3657:9
**justify** [3] - 3583:4,
3672:13, 3672:14

--------

## K

**K&L** [2] - 3524:19,
3524:22
**keep** [9] - 3533:9,
3537:20, 3545:16,
3588:24, 3606:23,
3622:21, 3653:11,
3669:6, 3677:11
**keeping** [2] - 3541:20,
3634:13
**keeps** [1] - 3575:5
**key** [15] - 3526:14,
3526:25, 3528:17,
3547:6, 3551:21,
3569:16, 3569:18,

3587:5, 3606:25, 3634:9, 3634:12, 3644:10, 3657:9, 3671:19

**kind** [30] - 3529:10, 3534:18, 3535:16, 3537:4, 3542:6, 3547:6, 3559:12, 3565:6, 3569:23, 3582:8, 3607:12, 3617:11, 3618:25, 3627:12, 3629:9, 3644:9, 3659:5, 3659:16, 3661:7, 3661:12, 3662:18, 3663:24, 3668:18, 3669:7, 3669:18, 3670:15, 3671:5, 3674:14, 3675:21, 3676:12

**kinds** [6] - 3548:20, 3564:3, 3617:6, 3647:20, 3670:9, 3673:22

**knowledge** [5] - 3543:8, 3587:7, 3619:6, 3673:25, 3674:23

**known** [2] - 3594:6, 3594:10

**Komisarjevsky** [1] - 3660:11

**Kopcke** [2] - 3674:11, 3676:2

**Kopne** [1] - 3674:10

**KORN** [1] - 3515:9

**KWELTY** [1] - 3515:6

**L**

**Lakind** [10] - 3518:19, 3521:10, 3521:12, 3521:20, 3521:25, 3522:7, 3525:12, 3545:5, 3625:11, 3625:18

**LAKIND** [47] - 3515:3, 3515:4, 3515:5, 3517:3, 3518:20, 3519:1, 3519:22, 3522:14, 3522:23, 3523:1, 3523:9, 3523:25, 3525:13, 3527:9, 3533:16, 3533:23, 3534:3, 3536:7, 3540:22, 3544:4, 3545:9, 3559:19, 3560:7, 3560:19, 3571:10, 3573:6, 3575:12,

3592:7, 3595:22, 3604:9, 3612:2, 3614:12, 3620:14, 3620:19, 3625:12, 3625:19, 3626:1, 3629:13, 3630:2, 3639:18, 3647:6, 3648:8, 3648:16, 3649:1, 3649:7, 3657:14, 3671:10

**language** [1] - 3589:15

**lapses** [1] - 3667:12

**large** [8] - 3517:7, 3548:14, 3583:3, 3584:24, 3621:3, 3649:4, 3659:6, 3660:13

**Large** [2] - 3557:3, 3558:2

**largely** [1] - 3567:23

**larger** [1] - 3632:10

**laser** [1] - 3674:15

**last** [17] - 3541:17, 3553:11, 3591:23, 3593:21, 3616:9, 3625:23, 3630:23, 3635:7, 3640:21, 3648:3, 3655:1, 3655:8, 3662:17, 3662:25, 3664:18, 3665:10, 3667:17

**lastly** [1] - 3657:3

**law** [2] - 3525:9, 3542:19

**laws** [1] - 3543:1

**lawsuit** [8] - 3580:20, 3655:2, 3655:3, 3655:5, 3655:8, 3669:1, 3671:15

**lawyer** [1] - 3607:22

**lawyers** [1] - 3659:14

**lead** [13] - 3519:18, 3526:23, 3526:24, 3529:5, 3534:13, 3538:1, 3581:5, 3656:5, 3664:12, 3665:14, 3668:4, 3668:5, 3668:11

**leaders** [1] - 3670:22

**leading** [1] - 3575:12

**leafs** [1] - 3517:7

**learn** [1] - 3622:19

**Learned** [1] - 3612:5

**learned** [3] - 3552:12, 3594:5, 3594:8, 3612:4, 3622:13, 3622:17, 3655:6

**learning** [1] - 3662:12

**least** [18] - 3526:13,

3526:23, 3527:2, 3528:22, 3539:11, 3554:1, 3570:24, 3588:24, 3605:10, 3609:15, 3609:16, 3627:17, 3637:16, 3639:5, 3661:2, 3667:1, 3670:17, 3674:24

**leaves** [1] - 3517:18

**leaving** [1] - 3556:11

**left** [4] - 3517:4, 3524:16, 3544:21, 3553:4

**leg** [1] - 3655:1

**Legal** [1] - 3542:17

**legal** [8] - 3542:18, 3548:23, 3570:1, 3573:4, 3573:5, 3577:11, 3596:18

**legend** [1] - 3553:20

**legible** [1] - 3517:11

**length** [6] - 3580:6, 3609:7, 3642:10, 3661:25, 3663:1, 3664:6

**less** [8] - 3546:2, 3554:12, 3609:20, 3649:25, 3652:11, 3654:3, 3654:18, 3675:10

**level** [29] - 3546:9, 3548:22, 3549:11, 3551:6, 3563:10, 3563:11, 3564:15, 3564:16, 3577:3, 3582:11, 3598:21, 3598:22, 3611:3, 3626:13, 3631:9, 3631:16, 3632:14, 3632:23, 3633:13, 3634:2, 3634:3, 3634:8, 3637:22, 3637:25, 3667:2, 3677:22, 3677:25

**levels** [10] - 3546:1, 3627:10, 3628:19, 3631:1, 3631:21, 3631:23, 3633:1, 3633:7, 3653:11, 3658:23

**leverage** [1] - 3609:20

**Lewis** [4] - 3520:13, 3524:18, 3659:6, 3668:14

**LIFE** [2] - 3514:6, 3515:17

**likely** [1] - 3633:9

**limit** [1] - 3601:10

**limitation** [2] - 3532:3,

3631:6

**limitations** [6] - 3585:24, 3598:10, 3602:21, 3627:15, 3675:19, 3675:21

**limited** [3] - 3523:20, 3579:15, 3585:1

**line** [7] - 3568:1, 3607:17, 3649:18, 3649:25, 3650:6, 3675:22

**Lipper** [19] - 3551:17, 3566:1, 3595:21, 3596:6, 3597:22, 3599:14, 3600:18, 3600:19, 3600:23, 3601:2, 3605:1, 3644:11, 3645:10, 3645:11, 3669:16, 3669:25, 3670:4, 3675:19

**list** [19] - 3539:1, 3539:17, 3552:2, 3555:15, 3555:17, 3555:20, 3555:22, 3555:23, 3556:5, 3557:9, 3559:3, 3566:18, 3571:1, 3581:21, 3589:17, 3589:18, 3644:7, 3644:10

**listed** [3] - 3525:5, 3557:8, 3601:6

**lists** [5] - 3570:1, 3586:20, 3586:21, 3628:12, 3643:21

**litigation** [7] - 3526:11, 3540:21, 3541:20, 3587:15, 3587:20, 3603:22, 3613:7

**live** [1] - 3659:18

**lived** [1] - 3661:19

**living** [1] - 3661:20

**LLP** [2] - 3515:9, 3515:12

**load** [1] - 3608:5

**log** [1] - 3521:3

**long-held** [1] - 3607:24

**look** [78] - 3522:24, 3525:12, 3530:8, 3543:22, 3544:12, 3546:18, 3546:24, 3551:6, 3557:1, 3557:25, 3560:22, 3562:3, 3562:17, 3562:18, 3563:4, 3563:11, 3564:9, 3564:17, 3575:5,

3577:17, 3578:5, 3579:9, 3579:22, 3582:19, 3583:4, 3583:5, 3583:6, 3583:10, 3583:16, 3583:17, 3583:19, 3583:23, 3583:24, 3583:25, 3584:1, 3584:3, 3584:6, 3584:7, 3584:9, 3584:15, 3585:2, 3585:21, 3586:2, 3586:6, 3597:21, 3598:18, 3600:3, 3600:16, 3600:18, 3600:20, 3602:7, 3603:2, 3603:16, 3603:20, 3604:4, 3605:3, 3607:17, 3613:17, 3624:16, 3632:11, 3633:11, 3643:16, 3649:18, 3650:12, 3660:11, 3660:19, 3667:4, 3669:21, 3673:10, 3674:22, 3675:16, 3675:22, 3676:12

**looked** [11] - 3577:10, 3614:1, 3624:16, 3644:8, 3645:16, 3651:21, 3657:19, 3667:17, 3671:4, 3671:24, 3674:12

**looking** [33] - 3525:19, 3551:8, 3559:8, 3576:14, 3579:11, 3579:19, 3582:25, 3583:21, 3585:24, 3597:24, 3598:10, 3599:22, 3600:21, 3602:20, 3602:22, 3632:15, 3633:1, 3633:6, 3648:11, 3649:17, 3657:9, 3659:20, 3659:21, 3661:5, 3661:23, 3664:3, 3666:5, 3666:8, 3674:14, 3676:4, 3676:6, 3676:19, 3677:22

**looks** [6] - 3526:11, 3557:19, 3559:1, 3569:2, 3582:19, 3659:12

**loose** [1] - 3517:7

**Lord** [1] - 3559:9

**lost** [2] - 3633:2, 3677:12

**LOUIE** [1] - 3515:16

**Louie** [2] - 3525:22,

3641:10
**low** [2] - 3585:4, 3609:11
**lower** [3] - 3546:1, 3546:5, 3554:13
**lowered** [2] - 3562:1, 3562:2
**lowest** [1] - 3557:18
**lunch** [1] - 3568:11
**Luncheon** [1] - 3568:17

# M

**magnitude** [3] - 3620:8, 3620:12, 3620:21
**mail** [1] - 3521:1
**main** [2] - 3531:10, 3606:23
**maintained** [1] - 3589:1
**major** [13] - 3548:22, 3556:10, 3556:11, 3561:20, 3565:12, 3566:4, 3577:25, 3578:10, 3581:4, 3614:1, 3618:8, 3666:11, 3670:14
**manage** [3] - 3535:9, 3542:19, 3667:10
**managed** [5] - 3543:25, 3544:19, 3547:16, 3651:7
**Management** [5] - 3563:16, 3573:14, 3573:16, 3575:5, 3605:2
**MANAGEMENT** [1] - 3514:11
**management** [67] - 3527:16, 3530:16, 3530:18, 3538:24, 3545:24, 3545:25, 3547:22, 3548:3, 3563:2, 3563:18, 3564:4, 3571:16, 3571:23, 3572:3, 3573:20, 3575:3, 3585:3, 3587:23, 3587:24, 3587:25, 3588:7, 3589:20, 3593:24, 3594:25, 3595:20, 3596:5, 3596:15, 3596:18, 3597:6, 3597:18, 3597:22, 3598:2, 3598:3, 3598:7, 3598:9, 3598:11, 3600:2, 3602:3,

3606:9, 3608:9, 3608:24, 3615:21, 3620:3, 3621:10, 3622:4, 3622:6, 3626:21, 3631:1, 3631:8, 3633:17, 3637:2, 3638:15, 3640:9, 3642:2, 3643:3, 3651:11, 3651:23, 3651:24, 3652:3, 3652:10, 3652:23, 3652:24, 3653:4, 3653:6, 3658:8, 3658:20
**management/ advisory** [1] - 3654:17
**manager** [48] - 3531:20, 3535:5, 3536:1, 3536:23, 3537:10, 3540:2, 3544:16, 3546:10, 3548:18, 3556:9, 3564:13, 3564:19, 3564:23, 3565:3, 3566:7, 3573:17, 3576:21, 3577:9, 3578:6, 3585:11, 3585:12, 3585:15, 3587:14, 3598:6, 3604:6, 3605:8, 3608:12, 3609:7, 3616:22, 3616:24, 3628:14, 3631:4, 3632:1, 3634:2, 3634:3, 3634:5, 3634:7, 3636:17, 3644:17, 3647:1, 3651:5, 3651:7, 3651:8, 3652:22, 3656:21, 3665:19, 3672:13
**manager's** [4] - 3554:14, 3573:18, 3618:25, 3636:21
**managers** [16] - 3564:19, 3564:23, 3575:19, 3575:23, 3599:20, 3601:4, 3604:8, 3604:23, 3605:4, 3605:11, 3658:9, 3658:12, 3658:13, 3661:5, 3662:10, 3670:4
**manages** [2] - 3529:17, 3542:4
**MANAGING** [1] - 3515:16
**managing** [3] - 3570:22, 3585:2,

3636:18
**mandated** [1] - 3671:23
**mandates** [1] - 3657:25
**manual** [2] - 3523:19, 3673:6
**margin** [1] - 3604:7
**mark** [3] - 3530:21, 3547:13, 3637:23
**MARK** [1] - 3515:5
**marked** [25] - 3516:6, 3516:8, 3516:9, 3516:10, 3516:11, 3516:12, 3516:13, 3516:14, 3516:15, 3516:16, 3516:17, 3516:18, 3523:17, 3524:3, 3527:11, 3533:21, 3534:5, 3536:9, 3559:21, 3571:12, 3625:14, 3625:21, 3626:3, 3629:15, 3647:8
**markers** [1] - 3675:12
**market** [4] - 3578:1, 3578:2, 3631:14, 3650:25
**marketed** [2] - 3564:1, 3576:9
**marketing** [1] - 3637:23
**MARY** [1] - 3514:3
**match** [1] - 3544:20
**material** [5] - 3519:25, 3539:9, 3540:19, 3615:9, 3618:21
**materials** [15] - 3525:20, 3526:8, 3527:6, 3529:3, 3532:6, 3533:3, 3551:9, 3569:9, 3571:9, 3582:5, 3616:20, 3619:21, 3619:24, 3647:17
**matter** [10] - 3557:22, 3561:1, 3566:4, 3580:2, 3581:1, 3657:6, 3660:1, 3663:5, 3675:19, 3676:18
**matters** [7] - 3520:11, 3530:2, 3540:21, 3541:21, 3543:5, 3570:1, 3657:8
**McCLOY** [1] - 3515:12
**mean** [43] - 3541:14, 3544:2, 3544:9, 3559:6, 3560:7, 3560:25, 3561:12,

