```
 1                   UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
 2

 3  _____
    MARY ANN SIVOLELLA, et al,
 4                    PLAINTIFFS

 5      Vs.                          CIVIL NO.
                                     11-4194 (PGS)
 6  AXA EQUITABLE LIFE INS. CO.,
    et al,
 7                    DEFENDANTS
    _____
 8  GLENN D. SANFORD, et al,
                      PLAINTIFFS
 9
        Vs.                          CIVIL NO.
10                                   13-312 (PGS)
    AXA EQUITABLE FUNDS
11  MANAGEMENT GROUP,
                      DEFENDANT
12  _____

13

14                               FEBRUARY 22, 2016
                                 CLARKSON S. FISHER COURTHOUSE
                                 402 EAST STATE STREET
15                               TRENTON, NEW JERSEY  08608

16

17  B E F O R E:      THE HONORABLE PETER G. SHERIDAN
                      U.S. DISTRICT COURT JUDGE
18                    DISTRICT OF NEW JERSEY

19

20
    TRIAL - DAY 22
21

22

23                               Certified as true and correct as required
                                 by Title 28, U.S.C. Section 753
24                               /S/ Francis J. Gable
                                 FRANCIS J. GABLE, C.S.R., R.M.R.
25                               OFFICIAL U.S. REPORTER
                                 (856) 889-4761
```

*United States District Court*
*Trenton, New Jersey*

```
 1

 2    A P P E A R A N C E S:

 3
          SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, PC
 4        BY:  ARNOLD C. LAKIND, ESQUIRE
               DANIEL S. SWEETSER, ESQUIRE
 5             ROBERT L. LAKIND, ESQUIRE
               MARK A. FISHER, ESQUIRE
 6             CHRISTOPHER S. KWELTY, ESQUIRE
               CHRISTOPHER S. MYLES, ESQUIRE
 7        FOR THE PLAINTIFFS

 8

 9        BLANK ROME, LLP
          BY:  JONATHAN M. KORN, ESQUIRE
10        FOR THE DEFENDANTS

11

12        MILBANK, TWEED, HADLEY & McCLOY, LLP
          BY:  SEAN M. MURPHY, ESQUIRE
13             ROBERT C. HORA, ESQUIRE
               JAMES N. BENEDICT, ESQUIRE
14             BENJAMIN REED, ESQUIRE
          FOR THE DEFENDANTS
15

16    ALSO PRESENT:  PATRICIA LOUIE, ESQUIRE
                      MANAGING DIRECTOR & ASSOCIATE GENERAL COUNSEL
17                    AXA EQUITABLE LIFE INSURANCE CO.

18

19

20

21

22

23

24

25
```

*United States District Court*
*Trenton, New Jersey*

1                    I N D E X

2

GARY SCHPERO                                      3714
3  CROSS-EXAMINATION OF GARY SCHPERO BY MR. A.       3714
   LAKIND

4

5

6

7                    E X H I B I T S

8

Defendant's Exhibit 1445 was marked into evidence   3875
9  Plaintiff's Exhibit 721 was marked into evidence   3876

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  Good morning.

2      Any applications?

3      MR. A. LAKIND:  Not from plaintiff, your Honor.

4      MR. MURPHY: Your Honor, just one housekeeping

00:00    5  matter, sort of a housekeeping matter.  We have four days

6  left, we are supposed to finish Thursday afternoon.  My

7  understanding from Mr. Lakind is that he plans to use very

8  likely all day today with Mr. Schpero on cross, so he's using

9  one of the four days.  They've also filed two --

00:00   10     THE COURT:  Is this for an extension of time?

11     MR. MURPHY:  No.  You'll recall, your Honor, in

12  chambers at one point I had mentioned that we might come to

13  you at some point and ask for a division of the remaining

14  time, so that we all have the same incentives to use the

00:00   15  remaining time efficiently.  Just a couple of statistics, your

16  Honor.

17     So, we have gone back and looked at the transcript;

18  I mean plaintiffs are beating us in terms of time of

19  possession with the ball by not quite two to one, but getting

00:01   20  very close to that if they use Mr. Schpero all day.  We -- the

21  entirety of our cross-examinations of all of their direct case

22  equaled about six hours; they used almost that with Mr. Joenk.

23  Now they are going to exceed that with our first two

24  witnesses.

00:01   25     They also -- as I mentioned briefly or about to

*United States District Court*
*Trenton, New Jersey*

1   discuss, they've served two subpoenas, one on JP Morgan,

2   you'll recall we've had some dialogue on that; they also

3   served a subpoena on Friday to trustees' counsel, Morgan

4   Lewis.  I don't think the brief's been filed yet, but I saw

5   Morgan Lewis' response, it's a 23 page opposition brief for

6   motion to quash.  There could be argument on these two motions

7   that plaintiffs are causing.

8          So I just see our four days evaporating and being

9   used by the plaintiffs.  And again, we've only really put on

10  two witnesses and a custodian of records.  I would just ask

11  that we kind of come up with a division of the remaining time

12  that's fair so that everyone has the same incentive to use the

13  time efficiently.

14         THE COURT:  So, how many more witnesses do you have?

15         MR. MURPHY:  I mean we're in the uncomfortable

16  position, your Honor, of cutting witnesses.  We have -- we

17  have four experts, one is our governance expert who has -- you

18  know, came from the SEC Division of Investment Management, we

19  think she'd be an important witness on the governance process,

20  but she is in Antarctica.  And given the fact that we are --

21  we're crunched on time we're thinking about dispensing with

22  her, which is all but a foregone conclusion at this point.

23         We have a number of fact witnesses where we're in

24  the difficult position of saying do we put them at all or try

25  to put them on in a half hour.  We think we can get it done on

1   Thursday, but I can't do it quite frankly, your Honor, if they

2   take two and a half of the four days and I have a day and a

3   half.  I need to at a minimum put on my three other experts.

4         So, if we had something like there's four days, we

00:02   5   each get 50 percent of it, I could find a way to get it done.

6   If they're going to use the lion's share of what's left --

7   because right now they have no incentive to use the clock

8   efficiently; in fact, they have the opposite incentive.  And

9   I'm not questioning their incentives or motives with how they

00:03   10   present their case, but nothing sharpens the mind like a clock

11   ticking, your Honor.  We're going through that process, and

12   they don't have that pressure which is a little bit of an

13   unlevel playing field, in light of the fact that they've got

14   us on a clock on a two-to-one ratio almost.

00:03   15         THE COURT:  All right.  Does anyone wish to be

16   heard?

17         MR. A. LAKIND:  Yes, your Honor.  Number one, I'm

18   not prepared to say who spent more time --

19         THE COURT:  What are you prepared to say, Mr.

00:03   20   Lakind?

21         MR. A. LAKIND:  I'm prepared to say that with regard

22   to the comments they make, it took Mr. Benedict roughly two

23   days to examine Mr. Schpero; I think I can do it in one day.

24   With regard --

00:03   25         THE COURT:  Okay.

Schpero - Cross - A. Lakind

1          MR. A. LAKIND:  With regard to their assessment that

2     they put six hours of cross, I mean it seemed they did Mr.

3     Barrett for a full day, so I'm not sure how this he come up

4     with six hours.  They deposed -- excuse me; they crossed Mr.

00:04   5     Kopcke, Mr. Pomerantz.  I'm -- we'll withdraw the subpoena to

6     Morgan Lewis, that will expedite things, and I'll proceed as

7     quickly as I can.  Perhaps we can revisit it at the end of the

8     day.

9          THE COURT:  Well, I'm sticking to the four days.  I

00:04  10    think that everybody's had more than enough time the present

11    their cases now.  I've extended it a number of times,

12    plaintiff had more than enough time, and generally the

13    defendants wished for eight days and I think we've extended

14    that by two or three days, so I think we should finish by the

00:04  15    end of Thursday.  So we'll proceed as we are right now.

16         MR. A. LAKIND:  Thank you, your Honor.

17         THE COURT:  We're going to do the cross-examination

18    of Mr. Schpero?  Mr. Schpero, you may take the stand.

19              (GARY SCHPERO, previously sworn, resumes witness

00:-19  20    stand.)

21         THE COURT:  So, you're still under oath, Mr.

22    Schpero.  Good morning.

23    (CROSS-EXAMINATION OF GARY SCHPERO BY MR. A. LAKIND:)

24    Q.   Good morning, Mr. Schpero.  Are you ready to proceed?

00:05  25    A.   Yes, I am.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1          MR. A. LAKIND:  Your Honor, may I proceed?

2          THE COURT:  You may.

3          MR. A. LAKIND:  Thank you.

4     Q.   Mr. Schpero, I'd like to just give you some notice of

00:06   5     what I intend to do today.  I'm going to --

6          THE COURT:  No speeches.

7          MR. A. LAKIND:  Okay.

8          THE COURT:  Let's get to questions.

9     Q.   Mr. Schpero, in the context of your direct testimony, you

00:06  10     indicated that your goal was to see that the fees are fair and

11     reasonable; do you recall that?

12    A.   Yes, I do.

13    Q.   And what is your understanding of what a fair and

14     reasonable fee is?

00:06  15    A.   I think a fair and reasonable fee is one that is

16     reflective of a process that the Board engages in as

17     fiduciaries acting in good faith on behalf of the investors,

18     where we examine all of the data and exercise our business

19     judgment, each of us exercises our business judgment, to reach

00:06  20     a decision that we think is in the best interest of the

21     investors.

22    Q.   Was it your goal to have a fee that was fair and

23     reasonable to FMG as well?

24    A.   No, that is not my goal.

00:07  25    Q.   Okay.  In response to questions from the Court, you

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  identified the Investment Company Institute as a source of

2  data; is that correct?

3  A.   That's one of many sources, yes.

4  Q.   And are you familiar with an organization called the

5  Mutual Fund Directors Forum?

6  A.   Yes, I am.

7  Q.   And who are they?

8  A.   They are an independent forum that, again, acts on behalf

9  of independent trustees as the Independent Directors Council

10 that I mentioned, and that is a source of both information,

11 education programs, things of that sort.

12 Q.   Does your Board take advantage of any services from the

13 Mutual Fund Directors Board?

14 A.   Yes, we -- we certainly have received -- my recollection

15 is we've received documents over the years that reflect

16 studies and things of that sort that have been done.

17 Q.   Have you found the Investment Company Institute to be a

18 reliable source of information?

19 A.   A -- yes, I have -- I have no reason to believe they're

20 not reliable.

21 Q.   And what about the Mutual Funds Directors Board, do you

22 find them to be a reliable source of information?

23 A.   No reason to believe otherwise.

24 Q.   Mr. Schpero, you recognize that there is essentially an

25 inherent conflict between FMG and the Board; is that correct?

*United States District Court*
*Trenton, New Jersey*

3717

Schpero - Cross - A. Lakind

1   A.   Yes, I -- I think I've testified to that.

2   Q.   And you recognize as well that your -- your role is one

3   of a watchdog to act on behalf of investor; is that correct?

4   A.   Yes.

00:08   5   Q.   And that means your goal is to protect the investors from

6   any overreaching by FMG; is that correct?

7   A.   Yes.

8   Q.   You were asked in the course of your direct testimony why

9   you don't have more input from consultants; do you recall

00:08   10   that?

11   A.   I don't recall specifically, but I may have been asked

12   that.

13   Q.   Do you recall testifying that you had confidence in the

14   integrity of the information which you received from FMG?

00:09   15   A.   I'm sorry; say that again please?

16   Q.   Do you recall testifying that you had confidence in the

17   integrity of the information that you received from FMG?

18   A.   Yes, I do.

19   Q.   And it has been your view that you can evaluate that

00:09   20   information without the assistance of outside consultants; is

21   that correct?

22   A.   No, that would not be correct.

23   Q.   Is it true that one hundred percent of all the

24   information the Board receives comes from FMG?

00:09   25   A.   No, that's not correct.

*United States District Court*
*Trenton, New Jersey*

3718

Schpero - Cross - A. Lakind

1    Q.    Okay.  And what other information does the Board receive

2    that does not come from FMG?

3    A.    Well, as I think I testified, we receive information from

4    many sources, we receive information from Lipper --

00:09    5    Q.    Excuse me; but the Lipper material comes from FMG; is

6    that correct?

7    A.    So you're just asking me the technical issue of who

8    delivers the information to us?

9    Q.    Yes.

00:10    10    A.    Yes, the deliverer of information -- even that I guess I

11    have to disagree with you, because we certainly receive direct

12    information quite frequently from our counsel; I receive

13    direct mailings and e-mails from the Investment Company

14    Institute as well as the Independent Directors Council; I

00:10    15    receive direct information including, daily and weekly e-mails

16    from two of the periodicals that cover on a daily basis or

17    weekly base the industry, Funding Nights and Fund Directions;

18    those would be at least some of the items that I think of that

19    I get directly.

00:10    20    Q.    In connection with the review of the management and the

21    administrative contracts, the 15(c) material comes one hundred

22    percent from FMG; is that correct?

23    A.    All -- again, I guess the exception I clearly remember,

24    since you're just asking again about the manual process, the

00:11    25    exception I certainly remember is we receive memorandums and

3719

Schpero - Cross - A. Lakind

1    documents and things from our independent counsel separately.

2    Q.   And it's your position that -- strike that.

3        The information you receive from the independent

4    counsel, that assists you in reviewing the 15(c) material; is

00:11    5    that correct?

6    A.   Yes.

7    Q.   And if that information assists you it's conceivable it

8    would assist the Court as well; is that correct?

9    A.   I guess that would be correct.

00:11    10   Q.   And the information you receive from counsel, you did not

11   include that information in the two binders you provided to me

12   at your deposition; is that correct?

13   A.   I believe that's correct.  Obviously on the advice of

14   counsel.

00:12    15   Q.   And you did not include that information in Defendant's

16   Exhibits 1811 or 1812, which has been moved into evidence here

17   as well; is that correct?

18   A.   Well, I didn't prepare defendant's exhibit, but I don't

19   recall seeing anything when I was under direct testimony.

00:12    20   Q.   Now, given your duty as a watchdog for fund investors and

21   the duty of loyalty to which you owe to fund investors, would

22   you agree that the Court can make a more reasoned decision if

23   it had the benefit of the information provided by your

24   counsel?

00:12    25        (Brief pause.)

Schpero - Cross - A. Lakind

1    A.    I don't -- I guess I'm not sure how to answer that.    I

2    mean we receive a lot of information from our counsel; I

3    certainly have testified that I find it important and

4    essential in my decisions.    I guess I'm not going to pretend

00:13    5    to take a view as to how the Court would analyze this

6    material.

7              MR. A. LAKIND:  Would you please supply the witness

8    Defendant's Exhibit 1445, please?

9              MR. BENEDICT:  What is 1445?

00:13    10              MR. A. LAKIND:  We're passing it over to you in a

11    moment.

12              THE WITNESS:  Do I need these books that are here?

13    BY MR. A. LAKIND:

14    Q.    You will shortly.

00:13    15    A.    Okay.

16    Q.    Mr. Schpero, can you please identify Defendant's Exhibit

17    1445 for us, please?

18    A.    This is the one of the reports that had been put together

19    by the Mutual Fund Directors Forum which you asked about a few

00:14    20    moments ago, it's called Best Practices and Practical Guidance

21    For Mutual Fund Directors.

22    Q.    And is this a document which the Board has received over

23    the years?

24    A.    I believe it has.

00:14    25    Q.    And is this a document --

Schpero - Cross - A. Lakind

1   A.   I can -- I should only speak for myself; I have seen

2   this.

3   Q.   And when you saw the document, did you take the time to

4   review it?

00:14   5   A.   Yes, I did.

6   Q.   If you would, turn over to -- strike that.

7        You were asked in the course of your direct testimony

8   about whether it was wise for a representative of FMG to be a

9   chairman of the funds' Board of Directors; do you recall that

00:15   10   question?

11   A.   Yes, I do.

12   Q.   And do you recall what your answer was?

13   A.   I don't remember my wording; I'm happy to give you the

14   answer if you'd like to hear it.

00:15   15   Q.   And your answer was in your view that was not

16   problematic; is that correct?

17   A.   That would -- that would be consistent with my view, yes.

18   Q.   If you would turn over to page 6 of Defendant's Exhibit

19   1445 -- I'm sorry; page 5 has a Roman Numeral III.  Do you see

00:15   20   where that is?

21   A.   Page 5; sorry.  Page 5?  I don't see a Roman Numeral

22   III --

23   Q.   At the very top, sir?

24   A.   Oh yes, yeah.

00:15   25   Q.   Recommendations to enhance the independence of fund

Schpero - Cross - A. Lakind

1    independent directors; do you see where that is?

2    A.   Right.

3    Q.   And would you read for the Court, please, recommendation

4    number 2?

00:16    5    A.   So that's on page 6?

6    Q.   Yes.

7    A.   Yeah:  The chairman of the funds' board should be a

8    person who is independent of the advisor and of entities

9    affiliated with the advisor.

00:16    10    Q.   And you disagree with that; is that correct?

11    A.   I don't -- I don't disagree -- I'm sorry; I'm going to

12    have to change my glasses, I apologize.  I think as I told the

13    Court on Friday, there are two I believe very acceptable

14    approaches that the SEC has I think -- I think actually since

00:16    15    this date, has made clear are acceptable practices for the

16    fund industry.  And they are either having an independent

17    chair or having a lead independent trustee who serves the same

18    substantive purpose.  And I believe both of those are very

19    much practices in the industry.

00:16    20         MR. A. LAKIND:  Your Honor, motion to strike; I

21    asked a simple yes or no question and we'd move much more

22    quickly if I had a yes or no answer.

23         THE COURT:  He answered the question, you can go to

24    your next one.

00:17    25    BY MR. A. LAKIND:

*United States District Court*
*Trenton, New Jersey*

*3723*

Schpero - Cross - A. Lakind

1   Q.   If you would turn to footnote 12 on page 6.  See where

2   that is?

3   A.   Yes, I do.

4   Q.   And I'm going to read it because we both apparently have

00:17   5   vision problems:  See Investment Company Governance,

6   Investment Company Act Rel. No. 26323, January 15, 2004,

7   governance proposing release.  And then it has a parentheses:

8   The chairman of a fund board can largely control the board's

9   agenda which may include matters not welcomed by the advisor;

00:17   10   the chairman of the board can have a substantial influence on

11   the fund's boardroom culture.

12        Did I read that accurately?

13   A.   Yes, you did.

14   Q.   Is that a concern that you've had about the impact of Mr.

00:17   15   Joenk?

16   A.   Do you mind if I read the context the full --

17   Q.   Absolutely.

18        THE COURT:  You may read the whole -- you may.

19   A.   Thank you.

00:18   20        (Witness reviewing.)  I'm sorry; your question?

21   Q.   Do you -- I forget what my question was.  Do you disagree

22   with that statement in the footnote that I read to you?

23   A.   So, your Honor, to answer that I guess -- I'm happy to

24   answer it, but --

00:19   25        THE COURT:  What's the question again, Mr. Lakind?

Schpero - Cross - A. Lakind

1        MR. A. LAKIND:  I'm sorry, your Honor?

2        THE COURT:  What's the question again?

3        MR. A. LAKIND:  I asked him if he disagreed with

4    this statement that I read to him about --

00:19    5        THE COURT:  So you can answer that yes or no, do you

6    disagree.

7        THE WITNESS:  Yeah, I agree those are two accurate

8    statements.

9    BY MR. A. LAKIND:

00:19    10   Q.   Okay.  The last sentence reads:  More recently Paul F.

11   Royce (sic) the director of the SEC's Division of Investment

12   Management observed in his opening statement that the

13   Commission on June 23, 2004, "a fund board with an independent

14   chairman and independent leadership is more likely to ask the

00:19    15   tough questions, more likely to say no when necessary, and

16   more likely to be an effective check on fund management."

17        Do you agree with that sentence?

18   A.   Actually I do not.

19   Q.   Turn over if you would to page 28.  See where it says

00:20    20   recommendation 16?

21   A.   16, yes.

22   Q.   It reads:  A fund's board should designate a committee

23   consisting of some or all of the fund's independent directors

24   to oversee the fund review process and the committee should

00:20    25   have a written charter.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1       Did you have a committee that had a written charter to

2  oversee the 15(c) process?

3  A.   No, we do not.

4  Q.   Turn over the page 29, if you would.  See recommendation

00:20      5  18?

6  A.   Yes.

7  Q.   It reads:  Independent directors and the contract review

8  committee should consider retaining unaffiliated third-party

9  consultants.

00:20     10       Did I read that accurately?

11  A.   Yes, you did.

12  Q.   Did the Board retain in this case any unaffiliated

13  third-party consultants?

14  A.   Yes, as I think I've testified we -- Lipper is retained

00:21     15  to provide performance information, and certainly we receive

16  data from other third-party entities, I think I've listed

17  several of them in my direct testimony.

18  Q.   Strategic Insights and organizations of that nature?

19  A.   Management Practice, yes.

00:21     20  Q.   But did the Board retain a consultant with an expertise

21  in the 15(c) review process --

22  A.   I'm sorry; did we?

23  Q.   Did the Board retain a consultant with expertise in the

24  15(c) process to assist it?

00:21     25  A.   Outside of what I've testified, no.

3726

Schpero - Cross - A. Lakind

1    Q.   If you would, turn over to page 36, footnote 81.  It

2    reads as follows:  The commission -- and that's referring to

3    the SEC -- staff believes that effective fund governance can

4    be enhanced when funds align the interests of their directors

5    with the interests of their shareholders; fund directors who

6    own shares in the funds that they oversee have a clear

7    economic incentive to protect the interests of fund

8    shareholders.

9         Did I read that accurately?

10   A.   Yes, you did.

11   Q.   Do you own any shares in any of the funds -- excuse me;

12   any of the funds within the EQAT Trust?

13   A.   Mr. Lakind, I am prohibited from doing that, and if I

14   owned them I would be an -- I would not be deemed an

15   independent trustee.  Because of the structure of these kinds

16   of funds where you have insurance policies.

17   Q.   Now, you are a trustee for the Blackstone funds as well;

18   is that correct?

19   A.   That's correct.

20   Q.   And you own shares in the Blackstone funds; is that

21   correct?

22   A.   Because there it is not sold through an insurance policy

23   so I'm able to buy them, and I would have here if I could.

24   Q.   You own shares in the Blackstone funds?

25   A.   I just said yes, yeah.

*United States District Court*
*Trenton, New Jersey*

3727

Schpero - Cross - A. Lakind

1   Q.   If you would turn over the page 44.  And if you would

2   read the third bullet down, which begins, a detailed analysis

3   of the advisor's cost structure.  I'll read it so --

4   A.   You have to give me a minute, I haven't even gotten

00:23   5   there.

6   Q.   Yeah.  Essentially it deals with suggested information to

7   be made part of the Section 15(c) request, and it requests a

8   detailed analysis of the --

9   A.   I'm sorry; just tell me where you are.

00:23   10         THE COURT:  He needs to take a look at it, Mr.

11   Lakind.

12         MR. A. LAKIND:  I'm sorry, your Honor.

13         THE COURT:  He's only seen the document for two

14   minutes; right?

00:23   15   A.   So we're on page 44; where you would like me to look?

16   Q.   The third bullet.

17   A.   And do you want me to read it, or are you going to read

18   it to me?

19   Q.   Why don't you read it to yourself.

00:23   20         (Witness reviewing.)

21   A.   All right.  I've read it.

22   Q.   Did the Board receive a detailed analysis of FMG's cost

23   structure identifying the amount spent on portfolio management

24   decisions?

00:24   25   A.   No, we had not seen that.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  Q.  The amount spent on research?

2  A.  I don't recall seeing that.

3  Q.  The amount spent on trading and product development?

4  A.  Same answer, no.

00:25  5  Q.  What about cash management?

6  A.  No.

7  Q.  You can feel free to put that aside if you would.

8      Mr. Schpero, you would agree that in order to fill your

9  role to achieve an arms-length bargain, it was important that

00:25  10  the Board have accurate information as to the legal standards

11  which it was to apply; is that correct?

12  A.  Yes, that would be correct.

13  Q.  And in order to fill your role to achieve an arms-length

14  bargain, it was important that the information you received

00:25  15  about the investment management and administrative fees

16  charged by FMG in comparison to the fees charged by other

17  funds was accurate; is that correct?

18  A.  That the comparative fee data be accurate, yes.

19  Q.  And that's the Lipper data that you testified about; is

00:26  20  that correct?  That is the Lipper data you testified about

21  yesterday?

22  A.  That sounds right.

23  Q.  I'm sorry, on Friday.  And it's also important that the

24  information you received about performance of the funds is

00:26  25  accurate; is that correct?

Schpero - Cross - A. Lakind

1   A.   Yes.

2   Q.   And the information you received about the profits of the

3   funds -- excuse me.  The profit of the investment advisor was

4   accurate; is that correct?

00:26   5   A.   Yes.

6   Q.   You wanted to be sure that when FMG said it was passing

7   along economies of scale it was in fact doing that; is that

8   correct?

9   A.   Well, as I've testified we certainly consider economies

00:26   10   of scale, yes.

11   Q.   And it was important to you that the information you have

12   with regard to economies of scale was accurate; is that

13   correct?

14   A.   Yes.

00:26   15   Q.   And it was important to you that the Board properly

16   understood the nature of services provided by FMG and the

17   nature of services provided by the sub-advisors and by the

18   sub-administrator; is that correct?

19   A.   Yes, it is.

00:27   20   Q.   And it's important that the Board understood how the cost

21   allocation methodology worked; is that correct?

22   A.   Yes.

23   Q.   And it's important that the Board had the correct

24   definition of fallout benefits; is that correct?

00:27   25   A.   Yes, that we had -- certainly that we had an

*United States District Court*
*Trenton, New Jersey*

3730

Schpero - Cross - A. Lakind

1  understanding of fallout benefits.

2  Q.   The question I asked you was whether it was important

3  that the Board had the correct definition of fallout benefits.

4  A.   Yes, that would be -- I would agree with that.

00:27  5  Q.   Did you ever have a concern that the sheer magnitude of

6  information received from FMG might overwhelm the Board?

7  A.   No.

8  Q.   Do you ever have a concern that the --

9  A.   I guess -- your Honor, I guess I'd like to try the

00:27  10  explain the no, but --

11       THE COURT:  Your lawyer will have a chance on

12  redirect.

13       THE WITNESS:  Fine.

14  BY MR. A. LAKIND:

00:27  15  Q.   Did you ever have a concern that the sheer magnitude of

16  information you receive would prevent you from distinguishing

17  the important information from the unimportant?

18  A.   Could you ask me that again please?

19  Q.   Sure.  Did you ever have a concern that the magnitude of

00:28  20  information you received, would make it difficult to

21  distinguish the important information from the unimportant

22  information?

23  A.   No.

24  Q.   Did you ever have a concern that the information you

00:28  25  receive from FMG was untruthful?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1   A.   No.

2   Q.   Did you ever have a concern that important information

3   might be missing from the 15(c) packages?

4   A.   No, I mean on all of these things I think I need to say

00:28   5   that understanding the nature of the inherent conflicts that I

6   -- I'm not going to speak for the whole board; are always

7   diligent and thoughtful in questioning.  We never assume that

8   anything is -- is -- you know, that the full picture is there,

9   and that's why we have the kind of discussions, that's why we

00:28   10   have independent counsel there at our side reviewing

11   everything.

12        So I don't go into any of this assuming that the

13   materials we have are sufficient, or that there aren't

14   additional things we need to do when they think it's the

00:29   15   appropriate exercise of our reasonable judgment.

16   Q.   Do you have a recollection of any specific item of

17   information given to you by FMG as being inaccurate?

18   A.   I'm struggling to remember anything specifically.

19   Q.   You have no recollection.

00:29   20   A.   I mean I do -- I do -- I mean I definitely have

21   recollections of particularly in the performance area where

22   there have been mistakes made where we the Board has pointed

23   out data and presentations that are inconsistent with other

24   presentations, and there were errors made; I can -- sorry;

00:30   25   there was another one coming to mind, but there have certainly

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    been a number of times, there have been minutes where the

2    Board has -- you know, has pointed out that things that needed

3    to be corrected.  So there are certainly have been any number

4    of times where I or others have identified things.

00:30        5           In fact, I was reviewing the long -- another example I

6    guess is what you're asking me for, another example; I was

7    reviewing the long sheets for the at-issue funds in

8    preparation for this deposition, and I noticed that one of the

9    long sheets I think incorrectly summarized the number of

00:30       10    sub-advisors.  So certainly there are any number of occasions

11    where errors are going to occur.

12    Q.   Do you ever receive information from FMG that you thought

13    was misleading?

14    A.   No, I cannot think of an occasion.

00:30       15    Q.   Now, you sit on a fund board for Blackstone; is that

16    correct?

17    A.   There are three separate closed-end funds, but it's a

18    single board meeting, yes.

19    Q.   And how much are you paid by Blackstone?

00:31       20    A.   I receive in total, because I'm also the chairman of the

21    governance committee, approximately 90,000 a year.

22    Q.   And how much do you see receive for your services to the

23    EQAT?

24    A.   So I receive 285,000 as retainer, and 40,000 as the lead

00:31       25    independent trustee.

Schpero - Cross - A. Lakind

1   Q.   Are you reimbursed for expenses, travel and the --

2   A.   And I'm reimbursed for any expenses.

3   Q.   Now, in the role that you fulfilled for Blackstone does

4   that -- do those funds go through the 15(c) process?

00:31   5   A.   Yes, they do.

6   Q.   And do you consider the same *Gartenberg* factors that you

7   consider in connection with FMG?

8   A.   Yes, we do.

9   Q.   And do you receive a 15(c) package in connection with

00:31   10   those funds?

11   A.   That's correct.

12   Q.   And how large is the 15(c) package you receive?  How many

13   pages?

14   A.   I could not tell you the number of pages.

00:32   15         THE COURT:  Are you looking at one particular

16   meeting, or is this just a general statement as to --

17         MR. A. LAKIND:  Well, to be more precise -- thank

18   you, your Honor.

19   Q.   For the last meeting, do you know how many pages you

00:32   20   would have received?

21   A.   I do not know the number of pages, no, sir.

22   Q.   Was it anywhere near the 15,000 that you received from

23   FMG?

24   A.   These are three very relatively small funds, so no, it

00:32   25   would not be anywhere near.


*United States District Court*
*Trenton, New Jersey*

3734

Schpero - Cross - A. Lakind

1   Q.   More than 200 pages?

2   A.   Probably more, yes, I would suspect more than 200.

3   Q.   Do you find that the services you provide to FMG is

4   helpful -- excuse me; the education you get working on behalf

00:32   5   of the EQAT helps you fulfill the duties you perform in

6   connection with Blackstone?

7   A.   Yes, and vice versa.

8   Q.   Now, counsel for FMG early on in your examination asked

9   you about a few exhibits, one dealing with the resumes of the

00:33   10   Board members; do you recall that?

11   A.   Yes, I do.

12   Q.   And you testified that those resumes were prepared by

13   independent counsel; is that correct -- excuse me; counsel for

14   the independent trustees.  Is that correct?

00:33   15   A.   That exhibit was prepared by counsel of the independent

16   trustees.

17   Q.   And --

18   A.   It's another case of a page that had some mistakes,

19   that's going to happen.

00:33   20   Q.   Who is paying counsel to the independent trustees to

21   prepare an exhibit that FMG used in this case?

22   A.   Who is -- can you ask that again?

23   Q.   Sure.  Who is paying counsel to the independent trustees

24   for the time devoted to prepare the exhibit used in this case?

00:34   25        THE COURT:  With regard to the resumes?

*United States District Court*
*Trenton, New Jersey*

3735

Schpero - Cross - A. Lakind

1        MR. A. LAKIND:  With regard to the resumes, your

2   Honor, yes, sir.

3        THE WITNESS:  I guess I can only, your Honor, give

4   my general understanding of -- because I approve their bills,

00:34   5   and their bills -- certainly all of the bills that I see are

6   to -- as you would expect are to our -- are directed to me in

7   the first case, and then they are paid for -- they're really

8   separated; one is regular fund business, which is then passed

9   on to fund personnel to pay; and the second category would be

00:34  10   any matters having to do with the litigation, and that's

11   broken out separately as a separate monthly bill.  And those

12   bills are I believe passed on to the -- to the insurance

13   company, for reimbursement over the insurance.

14        THE COURT:  All right.

00:34  15   BY MR. A. LAKIND:

16   Q.  In response to a question from defendants you

17   testified -- strike that.

18        In Defendant's Exhibit 2064 there was a footer at the

19   bottom that listed the --

00:35  20   A.  I don't know what exhibit you're referring to.

21   Q.  It's the resumes, the resumes.

22        THE COURT:  So, do you have a copy you can show --

23        MR. A. LAKIND:  Yes, I'm going to go through this

24   very quickly, your Honor.

00:35  25        THE COURT:  Well if you're asking him to answer

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    questions on the exhibit, he should have access to the

2    exhibit.

3              Unless you can read on it the Board there.

4              THE WITNESS:  That's going to be a mistake.

00:35    5              THE COURT:  Okay.

6    BY MR. A. LAKIND:

7    Q.   Let me move on.  In the course of that -- your testimony,

8    you indicated that the exhibits that were used to prepare the

9    resume were provided to plaintiffs' counsel.  How did you know

00:35   10   that?

11   A.   I'm sorry; you need to ask me again.

12   Q.   Sure.  In the course of your testimony you indicated that

13   the exhibits referred to at the bottom of 2064, upon -- that

14   were used to prepare 2064, were provided the plaintiffs'

00:36   15   counsel, and I was just wondering how knew that.

16             THE COURT:  What is Exhibit 2064?

17             MR. A. LAKIND:  It's the resumes, your Honor, the

18   qualifications.

19             THE COURT:  If you recall.

00:36   20             THE WITNESS:  You're confusing me.  I testified that

21   the -- oh, I understand, I think I know what your reference

22   is.

23             THE COURT:  Well, if you don't understand the

24   question, he can rephrase it.

00:36   25             So will you rephrase, please?

3737

Schpero - Cross - A. Lakind

1   BY MR. A. LAKIND:

2   Q.   On the bottom of 2064 --

3   A.   Which I still haven't seen.

4   Q.   Can you see it from over there?

00:36    5           THE COURT:  It's hard to read.

6           MR. A. LAKIND:  All right.  I'll move on to another

7   area.

8   Q.   In the course of this litigation, have you had occasion

9   to meet with counsel to FMG?

00:36   10   A.   Yes, I have.

11   Q.   And on how many occasions?

12   A.   Well, counsel came to a number of meetings of the Board

13   to -- obviously along with FMG personnel, and along with --

14   these are Board meetings so clearly our counsel was at our

00:37   15   side; but they came as part of the process I testified to the

16   other day in terms of assisting us and being informed on and

17   monitoring the litigation.  So how many times that happened?

18   I would be guessing a number.

19           I mean the litigation has been going on for how many

00:37   20   years since 2011, and each time there is a significant

21   development the Board has asked -- and again, your Honor, when

22   I say the Board I mean the independent trustees; but each time

23   there's been a significant development we naturally have asked

24   for an opportunity to fully discuss that with all relevant

00:37   25   personnel.  So it would be any number much of times that

United States District Court
Trenton, New Jersey

Schpero - Cross - A. Lakind

1    they've come to discuss what has occurred.

2    Q.    Did counsel to FMG -- were they present when you were

3    prepared for your deposition?

4    A.    They were --

00:38    5            THE COURT:  What counsel, you mean --

6            MR. A. LAKIND:  Milbank Tweed, your Honor.

7    Q.    Was Milbank Tweed present when you were preparing for

8    your deposition?

9    A.    I would separate things out.  I did have preparation

00:38    10   with -- for this litigation with my counsel alone; there was a

11   stage back in December where Milbank Tweed asked through my

12   counsel if I would be willing to be interviewed, as I had

13   understood it for the purpose of them having a sense for how I

14   would be responding in the litigation, and my counsel said

00:38    15   that given the -- I'm forgetting the technical term for the --

16   it's not a joint defense, but given the common interest

17   defense with respect to the allegations -- sorry, I wasn't a

18   litigator.

19           THE COURT:  That's okay.

00:39    20           THE WITNESS:  But I think that's what it was called.

21   But that given that they thought it was perfectly appropriate

22   to let them ask questions.  I met with them with my counsel

23   present, and I made it clear that -- at that session I made it

24   clear that I was only interested in responding to questions, I

00:39    25   did not have any -- I did not want to hear their reactions to

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  questions or responses or any suggestions on their part.

2  BY MR. A. LAKIND:

3  Q.   Did you at any time in this litigation reach out the

4  plaintiffs' counsel to inquire about their view of this

00:39    5  litigation?

6  A.   No, I did not.

7  Q.   Did you at any time reach out to plaintiffs and ask if

8  they would make their experts available to the Board to

9  explain the basis of their claims?

00:39    10  A.   I did not.

11  Q.   Did you at any time in this litigation ask that somebody

12  provide a summary -- excuse me; that plaintiffs provide a

13  summary of the discovery developed to date?

14  A.   I did not.  I'm happy to explain why, but I did not.

00:40    15  Q.   Now, Mr. Schpero, I reached out to you, did I not, or

16  your counsel, to ask if the Board would entertain a meeting

17  with me to discuss this litigation; do you recall that?

18  A.   My understanding is that there was an effort on your

19  part, I believe it was probably about a month or month and a

00:40    20  half ago, very late in the process, to ask for some kind of

21  meeting with conditions connected with it.

22  Q.   And the conditions connected were that the conversation

23  we had would not be disclosed to Milbank Tweed, counsel to

24  FMG; is that correct?

00:40    25  A.   I believe there were a number of conditions connected; I

3740

Schpero - Cross - A. Lakind

1   know it went through a process -- I'm not entirely sure where

2   it ended up, but I did discuss this with my counsel, I should

3   say the Board discussed it with our counsel, and in light of

4   the fact that there were conditions and that you would have to

00:41   5   opportunity to spend three long days with three of the

6   independent trustees, in the end with guidance from our

7   counsel we -- actually now that I think about it, with

8   guidance with our counsel we still awaited -- I think in the

9   end I guess with guidance of our counsel we chose not to meet

00:41   10   with you if I can remember the way the conditions evolved over

11   that period.

12   Q.   Was it your view that you could obtain no information

13   that would be helpful to the Board as a consequence of that

14   type of meeting?

00:41   15   A.   It was my view that given my careful reading of what had

16   appeared in the documents that you -- you and your experts had

17   filed over time, and the extent to which from my personal

18   perspective I saw misleading -- misleading statements and

19   mischaracterizations, and statements that were simply not

00:41   20   consistent with the reality of the industry, I personally --

21   and having spent a full day being deposed, I personally no saw

22   benefit in an additional meeting just before this trial began.

23   Q.   Okay, fine.  You understood that in that the Board was

24   required to essentially review the -- excuse me -- the

00:42   25   investment management/administrative fee separately for each

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    portfolio; is that correct?

2    A.   Yes, that's correct.

3    Q.   And you also understood that each category of fee was to

4    be separately evaluated; is that correct?

00:42    5    A.   I guess I don't know what you mean by category.

6    Q.   That the investment management fee was to be evaluated

7    without consideration of distribution costs; is that correct?

8    A.   Yes, I certainly understood that.

9    Q.   And the investment management fee was to be evaluated

00:42    10   without consideration of transfer agency costs; is that

11   correct?

12   A.   Yes, the investment management fee needed to be

13   considered as an investment management fee, for the services

14   that were being provided.

00:42    15   Q.   For investment management.

16   A.   When we examine the investment management fees, yes, we

17   are examining the -- we are examining the services provided in

18   connection with those fees.

19   Q.   And when you're examining the administrative fees you're

00:43    20   examining the services provided in connection with those fees

21   as well; is that correct?

22   A.   Yes, when we're examining the administrative -- the fees

23   under that contract, we are examining the services provided

24   under that contract.

00:43    25   Q.   Now, transfer agency costs, they were treated as part of

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  the distribution fees; is that correct?

2  A.   No, I don't think that is correct.

3  Q.   Now, you received advice from your legal counsel Bingham;

4  is that correct?

00:43  5  A.   Well, they're -- now they merged so they're now Morgan

6  Lewis, but we do receive extensive advice from our -- our

7  independent counsel.

8  Q.   And am I correct to say among the advice you received was

9  a recommendation that the Board record in the minutes of the

00:44  10  meetings, the bases for the various decisions it makes to

11  approve fees; is that correct?

12  A.   Yeah, I don't -- I don't recall that that was specific

13  advice from my counsel if that's your question.

14  Q.   Is that consistent with what you would view as the best

00:44  15  practices for a fund board?

16  A.   To do what again?

17  Q.   To record the product of your deliberations in board

18  minutes.

19  A.   Yes.  As I think you know it's really become kind of a

00:44  20  divided process, because the SEC has mandated rather fulsome

21  disclosure to the investors of that process.  And so there are

22  the minutes and there are also the annual shareholder

23  disclosure where the investors are walked through the analysis

24  and factors the Board considered.

00:45  25          MR. A. LAKIND:  Chris, would you provide the witness

Schpero - Cross - A. Lakind

1    with Exhibit 721, please?

2    Q.   If you take a moment to review that exhibit, please.

3    A.   Sure.

4         (Witness reviewing.)  I assume you don't want me to

00:46    5    read --

6    Q.   No, no, I'll point you to what --

7    A.   I'm familiar with what this is.

8    Q.   This is a memorandum from the Bingham law firm dated May

9    18 to Ms. Williams and a Mr. Walker; is that correct?

00:46    10   A.   Correct.

11   Q.   And they are members of the Board of Trustees of the

12   EQAT; is that correct?

13   A.   Yeah, this would have been I believe in the context of

14   the education process where they were joining the Board.

00:46    15   Actually at the time they were probably not full members of

16   the Board.

17   Q.   If you would turn over to Bates page ending in 2038.

18   Just tell me when you're there.

19   A.   Okay.

00:47    20   Q.   And I'd like to read to you the sentence on the bottom of

21   the first paragraph:  Because the actions of boards and

22   independent directors may be questioned in hindsight, it is

23   all the more important to ensure that your deliberations and

24   decisions are documented in a way that demonstrates the care

00:47    25   and attention with which you have discharged your duties.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1          Did I read that accurately?

2     A.   Yes, you did.

3     Q.   And do you believe the Board fulfilled that goal?

4     A.   Yes, I do.

00:47    5     Q.   Okay.  Let's move on to the third bullet.  Which reads:

6     Articulate the reasons for your decisions; if you decide to

7     take a specific action such as renewing an advisory agreement,

8     agree on the specific reasons for your decision and make sure

9     that they are recorded in the minutes of your meeting; satisfy

00:47   10    yourself that if the decision were challenged your reasons

11    would support a robust defense of your decision; play devil's

12    advocate and consider the arguments that might be made by

13    someone challenging your decision and how you would rebut

14    those arguments.

00:48   15         Did I read that accurately?

16    A.   Yes, you did.

17    Q.   Do you believe the Board fulfilled that goal?

18    A.   Yes, I do.

19    Q.   And the -- what document would I look to to satisfy

00:48   20    myself that that goal was achieved?

21         THE COURT:  Do you understand that question?

22         THE WITNESS:  I think it ought to be rephrased or

23    given to me again.

24    Q.   Sure.  Did the Board fulfill those goals in its

00:48   25    preparation of minutes of Board meetings?

*United States District Court*
*Trenton, New Jersey*

3745

Schpero - Cross - A. Lakind

1          (Brief pause.)

2    A.   The only thing I'm struggling with is minutes by their

3    nature have limitations, so I -- I'm not -- I certainly can

4    represent to you that I think the minutes were appropriately

5    done, I have read them and I think they serve their purpose.

6    But I also will readily tell you that minutes are just that,

7    they are summaries, they're certainly not a transcript of

8    what's occurred at a meeting.

9    Q.   Okay.  I'm going to move into another area right now.  In

10   connection with your role as a member of the Board, you had to

11   undertake review of a number of Investment Management

12   Agreements between FMG and the EQAT; is that correct?

13   A.   Yes.

14   Q.   And do you have any reason to believe that any aspect of

15   those agreements was inaccurate?

16   A.   Of the Investment Management Agreements?

17   Q.   Yes, sir.

18   A.   No, I do not.

19   Q.   And you also undertook the review a variety of

20   Sub-Advisory Agreements; is that correct?

21   A.   Yes.

22   Q.   And do you have any reason to believe that any of those

23   agreements were inaccurate?

24   A.   I do not.

25   Q.   You also undertook to review Administrative Agreements

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  between FMG and the EQAT; do you have any reason to believe

2  that any of those were inaccurate?

3  A.   I do not.

4  Q.   You also -- you did not undertake review of the

00:50   5  Sub-Administration Agreement; is that correct?

6  A.   That's correct.

7  Q.   And you're familiar with a document called the Shared

8  Services Agreement; is that correct?

9  A.   I have -- I have seen it, yes.

00:50   10  Q.   Have you ever reviewed it?

11  A.   Yes, I reviewed it.

12  Q.   And do you have any reason to believe any aspect of that

13  agreement is inaccurate?

14  A.   Well, as you know, that agreement was not subject to

00:50   15  Board approval; I saw it in the context of it coming up in

16  this litigation.  I am not an insurance lawyer, but -- so I

17  would be reluctant to tell you whether the wording of that

18  agreement is appropriately written or not.  I certainly --as I

19  think I testified on direct, I certainly understand what the

00:50   20  purpose of that agreement was, and I am comfortable that it's

21  not inconsistent with my -- what have been my understanding of

22  the nature of the arrangements in place.

23      MR. A. LAKIND:  Chris, would you please hand the

24  witness and his Honor Defendant's Exhibit 449, please.

00:51   25      MR. KWELTY:  P-273.

*United States District Court*
*Trenton, New Jersey*

3747

Schpero - Cross - A. Lakind

1          MR. A. LAKIND:  Or P-273 is the same document.

2    BY MR. A. LAKIND:

3    Q.   Have you had -- strike that.

4          Would you please identify Plaintiff's Exhibit 273?

00:52  5    A.   Yeah, this is the service agreement between AXA and FMG,

6    I guess entered into in 2011.

7    Q.   Now, the first paragraph, do you see where that is,

8    paragraph 1?

9    A.   I do.

00:52  10   Q.   And I'll read that to you, if I might:  AXA Equitable

11   from time to time may provide as available to FMG the

12   personnel, property and services reasonably necessary to

13   perform its management, administrative and other non-insurance

14   related functions.

00:52  15        Did I read that accurately?

16   A.   Yes, you did.

17   Q.   Then it goes on to say:  The services to be fund may

18   include, without limitation, management, corporate, finance,

19   and strategic planning -- and I'll go on after that.  Did FMG

00:52  20   provide those -- strike that.

21        Did AXA to your knowledge provide those services to

22   FMG?

23   A.   My understanding is that AXA does provide from our review

24   of the profitability allocation analysis.  You just stopping

00:53  25   where?

*United States District Court*
*Trenton, New Jersey*

3748

Schpero - Cross - A. Lakind

1    Q.   At strategic planning.

2    A.   I think those -- I believe those are in the list of

3    services that AXA provides to FMG.

4    Q.   And in connection -- it goes on to say -- administration,

00:53    5    office and general supplies, financial, treasury and cash

6    management.  Are those services AXA supplies to FMG to your

7    knowledge?

8    A.   I believe that would be in the list.

9    Q.   And it goes on to say:  Printing, actuarial and

00:53    10    accounting.  Are those services FMG -- or excuse me; AXA

11    provides to FMG?

12    A.   Again, I certainly haven't memorized all the services,

13    but I think that's within the spirit of my sense of the

14    understanding.

00:54    15    Q.   Tax -- the agreement continues:  Tax, auditing, legal and

16    regulatory, human resources.

17         Again, is that provided by AXA to FMG?

18    A.   I believe so.

19    Q.   Corporate and financial communications, public relations

00:54    20    and advertising.  Is that provided?

21    A.   I believe so.  Again, I -- it's been a while since I've

22    reviewed at our annual --at our annual July meetings there is

23    a review with the independent trustees of the services that

24    AXA provides, in the -- that are part of the cost allocation

00:54    25    process.  It's a long list, so I'm not going to represent that

Schpero - Cross - A. Lakind

1  I remember these specifically, but I think a number of them
2  are.

3  Q.   To your knowledge, does AXA provide risk management
4  technology and corporate secretarial services?

00:54   5  A.   Again, I think that's within the spirit of the kinds of
6  things I remember.

7  Q.   Go on the paragraph 5 if you would, please.  And that
8  reads -- are you there, sir?

9  A.   Yes, I am.

00:55  10  Q.   Within 45 days after the end of each calendar quarter and
11  more often if desired, AXA Equitable shall submit to FMG a
12  statement of apportioned expenses showing the basis for the
13  apportionment for each item.

14      Did I read that accurately?

00:55  15  A.   Yes, you did.

16  Q.   Do you know if AXA submitted such a statement to FMG?

17  A.   I do not, no.

18  Q.   Now, there was a fairly large apportionment of expenses
19  in connection with the approval of the advisory and
00:55  20  administrative fees; is that correct?

21  A.   You need to be more specific what you are talking about.

22  Q.   Sure.  Are you familiar with a document called a cost
23  allocation methodology?

24  A.   Yes, I am.

00:56  25  Q.   And that document is used to allocate AXA expenses;

*United States District Court*
*Trenton, New Jersey*

3750

Schpero - Cross - A. Lakind

1   correct?

2   A.   Correct.

3   Q.   And to whom are those expenses allocated?

4   A.   They're allocated to FM -- the costs that you're

00:56   5   referring to are allocated and reflected as part of the

6   profitability analysis that's done for FMG.

7   Q.   And the Board considered that profitability analysis in

8   approving FMG's fees; is that correct?

9   A.   That's correct.

00:56   10   Q.   In connection with the consideration of that

11   profitability analysis, did the Board ever ask for a copy of

12   the quarterly statement showing that allocation?

13   A.   My hesitation is I think -- I think we're confusing two

14   different things here.  Because I do not believe that what

00:56   15   is -- what you've just been reading to me has anything to do

16   with the cost allocation numbers and services that are in that

17   cost allocation study.

18       So I wouldn't have -- I wouldn't -- I've seen this

19   agreement once, I think I understand what it's about, but I

00:57   20   don't think it has anything to do with what you just referred

21   to, which is the cost allocation process that allocates all of

22   the various corporate services that are provided by AXA to FMG

23   or to the funds.

24   Q.   So let me make sure I understand what you are telling me.

00:57   25   The Shared Services Agreement has nothing to do with the cost

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

00:57

1   allocation methodology?

2   A.   That's correct.

3   Q.   Okay.

4   A.   That is my understanding.

5   Q.   I misunderstood your earlier testimony.  What is it --

6   what type of services then does that agreement refer to or

7   those services directly --

8   A.   My understanding -- why don't you ask the question again.

9   Q.   Sure.  Are the services that are the subject of the

00:57

10   Shared Service Agreement, are those the services that AXA

11   provides to FMG that we've generally called direct costs or

12   direct services?

13          MR. BENEDICT:  Objection.

14          THE COURT:  I'm sorry?

00:58

15          MR. BENEDICT:  Objection to form.  No foundation to

16   what he's referring to as direct services.

17          THE COURT:  Frank, can you repeat the question?

18          (Question read back by the reporter.)

19          THE COURT:  All right.  You may answer if you

00:58

20   understand the question.

21          THE WITNESS:  Yeah, I think there is some confusion

22   in the question, your Honor, because Mr. Lakind is referring

23   to direct costs, and those -- I recall the profitability study

24   there are direct costs that are at the FMG level, but they're

00:58

25   not -- it's not how they're referenced at the AXA level.  So

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1   I'm a little mystified as to the way the question is being

2   asked.

3            THE COURT:  So you have to rephrase the question,

4   Mr. Lakind.

00:59    5            MR. A. LAKIND:  Yes, your Honor.

6   BY MR. A. LAKIND:

7   Q.   Are the services that are referred to in the Shared

8   Services Agreement, are those services ultimately provided to

9   the EQAT?

00:59   10   A.   I'm not sure -- I think the only way I can answer that is

11   to tell you my understanding of what this agreement is.  I

12   don't know how else to respond.

13   Q.   Sure.

14   A.   I believe this agreement -- when we learned about it --

00:59   15   because it's not an agreement the fund is subject to; we the

16   Board certainly had extensive discussions with the help of our

17   counsel, with management, and my understanding is this is an

18   agreement that was entered into when FMG as a division in 2011

19   was moved over to be a subsidiary.

00:59   20            And I'm not an insurance lawyer, I'm actually a retired

21   lawyer so I'm not any kind of lawyer, but my understanding --

22   I certainly know very little about insurance law, but my

23   understanding is that there were insurance regulations that

24   required that in the context of moving from a subsidiary to a

01:00   25   -- sorry; from a division to a subsidiary, that there

Schpero - Cross - A. Lakind

1   apparently had to be a shared servicing arrangement.  And that

2   arrangement was intended to simply reimburse AXA for the

3   direct costs that had already been -- that had been

4   traditionally incurred at the division level.

01:00       5        So that if you -- it's effectively reimbursing AXA for

6   the direct costs that were being already provided by FMG when

7   it was a division, and that it's now as a subsidiary is paying

8   cash back for that amount.  But it is effectively the amount

9   that shows up as the direct expenses line on the profitability

01:00   10   study, and as I understand it, is unrelated to the AXA

11   corporate type services that are allocated in the

12   profitability study.

13   Q.   Mr. Joenk --

14        THE COURT:  Excuse me, Mr. Lakind, so with regard to

01:01   15   this subpoena to Morgan Lewis, you said you're withdrawing

16   that?

17        MR. A. LAKIND:  Yes, your Honor.

18        THE COURT:  So, any of the people that are here that

19   may be involved with that subpoena can be relieved to move

01:01   20   forward, because we're not going to have any arguments.

21   Right?

22        MR. A. LAKIND:  That is correct, your Honor.

23        THE COURT:  So if there's any folks here with regard

24   to the Morgan Lewis subpoena, the plaintiff has withdrawn

01:01   25   that.  Thank you.

Schpero - Cross - A. Lakind

1          MR. A. LAKIND:  Thank you, your Honor.

2   BY MR. A. LAKIND:

3   Q.  Mr. Schpero, Mr. Joenk testified in this case about the

4   Shared Services Agreement several days ago.  And the following

01:01   5   colloquy occurs at page 2918 of his testimony, the Court,

6   referring to the agreement:  And then what about services,

7   what do they mean by that under this agreement?  Referring to

8   the Shared Services Agreement.

9          Witness:  Well, you know, I have a telephone and a

01:02  10   computer in my office.

11          The Court:  That kind of thing.  So your FMG would be

12   part of the same telephone system as AXA Equitable.

13          The witness:  Correct.

14          The Court:  So someone calls and asks for FMG.  So how

01:02  15   about computers, are all your computers linked in the same

16   fashion?

17          The witness:  We are all on the network to -- actually

18   the servers are in France now to AXA's groups system.

19          The Court:  But this also includes like your utility

01:02  20   bills and things of that nature.

21          The witness:  Yes, the lights and heat.

22          The Court:  Okay, thank you.  Is there anything else

23   outside of those basic services?

24          The witness:  Those are the basic services that I

01:02  25   budget for every year, and that's what this was designed to

Schpero - Cross - A. Lakind

1    cover.  In addition, there's a processing of some, you know,

2    delivery of mail, things like that.

3         Now, the language that we read in the Shared Services

4    Agreement is considerably broader than the description

01:03    5    provided by Mr. Joenk in his trial testimony.  Is that

6    correct?

7    A.    Yeah, I'm not entirely sure I could follow all that, but

8    I would certainly agree that the language is -- is much

9    broader.

01:03   10    Q.    And it's inconsistent with the testimony of Mr. Joenk; is

11    that correct?

12    A.    I'm not prepared to say that, because I really had

13    trouble understanding what that testimony said.  You're at a

14    level that is not -- that I'm not going to claim particularly

01:03   15    familiarity with in terms of the telephone systems and

16    computers at that level.

17    Q.    Okay.  I want you to define some terms and then we'll

18    move on from there.  An index fund, what is an index fund?

19    A.    An index fund is a fund that is intended to be managed in

01:03   20    a way that it tracks as closely as reasonable, taking into

21    account any fees that are in place, but the actual benchmark

22    or index that's been identified.

23    Q.    And an actively managed fund, what is that?

24    A.    Actively managed would be a fund or a sleeve that is

01:04   25    managed by one or more specific managers to ideally meet some

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    investment objective which often would be trying to meet --

2    often beat some kind of benchmark.

3    Q.    And a pactive fund, does that have a meaning to you?

4    A.    Yes, it does.

01:04    5    Q.    And what is that?

6    A.    A pactive is a hybrid, as I think I said in my direct

7    testimony, that would be where you have a combination

8    typically -- the typical pactive fund in -- in AXA's complex

9    would have a passive or an index sleeve that might be 60

01:04    10    percent of the portfolio, thereabouts, and/or 70 percent

11    actually I think; and then it would have an active sleeve that

12    might be about 20 percent or 30 percent; there might be an ETF

13    sleeve, but it is a hybrid and it's the combination of active

14    and index typically.  Again, these are not carefully defined

01:05    15    terms, but I think that's the concept.

16    Q.    In this case there are a number of pactive or plus funds;

17    is that correct?

18    A.    The at-issue funds?

19    Q.    Yeah.

01:05    20    A.    Yes, there are a number of pactive.

21    Q.    And generally the index component of those funds hovers

22    around 60 to 80 percent; is that correct?

23    A.    I think that's right.

24    Q.    And what is known by the term benchmark?

01:05    25    A.    Benchmark might be some kind of independent -- let me

3757

Schpero - Cross - A. Lakind

1    restate that.  It would be some kind of index or combined

2    index, but it's -- it's reflecting usually some kind of -- I

3    can give you examples.  S&P 500 is an index, there are bond

4    indexes, there are equity indexes, but they are -- they are

01:06  5    some kind of combination of fixed -- fixed set of securities

6    that as I said you would be trying to either track if you're

7    an index fund, or ideally beat if you were an active fund,

8    assuming that was the relevant benchmark you were trying to

9    track.

01:06  10   Q.  Have you ever heard the term broad based security index?

11   A.  I don't remember it specifically, but it doesn't sound

12   unfamiliar.

13   Q.  Do you know what that means?

14   A.  I think that would be referring to an index that --

01:06  15   that -- again, I think it's been used in different ways.  In

16   my mind broad based would probably be covering an index that

17   covers a number of different sectors.  So it might be an index

18   that's -- that would include value and growth, for example, or

19   some kind of combination of a number of different sectors.

01:07  20       MR. A. LAKIND:  Chris, would you hand his Honor and

21   the witness Plaintiff's Exhibit 239, please?

22       THE WITNESS:  Your Honor, could I use a five

23   minute --

24       THE COURT:  Sure, let's take a break.  We'll be back

01:07  25   out in 15 minutes and we'll go to like 1 o'clock.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1          THE WITNESS:  Thank you.

2          MR. A. LAKIND:  Thank you, your Honor.

3          (Recess.)

4          THE COURT:  Please be seated.

01:26    5          Mr. Schpero, you can take the stand.

6          MR. A. LAKIND:  Your Honor, may I proceed?

7          THE COURT:  You may.

8          MR. A. LAKIND:  Thank you.

9          Chris, would you please hand his Honor and the

01:27   10   witness Plaintiff's Exhibit 239?

11   BY MR. A. LAKIND:

12   Q.  Mr. Schpero, please take a moment and review P-239.

13   (Witness reviewing.)

14   A.  Okay.

01:27   15   Q.  Can you tell me what P-239 is please?

16   A.  Yes, this is kind of a setting-the-foundation document I

17   think we often see it in June and July, but in this case it's

18   from July.  It's a set of slides that would appear on a screen

19   with FMG reviewing the 15(c) process, or at least elements of

01:28   20   it.

21   Q.  Bates 609 is entitled Your Traditional Standard; do you

22   see where that is?

23   A.  I'm sorry what page?

24   Q.  I'm sorry.  Bates 609.

01:28   25   A.  The Traditional Standard, yes.

Schpero - Cross - A. Lakind

1  Q.  And it refers to *Gartenberg v. Merrill Lynch*; is that

2  correct?

3  A.  Yes.

4  Q.  And then if you go over to page 611, do you see where

01:28   5  that is?

6  A.  Yes, I do.

7  Q.  And it refers to the Chicago School Standard; do you see

8  that?

9  A.  Yes.

01:28   10  Q.  And it provides that:  A fiduciary must make full

11  disclosure and play no tricks, but is not subject to a cap on

12  compensation.

13      Did I read that correctly?

14  A.  Yes, you did.

01:29   15  Q.  Are you familiar with what the Chicago School Standard

16  is?

17  A.  I don't remember that specific wording, but I certainly

18  have read the *Jones v. Harris* case in the past.

19  Q.  And do you have any reason to believe that the statement

01:29   20  of that standard is in fact misleading?

21      THE COURT:  Are you talking about the statement on

22  this page Bates 611?

23      MR. A. LAKIND:  I am, your Honor.

24      THE COURT:  Okay.  So, do you understand the

01:29   25  question then, Mr. Schpero?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1          THE WITNESS:  Yeah --

2          THE COURT:  Mr. Lakind is referring to the standard

3  set forth on that Bates page 130611.

4          THE WITNESS:  Again, I'm not going to be able to

01:29      5  recall the context of this discussion, this is a presentation

6  on the litigation environment at the time.  If this is a quote

7  from the Supreme Court decision, then I'm certainly not going

8  to quarrel with it.  I don't know if this is from a lower

9  court, I just don't remember the presentation at this point.

01:30     10  BY MR. A. LAKIND:

11  Q.  Would it surprise you to learn that the quote on page 611

12  in fact articulates a standard that was rejected by the

13  Supreme Court as insufficiently protective of investors?

14  A.  Well, I think I just said to you that -- I think I pretty

01:30     15  clearly said to you that I don't remember the context in which

16  this was presented, and I couldn't tell from this at what

17  point even in the decision process this would be from.  But

18  this is a slide that would have been part of the presentation,

19  and I think without being able to remember the specifics of

01:30     20  that presentation I'm not going to be helpful to you.

21  Q.  The question I asked, though, would it surprise you to

22  learn that the quote on page 611 is not an accurate statement

23  of the holding of *Jones v. Harris*?

24          MR. BENEDICT:  Objection, your Honor.  I don't know

01:31     25  where this is going, the question was confusing at best.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1           THE COURT:  All right.  If you ask me it looks like

2    it should be Mr. Schpero should be given the opportunity to

3    look at the entire litigation environment, because there's

4    more quotes on the next page, I don't even know if they're

01:31  5    from the same page.  So you have to either rephrase, Mr.

6    Lakind, or give the witness the opportunity to look at the

7    entire section.

8    BY MR. A. LAKIND:

9    Q.  Mr. Schpero, would you please look at the entire section.

01:31  10          THE COURT:  So, the litigation environment section.

11         (Witness reviewing.)

12    A.  What's your question?

13    Q.  My question to you, sir, would it surprise you to learn

14    that the quote that is cited on page 211, in fact was a

01:32  15    standard rejected by the Supreme Court as insufficient -- I'm

16    sorry, 611; insufficiently protective of investors?

17    A.  No, actually I'm not.  As I think I testified a moment

18    ago, this -- as I'm looking through these pages, again, I

19    think this was part of the presentation at the time when

01:33  20    there's continuing updates on the litigation.  I actually in

21    looking at this was a little bit mystified by part of -- at

22    least the second -- there's no question about fiduciary making

23    full disclosure, but I -- subject to a cap on compensation was

24    a little bit difficult for me to understand just given my

01:33  25    general understanding of the area.

3762

Schpero - Cross - A. Lakind

1          So, as I said earlier this -- this is part of a slide,

2    it would have been part of an update on what was happening at

3    the time.  It's not -- this is not a quote that I personally

4    use in my understanding of review of the 15(c) process.

01:33    5    Q.   Your expectation, though, was that if FMG were to provide

6    you with information about legal standards they would be

7    accurate; is that correct?

8    A.   Yeah, I think that's a fair statement.

9    Q.   Mr. Schpero, I'd like you to take a look at Defendant's

01:34   10    Exhibit 1812, tab 63, and that's one of the large white

11    binders.  Have you had chance to look at that, sir?

12    A.   I think I would know if I had that in front of me.

13          THE COURT:  He didn't get it yet.

14          MR. A. LAKIND:  I'm sorry.

01:34   15          Your Honor, it's not mine to give, it was an exhibit

16    that they used on Friday.

17          Chris, it's a white binder, it should be back there.

18          THE COURT:  What's the number on it?

19          MR. A. LAKIND:  Your Honor, it's 1812, tab 63.

01:35   20          THE COURT:  Here you go.

21          (Handing to witness.)

22          THE WITNESS:  I've got it.

23    BY MR. A. LAKIND:

24    Q.   If you would just take a moment to look briefly at that

01:35   25    exhibit, please.

United States District Court
Trenton, New Jersey

Schpero - Cross - A. Lakind

1   A.   Yeah, I know what the book is.

2   Q.   And that book is something -- is a book of material upon

3   which the Board relied in its 15(c) review; is that correct?

4   A.   Yeah, I think what I testified on direct is that this was

01:35   5   a best efforts -- this reflected our best -- or my best

6   efforts in gathering documents that I thought were responsive

7   as best I could to your 30(b)(6) request.

8   Q.   And what is tab 63, sir?

9   A.   63?

01:36   10   Q.   Yes, sir.

11   A.   This is an ICI, is the Investment Company Institute,

12   it's -- it looks like one of their periodic industry level

13   presentations that was delivered to the Board in July of 2013

14   on trends and expenses and fees of mutual funds.

01:36   15   Q.   Turn over if you would to Bates ending 937, please.

16   A.   Yeah.

17   Q.   I'm going to ask you a series of questions about this

18   document.  And on the left-hand column, the last paragraph --

19        MR. BENEDICT:  I'm sorry, your Honor, can we give

01:36   20   the witness a chance to read through the document?

21        THE COURT:  All right.  Please peruse it, Mr.

22   Schpero.

23        THE WITNESS:  You want me to read this full

24   document?

01:36   25        MR. A. LAKIND:  It's not necessary for the questions

*United States District Court*
*Trenton, New Jersey*

3764

Schpero - Cross - A. Lakind

1  I'm going to ask.  I think if I can ask the question, he can

2  decide whether he needs to read it.

3          THE COURT:  All right.

4  BY MR. A. LAKIND:

01:37   5  Q.   Just have to put my magnifying glass on.

6          THE COURT:  I see that.

7          Could you read it, Mr. Schpero?

8          THE WITNESS:  The document itself?  Yeah, I'm all

9  right.

01:37  10          THE COURT:  I see Mr. Lakind has a little aid there.

11          MR. A. LAKIND:  Getting old is not easy.

12          THE COURT:  I know.  I didn't have know they had a

13  app for that.

14  BY MR. A. LAKIND:

01:37  15  Q.   Mr. Schpero, on the left-hand side there's a paragraph at

16  the last column; do you see where that is?

17  A.   I'm sorry; again, we are at 937?

18  Q.   No, sir -- 937.  I'm sorry.

19  A.   Left-hand side bottom left.

01:37  20  Q.   Right.  And it reads:  Over the past two decades on an

21  asset weighted basis, average expenses paid by mutual fund

22  investors have fallen significantly.

23          Did I read that correctly?

24  A.   Yes, you did.

01:38  25  Q.   And is that something you agree with?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.   I don't know how I could say I agree or disagree.  This

2    is -- you know, this is from the Investment Company Institute,

3    so I would -- as I think I testified earlier I think it's

4    reliable, so I'm assuming it's accurate.

01:38    5    Q.   Okay.  Turn over if you would to page 940.

6    A.   Yeah.

7    Q.   And there's a graph on the top of page 940; do you see

8    where that is?

9    A.   Yes, I do.

01:38    10   Q.   And that graph seems to indicate that as assets under

11   management grow, the fees charged shrink; is that correct?

12           (Witness reviewing.)

13           MR. BENEDICT:  Objection, your Honor.  I have no

14   idea what he's referring to.

01:39    15           THE COURT:  You don't understand the question, Mr.

16   Benedict?

17           MR. BENEDICT:  I do not understand the question.

18           THE WITNESS:  I'm not sure I do either actually as

19   I'm looking at the chart.

01:39    20           THE COURT:  So rephrase the question.

21           MR. A. LAKIND:  I will.

22   BY MR. A. LAKIND:

23   Q.   Would you agree with the proposition that as assets under

24   management grow, typically the expense ratio shrinks.

01:39    25   A.   You're talking generically in the industry at large?

Schpero - Cross - A. Lakind

1    Q.   Yes, sir.

2    A.   I guess I would want to look at charts that told me that.

3    Q.   Well, you're on the Board of Trustees for a variety of

4    mutual funds, and you never had occasion to consider the

01:39    5    impact of size on fees?

6    A.   What I'm struggling with, sir, is your question is so

7    broad, it doesn't seem -- it's not specific to a fund, it's

8    not even specific to a complex.  You're asking me about the

9    whole industry, at any given time or decade; I don't know

01:40    10   what's happening in the industry -- assets growing in certain

11   kinds of funds may have an impact on expense ratios than

12   others; I'm not sure where to go with that question.

13        THE COURT:  All right, next question.

14   Q.   Would you agree with the proposition that index funds

01:40    15   tend to have lower funds than actively managed funds?

16   A.   Yes, I think that's generally true.

17   Q.   And if you would turn over to page 942 in tab 63, there's

18   a graph called expense ratios of actively managed index funds.

19   Do you see where that is?

01:40    20   A.   Yes.

21   Q.   The expense ratio of index funds is quite significantly

22   smaller than the expense ratio of active funds; correct?

23        THE COURT:  Hold on a second; there's an objection.

24        Mr. Benedict?

01:40    25        MR. BENEDICT:  Your Honor, he has laid no foundation

3767

Schpero - Cross - A. Lakind

1    whatsoever for this exhibit, what it is, what it was used for.

2    For the last two days on direct he would even let me ask

3    questions about EQAT as a total; he says that we have to talk

4    about the 12 funds at issue.  Now we have some generic

01:41    5    analysis from ICI dealing with the industry as a whole;

6    there's been no -- nothing established as to what this is,

7    what it's intended to do, what funds it covers, none of that.

8            THE COURT:  It's cross-examination, so I'll allow

9    it.

01:41    10            If you can understand the question.

11            THE WITNESS:  I don't remember it now, so maybe you

12    can ask it again.

13            MR. A. LAKIND:  Your Honor, can I ask Mr. Gable to

14    read it back?

01:41    15            (Question read back by the reporter.)

16            THE WITNESS:  Sorry; I'm just trying to read the

17    chart a moment.

18            So, I'm reading the note, I do want to understand

19    what I'm looking at; the note points out these are measured on

01:42    20    an asset weighted average.  It also points out that it

21    excludes mutual funds available as investment choices in

22    variable annuities, which are the products we're talking about

23    here, and fund of funds.  So I just want to start with that

24    point which --

01:42    25            THE COURT:  So does your question have anything to

*United States District Court*
*Trenton, New Jersey*

3768

Schpero - Cross - A. Lakind

1   do with the chart?

2           MR. A. LAKIND:  The only thing I want to establish

3   with this witness is that index funds tend to charge

4   substantially less by way of fees than actively managed funds.

01:42   5           THE COURT:  If you know that --

6           THE WITNESS:  I thought the question just two

7   minutes ago asked me whether I thought that index funds

8   charged less -- tend to be lower and I think my answer had

9   been yes.

01:42   10           THE COURT:  That's what I thought, too.

11           Next question.

12           MR. A. LAKIND:  If you can hand the witness 2042, 43

13   and 44.

14           And Rob, if you can put 2042 up, please?

01:43   15           THE COURT:  What exhibit was that?

16           MR. A. LAKIND:  Your Honor, Defendant's Exhibits

17   2042, 2043, and 2044.

18           THE WITNESS:  Mr. Lakind, do I still need to hold

19   this?

01:43   20   BY MR. A. LAKIND:

21   Q.   You do not.

22           Mr. Schpero, would you take a moment just to review

23   Defendant's Exhibit 2042?

24   A.   That's these three -- I'm sorry; just one of them.  2042?

01:44   25   Q.   Yeah.  I'm going to ask you some questions about

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    comparative fees.

2            MR. A. LAKIND:  Your Honor, would it be okay if I

3    move closer to the exhibit?

4            THE COURT:  You may.

01:44    5            MR. A. LAKIND:  Thank you.

6            (Witness reviewing.)

7            THE COURT:  Do you need more time --

8            THE WITNESS:  Yeah, I need one more minute, your

9    Honor.

01:45    10           Okay.

11   BY MR. A. LAKIND:

12   Q.   Mr. Schpero, 2042 bears the title Contractual Management

13   Administrative Fees at Common Asset Levels Versus Funds in the

14   Lipper Expense Universe; do you see where that is?

01:45    15   A.   Yes, I do.

16   Q.   Do you have an understanding of what's meant by

17   contractual management and administrative fees?

18   A.   Yes, I do.

19   Q.   And what is that?

01:45    20   A.   So that would be fees at -- per the contract at a

21   particular asset level.  The reason it says contractual is

22   it's distinguishing from effective fees, which I think I

23   testified on Thursday or Friday, which would be the actual fee

24   at a particular asset level that would take into account any

01:46    25   expense waivers or caps that might have been put in place by

*United States District Court*
*Trenton, New Jersey*

3770

Schpero - Cross - A. Lakind

1   the management company.

2   Q.   And Exhibit 2043 is entitled Total Expense Less 12b-1 --

3   A.   I'm sorry?

4   Q.   2043, sir?

01:46   5   A.   So we're moving to another one?

6   Q.   Yes, please.

7   A.   All right.

8   Q.   And that refers to total expenses less 12b-1/non 12b-1

9   fees; do you see where that is?

01:46   10   A.   Yes, I do.

11   Q.   And it compares those fees the funds in the Lipper

12   expense universe; is that correct?

13   A.   Correct.

14   Q.   And there is an indication in green that those funds

01:47   15   with -- that are colored in green are at or below their Lipper

16   median; is that correct?

17       MR. BENEDICT:  Your Honor, there's been no

18   foundation laid whatsoever for this exhibit.  To the best of

19   my knowledge this witness may never have even seen this

01:47   20   document before, it was put into evidence through Mr. Joenk

21   and prepared by FMG.  I don't know if the witness has any

22   basis to testify as to this.

23       THE COURT:  Well, we should know whether he's seen

24   the document before.  I imagine they come out of the Board

01:47   25   minutes, but you can ask him that question, too.

Schpero - Cross - A. Lakind

1   BY MR. A. LAKIND:

2   Q.   Have you ever seen this document, Mr. Schpero?

3   A.   I don't believe so.

4          MR. A. LAKIND:  Your Honor, it's not critical that

01:47   5   he sees it; I can cross-examine him on pretty much anything as

6   long as I have a good faith belief that it shows evidence

7   that's relevant, and I just want to have an understanding of

8   his interpretation of this document.

9          THE COURT:  All right.  I don't have any objection

01:48   10   to you cross-examining on it, but it's good to know whether he

11   has had any experience with it.

12          MR. A. LAKIND:  I'm sorry, I should have asked that.

13   BY MR. A. LAKIND:

14   Q.   Mr. Schpero, you understand this document to indicate, do

01:48   15   you not, that those funds in the green are at or below their

16   Lipper median; is that correct?

17   A.   That's what it indicates.

18   Q.   Now, you do receive a report from Lipper; is that

19   correct?

01:48   20   A.   Yes.

21   Q.   Memorialized on that report in connection with the fee

22   review process; is that correct?

23   A.   I'm sorry --

24          THE COURT:  Are you finished with 2043?

01:48   25          MR. A. LAKIND:  For now I am, your Honor.

*United States District Court*
*Trenton, New Jersey*

3772

Schpero - Cross - A. Lakind

1          THE COURT:  For now.  So you're going back to it

2    again?

3          MR. A. LAKIND:  I will.

4          THE COURT:  All right.

01:48     5          THE WITNESS:  You have to repeat the question.

6    BY MR. A. LAKIND:

7    Q.   Yes.  Sir, you receive a report from Lipper that the

8    Board considers in its fee review process; is that correct?

9    A.   Yes, that's correct.

01:49    10    Q.   And it's your expectation that that report is accurate;

11    is that correct?

12    A.   It's accurate, but as I testified it's subject to -- as

13    any of these comparisons are, to inherent limitations in terms

14    of trying to find peer groups, and the fact that within peer

01:49    15    groups there are lots of issues in terms of trying to compare

16    funds.

17    Q.   Okay.  Mr. Schpero, I'd like you to turn to plaintiff's

18    -- strike that; I'm sorry.

19          Exhibit 1812.  Defendant's Exhibit 1812.  I'm sorry.

01:49    20    A.   Do I have that already?

21    Q.   Yes, you do, sir.

22          THE COURT:  You need the binder.  Why don't you keep

23    it.  (Handing to witness.)

24          (Laughter.)

01:50    25          THE WITNESS:  I kind of liked it over there.

*United States District Court*
*Trenton, New Jersey*

3773

Schpero - Cross - A. Lakind

1   Q.   Pretty heavy I guess.

2   A.   Okay.

3   Q.   Now, sir, that is a Lipper report that was included in

4   the documents you provided to me at depositions; is that

01:50   5   correct?

6           MR. BENEDICT:  I'm sorry; what tab?

7           THE COURT:   What page?

8           MR. A. LAKIND:  I apologize, I apologize; tab 45.

9   I'm sorry.

01:50   10          THE COURT:  Then could you just repeat your question

11   again, Mr. Lakind?

12          MR. A. LAKIND:  Yes, sir.

13  BY MR. A. LAKIND:

14  Q.   The Lipper report at tab 45 was something that you

01:50   15  provided at your deposition; is that correct?

16  A.   Yes, this is in the 30(b)(6) booklets, yes.

17  Q.   And the Lipper report shown at tab 45 is the type of

18  document that the Board considers in determining whether the

19  fees of the funds at issue are appropriate; correct?

01:51   20  A.   That's correct.

21  Q.   Now, one of the reports that Lipper provides is something

22  they call a total return performance report; are you aware of

23  that?

24  A.   Total return performance; are you referring to something

01:51   25  in this book?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  Q.   No, it's not in that book, I'm asking --

2  A.   That's why you're confusing me, because I thought you had

3  me looking at this book.

4  Q.   Turn over to Bates 5595, sir.

01:51  5  A.   Yes.

6  Q.   And in the second paragraph from the bottom on the left

7  -- the left-hand side, do you see where that is?

8  A.   The paragraph that begins comparative data?

9  Q.   Yes, sir.

01:51  10  A.   Yeah.

11  Q.   Comparative data shown in the report typically includes

12  contractual and actual management fees.  Your Lipper report

13  includes that; correct?

14  A.   Yes, it does.

01:52  15  Q.   And operating expense components.  Does Lipper report

16  include that?  By that I mean --

17  A.   Sorry; I'm just trying to understand what you're pointing

18  to me.  So I guess what we're looking at is the introduction

19  which just discusses generally what Lipper does.

01:52  20  Q.   Yes, sir.

21  A.   So, your first question had been that comparative data

22  typically includes contractual and actual management fees; and

23  yes, I definitely see contractual and actual management fees.

24  Operating expense components; I -- again, I guess I'd have to

01:52  25  flip through to remember, but I believe there is -- I'm seeing

*United States District Court*
*Trenton, New Jersey*

3775

Schpero - Cross - A. Lakind

1  now expense ratio components table, so yes, this is in the

2  report we received.

3  Q.   Okay.  And the last is, sir, total return performance; do

4  you know what that is?

01:53  5  A.   Yeah, the reason I hesitated on that one when you first

6  asked it is I didn't think -- and again, this is a 300 page or

7  so book; but my recollection was that -- was that all of our

8  performance information -- or much of it which is from Lipper,

9  but I don't recall that we get -- I think our format is that

01:53  10  we do not get it in the Lipper expense book, because that's a

11  book we get specifically with respect to expense comparisons.

12  And I believe we get a lot of Lipper performance data at every

13  Board meeting as well as for July, but -- but I don't think

14  it's part of this book.

01:53  15  Q.   Mr. Schpero, you do not receive a Lipper performance

16  report; isn't that correct?  And by you I mean the Board; I'm

17  sorry.

18  A.   Well, I guess I don't know what that means, because we --

19  we receive extensive Lipper performance comparisons.  So that

01:54  20  at every Board meeting we see the comparisons of the funds

21  against Lipper peer groups prepared by Lipper.

22  Q.   Okay, I'm going to come back to that in a few moments.

23  A.   Sure.

24  Q.   With regard to the expense comparisons shown in tab 45,

01:54  25  you have no way of knowing whether or not the funds to which

Schpero - Cross - A. Lakind

1    the FMG funds are compared, have fees that are the product of

2    an arms-length negotiation; is that correct?

3    A.   Could you give that to me, I'm sorry, one more time?

4    Q.   Yes, sir.  The comparative fee report at P-45, compares

01:54    5    the fees of the FMG funds to a number of comparative funds;

6    correct?

7    A.   Right.

8    Q.   And do you know if the fees shown on the comparison table

9    are the product of an arms-length negotiation?

01:55    10    A.   I don't personally know.  I know that they are all funds

11    that are subject to the Investment Company Act and to the case

12    law in the area, and they all I'm certain have boards that

13    satisfy the SEC and regulatory requirements, but I certainly

14    can't represent I know precisely what each of those boards do.

01:55    15    Q.   And you don't know if fallout benefits are available to

16    any of those funds; is that correct?

17    A.   I would not be privied to what the specific information

18    each of those boards receives.

19    Q.   And you don't know what the costs are of running any of

01:55    20    those funds; is that correct?

21    A.   Same answer, I certainly wouldn't be privy to that.

22    Q.   And you understand that FMG reviews the Lipper report

23    before it's sent to the Board; is that correct?

24    A.   I don't know.

01:55    25    Q.   Okay.  Who determines the contents of the Lipper report,

*United States District Court*
*Trenton, New Jersey*

3777

Schpero - Cross - A. Lakind

1  is that FMG, is that the Board or is it done some other

2  fashion?

3  A.   I believe Lipper determines the content.

4  Q.   Lipper determines the content.

01:56    5  A.   Yeah.  In terms of the substantive information in there,

6  in terms of who the peer groups are, I think that's all

7  determined by Lipper.  When I say that I know -- let me be

8  careful because I know that the Board has pushed hard, for

9  example, Lipper for years, for reasons I've never understood,

01:56   10  reviewed to break out index funds from active funds.  So a lot

11  of the comparisons they would provide -- and this went to my

12  point about the limitations of the Lipper data; a lot of the

13  comparisons they would provide for -- including for a number

14  of these at-issue funds, would compare an index fund to a peer

01:56   15  group that included -- that included both active funds and

16  passive funds.  And the Board was -- struggled with that.

17        And so we would -- in the first case we would ask FMG

18  on their own to try to break it out -- well, the first case we

19  would ask them to go back to Lipper, which is why I wanted to

01:57   20  respond to this, and see if Lipper understanding this issue

21  could break it out.  And not surprisingly, because this has

22  been my experience in the industry, Lipper, because they

23  believe incorrectly that they're independent, said we make our

24  own decisions; I believe very recently they've begun to break

01:57   25  it out, but that's -- I'm giving that as an example because I

3778

Schpero - Cross - A. Lakind

1   do think there have been cases where certainly the Board has

2   attempted to get Lipper to change things, and we use FMG as a

3   conduit in trying to pass that information on.

4   Q.   But the Lipper data used in 2042 and 2043, is data which

01:57   5   compares the EQAT's index funds to actively managed funds;

6   correct?

7   A.   The Lipper used data used where?

8   Q.   The Lipper data reported at tab 45 for many of the funds

9   compares EQAT index funds to -- to active comparative funds;

01:58   10   is that correct?

11   A.   I believe that it compares EQAT index funds to peer

12   groups that include both index funds and active funds.

13   Q.   All right.  We're going to review that in a moment.  I

14   have some questions about some definitions.  What does the

01:58   15   term median mean to you?

16   A.   Median would be the -- would be the midpoint of the

17   information provided.

18   Q.   In other words, if you have information with regard to 25

19   funds, the median would be the fund that is halfway from the

01:58   20   highest and halfway from the lowest.

21   A.   That's correct.

22   Q.   What about mean, what does that mean?  Excuse the pun.

23   A.   I'm sorry?

24   Q.   What is mean?  What is the definition of mean?

01:58   25   A.   You know, I'm not going to remember the difference

Schpero - Cross - A. Lakind

1    between -- I don't remember.

2    Q.   A mean is an average, so you add --

3    A.   So average I remember, I just didn't remember that mean

4    is the same term.

01:59    5    Q.   Okay.  And what is weighted average?

6    A.   So weighted average I believe is where the -- where the

7    effort is to eliminate the smaller funds and only look at the

8    larger fund assets in doing the analysis.

9    Q.   And do you know how that analysis is done?

01:59    10   A.   The actual mechanics of it?

11   Q.   Yes, sir.

12   A.   I'm not going to remember.

13   Q.   Okay.  And do you know why people undertake to compute a

14   weighted average in the investment industry?

01:59    15   A.   Well, there seems to be an assumption in what you just

16   said that it's -- it's the common practice; I don't know that

17   that's -- I don't know that you're intending to imply that.  I

18   know the Investment Company Institute, we've seen some

19   presentations from them that is done that way, I don't think

01:59    20   Lipper does it that way.

21   Q.   Correct.  At tab 45 the Lipper report provides

22   information about the median and mean of each -- of the

23   comparative funds and the EQAT Funds; correct?

24        MR. BENEDICT:  Where are you referring, Mr. Lakind?

02:00    25   You have the specific page?

*United States District Court*
*Trenton, New Jersey*

3780

Schpero - Cross - A. Lakind

1          MR. A. LAKIND:  There's a list of comparative fees

2    throughout this -- this document tab 45.

3    A.  I guess -- I mean I'm looking at page 41, it shows the

4    median, it doesn't show the mean; that's why I'm struggling

02:00    5    with that kind of question.

6    Q.  There's no information about a weighted average in tab 45

7    for any of the funds; is that correct?

8    A.  Well, unless I read through this whole book I can't -- my

9    general sense is that Lipper doesn't tend to use weighted

02:00    10   average, but I'm not going to be able to represent to you

11   what's in this book without reading it.

12         MR. A. LAKIND:  Would you please provide the witness

13   with Defendant's Exhibit 1924?  And the Court please?

14         THE WITNESS:  So this book --

02:01    15   Q.  If you would keep it open?

16   A.  245?

17   Q.  Yes, sir.

18   A.  Okay.

19   Q.  Mr. Schpero, would you just identify this document for us

02:01    20   please?

21   A.  It's from Strategic Insight, it's labeled Mutual Fund

22   Fees, Facts, Trends, Economies of Scale and Market Forces.

23   Q.  And Strategic Insight is one of the companies you

24   mentioned that provides information to the Board; is that

02:01    25   correct?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.   That's -- yes, it's one of the companies that we've

2    certainly accessed, yes.

3    Q.   Take a moment to review Defendant's Exhibit 1924, and I'm

4    going to point your attention to something on the second page.

02:02    5            THE COURT:  So this document is from the year 2004?

6            MR. A. LAKIND:  It is, your Honor.

7            THE COURT:  Okay.

8            MR. A. LAKIND:  It's actually page I it looks like.

9            THE WITNESS:  I assume you just want me to turn to

02:02    10   that page?  It looks like there's a lot of information --

11   BY MR. A. LAKIND:

12   Q.   Yes, sir?

13   A.   You want me to turn to the second page of the book.

14   Q.   Yes, sir.

02:02    15   A.   Okay.

16   Q.   All right.  I would just like you to follow along with

17   me, I'm going to ask you some questions about the text there.

18   It's entitled Mutual Fund Fees:  Averages sometimes lie and

19   often mislead.

02:02    20           Do you see where that is?

21   A.   Down at the bottom, yes.

22   Q.   The average weight of all cars and trucks has been rising

23   over the past 20 years; the average speed of all flying

24   objects has increased since 1903; the Fidelity Magellan fund

02:03    25   controls nearly 70 billion in assets for over five million

Schpero - Cross - A. Lakind

1  shareholders at a total expense ratio of .72 percent as of

2  9/03; the Boyle Marathon Fund runs one million for 400

3  shareholders at a total expense ratio of over three percent;

4  averaging the expense ratios with these two funds to imply an

02:03    5  average cost for the fund shareholders is patently ridiculous.

6      Did you read that accurately?

7  A.   Yes, you did.

8  Q.   Nevertheless, a similar calculation that gives equal

9  weight to funds of all sizes and treats the many thousands of

02:03   10  tiny expensive funds the same as the few hundred large ones

11  with a lower -- excuse me; with lower expense ratios that

12  control almost all fund assets has become a daily exercise in

13  misinterpreting statistics.

14      Did I read that accurately?

02:03   15  A.   Yes, you did.

16  Q.   And a median and an average both give equal weight to

17  each data point; is that correct?

18      MR. BENEDICT:  Objection, your Honor --

19  A.   You're not reading that now?

02:04   20  Q.   No, I'm asking you a question, sir.

21  A.   I'm not really sure how to respond to that.  I mean we've

22  already defined what the two do.  The information that I see

23  from Lipper as I recall it, typically deals with a median, and

24  it deals specifically with peer groups at particular similar

02:04   25  asset levels.  So I'm having trouble seeing the relationship

3783

Schpero - Cross - A. Lakind

1    between that and what you're showing me here.

2    Q.   Okay, we're going to get to that in a few moments as

3    well.  Do you have any reason to disagree with the accuracy of

4    what I read to you, sir?

02:04    5         MR. BENEDICT:  Your Honor, again, no foundation has

6    been laid whatsoever.  We don't know if the witness has ever

7    seen this, and it's well beyond the scope of direct

8    examination.

9         MR. A. LAKIND:  Your Honor, he was deposed -- excuse

02:04   10    me; he was examined about comparative fees, they introduced

11    the Lipper data, and whether the witness has seen this or not,

12    it's an exhibit which defendants admitted into evidence and I

13    want to see if he agrees with it.

14         THE COURT:  But you go back to where you compared

02:05   15    the Fidelity with the Boyle?

16         MR. A. LAKIND:  Yes, sir?

17         THE COURT:  Are you using all of that in this?

18         MR. A. LAKIND:  Yes, sir.

19         THE COURT:  So, Mr. Schpero, if you can, you can

02:05   20    answer the question.

21         THE WITNESS:  And the question again is?

22    BY MR. A. LAKIND:

23    Q.   Do you agree with the paragraph that I read to you

24    beginning with the Fidelity Magellan?

02:05   25    A.   I'm sorry; I'm going to reread it again.

Schpero - Cross - A. Lakind

1          THE COURT:  You may.

2          (Witness reviewing.)

3    A.   Yeah, I am not a statistical expert, I don't have any

4    reason to disagree with it.

02:06    5    Q.   Okay.  The second paragraph on page -- looks like double

6    I, sir, there's some bolded language at the bottom of that

7    paragraph and I'll read that to you:  The use of "simple

8    mathematical averages which --

9    A.   I'm sorry; where are we now?

02:06    10   Q.   I'm sorry, sir.  Double I, left-hand corner -- left-hand

11   side second paragraph.

12          THE COURT:  Bold print?

13          MR. A. LAKIND:  Bold print, yes, sir -- your Honor.

14   A.   Yeah, okay.

02:06    15   Q.   I'm going read that to you, sir:  The use of "simple

16   mathematical averages" which equates the fee ratios of the

17   many thousands of tiny expensive funds that hardly anyone

18   owns, with the lower fees among the few hundred funds that

19   control most fund assets is inappropriate, misleading and

02:07    20   irresponsible."

21          Did I read that correctly, sir?

22   A.   Yes, you did.

23   Q.   And do you agree with that?

24   A.   I will -- again, I am reluctant only because as I've

02:07    25   testified previously we have a lot of trustees with lots of

Schpero - Cross - A. Lakind

1    areas of expertise; statistical analysis is not something that

2    I'm schooled in.  So I can read that, I understand the concept

3    that that's there, but I'm not going to -- I'm not prepared to

4    offer much more than that, because we're in an area that I

02:07    5    don't claim expertise in.

6    Q.   All right.  Let me go through one more paragraph and then

7    I'll move off this exhibit if I might.  The paragraph below

8    says:  To see the dramatic distortion generated by simple

9    averages, consider this; for all actively managed equity funds

02:07    10   the asset weighted average total expense ratio (cost ratio

11   actually paid by investor) was 1.10 percent in 2002, whereas

12   the simple average expense ratio was 1.71 percent, 55 percent

13   higher than the true cost ratio.

14        Do you see where that is?

02:08    15   A.   I do.

16   Q.   And you have no opinion as to whether that is accurate or

17   inaccurate; correct?

18   A.   I've never seen this before, I've certainly have not had

19   an opportunity to think about it or talk to it with

02:08    20   co-trustees who would -- who have statistical backgrounds, but

21   I understand the concept.

22   Q.   Do you ever -- excuse me; did you ever ask FMG to provide

23   information about weighted average fees?

24   A.   Not that I recall.

02:08    25   Q.   Have you ever considered retaining an consultant to

*United States District Court*
*Trenton, New Jersey*

3786
Schpero - Cross - A. Lakind

1  assist you to develop information about weighted average fees?

2  A.   I don't believe so.

3  Q.   Is there any disadvantage to providing the trustees with

4  information about weighted average fees?

02:08  5  A.   I can only answer that from the perspective of what I

6  know we do, which is we very much consistent with industry

7  practice use the premiere provider of comparative fee

8  information, and we rely on the format that they provide, not

9  that FMG provides.

02:09  10  Q.   Have you ever asked Lipper to provide information to you

11  about weighted average fees?

12  A.   I have not.  But I also would say I don't think Lipper

13  provides us with simple average fees, I think they --

14  information; I think they provide it where you see the actual

02:09  15  fee of each of the peer group where there are similar --

16  similar asset levels against the median of that peer group.  I

17  don't think there's anything misleading about that.

18  Q.   And you're referring to the contractual fee comparison,

19  sir?

02:09  20  A.   My recollection is that they provide it both at a

21  contractual level, at different asset levels and I believe

22  they provide it at effective fee levels of different asset

23  levels.

24  Q.   Can you show me in that exhibit, tab 45, where Lipper

02:10  25  provides the effective fee at an asset level for any fund at

3787

Schpero - Cross - A. Lakind

1    issue in this case?

2    A.   I do see contractual, I'm not finding effective.  I do

3    know the Board sees effective for every fund we looked at.

4    Q.   Lipper does not provide you with the effective fee rate

02:11    5    at the asset levels; is that correct, sir?

6    A.   I don't see that here.  Again, I don't remember -- I'm

7    trying to remember the long sheets that we see in the

8    summaries, and I believe we see effective fee levels; now I

9    may be wrong and that may not be Lipper, that may be provided

02:11    10   by FMG, I just don't remember.

11   Q.   Your testimony is that the long sheets provide the

12   effective fee levels of comparative funds, sir?  Is that your

13   testimony?

14   A.   I'm trying to remember.

02:12    15          THE COURT:  Well, do you need the document?

16          THE WITNESS:  Certainly in terms of what the long

17   sheet shows, at this point I'm just trying to remember what

18   they look like.

19          MR. A. LAKIND:  Your Honor, it's in 1811, right at

02:12    20   the very beginning of Defendant's Exhibit 1811.

21          THE WITNESS:  In this book?

22   BY MR. A. LAKIND:

23   Q.   I think you have 1812.  It's -- 1811 is the right one.

24          (Court handing to witness.)

02:12    25          MR. BENEDICT:  Do you have extra copies for us, Mr.

*United States District Court*
*Trenton, New Jersey*

3788

Schpero - Cross - A. Lakind

1  Lakind?

2          MR. A. LAKIND:  It's your exhibit.  I'll give you a

3  copy.

4          MR. BENEDICT:  I don't even know which exhibit

02:12  5  you're referring to.

6          THE WITNESS:  I assume you're suggesting that I pull

7  out the long sheets; is that correct?

8  BY MR. A. LAKIND:

9  Q.   Yes, sir, just to confirm your testimony is correct.

02:13  10          THE COURT:  Where is that?

11          THE WITNESS:  This was right on the inside of the

12  book.

13          THE COURT:  Oh, okay.

14          MR. BENEDICT:  Mr. Lakind, is this the version of

02:13  15  the long sheet that's included in the 30(b)(6) binder?

16          MR. A. LAKIND:  It is.  I'm looking at the long

17  sheet that you gave me this morning.

18          MR. BENEDICT:  Ending with Bate stamp -- first page

19  1568, ending the Bate stamp 82111, are you talking about the

02:14  20  same document?

21          THE COURT:  Well, Mr. Benedict, I think you should

22  come up and take a look at the one that Mr. Schpero is

23  referring to.

24          THE WITNESS:  This was inside the beginning of the

02:14  25  book that has tabs 1 through 40.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1        MR. BENEDICT:  And what's the Bate stamp number?

2        THE WITNESS:  AXA0282111.

3        MR. BENEDICT:  I'm fine.  Thank you, your Honor.

4        THE COURT:  All right.

02:14   5        Are you on the same one, Mr. Lakind?

6        MR. A. LAKIND:  I am, your Honor.

7        THE WITNESS:  And I'm looking at the first one,

8   which is for the EQ/Equity 500 Index.  And if you just let me

9   try to look at this at bit, because it's pretty small.

02:14   10        Yeah, as I think I suggested, this shows the actual

11   contractual fee, and then it shows the effective management

12   fee, which would be the fee at the current asset level

13   reflecting any kind of expense caps or waivers.  And then

14   several columns over it shows the actual

02:15   15   management/administrative fee, which again I think is -- which

16   I believe is the effective fee --

17   BY MR. A. LAKIND:

18   Q.  Mr. Schpero, can I stop you?

19   A.  Sure.

02:15   20        THE COURT:  No, let him finish his answer.

21        MR. A. LAKIND:  It's not the question I asked.

22        THE WITNESS:  Your Honor, I thought the question had

23   been whether -- whether I see the effective fee, and I said I

24   thought it was, it was on the long sheet, and in the long

02:15   25   sheet I am looking and I see the effective fee, it's 25 basis

3790

Schpero - Cross - A. Lakind

1   points on a net basis for the EQ 500 Index; and I also see the

2   percentile of the effective fee compared to the Lipper

3   universe for Class K; and similarly I see that for the A and B

4   Classes.  So that's what I was remembering and that's what I

02:16    5   see here.

6   BY MR. A. LAKIND:

7   Q.   Okay.  Turn over if you would to Bates 5785 of the Lipper

8   report, which was tab 45, sir.

9   A.   So we're back in the Lipper book?

02:16   10   Q.   Yes, sir.

11   A.   And I'm sorry; what --

12   Q.   Page Bates 5785.

13   A.   5785.  Yeah, 5785, S&P 500 index.

14   Q.   Right.  And that's a spreadsheet, is it not, that

02:17   15   compares the fee on the EQ 500 Index to a variety of

16   comparative funds; is that correct?

17   A.   This shows the EQ Index against -- I guess it shows the

18   -- I'm just trying to see; it shows -- yeah, it shows the

19   expense ratio components, excluding 12b-1.

02:17   20   Q.   And the left-hand column is name of fund; is that

21   correct?

22   A.   Yes.

23   Q.   And there's a list of funds under that; sir?

24   A.   Correct.

02:17   25   Q.   And the majority of those funds are index funds; is that

*United States District Court*
*Trenton, New Jersey*

3791

Schpero - Cross - A. Lakind

1  correct?

2  A.   So this is the S&P 500; if I didn't say earlier, I could

3  have told you, that I think that's the one fund -- remember I

4  said that there were -- the problem with Lipper is that many

02:17  5  of their funds for years that they did not break out index and

6  active; the one fund that was the exception to that is the S&P

7  500.

8         So here -- I'm saying that only because as a result I

9  think what you just asked me I think I can answer pretty

02:18  10  readily, but given that I understood that was the only case

11  where they were willing to break out index funds, then I'm

12  assuming -- I can't always tell by the name, but it looks to

13  me like these are probably all of the index funds.

14  Q.   Okay.  And then if you go over four columns, it says

02:18  15  portfolio average net assets; do you see where that is?

16  A.   Yes, I do.

17  Q.   And the average net assets of the EQ 500 is about $3

18  billion?

19  A.   Yes.

02:18  20  Q.   And the average net assets of the funds to which it's

21  compared, some of them are as small as $60 million; correct?

22  A.   I see funds -- yes, I see a fund that's 63 million I

23  guess.

24  Q.   And in fact, the EQ 500 has the highest actual management

02:19  25  and administrative fee of any fund on that chart at page 5785;

*United States District Court*
*Trenton, New Jersey*

3792

Schpero - Cross - A. Lakind

1   correct?

2   A.   I'm looking at it now; and I'm sorry, are you asking

3   about the actual --

4   Q.   Yes, sir.

02:19   5   A.   I don't think it's the highest.  No, that looks like --

6   that does not appear to be correct.

7   Q.   Tell me which of these 20, 25 funds have a higher fee.

8        THE COURT:   In gross dollars?

9        MR. A. LAKIND:   No, I'm sorry, in fee rate.

02:19   10        THE WITNESS:   So again, just so we're in the right

11   place, I am over -- five over at the column that's called

12   actual management/administrative fee?

13   BY MR. A. LAKIND:

14   Q.   Yes, sir.

02:19   15   A.   Which as I understand it would be the effective fee.  And

16   the fee that EQ/S&P 500 is .352; and I see -- down near the

17   bottom I see one that's Large Cap is .387; I see MML SRS is at

18   .399; I see Ohio National, which is at .376; and Sun America

19   is at .370.

02:20   20   Q.   And what are the assets in the Ohio National, sir?

21   A.   193 million.

22   Q.   About three percent of those in the EQ 500; correct?

23   A.   Beg your pardon?

24   Q.   It's about three percent of the assets in the EQ 500?

02:20   25   A.   It's obviously much smaller, I don't know what the

*United States District Court*
*Trenton, New Jersey*

3793

Schpero - Cross - A. Lakind

1   percentage is.

2   Q.   And the same with the Sun America; correct?

3   A.   Correct.

4   Q.   In fact, with the exception of the EQ 500, every fund

02:20  5   that which you receive a Lipper report, compares an -- an

6   index -- excuse me; I'm sorry.  With regard to the index funds

7   at issue, the Lipper report compares index funds to active

8   funds with every single fund; is that correct?

9   A.   Say that again please?

02:21  10  Q.   Yes, sir.  With regard to the index funds that are at

11  issue, the Lipper report compares an index EQAT fund to a

12  group of active funds; is that correct?

13  A.   With the exception of S&P 500.

14  Q.   Yes, sir.  And with regard to the --

02:21  15  A.   Was that a question?

16  Q.   I'm sorry?

17  A.   I'm sorry; was that the question?

18  Q.   Yes, that was.

19  A.   So yes, and that's why we've always asked for a breakout

02:21  20  of index funds alone on those other funds.  So we can see this

21  same comparison.

22  Q.   And can you tell me where that breakout is?  Do you know

23  where it is in 1811, 1812?

24  A.   In these two books?

02:21  25  Q.   Yes, sir.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  A.   If you want to give me time to look -- I -- I will

2  represent to you that -- that the Board, because of what we

3  identified as an issue with the Lipper data, where you see

4  both index and active together, the Board has asked FMG to

02:22   5  deliver and has received from FMG presentations where we have

6  seen for the other funds -- not the S&P, but the other funds,

7  a breakout that shows us just the index funds gathered from as

8  best they could, gathered from the Lipper data so that we can

9  see a -- a better apples to apples comparison.  Where is that

02:22   10  this is in the two books I'm not going to be able to tell you,

11  I -- it certainly was in the Board materials which you have

12  received.

13  Q.   Right.  You never thought to retain a consultant to

14  undertake the same analysis that Lipper did, but to do it with

02:22   15  index funds; is that correct?  You relied on FMG to do that.

16  A.   We relied on FMG to go through the Lipper data and

17  identify the index funds.

18  Q.   Turn over if you would the Bates 5611?

19       MR. A. LAKIND:  Your Honor, I'm almost done with

02:23   20  this area.

21       THE COURT:  Okay.

22  A.   56 -- I'm sorry same tab?

23  Q.   Yes, sir.

24  A.   56 what?

02:23   25  Q.   11; it's tab 45.

Schpero - Cross - A. Lakind

1   A.   Sorry; having trouble finding this one.

2        THE COURT:  Mr. Lakind, can you come forward and

3   just direct Mr. Schpero --

4   A.   I think I'm heading in the right spot.  5611; I've got

02:23   5   it.

6   Q.   And that -- that serves for the Intermediate Government

7   Bond Index; correct?

8   A.   Yes, that's correct.

9   Q.   And the assets under management for the Intermediate

02:24   10   Government Bond Index is $7.3 billion; is that correct?

11   A.   Yes, it is.

12   Q.   And the second highest -- the second largest fund has

13   assets of about $3.8 billion; is that correct?

14   A.   Yes, that appears to be correct.

02:24   15   Q.   And the Goldman VIT Fund, about 60 percent of the way

16   down, that has assets of $68.1 million; is that correct?

17   A.   Yes, it is.

18   Q.   And you think a comparison to the Goldman VIT Fund is a

19   meaningful comparison to assess the reasonableness of the fees

02:24   20   for the Intermediate Government Bond Index?

21   A.   Your question again is do I think it's what?

22   Q.   It's a meaningful or helpful comparison to compare a fund

23   that has assets of 69 or $68 billion, to one that has assets

24   -- excuse me; $68 million to one that has assets of $7

02:25   25   billion?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.   Yeah, I think certainly that comparison just on the

2    simple basis you just gave it is not helpful, but I believe

3    what we typically what we -- well, we gets lots of data

4    obviously, but among other things what often say among each

02:25    5    fund is comparisons of effective fee levels at the same asset

6    level for each fund, which I think is a meaningful way to look

7    at it.

8            But if you're just going to look at a fund at what its

9    rate is at 68 million versus a fund that's 7 billion alone, I

02:25    10    would certainly agree that is not sufficient information to do

11    an analysis.

12    Q.   Turn over if you would, sir, to Bates 5608.

13    A.   Yes, I'm there.

14    Q.   That's called Contractual Management Fees At Various

02:26    15    Asset Levels; is that correct?

16    A.   Correct.

17    Q.   And what do you understand this chart to be saying?

18    A.   Just give me minute to look at it.

19            Yeah, so this is looking at the fund's contractual fee

02:26    20    at different data points, different asset levels, versus other

21    funds that Lipper has identified as peers at the same asset

22    levels.

23    Q.   Do you have any reason to believe that type of analysis

24    is flawed?

02:27    25    A.   Well, I think I've already testified that I think there

*United States District Court*
*Trenton, New Jersey*

3797

Schpero - Cross - A. Lakind

1    are inherent limitations in these comparisons.  At a minimum

2    when you're looking at -- I guess a couple of things.  I'm

3    just going to jot so I can remember to make both my points.

4         One would be the -- the fact that comparing fees --

02:27    5    management fees, which under Lipper include administrative

6    fees fund by fund has its inherent limitations, because as

7    I've testified last week, particularly the administrative

8    types of fees that are components of that depending on the

9    fund complex, may or may not be part of the

02:28    10    management/administrative fees.  So you can have funds where

11    there are account fees and other fees that show up elsewhere,

12    which is -- so I think one point I made was that as a result

13    often looking at total expense ratios is another important

14    data point as a result of that, I think that would be one

02:28    15    point.

16         Second point I would make is that we certainly --

17    again, I should talk about myself; but this is why we see the

18    Lipper data, because we understand that depending on the

19    presentation there are limitations that Lipper is based with

02:28    20    in terms of the amount of peers that they can find and what

21    those peers look like.  So inherently you've got limitations

22    in terms of who could be compared, and as you pointed out

23    there's certainly as a result -- can result in funds that are

24    at different asset levels.

02:28    25    Q.   Now, you would agree -- strike that.

*United States District Court*
*Trenton, New Jersey*

*3798*

Schpero - Cross - A. Lakind

1    The contractual management fees, it's a bar graph, and

2    it has 250 million, 500 million, one billion; do you see where

3    is that?

4    A.   Yes, I do.

02:29    5    Q.   And all -- there's a number of lines that represents each

6    fund in the Lipper universe; correct?

7    A.   Right.

8    Q.   Now, a fund at $250 million is very unlikely to have

9    breakpoints at 3 billion, 5 billion or 7.5 billion; isn't that

02:29   10    so?

11    A.   A fund that's currently at 250 million?

12    Q.   Yes, sir.

13    A.   May or may not.  I think -- I think it depends on the

14    complex.  There are certainly complexes where you could, but I

02:29   15    agree there are ones where you may not.

16    Q.   It would be fairly unlikely for a small fund to have

17    breakpoints at a much higher -- higher asset levels, 5, 6, 7

18    billion; would you agree with that?

19    A.   I guess I wouldn't be prepared to say yes or no, because

02:29   20    I think there are a lot of -- I've certainly seen what I would

21    call mature complexes where when they set up new funds they

22    simply use the fee structure that's in place with their other

23    funds, notwithstanding that it may be starting up as a small

24    fund.

02:30   25    Q.   Did the Board make any effort to determine whether the

3799

Schpero - Cross - A. Lakind

1    small funds had breakpoints that would -- at asset levels as

2    high as $7 billion that are included in the contractual

3    management fee table?

4    A.   I don't recall seeing specific information on that.

02:30    5         MR. A. LAKIND:  Your Honor, perhaps now would be a

6    good time to break if your Honor desires.

7         THE COURT:  No, let's keep going for a few more

8    minutes.

9         MR. A. LAKIND:  Okay.

02:30   10   Q.   I'd like to turn to risk.  And you testified about risk

11   when you were examined by FMG; is that correct?

12   A.   Just give me one minute.  Can I put this book aside?

13   Q.   Yes, sir.

14   A.   I'm sorry; your question?

02:31   15   Q.   Yes, sir.  You testified under examination about FMG's

16   counsel about risks; do you recall that?

17   A.   Yes, I do.

18   Q.   And you identified two types of risk, entrepreneurial

19   risk and enterprise risk; is that correct?

02:31   20   A.   Correct.

21   Q.   Entrepreneurial risk you described as the risk associated

22   with starting a fund, will it succeed, et cetera; is that

23   correct?

24   A.   Right.

02:31   25   Q.   Now, these funds Mr. Joenk testified were in the

*3800*

Schpero - Cross - A. Lakind

**1**  neighborhood of 15 years old; is that consistent with your

**2**  understanding?

**3**  A.   The at-issue funds?

**4**  Q.   Yes, sir.

02:31  **5**  A.   I believe -- well, if he testified to that then I'm sure

**6**  that's the case.

**7**  Q.   Do you associate any entrepreneurial risk with any of the

**8**  existing funds?

**9**       (Brief pause.)

02:32  **10**  A.   No, I think -- I think at this point if they're 15 years

**11**  old, I don't see significant entrepreneurial risk.

**12**  Q.   But you mentioned that there are enterprise risks

**13**  associated with these funds; correct?

**14**  A.   Right.

02:32  **15**  Q.   And among the things you mentioned are regulatory

**16**  violations, legal, operational, compliance risks and so on;

**17**  correct?

**18**  A.   Yes.

**19**  Q.   Now, you were asked by the Court if some of those risks

02:32  **20**  can be passed on to sub-advisors; do you recall that?

**21**  A.   Yes, I do.

**22**  Q.   And you responded that the sub-advisors might not have

**23**  the ability to pay; correct?

**24**  A.   I think that was at least part of my answer.

02:32  **25**  Q.   With regard to the risks, has the EQAT Board or FMG to

Schpero - Cross - A. Lakind

1   your knowledge ever sought to quantify those risks?

2   A.   No, I think -- we certainly discussed this concept;

3   there's no specific quantification.  I'm not sure how we would

4   quantify it.

02:32    5   Q.   Did you ever bring a consultant in to help you assess the

6   risks?

7   A.   No.

8   Q.   Did Ms. Louie ever tell the Board that in her view the

9   risks are limited?

02:33    10   A.   I don't have a recollection of that discussion.

11   Q.   Earlier I showed you a slide which showed the total fee

12   for index funds to be about 12 basis points; do you recall

13   that?

14   A.   This was the ICI study that was done excluding funds in

02:33    15   on this arena?

16   Q.   Yes, sir.

17   A.   Yes.

18   Q.   And that was the total fee, including distribution,

19   management, administration, compliance, legal, risk, et

02:33    20   cetera; correct?

21   A.   I put it aside but --

22   Q.   Okay.  Rather than spend the time to go back to it let me

23   move into another area.

24       There's several ways to mitigate risk; is that correct?

02:33    25   A.   Sure.

Schpero - Cross - A. Lakind

1  Q.  One is insurance?

2  A.  Yes, insurance.

3  Q.  And do you know how much insurance FMG has to protect the

4  EQAT against risk?

02:33   5  A.  To protect EQAT; I'm not sure I understand the question.

6  Q.  Do you know how much insurance FMG has in connection with

7  the types of risks you've identified as enterprise risks?

8  A.  Well, the only insurance that I know specifically of is

9  the D & O and E & O insurance that is -- that jointly covers

02:34  10  the funds and FMG.

11  Q.  Did you make any effort in connection with your work on

12  the Board to assess the adequacy of the insurance that FMG

13  had?

14  A.  No, I would not, I would not engage --

02:34  15      MR. BENEDICT:  Objection, vague.

16      THE COURT:  Did you understand the question?

17      THE WITNESS:  Why don't you ask it again.

18  BY MR. A. LAKIND:

19  Q.  Sure.  Did you make any effort to assess whether or not

02:34  20  FMG had adequate insurance to cover the risks you testified

21  to?

22  A.  No, I don't -- I wouldn't see engaging in that, but no, I

23  have not.

24  Q.  A second way to mitigate risk is to require FMG to keep a

02:35  25  certain amount of capital; correct?

3803

Schpero - Cross - A. Lakind

1    A.   In theory I guess.

2    Q.   Is the -- does the Board have any capital requirements

3    imposed upon FMG?

4    A.   I think we're confusing points here, Mr. Lakind.   The

02:35    5    Board -- we are not -- I am not a trustee of FMG, I am a

6    trustee of the fund under the -- under the case law and

7    presentations that we receive from our counsel, we're --

8    there's a lot of information that we are obliged to look at in

9    determining the fairness and reasonableness of the fees.   And

02:35    10   I think all that I tried to suggest the other day is that one

11   of the many factors we take into account is -- in analyzing

12   the fee, is that as part of the services that are provided we

13   want -- we think it's important that we at least take into

14   account the fact that there are risks associated with managing

02:36    15   the fund, and that's just another data point in analyzing the

16   fee.

17        But I think -- that's different from somebody who is a

18   on the Board of AXA or FMG who by definition would be

19   concerned about the specific capital and other requirements of

02:36    20   that entity.

21   Q.   Mr. Schpero, you testified yesterday -- or excuse me,

22   Friday, that if something went wrong you're going to sue FMG;

23   correct?

24   A.   If something went wrong, I would hope we wouldn't get to

02:36    25   that point, because I think I testified that my expectation

*United States District Court*
*Trenton, New Jersey*

3804

Schpero - Cross - A. Lakind

1  based on my reasonable business judgment and working with them

2  over the years is that if something went wrong and the Board

3  said that the fund needed to be made whole, the fund would be

4  immediately be made whole.

02:36    5  Q.   But you didn't think it was helpful to ascertain whether

6  or not FMG had the capital that was sufficient to make the

7  Board whole?

8  A.   Mr. Lakind, we see every year the financials of AXA

9  Equitable, we meet with senior management and I personally

02:37   10  take great comfort from the fact that we are dealing with one

11  of the largest insurance companies in the world, so those

12  specifics are not my concern.

13  Q.   Mr. Schpero, your contract is with FMG, it's not with AXA

14  Equitable --

02:37   15  A.   I understand.

16  Q.   EQAT's contract, I'm sorry.  Is not with AXA Equitable,

17  it's with FMG; isn't that correct?

18  A.   I understand that.

19  Q.   Now, you told the judge that some of the sub-advisors

02:37   20  might not have sufficient assets to pay a judgment should the

21  EQAT obtain one; is that correct?

22  A.   I think what I said was that there are a number of very

23  small sub-advisors, and that one of the -- one of the risks

24  inherent in this process where you're retaining, where they're

02:37   25  retaining many different sub-advisors to make that available

Schpero - Cross - A. Lakind

1    to the marketplace is that some of them are start-ups or

2    small, and there are risks associated with that.

3    Q.   Among the sub-advisors to the at-issue funds is

4    Blackrock; is that a small sub-advisor?

02:38    5    A.   No, Blackrock is not.

6    Q.   What about Morgan Stanley, is that a small sub-advisor?

7    A.   No.

8    Q.   Oppenheimer?

9    A.   Probably not for particular particularly.

02:38    10    Q.   Wellington, sir?

11    A.   I don't know the size of Wellington, but I think they're

12    of some size.

13    Q.   GAMCO?

14    A.   They're not small.

02:38    15    Q.   T.Rowe Price?

16    A.   Same.

17    Q.   So, all of the sub-advisors to the at-issue funds in fact

18    are considerably larger than FMG, are they not?

19    A.   Well, again, first of all I don't know that I would be

02:38    20    comparing them to FMG.  As I said from the perspective of

21    sitting on the Board, I look to AXA and FMG as the sponsors

22    who would be standing behind these funds.  And I would also

23    note that I think you're identifying one of to me would be a

24    number of reasons why a sub-advisor may not be the party that

02:39    25    would be willing to step up, which is why I think those risks

*United States District Court*
*Trenton, New Jersey*

3806

Schpero - Cross - A. Lakind

1    are in place.

2    Q.   The EQAT has no indemnity agreement with AXA, does it?

3    A.   I believe there are indemnification provisions in the

4    management contract.

02:39    5         MR. A. LAKIND:  If I might, if you could just hand

6    the judge and the witness J-4 please?

7         THE COURT:  Is this a new topic?

8         MR. A. LAKIND:  It's still within risk.

9         THE WITNESS:  Good time for a break.

02:39    10        THE COURT:  All right.  It's time for a break?  So

11   we'll break for lunch at the present time.  I didn't realize

12   we were so far after 1:00.  We'll reconvene at 2:00.

13        And then Mr. Lakind, you have two more hours to

14   cross-examine and that's it.

02:39    15        MR. A. LAKIND:  Thank you, your Honor.

16        (Luncheon recess.)

17        THE COURT:  Mr. Schpero, you should know that you're

18   here until after 4 o'clock today.

19        THE WITNESS:  Whatever you ask.

03:28    20        THE COURT:  So, you may be seated.  Thank you.

21        Mr. Lakind?

22        MR. A. LAKIND:  May I proceed, your Honor?

23        THE COURT:  You may.

24        THE WITNESS:  I apologize; my glasses I seem to have

03:28    25   left in my bag.

3807

Schpero - Cross - A. Lakind

1          (Pause; witness getting glasses.)

2          THE WITNESS:  Sorry.

3          THE COURT:  That's okay

4          MR. A. LAKIND:  May I proceed, your Honor?

03:29   5          THE COURT:  You may.

6          MR. A. LAKIND:  Thank you.

7   BY MR. A. LAKIND:

8   Q.   Mr. Schpero, are you familiar with the term report card

9   as used in the material provided as part of the 15(c) process?

03:29   10  A.   Yes, I am.

11  Q.   And that report card assigns a grade to each of the EQAT

12  Funds in the areas of performance and so on; is that correct?

13  A.   Yes, it does.

14  Q.   And what role did the EQAT have in determining the

03:29   15  criteria used to assign those grades?

16  A.   You know, that's going to be hard for me to remember,

17  that report card's been used for a long time, there's been a

18  lot of discussions so I can't remember at this point it's been

19  a -- it's been a lot of years.

03:29   20  Q.   Fallout benefits, could you define -- strike that.

21          Both you and Mr. Joenk used a but-for test for fallout

22  benefits; is that correct?

23  A.   Right.

24  Q.   And can you repeat that test, please, so I understand it?

03:30   25  A.   Yeah, those are benefits that would not -- those are

*United States District Court*
*Trenton, New Jersey*

3808

Schpero - Cross - A. Lakind

1    benefits elsewhere from the management contract itself that

2    are received by affiliates or related parties, that would not

3    be received but for the relationship between FMG and the

4    funds.

03:30    5    Q.   In this case there are separate account fees and general

6    account fees that accrued to the benefit of AXA; is that

7    correct?

8    A.   I don't think you mean separate account fees; there are

9    general account fees that AXA receives, is that what you're --

03:30    10   Q.   Yes, sir.  And product wrapper fees that AXA receives as

11   well; right?

12   A.   Right.

13   Q.   And they receive those benefits because of their

14   relationship with the mutual fund, isn't that so?

03:31    15   A.   I don't think that's correct.

16   Q.   You do not.

17   A.   No, as I testified I'm -- and we certainly have discussed

18   this over the years with our counsel; you've got two different

19   fees you just referenced, in both cases I believe that they

03:31    20   would be either -- whether or not these funds are there, the

21   general account fee is -- is an alternative to the funds; and

22   the wrapper is a wrapper to the insurance product, which makes

23   available not just the funds but other outside products, and

24   in fact a lot of outside products.

03:31    25   Q.   But because AXA has a relationship with the funds, it

*3809*

Schpero - Cross - A. Lakind

1   receives product wrapper fees, does it not?

2   A.   I just disagreed with that a moment ago.

3   Q.   Okay.  Now, you would agree with me that the if the Board

4   were improperly advised as to the definition of fallout

03:32   5   benefits, that would be something that's important to you;

6   correct?

7   A.   If we were improperly advised?  Yes, that would be --

8   Q.   If you got an improper definition; correct?

9   A.   That would be a concern, correct.

03:32   10   Q.   Now you know *Jones v. Harris* defines fallout benefits, is

11   that so?  Are you aware of that?

12   A.   As I said I've read the case, I don't remember the --

13   Q.   Would it --

14   A.   It's a lot of pages.

03:32   15   Q.   Would it surprise you to learn that the but-for test is

16   nowhere in *Jones v. Harris*?

17   A.    I don't think -- I don't think that would be -- I don't

18   think that would be surprising, because I think the but-for

19   case is -- but-for test is a -- is kind of a summary way of

03:32   20   trying to analyze it.  I think the general concept are

21   benefits that are received as a result of the relationship.

22   Q.   Okay, thank you.  Did you ever retain a consultant to

23   assess whether or not product wrapper and general account

24   spread are fallout benefits?

03:32   25   A.   No.  Other than obviously relying quite extensively on

Schpero - Cross - A. Lakind

1  our independent counsel.

2  Q.   Okay.  If you would I'd like to turn to the --

3       THE WITNESS:  I'm going to take a candy if that's

4  all right, your Honor.

03:33    5       THE COURT:  You may.

6  A.   Sorry.

7  Q.   Profit.  And if you would, Defendant's Exhibit 1812, I

8  think Milbank located another copy of that; tab 47, please.

9  A.   I'm sorry; tab what?

03:33   10  Q.   47.

11  A.   Okay.

12  Q.   Turn over if you would to Bates 794, please.

13  A.   Can I look at it a moment?

14  Q.   Yeah, sure.  Of course.

03:34   15  A.   This is the -- it's Headed Pre-Marketing; is that right?

16  Q.   Yes, sir.

17       (Witness reviewing.)

18  A.   Okay.

19  Q.   Now, tab 47 is entitled Profitability Discussion;

03:35   20  correct?

21  A.   Yeah.

22  Q.   And Bates 794 compares the pre-marketing profit of the

23  EQAT to a variety of investment advisors; correct?

24  A.   That's correct.

03:35   25  Q.   Now, the profitability of the EQAT is not relevant to the

*United States District Court*
*Trenton, New Jersey*

3811

Schpero - Cross - A. Lakind

1    *Gartenberg* factors; is it?

2    A.   I think this is -- I said that was correct that it

3    references the word EQAT, but I think -- and again, we're

4    looking at a document that was delivered I guess to the Board

03:35   5    in July of almost three years ago, but I would have guessed

6    that this is a reference to FMG's profitability.

7    Q.   Because the profitability of the EQAT would be irrelevant

8    to the Board's assessment of the appropriateness of fees.

9    A.   Well, in fact, there is no -- there's not even a

03:36   10   profitability to examine of the EQAT.

11   Q.   That's correct.

12   A.   So I think that was probably just an error in the wording

13   of the document, which happens periodically.

14   Q.   If you would, turn over to Bates 796.  And do you --

03:36   15   would you take a moment to look at that?

16   A.   I'm sorry; the pages are switched around, so I have to

17   access it.

18       796, right.

19   Q.   And again, it shows the post-marketing profitability of

03:36   20   the EQAT; correct?

21   A.   Yeah, and again, I think this is -- this was just -- for

22   whatever reason this was their short shorthand way of

23   referring to FMG's profitability.  Because there is no EQAT

24   profitability.

03:37   25   Q.   And that's repeated on 799, and 801, et cetera; correct?

*United States District Court*
*Trenton, New Jersey*

3812

Schpero - Cross - A. Lakind

1   A.   You want me to look at each of those pages?

2   Q.   Please.

3   A.   So, what was the next one?

4   Q.   801.

03:37   5   A.   801, I see EQAT's referenced.  And what's the next one?

6   Q.   That was the last one.

7   A.   Okay.

8   Q.   So it's your testimony that you believe the reference to

9   EQAT refers to FMG the investment manager; is that correct?

03:37   10   A.   Yeah, I mean this is profitability numbers, when we look

11   at profitability it's FMG; again, there's no concept of

12   profitability of a mutual fund.  So -- you know, the fund

13   itself.  So I think that was just a shorthand reference to

14   FMG.

03:38   15   Q.   Mr. Schpero, we've introduced into evidence, and I'd like

16   to go quickly through this, audited financial statements for

17   FMG which show their pre-market profitability of being 75

18   percent.  On any of the exhibits you just looked at, is that

19   disclosed?

03:38   20   THE COURT:  Well, when did he look at these, just --

21   MR. A. LAKIND:  Just right now; I'm sorry.

22   THE COURT:  Okay.  So the last three pages?

23   MR. A. LAKIND:  Yes, your Honor, sorry.

24   THE WITNESS:  So, again, I guess -- I think the

03:38   25   first page you had me look at was 794?

*United States District Court*
*Trenton, New Jersey*

3813

Schpero - Cross - A. Lakind

1    BY MR. A. LAKIND:

2    Q.   Right.  And the audited financials, which are in

3    evidence, show FMG's profit at 75 percent.

4    A.   Well -- so you're comparing the audited financial

03:39    5    statement of FMG, to what I believe is intended to show the

6    profitability of FMG, including any appropriate allocations,

7    with respect to the funds.  I think we're talking apples and

8    oranges.

9    Q.   So you don't think the profitability shown in the audited

03:39    10    financials of FMG is germane to your assessment of the

11    reasonableness of its fee?

12    A.   I wouldn't say that, I did not say that, I don't think I

13    said anything like that.  The audited financials, as I've

14    testified before, we certainly look at very closely, but we

03:39    15    also look at a profitability study pursuant to a methodology

16    that's been allowed.  And that profitability study is I

17    believe reflects an analysis that is different than an audited

18    income statement of the investment manager.

19    Q.   Turn over if you would to Bates 827.

03:40    20         MR. BENEDICT:  This is at tab 47?

21         MR. A. LAKIND:  Yes, sir.

22         MR. BENEDICT:  827?

23         MR. A. LAKIND:  Yeah.

24    BY MR. A. LAKIND:

03:41    25    Q.   Have you found that document?

*United States District Court*
*Trenton, New Jersey*

3814

Schpero - Cross - A. Lakind

1    A.   Yeah.

2    Q.   And it's entitled Average -- excuse me; Arithmetic

3    Average of All Firms at 250 million; correct?

4    A.   Right.

03:41    5    Q.   Does the EQAT have $200 million in it?

6         MR. BENEDICT:  I'm sorry; could you repeat the

7    question?

8    Q.   Does the EQAT have $200 million in it?

9    A.   So you're saying separate from this chart does EQAT have

03:41    10   only 200 million in it?

11   Q.   Yes, sir.

12   A.   No.

13   Q.   I'd like to move on to nature of services.

14   A.   Okay.  Should I close this book up?

03:41    15   Q.   Yes, please.

16        MR. A. LAKIND:  And Chris, if you could provide his

17   Honor and the witness with Defendant's Exhibit 144.18 at tab

18   13 -- I'm sorry; it doesn't have a tab.  It's tab 18 -- tab 13

19   of the book that defendants were going to leave up there.

03:42    20   Q.   Mr. Schpero, do you recognize this document?  P-144.18?

21   A.   Yes, I do.

22   Q.   And can you tell us what it is?

23   A.   It would be one of the presentations that were done I

24   guess in July 2013; looks like it's specific -- it

03:43    25   specifically is looking at the spread and analyzing it in

Schpero - Cross - A. Lakind

1    different ways.

2    Q.   And Bates page ending 877, that's a document that's

3    called the Gary chart after you?

4    A.   Yeah, I think all of these unfortunately are called that.

03:43  5    Q.   And 877 is entitled Net Advisory Spread as a Percentage

6    of Gross Advisory Fee?

7    A.   Right.

8    Q.   And that's the percentage of the gross fee represented by

9    the portion that's paid to FMG; correct?

03:43  10   A.   Yeah, I'm sorry, I'm just looking at it compared to the

11   prior page to make sure I know what I'm looking at.  So I

12   guess some of them give basis points, I guess this one gives

13   it in percentage.  Yeah.

14   Q.   And that indicates that the Intermediate Government Bond

03:44  15   Fund, the EQ/Core Bond, the Global Bond PLUS and the PIMCO

16   Ultra Short are between 80 and some of them as high as 95

17   percent; correct?

18   A.   Do you want to identify specific funds?  Because you just

19   went very quickly.

03:44  20   Q.   Yes, sir.  The Intermediate Government Bond Index, that's

21   slightly over 95 percent as to its net advisory spread;

22   correct?

23   A.   Intermediate Government -- yes.

24   Q.   Core Bond Index is about the same?

03:44  25   A.   Yes.

Schpero - Cross - A. Lakind

1    Q.   And the Global Bond is probably around 80 something

2    percent?

3    A.   Right.

4    Q.   And the PIMCO Ultra Short is slightly under 68 percent;

03:45    5    correct?

6    A.   Correct.

7    Q.   And if you go to the next page, it has the Lipper median

8    retention; do you see that where that is at Bates 878?

9    A.   Yes, I do.

03:45    10   Q.   And for fixed income funds it's about 66 percent at $1

11   billion; correct?

12   A.   That's what it says, yes.

13   Q.   And the EQAT weighted average is 68.4 percent; correct?

14   A.   Correct.

03:45    15   Q.   Have you ever computed the spread in dollar terms in

16   connection with your review of the advisory fee?

17   A.   Well, I guess I would make two points in response to

18   that.  First is I think importantly, which is why I asked to

19   make sure this is the document I thought it was, I actually

03:45    20   don't look at -- I shouldn't say I don't look; I give very

21   little weight to the percentage, I think much more importantly

22   is the basis points which shows up earlier in the document; I

23   think the percentage is just an arithmetic result as opposed

24   to the basis points, which I think are more realistic in

03:46    25   understanding the actual spread.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1        And in terms of what the actual spread is in dollars, I

2    believe we see that as part of the process that the Board

3    works through.  I don't calculate it, but I believe we have

4    seen those numbers.

03:46    5    Q.  And it's your testimony that the dollar spread is in the

6    15(c) material; is that correct?

7    A.  You know, I'm just trying -- we see a lot of material, we

8    certainly see the total -- let me just think about it.  We

9    see -- yeah, I mean the profitability -- sorry; I'm thinking

03:46    10   out loud.  The profitability presentation we see for each fund

11   shows the revenues that are received by FMG, and it shows as

12   separate line items the deductions for the sub-advisory fees.

13   And we see that -- those numbers I believe in actual dollars,

14   and then we see the percentages, so I think that is -- I

03:47    15   believe that's all there.

16   Q.  Now, I don't want to take the time to go over an exhibit

17   with you, but from my review of P-52, which is the spreadsheet

18   I think you referred to, it appeared the Core Bond Index had a

19   management fee of about 22.17 million and sub-advisory fee of

03:47    20   1.06 million; does that seem right, or do you want me to show

21   you to document?

22   A.  I think you better show me.

23        MR. A. LAKIND:  P-52, Chris?

24   A.  So, which fund you want me to look at?

03:48    25   Q.  Core Bond Index.  And towards the end of that document

3818

Schpero - Cross - A. Lakind

1    there's a spreadsheet.

2    A.   I'm sorry; there's two exhibits that were attached

3    together; do you want me to look at the second exhibit?

4    Q.   Yeah, Bates 4211.

03:48    5    A.   4211, yeah.

6    Q.   Do you see about six columns over there's a reference to

7    the Core Bond Index?

8    A.   Yes.

9    Q.   And it shows a management fee of $22.174 million;

03:48    10   correct?

11   A.   Yes I see that.

12   Q.   And a sub-advisory fee of about 1.066 or 60 dollars?

13   A.   Yes, I see that.

14   Q.   So the difference between those two numbers is about $21

03:49    15   million; correct?

16   A.   You know, I apologize; so you see -- you point out the

17   management fee of 22 million, and then you're identifying

18   specifically the sub-advisory fee of one million; is that

19   correct?

03:49    20   Q.   No, I think it's 1.060.

21   A.   Yeah, I see, it yes.

22   Q.   So the difference in dollar terms is about $21 million;

23   correct?

24   A.   Approximately, yeah.

03:49    25   Q.   You can lay that aside for the moment.

3819

Schpero - Cross - A. Lakind

1          Now, in D-1811 --

2   A.   I'm sorry; different document?

3   Q.   Yes, sir.  In 1811 there are a bunch of what we call long

4   sheets, or what you have referred to as long sheets.  You

03:50   5   should have a Bates number to bottom 2111.

6   A.   Right.  First page?

7   Q.   Yes, sir.  And if you go to the right-hand side, there's

8   something where it says EQ/Equity 500 Index, and there's some

9   purple bars and some blue bars; do you see where that is?

03:50   10  A.   Yes.

11  Q.   Turn over, if you would, to the EQ/Common Stock Index.

12  That's Bates number 113.

13  A.   Yeah, I'm there.

14  Q.   Okay.  There's a chart on the right that I believe that

03:51   15  color is brown and purple is also there; do you see where that

16  is?  I'm color blind so --

17  A.   I was going to say, I see a chart middle right, I think

18  it's purple and yellow --

19  Q.   Okay.  I'm sure you're right, I'm wrong.  Do you know

03:51   20  what the purple represents?

21  A.   Let me look at it one moment if that's all right.

22          MR. A. LAKIND:  Your Honor, should I hand up my

23  magnifying glass to somebody?

24          THE COURT:  Maybe Mr. Schpero needs it.

03:51   25          THE WITNESS:  No, I'm okay.  I just want to make

3820

Schpero - Cross - A. Lakind

1   sure I know what I'm looking at before I respond, but I can

2   see it.

3          Yeah, so the -- so the purple -- I think that was

4   your question.

03:51   5   BY MR. A. LAKIND:

6   Q.   Yes, sir.

7   A.   Shows the total management and -- and administrative fee.

8   I'm just double checking I believe -- bear with me.  I believe

9   that's the total management, effective management and

03:52   10   administrative fee.

11   Q.   And what is the yellow?

12   A.   The yellow would be the variable expenses, which would

13   consist of the sub-advisory fee -- I'm sorry; I'm just having

14   trouble -- I'm pretty sure -- I'm trying to tie this so I can

03:52   15   accurately represent to you.  I'm just struggling with whether

16   that is --

17          THE COURT:  The problem he's having, Mr. Lakind, is

18   you can't read the chart when it refers to what the purple is

19   and what the yellow is.

03:53   20          THE WITNESS:  Yeah, I'm pretty --

21          THE COURT:  So why don't you tell him what it says.

22          MR. A. LAKIND:  Your Honor, this is -- remember when

23   I complained about a chart I couldn't read and defendants were

24   going to give me a better chart?  This is the best they could

03:53   25   give me.

United States District Court
Trenton, New Jersey

3821

Schpero - Cross - A. Lakind

1          THE COURT:  Well, you can tell him what it says.

2          THE WITNESS:  I think I'm okay.  So I think -- I

3   believe it says management advisory fee, so that's what I

4   wanted to clarify.

03:53   5   BY MR. A. LAKIND:

6   Q.   Okay.

7   A.   I believe that's just showing the management and advisory

8   fee, I don't think it includes administrative from looking at

9   the top; and that was the point I was trying to clarify.  And

03:53  10   then below that is the variable expenses for that fee, and

11   again, I'm just trying to confirm it so I can accurately

12   represent to you -- the sub-advisory, if I'm correct it's

13   without administrative fee, then the yellow would be the --

14   would be the sub-advisory fee as well as any expense caps or

03:54  15   waivers.

16   Q.   Okay, and the blue below that represents the spread in

17   basis points; correct?

18   A.   Correct.

19   Q.   And for the Common Stock Index the spread seems to have

03:54  20   gone up quite a bit between 2008 and 2009; correct, more than

21   doubled?

22   A.   Just bear with me one minute; I'm just, again, trying to

23   take a closer look at this.  (Witness reviewing.)

24          So, I apologize, it's just difficult to see this.  And

03:55  25   I'm trying to track it up to the information that's very clear

Schpero - Cross - A. Lakind

1    up top, and I see that the net management fee is 35 basis

2    points, the net spread after a waiver is 30, and then the

3    administrative spread is about 9.  So it would look to me like

4    the total spread is about -- would be a little under 39 basis

03:56    5    points probably.

6    Q.   Okay.  You see this document every year at every 15(c)

7    meeting, don't you?

8    A.   Yes, I do.

9    Q.   Okay.  Turn over to page 120, which is the Core Bond

03:56    10    Index.

11    A.   I'm sorry to take your time, I'm just trying -- I'm just

12    trying to see these numbers again.

13    Q.   Are you ready for me, Mr. Schpero?

14    A.   No, I'm not just yet.

03:56    15         MR. BENEDICT:  Your Honor, we may have a clearer

16    version here for the witness.

17         THE COURT:  Oh, if you do why don't we just --

18         THE WITNESS:  That would be helpful.

19         THE COURT:  Show it to Mr. Lakind so he knows it's

03:57    20    the same.

21         MR. BENEDICT:  I think we gave one to Mr. Lakind.

22         MR. MURPHY:  That's the one I gave you this morning.

23         MR. BENEDICT:  If I may approach, your Honor?

24         MR. A. LAKIND:  Your Honor, I would be more helpful

03:57    25    if I could, but --

*United States District Court*
*Trenton, New Jersey*

3823

Schpero - Cross - A. Lakind

1          THE COURT:  Can't what?

2          MR. A. LAKIND:  I can't read it.

3          (Handing to witness.)

4          MR. BENEDICT:  Is this more helpful?

03:57     5          THE WITNESS:  Yes, it is.

6          THE COURT:  That should help us along.

7          THE WITNESS:  So I'm looking at -- let's just start

8   with the one I was trying to read, which is the Common

9   Stock --

03:57     10          THE COURT:  Core Bond Index.

11          MR. BENEDICT:  Your Honor, would you like a cleaner

12   version as well?

13          THE COURT:  No, I'm good, I can read it.

14          THE WITNESS:  So I can now see the numbers which

03:57     15   allows me to be able to better answer your question.  If you

16   don't mind I just want to clarify on Common Stock Index.  As

17   you would expect these charts are summaries of other

18   information, and so it's important to be able to make sure I

19   know what the summary is showing, that's why I couldn't -- I

03:58     20   couldn't do it without the numbers.

21          So it's clear to me that the actual net management

22   fee is 35 basis points, so that is what the purple is, it's

23   just the management fee alone.  And then the spread would be

24   -- sorry; the yellow under that, which actually now looks

03:58     25   brown or green, I can't see that number, but that would be the

Schpero - Cross - A. Lakind

1  variable expenses, which is the sub-advisory fees and the

2  product -- any product waivers.  And so that difference would

3  be the turquoise below that would be the spread under the

4  management contract, I think it's very clear now.

03:58   5  BY MR. A. LAKIND:

6  Q.   Okay.  Now, turn over to the Core Bond Index, if you

7  would, which is Bates 2120.

8  A.   Got it.

9  Q.   Turquoise -- on the right-hand side there's the graph

03:58   10  with the turquoise line; do you see where that is?

11  A.   Yes.

12  Q.   And looks like the spread has remained a constant at .230

13  percent; correct?

14  A.   That's correct -- well, it's remained constant, yeah,

03:58   15  since 2008.

16  Q.   Yes.  Now, if -- there's a chart called average assets in

17  millions, just about an inch above the turquoise; correct?

18  A.   Correct.

19  Q.   And in 2009 the average assets were about 3 million --

03:59   20  $3,136,000,000; correct?

21  A.   Right.

22  Q.   And in 2012 it grew to $6,404,000,000; correct?

23  A.   Yes, I see that.

24  Q.   So, the spread in dollar terms in 2009 was probably about

03:59   25  half of the spread in dollar terms in 2012; correct?

3825

Schpero - Cross - A. Lakind

1  A.   The percentage -- if you apply the percentage it would

2  have increased over that period.

3  Q.   Yes, sir.  So the spread in 2009 would have been roughly

4  10 million and the spread in 2012 roughly 21 million?

03:59       5  A.   That's probably right.

6  Q.   Now, earlier we look at the Gary chart which said that

7  the sub-advisory fees were about -- I'm sorry; strike that.

8       That the percentage spread was about 68 percent; do you

9  recall that?

04:00      10  A.   Percentage spread of what?

11  Q.   I'm sorry; I apologize.  The EQAT, overall weighted

12  average EQAT spread was about 68 percent?

13       MR. BENEDICT:  Could you put a document in front of

14  the witness --

04:00      15  Q.   Yeah.  Pick up, if you would, again 144.18, please?  It's

16  an exhibit you looked at a few minutes ago, it's called the

17  Gary chart.

18  A.   Is that in the book?

19  Q.   It's in front of you I believe.

04:00      20  A.   And you're pointing me to which page?

21  Q.   Page 878.

22  A.   Right.

23  Q.   And it shows the EQAT weighted average spread about 68.4

24  percent; right?

04:01      25  A.   Yes, this is where I told you the percentages to me are

United States District Court
Trenton, New Jersey

Schpero - Cross - A. Lakind

1    not very helpful.

2  Q.   Okay.  And the management fee -- excuse me; strike that.

3       The sub-advisory fee was about a million dollars for the

4    EQ/Core Bond Index; correct?

04:01    5  A.   The one we just looked at -- which was a million dollars,

6    the sub fee is that what you're saying?

7  Q.   Yeah, sub-advisory fee for EQ/Core Bond Index, P-52, you

8    looked at it a minute ago.

9  A.   Okay.

04:01   10  Q.   About a million dollars; correct?

11  A.   Yeah, I think that was the number you showed me.

12  Q.   Now, if the spread for the EQ/Core Bond Index were on a

13   percentage basis the same as the spread for the EQAT as a

14   whole, the management fee to the EQ/Core Bond Index would be

04:01   15   roughly $3 million right because 68 percent -- because if you

16   multiply 68 percent by 3 million, you're left with a million

17   as a sub-advisory fee; does that make sense to you?

18          MR. BENEDICT:  Objection; vague and ambiguous.

19          THE COURT:  Rephrase.

04:02   20  BY MR. A. LAKIND:

21  Q.   Knowing the sub-advisory fee of one million, and the EQAT

22   weighted average spread of 68 percent, are you able to

23   calculate what management fee would translate to a 68

24   percent -- percent margin?

04:02   25  A.   Well, as I --

Schpero - Cross - A. Lakind

1          MR. BENEDICT:  Totally hypothetical.

2          THE COURT:  I'll allow it.  It's cross-examination.

3          If you understand the question.  And if you can do

4    the math.

04:02    5          THE WITNESS:  I'm certain I can't do the math, and I

6    think the point I would want to -- I would want to stress is

7    that I think trying to do the math off of percentages is

8    actually just an incorrect way to approach this.  What the

9    reality is, is the manager's getting paid a certain amount of

04:03    10   basis points and we examine those carefully for the services.

11         But the fee itself is purely an arithmetic play

12   based on a differential between whether it's -- whether the

13   index -- whether it's an index fund versus -- whether it's a

14   sub-advisor running an index fund versus a sub-advisor running

04:03    15   an active fund, you can get a vastly different percentage,

16   even though in both cases FMG is receiving effectively a

17   similar fee.  So the percentage can throw you wildly off in

18   examining this.

19         THE COURT:  So the answer to his question is you

04:03    20   couldn't figure it out?

21         THE WITNESS:  Yeah.

22   BY MR. A. LAKIND:

23   Q.   Mr. Schpero, is it the sub-advisor's responsibility to

24   formulate the investment program?

04:03    25   A.   I don't think I would put it that way.

*3828*

Schpero - Cross - A. Lakind

1    Q.   Okay.  Does the sub-advisor have the obligation to obtain

2    and evaluate economics statistical and financial information

3    affecting the economy generally?

4    A.   I'm sorry, sir?

04:04    5    Q.   Does the sub-advisor have -- undertake to obtain and

6    evaluate economics, statistical and financial information

7    about the economy in connection with the services it renders?

8    A.   Well, I don't have the form of contract in front of me,

9    but given my understanding, which I think it's pretty clear

04:04    10   what the sub-advisor does, I would expect that that would be

11   part of trying to figure out the day-to-day actual investments

12   that they make.

13   Q.   And it's a sub-advisor that selects the brokers and

14   dealers?

04:04    15   A.   Does what?

16   Q.   The sub-advisor is the one that selects the brokers with

17   the stock purchases?

18   A.   Yes, it does.

19   Q.   And the sub-advisor negotiates brokerage commissions?

04:04    20   A.   Yes, it does.

21   Q.   And the sub-advisor maintains accounts and records with

22   respect to the funds that are required?

23   A.   I'm not sure that that would -- I don't know -- I don't

24   think that's accurate.

04:05    25   Q.   Okay.  And who votes proxies?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.    The proxies itself I believe is -- I believe it's voted

2    by the sub-advisor.

3    Q.    And the sub-advisors have the responsibility to calculate

4    the fund's performance?

04:05    5    A.    I don't know -- again, I'm not -- again, I don't have the

6    contract in front of me; I certainly haven't reviewed it

7    recently, but I don't know that's technically required.  I

8    mean you would expect the sub-advisor is going to provide that

9    information, and as I testified the manager I think quite

04:05    10    appropriately does, manager FMG, does its own calculation and

11    analysis of the performance.

12    Q.    Does the sub-advisor undertake and compare the fund's

13    performance against the benchmark in the Lipper peer group or

14    is that something the manager does?

04:06    15    A.    I think that, again, I would expect the sub-advisor in

16    seeking to defend its own performance is certainly going to go

17    through that analysis as well.

18    Q.    Sub-advisor perform an attribution analysis?

19    A.    I don't -- I don't believe there's any -- I don't think

04:06    20    that's -- we see attribution analyses at each Board meeting,

21    but they come from FMG, they are not prepared by the

22    sub-advisor.

23    Q.    Incidentally, insofar as the sub-advisors undertake to

24    compare funds performance to a benchmark or a Lipper peer

04:06    25    group, do you know if they make that information available to

3830

Schpero - Cross - A. Lakind

1    FMG?

2    A.   The only thing I can answer on this point, Mr. Lakind, is

3    that as I've testified periodically, the Board meets with the

4    sub-advisor, when the sub-advisor comes in, they prepare their

04:07    5    own booklet kind of making their case as to how they've done,

6    and they certainly show various comparisons and analysis

7    that's kind of part of their marketing material.

8        Separate from that we get separate analytics, not only

9    then, but at every Board meeting from FMG.  The only time we

04:07    10   get I believe direct information from the sub-advisor is that

11   once every 18 months or whenever it might be, where they come

12   in and they bring in what I call their marketing brochure and

13   make their own presentation.

14   Q.   Now, if the contracts were inconsistent with your

04:07    15   recollection with regard to the allocation of duties, you

16   would acknowledge -- you would defer to the contract; is that

17   correct?

18   A.   Yeah, the contract clearly is -- is a critical part of

19   this.  So what the contract says and how it's interpreted,

04:07    20   these contracts are -- you know, are somewhat vague.  But yes,

21   the contract is certainly what I would look at.

22        MR. A. LAKIND:  Chris, would you give the judge and

23   Mr. Schpero P-29, please?

24   Q.   Would you take a look at P-29, please?

04:08    25   A.   Sure.

3831

Schpero - Cross - A. Lakind

1          Okay.

2   Q.   P-29 appears to be something that was provided to the

3   Board in connection with the meeting July 2013; is that

4   correct?

04:09   5   A.   I'm just looking -- yes, July 2013.

6   Q.   And on page 998 it refers to something called terms of

7   endearment?

8   A.   Right.

9   Q.   And how did this terms of endearment document come to be

04:09   10   created?

11   A.   I'm really -- I have some recollection of seeing it; I

12   don't remember the origins of it.

13   Q.   Page 999 describes FMG's business structure; do you see

14   where that is?

04:10   15   A.   Yes, I do.

16   Q.   And then finally you get to the next page 1000, it's a

17   called FMG Business Structure Day-to-Day; do you see there?

18   A.   Yes.

19   Q.   And under the heading Investment Management it lists a

04:10   20   bunch of tasks; correct?

21   A.   Right.

22   Q.   It indicates that there's seven full-time employees at

23   the very bottom?

24   A.   I think it indicates that there are seven full-time

04:10   25   employees as I read this that report to Mr. Kozlowski.

*3832*

Schpero - Cross - A. Lakind

1   Q.   Okay.  And the employees that do investment management,

2   manage investments on behalf of the EQAT and the other funds

3   that FMG manage -- or excuse me, the other trusts that FMG

4   manages; correct?

04:10   5   A.   I'm sorry; again please?

6   Q.   Sure.  Those who perform investment management services

7   don't only manage the EQAT, they manage the offshore fund, the

8   VIP and other -- and several other non-EQAT Trusts; is that

9   correct?

04:11   10   A.   Yeah, FMG employees generally you're saying.

11   Q.   Yes.

12   A.   Yes, I'm aware there's the VIP funds, I don't know that

13   there's a lot more beyond that.

14   Q.   Now, the first heading under investment management reads

04:11   15   responsible for hiring, firing, monitoring and reporting on

16   sub-advisors; do you see where that is?

17   A.   Yes, I do.

18   Q.   And essentially that is something that FMG does; correct?

19   A.   They do that -- certainly play a lead role.  I'm

04:11   20   hesitating only because the independent trustees certainly

21   have the ultimate say on these matters, but recommendations

22   are made by FMG to the Board.

23   Q.   The second entry --

24   A.   At least with respect to hiring and firing.

04:11   25   Q.   Okay, I'm sorry.  The second entry is managing daily cash

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  flow at the fund and sleeve level; do you see where that is?

2  A.   Yes.

3  Q.   Now, the Core Bond Index has no sleeve; correct?

4  A.   Core Bond has no sleeve, that's correct.

04:11   5  Q.   And trading ETF baskets, Core Bond has no ETFs; correct?

6  A.   Correct.

7  Q.   All asset allocation activities, re-balancing analytics,

8  is that work done on behalf of the Core Bond?

9  A.   I don't believe -- I think that's referring again to

04:12   10  allocations among funds or sleeves, and as we've just said

11  there are none there.

12  Q.   ATM execution; what is the ATM?

13  A.   That's the volatility management structure; I don't have

14  -- which fund are you we talking about?

04:12   15  Q.   Core Bond.

16  A.   I don't have it in front of me.  It would identify

17  whether it has a volatility overlay or not, so I don't

18  remember.

19  Q.   I don't want to spend time pulling out document.

04:12   20  A.   I'm just answering your question.

21  Q.   But it does not.  And finally management, due diligence;

22  FMG does that, correct, for the Core Bond?

23  A.   Yes.

24  Q.   And Board reporting, FMG does that?

04:13   25  A.   Correct.

*United States District Court*
*Trenton, New Jersey*

3834

Schpero - Cross - A. Lakind

1   Q.   So essentially, and correct me if I'm wrong, we come down

2   to hiring, firing, monitoring and reporting on sub-advisors,

3   manager, due diligence, Board reporting; correct, that are

4   done for the Core Bond?

04:13   5   A.   Well, I think -- when you say correct, I think that is

6   correct in terms of the few items that are listed here, but I

7   certainly don't think this is at all a full list of the

8   investment management services that FMG provides.

9   Q.   It's a full list of the investment management services

04:13   10  set forth in the terms of endearment document; correct?

11  A.   I'm just looking to see how this is structured.  This is

12  in 2013, so whether you look at the FMG memorandum or the

13  charts that were done, I think you would see there are

14  certainly a -- much longer list than what you got me looking

04:14   15  at on this page.

16  Q.   Are you saying that page 1000 is inaccurate?

17  A.   I am saying that this appears to be -- since as I told

18  you I don't remember the origins of this chart or its purpose,

19  this -- these are slides that would have been done in

04:14   20  conjunction with very extensive presentations on all of the

21  services that FMG provides.  And what the goal was here I

22  don't know, but this in no way summarizes all of the services

23  that are provided by FMG under the investment management

24  contract.

04:14   25  Q.   You would agree, would you not, that the services

3835

Schpero - Cross - A. Lakind

1  described on Bates 1000, do not warrant a management fee to

2  FMG of roughly -- to FMG for the Core Bond Index of $20

3  million?

4  A.   Well, I'm not going to agree or disagree, because that's

04:14   5  not the analysis that I would ever do, since this is not all

6  of the services that are provided.

7  Q.   Now, between 2009 and 2012, we did some arithmetic and

8  found that the portion of the retained management fee by FMG

9  grew from 10 million to 21 million; do you recall that?

04:15   10  A.   Do I recall your analysis?

11  Q.   Yes, sir.  We did some --

12  A.   We meaning -- sorry; I thought your law firm did this, I

13  didn't know who the we is.

14  Q.   No.  I had asked you a question earlier referring to the

04:15   15  long sheets, and said isn't it apparent that the dollar

16  retention of FMG on the Core Bond Index rose from roughly 10

17  to 20 million, and you said that seems correct; do you recall

18  that testimony?

19  A.   Yes, on the -- I think you were suggesting that -- I'm

04:15   20  sorry; I'm not -- I don't remember the specifics of the

21  analysis now, we've gone through several charts.

22  Q.   Yes.  But we did earlier go through a calculation where I

23  thought you had agreed that in 2009 the dollar retention was

24  about 10 million, and it had grown to about 21 million in

04:16   25  2012.

Schpero - Cross - A. Lakind

1    A.   Because -- because the assets had doubled in size.

2    Q.   Yes, correct.

3    A.   I remember that now, yes.

4    Q.   Okay, thank you.

04:16    5    A.   I'm sorry; we're moving through a lot of material here,

6    so it is hard to keep track.

7    Q.   Yeah, and it's been long day for both of us.

8    A.   Right.

9    Q.   What changes in management services occurred between 2009

04:16    10   and 2012 to warrant a $10 million increase in the management

11   fee?

12   A.   Well, first of all, again, this is very difficult without

13   having all of the documentation for the fund in place.  So

14   when we look at the fund each year, as you know we look at a

04:16    15   lot of material, and you've got me looking at a couple of

16   isolated pieces of paper.  With respect to the index funds in

17   particular I know that over that period we've added -- we, the

18   Board, have added breakpoints, and I know that there have been

19   points where we reduced the management fee.  So I'm a little

04:17    20   bit uncertain as to the numbers that I was looking at in terms

21   of how they relate to what the facts were each year.

22        But I will also tell you that with respect to an

23   increase in assets, there are lots of services that increase,

24   and there are greater burdens that are often associated with

04:17    25   increase in assets.  The fund we're talking about is which

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  fund?

2  Q.   Core Bond Index.

3  A.   Core Bond?  I believe -- I believe has thousands of

4  stocks in it, and you would be talking about a significant

04:17   5  amount of asset flow going in, significant additional trading

6  and compliance issues; bonds have become a marketplace where

7  there are very significant liquidity issues.  So from an

8  valuation perspective, the role of the valuation committee in

9  trying to -- which is FMG's responsibility, in terms of trying

04:18   10  to do the daily analysis of pricing of these securities where

11  there are trade halts or where there are liquidity issues

12  arising, all of these are things that would increase in size

13  as the assets would increase.

14      But I also would tell you that trying to analyze that

04:18   15  in isolation looking at an over four year period as opposed to

16  doing what I think the Board does in the exercise of our

17  business judgment, which is to look each year at all of the

18  data, I think that's the way we do it.  I think trying to do

19  this big macro look at the information is not going to be a

04:18   20  very helpful endeavor.

21  Q.   Trading is something you referred to, that's done by the

22  sub-advisor; isn't that correct?

23  A.   The trading is done by the sub-advisors, but there are

24  very significant compliance issues that result from that, and

04:19   25  there's a complete -- a significant overview and role that FMG

Schpero - Cross - A. Lakind

1  plays both at the manager level and the administrative level

2  with respect to those kinds of activities.

3  Q.   And compliance activities are split between the

4  sub-advisor JP Morgan, and FMG; correct?

04:19   5  A.   Between the sub-advisor -- the sub-advisor you just said

6  JP Morgan --

7  Q.   JP Morgan, the sub-administrator.

8  A.   You said the sub-advisor, that's why I'm confused.

9       THE COURT:  Why don't you rephrase the question.

04:19   10      MR. A. LAKIND:  I will.

11  Q.   The sub-advisor has compliance responsibilities; correct?

12  A.   The sub-advisor -- so we're not talking about the

13  sub-administrator, you're asking me --

14  Q.   No, sub-advisor.

04:19   15  A.   The sub-advisor has compliance responsibilities, yes.

16  Q.   Does the sub-administrator have any compliance

17  responsibilities?

18  A.   My recollection is there are some -- I think it's fairly

19  limited, I think -- I think there's some computer systems;

04:19   20  we've had presentations, but I don't think it's terribly

21  extensive is my recollection.

22  Q.   Net asset valuation determinations, they are done by JP

23  Morgan, aren't they?

24  A.   That's correct.

04:20   25  Q.   The cost of hiring, firing and monitoring sub-advisors,

Schpero - Cross - A. Lakind

1    that didn't double from 2009 to 2012 in connection with the

2    Core Bond Index, did it?

3    A.   Cost of hiring and firing, no, I would not imagine it

4    did.

04:21    5        MR. A. LAKIND:  Chris, would you put up P-373,

6    please?

7    Q.   Mr. Schpero, would you please take a look at P-373?

8    A.   Okay.

9    Q.   Can you tell us what that document is please?

04:22    10       (Witness reviewing.)

11   A.   Yeah, this is -- this is a summary of -- as indicated, of

12   certain of the administrative management and administrative

13   services over this time period from 2010 to 2013.

14   Q.   And has a number of columns and rows; correct?

04:22    15   A.   Yeah, it appears to identify each of the at-issue funds.

16   Q.   And three columns from the right is the EQ/Core Bond

17   Index; do you see where that is?

18   A.   Yes, I do.

19   Q.   If you could turn over to Bates page ending in 152,

04:23    20   please.

21   A.   The last page?

22   Q.   Yes, sir.

23   A.   Yeah.

24   Q.   And the left-hand column there's something called

04:23    25   in-house meetings; do you see where that is?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1   A.   Yes, I do.

2   Q.   And how many in-house meetings occurred with -- involving

3   the EQ/Core Bond Index?

4   A.   It says N/A, which appears to be non-applicable or non --

04:23   5   I don't know what N/A means in this context.

6   Q.   Conference calls, you don't know what that means either;

7   correct?

8   A.   I know what conference calls mean, I don't know what the

9   N/A is supposed to identify.

04:23   10   Q.   Right.  I didn't mean to suggest that.  Compliance

11   issues, there was one compliance issue in February 2011?

12   A.   Right.

13   Q.   And over the period of time there are essentially five

14   valuation meetings involving the Core Bond Index; correct?

04:24   15   A.   Yeah.

16   Q.   Core Bond Index's got no savings on the directed

17   brokerage program?

18   A.   No.

19   Q.   That was a double negative.  Did the Core Bond Index

04:24   20   achieve any savings --

21   A.   This shows none.

22   Q.   And on the preceding page ending in 151?

23   A.   Yeah, I'm there.

24   Q.   In the three-year period there were three on-site due

04:24   25   diligence visits; correct?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.   Core Bond?

2    Q.   Yes, sir.

3    A.   There are three, yes.

4    Q.   And there were four under the next row, annual compliance

04:25    5    questionnaires completed?

6    A.   Right.

7    Q.   And there were four Board presentations; correct?

8    A.   Correct.

9    Q.   Mr. Schpero, do you agree -- strike that.

04:26    10         Essentially it's your -- it is your understanding, is

11    it not, that JP Morgan essentially provides three functions,

12    for FMG:  The first is to do net asset value calculations for

13    the portfolios; the second is to keep the books and records;

14    and the third is to provide assistance -- some assistance in

04:26    15    filings such as shareholder reports.  Is that correct?

16    A.   Yeah, I think I've -- I think I testified and I said so a

17    few minutes ago.  Again, I believe there's some limited

18    compliance systems that are available as well.

19    Q.   At your deposition do you recall if you mentioned

04:26    20    compliance work on behalf of JP Morgan -- done by JP Morgan?

21    A.   I do not recall at this point.

22    Q.   With regard to that compliance work, would you

23    acknowledge that JP Morgan on a daily basis monitors the

24    portfolios for investment restrictions and regulatory

04:27    25    requirement?

3842

Schpero - Cross - A. Lakind

1  A.   You're going to have to say that again; I'm sorry.

2  Q.   Would you acknowledge that JP Morgan on a daily basis

3  monitors the portfolios for investment restrictions and

4  regulatory requirements?

04:27  5  A.   You know, that's -- I think I can only stick by what I

6  remember, which is that I do remember that they provide some

7  limited compliance work; I don't know that that's inconsistent

8  with what you just read.

9  Q.   Does JP Morgan essentially do the compliance work in

04:27  10  connection with Section 17-H of the Internal Revenue Code?

11  A.   I just don't remember.

12  Q.   Does JP Morgan maintain journals of the daily records of

13  all purchases and sales of securities?

14  A.   Well, they keep -- they do -- they do maintain -- I think

04:28  15  have a definite service of maintaining the books and records,

16  and that may well be part of the book and records of the fund.

17  Q.   Well, do you know for a fact if they maintain daily

18  records and purchase of sales and securities for the funds?

19  A.   I just don't remember.

04:28  20  Q.   You've been on the Board for how long, sir?

21  A.   Almost 15 years.  And I've sat through many presentations

22  by JP Morgan.

23  Q.   You believe JP Morgan has the obligation to update

24  accounting records to reflect completed share transactions?

04:28  25  A.   Give it to me again please?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  Q.   Yes, sir.  Do you believe that JP Morgan has the

2  obligation to update accounting records to reflect completed

3  share transactions?

4  A.   I'm -- again, the specifics are very hard for me to

5  remember, it would seem again to be consistent with either

6  their net asset value calculations or books and records

7  maintenance, but I don't remember the specifics.

8  Q.   Is it JP Morgan's responsibility to compute each fund's

9  net income and capital gains dividend payables, dividend

10  factors, and agreed upon rates and yields?

11  A.   Give me the list again please?

12  Q.   Yes, sir.  To compute each fund's net income and capital

13  gains, dividend payables, dividend factors and agreed upon

14  rates and yield, is that a responsibility of JP Morgan?

15        MR. BENEDICT:  Objection to form, your Honor.

16  There's about 16 questions put into that.

17        THE COURT:  It's one list.  If you understood the

18  question you may answer it, Mr. Schpero.

19        THE WITNESS:  What I can't remember is to what

20  extent these are subsets of what needs to be done to calculate

21  an asset value, so I don't -- I don't remember that -- that

22  specifically.

23  BY MR. A. LAKIND:

24  Q.   Does JP Morgan record fund distributions?

25  A.   I would think that would be part of the books and

Schpero - Cross - A. Lakind

1    records.

2    Q.   Does JP Morgan provide assistance to the EQAT's auditors?

3    A.   I think by definition they would have to do that since

4    they do the calculations I've described.

04:30    5    Q.   Does JP Morgan file annual and semi-annual reports with

6    the SEC?

7    A.   I think they -- I know they do that very much in

8    conjunction with FMG; I believe FMG has the primary

9    responsibility there, although I think they do certainly

04:30    10   receive as I said earlier some portions of the financial

11   information from JP Morgan.

12   Q.   Are you familiar with a document called a 24f-2 notice?

13   A.   I'm trying to remember what that specifically references;

14   it might have to do with the purchase and sale of securities,

04:31    15   but I don't remember that clearly now.

16   Q.   Do you remember whether it's JP Morgan's responsibility

17   to prepare that notice?

18   A.   Since I can't specifically remember that actual document,

19   then I'm certainly not going to guess as to that.

04:31    20   Q.   Do you know what a form N-Q is?  N dash Q, do you know

21   what that form is?

22   A.   N dash 2?

23   Q.   N dash Q, quiet.

24   A.   I don't remember that.

04:31    25   Q.   You don't know if JP Morgan completes that document?

3845

Schpero - Cross - A. Lakind

1  A.   I don't remember the document, so I don't recall whose

2  responsibility that is.

3  Q.   Do you know what an N-SAR is?

4  A.   Yes, I do.

04:31    5  Q.   And what is that?

6  A.   I thinks that's -- I think that's a semi-annual report; I

7  think it's different from the actual disclosure document, but

8  I think it's some kind of semi-annual filing by open-end

9  funds.

04:31    10  Q.   Does JP Morgan prepare that document?

11  A.   I'm sure they play a role, because again, I think it

12  would be dependent on some of the basic underlying NAV and

13  financial information.

14  Q.   But you don't think they have the responsibility to

04:32    15  entirely prepare that form; correct?

16  A.   I just -- I can tell you, I just don't remember at this

17  point.

18  Q.   Who is it that prepares and files tax returns, is that JP

19  Morgan or FMG?

04:32    20  A.   I think that's FMG that does the tax returns.  I mean I

21  will tell you that certainly the tax and budgeting and other

22  accounting information, I think the primary responsibility

23  there is in Mr. Walsh's group at FMG.

24  Q.   Now, Mr. Walsh testified in depositions that JP Morgan

04:32    25  prepares the tax returns?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  A.   Then I'm wrong.

2  Q.   Okay.  And JP Morgan calculates dividend distributions;

3  is that correct?

4  A.   Again, JP Morgan --

04:33  5  Q.   Does JP Morgan undertake the task to calculate dividend

6  distributions?

7  A.   I think, again, that would be -- that would be connected

8  with the NAV information, so I think they probably do.

9  Q.   And does JP Morgan record fund or class expense accruals?

04:33  10  A.   Again, I think that's connected with NAV, so I would

11  think they do.

12  Q.   Now, FMG entered into a new fund services agreement with

13  JP Morgan in 2015; is that correct?

14  A.   Right.

04:33  15  Q.   And have you ever seen that agreement?

16  A.   Yes, we reviewed it at the time.

17  Q.   Did you have any reason to believe that agreement was

18  inaccurate?

19  A.   The new agreement that was entered into in -- by the

04:34  20  funds in the spring of 2015.

21  Q.   Yes, sir.

22  A.   It was amending the agreement that had been in place

23  since 2000?

24  Q.   Yes, sir.

04:34  25  A.   No, I don't have any reason to believe it's inaccurate.

*United States District Court*
*Trenton, New Jersey*

3847

Schpero - Cross - A. Lakind

1  Q.   Mr. Schpero, you acknowledge, do you not, that one of

2  your tasks in approving contracts is to assess the services

3  performed by FMG in the management area, in comparison to the

4  fee FMG earns and the services performed by the sub-advisor in

04:34  5  the management area in comparison to the fees the sub-advisor

6  earns; do you agree with that?

7  A.   You have to ask me that again please.

8  Q.   Sure.  Is one of your tasks as the EQAT Board, to assess

9  the services performed by FMG, under the Management Agreement,

04:35  10  in comparison to the fees received by FMG?

11  A.   Yes.

12  Q.   And in that undertaking, do you also attempt to assess

13  the fees paid to the sub-advisors in comparison to the

14  services performed by the sub-advisors?

04:35  15  A.   That's correct.

16  Q.   You do that.

17  A.   Yes.

18  Q.   In connection with the Administration Agreement, is it

19  one of the Board's tasks to ascertain the services performed

04:35  20  by FMG in -- in comparison to the fees earned by FMG?

21  A.   Yes, it is.

22  Q.   And in connection with your approval -- strike that.

23      And in that endeavor, do you seek to ascertain what

24  services the sub-administrator performs in relationship to the

04:36  25  fees paid to the sub-administrator?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.   Yes, and -- and we receive extensive information over the

2    years as to what the parties do, as well as having an

3    opportunity to meet with each of them.

4    Q.   And if your assessment of the services of any of those

04:36    5    parties was inaccurate, that could jeopardize your assessment

6    of what the fees should be; is that correct?

7    A.   Well, I certainly agree that it's important to understand

8    the key services that each -- each provider provides.

9         MR. A. LAKIND:  Your Honor, can I just have a minute

04:36    10   without leaving just to go through my notes?

11        THE COURT:  Can we take a 10 minute break and we'll

12   can back out?

13        MR. A. LAKIND:  Yes, sir.

14        THE COURT:  So we'll take a 10 minute break and be

04:36    15   back out around 3:30.

16        MR. A. LAKIND:  Thank you, your Honor.

17        (Recess.)

18        THE COURT:  Ready to go, Mr. Lakind?

19        MR. A. LAKIND:  I am, your Honor.  Thank you.

04:48    20        Chris, will you please hand up J-4 to the witness

21   and to his Honor?

22   BY MR. A. LAKIND:

23   Q.   Mr. Schpero, when this deposition began -- excuse me.

24   Your testimony began we talked about a duty of loyalty that

04:48    25   the Board trustees owed to the fund; is that correct?  Do you

*United States District Court*
*Trenton, New Jersey*

3849

Schpero - Cross - A. Lakind

1    recall --

2    A.   Yes we did.

3    Q.   And in pursuant to that duty of loyalty, do you agree it

4    would be imprudent for the -- for the EQAT Board to agree to

04:48    5    indemnify FMG as fund manager?

6    A.   It's a very general question; I'm trying to remember in

7    response from my own experience the way that management

8    contracts are structured.  I think there probably is some

9    cross-indemnity that's usually in there, but I don't remember

04:49    10    the specifics.

11    Q.   If you would, take a look at J-4 please and tell us what

12    that is?

13    A.   I'm sorry; look at the document itself?

14    Q.   Yeah.

04:49    15    A.   This at this Investment Management Agreement.

16    Q.   And turn over to page 4030.

17    A.   Yes.

18    Q.   There's a paragraph entitled Limitations on Liability; do

19    you see where that is?

04:49    20    A.   Yes, I do.

21    Q.   And I'm going to read that paragraph if I might:  Manager

22    will exercise its best judgment in rendering its services to

23    the Trust, and the Trust agrees as an inducement to manager's

24    undertaking to do so that the manager will not be liable for

04:49    25    any error of judgment or mistake of law or for any loss

*United States District Court*
*Trenton, New Jersey*

3850

Schpero - Cross - A. Lakind

1    suffered by the Trust in connection with the matters to which

2    this agreement relates, but will be liable only for willful

3    misconduct, bad faith, gross negligence, reckless disregard of

4    its duties, or the failure to exercise due care in rendering

04:50    5    its services to the Trust as specified in this agreement.

6         Did I read that accurately?

7    A.   Yes, you did.

8    Q.   And do you think that provision is in the best interest

9    of the Trust?

04:50    10    A.   I think that that is -- I think that is part and parcel,

11    now that you've shown it to me, of what I think is industry

12    practice and is a standard that's generally out there.

13    Q.   Do you think that provision is in the best interest of

14    the Trust?

04:50    15    A.   I don't think the Trust is in any way disadvantaged for

16    reasons I've testified about previously, which is that the

17    independent trustees I think have the leverage to make sure

18    that the investors are never harmed.

19    Q.   Don't they have to same leverage to encourage reductions

04:50    20    in fees?

21    A.   I'm sorry?

22    Q.   Don't they have the same leverage to bring about

23    reductions in fees?

24    A.   Which the independent trustees have done.

04:50    25    Q.   The next sentence reads:  Any person, even though an

*United States District Court*
*Trenton, New Jersey*

3851

Schpero - Cross - A. Lakind

1   officer, director or employee or agent of manager, who may be

2   or become an officer, trustee, employee or agent of the

3   Trust -- now that would include various employees such as Ms.

4   Louie, Mr. Joenk, sub-advisors, sub-administrator; is that

5   correct?

6   A.   Yes, anybody that FMG -- looks like anybody that FMG

7   provides who may become an officer, employee or agent of the

8   Trust, yeah.

9   Q.   And that would include the sub-advisors and

10   sub-administrators because they're agents as well; correct?

11   A.   May become an officer, trustee or agent of the Trust; I'm

12   not sure what that language means.

13   Q.   Okay.  Goes on to -- you've been on this Board for 15

14   years and you don't have an understanding of a limitation of

15   liability provision in a management agreement between FMG and

16   EQAT, is that what you're saying?

17   A.   I don't believe that's what I just said.

18   Q.   I thought you said you don't know what it means.

19   A.   I'm looking at this on the spur at your request without a

20   chance to think about it; these contracts have been reviewed

21   many times with two counsels, and I believe this is very

22   standard language in the industry.  And for reasons I've

23   already testified I am very comfortable that if there was ever

24   a problem with these funds, whether covered by this limitation

25   or not, that the nature of the Board's leverage over the

Schpero - Cross - A. Lakind

1    manager is the investors will never be harmed.

2    Q.   Let me continue if I might after the word trustee,

3    employee or agent of the Trust:  Shall be deemed when

4    rendering services to the Trust or when acting on any business

04:52    5    of the Trust, to be rendering such services to or to be acting

6    solely for the Trust and not as an officer, director, employee

7    or agent, or one under the control or direction of manager

8    even though paid by it.

9         Did I read that accurately?

04:52    10    A.   Yes, you did.

11    Q.   And is that provision in the best interest of the Trust?

12    A.   I think it is standard investment management contract

13    language, and for the reasons I've indicated I don't think

14    that there's any disadvantage to the investor as a result.

04:53    15    Q.   Now, given the leverage --

16    A.   You understand we can terminate any of these contracts at

17    any time, so there's -- there's ultimate leverage there.

18    Q.   Given that leverage, would it not have been prudent to

19    negotiate a liability provision more in the interests of the

04:53    20    EQAT than the one I just read you?

21    A.   Again, I think there's a matter of practice in the

22    industry.  I think given the nature of the -- of the power

23    that the independent trustees have, I don't think there's any

24    disadvantage.

04:53    25         MR. A. LAKIND:  If you could, Chris, would you give

*United States District Court*
*Trenton, New Jersey*

3853

Schpero - Cross - A. Lakind

1   his Honor J-5 and Mr. Schpero J-5 as well?

2            THE WITNESS:  Thank you.

3            THE COURT:  Thank you.

4   BY MR. A. LAKIND:

04:54   5   Q.  Can you tell us -- take a look at this agreement, please.

6   A.  Sure.  Okay.

7   Q.  Can you tell me what that agreement says -- what it is?

8   I'm sorry.

9   A.   So this is the mutual funds service agreement, so this is

04:54   10   the agreement covering the administrative arrangements.  And

11   it looks like it starts with an amendment.

12   Q.  And it's between the EQAT and FMG; is that correct?

13   A.   Correct.

14   Q.  And if you would turn over to page Bates number 821.

04:54   15   A.   Page?  I'm sorry.

16   Q.  821, Bates 821.  Do you see paragraph 6 there?

17   A.   Yes, I do.

18   Q.  And I'll read a portion of that to you:  Equitable shall

19   not be liable for any error of judgment or mistake of law or

04:55   20   for any loss or expense suffered by the Trust in connection

21   with the matters to which this agreement relates, except for a

22   loss or expense caused by or resulting from or attributable to

23   willful misfeasance, bad faith or negligence on equitable's

24   part (or on part of any third-party to whom equitable has

04:55   25   delegated any of its duties and obligations pursuant to

3854

Schpero - Cross - A. Lakind

1    Section 4C hereunder) in performance of it's (or such

2    third-party's duties) or for reckless disregard by equitable,

3    et cetera.

4         Read the rest of that paragraph to yourself if you

04:55    5    would.

6         (Witness reviewing.)

7    A.   Okay.

8    Q.   Is that provision a provision that you deem to be in the

9    best interest of the Trust?

04:56    10   A.   I'm going to make the same point, which is I think this

11   is standard industry contract language; and again, I think

12   that the Board has very significant leverage over making sure

13   that what has happened for the last 15 years is not going to

14   happen going forward, which is there has never been a loss

04:56    15   suffered by fund investors, from any compliance or issues of

16   that sort.

17   Q.   Once again given that leverage, would it not have been

18   prudent to negotiate an agreement more favorable to the EQAT?

19   A.   I think we -- I think an agreement was put in place that

04:57    20   our very experienced independent counsel thought was

21   appropriate and consistent with industry practice.

22   Q.   Given the fact that there has been no problems over the

23   last 15 years, is that a fact you considered when you were

24   testifying in court about the enterprise risk which FMG

04:57    25   sustains?

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.   I don't think I said that there weren't any problems, I

2    think that the investors would never suffer any loss and

3    haven't.  In fact, I can think of any number of compliance

4    issues that have -- that have come up over the years, I think

04:57    5    in every case so far that I can remember, although we're

6    talking 14, 15 years, in every case where there was an issue,

7    reimbursement to the fund was made.  I think that typically

8    that has been by sub-advisors, but there may well have been

9    times it was made by the manager, and nobody has spent a

04:58    10   single moment looking at this language, because the

11   understanding is the Board wouldn't stand for anything other

12   than that.

13         MR. A. LAKIND:  Chris, if you would give the

14   witness, please, J-26.

04:58    15   Q.   Can you tell us what that agreement is please?

16   A.   Yeah, this is the Sub-Administration Agreement entered

17   into -- it looks like in May of 2000, between Equitable and I

18   guess the predecessor to JP Morgan -- predecessor to FMG, and

19   JP Morgan.

04:58    20   Q.   Turn over to page 874, please?

21   A.   874?

22   Q.   Yes, sir, Bates 874.

23   A.   Yeah.

24   Q.   Are you there?  Do you see paragraph 6 entitled

04:59    25   Limitations on Liability and Indemnification?

*United States District Court*
*Trenton, New Jersey*

3856

Schpero - Cross - A. Lakind

1   A.   Yes, I do.

2   Q.   And this is an agreement between FMG and what's known now

3   as JP Morgan, but was then known as Chase; correct?

4   A.   Right.

04:59   5   Q.   And paragraph A reads:  Chase shall not be liable for any

6   error of judgment or mistake of law or for any loss or expense

7   suffered by equitable or the Trust in connection with the

8   matters to which this agreement relates -- and then goes on to

9   list four exceptions.  Except for:  (i) willful misfeasance,

04:59   10   bad faith or negligence on Chase's part in the performance of

11   its duties; (ii) from reckless disregard by Chase of its

12   obligations and duties under this agreement; from Chase's

13   refusal or failure to comply with the terms of this agreement;

14   or the breach of any representation or warranty of Chase.

04:59   15        Did I read that accurately?

16   A.   Yes, you did.

17   Q.   Is this an agreement that you viewed to be in the best

18   interest of FMG?

19   A.   Well, I'm puzzled by your question, because this is not

05:00   20   an agreement that the fund would have reviewed or approved.

21   There is no requirement for the Sub-Administration Agreement

22   to be approved by the independent trustees, and I believe this

23   was not presented to the Board.

24   Q.   The reason I asked that is there was testimony earlier in

05:00   25   this case that FMG was reluctant to amend the

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1   Sub-Administration Agreement because it viewed the indemnity

2   provisions as favorable, and I was just wondering if that

3   issue was ever presented to the Board.

4   A.   Which issue?

05:00   5   Q.   Whether or not the Sub-Administration Agreement should be

6   amended.

7   A.   I'm sorry, you're -- you have to restate the question.

8          Ml:  Your Honor, I have 10 minutes I guess; is that

9   right?

05:01   10          THE COURT:  No, I said you'd have two hours, and we

11   started late, so I think you can go to 10 after 4:00.

12          MR. A. LAKIND:  Okay, thank you.

13          THE COURT:  So you have 20 minutes.

14          MR. A. LAKIND:  Thank you.

05:01   15          THE COURT:  But we're counting.

16          THE WITNESS:  Me too.

17          MR. A. LAKIND:  Me too.

18   BY MR. A. LAKIND:

19   Q.   Mr. Schpero, I want to ask you some questions about the

05:01   20   Board process, and make sure I have an understanding.  You

21   would agree, would you not, that the Board over the years has

22   made no effort to verify the magnitude of direct and variable

23   expenses shown in the cost allocation methodology; is that

24   correct?

05:01   25   A.   So when you -- I just want to understand the question.

3858

Schpero - Cross - A. Lakind

1   So your question is whether the Board has sought some kind of

2   audit of those numbers; is that what you're asking?

3   Q.   Yes.

4   A.   I think -- yeah, the Board has not made that request.

05:02   5   Q.   Has the Board ever retained an accountant to assist it in

6   evaluating the cost allocation methodology in the last four or

7   five years, last five years?

8   A.   Retained an accountant to do that, no.

9   Q.   Has the Board ever verified the variable expenses

05:02   10   reported as part of the administrative profitability report of

11   FMG?

12          MR. BENEDICT:  Would you repeat the question,

13   please?

14          MR. A. LAKIND:  Could I ask Mr. Gable to read it

05:02   15   back?

16          (Question read back by the reporter.)

17          THE WITNESS:  We've not had an independent

18   evaluation.  Those numbers, you know, often tied pretty

19   obviously to the other information we receive, but there's not

05:02   20   been an outside entity that's come in and reviewed that.

21   BY MR. A. LAKIND:

22   Q.   Now, the cost allocation methodology is based on certain

23   baskets; is that correct?  The first step to allocate expenses

24   what they call baskets; do you understand that?

05:03   25   A.   Yes, I recall that.

*United States District Court*
*Trenton, New Jersey*

3859

Schpero - Cross - A. Lakind

1   Q.   And has the Board ever undertaken any review to determine

2   if the expenses are allocated to the appropriate basket?

3   A.   There's not been an independent review.

4   Q.   Has the Board undertaken any review to determine whether

05:03   5   or not the baskets are appropriately allocated between the

6   different lines of business, be it the variable annuity line,

7   the mutual fund line, et cetera?

8   A.   No, other than as I think there's been -- I think I

9   testified as to -- and others I suspect have, as to the role

05:03   10   of two independent accounting firms in reviewing all aspects

11   of the methodology.

12   Q.   And that review occurred in 2000; correct?

13   A.   Correct.

14   Q.   Now, do you know if depreciation is allocated pursuant to

05:03   15   the cost allocation methodology?

16   A.   I just -- I don't remember.  I mean I know the starting

17   place is -- is the expense -- the audited expenses of AXA;

18   there are certain things pursuant to the methodology that are

19   deducted from the start; I remember deferred acquisition costs

05:04   20   are deducted, and all the direct expenses are deducted, but

21   that's as much as I remember at this point.

22   Q.   Do you know if a depreciation expense is allocated?

23   A.   I just don't remember.

24   Q.   And you said the deferred acquisition cost is deducted;

05:04   25   correct?

3860

Schpero - Cross - A. Lakind

1  A.  Yes, I do recall that.

2  Q.  Does the Board make any effort to determine that

3  allocations of expenses are appropriately divided among the

4  Trust?

05:04  5  A.  Well, we certainly have discussions, as I'm sure you've

6  heard we have -- there is an extensive review in June and July

7  every year of the allocation methodology, and we certainly

8  have discussions and explore with FMG the way the allocations

9  are made and we've had that presentation.

05:05  10  Q.  Has the Board ever retained a consultant to see if other

11  cost allocation methodologies might be more favorable to the

12  Trust?

13  A.  Other than the process that the two independent

14  accounting firms went through, no.

05:05  15  Q.  Since 2000.

16  A.  Well, as I believe I testified the other day, I certainly

17  have asked Pricewaterhouse periodically about the methodology

18  and whether it continues to be consistent with industry

19  practice.

05:05  20  Q.  Are you aware of the fact there's testimony in this case

21  from Pricewaterhouse that an appropriate allocation would be

22  time based?  By way of deposition.

23        MR. BENEDICT:  Objection; no foundation for that.

24  Q.  By way of deposition.

05:06  25        THE COURT:  Wait; Mr. Benedict, do you wish to be

3861

Schpero - Cross - A. Lakind

1    heard on that?

2            MR. BENEDICT:  There's no foundation whatsoever that

3    he's laid as to discussions or to the deposition of PwC.

4            THE COURT:  Well, wasn't there -- we submitted some

05:06    5    depositions; right?

6            MR. BENEDICT:  And I don't know if that's been read

7    into evidence or not.

8            THE COURT:  I can't remember that.

9            MR. A. LAKIND:  It was, your Honor.

05:06    10            THE COURT:  So who would be the person?  Whose

11    deposition?

12            MR. A. LAKIND:  Mr. Warren I believe --

13            MR. R. LAKIND:  Martin Jennings.

14            MR. A. LAKIND:  It was Martin Jennings, your Honor.

05:06    15            THE COURT:  He read part Martin Jennings; right?

16            MR. BENEDICT:  Yes, he did.

17            THE COURT:  All right.  So, Frank, can you repeat

18    that question?

19            (Question read back by the reporter.)

05:07    20            THE COURT:  Do you understand that question?

21            THE WITNESS:  Yeah.  I'm hesitant because I do know

22    at some point probably around -- after my deposition, I was

23    shown some language from the Pw deposition, but I don't think

24    it went to this point.  So I don't -- I don't remember the

05:07    25    specifics of that.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1  BY MR. A. LAKIND:

2  Q.   At the time you voted -- excuse me -- that you considered

3  the allocation methodology, the Board had not seen the Shared

4  Services Agreement; correct?

05:07  5  A.   Yes, we had not seen the Shared Services Agreement until

6  in the last year or two when it came up in the context of this

7  litigation.

8  Q.   Were you able to assess whether or not costs allocated

9  pursuant to the cost allocation methodology were included in

05:07  10  the Shared Service Agreement?

11  A.   Yes, I think as I've testified I think extensively this

12  morning, we've had extensive discussions with management, as

13  well as with some of defendant's experts on that very subject,

14  and I certainly was very comfortable that the Shared Services

05:08  15  Agreement only covered the direct expenses that are in the

16  profitability study.

17  Q.   Now, the Board never undertook to assess whether the

18  sub-advisors are devoting greater labor to the funds than FMG

19  is devoting; is that correct?

05:08  20  A.   I don't -- I think we're talking about two very different

21  service providers, so I don't know why the Board would go

22  through that analysis.

23  Q.   Did the Board go through that analysis?

24  A.   FMG is not providing sub-advisory services alongside a

05:08  25  sub-advisor, they're providing management services and they're

Schpero - Cross - A. Lakind

1    very different construct of services.  So I don't -- as you

2    asked earlier, we certainly examine each of the service

3    providers and the services they provide, but to try to compare

4    the two I think is not a terribly fruitful exercise.

05:09   5    Q.   And no effort was made to do that; is that correct?

6    A.   That's what I just said, yes.

7    Q.   The Board never attempted to determine the costs

8    sustained by the sub-advisors; correct?

9    A.   Beg your pardon?

05:09   10   Q.   The Board never made an effort to ascertain the costs

11   sustained by the sub-advisors?

12   A.   I believe what I testified on -- I guess it wasn't

13   yesterday, Friday, was that we do see profitability analysis

14   for the affiliated advisor Alliance, but for the reasons I

05:09   15   testified to we do not get profitability information on the

16   other sub-advisors.

17        MR. A. LAKIND:  Your Honor, if I could just have one

18   minute?

19        THE COURT:  You may.

05:09   20        (Brief pause.)

21   BY MR. A. LAKIND:

22   Q.   You referred to deferred acquisition costs earlier; do

23   you recall that?

24   A.   Yes.

05:10   25   Q.   And what is that?

Schpero - Cross - A. Lakind

1  A.   My recollection is -- and again, this comes from the

2  detailed presentations we get on -- with many pages of the

3  profitability analysis, but my recollection is that those are

4  -- and this goes back to methodology obviously reviewed by

05:10  5  these two accounting firms in 2000; where as I recall it was

6  determined that these were actuarial related expenses, and I

7  think not unimportantly, all distribution related, but

8  actuarial related expenses that in order to normalize the

9  presentation of information, that the most reasonable approach

05:11  10  was to have those deducted from the expenses right at the top,

11  and that's been a consistent presentation ever since.

12       MR. A. LAKIND:  Chris, Plaintiff's Exhibit 210,

13  please?

14  Q.   Mr. Schpero, before you look at that, I neglected to ask

05:11  15  you a question.  The reason the DAC is deducted from the

16  expense allocation is because it's a distribution expense;

17  correct?

18  A.   Obviously I'm telling you from memory because these are

19  long conversations that have taken place a while ago now; but

05:11  20  my recollection is the DAC, these actuarial expenses, are

21  primarily distribution related.  That's the best of my memory.

22  Q.   Okay.  If you would, would take look at Exhibit P-210 and

23  tell us what that is please?

24  A.   Yeah, this looks like one of the presentations, slide

05:12  25  presentations that would have been made in walking the Board

*United States District Court*
*Trenton, New Jersey*

3865

Schpero - Cross - A. Lakind

1   through the allocation; looks like there was done in July

2   2013.

3   Q.   Now, turn over if you would to page 747 please.

4   A.   Yeah, I'm there.

05:13   5   Q.   Okay.  On the left-hand column there's kind a red

6   rectangular box; do you see what is that?

7   A.   Yes, I do.

8   Q.   And on the bottom it says total AXA equitable allocated

9   expenses 2.275 billion I believe that is?

05:13   10   A.   Right.

11   Q.   Is that accurate?

12   A.   Yes.

13   Q.   And the starting point is 1.615 billion; correct?

14   A.   Yes -- hang on; I'm just looking at this a second.  Yes,

05:13   15   right.

16   Q.   And then under that there's $14.4 million in FMG direct

17   expenses; correct?

18   A.   Correct.

19   Q.   And then under that there's a DAC impact of 674 million;

05:14   20   correct?

21   A.   Correct.

22   Q.   The DAC impact -- the DAC impact is in fact added, not

23   deducted to the starting expenses; isn't that correct?

24   A.   Given that it's in parentheses I would assume that's

05:14   25   correct, yeah.

*United States District Court*
*Trenton, New Jersey*

3866

Schpero - Cross - A. Lakind

1  Q.   So, in other words, it's a 1.615 billion, minus 14.4

2  billion, plus 674 billion, gets you to 2.275 billion; correct?

3  A.   That's correct.

4  Q.   So the testimony you gave earlier was erroneous that the

05:14   5  DAC was deducted; correct?

6  A.   No, I don't think I was erroneous at all.  It just

7  happens that this is -- I mean I was certainly not a

8  mathematics major, but I think this is showing subtraction of

9  two things; in one case the subtraction is in parentheses, so

05:14   10  it ends up being added, but I don't think there's anything

11  incorrect about my statement.

12  Q.   Could you say that again?  But I didn't understand that.

13  A.   Yeah.  I think you have total expenses, and then you are

14  subtracting two things.  As I recall -- I don't remember

05:15   15  whether this was algebra or what category of coursework, but

16  as I recall when you subtract a negative, which is effectively

17  what's in parentheses, it's added.  So I think we're both

18  right, but I don't think there was anything incorrect about

19  the statement I made, I think these are subtractions.

05:15   20  Q.   Okay.  So the 674 million DAC impact, is added to the 1.6

21  in order to get to the 2.2; right?

22  A.   That appears to be the mathematics to me, yes.

23  Q.   Okay.  So, in other words, distribution costs are a part

24  of the allocation.

05:15   25  A.   Distribution costs -- yeah, I don't -- I'm hesitating

Schpero - Cross - A. Lakind

1    because there are clearly costs in this presentation that are

2    allocated between management and distribution.  And that you

3    can see later on in the presentation.

4    Q.   Yes, sir.

05:16    5    A.   You have -- I think my failure here again is because I'm

6    not a mathematician, but I believe that what was happening was

7    there was an attempt to reverse -- and I use the word minus, I

8    think it's the same point; to reverse these actuarial deferred

9    acquisition costs.  As it happens here it ends up being a

05:17    10   double negative.  I don't think that means that therefore

11   distribution costs are being allocated.  But I certainly don't

12   profess to be an accounting expert.

13   Q.   This allocation methodology results in an allocation of

14   $309 million to the EQAT; correct?

05:17    15   A.   That's correct.  Yes, but that -- that 309 -- yes, would

16   have been before allocating between distribution and

17   management within this structure.

18   Q.   Do you know, Mr. Schpero, how costs are allocated between

19   the product wrapper, general account and the investment

05:18    20   portfolios?

21   A.   So, we're looking at the -- at B in the middle here?

22   Q.   Yes, sir.

23   A.   I believe that they are allocated based -- my

24   recollection is I'm pretty certain it's based on revenues.

05:18    25   Q.   Okay.  So, in other words if the revenues of the mutual

Schpero - Cross - A. Lakind

1    funds increase, they're going to get a higher percentage of

2    the allocated costs; correct?

3          (Brief pause.)

4    A.   A year-by-year basis, I guess that would be right.

05:18    5    Q.   And if the revenues of the product wrapper and the

6    general account spread increase, they will get a higher

7    percentage; correct?

8    A.   Right.

9    Q.   And if the revenues of the general account spread and the

05:19    10   product wrapper shrink, they will are get -- they'll get a

11   lower percentage; is that correct?

12   A.   I believe that's correct.

13   Q.   Why would your Board -- strike that.

14        If that in fact happens, is not -- are not the funds,

05:19    15   the portfolios, absorbing increased costs because of poor

16   performance of the general account spread and the product

17   wrapper?

18   A.   You're going have to try me again with that one.

19   Q.   Sure.  If the general account revenues shrink --

05:19    20        THE COURT:  So, this is a hypothetical question?

21        MR. A. LAKIND:  No, no, it's based right, your

22   Honor, right on the formula -- maybe I should do it a

23   different way, I think I'm not doing it very well.

24   BY MR. A. LAKIND:

05:19    25   Q.   Turn over if you would to 756.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1    A.    Okay.

2    Q.    Do you see to the bottom it reads, expenses are allocated

3    by revenue contribution within each of the products for each

4    category?  Do you see where that is?

05:20    5    A.    Right, which is what I think I just said.

6    Q.    Yes, it is.  So if the revenue contribution of the

7    general account spread, if the general account and the wrapper

8    were to shrink, more expenses would be allocated to the

9    portfolios; correct?

05:20    10    A.    Right.

11            MR. BENEDICT:  Objection.  I don't believe there's

12    any testimony they're allocated to the portfolios, they're

13    allocated to FMG for profitability presentation purposes to

14    the funds.

05:20    15            THE COURT:  Do you wish to be heard on that?

16            MR. A. LAKIND:  Yes, your Honor.  It says allocated

17    to the EQAT on page 747.

18            THE COURT:  So where does it say that?

19            MR. A. LAKIND:  Your Honor, 747, right in the

05:20    20    middle.

21            THE COURT:  I see.

22            MR. A. LAKIND:  About two inches from the right.

23            THE COURT:  Under C?

24            MR. A. LAKIND:  Yes, your Honor.

05:20    25            THE COURT:  Okay.

Schpero - Cross - A. Lakind

1          MR. A. LAKIND:  May I continue?

2          THE COURT:  You may.

3          MR. A. LAKIND:  Could I just ask Mr. Gable to read

4    back the last question and answer?

05:21    5          (Question and answer read back by the reporter.)

6          THE WITNESS:  And just to clarify, when you say the

7    portfolios, we're of course not talking about allocating to

8    the complex, in all of this we're talking about -- so the

9    point is it would be allocated to FMG in its profitability

05:21   10   study, as opposed to whatever analysis might be done for the

11   wrapper or the general account.  None of this is about

12   allocating costs to the fund complex.

13   BY MR. A. LAKIND:

14   Q.   Those allocated costs are considered when -- excuse me --

05:21   15   when the EQAT Board reviews FMG's fee -- fees; is that

16   correct?

17   A.   They are considered -- one of many things we consider and

18   specifically they are considered in the context -- exclusively

19   in the context of looking at FMG's profitability with respect

05:22   20   to the funds.  They have nothing to do with costs of the fund

21   level.

22   Q.   Nothing to do with costs at the fund level.

23          Now, let me ask you my last question; I think.  Under

24   the methodology we just reviewed, if the performance of the

05:22   25   variable annuity and the general account spread is poor, then

*United States District Court*
*Trenton, New Jersey*

3871

Schpero - Cross - A. Lakind

1    a greater amount of expenses are allocated to FMG in

2    connection with the services it performs for the EQAT;

3    correct?

4              MR. BENEDICT:  Objection; vague and confusing.

05:22    5              THE COURT:  Did you understand the question, Mr.

6    Schpero?

7              THE WITNESS:  Maybe if I heard it again I'll be

8    okay.

9              THE COURT:  Frank, can you repeat the question one

05:22   10    more time?

11              (Question read back by the reporter.)

12              THE COURT:  So, this is a hypothetical question?

13              MR. A. LAKIND:  Yes, your Honor.

14              MR. BENEDICT:  Objection; he's a fact witness, your

05:23   15    Honor, this is not an expert?

16              MR. A. LAKIND:  A hypothetical is permissible to a

17    fact witness as long as it's -- I have the case.

18              THE COURT:  All right.  I'd rather you stick with

19    the facts of the case.  Did this happen at any time during the

05:23   20    five years?

21              MR. A. LAKIND:  Well, it varies from year to year,

22    so it does.

23              THE COURT:  All right.  So what's the case?

24              MR. BENEDICT:  There is no foundation that this has

05:24   25    ever happened.

*United States District Court*
*Trenton, New Jersey*

Schpero - Cross - A. Lakind

1          MR. A. LAKIND:  I have the case, but I'll tell you

2     -- I'll conclude my testimony.  But for anyone's interest, the

3     case is *Teen-Ed v. Kimble*, 620 F.2d 399:  While generally a

4     lay witness cannot answer a hypothetical, so long as you base

05:24   5     your hypothetical on facts in the record, then the

6     hypothetical becomes acceptable.

7          I'll leave it go, your Honor, though.  I have no

8     further questions.

9          THE COURT:  You have no further questions?

05:24  10          MR. A. LAKIND:  None.

11          THE COURT:  All right.  Any redirect?

12          MR. BENEDICT:  No, your Honor.

13          THE COURT:  All right.  So, Mr. Schpero, you're

14     completed.  Thank you for coming.

05:24  15          THE WITNESS:  Thank you very much.

16          MR. A. LAKIND:  Thank you, your Honor.

17          THE COURT:  Oh, I had a question for you, Mr.

18     Schpero; I'm sorry.

19          A few days ago, Mr. Joenk had indicated -- and I'm

05:24  20     not sure, but he said that he has a goal of reaching -- I

21     don't know whether it was the 50 percent level or 50 percent

22     area of fees that are reported by Lipper of all similar funds,

23     or whether it was 50 basis points; but he has this goal.  Does

24     the Board have a goal?

05:25  25          THE WITNESS:  A couple things.  First of all, I know

Schpero - Cross - A. Lakind

1    he has a goal, and I will tell you that that is his goal, not

2    ours.  The Board's goal is to look at all of this relevant

3    information each year, and this is, as you know, a

4    year-by-year analysis, it is fund by fund.  And our goal is to

05:25    5    -- and in as a conscientious manner as possible, diligencing

6    all of this information, determine whether we are comfortable,

7    that at the end of the process, including often negotiations,

8    the fee is fair and reasonable.

9            And I can only, you know, emphasize what I think I

05:26    10    mentioned to you in our discussion on Friday, you know, at the

11    end of the day that's an exercise of our business judgment.

12    And I think the fact of the matter is there is not a lot of

13    specificity in the case law as to a lot of the issues we

14    talked about.  That's why we rely heavily on our independent

05:26    15    counsel for guidance, and we rely heavily on understanding

16    what the practice is out there, and we look at comparative

17    data, we look at all the other factors, and we then on a

18    case-by-case analysis come to a decision.

19            But we certainly do not have any specific numerical

05:26    20    goal.  And I will tell you every year, you know, there's a

21    fund where one year we are untroubled, and a year later we

22    have a very different view; and that can be based on

23    performance, that can be based on asset growth where funds

24    have grown to a sufficient size where we do think there should

05:26    25    be additional negotiations; it can be based on some kind of

3874

Schpero - Cross - A. Lakind

1    concern on the service for that particular fund; but it's very

2    much fund by fund.  And at the end it's -- it's eight

3    trustees, each weighing those factors as best they can in

4    coming to individual judgments.

05:27        5           THE COURT:  Okay.  And my last question is -- and

6    this is my last question --

7                THE WITNESS:  You did tell me the last one was your

8    last question.

9                THE COURT:  I know, I did; I'm sorry.

05:27        10          THE WITNESS:  But you're in charge, so it's all

11   right.

12               THE COURT:  At any rate, part of the factors that I

13   need to look at is whether or not the fee is disproportionate.

14   So, does the Board have a definition of disproportionate?

05:27        15          THE WITNESS:  No.  I'm very familiar, and the Board

16   is certainly very familiar with that language.  You know,

17   again, I think that's -- that's a reasonable person's

18   judgment.  I have never seen a definition of what that is, as

19   I recall, so disproportionate that it could not have been

05:28        20   negotiated at an arms-length basis.  And again, from the

21   Board's perspective, I think that, you know, the question is,

22   is the fee -- is the fee fair and reasonable.  And if we get

23   to that analysis, I certainly don't think it is -- anywhere

24   close to that kind of range.  But we're certainly very much

05:28        25   aware that that's the ultimate test.

Schpero - Cross - A. Lakind

1              THE COURT:  All right.  Okay, thank you.

2              THE WITNESS:  Thank you.

3              MR. A. LAKIND:  Your Honor, there are two exhibits I

4    neglected to move in --

05:28    5          THE COURT:  So, you may step down, Mr. Schpero.

6              THE WITNESS:  Thank you.

7              (Witness excused.)

8              MR. A. LAKIND:  There's two exhibits I neglected to

9    move in.  I know I should technically do it in my rebuttal

05:28    10   case or if you wish I can wait until tomorrow --

11             THE COURT:  Just tell me what --

12             MR. A. LAKIND:  The two are DX-1445; I don't know if

13   they admitted that or not.  It's one of the defendant

14   exhibits.  And 721, which is a Bingham letter.

05:29    15         MR. BENEDICT:  We have no objection.

16             THE COURT:  I'm sorry; let me just see if I can find

17   them.

18             MR. KORN:  It was the first exhibit of the day, your

19   Honor.

05:29    20         MR. A. LAKIND:  Mutual Fund Directors Forum, your

21   Honor.

22             THE COURT:  And what was the number on that?

23             MR. A. LAKIND:  Your Honor, it was D-1445.

24             THE COURT:  Okay, admitted.

05:29    25         (Defendant's Exhibit 1445 was marked into evidence.)

1           MR. A. LAKIND:  And then P-721 was a letter from

2     Bingham to -- to two new trustees.

3           MR. BENEDICT:  No objection, your Honor.

4           THE COURT:  Okay, admitted.

05:29    5           (Plaintiff's Exhibit 721 was marked into evidence.)

6           MR. A. LAKIND:  Your Honor, I apologize for going so

7     long, but thank you.

8           THE COURT:  No, that's fine.  Thank you.

9           So we'll reconvene tomorrow.  So we'll see you

05:30   10     tomorrow at 10:30.

11           MR. A. LAKIND:  Thank you, your Honor.

12           THE COURT:  Have a good evening.

13           (Proceedings concluded for the day.)

14

15

16

17

18

19

20

21

22

23

24

25

*3877*

## $

**$10** [1] - 3836:10
**$20** [1] - 3835:2
**$200** [2] - 3814:5, 3814:8
**$21** [2] - 3818:14, 3818:22
**$22.174** [1] - 3818:9
**$250** [1] - 3798:8
**$3,136,000,000** [1] - 3824:20
**$309** [1] - 3867:14
**$6,404,000,000** [1] - 3824:22
**$60** [1] - 3791:21
**$68** [2] - 3795:23, 3795:24

## /

**/S** [1] - 3708:24

## 0

**08608** [1] - 3708:15

## 1

**1** [4] - 3747:8, 3757:25, 3788:25, 3816:10
**1.06** [1] - 3817:20
**1.060** [1] - 3818:20
**1.066** [1] - 3818:17
**1.10** [1] - 3785:11
**1.6** [1] - 3866:20
**1.615** [2] - 3865:13, 3866:1
**1.71** [1] - 3785:12
**10** [8] - 3825:4, 3835:9, 3835:16, 3835:24, 3848:11, 3848:14, 3857:8, 3857:11
**1000** [3] - 3831:16, 3834:16, 3835:1
**10:30** [1] - 3876:10
**11** [1] - 3794:25
**11-4194** [1] - 3708:5
**113** [1] - 3819:12
**12** [3] - 3723:1, 3767:4, 3801:12
**120** [1] - 3822:9
**12b-1** [3] - 3770:2, 3770:8, 3790:19
**12b-1/non** [1] - 3770:8

**13** [2] - 3814:18
**13-312** [1] - 3708:10
**130611** [1] - 3760:3
**14** [1] - 3855:6
**14.4** [2] - 3865:16, 3866:1
**144.18** [2] - 3814:17, 3825:15
**1445** [6] - 3710:8, 3720:8, 3720:9, 3720:17, 3721:19, 3875:25
**15** [9] - 3723:6, 3757:25, 3800:1, 3800:10, 3842:21, 3851:13, 3854:13, 3854:23, 3855:6
**15(c** [16] - 3718:21, 3719:4, 3725:2, 3725:21, 3725:24, 3727:7, 3731:3, 3733:4, 3733:9, 3733:12, 3758:19, 3762:4, 3763:3, 3807:9, 3817:6, 3822:6
**15,000** [1] - 3733:22
**151** [1] - 3840:22
**152** [1] - 3839:19
**1568** [1] - 3788:19
**16** [3] - 3724:20, 3724:21, 3843:16
**17-H** [1] - 3842:10
**18** [4] - 3725:5, 3743:9, 3814:18, 3830:11
**1811** [6] - 3719:16, 3787:19, 3787:20, 3787:23, 3793:23, 3819:3
**1812** [6] - 3719:16, 3762:10, 3762:19, 3772:19, 3787:23, 3793:23, 3810:7
**1903** [1] - 3781:24
**1924** [2] - 3780:13, 3781:3
**193** [1] - 3792:21
**1:00** [1] - 3806:12

## 2

**2** [2] - 3722:4, 3844:22
**2.2** [1] - 3866:21
**2.275** [2] - 3865:9, 3866:2
**20** [5] - 3756:12, 3781:23, 3792:7, 3835:17, 3857:13

**200** [3] - 3734:1, 3734:2, 3814:10
**2000** [5] - 3846:23, 3855:17, 3859:12, 3860:15, 3864:5
**2002** [1] - 3785:11
**2004** [3] - 3723:6, 3724:13, 3781:5
**2008** [2] - 3821:20, 3824:15
**2009** [8] - 3821:20, 3824:19, 3824:24, 3825:3, 3835:7, 3835:23, 3836:9, 3839:1
**2010** [1] - 3839:13
**2011** [4] - 3737:20, 3747:6, 3752:18, 3840:11
**2012** [7] - 3824:22, 3824:25, 3835:4, 3835:7, 3835:25, 3836:10, 3839:11
**2013** [7] - 3763:13, 3814:24, 3831:3, 3831:5, 3834:12, 3839:13, 3865:2
**2015** [2] - 3846:13, 3846:20
**2016** [1] - 3708:13
**2038** [1] - 3743:17
**2042** [7] - 3768:12, 3768:14, 3768:17, 3768:23, 3768:24, 3769:12, 3778:4
**2043** [5] - 3768:17, 3770:2, 3770:4, 3771:24, 3778:4
**2044** [1] - 3768:17
**2064** [5] - 3735:18, 3736:13, 3736:14, 3736:16, 3737:2
**21** [3] - 3825:4, 3835:9, 3835:24
**210** [1] - 3864:12
**211** [1] - 3761:14
**2111** [1] - 3819:5
**2120** [1] - 3824:7
**22** [3] - 3708:13, 3708:20, 3818:17
**22.17** [1] - 3817:19
**23** [2] - 3712:5, 3724:13
**230** [1] - 3824:12
**239** [2] - 3757:21, 3758:10
**245** [1] - 3780:16
**24f-2** [1] - 3844:12
**25** [3] - 3778:18, 3789:25, 3792:7

**250** [3] - 3798:2, 3798:11, 3814:3
**26323** [1] - 3723:6
**273** [1] - 3747:4
**28** [2] - 3708:23, 3724:19
**285,000** [1] - 3732:24
**29** [1] - 3725:4
**2918** [1] - 3754:5
**2:00** [1] - 3806:12

## 3

**3** [5] - 3791:17, 3798:9, 3824:19, 3826:15, 3826:16
**3.8** [1] - 3795:13
**30** [2] - 3756:12, 3822:2
**30(b)(6** [3] - 3763:7, 3773:16, 3788:15
**300** [1] - 3775:6
**309** [1] - 3867:15
**35** [2] - 3822:1, 3823:22
**352** [1] - 3792:16
**36** [1] - 3726:1
**370** [1] - 3792:19
**3714** [2] - 3710:2, 3710:3
**376** [1] - 3792:18
**387** [1] - 3792:17
**3875** [1] - 3710:8
**3876** [1] - 3710:8
**39** [1] - 3822:4
**399** [2] - 3792:18, 3872:3
**3:30** [1] - 3848:15

## 4

**4** [1] - 3806:18
**40** [1] - 3788:25
**40,000** [1] - 3732:24
**400** [1] - 3782:2
**402** [1] - 3708:14
**4030** [1] - 3849:16
**41** [1] - 3780:3
**4211** [2] - 3818:4, 3818:5
**43** [1] - 3768:12
**44** [3] - 3727:1, 3727:15, 3768:13
**449** [1] - 3746:24
**45** [12] - 3749:10, 3773:8, 3773:14, 3773:17, 3775:24, 3778:8, 3779:21,

**3780:2, 3780:6, 3786:24, 3790:8, 3794:25
**47** [4] - 3810:8, 3810:10, 3810:19, 3813:20
**4:00** [1] - 3857:11
**4C** [1] - 3854:1

## 5

**5** [6] - 3721:19, 3721:21, 3749:7, 3798:9, 3798:17
**50** [4] - 3713:5, 3872:21, 3872:23
**500** [5] - 3757:3, 3789:8, 3790:1, 3790:13, 3790:15, 3791:2, 3791:7, 3791:17, 3791:24, 3792:16, 3792:22, 3792:24, 3793:4, 3793:13, 3798:2, 3819:8
**55** [1] - 3785:12
**5595** [1] - 3774:4
**56** [2] - 3794:22, 3794:24
**5608** [1] - 3796:12
**5611** [2] - 3794:18, 3795:4
**5785** [5] - 3790:7, 3790:12, 3790:13, 3791:25

## 6

**6** [6] - 3721:18, 3722:5, 3723:1, 3798:17, 3853:16, 3855:24
**60** [4] - 3756:9, 3756:22, 3795:15, 3818:12
**609** [2] - 3758:21, 3758:24
**611** [5] - 3759:4, 3759:22, 3760:11, 3760:22, 3761:16
**620** [1] - 3872:3
**63** [6] - 3762:10, 3762:19, 3763:8, 3763:9, 3766:17, 3791:22
**66** [1] - 3816:10
**674** [3] - 3865:19, 3866:2, 3866:20
**68** [8] - 3796:9,

3816:4, 3825:8,
3825:12, 3826:15,
3826:16, 3826:22,
3826:23
**68.1** [1] - 3795:16
**68.4** [2] - 3816:13,
3825:23
**69** [1] - 3795:23

---

**7**

7 [4] - 3795:24,
3796:9, 3798:17,
3799:2
**7.3** [1] - 3795:10
**7.5** [1] - 3798:9
**70** [2] - 3756:10,
3781:25
**72** [1] - 3782:1
**721** [4] - 3710:8,
3743:1, 3875:14,
3876:5
**747** [3] - 3865:3,
3869:17, 3869:19
**75** [2] - 3812:17,
3813:3
**753** [1] - 3708:23
**756** [1] - 3868:25
**794** [3] - 3810:12,
3810:22, 3812:25
**796** [2] - 3811:14,
3811:18
**799** [1] - 3811:25

---

**8**

80 [3] - 3756:22,
3815:16, 3816:1
**801** [3] - 3811:25,
3812:4, 3812:5
**81** [1] - 3726:1
**821** [3] - 3853:14,
3853:16
**82111** [1] - 3788:19
**827** [2] - 3813:19,
3813:22
**856** [1] - 3708:25
**874** [3] - 3855:20,
3855:21, 3855:22
**877** [2] - 3815:2,
3815:5
**878** [2] - 3816:8,
3825:21
**889-4761** [1] - 3708:25

---

**9**

9 [1] - 3822:3

---

**9/03** [1] - 3782:2
**90,000** [1] - 3732:21
**937** [3] - 3763:15,
3764:17, 3764:18
**940** [2] - 3765:5,
3765:7
**942** [1] - 3766:17
**95** [2] - 3815:16,
3815:21
**998** [1] - 3831:6
**999** [1] - 3831:13

---

**A**

ability [1] - 3800:23
able [9] - 3726:23,
3760:4, 3760:19,
3780:10, 3794:10,
3823:15, 3823:18,
3826:22, 3862:8
Absolutely [1] -
3723:17
absorbing [1] -
3868:15
acceptable [3] -
3722:13, 3722:15,
3872:6
access [2] - 3736:1,
3811:17
accessed [1] - 3781:2
account [20] -
3755:21, 3769:24,
3797:11, 3803:11,
3803:14, 3808:5,
3808:6, 3808:8,
3808:9, 3808:21,
3809:23, 3867:19,
3868:6, 3868:9,
3868:16, 3868:19,
3869:7, 3870:11,
3870:25
accountant [2] -
3858:5, 3858:8
accounting [8] -
3748:10, 3842:24,
3843:2, 3845:22,
3859:10, 3860:14,
3864:5, 3867:12
accounts [1] -
3828:21
accruals [1] - 3846:9
accrued [1] - 3808:6
accuracy [1] - 3783:3
accurate [15] - 3724:7,
3728:10, 3728:17,
3728:18, 3728:25,
3729:4, 3729:12,
3760:22, 3762:7,
3765:4, 3772:10,

3772:12, 3785:16,
3828:24, 3865:11
accurately [14] -
3723:12, 3725:10,
3726:9, 3744:1,
3744:15, 3747:15,
3749:14, 3782:6,
3782:14, 3820:15,
3821:11, 3850:6,
3852:9, 3856:15
achieve [3] - 3728:9,
3728:13, 3840:20
achieved [1] - 3744:20
acknowledge [4] -
3830:16, 3841:23,
3842:2, 3847:1
acquisition [4] -
3859:19, 3859:24,
3863:22, 3867:9
act [1] - 3717:3
Act [2] - 3723:6,
3776:11
acting [3] - 3715:17,
3852:4, 3852:5
action [1] - 3744:7
actions [1] - 3743:21
active [13] - 3756:11,
3756:13, 3757:7,
3766:22, 3777:10,
3777:15, 3778:9,
3778:12, 3791:6,
3793:7, 3793:12,
3794:4, 3827:15
actively [6] - 3755:23,
3766:15, 3766:18,
3768:4, 3778:5,
3785:9
Actively [1] - 3755:24
activities [3] - 3833:7,
3838:2, 3838:3
acts [1] - 3716:8
actual [19] - 3755:21,
3769:23, 3774:12,
3774:22, 3774:23,
3779:10, 3786:14,
3789:10, 3789:14,
3791:24, 3792:3,
3792:12, 3816:25,
3817:1, 3817:13,
3823:21, 3828:11,
3844:18, 3845:7
actuarial [5] - 3748:9,
3864:6, 3864:8,
3864:20, 3867:8
add [1] - 3779:2
added [6] - 3836:17,
3836:18, 3865:22,
3866:10, 3866:17,
3866:20
addition [1] - 3755:1

additional [4] -
3731:14, 3740:22,
3837:5, 3873:25
adequacy [1] -
3802:12
adequate [1] -
3802:20
Administration [6] -
3746:5, 3847:18,
3855:16, 3856:21,
3857:1, 3857:5
administration [2] -
3748:4, 3801:19
administrative [20] -
3718:21, 3728:15,
3741:19, 3741:22,
3747:13, 3749:20,
3769:17, 3791:25,
3797:5, 3797:7,
3820:7, 3820:10,
3821:8, 3821:13,
3822:3, 3838:1,
3839:12, 3853:10,
3858:10
Administrative [2] -
3745:25, 3769:13
administrator [7] -
3729:18, 3838:7,
3838:13, 3838:16,
3847:24, 3847:25,
3851:4
administrators [1] -
3851:10
admitted [4] -
3783:12, 3875:13,
3875:24, 3876:4
advantage [1] -
3716:12
advertising [1] -
3748:20
advice [5] - 3719:13,
3742:3, 3742:6,
3742:8, 3742:13
advised [2] - 3809:4,
3809:7
advisor [38] - 3722:8,
3722:9, 3723:9,
3729:3, 3805:4,
3805:6, 3805:24,
3827:14, 3828:1,
3828:5, 3828:10,
3828:13, 3828:16,
3828:19, 3828:21,
3829:2, 3829:8,
3829:12, 3829:15,
3829:18, 3829:22,
3830:4, 3830:10,
3837:22, 3838:4,
3838:5, 3838:8,
3838:11, 3838:12,

3838:14, 3838:15,
3847:4, 3847:5,
3862:25, 3863:14
advisor's [2] - 3727:3,
3827:23
advisors [25] -
3729:17, 3732:10,
3800:20, 3800:22,
3804:19, 3804:23,
3804:25, 3805:3,
3805:17, 3810:23,
3829:3, 3829:23,
3832:16, 3834:2,
3837:23, 3838:25,
3847:13, 3847:14,
3851:4, 3851:9,
3855:8, 3862:18,
3863:8, 3863:11,
3863:16
advisory [20] - 3744:7,
3749:19, 3815:21,
3816:16, 3817:12,
3817:19, 3818:12,
3818:18, 3820:13,
3821:3, 3821:7,
3821:12, 3821:14,
3824:1, 3825:7,
3826:3, 3826:7,
3826:17, 3826:21,
3862:24
Advisory [3] -
3745:20, 3815:5,
3815:6
advocate [1] - 3744:12
affecting [1] - 3828:3
affiliated [2] - 3722:9,
3863:14
affiliates [1] - 3808:2
afternoon [1] - 3711:6
agency [2] - 3741:10,
3741:25
agenda [1] - 3723:9
agent [6] - 3851:1,
3851:2, 3851:7,
3851:11, 3852:3,
3852:7
agents [1] - 3851:10
ago [12] - 3720:20,
3739:20, 3754:4,
3761:18, 3768:7,
3809:2, 3811:5,
3825:16, 3826:8,
3841:17, 3864:19,
3872:19
agree [26] - 3719:22,
3724:7, 3724:17,
3728:8, 3730:4,
3744:8, 3755:8,
3764:25, 3765:1,
3765:23, 3766:14,

3783:23, 3784:23,
3796:10, 3797:25,
3798:15, 3798:18,
3809:3, 3834:25,
3835:4, 3841:9,
3847:6, 3848:7,
3849:3, 3849:4,
3857:21

**agreed** [3] - 3835:23,
3843:10, 3843:13

**agreement** [38] -
3744:7, 3746:13,
3746:14, 3746:18,
3746:20, 3747:5,
3748:15, 3750:19,
3751:6, 3752:11,
3752:14, 3752:15,
3752:18, 3754:6,
3754:7, 3806:2,
3846:12, 3846:15,
3846:17, 3846:19,
3846:22, 3850:2,
3850:5, 3851:15,
3853:5, 3853:7,
3853:9, 3853:10,
3853:21, 3854:18,
3854:19, 3855:15,
3856:2, 3856:8,
3856:12, 3856:13,
3856:17, 3856:20

**Agreement** [19] -
3746:5, 3746:8,
3750:25, 3751:10,
3752:8, 3754:4,
3754:8, 3755:4,
3847:9, 3847:18,
3849:15, 3855:16,
3856:21, 3857:1,
3857:5, 3862:4,
3862:5, 3862:10,
3862:15

**Agreements** [4] -
3745:12, 3745:16,
3745:20, 3745:25

**agreements** [2] -
3745:15, 3745:23

**agrees** [2] - 3783:13,
3849:23

**aid** [1] - 3764:10

**al** [3] - 3708:3, 3708:6,
3708:8

**algebra** [1] - 3866:15

**align** [1] - 3726:4

**allegations** [1] -
3738:17

**Alliance** [1] - 3863:14

**allocate** [2] - 3749:25,
3858:23

**allocated** [23] -
3750:3, 3750:4,

3750:5, 3753:11,
3859:2, 3859:5,
3859:14, 3859:22,
3862:8, 3865:8,
3867:2, 3867:11,
3867:18, 3867:23,
3868:2, 3869:2,
3869:8, 3869:12,
3869:13, 3869:16,
3870:9, 3870:14,
3871:1

**allocates** [1] - 3750:21

**allocating** [3] -
3867:16, 3870:7,
3870:12

**allocation** [25] -
3729:21, 3747:24,
3748:24, 3749:23,
3750:12, 3750:16,
3750:17, 3750:21,
3751:1, 3830:15,
3833:7, 3857:23,
3858:6, 3858:22,
3859:15, 3860:7,
3860:11, 3860:21,
3862:3, 3862:9,
3864:16, 3865:1,
3866:24, 3867:13

**allocations** [4] -
3813:6, 3833:10,
3860:3, 3860:8

**allow** [2] - 3767:8,
3827:2

**allowed** [1] - 3813:16

**allows** [1] - 3823:15

**Almost** [1] - 3842:21

**almost** [5] - 3711:22,
3713:14, 3782:12,
3794:19, 3811:5

**alone** [4] - 3738:10,
3793:20, 3796:9,
3823:23

**alongside** [1] -
3862:24

**ALSO** [1] - 3709:16

**alternative** [1] -
3808:21

**ambiguous** [1] -
3826:18

**amend** [1] - 3856:25

**amended** [1] - 3857:6

**amending** [1] -
3846:22

**amendment** [1] -
3853:11

**America** [2] - 3792:18,
3793:2

**amount** [10] - 3727:23,
3728:1, 3728:3,
3753:8, 3797:20,

3802:25, 3827:9,
3837:5, 3871:1

**analyses** [1] - 3829:20

**analysis** [32] - 3727:2,
3727:8, 3727:22,
3742:23, 3747:24,
3750:6, 3750:7,
3750:11, 3767:5,
3779:8, 3779:9,
3785:1, 3794:14,
3796:11, 3796:23,
3813:17, 3829:11,
3829:17, 3829:18,
3830:6, 3835:5,
3835:10, 3835:21,
3837:10, 3862:22,
3862:23, 3863:13,
3864:3, 3870:10,
3873:4, 3873:18,
3874:23

**analytics** [2] - 3830:8,
3833:7

**analyze** [3] - 3720:5,
3809:20, 3837:14

**analyzing** [3] -
3803:11, 3803:15,
3814:25

**ANN** [1] - 3708:3

**annual** [8] - 3742:22,
3748:22, 3841:4,
3844:5, 3845:6,
3845:8

**annuities** [1] -
3767:22

**annuity** [2] - 3859:6,
3870:25

**answer** [26] - 3720:1,
3721:12, 3721:14,
3721:15, 3722:22,
3723:23, 3723:24,
3724:5, 3728:4,
3735:25, 3751:19,
3752:10, 3768:8,
3776:21, 3783:20,
3786:5, 3789:20,
3791:9, 3800:24,
3823:15, 3827:19,
3830:2, 3843:18,
3870:4, 3870:5,
3872:4

**answered** [1] -
3722:23

**answering** [1] -
3833:20

**Antarctica** [1] -
3712:20

**apologize** [8] -
3722:12, 3773:8,
3806:24, 3818:16,
3821:24, 3825:11,

3876:6

**app** [1] - 3764:13

**apparent** [1] - 3835:15

**appear** [2] - 3758:18,
3792:6

**appeared** [2] -
3740:16, 3817:18

**apples** [3] - 3794:9,
3813:7

**applicable** [1] -
3840:4

**applications** [1] -
3711:2

**apply** [2] - 3728:11,
3825:1

**apportioned** [1] -
3749:12

**apportionment** [2] -
3749:13, 3749:18

**approach** [3] -
3822:23, 3827:8,
3864:9

**approaches** [1] -
3722:14

**appropriate** [7] -
3731:15, 3738:21,
3773:19, 3813:6,
3854:21, 3859:2,
3860:21

**appropriately** [5] -
3745:4, 3746:18,
3829:10, 3859:5,
3860:3

**appropriateness** [1] -
3811:8

**approval** [3] -
3746:15, 3749:19,
3847:22

**approve** [2] - 3735:4,
3742:11

**approved** [2] -
3856:20, 3856:22

**approving** [2] -
3750:8, 3847:2

**area** [11] - 3731:21,
3737:7, 3745:9,
3761:25, 3776:12,
3785:4, 3794:20,
3801:23, 3847:3,
3847:5, 3872:22

**areas** [2] - 3785:1,
3807:12

**arena** [1] - 3801:15

**argument** [1] - 3712:6

**arguments** [3] -
3744:12, 3744:14,
3753:20

**arising** [1] - 3837:12

**arithmetic** [3] -
3816:23, 3827:11,

3835:7

**Arithmetic** [1] -
3814:2

**arms** [5] - 3728:9,
3728:13, 3776:2,
3776:9, 3874:20

**arms-length** [5] -
3728:9, 3728:13,
3776:2, 3776:9,
3874:20

**ARNOLD** [1] - 3709:4

**arrangement** [2] -
3753:1, 3753:2

**arrangements** [2] -
3746:22, 3853:10

**Articulate** [1] - 3744:6

**articulates** [1] -
3760:12

**ascertain** [4] - 3804:5,
3847:19, 3847:23,
3863:10

**aside** [4] - 3728:7,
3799:12, 3801:21,
3818:25

**aspect** [2] - 3745:14,
3746:12

**aspects** [10] - 3759:19,
3801:5, 3802:12,
3802:19, 3809:23,
3847:2, 3847:8,
3847:12, 3862:8,
3862:17

**assess** [5] - 3714:1,
3811:8, 3813:10,
3848:4, 3848:5

**Asset** [2] - 3769:13,
3796:15

**asset** [25] - 3764:21,
3767:20, 3769:21,
3769:24, 3782:25,
3785:10, 3786:16,
3786:21, 3786:22,
3786:25, 3787:5,
3789:12, 3796:5,
3796:20, 3796:21,
3797:24, 3798:17,
3799:1, 3833:7,
3837:5, 3838:22,
3841:12, 3843:6,
3843:21, 3873:23

**assets** [25] - 3765:10,
3765:23, 3766:10,
3779:8, 3781:25,
3782:12, 3784:19,
3791:15, 3791:17,
3791:20, 3792:20,
3792:24, 3795:9,
3795:13, 3795:16,

3795:23, 3795:24, 3804:20, 3824:16, 3824:19, 3836:1, 3836:23, 3836:25, 3837:13

**assign** [1] - 3807:15

**assigns** [1] - 3807:11

**assist** [4] - 3719:8, 3725:24, 3786:1, 3858:5

**assistance** [4] - 3717:20, 3841:14, 3844:2

**assisting** [1] - 3737:16

**assists** [2] - 3719:4, 3719:7

**ASSOCIATE** [1] - 3709:16

**associate** [1] - 3800:7

**associated** [5] - 3799:21, 3800:13, 3803:14, 3805:2, 3836:24

**assume** [5] - 3731:7, 3743:4, 3781:9, 3788:6, 3865:24

**assuming** [4] - 3731:12, 3757:8, 3765:4, 3791:12

**assumption** [1] - 3779:15

**at-issue** [7] - 3732:7, 3756:18, 3777:14, 3800:3, 3805:3, 3805:17, 3839:15

**ATM** [2] - 3833:12

**attached** [1] - 3818:2

**attempt** [2] - 3847:12, 3867:7

**attempted** [2] - 3778:2, 3863:7

**attention** [2] - 3743:25, 3781:4

**attributable** [1] - 3853:22

**attribution** [2] - 3829:18, 3829:20

**audit** [1] - 3858:2

**audited** [7] - 3812:16, 3813:2, 3813:4, 3813:9, 3813:13, 3813:17, 3859:17

**auditing** [1] - 3748:15

**auditors** [1] - 3844:2

**available** [8] - 3739:8, 3747:11, 3767:21, 3776:15, 3804:25, 3808:23, 3829:25, 3841:18

**Average** [2] - 3814:2, 3814:3

**average** [29] - 3764:21, 3767:20, 3779:2, 3779:3, 3779:5, 3779:6, 3779:14, 3780:6, 3780:10, 3781:22, 3781:23, 3782:5, 3782:16, 3785:10, 3785:12, 3785:23, 3786:1, 3786:4, 3786:11, 3786:13, 3791:15, 3791:17, 3791:20, 3816:13, 3824:16, 3824:19, 3825:12, 3825:23, 3826:22

**Averages** [1] - 3781:18

**averages** [3] - 3784:8, 3784:16, 3785:9

**averaging** [1] - 3782:4

**awaited** [1] - 3740:8

**aware** [5] - 3773:22, 3809:11, 3832:12, 3860:20, 3874:25

**AXA** [35] - 3708:6, 3708:10, 3709:17, 3747:5, 3747:10, 3747:21, 3747:23, 3748:3, 3748:6, 3748:10, 3748:17, 3748:24, 3749:3, 3749:11, 3749:16, 3749:25, 3750:22, 3751:10, 3751:25, 3753:2, 3753:5, 3753:10, 3754:12, 3803:18, 3804:8, 3804:13, 3804:16, 3805:21, 3806:2, 3808:6, 3808:9, 3808:10, 3808:25, 3859:17, 3865:8

**AXA's** [2] - 3754:18, 3756:8

**AXA0282111** [1] - 3789:2

---

# B

**backgrounds** [1] - 3785:20

**bad** [3] - 3850:3, 3853:23, 3856:10

**bag** [1] - 3806:25

**balancing** [1] - 3833:7

**ball** [1] - 3711:19

**bar** [1] - 3798:1

**bargain** [2] - 3728:9, 3728:14

**Barrett** [1] - 3714:3

**bars** [2] - 3819:9

**base** [2] - 3718:17, 3872:4

**based** [13] - 3757:10, 3757:16, 3779:19, 3804:1, 3827:12, 3858:22, 3860:22, 3867:23, 3867:24, 3868:21, 3873:22, 3873:23, 3873:25

**bases** [1] - 3742:10

**basic** [3] - 3754:23, 3754:24, 3845:12

**basis** [23] - 3718:16, 3739:9, 3749:12, 3764:21, 3770:22, 3789:25, 3790:1, 3796:2, 3801:12, 3815:12, 3816:22, 3816:24, 3821:17, 3822:1, 3822:4, 3823:22, 3826:13, 3827:10, 3841:23, 3842:2, 3868:4, 3872:23, 3874:20

**basket** [1] - 3859:2

**baskets** [4] - 3833:5, 3858:23, 3858:24, 3859:5

**Bate** [3] - 3788:18, 3788:19, 3789:1

**Bates** [26] - 3743:17, 3758:21, 3758:24, 3759:22, 3760:3, 3763:15, 3774:4, 3790:7, 3790:12, 3794:18, 3796:12, 3810:12, 3810:22, 3811:14, 3813:19, 3815:2, 3816:8, 3818:4, 3819:5, 3819:12, 3824:7, 3835:1, 3839:19, 3853:14, 3853:16, 3855:22

**bear** [2] - 3820:8, 3821:22

**bears** [1] - 3769:12

**beat** [2] - 3756:2, 3757:7

**beating** [1] - 3711:18

**become** [6] - 3742:19, 3782:12, 3837:6, 3851:2, 3851:7, 3851:11

**becomes** [1] - 3872:6

**Beg** [2] - 3792:23,

3863:9

**began** [3] - 3740:22, 3848:23, 3848:24

**beginning** [3] - 3783:24, 3787:20, 3788:24

**begins** [2] - 3727:2, 3774:8

**begun** [1] - 3777:24

**behalf** [7] - 3715:17, 3716:8, 3717:3, 3734:4, 3832:2, 3833:8, 3841:20

**behind** [1] - 3805:22

**belief** [1] - 3771:6

**believes** [1] - 3726:3

**below** [6] - 3770:15, 3771:15, 3785:7, 3821:10, 3821:16, 3824:3

**Benchmark** [1] - 3756:25

**benchmark** [6] - 3755:21, 3756:2, 3756:24, 3757:8, 3829:13, 3829:24

**BENEDICT** [45] - 3709:13, 3720:9, 3751:13, 3751:15, 3760:24, 3763:19, 3765:13, 3765:17, 3766:25, 3770:17, 3773:6, 3779:24, 3782:18, 3783:5, 3787:25, 3788:4, 3788:14, 3788:18, 3789:1, 3789:3, 3802:15, 3813:20, 3813:22, 3814:6, 3822:15, 3822:21, 3822:23, 3823:4, 3823:11, 3825:13, 3826:18, 3827:1, 3843:15, 3858:12, 3860:23, 3861:2, 3861:6, 3861:16, 3869:11, 3871:4, 3871:14, 3871:24, 3872:12, 3875:15, 3876:3

**Benedict** [5] - 3713:22, 3765:16, 3766:24, 3788:21, 3860:25

**benefit** [3] - 3719:23, 3740:22, 3808:6

**benefits** [13] - 3729:24, 3730:1, 3730:3, 3776:15, 3807:20, 3807:22,

3807:25, 3808:1, 3808:13, 3809:5, 3809:10, 3809:21, 3809:24

**BENJAMIN** [1] - 3709:14

**Best** [1] - 3720:20

**best** [18] - 3715:20, 3742:14, 3760:25, 3763:5, 3763:7, 3770:18, 3794:8, 3820:24, 3849:22, 3850:8, 3850:13, 3852:11, 3854:9, 3856:17, 3864:21, 3874:3

**better** [4] - 3794:9, 3817:22, 3820:24, 3823:15

**Between** [1] - 3838:5

**between** [22] - 3716:25, 3745:12, 3746:1, 3747:5, 3779:1, 3783:1, 3808:3, 3815:16, 3818:14, 3821:20, 3827:12, 3835:7, 3836:9, 3838:3, 3851:15, 3853:12, 3855:17, 3856:2, 3869:5, 3867:2, 3867:16, 3867:18

**beyond** [2] - 3783:7, 3832:13

**big** [1] - 3837:19

**bill** [1] - 3735:11

**billion** [20] - 3781:25, 3791:18, 3795:10, 3795:13, 3795:23, 3795:25, 3796:9, 3798:2, 3798:9, 3798:18, 3799:2, 3816:11, 3865:9, 3865:13, 3866:1, 3866:2

**bills** [5] - 3735:4, 3735:5, 3735:12, 3754:20

**binder** [3] - 3762:17, 3772:22, 3788:15

**binders** [2] - 3719:11, 3762:11

**Bingham** [4] - 3742:3, 3743:8, 3875:14, 3876:2

**bit** [6] - 3713:12, 3761:21, 3761:24, 3789:9, 3821:20, 3836:20

**Blackrock** [2] -

3805:4, 3805:5
**Blackstone** [7] -
3726:17, 3726:20,
3726:24, 3732:15,
3732:19, 3733:3,
3734:6
**BLADER** [1] - 3709:3
**BLANK** [1] - 3709:9
**blind** [1] - 3819:16
**blue** [2] - 3819:9,
3821:16
**BLUMSTEIN** [1] -
3709:3
**Board** [119] - 3715:16,
3716:12, 3716:13,
3716:21, 3716:25,
3717:24, 3718:1,
3720:22, 3721:9,
3725:12, 3725:20,
3725:23, 3727:22,
3728:10, 3729:15,
3729:20, 3729:23,
3730:3, 3730:6,
3731:22, 3732:2,
3734:10, 3736:3,
3737:12, 3737:14,
3737:21, 3737:22,
3739:8, 3739:16,
3740:3, 3740:13,
3740:23, 3742:9,
3742:24, 3743:11,
3743:14, 3743:16,
3744:3, 3744:17,
3744:24, 3744:25,
3745:10, 3746:15,
3750:7, 3750:11,
3752:16, 3763:3,
3763:13, 3766:3,
3770:24, 3772:8,
3773:18, 3775:13,
3775:16, 3775:20,
3776:23, 3777:1,
3777:8, 3777:16,
3778:1, 3780:24,
3787:3, 3794:2,
3794:4, 3794:11,
3798:25, 3800:25,
3801:8, 3802:12,
3803:2, 3803:5,
3803:18, 3804:2,
3804:7, 3805:21,
3809:3, 3811:4,
3817:2, 3829:20,
3830:3, 3830:9,
3831:3, 3832:22,
3833:24, 3834:3,
3836:18, 3837:16,
3841:7, 3842:20,
3847:8, 3848:25,
3849:4, 3851:13,

3854:12, 3855:11,
3856:23, 3857:3,
3857:20, 3857:21,
3858:1, 3858:4,
3858:5, 3858:9,
3859:1, 3859:4,
3860:2, 3860:10,
3862:3, 3862:17,
3862:21, 3862:23,
3863:7, 3863:10,
3864:25, 3868:13,
3870:15, 3872:24,
3874:14, 3874:15
**board** [10] - 3722:7,
3723:8, 3723:10,
3724:13, 3724:22,
3731:6, 3732:15,
3732:18, 3742:15,
3742:17
**Board's** [5] - 3811:8,
3847:19, 3851:25,
3873:2, 3874:21
**board's** [1] - 3723:8
**boardroom** [1] -
3723:11
**boards** [4] - 3743:21,
3776:12, 3776:14,
3776:18
**Bold** [2] - 3784:12,
3784:13
**bolded** [1] - 3784:6
**Bond** [37] - 3795:7,
3795:10, 3795:20,
3815:14, 3815:15,
3815:20, 3815:24,
3816:1, 3817:18,
3817:25, 3818:7,
3822:9, 3823:10,
3824:6, 3826:4,
3826:7, 3826:12,
3826:14, 3833:3,
3833:4, 3833:5,
3833:8, 3833:15,
3833:22, 3834:4,
3835:2, 3835:16,
3837:2, 3837:3,
3839:2, 3839:16,
3840:3, 3840:14,
3840:16, 3840:19,
3841:1
**bond** [1] - 3757:3
**bonds** [1] - 3837:6
**book** [23] - 3763:1,
3763:2, 3773:25,
3774:1, 3774:3,
3775:7, 3775:10,
3775:11, 3775:14,
3780:8, 3780:11,
3780:14, 3781:13,
3787:21, 3788:12,

3788:25, 3790:9,
3799:12, 3814:14,
3814:19, 3825:18,
3842:16
**booklet** [1] - 3830:5
**booklets** [1] - 3773:16
**books** [7] - 3720:12,
3793:24, 3794:10,
3841:13, 3842:15,
3843:6, 3843:25
**bottom** [13] - 3735:19,
3736:13, 3737:2,
3743:20, 3764:19,
3774:6, 3781:21,
3784:6, 3792:17,
3819:5, 3831:23,
3865:8, 3869:2
**box** [1] - 3865:6
**Boyle** [2] - 3782:2,
3783:15
**breach** [1] - 3856:14
**break** [13] - 3757:24,
3777:10, 3777:18,
3777:21, 3777:24,
3791:5, 3791:11,
3799:6, 3806:9,
3806:10, 3806:11,
3848:11, 3848:14
**breakout** [3] -
3793:19, 3793:22,
3794:7
**breakpoints** [4] -
3798:9, 3798:17,
3799:1, 3836:18
**brief** [1] - 3712:5
**Brief** [5] - 3719:25,
3745:1, 3800:9,
3863:20, 3868:3
**brief's** [1] - 3712:4
**briefly** [2] - 3711:25,
3762:24
**bring** [3] - 3801:5,
3830:12, 3850:22
**broad** [3] - 3757:10,
3757:16, 3766:7
**broader** [2] - 3755:4,
3755:9
**brochure** [1] - 3830:12
**broken** [1] - 3735:11
**brokerage** [2] -
3828:19, 3840:17
**brokers** [2] - 3828:13,
3828:16
**brown** [2] - 3819:15,
3823:25
**budget** [1] - 3754:25
**budgeting** [1] -
3845:21
**bullet** [3] - 3727:2,
3727:16, 3744:5

**bunch** [2] - 3819:3,
3831:20
**burdens** [1] - 3836:24
**business** [9] -
3715:18, 3715:19,
3735:8, 3804:1,
3831:13, 3837:17,
3852:4, 3859:6,
3873:11
**Business** [1] -
3831:17
**but-for** [4] - 3807:21,
3809:15, 3809:18,
3809:19
**buy** [1] - 3726:23
**BY** [54] - 3709:4,
3709:9, 3709:12,
3710:3, 3714:23,
3720:13, 3722:25,
3724:9, 3730:14,
3735:15, 3736:6,
3737:1, 3739:2,
3747:2, 3752:6,
3754:2, 3758:11,
3760:10, 3761:8,
3762:23, 3764:4,
3764:14, 3765:22,
3768:20, 3769:11,
3771:1, 3771:13,
3772:6, 3773:13,
3781:11, 3783:22,
3787:22, 3788:8,
3789:17, 3790:6,
3792:13, 3802:18,
3807:7, 3813:1,
3813:24, 3820:5,
3821:5, 3824:5,
3826:20, 3827:22,
3843:23, 3848:22,
3853:4, 3857:18,
3858:21, 3862:1,
3863:21, 3868:24,
3870:13

---

# C

**C.S.R** [1] - 3708:24
**calculate** [5] - 3817:3,
3826:23, 3829:3,
3843:20, 3846:5
**calculates** [1] - 3846:2
**calculation** [3] -
3782:8, 3829:10,
3835:22
**calculations** [3] -
3841:12, 3843:6,
3844:4
**calendar** [1] - 3749:10
**candy** [1] - 3810:3
**cannot** [2] - 3732:14,

3872:4
**Cap** [1] - 3792:17
**cap** [2] - 3759:11,
3761:23
**capital** [6] - 3802:25,
3803:2, 3803:19,
3804:6, 3843:9,
3843:12
**caps** [3] - 3769:25,
3789:13, 3821:14
**card** [2] - 3807:8,
3807:11
**card's** [1] - 3807:17
**care** [2] - 3743:24,
3850:4
**careful** [2] - 3740:15,
3777:8
**carefully** [2] -
3756:14, 3827:10
**cars** [1] - 3781:22
**case** [36] - 3711:21,
3713:10, 3725:12,
3734:18, 3734:21,
3734:24, 3735:7,
3754:3, 3756:16,
3758:17, 3759:18,
3776:11, 3777:17,
3777:18, 3787:1,
3791:10, 3800:6,
3803:6, 3808:5,
3809:12, 3809:19,
3830:5, 3855:5,
3855:6, 3856:25,
3860:20, 3866:9,
3871:17, 3871:19,
3871:23, 3872:1,
3872:3, 3873:13,
3873:18, 3875:10
**case-by-case** [1] -
3873:18
**cases** [4] - 3714:11,
3778:1, 3808:19,
3827:16
**cash** [4] - 3728:5,
3748:5, 3753:8,
3832:25
**category** [5] - 3735:9,
3741:3, 3741:5,
3866:15, 3869:4
**caused** [1] - 3853:22
**causing** [1] - 3712:7
**certain** [9] - 3766:10,
3776:12, 3802:25,
3827:5, 3827:9,
3839:12, 3858:22,
3859:18, 3867:24
**certainly** [61] -
3716:14, 3718:11,
3718:25, 3720:3,
3725:15, 3729:9,

3729:25, 3731:25, 3732:3, 3732:10, 3735:5, 3741:8, 3745:3, 3745:7, 3746:18, 3746:19, 3748:12, 3752:16, 3752:22, 3755:8, 3759:17, 3760:7, 3776:13, 3776:21, 3778:1, 3781:2, 3785:18, 3794:11, 3796:1, 3796:10, 3797:16, 3797:23, 3798:14, 3798:20, 3801:2, 3808:17, 3813:14, 3817:8, 3829:6, 3829:16, 3830:6, 3830:21, 3832:19, 3832:20, 3834:7, 3834:14, 3844:9, 3844:19, 3845:21, 3848:7, 3860:5, 3860:7, 3860:16, 3862:14, 3863:2, 3866:7, 3867:11, 3873:19, 3874:16, 3874:23, 3874:24

**Certainly** [1] - 3787:16
**Certified** [1] - 3708:23
**cetera** [5] - 3799:22, 3801:20, 3811:25, 3854:3, 3859:7
**chair** [1] - 3722:17
**chairman** [6] - 3721:9, 3722:7, 3723:8, 3723:10, 3724:14, 3732:20
**challenged** [1] - 3744:10
**challenging** [1] - 3744:13
**chambers** [1] - 3711:12
**chance** [4] - 3730:11, 3762:11, 3763:20, 3851:20
**change** [2] - 3722:12, 3778:2
**changes** [1] - 3836:9
**charge** [2] - 3768:3, 3874:10
**charged** [4] - 3728:16, 3765:11, 3768:8
**chart** [16] - 3765:19, 3767:17, 3768:1, 3791:25, 3796:17, 3814:9, 3815:3, 3819:14, 3819:17, 3820:18, 3820:23,

**closely** [2] - 3755:20, 3813:14
**closer** [2] - 3769:3, 3821:23
**co** [1] - 3785:20
**CO** [2] - 3708:6, 3709:17
**co-trustees** [1] - 3785:20
**Code** [1] - 3842:10
**colloquy** [1] - 3754:5
**color** [2] - 3819:15, 3819:16
**colored** [1] - 3770:15
**column** [6] - 3763:18, 3764:16, 3790:20, 3792:11, 3839:24, 3865:5
**columns** [5] - 3789:14, 3791:14, 3818:6, 3839:14, 3839:16
**combination** [4] - 3756:7, 3756:13, 3757:5, 3757:19
**combined** [1] - 3757:1
**comfort** [1] - 3804:10
**comfortable** [4] - 3746:20, 3851:23, 3862:14, 3873:6
**coming** [4] - 3731:25, 3746:15, 3872:14, 3874:4
**comments** [1] - 3713:22
**Commission** [1] - 3724:13
**commission** [1] - 3726:2
**commissions** [1] - 3828:19
**committee** [6] - 3724:22, 3724:24, 3725:1, 3725:8, 3732:21, 3837:8
**common** [2] - 3738:16, 3779:16
**Common** [4] - 3769:13, 3821:19, 3823:8, 3823:16
**communications** [1] - 3748:19
**companies** [3] - 3780:23, 3781:1, 3804:11
**company** [2] - 3735:13, 3770:1
**Company** [9] - 3716:1, 3716:17, 3718:13, 3723:5, 3723:6,

3763:11, 3765:2, 3776:11, 3779:18
**comparative** [14] - 3728:18, 3769:1, 3774:8, 3774:21, 3776:4, 3776:5, 3778:9, 3779:23, 3780:1, 3783:10, 3786:7, 3787:12, 3790:16, 3873:16
**Comparative** [1] - 3774:11
**compare** [6] - 3772:15, 3777:14, 3795:22, 3829:12, 3829:24, 3863:3
**compared** [6] - 3776:1, 3783:14, 3790:2, 3791:21, 3797:22, 3815:10
**compares** [10] - 3770:11, 3776:4, 3778:5, 3778:9, 3778:11, 3790:15, 3793:5, 3793:7, 3793:11, 3810:22
**comparing** [3] - 3797:4, 3805:20, 3813:4
**comparison** [14] - 3728:16, 3776:8, 3786:18, 3793:21, 3794:9, 3795:18, 3795:19, 3795:22, 3796:1, 3847:3, 3847:5, 3847:10, 3847:13, 3847:20
**comparisons** [10] - 3772:13, 3775:11, 3775:19, 3775:20, 3775:24, 3777:11, 3777:13, 3796:5, 3797:1, 3830:6
**compensation** [2] - 3759:12, 3761:23
**complained** [1] - 3820:23
**complete** [1] - 3837:25
**completed** [4] - 3841:5, 3842:24, 3843:2, 3872:14
**completes** [1] - 3844:25
**complex** [6] - 3756:8, 3766:8, 3797:9, 3798:14, 3870:8, 3870:12
**complexes** [2] - 3798:14, 3798:21

**Compliance** [1] - 3840:10
**compliance** [17] - 3800:16, 3801:19, 3837:6, 3837:24, 3838:3, 3838:11, 3838:15, 3838:16, 3840:11, 3841:4, 3841:18, 3841:20, 3841:22, 3842:7, 3842:9, 3854:15, 3855:3
**comply** [1] - 3856:13
**component** [1] - 3756:21
**components** [5] - 3774:15, 3774:24, 3775:1, 3790:19, 3797:8
**compute** [3] - 3779:13, 3843:8, 3843:12
**computed** [1] - 3816:15
**computer** [2] - 3754:10, 3838:19
**computers** [3] - 3754:15, 3755:16
**conceivable** [1] - 3719:7
**concept** [6] - 3756:15, 3785:2, 3785:21, 3801:2, 3809:20, 3812:11
**concern** [10] - 3723:14, 3730:5, 3730:8, 3730:15, 3730:19, 3730:24, 3731:2, 3804:12, 3809:9, 3874:1
**concerned** [1] - 3803:19
**conclude** [1] - 3872:2
**concluded** [1] - 3876:13
**conclusion** [1] - 3712:22
**conditions** [5] - 3739:21, 3739:22, 3739:25, 3740:4, 3740:10
**conduit** [1] - 3778:3
**Conference** [1] - 3840:6
**conference** [1] - 3840:8
**confidence** [2] - 3717:13, 3717:16
**confirm** [2] - 3788:9, 3821:11

**conflict** [1] - 3716:25
**conflicts** [1] - 3731:5
**confused** [1] - 3838:8
**confusing** [6] -
3736:20, 3750:13,
3760:25, 3774:2,
3803:4, 3871:4
**confusion** [1] -
3751:21
**conjunction** [2] -
3834:20, 3844:8
**connected** [5] -
3739:21, 3739:22,
3739:25, 3846:7,
3846:10
**connection** [24] -
3718:20, 3733:7,
3733:9, 3734:6,
3741:18, 3741:20,
3745:10, 3748:4,
3749:19, 3750:10,
3771:21, 3802:6,
3802:11, 3816:16,
3828:7, 3831:3,
3839:1, 3842:10,
3847:18, 3847:22,
3850:1, 3853:20,
3856:7, 3871:2
**conscientious** [1] -
3873:5
**consequence** [1] -
3740:13
**consider** [8] - 3725:8,
3729:9, 3733:6,
3733:7, 3744:12,
3766:4, 3785:9,
3870:17
**considerably** [2] -
3755:4, 3805:18
**consideration** [3] -
3741:7, 3741:10,
3750:10
**considered** [9] -
3741:13, 3742:24,
3750:7, 3785:25,
3854:23, 3862:2,
3870:14, 3870:17,
3870:18
**considers** [2] -
3772:8, 3773:18
**consist** [1] - 3820:13
**consistent** [9] -
3721:17, 3740:20,
3742:14, 3786:6,
3800:1, 3843:5,
3854:21, 3860:18,
3864:11
**consisting** [1] -
3724:23
**constant** [2] -

3824:12, 3824:14
**construct** [1] - 3863:1
**consultant** [7] -
3725:20, 3725:23,
3785:25, 3794:13,
3801:5, 3809:22,
3860:10
**consultants** [4] -
3717:9, 3717:20,
3725:9, 3725:13
**content** [2] - 3777:3,
3777:4
**contents** [1] - 3776:25
**context** [11] - 3715:9,
3723:16, 3743:13,
3746:15, 3752:24,
3760:5, 3760:15,
3840:5, 3862:6,
3870:18, 3870:19
**continue** [2] - 3852:2,
3870:1
**continues** [2] -
3748:15, 3860:18
**continuing** [1] -
3761:20
**contract** [18] - 3725:7,
3741:23, 3741:24,
3769:20, 3804:13,
3804:16, 3806:4,
3808:1, 3824:4,
3828:8, 3829:6,
3830:16, 3830:18,
3830:19, 3830:21,
3834:24, 3852:12,
3854:11
**contracts** [7] -
3718:21, 3830:14,
3830:20, 3847:2,
3849:8, 3851:20,
3852:16
**Contractual** [2] -
3769:12, 3796:14
**contractual** [12] -
3769:17, 3769:21,
3774:12, 3774:22,
3774:23, 3786:18,
3786:21, 3787:2,
3789:11, 3796:19,
3798:1, 3799:2
**contribution** [2] -
3869:3, 3869:6
**control** [4] - 3723:8,
3782:12, 3784:19,
3852:7
**controls** [1] - 3781:25
**conversation** [1] -
3739:22
**conversations** [1] -
3864:19
**copies** [1] - 3787:25

**copy** [4] - 3735:22,
3750:11, 3788:3,
3810:8
**Core** [23] - 3815:24,
3817:18, 3817:25,
3818:7, 3822:9,
3823:10, 3824:6,
3833:3, 3833:4,
3833:5, 3833:8,
3833:15, 3833:22,
3834:4, 3835:2,
3835:16, 3837:2,
3837:3, 3839:2,
3840:14, 3840:16,
3840:19, 3841:1
**corner** [1] - 3784:10
**corporate** [4] -
3747:18, 3749:4,
3750:22, 3753:11
**Corporate** [1] -
3834:19
**correct** [234] -
3708:23, 3716:2,
3716:25, 3717:3,
3717:6, 3717:21,
3717:22, 3717:25,
3718:6, 3718:22,
3719:5, 3719:8,
3719:9, 3719:12,
3719:13, 3719:17,
3721:16, 3722:10,
3726:18, 3726:19,
3726:21, 3728:11,
3728:12, 3728:17,
3728:20, 3728:25,
3729:4, 3729:8,
3729:13, 3729:18,
3729:21, 3729:23,
3729:24, 3730:3,
3732:16, 3733:11,
3734:13, 3734:14,
3739:24, 3741:1,
3741:2, 3741:4,
3741:7, 3741:11,
3741:21, 3742:1,
3742:2, 3742:4,
3742:8, 3742:11,
3743:9, 3743:12,
3745:12, 3745:20,
3746:5, 3746:6,
3746:8, 3749:20,
3750:1, 3750:8,
3750:9, 3751:2,
3753:22, 3755:6,
3755:11, 3756:17,
3756:22, 3759:2,
3762:7, 3763:3,
3765:11, 3766:22,
3770:12, 3770:16,
3771:16, 3771:19,

3771:22, 3772:8,
3772:9, 3772:11,
3773:5, 3773:15,
3773:19, 3773:20,
3774:13, 3775:16,
3776:2, 3776:6,
3776:16, 3776:20,
3776:23, 3778:6,
3778:10, 3778:21,
3779:23, 3780:7,
3780:25, 3782:17,
3785:17, 3787:5,
3788:7, 3788:9,
3790:16, 3790:21,
3791:1, 3791:21,
3792:1, 3792:6,
3792:22, 3793:2,
3793:8, 3793:12,
3794:15, 3795:7,
3795:8, 3795:10,
3795:13, 3795:14,
3795:16, 3796:15,
3798:6, 3799:11,
3799:19, 3799:23,
3800:13, 3800:17,
3800:23, 3801:20,
3801:24, 3802:25,
3803:23, 3804:17,
3804:21, 3807:12,
3807:22, 3808:7,
3808:15, 3809:6,
3809:8, 3809:9,
3810:20, 3810:23,
3810:24, 3811:2,
3811:11, 3811:20,
3811:25, 3812:9,
3814:3, 3815:9,
3815:17, 3815:22,
3816:5, 3816:11,
3816:13, 3817:6,
3818:10, 3818:15,
3818:19, 3818:23,
3821:12, 3821:17,
3821:20, 3824:13,
3824:14, 3824:17,
3824:20, 3824:22,
3824:25, 3826:4,
3826:10, 3830:17,
3831:4, 3831:20,
3832:4, 3832:9,
3832:18, 3833:3,
3833:4, 3833:5,
3833:22, 3834:1,
3834:3, 3834:5,
3834:6, 3834:10,
3835:17, 3836:2,
3837:22, 3838:4,
3838:11, 3838:24,
3839:14, 3840:7,
3840:14, 3840:25,
3841:7, 3841:15,

3845:15, 3846:3,
3846:13, 3847:15,
3848:6, 3848:25,
3851:5, 3851:10,
3853:12, 3856:3,
3857:24, 3858:23,
3859:12, 3859:25,
3862:4, 3862:19,
3863:5, 3863:8,
3864:17, 3865:13,
3865:17, 3865:20,
3865:23, 3865:25,
3866:2, 3866:3,
3866:5, 3867:14,
3867:15, 3868:2,
3868:7, 3868:11,
3868:12, 3869:9,
3870:16, 3871:3
**Correct** [20] - 3743:10,
3750:2, 3754:13,
3770:13, 3779:21,
3790:24, 3793:3,
3796:16, 3799:20,
3816:6, 3816:14,
3821:18, 3824:18,
3833:6, 3833:25,
3841:8, 3853:13,
3859:13, 3865:18,
3865:21
**corrected** [1] - 3732:3
**correctly** [3] -
3759:13, 3764:23,
3784:21
**Cost** [1] - 3839:3
**cost** [20] - 3727:3,
3727:22, 3729:20,
3748:24, 3749:22,
3750:16, 3750:17,
3750:21, 3750:25,
3782:5, 3785:10,
3785:13, 3838:25,
3857:23, 3858:6,
3858:22, 3859:15,
3859:24, 3860:11,
3862:9
**costs** [27] - 3741:7,
3741:10, 3741:25,
3750:4, 3751:11,
3751:23, 3751:24,
3753:3, 3753:6,
3776:19, 3859:19,
3862:8, 3863:7,
3863:10, 3863:22,
3866:23, 3866:25,
3867:1, 3867:9,
3867:11, 3867:18,
3868:2, 3868:15,
3870:12, 3870:14,
3870:20, 3870:22
**Council** [2] - 3716:9,

3718:14

**counsel** [44] - 3712:3, 3718:12, 3719:1, 3719:4, 3719:10, 3719:14, 3719:24, 3720:2, 3731:10, 3734:8, 3734:13, 3734:15, 3734:20, 3734:23, 3736:9, 3736:15, 3737:9, 3737:12, 3737:14, 3738:2, 3738:5, 3738:10, 3738:12, 3738:14, 3738:22, 3739:4, 3739:16, 3739:23, 3740:2, 3740:3, 3740:7, 3740:8, 3740:9, 3742:3, 3742:7, 3742:13, 3752:17, 3799:16, 3803:7, 3808:18, 3810:1, 3854:20, 3873:15

**COUNSEL** [1] - 3709:16

**counsels** [1] - 3851:21

**counting** [1] - 3857:15

**couple** [4] - 3711:15, 3797:2, 3836:15, 3872:25

**course** [7] - 3717:8, 3721:7, 3736:7, 3736:12, 3737:8, 3810:14, 3870:7

**coursework** [1] - 3866:15

**Court** [17] - 3715:25, 3719:8, 3719:22, 3720:5, 3722:3, 3722:13, 3754:5, 3754:11, 3754:14, 3754:19, 3754:22, 3760:7, 3760:13, 3761:15, 3780:13, 3787:24, 3800:19

**court** [2] - 3760:9, 3854:24

**COURT** [163] - 3708:1, 3708:17, 3711:1, 3711:10, 3712:14, 3713:15, 3713:19, 3713:25, 3714:9, 3714:17, 3714:21, 3715:2, 3715:6, 3715:8, 3722:23, 3723:18, 3723:25, 3724:2, 3724:5, 3727:10, 3727:13, 3730:11, 3733:15,

3734:25, 3735:14, 3735:22, 3735:25, 3736:5, 3736:16, 3736:19, 3736:23, 3737:5, 3738:5, 3738:19, 3744:21, 3751:14, 3751:17, 3751:19, 3752:3, 3753:14, 3753:18, 3753:23, 3757:24, 3758:4, 3758:7, 3759:21, 3759:24, 3760:2, 3761:1, 3761:10, 3762:13, 3762:18, 3762:20, 3763:21, 3764:3, 3764:6, 3764:10, 3764:12, 3765:15, 3765:20, 3766:13, 3766:23, 3767:8, 3767:25, 3768:5, 3768:10, 3768:15, 3769:4, 3769:7, 3770:23, 3771:9, 3771:24, 3772:1, 3772:4, 3772:22, 3773:7, 3773:10, 3781:5, 3781:7, 3783:14, 3783:17, 3783:19, 3784:1, 3784:12, 3787:15, 3788:10, 3788:13, 3788:21, 3789:4, 3789:20, 3792:8, 3794:21, 3795:2, 3799:7, 3802:16, 3806:7, 3806:10, 3806:17, 3806:20, 3806:23, 3807:3, 3807:5, 3810:5, 3812:20, 3812:22, 3819:24, 3820:17, 3820:21, 3821:1, 3822:17, 3822:19, 3823:1, 3823:6, 3823:10, 3823:13, 3826:19, 3827:2, 3827:19, 3838:9, 3843:17, 3848:11, 3848:14, 3848:18, 3853:3, 3857:10, 3857:13, 3857:15, 3860:25, 3861:4, 3861:8, 3861:10, 3861:15, 3861:17, 3861:20, 3863:19, 3868:20, 3869:15, 3869:18, 3869:21, 3869:23, 3869:25, 3870:2, 3871:5, 3871:9, 3871:12,

3871:18, 3871:23, 3872:9, 3872:11, 3872:13, 3872:17, 3874:5, 3874:9, 3874:12, 3875:1, 3875:5, 3875:11, 3875:16, 3875:22, 3875:24, 3876:4, 3876:8, 3876:12

**COURTHOUSE** [1] - 3708:14

**cover** [3] - 3718:16, 3755:1, 3802:20

**covered** [2] - 3851:24, 3862:15

**covering** [2] - 3757:16, 3853:10

**covers** [3] - 3757:17, 3767:7, 3802:9

**created** [1] - 3831:10

**criteria** [1] - 3807:15

**critical** [2] - 3771:4, 3830:18

**cross** [10] - 3711:8, 3711:21, 3714:2, 3714:17, 3767:8, 3771:5, 3771:10, 3806:14, 3827:2, 3849:9

**CROSS** [2] - 3710:3, 3714:23

**cross-examination** [3] - 3714:17, 3767:8, 3827:2

**CROSS-EXAMINATION** [2] - 3710:3, 3714:23

**cross-examinations** [1] - 3711:21

**cross-examine** [2] - 3771:5, 3806:14

**cross-examining** [1] - 3771:10

**cross-indemnity** [1] - 3849:9

**crossed** [1] - 3714:4

**crunched** [1] - 3712:21

**culture** [1] - 3723:11

**current** [1] - 3789:12

**custodian** [1] - 3712:10

**cutting** [1] - 3712:16

## D

**D-1445** [1] - 3875:23

**D-1811** [1] - 3819:1

**DAC** [7] - 3864:15,

3864:20, 3865:19, 3865:22, 3866:5, 3866:20

**daily** [9] - 3718:15, 3718:16, 3782:12, 3832:25, 3837:10, 3841:23, 3842:2, 3842:12, 3842:17

**DANIEL** [1] - 3709:4

**dash** [3] - 3844:20, 3844:22, 3844:23

**data** [28] - 3715:18, 3716:2, 3725:16, 3728:18, 3728:19, 3728:20, 3731:23, 3774:8, 3774:11, 3774:21, 3775:12, 3777:12, 3778:4, 3778:7, 3778:8, 3782:17, 3783:11, 3794:3, 3794:8, 3794:16, 3796:3, 3796:20, 3797:14, 3797:18, 3803:15, 3837:18, 3873:17

**date** [2] - 3722:15, 3739:13

**dated** [1] - 3743:8

**DAY** [1] - 3708:20

**day-to-day** [1] - 3828:11

**Day-to-Day** [1] - 3831:17

**days** [14] - 3711:5, 3711:9, 3712:8, 3713:2, 3713:4, 3713:23, 3714:9, 3714:13, 3714:14, 3740:5, 3749:10, 3754:4, 3767:2, 3872:19

**dealers** [1] - 3828:14

**dealing** [3] - 3734:9, 3767:5, 3804:10

**deals** [3] - 3727:6, 3782:23, 3782:24

**decade** [1] - 3766:9

**decades** [1] - 3764:20

**December** [1] - 3738:11

**decide** [2] - 3744:6, 3764:2

**decision** [9] - 3715:20, 3719:22, 3744:8, 3744:10, 3744:11, 3744:13, 3760:7, 3760:17, 3873:18

**decisions** [6] - 3720:4, 3727:24,

3742:10, 3743:24, 3744:6, 3777:24

**deducted** [8] - 3859:19, 3859:20, 3859:24, 3864:10, 3864:15, 3865:23, 3866:5

**deductions** [1] - 3817:12

**deem** [1] - 3854:8

**deemed** [2] - 3726:14, 3852:3

**defend** [1] - 3829:16

**DEFENDANT** [1] - 3708:11

**defendant** [1] - 3875:13

**defendant's** [2] - 3719:18, 3862:13

**Defendant's** [17] - 3710:8, 3719:15, 3720:8, 3720:16, 3721:18, 3735:18, 3746:24, 3762:9, 3768:16, 3768:23, 3772:19, 3780:13, 3781:3, 3787:20, 3810:7, 3814:17, 3875:25

**DEFENDANTS** [3] - 3708:7, 3709:10, 3709:14

**defendants** [5] - 3714:13, 3735:6, 3783:12, 3814:19, 3820:23

**defense** [3] - 3738:16, 3738:17, 3744:11

**defer** [1] - 3830:16

**deferred** [4] - 3859:19, 3859:24, 3863:22, 3867:8

**define** [2] - 3755:17, 3807:20

**defined** [2] - 3756:14, 3782:22

**defines** [1] - 3809:10

**definite** [1] - 3842:15

**definitely** [2] - 3731:20, 3774:23

**definition** [5] - 3729:24, 3730:3, 3778:24, 3803:18, 3809:4, 3809:8, 3844:3, 3874:14, 3874:18

**definitions** [1] - 3778:14

**delegated** [1] - 3853:25

deliberations [2] - 3742:17, 3743:23
deliver [1] - 3794:5
delivered [2] - 3763:13, 3811:4
deliverer [1] - 3718:10
delivers [1] - 3718:8
delivery [1] - 3755:2
demonstrates [1] - 3743:24
dependent [1] - 3845:12
deposed [3] - 3714:4, 3740:21, 3783:9
deposition [13] - 3719:12, 3732:8, 3738:3, 3738:8, 3773:15, 3841:19, 3848:23, 3860:22, 3860:24, 3861:3, 3861:11, 3861:22, 3861:23
depositions [3] - 3773:4, 3845:24, 3861:5
depreciation [2] - 3859:14, 3859:22
described [3] - 3799:21, 3835:1, 3844:4
describes [1] - 3831:13
description [1] - 3755:4
designate [1] - 3724:22
designed [1] - 3754:25
desired [1] - 3749:11
desires [1] - 3799:6
detailed [4] - 3727:2, 3727:8, 3727:22, 3864:2
determinations [1] - 3838:22
determine [6] - 3798:25, 3859:1, 3859:4, 3860:2, 3863:7, 3873:6
determined [2] - 3777:7, 3864:6
determines [3] - 3776:25, 3777:3, 3777:4
determining [3] - 3773:18, 3803:9, 3807:14
develop [1] - 3786:1
developed [1] - 3739:13

development [3] - 3728:3, 3737:21, 3737:23
devil's [1] - 3744:11
devoted [1] - 3734:24
devoting [2] - 3862:18, 3862:19
dialogue [1] - 3712:2
difference [4] - 3778:25, 3818:14, 3818:22, 3824:2
different [22] - 3750:14, 3757:15, 3757:17, 3757:19, 3786:21, 3786:22, 3796:20, 3797:24, 3803:17, 3804:25, 3808:18, 3813:17, 3815:1, 3819:2, 3827:15, 3845:7, 3859:6, 3862:20, 3863:1, 3868:23, 3873:22
differential [1] - 3827:12
difficult [5] - 3712:24, 3730:20, 3761:24, 3821:24, 3836:12
diligence [3] - 3833:21, 3834:3, 3840:25
diligencing [1] - 3873:5
diligent [1] - 3731:7
direct [28] - 3711:21, 3715:9, 3717:8, 3718:11, 3718:13, 3718:15, 3719:19, 3721:7, 3725:17, 3746:19, 3751:11, 3751:12, 3751:16, 3751:23, 3751:24, 3753:3, 3753:6, 3753:9, 3756:6, 3763:4, 3767:2, 3783:7, 3795:3, 3830:10, 3857:22, 3859:20, 3862:15, 3865:16
directed [2] - 3735:6, 3840:16
direction [1] - 3852:7
Directions [1] - 3718:17
directly [2] - 3718:19, 3751:7
director [3] - 3724:11, 3851:1, 3852:6
DIRECTOR [1] - 3709:16

directors [6] - 3722:1, 3724:23, 3725:7, 3726:4, 3726:5, 3743:22
Directors [9] - 3716:5, 3716:9, 3716:13, 3716:21, 3718:14, 3720:19, 3720:21, 3721:9, 3875:20
disadvantage [3] - 3786:3, 3852:14, 3852:24
disadvantaged [1] - 3850:15
disagree [9] - 3718:11, 3722:10, 3722:11, 3723:21, 3724:6, 3765:1, 3783:3, 3784:4, 3835:4
disagreed [2] - 3724:3, 3809:2
discharged [1] - 3743:25
disclosed [2] - 3739:23, 3812:19
disclosure [5] - 3742:21, 3742:23, 3759:11, 3761:23, 3845:7
discovery [1] - 3739:13
discuss [5] - 3712:1, 3737:24, 3738:1, 3739:17, 3740:2
discussed [2] - 3740:3, 3801:2, 3808:17
discusses [1] - 3774:19
discussion [3] - 3760:5, 3801:10, 3873:10
Discussion [1] - 3810:19
discussions [7] - 3731:9, 3752:16, 3807:18, 3860:5, 3860:8, 3861:3, 3862:12
dispensing [1] - 3712:21
disproportionate [3] - 3874:13, 3874:14, 3874:19
disregard [3] - 3850:3, 3854:2, 3856:11
distinguish [1] - 3730:21
distinguishing [2] -

3730:16, 3769:22
distortion [1] - 3785:8
Distribution [1] - 3866:25
distribution [10] - 3741:7, 3742:1, 3801:18, 3864:7, 3864:16, 3864:21, 3866:23, 3867:2, 3867:11, 3867:16
distributions [3] - 3843:24, 3846:2, 3846:6
DISTRICT [4] - 3708:1, 3708:1, 3708:17, 3708:18
divided [2] - 3742:20, 3860:3
dividend [6] - 3843:9, 3843:13, 3846:2, 3846:5
division [6] - 3711:3, 3712:11, 3752:18, 3752:25, 3753:4, 3753:7
Division [2] - 3712:18, 3724:11
document [48] - 3720:22, 3720:25, 3721:3, 3727:13, 3744:19, 3746:7, 3747:1, 3749:22, 3749:25, 3758:16, 3763:18, 3763:20, 3763:24, 3764:8, 3770:20, 3770:24, 3771:2, 3771:8, 3771:14, 3773:18, 3780:2, 3780:19, 3781:5, 3787:15, 3788:20, 3811:4, 3811:13, 3813:25, 3814:20, 3815:2, 3816:19, 3816:22, 3817:21, 3817:25, 3819:2, 3822:6, 3825:13, 3831:9, 3833:19, 3834:10, 3839:9, 3844:12, 3844:18, 3844:25, 3845:1, 3845:7, 3845:10, 3849:13
documentation [1] - 3836:13
documented [1] - 3743:24
documents [5] - 3716:15, 3719:1, 3740:16, 3763:6, 3773:4

3730:16, 3769:22
dollar [7] - 3816:15, 3817:5, 3818:22, 3824:24, 3824:25, 3835:15, 3835:23
dollars [7] - 3792:8, 3817:1, 3817:13, 3818:12, 3826:3, 3826:5, 3826:10
done [24] - 3712:25, 3713:5, 3716:16, 3745:5, 3750:6, 3777:1, 3779:9, 3779:19, 3794:19, 3801:14, 3814:23, 3830:5, 3833:8, 3834:4, 3834:13, 3834:19, 3837:21, 3837:23, 3838:22, 3841:20, 3843:20, 3850:24, 3865:1, 3870:10
double [5] - 3784:5, 3820:8, 3839:1, 3840:19, 3867:10
Double [1] - 3784:10
doubled [2] - 3821:21, 3836:1
down [5] - 3727:2, 3792:16, 3795:16, 3834:1, 3875:5
Down [1] - 3781:21
dramatic [1] - 3785:8
due [4] - 3833:21, 3834:3, 3840:24, 3850:4
during [1] - 3871:19
duties [8] - 3734:5, 3743:25, 3830:15, 3850:4, 3853:25, 3854:2, 3856:11, 3856:12
duty [4] - 3719:20, 3719:21, 3848:24, 3849:3
DX-1445 [1] - 3875:12

**E**

e-mails [2] - 3718:13, 3718:15
early [1] - 3734:8
earned [1] - 3847:20
earns [2] - 3847:4, 3847:6
EAST [1] - 3708:14
easy [1] - 3764:11
economic [1] - 3726:7
economics [2] - 3828:2, 3828:6

**Economies** [1] - 3780:22

**economies** [3] - 3729:7, 3729:9, 3729:12

**economy** [2] - 3828:3, 3828:7

**Ed** [1] - 3872:3

**education** [3] - 3716:11, 3734:4, 3743:14

**effective** [18] - 3724:16, 3726:3, 3769:22, 3786:22, 3786:25, 3787:2, 3787:3, 3787:4, 3787:8, 3787:12, 3789:11, 3789:16, 3789:23, 3789:25, 3790:2, 3792:15, 3796:5, 3820:9

**effectively** [4] - 3753:5, 3753:8, 3827:16, 3866:16

**efficiently** [3] - 3711:15, 3712:13, 3713:8

**effort** [9] - 3739:18, 3779:7, 3798:25, 3802:11, 3802:19, 3857:22, 3860:2, 3863:5, 3863:10

**efforts** [2] - 3763:5, 3763:6

**eight** [2] - 3714:13, 3874:2

**either** [7] - 3722:16, 3757:6, 3761:5, 3765:18, 3808:20, 3840:6, 3843:5

**elements** [1] - 3758:19

**eliminate** [1] - 3779:7

**elsewhere** [2] - 3797:11, 3808:1

**emphasize** [1] - 3873:9

**employee** [5] - 3851:1, 3851:2, 3851:7, 3852:3, 3852:6

**employees** [5] - 3831:22, 3831:25, 3832:1, 3832:10, 3851:3

**encourage** [1] - 3850:19

**end** [11] - 3714:7, 3714:15, 3732:17, 3740:6, 3740:9, 3749:10, 3817:25, 3845:8, 3873:7,

3873:11, 3874:2

**endearment** [3] - 3831:7, 3831:9, 3834:10

**endeavor** [2] - 3837:20, 3847:23

**ended** [1] - 3740:2

**Ending** [1] - 3788:18

**ending** [6] - 3743:17, 3763:15, 3788:19, 3815:2, 3839:19, 3840:22

**ends** [2] - 3866:10, 3867:9

**engage** [1] - 3802:14

**engages** [1] - 3715:16

**engaging** [1] - 3802:22

**enhance** [1] - 3721:25

**enhanced** [1] - 3726:4

**ensure** [1] - 3743:23

**entered** [5] - 3747:6, 3752:18, 3846:12, 3846:19, 3855:16

**enterprise** [4] - 3799:19, 3800:12, 3802:7, 3854:24

**entertain** [1] - 3739:16

**entire** [3] - 3761:3, 3761:7, 3761:9

**entirely** [2] - 3740:1, 3755:7, 3845:15

**entirety** [1] - 3711:21

**entities** [2] - 3722:8, 3725:16

**entitled** [8] - 3758:21, 3770:2, 3781:18, 3810:19, 3814:2, 3815:5, 3849:18, 3855:24

**entity** [2] - 3803:20, 3858:20

**entrepreneurial** [3] - 3799:18, 3800:7, 3800:11

**Entrepreneurial** [1] - 3799:21

**entry** [2] - 3832:23, 3832:25

**environment** [3] - 3760:6, 3761:3, 3761:10

**EQ** [8] - 3790:1, 3790:15, 3790:17, 3791:17, 3791:24, 3792:22, 3792:24, 3793:4

**EQ/Common** [1] - 3819:11

**EQ/Core** [7] - 3815:15,

3826:4, 3826:7, 3826:12, 3826:14, 3839:16, 3840:3

**EQ/Equity** [2] - 3789:8, 3819:8

**EQ/S&P** [1] - 3792:16

**EQAT** [49] - 3726:12, 3732:23, 3734:5, 3743:12, 3745:12, 3746:1, 3752:9, 3767:3, 3778:9, 3778:11, 3779:23, 3793:11, 3800:25, 3802:4, 3802:5, 3804:21, 3806:2, 3807:11, 3807:14, 3810:23, 3810:25, 3811:3, 3811:7, 3811:10, 3811:20, 3811:23, 3812:9, 3814:5, 3814:8, 3814:9, 3816:13, 3825:11, 3825:12, 3825:23, 3826:13, 3826:21, 3832:2, 3832:7, 3832:8, 3847:8, 3849:4, 3851:16, 3852:20, 3853:12, 3854:18, 3867:14, 3869:17, 3870:15, 3871:2

**EQAT's** [4] - 3778:5, 3804:16, 3812:5, 3844:2

**equal** [2] - 3782:8, 3782:16

**equaled** [1] - 3711:22

**equates** [1] - 3784:16

**EQUITABLE** [3] - 3708:6, 3708:10, 3709:17

**equitable** [4] - 3853:24, 3854:2, 3856:7, 3865:8

**Equitable** [8] - 3747:10, 3749:11, 3754:12, 3804:9, 3804:14, 3804:16, 3853:18, 3855:17

**equitable's** [1] - 3853:23

**equity** [2] - 3757:4, 3785:9

**erroneous** [2] - 3866:4, 3866:6

**error** [4] - 3811:12, 3849:25, 3853:19, 3856:6

**errors** [2] - 3731:24, 3732:11

**ESQUIRE** [12] - 3709:4, 3709:4, 3709:5, 3709:5, 3709:6, 3709:6, 3709:9, 3709:12, 3709:13, 3709:13, 3709:14, 3709:16

**essential** [1] - 3720:4

**Essentially** [2] - 3727:6, 3841:10

**essentially** [7] - 3716:24, 3740:24, 3832:18, 3834:1, 3840:13, 3841:11, 3842:9

**establish** [1] - 3768:2

**established** [1] - 3767:6

**et** [8] - 3708:3, 3708:6, 3708:8, 3799:22, 3801:19, 3811:25, 3854:3, 3859:7

**ETF** [2] - 3756:12, 3833:5

**ETFs** [1] - 3833:5

**evaluate** [3] - 3717:19, 3828:2, 3828:6

**evaluated** [2] - 3741:4, 3741:6, 3741:9

**evaluating** [1] - 3858:6

**evaluation** [1] - 3858:18

**evaporating** [1] - 3712:8

**evening** [1] - 3876:12

**evidence** [11] - 3710:8, 3710:8, 3719:16, 3770:20, 3771:6, 3783:12, 3812:15, 3813:3, 3861:7, 3875:25, 3876:5

**evolved** [1] - 3740:10

**examination** [6] - 3714:17, 3734:8, 3767:8, 3783:8, 3799:15, 3827:2

**EXAMINATION** [2] - 3710:3, 3714:23

**examinations** [1] - 3711:21

**examine** [8] - 3713:23, 3715:18, 3741:16, 3771:5, 3806:14, 3811:10, 3827:10, 3863:2

**examined** [2] - 3783:10, 3799:11

**examining** [8] -

**example** [5] - 3732:5, 3732:6, 3757:18, 3777:9, 3777:25

**examples** [1] - 3757:3

**exceed** [1] - 3711:23

**except** [1] - 3853:21

**Except** [1] - 3856:9

**exception** [5] - 3718:23, 3718:25, 3791:6, 3793:4, 3793:13

**exceptions** [1] - 3856:9

**excludes** [1] - 3767:21

**excluding** [2] - 3790:19, 3801:14

**exclusively** [1] - 3870:18

**excuse** [20] - 3714:4, 3726:11, 3729:3, 3734:4, 3734:13, 3739:12, 3740:24, 3748:10, 3782:11, 3783:9, 3785:22, 3793:6, 3795:24, 3803:21, 3814:2, 3826:2, 3832:3, 3848:23, 3862:2, 3870:14

**Excuse** [3] - 3718:5, 3753:14, 3778:22

**excused** [1] - 3875:7

**execution** [1] - 3833:12

**exercise** [8] - 3715:18, 3731:15, 3782:12, 3837:16, 3849:22, 3850:4, 3863:4, 3873:11

**exercises** [1] - 3715:19

**Exhibit** [26] - 3710:8, 3710:8, 3720:8, 3720:16, 3721:18, 3735:18, 3736:16, 3743:1, 3746:24, 3747:4, 3757:21, 3758:10, 3762:10, 3768:23, 3770:2, 3772:19, 3780:13, 3781:3, 3787:20, 3810:7, 3814:17, 3864:12, 3864:22, 3875:25, 3876:5

**exhibit** [23] - 3719:18, 3734:15, 3734:21,

3734:24, 3735:20, 3736:1, 3736:2, 3743:2, 3762:15, 3762:25, 3767:1, 3768:15, 3769:3, 3770:18, 3783:12, 3785:7, 3786:24, 3788:2, 3788:4, 3817:16, 3818:3, 3825:16, 3875:18

**exhibits** [8] - 3734:9, 3736:8, 3736:13, 3812:18, 3818:2, 3875:3, 3875:8, 3875:14

**Exhibits** [2] - 3719:16, 3768:16

**existing** [1] - 3800:8

**expect** [5] - 3735:6, 3823:17, 3828:10, 3829:8, 3829:15

**expectation** [3] - 3762:5, 3772:10, 3803:25

**expedite** [1] - 3714:6

**expense** [31] - 3765:24, 3766:11, 3766:18, 3766:21, 3766:22, 3769:25, 3770:12, 3774:15, 3774:24, 3775:1, 3775:10, 3775:11, 3775:24, 3782:1, 3782:3, 3782:4, 3782:11, 3785:10, 3785:12, 3789:13, 3790:19, 3797:13, 3821:14, 3846:9, 3853:20, 3853:22, 3856:6, 3859:17, 3859:22, 3864:16

**Expense** [2] - 3769:14, 3770:2

**expenses** [32] - 3733:1, 3733:2, 3749:12, 3749:18, 3749:25, 3750:3, 3753:9, 3763:14, 3764:21, 3770:8, 3820:12, 3821:10, 3824:1, 3857:23, 3858:9, 3858:23, 3859:2, 3859:17, 3859:20, 3860:3, 3862:15, 3864:6, 3864:8, 3864:10, 3864:20, 3865:9, 3865:17, 3865:23, 3866:13, 3869:2, 3869:8, 3871:1

expensive [2] - 3782:10, 3784:17

**experience** [3] - 3771:11, 3777:22, 3849:7

**experienced** [1] - 3854:20

**expert** [4] - 3712:17, 3784:3, 3867:12, 3871:15

**expertise** [4] - 3725:20, 3725:23, 3785:1, 3785:5

**experts** [5] - 3712:17, 3713:3, 3739:8, 3740:16, 3862:13

**explain** [3] - 3730:10, 3739:9, 3739:14

**explore** [1] - 3860:8

**extended** [2] - 3714:11, 3714:13

**extension** [1] - 3711:10

**extensive** [8] - 3742:6, 3752:16, 3775:19, 3834:20, 3838:21, 3848:1, 3860:6, 3862:12

**extensively** [2] - 3809:25, 3862:11

**extent** [2] - 3740:17, 3843:20

**extra** [1] - 3787:25

---

# F

**F.2d** [1] - 3872:3

**fact** [29] - 3712:20, 3712:23, 3713:8, 3713:13, 3729:7, 3732:5, 3740:4, 3759:20, 3760:12, 3761:14, 3772:14, 3791:24, 3793:4, 3797:4, 3803:14, 3804:10, 3805:17, 3808:24, 3811:9, 3842:17, 3854:22, 3854:23, 3855:3, 3860:20, 3865:22, 3868:14, 3871:14, 3871:17, 3873:12

**factors** [9] - 3733:6, 3742:24, 3803:11, 3811:1, 3843:10, 3843:13, 3873:17, 3874:3, 3874:12

**Facts** [1] - 3780:22

**facts** [3] - 3836:21,

3871:19, 3872:5

**failure** [3] - 3850:4, 3856:13, 3867:5

**fair** [8] - 3712:12, 3715:10, 3715:13, 3715:15, 3715:22, 3762:8, 3873:8, 3874:22

**fairly** [3] - 3749:18, 3798:16, 3838:18

**fairness** [1] - 3803:9

**faith** [5] - 3715:17, 3771:6, 3850:3, 3853:23, 3856:10

**fallen** [1] - 3764:22

**Fallout** [1] - 3807:20

**fallout** [8] - 3729:24, 3730:1, 3730:3, 3776:15, 3807:21, 3809:4, 3809:10, 3809:24

**familiar** [9] - 3716:4, 3743:7, 3746:7, 3749:22, 3759:15, 3807:8, 3844:12, 3874:15, 3874:16

**familiarity** [1] - 3755:15

**far** [2] - 3806:12, 3855:5

**fashion** [2] - 3754:16, 3777:2

**favorable** [3] - 3854:18, 3857:2, 3860:11

**FEBRUARY** [1] - 3708:13

**February** [1] - 3840:11

**Fee** [1] - 3815:6

**fee** [87] - 3715:14, 3715:15, 3715:22, 3728:18, 3740:25, 3741:3, 3741:6, 3741:9, 3741:12, 3741:13, 3769:23, 3771:21, 3772:8, 3776:4, 3784:16, 3786:7, 3784:18, 3786:18, 3786:22, 3786:25, 3787:4, 3787:8, 3787:12, 3789:11, 3789:12, 3789:15, 3789:16, 3789:23, 3789:25, 3790:2, 3790:15, 3791:25, 3792:7, 3792:9, 3792:12, 3792:15, 3792:16, 3796:5, 3796:19, 3798:22, 3799:3,

3801:11, 3801:18, 3803:12, 3803:16, 3808:21, 3813:11, 3815:8, 3816:16, 3817:19, 3818:9, 3818:12, 3818:17, 3818:18, 3820:7, 3820:10, 3820:13, 3821:3, 3821:8, 3821:10, 3821:13, 3821:14, 3822:1, 3823:22, 3823:23, 3826:2, 3826:3, 3826:6, 3826:7, 3826:14, 3826:17, 3826:21, 3826:23, 3827:11, 3827:17, 3835:1, 3835:8, 3836:11, 3836:19, 3847:4, 3870:15, 3873:8, 3874:13, 3874:22

**Fees** [4] - 3769:13, 3780:22, 3781:18, 3796:14

**fees** [69] - 3715:10, 3728:15, 3728:16, 3741:16, 3741:18, 3741:19, 3741:20, 3741:22, 3742:1, 3742:11, 3749:20, 3750:8, 3755:21, 3763:14, 3765:11, 3766:5, 3768:4, 3769:1, 3769:17, 3769:20, 3769:22, 3770:9, 3770:11, 3773:19, 3774:12, 3774:22, 3774:23, 3776:1, 3776:5, 3776:8, 3780:1, 3783:10, 3784:18, 3785:23, 3786:1, 3786:4, 3786:11, 3786:13, 3795:19, 3797:4, 3797:5, 3797:6, 3797:8, 3797:10, 3797:11, 3798:1, 3803:9, 3808:5, 3808:6, 3808:8, 3808:9, 3808:10, 3808:19, 3809:1, 3811:8, 3817:12, 3824:1, 3825:7, 3847:5, 3847:10, 3847:13, 3847:20, 3847:25, 3848:6, 3850:20, 3850:23, 3870:15, 3872:22

**few** [11] - 3720:19,

3734:9, 3775:22, 3782:10, 3783:2, 3784:18, 3799:7, 3825:16, 3834:6, 3841:17, 3872:19

**Fidelity** [2] - 3781:24, 3783:15, 3783:24

**fiduciaries** [1] - 3715:17

**fiduciary** [2] - 3759:10, 3761:22

**field** [1] - 3713:13

**figure** [2] - 3827:20, 3828:11

**file** [1] - 3844:5

**filed** [3] - 3711:9, 3712:4, 3740:17

**files** [1] - 3845:18

**filing** [1] - 3845:8

**filings** [1] - 3841:15

**fill** [2] - 3831:16, 3728:13

**finally** [2] - 3831:16, 3833:21

**finance** [1] - 3747:18

**financial** [8] - 3748:5, 3748:19, 3812:16, 3813:4, 3828:2, 3828:6, 3844:10, 3845:13

**financials** [4] - 3804:8, 3813:2, 3813:10, 3813:13

**Fine** [1] - 3730:13

**fine** [3] - 3740:23, 3789:3, 3876:8

**finish** [3] - 3711:6, 3714:14, 3789:20

**finished** [1] - 3771:24

**firing** [5] - 3832:15, 3832:24, 3834:2, 3838:25, 3839:3

**firm** [2] - 3743:8, 3835:12

**firms** [3] - 3859:10, 3860:14, 3864:5

**Firms** [1] - 3814:3

**first** [17] - 3711:23, 3735:7, 3743:21, 3747:7, 3774:21, 3775:5, 3777:17, 3777:18, 3788:18, 3789:7, 3805:19, 3812:25, 3832:14, 3836:12, 3841:12, 3858:23, 3875:18

**First** [3] - 3816:18, 3819:6, 3872:25

**FISHER** [2] - 3708:14, 3709:5

**five** [7] - 3757:22, 3781:25, 3792:11, 3840:13, 3858:7, 3871:20
**fixed** [3] - 3757:5, 3816:10
**flawed** [1] - 3796:24
**flip** [1] - 3774:25
**flow** [2] - 3833:1, 3837:5
**flying** [1] - 3781:23
**FM** [1] - 3750:4
**FMG** [145] - 3715:23, 3716:25, 3717:6, 3717:14, 3717:17, 3717:24, 3718:2, 3718:5, 3718:22, 3721:8, 3728:16, 3729:6, 3729:16, 3730:6, 3730:25, 3731:17, 3732:12, 3733:7, 3733:23, 3734:3, 3734:8, 3734:21, 3737:9, 3737:13, 3738:2, 3739:24, 3745:12, 3746:1, 3747:5, 3747:11, 3747:19, 3747:22, 3748:3, 3748:6, 3748:10, 3748:11, 3748:17, 3749:11, 3749:16, 3750:6, 3750:22, 3751:11, 3751:24, 3752:18, 3753:6, 3754:11, 3754:14, 3758:19, 3762:5, 3770:21, 3776:1, 3776:5, 3776:22, 3777:1, 3777:17, 3778:2, 3785:22, 3786:9, 3787:10, 3794:4, 3794:5, 3794:15, 3794:16, 3799:11, 3800:25, 3802:3, 3802:6, 3802:10, 3802:12, 3802:20, 3802:24, 3803:3, 3803:5, 3803:18, 3803:22, 3804:6, 3804:13, 3804:17, 3805:18, 3805:20, 3805:21, 3808:3, 3812:9, 3812:11, 3812:14, 3812:17, 3813:5, 3813:6, 3813:10, 3815:9, 3817:11, 3827:16, 3829:10, 3829:21, 3830:1,
3830:9, 3831:17, 3832:3, 3832:10, 3832:18, 3832:22, 3833:22, 3833:24, 3834:8, 3834:12, 3834:21, 3834:23, 3835:2, 3835:8, 3835:16, 3837:25, 3838:4, 3841:12, 3844:8, 3845:19, 3845:20, 3845:23, 3846:12, 3847:3, 3847:4, 3847:9, 3847:10, 3847:20, 3849:5, 3851:6, 3851:15, 3853:12, 3854:24, 3855:18, 3856:2, 3856:18, 3856:25, 3858:11, 3860:8, 3862:18, 3862:24, 3865:16, 3869:13, 3870:9, 3871:1
**FMG's** [10] - 3727:22, 3750:8, 3799:15, 3811:6, 3811:23, 3813:3, 3831:13, 3837:9, 3870:15, 3870:19
**folks** [1] - 3753:23
**follow** [2] - 3755:7, 3781:16
**following** [1] - 3754:4
**follows** [1] - 3726:2
**footer** [1] - 3735:18
**footnote** [3] - 3723:1, 3723:22, 3726:1
**FOR** [3] - 3709:7, 3709:10, 3709:14
**Forces** [1] - 3780:22
**foregone** [1] - 3712:22
**forget** [1] - 3723:21
**forgetting** [1] - 3738:15
**form** [6] - 3751:15, 3828:8, 3843:15, 3844:20, 3844:21, 3845:15
**format** [2] - 3775:9, 3786:8
**formula** [1] - 3868:22
**formulate** [1] - 3827:24
**forth** [2] - 3760:3, 3834:10
**Forum** [3] - 3716:5, 3720:19, 3875:20
**forum** [1] - 3716:8
**forward** [3] - 3753:20, 3795:2, 3854:14

**foundation** [8] - 3751:15, 3758:16, 3766:25, 3770:16, 3783:5, 3860:23, 3861:2, 3871:24
**four** [13] - 3711:5, 3711:9, 3712:8, 3712:17, 3713:2, 3713:4, 3714:9, 3791:14, 3837:15, 3841:4, 3841:7, 3856:9, 3858:6
**France** [1] - 3754:18
**Francis** [1] - 3708:24
**FRANCIS** [1] - 3708:24
**Frank** [3] - 3751:17, 3861:17, 3871:9
**frankly** [1] - 3713:1
**free** [1] - 3728:7
**frequently** [1] - 3718:12
**Friday** [8] - 3712:3, 3722:13, 3728:23, 3762:16, 3769:23, 3803:22, 3863:13, 3873:10
**front** [6] - 3762:12, 3825:13, 3825:19, 3828:8, 3829:6, 3833:16
**fruitful** [1] - 3863:4
**fulfill** [2] - 3734:5, 3744:24
**fulfilled** [3] - 3733:3, 3744:3, 3744:17
**full** [12] - 3714:3, 3723:16, 3731:8, 3740:21, 3743:15, 3759:10, 3761:23, 3763:23, 3831:22, 3831:24, 3834:7, 3834:9
**full-time** [2] - 3831:22, 3831:24
**fully** [1] - 3737:24
**fulsome** [1] - 3742:20
**functions** [2] - 3747:14, 3841:11
**Fund** [12] - 3716:5, 3716:13, 3718:17, 3720:19, 3720:21, 3780:21, 3781:18, 3782:2, 3795:15, 3795:18, 3815:15, 3875:20
**fund** [100] - 3719:20, 3719:21, 3721:25, 3722:16, 3723:8, 3724:13, 3724:16,

3724:24, 3726:3, 3726:5, 3726:7, 3732:15, 3735:8, 3735:9, 3742:15, 3747:17, 3752:15, 3755:18, 3755:19, 3755:23, 3755:24, 3756:3, 3756:8, 3757:7, 3764:21, 3766:7, 3767:23, 3777:14, 3778:19, 3779:8, 3781:24, 3782:5, 3782:12, 3784:19, 3786:25, 3787:3, 3790:20, 3791:3, 3791:6, 3791:22, 3791:25, 3793:4, 3793:8, 3793:11, 3795:12, 3795:22, 3796:5, 3796:6, 3796:8, 3796:9, 3797:6, 3797:9, 3798:6, 3798:8, 3798:11, 3798:16, 3798:24, 3799:22, 3803:6, 3803:15, 3804:3, 3808:14, 3812:12, 3817:10, 3817:24, 3827:13, 3827:14, 3827:15, 3832:7, 3833:1, 3833:14, 3836:13, 3836:14, 3836:25, 3837:1, 3842:16, 3843:24, 3846:9, 3846:12, 3848:25, 3849:5, 3854:15, 3855:7, 3856:20, 3859:7, 3870:12, 3870:20, 3870:22, 3873:4, 3873:21, 3874:1, 3874:2
**fund's** [8] - 3723:11, 3724:22, 3724:23, 3796:19, 3829:4, 3829:12, 3843:8, 3843:12
**Funding** [1] - 3718:17
**FUNDS** [1] - 3708:10
**Funds** [4] - 3716:21, 3769:13, 3779:23, 3807:12
**funds** [138] - 3726:4, 3726:6, 3726:11, 3726:12, 3726:16, 3726:17, 3726:20, 3726:24, 3728:17, 3728:24, 3729:3, 3732:7, 3732:17,

3733:4, 3733:10, 3733:24, 3750:23, 3756:16, 3756:18, 3756:21, 3763:14, 3766:4, 3766:11, 3766:14, 3766:15, 3766:18, 3766:21, 3766:22, 3767:4, 3767:7, 3767:21, 3767:23, 3768:3, 3768:4, 3768:7, 3770:11, 3770:14, 3771:15, 3772:16, 3773:19, 3775:20, 3775:25, 3776:1, 3776:5, 3776:10, 3776:16, 3776:20, 3777:10, 3777:14, 3777:15, 3777:16, 3778:5, 3778:8, 3778:9, 3778:11, 3778:12, 3778:19, 3779:7, 3779:23, 3780:7, 3782:4, 3782:9, 3782:10, 3784:17, 3784:18, 3785:9, 3787:12, 3790:16, 3790:23, 3790:25, 3791:5, 3791:11, 3791:13, 3791:20, 3791:22, 3792:7, 3793:6, 3793:7, 3793:8, 3793:10, 3793:12, 3793:20, 3794:6, 3794:7, 3794:15, 3794:17, 3796:21, 3797:10, 3797:23, 3798:21, 3798:23, 3799:1, 3799:25, 3800:3, 3800:8, 3800:13, 3801:12, 3801:14, 3802:10, 3805:3, 3805:17, 3805:22, 3808:4, 3808:20, 3808:21, 3808:23, 3808:25, 3813:7, 3815:18, 3816:10, 3828:22, 3829:24, 3832:2, 3832:12, 3833:10, 3836:16, 3839:15, 3842:18, 3845:9, 3846:20, 3851:24, 3853:9, 3862:18, 3868:1, 3868:14, 3869:14, 3870:20, 3872:22, 3873:23
**funds'** [2] - 3721:9, 3722:7

# G

**Gable** [4] - 3708:24, 3767:13, 3858:14, 3870:3
**GABLE** [1] - 3708:24
**gains** [2] - 3843:9, 3843:13
**GAMCO** [1] - 3805:13
**Gartenberg** [3] - 3733:6, 3759:1, 3811:1
**Gary** [3] - 3815:3, 3825:6, 3825:17
**GARY** [4] - 3710:2, 3710:3, 3714:19, 3714:23
**gathered** [2] - 3794:7, 3794:8
**gathering** [1] - 3763:6
**general** [20] - 3733:16, 3735:4, 3748:5, 3761:25, 3780:9, 3808:5, 3808:9, 3808:21, 3809:20, 3809:23, 3849:6, 3867:19, 3868:6, 3868:9, 3868:16, 3868:19, 3869:7, 3870:11, 3870:25
**GENERAL** [1] - 3709:16
**generally** [9] - 3714:12, 3751:11, 3756:21, 3766:16, 3774:19, 3828:3, 3832:10, 3850:12, 3872:3
**generated** [1] - 3785:8
**generic** [1] - 3767:4
**generically** [1] - 3765:25
**germane** [1] - 3813:10
**Given** [3] - 3852:18, 3854:22, 3865:24
**given** [16] - 3712:20, 3719:20, 3731:17, 3738:15, 3738:16, 3738:21, 3740:15, 3744:23, 3761:2, 3761:24, 3766:9, 3791:10, 3828:9, 3852:15, 3852:22, 3854:17
**glass** [2] - 3764:5, 3819:23
**glasses** [3] - 3722:12, 3806:24, 3807:1
**GLENN** [1] - 3708:8

**Global** [2] - 3815:15, 3816:1
**goal** [16] - 3715:10, 3715:22, 3715:24, 3717:5, 3744:3, 3744:17, 3744:20, 3834:21, 3872:20, 3872:23, 3872:24, 3873:1, 3873:2, 3873:4, 3873:20
**goals** [1] - 3744:24
**Goldman** [2] - 3795:15, 3795:18
**governance** [5] - 3712:17, 3712:19, 3723:7, 3726:3, 3732:21
**Governance** [1] - 3723:5
**Government** [6] - 3795:6, 3795:10, 3795:20, 3815:14, 3815:20, 3815:23
**grade** [1] - 3807:11
**grades** [1] - 3807:15
**graph** [5] - 3765:7, 3765:10, 3766:18, 3798:1, 3824:9
**great** [1] - 3804:10
**greater** [3] - 3836:24, 3862:18, 3871:1
**green** [4] - 3770:14, 3770:15, 3771:15, 3823:25
**grew** [2] - 3824:22, 3835:9
**gross** [3] - 3792:8, 3815:8, 3850:3
**Gross** [1] - 3815:6
**GROUP** [1] - 3708:11
**group** [7] - 3777:15, 3786:15, 3786:16, 3793:12, 3829:13, 3829:25, 3845:23
**groups** [7] - 3754:18, 3772:14, 3772:15, 3775:21, 3777:6, 3778:12, 3782:24
**grow** [2] - 3765:11, 3765:24
**growing** [1] - 3766:10
**grown** [2] - 3835:24, 3873:24
**growth** [2] - 3757:18, 3873:23
**guess** [35] - 3718:10, 3718:23, 3719:9, 3720:1, 3720:4, 3723:23, 3730:9, 3732:6, 3735:3,

3740:9, 3741:5, 3747:6, 3766:2, 3773:1, 3774:18, 3774:24, 3775:18, 3780:3, 3790:17, 3791:23, 3797:2, 3798:19, 3803:1, 3811:4, 3812:24, 3814:24, 3815:12, 3816:17, 3844:19, 3855:18, 3857:8, 3863:12, 3868:4
**guessed** [1] - 3811:5
**guessing** [1] - 3737:18
**guidance** [4] - 3740:6, 3740:8, 3740:9, 3873:15
**Guidance** [1] - 3720:20

# H

**HADLEY** [1] - 3709:12
**half** [5] - 3712:25, 3713:2, 3713:3, 3739:20, 3824:25
**halfway** [2] - 3778:19, 3778:20
**halts** [1] - 3837:11
**hand** [18] - 3746:23, 3757:20, 3758:9, 3763:18, 3764:15, 3764:19, 3768:12, 3774:7, 3784:10, 3790:20, 3806:5, 3819:7, 3819:22, 3824:9, 3839:24, 3848:20, 3865:1
**handing** [1] - 3787:24
**Handing** [3] - 3762:21, 3772:23, 3823:3
**hang** [1] - 3865:14
**happy** [3] - 3721:13, 3723:23, 3739:14
**hard** [5] - 3737:5, 3777:8, 3807:16, 3836:6, 3843:4
**hardly** [1] - 3784:17
**harmed** [2] - 3850:18, 3852:1
**Harris** [4] - 3759:18, 3760:23, 3809:10, 3809:16
**Headed** [1] - 3810:15
**heading** [3] - 3795:4, 3831:19, 3832:14
**hear** [2] - 3721:14, 3738:25

**heard** [6] - 3713:16, 3757:10, 3860:6, 3861:1, 3869:15, 3871:7
**heat** [1] - 3754:21
**heavily** [2] - 3873:14, 3873:15
**heavy** [1] - 3773:1
**help** [3] - 3752:16, 3801:5, 3823:6
**helpful** [1] - 3734:4, 3740:13, 3760:20, 3795:22, 3796:2, 3804:5, 3822:18, 3822:24, 3823:4, 3826:1, 3837:20
**helps** [1] - 3734:5
**hereunder** [1] - 3854:1
**hesitant** [1] - 3861:21
**hesitated** [1] - 3775:5
**hesitating** [2] - 3832:20, 3866:25
**hesitation** [1] - 3750:13
**high** [2] - 3799:2, 3815:16
**higher** [6] - 3785:13, 3792:7, 3798:17, 3868:1, 3868:6
**highest** [4] - 3778:20, 3791:24, 3792:5, 3795:12
**hindsight** [1] - 3743:22
**hiring** [5] - 3832:15, 3832:24, 3834:2, 3838:25, 3839:3
**Hold** [1] - 3766:23
**hold** [1] - 3768:18
**holding** [1] - 3760:23
**Honor** [97] - 3711:3, 3711:4, 3711:11, 3711:16, 3712:16, 3713:1, 3713:11, 3713:17, 3714:16, 3715:1, 3722:20, 3723:23, 3724:1, 3727:12, 3730:9, 3733:18, 3735:2, 3735:3, 3735:24, 3736:17, 3737:21, 3738:6, 3746:24, 3751:22, 3752:5, 3753:17, 3753:22, 3754:1, 3757:20, 3757:22, 3758:2, 3758:6, 3758:9, 3759:23, 3760:24, 3762:15, 3762:19, 3763:19, 3765:13,

3766:25, 3767:13, 3768:16, 3769:2, 3769:9, 3770:17, 3771:4, 3771:25, 3781:6, 3782:18, 3783:5, 3783:9, 3784:13, 3787:19, 3789:3, 3789:6, 3789:22, 3794:19, 3799:5, 3799:6, 3806:15, 3806:22, 3807:4, 3810:4, 3812:23, 3814:17, 3819:22, 3820:22, 3822:15, 3822:23, 3822:24, 3823:11, 3843:15, 3848:9, 3848:16, 3848:19, 3848:21, 3853:1, 3857:8, 3861:9, 3861:14, 3863:17, 3868:22, 3869:16, 3869:19, 3869:24, 3871:13, 3871:15, 3872:7, 3872:12, 3872:16, 3875:3, 3875:19, 3875:21, 3875:23, 3876:3, 3876:6, 3876:11
**HONORABLE** [1] - 3708:17
**hope** [1] - 3803:24
**HORA** [1] - 3709:13
**hour** [1] - 3712:25
**hours** [5] - 3711:22, 3714:2, 3714:4, 3806:13, 3857:10
**house** [2] - 3839:25, 3840:2
**housekeeping** [2] - 3711:4, 3711:5
**hovers** [1] - 3756:21
**human** [1] - 3748:16
**hundred** [4] - 3717:23, 3718:21, 3782:10, 3784:18
**hybrid** [2] - 3756:6, 3756:13
**hypothetical** [7] - 3827:1, 3868:20, 3871:12, 3871:16, 3872:4, 3872:5, 3872:6

# I

**ICI** [3] - 3763:11, 3767:5, 3801:14
**idea** [1] - 3765:14
**ideally** [2] - 3755:25,

3757:7
**identified** [7] - 3716:1, 3732:4, 3755:22, 3794:3, 3796:21, 3799:18, 3802:7
**identify** [8] - 3720:16, 3747:4, 3780:19, 3794:17, 3815:18, 3833:16, 3839:15, 3840:9
**identifying** [3] - 3727:23, 3805:23, 3818:17
**ii** [1] - 3856:11
**III** [2] - 3721:19, 3721:22
**imagine** [2] - 3770:24, 3839:3
**immediately** [1] - 3804:4
**impact** [7] - 3723:14, 3766:5, 3766:11, 3865:19, 3865:22, 3866:20
**imply** [2] - 3779:17, 3782:4
**important** [19] - 3712:19, 3720:3, 3728:9, 3728:14, 3728:23, 3729:11, 3729:15, 3729:20, 3729:23, 3730:2, 3730:17, 3730:21, 3731:2, 3743:23, 3797:13, 3803:13, 3809:5, 3823:18, 3848:7
**importantly** [2] - 3816:18, 3816:21
**imposed** [1] - 3803:3
**improper** [1] - 3809:8
**improperly** [2] - 3809:4, 3809:7
**imprudent** [1] - 3849:4
**in-house** [2] - 3839:25, 3840:2
**inaccurate** [10] - 3731:17, 3745:15, 3745:23, 3746:2, 3746:13, 3785:17, 3834:16, 3846:18, 3846:25, 3848:5
**inappropriate** [1] - 3784:19
**incentive** [4] - 3712:12, 3713:7, 3713:8, 3726:7
**incentives** [2] - 3711:14, 3713:9

**inch** [1] - 3824:17
**inches** [1] - 3869:22
**Incidentally** [1] - 3829:23
**include** [10] - 3719:11, 3719:15, 3723:9, 3747:18, 3757:18, 3774:16, 3778:12, 3797:5, 3851:3, 3851:9
**included** [6] - 3773:3, 3777:15, 3788:15, 3799:2, 3862:9
**includes** [5] - 3754:19, 3774:11, 3774:13, 3774:22, 3821:8
**including** [5] - 3718:15, 3777:13, 3801:18, 3813:6, 3873:7
**income** [4] - 3813:18, 3816:10, 3843:9, 3843:12
**inconsistent** [5] - 3731:23, 3746:21, 3755:10, 3830:14, 3842:7
**incorrect** [3] - 3827:8, 3866:11, 3866:18
**incorrectly** [2] - 3732:9, 3777:23
**increase** [8] - 3836:10, 3836:23, 3836:25, 3837:12, 3837:13, 3868:1, 3868:6
**increased** [3] - 3781:24, 3825:2, 3868:15
**incurred** [1] - 3753:4
**Indemnification** [1] - 3855:25
**indemnification** [1] - 3806:3
**indemnify** [1] - 3849:5
**indemnity** [3] - 3806:2, 3849:9, 3857:1
**independence** [1] - 3721:25
**independent** [38] - 3716:8, 3716:9, 3719:1, 3719:3, 3722:1, 3722:8, 3722:16, 3722:17, 3724:13, 3724:14, 3724:23, 3726:15, 3731:10, 3732:25, 3734:13, 3734:14, 3734:15, 3734:20,

3734:23, 3737:22, 3740:6, 3742:7, 3743:22, 3748:23, 3756:25, 3777:23, 3810:1, 3832:20, 3850:17, 3850:24, 3852:23, 3854:20, 3856:22, 3858:17, 3859:3, 3859:10, 3860:13, 3873:14
**Independent** [3] - 3716:9, 3718:14, 3725:7
**Index** [32] - 3789:8, 3790:1, 3790:15, 3790:17, 3795:7, 3795:10, 3795:20, 3815:20, 3815:24, 3817:18, 3817:25, 3818:7, 3819:8, 3819:11, 3821:19, 3822:10, 3823:10, 3823:16, 3824:4, 3826:4, 3826:7, 3826:12, 3826:14, 3833:3, 3835:2, 3835:16, 3837:2, 3839:2, 3839:17, 3840:3, 3840:14, 3840:19
**index** [46] - 3755:18, 3755:19, 3755:22, 3756:9, 3756:14, 3756:21, 3757:1, 3757:2, 3757:3, 3757:7, 3757:10, 3757:14, 3757:16, 3757:17, 3766:14, 3766:18, 3766:21, 3768:3, 3768:7, 3777:10, 3777:14, 3778:5, 3778:9, 3778:11, 3778:12, 3790:13, 3790:25, 3791:5, 3791:11, 3791:13, 3793:6, 3793:7, 3793:10, 3793:11, 3793:20, 3794:4, 3794:7, 3794:15, 3794:17, 3801:12, 3827:13, 3827:14, 3836:16
**Index's** [1] - 3840:16
**indexes** [2] - 3757:4
**indicate** [2] - 3765:10, 3771:14
**indicated** [6] - 3715:10, 3736:8, 3736:12, 3839:11, 3852:13, 3872:19

**indicates** [4] - 3771:17, 3815:14, 3831:22, 3831:24
**indication** [1] - 3770:14
**individual** [1] - 3874:4
**inducement** [1] - 3849:23
**industry** [18] - 3718:17, 3722:16, 3722:19, 3740:20, 3763:12, 3765:25, 3766:9, 3766:10, 3767:5, 3777:22, 3779:14, 3786:6, 3850:11, 3851:22, 3852:22, 3854:11, 3854:21, 3860:18
**influence** [1] - 3723:10
**information** [78] - 3716:10, 3716:18, 3716:22, 3717:14, 3717:17, 3717:20, 3717:24, 3718:1, 3718:3, 3718:4, 3718:8, 3718:10, 3718:12, 3718:15, 3719:3, 3719:7, 3719:10, 3719:11, 3719:15, 3719:23, 3720:2, 3725:15, 3727:6, 3728:10, 3728:14, 3728:24, 3729:2, 3729:11, 3730:6, 3730:16, 3730:17, 3730:20, 3730:21, 3730:22, 3730:24, 3731:2, 3731:17, 3732:12, 3740:12, 3762:6, 3775:8, 3776:17, 3777:5, 3778:3, 3778:17, 3778:18, 3779:22, 3780:6, 3780:24, 3781:10, 3782:22, 3785:23, 3786:1, 3786:4, 3786:8, 3786:10, 3786:14, 3796:10, 3799:4, 3803:8, 3821:25, 3823:18, 3828:2, 3828:6, 3829:9, 3829:25, 3830:10, 3837:19, 3844:11, 3845:13, 3845:22, 3846:8, 3848:1, 3858:19, 3863:15, 3864:9, 3873:3, 3873:6

**informed** [1] - 3737:16
**inherent** [6] - 3716:25, 3731:5, 3772:13, 3797:1, 3797:6, 3804:24
**inherently** [1] - 3797:21
**input** [1] - 3717:9
**inquire** [1] - 3739:4
**INS** [1] - 3708:6
**inside** [2] - 3788:11, 3788:24
**Insight** [2] - 3780:21, 3780:23
**Insights** [1] - 3725:18
**insofar** [1] - 3829:23
**Institute** [6] - 3716:1, 3716:17, 3718:14, 3763:11, 3765:2, 3779:18
**insufficient** [1] - 3761:15
**insufficiently** [2] - 3760:13, 3761:16
**INSURANCE** [1] - 3709:17
**insurance** [19] - 3726:16, 3726:22, 3735:12, 3735:13, 3746:16, 3747:13, 3752:20, 3752:22, 3752:23, 3802:1, 3802:2, 3802:3, 3802:6, 3802:8, 3802:9, 3802:12, 3802:20, 3804:11, 3808:22
**integrity** [2] - 3717:14, 3717:17
**intend** [1] - 3715:5
**intended** [4] - 3753:2, 3755:19, 3767:7, 3813:5
**intending** [1] - 3779:17
**interest** [8] - 3715:20, 3738:16, 3850:8, 3850:13, 3852:11, 3854:9, 3856:18, 3872:2
**interested** [1] - 3738:24
**interests** [4] - 3726:4, 3726:5, 3726:7, 3852:19
**Intermediate** [6] - 3795:6, 3795:9, 3795:20, 3815:14, 3815:20, 3815:23
**Internal** [1] - 3842:10

interpretation [1] - 3771:8
interpreted [1] - 3830:19
interviewed [1] - 3738:12
introduced [2] - 3783:10, 3812:15
introduction [1] - 3774:18
Investment [15] - 3712:18, 3716:1, 3716:17, 3718:13, 3723:5, 3723:6, 3724:11, 3745:11, 3745:16, 3763:11, 3765:2, 3776:11, 3779:18, 3831:19, 3849:15
investment [26] - 3728:15, 3729:3, 3740:25, 3741:6, 3741:9, 3741:12, 3741:13, 3741:15, 3741:16, 3756:1, 3767:21, 3779:14, 3810:23, 3812:9, 3813:18, 3827:24, 3832:1, 3832:6, 3832:14, 3834:8, 3834:9, 3834:23, 3841:24, 3842:3, 3852:12, 3867:19
investments [2] - 3828:11, 3832:2
investor [3] - 3717:3, 3785:11, 3852:14
investors [14] - 3715:17, 3715:21, 3717:5, 3719:20, 3719:21, 3742:21, 3742:23, 3760:13, 3761:16, 3764:22, 3850:18, 3852:1, 3854:15, 3855:2
involved [1] - 3753:19
involving [2] - 3840:2, 3840:14
irrelevant [1] - 3811:7
irresponsible [1] - 3784:20
isolated [1] - 3836:16
isolation [1] - 3837:15
issue [19] - 3718:7, 3732:7, 3756:18, 3767:4, 3773:19, 3777:14, 3777:20, 3787:1, 3793:7, 3793:11, 3794:3, 3800:3, 3805:3,

3805:17, 3839:15, 3840:11, 3855:6, 3857:3, 3857:4
issues [9] - 3772:15, 3837:6, 3837:7, 3837:11, 3837:24, 3840:11, 3854:15, 3855:4, 3873:13
item [2] - 3731:16, 3749:13
items [3] - 3718:18, 3817:12, 3834:6
itself [6] - 3764:8, 3808:1, 3812:13, 3827:11, 3829:1, 3849:13

J

J-26 [1] - 3855:14
J-4 [3] - 3806:6, 3848:20, 3849:11
J-5 [2] - 3853:1
JAMES [1] - 3709:13
January [1] - 3723:6
Jennings [3] - 3861:13, 3861:14, 3861:15
jeopardize [1] - 3848:5
JERSEY [3] - 3708:1, 3708:15, 3708:18
Joenk [11] - 3711:22, 3723:15, 3753:13, 3754:3, 3755:5, 3755:10, 3770:20, 3799:25, 3807:21, 3851:4, 3872:19
joining [1] - 3743:14
joint [1] - 3738:16
jointly [1] - 3802:9
JONATHAN [1] - 3709:9
Jones [4] - 3759:18, 3760:23, 3809:10, 3809:16
jot [1] - 3797:3
journals [1] - 3842:12
JP [34] - 3712:1, 3838:4, 3838:6, 3838:7, 3838:22, 3841:11, 3841:20, 3841:23, 3842:2, 3842:9, 3842:12, 3842:22, 3842:23, 3843:1, 3843:8, 3843:14, 3843:24, 3844:2, 3844:5, 3844:11, 3844:16,

3844:25, 3845:10, 3845:18, 3845:24, 3846:2, 3846:4, 3846:5, 3846:9, 3846:13, 3855:18, 3855:19, 3856:3
JUDGE [1] - 3708:17
judge [3] - 3804:19, 3806:6, 3830:22
judgment [12] - 3715:19, 3731:15, 3804:1, 3804:20, 3837:17, 3849:22, 3849:25, 3853:19, 3856:6, 3873:11, 3874:18
judgments [1] - 3874:4
July [11] - 3748:22, 3758:17, 3758:18, 3763:13, 3775:13, 3811:5, 3814:24, 3831:3, 3831:5, 3860:6, 3865:1
June [3] - 3724:13, 3758:17, 3860:6

K

keep [7] - 3772:22, 3780:15, 3799:7, 3802:24, 3836:6, 3841:13, 3842:14
key [1] - 3848:8
Kimble [1] - 3872:3
kind [24] - 3712:11, 3731:9, 3739:20, 3742:19, 3752:21, 3754:11, 3756:2, 3756:25, 3757:1, 3757:2, 3757:5, 3757:19, 3758:16, 3772:25, 3780:5, 3789:13, 3809:19, 3830:5, 3830:7, 3845:8, 3858:1, 3865:5, 3873:25, 3874:24
kinds [4] - 3726:15, 3749:5, 3766:11, 3838:2
Knowing [1] - 3826:21
knowing [1] - 3775:25
knowledge [5] - 3747:21, 3748:7, 3749:3, 3770:19, 3801:1
known [3] - 3756:24, 3856:2, 3856:3
knows [1] - 3822:19

Kopcke [1] - 3714:5
KORN [2] - 3709:9, 3875:18
Kozlowski [1] - 3831:25
KWELTY [2] - 3709:6, 3746:25

L

labeled [1] - 3780:21
labor [1] - 3862:10
laid [4] - 3766:25, 3770:18, 3783:6, 3861:3
Lakind [27] - 3711:7, 3713:20, 3723:25, 3726:13, 3727:11, 3751:22, 3752:4, 3753:14, 3760:2, 3761:6, 3764:10, 3768:18, 3773:11, 3779:24, 3788:1, 3788:14, 3789:5, 3795:2, 3803:4, 3804:8, 3806:13, 3806:21, 3820:17, 3822:19, 3822:21, 3830:2, 3848:18
LAKIND [176] - 3709:3, 3709:4, 3709:5, 3710:3, 3711:3, 3713:17, 3713:21, 3714:1, 3714:16, 3714:23, 3715:1, 3715:3, 3715:7, 3720:7, 3720:10, 3720:13, 3722:20, 3722:25, 3724:1, 3724:3, 3724:9, 3727:12, 3730:14, 3733:17, 3735:1, 3735:15, 3735:23, 3736:6, 3736:17, 3737:1, 3737:6, 3738:6, 3739:2, 3742:25, 3746:23, 3747:1, 3747:2, 3752:5, 3752:6, 3753:17, 3753:22, 3754:1, 3754:2, 3757:20, 3758:2, 3758:6, 3758:8, 3758:11, 3759:23, 3760:10, 3761:8, 3762:14, 3762:19, 3762:23, 3763:25, 3764:4, 3764:11, 3764:14, 3765:21, 3765:22, 3767:13,

3768:2, 3768:12, 3768:16, 3768:20, 3769:2, 3769:5, 3769:11, 3771:1, 3771:4, 3771:12, 3771:13, 3771:25, 3772:3, 3772:6, 3773:8, 3773:12, 3773:13, 3780:1, 3780:12, 3781:6, 3781:8, 3781:11, 3783:9, 3783:16, 3783:18, 3783:22, 3784:13, 3787:19, 3787:22, 3788:2, 3788:8, 3788:16, 3789:6, 3789:17, 3789:21, 3790:6, 3792:9, 3792:13, 3794:19, 3799:5, 3799:9, 3802:18, 3806:5, 3806:8, 3806:15, 3806:22, 3807:4, 3807:6, 3807:7, 3812:21, 3812:23, 3813:1, 3813:21, 3813:23, 3813:24, 3814:16, 3817:23, 3819:22, 3820:5, 3820:22, 3821:5, 3822:24, 3823:2, 3824:5, 3826:20, 3827:22, 3830:22, 3838:10, 3839:5, 3843:23, 3848:9, 3848:13, 3848:16, 3848:19, 3848:22, 3852:25, 3853:4, 3855:13, 3857:12, 3857:14, 3857:17, 3857:18, 3858:14, 3858:21, 3861:9, 3861:12, 3861:13, 3861:14, 3862:1, 3863:17, 3863:21, 3864:12, 3868:21, 3868:24, 3869:16, 3869:19, 3869:22, 3869:24, 3870:1, 3870:3, 3870:13, 3871:13, 3871:16, 3871:21, 3872:1, 3872:10, 3872:16, 3875:3, 3875:8, 3875:12, 3875:20, 3875:23, 3876:1, 3876:6, 3876:11
language [10] - 3755:3, 3755:8, 3784:6, 3851:12,

3851:22, 3852:13, 3854:11, 3855:10, 3861:23, 3874:16
**Large** [1] - 3792:17
**large** [5] - 3733:12, 3749:18, 3762:10, 3765:25, 3782:10
**largely** [1] - 3723:8
**larger** [2] - 3779:8, 3805:18
**largest** [2] - 3795:12, 3804:11
**last** [21] - 3724:10, 3733:19, 3763:18, 3764:16, 3767:2, 3775:3, 3797:7, 3812:6, 3812:22, 3839:21, 3854:13, 3854:23, 3858:6, 3858:7, 3862:6, 3870:4, 3870:23, 3874:5, 3874:6, 3874:7, 3874:8
**late** [2] - 3739:20, 3857:11
**Laughter** [1] - 3772:24
**law** [9] - 3743:8, 3752:22, 3776:12, 3803:6, 3835:12, 3849:25, 3853:19, 3856:6, 3873:13
**lawyer** [5] - 3730:11, 3746:16, 3752:20, 3752:21
**lay** [2] - 3818:25, 3872:4
**lead** [3] - 3722:17, 3732:24, 3832:19
**leadership** [1] - 3724:14
**learn** [4] - 3760:11, 3760:22, 3761:13, 3809:15
**learned** [1] - 3752:14
**least** [6] - 3718:18, 3758:19, 3761:22, 3800:24, 3803:13, 3832:24
**leave** [2] - 3814:19, 3872:7
**leaving** [1] - 3848:10
**Left** [1] - 3764:19
**left** [14] - 3711:6, 3713:6, 3763:18, 3764:15, 3764:19, 3774:6, 3774:7, 3784:10, 3790:20, 3806:25, 3826:16, 3839:24, 3865:5
**left-hand** [8] -

3763:18, 3764:15, 3774:7, 3784:10, 3790:20, 3839:24, 3865:5
**Left-hand** [1] - 3764:19
**legal** [6] - 3728:10, 3742:3, 3748:15, 3762:6, 3800:16, 3801:19
**length** [5] - 3728:9, 3728:13, 3776:2, 3776:9, 3874:20
**Less** [1] - 3770:2
**less** [3] - 3768:4, 3768:8, 3770:8
**letter** [2] - 3875:14, 3876:1
**level** [18] - 3751:24, 3751:25, 3753:4, 3755:14, 3755:16, 3763:12, 3769:21, 3769:24, 3786:21, 3786:25, 3789:12, 3796:6, 3833:1, 3838:1, 3870:21, 3870:22, 3872:21
**levels** [14] - 3782:25, 3786:16, 3786:21, 3786:22, 3786:23, 3787:5, 3787:8, 3787:12, 3796:5, 3796:20, 3796:22, 3797:24, 3798:17, 3799:1
**Levels** [2] - 3769:13, 3796:15
**leverage** [9] - 3850:17, 3850:19, 3850:22, 3851:25, 3852:15, 3852:17, 3852:18, 3854:12, 3854:17
**Lewis** [5] - 3712:4, 3714:6, 3742:6, 3753:15, 3753:24
**Lewis'** [1] - 3712:5
**Liability** [2] - 3849:18, 3855:25
**liability** [2] - 3851:15, 3852:19
**liable** [4] - 3849:24, 3850:2, 3853:19, 3856:5
**lie** [1] - 3781:18
**LIFE** [2] - 3708:6, 3709:17
**light** [2] - 3713:13, 3740:3
**lights** [1] - 3754:21
**likely** [4] - 3711:8,

3724:14, 3724:15, 3724:16
**limitation** [3] - 3747:18, 3851:14, 3851:24
**Limitations** [2] - 3849:18, 3855:25
**limitations** [7] - 3745:3, 3772:13, 3777:12, 3797:1, 3797:6, 3797:19, 3797:21
**limited** [4] - 3801:9, 3838:19, 3841:17, 3842:7
**line** [5] - 3753:9, 3817:12, 3824:10, 3859:6, 3859:7
**lines** [2] - 3798:5, 3859:6
**linked** [1] - 3754:15
**lion's** [1] - 3713:6
**Lipper** [69] - 3718:4, 3718:5, 3725:14, 3728:19, 3728:20, 3769:14, 3770:11, 3770:15, 3771:16, 3771:18, 3772:7, 3773:3, 3773:14, 3773:17, 3773:21, 3774:12, 3774:15, 3774:19, 3775:8, 3775:10, 3775:12, 3775:15, 3775:19, 3775:21, 3776:22, 3776:25, 3777:3, 3777:4, 3777:7, 3777:9, 3777:12, 3777:19, 3777:20, 3777:22, 3778:2, 3778:4, 3778:7, 3778:8, 3779:20, 3779:21, 3780:9, 3782:23, 3783:11, 3786:10, 3786:12, 3786:24, 3787:4, 3787:9, 3790:2, 3790:7, 3790:9, 3791:4, 3793:5, 3793:7, 3793:11, 3794:3, 3794:8, 3794:14, 3794:16, 3796:21, 3797:5, 3797:18, 3797:19, 3798:6, 3816:7, 3829:13, 3829:24, 3872:22
**liquidity** [2] - 3837:7, 3837:11
**list** [11] - 3748:2,

3748:8, 3748:25, 3780:1, 3790:23, 3834:7, 3834:9, 3834:14, 3843:11, 3843:17, 3856:9
**listed** [3] - 3725:16, 3735:19, 3834:6
**lists** [1] - 3831:19
**litigation** [16] - 3735:10, 3737:8, 3737:17, 3737:19, 3738:10, 3738:14, 3739:3, 3739:5, 3739:11, 3739:17, 3746:16, 3760:6, 3761:3, 3761:10, 3761:20, 3862:7
**litigator** [1] - 3738:18
**LLP** [2] - 3709:9, 3709:12
**located** [1] - 3810:8
**look** [54] - 3727:10, 3727:15, 3744:19, 3761:3, 3761:6, 3761:9, 3762:9, 3762:11, 3762:24, 3766:2, 3779:7, 3787:18, 3788:22, 3789:9, 3794:1, 3796:6, 3796:8, 3796:18, 3797:21, 3803:8, 3805:21, 3810:13, 3811:15, 3812:1, 3812:10, 3812:20, 3812:25, 3813:14, 3813:15, 3816:20, 3817:24, 3818:3, 3819:21, 3821:23, 3822:3, 3825:6, 3830:21, 3830:24, 3834:12, 3836:14, 3837:17, 3837:19, 3839:7, 3849:11, 3849:13, 3853:5, 3864:14, 3864:22, 3873:2, 3873:16, 3873:17, 3874:13
**looked** [6] - 3711:17, 3787:3, 3812:18, 3825:16, 3826:5, 3826:8
**looking** [33] - 3733:15, 3761:18, 3761:21, 3765:19, 3767:19, 3774:3, 3774:18, 3780:3, 3788:16, 3789:7, 3789:25, 3792:2, 3796:19, 3797:2, 3797:13,

3811:4, 3814:25, 3815:10, 3815:11, 3820:1, 3821:8, 3823:7, 3831:5, 3834:11, 3834:14, 3836:15, 3836:20, 3837:15, 3851:19, 3855:10, 3865:14, 3867:21, 3870:19
**looks** [15] - 3761:1, 3763:12, 3781:8, 3781:10, 3784:5, 3791:12, 3792:5, 3814:24, 3823:24, 3824:12, 3851:6, 3853:11, 3855:17, 3864:24, 3865:1
**loss** [6] - 3849:25, 3853:20, 3853:22, 3854:14, 3855:2, 3856:6
**loud** [1] - 3817:10
**Louie** [2] - 3801:8, 3851:4
**LOUIE** [1] - 3709:16
**lower** [7] - 3760:8, 3766:15, 3768:8, 3782:11, 3784:18, 3868:11
**lowest** [1] - 3778:20
**loyalty** [3] - 3719:21, 3848:24, 3849:3
**lunch** [1] - 3806:11
**Luncheon** [1] - 3806:16
**Lynch** [1] - 3759:1

___

**M**

**macro** [1] - 3837:19
**Magellan** [2] - 3781:24, 3783:24
**magnifying** [2] - 3764:5, 3819:23
**magnitude** [4] - 3730:5, 3730:15, 3730:19, 3857:22
**mail** [1] - 3755:2
**mailings** [1] - 3718:13
**mails** [2] - 3718:13, 3718:15
**maintain** [3] - 3842:12, 3842:14, 3842:17
**maintaining** [1] - 3842:15
**maintains** [1] - 3828:21
**maintenance** [1] -

3843:7

**major** [1] - 3866:8
**majority** [1] - 3790:25
**manage** [4] - 3832:2, 3832:3, 3832:7
**managed** [9] - 3755:19, 3755:23, 3755:24, 3755:25, 3766:15, 3766:18, 3768:4, 3778:5, 3785:9
**management** [71] - 3718:20, 3724:16, 3727:23, 3728:5, 3728:15, 3741:6, 3741:9, 3741:12, 3741:13, 3741:15, 3741:16, 3747:13, 3747:18, 3748:6, 3749:3, 3752:17, 3765:11, 3765:24, 3769:17, 3770:1, 3774:12, 3774:22, 3774:23, 3789:11, 3791:24, 3795:9, 3797:5, 3798:1, 3799:3, 3801:19, 3804:9, 3806:4, 3808:1, 3817:19, 3818:9, 3818:17, 3820:7, 3820:9, 3821:3, 3821:7, 3822:1, 3823:21, 3823:23, 3824:4, 3826:2, 3826:14, 3826:23, 3832:1, 3832:6, 3832:14, 3833:13, 3833:21, 3834:8, 3834:9, 3834:23, 3835:1, 3835:8, 3836:9, 3839:12, 3847:3, 3847:5, 3849:7, 3851:15, 3852:12, 3862:12, 3862:25, 3867:2, 3867:17
**MANAGEMENT** [1] - 3708:11
**Management** [10] - 3712:18, 3724:12, 3725:19, 3745:11, 3745:16, 3769:12, 3796:14, 3831:19, 3847:9, 3849:15
**management/ administrative** [4] - 3740:25, 3789:15, 3792:12, 3797:10
**Manager** [1] - 3849:21

**manager** [13] - 3812:9, 3813:18, 3829:9, 3829:10, 3829:14, 3834:3, 3838:1, 3849:5, 3849:24, 3851:1, 3852:1, 3852:7, 3855:9
**manager's** [2] - 3827:9, 3849:23
**managers** [1] - 3755:25
**manages** [1] - 3832:4
**managing** [2] - 3803:14, 3832:25
**MANAGING** [1] - 3709:16
**mandated** [1] - 3742:20
**manner** [1] - 3873:5
**manual** [1] - 3718:24
**Marathon** [1] - 3782:2
**margin** [1] - 3826:24
**MARK** [1] - 3709:5
**marked** [4] - 3710:8, 3710:8, 3875:25, 3876:5
**Market** [1] - 3780:22
**market** [1] - 3812:17
**Marketing** [1] - 3810:15
**marketing** [4] - 3810:22, 3811:19, 3830:7, 3830:12
**marketplace** [2] - 3805:1, 3837:6
**Martin** [3] - 3861:13, 3861:14, 3861:15
**MARY** [1] - 3709:12
**material** [11] - 3718:5, 3718:21, 3719:4, 3720:6, 3763:2, 3807:9, 3817:6, 3817:7, 3830:7, 3836:5, 3836:15
**materials** [2] - 3731:13, 3794:11
**math** [3] - 3827:4, 3827:5, 3827:7
**mathematical** [2] - 3784:8, 3784:16
**mathematician** [1] - 3867:6
**mathematics** [2] - 3866:8, 3866:22
**matter** [4] - 3711:5, 3852:21, 3873:12
**matters** [6] - 3723:9, 3735:10, 3832:21, 3850:1, 3853:21, 3856:8

**mature** [1] - 3798:21
**McCLOY** [1] - 3709:12
**mean** [34] - 3711:18, 3712:15, 3714:2, 3720:2, 3731:4, 3731:20, 3737:19, 3737:22, 3738:5, 3741:5, 3754:7, 3774:16, 3775:16, 3778:15, 3778:22, 3778:24, 3779:2, 3779:3, 3779:22, 3780:3, 3780:4, 3782:21, 3808:8, 3812:10, 3817:9, 3829:8, 3840:8, 3840:10, 3845:20, 3859:16, 3866:7
**meaning** [2] - 3756:3, 3835:12
**meaningful** [3] - 3795:19, 3795:22, 3796:6
**means** [8] - 3717:5, 3757:13, 3775:18, 3840:5, 3840:6, 3851:12, 3851:18, 3867:10
**meant** [1] - 3769:16
**measured** [1] - 3767:19
**mechanics** [1] - 3779:10
**median** [10] - 3770:16, 3771:16, 3778:15, 3778:19, 3779:22, 3780:4, 3782:16, 3782:23, 3786:16, 3816:7
**Median** [1] - 3778:16
**meet** [6] - 3737:9, 3740:9, 3755:25, 3756:1, 3804:9, 3848:3
**meeting** [15] - 3732:18, 3733:16, 3733:19, 3739:16, 3739:21, 3740:14, 3740:22, 3744:9, 3745:8, 3775:13, 3775:20, 3822:7, 3829:20, 3830:9, 3831:3
**meetings** [8] - 3737:12, 3737:14, 3742:10, 3744:25, 3748:22, 3839:25, 3840:2, 3840:14
**meets** [1] - 3830:3
**member** [1] - 3745:10

**members** [3] - 3734:10, 3743:11, 3743:15
**memorandum** [2] - 3743:8, 3834:12
**memorandums** [1] - 3718:25
**Memorialized** [1] - 3771:21
**memorized** [1] - 3748:12
**memory** [2] - 3864:18, 3864:21
**mentioned** [8] - 3711:12, 3711:25, 3716:10, 3780:24, 3800:12, 3800:15, 3841:19, 3873:10
**merged** [1] - 3742:5
**Merrill** [1] - 3759:1
**met** [1] - 3738:22
**methodologies** [1] - 3860:11
**methodology** [17] - 3729:21, 3749:23, 3751:1, 3813:15, 3857:23, 3858:6, 3858:22, 3859:11, 3859:15, 3859:18, 3860:7, 3860:17, 3862:3, 3862:9, 3864:4, 3867:13, 3870:24
**middle** [3] - 3819:17, 3867:21, 3869:20
**midpoint** [1] - 3778:16
**might** [21] - 3711:12, 3730:6, 3731:3, 3744:12, 3747:10, 3756:9, 3756:12, 3756:25, 3757:17, 3769:25, 3785:7, 3800:22, 3804:20, 3806:5, 3830:11, 3844:14, 3849:21, 3852:2, 3860:11, 3870:10
**Milbank** [5] - 3738:6, 3738:7, 3738:11, 3739:23, 3810:8
**MILBANK** [1] - 3709:12
**million** [44] - 3781:25, 3782:2, 3791:21, 3791:22, 3792:21, 3795:16, 3795:24, 3796:9, 3798:2, 3798:8, 3798:11, 3814:3, 3814:5, 3814:8, 3814:10,

3817:19, 3817:20, 3818:9, 3818:15, 3818:17, 3818:18, 3818:22, 3824:19, 3825:4, 3826:3, 3826:5, 3826:10, 3826:15, 3826:16, 3826:21, 3835:3, 3835:9, 3835:17, 3835:24, 3836:10, 3836:16, 3866:19, 3866:20, 3867:14
**millions** [1] - 3824:17
**mind** [5] - 3713:10, 3723:16, 3731:25, 3757:16, 3823:16
**mine** [1] - 3762:15
**minimum** [2] - 3713:3, 3797:1
**minus** [2] - 3866:1, 3867:7
**minute** [11] - 3727:4, 3757:23, 3769:8, 3796:18, 3799:12, 3821:22, 3826:8, 3848:9, 3848:11, 3848:14, 3863:18
**minutes** [18] - 3727:14, 3732:1, 3742:9, 3742:18, 3742:22, 3744:9, 3744:25, 3745:2, 3745:4, 3745:6, 3757:25, 3768:7, 3770:25, 3799:8, 3825:16, 3841:17, 3857:8, 3857:13
**mischaracterizations** [1] - 3740:19
**misconduct** [1] - 3850:3
**misfeasance** [2] - 3853:23, 3856:9
**misinterpreting** [1] - 3782:13
**mislead** [1] - 3781:19
**misleading** [6] - 3732:13, 3740:18, 3759:20, 3784:19, 3786:17
**missing** [1] - 3731:3
**mistake** [4] - 3736:4, 3849:25, 3853:19, 3856:6
**mistakes** [2] - 3731:22, 3734:18
**misunderstood** [1] - 3751:5
**mitigate** [2] - 3801:24, 3802:24

MI [1] - 3857:8
MML [1] - 3792:17
moment [15] -
3720:11, 3743:2,
3758:12, 3761:17,
3762:24, 3767:17,
3768:22, 3778:13,
3781:3, 3809:2,
3810:13, 3811:15,
3818:25, 3819:21,
3855:10
moments [3] -
3720:20, 3775:22,
3783:2
monitoring [4] -
3737:17, 3832:15,
3834:2, 3838:25
monitors [2] -
3841:23, 3842:3
month [2] - 3739:19
monthly [1] - 3735:11
months [1] - 3830:11
Morgan [39] - 3712:1,
3712:3, 3712:5,
3714:6, 3742:5,
3753:15, 3753:24,
3805:6, 3838:4,
3838:6, 3838:7,
3838:23, 3841:11,
3841:20, 3841:23,
3842:2, 3842:9,
3842:12, 3842:22,
3842:23, 3843:1,
3843:14, 3843:24,
3844:2, 3844:5,
3844:11, 3844:25,
3845:10, 3845:19,
3845:24, 3846:2,
3846:4, 3846:5,
3846:9, 3846:13,
3855:18, 3855:19,
3856:3
Morgan's [2] - 3843:8,
3844:16
morning [6] - 3711:1,
3714:22, 3714:24,
3788:17, 3822:22,
3862:12
most [2] - 3784:19,
3864:9
motion [2] - 3712:6,
3722:20
motions [1] - 3712:6
motives [1] - 3713:9
move [13] - 3722:21,
3736:7, 3737:6,
3744:5, 3745:9,
3753:19, 3755:18,
3769:3, 3785:7,
3801:23, 3814:13,

3875:4, 3875:9
moved [2] - 3719:16,
3752:19
moving [3] - 3752:24,
3770:5, 3836:5
multiply [1] - 3826:16
MURPHY [5] -
3709:12, 3711:4,
3711:11, 3712:15,
3822:22
must [1] - 3759:10
mutual [9] - 3763:14,
3764:21, 3766:4,
3767:21, 3808:14,
3812:12, 3853:9,
3859:7, 3867:25
Mutual [8] - 3716:5,
3716:13, 3716:21,
3720:19, 3720:21,
3780:21, 3781:18,
3875:20
MYLES [1] - 3709:6
mystified [2] - 3752:1,
3761:21

## N

N-SAR [1] - 3845:3
N/A [3] - 3840:4,
3840:5, 3840:9
name [2] - 3790:20,
3791:12
National [2] - 3792:18,
3792:20
naturally [1] - 3737:23
nature [10] - 3725:18,
3729:16, 3729:17,
3731:5, 3745:3,
3746:22, 3754:20,
3814:13, 3851:25,
3852:22
NAV [3] - 3845:12,
3846:8, 3846:10
near [3] - 3733:22,
3733:25, 3792:16
nearly [1] - 3781:25
necessary [3] -
3724:15, 3747:12,
3763:25
need [12] - 3713:3,
3720:12, 3731:4,
3731:14, 3736:11,
3749:21, 3768:18,
3769:7, 3769:8,
3772:22, 3787:15,
3874:13
needed [3] - 3732:2,
3741:12, 3804:3
needs [4] - 3727:10,

3764:2, 3819:24,
3843:20
negative [3] - 3840:19,
3866:16, 3867:10
neglected [3] -
3864:14, 3875:4,
3875:8
negligence [3] -
3850:3, 3853:23,
3856:10
negotiate [2] -
3852:19, 3854:18
negotiated [1] -
3874:20
negotiates [1] -
3828:19
negotiation [2] -
3776:2, 3776:9
negotiations [2] -
3873:7, 3873:25
neighborhood [1] -
3800:1
Net [2] - 3815:5,
3838:22
net [12] - 3790:1,
3791:15, 3791:17,
3791:20, 3815:21,
3822:1, 3822:2,
3823:21, 3841:12,
3843:6, 3843:9,
3843:12
network [1] - 3754:17
never [14] - 3731:7,
3766:4, 3770:19,
3777:9, 3785:18,
3794:13, 3850:18,
3852:1, 3854:14,
3855:2, 3862:17,
3863:7, 3863:10,
3874:18
Nevertheless [1] -
3782:8
new [5] - 3798:21,
3806:7, 3846:12,
3846:19, 3876:2
NEW [3] - 3708:1,
3708:15, 3708:18
next [9] - 3722:24,
3761:4, 3766:13,
3812:3, 3812:5,
3816:7, 3831:16,
3841:4, 3850:25
Next [1] - 3768:11
Nights [1] - 3718:17
NO [2] - 3708:5,
3708:9
nobody [1] - 3855:9
non [4] - 3747:13,
3832:8, 3840:4
non-applicable [1] -

3840:4
non-EQAT [1] -
3832:8
non-insurance [1] -
3747:13
None [2] - 3870:11,
3872:10
none [3] - 3767:7,
3833:11, 3840:21
normalize [1] - 3864:8
note [3] - 3767:18,
3767:19, 3805:23
notes [1] - 3848:10
Nothing [1] - 3870:22
nothing [4] - 3713:10,
3750:25, 3767:6,
3870:20
notice [3] - 3715:4,
3844:12, 3844:17
noticed [1] - 3732:8
notwithstanding [1] -
3798:23
nowhere [1] - 3809:16
NQ [1] - 3844:20
Number [1] - 3713:17
number [34] -
3712:23, 3714:11,
3722:4, 3732:1,
3732:3, 3732:9,
3732:10, 3733:14,
3733:21, 3737:12,
3737:18, 3737:25,
3739:25, 3745:11,
3749:1, 3756:16,
3756:20, 3757:17,
3757:19, 3762:18,
3776:5, 3777:13,
3789:1, 3798:5,
3804:22, 3805:24,
3819:5, 3819:12,
3823:25, 3826:11,
3839:14, 3853:14,
3855:3, 3875:22
numbers [11] -
3750:16, 3812:10,
3817:4, 3817:13,
3818:14, 3822:12,
3823:14, 3823:20,
3836:20, 3858:2,
3858:18
Numeral [2] - 3721:19,
3721:21
numerical [1] -
3873:19

## O

o'clock [2] - 3757:25,
3806:18

3840:4
non-EQAT [1] -
3832:8
oath [1] - 3714:21
Objection [12] -
3751:13, 3751:15,
3760:24, 3765:13,
3782:18, 3802:15,
3826:18, 3843:15,
3860:23, 3869:11,
3871:4, 3871:14
objection [4] -
3766:23, 3771:9,
3875:15, 3876:3
objective [1] - 3756:1
objects [1] - 3781:24
obligation [3] -
3828:1, 3842:23,
3843:2
obligations [2] -
3853:25, 3856:12
obliged [1] - 3803:8
observed [1] -
3724:12
obtain [4] - 3740:12,
3804:21, 3828:1,
3828:5
obviously [6] -
3737:13, 3792:25,
3796:4, 3809:25,
3858:19, 3864:4
Obviously [2] -
3719:13, 3864:18
occasion [3] -
3732:14, 3737:8,
3766:4
occasions [2] -
3732:10, 3737:11
occur [1] - 3732:11
occurred [5] - 3738:1,
3745:8, 3836:9,
3840:2, 3859:12
occurs [1] - 3754:5
OF [4] - 3708:1,
3708:18, 3710:3,
3714:23
offer [1] - 3785:4
office [2] - 3748:5,
3754:10
officer [5] - 3851:1,
3851:2, 3851:7,
3851:11, 3852:6
OFFICIAL [1] -
3708:25
offshore [1] - 3832:7
often [10] - 3749:11,
3756:1, 3756:2,
3758:17, 3781:19,
3796:4, 3797:13,
3836:24, 3858:18,
3873:7
Ohio [2] - 3792:18,
3792:20

**old** [3] - 3764:11, 3800:1, 3800:11
**on-site** [1] - 3840:24
**once** [2] - 3750:19, 3830:11
**Once** [1] - 3854:17
**one** [84] - 3711:4, 3711:9, 3711:12, 3711:19, 3712:1, 3712:17, 3713:14, 3713:17, 3713:23, 3715:15, 3716:3, 3717:2, 3717:23, 3718:21, 3720:18, 3722:24, 3731:25, 3732:8, 3733:15, 3734:9, 3735:8, 3755:25, 3762:10, 3763:12, 3768:24, 3769:8, 3770:5, 3773:21, 3775:5, 3776:3, 3780:23, 3781:1, 3782:2, 3785:6, 3787:23, 3788:22, 3789:5, 3789:7, 3791:3, 3791:6, 3792:17, 3795:1, 3795:23, 3795:24, 3797:12, 3797:14, 3798:2, 3799:12, 3803:10, 3804:10, 3804:21, 3804:23, 3805:23, 3812:3, 3812:5, 3812:6, 3814:23, 3815:12, 3818:18, 3819:21, 3821:22, 3822:21, 3822:22, 3823:8, 3826:5, 3826:21, 3828:16, 3840:11, 3843:17, 3847:1, 3847:8, 3847:19, 3852:7, 3852:20, 3863:17, 3864:24, 3866:9, 3868:18, 3870:17, 3871:9, 3873:21, 3874:7, 3875:13
**One** [2] - 3797:4, 3802:1
**ones** [2] - 3782:10, 3798:15
**open** [2] - 3780:15, 3845:8
**open-end** [1] - 3845:8
**opening** [1] - 3724:12
**operating** [1] - 3774:15
**Operating** [1] - 3774:24

**operational** [1] - 3800:16
**opinion** [1] - 3785:16
**Oppenheimer** [1] - 3805:8
**opportunity** [6] - 3737:24, 3740:5, 3761:2, 3761:6, 3785:19, 3848:3
**opposed** [3] - 3816:23, 3837:15, 3870:10
**opposite** [1] - 3713:8
**opposition** [1] - 3712:5
**oranges** [1] - 3813:8
**order** [4] - 3728:8, 3728:13, 3864:8, 3866:21
**organization** [1] - 3716:4
**organizations** [1] - 3725:18
**origins** [2] - 3831:12, 3834:18
**otherwise** [1] - 3716:23
**ought** [1] - 3744:22
**outside** [5] - 3717:20, 3754:23, 3808:23, 3808:24, 3858:20
**Outside** [1] - 3725:25
**overall** [1] - 3825:11
**overlay** [1] - 3833:17
**overreaching** [1] - 3717:6
**oversee** [3] - 3724:24, 3725:2, 3726:6
**overview** [1] - 3837:25
**overwhelm** [1] - 3730:6
**owe** [1] - 3719:21
**owed** [1] - 3848:25
**own** [11] - 3726:6, 3726:11, 3726:20, 3726:24, 3777:18, 3777:24, 3829:10, 3829:16, 3830:5, 3830:13, 3849:7
**owned** [1] - 3726:14
**owns** [1] - 3784:18

**P**

**P-144.18** [1] - 3814:20
**P-210** [1] - 3864:22
**P-239** [2] - 3758:12, 3758:15
**P-273** [2] - 3746:25,

3747:1
**P-29** [3] - 3830:23, 3830:24, 3831:2
**P-373** [2] - 3839:5, 3839:7
**P-45** [1] - 3776:4
**P-52** [3] - 3817:17, 3817:23, 3826:7
**P-721** [1] - 3876:1
**package** [2] - 3733:9, 3733:12
**packages** [1] - 3731:3
**pactive** [5] - 3756:3, 3756:6, 3756:8, 3756:16, 3756:20
**page** [55] - 3712:5, 3721:18, 3721:19, 3722:5, 3723:1, 3724:19, 3725:4, 3726:1, 3727:1, 3727:15, 3734:18, 3743:17, 3754:5, 3758:23, 3759:4, 3759:22, 3760:3, 3760:11, 3760:22, 3761:4, 3761:5, 3761:14, 3765:5, 3765:7, 3766:17, 3773:7, 3775:6, 3779:25, 3780:3, 3781:4, 3781:8, 3781:10, 3781:13, 3784:5, 3788:18, 3791:25, 3812:25, 3815:2, 3815:11, 3816:7, 3819:6, 3822:9, 3825:20, 3831:6, 3831:16, 3834:15, 3834:16, 3839:19, 3839:21, 3840:22, 3849:16, 3853:14, 3855:20, 3865:3, 3869:17
**Page** [6] - 3721:21, 3790:12, 3825:21, 3831:13, 3853:15
**pages** [11] - 3733:13, 3733:14, 3733:19, 3733:21, 3734:1, 3761:18, 3809:14, 3811:16, 3812:1, 3812:22, 3864:2
**paid** [9] - 3732:19, 3735:7, 3764:21, 3785:11, 3815:9, 3827:9, 3847:13, 3847:25, 3852:8
**paper** [1] - 3836:16
**paragraph** [20] - 3743:21, 3747:7,

3747:8, 3749:7, 3763:18, 3764:15, 3774:6, 3774:8, 3783:23, 3784:5, 3784:7, 3784:11, 3785:6, 3785:7, 3849:18, 3849:21, 3853:16, 3854:4, 3855:24, 3856:5
**parcel** [1] - 3850:10
**pardon** [2] - 3792:23, 3863:9
**parentheses** [4] - 3723:7, 3865:24, 3866:9, 3866:17
**part** [32] - 3727:7, 3737:15, 3739:1, 3739:19, 3741:25, 3748:24, 3750:5, 3754:12, 3760:18, 3761:19, 3761:21, 3762:1, 3762:2, 3775:14, 3797:9, 3800:24, 3803:12, 3807:9, 3817:2, 3828:11, 3830:7, 3830:18, 3842:16, 3843:25, 3850:10, 3853:24, 3856:10, 3858:10, 3861:15, 3866:23, 3874:12
**particular** [7] - 3733:15, 3769:21, 3769:24, 3782:24, 3805:9, 3836:17, 3874:1
**particularly** [4] - 3731:21, 3755:14, 3797:7, 3805:9
**parties** [3] - 3808:2, 3848:2, 3848:5
**party** [5] - 3725:8, 3725:13, 3725:16, 3805:24, 3853:24
**party's** [1] - 3854:2
**pass** [1] - 3778:3
**passed** [3] - 3735:8, 3735:12, 3800:20
**passing** [2] - 3720:10, 3729:6
**passive** [2] - 3756:9, 3777:16
**past** [3] - 3759:18, 3764:20, 3781:23
**patently** [1] - 3782:5
**PATRICIA** [1] - 3709:16
**Paul** [1] - 3724:10
**Pause** [1] - 3807:1
**pause** [5] - 3719:25,

3745:1, 3800:9, 3863:20, 3868:3
**pay** [3] - 3735:9, 3800:23, 3804:20
**payables** [2] - 3843:9, 3843:13
**paying** [3] - 3734:20, 3734:23, 3753:7
**PC** [1] - 3709:3
**peer** [11] - 3772:14, 3775:21, 3777:6, 3777:14, 3778:11, 3782:24, 3786:15, 3786:16, 3829:13, 3829:24
**peers** [3] - 3796:21, 3797:20, 3797:21
**people** [2] - 3753:18, 3779:13
**per** [1] - 3769:20
**percent** [35] - 3713:5, 3717:23, 3718:22, 3756:10, 3756:12, 3756:22, 3782:1, 3782:3, 3785:11, 3785:12, 3792:22, 3792:24, 3795:15, 3812:18, 3813:3, 3815:17, 3815:21, 3816:2, 3816:4, 3816:10, 3816:13, 3824:13, 3825:8, 3825:12, 3825:24, 3826:15, 3826:16, 3826:22, 3826:24, 3872:21
**percentage** [14] - 3793:1, 3815:8, 3815:13, 3816:21, 3816:23, 3825:1, 3825:8, 3826:13, 3827:15, 3827:17, 3868:1, 3868:7, 3868:11
**Percentage** [2] - 3815:5, 3825:10
**percentages** [3] - 3817:14, 3825:25, 3827:7
**percentile** [1] - 3790:2
**perfectly** [1] - 3738:21
**perform** [4] - 3734:5, 3747:13, 3829:18, 3832:6
**performance** [21] - 3725:15, 3728:24, 3731:21, 3773:22, 3773:24, 3775:3, 3775:8, 3775:12, 3775:15, 3775:19,

3807:12, 3829:4,
3829:11, 3829:13,
3829:16, 3829:24,
3854:1, 3856:10,
3868:16, 3870:24,
3873:23
**performed** [5] -
3847:3, 3847:4,
3847:9, 3847:14,
3847:19
**performs** [2] -
3847:24, 3871:2
**perhaps** [1] - 3799:5
**Perhaps** [1] - 3714:7
**period** [7] - 3740:11,
3825:2, 3836:17,
3837:15, 3839:13,
3840:13, 3840:24
**periodic** [1] - 3763:12
**periodically** [3] -
3811:13, 3830:3,
3860:17
**periodicals** [1] -
3718:16
**permissible** [1] -
3871:16
**person** [3] - 3722:8,
3850:25, 3861:10
**person's** [1] - 3874:17
**personal** [1] - 3740:17
**personally** [5] -
3740:20, 3740:21,
3762:3, 3776:10,
3804:9
**personnel** [4] -
3735:9, 3737:13,
3737:25, 3747:12
**perspective** [5] -
3740:18, 3786:5,
3805:20, 3837:8,
3874:21
**peruse** [1] - 3763:21
**PETER** [1] - 3708:17
**PGS** [2] - 3708:5,
3708:10
**Pick** [1] - 3825:15
**picture** [1] - 3731:8
**pieces** [1] - 3836:16
**PIMCO** [2] - 3815:15,
3816:4
**place** [11] - 3746:22,
3755:21, 3769:25,
3792:11, 3798:22,
3806:1, 3836:13,
3846:22, 3854:19,
3859:17, 3864:19
**plaintiff** [3] - 3711:3,
3714:12, 3753:24
**Plaintiff's** [6] - 3710:8,
3747:4, 3757:21,

3758:10, 3864:12,
3876:5
**plaintiff's** [1] -
3772:17
**PLAINTIFFS** [3] -
3708:4, 3708:8,
3709:7
**plaintiffs** [5] -
3711:18, 3712:7,
3712:9, 3739:7,
3739:12
**plaintiffs'** [3] - 3736:9,
3736:14, 3739:4
**planning** [2] -
3747:19, 3748:1
**plans** [1] - 3711:7
**play** [5] - 3744:11,
3759:11, 3827:11,
3832:19, 3845:11
**playing** [1] - 3713:13
**plays** [1] - 3838:1
**plus** [2] - 3756:16,
3866:2
**PLUS** [1] - 3815:15
**point** [32] - 3711:12,
3711:13, 3712:22,
3743:6, 3760:9,
3760:17, 3767:24,
3777:12, 3781:4,
3782:17, 3787:17,
3797:12, 3797:14,
3797:15, 3797:16,
3800:10, 3803:15,
3803:25, 3807:18,
3818:16, 3821:9,
3827:6, 3830:2,
3841:21, 3845:17,
3854:10, 3859:21,
3861:22, 3861:24,
3865:13, 3867:8,
3870:9
**pointed** [3] - 3731:22,
3732:2, 3797:22
**pointing** [2] - 3774:17,
3825:20
**points** [18] - 3767:19,
3767:20, 3790:1,
3796:20, 3797:3,
3801:12, 3803:4,
3815:12, 3816:17,
3816:22, 3816:24,
3821:17, 3822:2,
3822:5, 3823:22,
3827:10, 3836:19,
3872:23
**policies** [1] - 3726:16
**policy** [1] - 3726:22
**Pomerantz** [1] -
3714:5
**poor** [2] - 3868:15,

3870:25
**portfolio** [4] -
3727:23, 3741:1,
3756:10, 3791:15
**portfolios** [8] -
3841:13, 3841:24,
3842:3, 3867:20,
3868:15, 3869:9,
3869:12, 3870:7
**portion** [3] - 3815:9,
3835:8, 3853:18
**portions** [1] - 3844:10
**position** [3] - 3712:16,
3712:24, 3719:2
**possession** [1] -
3711:19
**possible** [1] - 3873:5
**post** [1] - 3811:19
**post-marketing** [1] -
3811:19
**power** [1] - 3852:22
**Practical** [1] - 3720:20
**practice** [7] - 3779:16,
3786:7, 3850:12,
3852:21, 3854:21,
3860:19, 3873:16
**Practice** [1] - 3725:19
**practices** [3] -
3722:15, 3722:19,
3742:15
**Practices** [1] -
3720:20
**Pre** [1] - 3810:15
**pre** [2] - 3810:22,
3812:17
**pre-market** [1] -
3812:17
**Pre-Marketing** [1] -
3810:15
**pre-marketing** [1] -
3810:22
**preceding** [1] -
3840:22
**precise** [1] - 3733:17
**precisely** [1] - 3776:14
**predecessor** [2] -
3855:18
**premiere** [1] - 3786:7
**preparation** [3] -
3732:8, 3738:9,
3744:25
**prepare** [9] - 3719:18,
3734:21, 3734:24,
3736:8, 3736:14,
3830:4, 3844:17,
3845:10, 3845:15
**prepared** [12] -
3713:18, 3713:19,
3713:21, 3734:12,
3734:15, 3738:3,

3755:12, 3770:21,
3775:21, 3785:3,
3798:19, 3829:21
**prepares** [2] -
3845:18, 3845:25
**preparing** [1] - 3738:7
**PRESENT** [1] -
3709:16
**present** [6] - 3713:10,
3714:10, 3738:2,
3738:7, 3738:23,
3806:11
**presentation** [14] -
3760:5, 3760:9,
3760:18, 3760:20,
3761:19, 3797:19,
3817:10, 3830:13,
3860:9, 3864:9,
3864:11, 3867:1,
3867:3, 3869:13
**presentations** [14] -
3731:23, 3731:24,
3763:13, 3779:19,
3794:5, 3803:7,
3814:23, 3834:20,
3838:20, 3841:7,
3842:21, 3864:2,
3864:24, 3864:25
**presented** [3] -
3760:16, 3856:23,
3857:3
**pressure** [1] - 3713:12
**pretend** [1] - 3720:4
**Pretty** [1] - 3773:1
**pretty** [9] - 3760:14,
3771:5, 3789:9,
3791:9, 3820:14,
3820:20, 3828:9,
3858:18, 3867:24
**prevent** [1] - 3730:16
**previously** [3] -
3714:19, 3784:25,
3850:16
**Price** [1] - 3805:15
**Pricewaterhouse** [2] -
3860:17, 3860:21
**pricing** [1] - 3837:10
**primarily** [1] - 3864:21
**primary** [2] - 3844:8,
3845:22
**print** [2] - 3784:12,
3784:13
**Printing** [1] - 3748:9
**privied** [1] - 3776:17
**privy** [1] - 3776:21
**problem** [3] - 3791:4,
3820:17, 3851:24
**problematic** [1] -
3721:16
**problems** [3] - 3723:5,

3854:22, 3855:1
**proceed** [7] - 3714:6,
3714:15, 3714:24,
3715:1, 3758:6,
3806:22, 3807:4
**Proceedings** [1] -
3876:13
**process** [28] -
3712:19, 3713:11,
3715:16, 3718:24,
3724:24, 3725:2,
3725:21, 3725:24,
3733:4, 3737:15,
3739:20, 3740:1,
3742:20, 3742:21,
3743:14, 3748:25,
3750:21, 3758:19,
3760:17, 3762:4,
3771:22, 3772:8,
3804:24, 3807:9,
3817:2, 3857:20,
3860:13, 3873:7
**processing** [1] -
3755:1
**product** [14] - 3728:3,
3742:17, 3776:1,
3776:9, 3808:10,
3808:22, 3809:1,
3809:23, 3824:2,
3867:19, 3868:5,
3868:10, 3868:16
**products** [4] -
3767:22, 3808:23,
3808:24, 3869:3
**profess** [1] - 3867:12
**Profit** [1] - 3810:7
**profit** [3] - 3729:3,
3810:22, 3813:3
**Profitability** [1] -
3810:19
**profitability** [32] -
3747:24, 3750:6,
3750:7, 3750:11,
3751:23, 3753:9,
3753:12, 3810:25,
3811:6, 3811:7,
3811:10, 3811:19,
3811:23, 3811:24,
3812:10, 3812:11,
3812:12, 3812:17,
3813:6, 3813:9,
3813:15, 3813:16,
3817:9, 3817:10,
3858:10, 3862:16,
3863:13, 3863:15,
3864:3, 3869:13,
3870:9, 3870:19
**profits** [2] - 3729:2
**program** [2] - 3827:24,
3840:17

programs [1] - 3716:11
prohibited [1] - 3726:13
properly [1] - 3729:15
property [1] - 3747:12
proposing [1] - 3723:7
proposition [2] - 3765:23, 3766:14
protect [4] - 3717:5, 3726:7, 3802:3, 3802:5
protective [2] - 3760:13, 3761:16
provide [28] - 3725:15, 3734:3, 3739:12, 3742:25, 3747:11, 3747:20, 3747:21, 3747:23, 3749:3, 3762:5, 3777:11, 3777:13, 3780:12, 3785:22, 3786:8, 3786:10, 3786:14, 3786:20, 3786:22, 3787:4, 3787:11, 3814:16, 3829:8, 3841:14, 3842:6, 3844:2, 3863:3
provided [25] - 3719:11, 3719:23, 3729:16, 3729:17, 3736:9, 3736:14, 3741:14, 3741:17, 3741:20, 3741:23, 3748:17, 3748:20, 3750:22, 3752:8, 3753:6, 3755:5, 3773:4, 3773:15, 3778:17, 3787:9, 3803:12, 3807:9, 3831:2, 3834:23, 3835:6
provider [2] - 3786:7, 3848:8
providers [2] - 3862:21, 3863:3
provides [16] - 3748:3, 3748:11, 3748:24, 3751:11, 3759:10, 3773:21, 3779:21, 3780:24, 3786:9, 3786:13, 3786:25, 3834:8, 3834:21, 3841:11, 3848:8, 3851:7
providing [3] - 3786:3, 3862:24, 3862:25
provision [7] - 3850:8, 3850:13, 3851:15,

3852:11, 3852:19, 3854:8
provisions [2] - 3806:3, 3857:2
proxies [2] - 3828:25, 3829:1
prudent [2] - 3852:18, 3854:18
public [1] - 3748:19
pull [1] - 3788:6
pulling [1] - 3833:19
pun [1] - 3778:22
purchase [2] - 3842:18, 3844:14
purchases [2] - 3828:17, 3842:13
purely [1] - 3827:11
purple [7] - 3819:9, 3819:15, 3819:18, 3819:20, 3820:3, 3820:18, 3823:22
purpose [5] - 3722:18, 3738:13, 3745:5, 3746:20, 3834:18
purposes [1] - 3869:13
pursuant [6] - 3813:15, 3849:3, 3853:25, 3859:14, 3859:18, 3862:9
pushed [1] - 3777:8
put [18] - 3712:9, 3712:24, 3712:25, 3713:3, 3714:2, 3720:18, 3728:7, 3764:5, 3768:14, 3769:25, 3770:20, 3799:12, 3801:21, 3825:13, 3827:25, 3839:5, 3843:16, 3854:19
puzzled [1] - 3856:19
Pw [1] - 3861:23
PwC [1] - 3861:3

**Q**

qualifications [1] - 3736:18
quantification [1] - 3801:3
quantify [2] - 3801:1, 3801:4
quarrel [1] - 3760:8
quarter [1] - 3749:10
quarterly [1] - 3750:12
quash [1] - 3712:6
questioned [1] - 3743:22

questioning [2] - 3713:9, 3731:7
questionnaires [1] - 3841:5
questions [17] - 3715:8, 3715:25, 3724:15, 3736:1, 3738:22, 3738:24, 3739:1, 3763:17, 3763:25, 3767:3, 3768:25, 3778:14, 3781:17, 3843:16, 3857:19, 3872:8, 3872:9
quickly [5] - 3714:7, 3722:22, 3735:24, 3812:16, 3815:19
quiet [1] - 3844:23
quite [7] - 3711:19, 3713:1, 3718:12, 3766:21, 3809:25, 3821:20, 3829:9
quote [5] - 3760:6, 3760:11, 3760:22, 3761:14, 3762:3
quotes [1] - 3761:4

**R**

R.M.R [1] - 3708:24
range [1] - 3874:24
rate [4] - 3787:4, 3792:9, 3796:9, 3874:12
rates [2] - 3843:10, 3843:14
Rather [1] - 3801:22
rather [2] - 3742:20, 3871:18
ratio [12] - 3713:14, 3765:24, 3766:21, 3766:22, 3775:1, 3782:1, 3782:3, 3785:10, 3785:12, 3785:13, 3790:19
ratios [6] - 3766:11, 3766:18, 3782:4, 3782:11, 3784:16, 3797:13
re [1] - 3833:7
re-balancing [1] - 3833:7
reach [3] - 3715:19, 3739:3, 3739:7
reached [1] - 3739:15
reaching [1] - 3872:20
reactions [1] - 3738:25
Read [1] - 3854:4

read [68] - 3722:3, 3723:4, 3723:12, 3723:16, 3723:18, 3723:22, 3724:4, 3725:10, 3726:9, 3727:2, 3727:3, 3727:17, 3727:19, 3727:21, 3736:3, 3737:5, 3743:5, 3743:20, 3744:1, 3744:15, 3745:5, 3747:10, 3747:15, 3749:14, 3751:18, 3755:3, 3759:13, 3759:18, 3763:20, 3763:23, 3764:2, 3764:7, 3764:23, 3767:14, 3767:15, 3767:16, 3780:8, 3782:6, 3782:14, 3783:4, 3783:23, 3784:7, 3784:15, 3784:21, 3785:2, 3809:12, 3820:18, 3820:23, 3823:2, 3823:8, 3823:13, 3831:25, 3842:8, 3849:21, 3850:6, 3852:9, 3852:20, 3853:18, 3856:15, 3858:14, 3858:16, 3861:6, 3861:15, 3861:19, 3870:3, 3870:5, 3871:11
readily [2] - 3745:6, 3791:10
reading [5] - 3740:15, 3750:15, 3767:18, 3780:11, 3782:19
reads [11] - 3724:10, 3724:22, 3725:7, 3726:2, 3744:5, 3749:8, 3764:20, 3832:14, 3850:25, 3856:5, 3869:2
ready [2] - 3714:24, 3822:13
Ready [1] - 3848:18
realistic [1] - 3816:24
reality [2] - 3740:20, 3827:9
realize [1] - 3806:11
really [8] - 3712:9, 3735:7, 3742:19, 3755:12, 3782:21, 3831:11
reason [17] - 3716:19, 3716:23, 3745:14, 3745:22, 3746:1, 3746:12, 3759:19,

3769:21, 3775:5, 3783:3, 3784:4, 3796:23, 3811:22, 3846:17, 3846:25, 3856:24, 3864:15
reasonable [11] - 3715:11, 3715:14, 3715:15, 3715:23, 3731:15, 3755:20, 3804:1, 3864:9, 3873:8, 3874:17, 3874:22
reasonableness [3] - 3795:19, 3803:9, 3813:11
reasonably [1] - 3747:12
reasoned [1] - 3719:22
reasons [9] - 3744:6, 3744:8, 3744:10, 3777:9, 3805:24, 3850:16, 3851:22, 3852:13, 3863:14
rebut [1] - 3744:13
rebuttal [1] - 3875:9
receive [31] - 3718:1, 3718:3, 3718:4, 3718:11, 3718:12, 3718:15, 3718:25, 3719:3, 3719:10, 3720:2, 3725:15, 3727:22, 3730:16, 3730:25, 3732:12, 3732:20, 3732:22, 3732:24, 3733:9, 3733:12, 3742:6, 3771:18, 3772:7, 3775:15, 3775:19, 3793:5, 3803:7, 3808:13, 3844:10, 3848:1, 3858:19
received [22] - 3716:14, 3716:15, 3717:14, 3717:17, 3720:22, 3728:14, 3728:24, 3729:2, 3730:6, 3730:20, 3733:20, 3733:22, 3742:3, 3742:8, 3775:2, 3794:5, 3794:12, 3808:2, 3808:3, 3809:21, 3817:11, 3847:10
receives [5] - 3717:24, 3776:18, 3808:9, 3808:10, 3809:1
receiving [1] - 3827:16
recently [3] - 3724:10,

3777:24, 3829:7
**recess** [1] - 3806:16
**Recess** [2] - 3758:3, 3848:17
**reckless** [3] - 3850:3, 3854:2, 3856:11
**recognize** [3] - 3716:24, 3717:2, 3814:20
**recollection** [14] - 3716:14, 3731:16, 3731:19, 3775:7, 3786:20, 3801:10, 3830:15, 3831:11, 3838:18, 3838:21, 3864:1, 3864:3, 3864:20, 3867:24
**recollections** [1] - 3731:21
**recommendation** [4] - 3722:3, 3724:20, 3725:4, 3742:9
**recommendations** [1] - 3832:21
**Recommendations** [1] - 3721:25
**reconvene** [2] - 3806:12, 3876:9
**record** [5] - 3742:9, 3742:17, 3843:24, 3846:9, 3872:5
**recorded** [1] - 3744:9
**records** [11] - 3712:10, 3828:21, 3841:13, 3842:12, 3842:15, 3842:16, 3842:18, 3842:24, 3843:2, 3843:6, 3844:1
**rectangular** [1] - 3865:6
**red** [1] - 3865:5
**redirect** [2] - 3730:12, 3872:11
**reduced** [1] - 3836:19
**reductions** [2] - 3850:19, 3850:23
**REED** [1] - 3709:14
**refer** [1] - 3751:6
**reference** [5] - 3736:21, 3811:6, 3812:8, 3812:13, 3818:6
**referenced** [3] - 3751:25, 3808:19, 3812:5
**references** [2] - 3811:3, 3844:13
**referred** [7] - 3736:13, 3750:20, 3752:7,

3817:18, 3819:4, 3837:21, 3863:22
**referring** [17] - 3726:2, 3735:20, 3750:5, 3751:16, 3751:22, 3754:6, 3757:14, 3760:2, 3765:14, 3773:24, 3779:24, 3786:18, 3788:5, 3788:23, 3811:23, 3833:9, 3835:14
**Referring** [1] - 3754:7
**refers** [6] - 3759:1, 3759:7, 3770:8, 3812:9, 3820:18, 3831:6
**reflect** [3] - 3716:15, 3842:24, 3843:2
**reflected** [2] - 3750:5, 3763:5
**reflecting** [2] - 3757:2, 3789:13
**reflective** [1] - 3715:16
**reflects** [1] - 3813:17
**refusal** [1] - 3856:13
**regard** [16] - 3713:21, 3713:24, 3714:1, 3729:12, 3734:25, 3735:1, 3753:14, 3753:23, 3775:24, 3778:18, 3793:6, 3793:10, 3793:14, 3800:25, 3830:15, 3841:22
**regular** [1] - 3735:8
**regulations** [1] - 3752:23
**regulatory** [5] - 3748:16, 3776:13, 3800:15, 3841:24, 3842:4
**reimburse** [1] - 3753:2
**reimbursed** [2] - 3733:1, 3733:2
**reimbursement** [2] - 3735:13, 3855:7
**reimbursing** [1] - 3753:5
**rejected** [2] - 3760:12, 3761:15
**Rel** [1] - 3723:6
**relate** [1] - 3836:21
**related** [6] - 3747:14, 3808:2, 3864:6, 3864:7, 3864:8, 3864:21
**relates** [3] - 3850:2, 3853:21, 3856:8
**relations** [1] - 3748:19

**relationship** [6] - 3782:25, 3808:3, 3808:14, 3808:25, 3809:21, 3847:24
**relatively** [1] - 3733:24
**release** [1] - 3723:7
**relevant** [5] - 3737:24, 3757:8, 3771:7, 3810:25, 3873:2
**reliable** [4] - 3716:18, 3716:20, 3716:22, 3765:4
**relied** [3] - 3763:3, 3794:15, 3794:16
**relieved** [1] - 3753:19
**reluctant** [3] - 3746:17, 3784:24, 3856:25
**rely** [3] - 3786:8, 3873:14, 3873:15
**relying** [1] - 3809:25
**remained** [2] - 3824:12, 3824:14
**remaining** [3] - 3711:13, 3711:15, 3712:11
**remember** [60] - 3718:23, 3718:25, 3721:13, 3731:18, 3740:10, 3749:1, 3749:6, 3757:11, 3759:17, 3760:9, 3760:15, 3760:19, 3767:11, 3774:25, 3778:25, 3779:1, 3779:3, 3779:12, 3787:6, 3787:7, 3787:10, 3787:14, 3787:17, 3791:3, 3797:3, 3807:16, 3807:18, 3809:12, 3820:22, 3831:12, 3833:18, 3834:18, 3835:20, 3836:3, 3842:6, 3842:11, 3842:19, 3843:5, 3843:7, 3843:19, 3843:21, 3844:13, 3844:15, 3844:16, 3844:18, 3844:24, 3845:1, 3845:16, 3849:6, 3849:9, 3855:5, 3859:16, 3859:19, 3859:21, 3859:23, 3861:8, 3861:24, 3866:14
**remembering** [1] - 3790:4
**rendering** [4] - 3849:22, 3850:4,

3852:4, 3852:5
**renders** [1] - 3828:7
**renewing** [1] - 3744:7
**repeat** [8] - 3751:17, 3772:5, 3773:10, 3807:24, 3814:6, 3858:12, 3861:17, 3871:9
**repeated** [1] - 3811:25
**rephrase** [6] - 3736:24, 3736:25, 3752:3, 3761:5, 3765:20, 3838:9
**Rephrase** [1] - 3826:19
**rephrased** [1] - 3744:22
**report** [27] - 3771:13, 3771:21, 3772:7, 3772:10, 3773:3, 3773:14, 3773:17, 3773:22, 3774:11, 3774:12, 3774:15, 3775:2, 3775:16, 3776:4, 3776:22, 3776:25, 3779:21, 3790:8, 3793:5, 3793:7, 3793:11, 3807:8, 3807:11, 3807:17, 3831:25, 3845:6, 3858:10
**reported** [3] - 3778:8, 3858:10, 3872:22
**REPORTER** [1] - 3708:25
**reporter** [6] - 3751:18, 3767:15, 3858:16, 3861:19, 3870:5, 3871:11
**reporting** [4] - 3832:15, 3833:24, 3834:2, 3834:3
**reports** [4] - 3720:18, 3773:21, 3841:15, 3844:5
**represent** [7] - 3745:4, 3748:25, 3776:14, 3780:10, 3794:2, 3820:15, 3821:12
**representation** [1] - 3856:14
**representative** [1] - 3721:8
**represented** [1] - 3815:8
**represents** [3] - 3798:5, 3819:20, 3821:16
**request** [4] - 3727:7, 3763:7, 3851:19,

3858:4
**requests** [1] - 3727:7
**require** [1] - 3802:24
**required** [5] - 3708:23, 3740:24, 3752:24, 3828:22, 3829:7
**requirement** [2] - 3841:25, 3856:21
**requirements** [4] - 3776:13, 3803:2, 3803:19, 3842:4
**reread** [1] - 3783:25
**research** [1] - 3728:1
**resources** [1] - 3748:16
**respect** [9] - 3738:17, 3775:11, 3813:7, 3828:22, 3832:24, 3836:16, 3836:22, 3838:2, 3870:19
**respond** [4] - 3752:12, 3777:20, 3782:21, 3820:1
**responded** [1] - 3800:22
**responding** [2] - 3738:14, 3738:24
**response** [5] - 3712:5, 3715:25, 3735:16, 3816:17, 3849:7
**responses** [1] - 3739:1
**responsibilities** [3] - 3838:11, 3838:15, 3838:17
**responsibility** [10] - 3827:23, 3829:3, 3837:9, 3843:8, 3843:14, 3844:9, 3844:16, 3845:2, 3845:14, 3845:22
**responsible** [1] - 3832:15
**responsive** [1] - 3763:6
**rest** [1] - 3854:4
**restate** [2] - 3757:1, 3857:7
**restrictions** [2] - 3841:24, 3842:3
**result** [9] - 3791:8, 3797:12, 3797:14, 3797:23, 3809:21, 3816:23, 3837:24, 3852:14
**resulting** [1] - 3853:22
**results** [1] - 3867:13
**resume** [1] - 3736:9
**resumes** [8] - 3714:19, 3734:9,

3734:12, 3734:25, 3735:1, 3735:21, 3736:17
**retain** [5] - 3725:12, 3725:20, 3725:23, 3794:13, 3809:22
**Retained** [1] - 3858:8
**retained** [4] - 3725:14, 3835:8, 3858:5, 3860:10
**retainer** [1] - 3732:24
**retaining** [4] - 3725:8, 3785:25, 3804:24, 3804:25
**retention** [3] - 3816:8, 3835:16, 3835:23
**retired** [1] - 3752:20
**return** [3] - 3773:22, 3773:24, 3775:3
**returns** [3] - 3845:18, 3845:20, 3845:25
**revenue** [2] - 3869:3, 3869:6
**Revenue** [1] - 3842:10
**revenues** [6] - 3817:11, 3867:24, 3867:25, 3868:5, 3868:9, 3868:19
**reverse** [2] - 3867:7, 3867:8
**review** [28] - 3718:20, 3721:4, 3724:24, 3725:7, 3725:21, 3740:24, 3743:2, 3745:11, 3745:19, 3745:25, 3746:4, 3747:23, 3748:23, 3758:12, 3762:4, 3763:3, 3768:22, 3771:22, 3772:8, 3778:13, 3781:3, 3816:16, 3817:17, 3859:1, 3859:3, 3859:4, 3859:12, 3860:6
**reviewed** [11] - 3746:10, 3746:11, 3748:22, 3777:10, 3829:6, 3846:16, 3851:20, 3856:20, 3858:20, 3864:4, 3870:24
**reviewing** [18] - 3719:4, 3723:20, 3727:20, 3731:10, 3732:5, 3732:7, 3743:4, 3758:13, 3758:19, 3761:11, 3765:12, 3769:6, 3784:2, 3810:17,

3821:23, 3839:10, 3854:6, 3859:10
**reviews** [2] - 3776:22, 3870:15
**revisit** [1] - 3714:7
**ridiculous** [1] - 3782:5
**right-hand** [2] - 3819:7, 3824:9
**rising** [1] - 3781:22
**risk** [16] - 3749:3, 3799:10, 3799:18, 3799:19, 3799:21, 3800:7, 3800:11, 3801:19, 3801:24, 3802:4, 3802:24, 3806:8, 3854:24
**risks** [15] - 3799:16, 3800:12, 3800:16, 3800:19, 3800:25, 3801:1, 3801:6, 3801:9, 3802:7, 3802:20, 3803:14, 3804:23, 3805:2, 3805:25
**Rob** [1] - 3768:14
**ROBERT** [2] - 3709:5, 3709:13
**robust** [1] - 3744:11
**role** [11] - 3717:2, 3728:9, 3728:13, 3733:3, 3745:10, 3807:14, 3832:19, 3837:8, 3837:25, 3845:11, 3859:9
**Roman** [2] - 3721:19, 3721:21
**ROME** [1] - 3709:9
**rose** [1] - 3835:16
**roughly** [6] - 3713:22, 3825:3, 3825:4, 3826:15, 3835:2, 3835:16
**row** [1] - 3841:4
**rows** [1] - 3839:14
**Royce** [1] - 3724:11
**running** [3] - 3776:19, 3827:14
**runs** [1] - 3782:2

## S

**S&P** [6] - 3757:3, 3790:13, 3791:2, 3791:6, 3793:13, 3794:6
**sale** [1] - 3844:14
**sales** [2] - 3842:13, 3842:18
**SANFORD** [1] -

3708:8
**SAR** [1] - 3845:3
**sat** [1] - 3842:21
**satisfy** [3] - 3744:9, 3744:19, 3776:13
**savings** [2] - 3840:16, 3840:20
**saw** [5] - 3712:4, 3721:3, 3740:18, 3740:21, 3746:15
**Scale** [1] - 3780:22
**scale** [3] - 3729:7, 3729:10, 3729:12
**School** [2] - 3759:7, 3759:15
**schooled** [1] - 3785:2
**Schpero** [57] - 3711:8, 3711:20, 3713:23, 3714:18, 3714:22, 3714:24, 3715:4, 3715:9, 3716:24, 3720:16, 3728:8, 3739:15, 3754:3, 3758:5, 3758:12, 3759:25, 3761:2, 3761:9, 3762:9, 3763:22, 3764:7, 3764:15, 3768:22, 3769:12, 3771:2, 3771:14, 3772:17, 3775:15, 3780:19, 3783:19, 3788:22, 3789:18, 3795:3, 3803:21, 3804:13, 3806:17, 3807:8, 3812:15, 3814:20, 3819:24, 3822:13, 3827:23, 3830:23, 3839:7, 3841:9, 3843:18, 3847:1, 3848:23, 3853:1, 3857:19, 3864:14, 3867:18, 3871:6, 3872:13, 3872:18, 3875:3
**SCHPERO** [4] - 3710:2, 3710:3, 3714:19, 3714:23
**scope** [1] - 3783:7
**screen** [1] - 3758:18
**SEAN** [1] - 3709:12
**seated** [2] - 3758:4, 3806:20
**SEC** [6] - 3712:18, 3722:14, 3726:3, 3742:20, 3776:13, 3844:6
**SEC's** [1] - 3724:11
**Second** [1] - 3797:16
**second** [16] - 3735:9,

3761:22, 3766:23, 3774:6, 3781:4, 3781:13, 3784:5, 3784:11, 3795:12, 3802:24, 3818:3, 3832:23, 3832:25, 3841:13, 3865:14
**secretarial** [1] - 3749:4
**section** [3] - 3761:7, 3761:9, 3761:10
**Section** [4] - 3708:23, 3727:7, 3842:10, 3854:1
**sectors** [2] - 3757:17, 3757:19
**securities** [5] - 3757:5, 3837:10, 3842:13, 3842:18, 3844:14
**security** [1] - 3757:10
**See** [4] - 3723:1, 3723:5, 3724:19, 3725:4
**see** [102] - 3712:8, 3715:10, 3721:19, 3721:21, 3722:1, 3732:22, 3735:5, 3737:4, 3747:7, 3758:17, 3758:22, 3759:4, 3759:7, 3764:6, 3764:10, 3764:16, 3765:7, 3766:19, 3769:14, 3770:9, 3774:7, 3774:23, 3775:20, 3777:20, 3781:20, 3782:22, 3783:13, 3785:8, 3785:14, 3786:14, 3787:2, 3787:6, 3787:7, 3787:8, 3789:23, 3789:25, 3790:1, 3790:3, 3790:5, 3790:18, 3791:15, 3791:22, 3792:16, 3792:17, 3792:18, 3793:20, 3794:3, 3794:9, 3797:17, 3798:2, 3800:11, 3802:22, 3804:8, 3812:5, 3816:8, 3817:2, 3817:7, 3817:8, 3817:9, 3817:10, 3817:13, 3817:14, 3818:6, 3818:11, 3818:13, 3818:16, 3818:21, 3819:9, 3819:15, 3819:17, 3820:2,

3821:24, 3822:1, 3822:6, 3822:12, 3823:14, 3823:25, 3824:10, 3824:23, 3829:20, 3831:13, 3831:17, 3832:16, 3833:1, 3834:11, 3834:13, 3839:17, 3839:25, 3849:19, 3853:16, 3855:24, 3860:10, 3863:13, 3865:6, 3867:3, 3869:2, 3869:4, 3869:21, 3875:16, 3876:9
**seeing** [6] - 3719:19, 3728:2, 3774:25, 3782:25, 3799:4, 3831:11
**seek** [1] - 3847:23
**seeking** [1] - 3829:16
**seem** [4] - 3766:7, 3806:24, 3817:20, 3843:5
**sees** [2] - 3771:5, 3787:3
**selects** [2] - 3828:13, 3828:16
**semi** [3] - 3844:5, 3845:6, 3845:8
**semi-annual** [3] - 3844:5, 3845:6, 3845:8
**senior** [1] - 3804:9
**sense** [4] - 3738:13, 3748:13, 3780:9, 3826:17
**sent** [1] - 3776:23
**sentence** [4] - 3724:10, 3724:17, 3743:20, 3850:25
**Separate** [1] - 3830:8
**separate** [8] - 3732:17, 3735:11, 3738:9, 3808:5, 3808:8, 3814:9, 3817:12, 3830:8
**separated** [1] - 3735:8
**separately** [4] - 3719:1, 3735:11, 3740:25, 3741:4
**series** [1] - 3763:17
**serve** [1] - 3745:5
**served** [2] - 3712:1, 3712:3
**servers** [1] - 3754:18
**serves** [2] - 3722:17, 3795:6
**service** [6] - 3747:5, 3842:15, 3853:9,

3862:21, 3863:2, 3874:1

**Service** [2] - 3751:10, 3862:10

**Services** [9] - 3746:8, 3750:25, 3752:8, 3754:4, 3754:8, 3755:3, 3862:4, 3862:5, 3862:14

**services** [64] - 3716:12, 3729:16, 3729:17, 3732:22, 3734:3, 3741:13, 3741:17, 3741:20, 3741:23, 3747:12, 3747:17, 3747:21, 3748:3, 3748:6, 3748:10, 3748:12, 3748:23, 3749:4, 3750:16, 3750:22, 3751:6, 3751:7, 3751:9, 3751:10, 3751:12, 3751:16, 3752:7, 3752:8, 3753:11, 3754:6, 3754:23, 3754:24, 3803:12, 3814:13, 3827:10, 3828:7, 3832:6, 3834:8, 3834:9, 3834:21, 3834:22, 3834:25, 3835:6, 3836:9, 3836:23, 3839:13, 3846:12, 3847:2, 3847:4, 3847:9, 3847:14, 3847:19, 3847:24, 3848:4, 3848:8, 3849:22, 3850:5, 3852:4, 3852:5, 3862:24, 3862:25, 3863:1, 3863:3, 3871:2

**servicing** [1] - 3753:1

**session** [1] - 3738:23

**set** [5] - 3757:5, 3758:18, 3760:3, 3798:21, 3834:10

**setting** [1] - 3758:16

**setting-the-foundation** [1] - 3758:16

**seven** [2] - 3831:22, 3831:24

**several** [6] - 3725:17, 3754:4, 3789:14, 3801:24, 3832:8, 3835:21

**shall** [3] - 3749:11, 3853:18, 3856:5

**Shall** [1] - 3852:3

**share** [3] - 3713:6, 3842:24, 3843:3

**Shared** [11] - 3746:7, 3750:25, 3751:10, 3752:7, 3754:4, 3754:8, 3755:3, 3862:3, 3862:5, 3862:10, 3862:14

**shared** [1] - 3753:1

**shareholder** [2] - 3742:22, 3841:15

**shareholders** [5] - 3726:5, 3726:8, 3782:1, 3782:3, 3782:5

**shares** [4] - 3726:6, 3726:11, 3726:20, 3726:24

**sharpens** [1] - 3713:10

**sheer** [2] - 3730:5, 3730:15

**sheet** [5] - 3787:17, 3788:15, 3788:17, 3789:24, 3789:25

**sheets** [8] - 3732:7, 3732:9, 3787:7, 3787:11, 3788:7, 3819:4, 3835:15

**SHERIDAN** [1] - 3708:17

**short** [1] - 3811:22

**Short** [2] - 3815:16, 3816:4

**shorthand** [2] - 3811:22, 3812:13

**shortly** [1] - 3720:14

**Show** [1] - 3822:19

**show** [10] - 3735:22, 3780:4, 3786:24, 3797:11, 3812:17, 3813:3, 3813:5, 3817:20, 3817:22, 3830:6

**showed** [3] - 3801:11, 3826:11

**showing** [6] - 3749:12, 3750:12, 3783:1, 3821:7, 3823:19, 3866:8

**shown** [8] - 3773:17, 3774:11, 3775:24, 3776:8, 3813:9, 3850:11, 3857:23, 3861:23

**Shows** [1] - 3820:7

**shows** [19] - 3753:9, 3771:6, 3780:3, 3787:17, 3789:10, 3789:11, 3789:14,

3790:17, 3790:18, 3794:7, 3811:19, 3816:22, 3817:11, 3818:9, 3825:23, 3840:21

**shrink** [4] - 3765:11, 3868:10, 3868:19, 3869:8

**shrinks** [1] - 3765:24

**sic** [1] - 3724:11

**side** [8] - 3731:10, 3737:15, 3764:15, 3764:19, 3774:7, 3784:11, 3819:7, 3824:9

**significant** [9] - 3737:20, 3737:23, 3800:11, 3837:4, 3837:5, 3837:7, 3837:24, 3837:25, 3854:12

**significantly** [2] - 3764:22, 3766:21

**similar** [6] - 3782:8, 3782:24, 3786:15, 3786:16, 3827:17, 3872:22

**similarly** [1] - 3790:3

**simple** [7] - 3722:21, 3784:7, 3784:15, 3785:8, 3785:12, 3786:13, 3796:2

**simply** [3] - 3740:19, 3753:2, 3798:22

**single** [3] - 3732:18, 3793:8, 3855:10

**sit** [1] - 3732:15

**site** [1] - 3840:24

**sitting** [1] - 3805:21

**SIVOLELLA** [1] - 3708:3

**six** [4] - 3711:22, 3714:2, 3714:4, 3818:6

**size** [6] - 3766:5, 3805:11, 3805:12, 3836:1, 3837:12, 3873:24

**sizes** [1] - 3782:9

**sleeve** [7] - 3755:24, 3756:9, 3756:11, 3756:13, 3833:1, 3833:3, 3833:4

**sleeves** [1] - 3833:10

**slide** [4] - 3760:18, 3762:1, 3801:11, 3864:24

**slides** [2] - 3758:18, 3834:19

**slightly** [2] - 3815:21,

3816:4

**small** [11] - 3733:24, 3789:9, 3791:21, 3798:16, 3798:23, 3799:1, 3804:23, 3805:2, 3805:4, 3805:6, 3805:14

**smaller** [3] - 3766:22, 3779:7, 3792:25

**sold** [1] - 3726:22

**solely** [1] - 3852:6

**someone** [2] - 3744:13, 3754:14

**sometimes** [1] - 3781:18

**somewhat** [1] - 3830:20

**Sorry** [5] - 3767:16, 3774:17, 3795:1, 3807:2, 3810:6

**sorry** [75] - 3717:15, 3721:19, 3721:21, 3722:11, 3723:20, 3724:1, 3725:22, 3727:9, 3727:12, 3728:23, 3731:24, 3736:11, 3738:17, 3751:14, 3752:25, 3758:23, 3758:24, 3761:16, 3762:14, 3763:19, 3764:17, 3764:18, 3768:24, 3770:3, 3771:12, 3771:23, 3772:18, 3772:19, 3773:6, 3773:9, 3775:17, 3776:3, 3778:23, 3783:25, 3784:9, 3784:10, 3790:11, 3792:2, 3792:9, 3793:6, 3793:16, 3793:17, 3794:22, 3799:14, 3804:16, 3810:9, 3811:16, 3812:21, 3812:23, 3814:6, 3814:18, 3815:10, 3817:9, 3818:2, 3819:2, 3820:13, 3822:11, 3823:24, 3825:7, 3825:11, 3828:4, 3832:5, 3832:25, 3835:12, 3835:20, 3836:5, 3842:1, 3849:13, 3850:21, 3853:8, 3853:15, 3857:7, 3872:18, 3874:9, 3875:16

**sort** [4] - 3711:5, 3716:11, 3716:16,

3816:4

**sought** [2] - 3801:1, 3858:1

**sound** [1] - 3757:11

**sounds** [1] - 3728:22

**source** [4] - 3716:1, 3716:10, 3716:18, 3716:22

**sources** [3] - 3716:3, 3718:4

**specific** [17] - 3731:16, 3742:12, 3744:7, 3744:8, 3749:21, 3755:25, 3759:17, 3766:7, 3766:8, 3776:17, 3779:25, 3799:4, 3801:3, 3803:19, 3814:24, 3815:18, 3873:19

**specifically** [13] - 3717:11, 3731:18, 3749:1, 3757:11, 3775:11, 3782:24, 3802:8, 3814:25, 3818:18, 3844:22, 3844:13, 3844:18, 3870:18

**specificity** [1] - 3873:13

**specifics** [7] - 3760:19, 3804:12, 3835:20, 3843:4, 3843:7, 3849:10, 3861:25

**specified** [1] - 3850:5

**speeches** [1] - 3715:6

**speed** [1] - 3781:23

**spend** [3] - 3740:5, 3801:22, 3833:19

**spent** [6] - 3713:18, 3727:23, 3728:1, 3728:3, 3740:21, 3855:9

**spirit** [2] - 3748:13, 3749:5

**split** [1] - 3838:3

**sponsors** [1] - 3805:21

**spot** [1] - 3795:4

**Spread** [1] - 3815:5

**spread** [31] - 3809:24, 3814:25, 3815:21, 3816:15, 3816:25, 3817:1, 3817:5, 3821:16, 3821:19, 3822:2, 3822:3, 3822:4, 3823:23, 3824:3, 3824:12, 3824:24, 3824:25,

3825:3, 3825:4, 3825:8, 3825:10, 3825:12, 3825:23, 3826:12, 3826:13, 3826:22, 3868:6, 3868:9, 3868:16, 3869:7, 3870:25
**spreadsheet** [3] - 3790:14, 3817:17, 3818:1
**spring** [1] - 3846:20
**spur** [1] - 3851:19
**SRS** [1] - 3792:17
**staff** [1] - 3726:3
**stage** [1] - 3738:11
**stamp** [3] - 3788:18, 3788:19, 3789:1
**stand** [4] - 3714:18, 3714:20, 3758:5, 3855:11
**Standard** [4] - 3758:21, 3758:25, 3759:7, 3759:15
**standard** [8] - 3759:20, 3760:2, 3760:12, 3761:15, 3850:12, 3851:22, 3852:12, 3854:11
**standards** [2] - 3728:10, 3762:6
**standing** [1] - 3805:22
**Stanley** [1] - 3805:6
**start** [4] - 3767:23, 3805:1, 3823:7, 3859:19
**start-ups** [1] - 3805:1
**started** [1] - 3857:11
**starting** [5] - 3798:23, 3799:22, 3859:16, 3865:13, 3865:23
**starts** [1] - 3853:11
**STATE** [1] - 3708:14
**statement** [15] - 3723:22, 3724:4, 3724:12, 3733:16, 3749:12, 3749:16, 3750:12, 3759:19, 3759:21, 3760:22, 3762:8, 3813:5, 3813:18, 3866:11, 3866:19
**statements** [4] - 3724:8, 3740:18, 3740:19, 3812:16
**STATES** [1] - 3708:1
**statistical** [5] - 3784:3, 3785:1, 3785:20, 3828:2, 3828:6
**statistics** [2] -

3711:15, 3782:13
**step** [3] - 3805:25, 3858:23, 3875:5
**stick** [2] - 3842:5, 3871:18
**sticking** [1] - 3714:9
**still** [5] - 3714:21, 3737:3, 3740:8, 3768:18, 3806:8
**stock** [1] - 3828:17
**Stock** [4] - 3819:11, 3821:19, 3823:9, 3823:16
**stocks** [1] - 3837:4
**stop** [1] - 3789:18
**stopping** [1] - 3747:24
**Strategic** [3] - 3725:18, 3780:21, 3780:23
**strategic** [2] - 3747:19, 3748:1
**STREET** [1] - 3708:14
**stress** [1] - 3827:6
**strike** [14] - 3719:2, 3721:6, 3722:20, 3735:17, 3747:3, 3747:20, 3772:18, 3797:25, 3807:20, 3825:7, 3826:2, 3841:9, 3847:22, 3868:13
**Structure** [1] - 3831:17
**structure** [7] - 3726:15, 3727:3, 3727:23, 3798:22, 3831:13, 3833:13, 3867:17
**structured** [2] - 3834:11, 3849:8
**struggled** [1] - 3777:16
**struggling** [5] - 3731:18, 3745:2, 3766:6, 3780:4, 3820:15
**studies** [1] - 3716:16
**study** [9] - 3750:17, 3751:23, 3753:10, 3753:12, 3801:14, 3813:15, 3813:16, 3862:16, 3870:10
**sub** [80] - 3729:17, 3729:18, 3732:10, 3800:20, 3800:22, 3804:19, 3804:23, 3804:25, 3805:3, 3805:4, 3805:6, 3805:17, 3805:24, 3817:12, 3817:19,

3818:12, 3818:18, 3820:13, 3821:12, 3821:14, 3824:1, 3825:7, 3826:3, 3826:6, 3826:7, 3826:17, 3826:21, 3827:14, 3827:23, 3828:1, 3828:5, 3828:10, 3828:13, 3828:16, 3828:19, 3828:21, 3829:2, 3829:3, 3829:8, 3829:12, 3829:15, 3829:22, 3829:23, 3830:4, 3830:10, 3832:16, 3834:2, 3837:22, 3837:23, 3838:4, 3838:5, 3838:7, 3838:8, 3838:11, 3838:12, 3838:13, 3838:14, 3838:15, 3838:16, 3838:25, 3847:4, 3847:5, 3847:13, 3847:14, 3847:24, 3847:25, 3851:4, 3851:9, 3851:10, 3855:8, 3862:18, 3862:24, 3862:25, 3863:8, 3863:11, 3863:16
**Sub** [7] - 3745:20, 3746:5, 3829:18, 3855:16, 3856:21, 3857:1, 3857:5
**Sub-Administration** [5] - 3746:5, 3855:16, 3856:21, 3857:1, 3857:5
**sub-administrator** [7] - 3729:18, 3838:7, 3838:13, 3838:16, 3847:24, 3847:25, 3851:4
**sub-administrators** [1] - 3851:10
**Sub-advisor** [1] - 3829:18
**sub-advisor** [32] - 3805:4, 3805:6, 3805:24, 3827:14, 3828:1, 3828:5, 3828:10, 3828:13, 3828:16, 3828:19, 3828:21, 3829:2, 3829:8, 3829:12, 3829:15, 3829:22, 3830:4, 3830:10, 3837:22, 3838:4, 3838:5, 3838:8,

3838:11, 3838:12, 3838:14, 3838:15, 3847:4, 3847:5, 3862:25
**sub-advisor's** [1] - 3827:23
**sub-advisors** [24] - 3729:17, 3732:10, 3800:20, 3800:22, 3804:19, 3804:23, 3804:25, 3805:3, 3805:17, 3829:3, 3829:23, 3832:16, 3834:2, 3837:23, 3838:25, 3847:13, 3847:14, 3851:4, 3851:9, 3855:8, 3862:18, 3863:11, 3863:16
**Sub-Advisory** [1] - 3745:20
**sub-advisory** [14] - 3817:12, 3817:19, 3818:12, 3818:18, 3820:13, 3821:12, 3821:14, 3824:1, 3825:7, 3826:3, 3826:7, 3826:17, 3826:21, 3862:24
**subject** [8] - 3746:14, 3751:9, 3752:15, 3759:11, 3761:23, 3772:12, 3776:11, 3862:13
**submit** [1] - 3749:11
**submitted** [2] - 3749:16, 3861:4
**subpoena** [5] - 3712:3, 3714:5, 3753:15, 3753:19, 3753:24
**subpoenas** [1] - 3712:1
**subsets** [1] - 3843:20
**subsidiary** [4] - 3752:19, 3752:24, 3752:25, 3753:7
**substantial** [1] - 3723:10
**substantially** [1] - 3768:4
**substantive** [2] - 3722:18, 3777:5
**subtract** [1] - 3866:16
**subtracting** [1] - 3866:14
**subtraction** [2] - 3866:8, 3866:9
**subtractions** [1] - 3866:19

3838:11, 3838:12, 3838:14, 3838:15, 3847:4, 3847:5, 3862:25
**sub-advisor's** [1] - 3827:23
**sub-advisors** [24] - 3729:17, 3732:10, 3800:20, 3800:22, 3804:19, 3804:23, 3804:25, 3805:3, 3805:17, 3829:3, 3829:23, 3832:16, 3834:2, 3837:23, 3838:25, 3847:13, 3847:14, 3851:4, 3851:9, 3855:8, 3862:18, 3863:11, 3863:16
**succeed** [1] - 3799:22
**sue** [1] - 3803:22
**suffer** [1] - 3855:2
**suffered** [4] - 3850:1, 3853:20, 3854:15, 3856:7
**sufficient** [5] - 3731:13, 3796:10, 3804:6, 3804:20, 3873:24
**suggest** [2] - 3803:10, 3840:10
**suggested** [2] - 3727:6, 3789:10
**suggesting** [2] - 3788:6, 3835:19
**suggestions** [1] - 3739:1
**summaries** [3] - 3745:7, 3787:8, 3823:17
**summarized** [1] - 3732:9
**summarizes** [1] - 3834:22
**summary** [5] - 3739:12, 3739:13, 3809:19, 3823:19, 3839:11
**Sun** [2] - 3792:18, 3793:2
**supplies** [2] - 3748:5, 3748:6
**supply** [1] - 3720:7
**support** [1] - 3744:11
**supposed** [2] - 3711:6, 3840:9
**Supreme** [3] - 3760:7, 3760:13, 3761:15
**surprise** [4] - 3760:11, 3760:21, 3761:13, 3809:15
**surprising** [1] - 3809:18
**surprisingly** [1] - 3777:21
**suspect** [2] - 3734:2, 3859:9
**sustained** [2] - 3863:8, 3863:11
**sustains** [1] - 3854:25
**SWEETSER** [1] - 3709:4
**switched** [1] - 3811:16
**sworn** [1] - 3714:19
**system** [2] - 3754:12, 3754:18
**systems** [3] - 3755:15, 3838:19, 3841:18
**SZAFERMAN** [1] -

3709:3

# T

**T.Rowe** [1] - 3805:15
**tab** [25] - 3762:10, 3762:19, 3763:8, 3766:17, 3773:6, 3773:8, 3773:14, 3773:17, 3775:24, 3778:8, 3779:21, 3780:2, 3780:6, 3786:24, 3790:8, 3794:22, 3794:25, 3810:8, 3810:9, 3810:19, 3813:20, 3814:17, 3814:18
**table** [3] - 3775:1, 3776:8, 3799:3
**tabs** [1] - 3788:25
**task** [1] - 3846:5
**tasks** [4] - 3831:20, 3847:2, 3847:8, 3847:19
**Tax** [2] - 3748:15
**tax** [4] - 3845:18, 3845:20, 3845:21, 3845:25
**technical** [2] - 3718:7, 3738:15
**technically** [2] - 3829:7, 3875:9
**technology** [1] - 3749:4
**Teen** [1] - 3872:3
**Teen-Ed** [1] - 3872:3
**telephone** [3] - 3754:9, 3754:12, 3755:15
**tend** [4] - 3766:15, 3768:3, 3768:8, 3780:9
**term** [6] - 3738:15, 3756:24, 3757:10, 3778:15, 3779:4, 3807:8
**terminate** [1] - 3852:16
**terms** [24] - 3711:18, 3737:16, 3755:15, 3755:17, 3756:15, 3772:13, 3772:15, 3777:5, 3777:6, 3787:16, 3797:20, 3797:22, 3816:15, 3817:1, 3818:22, 3824:24, 3824:25, 3831:6, 3831:9, 3834:6, 3834:10,

3836:20, 3837:9, 3856:13
**terribly** [2] - 3838:20, 3863:4
**test** [5] - 3807:21, 3807:24, 3809:15, 3809:19, 3874:25
**testified** [42] - 3717:1, 3718:3, 3720:3, 3725:14, 3725:25, 3728:19, 3728:20, 3729:9, 3734:12, 3735:17, 3736:20, 3737:15, 3746:19, 3754:3, 3761:17, 3763:4, 3765:3, 3769:23, 3772:12, 3784:25, 3796:25, 3797:7, 3799:10, 3799:15, 3799:25, 3800:5, 3802:20, 3803:21, 3803:25, 3808:17, 3813:14, 3829:9, 3830:3, 3841:16, 3845:24, 3850:16, 3851:23, 3859:9, 3860:16, 3862:11, 3863:12, 3863:15
**testify** [1] - 3770:22
**testifying** [3] - 3717:13, 3717:16, 3854:24
**testimony** [25] - 3715:9, 3717:8, 3719:19, 3721:7, 3725:17, 3736:7, 3736:12, 3751:5, 3754:5, 3755:5, 3755:10, 3755:13, 3756:7, 3787:11, 3787:13, 3788:9, 3812:8, 3817:5, 3835:18, 3848:24, 3856:24, 3860:20, 3866:4, 3869:12, 3872:2
**text** [1] - 3781:17
**theory** [1] - 3803:1
**thereabouts** [1] - 3756:10
**therefore** [1] - 3867:10
**They've** [1] - 3711:9
**they've** [5] - 3712:1, 3713:13, 3738:1, 3777:24, 3830:5
**thinking** [2] - 3712:21, 3817:9
**thinks** [1] - 3845:6
**third** [9] - 3725:8,

3725:13, 3725:16, 3727:2, 3727:16, 3744:5, 3841:14, 3853:24, 3854:2
**third-party** [4] - 3725:8, 3725:13, 3725:16, 3853:24
**third-party's** [1] - 3854:2
**thoughtful** [1] - 3731:7
**thousands** [3] - 3782:9, 3784:17, 3837:3
**three** [17] - 3713:3, 3714:14, 3732:17, 3733:24, 3740:5, 3768:24, 3782:3, 3792:22, 3792:24, 3811:5, 3812:22, 3839:16, 3840:24, 3841:3, 3841:11
**three-year** [1] - 3840:24
**throughout** [1] - 3780:2
**throw** [1] - 3827:17
**Thursday** [4] - 3711:6, 3713:1, 3714:15, 3769:23
**ticking** [1] - 3713:11
**tie** [1] - 3820:14
**tied** [1] - 3858:18
**tiny** [2] - 3782:10, 3784:17
**title** [1] - 3769:12
**Title** [1] - 3708:23
**today** [3] - 3711:8, 3715:5, 3806:18
**together** [3] - 3720:18, 3794:4, 3818:3
**tomorrow** [3] - 3875:10, 3876:9, 3876:10
**took** [1] - 3713:22
**top** [5] - 3721:23, 3765:7, 3821:9, 3822:1, 3864:10
**topic** [1] - 3806:7
**total** [17] - 3732:20, 3767:3, 3770:8, 3773:22, 3775:3, 3782:1, 3782:3, 3785:10, 3797:13, 3801:11, 3801:18, 3817:8, 3820:7, 3820:9, 3822:4, 3865:8, 3866:13
**Total** [2] - 3770:2, 3773:24

**Totally** [1] - 3827:1
**tough** [1] - 3724:15
**towards** [1] - 3817:25
**track** [4] - 3757:6, 3757:9, 3821:25, 3836:6
**tracks** [1] - 3755:20
**trade** [1] - 3837:11
**trading** [4] - 3728:3, 3833:5, 3837:5, 3837:23
**Trading** [1] - 3837:21
**Traditional** [2] - 3758:21, 3758:25
**traditionally** [1] - 3753:4
**transactions** [2] - 3842:24, 3843:3
**transcript** [2] - 3711:17, 3745:7
**transfer** [2] - 3741:10, 3741:25
**translate** [1] - 3826:23
**travel** [1] - 3733:1
**treasury** [1] - 3748:5
**treated** [1] - 3741:25
**treats** [1] - 3782:9
**Trends** [1] - 3780:22
**trends** [1] - 3763:14
**TRENTON** [1] - 3708:15
**trial** [2] - 3740:22, 3755:5
**TRIAL** [1] - 3708:20
**tricks** [1] - 3759:11
**tried** [1] - 3803:10
**trouble** [4] - 3755:13, 3782:25, 3795:1, 3820:14
**trucks** [1] - 3781:22
**true** [4] - 3708:23, 3717:23, 3766:16, 3785:13
**Trust** [21] - 3726:12, 3849:23, 3850:1, 3850:5, 3850:9, 3850:14, 3850:15, 3851:3, 3851:8, 3851:11, 3852:3, 3852:4, 3852:5, 3852:6, 3852:11, 3853:20, 3854:9, 3856:7, 3860:4, 3860:12
**trustee** [9] - 3722:17, 3726:15, 3726:17, 3732:25, 3803:5, 3803:6, 3851:2, 3851:11, 3852:2
**Trustees** [2] -

3743:11, 3766:3
**trustees** [19] - 3716:9, 3734:14, 3734:16, 3734:20, 3734:23, 3737:22, 3740:6, 3748:23, 3784:25, 3785:20, 3786:3, 3832:20, 3848:25, 3850:17, 3850:24, 3852:23, 3856:22, 3874:3, 3876:2
**trustees'** [1] - 3712:3
**trusts** [1] - 3832:3
**Trusts** [1] - 3832:8
**try** [6] - 3712:24, 3730:9, 3777:18, 3789:9, 3863:3, 3868:18
**trying** [30] - 3756:1, 3757:6, 3757:8, 3767:16, 3772:14, 3772:15, 3774:17, 3778:3, 3787:7, 3787:14, 3787:17, 3790:18, 3809:20, 3817:7, 3820:14, 3821:9, 3821:11, 3821:22, 3821:25, 3822:11, 3822:12, 3823:8, 3827:7, 3828:11, 3837:9, 3837:14, 3837:18, 3844:13, 3849:6
**turn** [18] - 3721:6, 3721:18, 3723:1, 3726:1, 3727:1, 3743:17, 3766:17, 3772:17, 3781:9, 3781:13, 3799:10, 3810:2, 3811:14, 3824:6, 3839:19, 3849:16, 3853:14, 3865:3
**Turn** [14] - 3724:19, 3725:4, 3763:15, 3765:5, 3774:4, 3790:7, 3794:18, 3796:12, 3810:12, 3813:19, 3819:11, 3822:9, 3855:20, 3868:25
**turquoise** [3] - 3824:3, 3824:10, 3824:17
**Turquoise** [1] - 3824:9
**TWEED** [1] - 3709:12
**Tweed** [4] - 3738:6, 3738:7, 3738:11, 3739:23
**two** [44] - 3711:9, 3711:19, 3711:23,

3712:1, 3712:6, 3712:10, 3713:2, 3713:14, 3713:22, 3714:14, 3718:16, 3719:11, 3722:13, 3724:7, 3727:13, 3750:13, 3764:20, 3767:2, 3768:6, 3782:4, 3782:22, 3793:24, 3794:10, 3799:18, 3806:13, 3808:18, 3816:17, 3818:2, 3818:14, 3851:21, 3857:10, 3859:10, 3860:13, 3862:6, 3862:20, 3863:4, 3864:5, 3866:9, 3866:14, 3869:22, 3875:3, 3875:8, 3875:12, 3876:2

**two-to-one** [1] - 3713:14

**type** [5] - 3740:14, 3751:6, 3753:11, 3773:17, 3796:23

**types** [3] - 3797:8, 3799:18, 3802:7

**typical** [1] - 3756:8

**typically** [8] - 3756:8, 3756:14, 3765:24, 3774:11, 3774:22, 3782:23, 3796:3, 3855:7

---

**U**

**U.S** [2] - 3708:17, 3708:25

**U.S.C** [1] - 3708:23

**ultimate** [3] - 3832:21, 3852:17, 3874:25

**ultimately** [1] - 3752:8

**Ultra** [2] - 3815:16, 3816:4

**unaffiliated** [2] - 3725:8, 3725:12

**uncertain** [1] - 3836:20

**uncomfortable** [1] - 3712:15

**under** [26] - 3714:21, 3719:19, 3741:23, 3741:24, 3754:7, 3765:10, 3765:23, 3790:23, 3795:9, 3797:5, 3799:15, 3803:6, 3816:4, 3822:4, 3823:24, 3824:3, 3831:19,

3832:14, 3834:23, 3841:4, 3847:9, 3852:7, 3856:12, 3865:16, 3865:19

**Under** [2] - 3869:23, 3870:23

**underlying** [1] - 3845:12

**understood** [9] - 3729:16, 3729:20, 3738:13, 3740:23, 3741:3, 3741:8, 3777:9, 3791:10, 3843:17

**undertake** [8] - 3745:11, 3746:4, 3779:13, 3794:14, 3828:5, 3829:12, 3829:23, 3846:5

**undertaken** [2] - 3859:1, 3859:4

**undertaking** [2] - 3847:12, 3849:24

**undertook** [3] - 3745:19, 3745:25, 3862:17

**unfamiliar** [1] - 3757:12

**unfortunately** [1] - 3815:4

**unimportant** [2] - 3730:17, 3730:21

**unimportantly** [1] - 3864:7

**UNITED** [1] - 3708:1

**Universe** [1] - 3769:14

**universe** [3] - 3770:12, 3790:3, 3798:6

**Unless** [1] - 3736:3

**unless** [1] - 3780:8

**unlevel** [1] - 3713:13

**unlikely** [2] - 3798:8, 3798:16

**unrelated** [1] - 3753:10

**untroubled** [1] - 3873:21

**untruthful** [1] - 3730:25

**up** [25] - 3712:11, 3714:3, 3740:2, 3746:15, 3753:9, 3768:14, 3788:22, 3797:11, 3798:21, 3798:23, 3805:25, 3814:14, 3814:19, 3816:22, 3819:22, 3821:20, 3821:25, 3822:1, 3825:15,

3839:5, 3848:20, 3855:4, 3862:6, 3866:10, 3867:9

**update** [3] - 3762:2, 3842:23, 3843:2

**updates** [1] - 3761:20

**ups** [1] - 3805:1

**utility** [1] - 3754:19

---

**V**

**vague** [4] - 3802:15, 3826:18, 3830:20, 3871:4

**valuation** [4] - 3837:8, 3838:22, 3840:14

**value** [4] - 3757:18, 3841:12, 3843:6, 3843:21

**variable** [8] - 3767:22, 3820:12, 3821:10, 3824:1, 3857:22, 3858:9, 3859:6, 3870:25

**varies** [1] - 3871:21

**variety** [4] - 3745:19, 3766:3, 3790:15, 3810:23

**various** [4] - 3742:10, 3750:22, 3830:6, 3851:3

**Various** [1] - 3796:14

**vastly** [1] - 3827:15

**verified** [1] - 3858:9

**verify** [1] - 3857:22

**versa** [1] - 3734:7

**version** [3] - 3788:14, 3822:16, 3823:12

**Versus** [1] - 3769:13

**versus** [4] - 3796:9, 3796:20, 3827:13, 3827:14

**vice** [1] - 3734:7

**view** [10] - 3717:19, 3720:5, 3721:15, 3721:17, 3739:4, 3740:12, 3740:15, 3742:14, 3801:8, 3873:22

**viewed** [2] - 3856:17, 3857:1

**violations** [1] - 3800:16

**VIP** [2] - 3832:8, 3832:12

**vision** [1] - 3723:5

**visits** [1] - 3840:25

**VIT** [2] - 3795:15, 3795:18

volatility [2] - 3833:13, 3833:17

**voted** [2] - 3829:1, 3862:2

**votes** [1] - 3828:25

**Vs** [2] - 3708:5, 3708:9

---

**W**

**wait** [1] - 3875:10

**Wait** [1] - 3860:25

**waiver** [1] - 3822:2

**waivers** [4] - 3769:25, 3789:13, 3821:15, 3824:2

**walked** [1] - 3742:23

**Walker** [1] - 3743:9

**walking** [1] - 3864:25

**Walsh** [1] - 3845:24

**Walsh's** [1] - 3845:23

**warrant** [2] - 3835:1, 3836:10

**warranty** [1] - 3856:14

**Warren** [1] - 3861:12

**watchdog** [2] - 3717:3, 3719:20

**ways** [3] - 3715:15, 3801:24, 3815:1

**week** [1] - 3797:7

**weekly** [2] - 3718:15, 3718:17

**weighing** [1] - 3874:3

**weight** [4] - 3781:22, 3782:9, 3782:16, 3816:21

**weighted** [16] - 3764:21, 3767:20, 3779:5, 3779:6, 3779:14, 3780:6, 3780:9, 3785:10, 3785:23, 3786:1, 3786:4, 3786:11, 3816:13, 3825:11, 3825:23, 3826:22

**welcomed** [1] - 3723:9

**Wellington** [2] - 3805:10, 3805:11

**whatsoever** [4] - 3767:1, 3770:18, 3783:6, 3861:2

**whereas** [1] - 3785:11

**white** [2] - 3762:10, 3762:17

**whole** [9] - 3723:18, 3731:6, 3766:9, 3767:5, 3780:8, 3804:3, 3804:4, 3804:7, 3826:14

**wildly** [1] - 3827:17

**willful** [3] - 3850:2, 3853:23, 3856:9

**Williams** [1] - 3743:9

**willing** [3] - 3738:12, 3791:11, 3805:25

**wise** [1] - 3721:8

**wish** [4] - 3713:15, 3860:25, 3869:15, 3875:10

**wished** [1] - 3714:13

**withdraw** [1] - 3714:5

**withdrawing** [1] - 3753:15

**withdrawn** [1] - 3753:24

**witness** [34] - 3712:19, 3714:19, 3720:7, 3742:25, 3746:24, 3754:13, 3754:17, 3754:21, 3754:24, 3757:21, 3758:10, 3761:6, 3762:21, 3763:20, 3768:3, 3768:12, 3770:19, 3770:21, 3772:23, 3780:12, 3783:6, 3783:11, 3787:24, 3806:6, 3807:1, 3814:17, 3822:16, 3823:3, 3825:14, 3848:20, 3855:14, 3871:14, 3871:17, 3872:4

**WITNESS** [66] - 3720:12, 3724:7, 3730:13, 3735:3, 3736:4, 3736:20, 3738:20, 3744:22, 3751:21, 3757:22, 3758:1, 3760:1, 3760:4, 3762:22, 3763:23, 3764:8, 3765:18, 3767:11, 3767:16, 3768:6, 3769:9, 3769:18, 3772:5, 3772:25, 3780:14, 3781:9, 3783:21, 3787:16, 3787:21, 3788:6, 3788:11, 3788:24, 3789:2, 3789:7, 3789:22, 3792:10, 3802:17, 3806:9, 3806:19, 3806:24, 3807:2, 3810:3, 3812:24, 3819:25, 3820:20, 3821:2, 3822:18, 3823:5, 3823:7, 3823:14, 3827:5, 3827:21,

*3904*

3843:19, 3853:2,
3857:16, 3858:17,
3861:21, 3870:6,
3871:7, 3872:15,
3872:25, 3874:7,
3874:10, 3874:15,
3875:2, 3875:6

**Witness** [14] -
3723:20, 3727:20,
3743:4, 3754:9,
3758:13, 3761:11,
3765:12, 3769:6,
3784:2, 3810:17,
3821:23, 3839:10,
3854:6, 3875:7

**witnesses** [5] -
3711:24, 3712:10,
3712:14, 3712:16,
3712:23

**wondering** [2] -
3736:15, 3857:2

**word** [3] - 3811:3,
3852:2, 3867:7

**wording** [4] - 3721:13,
3746:17, 3759:17,
3811:12

**words** [4] - 3778:18,
3866:1, 3866:23,
3867:25

**works** [1] - 3817:3

**world** [1] - 3804:11

**wrapper** [11] -
3808:10, 3808:22,
3809:1, 3809:23,
3867:19, 3868:5,
3868:10, 3868:17,
3869:7, 3870:11

**written** [3] - 3724:25,
3725:1, 3746:18

**Y**

**year** [22] - 3732:21,
3754:25, 3781:5,
3804:8, 3822:6,
3836:14, 3836:21,
3837:15, 3837:17,
3840:24, 3860:7,
3862:6, 3868:4,
3871:21, 3873:3,
3873:4, 3873:20,
3873:21

**year-by-year** [2] -
3868:4, 3873:4

**years** [23] - 3716:15,
3720:23, 3737:20,
3777:9, 3781:23,
3791:5, 3800:1,
3800:10, 3804:2,
3807:19, 3808:18,

3811:5, 3842:21,
3848:2, 3851:14,
3854:13, 3854:23,
3855:4, 3855:6,
3857:21, 3858:7,
3871:20

**yellow** [6] - 3819:18,
3820:11, 3820:12,
3820:19, 3821:13,
3823:24

**yesterday** [3] -
3728:21, 3803:21,
3863:13

**yield** [1] - 3843:14

**yields** [1] - 3843:10

**yourself** [3] - 3727:19,
3744:10, 3854:4