1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
2

3    _____
     MARY ANN SIVOLELLA, et al,
4                    PLAINTIFFS

5       Vs.                              CIVIL NO.
                                         11-4194 (PGS)
6    AXA EQUITABLE LIFE INS. CO.,
     et al,
7                    DEFENDANTS
     _____
8    GLENN D. SANFORD, et al,
                     PLAINTIFFS
9
        Vs.                              CIVIL NO.
10                                       13-312 (PGS)
     AXA EQUITABLE FUNDS
11   MANAGEMENT GROUP,
                     DEFENDANT
12   _____

13
                             **FEBRUARY 23, 2016**
14                           CLARKSON S. FISHER COURTHOUSE
                             402 EAST STATE STREET
15                           TRENTON, NEW JERSEY  08608

16

17   B E F O R E:       THE HONORABLE PETER G. SHERIDAN
                        U.S. DISTRICT COURT JUDGE
18                      DISTRICT OF NEW JERSEY

19

20
     **TRIAL - DAY 23**
21

22

23                           Certified as true and correct as required
                             by Title 28, U.S.C. Section 753
24                           /S/ Francis J. Gable
                             FRANCIS J. GABLE, C.S.R., R.M.R.
25                           OFFICIAL U.S. REPORTER
                             (856) 889-4761


                     *United States District Court*
                       *Trenton, New Jersey*

1

2   A P P E A R A N C E S:

3
        SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, PC
4       BY:  ARNOLD C. LAKIND, ESQUIRE
             DANIEL S. SWEETSER, ESQUIRE
5            ROBERT L. LAKIND, ESQUIRE
             ROBERT G. STEVENS, JR., ESQUIRE
6            MARK A. FISHER, ESQUIRE
             CHRISTOPHER S. KWELTY, ESQUIRE
7            CHRISTOPHER S. MYLES, ESQUIRE
        FOR THE PLAINTIFFS
8

9
        BLANK ROME, LLP
10      BY:  JONATHAN M. KORN, ESQUIRE
        FOR THE DEFENDANTS
11

12
        MILBANK, TWEED, HADLEY & McCLOY, LLP
13      BY:  SEAN M. MURPHY, ESQUIRE
             ROBERT C. HORA, ESQUIRE
14           JAMES N. BENEDICT, ESQUIRE
             NIKKI NIELSON, ESQUIRE
15           ANDREA HOOD, ESQUIRE
        FOR THE DEFENDANTS
16

17  ALSO PRESENT:  PATRICIA LOUIE, ESQUIRE
                   MANAGING DIRECTOR & ASSOCIATE GENERAL COUNSEL
18                 AXA EQUITABLE LIFE INSURANCE CO.

19

20

21

22

23

24

25


                    *United States District Court*
                    *Trenton, New Jersey*

1                        I N D E X

2   WILLIAM W. HOLDER                                    3908
    DIRECT EXAMINATION OF WILLIAM HOLDER BY MR. HORA     3908
3   CROSS-EXAMINATION OF WILLIAM HOLDER BY MR.           3965
    STEVENS
4   CHRISTOPHER M. JAMES, Ph.D.                          4042
    DIRECT EXAMINATION OF CHRISTOPHER M. JAMES, Ph.D.    4042
5   BY MS. HOOD
    VOIR DIRE ON QUALIFICATIONS BY MR. A. LAKIND         4059

6


7


8                     E X H I B I T S

9
    Defendant's Exhibit 1510 was marked into evidence    3931
10  Plaintiff's Exhibits 847, 848, 849 were marked       3992
    into evidence
11  Plaintiff's Exhibit 787 was marked into evidence     4034

12


13


14


15


16


17


18


19


20


21


22


23


24


25

3908

Holder - Direct - Hora

1         THE COURT:  Good morning.  Please be seated.

2         Any applications?

3         MR. MURPHY:  None from defendants, your Honor.

4         THE COURT:  Ready to begin?

00:00    5         MR. HORA:  Your Honor, Robert Hora for defendants.

6    Defendants called call expert witness, William Holder.

7         THE COURT:  All right.  Mr. Holder.

8         (WILLIAM W. HOLDER, sworn)

9         THE DEPUTY CLERK:  State your name for the record.

00:00   10         THE WITNESS:  William Wallace Holder.

11         THE COURT:  Once you're seated, sir, could you just

12    spell your last name for us?

13         THE WITNESS:  Certainly, it is H-o-l-d-e-r.

14    (DIRECT EXAMINATION OF WILLIAM HOLDER BY MR. HORA:)

00:01   15    Q.  Mr. Holder, what is your current occupation?

16    A.  I serve as Dean of the Leventhal School of Accounting at

17    the University of Southern California, and also teach and

18    serve as professor there.

19    Q.  Could you please describe for us your educational

00:01   20    background beginning with college?

21    A.  Certainly.  I received a Bachelor of Science in business

22    administration degree with a major in accounting, from

23    Oklahoma State University; I then attended the University of

24    Oklahoma where I received a Master of accountancy degree and a

00:01   25    Doctorate in business administration with a dissertation field

Holder - Direct - Hora

1  also in accounting.

2  Q.  Can you just put some dates on that?  When did you get

3  your Bachelor's and when did you get the other degrees?

4  A.  Certainly.  I received my Bachelor's degree in 1969, my

00:02     5  Master's in 1972, and the Doctorate in 1974.

6  Q.  Could you please describe your academic employment

7  history since graduating with your Doctorate in 1974?

8  A.  Certainly.  I first joined the faculty at Texas Tech

9  University, I served there for five years, I began as an

00:02    10  assistant professor during that period of time, I was promoted

11  to associate professor and granted tenure; during that period

12  of time I also served as a visiting professor at the

13  University of Tennessee.

14      In 1979 I joined the faculty at the University of

00:02    15  Southern California as an untenured associate, and since then

16  I've been granted tenure, promoted to professor or full

17  professor, and then I held I think it's three endowed chairs

18  or professorships.

19  Q.  So, roughly how long have you been tenured at the USC?

00:03    20  A.  Well, it would have been since the early to mid '80s, I

21  don't remember the exact date of that grant.

22  Q.  And all of those positions that you've been talking

23  about, they've been in the field of accounting?

24  A.  They have, yes, sir.

00:03    25  Q.  Broadly speaking, what have you done as an academic in

*3910*

Holder - Direct - Hora

1 the field of accounting?

2 A.   Well, the things one would normally expect I think, I've

3 certainly taught financial accounting, managerial accounting,

4 cost accounting, I've taught auditing; over the years, I have

00:03   5 conducted research, published the results thereof, I have --

6 and that's generally been in the fields of managerial cost

7 accounting, financial accounting and reporting.

8      I have rendered service both to the university, but

9 also to the profession, serving on policy groups, standards --

00:03   10 accounting standards setting bodies over the years; and then

11 in addition to that I've done a good bit of consulting over

12 the duration of my career.

13 Q.   You just mentioned financial accounting, what is

14 financial accounting?

00:04   15 A.   Financial accounting is a functional area of accounting

16 that is designed primarily I think to provide decision useful

17 information to individuals outside a reporting entity, a

18 business enterprise.  Those individuals typically lack the

19 authority and the proximity to specify the type of information

00:04   20 that they would like to have on which to base their decisions,

21 primarily investment and credit decisions.

22      The financial accounting information is also commonly

23 used internally within organizations, business enterprises,

24 but it's designed primarily for those that are outside the

00:04   25 organization.

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1   Q.   Could you describe broadly for us what you've done in the

2   area of financial accounting?

3   A.   Sure.  I have taught in that area, I've written in that

4   area, I've conducted research in that area and published;

00:05   5   again, I mentioned the standards setting activities, financial

6   accounting generally encompasses a rather large range of

7   professional accounting standards that one must follow for

8   financial information to be presented in conformity with GAAP.

9   And I served on several of those accounting standards setting

00:05   10   groups over the years.

11       I've written textbooks or co-authored at least

12   textbooks in financial accounting that was published through

13   five editions used at numerous colleges and universities; I

14   still am involved in publishing a practice manual, which

00:05   15   guides audits of financial information presented in conformity

16   with generally accepted accounting principles.

17   Q.   And the textbook you just mentioned, what is that?

18   A.   Its title is Intermediate Accounting, it deals with -- or

19   dealt -- it deals with a wide range of financial accounting

00:06   20   and reporting topics.

21   Q.   Are you familiar with something called the SEC and

22   Financial Reporting Institute?

23   A.   I am, yes.

24   Q.   Could you explain what that is?

00:06   25   A.   That institute is an organization within the Leventhal

3912

Holder - Direct - Hora

1    School of Accounting at USC, it does a number of things over

2    the years; it's commissioned research, one of those projects I

3    and a couple colleagues participated in; it also hosts

4    so-called round tables, when there are major issues

00:06    5    confronting the profession, we can act as an independent forum

6    for practitioners and business executives to meet and confer

7    with regulators, standard setters, or individuals of that ilk,

8    and it provides a good forum for an interchange of ideas.

9         We also hold an annual conference that attracts 6 or

00:07    10    700 pretty much senior executives in business enterprises,

11    partners from public accounting firms; and the presenters at

12    that conference are -- we've been very blessed, they're

13    individuals such as the chairman of the financial accounting

14    standards boards, the chief accountant of the SEC,

00:07    15    commissioners of the SEC occasionally as the chair person.

16    Q.   And you mentioned a little bit earlier in your testimony

17    that you served on accounting standard setting bodies?

18    A.   I did.

19    Q.   Could you flesh that out a little bit for us?

00:07    20    A.   Sure.  I served originally as the senior technical editor

21    of an industry accounting and audit guide, dealing with audits

22    of state and local government units; I also then served on a

23    compliance auditing task force that focused on the auditor's

24    responsibility for identifying violations of laws and

00:08    25    regulations in the related disclosures in financial statements

*United States District Court*
*Trenton, New Jersey*

3913

Holder - Direct - Hora

1    for those.  I then served on a group called the accounting

2    standards executive committee; that was a group that published

3    a variety of different types of standards.  We issued

4    statements of position accounting and audit guides; other

00:08    5    documents, practice bulletins and so on, that in part

6    established generally accepted accounting principles.

7           That worked focused on a wide range of entities.  We

8    set -- during my time on the committee, we set accounting

9    standards for everything from common interest realty

00:08    10    associations to insurance companies, mutual funds and so on,

11    as well as other financial institutions, banks, savings and

12    loans.

13   Q.   And when were you on that committee?

14   A.   That was from '87 to '90.

00:08    15   Q.   Have you had any other roles with accounting standards

16   setting bodies?

17   A.   I have.  I served two five-year terms on the governmental

18   accounting standards board that started in 2000, and ended in

19   2010.  That group sets generally accepted accounting

00:09    20   principles for the nation's 80,000 or so units of state and

21   local government.

22   Q.   Now, you mentioned generally accepted accounting

23   principles a couple of times; what is that or what are they?

24   A.   Sure.  Generally accepted accounting principles

00:09    25   represents a body of knowledge composed I would say primarily

*United States District Court*
*Trenton, New Jersey*

3914

Holder - Direct - Hora

1  of written accounting standards, with which information

2  contained in financial reports must comply, if those financial

3  -- resulting financial statements are to be presented in

4  conformity with generally accepted accounting principles.  The

00:09    5  Securities and Exchange, for example, requires SEC registrants

6  generally to prepare their information in conformity with that

7  body of knowledge, in conformity with generally accepted

8  accounting principles.

9  Q.    And who forms generally accepted accounting principles?

00:10   10  A.    Over the years a large number of or relatively large

11  number of organizations have performed that function.  The SEC

12  was formed back in the early '30, and one of the first things

13  they did was they had the authority to set accounting

14  standards; they delegated that authority to the private sector

00:10   15  and a number of organizations over the years, including AcSEC,

16  has been active in writing those accounting standards.

17         MR. STEVENS:  If I just may object; you used a

18  phrase there AcSEC --

19         MR. HORA:  I was just going to get to that.

00:10   20  BY MR. HORA:

21  Q.    You used an acronym and I'd like you to explain that.

22  A.    I did and I apologize.  The Accounting Standards

23  Executive Committee, which I alluded to earlier and on which I

24  had served, was known by that acronym of AcSEC.  Sorry.

00:10   25  Q.    Are you familiar with something called FASB?

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1  A.   GASB?

2  Q.   FASB, F-A-S-B --

3  A.   FASB, yes, absolutely.

4  Q.   What's FASB?

00:11  5  A.   FASB is the Financial Accounting Standards Board, it is

6  currently the most authoritative standards setter establishing

7  GAAP for business enterprises, and not-for-profit

8  organizations.  Such as USC, for example.

9  Q.   Have you had any role with FASB?

00:11  10  A.   I have, yes.  The FASB and the GASB are frequently

11  characterized as sister boards, so during my 10 years were

12  housed in the same building and shared the same facilities.

13  So, during the 10 years I was on GASB many of our projects

14  would have some relationship to -- some interrelationship with

00:11  15  those being pursued by the FASB.  So we would discuss those

16  projects among board members of both FASB and GASB or staffs

17  would interact and so on.  We both had accounting for

18  derivatives projects going at the same time, so there was a

19  good bit of discussion about those that took place.  In

00:12  20  addition to that I was commissioned to do research at an

21  earlier point by the FASB that were designed to help their

22  standards setting efforts.

23  Q.   Now, earlier in your testimony you mentioned something

24  called managerial accounting; do you recall that?

00:12  25  A.   I do.

Holder - Direct - Hora

1    Q.    What is managerial accounting?

2    A.    Managerial accounting is a functional area of accounting

3    that is designed to provide decision useful information to

4    those that manage business enterprises.  And there are a

00:12    5    number of facets of managerial accounting, cost accounting

6    being one of those; cost accounting also related to financial

7    accounting very closely.  But managerial accounting is

8    designed to provide information of use to those that are

9    charged with the responsibility of managing the business.

00:12    10    Q.    Broadly speaking, could you describe your experience in

11    the area of managerial accounting?

12    A.    Sure.  Well, again, I've taught in that area, I've taught

13    a number of managerial and cost accounting courses over the

14    years; I also have written in that area, performed research

00:13    15    and published information about managerial accounting,

16    contributed to a handbook on cost accounting; I also have

17    consulted on cost accounting issues and learned from those

18    endeavors as well.

19    Q.    How if at all does managerial accounting differ from

00:13    20    financial accounting, which is what we were talking about a

21    little bit earlier?

22    A.    Well, there's a considerable overlap.  I think it's a

23    fair to say while financial accounting is required to be

24    guided by professional accounting standards established

00:13    25    establishing generally accepted accounting principles, under

*United States District Court*
*Trenton, New Jersey*

1  managerial accounting you do have more flexibility, you can

2  ask for alternative presentations.  I think the managerial

3  accounting body of knowledge recognizes that the decisions

4  that individuals make that manage business enterprises vary,

00:14  5  from very strategic long-range focus, to incremental

6  decisions, should we accept this order that's coming in or

7  should we reject it.  So there are great many types of

8  decisions that managerial accounting addresses, that really

9  aren't the subject of financial accounting.

00:14  10  Q.  And you've talked a little bit in your testimony so far

11  about cost accounting, and I'd like to step back a little bit

12  and define that.  What is cost accounting?

13  A.  Cost accounting generally is the process of associating

14  economic endeavor, that is, the costs that incurred in

00:14  15  fulfilling some function, some activity, some good or some

16  service.  So cost accounting is the association of economic

17  endeavor with some productive function, some

18  revenue-generating activity, some good, some service.

19  Q.  And broadly speaking, could you explain for us what

00:15  20  you've done in the area of cost accounting?

21  A.  Again, I've taught in that area, college courses devoted

22  to cost accounting, and college courses and university courses

23  that deal in part with cost accounting, concepts and

24  practices; I've also performed research and published in that

00:15  25  area; and also consulted over the years in -- on issues of

Holder - Direct - Hora

1    cost accounting.

2    Q.   And generally, without revealing any confidential

3    information, could you describe for us your consulting work

4    with respect to cost accounting?

00:15  5  A.   Sure.  The earliest involvement involved a hospital.  The

6    Medicare formula had just been -- the Medicare program had

7    just been put in place recently, and the whole process of

8    reporting the Medicare and receiving reimbursement for

9    providing services under that program, was cost based; that

00:16  10 is, the cost of providing services to Medicare patients needed

11   to be measured, and that would in large measure determine the

12   amount of reimbursement that a hospital would receive.

13       And so you had a large number of revenue producing

14   departments within the hospital, various varying levels of

00:16  15 Medicare penetration as we would call it, that is, the

16   percentage of patients served that were Medicare eligible; for

17   example, nursing service, which is essentially the room and

18   board, would generally have a higher percentage of Medicare

19   patients, than say something like OB-GYN, older people don't

00:16  20 have babies too much.

21       So the cost -- finding the cost determination for that

22   we would try to allocate the cost of various support

23   departments, like housekeeping and purchasing and human

24   resources and medical records, to those revenue producing

00:17  25 areas for purposes of determining the appropriate

3919

Holder - Direct - Hora

1   reimbursement for Medicare.

2        Since that time I have worked with other hospitals

3   trying to assist them in developing systems that will allow

4   them to evaluate cost relationships with productive functions

00:17  5   they were considering.  I've also been involved in terms of

6   cost accounting in the standards setting activities I alluded

7   to.  A good deal of cost accounting is found in financial

8   accounting reporting; for example, we had a project on

9   environment contamination remediation obligations and trying

00:17  10  to measure the costs that would be incurred by a government in

11  cleaning up a polluted harbor or some other property that the

12  government owned that required remediation, and, of course,

13  you know, there are great many cost allocation problems that

14  are associated with -- with those processes.

00:18  15       I've consulted on other issues that involved cost

16  accounting, the costs, for example, of acquiring a building,

17  if you're building it yourself will require -- to construct a

18  building may require cost allocations, frequently does.

19  Q.   Have you done any cost accounting work with respect to

00:18  20  mutual funds?

21  A.   I don't recall doing so, other than in this case in

22  looking at it.

23  Q.   How if at all are cost accounting principles and concepts

24  applicable to different industries?

00:18  25  A.   Well, I think the same general concepts apply almost

*United States District Court*
*Trenton, New Jersey*

3920

Holder - Direct - Hora

1  regardless of the industry.  Again, the goal of cost

2  accounting is to associate the amount of economic endeavor,

3  that is, the costs that were incurred with some financial

4  that's being performed by the organization, and that

00:19      5  transcends industries generally.

6  Q.  Mr. Holder, have you ever testified before Congress?

7  A.  I have, yes.

8  Q.  Could you explain when and on what subjects?

9  A.  Sure.  As I recall that was in May I believe of 2002;

00:19     10  Congress at that time was considering legislation that would

11  become known later when passed as the Sarbanes-Oxley Act, they

12  were interested in the nature, extent I guess of alleged

13  fraudulent financial reporting that was occurring in our

14  capital markets.  Enron had just failed, Worldcom also had had

00:19     15  its problems; the congressional committee before whom I

16  testified was -- they thought well informed about those, so

17  they asked me to look at five other instances that had been

18  reported in the press involving allegations of fraudulent

19  financial reporting and to try to provide insights to them on

00:20     20  the causes and perhaps the cures, things that could be done

21  that would mitigate or extinguish instances of fraudulent

22  financial reporting.

23  Q.  Have you heard of something called the National

24  Commission on Fraudulent Financial Reporting?

00:20     25  A.  I have.

*United States District Court*
*Trenton, New Jersey*

3921

Holder - Direct - Hora

1   Q.   What is that?

2   A.   That was a commission formed back in the '80s for similar

3 reasons.  I think that was probably a response to the -- what

4 became known as the savings and loan crisis, the failure of a

00:20    5 great many savings and loans, and financial accounting and

6 reportings role in either not predicting that or not conveying

7 the troubles of a given institution on a timely basis.

8      The commission was named after its chairman, James

9 Treadway was an SEC commissioner, and he chaired that

00:21   10 commission, so it became known as the Treadway Commission.

11 But they commissioned themselves a number of research

12 projects, one of which I participated in with two of my

13 colleagues.  Our charge was to look at things that the

14 Securities and Exchange Commission could do or do differently

00:21   15 that would mitigate or diminish the frequency, severity of

16 instances of fraudulent financial reporting.

17   Q.   Thank you.  Do you have any professional accreditations?

18   A.   Yes, I do.

19   Q.   What are they?

00:21   20   A.   I am a Certified Public Accountant both in California and

21 Oklahoma where I took the examination.

22   Q.   And how about a professional affiliations, do you have

23 any of those?

24   A.   I do, I am a member of the American Institute of

00:21   25 Certified Public Accountants; I'm a member of the California

*United States District Court*
*Trenton, New Jersey*

3922

Holder - Direct - Hora

1   Society of Certified Public Accountants; I am a member of the

2   American Accounting Association; and then in each of those

3   organizations I've held various offices and served on

4   committees, chaired some of them.

00:22   5   Q.   Have you received any awards during your career?

6   A.   I have, yes.

7   Q.   Generally speaking, what have you received?

8   A.   Well, there have been a number of teaching awards and

9   because students propel those that they tend to mean a great

00:22   10   deal to the recipient, they certainly do to me.  I've also

11   received awards from professional societies; I've received

12   awards from the two schools from which I graduated, Oklahoma

13   State, the university of Oklahoma; I received the Gold Medal

14   for distinguished service from the American Institute of CPAs;

00:22   15   I also was named for a couple years as one of the hundred most

16   -- I think the phrasing is influential people in accounting.

17   Q.   Okay.  Mr. Holder, who developed the opinions that you

18   intend to offer today?

19   A.   Yes, I did.

00:23   20   Q.   You did.

21   A.   I did.  I'm sorry, I thought --

22   Q.   I said who developed.  In the process of forming your

23   opinions, did anyone assist you?

24   A.   Yes, they did.  I was assisted by the professional staff

00:23   25   of Cornerstone Research.

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1  Q.   What is Cornerstone Research?

2  A.   They are a company that tends to as least focuses, to my

3  knowledge, on economic analysis; they provide litigation

4  support over a wide range of matters and topics and functional

00:23  5  areas, including accounting and financial reporting; they've

6  assisted me in numerous engagements I've been involved in, and

7  they did in this one.

8  Q.   And why did you obtain assistance from Cornerstone?

9  A.   Well, I think there were efficiency concerns at issue.  I

00:23  10  think they were -- in my experience have been well positioned

11  to provide that kind of assistance.  I generally used them as

12  I would use a research assistant on a research project;

13  they're very helpful in organizing information, getting

14  documents, putting them in logical order and so on.  But they

00:24  15  were -- they were helpful in a variety of ways, in assisting

16  me in developing my opinions.

17  Q.   Thank you.

18       MR. HORA:  Your Honor, at this time I ask the Court

19  to qualify Mr. Holder as an expert in financial accounting,

00:24  20  managerial accounting, and cost accounting, and submit that

21  he's qualified to testify as an expert in these areas by

22  reason of his experience and training.

23       THE COURT:  Mr. Stevens?

24       MR. STEVENS:  Good morning, your Honor.  The only

00:24  25  thing I would note is that we had filed prior to this a motion

*United States District Court*
*Trenton, New Jersey*

3924

Holder - Direct - Hora

1   in limine to preclude his testimony entirely.  It's my

2   understanding based on discussions I heard yesterday that the

3   trial schedule and everybody agrees we'll be finished Thursday

4   and that's sufficient time for defendant to put in all its

00:24   5   witnesses; because of that we're going to reserve on that

6   motion, not entertain it at this point and wait for

7   cross-examination to raise the issues that we had identified

8   in that specific motion, your Honor.

9           THE COURT:  All right.  Do you have any objections

00:25   10   to that?

11           MR. HORA:  No objection to that.

12           THE COURT:  All right.  I guess I'm tentatively

13   finding that Mr. Holder is an expert in financial, managerial

14   and cost accounting.

00:25   15           MR. HORA:  Thank you.

16   BY MR. HORA:

17   Q.   Mr. Holder, as part of your work in this matter, have you

18   reviewed the process by which FMG reports its profitability to

19   the EQAT, E-Q-A-T, Board of Trustees?

00:25   20   A.   Yes, I have.

21   Q.   And based on your understanding how does FMG classify

22   sub-advisory and sub-administrative fees in these reports?

23   A.   In the reports I've seen they classify those costs as

24   expenses, rather than as a direct reduction of revenues.

00:25   25   Q.   Okay.  And my next question I'm just going to ask for a

*United States District Court*
*Trenton, New Jersey*

3925

Holder - Direct - Hora

1  yes or no because I want to lay some foundation later for what

2  your opinion is, but did you reach any opinions about FMG's

3  classification of sub-advisory and sub-administrative fees in

4  those profitability reports?

00:26    5  A.   Yes.

6  Q.   And could you let us know what you did to prepare

7  yourself in forming your opinion?

8  A.   As they relate to this profitability issue, I read a

9  great number of documents; I looked at the arrangements, the

00:26   10  agreement between the Trust and FMG; I looked at the

11  agreements between -- some of the agreements at least between

12  FMG and the sub-advisors and sub-administrators; I had

13  interviews and discussions with Mr. Joenk, Ms. Louie; I read a

14  number of our documents, deposition testimony, trial

00:26   15  testimony; I also conducted analysis of the professional

16  literature of the accounting profession and considered it as I

17  went through my analysis.  Those things come to mind.

18  Q.   And could you please summarize for the Court your opinion

19  with respect to FMG's classification of sub-advisory and

00:27   20  sub-administrative fees in its profitability reports to the

21  EQAT Board?

22  A.   I think the classification as expenses as I've indicated

23  was perfectly appropriate.

24  Q.   Now, you mentioned -- one thing you mentioned you looked

00:27   25  at was accounting standards, and I'd like to go through some

Holder - Direct - Hora

1   of the professional standards that I understand are related to

2   your opinion.

3          MR. HORA:   Could we hand the witness DX-1510?

4   Q.   Do you recognize this document?

00:28   5   A.   I do.

6   Q.   What is it?

7   A.   This is the text of an Emerging Issues Task Force

8   consensus abstract, that's what EITF at the top left stands

9   for, and it was issued in 1999.  It was the 19th abstract they

00:28   10   issued that year, so it's characterized this EITF 99-19.

11   Q.   And this is a document that Mr. Barrett cited in his

12   report; correct?

13   A.   I recall that being the case, yes.

14   Q.   What is the Emerging Issues Task Force?

00:28   15   A.   That is a group of practitioners, business executives, as

16   well as those in public accounting practice, established by

17   the FASB to deal with problems that were -- or challenges that

18   were arising in practice, there may be new transactions, there

19   may be into business structures; when those arise the EITF is

00:29   20   to provide immediate guidance if you will to the practicing

21   community, to the accounting profession.

22          The FASB in establishing its standards, goes through a

23   rather lengthy due process procedure, some of those can take

24   five, seven, eight years.  And so the EITF was designed to be

00:29   25   -- to provide much more immediate guidance to emerging issues,

3927

Holder - Direct - Hora

1    trends, things that are taking place in practice that are new.

2  Q.   Now, on this document in brackets it says, superseded by

3  FASB codification 9/15/2009; do you see that?

4  A.   Yes.

00:29    5  Q.   What does that mean?

6  A.   Well, as I testified earlier, there have been a very

7  relatively large number of standards setting organizations

8  over the years, and the standards they issued have all

9  different kinds of names; there was no central electronic

00:29   10  repository for all of those standards, it was difficult to

11  search, using keywords and so on, there wasn't a single

12  electronic database for all of the accounting standards.

13       So the FASB recognized that it would be highly

14  desirable to create such a database.  They set about doing so,

00:30   15  and in 2009 they codified all the existing authoritative

16  standards into that single accounting standards codification.

17  And so they took a great many, including EITF 99-19, a great

18  many existing standards and just arranged them into a single

19  database that was much easier to search and use and identify

00:30   20  the pertinent literature.

21  Q.   And did the substance of EITF 99-19 change when it was --

22  change when it was codified by FASB in 2009?

23  A.   It did not.

24  Q.   So it's still the same.

00:30   25  A.   Pardon me?

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1   Q.   It's still the same.

2   A.   Yes.

3   Q.   All right.  And could you let us know what the EITF 99-19

4   addresses?

00:30   5   A.   Well, it addresses circumstances in which there may --

6   there may have been deviations in practice or different

7   practices beginning to emerge for the circumstances in which

8   revenue would be reported gross with certain costs reported as

9   expenses, and circumstances in which revenue would be reduced

00:31   10   by those costs and not then reporting those costs as expenses.

11   There were a number of emerging issues here that I think

12   probably captured the task force's attention and caused them

13   to prepare this particular standard.

14        And so it's essentially provided in here are -- first

00:31   15   of all, considerable professional judgment is recognized as

16   necessary; and then secondly, there are a number of indicators

17   that are established that would mitigate toward reporting

18   those costs as expenses versus reporting them as reduction of

19   revenue.

00:31   20   Q.   And just to make this a little more tangible, can you

21   give us an example of a situation where this guidance would

22   apply to the issue of reporting revenues gross versus net?

23   A.   Sure.  There are a couple of that come to mind.  In

24   retail, for example, there may be instances in which a

00:32   25   retailer does not actually buy goods that are sold within its

*United States District Court*
*Trenton, New Jersey*

3929

Holder - Direct - Hora

1    premise, those goods are put on racks by another party, and

2    but yet they're sold through that store.  And the retailer

3    never takes possession or owns that inventory, if you will,

4    they don't have the risk of the inventory becoming obsolete,

5    they don't have to pay for the inventory regardless of whether

6    they sell it or not; and then there are other instances in the

7    same store in which they do buy the items that are being held

8    for resale, and they do have those risks of owning the

9    inventory.

10        And so both items go through the cash register when

11   people buy them, but should one of those items be reported as

12   a commission, if you will, for selling someone's else's goods

13   or services, or should they be reported as the total revenue

14   accruing to the -- to the retailer.  Amazon.com was one of the

15   organizations I think that probably helped propel this.  When

16   you order something from Amazon.com, in some circumstances at

17   least, you may send them $40, and what they do is arrange for

18   a book to be sent to you and pay the book seller the $32 for

19   the bookkeeping only the 8.  And questions arise as to whether

20   in a circumstance like that where Amazon did not acquire the

21   book and have the risk and rewards of the ownership of the

22   inventory of books, should that be reported as a commission or

23   did they generate $40 of revenue.  And so it's those kinds of

24   questions; how much revenue should be reported here, 8 or 40

25   in that case.

3930

Holder - Direct - Hora

1   Q.   Mr. Holder, I think you pushed the microphone away from

2   yourself a little bit.

3   A.   I'm sorry.

4   Q.   All right.  Could you turn to page 2 of DX-1510,

00:34   5   Defendant's Exhibit 1510.  And I want to specifically focus

6   you on the first sentence of paragraph 3.  Just let me know

7   when you're there.

8   A.   I'm there.

9   Q.   All right.  Could you read that sentence?

00:34   10   A.   Yes.  It says:  The issue is under what circumstances a

11   company should report revenue based on:  (a) the gross amount

12   billed to a customer because it has earned revenue from the

13   sale of goods or services, or (b) the net amount retained,

14   that is the amount billed to the customer less the amount paid

00:34   15   to a supplier, because it has earned a commission or fee.

16   Q.   And I'd like to understand how some of the terms in that

17   sentence apply to the case here as you understand it.

18   Focusing again on the first sentence of paragraph 3, what is

19   the company here?

00:35   20   A.   The company here would be FMG.

21   Q.   And who or what are the customers?

22   A.   The customer here would be the Trust, the funds

23   themselves.

24   Q.   And who are the -- who are the suppliers as you

00:35   25   understand it here?

*United States District Court*
*Trenton, New Jersey*

3931

Holder - Direct - Hora

1  A.   The supplies here would represent the sub-advisors and

2  sub-administrators.

3  Q.   All right, thank you.  Let's turn to page 4 of

4  Defendant's Exhibit 1310 -- 1510.  And there's a heading there

00:35  5  that says Indicators of Gross Revenue Reporting.  Do you see

6  that?

7  A.   I do, yes.

8  Q.   And just briefly -- because I think you kind of went over

9  it already, what's gross revenue reporting?

00:35  10  A.   Well, where you have this cost from a supplier, and it's

11  not clear in your own mind whether it should be reported as an

12  expense, or whether it should be reported as a direct

13  reduction of revenue, these eight indicators are designed to

14  provide guidance in resolving that question.

00:36  15  Q.   All right.  And have you summarized these eight

16  indicators of gross revenue reporting in a demonstrative?

17  A.   I have.

18          MR. HORA:  Okay.  We hand the witness Defendant's

19  Exhibit 2053.

00:36  20          And, your Honor, before I move into that document, I

21  would like to offer in evidence Defendant's Exhibit 1510.

22          THE COURT:  Any objections?

23          MR. STEVENS:  No objection, your Honor.

24          THE COURT:  All right, admitted.

00:36  25          (Defendant's Exhibit 1510 was marked into evidence.)

Holder - Direct - Hora

1  BY MR. HORA:

2  Q.   So, Mr. Holder, I take it you have in front of you

3  Defendant's Exhibit 2053?

4  A.   I do.

00:37  5  Q.   Was this a document that was prepared under your

6  direction?

7  A.   It is, yes.

8  Q.   What's the purpose of this demonstrative?

9  A.   Well, it's designed to summarize the general guidance and

00:37  10  provisions of the EITF we've been discussing, and apply

11  those -- those criteria or actually the indicators to the

12  relevant circumstances in this matter.

13  Q.   What information did you use to prepare this document?

14  A.   Well, certainly the mitigator -- or indicators that are

00:37  15  contained in the EITF document were used by me; in addition to

16  that, the documents that I've alluded to earlier in large

17  measure are the ones that I used in preparing this exhibit.

18  So, those would be the agreement between the Trust and FMG;

19  the agreements between FMG and some at least of the

00:38  20  sub-advisors and sub-administrators; the interviews and

21  discussions I've had with Mr. Joenk particularly and Ms.

22  Louie; trial testimony that I've read of this matter;

23  depositions, other documents come to mind.

24  Q.   Sure.  And could you walk us through your analysis with

00:38  25  respect to the eight indicators of gross revenue reporting?

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1   A.   Certainly.  You can see that there are eight here, you

2   can also see that item 2 and item 7 I did not find applicable,

3   because here in this case we're talking about services rather

4   than tangible inventory items that, you know, where you really

00:38   5   wouldn't have that kind of a risk in either 2 or 7.  So there

6   were six of these that I found to be of relevance.

7        And the following pages in the exhibit, there's one for

8   each of the six that are relevant.  So the first indicator is

9   that the entity in this case, FMG, is the primary obligor.

00:39   10  And so if you look at the second page, you can see just a

11  couple of examples that I picked from the information of which

12  I was aware, that support that the entity, FMG here, is the

13  primary obligor to the Trust and the funds.  So they -- the

14  question is whether they have accepted the obligation to

00:39   15  provide these services, or merely the obligation to arrange

16  for services say to be provided.

17       And so here, some of the language I've chosen to

18  present, the Trust hereby appoints the manager, that's FMG, as

19  the investment manager for each of the portfolios of the

00:39   20  Trust; and then FMG accepts such appointment and agrees to

21  render the services and assume the obligations.  In the

22  administrative side of it you find similar language; the Trust

23  hereby appoints FMG to provide administrative, accounting and

24  compliance services, and FMG accepts such appointment and

00:40   25  agrees to furnish the services.

3934

Holder - Direct - Hora

1        Speaking as an accountant and trying to interpret this

2   agreement and apply the accounting indicators to it, this

3   suggests to me, and it's consistent with other evidence I

4   recall, the testimony and so on, that indeed FMG was

00:40   5   responsible for the provision of the services and not just for

6   arranging someone else to provide them.

7        If you look at two -- or I'm sorry, the third one, the

8   second one is not applicable; it says the entity, FMG in this

9   case, has latitude in establishing price.  And so if you look

00:40   10   at the third backup, you can see that FMG has negotiated with

11   the Trust in those agreements, and that the Trust will pay the

12   manager, FMG, with respect to each portfolio the compensation

13   that's specified in the agreement.  And you see similar

14   language on the administrative side.  So, it appears here that

00:41   15   FMG was involved in establishing a price rather than say --

16   with the Trust, rather than say the sub-advisors or

17   sub-administrators.

18        If you look at the fourth one, here FMG changes the

19   product or performs part of the service.  And so, I'm aware of

00:41   20   the information here, and again these are examples that I've

21   chosen to include on this exhibit.  But FMG will have overall

22   supervisory responsibility for the general management and

23   investment of each portfolio's assets; full discretion to

24   select new or additional sub-advisors; FMG will -- is to

00:42   25   assess each portfolio's investment focus and seek to implement

Holder - Direct - Hora

1    decisions with respect to the allocation/reallocation of the

2    portfolio's assets among sub-advisors; FMG is to monitor

3    compliance of each sub-advisor with the investment objectives,

4    policies and restrictions; and FMG will also furnish to the

5    Trust office space, personnel, preparation of prospectus and

6    other documents.

7        So -- and you find similar language over on the

8    administrative side.  And so I think it's clear here that FMG

9    is involved in the providing of these services and assuring

10   that the services are of the quality that is necessary to

11   appropriately operate the funds.

12       If you look at the fifth one, does the entity, FMG in

13   this case, have discretion in selecting the suppliers.  And so

14   if you look at number 5, you can see here that FMG will at its

15   own expense select and contract with one or more sub-advisors.

16   Also, FMG will have full discretion to select new or

17   additional sub-advisors for each portfolio.  And you find

18   similar language I think in the administrative side.

19       And so, this suggests that strongly, that FMG does have

20   the ability to pick the sub-advisors, sub-administrators at --

21   at their discretion.

22       In 6, the entity FMG is involved in the determination

23   or product or service specifications.  And so if we turn to

24   the sixth item, again, we find language here that FMG has

25   overall supervisory responsibility for general management,

Holder - Direct - Hora

1  investment of each portfolio's assets; full discretion, again,

2  to select new additional advisors; full discretion to enter

3  into and materially modify existing advisor agreements; full

4  discretion to terminate and replace any advisor and full

5  investment discretion to make all determinations with respect

6  to the investment of a portfolio's assets not then managed by

7  an advisor.

8       Over on the administrative side it points out the

9  division of FMG's duties and obligations, hereunder between

10 those to be delegated and those to be performed, shall be in

11 FMG's sole discretion and may be changed from time to time by

12 FMG.

13      Again, the seventh one I didn't find applicable.  The

14 eighth one is that the entity FMG has credit risk.  That

15 essentially means if they don't get paid by the Trust, are

16 they still obliged to pay the suppliers, in this case the

17 sub-administrators and sub-advisors.

18      And again, speaking as an accountant interpreting this

19 and trying to apply it from an accounting perspective, you

20 find that in the agreement the Trust acknowledges and agrees

21 that it is -- it is contemplated that FMG will at its own

22 expense select and contract with one or more investment

23 advisors.  And you find similar language in the administrative

24 side; the compensation of the sub-administrator shall be paid

25 by FMG, and no obligation shall be incurred on behalf of the

Holder - Direct - Hora

1   Trust in such respect.  That suggests to me that FMG does

2   indeed have credit risk here with respect to the two sets of

3   general arrangement.

4        And so, that suggests that the indicators of gross

5   revenue reporting have generally been met here insofar as

6   they're generally applicable, and based on the evidence of

7   which I'm aware.

8   Q.   So, Mr. Holder, what's your overall conclusion with

9   respect to how these factors apply to FMG's classification of

10  sub-advisory and sub-administrative fees as expenses?

11  A.   Well, I recognize that the information is being reported

12  here to the Board, and that one is not completely bound by

13  generally accepted accounting principles in providing that

14  information.  However, I'm also quite aware that when

15  standards setters focus on an issue such as this, they are

16  focusing on the substance of the transaction, the economic

17  realities of the transaction as they perceive it and see it,

18  and that they try very hard to propound accounting standards

19  that will be representationally faithful to what's taking

20  place in the real world; that is, the manner in which these

21  transactions are presented on paper is a faithful

22  representation of what's transpiring in the real world with

23  the rights and risk of the transaction bearing from

24  transaction to transaction.

25        And so, I find this is very supporting of the

*United States District Court*
*Trenton, New Jersey*

3938

Holder - Direct - Hora

1   reasonableness of presenting these costs, the sub-advisor and

2   sub-administrative costs, as expenses, rather than as

3   reductions in revenue.

4   Q.   And by the way, how are sub-advisory and

5   sub-administrative fees reported in FMG's audited financial

6   statements?

7   A.   They're reported as expenses there, too.

8   Q.   And how if at all did that classification inform your

9   opinion in this matter?

10   A.   Well, it certainly supports it.  Those financial

11   statements were audited by PricewaterhouseCoopers, the amounts

12   involved I think are material, and so I take comfort from and

13   influence by the accounting treatment that was attributed

14   there, and Pricewaterhouse's unqualified or clean opinion on

15   those -- those financial statements.

16   Q.   Now, those financials are an example of financial

17   accounting, not managerial accounting; right?

18   A.   That's true, they -- the assertion made is that the

19   figures that are presented in conformity with GAAP.

20   Q.   Right.  And what's presented to the Board, FMG's

21   profitability calculations, that's an example of managerial

22   accounting; right?

23   A.   I think that's a fair statement, yes.

24   Q.   Okay.  And plaintiffs have asserted in this litigation

25   that the GAAP guidelines that we've been discussing so far,

00:47
00:47
00:47
00:48
00:48

Holder - Direct - Hora

1    specifically relate to financial accounting and have nothing

2    to do with how FMG should report revenues and expenses to the

3    EQAT Board.  What's your reaction to that?

4    A.   Well, I disagree with that.

00:48    5    Q.   Why is that?

6    A.   Well, I think nothing to do is a rather an extreme

7    statement.  I think -- for some of the reasons I already

8    articulated, that when accounting standards setters focus on

9    how a transaction should be reported, that they focus on the

00:48    10   substance of the transaction; they try to have replicated on

11   paper the economic realities, the economic substance of what's

12   transpiring in the real world.  I do not believe that is

13   disconsonant with what the goals would be in reporting to the

14   Board.

00:49    15       So I think one providing information to the Board would

16   certainly consider the application of these standards, the

17   contents of these standards, the philosophies, if you will, of

18   financial accounting and reporting that are embodied in them.

19   Because the goals are rather simple, that is to focus on the

00:49    20   substance of what's happening.

21   Q.   And plaintiffs' expert, Mr. Barrett, has testified at

22   this trial that classifying sub-advisory and

23   sub-administrative fees as expenses and reporting

24   profitability to the EQAT Board does not reflect the true

00:49    25   economics of the transaction; do you agree with that

3940

Holder - Direct - Hora

1    statement?

2    A.   I do not.

3    Q.   Why not?

4    A.   Well, because I think probably the best articulation of

00:49    5    the substance of the transactions and how they should be

6    accounted for when that substance is identified and subjected

7    to analysis, is probably contained in the EITF pronouncement

8    that we've just been discussing.  That I think is important

9    evidence as to what the substance of transactions are, and

00:50   10   when you apply those criteria generally to the arrangements

11   here, I think you're inexorably driven to the conclusion that

12   reporting them as expenses is at least perfectly appropriate,

13   if not the preferred or only acceptable way.

14   Q.   And as a matter of managerial accounting, do you think

00:50   15   it's appropriate for FMG to classify sub-advisory and

16   sub-administrative fees as expenses?

17   A.   Yes, I do.

18   Q.   All right.  Mr. Holder, do you know how the sub-advisory

19   and sub-administrative fees are physically paid?

00:50   20   A.   I do have that understanding, yes.

21   Q.   And what's your understanding?

22   A.   My understanding is that the Trust for the funds,

23   disburses cash directly to the sub-advisors and

24   sub-administrators.

00:51   25   Q.   And do you have an understanding of at whose direction

Holder - Direct - Hora

1  the Trust does that?

2  A.   If I recall correctly, it's at FMG's, yes.

3  Q.   Okay.  And so instead of having the Trust send the entire

4  management and administrative fees to FMG, FMG directs

00:51    5  payments of the sub-advisors and sub-administrator directly

6  from the Trust account?

7  A.   Yes.

8  Q.   Okay.  Now, does that payment mechanism affect your

9  opinion as to the appropriate classification of sub-advisory

00:51   10  and sub-administrative fees?

11  A.   It does not.

12  Q.   Why not?

13  A.   Well, I think it's ministerial in nature, I think it's

14  clerical in nature, I think frankly it's non-substantive in

00:51   15  nature.  There are analogies one can easily develop and

16  articulate that I think parallel this circumstance and

17  illustrate why that's not a particularly important feature of

18  what's transpiring.

19  Q.   Could you give us some examples or analogies?

00:52   20  A.   Well, I mean if -- to make it a personal example, if

21  you're being paid -- if your compensation your salary is

22  $200,000 a year, and you authorize your employer to withhold

23  from your salary let's say 10,000 and pay that to a healthcare

24  provider to provide insurance, health insurance for you, that

00:52   25  doesn't lower your compensation to 190,000, you're still

3942

Holder - Direct - Hora

1   receiving $200,000 compensation, you're incurring an expense

2   of 10,000; in that case the compensation of 10,000 is paid on

3   your behalf by your employer, but the fact that it's not paid

4   to you and then -- the fact that it's not paid to you and that

00:52   5   you pay the insurance company, doesn't have any impact on your

6   gross revenue, your gross revenue is the stated salary amount.

7   Q.   Thank you.

8           MR. HORA:   Unless your Honor has any questions, I'm

9   going to skip -- shift gears here.

00:53   10          THE COURT:   No.

11   Q.   All right.   Let's talk a little bit more about cost

12   allocation which you touched on a little bit earlier.

13   A.   Certainly.

14   Q.   Mr. Holder, are there any accounting requirements for a

00:53   15   cost allocation methodology to be considered a reasonable

16   methodology?

17   A.   There are.

18   Q.   And could you explain that a little?

19   A.   Sure.   Essentially there are two broad requirements.   One

00:53   20   is that the cost allocation methodology adopted be rational,

21   and that is that it makes sense at some level.   And while some

22   cost allocation processes are, you know, very obvious, others

23   are much more subjective; but regardless, the cost allocation

24   methodology needs to be rational at some level, that makes

00:54   25   sense.

United States District Court
Trenton, New Jersey

Holder - Direct - Hora

1        Secondly, the cost allocation methodology must be

2   systematic, and essentially that means it's replicable that

3   other individuals can come out, apply the same cost allocation

4   methodology, and reach similar or identical results.

00:54   5   Q.   All right.  And is cost allocation a science?

6   A.   I believe it to be an art.

7   Q.   And why is that?  Could you flesh that out for us a

8   little bit?

9   A.   Well, yes, because of the inherent subjectivity and

00:54  10   ambiguity that exists in many many situations in which one is

11   trying to attribute economic endeavor or cost to a given

12   activity, I think there are a number of processes, a number of

13   methodologies that would be appropriate to use in essentially

14   identical circumstances.  And therefore, the selection of what

00:54  15   one to use becomes a matter of the professional judgment of

16   the information preparer, and consequently, you know, you can

17   have similarly situated professionals applying judgment to the

18   same facts and at least times coming to different conclusions

19   and neither can necessarily be said to be wrong.

00:55  20   Q.   Okay.  Could you -- would it be possible to give us sort

21   of a real world example that would bring this to life?

22   A.   Well, sure.  There are a great many, I think that can do

23   that.  I mean something as simple as perhaps potentially

24   unremarkable is going to the store and buying a quart of milk;

00:55  25   if you pay a dollar 50 for that quart of milk and you bring it

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1    home in and put it in your refrigerator, and you're going to

2    have on your cereal tomorrow morning, the question might arise

3    what's the cost of that milk.  And certainly the cost would

4    include the dollar 50, but it would include many other costs,

00:56    5    as least from the perspective of accounting concepts; it would

6    include the cost of traveling to the store, and that would

7    involve if you drove your own car, depreciation on the car,

8    fuel cost, repair cost, you're burning rubber off the tire of

9    the car a little bit; it would require an allocation for the

00:56    10   value of your time; the cost of the labor involved in fetcing

11   it; when you get home you're storing it for a while, that

12   would involve the cost of utilities; there are also other

13   things in your refrigerator that are been being kept cool, so

14   you would have to allocate that electrical cost to all of

00:56    15   those items.

16         And then it gets even more complex.  If while at the

17   store you decide well, yes, I need not just milk, but I need

18   razor blades, so you bring two things home; does that cut in

19   half the cost of travel and so on for the milk.  I mean the

00:57    20   world that we're talking about here in this case, is far more

21   complex than the simple example that I've provided here.  But

22   I think one can see that a lot of cost allocations are going

23   to involve subjective determinations.

24   Q.   Sure.  And what limitations, if any, exist when choosing

00:57    25   a cost allocation methodology?

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1   A.   I'm sorry; could I --

2   Q.   Sure.  What limitations, if any, exist when choosing a

3   cost allocation methodology?

4   A.   Well, there are a number:  The availability of data; the

00:57   5   existence of cost drivers, does this cost result from directly

6   the activity that is under analysis; cost benefit limitations

7   certainly apply; the cost of acquiring data may see the

8   benefit from flows from acquiring it, if a less costly method

9   of cost allocation can be adopted, that doesn't result in

00:58   10   materially in early -- in materially different allocations

11   from one that costs more, one would -- would select the least

12   costly approach; of course, without doing both you really

13   don't know which is which.  But those are -- some of the

14   complex judgments that cause people to pick one cost

00:58   15   allocation methodology versus another.

16   Q.   And you mentioned cost drivers in your last answer;

17   what's a cost driver?

18   A.   A cost driver is a function, an activity that causes a

19   cause to increase, is there a direct cause and effect.

00:58   20   Q.   Sure.  And how if at all does the availability of cost

21   drivers effect the design of an allocation methodology?

22   A.   Well, the cost accounting literature I think is fairly

23   clear in providing guidance here.  I think there's a

24   preference for cost drivers if they exist, if they're

00:59   25   available, to use as a basis for allocating cost.  The problem

Holder - Direct - Hora

1    arises is that in many cases cost drivers simply don't exist,

2    but to the extent they do I think it's preferable that they be

3    used.

4    Q.   And so what do you do if a cost driver doesn't exist or

5    isn't available?

6    A.   Well, you must move to other allocation processes.  If

7    the overarching goal is to estimate the cost of providing a

8    function or the cost of providing a good or a service, then

9    all of the costs that are necessarily incurred to provide that

10   good or service need to at least in part be attributed to that

11   good or service.  And so less and less direct methods of

12   allocation must be selected.  This issue, this challenge is

13   identified in the cost accounting literature and developed at

14   some length.

15   Q.   Okay.

16   A.   And the path forward to finding other allocation bases.

17   Q.   And we'll look at some in a little bit.  Are you familiar

18   with something called time and motion studies?

19   A.   I am.

20   Q.   What are they?

21   A.   Well, time and motion studies are designed to determine

22   the effort it takes to fulfill a given task --

23        MR. STEVENS:  Your Honor, I just want to object at

24   this point; I believe this is outside the scope of his expert

25   report.

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1          MR. HORA:  I certainly don't think so.  He's got a

2    huge section in his report about cost allocation methodologies

3    and how they're developed.

4          THE COURT:  So this is one element to that?

01:00    5          MR. HORA:  Yes.

6          THE COURT:  All right.  So you may proceed.

7    BY MR. HORA:

8    Q.   I think I was asking you what are time and motion

9    studies.

01:00   10    A.   Yes, I think I had gotten to the point in my answer that

11    I was going to say they are most useful when the endeavor

12    being evaluated, is of high volume and of repetitive nature.

13    And so you're doing the same thing, one, a worker is doing the

14    same thing over and over and over again; and doing a time and

01:01   15    motion study provides evidence about the time it takes for a

16    particular function to be done.  These can become very

17    granular and frequently are.

18          I recall a consulting -- or an engagement in which I

19    was involved, involving a manufacturer of children's clothing,

01:01   20    and I think there were nine cost accounting steps in attaching

21    a zipper to the child's -- to the children's ware.  And each

22    of those had been subjected to a cost -- or a time and motion

23    study in order to estimate the cost it would reasonably incur

24    in fulfilling that function.

01:01   25    Q.   And how if at all are time and motion studies suited for

3948

Holder - Direct - Hora

1  measuring skilled professional services?

2  A.   They tend not to work very well because they're not

3  repetitive tasks, they differ from engagement to engagement,

4  from function to function, and so they're more difficult to

01:01    5  measure in any meaningful way.  An observation of what time it

6  took to fulfill a given function in one matter is not

7  necessarily predictive of the effort it will take in another

8  that has different characteristics.

9  Q.   And are time and motion studies a required allocation

01:02   10  basis?

11  A.   No, I don't believe so.

12  Q.   Now, Mr. Holder, are you aware that FMG goes through a

13  process of reporting its profitability to the EQAT Board

14  whereby it allocates expenses incurred by its parent AXA

01:02   15  Equitable?

16  A.   I am aware of that.

17  Q.   And, again, just yes or no to this because I want to lay

18  some foundation, have you formed an opinion as to whether it's

19  appropriate for FMG to perform such an allocation?

01:02   20  A.   I have.

21  Q.   What did you do to prepare yourself in forming that

22  opinion?

23  A.   Well, as before, I read a large volume of documents,

24  including company documents, Board presentations, the

01:02   25  deposition testimony I've alluded to earlier; trial testimony;

United States District Court
Trenton, New Jersey

Holder - Direct - Hora

1   I also considered the -- the information gained in my

2   interviews, particularly with Mr. Joenk; those things come to

3   mind.

4   Q.   And what's your opinion as to whether it's appropriate

01:03   5   for FMG when reporting its profitability to the EQAT Board, to

6   include costs allocated from its parent AXA Equitable?

7   A.   I think that's entirely appropriate.  As I indicated

8   earlier the tests for allocability of a cost is its necessity

9   for supporting the function that's being fulfilled.  And if

01:03   10   the goal is to determine the full cost of that function, then

11   all of the costs necessarily incurred in support of it would

12   at least in part, through the allocation process, need to be

13   attributed to it.

14   Q.   And is it your understanding that AXA Equitable performs

01:03   15   services in support of FMG and the funds?

16   A.   That is my understanding.

17   Q.   And broadly speaking, what's your -- well, what's that

18   understanding based on?

19   A.   Well, again, the same types of activities I've done

01:04   20   before; I've seen, you know, Board packages, I've seen lists

21   of expenses and so on that were incurred, categories of costs

22   that were incurred; I've gained an understanding of the

23   importance of those costs to the appropriate functioning of

24   the -- of the funds, and so on.  I've interviewed, again, Mr.

01:04   25   Joenk at some length and on various occasions; read lots of

*United States District Court*
*Trenton, New Jersey*

3950

Holder - Direct - Hora

1    documents.

2    Q.   And broadly speaking, what's your understanding of what

3    some of AXA Equitable's services are to FMG and the funds?

4    A.   Well, AXA Equitable provides a wide range of support

01:04    5    services to the funds outside those costs that were charged to

6    FMG.  I think it's important to understand that the costs that

7    are being allocated are not limited to just costs that were

8    incurred to support the 50 or 51 employees of FMG.  There were

9    certainly some costs that were attributed that support

01:05    10    directly those employees, but many of those costs were

11    supporting the operation of the funds generally.

12        Such things as shareholder activity, the treasury

13    function, accounting function, other functions like that were

14    in part at least necessarily incurred to allow the function --

01:05    15    the funds to function appropriately.

16    Q.   Now, Mr. Holder, we've talked about why FMG would

17    allocate costs from its parent AXA Equitable, I'd like to talk

18    now about how the allocations are performed.

19        MR. HORA:  Could we hand the witness Defendant's

01:05    20    Exhibit 2050?

21    Q.   Do you recognize this document?

22    A.   I do.

23    Q.   What is it?

24    A.   Well, it's an exhibit that I caused to be prepared that

01:06    25    summarizes the processes through with AXA goes in attributing

Holder - Direct - Hora

1     or allocating costs down to the individual fund allocations.

2  Q.   And is this document based on presentations in the EQAT

3     Board materials?

4  A.   It is, yes.

01:06  5  Q.   Is this document an accurate general representation of

6     the -- I see you cited some source documents in the bottom; is

7     it an accurate general representation of the source documents

8     cited?

9  A.   I believe that's the case, yes.

01:06  10           MR. HORA:  And your Honor, I'm just using this as an

11    illustrative aid.  You've probably seen a different flow chart

12    in the Board materials, we're trying to simplify it a little

13    bit.

14           THE COURT:  Okay, thank you.

01:07  15  Q.   All right.  This is broken out in three steps; correct,

16    Mr. Holder?

17  A.   Yes.

18  Q.   Could you walk us through what's identified as step A,

19    AXA-CAM?

01:07  20  A.   Certainly.  Step A begins with AXA Equitable expenses,

21    and those expenses are represented in the general ledger of

22    the trial balance and indeed the financial statements of AXA

23    Equitable.  Those costs which are contained in the general

24    ledger are subjected to the audit procedures performed by PwC

01:07  25    in the financial statement audit of AXA's financial

3952

Holder - Direct - Hora

1    statements.  And so I take comfort from that.

2         I think the evidence that I've seen at least is that

3    those are real expenses, their costs that have been incurred,

4    they've been subjected to audit, and I don't understand them

01:08    5    at that level to be contested really.

6         But the first step is to allocate those expenses of AXA

7    Equitable generally to the insurance products that AXA

8    Equitable offers.  And here, cost drivers are available, as I

9    understand it.  There are annual surveys that are sent out to

01:08   10    the -- I think they call them business managers, the cost

11    center managers; those individuals report how they spend their

12    time and so on, and what effort goes into various activities.

13    And then there are I think monthly updates sent, and it's

14    based on that data that there is an allocation of the expenses

01:08   15    at the corporate-wide level to the several insurance product

16    groups.

17    Q.   Okay.  And moving on to step B, could you please describe

18    step B of of the methodology?

19    A.   Yes.  Step B begins with the insurance product group

01:09   20    cost, and step B step allocates those insurance product costs

21    into the several elements of the product that each generate

22    revenue.  And so, they're allocated to the product wrapper, to

23    the general account and to the investment portfolio.  The

24    basis for allocation here is the relative respective revenues

01:09   25    generated by each of those three, the product wrapper, the

3953

Holder - Direct - Hora

1    general account and the investment portfolio.

2    Q.   Do you know how step B was developed?

3    A.   It was developed as I understand it by FMG, but it was

4    done so in consultation with the professional service firm PwC

01:09    5    as well as Ernst & Young.  So those two large public

6    accounting or professional service firms were involved in the

7    establishment of this allocation feature.

8    Q.   Does the fact that PwC and Ernst & Young were involved in

9    the development of step B, give you any comfort as to the

01:10   10    reasonableness of step B?

11    A.   It does, yes.

12    Q.   And why is that?

13    A.   Well, I mean these are very large, among the largest of

14    the professional service firms in the world, in my experience

01:10   15    they are very deep repositories of accounting knowledge, and

16    they each have extensive consulting practices; they will have

17    seen many many instances of cost allocations in their

18    practice, and their acceptance or involvement in the creation

19    of this -- this methodology provides some comfort.

01:10   20    Q.   This is going to be another question where I'm just

21    looking for a yes or no because I do want to lay some

22    foundation.  Do you have an opinion as to whether it's

23    appropriate to allocate costs in step B on this basis of

24    relative revenue?

01:11   25    A.   Yes.

United States District Court
Trenton, New Jersey

3954

Holder - Direct - Hora

1  Q.   All right.  Now, what did you look at in coming to that

2  opinion?

3  A.   Well, again, I looked at the Board materials that have

4  been alluded to here; I read deposition testimony; looked at

01:11  5  various documents; Excel spreadsheets, and so on; the

6  interviews that I conducted with Mr. Joenk particularly, but

7  Ms. Louie as well, provided information that was useful to me

8  in my analysis; I certainly considered the cost accounting

9  literature of the profession in evaluating the reasonableness

01:11  10  of what's transpiring here.

11  Q.   Let's talk a little bit about the cost accounting

12  literature of the profession as you just described it.  What

13  exactly are you talking about?

14  A.   Well, there are a number of cost accounting treatises and

01:11  15  texts, one that I use particularly in this matter, I think Mr.

16  Barrett alluded to it as well, is a book originally authored

17  by Professor Charles Horngren at Stanford University; that

18  book is I think highly respected, it's certainly widely used

19  in lots of colleges and universities, including our own, my

01:12  20  own.

21  Q.   And who is Professor Horngren or who was he?

22  A.   Sure.  He was an individual that really I think can

23  fairly be said to have kind of pioneered the approach --

24  before the Horngren text, cost accounting was kind of taught

01:12  25  in colleges and universities without too much of a context; it

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1    was let's just try to determine, you know, how much this

2    particular function costs.  But Professor Horngren added to

3    that the richness of all the management decisions that flow

4    from that, and how information is designed to be helpful to

01:12    5    those who manage business enterprises.  And so the title,

6    Managerial Approach, I think reveals his really great

7    contribution to accounting education, to the production of

8    this textbook.

9         MR. HORA:  Could we the hand the witness what's been

01:13    10    marked as Defendant's Exhibit 1329?

11    Q.    Are you ready?

12    A.    I am, yes, sir.

13    Q.    Do you recognize this, Mr. Holder?

14    A.    I do.

01:13    15    Q.    What is it?

16    A.    Well, it's an excerpt from the 13th edition of his

17    textbook Cost Accounting, an Managerial Emphasis.

18    Q.    And is this textbook something's routinely relied upon by

19    professionals in the field of cost accounting?

01:14    20    A.    In my understanding and view and knowledge it is, yes.

21    Q.    And I think you testified that you reviewed this in

22    connection with forming your opinions in this matter?

23    A.    I did.

24    Q.    All right.  Now, Mr. Holder, how does this Horngren text

01:14    25    inform your opinion with respect to the methodology in step B?

3956

Holder - Direct - Hora

1   A.   Well, the first page beyond the cover page that's

2   provided is page 502, and you can see near the bottom of that

3   page there's a section entitled Criteria to Guide Cost

4   Allocation Decisions.  And within that it points out that

5   using activity based costing and related cost drivers, that

6   cause and effect is the primary criterion that's used, and

7   supports the -- the process of using cost drivers.

8        He also points out that in his view there is a

9   superiority here of cause and effect, and the benefits

10  received criteria --

11  Q.   I'm sorry, Mr. Holder, you're on page 5 --

12  A.   502.

13  Q.   Okay.

14  A.   In the second paragraph following the criteria.  And so

15  he expresses preference for the cause and effect and the

16  benefits received criteria, in the circumstances that he

17  describes, to provide information for economic decisions, yes.

18       If you look at the four criterion that he lists on the

19  next page, on page 503, he identifies cause and effect and

20  benefits received near the top; and those are followed by two

21  that are not as preferable, fairness or equity and ability to

22  bear the cost allocation.  So his preference I think is caught

23  up in the first two that are listed there.

24  Q.   And I'd like you to read if you could the bullet point on

25  benefits received?

01:14

01:14

01:15

01:15

01:16

*United States District Court*
*Trenton, New Jersey*

*3957*

Holder - Direct - Hora

1   A.   Very well.  It's the second one, 2, it says benefits

2   received:  Using this criterion managers identify the

3   beneficiaries of the outputs of the cost object; the costs of

4   the cost object are allocated among the beneficiaries in

01:16   5   proportion to the benefits each receives.  Consider a

6   corporate-wide advertising program that promotes the general

7   image of the corporation rather than any individual product.

8   The costs of this program may be allocated on the basis of

9   division revenues.  The higher the revenues, the higher the

01:16   10   division's allocated cost of the advertising program.  The

11   rationale behind this allocation is that divisions with higher

12   revenues apparently benefited from the advertising costs more

13   than divisions with lower revenues, and therefore ought to be

14   allocated more of the advertising costs.

01:16   15   Q.   Now, Mr. Holder, what is your ultimate opinion as to

16   whether it's appropriate to allocate costs based on revenues

17   in step B of FMG's cost allocation methodology?

18   A.   In my opinion that's appropriate.

19   Q.   And why is that?

01:17   20   A.   Well, I think there's a probably a combination of cause

21   and effect, as well as benefits received that may exist here.

22   I think the higher revenue item may reveal higher levels of

23   activity; higher levels of activity generally can relate to

24   hire costs being incurred to support that activity.  But I

01:17   25   think as or more importantly, using relative revenues here is

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1  an example I believe of the benefits received approach; that

2  is, that the higher the revenue, the more benefit from all the

3  supportive activity that's taking place can be reasonably

4  attributed to each of the three revenue producing functions.

01:17  5  Q.   Now, Mr. Barrett has testified that step B of FMG's cost

6  allocation methodology is arbitrary, and I think I heard him

7  use the word irrational as well; do you agree with that?

8  A.   I do not.

9  Q.   Why not?

01:18  10  A.   Well, I don't think it's either of those.  I certainly

11  understand that in the instant case cost drivers were really

12  not available to make this allocation.  Again, if the

13  overarching desire is to estimate the costs that are incurred

14  in generating in this case these revenue streams, that some

01:18  15  process of allocation of those costs to those revenue streams

16  is going to be necessary.

17       And as you can see even in Mr. Horngren's example,

18  using revenue, there -- it's not completely clear in that

19  circumstance that each of those divisions benefited from that

01:19  20  general advertising campaign.  But it's reasonable to make

21  that assumption, an informed assumption, and to base the

22  allocation of revenue -- or, I'm sorry; of cost on those

23  respective levels of revenue.  I find this to be a very

24  similar circumstance.

01:19  25  Q.   Now, are you aware that the net results of FMG's cost

United States District Court
Trenton, New Jersey

3959

Holder - Direct - Hora

1  allocation methodology is that about $50 million of AXA

2  Equitable expenses are allocated to FMG for the purposes of

3  reporting its profitability to the EQAT Board?

4  A.  I recall that amount, yes.

01:19  5  Q.  All right.  I'd like to -- I'd like to hand you what's

6  been marked as Plaintiff's Exhibit 273.  Do you recognize this

7  document, Mr. Holder?

8  A.  I do.

9  Q.  What is it?

01:20  10  A.  Well, it's been characterized as the Shared Services

11  Agreement between AXA Equitable and FMG.

12  Q.  Did you review this agreement in connection with forming

13  your opinions?

14  A.  I did.

01:20  15  Q.  What is your understanding of what this agreement is?

16  A.  Well, it sets out a relationship between FMG and AXA

17  Equitable wherein certain services can be provided, may be

18  provided by AXA Equitable to FMG and for which a charge will

19  be made to FMG.

01:20  20  Q.  What's your understanding of how this agreement is used

21  in practice?

22  A.  My understanding in practice is that the primary costs

23  that flowed from this particular agreement were related to the

24  50 or so employees that devoted all of their effort to FMG and

01:21  25  by extension the funds that it was managing.

Holder - Direct - Hora

1    Q.   And how did you come to that understanding?

2    A.   Again, through reading documents, through my interviews

3    with Mr. Joenk and others, reading testimony here in this

4    matter, depositions.

01:21    5    Q.   Sure.  Now, you're aware that there's a charge that's

6    related to this agreement; right?  A charge or an expense that

7    FMG has to pay?

8    A.   Yes.

9    Q.   All right.  And are you aware that the amount that FMG is

01:21    10    charged under this agreement, and let's take 2012, was around

11    $14 million?

12    A.   I have that recollection, yes, sir.

13    Q.   And is it your understanding that the $14 million charge

14    to FMG is included in FMG's audited financial statements?

01:21    15    A.   I recall that being the case, yes, sir.

16    Q.   Okay.  So, my question to you is, how do you reconcile

17    the 49 or roughly $50 million in allocated expenses from AXA

18    Equitable resulting from FMG's cost allocation methodology,

19    with the roughly $14 million that's charged to FMG under the

01:22    20    Shared Services Agreement in FMG's audited financial

21    statements?

22    A.   I think there's several steps that were incorporated in

23    my analysis.  First, in this particular agreement, in

24    paragraph 1 I think it is, it indicates that AXA Equitable

01:22    25    from time to time may provide to FMG, and then there's a long

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1    list, the services to be furnished, may include; that speaks

2    to me as an accountant that not all of the costs necessary to

3    the operation of these funds may be provided through the

4    operation of this particular agreement.

01:22    5        As I look at what was -- what were the costs that were

6    charged by AXA Equitable to FMG under this agreement, as I've

7    said my recollection is they primarily related to the

8    compensation cost of these 50 or 51 individuals.

9        My understanding is further that in order for these

01:23    10   funds to operate appropriately, that many many other functions

11   of effort were going to be necessary in addition to those 50

12   or 51 individuals; such things as shareholder distribution

13   activity, when contributions are made, when withdrawals are

14   made, when dividends are paid, the accounting systems and so

01:23    15   on, for keeping up with all of that and doing so accurately

16   and under appropriate control, would not be part of the 50

17   employees, nor would those costs be there to provide human

18   resources type support or travel arrangements to those 50 or

19   51 employees.  Those would be services primarily benefitting

01:24    20   the funds directly that were necessary for the funds to

21   operate.  There were others such as treasury and various legal

22   costs that would be incurred.

23       And so, with that knowledge, again, from the work that

24   I had done, you know, and my understanding of the process

01:24    25   through which AXA had moved to allocate its general costs to

3962

Holder - Direct - Hora

1   the various funds, I -- I concluded that the result that was

2   obtained, the 49 or 50 million you alluded to, was reasonable

3   as a result of generally the reasonableness of the process.

4   I'm also aware that amount was about two percent I believe of

01:24   5   the total expenses.

6        And I also evaluated the relationship between the 49

7   million and the 14, and it's clear to me at least that that

8   relationship is not remarkable in any meaningful sense, given

9   the way the companies decided to provide these services and

01:25   10   the way they operated.

11   Q.   Let's talk about that a little bit, because one of the

12   things that plaintiffs have criticized in the litigation is

13   that the amount of allocated costs, this 49 or 50 million, is

14   a multiple of what's been referred to as FMG's direct costs,

01:25   15   which I think you referred to in a given year 2012 would be 14

16   million; do you think that's a valid criticism?

17   A.   No, I don't.  I think in order to understand the

18   reasonableness of that relationship one has to understand the

19   way the organization -- AXA was organized, the way it

01:25   20   conducted business, the nature and extent of costs charged,

21   I'll use the word directly to FMG, and the range of costs that

22   would necessarily be incurred in addition to those that would

23   be required for the funds to function appropriately.

24        And there are many instances I think where we judge the

01:26   25   reasonableness, accountants judge the reasonableness of a

Holder - Direct - Hora

1    result through the reasonableness of the process through which

2    one went in arriving at that result.

3    Q.   And I just have a couple of more questions for you.

4    Plaintiff's experts in the litigation have calculated 90

01:26    5    percent profit margins for FMG by treating sub-advisory and

6    sub-administrative fees as deductions from revenue, so it's

7    deductions from revenue rather than an expense, and excluding

8    expenses allocated from AXA; do you think that's appropriate?

9    A.   Not -- not in my view.

01:26    10    Q.   Why not?

11    A.   Well, I mean as an isolated statistic it doesn't mean too

12    much for reasons I've already testified about.  I think that

13    those sub-advisor and sub-administrative fees very clearly

14    should be reported as expenses not as reductions of revenues.

01:26    15    And again, the test for the allocability of the cost is the

16    necessity, at least in part, of the functions and the services

17    being rendered through the incurrence of those costs are being

18    necessary for the functioning of the funds.  If that's the

19    case, some allocation needs to take place.

01:27    20    Q.   And what's your opinion about the manner in which FMG

21    calculates its profitability for the EQAT Board?

22    A.   It seems reasonable to me, in my view it's a reasonable

23    approach.

24    Q.   And why is that?

01:27    25    A.   Well, it would be better to look at the --

*United States District Court*
*Trenton, New Jersey*

Holder - Direct - Hora

1    Q.    I guess by manner in which FMG calculates its

2    profitability, I meant treating sub-advisory and

3    sub-administrative fees as an expense, and including allocated

4    expenses from AXA and the method by which its done.

01:27    5    A.    Well, essentially I think that that better captures the

6    economic realities of what's transpiring here, than reporting

7    them as a reduction of revenue, for all of the reasons we

8    marched through earlier.

9              MR. HORA:  One second, your Honor.

01:27    10             (Brief pause.)

11   Q.    And Mr. Holder, just one point of classification.  You

12   mentioned a little bit earlier in your testimony, I think you

13   said two percent of AXA's expenses were allocated through this

14   allocation methodology process to the funds; could you expand

01:28    15   on that a little bit more what you meant by that?

16   A.    Well, it's a rather relatively small amount of the total

17   expenses that were incurred that ultimately get allocated

18   here.  I think you have to -- in order to assess

19   reasonableness of amounts you need to place those in an

01:28    20   appropriate context, and so that's part of that context.

21             MR. HORA:  Okay.  Your Honor, thank you.  I don't

22   have any additional questions.

23             THE COURT:  All right.

24             MR. HORA:  If your Honor does --

01:28    25             THE COURT:  All right, thank you.

Holder - Cross - Stevens

1        Cross?

2        MR. STEVENS:  Thank you, your Honor.

3        MR. HORA:  I need one minute to gather my papers.

4        THE COURT:  Do you want to break for 10 minutes and

01:29    5  then we'll come back out?

6        MR. HORA:  Sure.

7        THE COURT:  Mr. Holder, you may step down.  We're

8  going to break for 10 minutes, and then we'll be back out for

9  cross.

01:29   10        THE WITNESS:  Certainly.

11        THE COURT:  Okay, thank you.

12        (Recess.)

13        THE COURT:  Mr. Holder, you may take the stand.

14        MR. STEVENS:  Thank you, your Honor.

01:43   15  (CROSS-EXAMINATION OF WILLIAM HOLDER BY MR. STEVENS:)

16  Q.  Good afternoon, Dr. Holder.

17  A.  Good afternoon.

18  Q.  I want to go through a little bit of your background, as

19  it relates to certain issues.  Now, you have limited

01:43   20  experience in the insurance accounting industry; correct?

21  A.  I think that's generally a fair statement.  I think

22  that's probably true for any industry there are limitations.

23  Q.  Your most robust experience is working with the AcSEC,

24  which we defined before; correct?

01:44   25  A.  The Accounting Standards Executive Committee, that's

3966

Holder - Cross - Stevens

1   probably not unfair.

2   Q.   Okay.  And you did so with the AcSEC back in the '70s I

3   believe?

4   A.   Pardon me?

01:44   5   Q.   In the '70s; correct?

6   A.   No, sir.  Did you AcSEC?

7   Q.   Yes.

8   A.   No, that was not in the '70s.

9   Q.   When was that?

01:44   10   A.   That was '87 through '90 during the savings and loan, or

11   following the crisis.

12   Q.   And that was actually only for three years; correct?

13   A.   It was for three years, yes, sir.

14   Q.   Okay.  And when you were working with them, you developed

01:44   15   what you said was an industry guide; is that correct?

16   A.   Well, we worked on a number of industry accounting and

17   audit guides, yes.

18   Q.   Okay.  And during your deposition you were unable to

19   recall what industry guide you actually worked with and the

01:44   20   name of it as it relates to insurance accounting; correct?

21   A.   Yes, I'm not sure I would have that recollection today

22   either.

23   Q.   Okay.  And that's didn't involve mutual fund work;

24   correct?

01:45   25   A.   It didn't or did not?

*United States District Court*
*Trenton, New Jersey*

3967

Holder - Cross - Stevens

1  Q.  It did not.

2  A.  It was an amendment to the investment company's guide as

3  I recall, or there were -- we issued a statement of position

4  that I believe had an effect on a number of industry audit

01:45   5  guides, financial institutions, but including investment

6  companies, yes.

7  Q.  But it didn't include any work I'm saying in an

8  investment company or with a mutual fund; correct?

9  A.  I don't understand what you mean by that.

01:45   10  Q.  You were merely providing guidance pursuit to that

11  industry regulation; correct?

12  A.  We were providing accounting standards for mutual funds

13  and investment companies generally.

14  Q.  Okay.  And some of the experience you talked about

01:45   15  earlier involved some pension accounting that you were

16  involved in; correct?

17  A.  Technical accounting?

18  Q.  Pension.

19  A.  Pension accounting, yes.

01:45   20  Q.  And that was some of the government work that you said

21  you consulted on?

22  A.  Well, if I recall what you're recalling, I was on the

23  Governmental Accounting Standards Board, and during my time

24  there, we did indeed have a major pension accounting project

01:46   25  and another one very similar to it, other post-employment

United States District Court
Trenton, New Jersey

3968

Holder - Cross - Stevens

1  benefits, primarily defined healthcare plans, post-retirement

2  healthcare plans.

3  Q.   And that's not insurance accounting; correct?

4  A.   I wouldn't know how to respond to that.  I mean when

01:46   5  you're sponsoring a defined benefit plan, you are providing at

6  least assurances, if not insurance, that will people will

7  receive their pension benefit when they retire.  The concepts

8  are very closely related in my mind.  There are certainly

9  actuaries involved in calculating benefit obligations and

01:46   10  costs and so on.

11  Q.   So, you just indicated the deferred acquisition -- the

12  deferred benefits is pension; correct?

13  A.   I think that's one example of a deferred benefit, yes.

14  Q.   Okay.  And my question to you is very specific, pension

01:47   15  accounting is not insurance accounting; correct?

16  A.   There are elements that interact, but there are certainly

17  differences.

18        MR. STEVENS:  Can you approach the witness, Chris,

19  with his deposition testimony, please?  Which will be

01:47   20  identified as P-852.

21        THE COURT:  I didn't hear you, Mr. Stevens.

22        MR. STEVENS:  P-852, your Honor.

23        THE COURT:  Thank you.

24        MR. STEVENS:  And also P-852.1, which is the

01:47   25  exhibits that were attached to his deposition.

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1          MR. KWELTY:  Expert report?

2          MR. STEVENS:  I'm sorry; the expert report, and then

3    can you also approach with his deposition?  Which is marked --

4    what's the marking?

01:48    5          Okay.  Can you give the Court a deposition copy

6    also?

7          THE COURT:  I don't really need it.  You're using it

8    to impeach his credibility?

9          MR. STEVENS:  I am, your Honor.

01:48   10   BY MR. STEVENS:

11   Q.  I'd like you to turn your attention to page 160 of your

12   deposition testimony.

13   A.  I am there.

14   Q.  Okay.  And actually just before that, I just want you to

01:48   15   look at the first page of your deposition testimony and

16   confirm that what I've given you is in fact the deposition

17   testimony of William H. Holder.

18   A.  It's William W. Holder, and that's what the first page

19   says, but yes.

01:48   20   Q.  And it's dated November 19, 2014; correct?

21   A.  Yes, it says that was well.

22   Q.  And do you have a recollection of giving deposition

23   testimony in this case?

24   A.  I do.

01:49   25   Q.  And did you have the opportunity to review your

Holder - Cross - Stevens

1   deposition testimony prior to today?

2   A.   I recall that being the case.

3   Q.   And do you have any belief that what's recorded in your

4   deposition testimony isn't a fair and accurate recordation of

01:49   5   the testimony you gave on November 19th, 2014?

6   A.   I don't have any evidence to the contrary sir, no.

7   Q.   Okay.  Then with that said I'd like you to turn your

8   attention to page 160.  And I'm going to direct your attention

9   to line 3; okay?  Are you there?

01:49   10   A.   I'm there yes, sir.

11   Q.   Okay.  Line 3 the question was asked:  Pension accounting

12   is not insurance accounting, though; you're making an analogy,

13   right; that's correct; question, right?

14        Is that right?

01:49   15   A.   Yes.

16   Q.   And the answer is:  I think that's a fair -- fair

17   statement.  Correct?

18   A.   Yes.

19   Q.   And it is true that pension accounting does not involve

01:50   20   issues related to deferred acquisition costs also; correct?

21   A.   Yes, I don't recall that being the case. There are

22   certainly deferred costs that exist in pension accounting,

23   that are in some ways similar to deferred acquisition costs,

24   but I don't recall deferred acquisition costs being relevant

01:50   25   in pension accounting generally.

Holder - Cross - Stevens

1   Q.   Okay.  And as it relates to deferred costs -- I'm sorry.

2   I'd ask you about deferred acquisition costs and that's fine,

3   and you understand deferred acquisition costs are an element

4   within the industry industry; correct?

01:50   5   A.   I have that understanding, yes.

6   Q.   And you have that understanding; correct?  Meaning -- I'm

7   sorry.  And you don't have an expertise in your view in

8   insurance accounting; correct?

9   A.   Well, I have some level of expertise, I'm -- you know,

01:50   10   what can I say.  Deferred acquisition costs were at least some

11   of the considerations that we made in writing those standards

12   back in '87 through '90, the SOP; I studied the industry then

13   to prepare myself to participate and vote on those standards,

14   but I -- I don't know what you're alluding to really.

01:51   15   Q.   Well, is it a fair statement that you feel comfortable

16   with issues involved involved involved in insurance accounting

17   as a general matter?

18   A.   Certain aspects of it, yes; others, I haven't

19   familiarized myself in some time.

01:51   20   Q.   Okay.  And it is a fair statement then that you've never

21   worked within the insurance industry; correct?  In other

22   words, for an insurance company?

23   A.   I don't recall being the employ of an insurance company,

24   no.

01:51   25   Q.   And you never actually addressed or implemented deferred

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1   acquisition costs as it relates to financial accounting for an

2   insurance company; correct?

3   A.   I don't recall doing so, no.

4   Q.   And you've never worked for an investment company?

01:52   5   A.   I don't recall ever being in the employ of an investment

6   company, no.

7   Q.   And your experience with investment advisors and/or

8   managers is primarily as an expert witness; correct?

9   A.   Could I hear that question again?

01:52   10   Q.   Your experience with investment advisors and/or managers

11   is primarily as an expert witness; correct?

12   A.   I've run across investment advisors in numerous

13   capacities and circumstances; the sub-advisors here, I think

14   that's the first time I've looked at those relationships.

01:52   15   Q.   Okay.  And as it relates to cost allocation methodology

16   and the actual implementation of a cost allocation

17   methodology, your main experience was with a Norman, Oklahoma

18   hospital; correct?

19   A.   Yes, I think that's a fair statement.

01:53   20   Q.   And that was over a period of five years; correct?

21   A.   Yes, I was involved in that financial statement audit

22   during a five-year period.

23   Q.   Okay.  And that was from 1970 to 1975?

24   A.   I have that recollection.

01:53   25   Q.   All right.  And you were retained in this matter to

Holder - Cross - Stevens

1   render certain opinions as it relates to the issues in this

2   case; correct?

3   A.   Well, I was retained in the matter to develop opinions in

4   certain areas, yes.

01:53   5   Q.   And part of your retention wasn't to render opinions

6   also?

7   A.   Well, I don't know what you mean by that.  My opinions

8   are mine, they're independent.  I was retained to familiarize

9   myself with facts and circumstances and develop opinions,

01:53   10   based on that analysis and that work.

11   Q.   And in developing those opinions was it contemplated that

12   you would then have to project those opinions either into a

13   report and/or into court?

14   A.   Well, I think there was a tentativeness, I mean I think

01:54   15   it probably -- my inference is at least that it depended on

16   what opinions I developed.

17   Q.   Okay.  And in doing so you did eventually become engaged

18   by the Milbank firm to render such opinions or to develop such

19   opinions; correct?

01:54   20   A.   I was probably retained by the Milbank firm prior to

21   doing work any substantial work, at least in the development

22   of the opinions I'm here expressing today.

23   Q.   Okay.  And you have before you P-852; correct?

24   A.   Yes, yes, I do.

01:54   25   Q.   And that's entitled -- or captioned the Holder Report

3974

Holder - Cross - Stevens

1    or -- I'm sorry.  That's your report; correct?

2  A.    That's the case, yes.  It appears to.  I see the cover

3    page; I haven't looked through.

4  Q.    And you had testified earlier in preparing for this

01:55    5    report, a consultation firm by the name of Cornerstone was

6    retained; is that correct?

7  A.    I'm sorry, it must be my ears; what kind of firm?

8  Q.    Cornerstone?

9  A.    No, I heard --

01:55    10  Q.    Consultation firm?

11  A.    Consultation; sorry.  Yes, they were retained to assist

12    me at least in part.

13  Q.    And had you worked with Cornerstone before?

14  A.    I had.

01:55    15  Q.    And was it your suggestion to retain Cornerstone as it

16    related to the drafting of the Holder Report?

17  A.    You know, I honestly don't recall.  The -- the exact

18    processes.

19  Q.    Okay.  And it's true that there's no primary draftsperson

01:55    20    of the Holder Report; correct?

21  A.    Well, the report is mine, the responsibility is mine, I

22    made many of the keystrokes that are contained in the report;

23    I certainly was assisted by Cornerstone research in doing so.

24    I believe the report is mine.

01:56    25  Q.    And you believe the report is yours because you read it;

3975

Holder - Cross - Stevens

1    correct?

2    A.   I certainly -- I have read it, but I certainly don't

3    think that's the exclusive reason that it's mine.  I've read a

4    lot of documents, the things that I've alluded to in my direct

01:56    5    examination, I conducted interviews with person, I consulted

6    the literature, read deposition testimony.

7    Q.   Understood.  But I'm just actually talking about

8    specifically as it relates to the report and why you believe

9    it's yours concerning your involvement in the drafting of it.

01:56    10   So part of the reason you believe it's yours is because you

11   read it; correct?  And you edited it; correct?

12   A.   Well, in part those would be I think the reasons, some of

13   the reasons.  But certainly not all, nor really substantive

14   ones.

01:56    15   Q.   And you added verbiage yourself; correct?

16   A.   I think that's a fair statement, I made keystrokes

17   myself, I wrote many portions of it initially.

18   Q.   And you drafted some of it yourself; correct?

19   A.   Yes.

01:57    20   Q.   Now, you were paid $750 an hour by the defendants for

21   your work; correct?

22   A.   We agreed upon that fee, yes.

23   Q.   And were you actually paid by Cornerstone also?

24   A.   I do receive compensation from Cornerstone from time to

01:57    25   time.

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1   Q.   And is that in connection with this litigation?

2   A.   I don't know that I would characterize it so precisely, I

3   think -- I don't know the exact algorithm or formula, but

4   Cornerstone does compensate me from time to time, and part of

01:57   5   that is based on the level of activity I think that I have

6   with -- with their firm.

7   Q.   Okay.  And as it relates to the involvement of

8   Cornerstone, there's an individual from Cornerstone who

9   primarily helped you in drafting this report; correct?

01:57   10   A.   Well, he certainly assisted me in performing the work

11   that was necessary to do -- to prepare the report and develop

12   the opinions.

13   Q.   And he actually drafted some of the original report;

14   correct?

01:58   15   A.   I think he made keystrokes as well, yes.

16   Q.   But you had stated earlier in your testimony he drafted

17   as I understand some of it originally; is that a correct

18   statement?

19   A.   I -- yeah, that's what I meant by the keystroke.

01:58   20   Q.   And as it relates to your involvement in the drafting of

21   the report you recall drafting some portions of the rebuttal

22   to Kent Barrett's report; correct?

23   A.   I seem to recall that, yes.

24   Q.   As well as drafting a portion of the background section;

01:58   25   correct?

*United States District Court*
*Trenton, New Jersey*

3977

Holder - Cross - Stevens

1  A.   Yes.

2  Q.   As well as drafting the discussion of the literature of

3  professional guidance section; correct?

4  A.   I believe that to be the case, yes.

01:58    5  Q.   Okay.  And the drafting of this document occurred in the

6  spring and summer of 2014; is that correct?

7  A.   I think that's generally a fair characterization.

8  Q.   If I told you that you testified that the drafting was

9  occurring during the spring and summer of this year, which was

01:59   10  2014 during your deposition, do you dispute that?

11  A.   No.

12  Q.   And it's your belief that you don't believe that Milbank

13  drafted any of the report; correct?

14  A.   I don't have a recollection of them.  They may have had

01:59   15  some role in the cover page of it, and styling it or

16  something, but I don't recall them drafting or making

17  keystrokes.

18  Q.   Okay.  And a lot of the interaction with the Milbank firm

19  was done through Mr. Weemes; correct?

01:59   20  A.   Yes, we both interacted with the -- with the attorneys,

21  yes, but Mr. Weemes did interact with the attorneys.

22  Q.   And as it related to assistance that was provided to you

23  that was provided by Cornerstone; correct?

24  A.   Yes -- yes.

01:59   25  Q.   As well as Weemes; correct?

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    A.   Well, Mr. Weemes is an employee of Cornerstone.

2    Q.   Well, don't you believe that there were a couple other

3    individuals from Cornerstone who assisted Mr. Weemes and

4    yourself in the gathering of documents and drafting of the

02:00    5    report?

6    A.   I think that's a fair -- fair statement, but Mr. Weemes

7    is not separate and apart from Cornerstone.

8    Q.   Okay.  And part of what they did was going through a wide

9    range of documents; correct?

02:00    10    A.   Going through what?

11    Q.   A wide range of documents?

12    A.   Yes, I think they probably did.  I directed them to seek

13    documents from the attorneys from time to time.  And they

14    would read them as well as I.

02:00    15    Q.   And they put together the organizational structure of the

16    report; correct?

17    A.   I think they contributed to that, I -- you know,

18    certainly it's my report; if I had objected, and I don't

19    recall you know doing so, sitting here today, but then it

02:00    20    would have changed.

21    Q.   And you spoke with them, they conveyed information to

22    you; correct?

23    A.   Well I did speak with them, they did convey information

24    to me, but most of what I was doing was asking them for

02:01    25    documents and to, you know, organize the documents they were

3979

Holder - Cross - Stevens

1    getting in a coherent form, along the lines of the footnotes

2    that are in my report.

3    Q.   And part of what you had asked them to do is was provide

4    you with documents that were pertinent to the developing

02:01    5    opinions that were emerging from your work; correct?

6    A.   I did, I had an abiding instruction to them that any time

7    they saw any documentation, any documents that would be

8    pertinent to the opinions that I was developing, that they

9    were to provide that to me, absolutely.

02:01    10   Q.   And specific --

11   A.   I would want to see those personally.

12   Q.   Right.  And you specifically told them to direct your

13   attention to areas of deposition that would be of relevance to

14   the developing opinions; correct?

02:01    15   A.   Absolutely, I read many of the depositions, some of their

16   -- well, there weren't that many.  But I did ask them to call

17   my attention, to focus my attention on areas of depositions

18   that in their view would be particularly pertinent,

19   absolutely.

02:02    20   Q.   Okay.  And then after they identified those areas, you

21   then reviewed them; correct?

22   A.   Well, I looked at the depositions, but I looked at them

23   more broadly than just those specific areas they identified.

24   Q.   Okay.  And it's fair to say that Cornerstone actually

02:02    25   prepared the documents considered list that's attached to your

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    expert report; correct?

2    A.   I did ask them to keep up with all the documents they

3    were providing -- that they had received from the attorneys

4    and that they were providing to me, yes.  That was a good use

02:02    5    of their time I thought.

6    Q.   Okay.  And it's fair to say you didn't read every

7    document on the document list in its entirety; correct?

8    A.   I think that's a fair statement, yes.

9    Q.   As well as the deposition testimony that was brought to

02:02    10   you; correct?

11   A.   I think I did read -- there weren't that many

12   depositions, we can certainly look, but I recall reading those

13   -- I mean I read, you know, like at the end of depositions

14   where they have like an index of words that are used and

02:03    15   whether -- I didn't read those, I didn't read the front part,

16   but most of the substantive testimony I recall reading.

17   Q.   And that was after it was brought to your attention by

18   Cornerstone; correct?

19   A.   Pardon me?

02:03    20   Q.   That was after it was brought to your attention by

21   Cornerstone?

22   A.   What was brought to my attention by Cornerstone?

23   Q.   The pertinent parts of the relevant parts of the

24   deposition testimony; correct?

02:03    25   A.   Well, I certainly asked them to be sure and tell me their

3981

Holder - Cross - Stevens

1  view of the pertinent parts of the deposition, but I did not

2  restrict my reading to just those parts.

3  Q.   Okay.  And there were numerous conversations that you

4  testified to before that occurred between you and Mr. Joenk;

02:03  5  correct?

6  A.   There were discussions, interviews, yes.

7  Q.   And Cornerstone was involved in those discussions;

8  correct?

9  A.   I had that general recollection, I think they were at

02:03  10  that February meeting, but I don't have a particularly

11  distinct recollection of who was present.

12  Q.   And that February meeting would be before or at the

13  beginning of the time period when you were engaged to begin to

14  form your opinions?

02:04  15  A.   Somewhere thereabouts.  It probably followed my actual

16  engagement, but I don't recall the specificity.

17  Q.   And Cornerstone actually had conversations with the

18  defendants when you were not present; correct?

19  A.   I -- they may have, I don't know that.  But I may be

02:04  20  forgetting something.  I think most of their conversations

21  were with the attorneys that are representing the defendants,

22  but they may have spoken directly with Mr. Joenk, I just don't

23  really recall.

24  Q.   And so their discussions with the attorneys then that

02:04  25  were representing the defendants, some of those occurred

3982

Holder - Cross - Stevens

1  outside of you; correct?

2  A.   Yes, yes, there were many instances in which I would say

3  try to get this information, ask for this information, please

4  try to obtain this information, and they would do so at my

02:04   5  direction, yes.

6  Q.   Okay.  So you relied on Cornerstone to then go to the

7  attorneys to get the information you had requested; correct?

8  A.   In those instances where I had asked or directed that

9  they do that, yes.

02:05   10  Q.   Okay.  And you actually asked the attorneys outside of

11  what we had just talked about to provide the pertinent

12  information that they believed would be necessary in

13  developing your opinion; correct?

14  A.   Could I hear that question again?

02:05   15  Q.   Sure.

16       THE COURT:  Frank, do you want to restate it?

17       (Question read back by the reporter.)

18       THE WITNESS:  I don't understand the phrase in the

19  question.

02:05   20       THE COURT:  Restate your question, Mr. Stevens.

21       MR. STEVENS:  Yes, your Honor.

22  BY MR. STEVENS:

23  Q.   You also asked the attorneys to provide Cornerstone with

24  all of the information that would be pertinent to developing

02:05   25  your opinion; correct?

3983

Holder - Cross - Stevens

1    A.   Yes, all of the information that was available, yes, I

2    would have done that.

3    Q.   Okay.  And part of the documents that you asked

4    Cornerstone to look into was you wanted a pretty thorough

02:06    5    search of professional literature; correct?

6    A.   Yes, I asked them to contribute their ideas as to the

7    relevant portions of the literature that would be informative

8    in forming my opinions.

9    Q.   Right.  And you did so in order to immediately understand

02:06   10    the concepts and guidance for cost accounting; correct?

11    A.   Well, I think I had an understanding of those concepts

12    and the guidance that were contained in there.  Generally when

13    you embark on an engagement like this there's a degree of

14    specificity and support that at least I like to generate and

02:06   15    be able to refer to.  So while I felt comfortable with the

16    contents of Professor Horngren's book, for example, I would

17    want to get it, refresh my recollection and I would want to

18    cite to it and to other literature of the profession, and

19    refresh my recollection.  And yes, I did ask them to get that

02:07   20    literature, to assemble it and to provide to it me, rather

21    than getting it myself; that's typically how I would use a

22    research assistant.

23    Q.   Okay.

24    A.   And was really no different here.

02:07   25    Q.   And some of the guidance that you sought from Cornerstone

*United States District Court*
*Trenton, New Jersey*

3984

Holder - Cross - Stevens

1    or from others was a book by the name of Fund Governance,

2    Legal Duties of Investment Company Directors book; correct?

3    A.   I recall seeing that and reading it and becoming familiar

4    with it, yes.

02:07    5    Q.   Okay.  And did you read that book in its entirety?

6    A.   I don't recall doing so.  I would need to see the book at

7    this point and -- you know, I think I probably footnoted just

8    those portions of it that were of particular relevance to the

9    opinions I was being asked to develop.

02:07    10    Q.   Okay.  And as it relates to that book, you had never

11    consulted that book prior to this litigation; correct?

12    A.   I don't recall doing so.

13    Q.   Okay.  And you're aware that the author of the book is an

14    attorney; correct?

02:08    15    A.   I do have that recollection.

16    Q.   Okay.  And do you also recall that you were unable to

17    testify during a deposition of who selected the quotes during

18    the Fund Governance book that was contained within your

19    deposition?

02:08    20    A.   I don't -- I don't recall that.  I would have been aware

21    that they were there.  I recall looking at the book, but I

22    don't recall who may have identified the specific elements

23    that I chose to include in the report.

24    Q.   And you have P-852 before you, correct, your expert

02:08    25    report?

United States District Court
Trenton, New Jersey

Holder - Cross - Stevens

1    A.   Yes, sir, I still do.

2    Q.   I want you to turn your attention to page 11 of your

3    report.

4    A.   I'm there.

02:08    5    Q.   Specifically paragraph 25.

6    A.   I'm there.

7    Q.   And this paragraph 25 discusses that AXA maintains FMG's

8    bank accounts; correct?

9         (Witness reviewing.)

02:09    10   A.   I see that phrase in the paragraph, yes.

11   Q.   And you don't have a recollection as to whether or not

12   you drafted this section of the report; correct?

13   A.   You know, sitting here today I probably don't have a

14   specific recollection of which specific parts I individually

02:09    15   and originally authored in general, but there were many that I

16   did.  I don't recall who might have put pen to paper with the

17   first draft of what's in paragraph 25.  I can tell you that I

18   did read Mr. Joenk's deposition, and at least at one time was

19   aware of this lift of things that is -- that is identified

02:10    20   here.

21   Q.   Okay.  And if Mr. Joenk was wrong as to any of this

22   things identified in that paragraph, would that change your

23   opinion in this case?

24   A.   Not necessarily.  I mean this seems -- no, it would not;

02:10    25   at least not necessarily.

*United States District Court*
*Trenton, New Jersey*

3986

Holder - Cross - Stevens

1   Q.   And as it relates to -- you indicated as you sit here

2   today you don't have a recollection as to what parts of this

3   report you drafted in 2014 when you gave your deposition that

4   was in November; correct?

02:10   5   A.   I recall that being the case, yes.

6   Q.   And you indicated that this report was being drafted from

7   the spring to the summer; correct?

8   A.   I recall that.

9   Q.   Okay.  So that was roughly two to three months -- the

02:10   10   deposition was roughly two to three months after the final

11   draft of this report was done; correct?

12   A.   Little over three months I guess.

13   Q.   Okay.  And actually your report's dated August 8th, 2014;

14   correct?

02:11   15   A.   It is, yes.

16   Q.   And in 2014 as relates to paragraph 25, you didn't have a

17   recollection as to whether or not you drafted that report even

18   back then -- or that paragraph even back then; correct?

19   A.   I don't recall, I may or may not have; we have to look at

02:11   20   my deposition testimony.

21   Q.   I'd like you then turn to page 96 of your deposition

22   testimony, please.

23   A.   Sure.  I'm there.

24   Q.   Okay.  If you go to -- we'll start with line 1.  The

02:11   25   question is:  In your report on page 11, I guess it's

*United States District Court*
*Trenton, New Jersey*

3987

Holder - Cross - Stevens

1  paragraph 25, you did say that -- and it says you referred to

2  that AXA maintains FMG's bank accounts.

3      Do you see that?

4  A.  I do.

02:11  5  Q.  And the answer is:  Um-hmm.  The question:  So does that

6  mean that FMG has its own bank accounts?  The answer is:  No,

7  I don't think so, I mean that doesn't necessarily imply that.

8      Correct?

9  A.  That's what I said then, yes.

02:12  10  Q.  So the follow-up question was:  Did you write that?  And

11  your answer was:  I don't recall if I drafted these actual

12  words or not, I certainly read it, I approved it, I adopted it

13  as mine.

14      Correct?

02:12  15  A.  That's what the transcript says, yes.

16  Q.  Okay.  So then back in 2014, three months after you

17  drafted this report, you then were unsure as to whether or not

18  you drafted that specific paragraph in the report; correct?

19  A.  Well, you know, it's a little unclear what you're

02:12  20  alluding to here, whether it's confined to just the bank

21  account reference or the entirety of paragraph 25.  But it is

22  what it is.  I mean I don't have a better recollection today

23  than I did then.

24  Q.  Okay.  And you're paid as we indicated by the defendants;

02:12  25  correct?

United States District Court
Trenton, New Jersey

3988

Holder - Cross - Stevens

1    A.   I'm paid by what?

2    Q.   By the defendant for your work on this report; correct?

3    A.   That's my general understanding, yes.

4    Q.   And in order to get paid you have to submit something to

02:12    5    the defendants; correct?

6    A.   I submit monthly invoices with a summary of the time that

7    I've spent, yes.

8    Q.   Okay.  And are those invoices in your view trustworthy?

9    A.   Well, they may contain errors, but I certainly intend

02:13    10   them to be accurate.

11   Q.   Okay.  And based on the invoices you submitted, were you

12   actually paid by the defendant for the work contained within

13   those invoices?

14   A.   I don't think I've been paid for some of the most recent

02:13    15   ones, but generally, yes.

16   Q.   Okay.  Well, as it related to the work you performed in

17   2014, were you paid for that work?

18   A.   Yes, I have that recollection.

19        MR. STEVENS:  Chris, could you hand the witness and

02:13    20   the judge P-849 for identification purposes?

21   Q.   Do you recognize that document, Dr. Holder?

22   A.   Yes, it would appear to be the invoice I alluded -- the

23   type of invoice I alluded to earlier for the month of July.

24   Q.   Okay.  And as you're reviewing that invoice does it

02:14    25   appear to be trustworthy?

3989

Holder - Cross - Stevens

1   A.   I don't know what you mean by trustworthy.  I don't have

2   any indication or recollection that it contains errors.

3   Q.   So, is it a fair and accurate representation then of the

4   invoice you submitted back in July -- or for the July work you

02:14   5   did from July 1st to July 9th?

6   A.   I don't have much of a recollection independent of what

7   I'm looking at here.

8   Q.   I understand that.

9   A.   At this time, but it --

02:15   10   Q.   What I'm saying, though, is that invoice -- does that

11   appear to be a fair and accurate representation of the invoice

12   you submitted to the defendants for payment?

13   A.   As far as I know, yes.

14   Q.   And I want to direct your attention to July 1st of that

02:15   15   year.  Do you see that?

16   A.   I do.

17   Q.   And on that it indicates that you continue to draft a

18   report?

19   A.   Yes.

02:15   20   Q.   Is that the first time that you began to draft a report

21   as it related to this case?

22   A.   I -- I doubt that.  I certainly -- you can see here that

23   I was rendering services prior to the July period; I don't

24   know how I might have characterized those services previously.

02:15   25   But I -- if I recall correctly the drafting of the report

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1   began earlier and I would have been involved in that drafting.

2   Q.   Okay.  And that would be -- and if you were involved in

3   that drafting earlier, there would be an invoice that said

4   drafted report; correct?

02:16   5   A.   Not necessarily, no.

6   Q.   So you wouldn't have billed for the drafting of any of

7   the report prior to July 1st, 2014?

8   A.   I may not have characterized it that way, there are

9   different ways to characterize things.

02:16   10   Q.   Well, I'm going to have then P-856 shown to you, please.

11           (Brief pause.)

12           MR. STEVENS:  Let's go to P-847.  How's that.

13   Q.   Do you recognize what's been handed to you as P-847?

14   A.   I do.

02:17   15   Q.   And that's dated June 6th, 2014; correct?

16   A.   It is.

17   Q.   And that's a statement of services for May of 2014;

18   correct?

19   A.   Yes.

02:17   20   Q.   And there's no entries in that May of 2014 document that

21   indicates anything concerning drafting of a report; correct?

22   A.   I don't see the word drafting in the items that are

23   identified there.

24   Q.   Okay.

02:18   25           MR. STEVENS:  And I'd like 848 to be given to the

Holder - Cross - Stevens

1   witness, please.

2   Q.   And P-848 is a document at the front, that's dated July

3   7th, 2014; correct?

4   A.   It is, yes.

02:18   5   Q.   And it indicates that it's a statement for services for

6   the month of June 2014; correct?

7   A.   Yes.

8   Q.   And if you look on page 2, it has a listing of services;

9   correct?

02:18   10   A.   I'm sorry; say again?

11   Q.   It has a listing of services on page 2?

12   A.   Yes.

13   Q.   And again, there's no indication of the drafting of a

14   report at all; correct?

02:19   15   A.   I don't see the word drafting there either.

16   Q.   Do you see the word writing a report?

17   A.   I do not.

18   Q.   Okay.

19        MR. STEVENS:  Your Honor, at this point plaintiffs

02:19   20   would seek to admit P-847, 848 and 849 into evidence.

21        MR. HORA:  No objection.

22        THE COURT:  No objection, all right.  Admitted.

23        MR. STEVENS:  Thank you?

24        THE COURT:  So, 847; what was the other one, 849?

02:19   25        MR. STEVENS:  I'm sorry, your Honor?

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1          THE COURT:  I'm trying to figure out -- you had

2     three documents you wanted admitted, 849, 847 and?

3          MR. STEVENS:  And 848.

4          THE COURT:  Okay.  Admitted.

02:19    5          (Plaintiff's Exhibits 847, 848, 849 were marked into

6     evidence.)

7     BY MR. STEVENS:

8     Q.   And as it relate now to your Norman, Oklahoma experience

9     and your prior work experience, there was never a time that

02:20   10    you recalled where you ever used revenues as a basis to

11    allocate expenses; correct?

12    A.   As I recall testifying that's generally the case.  There

13    was the purchasing department in the hospital, they didn't

14    prepare a separate financial statement for purchasing, but had

02:20   15    they, that allocation would probably have been based on

16    revenues.  But that's the extent of my recollection sitting

17    here.

18    Q.   Okay.  But that didn't occur you said?

19    A.   What didn't occur was the separate financial statements

02:20   20    were not prepared for the purchasing department.

21    Q.   And you never suggested in any of your written

22    illustrations to use revenue to drive an expense allocation;

23    correct?

24    A.   You know, I honestly don't recall, I'd have to look back.

02:21   25    There were several articles, there's the manuscript on cost

Holder - Cross - Stevens

1    allocation, I think we've discussed it, but when California

2    passed a law that required not charging more for government

3    services than the cost of providing those services, I was

4    commissioned along with a co-author to write a manual, so that

02:21    5    cities could do a cost allocation and make a reasonable

6    determination of the cost of fulfilling various functions they

7    charged for, like marriage licenses and so on for that

8    purpose.  Whether revenue was the basis for allocation, I mean

9    I just don't recall.

02:21    10   Q.   The answer is you don't recall ever suggesting that.

11   A.   Yes, I think that's a fair -- fair statement.  Other

12   than, you know, Professor Horngren's use of revenue as an

13   example and the work that I've done in this particular case.

14   Q.   Okay, understood.  And as it related to Norman cost

02:22    15   allocation which is a hospital, you didn't -- you used various

16   bases to allocate the revenue produced in the areas; correct?

17   A.   Could I hear that again?

18   Q.   As related to the Norman cost allocation which was a

19   hospital that you had discussed working on for five years --

02:22    20   correct?

21   A.   Yes.

22   Q.   You used various bases to allocate to the revenue

23   producing areas --

24   A.   Yes, that's a true statement.

02:22    25   Q.   Cause and effect to the producing areas; correct?

3994

Holder - Cross - Stevens

1   A.   No, I don't think you can attribute that degree of

2   causation.

3   Q.   Okay.

4   A.   To many of the allocation bases that are used.

02:22   5   Q.   But you were able to determine cost drivers for the

6   allocation process; correct?

7   A.   Certainly not in all circumstances.

8   Q.   But you didn't just allocate pursuant to the portion of

9   revenue as you testified to before; correct?

02:22   10   A.   Like I testified before?

11   Q.   Correct.  You said that the only time -- the only

12   possibility you thought of allocating pursuant to revenue

13   would have been within that one department that you ended up

14   not doing it; correct?

02:23   15   A.   Sure, we're communicating, sure.

16   Q.   Okay, good.  I appreciate that.  And each year as related

17   to the Norman -- the five years that you were involved in the

18   cost allocation methodology, there was considerable effort

19   made to put together a cost allocation methodology per year;

02:23   20   correct?

21   A.   Well, yes, I mean they varied if I recall correctly from

22   year to year, but in the method at some level remained the

23   same; it was a step down cost, function rather than

24   simultaneous equations or something like that.

02:23   25   Q.   But because they varied, it's fair to say that in each of

United States District Court
Trenton, New Jersey

3995

Holder - Cross - Stevens

1   those years there would be considerable effort made to put

2   together a cost allocation process; correct?

3   A.   I think that's a fair characterization of our work, yes.

4   Q.   And that's fair as it relates to cost allocation;

02:23   5   correct?

6   A.   What's fair as it relates to cost allocation?

7   Q.   That each year there should be considerable effort put in

8   to the cost allocation to develop -- or to review the cost

9   allocation process; correct?

02:24   10   A.   No, I don't think so.

11   Q.   But you did that in the Norman, Oklahoma case; right?

12   A.   Yes, as I had indicated the Medicare formula had just

13   been put in place and there were changes being made to the

14   that -- to those regulations and so on, and so we did try to

02:24   15   stay abreast of the regulations and what they called for and

16   required, and that would have an effect on the cost allocation

17   process as used or at least it could have.

18   Q.   And that was based on your intent to be diligent as it

19   related to the appropriate allocation of the costs to the

02:24   20   appropriate revenue producing areas; correct?

21   A.   I need to hear the very first part of that sentence

22   again; you spoke so quickly.  I apologize, sir.

23   Q.   You know what, don't worry about it; I'll move on.

24        Now, as it relates to the need for FMG to use the

02:25   25   AXA-CAM, in your deposition you're unable to point to one

Holder - Cross - Stevens

1    specific document that you were able to identify that told you

2    that this was necessary; correct?

3    A.   That told me what was necessary?

4    Q.   The need to allocate -- that FMG need to allocate

02:25    5    pursuant to the FMG-CAM.

6    A.   I think that's the process that they developed.

7    Q.   Correct.  But you don't have any specific document that

8    you can point to that shows that there's a need to allocate

9    additional expenses to FMG; correct?

02:25    10    A.   And you're asking me at the time that I gave my

11    deposition?

12    Q.   Correct.

13    A.   You know, I just don't recall.

14    Q.   Okay.

02:25    15    A.   I recall -- you know, I've refreshed my recollection to

16    prepare myself for trial today.  I'm aware of the range of

17    costs, that it certainly resonates with me that those kinds of

18    costs would be necessary for the funds to operate

19    appropriately, and that thus some allocation would be an

02:26    20    appropriate approach to determine the full cost of providing

21    the service, providing the function.

22    Q.   And really the main area that you were able to identify,

23    at least in your deposition, was what's attached to -- is

24    P-8521, which is your documents supplied or your exhibits, and

02:26    25    it was specifically exhibit 6, page 15.

*United States District Court*
*Trenton, New Jersey*

3997

Holder - Cross - Stevens

1    A.   I'm sorry; I'm trying to find the sixth exhibit.

2    Q.   If you go to then -- if you go to your documents, go to

3    your exhibits, go to page 45 of 157, which is exhibit --

4    A.   Sure, that's helpful.

02:27    5    Q.   -- 6.

6    A.   Yeah, I'm there.

7    Q.   Okay.  And you recognize that document; correct?

8    A.   I do, yes, sir.

9    Q.   And that's the expense allocation document that reflects

02:27    10   the cost allocation methodology used by FMG; correct?

11            MR. HORA:  Mr. Stevens, if I can just see what

12   you're referring to?  Okay.  I have it.

13   A.   In summary form, yes.  I think that's a fair

14   characterization.

02:27    15   Q.   And this is one of the documents that you reviewed when

16   rendering your decision; correct?

17   A.   This is one of the documents that was available to me,

18   yes.

19   Q.   And that's one of the documents that in your view speaks

02:27    20   to the need to allocate if you want to determine the full cost

21   of rendering services to the funds; correct?

22   A.   No, I think this is more of a description of the

23   allocation process.

24   Q.   Okay.  And so then at your deposition testimony when you

02:28    25   stated that, you meant to state that as really just a

*United States District Court*
*Trenton, New Jersey*

*3998*

Holder - Cross - Stevens

1   description of what occurred; correct?

2   A.   Well, it's certainly not this disconsonant with my

3   understanding of the kinds of costs that are necessary to

4   support these activities, but I -- I believe sitting here

5   today that this is best characterized as a description of the

6   cost allocation at a summary level.

7            THE COURT:  So, Mr. Stevens, can we break for lunch

8   at the present time?

9            MR. STEVENS:  Absolutely.

10           THE COURT:  Okay.  So we'll break at the present

11  time, we'll reconvene at 2 o'clock.

12           So just so I have the timing down, we agreed

13  yesterday afternoon that the defendants would have the same

14  amount of time for cross-examination as the plaintiffs used

15  for direct.  So, on Mr. Holder, I started this morning, I

16  believe it was at 10:50 and they went to -- I have 12:27; so

17  it's about an hour and 40 minutes I believe.  And so you

18  started at 12:38, and now it's 1:22; so you've gone about 44

19  minutes.

20           MR. STEVENS:  Sound good, Judge.

21           THE COURT:  So you have another hour or so.

22           MR. STEVENS:  All right.  Thank you, your Honor.

23           THE COURT:  If I didn't tell the time right and --

24           MR. MURPHY:  I could shade it.

25           MR. HORA:  We're not going to nitpick a couple

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    minutes.

2              THE COURT:  Okay.  So thank you.  I'll be back at

3    2:00.

4              Mr. Holder, you may step down.

02:29    5         (Luncheon recess.)

6              THE COURT:  Good afternoon.  Please be seated.

7              Are you ready, Mr. Stevens?

8              MR. STEVENS:  I am, your Honor.  Thank you.

9              THE COURT:  Mr. Holder, could you take the stand?

03:26   10         So, you're still under oath, sir.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Mr. Stevens?

13             MR. STEVENS:  Thank you, your Honor.

14   BY MR. STEVENS:

03:26   15   Q.  Dr. Holder, as it related to how you learned the cost

16   allocation methodology employed by FMG, you were able to learn

17   it by having discussions with individuals such as Mr. Joenk;

18   correct?

19   A.  That be would part of it, yes.

03:26   20   Q.  Ms. Louie; correct?

21   A.  Yes.

22   Q.  A couple other individuals from FMG; correct?

23   A.  Yes.

24   Q.  You never had any conversations with anyone from

03:26   25   PricewaterhouseCoopers, did you?

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    A.   Not about this matter, no.

2    Q.   Or JP Morgan?

3    A.   Not about this matter, as I recall, no.

4    Q.   Or Ernst & Young?

03:26    5    A.   Not about this matter.

6    Q.   Okay.  And you had testified before as related to step A

7    of the AXA-CAM; do you recall that testimony?

8    A.   Yes.

9         MR. STEVENS:  And it may help if I have what's

03:27    10   already been marked into evidence I believe -- P-210 given to

11   the witness and also to the Court?

12   Q.   Do you recognize this document, Mr. Holder?

13   A.   I do.

14   Q.   And this is actually the document that's contained as

03:27    15   Exhibit 6 to your expert report; correct?

16   A.   I -- I could look and verify that; I recall this being

17   that exhibit, yes.

18   Q.   Okay.  So you do recollect that this is in your expert

19   report; correct?

03:27    20   A.   Yes, I do.

21   Q.   So if there's any deposition testimony as it relates to

22   Exhibit 6, it would be referring to this document; correct?

23   A.   Again, I haven't looked at this document.  I don't know,

24   it may contain pages that aren't in the exhibit, I haven't

03:28    25   compared them sitting here, but I'll accept your

4001

Holder - Cross - Stevens

1    representation that that's the case.

2    Q.    That's fine.    If we have to we can go through that

3    process; okay?

4    A.    Sure.

03:28    5    Q.    I'd like to direct your attention then to page 2 of this

6    document; do you see that?

7    A.    I am there, yes.

8    Q.    And it's entitled Expense Allocation and Methodology;

9    correct?

03:28    10    A.    Yes.

11    Q.    And it's an EQAT Board update; correct?

12    A.    Yes.

13    Q.    And is it your understanding that this document was

14    presented to the EQAT Board?

03:28    15    A.    I have that general understanding.

16    Q.    And so what I'd like to do then is just direct your

17    attention to what is page 15 of that document, and it's Bate

18    stamp 6745 which is at the bottom right.

19    A.    I'm there, yes.

03:28    20    Q.    And if you look at the column to the left where it says

21    A, is that fair to say that's the AXA-CAM?

22    A.    Yes, I've heard it characterized that way, I certainly

23    accept it.

24    Q.    And you then as it related to the document we had before

03:29    25    the Court, which is P-2050, which was your cost allocation

4002

Holder - Cross - Stevens

1  methodology overview, reflected what's in step A on that

2  document; correct?

3  A.   I think it's -- the page with Bates number ending 6745 is

4  a summary of these processes; mine is essentially a summary of

03:29   5  this summary.

6  Q.   Okay.

7  A.   But yes.

8  Q.   Understood.  And so, as it relates to step A, isn't it

9  true that the AXA-CAM is able to actually allocate costs in

03:29   10  step A; correct?

11  A.   That's -- that's my general understanding, yes.

12  Q.   And that results then in the allocation of the expenses

13  to the various products; correct?

14  A.   I have that understanding, yes.

03:29   15  Q.   And that AXA's able to allocate those expenses to the

16  products based on cost drivers that are identified by business

17  owners; correct?

18  A.   Generally, that's my understanding.

19  Q.   And they also use surveys with the managers and business

03:30   20  owners of those products; correct?

21  A.   My understanding that's part of the identification of the

22  cost drivers and the various allocations, but yes.

23  Q.   And that's all done by AXA as it relates to the total AXA

24  expenses; correct?

03:30   25  A.   Well, you see the adjustments to total AXA expenses here,

Holder - Cross - Stevens

1    I mean there are --

2    Q.    Understood.

3    A.    I'm sorry?

4    Q.    Understood; we can get to that.  I just wanted to

03:30   5    establish that that process is in relation to the total AXA

6    expenses; correct?

7    A.    Well, my understanding is that some of the AXA expenses

8    are charged directly to FMG, and then you have the deferred

9    acquisition costs, actuarial adjustment, but having said that

03:30   10   I -- I don't take further exception to agreeing with

11   your assertion.

12   Q.    Okay.  As it relates to those surveys that they

13   performed, based on those surveys adjustments are made each

14   year to the cost drivers; correct?

03:31   15   A.    If they are found to be appropriate, yes.  Based on that

16   process.

17   Q.    And that's a similar process that you -- or that you

18   actually engaged in as it related to the Norman, Oklahoma cost

19   allocation methodology that you employed from 1970 to 1975;

03:31   20   correct?

21   A.    It's similar.

22   Q.    Process where it was reviewed every year?

23   A.    No.

24   Q.    You didn't review the cost allocation methodology every

03:31   25   year when you were working with Norman, Oklahoma?

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    A.   We did that, but we didn't do so in the same manner as

2    it's done here.  I don't recall surveys being sent annually

3    and monthly kind of updates and so on.  But --

4    Q.   I'm sorry; it may have been a bad question on my behalf.

03:31    5    I didn't mean actually as it related to surveys, I just meant

6    that based on variables as it related to what was discovered

7    each year, adjustments were made by AXA; correct?

8    A.   As it relates to this part A, I think that's the case

9    insofar as changes were made.

03:32   10    Q.   Right.  And what I had meant to say that's the same

11    process as related to the adjustments that you engaged in in

12    Norman, Oklahoma depending on what variables arose each year;

13    correct?

14    A.   No, I don't think so.  The changes we would make in the

03:32   15    hospital that we -- that I've been answering questions about,

16    many of those, perhaps most were propelled by changes in the

17    Medicare regulations.  As I recall they were changing, you

18    know, rather quickly as Medicare was rather a new program

19    then.  And in addition to that it would be -- things were

03:32   20    fairly stable in a number of the revenue generating

21    activities, although there were advancements being made --

22    it's just so long ago I've forgotten, but it was in responses

23    to changes, and they weren't just changed every year in the

24    face of a stable environment.

03:33   25    Q.   But they were adjusted if there was a change was all I

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1   was asking --

2   A.   When there are changes in the regulatory environment, or

3   when there were changes in the basic structures of operations,

4   yes.

03:33   5   Q.   And as it relates to the cost allocation methodology that

6   was used by FMG, you are not prepared to say how it is that

7   FMG should have actually allocated any expenses down to the

8   EQAT; correct?

9   A.   I don't completely understand that question; the process

03:33   10   that we've just been --

11          THE COURT:  If you don't understand -- you have to

12   rephrase.

13          MR. STEVENS:  I'll rephrase, Judge.  Okay.

14   BY MR. STEVENS:

03:33   15   Q.   So you're not able to -- or you're not willing to

16   personally say how you would allocate any expenses if they

17   should have been allocated pursuant to expenses down -- let me

18   rephrase.

19          THE COURT:  So you're starting over?

03:34   20          MR. STEVENS:  I am.  Because I got little flustered.

21   Q.   Assuming that expenses needed to be further allocated

22   outside of what has already been charged to FMG by AXA

23   pursuant to the Shared Services Agreement, you are not willing

24   to offer a personal opinion as to how you would do that;

03:34   25   correct?

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1          MR. HORA:  Objection; confusing.

2          THE COURT:  Well, do you understand the question,

3     Mr. Holder?

4          THE WITNESS:  I don't understand the personal

03:34     5     opinion particularly --

6          THE COURT:  Then you have to rephrase.

7          THE WITNESS:  -- well.

8     BY MR. STEVENS:

9     Q.  It was your task as it related to your hiring and your

03:34     10    judging or your review of the cost allocation methodology in

11    this case, was merely to assess the reasonableness of the

12    allocation method being used; correct?

13    A.  I think that's generally a fair characterization in the

14    three phases.

15    Q.  Okay.  And it was not your intent to try to develop a

03:34     16    cost allocation methodology that would be different than what

17    was used in the cost allocation methodology by FMG; correct?

18    A.  I think that's a fair statement, yes.

19    Q.  And you did not consider alternatives to the revenue

03:35     20    based allocation system used by FMG in this matter; correct?

21    A.  Your question's now focusing on part B or the element B

22    of the allocation?

23    Q.  I should back that up.  It's my understand and from your

24    deposition testimony that you understood that the FMG cost

03:35     25    allocation methodology was step B and C of what's contained on

4007

Holder - Cross - Stevens

1    page 15 of P-210; is that correct?

2    A.   I heard it characterized that way, I'm comfortable with

3    that, yes.

4    Q.   Well, in Defendant's Exhibit 2050 you actually put step B

03:35    5    as FMG-CAM; right?

6    A.   Yes.

7    Q.   So then you're familiar with that; correct?

8    A.   Yes.

9    Q.   Step A is the AXA-CAM; correct?

03:35    10   A.   That's the way they've been characterized generally, I've

11   adopted those characterizations myself, sure.

12   Q.   And we discussed the various manners in which the AXA-CAM

13   allocates the cost as it relates to surveys and questioning of

14   businesses and managers; right?

03:36    15   A.   We have, yes.

16   Q.   And that they were able to identify cost drivers based on

17   that; correct?

18   A.   They were -- yes, they were able to -- they may have

19   identified cost drivers and then used this mechanism to

03:36    20   measure the extent to which each one would be considered a

21   cost driver for purposes of this specific allocation.

22   Q.   Right.  And as related then to step B and C, the FMG-CAM,

23   you didn't do any independent investigation to determine

24   whether or not there were cost drivers available to allocate

03:36    25   expenses down to the products if necessary; correct?

*United States District Court*
*Trenton, New Jersey*

4008

Holder - Cross - Stevens

1    A.   In the work I performed I didn't identify what I would

2    consider to be available cost drivers.

3    Q.   And you didn't try to identify available cost drivers;

4    correct?

03:37    5    A.   That wasn't the focus of my work.  But I can say that

6    none came to my attention that I recognized at least.

7    Q.   And I'd like to direct your attention to paragraph 48 of

8    your expert report.  Do you have that still before you, sir?

9    A.   I am getting there.

03:37   10    Q.   Okay, thanks.  And that's Plaintiff's Exhibit 852.

11    A.   It is, and I have paragraph 48 in front of me.

12    Q.   Okay, thank you.  And I'd like to direct your attention

13    to the paragraph that you indicate, many of the allocated

14    expenses arise --

03:37   15    A.   I'm sorry, forgive me; is it the first many down in the

16    middle of the paragraph?

17    Q.   Yes, where it says --

18    A.   I'm with you --

19    Q.   Many of the allocated expenses?

03:37   20    A.   Yes.

21    Q.   Okay.  It says:  Many of the allocated expenses arise

22    because of revenue producing activities, such as sales

23    activities engaged by AXA Equitable.  Correct?

24    A.   Yes, it says that.

03:38   25    Q.   And you go on further to state:  It is noteworthy that

*United States District Court*
*Trenton, New Jersey*

4009

Holder - Cross - Stevens

1  almost half of the 2.275 billion in AXA Equitable allocated

2  expenses in 2012 pertain to commission and acquisition related

3  expenses; correct?

4  A.   Yes, they're words to that general effect here.

03:38  5  Q.   Okay.  And then you continue:  The relationship between

6  sales related compensation and revenues, is clearly consistent

7  with the cause and effect criterion supported in the cost

8  accounting literature.  Correct?

9  A.   That -- those words are there, yes.

03:38  10  Q.   Okay.  And are those correct statements that are

11  contained within your report?

12  A.   I'm not aware that they're inaccurate.  I -- I believe

13  them to be a reasonable characterization of facts,

14  circumstances and judgment.

03:39  15  Q.   Okay.  Do you recall if you actually drafted this

16  section?

17  A.   No, I don't recall here.  I can tell you that I worked on

18  this section, I almost certainly made keystrokes to all of the

19  sections in here, but I can't recall who might have been the

03:39  20  original drafter of what became this paragraph.

21  Q.   Okay.  And basically what that paragraph is saying that

22  is sales commissions have a correlation with revenues as it

23  relates to the products; correct?

24  A.   I did not -- I think it indicates there's a relationship;

03:39  25  I did not try to measure correlation, that's essentially a

Holder - Cross - Stevens

1   statistical term, I did not attempt to develop correlation

2   coefficients.

3   Q.   But then as related to your opinion as to the

4   reasonableness of the cost allocation methodology, you

03:40   5   indicated in this paragraph that part of the reason for the

6   reasonableness is that these sales commissions and sales

7   related activities have a relationship then to the revenue

8   aspect of the EQAT; correct?

9   A.   If I understand your question I think generally that's

03:40   10   the case, yes.

11   Q.   And by sales related compensation are you referring to

12   commissions and other compensation that AXA Equitable pays to

13   its insurance product sales force and sales agents?

14   A.   Let me look at the context if I may for a moment.

03:40   15        Well, these are revenues -- the basis for the

16   allocation is generally revenues generated from the investors

17   or shareholders or participants.

18   Q.   Okay.  And so as at relates to the sales related

19   compensation that you're discussing, are you -- have you ever

03:41   20   heard the term distribution expenses?

21   A.   Yes.

22   Q.   Okay.  Would you consider those to be distribution

23   expenses?

24   A.   Would I consider -- what's those?

03:41   25   Q.   The sales related compensation that you reference in

United States District Court
Trenton, New Jersey

4011

Holder - Cross - Stevens

1    paragraph 48 of your report.

2    A.    They may well be among them, yes; I don't recall

3    specifically sitting here.

4    Q.    Okay.  Is that something that you would have known when

03:41    5    you drafted your report?

6    A.    I think I would have known it at one time given its

7    presence here, I don't recall beyond that, though.

8    Q.    Okay.  And if I could turn your attention the Defendant's

9    Exhibit 1329, which you should have before you from your

03:41    10    testimony earlier this morning.

11    A.    The cost accounting book?

12    Q.    Correct.

13    A.    I have that in front of me.

14    Q.    Okay.  I want to just direct your attention to footnote 2

03:42    15    on page -- what's the second page of this document; correct?

16    Do you see that?

17    A.    Almost.  I'm there.

18    Q.    Okay.  And it talks about the Federal Accounting

19    Standards Advisory Board; are you familiar with that?

03:42    20    A.    I am familiar with that organization.

21    Q.    And it indicates that cost assignments should be

22    performed either, A, directly tracing costs whenever feasible

23    and economically practicable -- correct?

24    A.    I see that, yes.

03:42    25    Q.    And B, assigning costs on a cause and effect basis --

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1  correct?

2  A.   Yes.

3  Q.   And C, allocating costs on a reasonable and consistent

4  basis.  Right?

03:42      5  A.   I see what you've read, yes.

6  Q.   And then you had referenced on the next page the benefits

7  received criterion listed in this; correct?

8  A.   Yes.

9  Q.   And in that benefits received criterion, the example they

03:43     10  give to consider corporate-wide advertising program; right?

11  A.   Yes, that's the example that professor included in -- in

12  that -- in part B -- or part 2; I'm sorry, yes, Professor

13  Horngren included.

14  Q.   Right.  And so the benefit -- or the comparison as it

03:43     15  relates to the corporate-wide advertising program is that the

16  rationale behind it as indicated in the last sentence of that

17  paragraph, is that the divisions with high revenues apparently

18  benefitted from the advertising more than the divisions with

19  lower revenues, and therefore ought to be allocated more --

03:43     20  more of the advertising costs; correct?

21  A.   I think that's what Professor Horngren's book says, yes.

22  Q.   Okay.  And is that the same type of comparison that you

23  were doing in paragraph 48 as it related to the sales

24  compensation?

03:44     25  A.   Well, I think the sales compensation passage -- and let

*United States District Court*
*Trenton, New Jersey*

4013

Holder - Cross - Stevens

1 me, if I may, get back to it; I set it aside.  But I think

2 that was more in the realm of cause and effect than benefits

3 received, I think if I recall correctly.  But having said that

4 I think there are elements that are intertwined in that

03:44  5 allocation basis of revenues, that are both related to cause

6 and effect, as well as benefits received.  I did not identify

7 with specificity cost drivers.

8 Q.   Okay.  And as it relates to the reasonableness and

9 consistent basis of the allocated costs that was referenced in

03:44 10 footnote 2, it's your belief and understanding that you should

11 consider the result of the reasonableness of a cost related

12 allocation?

13 A.   Yes, I think I testified generally to that to the extent

14 you're able to when I was providing my deposition.

03:45 15 Q.   Okay.  In fact, you should actually review the result for

16 reasonableness; correct?

17 A.   Well, I think we ought to look at what I had to say.  I

18 mean I think the ability to assess the reasonableness of any

19 complex process is a function of a great many variables, and

03:45 20 it ranges from being very specific in assessing

21 reasonableness, to only the most general considerations.

22 Q.   And as it related to your review of the results of the

23 CAM, you didn't actually opine as to the reasonableness of the

24 costs that were assessed or allocated to the EQAT; correct?

03:45 25 A.   I don't recall doing that.  I think the focus of my

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1  opinion was on the reasonableness of the process that was

2  used, but again, in my deposition I think the person taking my

3  deposition raised questions about that, and I testified as I

4  indicate.

03:46   5  Q.   Okay.  So then it's a fair statement to say that you

6  didn't say the costs were reasonable, correct, that you were

7  focusing on the methodology?

8  A.   I think that is generally a fair statement.

9  Q.   And that's a statement that applies in this case;

03:46  10  correct?

11  A.   I don't know what you mean by that.

12  Q.   You said a generally fair statement; I just asked if you

13  said that you didn't say that the costs were reasonable.

14  A.   I don't think I probably had a basis to make that

03:46  15  assertion.  I did not audit the records of the company, PwC

16  audited them, I relied to some extent on the comfort provided

17  by their unqualified clean opinion that these were the costs

18  incurred.  Yeah, that was way beyond the scope of anything I

19  was asked to do.

03:46  20  Q.   And you're familiar with the external department slide

21  that's contained within P-210; correct?  And I'll direct your

22  attention to page 4 of P-210.  P-210 is the expense allocation

23  and methodology presentation.

24  A.   I do have it in front of me now.  What page did you

03:47  25  direct my attention to?  I'm sorry.

Holder - Cross - Stevens

1    Q.   Page 4.

2    A.   Okay.  I am -- I'm there.

3    Q.   Okay.  And as it relates to page 4 of this, did you ever

4    review this and assess in relationship to the Shared Services

03:47    5    Agreement?

6    A.   I did, yes.

7    Q.   Okay.  And isn't it your testimony that you don't know

8    why this external department slide would not have been

9    contained within the Shared Services Agreement?

03:48    10   A.   Well, no, I don't think that's quite a fair

11   characterization.

12   Q.   Okay.  I'd like to turn your attention to page 44 of your

13   deposition.  If you look at -- it's actually 44 -- it begins

14   44-21; I'm just going to establish the foundation quickly to

03:48    15   show what you're looking at.  It talks about Exhibit 6 --

16            THE COURT:  So it's line 21?

17            MR. STEVENS:  I'm sorry, your Honor, page 44, line

18   21.

19            THE COURT:  Okay, thank you.

03:48    20   Q.   The question is, okay, so we can go back -- I guess it's

21   page 34 in Exhibit 6 -- and they're talking about your expert

22   report, you understand that; correct?  Because you were

23   talking about your expert report throughout the deposition;

24   right?

03:49    25   A.   Well, I don't know throughout the deposition, but yes,

Holder - Cross - Stevens

1    I'll accept that you're referring to that there, or that the

2    questioner was referring to that.

3    Q.   And then it actually continues and it says:  4, if you go

4    to page 45-8 -- so it's relating to page 4 of Exhibit 6 to

03:49    5    your deposition.  Do you see that?

6    A.   I do see that, yes.

7    Q.   And you're discussing throughout the testimony the items

8    that are contained on the -- the services that are contained

9    on this exhibit; correct?

03:49    10   A.   That's -- that's probably the case, I -- you know, let me

11   look.  Page 4 of the exhibit, okay, yeah, it would appear to

12   be, yes.

13   Q.   Okay, great.  And you were asked the question on page 46,

14   line 6, it says:  Assuming these costs aren't contained within

03:50    15   the $14.4 million, which is your understanding, correct; you

16   said, that is my understanding.

17        Right?

18   A.   Yes, that's -- that's correct.

19   Q.   And your testimony has been that the $14.4 million is a

03:50    20   direct and some indirect expenses that were assessed to FMG

21   pursuant to the Shared Services Agreement that exists between

22   FMG and AXA; correct?

23   A.   I -- I think that's a fair characterization, yes.

24   Q.   Okay.  So then the answer to the question why wouldn't

03:50    25   they be included was:  I don't know why they wouldn't include

Holder - Cross - Stevens

1    it.

2         Do you see that?

3    A.   I see the words that you are -- that I said according to

4    this transcript, yes.

03:50   5         MR. HORA:  Objection; there's more testimony in that

6    answer, that's not a complete answer.

7         THE COURT:  Well, you'll have redirect.

8    BY MR. STEVENS:

9    Q.   And so I'd like to now go back to page 15 of P-210, which

03:51  10    is the expense allocation -- the cost allocation methodology

11    that you were discussing -- we were discussing before.

12    A.   I'm there.

13    Q.   You're there; correct?  Okay.  On the left side there's a

14    box that says total AXA Equitable expenses; correct?

03:51  15    A.   I see that.  Yes.

16    Q.   And did you review this report -- this specific

17    presentation as it related to how the specific numbers were

18    resulted or were gotten on the left column?

19    A.   Generally, yes.

03:51  20    Q.   So if I turn your attention to page 6 of that report,

21    it's entitled Expense Allocation 2012.  Do you see that?

22    A.   I see the page to which you're calling my attention.

23    Q.   Okay.  And up top it indicates that this is a

24    consolidating income statement management format; correct?

03:52  25    A.   I see that, yes.

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1  Q.   And it's your understanding that this was presented to

2  the Board; right?

3  A.   I think it's part of this packet that was presented to

4  the Board.

03:52   5  Q.   Okay.

6  A.   That's my recollection.

7  Q.   And I want to direct your attention to a line which is

8  about three-quarters of the way down the page entitled Total

9  Expenses.

03:52   10  A.   I see that, yes.

11  Q.   If you go all the way over to the right which is a total

12  column for 2012 --

13  A.   Yes, sir.

14  Q.   On that line for total expenses there's a number 1.615;

03:52   15  right?

16  A.   I see that, yes.

17  Q.   If you turn back to page 15, that reflects the 1.615

18  billion of total AXA Equitable expenses; correct?

19  A.   That's my understanding, yes.

03:53   20  Q.   Okay.  And then on page 15 you have minus FMG direct

21  expenses 14.4 million; right?

22  A.   That's what it says, yes.

23  Q.   And that's pursuant to the Shared Services Agreement;

24  correct?

03:53   25  A.   Those are charges that were assigned directly to the --

Holder - Cross - Stevens

1    through the Shared Services Agreement.  They relate primarily

2    to those 50 or 51 employees, as I understand it.

3    Q.   Right.  And that was specifically to FMG; right?  As a

4    business entity or for doing business with AXA; correct?

03:53    5    A.   I don't take offense at your characterizations, yes.

6    Q.   And are you aware as to whether or not AXA has any other

7    business entities that -- or associates that they expense or

8    will bill for work that they perform?

9    A.   I'm not aware; I may have at one time been aware of that.

03:54    10   Q.   Assuming they have some additional business entities

11   that they do expense, would you expect to see those expenses

12   also deducted from the total AXA Equitable expenses as it

13   relates to the expense allocation methodology?

14        (Brief pause.)

03:54    15   A.   Could I hear that question again?

16   Q.   The 14.4 million is a deduction based on a bill that they

17   gave to a business entity; correct, FMG?

18   A.   Well, it's the expenses that were directly charged to

19   FMG, yes.

03:54    20   Q.   Assuming there are other expenses directly charged to

21   other businesses by AXA, they would then also be reflected as

22   a minus from the total AXA Equitable expenses; correct?

23   A.   Not necessarily -- not necessarily.

24   Q.   Okay.  These are the total AXA Equitable expenses;

03:55    25   correct?

*United States District Court*
*Trenton, New Jersey*

4020

Holder - Cross - Stevens

1    A.   I have that general understanding.

2    Q.   And if there were other expenses deducted from the total

3    AXA Equitable expenses, they should be reflected in this

4    slide, because if they're not that means that FMG is then

03:55    5    being allocated a portion of expenses that have already been

6    paid for by other businesses; correct?

7            THE COURT:  Hold on a second; there's an objection.

8            MR. HORA:  There's a foundation objection.  I think

9    if he's got some sort of document that shows that, I think he

03:55    10    should show the witness rather than speculating.

11            THE COURT:  You may answer the question if you

12    understood it, Doctor -- or Mr. Holder.

13            THE WITNESS:  Unless there was some extenuating

14    circumstance, that would seem to follow.

03:55    15    BY MR. STEVENS:

16    Q.   Okay, that's great.  And then we have directly below that

17    the actuary DAC impact of 674.8; do you see that?

18    A.   I do.

19    Q.   And that actually gets added to the total AXA Equitable

03:55    20    expenses; correct?

21    A.   Well, only -- I mean it's to remove its effects from the

22    AXA Equitable expenses, yes.

23    Q.   Correct.  And the effect by removing it is that it adds

24    AXA -- it adds expenses to the total AXA Equitable allocated

03:56    25    expenses that are then pushed down to my clients, the EQAT;

United States District Court
Trenton, New Jersey

4021

Holder - Cross - Stevens

1    correct?

2    A.   No, I don't think that's correct.

3    Q.   Well, the total AXA Equitable allocated expenses is 2.275

4    billion; correct?

03:56    5    A.   I see that, yes.

6    Q.   Okay.  1.615 billion minus 14.4, will come up with a

7    certain number; correct?  Roughly 1.6 billion; right?

8    A.   Okay.

9    Q.   Is that correct?

03:56    10    A.   1.615.3 billion less 14.4 billion gives a little over a

11    billion 600 million.

12    Q.   Right, okay.  And then as it relates to that, if you add

13    in the 674.8 million, that would total up to the 2.275 billion

14    as reflected in the total AXA Equitable allocated expenses;

03:57    15    correct?

16    A.   I think that generally follows.

17    Q.   Okay.

18    A.   But it's not appropriate to say that that removal of that

19    increases expenses.  The expenses are what they are, and when

03:57    20    you --

21    Q.   No; go ahead.  Okay.  Well, the removal of that as it

22    relates to the total AXA Equitable allocated expenses does

23    increase those expenses that are allocated; correct?

24    A.   It increases the costs that are allocated by excluding

03:57    25    this DAC impact.

*United States District Court*
*Trenton, New Jersey*

4022

Holder - Cross - Stevens

1  Q.  Okay.  And are you aware as to how much of the -- I'm

2  sorry; you're aware that DAC means deferred acquisition costs;

3  correct?

4  A.  I'm aware of that, yes.

03:57  5  Q.  And are you aware of how much the -- how much deferred

6  acquisition costs were actually realized in the year 2012?

7  A.  I -- I don't recall.

8  Q.  Okay.  Do you believe that it's the number that's

9  reflected there of roughly $674 million?

03:58  10  A.  I don't recall.  I'd have to look back at some of the

11  underlying data.

12  Q.  Let me ask you this.  If it wasn't the $674 million that

13  was realized, would that then call into question your

14  assessment of the cost allocation methodology?

03:58  15  A.  No, I don't think so.

16  Q.  So the fact that -- or not the fact, but the possibility

17  that $674 million was included in the allocated expenses that

18  then were allocated down to my clients, does not impact your

19  view in any respect as it relates to the reliability of the

03:58  20  cost allocation methodology?

21       THE COURT:  Wait a second.

22       MR. HORA:  Objection; there's no foundation for the

23  statement that they're allocated down to his clients.

24       THE COURT:  Do you understand the question, Mr.

03:58  25  Holder?

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1          THE WITNESS:  At this point I'd need to hear it

2   again, your Honor.

3          THE COURT:  So Frank, could you repeat question?  So

4   I'll deny that motion.

03:59    5          (Question read back by the reporter.)

6          THE WITNESS:  As I understand it, that wouldn't have

7   that effect.  I mean there is an accounting process in which

8   deferred acquisition costs get amortized over a period of

9   time.  There are actuarial evaluations of that also that take

03:59   10   place over time.  The actuarial DAC impact here of -- that's

11   removed, is in my recollection at least, not part of the

12   normal amortization of DAC that exists, and that's

13   appropriate.

14   BY MR. STEVENS:

04:00   15   Q.  So what I'm trying to -- you just said that that 674.8

16   million was not part of the actual amortization for the year

17   2012; correct?

18   A.  Well, I guess I don't understand your question.

19          THE COURT:  All right, then rephrase.

04:00   20          MR. STEVENS:  That's fine, your Honor.

21   Q.  I want to direction your attention quickly to page 6.

22   A.  I am there.

23   Q.  Of P-210?

24   A.  Yes.

04:00   25   Q.  And directly above the 1.615 there are certain numbers;

Holder - Cross - Stevens

1   do you see that?

2   A.   I do.

3   Q.   And it discusses -- the 1.65 is a total of all the

4   numbers that are contained directly above it, correct, in that

04:00   5   column?

6   A.   Well, it's the net of those I think.

7   Q.   Correct.  And it's all those numbers all the way up to

8   the top beginning with the underlying investment margin?

9   A.   Well, there's sub totals that are struck, so you can't

04:00   10   just add them all.

11   Q.   So it's a total of the net revenues; correct?

12   A.   No, it's not the total of the net revenues.  It

13   incorporates the other things that are listed there as well.

14   Q.   Understood.  I was about to list them out, but it

04:01   15   incorporates what's in that column; correct?

16   A.   I think that's a fair statement, yes, sir.

17   Q.   Okay.  And directly above the 1.615 there's two numbers;

18   right?

19   A.   Yes.

04:01   20   Q.   Amortization of DAC, deferred acquisition costs; correct?

21   A.   Right.

22   Q.   And that's 74 million; right?

23   A.   I see that, yes.

24   Q.   And amortization of VOBA, underlying results; do you see

04:01   25   that?

Holder - Cross - Stevens

1    A.   The valuation of business acquired, yes.

2    Q.   Right.  And that's 4 million; correct?

3    A.   I see that, yes.

4    Q.   So that's a total of 78 million that's amortized for both

5    the DAC and VOBA for that year; correct?

6    A.   That's my understanding.

7    Q.   And then that additional money that's reflected of 674

8    million minus 78 million was not amortized for 2012; correct?

9    A.   I don't understand that one, I'm sorry.

10   Q.   Is it your understanding that based on the 74 and 4

11   million that 78 million of DAC and VOBA was amortized for

12   2012.

13   A.   That's what that appears to reveal, the document which

14   you've drawn my attention.

15   Q.   Okay.  And as it relates the 674.8 million that was

16   reflected as DAC amortization on page 15 of P-210, that was

17   then put into the total AXA Equitable allocated expenses --

18   you see where I am; correct?

19   A.   Yes, but that's -- the characterization of it on the

20   document is actuarial deferred acquisition costs impact, not

21   amortization.

22   Q.   So then it's your position that they're merely putting

23   the impact of the additional 600 million of actuary DAC impact

24   in the allocated expenses; correct?

25   A.   No, no, they're removing the effects from the expenses

*United States District Court*
*Trenton, New Jersey*

4026

Holder - Cross - Stevens

1    that were actually incurred.

2    Q.   Right.  And so in removing --

3    A.   I'm sorry.

4    Q.   In removing those that then adds, as we indicated, to the

04:03    5    total AXA Equitable expenses; correct?

6    A.   No, the expenses are what they are, and this is -- this

7    number is contained in the two -- in the 1.615; and removing

8    its effects moves to the actual expenses incurred by AXA in

9    providing these services to the 2.275 billion as I understand

04:03    10    it.

11    Q.   So then is it your understanding of the cost allocation

12    methodology that the amount of expenses that are then put

13    through step A, B and C is not 2.275 billion?

14    A.   No, I didn't say that.

04:03    15    Q.   Okay.  So then we're talking on -- we're together that

16    2.275 billion is the total AXA Equitable expenses that are

17    then allocated down eventually to the EQAT.

18    A.   I think that's a fair statement.

19    Q.   Okay.  So if I can direct your attention to Defense

04:04    20    Exhibit 1510.  And that's the EITF 99-19.

21         THE COURT:  Mr. Holder, here you go.

22         THE WITNESS:  Thank you.

23         I have it.

24    Q.   Okay.  And this is part of what you used to suggest that

04:04    25    the sub-advisory and sub-administrative fees were

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1   appropriately assessed as expenses; correct?

2   A.   Appropriately reflected as --

3   Q.   Reflected as expenses; correct?

4   A.   Yes, this is part of the collection of information I used

04:04   5   in arriving at that judgment, yes.

6   Q.   Okay.  And if we look at the first page of that document,

7   this is a document that is actually by the Financial

8   Accounting Standards Board; correct?

9   A.   Yes, I think that's a fair statement.  The EITF is a

04:05   10   committee or a group established by and that reports to the

11   Financial Accounting Standards Board.

12   Q.   Okay.  And then as it relates to the financial -- the

13   financial accounting, you've already indicated that there's a

14   difference between management accounting and financial

04:05   15   accounting; correct?

16   A.   There are differences, sure.

17   Q.   And are you aware that this specific EITF 99-19 was

18   superseded in 2014?

19   A.   No, it really wasn't.  I mean I can't accept your

04:05   20   characterization of what transpired.

21   Q.   And why is that?

22   A.   Well, because there's a -- the FASB had been working for

23   year and years and years on a major revenue recognition

24   project, and they issued a new standard on revenue recognition

04:06   25   that was very broad and very pervasive in its effect.  That

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    standard has not yet become effective, and will become

2    effective for SEC registrants only -- well, it will be

3    effective in the next year; it will be effective for other

4    entities in the years following that.

04:06    5        I did look at the -- as part of my preparation here, at

6    the portion of that new standard that helps distinguish

7    between those costs that should be treated as a reduction of

8    revenue versus those that should be treated as an expense, and

9    I performed that analysis and came to the same conclusion

04:06   10    there are fewer indicators of --

11            MR. STEVENS:  If I could just object, your Honor --

12            THE COURT:  Well, wait; let him finish the answer.

13            MR. STEVENS:  The only concern I have, Judge, is I

14    have about two minutes left so I wanted to quickly get in --

04:07   15            THE COURT:  You asked the question, so we might as

16    well get the answer.

17            MR. STEVENS:  I didn't expect it to be so long.

18            THE COURT:  So Mr. Holder, you may continue.

19            THE WITNESS:  That supersession, which is not yet

04:07   20    effective, restated the indicators of reporting net versus

21    reporting gross, in my view it did not change them

22    substantively.  And in the instant case I still think that the

23    revenue, even if this new standard was effective today or --

24    and it's not, or back in 2012 and it's not, you would still

04:07   25    get the same result, that these costs should be reported as an

*United States District Court*
*Trenton, New Jersey*

4029

Holder - Cross - Stevens

1  expense and not as a reduction of revenue.

2  BY MR. STEVENS:

3  Q.   Okay.  And that's for financial reporting; correct?

4  A.   Well, it's for -- well, all of it is financial reporting.

04:07  5  I mean managerial accounting relies on financial reports.

6  Q.   And your opinion based on this is that this specific

7  standard applies the FMG; correct?

8  A.   I think FMG would use this standard and its predecessor

9  which was identical, and when the new one becomes effective

04:08  10  they will use it, in their financial reports which are

11  presented in conformity with GAAP.

12  Q.   Okay.  I want to direct your attention to page 3 of this

13  document.

14  A.   I am there.

04:08  15  Q.   And that is -- the top part is where you indicated that

16  -- I believe that you believe that FMG fell within the

17  confines of this -- of this EITF; correct?

18  A.   Well, I think you need to read the whole EITF in its

19  entirety and understand it collectively.  The part I alluded

04:08  20  to, though, begins on page 4 where the title indicators are

21  gross revenue reporting, and the next eight paragraphs march

22  through each of those, the first one there paragraph 7 is the

23  company's the primary obligor, the second one's the inventory

24  thing, but that's what I referred to, not page 3 specifically.

04:09  25  But I think you ought to read the entire document as you try

United States District Court
Trenton, New Jersey

Holder - Cross - Stevens

1    to understand it and implement it.

2    Q.   Okay.  And that was within -- you did that in what is

3    your the demonstrative exhibit Defendant's Exhibit 2053 which

4    references FASB 605-45; correct?

04:09  5    A.   Yes, sir.

6    Q.   And as it relates then to FMG, if FMG wasn't excluded

7    from this regulation, then it would be inappropriate to report

8    the sub-advisory fee and sub-administration fee as expenses

9    pursuant to this; correct?

04:09  10   A.   If this didn't -- I'm sorry.

11         MR. HORA:  I was just going to say objection, lack

12   of foundation.

13         THE COURT:  Frank, can you repeat the question?

14         (Question read back by the reporter.)

04:09  15         THE COURT:  Can you explain what you --

16         MR. HORA:  I just don't know what basis he has to

17   suggest that FMG's excluded from this guidance.

18         MR. STEVENS:  I'll get there, Judge.

19         THE COURT:  So you're going to go through this

04:10  20   issue?

21         MR. STEVENS:  I am.

22         THE COURT:  Okay.  You may.

23   BY MR. STEVENS:

24   Q.   Okay.  So as it relates -- I want you to look at

04:10  25   paragraph 4 on page 3.

Holder - Cross - Stevens

1    A.   I'm sorry; page 4 of?

2    Q.   Paragraph 4 on page 3 of the EITF 99-9 (sic).

3    A.   Yes, yes.

4    Q.   And paragraph 4 says:  This issue -- and that's relating

04:10    5    to the EITF; correct?

6    A.   Yes.

7    Q.   Excludes from a scope transactions for which guidance is

8    provided by categories A and B above of the GAAP hierarchy.

9    Correct?

04:11    10   A.   You've read that accurately, yes.

11   Q.   Including -- and I want you to skip down to the fourth

12   bullet point.  Do you see that?

13   A.   I do, yes.

14   Q.   And it says:  Revenue transactions in specialized

04:11    15   industries addressed in AICPA accounting and auditing guides,

16   and in then parentheses, for example, airlines, casinos,

17   investment companies and so on.  Do you see that?

18   A.   I do.

19   Q.   So if FMG pursuant to the FASB is treated as an

04:11    20   investment company, then they would be excluded from the

21   guidelines of the EITF; correct?

22          MR. HORA:  Objection; foundation.  FMG is not an

23   investment company.  There is no foundation for him to suggest

24   that it's an investment company.  That's...

04:11    25          THE COURT:  Have you finished your argument?

United States District Court
Trenton, New Jersey

Holder - Cross - Stevens

1          MR. HORA:  I have, yes.

2          THE COURT:  All right.  Mr. Stevens?

3          MR. STEVENS:  There's going -- I'm going to direct

4    him to the specific provision that's going to say that

04:11   5    pursuant to FASB, which is what I referenced, which is what

6    these EITFs are generated from and guidance from, would define

7    FMG as an investment company pursuant to the FASB.

8          THE COURT:  So, I don't recall this ever coming up

9    during the course of the trial to tell you the truth.

04:12  10          But, Mr. Holder, do you believe that -- or do you

11   have an opinion as to whether or not FMG is an investment

12   company, under these guidelines?

13          THE WITNESS:  Well, it doesn't say this here.  I

14   mean investment companies typically get characterized as those

04:12  15   covered by the Investment Company Act of 1940.  What I can

16   tell you I did do in answer to your question, and I think it

17   is pertinent, is I did look at the investment company's

18   accounting and audit guide, and I did look at the insurance

19   company's accounting and audit guide, although I don't believe

04:13  20   it is mentioned here, although insurance and reinsurance

21   premiums are, and I did not find guidance for this kind of a

22   transaction in those guides.

23          MR. STEVENS:  So if I could then, your Honor, direct

24   his attention to what I've had premarked as P-787.

04:13  25          THE COURT:  Does your adversaries have a copy of

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1  this?

2          MR. STEVENS:  They do, your Honor.

3  BY MR. STEVENS:

4  Q.   And Dr. Holder, are you familiar with this document in

04:13   5  any way?

6  A.   Generally, yes.

7  Q.   And it's actually a FASB accounting standards update;

8  correct?

9  A.   It is, yes.

04:13  10  Q.   And it's entitled Financial Services Investment

11  Companies; correct?

12  A.   I see that, yes.

13  Q.   Okay.  I want to turn your attention to page 12, of this

14  document.

04:13  15  A.   I am there.

16  Q.   Page 12 begins, assessment of investment company status.

17  Correct?

18  A.   I see that, yes.

19  Q.   And it defines pursuant to number 946-10-15-4, that:  An

04:14  20  entity regulated under the Investment Company Act of 1940 is

21  an investment company under this topic.  Do you see that?

22  A.   Yes.

23  Q.   And that's the FASB guidance as it relates to investment

24  company status; correct?

04:14  25  A.   Yes.

*4034*

Holder - Cross - Stevens

1  Q.   Okay, thank you.  As it relates to that document I just

2  showed you, is this a document that -- the FASB accounting

3  standards update, is this a document that's relied on by

4  individuals in your field?

04:14  5  A.   Yes, working in the appropriate realm, yes.

6  Q.   Okay.  Is it authoritative as it relates to the

7  accounting standards pursuant to the FASB?

8  A.   It's an authoritative part of generally accepted

9  accounting principles, yes.

04:15  10  Q.   And as you indicated you're familiar with this --

11        MR. STEVENS:  Your Honor, at this time plaintiffs

12  would move into evidence P-787.

13        THE COURT:  P-787?

14        MR. STEVENS:  Yes, your Honor.

04:15  15        THE COURT:  Any objections?

16        MR. HORA:  No objection.

17        THE COURT:  All right, admitted.

18        (Plaintiff's Exhibit 787 was marked into evidence.)

19  BY MR. STEVENS:

04:15  20  Q.   And you're aware that FMG uses the result of its cost

21  allocation methodology, which we've just been talking about,

22  in their profitability analysis that's presented to the EQAT

23  Board; correct?

24  A.   I understand that, yes.

04:15  25  Q.   And are you also aware that they do not report the

4035

Holder - Cross - Stevens

1  roughly 49 million of allocated expenses that result from the

2  FMG-CAM on their audited financial statements?

3  A.  I have that understanding.

4  Q.  Okay.  And are you also aware then that FMG never

04:16  5  actually pays a $49 million in allocated expenses to AXA?

6  A.  I don't recall seeing documents or evidence that suggests

7  that they do.

8  Q.  So then basically the only reason for the cost allocation

9  methodology is to report profitability to the Board; correct?

04:16  10  A.  I don't know if that's the only reason, but it's one that

11  I understand exists.

12  Q.  Okay.  And by including the $49 million as expenses in

13  its presentation to the Board, that decreases the profit FMG

14  reports to the Board related to the services rendered to the

04:16  15  EQAT under the Investment Management Agreement as well as the

16  Administration Agreement; correct?

17  A.  Yes.  The profitability analyses, or at least some of

18  them I looked at, don't show the portions of those 49 million

19  for individual elements of that, but eventually down at the

04:17  20  bottom they are included in the overall profitability

21  assessment.

22  Q.  And also including those costs then of 49 million would

23  also decrease the profit margin FMG reports to the Board;

24  correct?

04:17  25  A.  That would have that effect, yes.

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1          MR. STEVENS:  I have nothing further, your Honor.

2          THE COURT:  All right.  Redirect?

3          MR. HORA:  I don't have any questions.

4          THE COURT:  Okay.  So, wait; don't step down yet,

04:17    5  Mr. Holder.  You testified a bit about the DAC.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  All right.  Could you just go through

8  how that DAC and the formula that's used for cost allocation

9  works?  You know I'm a novice at this; I've been spending six

04:17   10  weeks here, but we've heard a lot about DAC and they testified

11  about it.  But if you could, just tell me how it works in this

12  cost allocation issue.

13          THE WITNESS:  Sure.  Deferred acquisition costs, or

14  DAC, arise when there's an origination of insurance policies,

04:18   15  other investment vehicles.  Compensation may be paid, for

16  example, to an agent that placed the policy up front; and yet

17  that compensation is going to benefit the paying company, say

18  AXA, over a relatively long period of time.

19          THE COURT:  I see.

04:18   20          THE WITNESS:  There are a number of actuarial

21  assumptions that go into the period over which, as I

22  understand it at least, DAC gets allocated generally.  And in

23  the questions that were being posed to me, there were a couple

24  of those that are the normal DAC allocation, that is done to

04:18   25  amortize those -- those deferred acquisition costs that will

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    appear on a balance sheet, over a period of time.

2              THE COURT:  A period of years.

3              THE WITNESS:  There is a management function that

4    frequently requires actuarial evaluation, and it doesn't

04:19    5    necessarily require entry into the -- to the accounting

6    records, but there's also a number of calculations that will

7    update the actuarial assumption from time to time.  As I

8    understand it, and there are better people to explain this

9    down at this level than me I think from the company, but

04:19   10    essentially, those actuarial adjustments are not considered

11    part of the day-to-day business of AXA; they're not the kinds

12    of transactions like paying someone a salary to render

13    services, whether that's one of these 50 people or whether

14    it's someone in data processing or in shareholder -- you know,

04:20   15    the amortization of DAC that is calculated does become part of

16    that expense stream.

17              The actuarial valuations that occur is this large

18    674 million that is excluded = from the recurring operating

19    expenses, the business based expenses of AXA, as I understand

04:20   20    it, your Honor.

21              THE COURT:  All right.  So when you're doing this

22    cost allocation, how does this impact how it affects the

23    Board?  Is that too --

24              THE WITNESS:  No, sir, I certainly --

04:20   25              THE COURT:  Do you understand what I'm trying to get

*4038*

Holder - Cross - Stevens

1    to?

2                THE WITNESS:  No, your Honor --

3                THE COURT:  I was trying to figure out if the Board

4    members are sitting there, and they're confronted with this

04:20    5    cost allocation theory, and they're looking at this DAC, what

6    impact does the DAC have on the cost allocations?  And I guess

7    what happens with the -- they're watchdogs for investors; so

8    what happens to the investor?

9                THE WITNESS:  I would hesitate to -- and I would not

04:21    10   try to speak as to what goes on in their minds and so on.  I

11   can speak to the information that's presented to them, and

12   certainly Board members, you know, have an obligation to probe

13   and raise questions in my own view at least, when they're

14   hearing information, when they're receiving information,

04:21    15   having said all of that the information shows that DAC

16   adjustment, it shows it being removed from the daily operating

17   expenses; that DAC adjustment could go the other way.  It

18   could reduce expenses, as well as increase expenses through

19   its presence.

04:22    20              And so when you remove its effects that could

21   cause the -- well, it wouldn't cause it without taking great

22   exception to that, but the costs that remain to be allocated

23   could be greater or less than the costs to be allocated with

24   that DAC actuarial adjustment in it.  But the primary reason

04:22    25   it's excluded is it's a valuation, not part of the

*United States District Court*
*Trenton, New Jersey*

Holder - Cross - Stevens

1    amortization of the costs that in fact were paid, and that are

2    being charged over a period of time.

3           THE COURT:  All right.  So they're deleting the DAC

4    from the cost allocation that -- of the expenses that are

04:22    5    borne by the investors?

6           THE WITNESS:  They are -- they are eliminating this

7    actuarial DAC adjustment, but not the DAC amortization.

8           THE COURT:  The adjustment.  So that's the one that

9    doesn't happen in the ordinary course of day-to-day --

04:23    10          THE WITNESS:  That is my understanding yes, your

11   Honor.

12          THE COURT:  Okay, thank you.  So, you know, we're

13   here looking at this -- the plaintiffs have this suit, that

14   the Board of the funds has breached a fiduciary duty to their

04:23    15   investors because they've allowed these expenses.  And I'm

16   oversimplifying this, but they've allowed these expenses of

17   FMG that are beyond reasonable.

18          So, from looking at the documents in this case, do

19   you think that the Board has been presented with the

04:23    20   appropriate types of documents necessary to evaluate those

21   expenses?

22          THE WITNESS:  Obviously this Board, like any board,

23   is dependent upon the information that flows from management.

24   They will take comfort from the audit opinion expressed by the

04:24    25   internal -- by the external independent auditor on its

United States District Court
Trenton, New Jersey

4040

Holder - Cross - Stevens

1   financial statements; they will take comfort from reports they

2   received from internal audit.

3        This process of allocation that has occurred I

4   think, it seems to me it was explained to the Board members in

04:24   5   a way that was lucid and sufficiently informative to allow a

6   Board member to raise questions if they didn't understand some

7   of the things being presented in these documents that weren't

8   clear to them.

9        THE COURT:  So, the entire case comes -- well, I

04:24   10   shouldn't say the entire case.  But what always happens is we

11   get back down to the basis points and the fees that are

12   charged.  So, we're always trying to get back to well, are the

13   basis points for the fee charged within this reasonableness

14   factor as to what other funds, not controlled by FMG, are

04:25   15   doing and things -- what the other people in the industry are

16   doing.  And do you think the information the Board had shows

17   that type of differentiation well enough?  If you know.

18        THE WITNESS:  I don't know what information might

19   have gone to the Board about other companies in the industry,

04:25   20   and, you know, the competitive pressures under which AXA might

21   be operating to price its products in a way that, you know,

22   would be attractive to investors.  So I'm -- I'm unaware of

23   that.

24        I do think that the Board would have become aware of

04:26   25   the total costs incurred by AXA, and that would have been

Holder - Cross - Stevens

1    considered reasonable -- reasonably considered.  It would have

2    been reasonable to consider those costs reliable; I think

3    there is the disclosure of the DAC exclusion; I -- I think the

4    cost allocation process based on these documents was explained

5    in sufficient detail, that someone could comprehend what was

6    going on.

7              THE COURT:  All right.

8              THE WITNESS:  I hesitate to go further.

9              THE COURT:  No, that's fine.  I had one more

10   question.  So, from your review of the industry -- and I

11   suppose what we're talking about AXA type of companies, and

12   these variable annuities that they have and things of that

13   nature; so, do you think that competitors of FMG or AXA let's

14   say, that they would have the same type of profitability

15   calculations that were being used in this case?  You know,

16   like the DAC, for instance, do you think they all have this

17   DAC issue?

18             THE WITNESS:  They probably all have the DAC issue,

19   because that's just part of the process, it's part of the

20   actuarial work that is necessary, all the way down to pricing

21   products.  How they treat it, how they assess profitability,

22   your Honor, I -- I don't have that general knowledge.  I feel

23   obviously rather strongly about if these costs are

24   appropriately allocated, the manner in which they're presented

25   as an expense rather than a reduction of revenue, makes --

James - Direct - Hood

1    makes sense.  It's entirely appropriate.

2              THE COURT:  All right, thank you.  You may step

3    down.

4              (Witness excused.)

04:28    5              THE COURT:  Next witness?

6              MR. MURPHY:  Your Honor, I believe Ms. Hood will

7    introduce herself.  I believe we're going to call our next

8    expert, Mr. Chris James to the stand.

9              (CHRISTOPHER M. JAMES, Ph.D.), affirmed.

04:29    10              THE COURT:  Could you just spell your last name once

11    you're seated?

12              THE WITNESS:  My Last name is spelled J-a-m-e-s,

13    first name Christopher.

14              THE COURT:  Thank you.

04:30    15              MS. HOOD:  Your Honor, before I begin, since this is

16    my first appearance in this trial, I'd just like to introduce

17    myself; I'm Andrea Hood with the Milbank firm on behalf

18    defendants.

19              THE COURT:  Good afternoon, Ms. Hood.

04:30    20              MS. HOOD:  Thank you.  May I?

21              THE COURT:  You may.  Please start.

22              MS. HOOD: Thank you.

23    (DIRECT EXAMINATION OF CHRISTOPHER M. JAMES, Ph.D. BY MS.

24    HOOD:)

04:30    25    Q.   Dr. James, what is your current occupation?

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1    A.   I'm a professor of finance, I have two appointments

2    currently, one at Cambridge University in the UK, and the

3    other at the University of Florida, where I'm the William H.

4    Dial Eminent Scholar in Finance.

04:30   5    Q.   And how long have you held your position at the

6    University of Florida?

7    A.   My daughter's 26; so 26 years.

8    Q.   And how about at the University of Cambridge?

9    A.   I've been there since the fall, last fall.

04:31   10   Q.   Dr. James, can you please tell the Court about your

11   educational background beginning with college?

12   A.   Sure.  I have an undergraduate degree in economics and

13   mathematics, Master's in business administration and finance,

14   and a PhD in economics, specializing in industrial

04:31   15   organization, finance, and applied statistical analysis.

16   Q.   And from what academic institution did you receive your

17   BA?

18   A.   From Michigan State University.

19   Q.   And your MBA?

04:31   20   A.   From the University of Michigan.

21   Q.   And your PhD?

22   A.   Another Michigan institution, University of Michigan.

23   Q.   And when did you receive your PhD in economics?

24   A.   I received my PhD in 1978.

04:31   25   Q.   Since receiving your PhD in 1978, have all of your

4044

James - Direct - Hood

1    employment positions been in the area of economics?

2    A.   Finance and economics, yes.  Primarily in the area of

3    finance as it applies to financial institutions such as banks,

4    mutual funds, insurance companies, that type of thing.

04:32    5    Q.   And have you ever been involved in government service?

6    A.   I have, I've had several stints with the government, I

7    can do it in reverse chronological order if you'd like.  From

8    2008 to 2014 I was a scholar at the San Francisco Federal

9    Reserve Bank, advising the President on issues regarding

04:32    10    primarily capital management at banks, under the regulatory

11    purview of the San Francisco Fed, as well as some issues

12    arising from the financial crisis.

13        Prior to that I held appointments at the Federal

14    Reserve Bank Board of Governors.

04:33    15        MR. MURPHY:  I'm just go to move your mic a little.

16    A.   Okay.  I have held several appointments at the Federal

17    Reserve Bank -- Federal Reserve Board of Governors as a

18    consultant on issues regarding regulatory policy.  Prior to

19    that at the FDIC, Federal Deposit Insurance Corporation,

04:33    20    again, as a consultant; and then at the U.S. Department of

21    Treasury as a senior economic advisor to the Comptroller of

22    the Currency, advising the comptroller on economic matters

23    that arose in the regulation and examination and oversight of

24    commercial banks and financial institutions.

04:33    25        I've also held what I'll call a quasi government

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

04:34

04:34

04:35

04:35

04:35

1  position; I was appointed and approved by the SEC as an

2  independent distribution consultant for the Janus Funds to

3  administer a fair fund settlement over a period of about four

4  years.  Janus Funds are mutual funds that were subject to a

5  regulatory settlement, and my job was to determine the

6  appropriateness of various allocation schemes, and to if

7  disagreements arose between the Janus Funds and the SEC as to

8  the appropriateness of a particular allocation, that I was the

9  arbitrator.

10      In addition I've worked as a consultant for -- at the

11  Office of the Chief Economist at the SEC, on issues regarding

12  mutual fund pricing and performance issues.

13  Q.  Okay, thank you.  And I just want to break that down a

14  little bit and see if we can provide the Court with a little

15  more detail regarding what your responsibilities were in each

16  of those government service capacities.

17  A.  Sure.

18  Q.  So, with respect to your -- before I get to that, all of

19  these positions that you've just described that you've held in

20  government service capacity, they've all been in the capacity

21  of a financial economist?

22  A.  Yes.

23  Q.  You mentioned that you've held a role with the Department

24  of Treasury; can you provide any detail as to -- any

25  additional detail as to what your responsibilities were there?

*United States District Court*
*Trenton, New Jersey*

4046

James - Direct - Hood

1    A.   Sure.   The Comptroller of the Currency is the primary

2    regulator of national banks, and as a senior advisor to the

3    comptroller I would advise -- it was John Heimann at the time;

4    on issues regarding either regulatory developments or

04:36    5    proposals, examination practices as it pertains to banks.  So,

6    for example, when I was at the comptroller's office, one of

7    the issues was the extent to which it might be appropriate to

8    have commercial banks through their holding company serve as

9    asset management firms, broadening the bank product offerings.

04:36    10    And so we looked very carefully at, for example, what

11    implications those types of activities would have for the

12    safety and soundness of the banks that we regulated, what

13    issues arose with respect to the risks that the bank would be

14    subject to; if they engaged in asset management, and as well

04:37    15    as potential synergies with other services or activities that

16    the bank engaged in.

17    Q.   And I believe I just heard you refer to asset management

18    firms; when you referred to asset management firms is that

19    term synonymous with an investment manager like FMG?

04:37    20    A.   Yes.  So, the issue is really should banks be able to

21    provide mutual fund products to their customers, and serve as

22    an investment manager and administrator for those products.

23    Q.   And you just went through some of your responsibilities

24    in your role as a scholar and consultant at the Federal

04:37    25    Reserve Bank in San Francisco?

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1    A.    Right.

2    Q.    With respect to that role, can you provide anymore detail

3    about your responsibilities there that perhaps would be

4    relevant in this case?

04:38    5    A.    Sure.  The banks and holding companies are regulated in

6    part based on the amount of capital that they have.  The idea

7    is to have capital sufficient to cover potential losses

8    arising from say operational issues or increased losses and

9    the like.  And I've been part of a team that has evaluated the

04:38    10    adequacy of both the risk management systems, as well as the

11    capital of major banks within the regulatory purview of the

12    San Francisco Federal Reserve.

13        And that would include looking at risk management

14    issues as it pertains both to the bank itself, as well as in a

04:38    15    holding company context subsidiaries that, for example, a bank

16    like Wells Fargo offers mutual funds, and serves as an

17    investment manager for some of its funds, and then sub-advises

18    out of those funds.

19    Q.    And in that capacity in looking at the risks that an

04:39    20    investment manager that's housed within a bank might face,

21    what types of risks do you look at?

22    A.    We typically look at -- it goes by various terms,

23    sometimes it's referred to as operational risk, sometimes it's

24    referred to as business risk, under the risk-based capital

04:39    25    standards that are applied to banks we call it operational

*United States District Court*
*Trenton, New Jersey*

4048

James - Direct - Hood

1    risk; so those are things such as risks arising from

2    operational failures or mistakes.  Certainly reputational

3    risks that arise from either those operational mistakes or

4    poor product performance.

04:39    5        In addition, regulatory and litigation related risks

6    that may impose losses on the bank.  As well as, you know,

7    risk in terms of the operation of the businesses to the extent

8    that you say you have a large decline in the volume of

9    business, what implication would that have in terms of the

04:40    10   company's ability to earn a profit.

11   Q.   And can you describe for the Court how it came about that

12   you came became involved in analyzing these types of risks

13   while you were at the Federal Reserve?

14   A.   Sure.  That's part and parcel of what I do as a financial

04:40    15   economist and what I teach my students when I teach financial

16   institutions management courses.  With respect to operational

17   risks, I was a part of a major project that was undertaken at

18   the Bank of America to assess operational risks in primarily

19   it's non-bank activities, so it's in trust activities, for

04:41    20   example, and other non-bank related activities.

21        I wrote a paper that's been widely cited on how you go

22   about measuring operational risks, and how they should be

23   considered in terms of evaluating say the profitability of a

24   financial institution.  And it was through that work that, you

04:41    25   know, I did a number of presentations, some at the Federal

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1   Reserve, and one thing led to another and I've been doing it

2   ever since.

3   Q.   You also mentioned that you've in I believe two stints

4   have held consulting positions with the Office of the Chief

04:41   5   Economist at the SEC?

6   A.   Yes, I was brought in on a couple of occasions to address

7   certain issues that the chief economist, who's the -- as the

8   name suggests, the chief advisor to the commission on economic

9   management.  One had to do with issues called soft dollar

04:42   10   brokerage, the payment for research services, by mutual funds

11   and their advisors.

12       The second was to do with issues concerning pricing of

13   mutual fund underlying portfolios, to ensure that the net

14   asset value, which is what's posted at the end of each day

04:42   15   where you buy and sell a mutual fund at, is not stale, meaning

16   it reflects accurately the value of the underlying portfolio

17   of a mutual fund.

18   Q.   And you also mentioned that you served as the independent

19   distribution consultant for the Janus Funds; what was the time

04:43   20   period where you've held that position?

21   A.   2003 to 2006 I believe.

22   Q.   And can you provide a little more detail on what your

23   responsibilities were as the independent distribution

24   consultant for the Janus Funds?

04:43   25   A.   Yes.  I was approved by the SEC to manage what's called a

James - Direct - Hood

1    fair fund settlement, which was a hundred million dollar

2    settlement that Janus entered into with the SEC pertaining to

3    damages that arose from allowing what are called market timers

4    to come into the fund and trade in and out of the various

04:43    5    mutual funds.  And both to assess the damage that was caused

6    by that, to allocate it to fund holders, in a way that was

7    reasonably related to the harm that was caused by having this

8    rapid trading in and out of mutual funds by certain large

9    investors.

04:44    10    Q.   And moving away from your roles in government service,

11    and without revealing any confidential information, have you

12    done any -- have you ever been hired by investment managers to

13    perform any consulting work?

14    A.   I have, I've been hired by several complexes to address

04:44    15    issues concerning certainly pricing issues, meaning fee

16    related issues; and risk assessment issues, in other words,

17    assessing risk exposure at various of the complexes; as well

18    as working on some product development issues.

19    Q.   Did any of your consulting work involve in any way

04:45    20    economies of scale?

21    A.   Oh, sure.  When -- when looking at and examining some of

22    the fee structures at the various complexes that I've been

23    employed at to look at issues regarding, for example,

24    profitability, the cost structure, how cost structures might

04:45    25    change as the scale of operation changes.

*United States District Court*
*Trenton, New Jersey*

*4051*

James - Direct - Hood

1  Q.   And prior to your current academic positions at the

2  University of Florida and the University of Cambridge, have

3  you held academic positions at any other universities?

4  A.   I have, I've taught at -- in terms of full-time at other

04:45   5  institutions, such as the University of New South Wales, the

6  University of Oregon, and the University of Michigan.

7  Q.   And have all those positions been as a professor of

8  economics or finance?

9  A.   They have been.

04:46   10  Q.   And you've taught courses in those positions?

11  A.   I've taught courses, my coursework focuses primarily on a

12  couple of issues; generally corporate finance, so

13  corporation's finance and sales.  I tell a teach a course in

14  financial institutions, which is the economics and management

04:46   15  of financial institutions, such as banks, mutual funds,

16  insurance companies, hedge funds, private equity funds; and I

17  teach a course in what's called organizations in markets,

18  which is a course that is really targeted towards Master's and

19  business administration students on industrial organization;

04:46   20  what factors determine an organization size, the extent to

21  which it out-sources versus in-source, that type of thing.

22  Q.   And the courses you've taught, at what levels have they

23  been at?

24  A.   For the last 24 years it's been graduate students, either

04:47   25  Master's or PhD level.  I've taught early in my career

James - Direct - Hood

1   undergraduates, but I haven't done that in a while.

2   Q.   And have you authored any articles as an economist?

3   A.   Yes, I am actively engaged in research; I think I've

4   published in my career in terms of peer-reviewed scholarly

04:47   5   journals maybe over 50, and in other publications another 50.

6   Q.   And without going through every publication, can you give

7   the Court a sense of what subject matters your publications

8   have addressed?

9   A.   They focused primarily again on financial institutions;

04:48   10   some issues -- papers on that address issues in banking;

11   papers that address issues in terms of risk management; papers

12   that address issues in terms of mutual fund performance

13   evaluation, and structure; so it's across a wide range of

14   areas.

04:48   15   Q.   Dr. James, do you hold any -- do you serve on any

16   editorial boards?

17   A.   I do.  I currently serve I believe on five boards, and

18   have served on pretty much have every -- each one of the top

19   tiered journals in my field, as either an associate editor, or

04:48   20   as the editor.

21   Q.   And what are some of those journals?

22   A.   The Journal of Finance; the Journal of Financial

23   Economics; the Journal of Financial and Quantitative Analysis;

24   the Journal of Financial Services Research; the Journal of

04:49   25   Financial Mediation, which is a journal targeted towards

James - Direct - Hood

1    issues regarding financial institutions; the Journal of

2    Economics and Decision Science; there's a couple others, but

3    that's what comes to mind as I sit here.

4    Q.   And what are your responsibilities on these editorial

5    boards?

6    A.   The editorial board serves as a -- really a gatekeeper,

7    with the editor or associate editor typically makes a decision

8    as to who will review a paper, and then ultimately the

9    decision as to whether the publish a paper is made by the

10   editor or one of the associate editors.  And that decision is

11   based on, you know, whether the study advances our knowledge

12   in a particular area in a significant way, and whether the

13   paper employs methodologies that are consistent with the

14   scientific method in my field.

15   Q.   And have any of the proposed articles you've had to deal

16   with as an editor or associate editor on these boards dealt

17   with mutual funds?

18   A.   A number of them have.  Having a specialization in

19   financial institutions, when I'm on the board I get most of

20   the papers that deal with financial institutions.  So, when I

21   was associate editor at the Journal of Finance, I'd get maybe

22   25 manuscripts on issues regarding mutual funds in a one or

23   two year time period.  Similarly, with the Journal of

24   Financial Economics, most of the papers that I either referee

25   myself or advise on publication are papers in the financial

04:49

04:49

04:50

04:50

04:51

4054

James - Direct - Hood

1    institutions area.

2    Q.   Dr. James, have you ever been permitted to testify as an

3    expert witness at trial?

4    A.   I have.

04:51   5    Q.   And approximately how many times?

6    A.   I've been -- I've been in the profession a long time;

7    about 25 times.

8    Q.   And by what tribunals have you been permitted to testify?

9    A.   Certainly in federal courts, state court, SEC

04:51   10   proceedings; that's what comes to mind.

11   Q.   And has that all been as an economist?

12   A.   Yes.

13   Q.   So recognizing that we've probably gone through some of

14   this already in going through your prior experience and

04:52   15   positions that you've held, can you describe for the Court

16   what, if any, experience you have relating to economies of

17   scale?

18   A.   Oh, well, my -- that begins back when I was a PhD student

19   at the University of Michigan, my field was industrial

04:52   20   organization; one of the first papers I did in order to

21   advance to candidacy was on economies of scale, measurement,

22   both in terms of analysis statistical analysis of the

23   relationship between scale of operation and costs, as well as

24   applying what was called a survivor technique to look at,

04:52   25   where whether within a particular industry's firm's clustered

James - Direct - Hood

1  at a particular size, that would suggest that that's the size

2  in which most economies of scale are realized; or the size

3  distribution of firms distributed along a wide range

4  suggesting that there's really no significant economies of

04:53  5  scale, because you have small firms in the industry and big

6  firms in the industry and they compete with one another and

7  survive.

8  Q.   And are there any other -- is there any experience you've

9  had that's related to economies of scale?

04:53  10  A.   I certainly looked at those issues as I mentioned in a

11  consulting context, and those were issues, you know, that we

12  looked at quite carefully when I was at the comptroller's

13  office and in other work I've a done at the government

14  agencies.

04:53  15  Q.   And somewhat relatedly, what if any experience do you

16  have relating to the extent to which economies of scale can --

17  in the investment management context, can be shared with fund

18  investors through breakpoints in the fund's fee schedules?

19  A.   That's something I've certainly looked at in this case,

04:54  20  and I've looked at both in other cases as well as in a

21  consulting role.

22  Q.   And again, without revealing any confidential

23  information, can you generally describe how that analysis of

24  breakpoints as they relate to economies of scale would work?

04:54  25  A.   Sure.  The economies of scale, so we're clear, refer to

James - Direct - Hood

1    how total unit costs change as the volume of a particular

2    product increases; so as scale of operation increases, what

3    happens to total unit costs.  And we say that there are

4    economies of scale if you observe declines in total unit cost

04:55    5    as a scale of operation increases.

6         And often times you'll find situations in which either

7    there are economies of scale in a particular range of

8    operation, or scale of operation, and then diseconomies of

9    scale, meaning unit costs are actually increasing as the scale

04:55    10   of operation increases.

11        So, it's really about looking at, to the extent that's

12   possible, of looking at unit costs.  You get some insights

13   into the existence of economies of scale by looking at the

14   structure of an industry, so if you see lots of firms within

04:55    15   an industry with varying size ranges, and you see a

16   distribution of fees across a variety of size ranges, that's

17   going to give you some indirect evidence of whether or not

18   economies of scale exists.

19   Q.   And as a general matter, again, without revealing any

04:56    20   confidential information from your prior consulting jobs,

21   how -- how in the past have you analyzed how breakpoints fit

22   into what you just described, breakpoints in the fund's fee

23   schedules?

24        MR. A. LAKIND:  Your Honor, I'm sorry to interrupt;

04:56    25   is this beyond the voir dire?  I'm not sure if this is beyond

James - Direct - Hood

1   the voir dire or we kind of morphed into direct --

2          THE COURT:  Ms. Hood hasn't offered the doctor as an

3   expert witness yet, so I thought we're still doing the voir

4   dire.

04:56   5          Is that right, Ms. Hood?

6          MS. HOOD:  That's correct, your Honor.

7          MR. A. LAKIND:  Okay.

8          THE WITNESS:  Well, typically when you're looking at

9   breakpoints you're looking at what happens to the total fee

04:56   10  paid by a fund holder, as the size of the fund or assets under

11  management increases.  And one can compute what savings arise

12  from a breakpoint by looking at what the fees would be if

13  there wasn't a breakpoint, and comparing them to what the fees

14  are with a breakpoint, and that difference is an economy

04:57   15  arising from the breakpoint.

16  BY MS. HOOD:

17  Q.   And these are analyses that you performed in the past?

18  A.   Yes.

19  Q.   Okay.  Again, we may have covered some of this through

04:57   20  your prior experience, but could you describe for the Court

21  what your experience is as it pertains to mutual fund fees?

22  A.   Well, as I indicated it's something that I've done my own

23  research on, I've refereed and edited papers on those issues;

24  I've a worked as a consultant to various mutual fund complexes

04:58   25  on those issues; and as I mentioned, I've been a consultant to

James - Direct - Hood

1   the chief economist of the SEC on those issues.

2   Q.   And with respect to the risks that investment manager

3   managers like FMG may face, what, if anything, is your

4   experience in that area?

5   A.   Well, most recently looking at various entities that

6   are -- that come under the purview of the San Francisco Fed in

7   terms of analyzing their overall risk exposure on a variety of

8   dimensions, including operational risks as they pertain to

9   both their banking activities, as well as their non-banking

10  activities.

11        MS. HOOD:  Your Honor, defendants at this time offer

12  Dr. James as an expert in economics, and submit that he is

13  qualified by reason of his experience and training and

14  specialized knowledge to offer opinions in this case in --

15  with respect to four main areas:  Whether plaintiffs' experts

16  have demonstrated that FMG realizes any economies of scale

17  with respect to the funds at issue; secondly, the extent to

18  which any such economies of scale have been shared by FMG with

19  fund investors through breakpoints in the fund's fee

20  schedules; third, the level of the fund's fees, the fees for

21  the funds at issue and how they compare to fees charged to

22  other mutual funds in the marketplace; and finally, the risks

23  that FMG as an investment manager faces with respect to

24  servicing the funds.

25        THE COURT:  All right, thank you.

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1          Any objections, Mr. Lakind?

2          MR. A. LAKIND:  Yes, your Honor, might I voir dire

3    the witness?

4          THE COURT:  You may voir dire the witness.

04:59    5          So, it's 3:52.

6    (VOIR DIRE ON QUALIFICATIONS BY MR. A. LAKIND:)

7    Q.  Good afternoon, Mr. James.

8    A.  Good afternoon.

9          MR. A. LAKIND:  May I proceed, your Honor?

05:00   10          THE COURT:  You may.

11   Q.  Mr. James, other than in this case, you have never been

12   called upon to assess the types of risks confronted by

13   investment managers in the mutual fund industry; is that

14   correct?

05:00   15   A.  No, that's not correct.

16   Q.  Other than this case, have you ever been called upon as

17   an expert witness to assess whether -- strike that.  You're

18   not offered in that area; I'm sorry.

19          Have you ever been retained to do any work in

05:00   20   connection with a sub-advised mutual fund?

21   A.  Have I ever been retained to do any work with respect to

22   a sub-advised mutual fund?

23   Q.  Yes, sir.

24   A.  Yes.

05:00   25   Q.  And what was that work?

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1    A.    In terms of the consulting work that I did on a couple of

2    complexes looking at various fee structures as it pertains to

3    both their advisory role and the sub-advisors that they

4    retained.

05:01    5    Q.    Have you had occasion to author any publications dealing

6    with sub-advised mutual funds?

7    A.    No.

8    Q.    Have you ever testified in a case in connection with a

9    sub-advised mutual fund?

05:01    10    A.    I have not.

11    Q.    Have you ever been -- strike that.

12          Have you ever been called upon to assess the

13    relationship between the fees and services provided by a fund

14    advisor in comparison to the fees and services provided by a

05:01    15    sub-advisor?

16    A.    Just for point of clarification, when you say called

17    upon, do you mean as an expert witness?

18    Q.    Yes, sir, as an expert witness.

19    A.    Yes, I've done those in consulting activities; I haven't

05:01    20    testified in court as an expert witness on that issue.

21    Q.    Have you ever been called upon to assess whether

22    economies of scale exist in connection with the management of

23    a sub-advised mutual fund?

24    A.    Again, I've not testified in court on that issue; I

05:02    25    certainly examined that issue in other cases.

James - Direct - Hood

1    Q.    In how many occasions?

2    A.    Two or three as I recall.

3    Q.    And for what purpose?

4    A.    It was in the context of -- when you say called upon, in

05:02    5    the context of serving as an expert witness.

6    Q.    Have you ever had occasion to author any publications

7    dealing with variable annuities?

8    A.    No.

9    Q.    Have you ever had occasion the testify as an expert in

05:02    10    connection with variable annuities?

11    A.    I'm sorry?

12    Q.    Have you ever had occasion to testify as an expert in a

13    case involving variable annuities?

14    A.    I don't believe so.

05:02    15    Q.    Now, you have also been an expert in bankruptcy cases; is

16    that correct?

17    A.    That's correct.

18    Q.    And you've been an expert in real estate matters; is that

19    correct?

05:02    20    A.    That's correct.

21    Q.    And in consumer fraud matters?

22    A.    That's correct.

23    Q.    You've been an expert in product liability matters?

24    A.    That's correct.

05:03    25    Q.    And you've been an expert in pharmaceutical matters?

James - Direct - Hood

1   A.   I have.

2   Q.   And you've testified as an expert in healthcare matters?

3   A.   That's correct.

4   Q.   And you're an employee of Cornerstone, are you not?

05:03   5   A.   I'm an advisor to Cornerstone, I'm not an employee.

6   Q.   In connection with your work in this case, you billed

7   about $200,000; is that correct?

8   A.   I believe at the time of my deposition it was around 200.

9   Q.   And what is it today, do you know?

05:03   10   A.   Maybe another hundred hours, or so.

11   Q.   And your compensation from Cornerstone is about $1.1

12   million annually?

13   A.   That's correct.

14   Q.   And you also have a note where Cornerstone owes you

05:03   15   somewhat over a million dollars; is that correct?

16   A.   That's correct.

17   Q.   And is the payment of that note contingent in any way on

18   the outcome of any expert witness work that you do?

19   A.   No.

05:03   20   Q.   Prior to testifying today -- I'm sorry.  Roughly what

21   percentage of your professional time in the last five years

22   has been devoted to the study of issues relating to investment

23   companies?

24   A.   Percentage of my professional time?

05:04   25   Q.   Yes, sir.

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

          1    A.   10 or 15 percent.

          2    Q.   Last four years have you ever testified in any case

          3    involving mutual fund fees?

          4    A.   Yes.

05:04     5    Q.   And on how many occasions?

          6    A.   I believe on three different occasions.

          7    Q.   Sir, you're familiar with 15(c) material, are you not?

          8    A.   Yes.

          9    Q.   And have you reviewed all of the 15(c) material that's

05:04    10    the subject of this case?

         11    A.   I'm not sure what you mean by all of the 15(c) material;

         12    I've reviewed 15(c) material.

         13    Q.   But you culled the material that you thought was relevant

         14    and clearly did not review everything; is that correct?

05:04    15    A.   I'd have to look at the material to tell you which of it

         16    I looked at and which of it I didn't, but I don't -- I've

         17    reviewed a lot of 15(c) material.

         18    Q.   There's some portion you did not review --

         19    A.   I think that's fair.

05:05    20    Q.   Okay.  Did you review all of the deposition transcripts

         21    in this case in their entirety?

         22    A.   No.

         23    Q.   Did you read all of the Board minutes in this case in its

         24    entirety?

05:05    25    A.   No, I reviewed a number of deposition transcripts and a

*United States District Court*
*Trenton, New Jersey*

4064

James - Direct - Hood

1    number of Board minutes, but I can't say I looked at all of

2    the depositions in their entirety or all of the Board minutes

3    in their entirety.

4    Q.   Now, you do have the ability to quantify the risks which

5    a mutual fund confronts; is that correct?

6    A.   I think that's true, yes.

7    Q.   And have you undertaken to quantify the risks that the

8    mutual funds confront in this case?

9    A.   I haven't been asked to do a quantification; I've

10   identified the nature of the risks, and believe they're

11   significant, but I haven't been asked to quantify those risks.

12   Q.   Have you undertaken to quantify the risks confronted by

13   -- strike that.

14        You do have the ability as well to quantify the risks

15   confronted by an investment manager; is that correct?

16   A.   Yes.

17   Q.   And you have not done that in this case either; is that

18   correct?

19   A.   I haven't been asked to provide a quantification.

20   Q.   To your knowledge is there any peer-reviewed literature

21   that identifies the risks borne by mutual fund advisors?

22   A.   Specifically with respect to mutual fund advisors,

23   nothing comes to mind.  There are publications, I have one of

24   them that's widely cited, that look at business risks for

25   financial institutions generally.  And those same procedures,

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1    be it for a bank or insurance company or asset management

2    firm, I think from an economic perspective are applicable to

3    across those institutions.

4    Q.   Is there any peer-reviewed literature that explains how

05:07    5    the concepts that are relevant to the financial institutions

6    you spoke about are also relevant to the mutual fund industry?

7    A.   Certainly what I've written on, for example, risk

8    adjusted return on capital, is -- is -- applies to mutual fund

9    management, I've applied it to mutual fund management.

05:07   10    Q.   Are there any peer-reviewed studies of how to measure

11    risk in the mutual fund industry?

12    A.   In terms of operational risks?

13    Q.   Yes, sir.

14    A.   Because certainly there are lots of risks, such as market

05:07   15    risks and investment risks that I've refereed and have

16    published articles on measurement of those types of risks.

17    With respect to specific operational risks, I think it's more

18    generic to financial institutions generally.

19    Q.   Your hypothesis that mutual fund -- you have hypothesized

05:08   20    in your report that mutual fund companies confront certain

21    types of risk, operational risks and so on; is that correct?

22    A.   Yes, and I provided evidence of those risks.

23    Q.   Are you aware of any criteria that exists that one could

24    test that hypothesis?

05:08   25    A.   Well, by looking at, for example, costs incurred for a --

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1    quite recently was in the Wall Street Journal, the problems at

2    Third Avenue, an asset management group, in which because of

3    investments and certain illiquid securities, the reputational

4    consequences were I think somewhere in the order of, in terms

05:09    5    of total outflow, three and a half billion or thereabouts.  Is

6    that my recollection?  It was just this January.

7    Q.    I was asking a somewhat different question.  The question

8    I was interested in is, are you aware of any criteria that is

9    available to test the hypothesis that mutual funds confront

05:09    10    operation risks?

11    A.    And I was prescribing how one goes about doing that,

12    okay; by looking -- some of the risks are risks that arise

13    infrequently.  So, for example, the risks that mutual funds

14    faced when there was a large outflow from money market funds

05:09    15    and break-the-buck issues that arose.  So one looks at what

16    the costs that were incurred by those institutions were

17    associated with the manifestation of that risk, to give a

18    sense of the quantification and the magnitude.

19         Certainly, for example, in my report I talk about and

05:10    20    identify through litigation tracker, a variety of settlements

21    in litigation related matters that mutual funds have been

22    subject to, that informs me of the -- both not only the

23    frequency, but the potential magnitude.  Which is a real cost

24    of doing business that needs to be considered.

05:10    25         And there are regulatory standards in the banking

4067

James - Direct - Hood

1    industry and some proposed for investment management, asset

2    management funds, to -- to address those real costs.

3    Q.   Okay.  Thank you, Mr. James.

4         MR. A. LAKIND:  Your Honor, if I might, with regard

05:11  5    to the proffer of the witness, plaintiffs have no objection to

6    the witness' credentials on certainly economies of scale,

7    comparable fees; the description of economics in general, if

8    that's meant to go beyond those, I would hope we can get a

9    somewhat more precise explanation.  If that's meant to be just

05:11  10    what was said after that, certainly we have no objection.

11         We would object to any testimony from this witness

12    on risk for two reasons.  Number one, risk could be

13    quantified, and the witness has not undertaken to quantify the

14    risk.  Whether or not any institution incurs risk is not

05:11  15    really -- would be appear to be a subject of expert testimony.

16         Secondly, the witness was asked if he is aware under

17    -- I didn't cite *Daubert*, but of any criteria that might be

18    used to testify -- excuse me; to test whether a risk exists,

19    and it doesn't appear that there is any such criteria.  So,

05:12  20    specifically we would object to any testimony about risk from

21    this witness.

22         THE COURT:  Risk, okay.

23         Ms. Hood, do you wish to be heard?

24         MS. HOOD:  Yes, please, your Honor.  My

05:12  25    understanding from Mr. Lakind is that the only -- the only

*United States District Court*
*Trenton, New Jersey*

4068

James - Direct - Hood

1   topic of the four topics I went through earlier that

2   plaintiffs have an objection to is Dr. James' testimony or

3   contemplated testimony on risk faced by investment managers.

4   And the basis that Mr. Lakind just gave -- one of the two

05:12   5   bases for why Dr. James should not be qualified in that area

6   is because it's possible to quantify risk, but Dr. James

7   hasn't done that here.

8           Dr. James concedes as he just testified he wasn't

9   asked to quantify it here.  He looked exclusively at the

05:13   10   nature of the risks that an investment manager like FMG faces.

11   And so the fact that he hasn't taken an analysis that -- has

12   not taken that analysis one step further to quantify the risks

13   has nothing to do with his qualifications to offer an opinion

14   on the nature of the risks that FMG faces.

05:13   15           THE COURT:  Does that answer your objection, Mr.

16   Lakind?

17           MR. A. LAKIND:  It does not, your Honor.  Because

18   the second part of the objection dealt with is there criteria

19   available to ascertain whether or not mutual funds sustain

05:13   20   risk, and I believe that is one of the *Daubert* factors.

21           THE COURT:  Okay.

22           MS. HOOD:  May I be heard, your Honor, on that

23   second argument?

24           THE COURT:  You may.

05:13   25           MS. HOOD:  So, Mr. Lakind asked Dr. James twice

*United States District Court*
*Trenton, New Jersey*

4069

James - Direct - Hood

1   about the standards and whether there are any standards that

2   could be applied to analyze the risks in this context, and he

3   gave an explanation that there are standards out there,

4   standards that he would uses as an economist.  And so again

05:14   5   this isn't a basis for disqualifying Dr. James with respect to

6   this issue.

7           THE COURT:  All right.  So my view of it is that

8   I've listened to Dr. James' credentials.  He's a professor at

9   two universities, University of Michigan and -- I'm sorry; the

05:14   10   Universities of Cambridge and Florida; he's also taught at

11   other colleges, like Michigan State and University of

12   Michigan; he's been a consultant for some type of settlement

13   between the Janus Fund that he oversaw, and he reviewed

14   different issues concerning what the Securities and Exchange

05:14   15   Commission may see as a legitimate basis for allocation of

16   settlement proceeds, as opposed to what Janus may think.

17           He's also been selected to work with the chief of

18   economics I believe of the Securities and Exchange Commission;

19   he worked on the pricing of mutual funds; he worked on

05:15   20   economies of scale as a consultant to certain mutual funds;

21   he's also indicated some information with regard to how you go

22   about in analyzing economies of scale; and then there was some

23   discussion with regard to risks.

24           But, at any rate, my view is in looking at the Rule

05:15   25   703:  A witness who is qualified as an expert by knowledge,

*United States District Court*
*Trenton, New Jersey*

James - Direct - Hood

1    skill, experience, training or education may testify in the

2    form of opinion or otherwise, if, the expert's scientific,

3    technical or specialized knowledge will help the trier of

4    fact; Mr. James has met that factor.

05:16    5        The testimony is based on sufficient facts or data;

6    it appears to me that Mr. James has a substantial amount of

7    facts and data from all his years of being on these editorial

8    boards of economic magazines and journals; he's also been with

9    the SEC -- I shouldn't say been with; but has been retained by

05:16   10    them on mutual fund matters.  He's also been with the Federal

11    Reserve in San Francisco, and he seems to have reviewed such

12    matters there.  So, based on that, there seems to be

13    sufficient facts.

14        I also think that based on what I've heard, the

05:16   15    testimony will be the product of reliable principles and

16    methods; which he has indicated that most of his research has

17    been about how go about testing for this or how you analyze

18    that.  So, I'm certain he will present those reliable

19    principles.

05:17   20        And lastly, the issue comes down to risk.  And it

21    seems to me with the risk and the nature of those risks as

22    opposed to the quantity of those risks, would be something he

23    would have learned from his prior expertise, so I'll allow

24    that.

05:17   25        And then lastly, although we didn't really go over

1    it too much, the expert must reliably apply the principles and

2    methods to the facts of the case, which I'm certain is going

3    to be -- or hopefully will be his testimony today.  So, based

4    on those four factors, I'll allow the testimony, and Mr. James

05:18    5    is qualified to be an expert.

6         MS. HOOD:  Thank you, your Honor.  And before I

7    proceed, I just note that it looks as if we're about 10

8    minutes passed 4:00 right now, and I'm happy to continue if

9    that's your preference.

05:18    10        THE COURT:  That's a good point; why don't we break

11   for the day, and we'll restart tomorrow at 10:30.

12        So, let me just go over the time for today.  So, Ms.

13   Hood, you had your voir dire from 3:22 the 3:52, so you had a

14   half hour.  And Mr. Lakind, you went from 3:52 to 4:05, which

05:18    15   is 13 minutes.  I think we're gearing for an and a half hour

16   per witness; isn't that right, Mr. --

17        MR. MURPHY:  Something like that.  There may be a

18   little fluidity there, but I think if we keep it as 50/50

19   we're still on target to finish Thursday afternoon.

05:19    20        THE COURT:  All right, thank you.

21        So, you may step down, Mr. James, we'll see you in

22   the morning.

23        THE COURT:  Have a good evening.

24        (Counsel say thank you.)

05:19    25        (Proceedings concluded for the day.)

## $

**$14** [3] - 3960:11, 3960:13, 3960:19
**$200,000** [3] - 3941:22, 3942:1, 4062:7
**$32** [1] - 3929:18
**$40** [2] - 3929:17, 3929:23
**$49** [2] - 4035:5, 4035:12
**$50** [2] - 3959:1, 3960:17
**$674** [3] - 4022:9, 4022:12, 4022:17
**$750** [1] - 3975:20

## '

**'30** [1] - 3914:12
**'70s** [3] - 3966:2, 3966:5, 3966:8
**'80s** [2] - 3909:20, 3921:2
**'87** [3] - 3913:14, 3966:10, 3971:12
**'90** [3] - 3913:14, 3966:10, 3971:12

## /

**/S** [1] - 3905:24

## 0

**08608** [1] - 3905:15

## 1

**1** [2] - 3960:24, 3986:24
**1.1** [1] - 4062:11
**1.6** [1] - 4021:7
**1.615** [6] - 4018:14, 4018:17, 4021:6, 4023:25, 4024:17, 4026:7
**1.615.3** [1] - 4021:10
**1.65** [1] - 4024:3
**10** [6] - 3915:11, 3915:13, 3965:4, 3965:8, 4063:1, 4071:7
**10,000** [3] - 3941:23, 3942:2

**10:30** [1] - 4071:11
**10:50** [1] - 3998:16
**11** [2] - 3985:2, 3986:25
**11-4194** [1] - 3905:5
**12** [2] - 4033:13, 4033:16
**12:27** [1] - 3998:16
**12:38** [1] - 3998:18
**13** [1] - 4071:15
**13-312** [1] - 3905:10
**1310** [1] - 3931:4
**1329** [2] - 3955:10, 4011:9
**13th** [1] - 3955:16
**14** [2] - 3962:7, 3962:15
**14.4** [6] - 4016:15, 4016:19, 4018:21, 4019:16, 4021:6, 4021:10
**15** [8] - 3996:25, 4001:17, 4007:1, 4017:9, 4018:17, 4018:20, 4025:16, 4063:1
**15(c** [5] - 4063:7, 4063:9, 4063:11, 4063:12, 4063:17
**1510** [6] - 3907:9, 3930:5, 3931:4, 3931:21, 3931:25, 4026:20
**157** [1] - 3997:3
**160** [2] - 3969:11, 3970:8
**19** [1] - 3969:20
**190,000** [1] - 3941:25
**1940** [2] - 4032:15, 4033:20
**1969** [1] - 3909:4
**1970** [2] - 3972:23, 4003:19
**1972** [1] - 3909:5
**1974** [2] - 3909:5, 3909:7
**1975** [2] - 3972:23, 4003:19
**1978** [2] - 4043:24, 4043:25
**1979** [1] - 3909:14
**1999** [1] - 3926:9
**19th** [2] - 3926:9, 3970:5
**1:22** [1] - 3998:18
**1st** [3] - 3989:5, 3989:14, 3990:7

## 2

**2** [11] - 3930:4, 3933:2, 3933:5, 3957:1, 3991:8, 3991:11, 3998:11, 4001:5, 4011:14, 4012:12, 4013:10
**2.275** [6] - 4009:1, 4021:3, 4021:13, 4026:9, 4026:13, 4026:16
**200** [1] - 4062:8
**2000** [1] - 3913:18
**2002** [1] - 3920:9
**2003** [1] - 4049:21
**2006** [1] - 4049:21
**2008** [1] - 4044:8
**2009** [2] - 3927:15, 3927:22
**2010** [1] - 3913:19
**2012** [10] - 3960:10, 3962:15, 4009:2, 4017:21, 4018:12, 4022:6, 4023:17, 4025:8, 4025:12, 4028:24
**2014** [17] - 3969:20, 3970:5, 3977:6, 3977:10, 3986:3, 3986:13, 3986:16, 3987:16, 3988:17, 3990:7, 3990:15, 3990:17, 3990:20, 3991:3, 3991:6, 4027:18, 4044:8
**2016** [1] - 3905:14
**2050** [2] - 3950:20, 4007:4
**2053** [2] - 3931:19, 3932:3, 4030:3
**21** [2] - 4015:16, 4015:18
**23** [2] - 3905:13, 3905:20
**24** [1] - 4051:24
**25** [8] - 3985:5, 3985:7, 3985:17, 3986:16, 3987:1, 3987:21, 4053:22, 4054:7
**26** [1] - 4043:7
**273** [1] - 3959:6
**28** [1] - 3905:23
**2:00** [1] - 3999:3

## 3

**3** [8] - 3930:6, 3930:18, 3970:9, 3970:11, 4029:12, 4029:24, 4030:25, 4031:2
**34** [1] - 4015:21
**3908** [2] - 3907:2, 3907:2
**3931** [1] - 3907:9
**3965** [1] - 3907:3
**3992** [1] - 3907:10
**3:22** [1] - 4071:13
**3:52** [3] - 4059:5, 4071:13, 4071:14

## 4

**4** [14] - 3931:3, 4014:22, 4015:1, 4015:3, 4016:3, 4016:4, 4016:11, 4025:2, 4025:10, 4029:20, 4030:25, 4031:1, 4031:2, 4031:4
**40** [2] - 3929:24, 3998:17
**402** [1] - 3905:14
**4034** [1] - 3907:11
**4042** [2] - 3907:4, 3907:4
**4059** [1] - 3907:5
**44** [4] - 3998:18, 4015:12, 4015:13, 4015:17
**44-21** [1] - 4015:14
**45** [1] - 3997:3
**45-8** [1] - 4016:4
**46** [1] - 4016:13
**48** [4] - 4008:7, 4008:11, 4011:1, 4012:23
**49** [7] - 3960:17, 3962:2, 3962:6, 3962:13, 4035:1, 4035:18, 4035:22
**4:00** [1] - 4071:8
**4:05** [1] - 4071:14

## 5

**5** [2] - 3935:14, 3956:11
**50** [14] - 3943:25, 3944:4, 3950:8, 3959:24, 3961:8, 3961:11, 3961:16, 3961:18, 3962:2, 3962:13, 4019:2, 4037:13, 4052:5
**50/50** [1] - 4071:18
**502** [2] - 3956:2, 3956:12
**503** [1] - 3956:19
**51** [5] - 3950:8, 3961:8, 3961:12, 3961:19, 4019:2

## 6

**6** [12] - 3912:9, 3935:22, 3996:25, 3997:5, 4000:15, 4000:22, 4015:15, 4015:21, 4016:4, 4016:14, 4017:20, 4023:21
**600** [2] - 4021:11, 4025:23
**605-45** [1] - 4030:4
**674** [2] - 4025:7, 4037:18
**674.8** [4] - 4020:17, 4021:13, 4023:15, 4025:15
**6745** [2] - 4001:18, 4002:3
**6th** [1] - 3990:15

## 7

**7** [3] - 3933:2, 3933:5, 4029:22
**700** [1] - 3912:10
**703** [1] - 4069:25
**74** [2] - 4024:22, 4025:10
**753** [1] - 3905:23
**78** [3] - 4025:4, 4025:8, 4025:11
**787** [2] - 3907:11, 4034:18
**7th** [1] - 3991:3

## 8

**8** [2] - 3929:19, 3929:24
**80,000** [1] - 3913:20
**847** [3] - 3907:10, 3991:24, 3992:2, 3992:5
**848** [5] - 3907:10, 3990:25, 3991:20,

3992:3, 3992:5
**849** [5] - 3907:10, 3991:20, 3991:24, 3992:2, 3992:5
**852** [1] - 4008:10
**856** [1] - 3905:25
**889-4761** [1] - 3905:24
**8th** [1] - 3986:13

## 9

**9/15/2009** [1] - 3927:3
**90** [1] - 3963:4
**946-10-15-4** [1] - 4033:19
**96** [1] - 3986:21
**99-19** [6] - 3926:10, 3927:17, 3927:21, 3928:3, 4026:20, 4027:17
**99-9** [1] - 4031:2
**9th** [1] - 3989:5

## A

**abiding** [1] - 3979:6
**ability** [6] - 3935:20, 3956:21, 4013:18, 4048:10, 4064:4, 4064:14
**able** [12] - 3983:15, 3994:5, 3996:1, 3996:22, 3999:16, 4002:9, 4002:15, 4005:15, 4007:16, 4007:18, 4013:14, 4046:20
**abreast** [1] - 3995:15
**absolutely** [3] - 3915:3, 3979:9, 3979:19
**Absolutely** [2] - 3979:15, 3998:9
**abstract** [2] - 3926:8, 3926:9
**academic** [5] - 3909:6, 3909:25, 4043:16, 4051:1, 4051:3
**accept** [5] - 3917:6, 4000:25, 4001:23, 4016:1, 4027:19
**acceptable** [1] - 3940:13
**acceptance** [1] - 3953:18
**accepted** [12] - 3911:16, 3913:6, 3913:19, 3913:22, 3913:24, 3914:4,

3914:7, 3914:9, 3916:25, 3933:14, 3937:13, 4034:8
**accepts** [2] - 3933:20, 3933:24
**according** [1] - 4017:3
**account** [4] - 3941:6, 3952:23, 3953:1, 3987:21
**accountancy** [1] - 3908:24
**accountant** [4] - 3912:14, 3934:1, 3936:18, 3961:2
**Accountant** [1] - 3921:20
**accountants** [1] - 3962:25
**Accountants** [2] - 3921:25, 3922:1
**accounted** [1] - 3940:6
**Accounting** [12] - 3908:16, 3911:18, 3912:1, 3914:22, 3915:5, 3922:2, 3955:17, 3965:25, 3967:23, 4011:18, 4027:8, 4027:11
**accounting** [157] - 3908:22, 3909:1, 3909:23, 3910:1, 3910:3, 3910:4, 3910:7, 3910:10, 3910:13, 3910:14, 3910:15, 3910:22, 3911:2, 3911:6, 3911:7, 3911:9, 3911:12, 3911:16, 3911:19, 3912:11, 3912:13, 3912:17, 3912:21, 3913:1, 3913:4, 3913:6, 3913:8, 3913:15, 3913:18, 3913:19, 3913:22, 3913:24, 3914:1, 3914:4, 3914:8, 3914:9, 3914:13, 3914:16, 3915:17, 3915:24, 3916:1, 3916:2, 3916:5, 3916:6, 3916:7, 3916:11, 3916:13, 3916:15, 3916:16, 3916:17, 3916:19, 3916:20, 3916:23, 3916:24, 3916:25, 3917:1, 3917:3, 3917:8, 3917:9, 3917:11,

3917:12, 3917:13, 3917:16, 3917:20, 3917:22, 3917:23, 3918:1, 3918:4, 3919:6, 3919:7, 3919:8, 3919:16, 3919:19, 3919:23, 3920:2, 3921:5, 3922:16, 3923:5, 3923:19, 3923:20, 3924:14, 3925:16, 3925:25, 3926:16, 3926:21, 3927:12, 3927:16, 3933:23, 3934:2, 3936:19, 3937:13, 3937:18, 3938:13, 3938:17, 3938:22, 3939:1, 3939:8, 3939:18, 3940:14, 3942:14, 3944:5, 3945:22, 3946:13, 3947:20, 3950:13, 3953:6, 3953:15, 3954:8, 3954:11, 3954:14, 3954:24, 3955:7, 3955:19, 3961:14, 3965:20, 3966:16, 3966:20, 3967:12, 3967:15, 3967:17, 3967:19, 3967:24, 3968:3, 3968:15, 3970:11, 3970:12, 3970:19, 3970:22, 3970:25, 3971:8, 3971:16, 3972:1, 3983:10, 4009:8, 4011:11, 4023:7, 4027:13, 4027:14, 4027:15, 4029:5, 4031:15, 4032:18, 4032:19, 4033:7, 4034:2, 4034:7, 4034:9, 4037:5
**accounts** [3] - 3985:8, 3987:2, 3987:6
**accreditations** [1] - 3921:17
**accruing** [1] - 3929:14
**accurate** [6] - 3951:5, 3951:7, 3970:4, 3988:10, 3989:3, 3989:11
**accurately** [3] - 3961:15, 4031:10, 4049:16
**acknowledges** [1] - 3936:20
**acquire** [1] - 3929:20
**acquired** [1] - 4025:1

**acquiring** [3] - 3919:16, 3945:7, 3945:8
**acquisition** [17] - 3968:11, 3970:20, 3970:23, 3970:24, 3971:2, 3971:3, 3971:10, 3972:1, 4003:9, 4009:2, 4022:2, 4022:6, 4023:8, 4024:20, 4025:20, 4036:13, 4036:25
**acronym** [2] - 3914:21, 3914:24
**AcSEC** [6] - 3914:15, 3914:18, 3914:24, 3965:23, 3966:2, 3966:6
**Act** [3] - 3920:11, 4032:15, 4033:20
**act** [1] - 3912:5
**active** [1] - 3914:16
**actively** [1] - 4052:3
**activities** [17] - 3911:5, 3919:6, 3949:19, 3952:12, 3998:4, 4004:21, 4008:22, 4008:23, 4010:7, 4046:11, 4046:15, 4048:19, 4048:20, 4058:9, 4058:10, 4060:19
**activity** [13] - 3917:15, 3917:18, 3943:12, 3945:6, 3945:18, 3950:12, 3956:5, 3957:23, 3957:24, 3958:3, 3961:13, 3976:5
**actual** [5] - 3972:16, 3981:15, 3987:11, 4023:16, 4026:8
**actuarial** [12] - 4003:9, 4023:9, 4023:10, 4025:20, 4036:20, 4037:4, 4037:7, 4037:10, 4037:17, 4038:24, 4039:7, 4041:20
**actuaries** [1] - 3968:9
**actuary** [2] - 4020:17, 4025:23
**add** [2] - 4021:12, 4024:10
**added** [3] - 3955:2, 3975:15, 4020:19
**addition** [8] - 3910:11, 3915:20, 3932:15, 3961:11, 3962:22,

4004:19, 4045:10, 4048:5
**additional** [9] - 3934:24, 3935:17, 3936:2, 3964:22, 3996:9, 4019:10, 4025:7, 4025:23, 4045:25
**address** [6] - 4049:6, 4050:14, 4052:10, 4052:11, 4052:12, 4067:2
**addressed** [3] - 3971:25, 4031:15, 4052:8
**addresses** [3] - 3917:8, 3928:4, 3928:5
**adds** [3] - 4020:23, 4020:24, 4026:4
**adequacy** [1] - 4047:10
**adjusted** [2] - 4004:25, 4065:8
**adjustment** [6] - 4003:9, 4038:16, 4038:17, 4038:24, 4039:7, 4039:8
**adjustments** [5] - 4002:25, 4003:13, 4004:7, 4004:11, 4037:10
**administer** [1] - 4045:3
**Administration** [1] - 4035:16
**administration** [5] - 3908:22, 3908:25, 4030:8, 4043:13, 4051:19
**administrative** [22] - 3924:22, 3925:3, 3925:20, 3933:22, 3933:23, 3934:14, 3935:8, 3935:18, 3936:8, 3936:23, 3937:10, 3938:2, 3938:5, 3939:23, 3940:16, 3940:19, 3941:4, 3941:10, 3963:6, 3963:13, 3964:3, 4026:25
**administrator** [3] - 3936:24, 3941:5, 4046:22
**administrators** [7] - 3925:12, 3931:2, 3932:20, 3934:17, 3935:20, 3936:17, 3940:24

**admit** [1] - 3991:20
**admitted** [3] - 3931:24, 3992:2, 4034:17
**Admitted** [2] - 3991:22, 3992:4
**adopted** [4] - 3942:20, 3945:9, 3987:12, 4007:11
**advance** [1] - 4054:21
**advancements** [1] - 4004:21
**advances** [1] - 4053:11
**adversaries** [1] - 4032:25
**advertising** [9] - 3957:6, 3957:10, 3957:12, 3957:14, 3958:20, 4012:10, 4012:15, 4012:18, 4012:20
**advise** [2] - 4046:3, 4053:25
**advised** [5] - 4059:20, 4059:22, 4060:6, 4060:9, 4060:23
**advises** [1] - 4047:17
**advising** [2] - 4044:9, 4044:22
**advisor** [12] - 3935:3, 3936:3, 3936:4, 3936:7, 3938:1, 3963:13, 4044:21, 4046:2, 4049:8, 4060:14, 4060:15, 4062:5
**advisors** [22] - 3925:12, 3931:1, 3932:20, 3934:16, 3934:24, 3935:2, 3935:15, 3935:17, 3935:20, 3936:2, 3936:17, 3936:23, 3940:23, 3941:5, 3972:7, 3972:10, 3972:12, 3972:13, 4049:11, 4060:3, 4064:21, 4064:22
**Advisory** [1] - 4011:19
**advisory** [14] - 3924:22, 3925:3, 3925:19, 3937:10, 3938:4, 3939:22, 3940:15, 3940:18, 3941:9, 3963:5, 3964:2, 4026:25, 4030:8, 4060:3
**affect** [1] - 3941:8
**affects** [1] - 4037:22

**affiliations** [1] - 3921:22
**affirmed** [1] - 4042:9
**afternoon** [8] - 3965:16, 3965:17, 3998:13, 3999:6, 4042:19, 4059:7, 4059:8, 4071:19
**agencies** [1] - 4055:14
**agent** [1] - 4036:16
**agents** [1] - 4010:13
**ago** [1] - 4004:22
**agree** [2] - 3939:25, 3958:7
**agreed** [2] - 3975:22, 3998:12
**agreeing** [1] - 4003:10
**agreement** [14] - 3925:10, 3932:18, 3934:2, 3934:13, 3936:20, 3959:12, 3959:15, 3959:20, 3959:23, 3960:6, 3960:10, 3960:23, 3961:4, 3961:6
**Agreement** [10] - 3959:11, 3960:20, 4005:23, 4015:5, 4015:9, 4016:21, 4018:23, 4019:1, 4035:15, 4035:16
**agreements** [5] - 3925:11, 3932:19, 3934:11, 3936:3
**agrees** [4] - 3924:3, 3933:20, 3933:25, 3936:20
**ahead** [1] - 4021:21
**AICPA** [1] - 4031:15
**aid** [1] - 3951:11
**airlines** [1] - 4031:16
**al** [3] - 3905:3, 3905:6, 3905:8
**algorithm** [1] - 3976:3
**allegations** [1] - 3920:18
**alleged** [1] - 3920:12
**allocability** [2] - 3949:8, 3963:15
**allocate** [20] - 3918:22, 3944:14, 3950:17, 3952:6, 3953:23, 3957:16, 3961:25, 3992:11, 3993:16, 3993:22, 3994:8, 3996:4, 3996:8, 3997:20, 4002:9, 4002:15, 4005:16, 4007:24, 4050:6

**allocated** [43] - 3949:6, 3950:7, 3952:22, 3957:4, 3957:8, 3957:10, 3957:14, 3959:2, 3960:17, 3962:13, 3963:8, 3964:3, 3964:13, 3964:17, 4005:7, 4005:17, 4005:21, 4008:13, 4008:19, 4008:21, 4009:1, 4012:19, 4013:9, 4013:24, 4020:5, 4020:24, 4021:3, 4021:14, 4021:22, 4021:23, 4021:24, 4022:17, 4022:18, 4022:23, 4025:17, 4025:24, 4026:17, 4035:1, 4035:5, 4036:22, 4038:22, 4038:23, 4041:24
**allocates** [3] - 3948:14, 3952:20, 4007:13
**allocating** [4] - 3945:25, 3951:1, 3994:12, 4012:3
**Allocation** [3] - 3956:4, 4001:8, 4017:21
**allocation** [99] - 3919:13, 3942:12, 3942:15, 3942:20, 3942:22, 3942:23, 3943:1, 3943:3, 3943:5, 3944:9, 3944:25, 3945:3, 3945:9, 3945:15, 3945:21, 3946:6, 3946:12, 3946:16, 3947:2, 3948:9, 3948:19, 3949:12, 3952:14, 3952:24, 3953:7, 3956:22, 3957:11, 3957:17, 3958:6, 3958:12, 3958:15, 3958:22, 3959:1, 3960:18, 3963:19, 3964:14, 3972:15, 3972:16, 3992:15, 3992:22, 3993:1, 3993:5, 3993:8, 3993:15, 3993:18, 3994:4, 3994:6, 3994:18, 3994:19, 3995:2, 3995:4, 3995:6, 3995:8, 3995:9,

3995:16, 3995:19, 3996:19, 3997:9, 3997:10, 3997:23, 3998:6, 3999:16, 4001:25, 4002:12, 4003:19, 4003:24, 4005:5, 4006:10, 4006:12, 4006:16, 4006:17, 4006:20, 4006:22, 4006:25, 4007:21, 4010:4, 4010:16, 4013:5, 4013:12, 4014:22, 4017:10, 4019:13, 4022:14, 4022:20, 4026:11, 4034:21, 4035:8, 4036:8, 4036:12, 4036:24, 4037:22, 4038:5, 4039:4, 4040:3, 4041:4, 4045:6, 4045:8, 4069:15
**allocation/ reallocation** [1] - 3935:1
**allocations** [8] - 3919:18, 3944:22, 3945:10, 3950:18, 3951:1, 3953:17, 4002:22, 4038:6
**allow** [5] - 3919:3, 3950:14, 4040:5, 4070:23, 4071:4
**allowed** [2] - 4039:15, 4039:16
**allowing** [1] - 4050:3
**alluded** [11] - 3914:23, 3919:6, 3932:16, 3948:25, 3954:4, 3954:16, 3962:2, 3975:4, 3988:22, 3988:23, 4029:19
**alluding** [2] - 3971:14, 3987:20
**almost** [3] - 3919:25, 4009:1, 4009:18
**Almost** [1] - 4011:17
**ALSO** [1] - 3906:17
**alternative** [1] - 3917:2
**alternatives** [1] - 4006:19
**Amazon** [1] - 3929:20
**Amazon.com** [2] - 3929:14, 3929:16
**ambiguity** [1] - 3943:10
**amendment** [1] - 3967:2
**America** [1] - 4048:18

**American** [3] - 3921:24, 3922:2, 3922:14
**amortization** [8] - 4023:12, 4023:16, 4024:24, 4025:16, 4025:21, 4037:15, 4039:1, 4039:7
**Amortization** [1] - 4024:20
**amortize** [1] - 4036:25
**amortized** [4] - 4023:8, 4025:4, 4025:8, 4025:11
**amount** [16] - 3918:12, 3920:2, 3930:11, 3930:13, 3930:14, 3942:6, 3959:4, 3960:9, 3962:4, 3962:13, 3964:16, 3998:14, 4026:12, 4047:6, 4070:6
**amounts** [2] - 3938:11, 3964:19
**analogies** [2] - 3941:15, 3941:19
**analogy** [1] - 3970:12
**analyses** [2] - 4035:17, 4057:17
**Analysis** [1] - 4052:23
**analysis** [17] - 3923:3, 3925:15, 3925:17, 3932:24, 3940:7, 3945:6, 3954:8, 3960:23, 3973:10, 4028:9, 4034:22, 4043:15, 4054:22, 4055:23, 4068:11, 4068:12
**analyze** [2] - 4069:2, 4070:17
**analyzed** [1] - 4056:21
**analyzing** [3] - 4048:12, 4058:7, 4069:22
**Andrea** [1] - 4042:17
**ANDREA** [1] - 3906:15
**ANN** [1] - 3905:3
**annual** [2] - 3912:9, 3952:9
**annually** [2] - 4004:2, 4062:12
**annuities** [4] - 4041:12, 4061:7, 4061:10, 4061:13
**answer** [15] - 3945:16, 3947:10, 3970:16, 3987:5, 3987:6, 3987:11, 3993:10, 4016:24, 4017:6,

4020:11, 4028:12, 4028:16, 4032:16, 4068:15
**answering** [1] - 4004:15
**apart** [1] - 3978:7
**apologize** [2] - 3914:22, 3995:22
**appear** [7] - 3988:22, 3988:25, 3989:11, 4016:11, 4037:1, 4067:15, 4067:19
**appearance** [1] - 4042:16
**applicable** [6] - 3919:24, 3933:2, 3934:8, 3936:13, 3937:6, 4065:2
**application** [1] - 3939:16
**applications** [1] - 3908:2
**applied** [4] - 4043:15, 4047:25, 4065:9, 4069:2
**applies** [4] - 4014:9, 4029:7, 4044:3, 4065:8
**apply** [11] - 3919:25, 3928:22, 3930:17, 3932:10, 3934:2, 3936:19, 3937:9, 3940:10, 3943:3, 3945:7, 4071:1
**applying** [2] - 3943:17, 4054:24
**appointed** [1] - 4045:1
**appointment** [2] - 3933:20, 3933:24
**appointments** [3] - 4043:1, 4044:13, 4044:16
**appoints** [2] - 3933:18, 3933:23
**appreciate** [1] - 3994:16
**Approach** [1] - 3955:6
**approach** [7] - 3945:12, 3954:23, 3958:1, 3963:23, 3968:18, 3969:3, 3996:20
**appropriate** [26] - 3918:25, 3925:23, 3940:12, 3940:15, 3941:9, 3943:13, 3948:19, 3949:4, 3949:7, 3949:23, 3953:23, 3957:16, 3957:18, 3961:16,

3963:8, 3964:20, 3995:19, 3995:20, 3996:20, 4003:15, 4021:18, 4023:13, 4034:5, 4039:20, 4042:1, 4046:7
**appropriately** [7] - 3935:11, 3950:15, 3961:10, 3962:23, 3996:19, 4027:1, 4041:24
**Appropriately** [1] - 4027:2
**appropriateness** [2] - 4045:6, 4045:8
**approved** [3] - 3987:12, 4045:1, 4049:25
**arbitrary** [1] - 3958:6
**arbitrator** [1] - 4045:9
**area** [20] - 3910:15, 3911:2, 3911:3, 3911:4, 3916:2, 3916:11, 3916:12, 3916:14, 3917:20, 3917:21, 3917:25, 3996:22, 4044:1, 4044:2, 4053:12, 4054:1, 4058:4, 4059:18, 4068:5
**areas** [14] - 3918:25, 3923:5, 3923:21, 3973:4, 3979:13, 3979:17, 3979:20, 3979:23, 3993:16, 3993:23, 3993:25, 3995:20, 4052:14, 4058:15
**argument** [2] - 4031:25, 4068:23
**arise** [9] - 3926:19, 3929:19, 3944:2, 4008:14, 4008:21, 4036:14, 4048:3, 4057:11, 4066:12
**arises** [1] - 3946:1
**arising** [5] - 3926:18, 4044:12, 4047:8, 4048:1, 4057:15
**ARNOLD** [1] - 3906:4
**arose** [6] - 4004:12, 4044:23, 4045:7, 4046:13, 4050:3, 4066:15
**arrange** [2] - 3929:17, 3933:15
**arranged** [1] - 3927:18
**arrangement** [1] - 3937:3
**arrangements** [3] -

3925:9, 3940:10, 3961:18
**arranging** [1] - 3934:6
**arriving** [1] - 3963:2, 4027:5
**art** [1] - 3943:6
**articles** [4] - 3992:25, 4052:2, 4053:15, 4065:16
**articulate** [1] - 3941:16
**articulated** [1] - 3939:8
**articulation** [1] - 3940:4
**ascertain** [1] - 4068:19
**aside** [1] - 4013:1
**aspect** [1] - 4010:8
**aspects** [1] - 3971:18
**assemble** [1] - 3983:20
**asserted** [1] - 3938:24
**assertion** [3] - 3938:18, 4003:11, 4014:15
**assess** [12] - 3934:25, 3964:18, 4006:11, 4013:18, 4015:4, 4041:21, 4048:18, 4050:5, 4059:12, 4059:17, 4060:12, 4060:21
**assessed** [3] - 4013:24, 4016:20, 4027:1
**assessing** [2] - 4013:20, 4050:17
**assessment** [4] - 4022:14, 4033:16, 4035:21, 4050:16
**asset** [8] - 4046:9, 4046:14, 4046:17, 4046:18, 4049:14, 4065:1, 4066:2, 4067:1
**assets** [5] - 3934:23, 3935:2, 3936:1, 3936:6, 4057:10
**assigned** [1] - 4018:25
**assigning** [1] - 4011:25
**assignments** [1] - 4011:21
**assist** [3] - 3919:3, 3922:23, 3974:11
**assistance** [1] - 3923:8, 3923:11, 3977:22

**assistant** [3] - 3909:10, 3923:12, 3983:22
**assisted** [5] - 3922:24, 3923:6, 3974:23, 3976:10, 3978:3
**assisting** [1] - 3923:15
**ASSOCIATE** [1] - 3906:17
**associate** [8] - 3909:11, 3909:15, 3920:2, 4052:19, 4053:7, 4053:10, 4053:16, 4053:21
**associated** [2] - 3919:14, 4066:17
**associates** [1] - 4019:7
**associating** [1] - 3917:13
**Association** [1] - 3922:2
**association** [1] - 3917:16
**associations** [1] - 3913:10
**assume** [1] - 3933:21
**Assuming** [4] - 4005:21, 4016:14, 4019:10, 4019:20
**assumption** [3] - 3958:21, 4037:7
**assumptions** [1] - 4036:21
**assurances** [1] - 3968:6
**assuring** [1] - 3935:9
**attached** [3] - 3968:25, 3979:25, 3996:23
**attaching** [1] - 3947:20
**attempt** [1] - 4010:1
**attended** [1] - 3908:23
**attention** [31] - 3928:12, 3969:11, 3970:8, 3979:13, 3979:17, 3980:17, 3980:20, 3980:22, 3985:2, 3989:14, 4001:5, 4001:17, 4008:6, 4008:7, 4008:12, 4011:8, 4011:14, 4014:22, 4014:25, 4015:12, 4017:20, 4017:22, 4018:7, 4023:21, 4025:14, 4026:19, 4029:12, 4032:24,

4033:13
**attorney** [1] - 3984:14
**attorneys** [9] - 3977:20, 3977:21, 3978:13, 3980:3, 3981:21, 3981:24, 3982:7, 3982:10, 3982:23
**attractive** [1] - 4040:22
**attracts** [1] - 3912:9
**attribute** [2] - 3943:11, 3994:1
**attributed** [5] - 3938:13, 3946:10, 3949:13, 3950:9, 3958:4
**attributing** [1] - 3950:25
**audit** [13] - 3912:21, 3913:4, 3951:24, 3951:25, 3952:4, 3966:17, 3967:4, 3972:21, 4014:15, 4032:18, 4032:19, 4039:24, 4040:2
**audited** [6] - 3938:5, 3938:11, 3960:14, 3960:20, 4014:16, 4035:2
**auditing** [3] - 3910:4, 3912:23, 4031:15
**auditor** [1] - 4039:25
**auditor's** [1] - 3912:23
**audits** [2] - 3911:15, 3912:21
**August** [1] - 3986:13
**author** [4] - 3984:13, 3993:4, 4060:5, 4061:6
**authored** [4] - 3911:11, 3954:16, 3985:15, 4052:2
**authoritative** [4] - 3915:6, 3927:15, 4034:6, 4034:8
**authority** [3] - 3910:19, 3914:13, 3914:14
**authorize** [1] - 3941:22
**availability** [2] - 3945:4, 3945:20
**available** [11] - 3945:25, 3946:5, 3952:8, 3958:12, 3983:1, 3997:17, 4007:24, 4008:2, 4008:3, 4066:9, 4068:19

**Avenue** [1] - 4066:2
**awards** [4] - 3922:5, 3922:8, 3922:11, 3922:12
**aware** [30] - 3933:12, 3934:19, 3937:7, 3937:14, 3948:12, 3948:16, 3958:25, 3960:5, 3960:9, 3962:4, 3984:13, 3984:20, 3985:19, 3996:16, 4009:12, 4019:6, 4019:9, 4022:1, 4022:2, 4022:4, 4022:5, 4027:17, 4034:20, 4034:25, 4035:4, 4040:24, 4065:23, 4066:8, 4067:16
**AXA** [73] - 3905:6, 3905:10, 3906:18, 3948:14, 3949:6, 3949:14, 3950:3, 3950:4, 3950:17, 3950:25, 3951:19, 3951:20, 3951:22, 3952:6, 3952:7, 3959:1, 3959:11, 3959:16, 3959:18, 3960:17, 3960:24, 3961:6, 3961:25, 3962:19, 3963:8, 3964:4, 3985:7, 3987:2, 3995:25, 4000:7, 4001:21, 4002:9, 4002:23, 4002:25, 4003:5, 4003:7, 4004:7, 4005:22, 4007:9, 4007:12, 4008:23, 4009:1, 4010:12, 4016:22, 4017:14, 4018:18, 4019:4, 4019:6, 4019:12, 4019:21, 4019:22, 4019:24, 4020:3, 4020:19, 4020:22, 4020:24, 4021:3, 4021:14, 4021:22, 4025:17, 4026:5, 4026:8, 4026:16, 4035:5, 4036:18, 4037:11, 4037:19, 4040:20, 4040:25, 4041:11, 4041:13
**AXA's** [3] - 3951:25, 3964:13, 4002:15
**AXA-CAM** [7] - 3951:19, 3995:25, 4000:7, 4001:21,

4002:9, 4007:9, 4007:12

___

# B

**BA** [1] - 4043:17
**babies** [1] - 3918:20
**Bachelor** [1] - 3908:21
**Bachelor's** [2] - 3909:3, 3909:4
**background** [4] - 3908:20, 3965:18, 3976:24, 4043:11
**backup** [1] - 3934:10
**bad** [1] - 4004:4
**balance** [2] - 3951:22, 4037:1
**bank** [14] - 3985:8, 3987:2, 3987:6, 3987:20, 4046:9, 4046:13, 4046:16, 4047:14, 4047:15, 4047:20, 4048:6, 4048:19, 4048:20, 4065:1
**Bank** [5] - 4044:9, 4044:14, 4044:17, 4046:25, 4048:18
**banking** [4] - 4052:10, 4058:9, 4066:25
**bankruptcy** [1] - 4061:15
**banks** [13] - 3913:11, 4044:3, 4044:10, 4044:24, 4046:2, 4046:5, 4046:8, 4046:12, 4046:20, 4047:5, 4047:11, 4047:25, 4051:15
**Barrett** [4] - 3926:11, 3939:21, 3954:16, 3958:5
**Barrett's** [1] - 3976:22
**base** [2] - 3910:20, 3958:21
**Based** [1] - 4003:15
**based** [32] - 3918:9, 3924:2, 3924:21, 3930:11, 3937:6, 3949:18, 3951:2, 3952:14, 3956:5, 3957:16, 3973:10, 3976:5, 3988:11, 3992:15, 3995:18, 4002:16, 4003:13, 4004:6, 4006:20, 4007:16, 4019:16, 4025:10, 4029:6, 4037:19, 4041:4,

4047:6, 4047:24, 4053:11, 4070:5, 4070:12, 4070:14, 4071:3
**bases** [5] - 3946:16, 3993:16, 3993:22, 3994:4, 4068:5
**basic** [1] - 4005:3
**basis** [20] - 3921:7, 3945:25, 3948:10, 3952:24, 3953:23, 3957:8, 3992:10, 3993:8, 4010:15, 4011:25, 4012:4, 4013:5, 4013:9, 4014:14, 4030:16, 4040:11, 4040:13, 4068:4, 4069:5, 4069:15
**Bate** [1] - 4001:17
**Bates** [1] - 4002:3
**bear** [1] - 3956:22
**bearing** [1] - 3937:23
**became** [4] - 3921:4, 3921:10, 4009:20, 4048:12
**become** [7] - 3920:11, 3947:16, 3973:17, 4028:1, 4037:15, 4040:24
**becomes** [2] - 3943:15, 4029:9
**becoming** [2] - 3929:4, 3984:3
**began** [3] - 3909:9, 3989:20, 3990:1
**begin** [3] - 3908:4, 3981:13, 4042:15
**beginning** [5] - 3908:20, 3968:7, 3981:13, 4024:8, 4043:11
**begins** [6] - 3951:20, 3952:19, 4015:13, 4029:20, 4033:16, 4054:18
**behalf** [4] - 3936:25, 3942:3, 4004:4, 4042:17
**behind** [2] - 3957:11, 4012:16
**belief** [3] - 3970:3, 3977:12, 4013:10
**below** [1] - 4020:16
**BENEDICT** [1] - 3906:14
**beneficiaries** [2] - 3957:3, 3957:4
**benefit** [9] - 3945:6, 3945:8, 3958:2,

3968:5, 3968:7, 3968:9, 3968:13, 4012:14, 4036:17
**benefited** [2] - 3957:12, 3958:19
**benefits** [14] - 3956:9, 3956:16, 3956:20, 3956:25, 3957:1, 3957:5, 3957:21, 3958:1, 3968:1, 3968:12, 4012:6, 4012:9, 4013:2, 4013:6
**benefitted** [1] - 4012:18
**benefitting** [1] - 3961:19
**best** [2] - 3940:4, 3998:5
**better** [4] - 3963:25, 3964:5, 3987:22, 4037:8
**between** [18] - 3925:10, 3925:11, 3932:18, 3932:19, 3936:9, 3959:11, 3959:16, 3962:6, 3981:4, 4009:5, 4016:21, 4027:14, 4028:7, 4045:7, 4054:23, 4060:13, 4069:13
**beyond** [7] - 3956:1, 4011:7, 4014:18, 4039:17, 4056:25, 4067:8
**big** [1] - 4055:5
**bill** [2] - 4019:8, 4019:16
**billed** [4] - 3930:12, 3930:14, 3990:6, 4062:6
**billion** [13] - 4009:1, 4018:18, 4021:4, 4021:6, 4021:7, 4021:10, 4021:11, 4021:13, 4026:9, 4026:13, 4026:16, 4066:5
**bit** [21] - 3910:11, 3912:16, 3912:19, 3915:19, 3916:21, 3917:10, 3917:11, 3930:2, 3942:11, 3942:12, 3943:8, 3944:9, 3946:17, 3951:13, 3954:11, 3962:11, 3964:12, 3964:15, 3965:18, 4036:5, 4045:14

**BLADER** [1] - 3906:3
**blades** [1] - 3944:18
**BLANK** [1] - 3906:9
**blessed** [1] - 3912:12
**BLUMSTEIN** [1] - 3906:3
**Board** [47] - 3915:5, 3924:19, 3925:21, 3937:12, 3938:20, 3939:3, 3939:14, 3939:15, 3939:24, 3948:13, 3948:24, 3949:5, 3949:20, 3951:3, 3951:12, 3954:3, 3959:3, 3963:21, 3967:23, 4001:11, 4001:14, 4011:19, 4018:2, 4018:4, 4027:8, 4027:11, 4034:23, 4035:9, 4035:13, 4035:14, 4035:23, 4037:23, 4038:3, 4038:12, 4039:14, 4039:19, 4039:22, 4040:4, 4040:6, 4040:16, 4040:19, 4040:24, 4044:14, 4044:17, 4063:23, 4064:1, 4064:2
**board** [6] - 3913:18, 3915:16, 3918:18, 4039:22, 4053:6, 4053:19
**boards** [7] - 3912:14, 3915:11, 4052:16, 4052:17, 4053:5, 4053:16, 4070:8
**bodies** [3] - 3910:10, 3912:17, 3913:16
**body** [3] - 3913:25, 3914:7, 3917:3
**book** [17] - 3929:18, 3929:21, 3954:16, 3954:18, 3983:16, 3984:1, 3984:2, 3984:5, 3984:6, 3984:10, 3984:11, 3984:13, 3984:18, 3984:21, 4011:11, 4012:21
**bookkeeping** [1] - 3929:19
**books** [1] - 3929:22
**borne** [2] - 4039:5, 4064:21
**bottom** [4] - 3951:6, 3956:2, 4001:18, 4035:20
**bound** [1] - 3937:12

**box** [1] - 4017:14
**brackets** [1] - 3927:2
**breached** [1] - 4039:14
**break** [7] - 3965:4, 3965:8, 3998:7, 3998:10, 4045:13, 4066:15, 4071:10
**break-the-buck** [1] - 4066:15
**breakpoint** [4] - 4057:12, 4057:13, 4057:14, 4057:15
**breakpoints** [6] - 4055:18, 4055:24, 4056:21, 4056:22, 4057:9, 4058:19
**Brief** [3] - 3964:10, 3990:11, 4019:14
**briefly** [1] - 3931:8
**bring** [3] - 3943:21, 3943:25, 3944:18
**broad** [2] - 3942:19, 4027:25
**broadening** [1] - 4046:9
**broadly** [5] - 3911:1, 3917:19, 3949:17, 3950:2, 3979:23
**Broadly** [2] - 3909:25, 3916:10
**broken** [1] - 3951:15
**brokerage** [1] - 4049:10
**brought** [5] - 3980:9, 3980:17, 3980:20, 3980:22, 4049:6
**buck** [1] - 4066:15
**building** [4] - 3915:12, 3919:16, 3919:17, 3919:18
**bullet** [2] - 3956:24, 4031:12
**bulletins** [1] - 3913:5
**burning** [1] - 3944:8
**business** [31] - 3908:21, 3908:25, 3910:18, 3910:23, 3912:6, 3912:10, 3915:7, 3916:4, 3916:9, 3917:4, 3926:15, 3926:19, 3952:10, 3955:5, 3962:20, 4002:16, 4002:19, 4019:7, 4019:10, 4019:17, 4025:1, 4037:11, 4037:19, 4043:13, 4047:24, 4048:9, 4051:19,

**businesses** [4] - 4007:14, 4019:21, 4020:6, 4048:7
**buy** [4] - 3928:25, 3929:7, 3929:11, 4049:15
**buying** [1] - 3943:24
**BY** [29] - 3906:4, 3906:10, 3906:13, 3907:2, 3907:3, 3907:5, 3907:5, 3908:14, 3914:20, 3924:16, 3932:1, 3947:7, 3965:15, 3969:10, 3982:22, 3992:7, 3999:14, 4005:14, 4006:8, 4017:8, 4020:15, 4023:14, 4029:2, 4030:23, 4033:3, 4034:19, 4042:23, 4057:16, 4059:6

## C

**C.S.R** [1] - 3905:24
**calculated** [2] - 3963:4, 4037:15
**calculates** [2] - 3963:21, 3964:1
**calculating** [1] - 3968:9
**calculations** [3] - 3938:21, 4037:6, 4041:15
**California** [5] - 3908:17, 3909:15, 3921:20, 3921:25, 3993:1
**CAM** [12] - 3951:19, 3995:25, 3996:5, 4000:7, 4001:21, 4002:9, 4007:5, 4007:9, 4007:12, 4007:22, 4013:23, 4035:2
**Cambridge** [4] - 4043:2, 4043:8, 4051:2, 4069:10
**campaign** [1] - 3958:20
**candidacy** [1] - 4054:21
**capacities** [2] - 3972:13, 4045:16
**capacity** [3] - 4045:20, 4047:19
**capital** [7] - 3920:14,

4044:10, 4047:6, 4047:7, 4047:11, 4047:24, 4065:8
**captioned** [1] - 3973:25
**captured** [1] - 3928:12
**captures** [1] - 3964:5
**car** [3] - 3944:7, 3944:9
**career** [4] - 3910:12, 3922:5, 4051:25, 4052:4
**carefully** [2] - 4046:10, 4055:12
**case** [54] - 3919:21, 3926:13, 3929:25, 3930:17, 3933:3, 3933:9, 3934:9, 3935:13, 3936:16, 3942:2, 3944:20, 3951:9, 3958:11, 3958:14, 3960:15, 3963:19, 3969:23, 3970:2, 3970:21, 3973:2, 3974:2, 3977:4, 3985:23, 3986:5, 3989:21, 3992:12, 3993:13, 3995:11, 4001:1, 4004:8, 4006:11, 4010:10, 4014:9, 4016:10, 4028:22, 4039:18, 4040:9, 4040:10, 4041:15, 4047:4, 4055:19, 4058:14, 4059:11, 4059:16, 4060:8, 4061:13, 4062:6, 4063:2, 4063:10, 4063:21, 4063:23, 4064:8, 4064:17, 4071:2
**cases** [4] - 3946:1, 4055:20, 4060:25, 4061:15
**cash** [2] - 3929:10, 3940:23
**casinos** [1] - 4031:16
**categories** [2] - 3949:21, 4031:8
**caught** [1] - 3956:22
**causation** [1] - 3994:2
**caused** [4] - 3928:12, 3950:24, 4050:5, 4050:7
**causes** [2] - 3920:20, 3945:18
**center** [1] - 3952:11
**central** [1] - 3927:9
**cereal** [1] - 3944:2

**certain** [14] - 3928:8, 3959:17, 3965:19, 3973:1, 3973:4, 4021:7, 4023:25, 4049:7, 4050:8, 4065:20, 4066:3, 4069:20, 4070:18, 4071:2
**Certain** [1] - 3971:18
**certainly** [39] - 3910:3, 3922:10, 3932:14, 3938:10, 3939:16, 3944:3, 3945:7, 3947:1, 3950:9, 3954:8, 3954:18, 3958:10, 3968:8, 3968:16, 3970:22, 3974:23, 3975:2, 3975:13, 3976:10, 3978:18, 3980:12, 3980:25, 3987:12, 3988:9, 3989:22, 3996:17, 3998:2, 4001:22, 4009:18, 4037:24, 4038:12, 4050:15, 4055:10, 4055:19, 4060:25, 4065:14, 4067:6, 4067:10
**Certainly** [13] - 3908:13, 3908:21, 3909:4, 3909:8, 3933:1, 3942:13, 3951:20, 3965:10, 3994:7, 4048:2, 4054:9, 4065:7, 4066:19
**Certified** [4] - 3905:23, 3921:20, 3921:25, 3922:1
**chair** [1] - 3912:15
**chaired** [2] - 3921:9, 3922:4
**chairman** [2] - 3912:13, 3921:8
**chairs** [1] - 3909:17
**challenge** [1] - 3946:12
**challenges** [1] - 3926:17
**change** [7] - 3927:21, 3927:22, 3985:22, 4004:25, 4028:21, 4050:25, 4056:1
**changed** [3] - 3936:11, 3978:20, 4004:23
**changes** [9] - 3934:18, 3995:13, 4004:9, 4004:14,

4004:16, 4004:23, 4005:2, 4005:3, 4050:25
**changing** [1] - 4004:17
**characteristics** [1] - 3948:8
**characterization** [9] - 3977:7, 3995:3, 3997:14, 4006:13, 4009:13, 4015:11, 4016:23, 4025:19, 4027:20
**characterizations** [2] - 4007:11, 4019:5
**characterize** [2] - 3976:2, 3990:9
**characterized** [10] - 3915:11, 3926:10, 3959:10, 3989:24, 3990:8, 3998:5, 4001:22, 4007:2, 4007:10, 4032:14
**charge** [5] - 3921:13, 3959:18, 3960:5, 3960:6, 3960:13
**charged** [15] - 3916:9, 3950:5, 3960:10, 3960:19, 3961:6, 3962:20, 3993:7, 4003:8, 4005:22, 4019:18, 4019:20, 4039:2, 4040:12, 4040:13, 4058:21
**charges** [1] - 4018:25
**charging** [1] - 3993:2
**Charles** [1] - 3954:17
**chart** [1] - 3951:11
**chief** [5] - 3912:14, 4049:7, 4049:8, 4058:1, 4069:17
**Chief** [2] - 4045:11, 4049:4
**child's** [1] - 3947:21
**children's** [2] - 3947:19, 3947:21
**choosing** [2] - 3944:24, 3945:2
**chose** [1] - 3984:23
**chosen** [2] - 3933:17, 3934:21
**Chris** [3] - 3968:18, 3988:19, 4042:8
**CHRISTOPHER** [6] - 3906:6, 3906:7, 3907:4, 3907:4, 4042:9, 4042:23
**Christopher** [1] - 4042:13
**chronological** [1] -

4044:7
**circumstance** [5] -
3929:20, 3941:16,
3958:19, 3958:24,
4020:14
**circumstances** [12] -
3928:5, 3928:7,
3928:9, 3929:16,
3930:10, 3932:12,
3943:14, 3956:16,
3972:13, 3973:9,
3994:7, 4009:14
**cite** [2] - 3983:18,
4067:17
**cited** [5] - 3926:11,
3951:6, 3951:8,
4048:21, 4064:24
**cities** [1] - 3993:5
**CIVIL** [2] - 3905:5,
3905:9
**clarification** [1] -
4060:16
**CLARKSON** [1] -
3905:14
**classification** [7] -
3925:3, 3925:19,
3925:22, 3937:9,
3938:8, 3941:9,
3964:11
**classify** [3] - 3924:21,
3924:23, 3940:15
**classifying** [1] -
3939:22
**clean** [2] - 3938:14,
4014:17
**cleaning** [1] - 3919:11
**clear** [7] - 3931:11,
3935:8, 3945:23,
3958:18, 3962:7,
4040:8, 4055:25
**clearly** [3] - 3963:13,
4009:6, 4063:14
**clerical** [1] - 3941:14
**CLERK** [1] - 3908:9
**clients** [3] - 4020:25,
4022:18, 4022:23
**closely** [2] - 3916:7,
3968:8
**clothing** [1] - 3947:19
**clustered** [1] -
4054:25
**CO** [2] - 3905:6,
3906:18
**co** [2] - 3911:11,
3993:4
**co-author** [1] - 3993:4
**co-authored** [1] -
3911:11
**codification** [2] -
3927:3, 3927:16

**codified** [2] - 3927:15,
3927:22
**coefficients** [1] -
4010:2
**coherent** [1] - 3979:1
**colleagues** [2] -
3912:3, 3921:13
**collection** [1] - 4027:4
**collectively** [1] -
4029:19
**college** [4] - 3908:20,
3917:21, 3917:22,
4043:11
**colleges** [4] - 3911:13,
3954:19, 3954:25,
4069:11
**column** [5] - 4001:20,
4017:18, 4018:12,
4024:5, 4024:15
**combination** [1] -
3957:20
**comfort** [7] - 3938:12,
3952:1, 3953:9,
3953:19, 4014:16,
4039:24, 4040:1
**comfortable** [3] -
3971:15, 3983:15,
4007:2
**coming** [4] - 3917:6,
3943:18, 3954:1,
4032:8
**commercial** [2] -
4044:24, 4046:8
**Commission** [5] -
3920:24, 3921:10,
3921:14, 4069:15,
4069:18
**commission** [4] -
3921:2, 3921:8,
3921:10, 3929:12,
3929:22, 3930:15,
4009:2, 4049:8
**commissioned** [4] -
3912:2, 3915:20,
3921:11, 3993:4
**commissioner** [1] -
3921:9
**commissioners** [1] -
3912:15
**commissions** [3] -
4009:22, 4010:6,
4010:12
**Committee** [2] -
3914:23, 3965:25
**committee** [5] -
3913:2, 3913:8,
3913:13, 3920:15,
4027:10
**committees** [1] -
3922:4

**common** [1] - 3913:9
**commonly** [1] -
3910:22
**communicating** [1] -
3994:15
**community** [1] -
3926:21
**Companies** [1] -
4033:11
**companies** [13] -
3913:10, 3962:9,
3967:6, 3967:13,
4031:17, 4032:14,
4040:19, 4041:11,
4044:4, 4047:5,
4051:16, 4062:23,
4065:20
**company** [26] -
3923:2, 3930:11,
3930:19, 3930:20,
3942:5, 3948:24,
3967:8, 3971:22,
3971:23, 3972:2,
3972:4, 3972:6,
4014:15, 4031:20,
4031:23, 4031:24,
4032:7, 4032:12,
4033:16, 4033:21,
4033:24, 4036:17,
4037:9, 4046:8,
4047:15, 4065:1
**Company** [3] - 3984:2,
4032:15, 4033:20
**company's** [5] -
3967:2, 4029:23,
4032:17, 4032:19,
4048:10
**comparable** [1] -
4067:7
**compare** [1] - 4058:21
**compared** [1] -
4000:25
**comparing** [1] -
4057:13
**comparison** [3] -
4012:14, 4012:22,
4060:14
**compensate** [1] -
3976:4
**compensation** [17] -
3934:12, 3936:24,
3941:21, 3941:25,
3942:1, 3942:2,
3961:8, 3975:24,
4009:6, 4010:11,
4010:12, 4010:19,
4010:25, 4012:24,
4012:25, 4036:17,
4062:11
**Compensation** [1] -

4036:15
**compete** [1] - 4055:6
**competitive** [1] -
4040:20
**competitors** [1] -
4041:13
**complete** [1] - 4017:6
**completely** [1] -
3937:12, 3958:18,
4005:9
**complex** [4] -
3944:16, 3944:21,
3945:14, 4013:19
**complexes** [1] -
4050:14, 4050:17,
4050:22, 4057:24,
4060:2
**compliance** [3] -
3912:23, 3933:24,
3935:3
**comply** [1] - 3914:2
**composed** [1] -
3913:25
**comprehend** [1] -
4041:5
**Comptroller** [2] -
4044:21, 4046:1
**comptroller** [2] -
4044:22, 4046:3
**comptroller's** [2] -
4046:6, 4050:12
**compute** [1] - 4057:11
**concedes** [1] - 4068:8
**concepts** [8] -
3917:23, 3919:23,
3919:25, 3944:5,
3968:7, 3983:10,
3983:11, 4065:5
**concern** [1] - 4028:13
**concerning** [5] -
3975:9, 3990:21,
4049:12, 4050:15,
4069:14
**concerns** [1] - 3923:9
**concluded** [2] -
3962:1, 4071:25
**conclusion** [3] -
3937:8, 3940:11,
4028:9
**conclusions** [1] -
3943:18
**conducted** [6] -
3910:5, 3911:4,
3925:15, 3954:6,
3962:20, 3975:5
**confer** [1] - 3912:6
**conference** [2] -
3912:9, 3912:12
**confidential** [4] -
3918:2, 4050:11,

4055:22, 4056:20
**confined** [1] - 3987:20
**confines** [1] - 4029:17
**confirm** [1] - 3969:16
**conformity** [7] -
3911:8, 3911:15,
3914:4, 3914:6,
3914:7, 3938:19,
4029:11
**confront** [3] - 4064:8,
4065:20, 4066:9
**confronted** [4] -
4038:4, 4059:12,
4064:12, 4064:15
**confronting** [1] -
3912:5
**confronts** [1] - 4064:5
**confusing** [1] - 4006:1
**Congress** [2] -
3920:6, 3920:10
**congressional** [1] -
3920:15
**connection** [8] -
3955:22, 3959:12,
3976:1, 4059:20,
4060:8, 4060:22,
4061:10, 4062:6
**consensus** [1] -
3926:8
**consequences** [1] -
4065:4
**consequently** [1] -
3943:16
**consider** [8] -
3939:16, 4006:19,
4008:2, 4010:22,
4010:24, 4012:10,
4013:11, 4041:2
**Consider** [1] - 3957:5
**considerable** [5] -
3916:22, 3928:15,
3994:18, 3995:1,
3995:7
**considerations** [2] -
3971:11, 4013:21
**considered** [11] -
3925:16, 3942:15,
3949:1, 3954:8,
3979:25, 4007:20,
4037:10, 4041:1,
4048:23, 4066:24
**considering** [2] -
3919:5, 3920:10
**consistent** [5] -
3934:3, 4009:6,
4012:3, 4013:9,
4053:13
**consolidating** [1] -
4017:24
**construct** [1] -

3919:17

**consultant** [11] -
4044:18, 4044:20,
4045:2, 4045:10,
4046:24, 4049:19,
4049:24, 4057:24,
4057:25, 4069:12,
4069:20

**Consultation** [2] -
3974:10, 3974:11

**consultation** [2] -
3953:4, 3974:5

**consulted** [6] -
3916:17, 3917:25,
3919:15, 3967:21,
3975:5, 3984:11

**consulting** [12] -
3910:11, 3918:3,
3947:18, 3953:16,
4049:4, 4050:13,
4050:19, 4055:11,
4055:21, 4056:20,
4060:1, 4060:19

**consumer** [1] -
4061:21

**contain** [2] - 3988:9,
4000:24

**contained** [18] -
3914:2, 3932:15,
3940:7, 3951:23,
3974:22, 3983:12,
3984:18, 3988:12,
4000:14, 4006:25,
4009:11, 4014:21,
4015:9, 4016:8,
4016:14, 4024:4,
4026:7

**contains** [1] - 3989:2

**contamination** [1] -
3919:9

**contemplated** [3] -
3936:21, 3973:11,
4068:3

**contents** [2] -
3939:17, 3983:16

**contested** [1] - 3952:5

**context** [10] - 3954:25,
3964:20, 4010:14,
4047:15, 4055:11,
4055:17, 4061:4,
4061:5, 4069:2

**contingent** [1] -
4062:17

**continue** [4] -
3989:17, 4009:5,
4028:18, 4071:8

**continues** [1] - 4016:3

**contract** [2] - 3935:15,
3936:22

**contrary** [1] - 3970:6

**contribute** [1] -
3983:6

**contributed** [2] -
3916:16, 3978:17

**contribution** [1] -
3955:7

**contributions** [1] -
3961:13

**control** [1] - 3961:16

**controlled** [1] -
4040:14

**conversations** [4] -
3981:3, 3981:17,
3981:20, 3999:24

**convey** [1] - 3978:23

**conveyed** [1] -
3978:21

**conveying** [1] -
3921:6

**cool** [1] - 3944:13

**copy** [2] - 3969:5,
4032:25

**Cornerstone** [31] -
3922:25, 3923:1,
3923:8, 3974:5,
3974:8, 3974:13,
3974:15, 3974:23,
3975:23, 3975:24,
3976:4, 3976:8,
3977:23, 3978:1,
3978:3, 3978:7,
3979:24, 3980:18,
3980:21, 3980:22,
3981:7, 3981:17,
3982:6, 3982:23,
3983:4, 3983:25,
4062:4, 4062:5,
4062:11, 4062:14

**corporate** [5] -
3952:15, 3957:6,
4012:10, 4012:15,
4051:12

**corporate-wide** [4] -
3952:15, 3957:6,
4012:10, 4012:15

**corporation** [1] -
3957:7

**Corporation** [1] -
4044:19

**corporation's** [1] -
4051:13

**Correct** [13] - 3970:17,
3987:8, 3987:14,
3994:11, 3996:7,
3996:12, 4008:23,
4009:8, 4011:12,
4020:23, 4024:7,
4031:9, 4033:17

**correct** [230] -
3905:23, 3926:12,

3951:15, 3965:20,
3965:24, 3966:5,
3966:12, 3966:15,
3966:20, 3966:24,
3967:8, 3967:11,
3967:16, 3968:3,
3968:12, 3968:15,
3969:20, 3970:13,
3970:20, 3971:4,
3971:6, 3971:8,
3971:21, 3972:2,
3972:8, 3972:11,
3972:18, 3972:20,
3973:2, 3973:19,
3973:23, 3974:1,
3974:6, 3974:20,
3975:1, 3975:11,
3975:15, 3975:18,
3975:21, 3976:9,
3976:14, 3976:17,
3976:22, 3976:25,
3977:3, 3977:6,
3977:13, 3977:19,
3977:23, 3977:25,
3978:9, 3978:16,
3978:22, 3979:5,
3979:14, 3979:21,
3980:1, 3980:7,
3980:10, 3980:18,
3980:24, 3981:5,
3981:8, 3981:18,
3982:1, 3982:7,
3982:13, 3982:25,
3983:5, 3983:10,
3984:2, 3984:11,
3984:14, 3984:24,
3985:8, 3985:12,
3986:4, 3986:7,
3986:11, 3986:14,
3986:18, 3987:18,
3987:25, 3988:2,
3988:5, 3990:4,
3990:15, 3990:18,
3990:21, 3991:3,
3991:6, 3991:9,
3991:14, 3992:11,
3992:23, 3993:16,
3993:20, 3993:25,
3994:6, 3994:9,
3994:14, 3994:20,
3995:2, 3995:5,
3995:9, 3995:20,
3996:2, 3996:9,
3997:7, 3997:10,
3997:16, 3997:21,
3998:1, 3999:18,
3999:20, 3999:22,
4000:15, 4000:19,
4000:22, 4001:9,
4001:11, 4002:2,
4002:10, 4002:13,

4002:17, 4002:20,
4002:24, 4003:6,
4003:14, 4003:20,
4004:7, 4004:13,
4005:8, 4005:25,
4006:12, 4006:17,
4006:20, 4007:1,
4007:7, 4007:9,
4007:17, 4007:25,
4008:4, 4009:3,
4009:10, 4009:23,
4010:8, 4011:15,
4011:23, 4012:1,
4012:7, 4012:20,
4013:16, 4013:24,
4014:6, 4014:10,
4014:21, 4015:22,
4016:9, 4016:15,
4016:18, 4016:22,
4017:13, 4017:14,
4017:24, 4018:18,
4018:24, 4019:4,
4019:17, 4019:22,
4019:25, 4020:6,
4020:20, 4021:1,
4021:2, 4021:4,
4021:7, 4021:9,
4021:15, 4021:23,
4022:3, 4023:17,
4024:4, 4024:11,
4024:15, 4024:20,
4025:2, 4025:5,
4025:8, 4025:18,
4025:24, 4026:5,
4027:1, 4027:3,
4027:8, 4027:15,
4029:3, 4029:7,
4029:17, 4030:4,
4030:9, 4031:5,
4031:21, 4033:8,
4033:11, 4033:24,
4034:23, 4035:9,
4035:16, 4035:24,
4057:6, 4059:14,
4059:15, 4061:16,
4061:17, 4061:19,
4061:20, 4061:22,
4061:24, 4062:3,
4062:7, 4062:13,
4062:15, 4062:16,
4063:14, 4064:5,
4064:15, 4064:18,
4065:21

**correctly** [4] - 3941:2,
3989:25, 3994:21,
4013:3

**correlation** [3] -
4009:22, 4009:25,
4010:1

**Cost** [3] - 3917:13,
3955:17, 3956:3

**cost** [165] - 3910:4,
3910:6, 3916:5,
3916:6, 3916:13,
3916:16, 3916:17,
3917:11, 3917:12,
3917:16, 3917:20,
3917:22, 3917:23,
3918:1, 3918:4,
3918:9, 3918:10,
3918:21, 3918:22,
3919:4, 3919:6,
3919:7, 3919:13,
3919:15, 3919:18,
3919:19, 3919:23,
3920:1, 3923:20,
3924:14, 3931:10,
3942:11, 3942:15,
3942:20, 3942:22,
3942:23, 3943:1,
3943:3, 3943:5,
3943:11, 3944:3,
3944:6, 3944:8,
3944:10, 3944:12,
3944:14, 3944:19,
3944:22, 3944:25,
3945:3, 3945:5,
3945:6, 3945:7,
3945:9, 3945:14,
3945:16, 3945:17,
3945:18, 3945:20,
3945:22, 3945:24,
3945:25, 3946:1,
3946:4, 3946:7,
3946:8, 3946:13,
3947:2, 3947:20,
3947:22, 3947:23,
3949:8, 3949:10,
3952:8, 3952:10,
3952:20, 3953:17,
3954:8, 3954:11,
3954:14, 3954:24,
3955:19, 3956:5,
3956:7, 3956:22,
3957:3, 3957:4,
3957:10, 3957:17,
3958:5, 3958:11,
3958:22, 3958:25,
3960:18, 3961:8,
3963:15, 3972:15,
3972:16, 3983:10,
3992:25, 3993:3,
3993:5, 3993:6,
3993:14, 3993:18,
3994:5, 3994:18,
3994:19, 3994:23,
3995:2, 3995:4,
3995:6, 3995:8,
3995:16, 3996:20,
3997:10, 3997:20,
3998:6, 3999:15,
4001:25, 4002:16,

4002:22, 4003:14, 4003:18, 4003:24, 4005:5, 4006:10, 4006:16, 4006:17, 4006:24, 4007:13, 4007:16, 4007:19, 4007:21, 4007:24, 4008:2, 4008:3, 4009:7, 4010:4, 4011:11, 4011:21, 4013:7, 4013:11, 4017:10, 4022:14, 4022:20, 4026:11, 4034:20, 4035:8, 4036:8, 4036:12, 4037:22, 4038:5, 4038:6, 4039:4, 4041:4, 4050:24, 4056:4, 4066:23

**costing** [1] - 3956:5

**costly** [2] - 3945:8, 3945:12

**costs** [100] - 3917:14, 3919:10, 3919:16, 3920:3, 3924:23, 3928:8, 3928:10, 3928:18, 3938:1, 3938:2, 3944:4, 3945:11, 3946:9, 3949:6, 3949:11, 3949:21, 3949:23, 3950:5, 3950:6, 3950:7, 3950:9, 3950:10, 3950:17, 3951:1, 3951:23, 3952:3, 3952:20, 3953:23, 3955:2, 3957:3, 3957:8, 3957:12, 3957:14, 3957:16, 3957:24, 3958:13, 3958:15, 3959:22, 3961:2, 3961:5, 3961:17, 3961:22, 3961:25, 3962:13, 3962:14, 3962:20, 3962:21, 3963:17, 3968:10, 3970:20, 3970:22, 3970:23, 3970:24, 3971:1, 3971:2, 3971:3, 3971:10, 3972:1, 3995:19, 3996:17, 3996:18, 3998:3, 4002:9, 4003:9, 4011:22, 4011:25, 4012:3, 4012:20, 4013:9, 4013:24, 4014:6, 4014:13, 4014:17, 4016:14, 4021:24, 4022:2, 4022:6,

4023:8, 4024:20, 4025:20, 4028:7, 4028:25, 4035:22, 4036:13, 4036:25, 4038:22, 4038:23, 4039:1, 4040:25, 4041:2, 4041:23, 4054:23, 4056:1, 4056:3, 4056:9, 4056:12, 4065:25, 4066:16, 4067:2

**Counsel** [1] - 4071:24

**COUNSEL** [1] - 3906:17

**couple** [14] - 3912:3, 3913:23, 3922:15, 3928:23, 3933:11, 3963:3, 3978:2, 3998:25, 3999:22, 4036:23, 4049:6, 4051:12, 4053:2, 4060:1

**course** [7] - 3919:12, 3945:12, 4032:9, 4039:9, 4051:13, 4051:17, 4051:18

**courses** [8] - 3916:13, 3917:21, 3917:22, 4048:16, 4051:10, 4051:11, 4051:22

**coursework** [1] - 4051:11

**COURT** [98] - 3905:1, 3905:17, 3908:1, 3908:4, 3908:7, 3908:11, 3923:23, 3924:9, 3924:12, 3931:22, 3931:24, 3942:10, 3947:4, 3947:6, 3951:14, 3964:23, 3964:25, 3965:4, 3965:7, 3965:11, 3965:13, 3968:21, 3968:23, 3969:7, 3982:16, 3982:20, 3991:22, 3991:24, 3992:1, 3992:4, 3998:7, 3998:10, 3998:21, 3998:23, 3999:2, 3999:6, 3999:9, 3999:12, 4005:11, 4005:19, 4006:2, 4006:6, 4015:16, 4015:19, 4017:7, 4020:7, 4020:11, 4022:21, 4022:24, 4023:3, 4023:19, 4026:21, 4028:12, 4028:15, 4028:18,

4030:13, 4030:15, 4030:19, 4030:22, 4031:25, 4032:2, 4032:8, 4032:25, 4034:13, 4034:15, 4034:17, 4036:2, 4036:4, 4036:7, 4036:19, 4037:2, 4037:21, 4037:25, 4038:3, 4039:3, 4039:8, 4039:12, 4040:9, 4041:7, 4041:9, 4042:2, 4042:5, 4042:10, 4042:14, 4042:19, 4042:21, 4057:2, 4058:25, 4059:4, 4059:10, 4067:22, 4068:15, 4068:21, 4068:24, 4069:7, 4071:10, 4071:20, 4071:23

**court** [4] - 3973:13, 4054:9, 4060:20, 4060:24

**Court** [11] - 3923:18, 3925:18, 3969:5, 4000:11, 4001:25, 4043:10, 4045:14, 4048:11, 4052:7, 4054:15, 4057:20

**COURTHOUSE** [1] - 3905:14

**courts** [1] - 4054:9

**cover** [4] - 3956:1, 3974:2, 3977:15, 4047:7

**covered** [2] - 4032:15, 4057:19

**CPAs** [1] - 3922:14

**create** [1] - 3927:14

**creation** [1] - 3953:18

**credentials** [2] - 4067:6, 4069:8

**credibility** [1] - 3969:8

**credit** [3] - 3910:21, 3936:14, 3937:2

**crisis** [3] - 3921:4, 3966:11, 4044:12

**Criteria** [1] - 3956:3

**criteria** [10] - 3932:11, 3940:10, 3956:10, 3956:14, 3956:16, 4065:23, 4066:8, 4067:17, 4067:19, 4068:18

**criterion** [6] - 3956:6, 3956:18, 3957:2, 4009:7, 4012:7, 4012:9

**dates** [1] - 3909:2

**criticism** [1] - 3962:16

**criticized** [1] - 3962:12

**CROSS** [2] - 3907:3, 3965:15

**Cross** [1] - 3965:1

**cross** [3] - 3924:7, 3965:9, 3998:14

**CROSS-EXAMINATION** [2] - 3907:3, 3965:15

**cross-examination** [2] - 3924:7, 3998:14

**culled** [1] - 4063:13

**cures** [1] - 3920:20

**Currency** [1] - 4044:22, 4046:1

**current** [3] - 3908:15, 4042:25, 4051:1

**customer** [3] - 3930:12, 3930:14, 3930:22

**customers** [2] - 3930:21, 4046:21

**cut** [1] - 3944:18

**D**

**DAC** [29] - 4020:17, 4021:25, 4022:2, 4023:10, 4023:12, 4024:20, 4025:5, 4025:11, 4025:16, 4025:23, 4036:5, 4036:8, 4036:10, 4036:14, 4036:22, 4036:24, 4037:15, 4038:5, 4038:6, 4038:15, 4038:17, 4038:24, 4039:3, 4039:7, 4041:3, 4041:16, 4041:17, 4041:18

**daily** [1] - 4038:16

**damage** [1] - 4050:5

**damages** [1] - 4050:3

**DANIEL** [1] - 3906:4

**data** [7] - 3945:4, 3945:7, 3952:14, 4022:11, 4037:14, 4070:5, 4070:7

**database** [3] - 3927:12, 3927:14, 3927:19

**date** [1] - 3909:21

**dated** [4] - 3969:20, 3986:13, 3990:15, 3991:2

**Daubert** [2] - 4067:17, 4068:20

**daughter's** [1] - 4043:7

**DAY** [1] - 3905:20

**day-to-day** [2] - 4037:11, 4039:9

**deal** [6] - 3917:23, 3919:7, 3922:10, 3926:17, 4053:15, 4053:20

**dealing** [3] - 3912:21, 4060:5, 4061:7

**deals** [2] - 3911:18, 3911:19

**dealt** [3] - 3911:19, 4053:16, 4068:18

**Dean** [1] - 3908:16

**decide** [1] - 3944:17

**decided** [1] - 3962:9

**decision** [6] - 3910:16, 3916:3, 3997:16, 4053:7, 4053:9, 4053:10

**Decision** [1] - 4053:2

**Decisions** [1] - 3956:4

**decisions** [8] - 3910:20, 3910:21, 3917:3, 3917:6, 3917:8, 3935:1, 3955:3, 3956:17

**decline** [1] - 4048:8

**declines** [1] - 4056:4

**decrease** [1] - 4035:23

**decreases** [1] - 4035:13

**deducted** [2] - 4019:12, 4020:2

**deduction** [1] - 4019:16

**deductions** [2] - 3963:6, 3963:7

**deep** [1] - 3953:15

**DEFENDANT** [1] - 3905:11

**defendant** [3] - 3924:4, 3988:2, 3988:12

**Defendant's** [12] - 3907:9, 3930:5, 3931:4, 3931:18, 3931:21, 3931:25, 3932:3, 3950:19, 3955:10, 4007:4, 4011:8, 4030:3

**DEFENDANTS** [3] - 3905:7, 3906:10, 3906:15

**defendants** [12] - 3908:3, 3908:5,

3975:20, 3981:18, 3981:21, 3981:25, 3987:24, 3988:5, 3989:12, 3998:13, 4042:18, 4058:11

**Defendants** [1] - 3908:6

**Defense** [1] - 4026:19

**deferred** [18] - 3968:11, 3968:12, 3968:13, 3970:20, 3970:22, 3970:23, 3970:24, 3971:1, 3971:2, 3971:3, 3971:25, 4003:8, 4022:2, 4022:5, 4023:8, 4024:20, 4025:20, 4036:25

**Deferred** [2] - 3971:10, 4036:13

**define** [2] - 3917:12, 4032:6

**defined** [3] - 3965:24, 3968:1, 3968:5

**defines** [1] - 4033:19

**degree** [6] - 3908:22, 3908:24, 3909:4, 3983:13, 3994:1, 4043:12

**degrees** [1] - 3909:3

**delegated** [2] - 3914:14, 3936:10

**deleting** [1] - 4039:3

**demonstrated** [1] - 4058:16

**demonstrative** [3] - 3931:16, 3932:8, 4030:3

**deny** [1] - 4023:4

**Department** [2] - 4044:20, 4045:23

**department** [5] - 3992:13, 3992:20, 3994:13, 4014:20, 4015:8

**departments** [2] - 3918:14, 3918:23

**depended** [1] - 3973:15

**dependent** [1] - 4039:23

**Deposit** [1] - 4044:19

**deposition** [43] - 3925:14, 3948:25, 3954:4, 3966:18, 3968:19, 3968:25, 3969:3, 3969:5, 3969:12, 3969:15, 3969:16, 3969:22, 3970:1, 3970:4,

3975:6, 3977:10, 3979:13, 3980:9, 3980:24, 3981:1, 3984:17, 3984:19, 3985:18, 3986:3, 3986:10, 3986:20, 3986:21, 3995:25, 3996:11, 3996:23, 3997:24, 4000:21, 4006:24, 4013:14, 4014:2, 4014:3, 4015:13, 4015:23, 4015:25, 4016:5, 4062:8, 4063:20, 4063:25

**depositions** [8] - 3932:23, 3960:4, 3979:15, 3979:17, 3979:22, 3980:12, 3980:13, 4064:2

**depreciation** [1] - 3944:7

**DEPUTY** [1] - 3908:9

**derivatives** [1] - 3915:18

**describe** [10] - 3908:19, 3909:6, 3911:1, 3916:10, 3918:3, 3952:17, 4048:11, 4054:15, 4055:23, 4057:20

**described** [3] - 3954:12, 4045:19, 4056:22

**describes** [1] - 3956:17

**description** [4] - 3997:22, 3998:1, 3998:5, 4067:7

**design** [1] - 3945:21

**designed** [10] - 3910:16, 3910:24, 3915:21, 3916:3, 3916:8, 3926:24, 3931:13, 3932:9, 3946:21, 3955:4

**desirable** [1] - 3927:14

**desire** [1] - 3958:13

**detail** [6] - 4041:5, 4045:15, 4045:24, 4045:25, 4047:2, 4049:22

**determination** [3] - 3918:21, 3935:22, 3993:6

**determinations** [2] - 3936:5, 3944:23

**determine** [10] - 3918:11, 3946:21,

3949:10, 3955:1, 3994:5, 3996:20, 3997:20, 4007:23, 4045:5, 4051:20

**determining** [1] - 3918:25

**develop** [9] - 3941:15, 3973:3, 3973:9, 3973:18, 3976:11, 3984:9, 3995:8, 4006:15, 4010:1

**developed** [9] - 3922:17, 3922:22, 3946:13, 3947:3, 3953:2, 3953:3, 3966:14, 3973:16, 3996:6

**developing** [8] - 3919:3, 3923:16, 3973:11, 3979:4, 3979:8, 3979:14, 3982:13, 3982:24

**development** [3] - 3953:9, 3973:21, 4050:18

**developments** [1] - 4046:4

**deviations** [1] - 3928:6

**devoted** [3] - 3917:21, 3959:24, 4062:22

**Dial** [1] - 4043:4

**differ** [2] - 3916:19, 3948:3

**difference** [2] - 4027:14, 4057:14

**differences** [2] - 3968:17, 4027:16

**different** [14] - 3913:3, 3919:24, 3927:9, 3928:6, 3943:18, 3945:10, 3948:8, 3951:11, 3983:24, 3990:9, 4006:16, 4063:6, 4066:7, 4069:14

**differentiation** [1] - 4040:17

**differently** [1] - 3921:14

**difficult** [2] - 3927:10, 3948:4

**diligent** [1] - 3995:18

**dimensions** [1] - 4058:8

**diminish** [1] - 3921:15

**DIRE** [2] - 3907:5, 4059:6

**dire** [6] - 4056:25, 4057:1, 4057:4,

4059:2, 4059:4, 4071:13

**direct** [25] - 3924:24, 3931:12, 3945:19, 3946:11, 3962:14, 3970:8, 3975:4, 3979:12, 3989:14, 3998:15, 4001:5, 4001:16, 4008:7, 4008:12, 4011:14, 4014:21, 4014:25, 4016:20, 4018:7, 4018:20, 4026:19, 4029:12, 4032:3, 4032:23, 4057:1

**DIRECT** [4] - 3907:2, 3907:4, 3908:14, 4042:23

**directed** [2] - 3978:12, 3982:8

**direction** [4] - 3932:6, 3940:25, 3982:5, 4023:21

**directly** [16] - 3940:23, 3941:5, 3945:5, 3950:10, 3961:20, 3962:21, 3981:22, 4003:8, 4011:22, 4018:25, 4019:18, 4019:20, 4020:16, 4023:25, 4024:4, 4024:17

**DIRECTOR** [1] - 3906:17

**Directors** [1] - 3984:2

**directs** [1] - 3941:4

**disagree** [1] - 3939:4

**disagreements** [1] - 4045:7

**disburses** [1] - 3940:23

**disclosure** [1] - 4041:3

**disclosures** [1] - 3912:25

**disconsonant** [2] - 3939:13, 3998:2

**discovered** [1] - 4004:6

**discretion** [9] - 3934:23, 3935:13, 3935:16, 3935:21, 3936:1, 3936:2, 3936:4, 3936:5, 3936:11

**discuss** [1] - 3915:15

**discussed** [3] - 3993:1, 3993:19, 4007:12

**discusses** [2] -

3985:7, 4024:3

**discussing** [7] - 3932:10, 3938:25, 3940:8, 4010:19, 4016:7, 4017:11

**discussion** [3] - 3915:19, 3977:2, 4069:23

**discussions** [7] - 3924:2, 3925:13, 3932:21, 3981:6, 3981:7, 3981:24, 3999:17

**diseconomies** [1] - 4056:8

**dispute** [1] - 3977:10

**disqualifying** [1] - 4069:5

**dissertation** [1] - 3908:25

**distinct** [1] - 3981:11

**distinguish** [1] - 4028:6

**distinguished** [1] - 3922:14

**distributed** [1] - 4055:3

**distribution** [8] - 3961:12, 4010:20, 4010:22, 4045:2, 4049:19, 4049:23, 4055:3, 4056:16

**DISTRICT** [4] - 3905:1, 3905:1, 3905:17, 3905:18

**dividends** [1] - 3961:14

**division** [2] - 3936:9, 3957:9

**division's** [1] - 3957:10

**divisions** [5] - 3957:11, 3957:13, 3958:19, 4012:17, 4012:18

**doctor** [1] - 4057:2

**Doctor** [1] - 4020:12

**Doctorate** [3] - 3908:25, 3909:5, 3909:7

**document** [43] - 3926:4, 3926:11, 3927:2, 3931:20, 3932:5, 3932:13, 3932:15, 3950:21, 3951:2, 3951:5, 3959:7, 3977:5, 3980:7, 3988:21, 3990:20, 3991:2, 3996:1, 3996:7,

3997:7, 3997:9, 4000:12, 4000:14, 4000:22, 4000:23, 4001:6, 4001:13, 4001:17, 4001:24, 4002:2, 4011:15, 4020:9, 4025:13, 4025:20, 4027:6, 4027:7, 4029:13, 4029:25, 4033:4, 4033:14, 4034:1, 4034:2, 4034:3
**documentation** [1] - 3979:7
**documents** [37] - 3913:5, 3923:14, 3925:9, 3925:14, 3932:16, 3932:23, 3935:6, 3948:23, 3948:24, 3950:1, 3951:6, 3951:7, 3954:5, 3960:2, 3975:4, 3978:4, 3978:9, 3978:11, 3978:13, 3978:25, 3979:4, 3979:7, 3979:25, 3980:2, 3983:3, 3992:2, 3996:24, 3997:2, 3997:15, 3997:17, 3997:19, 4035:6, 4039:18, 4039:20, 4040:7, 4041:4
**dollar** [4] - 3943:25, 3944:4, 4049:9, 4050:1
**dollars** [1] - 4062:15
**done** [25] - 3909:25, 3910:11, 3911:1, 3917:20, 3919:19, 3920:20, 3947:16, 3949:19, 3953:4, 3961:24, 3964:4, 3977:19, 3983:2, 3986:11, 3993:13, 4002:23, 4004:2, 4036:24, 4050:12, 4052:1, 4055:13, 4057:22, 4060:19, 4064:17, 4068:7
**doubt** [1] - 3989:22
**down** [24] - 3951:1, 3965:7, 3994:23, 3998:12, 3999:4, 4005:7, 4005:17, 4007:25, 4008:15, 4018:8, 4020:25, 4022:18, 4022:23, 4026:17, 4031:11, 4035:19, 4036:4,

4037:9, 4040:11, 4041:20, 4042:3, 4045:13, 4070:20, 4071:21
**Dr** [16] - 3965:16, 3988:21, 3999:15, 4033:4, 4042:25, 4043:10, 4052:15, 4054:2, 4058:12, 4068:2, 4068:5, 4068:6, 4068:8, 4068:25, 4069:5, 4069:8
**draft** [4] - 3985:17, 3986:11, 3989:17, 3989:20
**drafted** [14] - 3975:18, 3976:13, 3976:16, 3977:13, 3985:12, 3986:3, 3986:6, 3986:17, 3987:11, 3987:17, 3987:18, 3990:4, 4009:15, 4011:5
**drafter** [1] - 4009:20
**drafting** [19] - 3974:16, 3975:9, 3976:9, 3976:20, 3976:21, 3976:24, 3977:2, 3977:5, 3977:8, 3977:16, 3978:4, 3989:25, 3990:1, 3990:3, 3990:6, 3990:21, 3990:22, 3991:13, 3991:15
**draftsperson** [1] - 3974:19
**drawn** [1] - 4025:14
**drive** [1] - 3992:22
**driven** [1] - 3940:11
**driver** [4] - 3945:17, 3945:18, 3946:4, 4007:21
**drivers** [19] - 3945:5, 3945:16, 3945:21, 3945:24, 3946:1, 3952:8, 3956:5, 3956:7, 3958:11, 3994:5, 4002:16, 4002:22, 4003:14, 4007:16, 4007:19, 4007:24, 4008:2, 4008:3, 4013:7
**drove** [1] - 3944:7
**due** [1] - 3926:23
**duration** [1] - 3910:12
**during** [15] - 3909:10, 3909:11, 3913:8, 3915:11, 3915:13,

3922:5, 3966:10, 3966:18, 3967:23, 3972:22, 3977:9, 3977:10, 3984:17, 4032:9
**Duties** [1] - 3984:2
**duties** [1] - 3936:9
**duty** [1] - 4039:14
**DX-1510** [2] - 3926:3, 3930:4

---

# E

**earliest** [1] - 3918:5
**early** [4] - 3909:20, 3914:12, 3945:10, 4051:25
**earn** [1] - 4048:10
**earned** [2] - 3930:12, 3930:15
**ears** [1] - 3974:7
**easier** [1] - 3927:19
**easily** [1] - 3941:15
**EAST** [1] - 3905:14
**economic** [15] - 3917:14, 3917:16, 3920:2, 3923:3, 3937:16, 3939:11, 3943:11, 3956:17, 3964:6, 4044:21, 4044:22, 4049:8, 4065:2, 4070:8
**economically** [1] - 4011:23
**economics** [11] - 3939:25, 4043:12, 4043:14, 4043:23, 4044:1, 4044:2, 4051:8, 4051:14, 4058:12, 4067:7, 4069:18
**Economics** [3] - 4052:23, 4053:2, 4053:24
**economies** [19] - 4050:20, 4054:16, 4054:21, 4055:2, 4055:4, 4055:9, 4055:16, 4055:24, 4055:25, 4056:4, 4056:7, 4056:13, 4056:18, 4056:16, 4058:18, 4060:22, 4067:6, 4069:20, 4069:22
**Economist** [2] - 4045:11, 4049:5
**economist** [7] - 4045:21, 4048:15,

4049:7, 4052:2, 4054:11, 4058:1, 4069:4
**economy** [1] - 4057:14
**edited** [2] - 3975:11, 4057:23
**edition** [1] - 3955:16
**editions** [1] - 3911:13
**editor** [9] - 3912:20, 4052:19, 4052:20, 4053:7, 4053:10, 4053:16, 4053:21
**editorial** [4] - 4052:16, 4053:4, 4053:6, 4070:7
**editors** [1] - 4053:10
**education** [2] - 3955:7, 4070:1
**educational** [2] - 3908:19, 4043:11
**effect** [19] - 3945:19, 3945:21, 3956:6, 3956:9, 3956:15, 3956:19, 3957:21, 3967:4, 3993:25, 3995:16, 4009:4, 4009:7, 4011:25, 4013:2, 4013:6, 4020:23, 4023:7, 4027:25, 4035:25
**effective** [7] - 4028:1, 4028:2, 4028:3, 4028:20, 4028:23, 4029:9
**effects** [4] - 4020:21, 4025:25, 4026:8, 4038:20
**efficiency** [1] - 3923:9
**effort** [8] - 3946:22, 3948:7, 3952:12, 3959:24, 3961:11, 3994:18, 3995:1, 3995:7
**efforts** [1] - 3915:22
**eight** [6] - 3926:24, 3931:13, 3931:15, 3932:25, 3933:1, 4029:21
**eighth** [1] - 3936:14
**EITF** [18] - 3926:8, 3926:10, 3926:19, 3926:24, 3927:17, 3927:21, 3928:3, 3932:10, 3932:15, 3940:7, 4026:20, 4027:9, 4027:17, 4029:17, 4029:18, 4031:2, 4031:5, 4031:21

**EITFs** [1] - 4032:6
**either** [14] - 3921:6, 3933:5, 3958:10, 3966:22, 3973:12, 3991:15, 4011:22, 4046:4, 4048:3, 4051:24, 4052:19, 4053:24, 4056:6, 4064:17
**electrical** [1] - 3944:14
**electronic** [2] - 3927:9, 3927:12
**element** [3] - 3947:4, 3971:3, 4006:21
**elements** [5] - 3952:21, 3968:16, 3984:22, 4013:4, 4035:19
**eligible** [1] - 3918:16
**eliminating** [1] - 4039:6
**embark** [1] - 3983:13
**embodied** [1] - 3939:18
**emerge** [1] - 3928:7
**Emerging** [2] - 3926:7, 3926:14
**emerging** [3] - 3926:25, 3928:11, 3979:5
**Eminent** [1] - 4043:4
**Emphasis** [1] - 3955:17
**employ** [2] - 3971:23, 3972:5
**employed** [3] - 3999:16, 4003:19, 4050:23
**employee** [3] - 3978:1, 4062:4, 4062:5
**employees** [6] - 3950:8, 3950:10, 3959:24, 3961:17, 3961:19, 4019:2
**employer** [2] - 3941:22, 3942:3
**employment** [3] - 3909:6, 3967:25, 4044:1
**employs** [1] - 4053:13
**encompasses** [1] - 3911:6
**end** [2] - 3980:13, 4049:14
**endeavor** [5] - 3917:14, 3917:17, 3920:2, 3943:11, 3947:11
**endeavors** [1] - 3916:18

ended [2] - 3913:18, 3994:13
ending [1] - 4002:3
endowed [1] - 3909:17
engaged [8] - 3973:17, 3981:13, 4003:18, 4004:11, 4008:23, 4046:14, 4046:16, 4052:3
engagement [5] - 3947:18, 3948:3, 3981:16, 3983:13
engagements [1] - 3923:6
Enron [1] - 3920:14
ensure [1] - 4049:13
enter [1] - 3936:2
entered [1] - 4050:2
enterprise [1] - 3910:18
enterprises [6] - 3910:23, 3912:10, 3915:7, 3916:4, 3917:4, 3955:5
entertain [1] - 3924:6
entire [4] - 3941:3, 4029:25, 4040:9, 4040:10
entirely [3] - 3924:1, 3949:7, 4042:1
entirety [8] - 3980:7, 3984:5, 3987:21, 4029:19, 4063:21, 4063:24, 4064:2, 4064:3
entities [5] - 3913:7, 4019:7, 4019:10, 4028:4, 4058:5
entitled [6] - 3956:3, 3973:25, 4001:8, 4017:21, 4018:8, 4033:10
entity [10] - 3910:17, 3933:9, 3933:12, 3934:8, 3935:12, 3935:22, 3936:14, 4019:4, 4019:17, 4033:20
entries [1] - 3990:20
entry [1] - 4037:5
environment [3] - 3919:9, 4004:24, 4005:2
EQAT [19] - 3924:19, 3925:21, 3939:3, 3939:24, 3948:13, 3949:5, 3951:2, 3959:3, 3963:21, 4001:11, 4001:14,

4005:8, 4010:8, 4013:24, 4020:25, 4026:17, 4034:22, 4035:15
equations [1] - 3994:24
EQUITABLE [3] - 3905:6, 3905:10, 3906:18
Equitable [34] - 3948:15, 3949:6, 3949:14, 3950:4, 3950:17, 3951:20, 3951:23, 3952:7, 3952:8, 3959:2, 3959:11, 3959:17, 3959:18, 3960:18, 3960:24, 3961:6, 4008:23, 4009:1, 4010:12, 4017:14, 4018:18, 4019:12, 4019:22, 4019:24, 4020:3, 4020:19, 4020:22, 4020:24, 4021:3, 4021:14, 4021:22, 4025:17, 4026:5, 4026:16
Equitable's [1] - 3950:3
equity [2] - 3956:21, 4051:16
Ernst [3] - 3953:5, 3953:8, 4000:4
errors [2] - 3988:9, 3989:2
ESQUIRE [14] - 3906:4, 3906:4, 3906:5, 3906:5, 3906:6, 3906:6, 3906:7, 3906:10, 3906:13, 3906:13, 3906:14, 3906:14, 3906:15, 3906:17
essentially [9] - 3918:17, 3928:14, 3936:15, 3943:2, 3943:13, 3964:5, 4002:4, 4009:25, 4037:10
Essentially [1] - 3942:19
establish [2] - 4003:5, 4015:14
established [5] - 3913:6, 3916:24, 3926:16, 3928:17, 4027:10
establishing [5] - 3915:6, 3916:25, 3926:22, 3934:9,

3934:15
establishment [1] - 3953:7
estate [1] - 4061:18
estimate [3] - 3946:7, 3947:23, 3958:13
et [3] - 3905:3, 3905:6, 3905:8
evaluate [2] - 3919:4, 4039:20
evaluated [3] - 3947:12, 3962:6, 4047:9
evaluating [2] - 3954:9, 4048:23
evaluation [2] - 4037:4, 4052:13
evaluations [1] - 4023:9
evening [1] - 4071:23
eventually [3] - 3973:17, 4026:17, 4035:19
evidence [19] - 3907:9, 3907:10, 3907:11, 3931:21, 3931:25, 3934:3, 3937:6, 3940:9, 3947:15, 3952:2, 3970:6, 3991:20, 3992:6, 4000:10, 4034:12, 4034:18, 4035:6, 4056:17, 4065:22
exact [3] - 3909:21, 3974:17, 3976:3
exactly [1] - 3954:13
EXAMINATION [6] - 3907:2, 3907:3, 3907:4, 3908:14, 3965:15, 4042:23
examination [6] - 3921:21, 3924:7, 3975:5, 3998:14, 4044:23, 4046:5
examined [1] - 4060:25
examining [1] - 4050:21
example [30] - 3914:5, 3915:8, 3918:17, 3919:8, 3919:16, 3928:21, 3928:24, 3938:16, 3938:21, 3941:20, 3943:21, 3944:21, 3958:1, 3958:17, 3968:13, 3983:16, 3993:13, 4012:9, 4012:11, 4031:16, 4036:16,

4046:6, 4046:10, 4047:15, 4048:20, 4050:23, 4065:7, 4065:25, 4066:13, 4066:19
examples [3] - 3933:11, 3934:20, 3941:19
Excel [1] - 3954:5
exception [2] - 4003:10, 4038:22
excerpt [1] - 3955:16
Exchange [4] - 3914:5, 3921:14, 4069:14, 4069:18
excluded [5] - 4030:6, 4030:17, 4031:20, 4037:18, 4038:25
Excludes [1] - 4031:7
excluding [2] - 3963:7, 4021:24
exclusion [1] - 4041:3
exclusive [1] - 3975:3
exclusively [1] - 4068:9
excuse [1] - 4067:18
excused [1] - 4042:4
Executive [2] - 3914:23, 3965:25
executive [1] - 3913:2
executives [3] - 3912:6, 3912:10, 3926:15
Exhibit [22] - 3907:9, 3907:11, 3930:5, 3931:4, 3931:19, 3931:21, 3931:25, 3932:3, 3950:20, 3955:10, 3959:6, 4000:15, 4000:22, 4007:4, 4008:10, 4011:9, 4015:15, 4015:21, 4016:4, 4026:20, 4030:3, 4034:18
exhibit [12] - 3932:17, 3933:7, 3934:21, 3950:24, 3996:25, 3997:1, 3997:3, 4000:17, 4000:24, 4016:9, 4016:11, 4030:3
exhibits [3] - 3968:25, 3996:24, 3997:3
Exhibits [2] - 3907:10, 3992:5
exist [8] - 3944:24, 3945:2, 3945:24, 3946:1, 3946:4, 3957:21, 3970:22,

4060:22
existence [2] - 3945:5, 4056:13
existing [3] - 3927:15, 3927:18, 3936:3
exists [7] - 3943:10, 4016:21, 4023:12, 4035:11, 4056:18, 4065:23, 4067:18
expand [1] - 3964:14
expect [3] - 3910:2, 4019:11, 4028:17
expense [18] - 3931:12, 3935:15, 3936:22, 3942:1, 3960:6, 3963:7, 3964:3, 3992:22, 3997:9, 4014:22, 4017:10, 4019:7, 4019:11, 4019:13, 4028:8, 4029:1, 4037:16, 4041:25
Expense [2] - 4001:8, 4017:21
Expenses [1] - 4018:9
expenses [95] - 3924:24, 3925:22, 3928:9, 3928:10, 3928:18, 3937:10, 3938:2, 3938:7, 3939:2, 3939:23, 3940:12, 3940:16, 3948:14, 3949:21, 3951:20, 3951:21, 3952:3, 3952:6, 3952:14, 3959:2, 3960:17, 3962:5, 3963:8, 3963:14, 3964:4, 3964:13, 3964:17, 3992:11, 3996:9, 4002:12, 4002:15, 4002:24, 4002:25, 4003:6, 4003:7, 4005:7, 4005:16, 4005:17, 4005:21, 4007:25, 4008:14, 4008:19, 4008:21, 4009:2, 4009:3, 4010:20, 4010:23, 4016:20, 4017:14, 4018:14, 4018:18, 4018:21, 4019:11, 4019:12, 4019:18, 4019:20, 4019:22, 4019:24, 4020:2, 4020:3, 4020:5, 4020:20, 4020:22, 4020:24, 4020:25, 4021:3, 4021:14, 4021:19,

4021:22, 4021:23, 4022:17, 4025:17, 4025:24, 4025:25, 4026:5, 4026:6, 4026:8, 4026:12, 4026:16, 4027:1, 4027:3, 4030:8, 4035:1, 4035:5, 4035:12, 4037:19, 4038:17, 4038:18, 4039:4, 4039:15, 4039:16, 4039:21

**experience** [21] - 3916:10, 3923:10, 3923:22, 3953:14, 3965:20, 3965:23, 3967:14, 3972:7, 3972:10, 3972:17, 3992:8, 3992:9, 4054:14, 4054:16, 4055:8, 4055:15, 4057:20, 4057:21, 4058:4, 4058:13, 4070:1

**Expert** [1] - 3969:1

**expert** [37] - 3908:6, 3923:19, 3923:21, 3924:13, 3939:21, 3946:24, 3969:2, 3972:8, 3972:11, 3980:1, 3984:24, 4000:15, 4000:18, 4008:8, 4015:21, 4015:23, 4042:8, 4054:3, 4057:3, 4058:12, 4059:17, 4060:17, 4060:18, 4060:20, 4061:5, 4061:9, 4061:12, 4061:15, 4061:18, 4061:23, 4061:25, 4062:2, 4062:18, 4067:15, 4069:25, 4071:1, 4071:5

**expert's** [1] - 4070:2

**expertise** [3] - 3971:7, 3971:9, 4070:23

**experts** [2] - 3963:4, 4058:15

**explain** [7] - 3911:24, 3914:21, 3917:19, 3920:8, 3942:18, 4030:15, 4037:8

**explained** [2] - 4040:4, 4041:4

**explains** [1] - 4065:4

**explanation** [2] - 4067:9, 4069:3

**exposure** [2] - 4050:17, 4058:7

**expressed** [1] - 4039:24

**expresses** [1] - 3956:15

**expressing** [1] - 3973:22

**extension** [1] - 3959:25

**extensive** [1] - 3953:16

**extent** [13] - 3920:12, 3946:2, 3962:20, 3992:16, 4007:20, 4013:13, 4014:16, 4046:7, 4048:7, 4051:20, 4055:16, 4056:11, 4058:17

**extenuating** [1] - 4020:13

**external** [3] - 4014:20, 4015:8, 4039:25

**extinguish** [1] - 3920:21

**extreme** [1] - 3939:6

# F

**face** [3] - 4004:24, 4047:20, 4058:3

**faced** [2] - 4066:14, 4068:3

**faces** [3] - 4058:23, 4068:10, 4068:14

**facets** [1] - 3916:5

**facilities** [1] - 3915:12

**fact** [10] - 3942:3, 3942:4, 3953:8, 3969:16, 4013:15, 4022:16, 4039:1, 4068:11, 4070:4

**factor** [2] - 4040:14, 4070:4

**factors** [4] - 3937:9, 4051:20, 4068:20, 4071:4

**facts** [7] - 3943:18, 3973:9, 4009:13, 4070:5, 4070:7, 4070:13, 4071:2

**faculty** [2] - 3909:8, 3909:14

**failed** [1] - 3920:14

**failure** [1] - 3921:4

**failures** [1] - 4048:2

**fair** [39] - 3916:23, 3938:23, 3965:21, 3970:4, 3970:16, 3971:15, 3971:20, 3972:19, 3975:16,

3977:7, 3978:6, 3979:24, 3980:6, 3980:8, 3989:3, 3989:11, 3993:11, 3994:25, 3995:3, 3995:4, 3995:6, 3997:13, 4001:21, 4006:13, 4006:18, 4014:5, 4014:8, 4014:12, 4015:10, 4016:23, 4024:16, 4026:18, 4027:9, 4045:3, 4050:1, 4063:19

**fairly** [3] - 3945:22, 3954:23, 4004:20

**fairness** [1] - 3956:21

**faithful** [2] - 3937:19, 3937:21

**fall** [2] - 4043:9

**familiar** [11] - 3911:21, 3914:25, 3946:17, 3984:3, 4007:7, 4011:19, 4011:20, 4014:20, 4033:4, 4034:10, 4063:7

**familiarize** [1] - 3973:8

**familiarized** [1] - 3971:19

**far** [4] - 3917:10, 3938:25, 3944:20, 3989:13

**Fargo** [1] - 4047:16

**FASB** [25] - 3914:25, 3915:2, 3915:3, 3915:4, 3915:5, 3915:9, 3915:10, 3915:15, 3915:16, 3915:21, 3926:17, 3926:22, 3927:3, 3927:13, 3927:22, 4027:22, 4030:4, 4031:19, 4032:5, 4032:7, 4033:7, 4033:23, 4034:2, 4034:7

**FDIC** [1] - 4044:19

**feasible** [1] - 4011:22

**feature** [2] - 3941:17, 3953:7

**February** [2] - 3981:10, 3981:12

**FEBRUARY** [1] - 3955:13

**Fed** [2] - 4044:11, 4058:6

**federal** [1] - 4054:9

**Federal** [11] - 4011:18, 4044:8, 4044:13,

4044:16, 4044:17, 4044:19, 4046:24, 4047:12, 4048:13, 4048:25, 4070:10

**fee** [12] - 3930:15, 3975:22, 4030:8, 4040:13, 4050:15, 4050:22, 4055:18, 4056:22, 4057:9, 4058:19, 4060:2

**fees** [26] - 3924:22, 3925:3, 3925:20, 3937:10, 3938:5, 3939:23, 3940:16, 3940:19, 3941:4, 3941:10, 3963:6, 3963:13, 3964:3, 4026:25, 4040:11, 4056:16, 4057:12, 4057:13, 4057:21, 4058:20, 4058:21, 4060:13, 4060:14, 4065:4, 4067:2

**fell** [1] - 4029:16

**felt** [1] - 3983:15

**fetching** [1] - 3944:10

**fewer** [1] - 4028:10

**fiduciary** [1] - 4039:14

**field** [8] - 3908:25, 3909:23, 3910:1, 3955:19, 4034:4, 4052:19, 4053:14, 4054:19

**fields** [1] - 3910:6

**fifth** [1] - 3935:12

**figure** [2] - 3992:1, 4038:3

**figures** [1] - 3938:19

**filed** [1] - 3923:25

**final** [1] - 3986:10

**finally** [1] - 4058:22

**finance** [7] - 4043:1, 4043:13, 4043:15, 4044:3, 4051:8, 4051:12, 4051:13

**Finance** [4] - 4043:4, 4044:2, 4052:22, 4053:21

**financial** [73] - 3910:3, 3910:7, 3910:13, 3910:14, 3910:22, 3911:2, 3911:5, 3911:8, 3911:12, 3911:15, 3911:19, 3912:13, 3912:25, 3913:11, 3914:2, 3914:3, 3916:6, 3916:20, 3916:23, 3917:9, 3919:7, 3920:3, 3920:13,

3920:19, 3920:22, 3921:5, 3921:16, 3923:5, 3923:19, 3924:13, 3938:5, 3938:10, 3938:15, 3938:16, 3939:1, 3939:18, 3951:22, 3951:25, 3960:14, 3960:20, 3967:5, 3972:1, 3972:21, 3992:14, 3992:19, 4027:12, 4027:13, 4027:14, 4029:3, 4029:4, 4029:5, 4029:10, 4035:2, 4040:1, 4044:3, 4044:12, 4044:24, 4045:21, 4048:14, 4048:15, 4048:24, 4051:14, 4051:15, 4052:9, 4053:1, 4053:19, 4053:20, 4053:25, 4064:25, 4065:5, 4065:18

**Financial** [12] - 3910:15, 3911:22, 3915:5, 3920:24, 4027:7, 4027:11, 4033:10, 4052:22, 4052:23, 4052:24, 4052:25, 4053:24

**financials** [1] - 3938:16

**fine** [4] - 3971:2, 4001:2, 4023:20, 4041:9

**finish** [2] - 4028:12, 4071:19

**finished** [2] - 3924:3, 4031:25

**firm** [10] - 3953:4, 3973:18, 3973:20, 3974:5, 3974:7, 3974:10, 3976:6, 3977:18, 4042:17, 4065:2

**firm's** [1] - 4054:25

**firms** [10] - 3912:11, 3953:6, 3953:14, 4046:9, 4046:18, 4055:3, 4055:5, 4055:6, 4056:14

**first** [21] - 3909:8, 3914:12, 3928:14, 3930:6, 3930:18, 3933:8, 3952:6, 3956:1, 3956:23, 3969:15, 3969:18, 3972:14, 3985:17, 3989:20, 3995:21,

4008:15, 4027:6, 4029:22, 4042:13, 4042:16, 4054:20

**First** [1] - 3960:23

**FISHER** [2] - 3905:14, 3906:6

**fit** [1] - 4056:21

**five** [11] - 3909:9, 3911:13, 3913:17, 3920:17, 3926:24, 3972:20, 3972:22, 3993:19, 3994:17, 4052:17, 4062:21

**five-year** [2] - 3913:17, 3972:22

**flesh** [2] - 3912:19, 3943:7

**flexibility** [1] - 3917:1

**Florida** [4] - 4043:3, 4043:6, 4051:2, 4069:10

**flow** [2] - 3951:11, 3955:3

**flowed** [1] - 3959:23

**flows** [2] - 3945:8, 4039:23

**fluidity** [1] - 4071:18

**flustered** [1] - 4005:20

**FMG** [112] - 3924:18, 3924:21, 3925:10, 3925:12, 3930:20, 3932:18, 3932:19, 3933:9, 3933:12, 3933:18, 3933:20, 3933:23, 3933:24, 3934:4, 3934:8, 3934:10, 3934:12, 3934:15, 3934:18, 3934:21, 3934:24, 3935:2, 3935:4, 3935:8, 3935:12, 3935:14, 3935:16, 3935:19, 3935:22, 3935:24, 3936:12, 3936:14, 3936:21, 3936:25, 3937:1, 3939:2, 3940:15, 3941:4, 3948:12, 3948:19, 3949:5, 3949:15, 3950:3, 3950:6, 3950:8, 3950:16, 3953:3, 3959:2, 3959:11, 3959:16, 3959:18, 3959:19, 3959:24, 3960:7, 3960:9, 3960:14, 3960:19, 3960:25, 3961:6, 3962:21, 3963:5, 3963:20, 3964:1,

4028:4

**follows** [1] - 4021:16

**footnote** [2] - 4011:14, 4013:10

**footnoted** [1] - 3984:7

**footnotes** [1] - 3979:1

**FOR** [3] - 3906:7, 3906:10, 3906:15

**force** [2] - 3912:23, 4010:13

**Force** [2] - 3926:7, 3926:14

**force's** [1] - 3928:12

**forgetting** [1] - 3981:20

**forgive** [1] - 4008:15

**forgotten** [1] - 4004:22

**form** [4] - 3979:1, 3981:14, 3997:13, 4070:2

**format** [1] - 4017:24

**formed** [3] - 3914:12, 3921:2, 3948:18

**forming** [6] - 3922:22, 3925:7, 3948:21, 3955:22, 3959:12, 3983:8

**forms** [1] - 3914:9

**formula** [4] - 3918:6, 3976:3, 3995:12, 4036:8

**forum** [2] - 3912:5, 3912:8

**forward** [1] - 3946:16

**foundation** [9] - 3925:1, 3948:18, 3953:22, 4015:14, 4020:8, 4022:22, 4030:12, 4031:22, 4031:23

**four** [6] - 3956:18, 4045:3, 4058:15, 4063:2, 4068:1, 4071:4

**fourth** [2] - 3934:18, 4031:11

**Francis** [1] - 3905:24

**FRANCIS** [1] - 3905:24

**Francisco** [6] - 4044:8, 4044:11, 4046:25, 4047:12, 4058:6, 4070:11

**Frank** [3] - 3982:16, 4023:3, 4030:13

**frankly** [1] - 3941:14

**fraud** [1] - 4061:21

**fraudulent** [4] - 3920:13, 3920:18,

3920:21, 3921:16

**Fraudulent** [1] - 3920:24

**frequency** [2] - 3921:15, 4066:23

**frequently** [4] - 3915:10, 3919:18, 3947:17, 4037:4

**front** [7] - 3932:2, 3980:15, 3991:2, 4008:11, 4011:13, 4014:24, 4036:16

**fuel** [1] - 3944:8

**fulfill** [2] - 3946:22, 3948:6

**fulfilled** [1] - 3949:9

**fulfilling** [3] - 3917:15, 3947:24, 3993:6

**full** [11] - 3909:16, 3934:23, 3935:16, 3936:1, 3936:2, 3936:3, 3936:4, 3949:10, 3996:20, 3997:20, 4051:4

**full-time** [1] - 4051:4

**function** [22] - 3914:11, 3917:15, 3917:17, 3945:18, 3946:8, 3947:16, 3947:24, 3948:4, 3948:6, 3949:9, 3949:10, 3950:13, 3950:14, 3950:15, 3955:2, 3962:23, 3994:23, 3996:21, 4013:19, 4037:3

**functional** [3] - 3910:15, 3916:2, 3923:4

**functioning** [2] - 3949:23, 3963:18

**functions** [6] - 3919:4, 3950:13, 3958:4, 3961:10, 3963:16, 3993:6

**fund** [36] - 3951:1, 3966:23, 3967:8, 4045:3, 4045:12, 4046:21, 4049:13, 4049:15, 4049:17, 4050:1, 4050:4, 4050:6, 4052:12, 4055:17, 4057:10, 4057:21, 4057:24, 4058:19, 4059:13, 4059:20, 4059:22, 4060:9, 4060:13, 4060:23, 4063:3, 4064:5, 4064:21, 4064:22, 4065:6,

4065:8, 4065:9, 4065:11, 4065:19, 4065:20, 4070:10

**Fund** [3] - 3984:1, 3984:18, 4069:13

**fund's** [4] - 4055:18, 4056:22, 4058:19, 4058:20

**Funds** [5] - 4045:2, 4045:4, 4045:7, 4049:19, 4049:24

**FUNDS** [1] - 3905:10

**funds** [53] - 3913:10, 3919:20, 3930:22, 3933:13, 3935:11, 3940:22, 3949:15, 3949:24, 3950:3, 3950:5, 3950:11, 3950:15, 3959:25, 3961:3, 3961:10, 3961:20, 3962:1, 3962:23, 3963:18, 3964:14, 3967:12, 3996:18, 3997:21, 4039:14, 4040:14, 4044:4, 4045:4, 4047:16, 4047:17, 4047:18, 4049:10, 4050:5, 4050:8, 4051:15, 4051:16, 4053:17, 4053:22, 4058:17, 4058:21, 4058:22, 4058:24, 4060:6, 4064:8, 4066:9, 4066:13, 4066:14, 4066:21, 4067:2, 4068:19, 4069:19, 4069:20

**furnish** [2] - 3933:25, 3935:4

**furnished** [1] - 3961:1

---

# G

**GAAP** [6] - 3911:8, 3915:7, 3938:19, 3938:25, 4029:11, 4031:8

**Gable** [1] - 3905:24

**GABLE** [1] - 3905:24

**gained** [2] - 3949:1, 3949:22

**GASB** [4] - 3915:1, 3915:10, 3915:13, 3915:16

**gatekeeper** [1] - 4053:6

**gather** [1] - 3965:3

**gathering** [1] - 3978:4

**gearing** [1] - 4071:15

gears [1] - 3942:9
general [26] - 3919:25, 3932:9, 3934:22, 3935:25, 3937:3, 3951:5, 3951:7, 3951:21, 3951:23, 3952:23, 3953:1, 3957:6, 3958:20, 3961:25, 3971:17, 3981:9, 3985:15, 3988:3, 4001:15, 4002:11, 4009:4, 4013:21, 4020:1, 4041:22, 4056:19, 4067:7
GENERAL [1] - 3906:17
Generally [6] - 3913:24, 3922:7, 3983:12, 4002:18, 4017:19, 4033:6
generally [44] - 3910:6, 3911:6, 3911:16, 3913:6, 3913:19, 3913:22, 3914:4, 3914:6, 3914:7, 3914:9, 3916:25, 3917:13, 3918:2, 3918:18, 3920:5, 3923:11, 3937:5, 3937:6, 3937:13, 3940:10, 3950:11, 3952:7, 3957:23, 3962:3, 3965:21, 3967:13, 3970:25, 3977:7, 3988:15, 3992:12, 4006:13, 4007:10, 4010:9, 4010:16, 4013:13, 4014:8, 4014:12, 4021:16, 4034:8, 4036:22, 4051:12, 4055:23, 4064:25, 4065:18
generate [3] - 3929:23, 3952:21, 3983:14
generated [3] - 3952:25, 4010:16, 4032:6
generating [3] - 3917:18, 3958:14, 4004:20
generic [1] - 4065:18
given [10] - 3921:7, 3943:11, 3946:22, 3948:6, 3962:8, 3962:15, 3969:16, 3990:25, 4000:10, 4011:6

GLENN [1] - 3905:8
goal [3] - 3920:1, 3946:7, 3949:10
goals [2] - 3939:13, 3939:19
Gold [1] - 3922:13
goods [4] - 3928:25, 3929:1, 3929:12, 3930:13
Governance [2] - 3984:1, 3984:18
government [13] - 3912:22, 3913:21, 3919:10, 3919:12, 3967:20, 3993:2, 4044:5, 4044:6, 4044:25, 4045:16, 4045:20, 4050:10, 4055:13
Governmental [1] - 3967:23
governmental [1] - 3913:17
Governors [2] - 4044:14, 4044:17
graduate [1] - 4051:24
graduated [1] - 3922:12
graduating [1] - 3909:7
grant [1] - 3909:21
granted [2] - 3909:11, 3909:16
granular [1] - 3947:17
great [13] - 3917:7, 3919:13, 3921:5, 3922:9, 3925:9, 3927:17, 3943:22, 3955:6, 4013:19, 4016:13, 4020:16, 4038:21
greater [1] - 4038:23
Gross [1] - 3931:5
gross [11] - 3928:8, 3928:22, 3930:11, 3931:9, 3931:16, 3932:25, 3937:4, 3942:6, 4028:21, 4029:21
GROUP [1] - 3905:11
group [7] - 3913:1, 3913:2, 3913:19, 3926:15, 3952:19, 4027:10, 4066:2
groups [3] - 3910:9, 3911:10, 3952:16
guess [8] - 3920:12, 3924:12, 3964:1, 3986:12, 3986:25, 4015:20, 4023:18,

4038:6
guidance [16] - 3926:20, 3926:25, 3928:21, 3931:14, 3932:9, 3945:23, 3967:10, 3977:3, 3983:10, 3983:12, 3983:25, 4030:17, 4031:7, 4032:6, 4032:21, 4033:23
Guide [1] - 3956:3
guide [6] - 3912:21, 3966:15, 3966:19, 3967:2, 4032:18, 4032:19
guided [1] - 3916:24
guidelines [3] - 3938:25, 4031:21, 4032:12
guides [6] - 3911:15, 3913:4, 3966:17, 3967:5, 4031:15, 4032:22
GYN [1] - 3918:19

# H

H-o-l-d-e-r [1] - 3908:13
HADLEY [1] - 3906:12
half [5] - 3944:19, 4009:1, 4066:5, 4071:14, 4071:15
hand [6] - 3926:3, 3931:18, 3950:19, 3955:9, 3959:5, 3988:19
handbook [1] - 3916:16
handed [1] - 3990:13
happy [1] - 4071:8
harbor [1] - 3919:11
hard [1] - 3937:18
harm [1] - 4050:7
heading [1] - 3931:4
health [1] - 3941:24
healthcare [4] - 3941:23, 3968:1, 3968:2, 4062:2
hear [7] - 3968:21, 3972:9, 3982:14, 3993:17, 3995:21, 4019:15, 4023:1
heard [12] - 3920:23, 3924:2, 3958:6, 3974:9, 4001:22, 4007:2, 4010:20, 4036:10, 4046:17, 4067:23, 4068:22,

4070:14
hearing [1] - 4038:14
hedge [1] - 4051:16
Heimann [1] - 4046:3
held [13] - 3909:17, 3922:3, 3929:7, 4043:5, 4044:13, 4044:16, 4044:25, 4045:19, 4045:23, 4049:4, 4049:20, 4051:3, 4054:15
help [3] - 3915:21, 4000:9, 4070:3
helped [2] - 3929:15, 3976:9
helpful [4] - 3923:13, 3923:15, 3955:4, 3997:4
helps [1] - 4028:6
hereby [2] - 3933:18, 3933:23
hereunder [1] - 3936:9
herself [1] - 4042:7
hesitate [2] - 4038:9, 4041:8
hierarchy [1] - 4031:8
high [2] - 3947:12, 4012:17
higher [8] - 3918:18, 3957:9, 3957:11, 3957:22, 3957:23, 3958:2
highly [2] - 3927:13, 3954:18
hire [1] - 3957:24
hired [2] - 4050:12, 4050:14
hiring [1] - 4006:9
history [1] - 3909:7
hmm [1] - 3987:5
hold [2] - 3912:9, 4052:15
Hold [1] - 4020:7
Holder [45] - 3908:6, 3908:7, 3908:10, 3908:15, 3920:6, 3922:17, 3923:19, 3924:13, 3924:17, 3930:1, 3932:2, 3937:8, 3940:18, 3942:14, 3948:12, 3950:16, 3951:16, 3955:13, 3955:24, 3956:11, 3957:15, 3959:7, 3964:11, 3965:7, 3965:13, 3965:16, 3969:17, 3969:18, 3973:25, 3974:16, 3974:20, 3988:21, 3998:15,

3999:4, 3999:9, 3999:15, 4000:12, 4006:3, 4020:12, 4022:25, 4026:21, 4028:18, 4032:10, 4033:4, 4036:5
holder [1] - 4057:10
HOLDER [6] - 3907:2, 3907:2, 3907:3, 3908:8, 3908:14, 3965:15
holders [1] - 4050:6
holding [3] - 4046:8, 4047:5, 4047:15
home [3] - 3944:1, 3944:11, 3944:18
honestly [2] - 3974:17, 3992:24
Honor [48] - 3908:3, 3908:5, 3923:18, 3923:24, 3924:8, 3931:20, 3931:23, 3942:8, 3946:23, 3951:10, 3964:9, 3964:21, 3964:24, 3965:2, 3965:14, 3968:22, 3969:9, 3982:21, 3991:19, 3991:25, 3998:22, 3999:8, 3999:13, 4015:17, 4023:2, 4023:20, 4028:11, 4032:23, 4033:2, 4034:11, 4034:14, 4036:1, 4037:20, 4038:2, 4039:11, 4041:22, 4042:6, 4042:15, 4056:24, 4057:6, 4058:11, 4059:2, 4059:9, 4067:4, 4067:24, 4068:17, 4068:22, 4071:6
HONORABLE [1] - 3905:17
Hood [7] - 4042:6, 4042:17, 4042:19, 4057:2, 4057:5, 4067:23, 4071:13
HOOD [13] - 3906:15, 3907:5, 4042:15, 4042:20, 4042:22, 4042:24, 4057:6, 4057:16, 4058:11, 4067:24, 4068:22, 4068:25, 4071:6
hope [1] - 4067:8
hopefully [1] - 4071:3
Hora [1] - 3908:5
HORA [38] - 3906:13,

3907:2, 3908:5, 3908:14, 3914:19, 3914:20, 3923:18, 3924:11, 3924:15, 3924:16, 3926:3, 3931:18, 3932:1, 3942:8, 3947:1, 3947:5, 3947:7, 3950:19, 3951:10, 3955:9, 3964:9, 3964:21, 3964:24, 3965:3, 3965:6, 3991:21, 3997:11, 3998:25, 4006:1, 4017:5, 4020:8, 4022:22, 4030:11, 4030:16, 4031:22, 4032:1, 4034:16, 4036:3

**Horngren** [6] - 3954:17, 3954:21, 3954:24, 3955:2, 3955:24, 4012:13

**Horngren's** [4] - 3958:17, 3983:16, 3993:12, 4012:21

**hospital** [8] - 3918:5, 3918:12, 3918:14, 3972:18, 3992:13, 3993:15, 3993:19, 4004:15

**hospitals** [1] - 3919:2

**hosts** [1] - 3912:3

**hour** [5] - 3975:20, 3998:17, 3998:21, 4071:14, 4071:15

**hours** [1] - 4062:10

**housed** [2] - 3915:12, 4047:20

**housekeeping** [1] - 3918:23

**huge** [1] - 3947:2

**human** [2] - 3918:23, 3961:17

**hundred** [3] - 3922:15, 4050:1, 4062:10

**hypothesis** [3] - 4065:19, 4065:24, 4066:9

**hypothesized** [1] - 4065:19

---

**I**

**idea** [1] - 4047:6

**ideas** [2] - 3912:8, 3983:6

**identical** [3] - 3943:4, 3943:14, 4029:9

**identification** [2] - 3988:20, 4002:21

**identified** [14] - 3924:7, 3940:6, 3946:13, 3951:18, 3968:20, 3979:20, 3979:23, 3984:22, 3985:19, 3985:22, 3990:23, 4002:16, 4007:19, 4064:10

**identifies** [2] - 3956:19, 4064:21

**identify** [9] - 3927:19, 3957:2, 3996:1, 3996:22, 4007:16, 4008:1, 4008:3, 4013:6, 4066:20

**identifying** [1] - 3912:24

**ilk** [1] - 3912:7

**illiquid** [1] - 4066:3

**illustrate** [1] - 3941:17

**illustrations** [1] - 3992:22

**illustrative** [1] - 3951:11

**image** [1] - 3957:7

**immediate** [2] - 3926:20, 3926:25

**immediately** [1] - 3983:9

**impact** [10] - 3942:5, 4020:17, 4021:25, 4022:18, 4023:10, 4025:20, 4025:23, 4037:22, 4038:6

**impeach** [1] - 3969:8

**implement** [2] - 3934:25, 4030:1

**implementation** [1] - 3972:16

**implemented** [1] - 3971:25

**implication** [1] - 4048:9

**implications** [1] - 4046:11

**imply** [1] - 3987:7

**importance** [1] - 3949:23

**important** [3] - 3940:8, 3941:17, 3950:6

**importantly** [1] - 3957:25

**impose** [1] - 4048:6

**in-source** [1] - 4051:21

**inaccurate** [1] - 4009:12

**inappropriate** [1] - 4030:7

**include** [10] - 3934:21, 3944:4, 3944:6, 3949:6, 3961:1, 3967:7, 3984:23, 4016:25, 4047:13

**included** [6] - 3960:14, 4012:11, 4012:13, 4016:25, 4022:17, 4035:20

**including** [10] - 3914:15, 3923:5, 3927:17, 3948:24, 3954:19, 3964:3, 3967:5, 4035:12, 4035:22, 4058:8

**Including** [1] - 4031:11

**income** [1] - 4017:24

**incorporated** [1] - 3960:22

**incorporates** [2] - 4024:13, 4024:15

**increase** [3] - 3945:19, 4021:23, 4038:18

**increased** [1] - 4047:8

**increases** [7] - 4021:19, 4021:24, 4056:2, 4056:5, 4056:10, 4057:11

**increasing** [1] - 4056:9

**incremental** [1] - 3917:5

**incur** [1] - 3947:23

**incurred** [23] - 3917:14, 3919:10, 3920:3, 3936:25, 3946:9, 3948:14, 3949:11, 3949:21, 3949:22, 3950:8, 3950:14, 3952:3, 3957:24, 3958:13, 3961:22, 3962:22, 3964:17, 4014:18, 4026:1, 4026:8, 4040:25, 4065:25, 4066:16

**incurrence** [1] - 3963:17

**incurring** [1] - 3942:1

**incurs** [1] - 4067:14

**indeed** [4] - 3934:4, 3937:2, 3951:22, 3967:24

**independent** [8] - 3912:5, 3973:8, 3989:6, 4007:23, 4039:25, 4045:2,

4049:18, 4049:23

**index** [1] - 3980:14

**indicate** [1] - 4008:13

**indicated** [17] - 3925:22, 3949:7, 3968:11, 3986:1, 3986:6, 3987:24, 3995:12, 4010:5, 4012:16, 4014:4, 4026:4, 4027:13, 4029:15, 4034:10, 4057:22, 4069:21, 4070:16

**indicates** [7] - 3960:24, 3989:17, 3990:21, 3991:5, 4009:24, 4011:21, 4017:23

**indication** [2] - 3989:2, 3991:13

**indicator** [1] - 3933:8

**indicators** [11] - 3928:16, 3931:13, 3931:16, 3932:11, 3932:14, 3932:25, 3934:2, 3937:4, 4028:10, 4028:20, 4029:20

**Indicators** [1] - 3931:5

**indirect** [2] - 4016:20, 4056:17

**individual** [5] - 3951:1, 3954:22, 3957:7, 3976:8, 4035:19

**individually** [1] - 3985:14

**individuals** [13] - 3910:17, 3910:18, 3912:7, 3912:13, 3917:4, 3943:3, 3952:11, 3961:8, 3961:12, 3978:3, 3999:17, 3999:22, 4034:4

**industrial** [3] - 4043:14, 4051:19, 4054:19

**industries** [3] - 3919:24, 3920:5, 4031:15

**industry** [24] - 3912:21, 3920:1, 3965:20, 3965:22, 3966:15, 3966:16, 3966:19, 3967:4, 3967:11, 3971:4, 3971:12, 3971:21, 4040:15, 4040:19, 4041:10, 4055:5,

4055:6, 4056:14, 4056:15, 4059:13, 4065:6, 4065:11, 4067:1

**industry's** [1] - 4054:25

**inexorably** [1] - 3940:11

**inference** [1] - 3973:15

**influence** [1] - 3938:13

**influential** [1] - 3922:16

**inform** [2] - 3938:8, 3955:25

**information** [44] - 3910:17, 3910:19, 3910:22, 3911:8, 3911:15, 3914:1, 3914:6, 3916:3, 3916:8, 3916:15, 3918:3, 3923:13, 3932:13, 3933:11, 3934:20, 3937:11, 3937:14, 3939:15, 3943:16, 3949:1, 3954:7, 3955:4, 3956:17, 3978:21, 3978:23, 3982:3, 3982:4, 3982:7, 3982:12, 3982:24, 3983:1, 4027:4, 4038:11, 4038:14, 4038:15, 4039:23, 4040:16, 4040:18, 4050:11, 4055:23, 4056:20, 4069:21

**informative** [2] - 3983:7, 4040:5

**informed** [2] - 3920:16, 3958:21

**informs** [1] - 4066:22

**infrequently** [1] - 4066:13

**inherent** [1] - 3943:9

**INS** [1] - 3905:6

**insights** [2] - 3920:19, 4056:12

**insofar** [2] - 3937:5, 4004:9

**instance** [1] - 4041:16

**instances** [9] - 3920:17, 3920:21, 3921:16, 3928:24, 3929:6, 3953:17, 3962:24, 3982:2, 3982:8

**instant** [2] - 3958:11, 4028:22

instead [1] - 3941:3
Institute [3] - 3911:22, 3921:24, 3922:14
institute [1] - 3911:25
institution [5] - 3921:7, 4043:16, 4043:22, 4048:24, 4067:14
institutions [18] - 3913:11, 3967:5, 4044:3, 4044:24, 4048:16, 4051:5, 4051:14, 4051:15, 4052:9, 4053:1, 4053:19, 4053:20, 4054:1, 4064:25, 4065:3, 4065:5, 4065:18, 4066:16
instruction [1] - 3979:6
Insurance [1] - 4044:19
insurance [27] - 3913:10, 3941:24, 3942:5, 3952:7, 3952:15, 3952:19, 3952:20, 3965:20, 3966:20, 3968:3, 3968:6, 3968:15, 3970:12, 3971:8, 3971:16, 3971:21, 3971:22, 3971:23, 3972:2, 4010:13, 4032:18, 4032:20, 4036:14, 4044:4, 4051:16, 4065:1
INSURANCE [1] - 3906:18
intend [2] - 3922:18, 3988:9
intent [2] - 3995:18, 4006:15
interact [3] - 3915:17, 3968:16, 3977:21
interacted [1] - 3977:20
interaction [1] - 3977:18
interchange [1] - 3912:8
interest [1] - 3913:9
interested [2] - 3920:12, 4066:8
Intermediate [1] - 3911:18
internal [2] - 4039:25, 4040:2
internally [1] - 3910:23
interpret [1] - 3934:1

interpreting [1] - 3936:18
interrelationship [1] - 3915:14
interrupt [1] - 4056:24
intertwined [1] - 4013:4
interviewed [1] - 3949:24
interviews [7] - 3925:13, 3932:20, 3949:2, 3954:6, 3960:2, 3975:5, 3981:6
introduce [2] - 4042:7, 4042:16
inventory [7] - 3929:3, 3929:4, 3929:5, 3929:9, 3929:22, 3933:4, 4029:23
investigation [1] - 4007:23
investment [48] - 3910:21, 3933:19, 3934:23, 3934:25, 3935:3, 3936:1, 3936:5, 3936:6, 3936:22, 3952:23, 3953:1, 3967:2, 3967:5, 3967:8, 3967:13, 3972:4, 3972:5, 3972:7, 3972:10, 3972:12, 4024:8, 4031:17, 4031:20, 4031:23, 4031:24, 4032:7, 4032:11, 4032:14, 4032:17, 4033:16, 4033:21, 4033:23, 4036:15, 4046:19, 4046:22, 4047:17, 4047:20, 4050:12, 4055:17, 4058:2, 4058:23, 4059:13, 4062:22, 4064:15, 4065:15, 4067:1, 4068:3, 4068:10
Investment [5] - 3984:2, 4032:15, 4033:10, 4033:20, 4035:15
investments [1] - 4066:3
investor [1] - 4038:8
investors [8] - 4010:16, 4038:7, 4039:5, 4039:15, 4040:22, 4050:9, 4055:18, 4058:19
invoice [7] - 3988:22,

3988:23, 3988:24, 3989:4, 3989:10, 3989:11, 3990:3
invoices [4] - 3988:6, 3988:8, 3988:11, 3988:13
involve [6] - 3944:7, 3944:12, 3944:23, 3966:23, 3970:19, 4050:19
involved [26] - 3911:14, 3918:5, 3919:5, 3919:15, 3923:6, 3934:15, 3935:9, 3935:22, 3938:12, 3944:10, 3947:19, 3953:6, 3953:8, 3967:15, 3967:16, 3968:9, 3971:16, 3972:21, 3981:7, 3990:1, 3990:2, 3994:17, 4044:5, 4048:12
involvement [5] - 3918:5, 3953:18, 3975:9, 3976:7, 3976:20
involving [4] - 3920:18, 3947:19, 4061:13, 4063:3
irrational [1] - 3958:7
isolated [1] - 3963:11
issue [19] - 3923:9, 3925:8, 3928:22, 3930:10, 3937:15, 3946:12, 4030:20, 4031:4, 4036:12, 4041:17, 4041:18, 4046:20, 4058:17, 4058:21, 4060:20, 4060:24, 4060:25, 4069:6, 4070:20
issued [6] - 3913:3, 3926:9, 3926:10, 3927:8, 3967:3, 4027:24
Issues [2] - 3926:7, 3926:14
issues [45] - 3912:4, 3916:17, 3917:25, 3919:15, 3924:7, 3926:25, 3928:11, 3965:19, 3970:20, 3971:16, 3973:1, 4044:9, 4044:11, 4044:18, 4045:11, 4045:12, 4046:4, 4046:7, 4046:13, 4047:8, 4047:14, 4049:7, 4049:9,

4049:12, 4050:15, 4050:16, 4050:18, 4050:23, 4051:12, 4052:10, 4052:11, 4052:12, 4053:1, 4053:22, 4055:10, 4055:11, 4057:23, 4057:25, 4058:1, 4062:22, 4066:15, 4069:14
item [4] - 3933:2, 3935:24, 3957:22
items [7] - 3929:7, 3929:10, 3929:11, 3933:4, 3944:15, 3990:22, 4016:7
itself [1] - 4047:14

## J

JAMES [6] - 3906:14, 3907:4, 3907:4, 4042:9, 4042:12, 4042:23
James [19] - 3921:8, 4042:8, 4042:25, 4043:10, 4052:15, 4054:2, 4058:12, 4059:7, 4059:11, 4067:3, 4068:5, 4068:6, 4068:8, 4068:25, 4069:5, 4070:4, 4070:6, 4071:4, 4071:21
James' [2] - 4068:2, 4069:8
January [1] - 4066:6
Janus [8] - 4045:2, 4045:4, 4045:7, 4049:19, 4049:24, 4050:2, 4069:13, 4069:16
JERSEY [3] - 3905:1, 3905:15, 3905:18
job [1] - 4045:5
jobs [1] - 4056:20
Joenk [10] - 3925:13, 3932:21, 3949:2, 3949:25, 3954:6, 3960:3, 3981:4, 3981:22, 3985:21, 3999:17
Joenk's [1] - 3985:18
John [1] - 4046:3
joined [2] - 3909:8, 3909:14
JONATHAN [1] - 3906:10
Journal [9] - 4052:22,

4052:23, 4052:24, 4053:1, 4053:21, 4053:23, 4066:1
journal [1] - 4052:25
journals [4] - 4052:5, 4052:19, 4052:21, 4070:8
JP [1] - 4000:2
JR [1] - 3906:5
JUDGE [1] - 3905:17
Judge [4] - 3998:20, 4005:13, 4028:13, 4030:18
judge [3] - 3962:24, 3962:25, 3988:20
judging [1] - 4006:10
judgment [5] - 3928:15, 3943:15, 3943:17, 4009:14, 4027:5
judgments [1] - 3945:14
July [9] - 3988:23, 3989:4, 3989:5, 3989:14, 3989:23, 3990:7, 3991:2
June [2] - 3990:15, 3991:6

## K

keep [2] - 3980:2, 4071:18
keeping [1] - 3961:15
Kent [1] - 3976:22
kept [1] - 3944:13
keystroke [1] - 3976:19
keystrokes [5] - 3974:22, 3975:16, 3976:15, 3977:17, 4009:18
keywords [1] - 3927:11
kind [9] - 3923:11, 3931:8, 3933:5, 3954:23, 3954:24, 3974:7, 4004:3, 4032:21, 4057:1
kinds [5] - 3927:9, 3929:23, 3996:17, 3998:3, 4037:11
knowledge [13] - 3913:25, 3914:7, 3917:3, 3923:3, 3953:15, 3955:20, 3961:23, 4041:22, 4053:11, 4058:14, 4064:20, 4069:25,

4070:3
**known** [6] - 3914:24, 3920:11, 3921:4, 3921:10, 4011:4, 4011:6
**KORN** [1] - 3906:10
**KWELTY** [2] - 3906:6, 3969:1

## L

**labor** [1] - 3944:10
**lack** [2] - 3910:18, 4030:11
**Lakind** [6] - 4059:1, 4067:25, 4068:4, 4068:16, 4068:25, 4071:14
**LAKIND** [11] - 3906:3, 3906:4, 3906:5, 3907:5, 4056:24, 4057:7, 4059:2, 4059:6, 4059:9, 4067:4, 4068:17
**language** [7] - 3933:17, 3933:22, 3934:14, 3935:7, 3935:18, 3935:24, 3936:23
**large** [14] - 3911:6, 3914:10, 3918:11, 3918:13, 3927:7, 3932:16, 3948:23, 3953:5, 3953:13, 4037:17, 4048:8, 4050:8, 4066:14
**largest** [1] - 3953:13
**Last** [2] - 4042:12, 4063:2
**last** [7] - 3908:12, 3945:16, 4012:16, 4042:10, 4043:9, 4051:24, 4062:21
**lastly** [2] - 4070:20, 4070:25
**latitude** [1] - 3934:9
**law** [1] - 3993:2
**laws** [1] - 3912:24
**lay** [3] - 3925:1, 3948:17, 3953:21
**learn** [1] - 3999:16
**learned** [3] - 3916:17, 3999:15, 4070:23
**least** [30] - 3911:11, 3923:2, 3925:11, 3929:17, 3932:19, 3940:12, 3943:18, 3944:5, 3945:11, 3946:10, 3949:12,

3950:14, 3952:2, 3962:7, 3963:16, 3968:6, 3971:10, 3973:15, 3973:21, 3974:12, 3983:14, 3985:18, 3985:25, 3995:17, 3996:23, 4008:6, 4023:11, 4035:17, 4036:22, 4038:13
**led** [1] - 4049:1
**ledger** [2] - 3951:21, 3951:24
**left** [5] - 3926:8, 4001:20, 4017:13, 4017:18, 4028:14
**Legal** [1] - 3984:2
**legal** [1] - 3961:21
**legislation** [1] - 3920:10
**legitimate** [1] - 4069:15
**length** [2] - 3946:14, 3949:25
**lengthy** [1] - 3926:23
**less** [6] - 3930:14, 3945:8, 3946:11, 4021:10, 4038:23
**level** [11] - 3942:21, 3942:24, 3952:5, 3952:15, 3971:9, 3976:5, 3994:22, 3998:6, 4037:9, 4051:25, 4058:20
**levels** [5] - 3918:14, 3957:22, 3957:23, 3958:23, 4051:22
**Leventhal** [2] - 3908:16, 3911:25
**liability** [1] - 4061:23
**licenses** [1] - 3993:7
**life** [1] - 3943:21
**LIFE** [2] - 3905:6, 3906:18
**lift** [1] - 3985:19
**limine** [1] - 3924:1
**limitations** [4] - 3944:24, 3945:2, 3945:6, 3965:22
**limited** [2] - 3950:7, 3965:19
**line** [7] - 3970:9, 3986:24, 4015:16, 4015:17, 4016:14, 4018:7, 4018:14
**Line** [1] - 3970:11
**lines** [1] - 3979:1
**list** [4] - 3961:1, 3979:25, 3980:7, 4024:14

**listed** [3] - 3956:23, 4012:7, 4024:13
**listened** [1] - 4069:8
**listing** [2] - 3991:8, 3991:11
**lists** [2] - 3949:20, 3956:18
**literature** [15] - 3925:16, 3927:20, 3945:22, 3946:13, 3954:9, 3954:12, 3975:6, 3977:2, 3983:5, 3983:7, 3983:18, 3983:20, 4009:8, 4064:20, 4065:4
**litigation** [9] - 3923:3, 3938:24, 3962:12, 3963:4, 3976:1, 3984:11, 4048:5, 4066:20, 4066:21
**LLP** [2] - 3906:9, 3906:12
**loan** [2] - 3921:4, 3966:10
**loans** [2] - 3913:12, 3921:5
**local** [2] - 3912:22, 3913:21
**logical** [1] - 3923:14
**long-range** [1] - 3917:5
**look** [37] - 3920:17, 3921:13, 3933:10, 3934:7, 3934:9, 3934:18, 3935:12, 3935:14, 3946:17, 3954:1, 3956:18, 3961:5, 3963:25, 3969:15, 3980:12, 3983:4, 3986:19, 3991:8, 3992:24, 4000:16, 4001:20, 4010:14, 4013:17, 4015:13, 4016:11, 4022:10, 4027:6, 4028:5, 4030:24, 4032:17, 4032:18, 4047:21, 4047:22, 4050:23, 4054:24, 4063:15, 4064:24
**looked** [19] - 3925:9, 3925:10, 3925:24, 3954:3, 3954:4, 3972:14, 3974:3, 3979:22, 4000:23, 4035:18, 4046:10, 4055:10, 4055:12, 4055:19, 4055:20, 4063:16, 4064:1,

4068:9
**looking** [22] - 3919:22, 3953:21, 3984:21, 3989:7, 4015:15, 4038:5, 4039:13, 4039:18, 4047:13, 4047:19, 4050:21, 4056:11, 4056:12, 4056:13, 4057:8, 4057:9, 4057:12, 4058:5, 4060:2, 4065:25, 4066:12, 4069:24
**looks** [4] - 4066:15, 4071:7
**losses** [3] - 4047:7, 4047:8, 4048:6
**Louie** [4] - 3925:13, 3932:22, 3954:7, 3999:20
**LOUIE** [1] - 3906:17
**lower** [3] - 3941:25, 3957:13, 4012:19
**lucid** [1] - 4040:5
**lunch** [1] - 3998:7
**Luncheon** [1] - 3999:5

## M

**magazines** [1] - 4070:8
**magnitude** [2] - 4066:18, 4066:23
**main** [3] - 3972:17, 3996:22, 4058:15
**maintains** [2] - 3985:7, 3987:2
**major** [6] - 3908:22, 3912:4, 3967:24, 4027:23, 4047:11, 4048:17
**manage** [4] - 3916:4, 3917:4, 3955:5, 4049:25
**managed** [1] - 3936:6
**Management** [1] - 4035:15
**management** [28] - 3934:22, 3935:25, 3941:4, 3955:3, 4017:24, 4027:14, 4037:3, 4039:23, 4044:10, 4046:9, 4046:14, 4046:17, 4046:18, 4047:10, 4047:13, 4048:16, 4049:9, 4051:14, 4052:11, 4055:17, 4057:11, 4060:22,

4065:1, 4065:9, 4066:2, 4067:1, 4067:2
**MANAGEMENT** [1] - 3905:11
**manager** [11] - 3933:18, 3933:19, 3934:12, 4046:19, 4046:22, 4047:17, 4047:20, 4058:2, 4058:23, 4064:15, 4068:10
**Managerial** [3] - 3916:2, 3955:6, 3955:17
**managerial** [19] - 3910:3, 3910:6, 3915:24, 3916:1, 3916:5, 3916:7, 3916:11, 3916:13, 3916:15, 3916:19, 3917:1, 3917:2, 3917:8, 3923:22, 3924:13, 3938:17, 3938:21, 3940:14, 4058:3
**managers** [11] - 3952:10, 3952:11, 3957:2, 3972:8, 3972:10, 4002:19, 4007:14, 4050:12, 4058:3, 4059:13, 4068:3
**MANAGING** [1] - 3906:17
**managing** [2] - 3916:9, 3959:25
**manifestation** [1] - 4066:17
**manner** [5] - 3937:20, 3963:20, 3964:1, 4004:1, 4041:24
**manners** [1] - 4007:12
**manual** [2] - 3911:14, 3993:4
**manufacturer** [1] - 3947:19
**manuscript** [1] - 3992:25
**manuscripts** [1] - 4053:22
**march** [1] - 4029:21
**marched** [1] - 3964:8
**margin** [2] - 4024:8, 4035:23
**margins** [1] - 3963:5
**MARK** [1] - 3906:6
**marked** [10] - 3907:9, 3907:10, 3907:11, 3931:25, 3955:10,

3959:6, 3969:3,
3992:5, 4000:10,
4034:18
**market** [3] - 4050:3,
4065:14, 4066:14
**marketplace** [1] -
4058:22
**markets** [2] - 3920:14,
4051:17
**marking** [1] - 3969:4
**marriage** [1] - 3993:7
**MARY** [1] - 3905:3
**Master** [1] - 3908:24
**Master's** [4] - 3909:5,
4043:13, 4051:18,
4051:25
**material** [8] - 3938:12,
4063:7, 4063:9,
4063:11, 4063:12,
4063:13, 4063:15,
4063:17
**materially** [3] -
3936:3, 3945:10
**materials** [3] - 3951:3,
3951:12, 3954:3
**mathematics** [1] -
4043:13
**matter** [18] - 3924:17,
3932:12, 3932:22,
3938:9, 3940:14,
3943:15, 3948:6,
3954:15, 3955:22,
3960:4, 3971:17,
3972:25, 3973:3,
4000:1, 4000:3,
4000:5, 4006:20,
4056:19
**matters** [11] - 3923:4,
4044:22, 4052:7,
4061:18, 4061:21,
4061:23, 4061:25,
4062:2, 4066:21,
4070:10, 4070:12
**MBA** [1] - 4043:19
**McCLOY** [1] - 3906:12
**mean** [31] - 3922:9,
3927:5, 3941:20,
3943:23, 3944:19,
3953:13, 3963:11,
3967:9, 3968:4,
3973:7, 3973:14,
3980:13, 3985:24,
3987:6, 3987:7,
3987:22, 3989:1,
3993:8, 3994:21,
4003:1, 4004:5,
4013:18, 4014:11,
4020:21, 4023:7,
4027:19, 4029:5,
4032:14, 4060:17,

4063:11
**meaning** [3] -
4049:15, 4050:15,
4056:9
**Meaning** [1] - 3971:6
**meaningful** [2] -
3948:5, 3962:8
**means** [4] - 3936:15,
3943:2, 4020:4,
4022:2
**meant** [8] - 3964:2,
3964:15, 3976:19,
3997:25, 4004:5,
4004:10, 4067:8,
4067:9
**measure** [7] -
3918:11, 3919:10,
3932:17, 3948:5,
4007:20, 4009:25,
4065:10
**measured** [1] -
3918:11
**measurement** [2] -
4054:21, 4065:16
**measuring** [2] -
3948:1, 4048:22
**mechanism** [2] -
3941:8, 4007:19
**Medal** [1] - 3922:13
**Mediation** [1] -
4052:25
**medical** [1] - 3918:24
**Medicare** [11] -
3918:6, 3918:8,
3918:10, 3918:15,
3918:16, 3918:18,
3919:1, 3995:12,
4004:17, 4004:18
**meet** [1] - 3912:6
**meeting** [2] - 3981:10,
3981:12
**member** [4] - 3921:24,
3921:25, 3922:1,
4040:6
**members** [4] -
3915:16, 4038:4,
4038:12, 4040:4
**mentioned** [15] -
3910:13, 3911:5,
3911:17, 3912:16,
3913:22, 3915:23,
3925:24, 3945:16,
3964:12, 4032:20,
4045:23, 4049:3,
4049:18, 4055:10,
4057:25
**merely** [4] - 3933:15,
3967:10, 4006:11,
4025:22
**met** [2] - 3937:5,

4070:4
**method** [5] - 3945:8,
3964:4, 3994:22,
4006:12, 4053:14
**methodologies** [3] -
3943:13, 3947:2,
4053:13
**methodology** [42] -
3942:15, 3942:16,
3942:20, 3942:24,
3943:1, 3943:4,
3944:25, 3945:3,
3945:15, 3945:21,
3952:18, 3953:19,
3955:25, 3957:17,
3958:6, 3959:1,
3960:18, 3964:14,
3972:15, 3972:17,
3994:18, 3994:19,
3997:10, 3999:16,
4002:1, 4003:19,
4003:24, 4005:5,
4006:10, 4006:16,
4006:17, 4006:25,
4010:4, 4014:7,
4014:23, 4017:10,
4019:13, 4022:14,
4022:20, 4026:12,
4034:21, 4035:9
**Methodology** [1] -
4001:8
**methods** [3] -
3946:11, 4070:16,
4071:2
**mic** [1] - 4044:15
**Michigan** [9] -
4043:18, 4043:20,
4043:22, 4051:6,
4054:19, 4069:9,
4069:11, 4069:12
**microphone** [1] -
3930:1
**mid** [1] - 3909:20
**middle** [1] - 4008:16
**might** [13] - 3944:2,
3985:16, 3989:24,
4009:19, 4028:15,
4040:18, 4040:20,
4046:7, 4047:20,
4050:24, 4059:2,
4067:4, 4067:17
**Milbank** [5] - 3973:18,
3973:20, 3977:12,
3977:18, 4042:17
**MILBANK** [1] -
3906:12
**milk** [5] - 3943:24,
3943:25, 3944:3,
3944:17, 3944:19
**million** [37] - 3959:1,

3960:11, 3960:13,
3960:17, 3960:19,
3962:2, 3962:7,
3962:13, 3962:16,
4016:15, 4016:19,
4018:21, 4019:16,
4021:11, 4021:13,
4022:9, 4022:12,
4022:17, 4023:16,
4024:22, 4025:2,
4025:4, 4025:8,
4025:11, 4025:15,
4025:23, 4035:1,
4035:5, 4035:12,
4035:18, 4035:22,
4037:18, 4050:1,
4062:12, 4062:15
**mind** [9] - 3925:17,
3928:23, 3931:11,
3932:23, 3949:3,
3968:8, 4053:3,
4054:10, 4064:23
**minds** [1] - 4038:10
**mine** [7] - 3973:8,
3974:21, 3974:24,
3975:3, 3987:13,
4002:4
**ministerial** [1] -
3941:13
**minus** [4] - 4018:20,
4019:22, 4021:6,
4025:8
**minute** [1] - 3965:3
**minutes** [11] - 3965:4,
3965:8, 3998:17,
3998:19, 3999:1,
4028:14, 4063:23,
4064:1, 4064:2,
4071:8, 4071:15
**mistakes** [2] - 4048:2,
4048:3
**mitigate** [3] - 3920:21,
3921:15, 3928:17
**mitigator** [1] - 3932:14
**modify** [1] - 3936:3
**moment** [1] - 4010:14
**money** [2] - 4025:7,
4066:14
**monitor** [1] - 3935:2
**month** [2] - 3988:23,
3991:6
**monthly** [3] - 3952:13,
3988:6, 4004:3
**months** [4] - 3986:9,
3986:10, 3986:12,
3987:16
**Morgan** [1] - 4000:2
**morning** [6] - 3908:1,
3923:24, 3944:2,
3998:15, 4011:10,

4071:22
**morphed** [1] - 4057:1
**most** [15] - 3915:6,
3922:15, 3947:11,
3965:23, 3978:24,
3980:16, 3981:20,
3988:14, 4004:16,
4013:21, 4053:19,
4053:24, 4055:2,
4058:5, 4070:16
**motion** [11] - 3923:25,
3924:6, 3924:8,
3946:18, 3946:21,
3947:8, 3947:15,
3947:22, 3947:25,
3948:9, 4023:4
**move** [5] - 3931:20,
3946:6, 3995:23,
4034:12, 4044:15
**moved** [1] - 3961:25
**moves** [1] - 4026:8
**moving** [2] - 3952:17,
4050:10
**MS** [12] - 3907:5,
4042:15, 4042:20,
4042:22, 4042:23,
4057:6, 4057:16,
4058:11, 4067:24,
4068:22, 4068:25,
4071:6
**multiple** [1] - 3962:14
**MURPHY** [6] -
3906:13, 3908:3,
3998:24, 4042:6,
4044:15, 4071:17
**must** [7] - 3911:7,
3914:2, 3943:1,
3946:6, 3946:12,
3974:7, 4071:1
**mutual** [47] - 3913:10,
3919:20, 3966:23,
3967:8, 3967:12,
4044:4, 4045:4,
4045:12, 4046:21,
4049:10, 4049:13,
4049:13, 4049:15,
4049:17, 4050:5,
4050:8, 4051:15,
4052:12, 4053:17,
4053:22, 4057:21,
4057:24, 4058:22,
4059:13, 4059:20,
4060:2, 4060:6,
4060:9, 4060:23,
4063:3, 4064:5,
4064:8, 4064:21,
4064:22, 4065:6,
4065:8, 4065:9,
4065:11, 4065:19,
4065:20, 4066:9,

4066:13, 4066:21,
4068:19, 4069:19,
4069:20, 4070:10
**MYLES** [1] - 3906:7

## N

**name** [9] - 3908:9,
3908:12, 3966:20,
3974:5, 3984:1,
4042:10, 4042:12,
4042:13, 4049:8
**named** [2] - 3921:8,
3922:15
**names** [1] - 3927:9
**nation's** [1] - 3913:20
**National** [1] - 3920:23
**national** [1] - 4046:2
**nature** [11] - 3920:12,
3941:13, 3941:14,
3941:15, 3947:12,
3962:20, 4041:13,
4064:10, 4068:10,
4068:14, 4070:21
**near** [2] - 3956:2,
3956:20
**necessarily** [13] -
3943:19, 3946:9,
3948:7, 3949:11,
3950:14, 3962:22,
3985:24, 3985:25,
3987:7, 3990:5,
4019:23, 4037:5
**necessary** [16] -
3928:16, 3935:10,
3958:16, 3961:2,
3961:11, 3961:20,
3963:18, 3976:11,
3982:12, 3996:2,
3996:3, 3996:18,
3998:3, 4007:25,
4039:20, 4041:20
**necessity** [2] - 3949:8,
3963:16
**need** [16] - 3944:17,
3946:10, 3949:12,
3964:19, 3965:3,
3969:7, 3984:6,
3995:21, 3995:24,
3996:4, 3996:8,
3997:20, 4023:1,
4029:18
**needed** [2] - 3918:10,
4005:21
**needs** [3] - 3942:24,
3963:19, 4066:24
**negotiated** [1] -
3934:10
**net** [8] - 3928:22,

3930:13, 3958:25,
4024:6, 4024:11,
4024:12, 4028:20,
4049:13
**never** [10] - 3929:3,
3971:20, 3971:25,
3972:4, 3984:10,
3992:9, 3992:21,
3999:24, 4035:4,
4059:11
**New** [1] - 4051:5
**NEW** [3] - 3905:1,
3905:15, 3905:18
**new** [10] - 3926:18,
3927:1, 3934:24,
3935:16, 3936:2,
4004:18, 4027:24,
4028:6, 4028:23,
4029:9
**Next** [1] - 4042:5
**next** [6] - 3924:25,
3956:19, 4012:6,
4028:3, 4029:21,
4042:7
**NIELSON** [1] -
3906:14
**NIKKI** [1] - 3906:14
**nine** [1] - 3947:20
**nitpick** [1] - 3998:25
**NO** [2] - 3905:5,
3905:9
**non** [4] - 3941:14,
4048:19, 4048:20,
4058:9
**non-bank** [2] -
4048:19, 4048:20
**non-banking** [1] -
4058:9
**non-substantive** [1] -
3941:14
**none** [1] - 4008:6
**None** [1] - 3908:3
**normal** [2] - 4023:12,
4036:24
**normally** [1] - 3910:2
**Norman** [9] - 3972:17,
3992:8, 3993:14,
3993:18, 3994:17,
3995:11, 4003:18,
4003:25, 4004:12
**not-for-profit** [1] -
3915:7
**note** [4] - 3923:25,
4062:14, 4062:17,
4071:7
**noteworthy** [1] -
4008:25
**nothing** [5] - 3939:1,
3939:6, 4036:1,
4064:23, 4068:13

**November** [3] -
3969:20, 3970:5,
3986:4
**novice** [1] - 4036:9
**number** [34] - 3912:1,
3914:10, 3914:11,
3914:15, 3916:5,
3916:13, 3918:13,
3921:11, 3922:8,
3925:9, 3925:14,
3927:7, 3928:11,
3928:16, 3935:14,
3943:12, 3945:4,
3954:14, 3966:16,
3967:4, 4002:3,
4004:20, 4018:14,
4021:7, 4022:8,
4026:7, 4033:19,
4036:20, 4037:6,
4048:25, 4053:18,
4063:25, 4064:1
**Number** [1] - 4067:12
**numbers** [5] -
4017:17, 4023:25,
4024:4, 4024:7,
4024:17
**numerous** [4] -
3911:13, 3923:6,
3972:12, 3981:3
**nursing** [1] - 3918:17

## O

**o'clock** [1] - 3998:11
**oath** [1] - 3999:10
**OB** [1] - 3918:19
**OB-GYN** [1] - 3918:19
**object** [7] - 3914:17,
3946:23, 3957:3,
3957:4, 4028:11,
4067:11, 4067:20
**objected** [1] - 3978:18
**objection** [13] -
3924:11, 3931:23,
3991:21, 3991:22,
4020:7, 4020:8,
4030:11, 4034:16,
4067:5, 4067:10,
4068:2, 4068:15,
4068:18
**Objection** [4] -
4006:1, 4017:5,
4022:22, 4031:22
**objections** [4] -
3924:9, 3931:22,
4034:15, 4059:1
**objectives** [1] - 3935:3
**obligation** [4] -
3933:14, 3933:15,

3936:25, 4038:12
**obligations** [4] -
3919:9, 3933:21,
3936:9, 3968:9
**obliged** [1] - 3936:16
**obligor** [3] - 3933:9,
3933:13, 4029:23
**observation** [1] -
3948:5
**observe** [1] - 4056:4
**obsolete** [1] - 3929:8
**obtain** [2] - 3923:8,
3982:4
**obtained** [1] - 3962:2
**obvious** [1] - 3942:22
**Obviously** [1] -
4039:22
**obviously** [1] -
4041:23
**occasion** [4] - 4060:5,
4061:6, 4061:9,
4061:12
**occasionally** [1] -
3912:15
**occasions** [5] -
3949:25, 4049:6,
4061:1, 4063:5,
4063:6
**occupation** [2] -
3908:15, 4042:25
**occur** [3] - 3992:18,
3992:19, 4037:17
**occurred** [5] - 3977:5,
3981:4, 3981:25,
3998:1, 4040:3
**occurring** [2] -
3920:13, 3977:9
**OF** [8] - 3905:1,
3905:18, 3907:2,
3907:3, 3907:4,
3908:14, 3965:15,
4042:23
**offense** [1] - 4019:5
**offer** [6] - 3922:18,
3931:21, 4005:24,
4058:11, 4058:14,
4068:13
**offered** [2] - 4057:2,
4059:18
**offerings** [1] - 4046:9
**offers** [2] - 3952:8,
4047:16
**office** [3] - 3935:5,
4046:6, 4055:13
**Office** [2] - 4045:11,
4049:4
**offices** [1] - 3922:3
**OFFICIAL** [1] -
3905:25
**often** [1] - 4056:6

**Oklahoma** [11] -
3908:23, 3908:24,
3921:21, 3922:12,
3922:13, 3972:17,
3992:8, 3995:11,
4003:18, 4003:25,
4004:12
**older** [1] - 3918:19
**ON** [2] - 3907:5,
4059:6
**once** [1] - 4042:10
**Once** [1] - 3908:11
**One** [3] - 3942:19,
3964:9, 4049:9
**one** [75] - 3910:2,
3911:7, 3912:2,
3914:12, 3916:6,
3921:12, 3922:15,
3923:7, 3925:24,
3929:11, 3929:14,
3933:7, 3934:7,
3934:8, 3934:18,
3935:12, 3935:15,
3936:13, 3936:14,
3936:22, 3937:12,
3939:15, 3941:15,
3943:10, 3943:15,
3944:22, 3945:11,
3945:14, 3947:4,
3947:13, 3948:6,
3954:15, 3957:1,
3962:11, 3962:18,
3963:2, 3964:11,
3965:3, 3967:25,
3968:13, 3985:18,
3991:24, 3994:13,
3995:25, 3997:15,
3997:17, 3997:19,
4007:20, 4011:6,
4019:9, 4025:9,
4029:9, 4029:22,
4035:10, 4037:13,
4039:8, 4041:9,
4043:2, 4046:6,
4049:1, 4052:18,
4053:10, 4053:22,
4054:20, 4055:6,
4057:11, 4064:23,
4065:23, 4066:11,
4066:15, 4067:12,
4068:4, 4068:12,
4068:20
**one's** [1] - 4029:23
**ones** [3] - 3932:17,
3975:14, 3988:15
**operate** [4] - 3935:11,
3961:10, 3961:21,
3996:18
**operated** [1] - 3962:10
**operating** [3] -

**Oregon** [1] - 4051:6
**organization** [9] - 3910:25, 3911:25, 3920:4, 3962:19, 4011:20, 4043:15, 4051:19, 4051:20, 4054:20
**organizational** [1] - 3978:15
**organizations** [8] - 3910:23, 3914:11, 3914:15, 3915:8, 3922:3, 3927:7, 3929:15, 4051:17
**organize** [1] - 3978:25
**organized** [1] - 3962:19
**organizing** [1] - 3923:13
**original** [2] - 3976:13, 4009:20
**originally** [4] - 3912:20, 3954:16, 3976:17, 3985:15
**origination** [1] - 4036:14
**otherwise** [1] - 4070:2
**ought** [4] - 3957:13, 4012:19, 4013:17, 4029:25
**out-sources** [1] - 4051:21
**outcome** [1] - 4062:18
**outflow** [2] - 4066:5, 4066:14
**outputs** [1] - 3957:3
**outside** [7] - 3910:17, 3910:24, 3946:24, 3950:5, 3982:1, 3982:10, 4005:22
**overall** [5] - 3934:21, 3935:25, 3937:8, 4035:20, 4058:7
**overarching** [2] - 3946:7, 3958:13
**overlap** [1] - 3916:22
**oversaw** [1] - 4069:13
**oversight** [1] - 4044:23
**oversimplifying** [1] - 4030:16
**overview** [1] - 4002:1
**owes** [1] - 4062:14
**own** [9] - 3931:11, 3935:15, 3936:21, 3944:7, 3954:19, 3954:20, 3987:6, 4038:13, 4057:22
**owned** [1] - 3919:12
**owners** [1] - 4002:17,

4002:20
**ownership** [1] - 3929:21
**owning** [1] - 3929:8
**owns** [1] - 3929:3
**Oxley** [1] - 3920:11

## P

**P-2050** [1] - 4001:25
**P-210** [8] - 4000:10, 4007:1, 4014:21, 4014:22, 4017:9, 4023:23, 4025:16
**P-787** [3] - 4032:24, 4034:12, 4034:13
**P-847** [3] - 3990:12, 3990:13, 3991:20
**P-848** [1] - 3991:2
**P-849** [1] - 3988:20
**P-852** [4] - 3968:20, 3968:22, 3973:23, 3984:24
**P-852.1** [1] - 3968:24
**P-8521** [1] - 3996:24
**P-856** [1] - 3990:10
**packages** [1] - 3949:20
**packet** [1] - 4018:3
**page** [55] - 3930:4, 3931:3, 3933:10, 3956:1, 3956:2, 3956:3, 3956:11, 3956:19, 3969:11, 3969:15, 3969:18, 3970:8, 3974:3, 3977:15, 3985:2, 3986:21, 3986:25, 3991:8, 3991:11, 3996:25, 3997:3, 4001:5, 4001:17, 4002:3, 4007:1, 4011:15, 4012:6, 4014:22, 4014:24, 4015:3, 4015:12, 4015:17, 4015:21, 4016:4, 4016:13, 4017:9, 4017:20, 4017:22, 4018:8, 4018:17, 4018:20, 4023:21, 4025:16, 4027:6, 4029:12, 4029:20, 4029:24, 4030:25, 4031:1, 4031:2, 4033:13
**Page** [3] - 4015:1, 4016:11, 4033:16
**pages** [2] - 3933:7, 4000:24

**paid** [21] - 3930:14, 3936:15, 3936:24, 3940:19, 3941:21, 3942:2, 3942:3, 3942:4, 3961:14, 3975:20, 3975:23, 3987:24, 3988:1, 3988:4, 3988:12, 3988:14, 3988:17, 4020:6, 4036:15, 4039:1, 4057:10
**paper** [7] - 3937:21, 3939:11, 3985:16, 4048:21, 4053:8, 4053:9, 4053:13
**papers** [9] - 3965:3, 4052:10, 4052:11, 4053:20, 4053:24, 4053:25, 4054:20, 4057:23
**paragraph** [27] - 3930:6, 3930:18, 3956:14, 3960:24, 3985:5, 3985:7, 3985:10, 3985:17, 3985:22, 3986:16, 3986:18, 3987:1, 3987:18, 3987:21, 4008:7, 4008:11, 4008:13, 4008:16, 4009:20, 4009:21, 4010:5, 4011:1, 4012:17, 4012:23, 4029:22, 4030:25, 4031:4
**Paragraph** [1] - 4031:2
**paragraphs** [1] - 4029:21
**parallel** [1] - 3941:16
**parcel** [1] - 4048:14
**Pardon** [3] - 3927:25, 3966:4, 3980:19
**parent** [3] - 3948:14, 3949:6, 3950:17
**parentheses** [1] - 4031:16
**part** [46] - 3913:5, 3917:23, 3924:17, 3934:19, 3946:10, 3949:12, 3950:14, 3961:16, 3963:16, 3964:20, 3973:5, 3974:12, 3975:10, 3975:12, 3976:4, 3978:8, 3979:3, 3980:15, 3983:3, 3995:21, 3999:19, 4002:21, 4004:8, 4006:21, 4010:5,

4012:12, 4018:3, 4023:11, 4023:16, 4026:24, 4027:4, 4028:5, 4029:15, 4029:19, 4034:8, 4037:11, 4037:15, 4038:25, 4041:19, 4047:6, 4047:9, 4048:14, 4048:17, 4068:18
**participants** [1] - 4010:17
**participate** [1] - 3971:13
**participated** [2] - 3912:3, 3921:12
**particular** [14] - 3928:13, 3947:16, 3955:2, 3959:23, 3960:23, 3961:4, 3984:8, 3993:13, 4045:8, 4053:12, 4054:25, 4055:1, 4056:1, 4056:7
**particularly** [8] - 3932:21, 3941:17, 3949:2, 3954:6, 3954:15, 3979:18, 3981:10, 4006:5
**partners** [1] - 3912:11
**parts** [6] - 3980:23, 3981:1, 3981:2, 3985:14, 3986:2
**party** [1] - 3929:1
**passage** [1] - 4012:25
**passed** [3] - 3920:11, 3993:2, 4071:8
**past** [2] - 4056:21, 4057:17
**path** [1] - 3946:16
**patients** [3] - 3918:10, 3918:16, 3918:19
**PATRICIA** [1] - 3906:17
**pause** [3] - 3964:10, 3990:11, 4019:14
**pay** [8] - 3929:5, 3929:18, 3934:11, 3936:16, 3941:23, 3942:5, 3943:25, 3960:7
**paying** [2] - 4036:17, 4037:12
**payment** [4] - 3941:8, 3989:12, 4049:10, 4062:17
**payments** [1] - 3941:5
**pays** [2] - 4010:12, 4035:5
**PC** [1] - 3906:3

4037:18, 4038:16, 4040:21
**operation** [12] - 3950:11, 3961:3, 3961:4, 4048:7, 4050:25, 4054:23, 4056:2, 4056:5, 4056:8, 4056:10, 4066:10
**operational** [12] - 4047:8, 4047:23, 4047:25, 4048:2, 4048:3, 4048:16, 4048:18, 4048:22, 4058:8, 4065:12, 4065:17, 4065:21
**operations** [1] - 4005:3
**opine** [1] - 4013:23
**opinion** [29] - 3925:2, 3925:7, 3925:18, 3926:2, 3938:9, 3938:14, 3941:9, 3948:18, 3948:22, 3949:4, 3953:22, 3954:2, 3955:25, 3957:15, 3957:18, 3963:20, 3982:13, 3982:25, 3985:23, 4005:24, 4006:5, 4010:3, 4014:1, 4014:17, 4029:6, 4032:11, 4039:24, 4068:13, 4070:2
**opinions** [25] - 3922:17, 3922:23, 3923:16, 3925:2, 3955:22, 3959:13, 3973:1, 3973:3, 3973:5, 3973:7, 3973:9, 3973:11, 3973:12, 3973:16, 3973:18, 3973:19, 3973:22, 3976:12, 3979:5, 3979:8, 3979:14, 3981:14, 3983:8, 3984:9, 4058:14
**opportunity** [1] - 3969:25
**opposed** [2] - 4069:16, 4070:22
**order** [12] - 3917:6, 3923:14, 3929:16, 3947:23, 3961:9, 3962:17, 3964:18, 3983:9, 3988:4, 4044:7, 4054:20, 4066:4
**ordinary** [1] - 4039:9

**peer** [4] - 4052:4, 4064:20, 4065:4, 4065:10
**peer-reviewed** [4] - 4052:4, 4064:20, 4065:4, 4065:10
**pen** [1] - 3985:16
**penetration** [1] - 3918:15
**pension** [8] - 3967:15, 3967:24, 3968:7, 3968:12, 3968:14, 3970:19, 3970:22, 3970:25
**Pension** [3] - 3967:18, 3967:19, 3970:11
**people** [8] - 3918:19, 3922:16, 3929:11, 3945:14, 3968:6, 4037:8, 4037:13, 4040:15
**per** [2] - 3994:19, 4071:16
**perceive** [1] - 3937:17
**percent** [4] - 3962:4, 3963:5, 3964:13, 4063:1
**percentage** [3] - 3918:16, 3918:18, 4062:21
**Percentage** [1] - 4062:24
**perfectly** [2] - 3925:23, 3940:12
**perform** [3] - 3948:19, 4019:8, 4050:13
**performance** [3] - 4045:12, 4048:4, 4052:12
**performed** [13] - 3914:11, 3916:14, 3917:24, 3920:4, 3936:10, 3950:18, 3951:24, 3988:16, 4003:13, 4008:1, 4011:22, 4028:9, 4057:17
**performing** [1] - 3976:10
**performs** [2] - 3934:19, 3949:14
**perhaps** [4] - 3920:20, 3943:23, 4004:16, 4047:3
**period** [15] - 3909:10, 3909:11, 3972:20, 3972:22, 3981:13, 3989:23, 4023:8, 4036:18, 4036:21, 4037:1, 4037:2,

4039:2, 4045:3, 4049:20, 4053:23
**permitted** [2] - 4054:2, 4054:8
**person** [3] - 3912:15, 3975:5, 4014:2
**personal** [3] - 3941:20, 4005:24, 4006:4
**personally** [2] - 3979:11, 4005:16
**personnel** [1] - 3935:5
**perspective** [3] - 3936:19, 3944:5, 4065:2
**pertain** [2] - 4009:2, 4058:8
**pertaining** [1] - 4050:2
**pertains** [4] - 4046:5, 4047:14, 4057:21, 4060:2
**pertinent** [9] - 3927:20, 3979:4, 3979:8, 3979:18, 3980:23, 3981:1, 3982:11, 3982:24, 4032:17
**pervasive** [1] - 4027:25
**PETER** [1] - 3905:17
**PGS** [2] - 3905:5, 3905:10
**Ph.D** [4] - 3907:4, 3907:4, 4042:9, 4042:23
**pharmaceutical** [1] - 4061:25
**phases** [1] - 4006:14
**PhD** [7] - 4043:14, 4043:21, 4043:23, 4043:24, 4043:25, 4051:25, 4054:18
**philosophies** [1] - 3939:17
**phrase** [3] - 3914:18, 3982:18, 3985:10
**phrasing** [1] - 3922:16
**physically** [1] - 3940:19
**pick** [2] - 3935:20, 3945:14
**picked** [1] - 3933:11
**pioneered** [1] - 3954:23
**place** [3] - 3915:19, 3918:7, 3927:1, 3937:20, 3958:3, 3963:19, 3964:19, 3995:13, 4023:10
**placed** [1] - 4036:16

**Plaintiff's** [7] - 3907:10, 3907:11, 3959:6, 3963:4, 3992:5, 4008:10, 4034:18
**PLAINTIFFS** [3] - 3905:4, 3905:8, 3906:7
**plaintiffs** [8] - 3938:24, 3962:12, 3991:19, 3998:14, 4034:11, 4039:13, 4067:5, 4068:2
**plaintiffs'** [2] - 3939:21, 4058:15
**plan** [1] - 3968:5
**plans** [2] - 3968:1, 3968:2
**point** [14] - 3915:21, 3924:6, 3946:24, 3947:10, 3956:24, 3964:11, 3984:7, 3991:19, 3995:25, 3996:8, 4023:1, 4031:12, 4060:16, 4071:10
**points** [5] - 3936:8, 3956:4, 3956:8, 4040:11, 4040:13
**policies** [2] - 3935:4, 4036:14
**policy** [3] - 3910:9, 4036:16, 4044:18
**polluted** [1] - 3919:11
**poor** [1] - 4048:4
**portfolio** [5] - 3934:12, 3935:17, 3952:23, 3953:1, 4049:16
**portfolio's** [5] - 3934:23, 3934:25, 3935:2, 3936:1, 3936:6
**portfolios** [2] - 3933:19, 4049:13
**portion** [5] - 3976:24, 3994:8, 4020:5, 4028:6, 4063:18
**portions** [5] - 3975:17, 3976:21, 3983:7, 3984:8, 4035:18
**posed** [1] - 4036:23
**position** [6] - 3913:4, 3967:3, 4025:22, 4043:5, 4045:1, 4049:20
**positioned** [1] - 3923:10
**positions** [9] - 3909:22, 4044:1,

4045:19, 4049:4, 4051:1, 4051:3, 4051:7, 4051:10, 4054:15
**possession** [1] - 3929:3
**possibility** [2] - 3994:12, 4022:16
**possible** [3] - 3943:20, 4056:12, 4068:6
**post** [2] - 3967:25, 3968:1
**post-employment** [1] - 3967:25
**post-retirement** [1] - 3968:1
**posted** [1] - 4049:14
**potential** [3] - 4046:15, 4047:7, 4066:23
**potentially** [1] - 3943:23
**practicable** [1] - 4011:23
**practice** [9] - 3911:14, 3913:5, 3926:16, 3926:18, 3927:1, 3928:6, 3953:18, 3959:21, 3959:22
**practices** [4] - 3917:24, 3928:7, 3953:16, 4046:5
**practicing** [1] - 3926:20
**practitioners** [2] - 3912:6, 3926:15
**precise** [1] - 4067:9
**precisely** [1] - 3976:2
**preclude** [1] - 3924:1
**predecessor** [1] - 4029:8
**predicting** [1] - 3921:6
**predictive** [1] - 3948:7
**preferable** [2] - 3946:2, 3956:21
**preference** [4] - 3945:24, 3956:15, 3956:22, 4071:9
**preferred** [1] - 3940:13
**premarked** [1] - 4032:24
**premise** [1] - 3929:1
**premiums** [1] - 4032:21
**preparation** [2] - 3935:5, 4028:5
**prepare** [9] - 3914:6, 3925:6, 3928:13,

3932:13, 3948:21, 3971:13, 3976:11, 3992:14, 3996:16
**prepared** [5] - 3932:5, 3950:24, 3979:25, 3992:20, 4005:6
**preparer** [1] - 3943:16
**preparing** [2] - 3932:17, 3974:4
**prescribing** [1] - 4066:11
**presence** [2] - 4011:7, 4038:19
**PRESENT** [1] - 3906:17
**present** [6] - 3933:18, 3981:11, 3981:18, 3998:8, 3998:10, 4070:18
**presentation** [3] - 4014:23, 4017:17, 4035:13
**presentations** [4] - 3917:2, 3948:24, 3951:2, 4048:25
**presented** [15] - 3911:8, 3911:15, 3914:3, 3937:21, 3938:19, 3938:20, 4001:14, 4018:1, 4018:3, 4029:11, 4034:22, 4038:11, 4039:19, 4040:7, 4041:24
**presenters** [1] - 3912:11
**presenting** [1] - 3938:1
**President** [1] - 4044:9
**press** [1] - 3920:18
**pressures** [1] - 4040:20
**pretty** [3] - 3912:10, 3983:4, 4052:18
**previously** [1] - 3989:24
**price** [3] - 3934:9, 3934:15, 4040:21
**Pricewaterhouse's** [1] - 3938:14
**PricewaterhouseCo opers** [3] - 3938:11, 3999:25
**pricing** [5] - 4041:20, 4045:12, 4049:12, 4050:15, 4069:19
**primarily** [15] - 3910:16, 3910:21, 3910:24, 3913:25, 3961:7, 3961:19,

3968:1, 3972:8, 3972:11, 3976:9, 4019:1, 4044:10, 4048:18, 4051:11, 4052:9

**Primarily** [1] - 4044:2

**primary** [8] - 3933:9, 3933:13, 3956:6, 3959:22, 3974:19, 4029:23, 4038:24, 4046:1

**principles** [15] - 3911:16, 3913:6, 3913:20, 3913:23, 3913:24, 3914:4, 3914:8, 3914:9, 3916:25, 3919:23, 3937:13, 4034:9, 4070:15, 4070:19, 4071:1

**private** [2] - 3914:14, 4051:16

**probe** [1] - 4038:12

**problem** [1] - 3945:25

**problems** [4] - 3919:13, 3920:15, 3926:17, 4066:1

**procedure** [1] - 3926:23

**procedures** [2] - 3951:24, 4064:25

**proceed** [3] - 3947:6, 4059:9, 4071:7

**Proceedings** [1] - 4071:25

**proceedings** [1] - 4054:10

**proceeds** [1] - 4069:16

**process** [31] - 3917:13, 3918:7, 3922:22, 3924:18, 3926:23, 3948:13, 3949:12, 3956:7, 3958:15, 3961:24, 3962:3, 3963:1, 3964:14, 3994:6, 3995:2, 3995:9, 3995:17, 3996:6, 3997:23, 4001:3, 4003:5, 4003:16, 4003:17, 4004:11, 4005:9, 4013:19, 4014:1, 4023:7, 4040:3, 4041:4, 4041:19

**Process** [1] - 4003:22

**processes** [7] - 3919:14, 3942:22, 3943:12, 3946:6,

3950:25, 3974:18, 4002:4

**processing** [1] - 4037:14

**produced** [1] - 3993:16

**producing** [7] - 3918:13, 3918:24, 3958:4, 3993:23, 3993:25, 3995:20, 4008:22

**product** [16] - 3934:19, 3935:23, 3952:15, 3952:19, 3952:20, 3952:21, 3952:22, 3952:25, 3957:7, 4010:13, 4046:9, 4048:4, 4050:18, 4056:2, 4061:23, 4070:15

**production** [1] - 3955:7

**productive** [2] - 3917:17, 3919:4

**products** [10] - 3952:7, 4002:13, 4002:16, 4002:20, 4007:25, 4009:23, 4040:21, 4041:21, 4046:21, 4046:22

**profession** [8] - 3910:9, 3912:5, 3925:16, 3926:21, 3954:9, 3954:12, 3983:18, 4054:6

**professional** [18] - 3911:7, 3916:24, 3921:17, 3921:22, 3922:11, 3922:24, 3925:15, 3926:1, 3928:15, 3943:15, 3948:1, 3953:4, 3953:6, 3953:14, 3977:3, 3983:5, 4062:21, 4062:24

**professionals** [2] - 3943:17, 3955:19

**professor** [10] - 3908:18, 3909:10, 3909:11, 3909:12, 3909:16, 3909:17, 4012:11, 4043:1, 4051:7, 4069:8

**Professor** [7] - 3954:17, 3954:21, 3955:2, 3983:16, 3993:12, 4012:12, 4012:20

**professorships** [1] - 3909:18

**proffer** [1] - 4067:5

**profit** [5] - 3915:7, 3963:5, 4035:13, 4035:23, 4048:10

**profitability** [19] - 3924:18, 3925:4, 3925:8, 3925:20, 3938:21, 3939:24, 3948:13, 3949:5, 3959:3, 3963:21, 3964:2, 4034:22, 4035:9, 4035:17, 4035:20, 4041:14, 4041:21, 4048:23, 4050:24

**program** [8] - 3918:6, 3918:9, 3957:6, 3957:8, 3957:10, 4004:18, 4012:10, 4012:15

**project** [6] - 3919:8, 3923:12, 3967:24, 3973:12, 4027:24, 4048:17

**projects** [5] - 3912:2, 3915:13, 3915:16, 3915:18, 3921:12

**promoted** [2] - 3909:10, 3909:16

**promotes** [1] - 3957:6

**pronouncement** [1] - 3940:7

**propel** [2] - 3922:9, 3929:15

**propelled** [1] - 4004:16

**property** [1] - 3919:11

**proportion** [1] - 3957:5

**proposals** [1] - 4046:5

**proposed** [2] - 4053:15, 4067:1

**propound** [1] - 3937:18

**prospectus** [1] - 3935:5

**provide** [29] - 3910:16, 3916:3, 3916:8, 3920:19, 3923:3, 3923:11, 3926:20, 3926:25, 3931:14, 3933:15, 3933:23, 3934:6, 3941:24, 3946:9, 3956:17, 3960:25, 3961:17, 3962:9, 3979:3, 3979:9, 3982:11, 3982:23, 3983:20, 4045:14, 4045:24, 4046:21, 4047:2,

4049:22, 4064:19

**provided** [15] - 3928:14, 3933:16, 3944:21, 3954:7, 3956:2, 3959:17, 3959:18, 3961:3, 3977:22, 3977:23, 4014:16, 4031:8, 4060:13, 4060:14, 4065:22

**provider** [1] - 3941:24

**provides** [4] - 3912:8, 3947:15, 3950:4, 3953:19

**providing** [18] - 3918:9, 3918:10, 3935:9, 3937:13, 3939:15, 3945:23, 3946:7, 3946:8, 3967:10, 3967:12, 3968:5, 3980:3, 3980:4, 3993:3, 3996:20, 3996:24, 4013:14, 4026:9

**provision** [2] - 3934:5, 4032:4

**provisions** [1] - 3932:10

**proximity** [1] - 3910:19

**Public** [3] - 3921:20, 3921:25, 3922:1

**public** [3] - 3912:11, 3926:16, 3953:5

**publication** [2] - 4052:6, 4053:25

**publications** [5] - 4052:5, 4052:7, 4060:5, 4061:6, 4064:23

**publish** [1] - 4053:9

**published** [8] - 3910:5, 3911:4, 3911:12, 3913:2, 3916:15, 3917:24, 4052:4, 4065:16

**publishing** [1] - 3911:14

**purchasing** [4] - 3918:23, 3992:13, 3992:14, 3992:20

**purpose** [3] - 3932:8, 3993:8, 4061:3

**purposes** [4] - 3918:25, 3959:2, 3988:20, 4007:21

**pursuant** [13] - 3994:8, 3994:12, 3996:5, 4005:17, 4005:23, 4016:21,

4018:23, 4030:9, 4031:19, 4032:5, 4032:7, 4033:19, 4034:7

**pursued** [1] - 3915:15

**pursuit** [1] - 3967:10

**purview** [3] - 4044:11, 4047:11, 4058:6

**pushed** [2] - 3930:1, 4020:25

**put** [12] - 3909:2, 3918:7, 3924:4, 3929:1, 3944:1, 3978:15, 3985:16, 3994:19, 3995:1, 3995:7, 3995:13, 4007:4, 4025:17, 4026:12

**putting** [2] - 3923:14, 4025:22

**PwC** [4] - 3951:24, 3953:4, 3953:8, 4014:15

## Q

**qualifications** [1] - 4068:13

**QUALIFICATIONS** [2] - 3907:5, 4059:6

**qualified** [5] - 3923:21, 4058:13, 4068:5, 4069:25, 4071:5

**qualify** [1] - 3923:19

**quality** [1] - 3935:10

**quantification** [3] - 4064:9, 4064:19, 4066:18

**quantified** [1] - 4067:13

**quantify** [9] - 4064:4, 4064:7, 4064:11, 4064:12, 4064:14, 4067:13, 4068:6, 4068:9, 4068:12

**Quantitative** [1] - 4052:23

**quantity** [1] - 4070:22

**quart** [2] - 3943:24, 3943:25

**quarters** [1] - 4018:8

**quasi** [1] - 4044:25

**question's** [1] - 4006:21

**questioner** [1] - 4016:2

**questioning** [1] - 4007:13

**questions** [11] - 3929:19, 3929:24, 3942:8, 3963:3, 3964:22, 4004:15, 4014:3, 4036:3, 4036:23, 4038:13, 4040:6

**quickly** [5] - 3995:22, 4004:18, 4015:14, 4023:21, 4028:14

**quite** [4] - 3937:14, 4015:10, 4055:12, 4066:1

**quotes** [1] - 3984:17

## R

**R.M.R** [1] - 3905:24

**racks** [1] - 3929:1

**raise** [3] - 3924:7, 4038:13, 4040:6

**raised** [1] - 4014:3

**range** [13] - 3911:6, 3911:19, 3913:7, 3917:5, 3923:4, 3950:4, 3962:21, 3978:9, 3978:11, 3996:16, 4052:13, 4055:3, 4056:7

**ranges** [3] - 4013:20, 4056:15, 4056:16

**rapid** [1] - 4050:8

**rate** [1] - 4069:24

**rather** [19] - 3911:6, 3924:24, 3926:23, 3933:3, 3934:15, 3934:16, 3938:2, 3939:6, 3939:19, 3957:7, 3963:7, 3964:16, 3983:20, 3994:23, 4004:18, 4020:10, 4041:23, 4041:25

**rational** [2] - 3942:20, 3942:24

**rationale** [2] - 3957:11, 4012:16

**razor** [1] - 3944:18

**reach** [2] - 3925:2, 3943:4

**reaction** [1] - 3939:3

**read** [31] - 3925:8, 3925:13, 3930:9, 3932:22, 3948:23, 3949:25, 3954:4, 3956:24, 3974:25, 3975:2, 3975:3, 3975:6, 3975:11, 3978:14, 3979:15,

3980:6, 3980:11, 3980:13, 3980:15, 3982:17, 3984:5, 3985:18, 3987:12, 4012:5, 4023:5, 4029:18, 4029:25, 4030:14, 4031:10, 4063:23

**reading** [6] - 3960:2, 3960:3, 3980:12, 3980:16, 3981:2, 3984:3

**ready** [2] - 3955:11, 3999:7

**Ready** [1] - 3908:4

**real** [8] - 3937:20, 3937:22, 3939:12, 3943:21, 3952:3, 4061:18, 4066:23, 4067:2

**realities** [3] - 3937:17, 3939:11, 3964:6

**realized** [2] - 4022:6, 4022:13, 4055:2

**realizes** [1] - 4058:16

**really** [22] - 3917:8, 3933:4, 3945:12, 3952:5, 3954:22, 3955:6, 3958:11, 3969:7, 3971:14, 3975:13, 3981:23, 3983:24, 3996:22, 3997:25, 4027:19, 4046:20, 4051:18, 4053:6, 4055:4, 4056:11, 4067:15, 4070:25

**realm** [2] - 4013:2, 4034:5

**realty** [1] - 3913:9

**reason** [8] - 3923:22, 3975:3, 3975:10, 4010:5, 4035:8, 4035:10, 4038:24, 4058:13

**reasonable** [13] - 3942:15, 3958:20, 3962:2, 3963:22, 3993:5, 4009:13, 4012:3, 4014:6, 4014:13, 4039:17, 4041:1, 4041:2

**reasonableness** [20] - 3938:1, 3953:10, 3954:9, 3962:3, 3962:18, 3962:25, 3963:1, 3964:19, 4006:11, 4010:4, 4010:6, 4013:8, 4013:11, 4013:16,

4013:18, 4013:21, 4013:23, 4014:1, 4040:13

**reasonably** [4] - 3947:23, 3958:3, 4041:1, 4050:7

**reasons** [7] - 3921:3, 3939:7, 3963:12, 3964:7, 3975:12, 3975:13, 4067:12

**rebuttal** [1] - 3976:21

**recalled** [1] - 3992:10

**recalling** [1] - 3967:22

**receive** [5] - 3918:12, 3968:7, 3975:24, 4043:16, 4043:23

**received** [22] - 3908:21, 3908:24, 3909:4, 3922:5, 3922:7, 3922:11, 3922:13, 3956:10, 3956:16, 3956:20, 3956:25, 3957:2, 3957:21, 3958:1, 3980:3, 4012:7, 4012:9, 4013:3, 4013:6, 4040:2, 4043:24

**receives** [1] - 3957:5

**receiving** [4] - 3918:8, 3942:1, 4038:14, 4043:25

**recent** [1] - 3988:14

**recently** [3] - 3918:7, 4058:5, 4066:1

**recess** [1] - 3999:5

**Recess** [1] - 3965:12

**recipient** [1] - 3922:10

**recognition** [2] - 4027:23, 4027:24

**recognize** [9] - 3926:4, 3937:11, 3950:21, 3955:13, 3959:6, 3988:21, 3990:13, 3997:7, 4000:12

**recognized** [3] - 3927:13, 3928:15, 4008:6

**recognizes** [1] - 3917:3

**recognizing** [1] - 4054:13

**recollect** [1] - 4000:18

**recollection** [24] - 3960:12, 3961:7, 3966:21, 3969:22, 3972:24, 3977:14, 3981:9, 3981:11, 3983:17, 3983:19,

3984:15, 3985:11, 3985:14, 3986:2, 3986:17, 3987:22, 3988:18, 3989:2, 3989:6, 3992:16, 3996:15, 4018:6, 4023:11, 4066:6

**reconcile** [1] - 3960:16

**reconvene** [1] - 3998:11

**record** [1] - 3908:9

**recordation** [1] - 3970:4

**recorded** [1] - 3970:3

**records** [3] - 3918:24, 4014:15, 4037:6

**recurring** [1] - 4037:18

**Redirect** [1] - 4036:2

**redirect** [1] - 4017:7

**reduce** [1] - 4038:18

**reduced** [1] - 3928:9

**reduction** [7] - 3924:24, 3928:18, 3931:13, 3964:7, 4028:7, 4029:1, 4041:25

**reductions** [2] - 3938:3, 3963:14

**refer** [3] - 3983:15, 4046:17, 4055:25

**referee** [1] - 4053:24

**refereed** [2] - 4057:23, 4065:15

**reference** [2] - 3987:21, 4010:25

**referenced** [3] - 4012:6, 4013:9, 4032:5

**references** [1] - 4030:4

**referred** [7] - 3962:14, 3962:15, 3987:1, 4029:24, 4046:18, 4047:23, 4047:24

**referring** [5] - 3997:12, 4000:22, 4010:11, 4016:1, 4016:2

**reflect** [1] - 3939:24

**reflected** [8] - 4002:1, 4019:21, 4020:3, 4021:14, 4022:9, 4025:7, 4025:16, 4027:2

**Reflected** [1] - 4027:3

**reflects** [3] - 3997:9, 4018:17, 4049:16

**refresh** [2] - 3983:17,

3983:19

**refreshed** [1] - 3996:15

**refrigerator** [2] - 3944:1, 3944:13

**regard** [3] - 4067:4, 4069:21, 4069:23

**regarding** [8] - 4044:9, 4044:18, 4045:11, 4045:15, 4046:4, 4050:23, 4053:1, 4053:22

**regardless** [3] - 3920:1, 3929:5, 3942:23

**register** [1] - 3929:10

**registrants** [2] - 3914:5, 4028:2

**regulated** [1] - 4033:20, 4046:12, 4047:5

**regulation** [3] - 3967:11, 4030:7, 4044:23

**regulations** [4] - 3912:25, 3995:14, 3995:15, 4004:17

**regulator** [1] - 4046:2

**regulators** [1] - 3912:7

**regulatory** [8] - 4005:2, 4044:10, 4044:18, 4045:5, 4046:4, 4047:11, 4048:5, 4066:25

**reimbursement** [3] - 3918:8, 3918:12, 3919:1

**reinsurance** [1] - 4032:20

**reject** [1] - 3917:7

**relate** [6] - 3925:8, 3939:1, 3957:23, 3992:8, 4019:1, 4055:24

**related** [45] - 3912:25, 3916:6, 3926:1, 3956:5, 3959:23, 3960:6, 3967:1, 3968:8, 3970:20, 3974:16, 3977:22, 3988:16, 3989:21, 3993:14, 3993:18, 3994:16, 3995:19, 3999:15, 4000:6, 4001:24, 4003:18, 4004:5, 4004:6, 4004:11, 4006:9, 4007:22, 4009:2, 4009:6, 4010:3, 4010:7, 4010:11,

4096

4010:18, 4010:25, 4012:23, 4013:5, 4013:11, 4013:22, 4017:17, 4035:14, 4048:5, 4048:20, 4050:7, 4050:16, 4055:9, 4066:21

**relatedly** [1] - 4055:15
**relates** [38] - 3965:19, 3966:20, 3971:1, 3972:1, 3972:15, 3973:1, 3975:8, 3976:7, 3976:20, 3984:10, 3986:1, 3986:16, 3995:4, 3995:6, 3995:24, 4000:21, 4002:8, 4002:23, 4003:12, 4004:8, 4005:5, 4007:13, 4009:23, 4010:18, 4012:15, 4013:8, 4015:3, 4019:13, 4021:12, 4021:22, 4022:19, 4025:15, 4027:12, 4030:6, 4030:24, 4033:23, 4034:1, 4034:6
**relating** [5] - 4016:4, 4031:4, 4054:16, 4055:16, 4062:22
**relation** [1] - 4003:5
**relationship** [11] - 3915:14, 3959:16, 3962:6, 3962:8, 3962:18, 4009:5, 4009:24, 4010:7, 4015:4, 4054:23, 4060:13
**relationships** [2] - 3919:4, 3972:14
**relative** [3] - 3952:24, 3953:24, 3957:25
**relatively** [4] - 3914:10, 3927:7, 3964:16, 4036:18
**relevance** [3] - 3933:6, 3979:13, 3984:8
**relevant** [9] - 3932:12, 3933:8, 3970:24, 3980:23, 3983:7, 4047:4, 4063:13, 4065:5, 4065:6
**reliability** [1] - 4022:19
**reliable** [3] - 4041:2, 4070:15, 4070:18
**reliably** [1] - 4071:1
**relied** [4] - 3955:18, 3982:6, 4014:16,

4034:3
**relies** [1] - 4029:5
**remain** [1] - 4038:22
**remained** [1] - 3994:22
**remarkable** [1] - 3962:8
**remediation** [2] - 3919:9, 3919:12
**remember** [1] - 3909:21
**removal** [2] - 4021:18, 4021:21
**remove** [2] - 4020:21, 4038:20
**removed** [2] - 4023:11, 4038:16
**removing** [5] - 4020:23, 4025:25, 4026:2, 4026:4, 4026:7
**render** [5] - 3933:21, 3973:1, 3973:5, 3973:18, 4037:12
**rendered** [3] - 3910:8, 3963:17, 4035:14
**rendering** [3] - 3989:23, 3997:16, 3997:21
**repair** [1] - 3944:8
**repeat** [2] - 4023:3, 4030:13
**repetitive** [2] - 3947:12, 3948:3
**rephrase** [5] - 4005:12, 4005:13, 4005:18, 4006:6, 4023:19
**replace** [1] - 3936:4
**replicable** [1] - 3943:2
**replicated** [1] - 3939:10
**report** [62] - 3926:12, 3930:11, 3939:2, 3946:25, 3947:2, 3952:11, 3969:1, 3969:2, 3973:13, 3974:1, 3974:5, 3974:21, 3974:22, 3974:24, 3974:25, 3975:8, 3976:9, 3976:11, 3976:13, 3976:21, 3976:22, 3977:13, 3978:5, 3978:16, 3978:18, 3979:2, 3980:1, 3984:23, 3984:25, 3985:3, 3985:12, 3986:3, 3986:6, 3986:11, 3986:17,

3986:25, 3987:17, 3987:18, 3988:2, 3989:18, 3989:20, 3989:25, 3990:4, 3990:7, 3990:21, 3991:14, 3991:16, 4000:15, 4000:19, 4008:8, 4009:11, 4011:1, 4011:5, 4015:22, 4015:23, 4017:16, 4017:20, 4030:7, 4034:25, 4035:9, 4065:20, 4066:19
**Report** [3] - 3973:25, 3974:16, 3974:20
**report's** [1] - 3986:13
**reported** [15] - 3920:18, 3928:8, 3929:11, 3929:13, 3929:22, 3929:24, 3931:11, 3931:12, 3937:11, 3938:5, 3938:7, 3939:9, 3963:14, 4028:25
**reporter** [3] - 3982:17, 4023:5, 4030:14
**REPORTER** [1] - 3905:25
**Reporting** [3] - 3911:22, 3920:24, 3931:5
**reporting** [31] - 3910:7, 3910:17, 3911:20, 3918:8, 3919:8, 3920:13, 3920:19, 3920:22, 3921:16, 3923:5, 3928:10, 3928:17, 3928:18, 3928:22, 3931:9, 3931:16, 3932:25, 3937:5, 3939:13, 3939:18, 3939:23, 3940:12, 3948:13, 3949:5, 3959:3, 3964:6, 4028:20, 4028:21, 4029:3, 4029:4, 4029:21
**reportings** [1] - 3921:6
**reports** [12] - 3914:2, 3924:18, 3924:22, 3924:23, 3925:4, 3925:20, 4027:10, 4029:5, 4029:10, 4035:14, 4035:23, 4040:1
**repositories** [1] - 3953:15

**repository** [1] - 3927:10
**represent** [1] - 3931:1
**representation** [6] - 3937:22, 3951:5, 3951:7, 3989:3, 3989:11, 4001:1
**representationally** [1] - 3937:19
**represented** [1] - 3951:21
**representing** [2] - 3981:21, 3981:25
**represents** [1] - 3913:25
**reputational** [2] - 4048:2, 4066:3
**requested** [1] - 3982:7
**require** [4] - 3919:17, 3919:18, 3944:9, 4037:5
**required** [7] - 3905:23, 3916:23, 3919:12, 3948:9, 3962:23, 3993:2, 3995:16
**requirements** [2] - 3942:14, 3942:19
**requires** [2] - 3914:5, 4037:4
**resale** [1] - 3929:8
**research** [15] - 3910:5, 3911:4, 3912:2, 3915:20, 3916:14, 3917:24, 3921:11, 3923:12, 3974:23, 3983:22, 4049:10, 4052:3, 4057:23, 4070:16
**Research** [3] - 3922:25, 3923:1, 4052:24
**Reserve** [9] - 4044:9, 4044:14, 4044:17, 4046:25, 4047:12, 4048:13, 4049:1, 4070:11
**reserve** [1] - 3924:5
**resolving** [1] - 3931:14
**resonates** [1] - 3996:17
**resources** [2] - 3918:24, 3961:18
**respect** [24] - 3918:4, 3919:19, 3925:19, 3932:25, 3934:12, 3935:1, 3936:5, 3937:1, 3937:2, 3937:9, 3955:25, 4022:19, 4045:18,

4046:13, 4047:2, 4048:16, 4058:22, 4058:15, 4058:17, 4058:23, 4059:21, 4064:22, 4065:17, 4069:5
**respected** [1] - 3954:18
**respective** [2] - 3952:24, 3958:23
**respond** [1] - 3968:4
**response** [1] - 3921:3
**responses** [1] - 4004:22
**responsibilities** [6] - 4045:15, 4045:25, 4046:23, 4047:3, 4049:23, 4053:4
**responsibility** [5] - 3912:24, 3916:9, 3934:22, 3935:25, 3974:21
**responsible** [1] - 3934:5
**restart** [1] - 4071:11
**restate** [1] - 3982:16
**Restate** [1] - 3982:20
**restated** [1] - 4028:20
**restrict** [1] - 3981:2
**restrictions** [1] - 3935:4
**result** [11] - 3945:5, 3945:9, 3962:1, 3962:3, 3963:1, 3963:2, 4013:11, 4013:15, 4028:25, 4034:20, 4035:1
**resulted** [1] - 4017:18
**resulting** [2] - 3914:3, 3960:18
**results** [6] - 3910:5, 3943:4, 3958:25, 4002:12, 4013:22, 4024:24
**retail** [1] - 3928:24
**retailer** [3] - 3928:25, 3929:2, 3929:14
**retain** [1] - 3974:15
**retained** [11] - 3930:13, 3972:25, 3973:3, 3973:8, 3973:20, 3974:6, 3974:11, 4059:19, 4059:21, 4060:4, 4070:9
**retention** [1] - 3973:5
**retire** [1] - 3968:7
**retirement** [1] - 3968:1
**return** [1] - 4065:8
**reveal** [2] - 3957:22,

4025:13
**revealing** [4] - 3918:2, 4050:11, 4055:22, 4056:19
**reveals** [1] - 3955:6
**Revenue** [2] - 3931:5, 4031:14
**revenue** [51] - 3917:18, 3918:13, 3918:24, 3928:8, 3928:9, 3928:19, 3929:13, 3929:23, 3929:24, 3930:11, 3930:12, 3931:9, 3931:13, 3931:16, 3932:25, 3937:5, 3938:3, 3942:6, 3952:22, 3953:24, 3957:22, 3958:2, 3958:4, 3958:14, 3958:15, 3958:18, 3958:22, 3958:23, 3963:6, 3963:7, 3964:7, 3992:22, 3993:8, 3993:12, 3993:16, 3993:22, 3994:9, 3994:12, 3995:20, 4004:20, 4006:19, 4008:22, 4010:7, 4027:23, 4027:24, 4028:8, 4028:23, 4029:1, 4029:21, 4041:25
**revenue-generating** [1] - 3917:18
**revenues** [22] - 3924:24, 3928:22, 3939:2, 3952:24, 3957:9, 3957:12, 3957:13, 3957:16, 3957:25, 3963:14, 3992:10, 3992:16, 4009:6, 4009:22, 4010:15, 4010:16, 4012:17, 4012:19, 4013:5, 4024:11, 4024:12
**reverse** [1] - 4044:7
**review** [14] - 3959:12, 3969:25, 3995:8, 4003:24, 4006:10, 4013:15, 4013:22, 4015:4, 4017:16, 4041:10, 4053:8, 4063:14, 4063:18, 4063:20
**reviewed** [15] - 3924:18, 3955:21, 3979:21, 3997:15, 4003:22, 4052:4,

4063:9, 4063:12, 4063:17, 4063:25, 4064:20, 4065:4, 4065:10, 4069:13, 4070:11
**reviewing** [2] - 3985:9, 3988:24
**rewards** [1] - 3929:21
**richness** [1] - 3955:3
**rights** [1] - 3937:23
**risk** [32] - 3929:4, 3929:21, 3933:5, 3936:14, 3937:2, 3937:23, 4047:10, 4047:13, 4047:23, 4047:24, 4048:1, 4048:7, 4050:16, 4050:17, 4052:11, 4058:7, 4065:7, 4065:11, 4065:21, 4066:17, 4067:12, 4067:14, 4067:18, 4067:20, 4068:3, 4068:6, 4068:20, 4070:20, 4070:21
**Risk** [1] - 4067:22
**risk-based** [1] - 4047:24
**risks** [42] - 3929:8, 4046:13, 4047:19, 4047:21, 4048:1, 4048:3, 4048:5, 4048:12, 4048:17, 4048:18, 4048:22, 4058:2, 4058:8, 4058:22, 4059:12, 4064:4, 4064:7, 4064:10, 4064:11, 4064:12, 4064:14, 4064:21, 4064:24, 4065:12, 4065:14, 4065:15, 4065:16, 4065:17, 4065:21, 4065:22, 4066:10, 4066:12, 4066:13, 4068:10, 4068:12, 4068:14, 4069:2, 4069:23, 4070:21, 4070:22
**ROBERT** [3] - 3906:5, 3906:5, 3906:13
**Robert** [1] - 3908:5
**robust** [1] - 3965:23
**role** [8] - 3915:9, 3921:6, 3977:15, 4045:23, 4046:24, 4047:2, 4055:21, 4060:3
**roles** [2] - 3913:15, 4050:10

**ROME** [1] - 3906:9
**room** [1] - 3918:17
**roughly** [7] - 3909:19, 3960:17, 3960:19, 3986:9, 3986:10, 4022:9, 4035:1
**Roughly** [2] - 4021:7, 4062:20
**round** [1] - 3912:4
**routinely** [1] - 3955:18
**rubber** [1] - 3944:8
**Rule** [1] - 4069:24
**run** [1] - 3972:12

---

## S

**safety** [1] - 4046:12
**salary** [4] - 3941:21, 3941:23, 3942:6, 4037:12
**sale** [1] - 3930:13
**sales** [13] - 4008:22, 4009:6, 4009:22, 4010:6, 4010:11, 4010:13, 4010:18, 4010:25, 4012:23, 4012:25, 4051:13
**San** [6] - 4044:8, 4044:11, 4046:25, 4047:12, 4058:6, 4070:11
**SANFORD** [1] - 3905:8
**Sarbanes** [1] - 3920:11
**Sarbanes-Oxley** [1] - 3920:11
**savings** [5] - 3913:11, 3921:4, 3921:5, 3966:10, 4057:11
**saw** [1] - 3979:7
**scale** [26] - 4050:20, 4050:25, 4054:17, 4054:21, 4054:23, 4055:2, 4055:5, 4055:9, 4055:16, 4055:24, 4055:25, 4056:2, 4056:4, 4056:5, 4056:7, 4056:8, 4056:9, 4056:13, 4056:18, 4058:16, 4058:18, 4060:22, 4067:6, 4069:20, 4069:22
**schedule** [1] - 3924:3
**schedules** [3] - 4055:18, 4056:23, 4058:20
**schemes** [1] - 4045:6

**Scholar** [1] - 4043:4
**scholar** [2] - 4044:8, 4046:24
**scholarly** [1] - 4052:4
**School** [2] - 3908:16, 3912:1
**schools** [1] - 3922:12
**science** [1] - 3943:5
**Science** [2] - 3908:21, 4053:2
**scientific** [2] - 4053:14, 4070:2
**scope** [3] - 3946:24, 4014:18, 4031:7
**SEAN** [1] - 3906:13
**search** [3] - 3927:11, 3927:19, 3983:5
**seated** [4] - 3908:1, 3908:11, 3999:6, 4042:11
**SEC** [16] - 3911:21, 3912:14, 3912:15, 3914:5, 3914:11, 3921:9, 4028:2, 4045:1, 4045:7, 4045:11, 4049:5, 4049:25, 4050:2, 4054:9, 4058:1, 4070:9
**second** [12] - 3933:10, 3934:8, 3956:14, 3957:1, 3964:9, 4011:15, 4020:7, 4022:21, 4029:23, 4049:12, 4068:18, 4068:23
**secondly** [2] - 3928:16, 4058:17
**Secondly** [2] - 3943:1, 4067:16
**Section** [1] - 3905:23
**section** [7] - 3947:2, 3956:3, 3976:24, 3977:3, 3985:12, 4009:16, 4009:18
**sections** [1] - 4009:19
**sector** [1] - 3914:14
**securities** [1] - 4066:3
**Securities** [4] - 3914:5, 3921:14, 4069:14, 4069:18
**see** [59] - 3927:3, 3931:5, 3933:1, 3933:2, 3933:10, 3934:10, 3934:13, 3935:14, 3937:17, 3944:22, 3945:7, 3951:6, 3956:2, 3958:17, 3974:2, 3979:11, 3984:6,

3985:10, 3987:3, 3989:15, 3989:22, 3990:22, 3991:15, 3991:16, 3997:11, 4001:6, 4002:25, 4011:16, 4011:24, 4012:5, 4016:5, 4016:6, 4017:2, 4017:3, 4017:15, 4017:21, 4017:22, 4017:25, 4018:10, 4018:16, 4019:11, 4020:17, 4021:5, 4024:1, 4024:23, 4024:24, 4025:3, 4025:18, 4031:12, 4031:17, 4033:12, 4033:18, 4033:21, 4036:19, 4045:14, 4056:14, 4056:15, 4069:15, 4071:21
**seeing** [2] - 3984:3, 4035:6
**seek** [3] - 3934:25, 3978:12, 3991:20
**seem** [2] - 3976:23, 4020:14
**select** [6] - 3934:24, 3935:15, 3935:16, 3936:2, 3936:22, 3945:11
**selected** [3] - 3946:12, 3984:17, 4069:17
**selecting** [1] - 3935:13
**selection** [1] - 3943:14
**sell** [2] - 3929:6, 4049:15
**seller** [1] - 3929:18
**selling** [1] - 3929:12
**send** [2] - 3929:17, 3941:3
**senior** [4] - 3912:10, 3912:20, 4044:21, 4046:2
**sense** [6] - 3942:21, 3942:25, 3962:8, 4042:1, 4052:7, 4066:18
**sent** [4] - 3929:18, 3952:9, 3952:13, 4004:2
**sentence** [6] - 3930:6, 3930:9, 3930:17, 3930:18, 3995:21, 4012:16
**separate** [3] - 3978:7, 3992:14, 3992:19
**serve** [6] - 3908:16,

3908:18, 4046:8, 4046:21, 4052:15, 4052:17

**served** [13] - 3909:9, 3909:12, 3911:9, 3912:17, 3912:20, 3912:22, 3913:1, 3913:17, 3914:24, 3918:16, 3922:3, 4049:18, 4052:18

**serves** [2] - 4047:16, 4053:6

**service** [18] - 3910:8, 3917:16, 3917:18, 3918:17, 3922:14, 3934:19, 3935:23, 3946:8, 3946:10, 3946:11, 3953:4, 3953:6, 3953:14, 3996:21, 4044:5, 4045:16, 4045:20, 4050:10

**Services** [10] - 3959:10, 3960:20, 4005:23, 4015:4, 4015:9, 4016:21, 4018:23, 4019:1, 4033:10, 4052:24

**services** [39] - 3918:9, 3918:10, 3929:13, 3930:13, 3933:3, 3933:15, 3933:16, 3933:21, 3933:24, 3933:25, 3934:5, 3935:9, 3935:10, 3948:1, 3949:15, 3950:3, 3950:5, 3959:17, 3961:1, 3961:19, 3962:9, 3963:16, 3989:23, 3989:24, 3990:17, 3991:5, 3991:8, 3991:11, 3993:3, 3997:21, 4016:8, 4026:9, 4035:14, 4037:13, 4046:15, 4049:10, 4060:13, 4060:14

**servicing** [1] - 4058:24

**serving** [2] - 3910:9, 4061:5

**set** [5] - 3913:8, 3914:13, 3927:14, 4013:1

**sets** [3] - 3913:19, 3937:2, 3959:16

**setter** [1] - 3915:6

**setters** [3] - 3912:7, 3937:15, 3939:8

**setting** [8] - 3910:10, 3911:5, 3911:9, 3912:17, 3913:16, 3915:22, 3919:6, 3927:7

**settlement** [6] - 4045:3, 4045:5, 4050:1, 4050:2, 4069:12, 4069:16

**settlements** [1] - 4066:20

**seven** [1] - 3926:24

**seventh** [1] - 3936:13

**several** [8] - 3911:9, 3952:15, 3952:21, 3960:22, 3992:25, 4044:6, 4044:16, 4050:14

**severity** [1] - 3921:15

**shade** [1] - 3998:24

**shall** [3] - 3936:10, 3936:24, 3936:25

**Shared** [8] - 3959:10, 3960:20, 4005:23, 4015:4, 4015:9, 4016:21, 4018:23, 4019:1

**shared** [3] - 3915:12, 4055:17, 4058:18

**shareholder** [3] - 3950:12, 3961:12, 4037:14

**shareholders** [1] - 4010:17

**sheet** [1] - 4037:1

**SHERIDAN** [1] - 3905:17

**shift** [1] - 3942:9

**show** [3] - 4015:15, 4020:10, 4035:18

**showed** [1] - 4034:2

**shown** [1] - 3990:10

**shows** [5] - 3996:8, 4020:9, 4038:15, 4038:16, 4040:16

**sic)** [1] - 4031:2

**side** [7] - 3933:22, 3934:14, 3935:8, 3935:18, 3936:8, 3936:24, 4017:13

**significant** [3] - 4053:12, 4055:4, 4064:11

**similar** [12] - 3921:2, 3933:22, 3934:13, 3935:7, 3935:18, 3936:23, 3943:4, 3958:24, 3967:25, 3970:23, 4003:17, 4003:21

**similarly** [1] - 3943:17

**Similarly** [1] - 4053:23

**simple** [3] - 3939:19, 3943:23, 3944:21

**simplify** [1] - 3951:12

**simply** [1] - 3946:1

**simultaneous** [1] - 3994:24

**single** [3] - 3927:11, 3927:16, 3927:18

**sister** [1] - 3915:11

**sit** [2] - 3886:1, 4053:3

**sitting** [7] - 3978:19, 3985:13, 3992:16, 3998:4, 4000:25, 4011:3, 4038:4

**situated** [1] - 3943:17

**situation** [1] - 3928:21

**situations** [1] - 3943:10, 4056:6

**SIVOLELLA** [1] - 3905:3

**six** [3] - 3933:6, 3933:8, 4036:9

**sixth** [2] - 3935:24, 3997:1

**size** [7] - 4051:20, 4055:1, 4055:2, 4056:15, 4056:16, 4057:10

**skill** [1] - 4070:1

**skilled** [1] - 3948:1

**skip** [2] - 3942:9, 4031:11

**slide** [3] - 4014:20, 4015:8, 4020:4

**small** [2] - 3964:16, 4055:5

**so-called** [1] - 3912:4

**societies** [1] - 3922:11

**Society** [1] - 3922:1

**soft** [1] - 4049:9

**sold** [2] - 3928:25, 3929:2

**sole** [1] - 3936:11

**someone** [4] - 3934:6, 4037:12, 4037:14, 4041:5

**something's** [1] - 3955:18

**sometimes** [2] - 4047:23

**somewhat** [4] - 4055:15, 4062:15, 4066:7, 4067:9

**somewhere** [1] - 4066:4

**Somewhere** [1] - 3981:15

**SOP** [1] - 3971:12

**Sorry** [1] - 3914:24

**sorry** [31] - 3922:21, 3930:3, 3934:7, 3945:1, 3956:11, 3958:22, 3969:2, 3971:1, 3971:7, 3974:1, 3974:7, 3974:11, 3991:10, 3991:25, 3997:1, 4003:3, 4004:4, 4008:15, 4012:12, 4014:25, 4015:17, 4022:2, 4025:9, 4026:3, 4030:10, 4031:1, 4056:24, 4059:18, 4061:11, 4062:20, 4069:9

**sort** [2] - 3943:20, 4020:9

**sought** [1] - 3983:25

**Sound** [1] - 3998:20

**soundness** [1] - 4046:12

**source** [3] - 3951:6, 3951:7, 4051:21

**sources** [1] - 4051:21

**South** [1] - 4051:5

**Southern** [2] - 3908:17, 3909:15

**space** [1] - 3935:5

**speaking** [7] - 3909:25, 3916:10, 3917:19, 3922:7, 3936:18, 3949:17, 3950:2

**Speaking** [1] - 3934:1

**speaks** [2] - 3961:1, 3997:19

**specialization** [1] - 4053:18

**specialized** [3] - 4031:14, 4058:14, 4070:3

**specializing** [1] - 4043:14

**specific** [18] - 3924:8, 3968:14, 3979:10, 3979:23, 3984:22, 3985:14, 3987:18, 3996:1, 3996:7, 4007:21, 4013:20, 4017:16, 4017:17, 4027:17, 4029:6, 4032:4, 4065:17

**specifically** [9] - 3930:5, 3939:1, 3975:8, 3979:12, 3996:25, 4011:3, 4019:3, 4029:24, 4067:20

**Specifically** [2] - 3985:5, 4064:22

**specifications** [1] - 3935:23

**specificity** [3] - 3981:16, 3983:14, 4013:7

**specified** [1] - 3934:13

**specify** [1] - 3910:19

**speculating** [1] - 4020:10

**spell** [2] - 3908:12, 4042:10

**spelled** [1] - 4042:12

**spend** [1] - 3952:11

**spending** [1] - 4036:9

**spent** [1] - 3988:7

**spoken** [1] - 3981:22

**sponsoring** [1] - 3968:5

**spreadsheets** [1] - 3954:5

**spring** [3] - 3977:6, 3977:9, 3986:7

**stable** [2] - 4004:20, 4004:24

**staff** [1] - 3922:24

**staffs** [1] - 3915:16

**stale** [1] - 4049:15

**stamp** [1] - 4001:18

**stand** [3] - 3965:13, 3999:9, 4042:8

**standard** [9] - 3912:7, 3912:17, 3928:13, 4027:24, 4028:1, 4028:6, 4028:23, 4029:7, 4029:8

**standards** [45] - 3910:9, 3910:10, 3911:5, 3911:7, 3911:9, 3912:14, 3913:2, 3913:3, 3913:9, 3913:15, 3913:18, 3914:1, 3914:14, 3914:16, 3915:6, 3915:22, 3916:24, 3919:6, 3925:25, 3926:1, 3926:22, 3927:7, 3927:8, 3927:10, 3927:12, 3927:16, 3927:18, 3937:15, 3937:18, 3939:8, 3939:16, 3939:17, 3967:12, 3971:11, 3971:13, 4033:7, 4034:3, 4034:7, 4047:25, 4066:25, 4069:1, 4069:3,

4069:4
**Standards** [7] -
3914:22, 3915:5,
3965:25, 3967:23,
4011:19, 4027:8,
4027:11
**stands** [1] - 3926:8
**Stanford** [1] - 3954:17
**start** [2] - 3986:24,
4042:21
**started** [3] - 3913:18,
3998:15, 3998:18
**starting** [1] - 4005:19
**State** [5] - 3908:9,
3908:23, 3922:13,
4043:18, 4069:11
**STATE** [1] - 3905:14
**state** [5] - 3912:22,
3913:20, 3997:25,
4008:25, 4054:9
**statement** [30] -
3938:23, 3939:7,
3940:1, 3951:25,
3965:21, 3967:3,
3970:17, 3971:15,
3971:20, 3972:19,
3972:21, 3975:16,
3976:18, 3978:6,
3980:8, 3990:17,
3991:5, 3992:14,
3993:11, 3993:24,
4006:18, 4014:5,
4014:8, 4014:9,
4014:12, 4017:24,
4022:23, 4024:16,
4026:18, 4027:9
**statements** [14] -
3912:25, 3913:4,
3914:3, 3938:6,
3938:11, 3938:15,
3951:22, 3952:1,
3960:14, 3960:21,
3992:19, 4009:10,
4035:2, 4040:1
**STATES** [1] - 3905:1
**statistic** [1] - 3963:11
**statistical** [3] -
4010:1, 4043:15,
4054:22
**status** [2] - 4033:16,
4033:24
**stay** [1] - 3995:15
**step** [29] - 3917:11,
3951:18, 3952:6,
3952:17, 3952:18,
3952:20, 3953:2,
3953:9, 3953:10,
3953:23, 3955:25,
3957:17, 3958:5,
3965:7, 3994:23,

3999:4, 4000:6,
4002:1, 4002:8,
4002:10, 4006:25,
4007:4, 4007:22,
4026:13, 4036:4,
4042:2, 4068:12,
4071:21
**Step** [3] - 3951:20,
3952:19, 4007:9
**steps** [3] - 3947:20,
3951:15, 3960:22
**STEVENS** [56] -
3906:5, 3907:3,
3914:17, 3923:24,
3931:23, 3946:23,
3965:2, 3965:14,
3965:15, 3968:18,
3968:22, 3968:24,
3969:2, 3969:9,
3969:10, 3982:21,
3982:22, 3988:19,
3990:12, 3990:25,
3991:19, 3991:23,
3991:25, 3992:3,
3992:7, 3998:9,
3998:20, 3998:22,
3999:8, 3999:13,
3999:14, 4000:9,
4005:13, 4005:14,
4005:20, 4006:8,
4015:17, 4017:8,
4020:15, 4023:14,
4023:20, 4028:11,
4028:13, 4028:17,
4029:2, 4030:18,
4030:21, 4030:23,
4032:3, 4032:23,
4033:2, 4033:3,
4034:11, 4034:14,
4034:19, 4036:1
**Stevens** [8] - 3923:23,
3968:21, 3982:20,
3997:11, 3998:7,
3999:7, 3999:12,
4032:2
**still** [12] - 3911:14,
3927:24, 3928:1,
3936:16, 3941:25,
3985:1, 3999:10,
4008:8, 4028:22,
4028:24, 4057:3,
4071:19
**stints** [2] - 4044:6,
4049:3
**store** [5] - 3929:2,
3929:7, 3943:24,
3944:6, 3944:17
**storing** [1] - 3944:11
**strategic** [1] - 3917:5
**stream** [1] - 4037:16

**streams** [2] - 3958:14,
3958:15
**Street** [1] - 4066:1
**STREET** [1] - 3905:14
**strike** [3] - 4059:17,
4060:11, 4064:13
**strongly** [2] - 3935:19,
4041:23
**struck** [1] - 4024:9
**structure** [4] -
3978:15, 4050:24,
4052:13, 4056:14
**structures** [5] -
3926:19, 4005:3,
4050:22, 4050:24,
4051:24
**student** [1] - 4054:18
**students** [4] - 3922:9,
4048:15, 4051:19,
4051:24
**studied** [1] - 3971:12
**studies** [6] - 3946:18,
3946:21, 3947:9,
3947:25, 3948:9,
4065:10
**study** [4] - 3947:15,
3947:23, 4053:11,
4062:22
**styling** [1] - 3977:15
**sub** [62] - 3924:22,
3925:3, 3925:12,
3925:19, 3925:20,
3931:1, 3931:2,
3932:20, 3934:16,
3934:17, 3934:24,
3935:2, 3935:3,
3935:15, 3935:17,
3935:20, 3936:17,
3936:24, 3937:10,
3938:1, 3938:2,
3938:4, 3938:5,
3939:22, 3939:23,
3940:15, 3940:16,
3940:18, 3940:19,
3940:23, 3940:24,
3941:5, 3941:9,
3941:10, 3963:5,
3963:6, 3963:13,
3964:2, 3964:3,
3972:13, 4024:9,
4026:25, 4030:8,
4047:17, 4059:20,
4059:22, 4060:3,
4060:6, 4060:9,
4060:15, 4060:23
**sub-administration**
[1] - 4030:8
**sub-administrative**
[14] - 3924:22,
3925:3, 3925:20,

3937:10, 3938:2,
3938:5, 3939:23,
3940:16, 3940:19,
3941:10, 3963:6,
3963:13, 3964:3,
4026:25
**sub-administrator** [2]
- 3936:24, 3941:5
**sub-administrators**
[7] - 3925:12, 3931:2,
3932:20, 3934:17,
3935:20, 3936:17,
3940:24
**sub-advised** [5] -
4059:20, 4059:22,
4060:6, 4060:9,
4060:23
**sub-advises** [1] -
4047:17
**sub-advisor** [4] -
3935:3, 3938:1,
3963:13, 4060:15
**sub-advisors** [14] -
3925:12, 3931:1,
3932:20, 3934:16,
3934:24, 3935:2,
3935:15, 3935:17,
3935:20, 3936:17,
3940:23, 3941:5,
3972:13, 4060:3
**sub-advisory** [13] -
3924:22, 3925:3,
3925:19, 3937:10,
3938:4, 3939:22,
3940:15, 3940:18,
3941:9, 3963:5,
3964:2, 4026:25,
4030:8
**subject** [7] - 3917:9,
4045:4, 4046:14,
4052:7, 4063:10,
4066:22, 4067:15
**subjected** [4] -
3940:6, 3947:22,
3951:24, 3952:4
**subjective** [2] -
3942:23, 3944:23
**subjectivity** [1] -
3943:9
**subjects** [1] - 3920:8
**submit** [4] - 3923:20,
3988:4, 3988:6,
4058:12
**submitted** [3] -
3988:11, 3989:4,
3989:12
**subsidiaries** [1] -
4047:15
**substance** [8] -
3927:21, 3937:16,

3939:10, 3939:11,
3939:20, 3940:5,
3940:6, 3940:9
**substantial** [2] -
3973:21, 4070:6
**substantive** [3] -
3941:14, 3975:13,
3980:16
**substantively** [1] -
4028:22
**sufficient** [5] - 3924:4,
4041:5, 4047:7,
4070:5, 4070:13
**sufficiently** [1] -
4040:5
**suggest** [4] - 4026:24,
4030:17, 4031:23,
4055:1
**suggested** [1] -
3992:21
**suggesting** [2] -
3993:10, 4055:4
**suggestion** [1] -
3974:15
**suggests** [6] - 3934:3,
3935:19, 3937:1,
3937:4, 4035:6,
4049:8
**suit** [1] - 4039:13
**suited** [1] - 3947:25
**summarize** [2] -
3925:18, 3932:9
**summarized** [1] -
3931:15
**summarizes** [1] -
3950:25
**summary** [6] - 3988:6,
3997:13, 3998:6,
4002:4, 4002:5
**summer** [3] - 3977:6,
3977:9, 3986:7
**superiority** [1] -
3956:9
**superseded** [2] -
3927:2, 4027:18
**supersession** [1] -
4028:19
**supervisory** [2] -
3934:22, 3935:25
**supplied** [1] - 3996:24
**supplier** [2] - 3930:15,
3931:10
**suppliers** [3] -
3930:24, 3935:13,
3936:16
**supplies** [1] - 3931:1
**support** [12] -
3918:22, 3923:4,
3933:12, 3949:11,
3949:15, 3950:4,

3950:8, 3950:9, 3957:24, 3961:18, 3983:14, 3998:4
**supported** [1] - 4009:7
**supporting** [3] - 3937:25, 3949:9, 3950:11
**supportive** [1] - 3958:3
**supports** [2] - 3938:10, 3956:7
**suppose** [1] - 4041:11
**surveys** [7] - 3952:9, 4002:19, 4003:12, 4003:13, 4004:2, 4004:5, 4007:13
**survive** [1] - 4055:7
**survivor** [1] - 4054:24
**sustain** [1] - 4068:19
**SWEETSER** [1] - 3906:4
**sworn** [1] - 3908:8
**synergies** [1] - 4046:15
**synonymous** [1] - 4046:19
**system** [1] - 4006:20
**systematic** [1] - 3943:2
**systems** [3] - 3919:3, 3961:14, 4047:10
**SZAFERMAN** [1] - 3906:3

**T**

**tables** [1] - 3912:4
**talks** [2] - 4011:18, 4015:15
**tangible** [1] - 3928:20, 3933:4
**target** [1] - 4071:19
**targeted** [2] - 4051:18, 4052:25
**Task** [2] - 3926:7, 3926:14
**task** [4] - 3912:23, 3928:12, 3946:22, 4006:9
**tasks** [1] - 3948:3
**taught** [13] - 3910:3, 3910:4, 3911:3, 3916:12, 3917:21, 3954:24, 4051:4, 4051:10, 4051:11, 4051:22, 4051:25, 4069:10
**teach** [5] - 3908:17,

4048:15, 4051:13, 4051:17
**teaching** [1] - 3922:8
**team** [1] - 4047:9
**Tech** [1] - 3909:8
**Technical** [1] - 3967:17
**technical** [2] - 3912:20, 4070:3
**technique** [1] - 4054:24
**tend** [2] - 3922:9, 3948:2
**tends** [1] - 3923:2
**Tennessee** [1] - 3909:13
**tentatively** [1] - 3924:12
**tentativeness** [1] - 3973:14
**tenure** [2] - 3909:11, 3909:16
**tenured** [1] - 3909:19
**term** [3] - 4010:1, 4010:20, 4046:19
**terminate** [1] - 3936:4
**terms** [16] - 3913:17, 3919:5, 3930:16, 4047:22, 4048:7, 4048:9, 4048:23, 4051:4, 4052:4, 4052:11, 4052:12, 4054:22, 4058:7, 4060:1, 4065:12, 4066:4
**test** [4] - 3963:15, 4065:24, 4066:9, 4067:18
**testified** [23] - 3920:6, 3920:16, 3927:6, 3939:21, 3955:21, 3958:5, 3963:12, 3974:4, 3977:8, 3981:4, 3994:9, 3994:10, 4000:6, 4013:13, 4014:3, 4036:5, 4036:10, 4060:8, 4060:20, 4060:24, 4062:2, 4063:2, 4068:8
**testify** [8] - 3923:21, 3984:17, 4054:2, 4054:8, 4061:9, 4061:12, 4067:18, 4070:1
**testifying** [2] - 3992:12, 4062:20
**testimony** [46] - 3912:16, 3915:23, 3917:10, 3924:1,

3925:14, 3925:15, 3932:22, 3934:4, 3948:25, 3954:4, 3960:3, 3964:12, 3968:19, 3969:12, 3969:15, 3969:17, 3969:23, 3970:1, 3970:4, 3970:5, 3975:6, 3976:16, 3980:9, 3980:16, 3980:24, 3986:20, 3986:22, 3997:24, 4000:7, 4000:21, 4006:24, 4011:10, 4015:7, 4016:7, 4016:19, 4017:5, 4067:11, 4067:15, 4067:20, 4068:2, 4068:3, 4070:5, 4070:15, 4071:3, 4071:4
**testing** [1] - 4070:17
**tests** [1] - 3949:8
**Texas** [1] - 3909:8
**text** [3] - 3926:7, 3954:24, 3955:24
**textbook** [4] - 3911:17, 3955:8, 3955:17, 3955:18
**textbooks** [2] - 3911:11, 3911:12
**texts** [1] - 3954:15
**That's..** [1] - 4031:24
**themselves** [2] - 3921:11, 3930:23
**theory** [1] - 4038:5
**thereabouts** [2] - 3981:15, 4066:5
**therefore** [3] - 3943:14, 3957:13, 4012:19
**thereof** [1] - 3910:5
**they've** [7] - 3909:23, 3923:5, 3952:4, 4007:10, 4039:15, 4039:16, 4045:20
**Third** [1] - 4066:2
**third** [3] - 3934:7, 3934:10, 4058:20
**thorough** [1] - 3983:4
**three** [16] - 3909:17, 3951:15, 3952:25, 3958:4, 3966:12, 3966:13, 3986:9, 3986:10, 3986:12, 3987:16, 3992:2, 4006:14, 4018:8, 4061:2, 4063:6, 4066:5
**three-quarters** [1] -

4018:8
**throughout** [3] - 4015:23, 4015:25, 4016:7
**Thursday** [2] - 3924:3, 4071:19
**tiered** [1] - 4052:19
**timely** [1] - 3921:7
**timers** [1] - 4050:3
**timing** [1] - 3998:12
**tire** [1] - 3944:8
**Title** [1] - 3905:23
**title** [3] - 3911:18, 3955:5, 4029:20
**today** [15] - 3922:18, 3966:21, 3970:1, 3973:22, 3978:19, 3985:13, 3986:2, 3987:22, 3996:16, 3998:5, 4028:23, 4062:9, 4062:20, 4071:3, 4071:12
**together** [4] - 3978:15, 3994:19, 3995:2, 4026:15
**tomorrow** [2] - 3944:2, 4071:11
**took** [4] - 3915:19, 3921:21, 3927:17, 3948:6
**top** [6] - 3926:8, 3956:20, 4017:23, 4024:8, 4029:15, 4052:18
**topic** [2] - 4033:21, 4068:1
**topics** [3] - 3911:20, 3923:4, 4068:1
**total** [33] - 3929:13, 3962:5, 3964:16, 4002:23, 4002:25, 4003:5, 4017:14, 4018:11, 4018:14, 4018:18, 4019:12, 4019:22, 4019:24, 4020:2, 4020:19, 4020:24, 4021:3, 4021:13, 4021:14, 4021:22, 4024:3, 4024:11, 4024:12, 4025:4, 4025:17, 4026:5, 4026:16, 4040:25, 4056:1, 4056:3, 4056:4, 4057:9, 4066:5
**Total** [1] - 4018:8
**totals** [1] - 4024:9
**touched** [1] - 3942:12
**toward** [1] - 3928:17
**towards** [2] - 4051:18,

4052:25
**tracing** [1] - 4011:22
**tracker** [1] - 4066:20
**trade** [1] - 4050:4
**trading** [1] - 4050:8
**training** [3] - 3923:22, 4058:13, 4070:1
**transaction** [9] - 3937:16, 3937:17, 3937:23, 3937:24, 3939:9, 3939:10, 3939:25, 4032:22
**transactions** [7] - 3926:18, 3937:21, 3940:5, 3940:9, 4031:7, 4031:14, 4037:12
**transcends** [1] - 3920:5
**transcript** [2] - 3987:15, 4017:4
**transcripts** [2] - 4063:20, 4063:25
**transpired** [1] - 4027:20
**transpiring** [5] - 3937:22, 3939:12, 3941:18, 3954:10, 3964:6
**travel** [2] - 3944:19, 3961:18
**traveling** [1] - 3944:6
**Treadway** [2] - 3921:9, 3921:10
**treasury** [2] - 3950:12, 3961:21
**Treasury** [2] - 4044:21, 4045:24
**treat** [1] - 4041:21
**treated** [3] - 4028:7, 4028:8, 4031:19
**treating** [2] - 3963:5, 3964:2
**treatises** [1] - 3954:14
**treatment** [1] - 3938:13
**trends** [1] - 3927:1
**TRENTON** [1] - 3905:15
**trial** [10] - 3924:3, 3925:14, 3932:22, 3939:22, 3948:25, 3951:22, 3996:16, 4032:9, 4042:16, 4054:3
**TRIAL** [1] - 3905:20
**tribunals** [1] - 4054:8
**trier** [1] - 4070:3
**troubles** [1] - 3921:7
**true** [9] - 3905:23,

3938:18, 3939:24, 3965:22, 3970:19, 3974:19, 3993:24, 4002:9, 4064:6
**Trust** [18] - 3925:10, 3930:22, 3932:18, 3933:13, 3933:18, 3933:20, 3933:22, 3934:11, 3934:16, 3935:5, 3936:15, 3936:20, 3937:1, 3940:22, 3941:1, 3941:3, 3941:6
**trust** [1] - 4048:19
**Trustees** [1] - 3924:19
**trustworthy** [3] - 3988:8, 3988:25, 3989:1
**truth** [1] - 4032:9
**try** [13] - 3918:22, 3920:19, 3937:18, 3939:10, 3955:1, 3982:3, 3982:4, 3995:14, 4006:15, 4008:3, 4009:25, 4029:25, 4038:10
**trying** [12] - 3919:3, 3919:9, 3934:1, 3936:19, 3943:11, 3951:12, 3992:1, 3997:1, 4023:15, 4037:25, 4038:3, 4040:12
**turn** [12] - 3930:4, 3931:3, 3935:23, 3969:11, 3970:7, 3985:2, 3986:21, 4011:8, 4015:12, 4017:20, 4018:17, 4033:13
**TWEED** [1] - 3906:12
**twice** [1] - 4068:25
**two** [23] - 3913:17, 3921:12, 3922:12, 3934:7, 3937:2, 3942:19, 3944:18, 3953:5, 3956:20, 3956:23, 3962:4, 3964:13, 3986:9, 3986:10, 4024:17, 4026:7, 4028:14, 4043:1, 4049:3, 4053:23, 4067:12, 4068:4, 4069:9
**Two** [1] - 4061:2
**type** [10] - 3910:19, 3961:18, 3988:23, 4012:22, 4040:17, 4041:11, 4041:14, 4044:4, 4051:21,

4069:12
**types** [10] - 3913:3, 3917:7, 3949:19, 4039:20, 4046:11, 4047:21, 4048:12, 4059:12, 4065:16, 4065:21
**typically** [6] - 3910:18, 3983:21, 4032:14, 4047:22, 4053:7, 4057:8

---

## U

**U.S** [3] - 3905:17, 3905:25, 4044:20
**U.S.C** [1] - 3905:23
**UK** [1] - 4043:2
**ultimate** [1] - 3957:15
**ultimately** [2] - 3964:17, 4053:8
**Um-hmm** [1] - 3987:5
**unable** [3] - 3966:18, 3984:16, 3995:25
**unaware** [1] - 4040:22
**unclear** [1] - 3987:19
**under** [20] - 3916:25, 3918:9, 3930:10, 3932:5, 3945:6, 3960:10, 3960:19, 3961:6, 3961:16, 3999:10, 4032:12, 4033:20, 4033:21, 4035:15, 4040:20, 4044:10, 4047:24, 4057:10, 4058:6, 4067:16
**undergraduate** [1] - 4043:12
**undergraduates** [1] - 4052:1
**underlying** [5] - 4022:11, 4024:8, 4024:24, 4049:13, 4049:16
**understood** [3] - 3993:14, 4006:24, 4020:12
**Understood** [5] - 3975:7, 4002:8, 4003:2, 4003:4, 4024:14
**undertaken** [4] - 4048:17, 4064:7, 4064:12, 4067:13
**unfair** [1] - 3966:1
**unit** [5] - 4056:1, 4056:3, 4056:4, 4056:9, 4056:12

**UNITED** [1] - 3905:1
**units** [2] - 3912:22, 3913:20
**Universities** [1] - 4069:10
**universities** [5] - 3911:13, 3954:19, 3954:25, 4051:3, 4069:9
**university** [3] - 3910:8, 3917:22, 3922:13
**University** [22] - 3908:17, 3908:23, 3909:9, 3909:13, 3909:14, 3954:17, 4043:2, 4043:3, 4043:6, 4043:8, 4043:18, 4043:20, 4043:22, 4051:2, 4051:5, 4051:6, 4054:19, 4069:9, 4069:11
**Unless** [2] - 3942:8, 4020:13
**unqualified** [2] - 3938:14, 4014:17
**unremarkable** [1] - 3943:24
**unsure** [1] - 3987:17
**untenured** [1] - 3909:15
**up** [13] - 3919:11, 3956:23, 3961:15, 3980:2, 3987:10, 3994:13, 4006:23, 4017:23, 4021:6, 4021:13, 4024:7, 4032:8, 4036:16
**update** [4] - 4001:11, 4033:7, 4034:3, 4037:7
**updates** [2] - 3952:13, 4004:3
**USC** [3] - 3909:19, 3912:1, 3915:8
**useful** [4] - 3910:16, 3916:3, 3947:11, 3954:7
**uses** [2] - 4034:20, 4069:4
**utilities** [1] - 3944:12

---

## V

**valid** [1] - 3962:16
**valuation** [2] - 4025:1, 4038:25
**valuations** [1] -

4037:17
**value** [3] - 3944:10, 4049:14, 4049:16
**variable** [4] - 4041:12, 4061:7, 4061:10, 4061:13
**variables** [3] - 4004:6, 4004:12, 4013:19
**varied** [2] - 3994:21, 3994:25
**variety** [5] - 3913:3, 3923:15, 4056:16, 4058:7, 4066:20
**various** [22] - 3918:14, 3918:22, 3922:3, 3949:25, 3952:12, 3954:5, 3961:21, 3962:1, 3993:6, 3993:15, 3993:22, 4002:13, 4002:22, 4007:12, 4045:6, 4047:22, 4050:4, 4050:17, 4050:22, 4057:24, 4058:5, 4060:2
**vary** [1] - 3917:4
**varying** [2] - 3918:14, 4056:15
**vehicles** [1] - 4036:15
**verbiage** [1] - 3975:15
**verify** [1] - 4000:16
**versus** [6] - 3928:18, 3928:22, 3945:15, 4028:8, 4028:20, 4051:21
**view** [14] - 3955:20, 3956:8, 3963:9, 3963:22, 3971:7, 3979:18, 3981:1, 3988:8, 3997:19, 4022:19, 4028:21, 4038:13, 4069:7, 4069:24
**violations** [1] - 3912:24
**visiting** [1] - 3909:12
**VOBA** [3] - 4024:24, 4025:5, 4025:11
**VOIR** [2] - 3907:5, 4059:6
**voir** [6] - 4056:25, 4057:1, 4057:3, 4059:2, 4059:4, 4071:13
**volume** [4] - 3947:12, 3948:23, 4048:8, 4056:1
**vote** [1] - 3971:13
**Vs** [2] - 3905:5, 3905:9

---

## W

**Wait** [1] - 4022:21
**wait** [3] - 3924:6, 4028:12, 4036:4
**Wales** [1] - 4051:5
**walk** [2] - 3932:24, 3951:18
**Wall** [1] - 4066:1
**Wallace** [1] - 3908:10
**ware** [1] - 3947:21
**watchdogs** [1] - 4038:7
**ways** [3] - 3923:15, 3970:23, 3990:9
**weeks** [1] - 4036:10
**Weemes** [8] - 3977:19, 3977:21, 3977:25, 3978:1, 3978:3, 3978:6
**Wells** [1] - 4047:16
**whereby** [1] - 3948:14
**wherein** [1] - 3959:17
**whole** [2] - 3918:7, 4029:18
**wide** [12] - 3911:19, 3913:7, 3923:4, 3950:4, 3952:15, 3957:6, 3978:8, 3978:11, 4012:10, 4012:15, 4052:13, 4055:3
**widely** [3] - 3954:18, 4048:21, 4064:24
**WILLIAM** [6] - 3907:2, 3907:2, 3907:3, 3908:8, 3908:14, 3965:15
**William** [5] - 3908:6, 3908:10, 3969:17, 3969:18, 4043:3
**willing** [2] - 4005:15, 4005:23
**wish** [1] - 4067:23
**withdrawals** [1] - 3961:13
**withhold** [1] - 3941:22
**witness** [30] - 3908:6, 3926:3, 3931:18, 3950:19, 3955:9, 3968:18, 3972:8, 3972:11, 3988:19, 3991:1, 4000:11, 4020:10, 4042:5, 4054:3, 4057:3, 4059:3, 4059:4, 4059:17, 4060:17, 4060:18, 4060:20, 4061:5, 4062:18,

4067:5, 4067:11, 4067:13, 4067:16, 4067:21, 4069:25, 4071:16

**Witness** [2] - 3985:9, 4042:4

**WITNESS** [28] - 3908:10, 3908:13, 3965:10, 3982:18, 3999:11, 4006:4, 4006:7, 4020:13, 4023:1, 4023:6, 4026:22, 4028:19, 4032:13, 4036:6, 4036:13, 4036:20, 4037:3, 4037:24, 4038:2, 4038:9, 4039:6, 4039:10, 4039:22, 4040:18, 4041:8, 4041:18, 4042:12, 4057:8

**witness'** [1] - 4067:6

**witnesses** [1] - 3924:5

**word** [5] - 3958:7, 3962:21, 3990:22, 3991:15, 3991:16

**words** [7] - 3971:22, 3980:14, 3987:12, 4009:4, 4009:9, 4017:3, 4050:16

**worker** [1] - 3947:13

**works** [2] - 4036:9, 4036:11

**world** [6] - 3937:20, 3937:22, 3939:12, 3943:21, 3944:20, 3953:14

**Worldcom** [1] - 3920:14

**worry** [1] - 3995:23

**wrapper** [2] - 3952:22, 3952:25

**write** [2] - 3987:10, 3993:4

**writing** [3] - 3914:16, 3971:11, 3991:16

**written** [6] - 3911:3, 3911:11, 3914:1, 3916:14, 3992:21, 4065:7

**wrote** [2] - 3975:17, 4048:21

---

**Y**

**year** [24] - 3913:17, 3926:10, 3941:22, 3962:15, 3972:22, 3977:9, 3989:15,

3994:16, 3994:19, 3994:22, 3995:7, 4003:14, 4003:22, 4003:25, 4004:7, 4004:12, 4004:23, 4022:6, 4023:16, 4025:5, 4027:23, 4028:3, 4053:23

**years** [30] - 3909:9, 3910:4, 3910:10, 3911:10, 3912:2, 3914:10, 3914:15, 3915:11, 3915:13, 3916:14, 3917:25, 3922:15, 3926:24, 3927:8, 3966:12, 3966:13, 3972:20, 3993:19, 3994:17, 3995:1, 4027:23, 4028:4, 4037:2, 4043:7, 4045:4, 4051:24, 4062:21, 4063:2, 4070:7

**yesterday** [2] - 3924:2, 3998:13

**Young** [3] - 3953:5, 3953:8, 4000:4

**yourself** [7] - 3919:17, 3925:7, 3930:2, 3948:21, 3975:15, 3975:18, 3978:4

---

**Z**

**zipper** [1] - 3947:21