Jonathan M. Korn
BLANK ROME LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
(609) 750-7700
Korn@BlankRome.com

James N. Benedict (*pro hac vice*)
Sean M. Murphy (*pro hac vice*)
James G. Cavoli (*pro hac vice*)
Robert C. Hora (*pro hac vice*)
Andrea G. Hood (*pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
(212) 530-5000

*Attorneys for Defendants AXA Equitable Life Insurance Company
and AXA Equitable Funds Management Group, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY and AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC,<br><br>　　　　　　　　　　　　　Defendants. | Civil Action No. 3:11-cv-04194 (PGS)<br><br>and<br><br>Civil Action No. 3:13-cv-00312 (PGS) |
| GLENN D. SANFORD, *et al.*,<br><br>　　　　　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC,<br><br>　　　　　　　　　　　　　Defendant. | **DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................1

I.   PLAINTIFFS GROSSLY MISSTATE THE SECTION 36(B)
     STANDARD...................................................................................................2

II.  PLAINTIFFS HAVE NOT RAISED ANY LEGITIMATE BASIS TO
     SECOND-GUESS THE BOARD'S APPROVAL OF THE FEES ...............7

III. PLAINTIFFS' ARGUMENTS REGARDING THE "NATURE AND
     QUALITY OF SERVICES" *GARTENBERG* FACTOR FAIL AS A
     MATTER OF LAW........................................................................................14

     A.   Plaintiffs' Theories Ignore AXA's Services And Thus Fail As
          A Matter Of Law ..............................................................................15

     B.   Plaintiffs' Arguments That FMG Delegated The "Bulk" Of The
          Funds' Services Are Factually Unsupported And Fail As A
          Matter Of Law ..................................................................................17

     C.   Plaintiffs Failed To Meet Their Burden With Respect To The
          Quality Of The Services Provided To The Funds...............................19

IV.  PLAINTIFFS TRY TO RADICALLY REWRITE THE LAW
     REGARDING *GARTENBERG*'S PROFITABILITY FACTOR.................21

V.   PLAINTIFFS HAVE NOT MET THEIR BURDEN ON THE
     "ECONOMIES OF SCALE" *GARTENBERG* FACTOR ...........................26

VI.  PLAINTIFFS' COMPARISONS UNDER THE "COMPARATIVE
     FEES" *GARTENBERG* FACTOR ARE IMPROPER UNDER THE
     LAW ..............................................................................................................30

VII. PLAINTIFFS' CLAIMED "FALL-OUT BENEFITS" DO NOT
     MEET THE LEGAL TEST FOR THIS *GARTENBERG* FACTOR.............34

VIII. PLAINTIFFS' DAMAGES MODELS RELY ON APPROACHES
      PROHIBITED BY SECTION 36(B)..............................................................38

-i-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Mut. Funds Fee Litig.*,
No. 04-5593, 2009 U.S. Dist. LEXIS 120597 (C.D. Cal. Dec. 28,
2009) ...................................................................................................*passim*

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006) ..........................................................27, 31, 32, 40

*Benak v. Alliance Capital Mgmt. L.P.*,
No. 01-5734, 2004 U.S. Dist. LEXIS 12231 (D.N.J. Feb. 9, 2004).............16, 19

*In re BlackRock Mut. Funds Advisory Fee Litig.*,
No. 14-1165, 2015 U.S. Dist. LEXIS 39514 (D.N.J. Mar. 25, 2015) ...............18

*CFTC v. Hanover Trading Corp.*,
34 F. Supp. 2d 203 (S.D.N.Y. 1999) .................................................................24

*Chamber of Commerce of U.S. v. SEC*,
443 F.3d 890 (D.C. Cir. 2006).........................................................................12

*Chill v. Calamos Advisors*,
No. 15-1014, 2016 U.S. Dist. LEXIS 39954 (S.D.N.Y. Mar. 28,
2016) .........................................................................................................8, 9, 35

*Curd v. SEI Invs. Mgmt. Corp.*,
No. 13-7219, 2015 U.S. Dist. LEXIS 90940 (E.D. Pa. July 13,
2015) ...................................................................................................................33

*Daily Income Fund, Inc. v. Fox*,
464 U.S. 523 (1984)...........................................................................................3

*Fogel v. Chestnutt*,
533 F.2d 731 (2d Cir. 1975) ...........................................................................12

*Gallus v. Ameriprise Fin., Inc.*,
675 F.3d 1173 (8th Cir. 2012) ...................................................................4, 12

*Gallus v. Ameriprise Fin., Inc.*,
    497 F. Supp. 2d 974 (D. Minn. 2007).................................................10, 18, 21, 30

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 (2d Cir. 1982) .........................................................*passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    528 F. Supp. 1038 (S.D.N.Y. 1981) ............................................*passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    573 F. Supp. 1293 (S.D.N.Y. 1983) ............................................*passim*

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.*,
    No. 14-414, 2016 U.S. Dist. LEXIS 23815 (S.D. Ohio Feb. 26,
    2016) ..............................................................................................18

*Green v. Fund Asset Mgmt., L.P.*,
    286 F.3d 682 (3d Cir. 2002) ...............................................................3

*Green v. Fund Asset Mgmt., L.P.*,
    147 F. Supp. 2d 318 (D.N.J. 2001).......................................................6

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ..........................................18, 33

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010)......................................................................*passim*

*Jones v. Harris Assocs. L.P.*,
    611 F. App'x 359 (7th Cir. 2015) ..................................................3, 40

*Jones v. Harris Assocs. L.P.*,
    No. 04-8305, 2007 U.S. Dist. LEXIS 13352 (N.D. Ill. Feb. 27,
    2007) ....................................................................................10, 11, 28

*Kalish v. Franklin Advisers, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990) ..............................................*passim*

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
    No. 11-1083, 2012 U.S. Dist. LEXIS 178234 (D.N.J. Dec. 17,
    2012) ..............................................................................................18

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
No. 11-1083, 2016 U.S. Dist. LEXIS 47063 (D.N.J. Mar. 24, 2016) ........*passim*

*Krinsk v. Fund Asset Mgmt., Inc.*,
875 F.2d 404 (2d Cir. 1989) .......................................................*passim*

*Krinsk v. Fund Asset Mgmt., Inc.*,
715 F. Supp. 472 (S.D.N.Y. 1988) .............................................*passim*

*Meyer v. Oppenheimer Mgmt. Corp.*,
895 F.2d 861 (2d Cir. 1990) .....................................................33, 36

*Meyer v. Oppenheimer Mgmt. Corp.*,
707 F. Supp. 1394 (S.D.N.Y. 1988) ..........................................26, 40

*Meyer v. Oppenheimer Mgmt. Corp.*,
715 F. Supp. 574 (S.D.N.Y. 1989) ..................................................34

*R.W. Grand Lodge of F. & A.M. of Pa. v. Salomon Bros. All Cap Value Fund*,
425 F. App'x 25 (2d Cir. 2011) .......................................................5

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
528 F. Supp. 2d 332 (S.D.N.Y. 2007) ............................................27

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
663 F. Supp. 962 (S.D.N.Y. 1987) ............................................*passim*

*SEC v. Capital Gains Research Bureau, Inc.*,
375 U.S. 180 (1963) ......................................................................12

*Strougo v. BEA Assocs.*,
188 F. Supp. 2d 373 (S.D.N.Y. 2002) ............................................30

*Turner v. Davis Selected Advisers, LP*,
626 F. App'x 713 (9th Cir. 2015) .............................................32, 36

**Statutes**

15 U.S.C. § 80a-2(a)(20) ...................................................................17

15 U.S.C. § 80a-35(b) ...............................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 26 ...................................................................................................39

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897
    (1970) ...........................................................................................................16, 39

*In re Smith Barney Fund Mgmt. LLC*, *et al.*,
    Order Instituting Administrative Cease-and-Desist Proceedings,
    File No. 3-11935, Release Nos. 51761 (Securities Exchange Act of
    1934), 2390 (Investment Advisers Act of 1940) (May 31, 2005) ........................5

## **PRELIMINARY STATEMENT**

Plaintiffs' 85-page Proposed Conclusions of Law ("PCOL"), which contains far more proposed facts than law, is remarkable for what it studiously avoids saying.  Tellingly, not once do Plaintiffs even quote the onerous, well-settled Section 36(b) standard, which was articulated by *Gartenberg* more than 30 years ago and squarely endorsed by the United States Supreme Court in *Jones v. Harris*: To establish liability under Section 36(b), a plaintiff must prove that an investment manager's fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones v. Harris*, 559 U.S. 335, 346 (2010) (emphasis added). That Plaintiffs run away from this standard as fast as they can is hardly a surprise, since they have not come anywhere close to meeting their heavy burden under it.

Just as tellingly, Plaintiffs mention only in passing the seven cases that have been tried to judgment under Section 36(b).  This too is no surprise, since no plaintiff has ever won a Section 36(b) case and the same tactics Plaintiffs pursue here—nitpicks of the Board process, subjective challenges to cost allocation methodologies without any alternatives, failure to consider affiliates' services and costs, and the like—have all been rejected by these prior cases.  In an effort to avoid the settled law, Plaintiffs instead rely on language from common law cases that do not apply to Section 36(b), take snippets from other cases that do not

involve Section 36(b) or were pre-*Gartenberg*, and point to isolated, out-of-context statements from *Jones* to argue that the Court should determine whether Defendants' fees are "inherently fair." PCOL ¶ 33. This is exactly the opposite of what Section 36(b) requires. Put simply, because the well-established law compels judgment for Defendants, Plaintiffs ask this Court to radically remake it.

