# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio, | *Filed Electronically* |
| Plaintiff, | Civil Action No. 3:11-cv-04194 (PGS) |
| vs. | and |
| AXA EQUITABLE LIFE INSURANCE COMPANY and AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, | Civil Action No. 3:13-cv-00312 (PGS) |
| Defendants. | |
| GLENN D. SANFORD, *et al.*, | |
| Plaintiffs, | |
| vs. | |
| AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, | |
| Defendant. | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' POST-TRIAL CONCLUSIONS OF LAW

**SZAFERMAN LAKIND, BLUMSTEIN & BLADER, P.C.**
Arnold C. Lakind, Esq.
101 Grovers Mill Rd, Suite 200
Lawrenceville, NJ 08648
Telephone: (609) 275-0400
Fax: (609) 275-4511
Alakind@szaferman.com
**ATTORNEYS FOR PLAINTIFFS**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................2

   POINT I ......................................................................................2

      FMG HAS DISTORTED THE EVIDENCE AND THE LAW ..........2

   POINT II ...................................................................................7

      FMG HAS VIOLATED SECTION 36(b) BY VIRTUE
      OF THE FACT THAT IT HAS RETAINED A
      DISPROPORTIONATE SHARE OF THE TOTAL FEE ...................7

   POINT III....................................................................................11

      THE BOARD'S DECISION TO APPROVE FMG'S FEES
      DOES NOT WARRANT ANY DEFERENCE ................................11

   POINT IV ...................................................................................16

      FMG'S FEES ARE NOT WARRANTED BY THE
      NATURE AND QUALITY OF ITS SERVICES ..............................16

         A.    Nature of Services............................................................16

         B.    Quality of Services .........................................................16

   POINT V ....................................................................................21

      PLAINTIFFS' PROFITABILITY ANALYSIS ACCURATELY
      PORTRAYS THE ECONOMIC REALITY OF FMG'S FEE
      ARRANGEMENTS AND THE DISPROPORTIONATE
      RELATIONSHIP BETWEEN FMG'S COMPENSATION
      AND THE SERVICES IT PROVIDED .............................................21

i

POINT VI ............................................................................................26

    FMG EXPERIENCED ECONOMIES OF SCALE BUT
    FAILED TO SHARE THE BENEFITS OF THOSE
    ECONOMIES OF SCALE WITH THE FUNDS ...............................26

POINT VII ...........................................................................................28

    THE FEES WHICH FMG CHARGED TO THE FUNDS
    EXCEEDED THE FEES CHARGED BY COMPETITORS.............28

POINT VIII..........................................................................................32

    THE COURT SHOULD CONSIDER, AND THE EQAT
    BOARD ERRED BY FAILING TO CONSIDER, THE
    VALUE OF THE PRODUCT WRAPPER FEES, THE
    GENERAL ACCOUNT SPREAD AND OTHER FALL-OUT
    BENEFITS ..........................................................................................32

POINT IX ............................................................................................36

    PLAINTIFFS ARE ENTITLED TO DAMAGES IN ORDER
    TO VINDICATE THEIR RIGHTS UNDER § 36(b)........................36

CONCLUSION .........................................................................................38

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Table of Cases</u>

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
    464 F.3d 338 (2d Cir. 2006) .......................................................................... 31

*Benak ex rel. the All. Premier Growth Fund v.*
    *All. Capital Mgmt. L.P.*,
    No. CIV.A. 01-5734, 2004 WL 1459249
    (D.N.J. Feb. 9, 2004) ............................................................................. 11, 20

*Chill v. Calamos Advisors,*
    15 CIV-1014, 2016 WL 1258984
    (S.D.N.Y. Mar. 28, 2016) .......................................................... 13, 29-30, 35

*Daily Income Fund, Inc. v. Fox*,
    464 U.S. 523 (1984) ........................................................................ 16, 26, 38

*Gallus v Ameriprise Fin. Inc.*,
    497 F. Supp. 2d 974 (D. Minn. 2007) ...................................................... 13, 14

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    528 F. Supp. 1038  (S.D.N.Y. 1981)
    *aff'd,* 694 F.  2d 923 (2d Cir. 1982)
    *cert. denied* 461 U.S. 906 (1983).......................................................... *passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    573 F. Supp. 1293 (S.D.N.Y. 1983),
    *aff'd,* 740 F. 2d 190 (2d Cir. 1984) .................................................... 13, 20, 34

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923(2d Cir. 1982) .................................................................. *passim*

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
    740 F.2d 190 (2d Cir. 1984) ................................................................. 13,34

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ..........................................................33

*In re American Mut. Funds Fee Litigation*,
    No. CV. 04-5593, 2009 WL 5215755
    (C.D. Cal. Dec. 28, 2009) ..................................................................*passim*

*In re Evangelist,*
    760 F.2d 27  (1st Cir. 1985) ........................................................37

*In re Franklin Mut. Funds Fee Litig.*,
    478 F. Supp. 2d 677  (D.N.J. 2007) ............................................20

*In re Winstar Commc'ns, Inc.,*
    554 F.3d 382 (3d Cir. 2009) ........................................................9

*In the Matter of Commonwealth Capital Management, LLC*,
    File No. 3-16599, 2015 WL 3760794
    (June 17, 2015)  ..........................................................................30

*In the Matter of Smith Barney Fund Mgmt. LLC*
    *and Citigroup Global Mkts., Inc.,*
    File No. 3-11935 (May 31, 2005)................................................24

*Jones v. Harris, L.P.,*
    559 U.S. 335 (2010)..............................................................*passim*

*Jones v. Harris*,
    611 F. App'x 359  (7th Cir. 2015) ......................................14, 32

*Kalish v. Franklin Advisers, Inc.*
    742 F. Supp. 1222 (S.D.N.Y. 1990),
    a*ff'd*, 928 F.2d 590  (2d Cir. 1991) ......................10, 12, 17, 19, 31

*Kasilag v. Hartford Inv. Fin. Serv., LLC*,
    No. 11-1083, 2016 WL 1394347,
    (D.N.J. Mar. 24, 2016)..........................................................11, 14

*Krinsk v. Fund Asset Mgmt., Inc.,*
715 F. Supp. 472 (S.D.N.Y. 1988),
*aff'd,* 875 F.2d 404 (2d Cir. 1989) ............................................................*passim*

*Levy v. Alliance Capital Mgmt. L.P.,*
189 F.3d 461 (2d Cir. 1999) ........................................................................8

*Meyer v. Oppenheimer Mgmt. Corp.,*
707 F. Supp. 1394  (S.D.N.Y. 1988)
*aff'd sub nom. Meyer v. Oppenheimer Mgmt. Corp.,*
895 F.2d 861 (2d Cir. 1990) ........................................................................22

*Meyer v. Oppenheimer Mgmt. Corp.,*
715 F. Supp. 574 (S.D.N.Y. 1989,
*aff'd,* 895 F.2d 861 (2d Cir. 1990) ..............................................................22

*Meyer v. Oppenheimer Mgmt. Corp.,*
895 F.2d 861 (2d Cir. 1990) ........................................................................8

*Migdal v. Rowe Price Fleming Intern, Inc.,*
248 F.3d 321 (4th Cir. 2001) ......................................................................26

*Operating Local 649 Annuity Trust Fund v.*
*Smith Barney Fund Mgmt, LLC,*
595 F.3d 86 (2d Cir. 2010) ....................................................................8, 10

*Pepper v. Litton,*
308 U.S. 295 (1939)..........................................................................36, 37

*Pfeifer v. Integrated Fund Services, Inc.,*
371 F. Supp. 2d 502 (S.D.N.Y. 2005) ..........................................................8

*Reso ex rel. Artisan Int'l Fund v.*
*Artisan Partners Ltd. P'ship,*
No. 11-CV-873, 2011 WL 5826034
(E.D. Wis. Nov. 18, 2011)..........................................................................28

*Schuyt v. T. Rowe Price Prime Reserve Fund, Inc.*
663 F. Supp. 962 (S.D.N.Y. 1987) ...............................................12, 20, 22, 25

*S.E.C. v. Am. Birthright Trust Mgmt. Co.*,
    No. 80-9266, 1980 WL 1479
    (D.D.C. Dec. 30, 1980)..................................................................................10

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931).....................................................................................37

*Strougo v. BEA Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002) .........................................................32

*The R.W. Grand Lodge of F. & A.M. of Pennsylvania v.*
    *Salomon Bros. All Cap Value Fund*,
    425 Fed. App'x 25  (2d Cir. 2011) ................................................................9