3562:7, 3564:11, 3577:12, 3577:23, 3597:17, 3597:19, 3601:7, 3605:6, 3613:5, 3618:14, 3626:10, 3629:1, 3630:13, 3630:15, 3634:20, 3643:21, 3646:12, 3646:22, 3654:6, 3658:6, 3658:10, 3658:15, 3659:25, 3662:3, 3664:16, 3664:18, 3669:20, 3669:24, 3671:4, 3671:21, 3673:1, 3673:19, 3674:21, 3675:4, 3676:8, 3677:3
**meaning** [2] - 3546:11, 3572:7
**means** [4] - 3552:9, 3554:15, 3559:7, 3559:8
**measure** [1] - 3626:18
**mechanism** [1] - 3556:23
**meet** [9] - 3520:11, 3552:7, 3593:5, 3614:5, 3638:8, 3638:12, 3639:14, 3663:12, 3668:19
**meeting** [35] - 3526:7, 3526:8, 3529:11, 3529:14, 3536:21, 3541:16, 3541:17, 3551:3, 3551:4, 3551:14, 3551:18, 3553:13, 3555:1, 3555:2, 3555:17, 3555:18, 3556:4, 3560:5, 3569:10, 3586:19, 3587:23, 3588:1, 3606:24, 3606:25, 3615:19, 3619:17, 3628:6, 3643:18, 3648:22, 3655:4, 3664:23, 3676:20, 3677:6
**meetings** [22] - 3526:15, 3539:10, 3550:16, 3552:9, 3565:22, 3570:11, 3571:6, 3592:12, 3592:15, 3593:9, 3613:14, 3617:8, 3619:16, 3619:19, 3628:7, 3641:9, 3642:3, 3642:6, 3642:8, 3642:9, 3657:9

**member** [1] - 3668:16
**members** [6] - 3518:21, 3527:14, 3529:4, 3615:1, 3657:20, 3663:15
**memo** [5] - 3524:22, 3526:6, 3531:7, 3531:14, 3538:20
**memoranda** [1] - 3524:23
**memorandum** [6] - 3524:17, 3524:18, 3531:18, 3532:8, 3532:9, 3570:6
**memorandums** [1] - 3638:6
**memorize** [1] - 3587:4
**memos** [2] - 3519:24, 3520:1
**men** [1] - 3661:18
**mention** [8] - 3541:7, 3541:13, 3541:21, 3541:24, 3541:25, 3542:15, 3543:4
**mentioned** [24] - 3541:19, 3544:9, 3545:3, 3547:17, 3550:15, 3564:19, 3567:13, 3570:5, 3570:9, 3591:8, 3593:21, 3594:24, 3595:10, 3596:10, 3602:1, 3628:12, 3628:15, 3631:3, 3631:19, 3632:19, 3645:24, 3650:18, 3651:3, 3663:10
**mentioning** [1] - 3668:18
**mentions** [1] - 3628:12
**met** [3] - 3518:9, 3519:9, 3613:13
**methodologies** [3] - 3612:22, 3613:25, 3614:11
**methodology** [19] - 3605:22, 3611:10, 3611:12, 3611:17, 3611:23, 3611:24, 3612:10, 3612:16, 3612:21, 3612:22, 3612:25, 3614:9, 3615:3, 3615:20, 3615:22, 3618:7, 3618:13, 3618:14, 3667:23
**might** [24] - 3517:3, 3533:9, 3541:5, 3541:23, 3544:12,

3544:13, 3544:21, 3546:1, 3551:18, 3556:24, 3558:12, 3562:11, 3608:1, 3624:16, 3629:8, 3631:13, 3631:23, 3632:5, 3651:16, 3657:21, 3659:11, 3671:15, 3674:24, 3677:2

**MILBANK** [1] - 3515:12

**million** [10] - 3580:9, 3622:23, 3623:4, 3623:5, 3623:16, 3631:10, 3650:12, 3654:23, 3654:25

**millions** [2] - 3578:3

**mind** [20] - 3525:14, 3540:9, 3546:17, 3548:12, 3548:20, 3558:11, 3571:22, 3581:22, 3582:22, 3583:4, 3588:21, 3597:17, 3606:23, 3630:23, 3634:13, 3642:12, 3664:17, 3676:2, 3677:2, 3677:4

**mine** [1] - 3658:16

**minimal** [1] - 3579:14

**minimizes** [1] - 3578:22

**minimum** [1] - 3544:16

**minor** [1] - 3523:15

**minute** [7] - 3536:15, 3599:13, 3616:1, 3624:23, 3645:2, 3648:8, 3662:24

**minutes** [14] - 3537:6, 3582:6, 3611:22, 3612:1, 3612:3, 3612:20, 3641:9, 3641:11, 3641:18, 3641:20, 3641:21, 3641:22, 3642:2, 3642:7

**mirror** [1] - 3591:24

**mirrors** [1] - 3535:16

**misleading** [1] - 3624:20

**missed** [1] - 3619:17

**misunderstanding** [1] - 3572:9

**mix** [2] - 3559:2, 3560:3

**moment** [5] - 3530:25, 3545:21, 3547:23, 3558:15, 3636:12

**Monday** [2] - 3657:13, 3678:5

**money** [2] - 3578:2, 3653:19

**money's** [1] - 3579:24

**monitor** [6] - 3537:18, 3539:5, 3542:11, 3543:1, 3556:14, 3566:10

**monitoring** [8] - 3539:25, 3541:22, 3542:10, 3550:17, 3550:20, 3551:1, 3587:19, 3613:7

**month** [2] - 3554:24, 3676:4

**monthly** [1] - 3539:11

**months** [7] - 3541:16, 3542:21, 3553:11, 3570:24, 3571:1, 3616:9, 3657:8

**moon** [1] - 3674:13

**Morgan** [22] - 3507:13, 3524:18, 3557:13, 3586:21, 3587:9, 3588:12, 3588:18, 3589:10, 3590:1, 3590:10, 3591:1, 3591:2, 3592:11, 3592:14, 3592:17, 3592:20, 3593:9, 3593:12, 3594:5, 3594:16, 3659:6, 3668:14

**morning** [6] - 3517:1, 3517:8, 3520:16, 3523:8, 3533:14, 3567:1

**most** [9] - 3518:14, 3551:18, 3566:7, 3580:18, 3588:24, 3589:19, 3620:4, 3632:14, 3669:5

**mouth** [1] - 3642:13

**move** [7] - 3534:1, 3547:13, 3549:8, 3562:13, 3565:20, 3647:3

**moved** [4] - 3517:6, 3546:1, 3622:2, 3651:1

**movement** [1] - 3655:7

**moving** [2] - 3549:4, 3651:4

**MURPHY** [3] - 3515:12, 3642:22, 3674:11

**Murphy** [1] - 3533:25

**must** [1] - 3676:19

**mutual** [7] - 3608:18, 3626:17, 3636:16, 3638:1, 3669:4, 3669:9, 3672:9

**MYLES** [1] - 3515:6

---

# N

**name** [4] - 3565:14, 3579:20, 3621:12, 3674:9

**named** [3] - 3529:13, 3534:15, 3534:16

**names** [1] - 3529:8

**narrow** [1] - 3641:7

**nature** [15] - 3530:16, 3530:17, 3532:19, 3563:24, 3579:11, 3581:12, 3581:14, 3583:10, 3584:10, 3618:19, 3644:16, 3647:23, 3651:11, 3652:17, 3658:6

**near** [1] - 3558:4

**necessarily** [6] - 3546:9, 3553:23, 3556:8, 3559:6, 3585:5, 3601:11

**necessary** [2] - 3538:13, 3588:10

**need** [19] - 3522:24, 3529:22, 3560:22, 3561:1, 3578:10, 3607:4, 3607:16, 3609:14, 3613:5, 3615:13, 3616:13, 3616:23, 3620:17, 3642:17, 3661:20, 3662:8, 3667:13, 3669:23, 3673:15

**needs** [4] - 3519:23, 3540:23, 3615:13, 3664:24

**negotiate** [4] - 3542:8, 3584:21, 3609:11, 3663:9

**negotiated** [8] - 3520:13, 3546:3, 3584:2, 3630:22, 3630:23, 3633:23, 3634:4, 3650:10

**negotiating** [2] - 3609:8, 3636:5

**negotiation** [2] - 3632:7, 3655:23

**negotiations** [7] - 3545:19, 3602:14, 3633:20, 3640:23, 3647:18, 3654:8,

3663:21

**net** [8] - 3520:11, 3562:14, 3562:16, 3563:13, 3588:21, 3588:22, 3632:9, 3654:22

**never** [4] - 3594:13, 3619:17, 3658:2

**New** [1] - 3661:1

**NEW** [3] - 3514:1, 3514:15, 3514:18

**new** [9] - 3544:17, 3568:3, 3569:1, 3579:12, 3588:16, 3591:15, 3591:16, 3594:1, 3629:4

**news** [1] - 3556:10

**next** [11] - 3520:3, 3537:23, 3537:25, 3538:5, 3558:3, 3587:23, 3587:25, 3632:6, 3644:9, 3645:9, 3665:6

**Next** [1] - 3557:3

**nice** [2] - 3537:4, 3666:14

**night** [1] - 3665:5

**NO** [2] - 3514:5, 3514:9

**nobody** [2] - 3619:15, 3671:25

**non** [4] - 3590:5, 3609:3, 3638:17

**non-affiliate** [1] - 3590:5

**non-affiliated** [1] - 3609:3

**non-AXA** [1] - 3638:17

**non-FMG** [1] - 3638:17

**none** [7] - 3579:3, 3618:3, 3653:25, 3661:19, 3661:25, 3665:25, 3666:1

**None** [1] - 3666:24

**normal** [1] - 3671:12

**note** [9] - 3527:5, 3533:2, 3533:11, 3538:18, 3563:11, 3585:19, 3605:22, 3614:19, 3641:19

**noted** [1] - 3542:3

**nothing** [1] - 3665:2

**Notwithstanding** [1] - 3518:20

**number** [40] - 3529:25, 3532:20, 3543:22, 3544:14, 3546:3, 3546:7, 3554:1, 3557:7,

3558:3, 3561:15, 3561:19, 3561:24, 3562:8, 3562:10, 3575:24, 3576:22, 3582:21, 3592:16, 3593:3, 3604:25, 3609:17, 3610:14, 3612:7, 3613:23, 3621:18, 3630:17, 3630:19, 3630:24, 3631:11, 3631:25, 3637:3, 3643:20, 3652:6, 3652:8, 3653:4, 3659:7, 3661:3, 3670:3, 3675:22

**Number** [1] - 3605:20

**numbers** [6] - 3554:15, 3554:20, 3554:21, 3621:16, 3624:8, 3632:13

---

# O

**oath** [3] - 3524:11, 3568:18, 3625:4

**object** [6] - 3517:14, 3517:25, 3519:5, 3533:15, 3545:10, 3649:7

**Objection** [3] - 3573:6, 3604:9, 3639:18

**objection** [20] - 3517:13, 3517:19, 3519:1, 3527:9, 3533:6, 3533:18, 3534:3, 3559:19, 3571:10, 3575:11, 3595:22, 3612:2, 3614:12, 3620:14, 3625:18, 3625:25, 3626:1, 3630:2, 3647:5, 3647:6

**objections** [5] - 3523:24, 3536:6, 3559:18, 3625:11, 3629:12

**obligation** [6] - 3573:4, 3583:8, 3584:6, 3660:7, 3667:6

**obligations** [1] - 3671:21

**obliged** [1] - 3654:4

**obvious** [1] - 3666:12

**Obviously** [3] - 3558:14, 3589:20, 3613:22

**obviously** [18] -

3528:25, 3529:11,
3531:22, 3538:7,
3539:9, 3551:5,
3565:25, 3584:7,
3587:18, 3600:25,
3609:12, 3613:11,
3640:13, 3655:19,
3657:8, 3660:2,
3669:23, 3671:4

**occasions** [2] -
3518:9, 3593:3

**occur** [1] - 3646:11

**occurred** [5] -
3543:18, 3545:20,
3547:8, 3649:20,
3650:5

**occurring** [1] - 3572:5

**occurs** [1] - 3673:3

**October** [1] - 3538:1

**odd** [2] - 3664:4,
3669:3

**OF** [4] - 3514:1,
3514:18, 3516:2,
3524:14

**offer** [8] - 3518:12,
3527:4, 3533:2,
3536:5, 3559:16,
3571:8, 3625:7,
3629:11

**offered** [1] - 3671:14

**officer** [6] - 3540:2,
3565:21, 3635:4,
3635:9, 3635:11,
3671:11

**officers** [1] - 3582:5

**offices** [1] - 3542:8

**OFFICIAL** [1] -
3514:25

**often** [27] - 3528:6,
3539:12, 3539:13,
3554:21, 3565:20,
3569:15, 3571:2,
3579:15, 3584:21,
3592:17, 3619:23,
3629:3, 3631:22,
3633:15, 3640:23,
3650:22, 3650:23,
3651:3, 3651:7,
3651:10, 3653:2,
3653:3, 3653:16,
3654:8, 3659:7,
3668:19, 3676:22