To accept Plaintiffs' statements of the law would be to abandon more than 30 years of settled Section 36(b) precedent, which *Jones* endorsed. And to rule for Plaintiffs and override the business judgment of the Independent Trustees would place the Court squarely in the position of acting as a super-trustee, which *Jones* expressly cautions against because that is not the courts' role. *Jones*, 559 U.S. at 352-53. The fees at issue were approved by an independent Board after careful consideration of the *Gartenberg* factors. Plaintiffs, like the plaintiffs in every prior Section 36(b) case to go to trial, have offered no legitimate basis to upset the Independent Trustees' informed business judgment.

## I.    PLAINTIFFS GROSSLY MISSTATE THE SECTION 36(B) STANDARD

Plaintiffs' attempt to remake the applicable law would turn *Gartenberg* and *Jones* on their heads. Ignoring *Gartenberg*'s and *Jones*'s actual requirement that a plaintiff meet the heavy burden of proving that the challenged fees are "so disproportionately large" that they "could not have been" the product of arm's-length bargaining, Plaintiffs instead suggest that the standard is "inherent fairness."

PCOL ¶¶ 33, 73-74.  It is not.  *Jones* could not have been clearer in its

endorsement of *Gartenberg*'s "so disproportionately large" test, and every case

since then has followed it.  *Jones*, 559 U.S. at 345-46 (squarely endorsing

*Gartenberg* test); *e.g.*, *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359, 360 (7th

Cir. 2015) (applying test on remand in affirming summary judgment for

defendants); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083, 2016 U.S.

Dist. LEXIS 47063, at *28, *44-45 (D.N.J. Mar. 24, 2016) (applying test).

Contrary to Plaintiffs' suggestions, traditional common law fiduciary

principles do not apply to Section 36(b):  Section 36(b) creates a "unique" and

"entirely new" right that "differs significantly" from pre-existing state law rights.

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 534 n.10, 535, 541 (1984).  As the

Third Circuit held in *Green v. Fund Asset Management, L.P.*, the duty "imposed by

§ 36(b) is significantly more circumscribed than common law fiduciary duty."  286

F.3d 682, 685 (3d Cir. 2002).  Plaintiffs try to make much of *Jones*'s reference to

the common law's "earmarks of an arm's length bargain" test.  But Plaintiffs gloss

over that *Jones* makes clear that Section 36(b)'s reversal of the traditional burden

of proof, and other protections afforded by the Act (*e.g.*, approval of fees by

disinterested directors), turn that test around to oblige a <u>plaintiff</u> to meet the heavy

burden of showing the fee is so disproportionately large it could <u>not have been</u> the

product of arm's-length bargaining.  *Jones*, 559 U.S. at 347-49; *Green*, 286 F.3d at

685 ("[T]he plaintiff has the burden of proving a breach of fiduciary duty, . . . in contrast with the common law rule that requires a fiduciary to justify its conduct.").

Plaintiffs' recitation of the legal standards is rife with additional errors. Plaintiffs incorrectly suggest that they only have the burden to show disproportionality if the board process is robust; otherwise, they claim their "inherently fair" standard applies.  PCOL ¶¶ 31-33.  But as *Jones* makes clear, regardless of the deference afforded the board, Section 36(b) <u>always</u> requires a showing that a fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  *Jones*, 559 U.S. at 351-52; *see also Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1181 (8th Cir. 2012) (applying *Gartenberg* test even where less deference given to board).  No support exists for Plaintiffs' assertion.

Indeed, in addition to taking the radical step of attempting to wipe away the settled *Gartenberg* test, Plaintiffs go on to invent an entirely new legal principle, claiming that an investment adviser commits a "garden variety breach of fiduciary duty" where it "delegates substantial work to a sub-advisor but retains a significant share of the compensation for itself."  PCOL ¶ 38.  In essence, Plaintiffs are saying that the more than 200 exemptive orders issued by the SEC permitting the use of

subadvisers must somehow violate the law.  *See* DPPF ¶ 19.[1]  But here too,

Plaintiffs rely on common law principles that do not apply to Section 36(b), as well

as on a transfer agency case with radically different facts.[2]  As Judge Bumb

recently held in her summary judgment decision in *Kasilag*, which Plaintiffs

notably fail to cite, Section 36(b) requires the Court to consider the "combined"

services of the adviser and subadviser against the "totality" of the advisory fee.

Plaintiffs have utterly failed to do this.  Moreover, they ignore the actual trial

record:  Defendants retained substantial work.  DPPF ¶¶ 202-347.

In yet another effort to remake the law, Plaintiffs go so far as to try to wipe

away the board factor <u>altogether</u>, claiming without any support that "an exhaustive

*Gartenberg* analysis is unnecessary, and [that] it is more important to focus on

---

[1] Capitalized and abbreviated terms not otherwise defined herein shall have the meaning ascribed to them in Defendants' Post-Trial Proposed Conclusions Of Law (May 2, 2016) (ECF No. 279) ("<u>DCOL</u>").

[2] *R.W. Grand Lodge of F. & A.M. of Pa. v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25, 30 (2d Cir. 2011), the case upon which Plaintiffs principally rely, was a <u>motion to dismiss</u> decision—*i.e.*, where the court was required to assume (without a trial) that the allegations in the complaint were true.  And the complaint in *R.W. Grand Lodge* alleged facts that have no application here, including that defendants had (1) created a sham subcontracting relationship that was specifically designed to conceal the existence of an illegal rebate paid to the defendant by the funds' former transfer agent, (2) performed essentially no work, and (3) committed massive failures to disclose to the board, including failure to disclose the existence of a secret side letter containing the terms of the hidden rebate.  *Id.*; *see also In re Smith Barney Fund Mgmt. LLC*, Order, File No. 3-11935 (May 31, 2005), *available at* https://www.sec.gov/litigation/admin/34-51761.pdf (describing factual background).  No such facts are remotely present here, nor does *R.W. Grand Lodge* express the holding that Plaintiffs ascribe to it.

other" factors.  PCOL ¶¶ 46-48.  To the contrary, approval by an independent

board is the single most important factor in evaluating a claim under Section 36(b)

and "militates strongly against the contention that the advisers have breached their

fiduciary duty to the funds or their shareholders."  *Green v. Fund Asset Mgmt.,*

*L.P.*, 147 F. Supp. 2d 318, 332 (D.N.J. 2001), *aff'd*, 286 F.3d 682 (3d Cir. 2002);

*Jones*, 559 U.S. at 349; *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 501

(S.D.N.Y. 1988) (courts "will not ignore a responsible decision by the Trustees"),

*aff'd*, 875 F.2d 404 (2d Cir. 1989); *Gartenberg*, 694 F.2d 923, 930 (2d Cir. 1982)

(board approval among the most "important factors").

     Plaintiffs' open-ended invitation for judicial review of adviser compensation

is precisely what Congress and *Jones* rejected.  As *Jones* notes, Section 36(b)

specifically does "not permit a compensation agreement to be reviewed in court for

'reasonableness.'"  *Jones*, 559 U.S. at 341 (explaining that Congress rejected

reasonableness requirement).  Likewise, it does not require a fund's directors to

negotiate the "best deal possible," *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404,

409 (2d Cir. 1989), nor does it require courts "to engage in a precise calculation of

fees representative of arm's-length bargaining," *Jones*, 559 U.S. at 352.  Viewed

under the proper standard and against the extensive and well-settled body of

precedent under Section 36(b), Plaintiffs' claims plainly fail.

## II.    PLAINTIFFS HAVE NOT RAISED ANY LEGITIMATE BASIS TO SECOND-GUESS THE BOARD'S APPROVAL OF THE FEES

Nowhere in Plaintiffs' lengthy submission do they point to any *Gartenberg* factor the Independent Trustees did not consider in their deliberations, nor do Plaintiffs dispute that the Independent Trustees received information pertaining to each of those factors.  Instead, relying on quantity rather than quality, Plaintiffs offer a litany of subjective criticisms of the Independent Trustees and their process, none of which has any merit.[3]  *See* DRPF ¶¶ 109, 183-88, 246-60, 136, 163-71, 172-76, 339-44; DPPF ¶¶ 191-92.  In fact, these criticisms amount to the exact same type of "armchair quarterbacking" that *Jones* specifically cautions against and that Judge Bumb expressly rejected in *Kasilag*.

In *Kasilag*, Judge Bumb addressed the "legion" of plaintiffs' arguments as to why the board's approval of the fees was allegedly inadequate.  2016 U.S. Dist. LEXIS 47063, at *29-44.  Those arguments, made by the same Plaintiffs' counsel in this case, mirror many of the arguments advanced here, including that the Hartford fund board:  (1) was given profitability information treating subadvisory fees as an expense (*id.* at *33-34); (2) relied on purportedly flawed Lipper fee comparisons (*id.* at *39-41); (3) never considered putting the advisory contract out

---

[3] As noted, Plaintiffs' Proposed Conclusions of Law contain more proposed facts than law.  To the extent there are factual assertions in Plaintiffs' Proposed Conclusions Of Law that Defendants do not directly address herein, Defendants do not concede those facts and, instead, respectfully refer the Court to Defendants' Response to Plaintiffs' Proposed Findings of Fact.

to bid (*id.* at *37-38); and (4) allegedly failed to understand the nature of the

adviser's services (*id*. at *30-33). In rejecting plaintiffs' arguments, the court held:

> [A] plaintiff should not be able to survive summary judgment through armchair quarterbacking and captious nit-picking. Such a standard would put defendants in the untenable posture of defending interminable, manufactured, and protracted litigation involving second-guessing a board's process. Here, Plaintiffs seek to do just that. They rely only upon their own experts' testimony and cherry-picked deposition excerpts suggesting Plaintiffs might have negotiated a different deal had they been in the directors' seats, but not showing that the Board abandoned or failed its watchdog function. Such carping, if sufficient, would eviscerate the deference that is to be paid to an informed Board's process under *Jones*. As such, the Court determines that the Board's decision is entitled to "substantial weight."