*Turner v. Davis Selected Advisers, LP*,
    626 F. App'x 713 (9th Cir. 2015) ................................................................30

## Table of Statutes

Investment Company Act of 1940,
    15 U.S.C. § 80a-35(b)
    also cited as § 36(b) of the Investment Company Act ..........................*passim*

N.Y. Ins. Law § 1712..................................................................................25

## Other Authorities

*Bearing of Distribution Expenses by Mutual Funds*,
    45 Fed. Reg. 73898, 73902-3 (Nov. 7, 1980) ............................................. 8

*Fund Profitability in Mutual Fund Fee Litigation*,
    45 REVIEW OF SECURITIES & COMMODITIES REGULATION 81,
    84 n.19 (April 25, 2012) ............................................................................ 23

http://www.sec.gov/News/Speech/Detail/Speech/1365171515448 ......................10

"*Public Policy Implications of Investment Company Growth*" at
    146 (Dec. 2, 1966) .....................................................................................38

Restatement (Third) Trusts, § 38, comment (c)(1) (2001) ...................................6,10

Restatement (Third) of Trusts § 100 (2012) .......................................................7, 37

Uniform Trust Act, § 708 (2010 rev.).....................................................................10

## INTRODUCTION

This case is unlike any previously litigated § 36(b) case because it involves four material deficiencies that have not concurrently been before the court.

First, Plaintiffs do not challenge FMG's right to delegate its work. Rather, Plaintiffs' claim is based on FMG's unlawful retention of enormous compensation given the limited services that it actually performs.

Second, given FMG's small number of employees, the 100 plus funds it services and FMG's admission that it performs the same investment management services and the same administration services for all Funds (PFOF, [1] ¶¶363, 417, 624), there is no plausible defense to the inordinately disproportionate fees FMG charged to the Funds. In 2014 with respect to two Plaintiffs' index funds, FMG's management fee for the Core Bond Index Fund was $26.4 million and $8.7 million for the Equity 500 Index Fund, an $17.7 million difference. (PFOF, ¶37). For the same two index funds, FMG's administration fee was $7.7 million and $3.8 million respectively, a $3.9 million difference. (PFOF, ¶38). In the same year, the GAMCO Small Company Value Fund paid $11.1 million in management fees and $2.8 million in administration fees while the T.Rowe Price Growth Stock Fund paid $2.4 million and $611,000 respectively. (PFOF, ¶¶37-38). Even within the same fund classification  (index and active) where FMG's services cannot be

---

[1] "DCOL" refers to Defendants' Proposed Conclusions of Law.  "PCOL" refers to Plaintiffs' Proposed Conclusions of Law.  "PFOF" refers to Plaintiffs' Proposed Findings of Fact.  "PRDFOF" refers to Plaintiffs' Response to Defendants' Proposed Findings of Fact.

possibly be claimed as different, FMG's investment management fees differed by tens of millions of dollars. The same unconscionable investment management fee disparity is present for all years, for all funds and for the administration fees alike. (PFOF, ¶¶37-38) This evidence irrefutably demonstrates that that there is no correlation whatsoever between FMG's fees and the services it provided to Plaintiffs Funds, and further confirms that FMG fees are grossly disproportionate to its services in violation of law.

Third, the Funds are offered in connection with a variable annuity insurance product that generates hundreds of millions of dollars in extra revenue to FMG's parent, AXA.  These sizeable revenues are fall out benefits and should have been utilized by the Board to negotiate lower fees. Here, the Board improperly ignored these revenues to AXA.

Fourth, no reported case has involved a misinformed and careless Board that approved high fees based upon misleading profit margin comparisons provided by the advisor, which is what FMG did here.

Any fair and logical reading of §36(b) requires a finding that the exorbitant fees FMG charged for the limited services it provided violate the Act.

# ARGUMENT

## POINT I
## FMG HAS DISTORTED THE EVIDENCE AND THE LAW

Defendants' Conclusions of Law ignore the law and the evidence.

First, the process employed by the EQAT Board to review FMG's fees was deficient.  The Board was headed by the CEO of FMG (PFOF, ¶¶72-82), deprived of relevant information, misled in important areas, failed to engage consultants (PFOF, ¶¶105-117, 538), and was overrun by management.  Among other things, Defendants failed to provide the Board with the Sub-Administration Agreement; without which the Board could not have had a full appreciation of the degree to which services FMG delegated services to JPMorgan. (DRPFOF, ¶173).  FMG also failed to provide the Board with the Shared Services Agreement. (DRPFOF, ¶167). That Agreement required FMG to reimburse AXA for all "direct" and "indirect" costs associated with the Funds.  Without that Agreement, the Board failed to understand that the purported AXA "Allocated Expenses" were already reimbursed under the Shared Services Agreement and should not have been claimed as FMG biggest expense in its profitability reports . (DRPFOF, ¶¶502-508, 522-526, 538-548).  Defendants failed to provide an analysis of their costs. (DRPFOF, ¶¶ 124-125).  FMG misrepresented its profit margin (PFOF, ¶¶ 246-60) and provided inapt fee comparisons. (PFOF, ¶¶ 315-334; 576-623).  The Board was unaware that FMG had delegated the day-to-day investment management

work to Sub-Advisors (DRPFOF, ¶¶211, 214, 216 and 395), and a significant amount of the administrative work to JPMorgan.  (PFOF, ¶¶ 226-241). The head of the Board's Audit Committee, Jettie Edwards, who Defendants describe as the Board's most diligent member, did not understand the cost allocation methodology, which produced AXA Allocated Expenses. (DRPFOF, ¶¶275, 276, 284-86).   This case is unlike any previously litigated § 36(b) case because the material Board improprieties were legion.

Second, FMG falsely contends that the "fee 'spreads' – *i.e.* the difference between the fees paid to FMG and the amount the EQAT pays to subcontractors – are well within the range of industry norms (DFOF, ¶468)."  (DCOL, ¶2, sixth bullet).   Review of the spread for the two largest Funds at issue, the Core Bond Index Fund and the Intermediate Government Bond Index Fund, reveals that FMG's retained fee spread exceeded 91% in all years in question, well in excess of the Lipper and EQAT medians of  66% or less.[2]  (PFOF, ¶¶397 to 408).

Third, according to FMG, the Funds performed "as expected, and several of the Funds performed very well relative to their benchmarks and/or peer funds." (DCOL, ¶2, seventh bullet).  The issue, however, is not how "the Funds" collectively performed or whether they met FMG's self-serving expectations. Rather, the issue is how each individual Fund performed against its peers.  The

---

[2] For example, in 2014 for the Intermediate Government Bond Index Fund, FMG retained approximately $24 million, while the Sub-Advisor received approximately $1.2 million (91% retainage by FMG).  (PFOF, ¶¶397, 406).

4

returns reported by FMG to the SEC and the Board confirm that nine of the twelve funds underperformed their benchmarks, and Lipper consistently ranked many of the Funds in the fourth (worst) quartile.  (PFOF, ¶¶453, 456, 458, 460 and 468).

Fourth, Defendants falsely contend that FMG's profit margins "are in line with industry averages."  (DCOL, ¶2, eighth bullet).  FMG's overall profit margin is 75% as calculated using their audited financial statements.  (PFOF, ¶¶244 to 260).  Plaintiffs contend, however, that the 75% understates FMG's profitability because it incorrectly includes as an expense the Sub-Advisory and Sub-Administration fees, which are not paid by FMG. (DRPFOF, ¶551).  Excluding those expenses results in an FMG profit margin in excess of 94%.  (PFOF, ¶¶260, 515). Under either calculation, FMG's profit margin far exceeds the profit margin of FMG's competitors (none of which is higher than 67%; and the median is 55%). (PFOF, ¶¶251, 255).

Fifth, according to FMG, the Funds "are among the least expensive Funds in their Lipper groups."  (DCOL, ¶2, first bullet).   However, with three exceptions, FMG's Lipper data improperly compares the fees of index and hybrid funds to the fees of actively managed funds which are an inapt comparison; actively managed funds have higher fees than index or hybrid funds.  (PFOF, ¶¶598-600, 604-606). Of the twelve at issue funds, only two of the active funds, the T.Rowe Price Growth Stock Fund and the GAMCO Small Company Value Fund, and one of the index funds, the Equity 500 Index Fund, are compared to similarly styled funds.