**Often** [1] - 3629:6

**old** [2] - 3568:4,
3568:5

**once** [11] - 3522:17,
3559:3, 3570:21,
3587:18, 3592:19,
3622:13, 3622:17,
3622:24, 3641:22

**One** [3] - 3517:5,
3607:1, 3625:9

**one** [65] - 3523:15,
3525:2, 3525:4,
3526:23, 3526:24,
3528:17, 3529:25,
3530:25, 3532:7,
3533:19, 3535:24,
3536:15, 3537:9,
3542:15, 3544:22,
3553:4, 3553:24,
3555:15, 3558:9,
3564:21, 3567:6,
3568:4, 3568:5,
3575:24, 3584:8,
3584:10, 3589:15,
3590:20, 3591:17,
3592:22, 3595:10,
3598:6, 3603:1,
3603:2, 3605:20,
3612:22, 3614:10,
3618:24, 3620:4,
3625:23, 3626:25,
3628:4, 3628:6,
3629:6, 3630:22,
3634:9, 3642:9,
3648:23, 3652:16,
3652:19, 3653:22,
3654:9, 3660:18,
3661:10, 3662:11,
3663:10, 3665:5,
3668:16, 3669:15,
3673:3, 3674:4,
3675:20, 3677:12,
3677:17

**one's** [1] - 3618:16

**ones** [3] - 3522:7,
3553:4, 3560:11

**ongoing** [1] - 3582:1

**open** [2] - 3517:4

**operation** [3] - 3677:1,
3677:2, 3677:5

**operational** [1] -
3577:12

**Operations** [1] -
3542:7

**operations** [1] -
3556:10

**opinion** [3] - 3614:13,
3619:9, 3620:15

**opinions** [2] -
3554:15, 3554:17

**opportunities** [1] -
3614:8

**opportunity** [13] -
3564:2, 3571:5,
3585:23, 3591:15,
3591:23, 3593:8,
3614:5, 3620:25,
3641:14, 3646:5,

3646:10, 3646:14,
3662:14

**opposed** [4] - 3548:6,
3578:6, 3587:9,
3669:17

**opted** [1] - 3658:18

**option** [2] - 3639:5,
3639:6

**options** [2] - 3616:24,
3675:6

**order** [5] - 3601:20,
3615:22, 3631:14,
3635:15

**ordered** [1] - 3520:16

**organization** [3] -
3556:11, 3610:9,
3669:14

**organizational** [1] -
3553:17

**organizations** [1] -
3584:24

**original** [3] - 3623:4,
3623:5, 3633:3

**originally** [3] - 3541:8,
3561:12, 3623:3

**otherwise** [3] -
3591:19, 3623:21,
3654:10

**ought** [2] - 3554:11,
3559:7

**outset** [1] - 3519:2

**outside** [12] - 3542:19,
3563:6, 3566:1,
3598:8, 3605:9,
3613:17, 3616:25,
3617:11, 3618:23,
3656:11, 3667:4,
3669:21

**overlay** [1] - 3635:13

**overruled** [1] - 3612:5

**Overruled** [2] -
3604:12, 3649:9

**overseen** [1] -
3657:24

**oversight** [1] -
3542:13

**overview** [3] -
3541:25, 3551:9,
3565:5

**own** [16] - 3530:4,
3530:10, 3582:7,
3584:23, 3584:24,
3584:25, 3620:18,
3626:10, 3631:5,
3650:24, 3653:17,
3653:23, 3654:2,
3666:7, 3668:6,
3676:9

**owned** [1] - 3581:3

**P**

**pactive** [4] - 3543:24,
3551:11, 3561:20,
3653:1

**page** [18] - 3549:14,
3549:18, 3558:4,
3599:3, 3600:16,
3603:16, 3607:7,
3610:16, 3610:20,
3643:19, 3644:5,
3645:8, 3645:14,
3648:11, 3649:17,
3650:12, 3654:24

**pages** [9] - 3521:15,
3551:24, 3557:25,
3599:2, 3603:14,
3603:20, 3648:6,
3672:1, 3672:24

**paid** [15] - 3532:3,
3537:8, 3572:20,
3572:23, 3575:4,
3580:14, 3585:7,
3585:17, 3585:25,
3617:24, 3618:1,
3635:17, 3653:19,
3653:20, 3653:21

**panels** [1] - 3670:21

**paragraph** [5] -
3520:19, 3520:25,
3558:12, 3644:7,
3644:9

**paragraphs** [1] -
3644:9

**parcel** [1] - 3632:21

**parent** [2] - 3547:20,
3548:1

**parentheses** [1] -
3557:4

**part** [54] - 3517:12,
3526:22, 3528:4,
3531:8, 3533:3,
3538:11, 3539:24,
3540:1, 3549:10,
3551:2, 3551:4,
3551:13, 3552:8,
3567:9, 3567:20,
3569:8, 3569:14,
3571:9, 3576:1,
3576:16, 3578:16,
3581:1, 3586:1,
3586:6, 3588:4,
3588:24, 3588:25,
3589:19, 3598:2,
3598:5, 3598:15,
3601:17, 3603:11,
3603:13, 3605:22,
3605:24, 3606:18,
3609:15, 3610:12,

3611:1, 3613:6,
3624:19, 3632:21,
3634:12, 3640:3,
3651:20, 3653:2,
3658:10, 3661:3,
3671:1, 3672:7,
3673:16, 3677:3,
3677:10

**particular** [44] -
3528:2, 3537:19,
3546:13, 3546:15,
3547:11, 3550:13,
3552:3, 3555:16,
3556:6, 3556:20,
3556:24, 3556:25,
3558:21, 3560:9,
3569:25, 3583:6,
3584:23, 3584:24,
3588:21, 3590:6,
3595:16, 3596:4,
3597:21, 3599:15,
3603:13, 3605:8,
3611:14, 3615:17,
3629:5, 3629:10,
3630:3, 3631:9,
3631:16, 3632:25,
3634:8, 3637:25,
3638:1, 3644:22,
3645:10, 3647:24,
3649:3, 3670:15,
3672:12

**particularly** [12] -
3556:19, 3585:20,
3588:1, 3598:4,
3599:2, 3615:24,
3616:5, 3637:12,
3651:1, 3663:12,
3668:15, 3673:17

**parties** [5] - 3523:16,
3544:17, 3587:6,
3605:9, 3646:14

**partner** [2] - 3658:17,
3668:19

**parts** [1] - 3589:2

**party** [7] - 3577:10,
3577:13, 3577:17,
3578:4, 3578:9,
3579:22, 3584:22

**passed** [4] - 3578:21,
3623:1, 3635:22,
3668:12

**passive** [2] - 3544:19,
3644:25

**passives** [1] - 3651:2

**past** [3] - 3551:7,
3670:20

**PATRICIA** [1] -
3515:16

**pay** [6] - 3573:4,
3579:19, 3616:18,

3654:1, 3675:13
**paying** [5] - 3653:16, 3672:7, 3672:9, 3672:10, 3675:24
**Paying** [1] - 3596:4
**payment** [5] - 3528:3, 3573:2, 3573:3, 3573:20
**payments** [1] - 3573:17
**pays** [4] - 3572:25, 3573:14, 3575:6, 3675:13
**PC** [1] - 3515:3
**peer** [6] - 3551:17, 3558:23, 3595:21, 3596:6, 3597:9, 3644:23
**peers** [6] - 3559:1, 3583:20, 3585:24, 3595:16, 3597:6, 3633:6
**pension** [1] - 3661:4
**people** [12] - 3615:16, 3658:22, 3658:23, 3659:23, 3661:24, 3661:25, 3665:4, 3671:5, 3671:9, 3673:4, 3676:21, 3677:6
**People** [1] - 3666:21
**per** [4] - 3624:2, 3624:5, 3624:8
**percent** [4] - 3544:19, 3544:20, 3651:7, 3651:8
**percentage** [4] - 3580:13, 3596:14
**perceptions** [1] - 3627:19
**perfect** [1] - 3666:1
**perfectly** [2] - 3607:13, 3664:15
**perform** [1] - 3538:24
**performance** [44] - 3529:9, 3531:23, 3539:6, 3539:7, 3546:15, 3550:17, 3551:1, 3551:15, 3551:25, 3552:4, 3552:15, 3552:17, 3552:18, 3553:10, 3556:8, 3556:12, 3558:21, 3559:25, 3560:15, 3561:12, 3561:16, 3561:21, 3562:10, 3562:14, 3562:16, 3562:18, 3562:21, 3563:4, 3563:11, 3563:12,

3565:25, 3566:5, 3566:9, 3566:10, 3582:8, 3582:10, 3584:7, 3595:3, 3619:6, 3635:16, 3637:21, 3644:21, 3650:25, 3672:19
**Performance** [1] - 3562:15
**performed** [5] - 3538:14, 3572:10, 3588:11, 3591:1, 3593:12
**performing** [5] - 3553:16, 3564:6, 3564:8, 3567:4, 3589:6
**performs** [1] - 3581:19
**perhaps** [5] - 3539:12, 3544:15, 3544:20, 3631:10, 3651:6
**period** [14] - 3522:3, 3546:11, 3547:9, 3551:19, 3648:25, 3649:14, 3650:6, 3650:7, 3650:9, 3650:10, 3650:14, 3653:10, 3655:20, 3667:24
**periodically** [5] - 3558:4, 3605:3, 3614:6, 3614:9, 3663:20
**periods** [1] - 3551:17
**permit** [1] - 3563:22
**permitted** [1] - 3520:21
**person** [8] - 3657:21, 3657:22, 3657:23, 3657:25, 3658:7, 3660:13, 3660:24, 3661:7
**personal** [2] - 3530:4, 3619:6
**personally** [2] - 3584:13, 3621:8
**personnel** [12] - 3546:8, 3551:21, 3552:11, 3553:17, 3556:11, 3565:4, 3565:19, 3566:4, 3601:19, 3621:1, 3623:2, 3666:10
**perspective** [20] - 3523:9, 3554:22, 3598:16, 3618:5, 3634:6, 3634:13, 3652:1, 3652:2, 3659:16, 3660:1, 3660:17, 3660:19,

3660:21, 3661:6, 3661:14, 3662:6, 3674:25, 3676:7, 3676:9, 3677:11
**PETER** [1] - 3514:17
**PGS** [2] - 3514:5, 3514:10
**phenomenal** [1] - 3669:14
**picture** [8] - 3542:6, 3586:2, 3607:14, 3666:5, 3676:2, 3676:7, 3676:13
**PIMCO** [2] - 3667:9, 3667:10
**place** [25] - 3543:21, 3544:12, 3546:3, 3549:6, 3549:9, 3563:5, 3577:6, 3591:16, 3622:21, 3623:3, 3623:15, 3630:17, 3630:20, 3631:13, 3635:6, 3635:12, 3635:13, 3649:22, 3654:11, 3662:25, 3668:8, 3669:8, 3672:16, 3673:10, 3677:24
**places** [1] - 3601:11
**Plaintiff's** [4] - 3533:13, 3546:19, 3560:16, 3561:8
**plaintiffs** [11] - 3520:9, 3520:14, 3520:18, 3520:19, 3571:15, 3582:23, 3589:9, 3613:10, 3623:6, 3650:25, 3674:8
**Plaintiffs** [4] - 3521:1, 3615:24, 3616:4, 3624:7
**PLAINTIFFS** [3] - 3514:4, 3514:8, 3515:7
**plaintiffs'** [1] - 3523:9
**plan** [7] - 3607:2, 3607:5, 3608:8, 3608:13, 3637:9
**play** [1] - 3576:10
**plays** [3] - 3661:7, 3664:17, 3665:14
**plus** [1] - 3645:5
**PLUS** [1] - 3558:2
**pocket** [2] - 3653:17, 3654:2
**point** [35] - 3525:2, 3533:19, 3543:6, 3545:15, 3550:8, 3554:11, 3556:19, 3556:21, 3561:15,

3568:9, 3571:20, 3576:12, 3585:23, 3596:14, 3597:19, 3602:24, 3603:1, 3607:10, 3609:24, 3613:9, 3614:24, 3617:22, 3626:12, 3630:13, 3634:11, 3637:16, 3649:20, 3658:18, 3659:3, 3662:24, 3665:10, 3666:9, 3666:25, 3668:24, 3671:19
**pointed** [1] - 3674:3
**pointing** [2] - 3558:20, 3663:6
**points** [27] - 3562:6, 3584:20, 3596:15, 3596:16, 3605:20, 3631:11, 3631:13, 3632:1, 3632:4, 3632:6, 3650:1, 3650:11, 3652:25, 3653:7, 3653:8, 3653:24, 3654:18, 3654:19, 3654:22, 3660:10, 3663:4, 3668:1, 3672:10, 3675:23
**police** [1] - 3671:11
**policy** [5] - 3580:8, 3580:11, 3608:1, 3608:2, 3608:11
**portfolio** [15] - 3535:5, 3535:25, 3544:21, 3551:10, 3558:22, 3562:17, 3564:4, 3564:15, 3566:21, 3570:23, 3572:1, 3583:6, 3588:23, 3605:8, 3644:22
**portfolios** [12] - 3529:11, 3535:11, 3540:4, 3540:5, 3541:22, 3541:23, 3542:4, 3543:25, 3550:18, 3643:22, 3644:25
**portion** [4] - 3528:3, 3528:22, 3573:2, 3573:3
**portions** [2] - 3536:2, 3589:4
**position** [4] - 3607:19, 3607:24, 3676:5, 3677:21
**possible** [4] - 3539:18, 3595:24, 3609:14, 3670:21
**potential** [3] -