*Id.* at *44.

This Court saw and heard first-hand from Lead Independent Trustee Gary

Schpero as to the rigorousness of the Board's process. As in *Kasilag*, Plaintiffs'

nitpicks—which rest almost entirely on expert witnesses who either were not

credible, were evasive, or offered unreliable testimony based on an incomplete and

selective review of the record—do not undermine that process. DPPF ¶ 193.

Indeed, Plaintiffs' legal citations illustrate the absence of support for their claims.

Notably, Plaintiffs point to a handful of facts from three cases <u>rejecting</u> challenges

to the independence and conscientiousness of mutual fund boards.[4] Far from

---

[4] In addition to *Schuyt*, *Kalish* and *Gartenberg*, all post-trial opinions rejecting Section 36(b) claims, Plaintiffs quote from *Chill v. Calamos Advisors*, No. 15-1014, 2016 U.S. Dist. LEXIS 39954 (S.D.N.Y. Mar. 28, 2016). PCOL ¶ 77;

supporting Plaintiffs, these cases as well as the many other post-trial Section 36(b)

decisions <u>confirm</u> the Independent Trustees' care and conscientiousness.  Merely

by way of example, like the directors in those cases:

- The Independent Trustees were experienced and well-qualified business professionals.  DPPF ¶¶ 113-14; *Schuyt*, 663 F. Supp. at 980 (independent directors were "well-educated and well-regarded members of the financial community"); *Gartenberg*, 528 F. Supp. at 1058; *Kalish*, 742 F. Supp. at 1242.

- The Independent Trustees were advised by experienced Independent Counsel who attended all meetings and with whom they met regularly in executive session.  DPPF ¶¶ 117-18, 123, 150-51; *Kalish*, 742 F. Supp. at 1242 ("An important element of the independent director's informed state is the advice they received from their independent counsel."); *Schuyt*, 663 F. Supp. at 982 (independent counsel is an "important resource"); *Gartenberg*, 528 F. Supp. at 1064 (independent counsel provided "conscientious and competent advice").

- The Independent Trustees reviewed and considered substantial information, including on each *Gartenberg* factor.  DPPF ¶¶ 162-68; *Gartenberg*, 528 F. Supp. at 1059-60; *Kalish*, 742 F. Supp. at 1246 ("directors were given a great deal of material" by the adviser); *Schuyt*, 663 F. Supp. at 981 (directors "had access to a wide variety of information").  FMG never refused to provide information requested by the Independent Trustees.  DPPF ¶ 174; *Schuyt*, 663 F. Supp. at

---

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038 (S.D.N.Y. 1981).  The court in *Calamos* decided a motion to dismiss; thus, the court's findings with regard to the board were reviewed under a different standard and solely limited to the allegations in plaintiffs' complaint.  *Chill*, 2016 U.S. Dist. LEXIS 39954, at *56 ("*Jones*'s instruction that courts afford 'considerable weight' to robust board determinations very well may end up applying in this case.  But the Complaint, taking all of its non-conclusory allegations as true, plausibly alleges that it may not.").

981 ("Adviser never declined to give the directors any information that they requested"); *Gartenberg*, 528 F. Supp. at 1059 ("[t]he Adviser fully complied with the duty of full disclosure").

- The Independent Trustees carefully reviewed and considered all the material they were provided, actively questioned FMG at meetings, and requested additional information from FMG when necessary. DPPF ¶¶ 169, 172-73, 176-77, 195; *Schuyt*, 663 F. Supp. at 984 ("The evidence indicates that the independent directors . . . actively questioned the Adviser and requested additional information.").

- The Independent Trustees bargained at arm's length with FMG to reduce the Funds' fees, and achieved numerous reductions to the Funds' fees. DPPF ¶¶ 182-85. *Kalish*, 742 F. Supp. at 1249 ("the independent directors achieved a fee reduction in the form of additional break-points"); *Schuyt*, 663 F. Supp. at 986 (independent directors negotiated "lower fee schedule").

*See also* DCOL, App'x A. Plaintiffs' criticisms of the Board process do not provide a legitimate basis for supplanting the Independent Trustees' informed approval of the challenged fees. *Jones*, 559 U.S. at 352 (Section 36(b) "does not call for judicial second-guessing of informed board decisions.").

Moreover, Plaintiffs have failed to show that any single one of the alleged defects in the Board process actually affected the Board's negotiations or resulting fees. *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 983 (D. Minn. 2007) ("[W]hile Plaintiffs contend that the information Defendants provided the Board was misleading, Plaintiffs fail to describe how these alleged deficiencies affected the results of the Board's fee-negotiation process."); *Jones v. Harris Assocs. L.P.*, No. 04-8305, 2007 U.S. Dist. LEXIS 13352, at *26-27 (N.D. Ill. Feb. 27, 2007);

-10-

*Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *33, 34-35 n.14, 39.[5]  In fact, the

Independent Trustees ultimately received many of the items Plaintiffs claim they

should have been provided, and continued to approve FMG's fees.  *In re Am. Mut.*

*Funds Fee Litig.*, No. 04-5593, 2009 U.S. Dist. LEXIS 120597, at *148-49 (C.D.

Cal. Dec. 28, 2009) (directors approved fees after receiving previously omitted

information and "[t]hus, there [was] no evidence that providing the information to

the directors [earlier] would have led to a different result"); DPPF ¶ 192.

Apparently recognizing this deficiency in their proof, Plaintiffs argue that

deference to a fund board is required only if it receives "all" information

(presumably according to Plaintiffs' definition of "all").  PCOL ¶ 72.  The law is

clear, however, that any defects in the board process must be <u>material</u>, and even

then, an assessment still must be made as to how much deference to give the

---

[5] Similarly, although Plaintiffs focus on the Independent Trustees' alleged failure
to hire <u>additional</u> consultants to review FMG's cost allocation methodology and
other topics, they have failed to demonstrate that information furnished to the
Independent Trustees on those topics was insufficient, or that hiring additional
consultants would have affected their approval of the fees.  *See Jones*, 2007 U.S.
Dist. LEXIS 13352, at *26-27 ("Plaintiffs must demonstrate that the flaws they
find in what transpired would have made a legally significant difference."); *Schuyt*,
663 F. Supp. at 983 ("Had [the independent directors] felt that incremental cost
studies would aid them in approving the fee, they surely would have asked the
Adviser to do such studies."); *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *34-35
n.14, *36.  Further, the Independent Trustees did, in fact, retain numerous
consultants, including E&Y, to assess FMG's cost allocation methodology,
notwithstanding that FMG's own auditor had separately done so.  *See Kalish*, 742
F. Supp. at 1248-49 (directors commissioned report from "formidable accountants"
relating to cost allocation); DPPF ¶¶ 121, 198, 429.

approval.  *Jones*, 559 U.S. at 351-52; *Gallus*, 675 F.3d at 1180 (granting summary

judgment after giving substantial deference to the board, albeit "less deference . . .

than would have been the case had [the adviser] been candid about" other clients'

fees).[6]  In light of the extensive information the Independent Trustees considered

on each *Gartenberg* factor, Plaintiffs have not shown that any of the alleged

defects they identify were material.  *See Schuyt*, 663 F. Supp. at 983-84

(insignificant that directors could have received additional reports because they

"already had ample information").  Thus, the Independent Trustees' approval of

the fees is entitled to "considerable weight" under *Jones.*  559 U.S. at 351.

Finally, Plaintiffs raise a single challenge to the independence of the Board

based on FMG President Steven Joenk's role as chairman, quoting at length a

defunct 2004 SEC rule that would have required an independent chair.  PCOL ¶ 78

& n.3.  As Plaintiffs note in passing, the rule was <u>vacated more than ten years ago</u>

by the United States Court of Appeals for the District of Columbia and has not

been re-promulgated.  *See Chamber of Commerce of U.S. v. SEC,* 443 F.3d 890

---

[6] In addition to misstating the legal standard under *Jones*, Plaintiffs quote from
opinions issued before *Gartenberg* and that were not even decided under Section
36(b).  *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)
(holding that securities scalping practices operated as a fraud upon clients of
investment advisers); *Fogel v. Chestnutt*, 533 F.2d 731 (2d Cir. 1975) (holding
defendants failed to recapture brokerage commissions for benefit of fund); PCOL
¶¶ 73-76.  *Capital Gains* (decided in 1963) and *Fogel* (brought in 1968) both
involved claims brought before Section 36(b) was even enacted.  *See Gartenberg*,
694 F.2d at 928 (Section 36(b) "was enacted in 1970"); *Fogel*, 533 F.2d at 737.
The decisions do not supply standards applicable to this case.

(D.C. Cir. 2006) (holding that SEC did not comply with section 553(c) of the

Administrative Procedure Act by relying on materials not in the rulemaking record

without opportunity for public comment).[7]  No case has refused to afford deference

to a board on the basis that the board had an interested chairman, a common

practice in the industry.  *See Schuyt*, 663 F. Supp. at 964, 988 (weighing "heavily"

approval of fees by board with an interested chairman).