(PFOF, ¶¶605-606, 618; PRDFOF, ¶¶461-464).  The fees of these funds, when compared to similarly styled funds, exceed the median fee reported by Lipper. (DFOF, ¶464). Moreover, the fees of every fund exceed the weighted average fees of comparable funds reported by the Investment Company Institute (the "ICI"). (PFOF, ¶¶588, 589, 593-596, 601, 605-618).

Sixth, while all of the Funds employ breakpoints  (DCOL, ¶2, tenth bullet), for reasons discussed in Point V, Defendants' breakpoints have been so ineffective that, for 7 of the 12 Funds, the effective management fee (i.e. actual management fee) remains at the highest contract level.  (PFOF, ¶689).  Thus, the defense contention that breakpoints fairly share the benefits reaped from economies of scale is pure sophistry.

Seventh, with regard to the nature of services, Defendants exaggerate their roles and fail to make the required fund by fund analysis.  By way of example, the management services FMG claims to provide, as outlined in its Terms of Endearment document (P-029, Bates 1000) and elsewhere in the proofs, do not warrant the approximately $25 million in annual fees paid by Plaintiffs' two largest index funds in 2014. (PFOF, ¶¶36-37).   Three of FMG's seven claimed advisory services - trading ETFs, ATM execution and asset allocation activities - are not even performed for Plaintiffs' index and active Funds.  (PFOF, ¶¶192-199). Defendants offer no response to these contentions, and furthermore, they fail

to explain why the annual advisory fees for the index funds are many times larger than the advisory fees for actively managed funds.  (PFOF, ¶¶397, 580).

Eight, FMG contends that the Court is paralyzed to vindicate statutory rights afforded by § 36(b). According to FMG, the EQAT Board, even if negligent and misled, is far better equipped to assess the reasonableness of FMG's fees than is the Court.  FMG's contention, if accepted, would make the Act a nullity. This Court has had the benefit of comprehensive evidence in a truly adversarial setting and is required and fully competent to assess Plaintiffs' damages.

Ninth, Defendants misinterpret *Jones v. Harris*, 559 U.S. 335, 344, 347 (2010), by ignoring the goals that the Court sought to achieve: a fee that replicates an "arm's length" bargain based upon consideration of "all of the surrounding circumstances."  *See Gartenberg*, 694 F.2d 923, 928 (2d Cir. 1982).

 Defendants suggest that because investment managers prior to *Jones* prevailed in a handful of reported § 36(b) cases, Defendants should prevail here. However, every case is different.  This case brings together a confluence of egregious facts on Board process, services, performance, profitability, comparative fees, economies of scale, fall out benefits, and other "pertinent circumstances" unseen in any case tried to date.

## POINT II
## FMG HAS VIOLATED SECTION 36(b) BY VIRTUE OF THE FACT THAT IT HAS RETAINED A DISPROPORTIONATE SHARE OF THE TOTAL FEE

FMG argues that Plaintiffs are engaging in a "myopic attack" on an isolated component of the total fee - the amount retained by FMG - because nothing in "section 36(b) permits the disaggregation of a unitary fee" or prohibits a manager from hiring third parties to assist it. (DCOL, ¶¶19-20). Defendants err. While Plaintiffs agree that nothing in § 36(b) prevents a fiduciary from hiring a third party to assist it, the issue here is whether or not the fees retained by FMG are disproportionate to the services it actually provides.[3]

Based upon a review of the language of § 36(b), the Supreme Court's decision in *Jones v. Harris*, 559 U.S. 335 and other cases, the views of the SEC,

---

[3] It is unclear whether Defendants are also arguing that Plaintiffs may not challenge FMG's management and administrative fee, without consideration of FMG's distribution fee. The EQAT Board professes to consider management and administrative fees separately from distribution fees, and they are correct to do so. A court, when resolving claims brought under § 36(b), is also to separately evaluate each category of fees. *See Levy v. Alliance Capital Mgmt. L.P.*, 189 F.3d 461 (2d Cir. 1999) (in ICA case, payments of each fee type must be examined for reasonableness separately, not aggregated and then considered as a whole); *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) (advisory and distribution fees are for different services); *Pfeifer v. Integrated Fund Services, Inc.*, 371 F. Supp. 2d 502, 508 (S.D.N.Y. 2005) (Section 36(b) does not require Plaintiffs to establish that the fees charged by defendants were excessive in the aggregate; Plaintiffs may challenge a particular fee); *In re Am. Mut. Funds Fee Litig.*, No. 5593, 2009 WL 5215755, * 44 (C. D. Cal., Dec. 28, 2009); *cf, Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86 (2d Cir. 2009); *Bearing of Distribution Expenses by Mutual Funds*, 45 Fed. Reg. 73898, 73902-3 (Nov. 7, 1980).

and common law principles, it is clear that a fiduciary must share the savings attributable to a delegation of fiduciary responsibilities.  (PCOL, ¶¶35-48).

ICA § 36(b) provides in pertinent part that:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, **to such investment adviser** ...

15 U.S.C. § 80a-35 (emphasis added).  As can be seen, Section 36(b) focuses on the "compensation … to such investment adviser," in this case, FMG. While *Jones v. Harris* does not address this issue specifically, it instructs fund boards and courts to only approve fees that replicate an arm's length transaction.  An arm's length transaction is "a transaction in good faith in the ordinary course of business by parties with independent interests . . . that each acting in his or her own best interest, would carry out a particular transaction." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 399 (3d Cir. 2009) (*quoting In re U.S. Med., Inc.*, 531 F.3d 1272, 1277 n.4 (10th Cir. 2008)).   A party negotiating in "his or her own best interest" would demand to share in significant savings attributable to a fiduciary's delegation of work to third parties.

The courts and other authorities to have considered this issue since *Jones,* have ruled that an investment fiduciary may not retain a disproportionate share of the fee while delegating a large portion of the work, which is what FMG did here. *See The R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value*

*Fund*, 425 Fed. App'x 25, 30 (2d Cir. 2011); *Operating Local 649 Annuity Trust Fund Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 93 (2d Cir. 2010) (manager may not reap the benefits attributable to the delegation of responsibilities).  *See also* The Restatement (Third) Trusts, § 38, comment (c)(1) (2001); Uniform Trust Act, § 708 (2010 rev.); *S.E.C. v. Am. Birthright Trust Mgmt. Co.*, No. 80-9266, 1980 WL 1479 at *1 (D.D.C. Dec. 30, 1980).

 More recently, Norm Champ, then the SEC's Director of Investment Management, expressed the SEC's concern about the ability of fund directors to appropriately evaluate fees in the sub-advisory setting:

> For instance, do fund directors focus appropriately on the fees paid to sub-advisers versus the advisers that oversee them? Do fund directors examine whether an adviser's fee is appropriate given the oversight function they perform, as opposed to the day-to-day portfolio management function?

http://www.sec.gov/News/Speech/Detail/Speech/1365171515448, last visited May 5, 2016.

The cases upon which Defendants rely are inapposite. In *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at * 13-14 (DCOL, ¶18), the Court did not find that a claim of excessive fee retention is not actionable.  Rather, it found that a fund administrator who administered funds that were several times larger than those at issue here and who retained 41% of the total administrative fee, (only 2.2 bps and less than half of the 90% FMG retains), did not violate § 36(b).  Nor did the Court in *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1228-29 (S.D.N.Y. 1990) reject the need to assess retainage.  On the contrary, that Court

10

compared the fees retained with the services provided and found that the investment adviser who employed five advisers to service a single fund (Defendants use less than one full-time employee to service each of Plaintiffs' Funds (PFOF, ¶350)) and who does extensive work was paid appropriately. *Benak v. Alliance Capital Mgmt., L.P.*, No. 01-CV-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) (DCOL, ¶19) is irrelevant. There, plaintiff alleged that he was overcharged because a portion of the management fee was devoted to evaluating an investment in one poorly performing stock. Dismissing, the Court observed that a § 36(b) claim could not be based on one poor investment choice among fifty different stocks. In *Kasilag v. Hartford Inv. Fin. Servs., LLC,* No. 11-1083, 2016 WL 1394347 (D.N.J. Mar. 24, 2016), the Court did not find "that plaintiffs' focus on only the services directly provided by the adviser relative to the 'retained' fee was improper . . .." (DCOL, ¶20). It merely noted that it was inclined - erroneously - in that direction, but made no definitive finding in denying defendants' summary judgment motion.