3626:20, 3629:23, 3630:11
**potentially** [2] - 3554:2, 3566:14
**practical** [1] - 3580:2
**practice** [21] - 3533:10, 3563:15, 3580:12, 3590:6, 3606:2, 3607:3, 3608:18, 3610:6, 3617:10, 3618:24, 3636:9, 3656:4, 3656:7, 3658:6, 3658:11, 3658:21, 3658:23, 3664:15, 3665:13, 3667:7, 3667:22
**Practice** [1] - 3605:2
**practiced** [1] - 3530:5
**practices** [4] - 3612:23, 3618:22, 3668:22, 3670:25
**practitioners** [1] - 3659:7
**pre** [2] - 3602:24, 3604:7
**pre-tax** [2] - 3602:24, 3604:7
**precise** [2] - 3521:11, 3525:16
**precisely** [1] - 3626:18
**precludes** [1] - 3666:24
**prefer** [1] - 3568:13
**premiere** [1] - 3670:1
**premium** [2] - 3580:10, 3580:14
**preparation** [6] - 3518:8, 3519:14, 3582:2, 3582:4, 3582:6, 3582:7
**prepared** [7] - 3525:15, 3532:7, 3538:11, 3569:8, 3601:3, 3619:19, 3646:2
**prepares** [2] - 3555:23, 3641:9
**preparing** [1] - 3589:2
**present** [8] - 3570:13, 3592:11, 3605:18, 3622:11, 3670:5, 3676:22
**PRESENT** [1] - 3515:16
**presentation** [11] - 3531:19, 3549:24, 3550:1, 3599:8, 3603:17, 3603:25, 3605:12, 3611:1,

3611:6, 3611:14, 3648:21

**presentations** [10] - 3542:13, 3551:5, 3551:23, 3570:10, 3592:14, 3592:20, 3611:11, 3611:12, 3611:21, 3628:4

**presented** [18] - 3528:1, 3550:2, 3551:9, 3551:20, 3557:21, 3562:14, 3562:16, 3562:22, 3563:10, 3586:18, 3590:6, 3592:17, 3605:21, 3611:23, 3614:2, 3620:1, 3623:24, 3628:8

**presenting** [3] - 3588:16, 3604:5, 3676:23

**press** [1] - 3620:3

**presumably** [1] - 3600:4

**pretty** [12] - 3552:8, 3587:12, 3587:13, 3591:10, 3600:25, 3621:16, 3624:15, 3643:25, 3658:25, 3660:10, 3673:2

**previewing** [1] - 3526:8

**previously** [4] - 3524:8, 3530:16, 3570:9, 3581:13

**Price** [6] - 3561:23, 3562:5, 3565:14, 3565:15, 3565:17, 3667:9

**Pricewaterhouse** [2] - 3612:13, 3618:10

**Pricewaterhouse's** [1] - 3614:18

**pride** [1] - 3670:6

**primarily** [1] - 3624:12

**primary** [1] - 3607:9

**privilege** [2] - 3520:10, 3521:3

**privileged** [2] - 3520:20, 3521:22

**pro** [1] - 3520:24

**problem** [8] - 3531:1, 3545:11, 3564:14, 3577:13, 3577:16, 3579:8, 3579:16, 3581:5

**problematic** [4] - 3556:7, 3556:21, 3561:22, 3571:3

**problems** [10] -

3559:11, 3577:11, 3577:12, 3578:1, 3593:7, 3597:15, 3677:12

**procedures** [1] - 3607:1

**proceed** [13] - 3522:20, 3524:12, 3546:22, 3555:6, 3559:14, 3581:9, 3586:9, 3594:20, 3601:23, 3608:15, 3625:5, 3654:12, 3654:13

**Proceedings** [1] - 3678:8

**proceedings** [1] - 3532:13

**process** [43] - 3526:22, 3526:25, 3530:12, 3531:9, 3539:4, 3539:17, 3539:21, 3541:24, 3552:6, 3553:22, 3567:9, 3567:21, 3569:14, 3572:1, 3578:12, 3578:16, 3581:2, 3601:21, 3602:10, 3602:16, 3603:13, 3606:19, 3611:2, 3611:10, 3611:11, 3611:15, 3612:1, 3613:7, 3613:9, 3618:19, 3640:3, 3640:13, 3640:25, 3654:9, 3655:20, 3656:8, 3657:5, 3670:1, 3673:16, 3673:25, 3674:4, 3677:24

**processes** [1] - 3553:16

**processing** [2] - 3549:1, 3549:2

**product** [8] - 3562:20, 3563:10, 3637:17, 3638:3, 3638:12, 3638:23, 3640:1, 3677:7

**production** [2] - 3520:10, 3521:1

**products** [7] - 3563:5, 3564:4, 3637:24, 3638:19, 3639:5, 3666:22, 3666:24

**profess** [1] - 3629:7

**professional** [3] - 3614:13, 3662:2, 3663:1

**professionals** [1] -

3674:2

**profit** [3] - 3604:7, 3624:1, 3624:5

**profitability** [48] - 3526:17, 3531:23, 3550:12, 3550:14, 3584:4, 3584:5, 3602:2, 3602:20, 3602:22, 3603:11, 3603:18, 3603:21, 3604:3, 3604:5, 3604:23, 3605:4, 3605:8, 3605:12, 3605:14, 3605:16, 3606:16, 3606:18, 3607:4, 3607:9, 3607:16, 3608:19, 3608:23, 3609:2, 3609:10, 3609:19, 3610:2, 3610:12, 3618:3, 3618:25, 3620:10, 3621:11, 3621:15, 3621:16, 3623:23, 3623:24, 3624:8, 3624:20, 3633:12, 3645:15, 3647:22, 3671:3, 3672:4, 3674:16

**program** [3] - 3542:14, 3589:5, 3669:6

**programs** [3] - 3539:22, 3658:11, 3661:22

**promise** [1] - 3642:20

**promised** [1] - 3642:18

**pronouncements** [1] - 3606:14

**proof** [1] - 3559:5

**properly** [1] - 3663:7

**proposal** [3] - 3527:17, 3529:22, 3597:6

**proposed** [2] - 3529:19, 3544:13

**prospectus** [3] - 3563:12, 3601:14, 3601:15

**prospectuses** [1] - 3672:1

**protected** [1] - 3521:19

**protecting** [1] - 3660:4

**provide** [33] - 3521:5, 3521:13, 3531:25, 3535:17, 3535:18, 3537:5, 3540:1, 3540:6, 3542:7, 3542:18, 3547:21,

3548:1, 3561:5, 3564:19, 3564:23, 3566:17, 3567:3, 3567:7, 3567:16, 3576:10, 3588:18, 3601:12, 3608:19, 3627:2, 3627:20, 3634:25, 3635:1, 3635:4, 3636:23, 3658:22, 3662:19, 3664:25

**provided** [33] - 3526:14, 3527:1, 3533:17, 3536:20, 3536:22, 3536:23, 3541:15, 3543:10, 3549:23, 3549:24, 3550:10, 3567:20, 3572:3, 3572:15, 3576:3, 3578:11, 3578:15, 3586:19, 3587:6, 3587:8, 3588:6, 3589:17, 3592:2, 3593:4, 3597:2, 3610:10, 3611:14, 3621:2, 3627:6, 3629:19, 3656:21, 3672:20, 3676:18

**provider** [3] - 3666:7, 3670:1, 3670:14

**providers** [6] - 3566:1, 3574:6, 3584:12, 3588:15, 3618:23, 3656:12

**provides** [18] - 3528:20, 3528:21, 3530:18, 3535:19, 3536:2, 3540:15, 3541:12, 3548:6, 3567:2, 3570:6, 3574:11, 3581:15, 3583:12, 3589:18, 3589:22, 3650:22, 3656:22, 3670:11

**providing** [13] - 3542:2, 3553:15, 3572:2, 3574:6, 3583:20, 3584:12, 3584:25, 3592:23, 3593:1, 3594:16, 3633:23, 3634:5, 3647:25

**proving** [2] - 3528:17, 3528:18

**provision** [1] - 3582:5

**proxy** [1] - 3582:4

**prudent** [1] - 3657:15

**public** [7] - 3599:19, 3599:20, 3601:3,

3601:8, 3601:19, 3660:14

**Public** [1] - 3601:5

**publicly** [3] - 3605:4, 3605:11, 3646:6

**pull** [1] - 3616:12

**purchased** [1] - 3638:18

**purchases** [1] - 3549:8

**purpose** [4] - 3556:5, 3645:17, 3663:19, 3672:15

**purposely** [1] - 3663:14

**purposes** [4] - 3519:19, 3605:12, 3607:16, 3621:25

**pursuant** [1] - 3580:12

**pushed** [1] - 3546:14

**put** [20] - 3518:10, 3518:23, 3519:19, 3538:20, 3547:23, 3550:21, 3556:13, 3577:6, 3578:2, 3591:16, 3600:22, 3616:1, 3631:13, 3635:13, 3642:12, 3650:11, 3652:16, 3655:3, 3672:16

**puts** [3] - 3519:8, 3565:24, 3600:21

**putting** [1] - 3607:22

**Pw** [2] - 3614:7, 3617:7

**PwC** [2] - 3612:18, 3614:12

## Q

**qualifications** [1] - 3619:12

**qualified** [1] - 3565:4

**quality** [22] - 3530:16, 3530:18, 3532:19, 3576:3, 3581:13, 3581:15, 3583:11, 3593:1, 3593:4, 3617:3, 3644:16, 3647:23, 3647:24, 3656:10, 3665:25, 3666:6, 3667:3, 3667:12, 3673:25, 3677:1, 3677:5

**quarter** [3] - 3551:7, 3554:24, 3625:1

**quarterly** [4] - 3539:9, 3550:16, 3555:18, 3589:21

**quarters** [3] - 3557:8, 3557:10, 3558:10
**quartile** [1] - 3529:9
**questioning** [1] - 3525:3
**questionnaire** [6] - 3535:15, 3535:16, 3567:11, 3567:14, 3567:18, 3569:15
**questionnaires** [1] - 3579:13
**questions** [9] - 3520:22, 3544:5, 3593:8, 3593:10, 3603:15, 3615:21, 3657:10, 3657:16, 3661:9
**quid** [1] - 3520:24
**Quite** [1] - 3571:7
**quite** [8] - 3528:13, 3562:1, 3572:7, 3585:4, 3592:16, 3662:8
**quo** [1] - 3520:24
**quote** [1] - 3520:19

---

# R

**R.M.R** [1] - 3514:24
**raise** [2] - 3556:22, 3660:16
**raised** [4] - 3517:8, 3534:12, 3534:13, 3556:24
**range** [4] - 3596:8, 3597:11, 3600:13, 3604:15
**rare** [3] - 3571:1, 3659:1, 3667:14
**rate** [1] - 3667:21
**rather** [2] - 3538:10, 3663:11
**rating** [1] - 3553:22
**ratings** [1] - 3554:14
**ratio** [18] - 3546:6, 3583:18, 3586:4, 3596:9, 3596:12, 3596:16, 3596:21, 3597:5, 3597:20, 3598:18, 3631:7, 3631:8, 3631:11, 3651:10, 3672:10, 3672:19, 3675:14, 3675:22
**rationale** [2] - 3673:8, 3673:9
**ratios** [2] - 3597:8, 3628:18
**re** [2] - 3582:8,

**re-does** [1] - 3582:8
**re-review** [1] - 3612:25
**reach** [1] - 3577:3
**read** [18] - 3522:16, 3541:4, 3558:11, 3573:9, 3590:14, 3590:15, 3590:16, 3590:24, 3604:11, 3611:25, 3646:22, 3655:10, 3671:25, 3673:19, 3675:1, 3675:2
**readily** [1] - 3541:14
**reading** [2] - 3540:25, 3541:1
**real** [15] - 3559:5, 3566:2, 3574:6, 3585:23, 3609:16, 3650:11, 3656:13, 3664:24, 3666:16, 3667:2, 3667:12, 3671:19, 3674:13, 3675:19
**realistic** [1] - 3665:22
**reality** [6] - 3565:23, 3566:2, 3576:5, 3673:16, 3677:19
**realized** [1] - 3671:25
**really** [24] - 3534:13, 3538:9, 3557:22, 3563:6, 3569:12, 3585:25, 3606:14, 3609:9, 3634:6, 3643:15, 3650:19, 3656:4, 3660:14, 3661:5, 3661:11, 3664:19, 3665:14, 3667:6, 3667:7, 3668:7, 3670:18, 3672:6, 3672:22
**realm** [2] - 3521:15, 3521:18
**reason** [14] - 3576:4, 3591:17, 3600:1, 3606:23, 3607:9, 3609:6, 3613:19, 3614:22, 3615:10, 3654:9, 3662:10, 3664:18, 3676:10
**reasonable** [30] - 3574:7, 3574:25, 3576:1, 3583:1, 3583:3, 3584:20, 3596:8, 3597:11, 3600:13, 3602:11, 3602:13, 3603:1, 3604:15, 3607:13, 3612:21,

3612:22, 3616:17, 3629:20, 3632:22, 3636:4, 3636:5, 3640:16, 3641:2, 3647:19, 3655:24, 3657:1, 3674:5, 3677:23
**reasonableness** [1] - 3671:14
**reasons** [11] - 3556:13, 3562:11, 3583:2, 3584:23, 3592:22, 3602:9, 3606:7, 3606:22, 3617:15, 3631:17, 3633:13
**receipt** [1] - 3574:19
**receive** [29] - 3528:10, 3530:4, 3530:17, 3531:8, 3532:2, 3553:12, 3554:23, 3554:25, 3573:19, 3581:14, 3593:15, 3604:25, 3606:17, 3608:22, 3616:21, 3624:1, 3624:4, 3627:12, 3627:22, 3629:2, 3629:10, 3636:2, 3638:6, 3638:23, 3639:24, 3641:8, 3654:4, 3656:25, 3674:1
**received** [29] - 3517:10, 3519:24, 3524:17, 3524:18, 3530:14, 3551:13, 3551:14, 3569:13, 3583:7, 3594:11, 3613:11, 3622:14, 3628:5, 3636:17, 3636:21, 3637:8, 3637:11, 3637:14, 3637:25, 3638:16, 3639:15, 3640:2, 3640:5, 3644:15, 3644:17, 3649:16, 3655:7, 3656:10
**receives** [10] - 3528:18, 3528:25, 3539:9, 3581:20, 3585:14, 3585:15, 3598:6, 3637:22, 3639:25, 3672:24
**receiving** [7] - 3527:1, 3609:13, 3634:8, 3653:22, 3654:3, 3665:24
**recent** [7] - 3526:11, 3551:18, 3552:5, 3635:3, 3643:4,