The Board's selection of Gary Schpero as Lead Independent Trustee—who

served as the functional equivalent of an independent chairman—aligned the

Board's process with best practice recommendations.  *See* DPPF ¶ 123; DRPF

¶ 72; DX-165 at 5984 ("Selecting either an independent chair or a lead independent

director may enable the board to further foster its independence.") (emphasis

added).  Further, Plaintiffs' suggestion that the Board was somehow "controlled"

by Mr. Joenk merely because he had the title "Chairman" improperly elevates form

over substance.  *Gartenberg*, 694 F.2d at 931 (rejecting plaintiff's argument that

"exalt[ed] form over substance").  Instead, the relevant inquiry is who in substance

---

[7] Plaintiffs' assertion that the Board was not "diverse" (PCOL ¶ 80) is incorrect
under the facts and the law.  Consistent with boards accorded deference in other
Section 36(b) cases, the Independent Trustees had experience in a range of
enterprises, including accounting, financial services, investment advisory,
consulting, legal and public relations businesses.  DPPF ¶¶ 113-14; DRPF ¶ 139;
*see, e.g.*, *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *14 ("[T]he Board is
comprised of business professionals with impressive resumes."); *Schuyt*, 663 F.
Supp. at 980 (independent directors were "well-educated and well-regarded
members of the financial community"); DCOL ¶ 26.

controlled the Board process.  Here, the evidence was clear that the Independent

Trustees controlled the Board process, and Plaintiffs adduced no evidence that Mr.

Joenk—the only interested Trustee—dominated the Board's deliberations or the

agendas at meetings.  *See, e.g.*, T3664:2-3665:15 (Schpero) ("[T]he independent

trustees, I should be very clear to you, run this Board.  There is nothing that

happens at the Board session that we don't bless."); DPPF ¶¶ 124, 172-88.

In sum, the evidence demonstrates that the Independent Trustees approved

the Funds' fees following a rigorous, independent process involving consideration

of each *Gartenberg* factor.  Plaintiffs have offered no legitimate basis for upsetting

their informed decision to approve the fees.  *Jones*, 559 U.S. at 351-52.

## III.   PLAINTIFFS' ARGUMENTS REGARDING THE "NATURE AND QUALITY OF SERVICES" *GARTENBERG* FACTOR FAIL AS A MATTER OF LAW

Plaintiffs' Proposed Conclusions of Law only confirms that Plaintiffs have

not met their burden with respect to the nature and quality of the services provided

to the Funds.  Among other defects, in direct contrast to *Gartenberg*, which

requires the Court to consider affiliates' services, Plaintiffs ask the Court to ignore

AXA's services in support of the Funds and FMG.  In addition, though they make

incorrect claims about the Funds' performance, nowhere do Plaintiffs address the

-14-

quality of Defendants' non-portfolio management services.  Under well-established precedent, these defects are fatal as a matter of law.[8]

**A.    Plaintiffs' Theories Ignore AXA's Services And Thus Fail As A Matter Of Law**

As they have throughout this case, when discussing Defendants' services, Plaintiffs narrowly focus only on the services provided by FMG's 50 to 60 employees.  Although those services are in themselves substantial and valuable, Plaintiffs ignore all the additional services that AXA's hundreds of employees provide, including a range of essential shareholder activity and other services provided directly to the Funds and their shareholders, as well as essential support services to FMG.  DPPF ¶¶ 203-305, 318-47.  Plaintiffs' suggestion that AXA's vast services can be simply ignored is wrong as a matter of law.  The Second Circuit's seminal decision in *Gartenberg* is directly on point:

> Proceeding on the <u>erroneous theory</u> that only the administrative costs <u>incurred by the Manager itself</u> may be considered, appellants ignore the heavy costs incurred by other Merrill Lynch affiliates in processing the increased volume of purchases and redemptions of Fund shares which were under the Manager's guidance.  Since the Manager and Broker were divisions of one economic unit, the district court was entitled to deduct these costs in calculating the Manager's net profits.   <u>To limit consideration to the Manager's own</u> <u>administrative expenses would be to exalt form over substance and</u> <u>disregard the expressed Congressional intent that "all the facts in</u>

---

[8] Plaintiffs' theories also are not supported by the facts: The evidence showed that FMG provided substantial and valuable services to the Funds and that the Funds performed as expected, if not better.  *See* DPPF ¶¶ 203-305, 348-63.

<u>connection with the determination and receipt of such compensation"
be considered</u>.

*Gartenberg*, 694 F.2d at 931 (emphasis added); *see also Gartenberg*, 528 F. Supp.

at 1049 ("Nothing in Section 36(b) obligates this Court, in assessing the fairness of

the investment advisory compensation, to restrict its vision only to those services

performed directly by [the manager].  Indeed, . . . the courts cannot be strictly

bound by corporate structure and ignore closely related entities whose functions

intimately impinge on one another.").[9]

Plaintiffs' failure to account for AXA's services is a fundamental defect that,

on its own, supports judgment for Defendants.  Section 36(b) requires that a court

"look at . . . <u>all</u> services rendered to the fund or its shareholders"—not merely a

subset of the services.  S. Rep. No. 91-184 (1969), at 13, *reprinted in* 1970

U.S.C.C.A.N. 4897, 4910 (1970) (emphasis added); *Gartenberg*, 528 F. Supp. at

1052 ("entirely proper for the fiduciary to consider the totality of the values placed

at the disposal of the shareholders"); *Benak v. Alliance Capital Mgmt. L.P.*, No.

01-5734, 2004 U.S. Dist. LEXIS 12231, at *25 (D.N.J. Feb. 9, 2004) ("[I]t is the

<u>overall</u> nature and quality of the services provided by the investment adviser that is

at issue—not merely some small percentage of those services.").

---

[9] In a similar vein, Plaintiffs' argument that FMG's direct costs show that the bulk
of the Funds' services has been delegated (PCOL ¶ 89(e)) ignores the costly
services provided by AXA and, thus, fails as a matter of law.

**B.      Plaintiffs' Arguments That FMG Delegated The "Bulk" Of The Funds' Services Are Factually Unsupported And Fail As A Matter Of Law**

Setting aside this threshold defect, Plaintiffs' claim that FMG delegated the

"bulk" of its services is also factually unsupported (*supra* n.8) and relies on a

number of unsupported legal arguments.  For example:

- Plaintiffs suggest portfolio management is the only service that "investment advisers" perform and the only service that should be considered in Section 36(b) cases (PCOL ¶¶ 87-88), but in numerous Section 36(b) cases the adviser or its affiliates performed and the courts considered the many additional services that are essential to running a mutual fund.[10]  *See, e.g.*, *Gartenberg,* 694 F.2d at 925-26, 931 (considering processing of daily shareholder orders, shareholder services and fund compliance); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *21 (adviser's services included executive, administrative, clerical, compliance and bookkeeping services); *Schuyt*, 663 F. Supp. at 975-76 (considering "shareholder services," "fund accounting" and "meeting legal and regulatory requirements"); *Krinsk*, 715 F. Supp. at 478 (considering administrative, financial, accounting, board governance, compliance and shareholder-related services).

- Plaintiffs contend the Court should limit its "review" of the Funds' services to contractual descriptions in "the applicable agreements" (PCOL ¶ 84), but Plaintiffs' assertion is directly contrary to the Second Circuit's decision in *Gartenberg* and other Section 36(b) cases that have required consideration of the actual services provided, rather

---

[10] In addition, Plaintiffs' reliance on the ICA's definition of "investment adviser" and *Kalish* for this assertion is misplaced.  Nothing in the ICA suggests portfolio management is the only work performed by an adviser, and *Kalish* recognizes exactly the opposite.  15 U.S.C. § 80a-2(a)(20); *Kalish*, 742 F. Supp. at 1228 (advisers provide "shareholder services" that "cover a wide range of functions generating around the opening of accounts, redeeming of shares, maintenance of records, and furnishing of information" and "insure compliance with federal securities regulations and comparable regulations of the 50 states").

-17-

than just those described in generally worded contracts.  DCOL ¶ 53 (citing case law).[11]

- Plaintiffs assert the Subadvisers and Subadministrator perform the "bulk" of the services because they allegedly have more employees than FMG (PCOL ¶¶ 89(g), 92(e)), but this comparison is irrelevant because FMG is ultimately responsible for (and the Court must consider) the entire package of services provided to the Funds—*i.e.*, including the services the Subadvisers and Subadministrator perform on FMG's behalf.  *Supra* at 5; *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *46-49 (considering "both the services performed by [the subadviser] and the services performed by the Hartford Defendants as adviser . . . measured against the totality of the advisory fee"). Plaintiffs' comparison also fails because Plaintiffs presented no evidence that the services provided by FMG and its service providers are the same—and, in fact, they are very different.  *Jones*, 559 U.S. at 349-50 & n.8 ("courts must be wary of inapt comparisons" because "there may be significant differences between the services provided"); *Gallus*, 497 F. Supp. 2d at 982 ("Plaintiffs have not demonstrated that the services provided . . . . are comparable."); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) ("[I]nvestment advisers and sub-advisers perform distinct services."); DPPF ¶¶ 203-317.

- Plaintiffs' focus on isolated references in certain documents to the "delegation" of the Funds' "day to day" services also fails to show that FMG delegated the bulk of the Funds' services.  *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *8 (although "some documents in the

---

[11] Further, Plaintiffs rely on two motion to dismiss decisions for this assertion— *i.e.*, where the court had nothing to consider other than the agreements and other documents quoted in the complaints because there was not yet any other evidence (*e.g.*, witness testimony) describing the services.  PCOL ¶ 84; *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083, 2012 U.S. Dist. LEXIS 178234, at *9 (D.N.J. Dec. 17, 2012); *In re BlackRock Mut. Funds Advisory Fee Litig.*, No. 14-1165, 2015 U.S. Dist. LEXIS 39514, at *14 (D.N.J. Mar. 25, 2015); *see also Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, No. 14-414,  2016 U.S. Dist. LEXIS 23815, at *23 (S.D. Ohio Feb. 26, 2016) ("[I]t is the work done and not the label given to the work that will likely and ultimately prove dispositive of Plaintiffs' claims. . .  The Court does not even know . . . whether the same labels used in the different agreements necessarily capture the same work.").

record indicate that [the subadviser] has responsibility for day-to-day management of the Fund" it is "clear" that the overall adviser has responsibility for supervising and overseeing that activity) (internal quotation marks omitted); DPPF ¶¶ 377-80; DRPF ¶ 347.