FMG's fees are disproportionate to the services rendered. For example, in 2014, FMG retained as a management fee from the Core Bond Index Fund $26.4 million and paid the Sub-Advisor $1.3 million (PFOF, ¶37), and retained as an administrative fee $7.7 million and paid the Sub-Administrator $682,325. (PFOF, ¶38). FMG made no argument to explain the gross disparity between the portion of the fee it retained in comparison to the fee paid to its subcontractors, which did

most of the work. Therefore, the Court should find that FMG breached its fiduciary duty under § 36(b).

## POINT III
## THE BOARD'S DECISION TO APPROVE FMG'S FEES DOES NOT WARRANT ANY DEFERENCE

The Supreme Court in *Jones*, 559 U.S. at 349, recognized that "a measure of deference to a board's judgment may be appropriate in some instances;" but the level of deference "varies depending on the circumstances."  Defendants argue that the Board's decision is entitled to great deference, but their argument is so general as to defy analysis.  Defendants' factual contentions are addressed at PFOF, ¶¶63-344 and PRDFOF, ¶¶110-201 and need not be repeated here.  In sum, a review of the board process employed in other § 36(b) cases, all of which involve high performing funds with low fees, reveals that the board  process employed in those cases was far more rigorous than here:

> a.      In *Schuyt v. Rowe Price Prime Reserve Fund, Inc.,* 663 F. Supp. 962, 985-87 (S.D.N.Y. 1987), the Board kept **extensive and informative minutes, concurrently retained an independent accountant to review the advisor's cost allocation methodology**,[4] required that the cost allocation methodology be redone, postponed consideration of some fee approvals and actively debated breakpoints.

---

[4] As Defendants admit, there is not a single document from any accounting firm reviewing the cost allocation methodology. (DRPFOF, ¶538).

12

b.    In *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. at 1243, **the Board retained its own consultant**[5] **to undertake a formal written analysis of the nature and extent of services provided** to the fund by the investment adviser as well as the adviser's fees, costs, expense allocation, profitability and performance.  A certified public accountant prepared a contemporaneous cost allocation methodology.

c.    In *Gartenberg v. Merrill Lynch Asset Mgmt, Inc.*, 528 F. Supp. at 1058-64, the Board was composed of diverse members, including educators.  The Board was fully informed about the scope of services rendered by the adviser, **received written weekly reports, detailed cost data and information about the costs of retaining other advisers, received data about the value of the advisory relationship to Merrill Lynch as a whole, and considered the bargaining power generated by the fund's size**.  The Board received an opinion from counsel on the impact of collateral costs incurred by the Merrill Lynch organization and a study of processing costs.

d.    In *Gartenberg v. Merrill Lynch Asset Mgmt, Inc.*, 573 F. Supp. 1293, 1304-05 (S.D.N.Y. 1983) *aff'd* 740 F.2d 190 (2d Cir. 1984) (*Gartenberg II)* the Board commissioned **an "elaborate and expensive study designed to attempt to quantify float and fall-out benefits**," and criticized the advisor's allocation methodology.  Unlike the EQAT Board, **"[t]he trustees considered alternatives to the then existing relationship between MLPFS, MLAM and the MLRAT, including internalization of the functions performed by MLAM and the selection of another advisor**." (Emphasis added).

e.    In *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974 (D. Minn. 2007), the board retained third party consultants, received a report identifying fall out benefits, as well as, **a detailed report of the advisor's expenses**, and unlike the EQAT board, was involved in the process to select

---

[5]Defendants' only consultant was legal counsel.  Lipper, Morningstar, Strategic Insight and Management Practice, Inc. are not consultants (DCOL, ¶¶29-32).  They are data providers.

peer groups for comparison and negotiated a fee structure dependent upon performance.

      f.    *Chill v. Calamos Advisors, LLC*, 15-CIV-1014, __ F. Supp. 3d ___, 2016 WL 1258984,  at *15, (S.D.N.Y. Mar. 28, 2016), the Court observed, "[I]ndeed, it would be difficult to say that deference is owed to a board that failed to make proper services comparisons to other funds . . ., punted on action to address sustained poor performance, ignored comparative profitability, assumed that economies-of-scale benefits were being passed along based solely on the existence of breakpoints, overlooked certain fall-out benefits, and, most importantly, served merely as a passive receptor of information instead of an active and aggressive negotiator…."

Defendants erroneously contend, relying on cases that predate *Jones*, that Plaintiffs must show how a Board deficiency impacted the results of the Board's fee negotiation.  (DCOL, ¶40).  One case Defendants rely on is the 2007 trial court decision in *Jones*, which was reversed by the Supreme Court.  The other is the decision in *Kasilag*, also unreported, which cites to *Gallus,* 497 F. Supp 2d. 974,  another case that predated *Jones*.  Most importantly, the Supreme Court in *Jones* at 351-352*,* imposed a far less rigorous test:

      When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information **might have hampered** the board's ability to function as an independent check upon the management.   (Emphasis added).

In DCOL, ¶41, Defendants merely list types of conduct that, in isolation, do not warrant a more stringent review of the Board's process.   In those cases, Plaintiffs made no argument like here that the board received misleading or incomplete information.  FMG argues that the EQAT Board "could obtain" more

facts (DCOL, ¶41, third bullet); that does not excuse its failure to do so.  Under *Jones,* more deference is only afforded to a board that "has been furnished with '**all** information,'" and has "**fully** informed [itself] about all facts bearing upon the [investment adviser's] service and fee." *Jones*, 559 U.S. at 348-51 (emphasis added).  Defendants' reliance on *Jones v. Harris*, 611 F. App'x 359, 361 (7th Cir. 2015) is also misplaced because there it was undisputed that the investment manager "provided accurate information to the fund's board."

*In re Am Mut. Funds Fee Litig.*, 2009 WL 5215755, at * 2, another unreported case upon which Defendants rely, is also distinguishable.  The adviser there was not charged with providing misleading information, only with omitting information.   The court criticized the board for not obtaining information about the compensation of employees, compensation levels at competing firms, and the role that appreciation played in asset growth.  *Id.* at *3, *55. These deficiencies led the court to conclude:

> These failures are significant given the Unaffiliated Directors' important role as "independent watchdogs" with primary responsibility for protecting shareholder interests.

*Id.* at * 55. The process, the court found, was "less a true negotiation and more an elaborate exercise in checking off boxes and papering the file." *Id.* at *3. Regardless, the court also found that the funds' performance was "good to excellent," *id.* at *48, seven of the eight at issue funds had the lowest advisory fees in their class, *id.* at *27, and each fund had a pre-tax profit margin that ranged

between 30% and 52%, *id.* at *50.  Those factors outweighed the court's concern with the board's conduct.

While any one deficiency standing alone may not be sufficient to warrant a more rigorous review of the EQAT Board's decision to approve FMG's fees, this case is about a pattern of pervasive deficiencies, misleading information and omissions.   Plaintiffs acknowledge that "a measure of deference to a board's judgment may be appropriate in some instances."  *Jones*, 559 U.S. at 348.  This case is not such an instance.

**POINT IV**
**FMG'S FEES ARE NOT WARRANTED BY THE NATURE AND QUALITY OF ITS SERVICES**

**A.    Nature of Services**

The overwhelming evidence demonstrates that FMG delegated substantially all of the investment management and administration work to the Sub-Advisors and the Sub-Administrator.  (PFOF, ¶¶362-396, 410-439).  Even if the list of services FMG claims to provide at DCOL, ¶45 (legal, compliance, direct portfolio management, accounting, transfer agency and "a host of other services") were accurate (which it is not), those services, only one of which can be categorized as investment management (rather than administrative), do not warrant the large management and large administrative fee paid by the Funds, particularly the larger index Funds for which FMG does not perform direct portfolio management,

provide a volatility management strategy, or manage ETFs. (DFOF, ¶¶24, 212-14, 220).

The starting point for an analysis of services is the statutorily required agreements.  *See e.g., Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-37 (ICA "requires that fees for investment advice and other services be governed by a written contract…").  As set forth in Plaintiffs' Proposed Findings of Fact, the relevant agreements, which have been unchanged since 2000, provide that the bulk of management and administrative functions are delegated to others.  (PFOF, ¶¶362-396, 410-439).  It would make no sense for the law to require that fees for investment advice and other services be governed by a written agreement, and also allow a fiduciary to make the self-serving claim that the written agreement is inaccurate, as FMG does here.  *See, e.g.,* DRPFOF, ¶364, DFOF, ¶374. *Gartenberg* does not authorize FMG to disregard its own agreements.