3643:5, 3650:20
**recently** [1] - 3625:7
**recess** [1] - 3568:17
**Recess** [1] - 3625:2
**recitation** [1] - 3587:5
**recognition** [2] - 3617:12, 3631:20
**recognize** [19] - 3526:1, 3527:22, 3531:3, 3534:23, 3536:14, 3536:18, 3547:2, 3549:20, 3553:3, 3555:11, 3569:4, 3586:15, 3599:5, 3603:8, 3610:23, 3628:1, 3633:11, 3643:9, 3648:18
**recognizes** [1] - 3637:1
**recognizing** [1] - 3528:19
**recollection** [5] - 3540:24, 3541:11, 3560:20, 3560:23, 3600:25
**recommend** [2] - 3559:4, 3566:12
**recommendation** [2] - 3539:19, 3554:1
**recommendations** [1] - 3539:14
**recommending** [1] - 3539:4
**reconvene** [1] - 3678:5
**record** [5] - 3527:5, 3533:11, 3538:18, 3568:6, 3630:21
**records** [3] - 3588:25, 3617:6, 3646:3
**recreate** [1] - 3562:12
**red** [4] - 3652:1, 3652:14, 3652:20, 3653:9
**redemptions** [1] - 3549:8
**reduce** [1] - 3631:23
**reduced** [5] - 3562:7, 3584:3, 3630:25, 3632:4, 3632:6
**reduction** [4] - 3651:9, 3651:10, 3652:2, 3652:13
**reductions** [4] - 3545:25, 3546:4, 3605:14, 3606:4
**REED** [1] - 3515:14
**Reed** [1] - 3530:22
**refer** [4] - 3531:10,

3540:10, 3548:16, 3560:16
**reference** [2] - 3521:10, 3523:19
**referenced** [3] - 3525:6, 3525:17, 3569:7
**references** [2] - 3540:18, 3638:6
**referencing** [1] - 3645:11
**referred** [9] - 3528:6, 3529:7, 3531:6, 3531:13, 3531:15, 3540:18, 3553:9, 3555:14, 3610:20
**referring** [4] - 3535:5, 3591:9, 3642:7, 3644:5
**reflect** [7] - 3554:14, 3591:20, 3592:1, 3610:7, 3631:15, 3634:4, 3636:9
**reflected** [6] - 3605:16, 3613:23, 3614:4, 3614:6, 3623:1, 3623:2
**reflecting** [5] - 3529:25, 3554:17, 3636:6, 3668:21, 3668:22
**reflection** [3] - 3517:22, 3529:23, 3633:20
**reflective** [4] - 3519:4, 3528:19, 3662:7, 3662:8
**reflects** [8] - 3548:12, 3553:22, 3553:23, 3555:23, 3569:12, 3596:17, 3610:6, 3675:3
**refresh** [3] - 3540:23, 3541:11, 3560:22
**refreshed** [1] - 3560:20
**regard** [3] - 3517:16, 3542:25, 3672:25
**regarding** [4] - 3530:17, 3573:19, 3581:14, 3593:15
**regime** [3] - 3635:9, 3658:5, 3672:15
**registration** [5] - 3531:25, 3569:16, 3582:2, 3582:3, 3601:18
**regroup** [2] - 3552:9, 3552:10
**regular** [1] - 3671:12

regularly [1] - 3619:16
regulations [1] - 3645:25
regulator [3] - 3657:23, 3658:14, 3658:19
regulators [4] - 3579:21, 3659:8, 3664:14, 3672:16
regulatory [13] - 3541:20, 3542:20, 3543:1, 3570:1, 3577:10, 3578:1, 3608:6, 3621:25, 3623:14, 3635:7, 3658:5, 3668:18, 3672:15
reimburse [2] - 3577:5, 3654:1
reimbursements [3] - 3579:3, 3649:24, 3653:10
reimburses [1] - 3623:7
reimbursing [2] - 3653:15, 3653:16
relate [1] - 3646:23
related [2] - 3562:20, 3610:9
relates [1] - 3646:25
relations [1] - 3660:14
relationship [18] - 3566:8, 3579:23, 3580:4, 3580:5, 3580:6, 3584:22, 3636:22, 3661:25, 3662:2, 3662:19, 3662:22, 3662:23, 3663:1, 3663:2, 3663:3, 3663:25, 3664:5, 3677:19
relationships [3] - 3528:18, 3536:25, 3662:4
relative [2] - 3574:11, 3636:24
relatively [1] - 3643:4
relevance [1] - 3649:7
relevant [13] - 3531:24, 3543:7, 3544:6, 3551:19, 3585:13, 3627:3, 3627:15, 3643:22, 3646:13, 3647:17, 3649:8, 3672:17, 3672:22
relied [6] - 3518:24, 3518:25, 3519:3, 3519:4, 3670:7, 3673:22

relief [2] - 3542:23, 3542:25
reluctant [1] - 3609:18
rely [1] - 3530:9
relying [5] - 3525:10, 3582:9, 3582:10, 3616:23, 3621:6
remains [1] - 3518:21
remember [7] - 3550:3, 3562:3, 3567:25, 3570:20, 3582:12, 3637:16, 3651:3
Remind [1] - 3544:24
reminded [3] - 3526:25, 3534:1, 3607:15
reminding [1] - 3541:18
reorganizations [1] - 3545:3
Reorganizations [1] - 3545:4
repeat [4] - 3550:25, 3573:8, 3604:10, 3616:4
repeating [1] - 3540:23
rephrase [5] - 3573:11, 3573:12, 3614:16, 3630:6, 3642:25
replace [1] - 3554:2
replacements [1] - 3539:16
replacing [4] - 3539:16, 3544:15, 3546:10, 3546:11
reply [1] - 3518:18
report [9] - 3553:6, 3553:13, 3601:6, 3643:1, 3643:12, 3646:2, 3646:7, 3646:22, 3649:10
reporter [3] - 3541:4, 3573:9, 3604:11
REPORTER [1] - 3514:25
reporting [2] - 3581:24, 3612:16
reports [11] - 3603:21, 3605:14, 3605:19, 3610:2, 3613:9, 3614:4, 3620:10, 3671:4, 3675:2, 3676:4, 3677:13
represent [4] - 3562:9, 3565:15, 3661:17, 3661:18
representative [1] -

3652:21
represented [1] - 3565:10
representing [1] - 3658:8
represents [2] - 3517:24, 3659:17
reputation [1] - 3581:3
reputational [1] - 3577:12
reputationally [1] - 3579:20
request [5] - 3552:2, 3574:20, 3588:4, 3601:16, 3619:21
requested [4] - 3527:15, 3528:8, 3529:3, 3588:5
requesting [1] - 3532:10
requests [1] - 3529:6
require [4] - 3559:7, 3581:7, 3609:10, 3671:25
required [15] - 3514:23, 3542:8, 3588:25, 3589:19, 3592:24, 3601:9, 3602:8, 3621:25, 3642:11, 3643:1, 3643:5, 3643:16, 3644:2, 3645:24, 3672:5
requirement [6] - 3570:24, 3590:5, 3594:12, 3622:25, 3638:18, 3643:4
requirements [2] - 3563:14, 3657:24
requires [3] - 3635:9, 3635:11
research [2] - 3566:18, 3566:22
Reserve [2] - 3674:9, 3674:22
resolution [1] - 3519:23
resolved [3] - 3517:9, 3517:12, 3522:2
resolving [1] - 3517:5
resources [1] - 3548:23
respect [40] - 3522:14, 3526:16, 3526:17, 3527:2, 3528:2, 3535:4, 3535:9, 3535:19, 3539:5, 3540:20, 3542:4, 3547:6, 3553:18,

3556:10, 3556:20, 3561:10, 3561:24, 3562:25, 3566:5, 3570:22, 3583:18, 3583:19, 3587:14, 3587:24, 3588:3, 3590:22, 3604:6, 3606:16, 3608:25, 3609:20, 3627:12, 3631:1, 3635:14, 3640:5, 3640:6, 3644:16, 3644:17, 3645:18, 3649:22, 3666:16
respectfully [1] - 3670:4
respective [3] - 3595:21, 3596:6, 3597:9
respond [1] - 3567:17
responded [1] - 3538:10
response [12] - 3531:13, 3532:8, 3535:17, 3538:12, 3539:23, 3542:1, 3543:20, 3562:10, 3588:4, 3635:6, 3650:23
responses [2] - 3570:2, 3604:14
responsibilities [3] - 3540:1, 3554:8, 3576:14
responsibility [11] - 3535:6, 3535:9, 3535:12, 3549:10, 3556:19, 3562:25, 3563:1, 3563:7, 3566:22, 3566:24, 3574:4
responsible [7] - 3549:4, 3564:6, 3564:10, 3573:17, 3584:16, 3588:22, 3589:6
responsive [2] - 3538:6, 3588:2
rest [2] - 3552:11, 3590:23
restate [3] - 3528:23, 3596:1, 3634:24
restructure [1] - 3652:5
restructured [7] - 3543:24, 3544:2, 3544:15, 3622:2, 3651:9, 3651:13, 3652:25
restructuring [7] -

3541:22, 3544:9, 3544:16, 3650:8, 3650:17, 3651:20, 3653:3
restructurings [2] - 3649:19, 3651:4
result [16] - 3520:11, 3546:8, 3598:10, 3614:17, 3614:19, 3621:4, 3631:17, 3632:9, 3632:22, 3652:9, 3653:3, 3654:3, 3654:7, 3654:8, 3654:18, 3663:8
resulted [1] - 3654:22
results [3] - 3549:7, 3565:6, 3640:24
resumes [1] - 3524:8
retail [1] - 3591:14
retained [6] - 3573:20, 3574:1, 3574:10, 3575:3, 3593:16, 3612:14
retaining [5] - 3528:11, 3544:15, 3574:8, 3582:22, 3614:23
retains [1] - 3528:3
retired [1] - 3616:8
revenue [5] - 3605:14, 3606:4, 3624:2, 3624:5, 3624:8
revenues [3] - 3638:2, 3639:9, 3639:25
review [36] - 3532:20, 3537:23, 3537:24, 3538:1, 3538:6, 3538:9, 3540:14, 3541:6, 3552:2, 3552:15, 3552:16, 3555:3, 3555:15, 3555:16, 3555:20, 3555:22, 3556:5, 3557:9, 3570:3, 3571:1, 3572:17, 3574:21, 3594:14, 3602:2, 3606:9, 3611:13, 3612:25, 3614:4, 3618:13, 3620:17, 3634:1, 3635:11, 3646:5, 3646:11, 3647:16, 3647:20
reviewed [7] - 3517:21, 3521:20, 3555:24, 3576:1, 3605:23, 3613:11
reviewing [16] - 3532:18, 3532:19,

3535:25, 3536:17, 3541:10, 3546:21, 3551:1, 3552:17, 3552:18, 3558:16, 3562:4, 3563:2, 3603:23, 3615:20, 3644:21, 3647:22

**reviews** [7] - 3567:15, 3608:24, 3641:20, 3644:2, 3644:12, 3644:14, 3648:23

**revisions** [2] - 3641:15, 3641:18

**right-hand** [2] - 3553:20, 3554:14

**rigorous** [3] - 3635:8, 3635:11, 3671:23

**risk** [6] - 3577:1, 3577:14, 3578:22, 3579:6, 3580:1

**risks** [13] - 3576:16, 3576:20, 3576:24, 3577:7, 3577:9, 3577:19, 3578:13, 3578:16, 3578:20, 3578:21, 3582:16, 3583:15

**ROBERT** [2] - 3515:5, 3515:13

**Robert** [1] - 3523:14

**role** [19] - 3529:5, 3535:4, 3535:19, 3535:25, 3539:2, 3542:8, 3542:11, 3548:17, 3549:2, 3549:3, 3550:17, 3551:2, 3572:9, 3658:22, 3661:8, 3664:17, 3665:15, 3677:10

**roles** [4] - 3531:20, 3532:18, 3539:20

**ROME** [1] - 3515:9

**room** [2] - 3550:23, 3672:18

**Rosenthal** [1] - 3529:12

**rough** [1] - 3659:11

**rule** [2] - 3643:5, 3673:2

**rules** [1] - 3645:25

**rulings** [1] - 3533:18

**run** [6] - 3565:12, 3585:9, 3651:8, 3651:12, 3665:2, 3665:7

**running** [2] - 3585:8, 3647:21

**runs** [1] - 3664:23

## S

**sales** [2] - 3608:5, 3669:9

**Sanchez** [1] - 3671:10

**sanctions** [1] - 3646:2

**SANFORD** [1] - 3514:8

**Santiago** [1] - 3671:9

**satisfactory** [1] - 3575:1

**satisfy** [3] - 3542:24, 3574:21, 3615:13

**satisfying** [1] - 3638:20

**savings** [5] - 3648:24, 3649:5, 3653:8, 3654:22, 3654:24

**saw** [4] - 3591:5, 3614:10, 3662:13, 3664:3

**scale** [24] - 3526:18, 3584:1, 3626:7, 3626:8, 3626:10, 3626:17, 3626:21, 3627:3, 3627:7, 3627:17, 3627:18, 3627:21, 3628:7, 3628:13, 3629:5, 3629:19, 3629:24, 3630:11, 3630:22, 3631:21, 3635:22, 3636:7, 3645:19, 3673:18

**scenarios** [1] - 3654:2

**schedule** [5] - 3532:1, 3532:2, 3570:19, 3633:17, 3635:17

**schedules** [1] - 3634:14

**Schpero** [88] - 3517:14, 3517:20, 3518:5, 3518:8, 3518:17, 3518:23, 3519:3, 3519:8, 3519:18, 3519:23, 3524:7, 3524:10, 3524:16, 3525:3, 3525:25, 3527:14, 3527:23, 3530:15, 3530:24, 3531:3, 3534:9, 3534:23, 3536:12, 3538:23, 3540:10, 3541:10, 3543:8, 3544:3, 3544:10, 3546:18, 3546:20, 3547:2, 3547:10, 3547:16, 3547:20, 3549:14,