In sum, Plaintiffs' assertion that FMG has delegated the "bulk" of the Funds' services is both legally and factually unsupported.[12]

## C.   Plaintiffs Failed To Meet Their Burden With Respect To The <u>Quality</u> Of The Services Provided To The Funds

Plaintiffs' arguments with respect to the quality of Defendants' services also suffer from a fatal defect:  Plaintiffs focus exclusively on the quality of Defendants' <u>portfolio management</u> services (the Funds' performance) and fail to address (and have presented no evidence regarding) the quality of any of Defendants' other numerous services—*e.g.*, the extensive administrative, legal, compliance, and shareholder processing and servicing work that FMG and AXA perform.  *See* PCOL ¶¶ 94-106.  Because Section 36(b) requires consideration of the totality of services provided to the Funds, Plaintiffs' Section 36(b) claim could be rejected on this basis alone.  *See Benak*, 2004 U.S. Dist. LEXIS 12231, at *25 ("[U]nder § 36(b) it is the <u>overall</u> nature and <u>quality</u> of the services provided by the

---

[12] *See also In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *40-43, *133-34 (fees did not violate § 36(b) where administrator subcontracted with third parties and "retained over $154 million in 2008 to cover its oversight of third parties, which includes monitoring, coordinating and assisting third party service providers"); *Kalish*, 742 F. Supp. at 1228-29 (rejecting § 36(b) claim alleging that adviser relied on third parties for security selection expertise, leaving the adviser to provide mainly "a back office type of function").

investment adviser that is at issue—<u>not merely some small percentage of those services</u>."); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *131 ("Aside from performance, Plaintiffs failed to offer any evidence about the nature and quality of other advisory services provided by the [manager] (*e.g.*, executive, administrative, compliance, bookkeeping, etc.)").

With respect to the Funds' performance, Plaintiffs cite two cases from the Southern District of New York for the proposition that "[i]vestment performance is a significant indication of service quality." PCOL ¶ 94. However, the Second Circuit and many other courts have cautioned against attaching too much weight to alleged underperformance. *See* DCOL ¶ 50. In any event, the Funds here did not, as Plaintiffs contend, perform poorly. Plaintiffs take no issue with the performance of three of the Funds (PCOL ¶ 106) and the evidence shows the other nine Funds performed as expected or better (DPPF ¶¶ 348-63, 393-413). For instance, Plaintiffs criticize the performance of the four index Funds, but those Funds performed exactly as they should have, nearly perfectly matching their benchmarks on a gross of fees basis.[13]  DPPF ¶¶ 406-407.

Thus, this case is no different from the six prior Section 36(b) cases that denied Section 36(b) claims, but which Plaintiffs attempt to distinguish on the

---

[13] Plaintiffs' criticisms of Dr. Wermers' opinions are baseless and *Krinsk* provides no support for Plaintiffs' assertions. PCOL ¶¶ 101-106; DRPF ¶¶ 474-99; *Krinsk*, 715 F. Supp. at 487 (rejecting <u>plaintiffs</u>' risk-adjusted performance figures where expert "<u>admitted</u> . . . [they were not] industry standard") (emphasis added).

grounds that, in those cases, the funds purportedly did not have "poor" performance.  PCOL ¶ 98.  Further, Plaintiffs ignore that the decisions they cite rejected the plaintiffs' unsupported claims regarding the funds' alleged underperformance, as the Court should do here.  *See Gallus*, 497 F. Supp. 2d at 980 (granting summary judgment for defendants despite that plaintiffs' expert, "Steve Pomerantz, will testify that the performance of the Funds was poor"); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *131; *Krinsk*, 715 F. Supp. at 487; *see also Gartenberg*, 528 F. Supp. at 1048 (dismissing Section 36(b) claim despite that fund performance had "not been spectacular").

## IV.   PLAINTIFFS TRY TO RADICALLY REWRITE THE LAW REGARDING *GARTENBERG*'S PROFITABILITY FACTOR

Plaintiffs do not dispute that the profit margins FMG provided to the Board were consistent with generally accepted accounting principles ("GAAP") and employed methodologies that two independent global accounting firms, PwC and E&Y, found to be reasonable.  Nor do they dispute that the resulting profit margins were within the ranges upheld in the prior Section 36(b) cases to proceed to judgment—precedent that Plaintiffs almost entirely ignore when discussing profitability because it does not help them.  Rather, Plaintiffs offer alternative margins that do not comply with GAAP by ignoring subadvisory and subadministrative expenses and directly contradict *Gartenberg* by ignoring AXA's costs.  Given that Plaintiffs' experts were unable to cite a single accounting

principle supporting their proposed methodology (DPPF ¶ 422), there is no basis to conclude that these margins are more reliable than those reviewed by the Board.

Plaintiffs hinge their legal argument on the unprecedented assertion that Defendants are obligated to calculate profitability in a manner that is most favorable to Plaintiffs.  PCOL ¶¶ 110-14.  But the common law cases that Plaintiffs invoke do not apply to Section 36(b) for the same reasons already noted, nor do they deal with profitability.  Moreover, Plaintiffs do not cite a single Section 36(b) case that supports the counter-intuitive assertion that, in calculating profitability in a manner that was consistent with GAAP, required by *Gartenberg*, and approved as reasonable by two independent outside accountants, Defendants somehow acted improperly.  In fact, the established Section 36(b) precedent is directly at odds with this notion.  *E.g.*, *Schuyt*, 663 F. Supp. at 978 n.49 (cost allocation methodologies approved by independent accountants were reasonable).

Under well-settled Section 36(b) precedent, the touchstone of any profitability methodology is reasonableness—not whether it would best suit plaintiffs' lawyers.  Courts in Section 36(b) cases have repeatedly recognized that it is "impossib[le]" to determine "an exact profitability figure" for funds and that allocation methodologies are an "art rather than a science."  *Krinsk*, 715 F. Supp. at 489; *see also Kalish*, 742 F. Supp. at 1237 ("The most that can be said is that, as in other cases involving multi-product services by an adviser-manager, the Court is

left with the problem of uncertain profitability."); *Schuyt*, 663 F. Supp. at 978

("There are many acceptable ways to allocate common costs . . . .").

As a result, courts have refused to determine whether an adviser allocated

expenses using the "best" or "correct" methodology, because that level of precision

simply does not exist. *Gartenberg*, 528 F. Supp. at 1051 ("[i]t would be an

exceedingly difficult task for this Court to choose the proper method of accounting

for determining the costs" of servicing individual funds).  Instead, courts have

focused on whether an adviser has estimated profitability using a methodology that

is <u>reasonable</u>.  *See Schuyt,* 663 F. Supp. at 978 n.49 ("While the PLPS is certainly

not the only possible way to calculate costs, it appears to the Court to be one

reasonable way of obtaining an approximate figure."); *Kalish,* 742 F. Supp. at 1232

(relying upon profitability figures calculated using allocation methodology that

adviser's accountant determined was "reasonable under the circumstances").  No

court has ever assessed a cost allocation methodology under anything other than a

reasonableness standard, and certainly no court has ever suggested that an adviser

must use a cost allocation methodology that results in the highest profit margins.

There is no credible basis to conclude that Defendants' profitability

methodology, which complies with GAAP and was approved by two independent

accountants, was unreasonable.  Citing an SEC settlement involving a transfer

agent in a matter with drastically different facts, Plaintiffs make the sweeping

assertion that "where an investment advisor treats fees paid to sub-services as its own expense, the SEC has declared such conduct to be 'materially misleading.'" PCOL ¶ 116 (citing *Smith Barney*).  But *Smith Barney*, which did not even involve an investment management arrangement and was a non-precedential consent order, says nothing of the sort.  *See Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *53 (describing *Smith Barney* as "thin" support for plaintiffs' proposed accounting treatment of subadvisory fees); *CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 206 n.19 (S.D.N.Y. 1999) (consent order was "untested in the adversary crucible" and "simply memorialize[d] an agreement of the parties to end litigation upon certain terms").  Among other things, the defendant there set up a sham sub-transfer agency arrangement designed to conceal the existence of an illegal rebate, performed virtually no work, and concealed the nature of the arrangement from the board.  Nothing remotely close to these facts is present here, nor does *Smith Barney* purport to establish any industry-wide accounting rules.

Nor does *Krinsk* help Plaintiffs.  *See* PCOL ¶ 119.  In that case, as part of its denial of a Section 36(b) claim, the district court carved out Rule 12b-1 payments to financial consultants as part of its profitability analysis, but did so specifically because the adviser "perform[ed] a purely administrative function in receiving and dispensing the payments," and the payments did not appear on the adviser's financial statements.  *Krinsk*, 715 F. Supp. at 490.  Here, FMG's payments to the

Subadvisers and Subadministrator <u>do</u> appear as expenses on FMG's financial statements as required by FMG's auditors, and FMG's role goes far beyond "a purely administrative function" of merely "receiving and dispensing the payments." *Id*. Among other things, FMG performs substantial services itself, engages and manages the Subadvisers and Subadministrator, and is ultimately responsible for their work. DPPF ¶¶ 203-324.