Moreover, FMG fails to explain how its 50 to 68 employees who provide services to 100 to 125 funds, only 12 of whom are investment professionals, could possibly provide more extensive services (DRPFOF, ¶¶345, 349-57) than the Sub-Advisors who employ 265 employees to service the Funds (PFOF, ¶¶358-359) and JPMorgan's 125 employees. (PFOF, ¶430).  Investment managers in other cases had a far larger workforce than FMG.  *See In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 at *16, where the manager had over 167 investment professionals; *Kalish*, 742 F. Supp. at 1247, manager had between 400 to 1700 employees.

17

Defendants also argue "[t]he law requires consideration of the services provided by the hundreds of AXA employees who also provide services to the Funds." (DCOL, ¶¶54-55).   First, AXA's alleged services are not provided under the contracts. (PRDFOF, ¶¶325-347). Second, in a six-week trial, Defendants did not identify a single AXA employee who provided services to the Funds, did not provide an organizational chart for AXA, did not provide a breakdown of AXA's expenses, and did not offer a single document as evidence of AXA's purported work.   Third, even if the Court were to find that AXA provided some minimal services outside of the contracts, such services could only pertain to the administration agreement, and have nothing to do with Plaintiffs' claim under the management agreement. (*See e.g.,* DFOF, ¶¶270, 273, 275, 301, 325).

Neither *Gartenberg,* 694 F.2d at 931-32 (DCOL, ¶ 55) nor *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 support Defendants' position.  Plaintiffs acknowledge that the work of an affiliate may be considered, *Gartenberg*, 694 F.2d at 931, and the evidence established that AXA's services and costs were considered.  They are subsumed within the direct and indirect costs and overhead reimbursed to AXA annually under the Shared Services Agreement. (DRPFOF, ¶¶501-508).

In defense of FMG's retention of an administration fee that was 10 times greater than the Sub-Administration fee paid to JPMorgan, Defendants quoted *In re Am. Mut. Funds Fee Litig.,* where the court permitted $154 million for administration oversight.  The Court should know that the remainder of the cited

18

finding of fact, which FMG omitted in its brief, stated: "CRMC [the defendant adviser] paid out $213 million to those same third parties to carry out their administrative responsibilities." 2009 WL 5215755, *14. Thus, in that case the defendant retained less than 41% of the total administration fee, whereas here, FMG retains more than ten times the fee that is paid to the Sub-Administrator. (PFOF, ¶444).   Further, in that case, the defendant's retained fee was approximately 2.2 basis points, [6] as compared to FMG's approximate 10 bps retained administration fee in this case. *Compare,* P-405 at Bates 9860 (approximate 12 basis point administration fee for FMG) *with* J-27 at Bates 9905 (approximate 1.5 basis point Sub-Administration fee).

Defendants also claim their fees are justified by alleged risks they incur. (DCOL, ¶46). If Defendants truly faced material risks, those risks could have and should been quantified per Defendants' expert, but were not. (DRPFOF, ¶¶566-67).  Defendants, in any event, shifted many of those risks to the Funds pursuant to the Investment Management Agreements which released FMG from liability. (PFOF, ¶¶297-305, 568; P-405 at Bates 9854, J-4 at Bates 4030).

**B.    Quality of Services**

Defendants wrongly claim that their funds performed well.  (DCOL, ¶¶ 48-50).  Investment performance is the most important indicator of the quality of

---

[6]The funds in *In re Am. Mut. Funds Fee Litig*, had $710 billion in assets, 2009 WL 5215755, *6, ¶ 29 which converts to 2.2 basis points. ($154 million/$710 billion).

services.  *Krinsk v. Fund Asset Mgmt. Inc.,* 875 F.2d 404, 409 (2d Cir. 1989);

*Kalish*, 742 F. Supp. at 1229.[7]  As set forth at PFOF, ¶¶453, 456, 458, 460 and 468,

whether measured against a benchmark chosen by FMG in accordance with SEC

requirements or as evaluated by Lipper, most of the Funds performed poorly.  In

contrast, in nearly every other reported case, the fund at issue was among the best

performers.  *See e.g. Krinsk*, 715 F. Supp. 472. 487 (S.D.N.Y. 1988) ("Funds'

performance has been superior"); *Schuyt*, 663 F. Supp. at 976 (fund performed

"well"); *Gartenberg*, 573 F. Supp. at 1300 (fund had "strong performance

record"); *In re Am. Mut. Funds Fee Litig.,* 2009 WL 521577 at *48 (performance

"ranged from good to excellent"); *Benak,* 2004 WL 1459249  (the poor

performance of one investment out of many was not indicative of the poor quality

of services); *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp 2d 677, 6876

(D.N.J. 2007) (a four month period of underperformance was not meaningful).

There is not a single § 36(b) case in which an investment adviser experienced a

prolonged period of significant underperformance comparable to that of FMG.

---

[7]To that end, PFOF, ¶468, Table 13, reproduces information from the Funds' SEC
prospectus which demonstrates that nine of the twelve Funds underperformed their
benchmark. (PFOF, ¶467-468).  In PFOF, ¶¶453, 456, 458 and 460, Plaintiffs
reproduced the Lipper quartile rankings for the Funds, which showed that Lipper
placed many of the Funds in the fourth quartile (i.e., worst performers).

Defendants falsely accuse Plaintiffs of relying on "alternative," (DCOL, ¶49) measures to evaluate the Funds' performance. Plaintiffs' evidence regarding the Funds' poor performance is based on SEC data and Lipper data reviewed by the Board. (DRPFOF, ¶446).  In contrast, Defendants, impermissibly manufactured through their expert, self-serving "hypothetical" Fund returns for the sole purpose of this case (PFOF, ¶¶474, 496).  *Krinsk*, 715 F. Supp. at 487 (rejecting expert's performance calculation that "neither the SEC nor the money market industry has adopted . . . as an industry standard.").

Defendants also incorrectly claim that "Plaintiffs presented no evidence at on the quality of the non-portfolio management services provided by Defendants . . ." (DCOL, ¶47).  There is limited evidence with regard to the quality of Defendants' administrative services because FMG delegated the "day-to-day . . . fund administration functions to JPMorgan."  (PFOF, ¶429).  However, Defendants did prepare Board materials, which were materially misleading and incomplete. (*See e.g.* PFOF, ¶¶124-126, 163-178).

## POINT V
## PLAINTIFFS' PROFITABILITY ANALYSIS ACCURATELY PORTRAYS THE ECONOMIC REALITY OF FMG'S FEE ARRANGEMENTS AND THE DISPROPORTIONATE RELATIONSHIP BETWEEN FMG'S COMPENSATION AND THE SERVICES IT PROVIDED

Defendants' profit margins are not "well within normal ranges."  (DCOL, ¶58).  FMG's overall profit margin is 75% as calculated using its audited financial

statements.  (PFOF, ¶¶246-260). This figure, however, understates FMG's profitability because it incorrectly includes as an expense the Sub-Advisory and Sub-Administration fees, which are not paid by FMG. (DRPFOF, ¶551). Excluding those expenses results in a 94% plus profit margin.  (PFOF, ¶260). Under either calculation, FMG's profit margin far exceeds the profit margin of every other competitor identified by FMG (none of which had a profit margin higher than 67%; with a median of 55%).  (PFOF, ¶¶251, 255).

No opinion by any court sanctions a 94% profit margin.  Among the opinions cited by Defendants, the highest reported pre-tax profit margin is 52%, with one exception, *Schuyt*, 663 F. Supp. 962.  There, the District Court explained that an advisory fee that produces a 77% profit margin "could very well be excessive:"

> The Court wishes to make clear that it is not holding that a profit margin of up to 77.3% can never be excessive. In fact, under other circumstances, such a profit margin could very well be excessive. For example, if advisory services being challenged were not of the highest quality and if the directors were not so obviously qualified, fully informed, and conscientious, a similar Fee structure could violate section 36(b).

*Schuyt*, 663 F. Supp. at 989 & n.77; *see also id.* at 986, 988 (the 77% profit margin was unforeseeable at the time the fee arrangement was negotiated by a vigorous board).