3550:15, 3552:22, 3553:3, 3555:9, 3559:24, 3560:22, 3562:13, 3566:16, 3568:2, 3568:18, 3568:23, 3570:9, 3571:15, 3573:14, 3576:16, 3578:18, 3578:19, 3581:12, 3582:13, 3582:15, 3586:12, 3588:10, 3591:9, 3592:11, 3593:21, 3594:23, 3596:4, 3598:23, 3600:14, 3602:1, 3603:3, 3603:25, 3606:8, 3608:22, 3610:15, 3612:11, 3617:22, 3619:3, 3620:8, 3625:4, 3626:6, 3627:23, 3629:18, 3636:10, 3640:8, 3642:25, 3645:2, 3646:21, 3647:11, 3648:18, 3649:12, 3655:1

**SCHPERO** [4] - 3516:2, 3516:2, 3524:8, 3524:14

**Schpero's** [5] - 3519:10, 3519:12, 3520:16, 3521:9, 3521:16

**science** [4] - 3595:14, 3613:25, 3617:14, 3675:5

**scope** [2] - 3522:2, 3594:15

**screen** [1] - 3603:6

**SEAN** [1] - 3515:12

**searching** [1] - 3601:3

**seated** [1] - 3625:3

**SEC** [21] - 3540:21, 3542:20, 3542:21, 3543:1, 3563:14, 3601:6, 3601:18, 3606:14, 3607:19, 3635:6, 3643:5, 3644:2, 3645:24, 3658:5, 3658:7, 3658:23, 3659:1, 3671:20, 3671:23, 3672:22, 3673:20

**second** [14] - 3517:12, 3535:15, 3550:21, 3552:8, 3558:4, 3558:12, 3562:3, 3564:21, 3575:24, 3603:5, 3610:17, 3619:3, 3625:9,

3654:24

**secondarily** [1] - 3578:7

**Secondly** [1] - 3522:17

**secretary** [1] - 3641:10

**Section** [2] - 3514:23

**section** [6] - 3535:10, 3557:25, 3558:1, 3644:25, 3645:17, 3645:21

**sector** [1] - 3551:10

**sectors** [1] - 3644:24

**secure** [2] - 3580:1, 3580:3

**securities** [3] - 3540:7, 3566:19, 3566:21

**see** [65] - 3519:17, 3529:14, 3535:14, 3541:6, 3542:9, 3549:19, 3552:20, 3553:10, 3553:25, 3555:16, 3558:2, 3558:15, 3560:18, 3565:7, 3565:18, 3565:19, 3565:21, 3568:1, 3570:21, 3570:24, 3571:2, 3579:13, 3585:14, 3592:19, 3593:17, 3597:22, 3600:25, 3603:17, 3603:19, 3605:11, 3607:4, 3609:14, 3616:15, 3617:9, 3618:21, 3621:13, 3621:14, 3621:15, 3623:15, 3627:13, 3627:14, 3627:17, 3627:19, 3632:13, 3638:20, 3644:24, 3648:22, 3652:12, 3657:21, 3657:22, 3659:1, 3661:18, 3661:22, 3661:23, 3661:24, 3667:9, 3670:25, 3672:4, 3676:14, 3677:5, 3677:6

**See** [1] - 3678:5

**seeing** [2] - 3598:20, 3609:10

**seek** [4] - 3520:18, 3520:19, 3521:1, 3521:23

**seeking** [2] - 3521:11, 3522:4

**seem** [1] - 3662:20

**selected** [2] - 3518:13,

3519:7

**selection** [2] - 3565:5, 3572:1

**self** [1] - 3663:4

**self-defeating** [1] - 3663:4

**selling** [2] - 3608:4, 3637:23

**senior** [1] - 3565:21

**sense** [6] - 3581:21, 3595:15, 3602:21, 3602:22, 3664:23, 3667:3

**sensitivities** [1] - 3631:15

**sent** [1] - 3567:11

**Separate** [1] - 3653:9

**separate** [10] - 3528:20, 3549:5, 3562:20, 3598:14, 3621:14, 3633:20, 3639:7, 3651:16, 3652:19

**separated** [1] - 3597:23

**separately** [5] - 3536:23, 3586:21, 3598:5, 3598:8, 3634:4

**September** [2] - 3551:18, 3562:6

**September/October** [1] - 3668:4

**series** [2] - 3591:14, 3603:14

**serious** [1] - 3538:7

**serve** [1] - 3616:6

**served** [3] - 3520:2, 3619:4, 3659:1

**service** [20] - 3553:14, 3574:6, 3576:10, 3583:7, 3584:10, 3584:11, 3584:20, 3585:1, 3585:6, 3588:15, 3598:15, 3617:4, 3634:5, 3647:24, 3650:21, 3665:25, 3667:3, 3670:11, 3670:18, 3676:21

**services** [94] - 3528:19, 3528:20, 3528:23, 3529:1, 3530:16, 3530:18, 3531:19, 3531:24, 3532:19, 3535:18, 3536:22, 3536:23, 3537:5, 3537:7, 3537:8, 3537:11, 3538:14, 3538:23,

3539:1, 3540:15,
3541:11, 3541:12,
3541:15, 3543:9,
3547:21, 3548:2,
3548:6, 3548:9,
3548:15, 3548:21,
3549:10, 3550:10,
3566:16, 3567:2,
3567:4, 3567:8,
3567:15, 3572:3,
3572:10, 3572:15,
3574:6, 3574:11,
3576:3, 3576:17,
3581:13, 3581:15,
3581:19, 3583:11,
3583:12, 3583:15,
3583:20, 3584:12,
3585:1, 3585:8,
3585:16, 3586:19,
3586:20, 3586:21,
3587:2, 3587:6,
3587:8, 3588:3,
3588:11, 3588:18,
3589:7, 3589:17,
3589:19, 3591:1,
3592:1, 3592:23,
3593:4, 3593:11,
3594:16, 3597:2,
3598:8, 3600:5,
3600:7, 3610:9,
3621:1, 3623:3,
3623:19, 3627:20,
3633:22, 3634:12,
3634:14, 3634:16,
3634:25, 3635:1,
3644:16, 3647:23,
3656:21, 3656:22,
3672:20, 3676:18

**Services** [3] -
3621:21, 3623:7,
3623:22

**servicing** [1] -
3623:17

**serving** [1] - 3617:1

**session** [1] - 3665:3

**sessions** [4] -
3539:10, 3552:13,
3663:19, 3663:20

**set** [5] - 3570:14,
3570:18, 3591:13,
3628:5, 3666:19

**setting** [3] - 3632:18,
3633:4, 3658:11

**seven** [3] - 3557:10,
3558:9, 3635:7

**seventh** [1] - 3522:3

**several** [6] - 3555:14,
3577:8, 3592:22,
3593:21, 3594:24,
3602:1

**shared** [3] - 3628:14,
3629:23, 3630:11

**Shared** [3] - 3621:21,
3623:6, 3623:22

**shareholder** [4] -
3623:17, 3634:16,
3634:22, 3643:16

**shareholders** [8] -
3564:24, 3608:7,
3640:17, 3641:3,
3649:6, 3656:1,
3656:14, 3656:15

**sharing** [3] - 3622:20,
3623:1, 3623:2

**Shearman** [1] -
3658:17

**sheet** [1] - 3557:1

**sheets** [1] - 3517:10

**SHERIDAN** [1] -
3514:17

**shift** [7] - 3530:15,
3578:18, 3581:12,
3594:23, 3600:14,
3636:10, 3640:8

**Shifting** [3] - 3610:1,
3621:20, 3655:1

**short** [1] - 3672:1

**shortly** [1] - 3655:4

**shot** [1] - 3674:13

**show** [7] - 3561:25,
3563:13, 3606:3,
3607:4, 3612:20,
3621:10, 3630:21

**showing** [8] - 3611:2,
3649:4, 3649:14,
3650:4, 3651:22,
3651:25, 3652:1,
3652:7

**shown** [2] - 3607:6,
3607:7

**shows** [1] - 3648:23

**side** [12] - 3538:13,
3538:19, 3540:11,
3553:20, 3588:6,
3588:10, 3589:22

**side-by-side** [5] -
3538:13, 3538:19,
3540:11, 3588:6,
3588:10

**sides** [1] - 3525:11

**sift** [1] - 3601:19

**signed** [3] - 3520:12,
3520:15

**significance** [1] -
3556:14

**significant** [34] -
3537:17, 3539:2,
3539:7, 3542:12,
3542:23, 3543:12,
3544:1, 3544:22,

3549:2, 3551:4,
3552:19, 3554:3,
3556:9, 3559:10,
3561:16, 3563:9,
3574:18, 3576:25,
3577:7, 3577:20,
3577:23, 3579:8,
3579:16, 3579:23,
3610:8, 3621:4,
3624:13, 3624:18,
3636:2, 3640:4,
3651:9, 3651:10,
3656:11, 3666:10

**significantly** [1] -
3579:17

**similar** [7] - 3550:1,
3583:20, 3587:12,
3587:13, 3588:6,
3600:4

**similarly** [2] - 3645:12,
3659:5

**Similarly** [1] - 3668:12

**simple** [1] - 3624:15

**simply** [2] - 3534:10,
3623:13

**Simply** [1] - 3540:25

**single** [1] - 3651:5

**singular** [1] - 3565:13

**sits** [1] - 3664:22

**sitting** [1] - 3541:16

**situated** [1] - 3548:24

**situation** [2] - 3566:3,
3609:13

**SIVOLELLA** [1] -
3514:3

**six** [7] - 3551:24,
3552:7, 3635:7,
3650:14, 3667:20,
3670:13, 3670:17

**six-year** [1] - 3650:14

**size** [1] - 3581:3

**sizeable** [1] - 3582:20

**sizes** [1] - 3627:11

**sleeve** [3] - 3551:16,
3562:18, 3653:2

**sleeves** [5] - 3540:5,
3588:23, 3651:6,
3651:14, 3653:2

**slides** [1] - 3628:5

**small** [4] - 3582:21,
3603:5, 3621:3,
3676:5

**socializing** [1] -
3662:1

**sold** [1] - 3671:8

**solely** [1] - 3652:20

**someone** [2] -
3657:23, 3674:21

**sometime** [1] -
3670:22

**sometimes** [9] -
3531:13, 3600:20,
3610:20, 3621:13,
3629:3, 3637:13,
3650:22, 3663:15,
3676:22

**somewhat** [4] -
3522:18, 3600:4,
3603:5, 3677:3

**sorry** [30] - 3522:11,
3532:24, 3534:24,
3540:22, 3544:15,
3544:24, 3545:20,
3547:23, 3549:2,
3549:16, 3552:16,
3560:18, 3578:19,
3591:12, 3592:13,
3595:2, 3610:19,
3616:4, 3624:3,
3633:2, 3634:3,
3634:11, 3642:7,
3643:15, 3649:1,
3650:3, 3654:1,
3665:10, 3667:11,
3675:4

**Sorry** [6] - 3550:23,
3550:24, 3552:23,
3568:25, 3604:13,
3642:12

**sort** [2] - 3582:6,
3628:16

**sought** [1] - 3639:15

**source** [2] - 3543:5,
3669:16

**sources** [1] - 3604:25

**speaking** [7] -
3538:23, 3566:16,
3588:18, 3595:20,
3596:5, 3597:8,
3600:10

**special** [7] - 3552:1,
3555:14, 3555:20,
3555:22, 3556:5,
3557:9, 3570:25

**specific** [32] -
3522:15, 3528:11,
3529:2, 3529:10,
3531:24, 3535:7,
3535:11, 3535:25,
3551:15, 3556:12,
3558:18, 3560:25,
3561:14, 3563:1,
3565:16, 3566:19,
3570:22, 3584:17,
3587:18, 3588:20,
3599:21, 3601:10,
3608:6, 3611:3,
3613:2, 3628:17,
3628:20, 3628:21,
3633:22, 3635:23,

3646:12, 3654:15

**Specifically** [1] -
3561:10

**specifically** [13] -
3522:9, 3538:10,
3562:17, 3583:5,
3588:5, 3588:8,
3595:10, 3610:16,
3614:5, 3618:12,
3630:10, 3634:21,
3648:6

**specifics** [4] -
3558:19, 3562:4,
3565:20, 3570:20

**spend** [1] - 3658:18

**spending** [2] - 3657:7,
3657:8

**spent** [6] - 3537:16,
3559:10, 3615:20,
3658:5, 3662:11,
3668:6

**spirit** [1] - 3589:21

**split** [2] - 3580:10,
3580:13

**sponsor** [5] - 3535:8,
3566:3, 3579:5,
3597:25, 3598:12

**sponsored** [2] -
3565:13, 3576:9

**sponsoring** [1] -
3576:25

**sponsors** [3] -
3565:12, 3577:25,
3609:19

**spread** [14] - 3528:2,
3528:21, 3573:24,
3573:25, 3582:19,
3582:25, 3583:6,
3583:12, 3583:19,
3584:17, 3585:22,
3621:18, 3634:7,
3653:24