Plaintiffs' effort to exclude AXA's expenses fares no better. Not only is it at odds with the facts (*see* DPPF ¶¶ 426-40), it is also squarely at odds with the law. *See Gartenberg*, 528 F. Supp. at 1049 (Section 36(b) "recognizes that in order to properly assess the fairness of advisory compensation, the courts cannot be strictly bound by corporate structure and ignore closely related entities whose functions intimately impinge on one another."). And while Plaintiffs criticize FMG's allocation of AXA's expenses on the basis of revenue, Plaintiffs offer no alternative other than excluding the expenses altogether—an approach that has no basis in the trial record, which confirms AXA's many services in support of the Funds. *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1311 (S.D.N.Y. 1983) ("[P]laintiff, who bears the burden of proof, offers no allocation of costs as an alternative.").

Calculating profitability in the manner approved by two global accounting firms—and in the manner considered appropriate by the Board in its business

judgment—FMG's pre-tax, pre-distribution profit margins are well within the ranges upheld in prior Section 36(b) cases (many of which included certain distribution costs, lowering the margins).[14]   DCOL ¶¶ 61-63; *Meyer v. Oppenheimer*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (margins up to 89%, including certain distribution costs); *Schuyt*, 663 F. Supp. at 978-79 (margins up to 77.3%, including "sales promotion" costs).  Plaintiffs' alternative margins have no legal or factual basis.

## V.   PLAINTIFFS HAVE NOT MET THEIR BURDEN ON THE "ECONOMIES OF SCALE" *GARTENBERG* FACTOR

Remarkably, nowhere in their Proposed Conclusions of Law do Plaintiffs cite any of the post-trial decisions setting forth a plaintiff's evidentiary burden with respect to economies of scale.  PCOL ¶¶ 194-214.  Instead, ostensibly because these cases illustrate the insufficiency of Plaintiffs' proof, Plaintiffs rely on a <u>motion to dismiss</u> decision from the Eastern District of Wisconsin for the proposition that economies of scale are realized when an adviser "does not suffer significant additional expenditures" as fund assets increase.  PCOL ¶ 197.  But the

---

[14] Plaintiffs' sweeping assertion that "[i]t is improper to consider distribution expenses when evaluating an advisory fee" goes too far.  PCOL ¶ 157.  Defendants took a conservative view of what they classified as "distribution" for the purposes of reporting profitability (DPPF ¶ 418) and, as the cases cited below show, courts have considered margins including distribution.  Further, distribution expenses are relevant to evaluating both economies of scale and comparative fees.  *See* Defs.' Mem. of Law in Opp. to Pls.' Mot. to Preclude the Admission of Evidence Regarding Transfer Agency and Distribution Servs. (ECF No. 192).

evidence showed that Defendants' expenses did increase as assets increased[15] and, in any event, this highly generalized assertion at best sets forth a <u>pleading</u> standard, not a recognized evidentiary standard.[16]

It is well-settled that Plaintiffs face a demanding burden with respect to economies of scale.  To prove their existence, Plaintiffs must show that "the per unit cost of performing Fund transactions decrease[s] as the number of transactions increase[s]"—*i.e.*, that the <u>per unit</u> costs of operating the Funds decreased as the Funds increased in size.  *Krinsk*, 875 F.2d at 411; *see also Kalish*, 742 F. Supp. at 1238.  This requires that Plaintiffs "create a detailed analysis of each element of a transaction surrounding [the Fund], over an extended period of time, over different levels of activity."  *Krinsk,* 715 F. Supp. at 496.  Plaintiffs also must analyze <u>all</u>

---

[15] *See* DX-2051, DX-2063; *see also* DPPF ¶ 448 (explaining that Plaintiffs' expert Mr. Barrett found that AXA's costs "increased very substantially as the funds have increased in size"); T2752:24-2763:26 (Joenk) (funds with more shareholders require more shareholder-related work); *Gartenberg*, 528 F. Supp. at 1055 ("That processing costs do not significantly diminish as Fund assets increase accords with logic and common sense. . . .  [I]t requires substantially more time, money and personnel to process 1 million shareholder orders than 100,000 orders.").  Notably, however, from 2010 to 2014 the assets for four Funds actually <u>decreased,</u> suggesting (if anything) <u>diseconomies</u> of scale.  DPPF ¶ 451.

[16] Plaintiffs also quote commentary about economies of scale in the fund industry generally (PCOL ¶¶ 194-95, 198-99), but this does not meet Plaintiffs' burden of showing <u>Defendants</u> realized economies of scale.  *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 341, 345 (2d Cir. 2006) (plaintiffs alleged "fees across the industry have generally been criticized as . . . impervious to economies of scale" but "allege[d] no facts related to the Funds"); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 339 (S.D.N.Y. 2007) (rejecting "non-Fund specific, economic analysis regarding theoretical economies of scale").

costs associated with operating the Funds, and not merely a subset of costs. *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *77 (plaintiffs must analyze "how total costs change with the level of output" because "[a]nalyzing only a subset of costs does not allow for the possibility that a firm may realize economies of scale in one function, but also realize diseconomies of scale in other functions"). Moreover, Plaintiffs must quantify the <u>amount</u> of any scale economies. *Jones*, 2007 U.S. Dist. LEXIS 13352, at *26.

Here, like the plaintiffs in all prior Section 36(b) cases, Plaintiffs have come nowhere close to satisfying their burden. Among other deficiencies, Plaintiffs: (1) performed no <u>per unit</u> cost analysis; (2) failed to analyze <u>all</u> costs because they ignored FMG's subadvisory and subadministrative expenses and AXA's expenses; and (3) failed to <u>quantify</u> FMG's purported economies of scale.[17] DCOL ¶ 73. Failing to meet their burden, Plaintiffs instead generically assert that FMG's <u>direct</u> expenses "remained largely constant." PCOL ¶ 203. However, general assertions about FMG's costs remaining constant or even declining are not sufficient. *Krinsk*, 875 F.2d at 411 ("[T]he fact that expenses . . . declined at a time when the Fund

---

[17] Plaintiffs assert FMG realized "$69.6 million in added retained fees" (PCOL ¶ 207), but Plaintiffs cite no evidence for this assertion (DRPF ¶ 683) and, in any event, any increase in FMG's <u>fees</u> says nothing about its per unit <u>costs</u>. *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *77 (must consider "how total <u>costs</u> change") (emphasis added); *Kalish*, 742 F. Supp. at 1238 (requiring "proof of decreasing <u>costs</u> on a per-unit basis") (emphasis added).

size grew . . . does not establish that such decline was necessarily due to economies of scale."); *Kalish*, 742 F. Supp. at 1238.

Even if Plaintiffs had met their threshold burden of proving and quantifying economies of scale (and they did not), Plaintiffs failed to show that any economies of scale were not adequately shared with the Funds.  Plaintiffs' factual assertions regarding the amount of FMG's sharing are unsupported and incorrect.  *See* DRPF ¶¶ 685-96.  Moreover, courts recognize that economies of scale can be shared through a variety of mechanisms, "including breakpoints, fee reductions and waivers, offering low fees from inception, or making additional investments to enhance shareholder services."  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *139-40.  Here, FMG shared through all of those mechanisms, including through more than $68 million in breakpoint savings alone.  DCOL ¶ 77.  Thus, even if Plaintiffs were correct that FMG realized $69 million in savings (*supra* n.17), this would mean FMG shared nearly 100% of those savings through breakpoints alone.  There is no credible evidence that FMG's sharing of any economies is insufficient.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *140-41 (plaintiffs' own analysis showed manager shared 40% of its savings and "only conclusion to be drawn from this evidence is that any economies of scale . . . were sufficiently shared"); *Gartenberg*, 528 F. Supp. at 1054 (savings from breakpoints are automatic form of sharing).

## VI.    PLAINTIFFS' COMPARISONS UNDER THE "COMPARATIVE FEES" *GARTENBERG* FACTOR ARE IMPROPER UNDER THE LAW

Although Defendants do not have the burden of proof, there is no real dispute that the Lipper fee comparisons provided to the Board show that the Funds' fees are consistent with the fees charged to similar funds.  DPPF ¶¶ 463-65.  Nor is there any dispute that numerous courts have relied on Lipper in Section 36(b) cases and found that it is a leading third-party source of fee data.  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *71-72 ("Lipper . . . is a recognized industry-leading third-party source for mutual fund industry data."); *Schuyt*, 663 F. Supp. at 970 n.24 ("Lipper rankings . . . are heavily relied on by those in the . . . industry . . . ."); *Kalish*, 742 F. Supp. at 1229 ("A leading source of statistics on mutual fund performances is Lipper Analytical Services, Inc."); *Krinsk*, 715 F. Supp. at 497 n.50 (relying on Lipper fee rankings); *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *41 (rejecting plaintiffs' assertions that adviser "exerted control over Lipper"); *Gallus*, 497 F. Supp. 2d at 982-83 (board considered Lipper fee data); *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 378 (S.D.N.Y. 2002) (same). Notably, Plaintiffs have pointed to no Section 36(b) case in which a court has rejected a fee comparison prepared by Lipper, and Defendants are aware of none. To the contrary, Plaintiffs' expert admitted that Lipper is authoritative, widely used

and considered to be independent (DPPF ¶ 462), and Plaintiffs themselves cite

Lipper comparisons from prior Section 36(b) cases (PCOL ¶¶ 173, 194).