Defendants misinterpret *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1405 (S.D.N.Y. 1988) *aff'd sub nom. Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861 (2d Cir. 1990). The *Meyer* court did not approve an 89% profit

margin. In truth, the district court did not even evaluate the manager's profit margin; rather, the court simply referred to the margin in dicta as that case dealt only with the enforcement of a settlement agreement.  Inexplicably, Defendants failed to cite to footnote 1 of that opinion stating that "in light of the parties' stipulation that the issue of fairness under section 36(b) of the Investment Company Act be reserved for later resolution, the portion of the opinion relating to § 36(b) is dicta." *Id*. at 1405 n.1.  In a subsequent opinion, the court ultimately addressed the issue of profit margin and held that the adviser's pre-tax margins of 11.6% to 23.2%  were not indicative of a violation of § 36(b).  *Meyer v. Oppenheimer Mgmt Corp.,* 715 F. Supp. 574, 577 (S.D. N.Y. 1989).  In fact, FMG's lead counsel, Sean M. Murphy, in an article he authored entitled *Fund Profitability in Mutual Fund Fee Litigation*, 45 REVIEW OF SECURITIES & COMMODITIES REGULATION 81, 84 n.19 (April 25, 2012), cited to *Meyer* for the proposition that "pre-tax margins ranging from 11.6% to 23.2% not indicative of a violation of 36(b)." It is improper and misleading for the defense to claim that *Meye*r authorized an 89% margin.

Plaintiffs and Defendants disagree on the treatment of payments made by the EQAT (not FMG) to Sub-Advisors and JPMorgan, and the treatment of AXA's "Allocated Expenses."  (DCOL, ¶64-69).  FMG's treatment of payments to Sub-Advisors and JPMorgan as FMG's expenses cannot be reconciled with the fact that (1) FMG must act in the best interests of the Funds; (2) under the relevant agreements, the Sub-Advisors and JPMorgan are declared to be "agents" of the

EQAT, (PFOF, ¶¶291, 303); (3) the Funds pay the fees of the Sub-Advisors' and JPMorgan (DRPFOF, ¶551); and (4) FMG does not need the infrastructure, labor force, technology or other resources needed to generate those fees; and (5) those fees need not be paid unless the Funds have assets.  Defendants do not cite to a single case to support their position that fees that it does not pay may be treated as FMG's own expense when reporting its profitability.

Even if FMG did pay the sub-contractors' fees, which it does not, SEC guidance and the case law supports  Plaintiffs' position that they should not be treated as the advisor's expenses.  Under § 36(b), the compensation "received" is the money that the adviser actually **retained** for the services the adviser rendered to a fund, and does not include fees paid by the fund that the adviser passed through to unrelated third parties for services they rendered – like the Sub-Advisors and Sub-Administrator here. *Pfeiffer v. Bjurman, Barry & Associates*, 2006 WL 497776, at *5, *affirmed* 215 F. App'x 30, 31-32 (2d Cir. 2007).  *See also*, *In the Matter of Smith Barney Fund Management LLC and Citigroup Global Markets, Inc*., SEC File No. 3-11935, 2005 WL 1278368, *13 (May 31, 2005) ("The economic reality would have been more accurately portrayed by deducting payments to [the sub-servicer] from revenue - not treating them as expenses of [the adviser's affiliate that delegated the work to the sub-servicer]"); *Krinsk*, 715 F. Supp. at 490 (holding that fees that an adviser passed through from the fund to the third party that provided the services "are neither a revenue nor an expense to" the adviser).

FMG's effort to minimize the significance of the SEC's *Smith Barney/Citigroup* Order is unavailing. (DCOL, ¶67). FMG fails to provide any legal or economic justification which would allow a fiduciary to treat expenses paid by a trust beneficiary as its own. It defies logic to permit FMG, whose 6 to 12 investment management employees merely monitor and select Sub-Advisors, to treat the expenses of the Sub-Advisors, with more than 250 employees, as an FMG expense. (PFOF, ¶¶355, 357, 359).

Also contrary to Defendants' assertion, Plaintiffs have not excluded "substantial [allocated] costs incurred by AXA." (DCOL, ¶68). Any allocation methodology must (1) allocate legitimate costs; (2) be reliable; and (3) be one that is in the best interests of the funds. (PCOL, ¶¶109-114). Only AXA's legitimate and reliable costs may be considered, and they are fully considered under in the form of the annual reimbursements under the Shared Services Agreement. Plaintiffs do not challenge these costs, which: (1) AXA incurs to support FMG's provision of investment management and administration services to the EQAT; (2) were actually paid; (3) were reported on FMG's audited financial statements; and (4) were calculated under a cost sharing agreement that is subject to New York Insurance law and requires reimbursement of AXA's "actual" "direct and indirect costs," or a "fair and equitable" approximation of these costs. *See* N.Y. Ins. Law § 1712. (DRPFOF, ¶¶502-508, 524-528). FMG has not put forth any basis to justify an allocation of AXA expenses beyond those reimbursed under the Shared Services Agreement.

As the proponent of the AXA Allocated Expenses, it is FMG's burden to substantiate its assertion that the AXA costs assigned by the FMG Cost Allocation Methodology are properly attributable to FMG.  *Krinsk*, 715 F. Supp. at 491. Courts must undertake a "critical examination" of any cost allocation that is offered to prove the adviser's actual costs related to the challenged fees.  *Id.* at 490. FMG must demonstrate that the allocation methodology is reliable and based upon sound mechanics. *Schuyt*, 663 F. Supp. at 978-979, n. 49 (court considered allocated expenses where 70% labor related and allocated on a time basis). Allocated costs that are not the product of reasonable and reliable assumptions may not be considered.  *Krinsk*, 715 F. Supp. at 491-92 (rejecting deficient time study performed by adviser as "speculative" and "of little probative value in assigning costs," rendering the adviser unable to prove that the "quantity" of the allocated costs were "properly attributable" to the fund, and requiring exclusion of such costs from the court's profitability calculations).

FMG has not offered any credible evidence to substantiate the AXA Allocated Expenses, and has therefore not met its burden.  There is not a single document in the record from an accounting firm explaining the basis for and/or the reasonableness of the allocation methodology.  (DRPFOF, ¶538).  As discussed in PFOF ¶¶518-548, Defendants' allocation methodology is flawed and should not be permitted in calculating FMG's profit margin.

### POINT VI
**FMG EXPERIENCED ECONOMIES OF SCALE BUT FAILED TO SHARE THE BENEFITS OF THOSE ECONOMIES OF SCALE WITH THE FUNDS**

The evidence is incontrovertible that FMG received enormous excess profits from economies of scale, but did not equitably share those profits with investors. Congress enacted § 36(b) in large part because it recognized "that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services." *Migdal v. Rowe Price-Fleming Int'l, Inc.,* 248 F.3d 321, 326-27 (4th Cir. 2001); *See also Daily Income Fund*, 464 U.S. at 537 ("The [SEC] determined that, as a fund's assets grew, this form of payment [as a percentage of assets] could produce unreasonable fees in light of the economies of scale realized in managing a large portfolio.")

While some case law requires a detailed analysis of each transaction, this is unnecessary here because FMG's costs are fixed by the Shared Services Agreement.  (PFOF, ¶¶663-684).  The evidence demonstrated that FMG's "manager of managers" business model allows it to retain exorbitant excess profits as funds grow because, to the extent increased expense may be required to service growing funds, they were borne by the Sub-Advisors and JPMorgan that did the actual work, not FMG.

FMG's annual profit[8] from the EQAT grew from $305.8 million ($317.2 million minus $11.4 million) in 2010 to $471 million ($484.6 million minus $13.6 million) in 2014. (PFOF, ¶¶667, 671). With respect to Plaintiffs' Funds collectively, FMG's annual profit increased from $136.47 million in 2010 to

---

[8]"Annual profit" as used here is the sum of the investment management fee, plus the administration fee, minus all Sub-Advisory, Sub-Administration and direct expenses, as set forth in FMG's audited financial statements.

$166.35 million in 2014. (PFOF, ¶¶674-684). FMG extracted excess profits at the individual Fund level as well. For example, FMG's annual profit from Plaintiffs' Intermediate Government Bond Fund grew from $7.3 million in 2010 (P-51a, Bates 4553), to $30.98 million in 2014. (P-54a, Bates 1760).  Given FMG's fiduciary duty to investors, equity dictates that FMG share the massive economies of scale it experiences with Investors. Any lesser degree of sharing undermines the intent of §36(b) and the compelling public policy which it seeks to vindicate.