**spreads** [1] - 3585:22

**spring** [8] - 3526:6,
3591:11, 3591:12,
3591:22, 3591:23,
3611:20, 3613:3,
3616:8

**stage** [2] - 3576:13,
3577:6

**stamp** [1] - 3549:15

**stand** [2] - 3524:9,
3622:9

**standard** [1] - 3607:3

**standpoint** [1] -
3674:19

**start** [9] - 3517:2,
3575:22, 3579:1,
3579:2, 3600:16,
3621:17, 3626:6,

3635:3, 3644:3
**start-up** [2] - 3579:1, 3579:2
**starting** [5] - 3551:6, 3576:24, 3618:6, 3644:14, 3650:19
**STATE** [1] - 3514:14
**statement** [7] - 3531:25, 3601:13, 3601:14, 3601:16, 3601:18, 3618:3, 3622:9
**statements** [10] - 3532:4, 3569:16, 3579:15, 3581:23, 3581:24, 3582:3, 3582:4, 3589:3, 3640:3
**STATES** [1] - 3514:1
**statistics** [1] - 3669:7
**stays** [1] - 3556:23
**stems** [1] - 3609:15
**step** [5] - 3568:15, 3595:19, 3676:12, 3676:15, 3677:10
**stepping** [1] - 3657:6
**Sterling** [1] - 3658:17
**stick** [1] - 3545:5
**still** [7] - 3524:10, 3566:1, 3568:18, 3609:21, 3625:4, 3638:22, 3642:20
**stip** [1] - 3520:22
**stipulation** [8] - 3520:12, 3520:15, 3521:15, 3521:18, 3521:19, 3521:22, 3522:17, 3523:4
**Stock** [1] - 3562:5
**stop** [2] - 3603:14, 3645:2
**strains** [1] - 3663:8
**strategic** [2] - 3541:21, 3543:5
**Strategic** [1] - 3605:1
**STREET** [1] - 3514:14
**Street** [4] - 3659:13, 3659:22, 3660:12, 3660:24
**strike** [1] - 3614:15
**strongly** [1] - 3572:12
**structure** [13] - 3548:14, 3557:23, 3564:2, 3564:18, 3564:19, 3564:23, 3608:6, 3624:19, 3628:15, 3631:22, 3652:9, 3652:10, 3672:12
**structured** [4] -

3551:12, 3597:25, 3665:12, 3666:19
**structures** [2] - 3544:18, 3630:24
**studies** [5] - 3550:12, 3550:14, 3605:2, 3605:3, 3627:17
**study** [7] - 3603:11, 3605:17, 3607:4, 3610:12, 3612:19, 3621:15, 3624:20
**sub** [135] - 3528:4, 3528:21, 3532:2, 3535:17, 3535:18, 3536:24, 3537:11, 3538:14, 3539:3, 3539:4, 3539:5, 3539:7, 3539:11, 3539:14, 3539:15, 3539:16, 3539:18, 3542:2, 3542:9, 3542:14, 3543:10, 3544:17, 3546:12, 3546:13, 3546:15, 3552:7, 3552:13, 3554:2, 3559:8, 3560:5, 3563:3, 3563:16, 3563:23, 3564:5, 3564:7, 3564:8, 3564:16, 3564:18, 3564:22, 3565:6, 3566:9, 3566:11, 3566:17, 3567:2, 3567:3, 3567:7, 3567:12, 3567:13, 3567:17, 3569:10, 3569:14, 3570:2, 3570:7, 3570:10, 3570:13, 3570:23, 3571:3, 3571:6, 3571:16, 3571:25, 3572:11, 3572:17, 3572:21, 3572:23, 3572:25, 3573:3, 3573:4, 3573:15, 3573:18, 3573:21, 3575:4, 3578:6, 3578:8, 3578:22, 3578:25, 3579:4, 3579:8, 3579:10, 3579:12, 3579:18, 3582:10, 3582:20, 3584:15, 3584:22, 3585:15, 3586:22, 3587:9, 3587:15, 3587:25, 3588:7, 3588:19, 3588:20, 3589:10, 3590:4, 3590:9, 3590:23, 3591:21, 3591:25, 3592:2,

3592:23, 3593:4, 3593:6, 3594:5, 3594:7, 3594:9, 3594:11, 3605:13, 3606:3, 3608:23, 3608:25, 3609:2, 3609:3, 3609:8, 3609:12, 3609:18, 3633:14, 3633:21, 3633:23, 3633:24, 3637:10, 3644:18, 3646:24, 3650:24, 3651:17, 3651:19, 3651:24, 3652:24, 3653:16, 3653:21, 3654:1, 3656:23, 3666:21
**Sub** [3] - 3589:25, 3590:25, 3592:3
**Sub-Administration** [3] - 3589:25, 3590:25, 3592:3
**sub-administration** [5] - 3590:4, 3590:9, 3590:23, 3591:25, 3605:13
**sub-administrator** [14] - 3586:22, 3587:9, 3588:19, 3588:20, 3589:10, 3591:21, 3592:2, 3592:23, 3593:4, 3593:6, 3594:5, 3594:7, 3594:9, 3594:11
**sub-administrators** [1] - 3656:23
**sub-advisor** [35] - 3528:4, 3528:21, 3536:24, 3537:11, 3546:12, 3546:13, 3554:2, 3559:8, 3560:5, 3567:12, 3567:13, 3570:13, 3572:11, 3573:3, 3573:4, 3573:18, 3578:25, 3579:8, 3579:10, 3579:18, 3582:20, 3585:15, 3594:5, 3608:25, 3609:2, 3609:8, 3609:12, 3633:22, 3633:24, 3637:10, 3651:24, 3653:16, 3653:21, 3654:1, 3656:23
**sub-advisors** [57] - 3535:17, 3535:18, 3538:14, 3539:3, 3539:4, 3539:5,

3539:7, 3539:11, 3539:14, 3539:15, 3539:16, 3539:18, 3542:2, 3542:9, 3542:14, 3543:10, 3546:15, 3552:7, 3552:13, 3563:16, 3563:23, 3565:6, 3566:9, 3566:11, 3566:17, 3567:3, 3567:7, 3567:17, 3569:14, 3570:10, 3570:23, 3571:3, 3571:6, 3571:16, 3571:25, 3572:21, 3572:23, 3572:25, 3573:15, 3573:21, 3575:4, 3578:6, 3578:8, 3578:22, 3579:12, 3582:10, 3584:22, 3587:15, 3608:23, 3609:3, 3609:18, 3644:18, 3650:24, 3651:17, 3651:19, 3666:21
**sub-advisors'** [1] - 3579:4
**sub-advisory** [22] - 3532:2, 3544:17, 3563:3, 3564:7, 3564:8, 3564:16, 3564:18, 3564:22, 3567:2, 3569:10, 3570:2, 3570:7, 3572:17, 3584:15, 3587:25, 3588:7, 3605:13, 3606:3, 3633:14, 3633:21, 3646:24, 3652:24
**subcontract** [2] - 3563:18, 3563:23
**subject** [5] - 3547:12, 3632:7, 3638:4, 3646:2, 3670:21
**subpar** [5] - 3559:25, 3560:5, 3560:15, 3561:12, 3561:16
**subpoena** [1] - 3520:2
**subsequent** [1] - 3587:15
**subsidiary** [6] - 3548:14, 3610:10, 3621:3, 3622:3, 3622:24, 3623:18
**substantial** [1] - 3572:15
**substantially** [1] - 3572:10
**substantive** [4] -

3539:7, 3539:11, 3539:14, 3539:15, 3539:16, 3539:18, 3542:2, 3542:9, 3542:14, 3543:10, 3546:15, 3552:7, 3552:13, 3563:16, 3565:6, 3566:9, 3566:11, 3566:17, 3567:3, 3567:9, 3567:14, 3570:10, 3570:23, 3571:3, 3571:6, 3571:16, 3571:25, 3572:21, 3572:23, 3572:25, 3573:15, 3573:21, 3575:4, 3578:6, 3578:8, 3578:22, 3579:12, 3582:10, 3584:22, 3587:15, 3608:23, 3609:3, 3609:8, 3644:18, 3650:24, 3651:17, 3651:19, 3666:21

3540:3, 3542:18, 3558:6, 3620:5
**successful** [1] - 3577:2
**sudden** [1] - 3621:16
**suddenly** [1] - 3668:24
**suffice** [1] - 3522:19
**sufficient** [5] - 3519:20, 3529:18, 3615:21, 3629:20, 3646:13
**suggest** [3] - 3641:15, 3641:17, 3650:25
**suggested** [2] - 3573:22, 3602:18
**suggestion** [4] - 3665:22, 3666:12, 3668:21, 3677:14
**suggestions** [1] - 3677:13
**suit** [3] - 3580:7, 3580:15, 3580:16
**suits** [1] - 3670:9
**Sullivan** [1] - 3668:19
**summaries** [1] - 3570:4
**summarize** [7] - 3526:11, 3526:16, 3539:2, 3543:18, 3552:11, 3569:18, 3599:9
**summarized** [1] - 3538:16
**summarizes** [4] - 3526:12, 3526:13, 3644:3, 3644:12
**summarizing** [4] - 3536:22, 3536:23, 3570:7, 3612:1
**summary** [22] - 3526:13, 3527:2, 3537:4, 3537:10, 3540:11, 3543:9, 3547:5, 3547:6, 3549:24, 3553:4, 3553:19, 3554:10, 3556:18, 3558:19, 3558:20, 3569:7, 3569:8, 3569:10, 3587:1, 3588:17, 3644:9, 3672:1
**summer** [1] - 3591:23
**superb** [1] - 3619:11
**supervising** [2] - 3539:3, 3542:2
**supplemental** [1] - 3535:3
**supplied** [1] - 3644:10
**support** [2] - 3549:24,

**term** [7] - 3572:6, 3596:9, 3621:13, 3626:8, 3636:11, 3636:15, 3637:17
**terms** [16] - 3529:24, 3532:18, 3539:6, 3540:18, 3541:21, 3551:7, 3551:25, 3583:14, 3615:12, 3615:13, 3619:3, 3645:16, 3648:24, 3649:15, 3666:17, 3676:24
**terrific** [1] - 3656:2
**test** [10] - 3596:14, 3596:25, 3636:20, 3638:8, 3638:12, 3638:21, 3639:14, 3656:4, 3656:13, 3673:1
**testified** [16] - 3518:9, 3519:24, 3530:1, 3530:17, 3537:6, 3540:25, 3572:14, 3581:14, 3587:19, 3633:22, 3640:22, 3641:6, 3655:20, 3665:22, 3669:25, 3675:18
**testify** [5] - 3585:23, 3612:5, 3614:21, 3649:9, 3649:10
**testimony** [9] - 3517:21, 3519:12, 3522:20, 3547:12, 3569:8, 3569:23, 3630:3, 3649:2, 3665:18
**testing** [1] - 3607:23
**text** [1] - 3643:22
**themselves** [3] - 3567:3, 3567:7, 3670:6
**theory** [1] - 3520:21
**therefore** [4] - 3548:25, 3566:10, 3626:13, 3659:8
**They've** [2] - 3635:13, 3642:18
**they've** [7] - 3529:7, 3532:4, 3535:13, 3598:13, 3634:20, 3634:24, 3635:4
**thinking** [3] - 3517:25, 3518:16, 3676:1
**thinks** [2] - 3663:6, 3673:12
**third** [1] - 3584:22
**third-party** [1] - 3584:22

**thoughtful** [2] - 3663:9, 3669:23
**thoughts** [1] - 3668:7
**thousand** [2] - 3642:21, 3672:21
**threaten** [1] - 3667:13
**three** [14] - 3517:8, 3553:11, 3558:24, 3566:18, 3566:23, 3606:7, 3625:7, 3651:6, 3651:14, 3651:16, 3653:1, 3657:7, 3658:19, 3670:20
**three-day** [1] - 3670:20
**throughout** [4] - 3532:21, 3653:9, 3655:20, 3667:24
**timeframe** [1] - 3545:6
**Title** [1] - 3514:23
**today** [11] - 3520:1, 3521:11, 3522:22, 3524:18, 3541:16, 3543:22, 3544:12, 3609:21, 3610:7, 3616:20, 3651:3
**together** [8] - 3518:10, 3518:24, 3519:8, 3519:19, 3597:23, 3600:21, 3600:22, 3673:4
**took** [1] - 3661:12
**top** [7] - 3525:5, 3566:9, 3618:7, 3644:5, 3649:18, 3649:25, 3670:11
**topic** [1] - 3594:1
**total** [24] - 3546:5, 3575:6, 3583:18, 3586:4, 3596:9, 3596:12, 3596:13, 3596:15, 3596:21, 3597:24, 3598:18, 3598:20, 3603:18, 3607:14, 3631:7, 3651:23, 3651:24, 3652:3, 3652:23, 3653:7, 3675:14, 3675:22
**totally** [3] - 3636:8, 3649:8, 3665:12
**track** [1] - 3537:20
**trade** [2] - 3535:10, 3566:23
**traded** [2] - 3535:10, 3605:11
**trades** [1] - 3637:13
**trading** [1] - 3540:7
**trailed** [1] - 3559:1

**train** [1] - 3633:2
**transcribed** [2] - 3516:7, 3524:4
**transcript** [3] - 3521:16, 3523:20, 3524:2
**transfer** [1] - 3549:3
**transferred** [1] - 3623:18
**transparency** [1] - 3617:4
**treasury** [1] - 3548:23
**treat** [1] - 3605:12
**tremendous** [2] - 3661:22, 3670:18
**TRENTON** [1] - 3514:15
**trial** [5] - 3516:7, 3522:3, 3522:21, 3524:4, 3533:7
**TRIAL** [1] - 3514:20
**tried** [1] - 3675:1
**tries** [3] - 3569:18, 3633:11, 3675:9
**trivialize** [1] - 3675:4
**troubled** [3] - 3593:3, 3622:13, 3622:15
**troubling** [1] - 3666:4
**true** [3] - 3514:23, 3583:22, 3631:24
**truly** [1] - 3670:10
**trust** [3] - 3521:3, 3521:4, 3563:22
**Trust** [19] - 3518:7, 3519:8, 3538:15, 3538:24, 3540:16, 3541:12, 3543:10, 3547:21, 3548:2, 3548:7, 3548:9, 3563:17, 3567:5, 3574:12, 3581:20, 3589:7, 3645:6, 3649:4, 3654:23
**trustee** [27] - 3529:5, 3534:13, 3534:14, 3538:1, 3552:14, 3554:20, 3573:7, 3577:15, 3581:6, 3604:22, 3615:25, 3619:7, 3619:10, 3619:11, 3619:23, 3620:16, 3626:20, 3654:8, 3656:5, 3662:14, 3662:15, 3664:13, 3665:14, 3668:4, 3668:5, 3668:11, 3677:11
**trustees** [43] - 3518:7, 3518:13, 3519:7, 3520:9, 3520:14,