Plaintiffs' main argument is that the Court should disregard the Funds'

Lipper comparisons[18] and, instead, compare the Funds' fees to the asset-weighted

average fees reported by ICI.[19]  However, Plaintiffs cite no Section 36(b) case that

has ever relied on asset-weighted averages and Plaintiffs' comparison is improper

as a matter of law.  First, comparisons to the asset-weighted average fees for index

funds have been rejected by a number of courts, in large part because they give

disproportionate weight to Vanguard funds (a "not-for-profit" fund family) and

other funds with the very lowest fees in the industry.  *Kalish*, 742 F. Supp. at 1250

("[t]he Vanguard comparison is seriously flawed"); *Amron*, 464 F.3d at 345 (fee

comparison to funds known to have low costs "raises little suspicion"); *Kasilag*,

---

[18] Plaintiffs claim the Funds' Lipper comparisons are flawed because they report
medians and compare certain Funds to actively managed funds.  PCOL ¶¶ 171-78.
Plaintiffs' criticisms are baseless.  DRPF ¶¶ 605-606, 648-51.  In addition,
Plaintiffs' assertion that "large funds should be compared to funds of similar size"
(PCOL ¶ 173) is different from Plaintiffs' asset-weighted average fee comparison,
which (as discussed below) is an improper comparison as a matter of law.  In any
event, none of the cases Plaintiffs cite required that fee comparisons be limited to
funds of the same size.  *Gartenberg*, 694 F.2d at 929; *In re Am. Mut. Funds Fee
Litig.*, 2009 U.S. Dist. LEXIS 120597, at *71; *Kalish*, 742 F. Supp. at 1230.

[19] Plaintiffs also contend that the fees for two Funds were "excessive" because,
they, respectively, fell in the fourth Lipper quartile and were ranked second highest
out of 23 Lipper peers in one year.  PCOL ¶¶ 181, 184.  However, no court has
ever found that a fee was excessive simply because it was in the fourth quartile—
*i.e.*, with 25% of all peer funds—or was ranked second in a single year.

2016 U.S. Dist. LEXIS 47063, at *57-58 (court expressing "skepticism" at same plaintiffs' expert's fee comparisons when compared to "actual [Lipper] peers").

Second, that the Funds' fees may be above an average says nothing about where the fees fall in the distribution of fees for other funds or whether they are outside the range of arm's-length bargaining. *Amron*, 464 F.3d at 345 (rejecting allegations that fees exceeded industry mean without information "on the distribution of fees"). In fact, Plaintiffs' asset-weighted average fee for equity funds is lower than the fees for 90% of *all* equity funds. P-117 at 80 (attached hereto as Exhibit A); T2023:1-10 (Pomerantz); T4218:14-20 (James).

Third, Plaintiffs' asset-weighted comparisons improperly rely on funds with all types of investment strategies—*i.e.*, including large cap and small cap, growth and value, etc.—and not just those that are comparable to the Funds. *Turner v. Davis Selected Advisers*, 626 F. App'x 713, 717 (9th Cir. 2015) (comparisons must be to funds with "similar investment strategy"); PCOL ¶¶ 179-80, 183, 186.

In addition to their asset-weighted average fee comparisons, Plaintiffs rely on equally flawed comparisons of the fees "retained" by FMG to the fees paid to the Subadvisers and Subadministrator. PCOL ¶¶ 49-66. No court has ever found that an adviser breaches its fiduciary duty under Section 36(b) by retaining a greater percentage of a fund's fees than it pays out to its service providers. To the contrary, the law is clear that comparisons of fees paid for different services are

"inapt," and there is no dispute that FMG and the Subadvisers/Subadministrator perform different services. *Jones*, 559 U.S. at 349-50 & n.8 ("courts must be wary of inapt comparisons" where "there may be significant differences" in services); *Hoffman*, 591 F. Supp. 2d at 540 ("investment advisers and sub-advisers perform distinct services" and "[t]he differences in services and compensation packages alone justify the different breakpoint arrangements"); DPPF ¶¶ 203-305 (FMG's services); DPPF ¶¶ 306-17 (Subadvisers' and Subadministrator's services).

Plaintiffs also assert that the fact that the Funds' fees are calculated based on assets, rather than the Funds' performance or Defendants' costs, "raise[s] a plausible inference that the fees are disproportionate." PCOL ¶ 191. But neither the *Curd* case Plaintiffs cite nor any other Section 36(b) case has ever held that asset-based fees, which are standard, are evidence that the fees are excessive.[20] To the contrary, every case that went to trial involved funds with asset-based fees.[21]

---

[20] In *Curd*, the court denied a motion to dismiss a complaint that, among many other allegations, asserted the fees were based on a percentage of assets and not on the quality or cost of providing services. *Curd v. SEI Invs. Mgmt. Corp.*, No. 13-7219, 2015 U.S. Dist. LEXIS 90940, at *12-13 (E.D. Pa. July 13, 2015). However, the court did not find that those allegations in and of themselves stated a "plausible claim" under Section 36(b), and instead focused on the allegation that the adviser had delegated the majority of its services. *Id.* (citing *Kasilag*'s motion to dismiss decision that upheld complaint with same allegation).

[21] *Meyer v. Oppenheimer Mgmt. Corp.* 895 F.2d 861, 863 (2d Cir. 1990); *Kalish*, 742 F. Supp. at 1225; *Krinsk*, 715 F. Supp. at 479; *Schuyt*, 663 F. Supp. at 964; *Gartenberg*, 573 F. Supp. at 1311; *Gartenberg*, 528 F. Supp. at 1040; *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *7.

Plaintiffs also argue that the fees in prior Section 36(b) cases were purportedly "low compared to their peer groups." PCOL ¶ 193. As a threshold matter, Plaintiffs' assertion ignores that, here too, a number of the Funds had expense ratios that were among the lowest in their peer groups. DPPF ¶ 463. Further, in making this assertion, Plaintiffs cite *Gallus* as a case that involved "[f]ees at or below the Lipper median." PCOL ¶ 193. But again, the vast majority of the Funds in this case also had fees that were at or below median. DPPF ¶¶ 463-64. In any event, contrary to what Plaintiffs suggest, Section 36(b) claims have been rejected even where the fees were above a median. *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574, 576 (S.D.N.Y. 1989) (fund's fees were "higher than all eighteen of the funds in Meyer's sample").

In sum, Plaintiffs have not demonstrated that the "comparative fees" *Gartenberg* factor supports a finding that Defendants breached their fiduciary duty.

## VII. PLAINTIFFS' CLAIMED "FALL-OUT BENEFITS" DO NOT MEET THE LEGAL TEST FOR THIS *GARTENBERG* FACTOR

Plaintiffs pin their arguments regarding *Gartenberg*'s fall-out benefits factor yet again on the hope that this Court will radically rewrite more than three decades of established precedent. For instance, notwithstanding that court after court has held that fall-out benefits are profits that would not accrue "but for" the existence of the funds at issue, Plaintiffs claim that this test is "wrong" and imply that some

-34-

sort of looser standard applies.  PCOL ¶ 246.  There is no less stringent standard,[22] and Plaintiffs do not explain how substituting the phrases "because of the funds," "as a result of the funds," or "attributable to the funds" for the words "but for" would make any difference:  These phrases all express the oft-cited "but for" test.

Further, despite that it is textbook law that Plaintiffs bear the burden of proof, Plaintiffs try to shift the burden to <u>Defendants</u>.  Using single-word snippets from *Gartenberg*, Plaintiffs suggest Defendants were required to quantify the purported fall-out benefits, and that Plaintiffs' burden was merely to provide a non-precise "estimate" of the benefits.  PCOL ¶ 216.  But *Gartenberg* makes clear that plaintiffs always have the burden on fall-out benefits.  *Gartenberg*, 694 F.2d at 932 ("the burden was on appellants, not the defendants").  Even if Plaintiffs could satisfy their burden with "estimates," they have not done so with any admissible evidence on the fund-by-fund basis that the law requires.  *In re Am. Mut. Funds Fee Litig*., 2009 U.S. Dist. LEXIS 120597, at *142-43 (plaintiffs must "<u>quantify</u> the fall-out benefits and demonstrate the appropriate share for <u>allocation</u> of said benefits as an offset to costs.") (emphasis added); DPPF ¶ 489; DRPF ¶ 744.

Plaintiffs also spill considerable ink attempting to establish post-trial on the papers what they did not do at trial—show that FMG realized any meaningful

---

[22] *See, e.g.*, *Krinsk*, 715 F. Supp. at 494-95 (applying "but for" test ); *Krinsk*, 875 F.2d at 411 (same); *Chill*, 2016 U.S. Dist. LEXIS 39954, at *44 (same); *In re Am. Mut. Funds Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142 (same); *Gartenberg*, 573 F. Supp. at 1313 (same).

benefit from purported fall-out benefits.  PCOL ¶¶ 215-47; *see also* DRPF ¶¶ 697-744; DCOL ¶¶ 93-98.  Plaintiffs first claim the subadvisory fees paid to AXA's affiliate AllianceBernstein are fall-out benefits, but those fees are built into the Funds' profitability and, thus, already considered by the Court.  Treating those fees as fall-out benefits would amount to improper double-counting.  DCOL ¶ 98.