The evidence belies FMG's claimed sharing. For several of Plaintiffs' Funds, including the largest funds, the effective management fee rate which FMG charged during the damage period was the exact same as the highest contractual fee rate. (PFOF, ¶¶688-696). For the other Funds, the reduction in the effective fee rate was *de minimus* – the "biggest" drop in effective fee rate was for the T. Rowe Price Growth Stock Fund which dropped from 78 bps in 2010, to 72 bps in 2014. (PFOF, ¶693). For the five other funds that realized any reduction in their effective fee rate during the damage period, four had a 1 bp reduction and the GAMCO Small Company Value Fund had a 3 bps reduction in its fee. (PFOF, ¶693, Table 44).

Even if FMG's claim that it passed on $33.2 million in investment management savings to Plaintiffs from 2010 through September 30, 2015 were true, this amounts to sharing less than 39.9% of the excess profits with the Funds ($33.2 million divided by $83.2 million [$50 million (PFOF, ¶679), plus 33.2 million (DFOF, ¶185] equals 39.9%).  FMG did not equitably share the excess

profits retained from Plaintiffs' Funds in breach of its fiduciary duty. *Reso ex rel. Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*, No. 11-CV-873, 2011 WL 5826034 at *9 (E.D. Wis. Nov. 18, 2011) (Where an adviser's asset-based fee is "reduced only slightly over the course of amassing a large amount of assets, but [the adviser] does not suffer significant additional expenditures over the course of that expansion," the adviser "is not appropriately passing on those economies of scale to the mutual funds.")

## POINT VII
### THE FEES WHICH FMG CHARGED TO THE FUNDS EXCEEDED THE FEES CHARGED BY COMPETITORS

Relying on weighted average fees, expert testimony and an assessment of fund costs, Plaintiffs demonstrated that FMG's fees were excessive. (PFOF, ¶¶ 573-662; PCOL, ¶¶162-193).  Since the parties agree on the magnitude of FMG's fees, the assessment of this factor turns on the manner in which the comparison group is to be constructed.

In *Jones*, 559 U.S. at 350, the Court expressed concern about the use of fee comparisons for two reasons.   First, fee comparisons are suspect when the services provided by the adviser differ from the services provided by advisers to comparison funds.  *Id.* at 350.  Second, comparisons to the fees of peers "are problematic because these fees may not be the product of negotiations conducted at arm's length." *Id.*; s*ee also Gartenberg*, 694 F.2d at 929 ("[r]eliance on prevailing industry advisory fees will not satisfy § 36(b)" and "[i]f rates charged by the many other advisers were an affirmative competitive criterion, there would be little

29

purpose in § 36(b)").  Consequently, comparative fee information is of limited, if any, in defense of an excessive fee claim:

> [W]hile the Supreme Court in *Jones* cited the Second Circuit in *Gartenberg* when cautioning against "rely[ing] too heavily on comparisons with fees charged to mutual funds by other advisers," 559 U.S. at 350, 130 S.Ct. 1418, the Court's reasoning was that such fees "may not be the product of negotiations conducted at arm's length"—in other words, caution is warranted because such comparisons could be to fees that are themselves excessive. **This warning has more purchase in response to a defendant's use of a below-average fee as a shield rather than, as is the case here, a plaintiff's use of an above-average fee as a sword.**

*Chill,* 2016 WL 1258984 at *8 n.9 (emphasis added).

The evidence Plaintiffs offered on fee comparisons addresses the concerns of *Jones*; the evidence which the Board received and upon which Defendants rely does not. While the trustees received data from Lipper comparing the Funds' fees (DCOL, ¶81), that data was of little value.  First, the Lipper data compared the fees of FMG's index and hybrid funds to the fees of actively managed funds. (PFOF, ¶¶605, 606, 643-645).  This type of comparison runs afoul of *Jones*. *See also Turner v. Davis Selected Advisers, LP*, 626 F. App'x 713, 717 (9th Cir. 2015) (criticizing the comparison of an index fund to an active fund); *In the Matter of Commonwealth Capital Management, LLC*, File No. 3-16599, 2015 WL 3760794, at *9 (June 17, 2015)  (the SEC found that the comparable fee information provided to the board "contained numerous inapt comparisons" because, among other things, the Lipper fee data compared the actively managed fund to "different

types of funds (including an exchange-traded fund, or index-based 'ETF,' and an unmanaged index fund . . .)."  Plaintiffs' fee analysis properly compares funds of the same style:  index to index and active to active.

Defendants' fee comparison is also inconsistent with *Jones'* warning that it is necessary to establish that the fees of the comparison funds are the product of competition.

Further, industry best practices require that, for fee comparison purposes, large funds should be compared to funds of similar size:

> Indeed, to the extent that other managers have tended "to reduce their effective charges as the fund grows in size," the Senate Committee noted that such a reduction represents "the best industry practice [which] will provide a guide."  S. Rep. No. 91-184 . . .

*Gartenberg*, 694 F.2d at 929.

By comparing the fees of the Plaintiffs' large funds to small funds, Defendants are comparing inapt funds.  Plaintiffs' use of an asset weighted average overcomes this deficiency.

The industry average total fee reported by the ICI for index funds - approximately 11 to 15 bps -  is a small fraction of FMG's management fee, of approximately 25 to 35 bps for Plaintiffs' index funds. (PFOF, ¶¶583-588). Defendants' contention that Plaintiffs' weighted average analysis does not distinguish among the different types of index funds is wrong.  (DCOL, ¶87). Plaintiffs compared the two equity index funds to equity index funds and the bond index to bond index funds.  *See* PFOF, ¶588.  Notwithstanding, it is self-evident

31

that index funds are far more similar to each other than to active funds, which comparison is advocated by FMG.

Defendants' invocation of the "Vanguard effect" is also unavailing. There is no proof that the weighted average of fees for comparator family of index or active funds reported by the ICI is skewed by the fees of the Vanguard funds. Defendants also err by contending that use of an "asset weighted average fee . . . has been rejected by numerous courts." (DCOL, ¶86). Defendants' cases all involve the comparison of the fund at issue to a **single** Vanguard fund. *Compare Kalish*, 742 F. Supp. at 1231; *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d Cir. 2006).[9] Further, FMG, by not using asset weighted averages, provides misleading fee comparisons:

> A key contributor to the misreading of the effectiveness of market forces in reducing costs paid by fund investors has been the inappropriate use of "simple mathematical average" of fund fees instead of "asset weighted averages". It is only "asset-weighted averages" that capture the costs of ownership for the average investor, since this ratio measures the experiences of most investors, who are

---

[9]FMG's reliance on the Seventh Circuit's decision in *Jones v. Harris Associates L.P.,* 611 F. App'x 359, 361 (7th Cir. 2015) is misplaced. *See* DCOL, ¶83. The opinion of the Seventh Circuit contradicts the decision of the Supreme Court which adopted the *Gartenberg* standard and explicitly concluded that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers." *Jones,* 559 U.S. at 350-51. Moreover, it was acknowledged that the funds performed well and that the fund board was fully informed. Similarly, FMG's reliance on *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373 (S.D.N.Y. 2002) is unavailing. Contrary to FMG's argument, the court in *Strougo* granted summary judgment based on the totality of all of the *Gartenberg* factors, not merely because "the fees were within the range of fees and expenses for similar funds." (DCOL, ¶84).

served by the largest funds. The use of 'simple mathematical averages,' which equate the fee ratios of the many thousands of tiny expensive funds that hardly anyone owns, with the lower fees among few hundred funds that control most fund assets, is inappropriate, misleading, and irresponsible. (DX-1924 at p. ii).

Last, Defendants argue that Plaintiffs' fee retainage argument, addressed at Point I above, is flawed because investment advisers and Sub-Advisors perform different services. (DCOL, ¶88). The existence of those differences is irrelevant to Plaintiffs' assertion about FMG's excess retention. Section 36(b) requires a comparison of the compensation received to the services performed. The point of the retention comparison is that the compensation which FMG retains is not warranted by the services which it performs.

## POINT VIII
### THE COURT SHOULD CONSIDER, AND THE EQAT BOARD ERRED BY FAILING TO CONSIDER, THE VALUE OF THE PRODUCT WRAPPER FEES, THE GENERAL ACCOUNT SPREAD AND OTHER FALL-OUT BENEFITS

According to Defendants, product wrapper fees (also known as separate account fees, DRPFOF, ¶716) and the general account spread would exist without the funds and cannot be considered fall-out benefits because they fail a "but-for" test. However, Defendants' rely upon a non-existent "but-for" test. (DCOL, ¶¶91-92). When the Supreme Court decided *Jones* in 2010, it held that "all of the surrounding circumstances" must be considered, "all pertinent facts must be weighed," and "all relevant circumstances must be taken into account." 559 U.S. at 344-47. It is inconceivable that AXA's receipt of 100's of millions of dollars in

variable annuity revenues attributable to the Funds is not a circumstance worthy of consideration.