3520:20, 3520:24, 3521:2, 3521:4, 3523:19, 3530:9, 3530:10, 3530:13, 3538:4, 3538:17, 3552:12, 3554:8, 3566:12, 3570:14, 3570:16, 3571:5, 3574:16, 3590:21, 3612:14, 3615:10, 3616:23, 3618:12, 3620:17, 3622:5, 3632:24, 3633:25, 3640:19, 3641:14, 3641:17, 3646:8, 3647:15, 3660:18, 3664:3, 3665:1, 3670:19, 3670:24, 3670:25, 3674:1
**Trustees** [2] - 3540:17, 3541:19
**trustees'** [2] - 3529:8, 3529:24
**truth** [2] - 3517:15, 3519:18
**truthful** [1] - 3618:17
**try** [18] - 3542:15, 3543:18, 3570:20, 3599:9, 3599:21, 3601:19, 3602:17, 3605:9, 3617:11, 3663:2, 3663:9, 3666:14, 3668:25, 3669:1, 3670:4, 3675:8, 3675:9, 3676:12
**trying** [12] - 3559:10, 3559:11, 3560:24, 3562:11, 3586:6, 3627:16, 3633:7, 3633:10, 3652:5, 3660:3, 3662:9, 3663:14
**turn** [29] - 3524:23, 3524:24, 3527:21, 3528:25, 3530:15, 3532:22, 3536:12, 3549:12, 3549:14, 3549:18, 3552:21, 3555:9, 3563:16, 3568:2, 3568:23, 3581:6, 3582:13, 3586:12, 3598:23, 3603:3, 3610:14, 3610:16, 3627:23, 3643:6, 3644:19, 3645:8, 3645:13, 3648:1, 3648:6
**turned** [1] - 3559:5
**Turning** [1] - 3534:22

**T.Rowe** [6] - 3561:23, 3562:5, 3565:14, 3565:17, 3667:9
**tab** [24] - 3524:24, 3526:2, 3526:3, 3527:21, 3532:22, 3534:24, 3536:12, 3549:12, 3549:17, 3552:21, 3552:24, 3555:9, 3568:3, 3568:6, 3568:23, 3568:25, 3582:13, 3586:12, 3598:23, 3603:3, 3610:14, 3627:23, 3643:6, 3648:1
**Tab** [2] - 3569:1, 3610:20
**table** [4] - 3523:18, 3656:17, 3658:14, 3658:25
**tabs** [1] - 3525:20
**talented** [1] - 3656:16
**talks** [2] - 3646:22, 3669:15
**tax** [4] - 3581:24, 3602:24, 3604:7, 3637:14
**teachers** [1] - 3671:8
**team** [3] - 3546:13, 3663:15, 3663:23
**teams** [1] - 3539:15
**tech** [1] - 3549:2
**technology** [2] - 3549:1, 3589:4
**tens** [1] - 3578:2

## T

**supposed** [1] - 3660:5
**surface** [1] - 3559:10
**surprise** [2] - 3519:25, 3617:9
**suspect** [2] - 3520:3, 3591:18
**sustained** [1] - 3592:8
**Sustained** [1] - 3541:5
**SWEETSER** [1] - 3515:4
**switching** [1] - 3547:20
**Switching** [1] - 3543:12
**sworn** [1] - 3524:8
**system** [2] - 3635:5, 3635:12
**SZAFERMAN** [1] - 3515:3

3550:10

turning [2] - 3525:25, 3613:9
turnover [1] - 3666:10
TWEED [1] - 3515:12
twice [2] - 3519:9, 3592:19
two [36] - 3517:4, 3517:9, 3518:8, 3518:9, 3519:24, 3521:9, 3522:2, 3526:15, 3527:3, 3557:11, 3557:25, 3558:21, 3576:23, 3584:11, 3584:12, 3585:9, 3587:6, 3587:17, 3588:15, 3605:23, 3612:12, 3614:1, 3618:8, 3632:6, 3633:20, 3634:11, 3640:21, 3649:12, 3651:6, 3653:1, 3655:21, 3658:21, 3664:11, 3664:18, 3665:5, 3672:24
type [8] - 3551:8, 3579:25, 3600:7, 3603:5, 3657:23, 3659:22, 3669:5, 3670:2
types [12] - 3538:23, 3540:15, 3541:12, 3543:15, 3544:25, 3545:3, 3551:12, 3561:13, 3576:20, 3581:18, 3583:15, 3627:5
typical [2] - 3631:22, 3658:14
typically [10] - 3544:18, 3559:2, 3565:11, 3570:21, 3571:2, 3579:4, 3585:11, 3592:19, 3601:8
Typically [1] - 3633:18

U

U.S [2] - 3514:17, 3514:25
U.S.C [1] - 3514:23
ultimate [8] - 3536:3, 3564:1, 3574:24, 3586:7, 3596:25, 3621:18, 3632:11, 3672:7
ultimately [14] - 3539:18, 3548:18, 3552:19, 3562:2,

3564:6, 3564:9, 3574:18, 3589:6, 3596:20, 3602:10, 3612:16, 3631:5, 3632:17, 3673:13
unaudited [1] - 3579:16
Under [3] - 3526:3, 3573:14, 3573:16
under [19] - 3521:22, 3524:10, 3526:2, 3534:24, 3536:24, 3541:19, 3558:21, 3563:1, 3568:18, 3572:3, 3577:5, 3583:1, 3597:3, 3623:6, 3623:17, 3625:4, 3631:21, 3637:8
under-performance [1] - 3558:21
underlying [2] - 3566:8, 3583:3
underneath [1] - 3525:5
understood [2] - 3548:9, 3613:24
undertaking [1] - 3579:25
unfortunately [1] - 3573:23
unhappiness [1] - 3546:13
unhappy [1] - 3666:25
UNITED [1] - 3514:1
universe [1] - 3632:8
university [1] - 3669:6
unless [2] - 3530:13, 3559:5
unreasonable [2] - 3620:13, 3620:22
unrelated [1] - 3609:8
unusual [1] - 3579:12
up [34] - 3520:3, 3521:8, 3530:22, 3539:17, 3540:5, 3546:19, 3551:17, 3561:25, 3568:4, 3568:5, 3570:14, 3570:18, 3576:24, 3579:1, 3579:2, 3583:22, 3590:19, 3591:13, 3603:6, 3608:5, 3612:16, 3631:11, 3631:25, 3632:1, 3632:25, 3636:12, 3644:3, 3650:19, 3653:15, 3658:11, 3666:19, 3670:13, 3672:23

upcoming [1] - 3526:8
update [1] - 3553:13
updated [4] - 3541:20, 3551:20, 3555:4, 3555:17
updates [2] - 3552:4, 3582:3
upper [1] - 3637:24
urging [1] - 3591:18
utilized [1] - 3611:17

V

valuation [3] - 3540:6, 3540:7, 3572:4
Value [1] - 3557:13
value [3] - 3576:17, 3588:21, 3588:22
variable [2] - 3638:2, 3639:25
various [19] - 3525:20, 3531:19, 3532:18, 3538:10, 3540:14, 3550:17, 3572:3, 3577:5, 3578:16, 3592:15, 3597:3, 3601:4, 3631:1, 3633:6, 3637:24, 3644:8, 3654:16, 3655:7
vast [1] - 3656:2
vastly [1] - 3635:5
versus [5] - 3551:11, 3584:14, 3585:22, 3650:6
viability [1] - 3578:8
viable [1] - 3577:6
view [9] - 3518:14, 3519:11, 3555:24, 3564:18, 3564:22, 3577:20, 3618:8, 3618:18, 3638:9
viewed [3] - 3517:14, 3624:8, 3670:10
viewpoint [2] - 3673:11, 3674:20
viewpoints [2] - 3659:24, 3675:3
views [7] - 3519:9, 3530:3, 3553:14, 3553:23, 3553:24, 3650:24, 3668:6
violating [1] - 3608:11
virtually [2] - 3542:25, 3630:20
visits [1] - 3539:10
volatility [1] - 3635:13
voluminous [1] - 3569:13

vote [3] - 3529:22, 3640:23, 3640:25
voted [5] - 3640:8, 3640:12, 3641:5, 3646:19, 3647:11
voting [2] - 3527:16, 3529:19
Vs [2] - 3514:5, 3514:9

W

wait [1] - 3657:13
waiting [1] - 3560:18
waivers [2] - 3649:24, 3650:9
waiving [2] - 3653:15, 3653:23
walk [2] - 3551:22, 3551:24
Wall [4] - 3659:13, 3659:22, 3660:12, 3660:24
ways [7] - 3571:22, 3576:23, 3614:3, 3628:13, 3628:14, 3660:18, 3664:12
weeds [2] - 3677:12, 3677:14
week [2] - 3520:3, 3522:3
weekly [3] - 3539:8, 3589:21, 3658:6
weeks [2] - 3667:21, 3670:13
weigh [2] - 3675:9, 3675:25
weighs [1] - 3640:19
weighted [1] - 3640:20
whatever's [1] - 3551:19
whatnot [1] - 3580:12
whole [9] - 3517:25, 3548:25, 3560:3, 3577:17, 3581:7, 3581:22, 3589:17, 3663:11, 3672:14
wide [1] - 3564:3
willing [1] - 3584:23
wish [2] - 3518:18, 3573:10
Witness [5] - 3536:17, 3546:21, 3558:16, 3562:4, 3603:23
witness [14] - 3518:6, 3519:13, 3524:8, 3530:23, 3546:23, 3547:13, 3560:8, 3573:6, 3595:23,

3612:3, 3630:3, 3649:2, 3657:11, 3661:10
WITNESS [90] - 3534:16, 3534:18, 3545:7, 3545:14, 3545:17, 3554:16, 3554:19, 3554:25, 3557:2, 3557:5, 3557:7, 3557:12, 3557:16, 3557:19, 3557:23, 3558:11, 3558:14, 3558:17, 3560:24, 3561:3, 3568:8, 3568:16, 3568:19, 3575:15, 3578:23, 3579:2, 3580:2, 3582:17, 3583:5, 3594:6, 3594:10, 3594:18, 3600:17, 3600:19, 3600:24, 3601:7, 3604:13, 3607:19, 3607:21, 3608:2, 3612:8, 3614:19, 3616:12, 3616:14, 3616:19, 3618:11, 3618:18, 3624:23, 3639:21, 3642:15, 3642:17, 3642:19, 3646:25, 3650:18, 3651:15, 3651:18, 3651:22, 3652:7, 3652:13, 3652:18, 3653:6, 3653:14, 3653:20, 3654:6, 3657:18, 3658:1, 3658:3, 3659:19, 3659:25, 3660:7, 3660:9, 3661:16, 3662:23, 3664:9, 3664:22, 3665:10, 3665:17, 3665:21, 3666:4, 3667:19, 3667:25, 3669:11, 3669:13, 3669:20, 3671:18, 3673:13, 3675:1, 3676:8, 3677:18, 3678:2
women [1] - 3661:19
wondering [3] - 3544:5, 3676:3, 3676:5
Worcester [1] - 3668:20
words [5] - 3571:21, 3608:5, 3622:22, 3626:10, 3638:16
works [3] - 3569:18, 3615:22, 3628:15

**world** [2] - 3660:15, 3666:16

**worse** [1] - 3528:6

**Wow** [1] - 3534:17

**wrapper** [9] - 3563:9, 3637:17, 3638:3, 3638:8, 3638:12, 3638:15, 3638:23, 3640:1, 3640:5

**writings** [3] - 3521:2, 3521:5, 3521:6

**written** [1] - 3645:3

**Y**

**year** [40] - 3526:23, 3531:8, 3535:25, 3537:20, 3550:2, 3550:4, 3551:7, 3557:15, 3558:25, 3567:12, 3570:21, 3571:4, 3572:18, 3575:25, 3578:11, 3578:15, 3587:17, 3592:19, 3593:17, 3603:18, 3611:2, 3611:10, 3611:15, 3629:1, 3629:2, 3629:4, 3629:8, 3640:9, 3642:11, 3643:1, 3643:12, 3646:19, 3647:11, 3650:14, 3657:2, 3657:5, 3667:24, 3668:3, 3668:25

**years** [51] - 3521:9, 3522:2, 3528:12, 3530:5, 3530:6, 3534:11, 3543:13, 3543:16, 3545:1, 3545:16, 3545:20, 3547:17, 3552:5, 3553:11, 3553:12, 3557:11, 3558:21, 3558:24, 3560:2, 3565:8, 3565:10, 3577:24, 3592:16, 3609:16, 3614:3, 3614:7, 3616:6, 3617:3, 3619:4, 3621:1, 3630:24, 3634:17, 3635:3, 3635:8, 3643:5, 3650:20, 3655:8, 3658:5, 3658:19, 3662:6, 3662:12, 3664:11, 3666:6, 3668:5, 3668:9, 3668:10, 3668:20, 3668:21, 3669:25,

3670:17

**yesterday** [11] - 3517:5, 3518:9, 3522:7, 3524:16, 3525:3, 3526:23, 3531:6, 3531:10, 3532:8, 3570:5, 3615:17

**Yesterday** [2] - 3523:17, 3550:15

**York** [1] - 3661:1

**Young** [4] - 3612:14, 3612:18, 3618:11

**Z**

**zone** [1] - 3667:5