Likewise, no court has ever found that Plaintiffs' next category of purported fall-out benefits—direct fees such as the distribution fees paid to AXA affiliates and administrative fees paid to FMG—are fall-out benefits.  *See, e.g.*, *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *83, *110, *143; *Krinsk*, 875 F.2d at 411 (benefits "generated directly by the [fund] . . . cannot be characterized as fall-out revenue"); DCOL ¶ 98.  To the contrary, courts have rejected claims that other fees charged to mutual funds are fall-out benefits absent a showing that those other fees are themselves excessive.  *Turner*, 626 F. App'x at 715-17 (rejecting plaintiff's allegation that funds' "service fees" were fall-out benefits because "mere labeling of such fees as 'fall out benefits' . . . says nothing about whether the service fee . . . fails to resemble what would be the product of arm's-length bargaining"); *Meyer*, 895 F.2d at 866 ("If the fee for each service

-36-

viewed separately is not excessive in relation to the service rendered, then the sum of the two is also permissible.").  Plaintiffs have made no such showing here.[23]

Finally, Plaintiffs claim that AXA's revenues from its variable annuity product wrapper fees and general account spread are fall-out benefits.  These revenues fail the threshold "but for" test because, as the evidence at trial demonstrated, AXA would receive those fees even if the Funds did not exist. DCOL ¶¶ 94-96.  Plaintiffs attempt to compare AXA's product-level revenues to the cash management account revenues in *Krinsk* (PCOL ¶ 232), but that case only confirms the deficiencies in Plaintiffs' proof.  In *Krinsk*, unlike the revenues here, the defendants agreed that the cash management revenues were dependent on the existence of the fund and its inclusion in an integrated money management account.  *Krinsk*, 715 F. Supp. at 477; *see also* DPPF ¶¶ 481, 485.  Moreover, in finding that the plaintiffs had failed to meet their burden on fall-out benefits, the court specifically criticized plaintiffs for attributing all cash management account revenues to the funds.  *Krinsk*, 715 F. Supp. at 495 (proposal to count all non-fee based income as fall-out benefits went "too far").  Even if Plaintiffs could show

---

[23] Moreover, although Plaintiffs focus on distribution fee revenues, they ignore that these fees are offset by substantial distribution expenses, which result in hundreds of millions of dollars in distribution losses (not profits) each year.  DCOL ¶ 97.  As to the administrative fees, Plaintiffs separately challenge them in this action, and thus the Court must already consider the profit from such fees; treating them as fall-out benefits would, again, amount to double-counting.  *Id.*

that product-level fees were fall-out benefits, they make the same mistake here by

attributing all product-level revenues to the existence of the Funds.[24]

## VIII.  PLAINTIFFS' DAMAGES MODELS RELY ON APPROACHES PROHIBITED BY SECTION 36(B)

No adequate basis exists to second-guess the Independent Trustees' approval

of FMG's fees, which was based on a thoughtful, time-consuming and rigorous

process and consistent with the evidence offered on each of the *Gartenberg* factors,

none of which weighs in favor of a finding that FMG's fees were excessive.  For

all the reasons explained above and in Defendants' other post-trial papers,

Plaintiffs have not come close to meeting their heavy burden of showing that

Defendants' fees are "so disproportionately large" as to be beyond the range of

arm's-length bargaining, and they are thus entitled to no damages.  As the Supreme

Court made explicit in *Jones*, it is not the courts' function under Section 36(b) to

set rates or sit as a super-trustee.  *See Jones*, 559 U.S. at 352-53.

Moreover, Plaintiffs' requested damages are based entirely on approaches

prohibited under Section 36(b).[25]  Here too, Plaintiffs try to rewrite the law.

---

[24] *Gartenberg*, 573 F. Supp. at 1314-15 (rejecting plaintiff's attempt to quantify alleged fall-out commissions paid to affiliated broker where plaintiff "ignore[d] the fact that the fall-out benefits would not accrue absent the use of the sophisticated solicitation techniques that are employed by [the affiliated broker]" and because "[the affiliated broker] is entitled to allocate a substantial portion of the net fall-out benefits to itself as compensation for its own entrepreneurial skill").

[25] Plaintiffs' damage models also should be rejected for the independent reason that they contain calculations and amounts that were not offered in discovery, pre-trial

Plaintiffs ask for disgorgement of "all profits," but as Judge Bumb recently held in *Kasilag* in response to the <u>same</u> argument by the <u>same</u> plaintiffs' attorneys, that is not a remedy provided by Section 36(b).  *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *60-62 (holding that proper remedy is "actual damages" measured by amount of the fee that is outside the range of arm's-length bargaining, not disgorgement of profits); 15 U.S.C. § 80a-35(b)(3) (limiting recovery to "the actual damages resulting from the breach of fiduciary duty"); DCOL ¶¶ 59, 102-104.[26]

Plaintiffs' "alternative" damage models also find no support in any precedent.  Plaintiffs' second and third damage models apply hypothetical profit margins to FMG's costs.  DRPF ¶¶ 836-59.  Notably, Plaintiffs do not cite a single case in support of these models, and there are none:  Section 36(b) specifically does not permit such a "cost-plus" approach.  S. Rep. No. 91-184, at 5 ("Nothing in [Section 36(b)] is intended to . . . suggest that a 'cost-plus' type of contract would be required"); DCOL ¶ 105 (citing cases).  Plaintiffs' use of 39% and

---

proceedings or at trial, and were disclosed only <u>after</u> trial in Plaintiffs' Proposed Findings of Fact.  This plainly violates Rule 26 of the Federal Rules of Civil Procedure and the Court's Final Pretrial Order.  *See* Fed. R. Civ. P. 26 (a)(1)(A)(iii), (e) (requiring pre-trial disclosure of all damage computations and ongoing supplementation of such disclosures); Joint Final Pretrial Order at 36 (ECF No. 178) (requiring Plaintiffs to set forth "each item of damages, the amount of each item, [and] the factual basis for each item").

[26] Like in *Kasilag*, Plaintiffs point to the common law's "earmarks of an arm's length bargain" test to support their disgorgement of "all profits" request.  PCOL ¶ 260.  But as explained above, Section 36(b)'s fiduciary duty is "significantly" more limited than the common law fiduciary duty.  *See supra* Section I.

59.57% margins as their benchmark for setting damages is also improper, as courts have upheld much higher margins in prior cases. *See, e.g.*, *Meyer*, 707 F. Supp. at 1401 (margins up to 89%); *Schuyt*, 663 F. Supp. at 979 (margins up to 77.3%).[27]

Finally, Plaintiffs' fourth damages model is simply a regurgitation of their flawed comparative fee analyses based on asset-weighted average fees, and fails for the same reasons already discussed above. *See supra* Section VI. Moreover, the asset-weighted average fees that Plaintiffs propose as a measure of damages represent among the very lowest fees in the industry. DCOL ¶ 86; DPPF ¶ 470. They hardly establish the outer limit of the range of arm's-length bargaining, and thus cannot serve as the basis for damages under Section 36(b). *See Jones*, 611 F. App'x at 360 ("the goal [in Section 36(b) cases] is to identify the outer bounds of arm's length bargaining and not engage in rate regulation"); *Amron*, 464 F.3d at 345 (allegation that fund's expense ratio exceeded mean insufficient as matter of law without information on where fund's fees fell "on the distribution of fees"). For all these reasons, Plaintiffs' proposed damages theories fail as a matter of law.

---

[27] Nothing in Section 36(b) refers to an action or remedies based on excessive profits. *Krinsk*, 875 F.2d at 410 (high profitability alone does not show fee is excessive); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *134-35 ("Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."). Indeed, using profit margins as a benchmark for damages would render the other *Gartenberg* factors meaningless.

Dated:  May 16, 2016

MILBANK, TWEED, HADLEY
& McCLOY LLP
James N. Benedict (*pro hac vice*)
Sean M. Murphy (*pro hac vice*)
James G. Cavoli (*pro hac vice*)
Robert C. Hora (*pro hac vice*)
Andrea G. Hood (*pro hac vice*)
28 Liberty Street
New York, NY  10005
(212) 530-5000

*Of Counsel*

Respectfully submitted,

BLANK ROME LLP

By:  /s/ Jonathan M. Korn
Jonathan M. Korn
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
(609) 750-7700

*Attorneys for Defendants*
*AXA Equitable Life Insurance Company and*
*AXA Equitable Funds Management Group,*
*LLC*

-41-

# EXHIBIT A



EXHIBIT

P-117

exhibitsticker.com

# 2013 Investment Company Fact Book

*A Review of Trends and Activities in the U.S. Investment Company Industry*

53rd edition

**WWW.ICIFACTBOOK.ORG**



## Understanding Differences in the Expense Ratios of Mutual Funds

Like the prices of most goods and services, the expenses of individual mutual funds differ considerably across the array of available products. The expense ratios of individual funds depend on many factors, including investment objective, fund assets, balances in shareholder accounts, and payments to intermediaries.

### Fund Investment Objective

Fund expenses vary by investment objective (Figure 5.7); for example, bond and money market funds tend to have lower expense ratios than equity funds. Among equity funds, expense ratios tend to be higher for funds that specialize in particular sectors—such as healthcare or real estate— or those that invest in international stocks, because such funds tend to be more costly to manage.

FIGURE 5.7

**Expense Ratios for Selected Investment Objectives**

*Basis points, 2012*

| Investment objective | 10th percentile | Median | 90th percentile | Asset-weighted average | Simple average |
|---|---|---|---|---|---|
| **Equity funds[1]** | **77** | **133** | **216** | **77** | **141** |
| Aggressive growth | 85 | 137 | 219 | 89 | 147 |
| Growth | 72 | 124 | 206 | 83 | 131 |
| Sector | 84 | 146 | 235 | 83 | 153 |
| Growth and income | 52 | 112 | 191 | 47 | 118 |
| Income | 68 | 112 | 187 | 82 | 120 |
| International | 93 | 147 | 230 | 93 | 155 |
| **Hybrid funds[1]** | **65** | **120** | **199** | **79** | **127** |
| **Bond funds[1]** | **49** | **89** | **167** | **61** | **101** |
| Taxable | 49 | 92 | 175 | 62 | 103 |
| Municipal | 50 | 82 | 159 | 60 | 97 |
| **Money market funds[2]** | **8** | **17** | **30** | **17** | **18** |
| **Target date funds[2]** | **49** | **104** | **172** | **58** | **107** |

[1] Data exclude mutual funds available as investment choices in variable annuities and mutual funds that invest primarily in other mutual funds. Data include index mutual funds but exclude ETFs.

[2] Data include the full universe of target date funds, 96 percent of which invest primarily in other mutual funds.

Sources: Investment Company Institute and Lipper