The obligation to consider fall-out benefits derives from the recognition that collateral economic benefits that accrue to an adviser or its affiliates should, in an arm's length environment, be used as negotiating leverage by a mutual fund to obtain lower management fees. *See Gartenberg*, 694 F.2d at 932 ("[E]stimates of such 'fall-out [benefits]' . . . while not precise, could be a factor of sufficient substance to give the Funds' trustees a sound basis for negotiating a lower Manager's fee)*; Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 539 (S.D.N.Y. 2008) ("'Fall-out' benefits are those benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund"). The "but for" test, for which FMG advocates, is inconsistent with *Gartenberg*, 694 F.2d at 932-33, *Gartenberg II*, 740 F2d. 190, and *Krinsk,* 715 F. Supp. at 495.  For example, in *Gartenberg II,* 573 F. Supp. at 1314, the lower court declined to consider float and commission revenues paid to Merrill Lynch by fund owners because plaintiffs' proof "ignores the fact that the fall-out benefits would not accrue absent the use of sophisticated solicitation techniques" employed by Merrill Lynch (the same argument Defendants make at DCOL, ¶96).  *Id.* at 1315.  The Second Circuit, 740 F. 2d at 194, affirmed on other grounds but found the lower court's fall-out benefit test too rigid because the board was required to consider "all benefits":[10]

---

[10]The quote from *Gartenberg* reproduced at DCOL, ¶91 summarizes the principle which was rejected by the Court of Appeals.

[W]e note that the court has misconstrued the governing legal principle in one respect. In his opinion Judge Pollack stated that "[i]n principle, voluntary float should not be counted as an offset to the processing costs incurred by [the Broker] on behalf of [the Fund]." 573 F. Supp. at 1312. He made a similar comment with respect to free credit balances, which arise when a shareholder instructs his broker to redeem Fund shares but does not immediately tell the broker what to do with the proceeds. * *  * As we noted in our earlier opinion, in assessing whether an advisory fee is reasonable a reviewing court must look to *all* the costs and benefits associated with the Fund. *Gartenberg I*, 694 F.2d at 931. The fact that float is voluntarily incurred by the shareholders is irrelevant for present purposes; whether or not they are voluntary the Manager realizes a benefit that is both large and predictable. We therefore reiterate our prior holding that *all* benefits, including float and free credit balances, are to be considered in evaluating the reasonableness of an advisory fee.

*Krinsk,* was decided in 1989 and the District Court was ambiguous as to the test it applied.  715 F. Supp. at 494-95.  On appeal, the Second Circuit did not adopt a "but for" test. *Krinsk,* 875 F.2d at 411.  Moreover, in 2010, the Supreme Court held that the Court must consider "all relevant circumstances ..." *Jones,* 559 U.S. at 347.  Thus, in 2016, in *Chill,* -- F.Supp.3d --, 2016 WL 1258984, at *13, the Court that decided *Krinsk,* held that "'Fall-out' benefits are those benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund."

Finally, even were there a "but-for" test, Plaintiffs meet it. As Defendants admit, "[t]he [EQAT] Trust [which holds the funds at issue in this case and others] enhances AXA Equitable' s variable insurance business," and  "adds value to AXA through 'Fall-out' impacts." (DRPFOF, ¶¶713-714).  As Mr. Joenk said, AXA's

"variable products don't exist without investment options."  (DRPFOF, ¶715). Further, as represented to the SEC, AXA collects its product wrapper/separate account fees from the Funds' assets (PFOF, ¶¶716-17).  The general account also holds investors assets, and Defendants use those assets to start new funds. (PFOF, ¶¶725-26, 730-31).   Furthermore, Defendants themselves classified both of these revenues as "'Fall-Out' Benefits." (PFOF, ¶¶729, 734-736).

Using the same pre-litigation methodology applied by Defendants, Plaintiffs' expert found that these fall-out benefit equaled approximately $1 billion. (PFOF, ¶¶738-9). Thus, under *Jones* and earlier cases, variable annuity product wrapper revenues and the general account spread are "surrounding circumstances" worthy of consideration when reviewing an advisory fee.

Finally, insofar as Defendants maintain that Plaintiffs have not quantified fall-out benefits, they err.  *See* PFOF, ¶744, Table 49; DCOL, ¶¶90-93.  Moreover, the specific values provided by Plaintiffs are more than sufficient because when, like here, an advisor fails to quantify  a fall-out benefit,  "estimates of such 'fall-out'…benefits" are "sufficient[.]" *Gartenberg*, 694 F.2d at 932.

## POINT IX
### PLAINTIFFS MUST BE AWARDED DAMAGES IN ORDER TO VINDICATE THEIR RIGHTS UNDER § 36(b)

When a fee arrangement is outside the realm of an arm's length bargain, "equity will set it aside." *Jones*, 559 U.S. at 347, quoting *Pepper v. Litton,* 308 U.S. 295, 306-07 (1939).  Once a fee arrangement is set aside, it is necessary to determine how damages are to be measured.

36

While § 36(b) provides little guidance on this issue, two principles should inform the damage inquiry.  First, as our Supreme Court has recognized, damage awards are the sole means to deter unlawful conduct:

> …it [is] the duty of [a] [] court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

*Pepper,* 308 U.S. at 312.  Second, damages need not be precise.  The award must be based on "just and reasonable inference, although the result be only approximate."  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see also Jones,* 559 U.S. at 352 ("[i]n reviewing compensation under § 36(b), the Act does not require courts to engage in a precise calculation of fees representative of arm's-length bargaining").

The traditional common law remedy for breach of fiduciary duty is disgorgement of "any benefit to the trustee personally."  Restatement (Third) of Trusts § 100 (2012).  However, most § 36(b) jurisprudence limits damages to a refund of the unreasonable portion of the fee.  *See Kalish*, 928 F.2d at 592 ("[a]ny unreasonable portion of the fee must be returned to the fund."); *See also In re Evangelist*, 760 F.2d 27, 29-30 (1st Cir. 1985) ("[T]he [restitution] remedy Congress created - the payment of any excess fee to the [investment] company - ... requires one owing a fiduciary duty to pay to the beneficiary of that obligation - to 'disgorge' - money taken in derogation of the duty").

37

To calculate damages under the Act, it is first necessary to determine what portion of the fee is deemed to be excessive.  Plaintiffs have proposed several models to make that determination which are broadly criticized by Defendants who argue that any damage model is tantamount to forbidden cost plus pricing. (DCOL, ¶105)  While a cost-plus contract is not "required" (DCOL, ¶105), this does not mean that Plaintiffs' damages models are unhelpful to the Court when determining an arm's length range of fees.  Were Defendants' objection to Plaintiffs' damage models sufficient to prevent redress, then the protections provided by  § 36(b) would be rendered illusory.  *Daily Income Fund*, 464 U.S. at 537.  As the SEC wrote in their report to the Committee on Interstate and Foreign Commerce when considering the addition of § 36(b), "the possibility of civil damages or injunctive relief serves a most effective weapon in enforcement." *Public Policy Implications of Investment Company Growth* at 146 (Dec. 2, 1966).

Finally, under § 36(b), the Court must review FMG's compensation on a fund-by-fund, contract-by-contract basis.  Plaintiffs' believe that evidence supports a verdict in their favor on all Funds for all years, but recognize that the evidence is most compelling with respect to the four index funds (Common Stock Index Fund, Core Bond Index Fund, Equity 500 Index Fund and Intermediate Government Bond Index Fund). FMG's compensation from these funds was so large and utterly detached from the services it provided.  Moreover, the fees FMG charged to the index funds were so grossly in excess of the fees received by the Sub-Advisors and

the Sub-Administrator, (PFOF, ¶397 and 444), that it is inconceivable that FMG's fees can be upheld under the law.

## **CONCLUSION**

The Court, it is respectfully submitted, should enter judgment in favor of each of the 12 Plaintiff Funds.

Respectfully submitted,

SZAFERMAN, LAKIND, BLUMSTEIN
 & BLADER, P.C.


By:   /s/ Arnold C. Lakind
      Arnold C. Lakind, Esq.
      101 Grovers Mill Road, Ste. 200
      Lawrenceville, NJ  08648
      (609) 275-0400
      (609) 275-4511
      alakind@szaferman.com
      Attorney for Plaintiffs

Dated:   May 16, 2016