## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MARY ANN SIVOLELLA, GLENN D.
SANFORD, BRIAN A. SANCHEZ, et al.

      Plaintiffs,

v.

AXA EQUITABLE LIFE INSURANCE
COMPANY, et al.

      Defendants.

GLENN D. SANFORD, et al.

      Plaintiffs,

v.

AXA EQUITABLE LIFE INSURANCE
COMPANY, et al.

      Defendants.

Civil Action No.: 11-cv-4194 (PGS)(DEA)

**OPINION**

RECEIVED

AUG 2 5 2016

AT 8:30_____M
WILLIAM T. WALSH
CLERK

This case arises under § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 8a-35(b) ("ICA" or "36(b)"). Plaintiffs bring this consolidated, derivative[1] action on behalf of mutual fund investors who are contract holders to variable annuity products with Defendants AXA Equitable Insurance Company ("AXA") and AXA Equitable Funds Management Group, LLC ("FMG").

The Court conducted a 25-day, non-jury trial beginning on January 6, 2016 and

---

[1] The two cases were consolidated because both emanate from the same factual background, and are brought against the same Defendants. This is a derivative suit because Plaintiffs, as mutual fund investors, seek damages on behalf of all investors in the funds in question, plus attorney's fees.

concluding on February 25, 2016.  Findings of Fact and Conclusions of Law were thereafter

submitted.  ECF Nos. 247, 248, 275, 276, 279, 290, 283, 284, 285.  Closing arguments were

heard on June 1, 2016.

Plaintiffs allege that the Board of Trustees (the "Board") for the EQ Advisors Trust

("EQAT" or the "Fund"), a mutual fund complex, breached its fiduciary duty by approving

service contracts that charged excessive management and administrative fees.  The thrust of the

trial focused on Plaintiffs' claim that FMG charged investors exorbitant fees for mutual fund

investment and administrative duties, and then delegated those same duties to sub-advisers and

sub-administrators for nominal fees.  Plaintiffs allege: (a) FMG's fees were so disproportionally

high when compared to the fees of sub-advisers and sub-administrators, and therefore some, if

not all, of FMG's fees should be reimbursed to the mutual fund rather than enriching FMG; (b)

the allegedly independent Board breached its fiduciary duty by authorizing such disproportionate

fees; and (c) FMG manipulated the Board meeting materials and duped the Board by providing

misleading and unreliable materials in the fee approval process.  In sum, Plaintiffs contend that

FMG's compensation under the investment management and administrative agreements "could

not have been the product of arm's-length bargaining."  ECF No. 276, Plaintiffs' Response to

Defendants' Proposed Findings of Fact ("PRDFOF"), ¶ 3.

Pursuant to FED. R. CIV. P. 52(a), and after careful consideration of the entire record in

this case and the applicable law, the Court concludes that Plaintiffs have failed to meet their

burden to demonstrate that Defendants breached their fiduciary duty in violation of § 36(b) of the

ICA or have shown any actual damages.  At odds with that conclusion is that the filing of the

lawsuit, as opposed to the substance of the proofs, has been the impetus to improve the quality of

2

the Board's decision-making, facilitating enhancements to the Board materials and changes in the Board's composition.

## Legal Standard

*A.*     *Statutory Cause of Action*

By way of background, Congress enacted the ICA because it understood that mutual fund products were different from stock of an individual company. Generally, "[a] mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." *Burks v. Lasker*, 441 U.S. 471, 480, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) (citing *Tennenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir. 1977)). A mutual fund is often created by an investment adviser who selects the fund's board of trustees, manages its investments, provides administrative services and markets the funds in exchange for fees paid out of the assets of the fund. *Jones v. Harris, L.P.*, 559 U.S. 335, 338, 130 S.Ct. 1418, 176 L.Ed.2d 265 (2010); *see also Burks*, 441 U.S. at 480, 99 S.Ct. at 1838.

Obviously, the investment adviser has superior control over the Board of Trustees than the individual investors do, like the Plaintiffs in this case, a teacher (Sivolella) and a police officer (Sanchez). As such, "the forces of arm's length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Jones*, 559 U.S. at 338, 130 S.Ct. at 1422 (internal citation omitted). As a result, the relationship between a fund and its investment adviser is considered to be "fraught with potential conflicts of interest . . ." *Id.* at 339 (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-38, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984)).

Congress adopted the ICA "because of its concern with the potential for abuse inherent in the structure of investment companies." *Jones*, 559 U.S. at 339. Hence, the Act declared its purpose:

3

> to mitigate and, so far as is feasible, to eliminate the conditions
> enumerated in this section which adversely affect the national public
> interest and the interest of investors.

15 U.S.C. §80a-1. When initially enacted, the ICA imposed a "scheme that regulates most

transactions between investment companies and their advisers." *Daily Income Fund*, 464 U.S. at

536 (citing 15 U.S.C. §80a-17). It limited the number of persons affiliated with the adviser who

may serve on the mutual fund's board of directors (15 U.S.C. § 80a-10), and required that fees

for investment advice and other services be governed by a written contract that the mutual fund's

board must approve (15 U.S.C. § 80a-15(c)). *Daily Income Fund*, 464 U.S. at 536-37. Under

the ICA's original scheme, a shareholder seeking to challenge an investment adviser's fee under

state law was required to demonstrate "common-law standards of corporate waste, under which

an unreasonable or unfair fee might be approved unless the court deemed it 'unconscionable' or

'shocking,'" and "security holders challenging adviser fees under the [ICA] itself had been

required to prove gross abuse of trust." *Jones*, 559 U.S. at 340 (quoting *Daily Income Fund*, 464

U.S. at 540, n.12)).

In response to the growth of mutual funds in the 1950s and 1960s, Congress amended the

Act in 1970 to bolster the protections afforded to mutual funds and their shareholders. *Jones*,

559 U.S. at 339; see also *Daily Income Fund*, 464 U.S. at 537-38. The amendment "required

that no more than 60 percent of a fund's directors be 'persons who are interested persons,' *e.g.*,

that they have no interest in or affiliation with the investment adviser." *Jones*, at 339-40

(quoting 15 U.S.C. § 80a-10(a); § 80a-2(a)(19)). This "was designed to place the unaffiliated

directors in the role of 'independent watchdogs.'" *Burks*, 441 U.S. at 484 (quoting *Tannenbaum*,

552 F.2d at 406). In serving as "independent watchdogs," unaffiliated directors are to ensure that

"mutual funds . . . operate in the interest of all classes of their securities holders, rather than for

4

the benefit of investment advisers, directors, or other special groups." *Tannenbaum*, 552 F.2d at 406.

The amendment also added Section 36(b), which imposes a "fiduciary duty" on investment advisers and their affiliates, "aiming to give shareholders a stronger remedy . . . to bring actions to challenge a fee that was not 'reasonable'. . ." *Jones*, 559 U.S. at 340; *see also Daily Income Fund*, 464 U.S. at 538. Section 36(b) states that "investment company advisers owe shareholders in investment companies a fiduciary duty with respect to determining and receiving their advisory fees." *Green v. Fund Asset Management, L.P.* 286 F.3d 682, 685 (3d Cir. 2002) (citing 15 U.S.C. § 80a-35(b)).

Furthermore, the Act allows for a private cause of action for breach of this fiduciary duty by shareholders in an investment company, "provided that they own shares at the time the action is initiated and continue to own shares throughout the pendency of the litigation." *Redus-Tarchis v. New York Life Insurance Management LLC*, 2015 WL 6525894 at * 4 (D.N.J. Oct. 28, 2015) (citing *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (USA)*, 677 F.3d 178, 182-83 (3d Cir. 2012)).

The Act imposes additional statutory requirements when bringing an action for breach of fiduciary duty under Section 36(b). Specifically, Congress: (a) limited the period of damages so that "[n]o award of damages shall be recoverable to any period prior to one year before the action was instituted"; (b) directed that the amount of any award be limited "to the actual damages resulting from the breach of fiduciary duty"; (c) required that "[n]o such action shall be brought or maintained against any person other than the recipient of such compensation or payments," *i.e.* the defendant must be either an investment adviser or an affiliated person to the investment adviser. 15 U.S.C. § 80a-35(b)(3); see also *In re Salomon Smith Barney Mut. Fund*

5

*Fees Litigation*, 441 F. Supp. 2d 579, 598-99 (S.D.N.Y. 2006). Finally, the Act provides that the board of directors' approval of compensation, payments, or contracts "shall be given such consideration by the court as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a-35(b)(2).

However, the "fiduciary duty imposed by § 36(b) is significantly more circumscribed than common law fiduciary duty doctrines . . . [T]he plaintiff has the burden of proving a breach of fiduciary duty [under § 36(b)] in contrast with the common law rule that requires a fiduciary to justify its conduct." *Green*, 286 F.3d 682 at 685 (internal citations omitted).

## *B.* *Case Law*

In addition to the Act's statutorily imposed requirements, there are primarily two cases that explain the standard for determining whether a breach of fiduciary duty occurred: *Jones, supra,* and *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982). Both *Jones* and *Gartenberg* teach that Section 36(b) liability requires proof that "the adviser-manager [to] charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining." *Gartenberg*, 694 F.2d at 928. To determine whether a disproportionate fee was approved or a breach of fiduciary duty has occurred, one considers the often referred to *Gartenberg* factors. *Id.* at 929-30 (internal citation omitted). They are: (1) the nature and quality of the services provided by the advisers to the shareholders; (2) the profitability of the mutual fund to the adviser; (3) "fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such savings are passed on to the shareholders; (5) comparative fee structures with other similar funds; and (6) the independence and conscientiousness of the mutual fund's Board of Trustees. *Gartenberg*, 694 F.2d at 929-30; *see also In re Salomon*, 441 F. Supp. 2d at 599; *Krinsk v. Fund Asset Mgmt. Inc.*, 875 F.2d 404, 409 (2d Cir.), cert. denied, 493 U.S. 919 (1989).

6

These factors are guides for the Court to follow; and not all of them need to favor Plaintiffs to impose liability. The Court weighs all of the evidence presented and the gravity of each factor to adjudicate the case. *Gartenberg*, 694 F.2d at 929-32; *see also In re Davis N.Y. Venture Fund Fee Litig.*, 2015 WL 7301077 at \*4, n.3 (S.D.N.Y. 2015).

The Supreme Court in *Jones* adopted the *Gartenberg* factors as the appropriate criteria to consider when assessing breach of fiduciary duty under the Act. *Jones*, 559 U.S. at 347-48. As Justice Alito noted, "[t]he *Gartenberg* approach fully incorporates this understanding of the fiduciary duty . . . and reflects § 36(b)(1)'s imposition of the burden on the plaintiff . . . *Gartenberg*'s approach also reflects §36(b)'s place in the statutory scheme and, in particular, its relationship to the other protections that the Act affords investors." *Id.*

The *Jones* Court indicated that, "[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process." *Jones*, 559 U.S. at 351 (citing *Burks*, 441 U.S. at 484). A court should not be second guessing informed board decisions. *See Jones*, 559 U.S. at 352. When a court is reviewing investment adviser fees, it should not hone in on the amount of the fees, but focus on whether the Board or the adviser fulfilled their fiduciary duties by acting in a manner consistent with their independent judgment. As such, the Supreme Court held that the *Gartenberg* factors are an appropriate manner and measure of the Board's duty. *Jones*, 559 U.S. at 336-37. Therefore, "if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Id.* at 351. However, "where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. When an investment adviser fails to disclose material information

7

to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as an independent check upon the management." *Id.* at 351-52 (internal citations omitted).

In sum, for Plaintiffs to prove a breach of fiduciary duty under the ICA, they carry the burden to establish the following elements by a preponderance[2] of the evidence:

1. Plaintiffs owned shares at the time the action was initiated and have continued to own shares throughout the pendency of the litigation;

2. Defendants are either investment advisers or a board of trustees;

3. The application of the *Gartenberg* factors demonstrates that FMG's fees were so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining, thus constituting a breach of fiduciary duty;

4. As a result of the breach, there was an injury or damages; and

5. The amount of <u>actual</u> damages related to the breach of fiduciary duty that occurred.

## **Standard of Proof**

Plaintiffs have the burden of proving their case by the preponderance of the evidence.

The Court adopts the definition in the Model Jury Instructions:

> That means Plaintiffs have to prove that their claims are more likely than not . . . To say it differently, if one puts the evidence favorable to Plaintiffs and the evidence favorable to Defendants on opposite sides of the scales, Plaintiffs would have to make the scales tip somewhat to their side. If Plaintiffs fail to meet this burden, the verdict must be for Defendants.[3]

---

[2] *Gartenberg, supra*, 694 F.2d at 933.

[3] Both Plaintiffs' and Defendants' counsel largely agree that the preponderance of evidence is the standard. T137:22-138:9 (Lakind Closing Argument); T139:9-15 (Murphy Closing Argument). Plaintiffs' counsel argues that it is different with "regard to allocated costs when *Krinsk* put that on defendant." T138:1-2 (Lakind Closing Argument). The Court does not see such an exception in *Krinsk.*

*See* Model Jury Charge 1.10, "Preponderance of the Evidence," available at

http://www.ca3.uscourts.gov/model-civil-jury-table-contents-and-instructions (July 2015).

## Role of the Court

In this case, the Court has three roles. First, as trier of fact, the Court's duty is to decide

the facts from the evidence that was heard and seen in court during the trial. The second duty is

to apply the law to the facts. The third role is to clearly explain the facts and the legal principles

underpinning the Court's decision.

Like any jury, the Court performs these duties fairly and impartially. The Court will not

allow sympathy, prejudice, fear, or public opinion to influence its decision. The Court will not

be influenced by any person's race, color, religion, national ancestry or gender. Here, all the

parties stand on equal footing, despite the "Main Street v. Wall Street" perception. *See* Model

Jury Charge 1.1, "Role of the Jury." Since the Court's decision is based upon evidence[4] seen and

heard in the courtroom, the Court followed the same guidelines as a jury would in determining

the evidence and what weight should be given to it.

The Court considered two types of evidence. One type of evidence is called "direct

evidence." An example of "direct evidence" is when a witness testifies about something that the

witness knows through his own senses — something the witness has seen, felt, touched, heard or

did. Another form of direct evidence is an exhibit where the fact to be proved is its existence or

---

[4] One of the Court's roles is to act as gatekeeper on what testimony and documents are admitted into evidence. There were two issues that require clarification. First, on an *in limine* motion, the Court admitted all of the Board of Trustees' meeting materials into evidence on a wholesale basis as relevant to the Board's approval of the contracts at issue in this case for a five year period, over Plaintiffs' objection. ECF No. 196, T44:25-46:14. The Court did so with the understanding that the parties would later identify and admit separately individual documents that were of particular importance to the case. Within this Opinion, the documents marked separately are referenced. Second, Plaintiffs' use of hostile witnesses, such as Joenk, in laying the foundation of the case sometimes led to imprecise questioning, and the responses were often evasive and truncated. The Court found this to be cumbersome in the beginning of the trial, but over time the testimony flowed smoothly.

9

current condition. The other type of evidence is "circumstantial evidence." "Circumstantial evidence" is proof of one or more facts from which one could find another fact.

The Court considered both direct and circumstantial evidence that was presented. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. *See* Model Jury Charge 1.6. For example, the Court did not let rumors, suspicions, or anything else that it may have seen or heard outside of the court to influence its decision in any way.[5] The evidence in this case consists of the testimony of the witnesses; documents and summary charts; and any fact or testimony that was stipulated. *See* Model Jury Charge 3.1. In order to assess the evidence, the Court used common sense, and considered it in light of everyday experience with people and events. As such, the Court has given the evidence whatever weight it believed it deserved. *See* Model Jury Charge 1.5.

## The Parties

### *A.   Plaintiffs*

Plaintiffs are Mary Ann Sivolella ("Sivolella"), Glen Sanford ("Sanford"), Mary and Robert Cusack, Patricia Lynn ("Lynn"), William Tucker ("Tucker"), and Brian Sanchez ("Sanchez"). Only one Plaintiff, Sanchez, testified at trial. None of the other Plaintiffs testified or attended the trial. Aside from Sivolella, a teacher (T36:16 (Plaintiffs' Opening)), and Sanchez, a retired police officer (T36:14-18 (Sanchez)), there were very few personal facts presented about the other Plaintiffs or their reason for bringing the suit, except for those facts set forth in the stipulations of the parties.

Plaintiffs are parties to variable annuity contracts with AXA. Court Ex. 1, Joint Stipulation of Facts (Jan. 12, 2016) ("JSOF") ¶¶ 1, 8-13. A variable annuity is a contract

---

[5] From time to time at social gatherings of public employees (teachers), the high fees of variable annuities/mutual funds arose as part of a retirement discussion. Since such a topic would be a rumor, the Court did not consider said comments in this opinion.

between an individual or entity and an insurance company, which allows Plaintiffs, as contract-holders, to convert gains from an investment into annuity payments over some period of time.  P-125 at Bates 8840, 8876-78.  Under these contracts, contract-holders contribute money and then allocate these monetary contributions to one or more investment options offered within the variable annuity.  JSOF ¶ 2.  Mutual funds are one such investment option.  A mutual fund is a professionally managed pool of stocks, bonds, or other investments.  JSOF ¶ 3.

Plaintiffs have allocated contributions to their variable annuities to one or more of the following twelve (12) mutual funds, all of which are part of EQAT:

1) EQ/Common Stock Index Portfolio;
2) EQ/Core Bond Index Portfolio;
3) EQ/Equity 500 Index Portfolio;
4) EQ/Equity Growth PLUS Portfolio.  (In 2014, the assets of this Fund were acquired by the EQ/Large Cap Growth PLUS Portfolio, renamed the AXA Large Cap Growth Managed Volatility Portfolio);
5) EQ/GAMCO Small Company Value Portfolio;
6) EQ/Global Bond PLUS Portfolio;
7) EQ/Global Multi-Sector Equity Portfolio.  (In 2014, the EQ/Global Multi-Sector Equity Portfolio was renamed the AXA Global Equity Managed Volatility Portfolio);
8) EQ/Intermediate Government Bond Index Portfolio. (In 2012, renamed the EQ/Intermediate Government Bond Portfolio);
9) EQ/Large Cap Value PLUS Portfolio. (In 2014, the EQ/Large Cap Value PLUS Portfolio was renamed the AXA Large Cap Value Managed Volatility Portfolio);
10) EQ/Mid Cap Value PLUS Portfolio. (In 2014, renamed the AXA Mid Cap Value Managed Volatility Portfolio);
11) EQ/PIMCO Ultra Short Bond Portfolio; and
12) EQ/T.Rowe Price Growth Stock Portfolio.

JSOF ¶ 4.

Sivolella allocated contributions to her variable annuity to the EQ/Common Stock Index Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the

EQ/Intermediate Government Bond Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, and the EQ/Mid Cap Value PLUS Portfolio.  JSOF ¶ 8.

Sanford allocated contributions to his variable annuity to the EQ/GAMCO Small Company Value Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Large Cap Value PLUS Portfolio, and the EQ/T.Rowe Price Growth Stock Portfolio.  JSOF ¶ 9.

Mary and Robert Cusack allocated contributions to their variable annuity to the EQ/Core Bond Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, and the EQ/Mid Cap Value PLUS Portfolio.  JSOF ¶ 10.

Lynn allocated contributions to her variable annuity to the EQ/GAMCO Small Company Value Portfolio, the EQ/Global Bond PLUS Portfolio, the EQ/Mid Cap Value PLUS Portfolio, and the EQ/PIMCO Ultra Short Bond Portfolio.  JSOF ¶ 11.

Sanchez allocated contributions to his variable annuity to the EQ/Global Multi-Sector Equity Portfolio and the EQ/Large Cap Value PLUS Portfolio.  JSOF ¶ 12.

Tucker allocated contributions to his variable annuity to the EQ/GAMCO Small Company Value Portfolio and the EQ/T.Rowe Price Growth Stock Portfolio.  JSOF ¶ 13.

### B.    *Defendants*

FMG administers and manages mutual funds offered by AXA's variable annuity products.  JSOF ¶ 14.  FMG is a registered investment adviser under the ICA.  JSOF ¶ 15.  FMG was previously an internal business unit within AXA, but became a separate legal entity and wholly-owned subsidiary of AXA in 2011.  JSOF ¶¶ 16-17.  On May 1, 2011, FMG contracted with EQAT and became the investment manager and administrator to the Funds.  ECF No. 276, PRDFOF ¶ 10.  At issue in this case are two distinct service agreements between FMG and EQAT: (1) the Investment Management Agreements (the "Management Agreements") (J-3; J-4); and (2) the Mutual Funds Service Agreement (the "Administrative Agreement") (P-405).

AXA markets variable annuities to employers and individuals. ECF No. 285-2, Defendants' Corrected Response to Plaintiffs' Findings of Fact ("DCRPFOF"), ¶ 1. AXA is an insurance company, and served as the investment manager and administrator to EQAT prior to FMG assuming these roles in 2011. JSOF ¶¶ 14-15. Defendants contend that, although FMG became the investment manager and administrator, AXA continued to provide services to Funds, including legal, compliance, accounting, and treasury services as FMG's parent corporation. ECF No. 276, PRDFOF, ¶ 12. Plaintiffs dispute the nature and quality of these services, which are set forth in detail, *infra* at p. 56.

## C.   *Board of Trustees*

Although not a party to these actions, the EQAT Board of Trustees plays a significant role in this case. Aside from Steven Joenk ("Joenk"), discussed *infra* at p. 15, the trustees on the EQAT Board are not employed by FMG or AXA. JSOF ¶ 67. Since July 2010, the trustees have included:

| NAME | TIME PERIOD |
|---|---|
| Theodossios Athanassiades | March 2000 to February 2014 |
| Jettie Edwards | March 1997 to March 2015 |
| Donald E. Foley | January 2014 to date of Stipulated Facts |
| David Fox | May 2000 to December 2012 |
| William Kearns, Jr. | March 1997 to December 2014 |
| Christopher Komisarjevsky | March 1997 to date of Stipulated Facts |
| H. Thomas McMeekin | January 2014 to date of Stipulated Facts |
| Harvey Rosenthal | March 1997 to date of Stipulated Facts |
| Gary Schpero | May 2000 to date of Stipulated Facts |
| Kenneth Walker | January 2012 to date of Stipulated Facts |
| Caroline Williams | January 2012 to date of Stipulated Facts |

JSOF ¶ 68.  The Board holds five regularly scheduled meetings each year, including four

quarterly meetings and an annual contract renewal meeting in July ("15(c) meeting").  JSOF ¶

70.  Pursuant to § 15(c) of the ICA, it is the duty of the Board to "request and evaluate . . . such

information as may be reasonably necessary to evaluate the terms of any contract" that provides

investment advisory services to the fund.  15 U.S.C. § 80a-15; ECF No. 267, PRDFOF, ¶ 141.

Specifically, at issue in this case is whether the Board breached its fiduciary duty in approving

contracts that awarded excessive fees to FMG and AXA for investment services that were then

delegated to sub-advisers for a much lesser fee.

## Damages Period[6]

The relevant time period for Plaintiffs' excessive fee claims depends on the particular

fund and the particular type of claim.  Sivolella filed the original complaint in this matter on July

21, 2011, alleging that the management fees charged to eight of the Funds were excessive.  *See*

Complaint, ECF No. 1.  In light of the one-year statute of limitation in § 26(b), 15 U.S.C.

35(b)(3), Plaintiffs' original claim is limited to the management fees charged to the eight original

Funds after June 20, 2010 (*i.e.* one year prior to the *Sivolella* Complaint).  T2910:24-2911:6

(Joenk).

On January 15, 2013, Plaintiffs filed a separate complaint alleging that FMG charged

excessive management fees to four of the eight original Funds, as well as four additional Funds

not included in the *Sivolella* Complaint.[7]  *See Sanford* Complaint, ECF No. 37.  Therefore, the

---

[6] The parties agree to the relevant time period. *See* ECF No. 276, PRDFOF, ¶¶ 43-46.
[7] The four additional funds are: (1) EQ/Core Bond Index Portfolio, (2) EQ/Global Board PLUS Portfolio; (3) EQ/PIMCO Ultra Short Bond Portfolio; and (4) EQ/T.Rowe Price Growth Stock Portfolio.

claims in *Sanford* relating to the four additional Funds are limited to management fees charged after January 14, 2012. *See* Time Period Stipulation, ¶ 6; ECF No. 56-1.

On April 15, 2013, Plaintiffs amended their complaint to allege that FMG charged excessive administrative fees to the Funds. *See* Amended Complaint, ECF No. 56. These claims are limited to the administrative fees charged to the funds after April 14, 2012. *See* Time Period Stipulation ¶¶ 5-6, ECF No. 56-1.

## **Trial Witnesses**

### *A.    Plaintiffs' Witnesses*

Plaintiffs presented the testimony of one Plaintiff, five employees of FMG, and four expert witnesses.

The only Plaintiff to testify at trial was Sanchez, a retired police officer who purchased an AXA-sponsored variable annuity product in December 2007, and placed some of his investment into some of the mutual funds at issue. T140:1-7 (Sanchez). Sanchez has little experience in investing. T141:16-18 (Sanchez). Other than taking advice from investment representatives in the past, he occasionally reads investment literature. T141:16-18 (Sanchez).

Plaintiffs called the following FMG employees, who were treated as adverse witnesses: Steven M. Joenk ("Joenk"), Alwi Chan ("Chan"), Xavier Poutas ("Poutas"), Brian Walsh ("Walsh"), and Patricia Louie ("Louie").

Both Plaintiffs and Defendants called Joenk as a fact witness. Joenk is the President and Chief Executive Officer ("CEO") of FMG. T177:13-19 (Joenk). Joenk is responsible for FMG's operations and also serves as Chairman of the Board of Trustees of the EQAT. T177:13-19; T181:25-182:4; T3385:10-15 (Joenk). Joenk received a Bachelor of Science in Chemical Engineering and a Master's in Business Administration from Washington University, and is in

15

the process of receiving a Doctorate in Finance. T2575:7-13 (Joenk). Prior to joining FMG, Joenk worked in fund administration at a number of banks, holding companies, and mutual funds. T2575:25-2576:10 (Joenk). Joenk is responsible for, among other things, overseeing FMG's operations and strategic planning. T181:25-182:4 (Joenk). In his role as Chairman of the Board of EQAT, Joenk makes presentations to the Board and apprises the Board of the funds' performance and other pertinent information. T3011:25 (Joenk).

Chan is a Senior Vice President and Deputy Chief Investment Officer of FMG. T868:4-10 (Chan). Chan manages a team responsible for portfolio analysis and management. T883:2-16 (Chan).

Poutas is a Senior Director of AXA, a portfolio manager at FMG, and leads the Asset Allocation Group. T951:3-952:5 (Poutas). The Asset Allocation Group is primarily responsible for trading Exchange-Traded Funds ("ETFs") and for managing "AXA's Tactical Manager" Strategy ("ATM Strategy"). T952:9-12; T978:14-25 (Poutas).

Walsh is a Senior Vice President of FMG. T1048:3-9 (Walsh). Walsh is the head of FMG's Fund Administration Group, which handles various operational and accounting matters relating to the Funds. T1049:10-15; T1050:3-7 (Walsh).

Both Plaintiffs and Defendants called Louie as a fact witness. Louie worked as an attorney for the SEC and with the Investment Company Institute prior to joining AXA in 1999. T1090:16-22; T1144:24-25 (Louie). At AXA, Louie currently serves as Managing Director and Assistant General Counsel. T1090:4-10 (Louie). In addition to her position with AXA, Louie holds the position of Executive Vice President and General Counsel with FMG. T1090:4-10 (Louie). At FMG, Louie heads the Legal and Compliance unit, which is primarily responsible for various legal, compliance, and Board process matters relating to the Funds. T1093:20-22;

16

T1108:3-1109:2 (Louie). She also currently serves as Vice President and Secretary of the EQAT. T1191:20-21 (Louie).

Plaintiffs also offered four expert witnesses: Kent E. Barrett ("Barrett"), Dr. Phillip F. Goldstein ("Goldstein"), Dr. Steven Pomerantz ("Pomerantz"), and Richard W. Kopcke ("Kopcke").

Barrett is licensed as a Certified Public Accountant and holds a certificate as a Certified Fraud Examiner from the American Institute of Certified Public Accountants. T1284:21-23; T1287:16-23 (Barrett). He is employed by Veris Consulting, and has been a senior managing director at the company for thirteen years. T1284:17-20; T1285:8-9 (Barrett). He received both his Bachelors and Masters in Accountancy from Brigham Young University. T1285:13-15 (Barrett). The majority of his work concerns litigation support. T1290:2-15 (Barrett). Barrett was qualified to testify as an expert in the field of accounting, and offered opinions related to: (1) the nature and quality of services provided by FMG; (2) FMG's profitability; and (3) calculations related to "fall-out" benefits. T1299:17-24; T1321:3-1322:4 (Barrett).

Plaintiffs called Goldstein as an expert witness in the areas of the nature and quality of services; the independence, care, and conscientiousness of the Independent Trustees; and management fees. T2118:24-2119:3; T2143:16-25 (Goldstein); ECF No. 285-1, Defendants' Corrected Findings of Fact ("DCFOF"), ¶ 66. Goldstein holds a Bachelors in Civil Engineering from the University of Southern California, and a Masters in Engineering from City College of New York. T2099:5-10 (Goldstein). Goldstein became an investment adviser in 1999, and is currently an owner and principal with Bulldog Investors. T2099:11-21; T2099:22-25 (Goldstein). He sits on the boards of three closed-end mutual funds. T2112:10-14 (Goldstein).

17

Plaintiffs called Pomerantz as an expert in the areas of mutual funds and investments. T1788:18-20; T1829:16-1830:13 (Pomerantz). He received a Bachelor of Arts from Queens College at City University in 1981, and a Doctorate in Mathematics in 1986 from the University of California, Berkeley. T1773:6-9 (Pomerantz). His experience in the mutual fund industry has included positions with Bank of America, Citibank, and Weiss Peck and Greer. T1773:15-20 (Pomerantz). He is employed as a professional expert witness. T1985:8-10 (Pomerantz). Pomerantz has testified in approximately two-dozen § 36(b) excessive fee cases against mutual fund advisers. T1985:16-18 (Pomerantz).

Kopcke holds a Bachelor of Arts in Economics from the University of Michigan, and a Doctorate in Economics from Harvard University. T2265:25-2266:11 (Kopcke). Kopcke is an economist and Chartered Financial Analyst, and is currently employed as an intermittent advisor with the U.S. Treasury in the Office of Technical Assistance. T2260:9-19 (Kopcke). He was a chief monetary policy economist at the Federal Reserve. T2270:15-17 (Kopcke). Kopcke was on two task forces and was with the National Association of Insurance Commissioners to develop regulations for variable insurance products and variable annuities. T2273-2274 (Kopcke). Kopcke was qualified as an expert to testify in economics, financial markets, and financial institutions, including investment management, administrative services, financial analysis, and economies of scale. T2286:18-24 (Kopcke). Kopcke offered opinions as to: (1) the services provided by FMG as manager and administrator (T2303:25-2313:23); (2) FMG's revenue, costs, and profitability (T2322:1-2362:13); (3) economies of scale (T2370-2374); (4) FMG's risks associated with managing the Plaintiffs' Funds (T2366:18-2367:17); and (5) comparative fees (T2363:14-2366:17).

18

## *B.    Defendants' Witnesses*

Defendants called two FMG employees, Joenk and Louie, the Lead Independent Trustee for the EQAT, Gary S. Schpero ("Schpero"), and three expert witnesses.

Schpero is the Lead Independent Trustee serving on the Board. T3081:15-16 (Schpero). He joined the Board in 2000, and has been the Lead Independent Trustee since September 2011.[8] T287:7-12; T287:19-20 (Joenk). Prior to joining the Board, Schpero practiced law at Simpson Thacher & Bartlett LLP for 22 years, where he was the managing partner of the Investment Management and Investment Company Practice Group, which represented mutual funds, independent directors, and investment advisers.   T3379:13-3382:2 (Schpero).  Schpero offered testimony on the nature of the services provided by the Board.

Defendants offered Dr. William Holder ("Holder") as expert in the areas of financial, managerial, and cost accounting.  Holder has a Bachelor of Science in Business Administration from Oklahoma State University, and a Masters in Accountancy and Doctorate in Business Administration, both from the University of Oklahoma.  T3908:20-25 (Holder).  Holder is the Dean of the Leventhal School of Accounting at the University of Southern California, and is a Certified Public Accountant in California and Oklahoma.  T3908:15-18; T3921:20-21 (Holder). He is also the co-author of a widely used accounting textbook.  T3911:11-20 (Holder).

Dr. Russell Wermers ("Wermers") is an expert in the areas of mutual fund performance and investment management services. T4325:9-25 (Wermers).  Wermers holds a Masters in Business Administration and a Doctorate in Finance from the University of California, Los Angeles.  T4316:17-24 (Wermers).  Wermers is a professor of finance at the Smith School of Business at the University of Maryland, where he teaches investment management, portfolio

---

[8] Schpero assumed this role after the filing of the Complaint in this matter, which occurred on July 21, 2011. *See* ECF No. 1.

performance, and empirical methods. T4315:16-4316:2; T4316:25-4318:5 (Wermers). He has authored and published a number of scholarly articles and works on fund performance and investment management. T4320:5-4321:8 (Wermers). Wermers previously worked as a consultant to the U.S. Department of Treasury concerning those practice areas. T4322:10-20 (Wermers).

Dr. Christopher M. James ("James") served as Defendants' expert in the areas of economies of scale, comparative fees, and investment manager risk. T4071:3-5 (James). James has a Bachelor of Arts in Economics from Michigan State University, a Masters in Business Administration and Finance from the University of Michigan, and a Doctorate in Economics from the University of Michigan. T4043:10-15 (James). James is a professor of finance with appointments at Cambridge University and the University of Florida, where he serves as the William H. Dial Eminent Scholar in Finance. T4042:25-4043:4 (James).

## C. *Deposition Read-Ins*

Deposition testimony was read-in for six individuals: Jettie Edwards ("Edwards"), Martin Jennings ("Jennings"), Harvey M. Rosenthal ("Rosenthal"), Gary Schpero, Russell Warren ("Warren"), and Harvey Rosen ("Rosen").

Edwards is a member of the EQAT Board, participating in the review of management and administrative service contracts. T4450:13-20 (Edwards Dep. Read-In). She served as an elected Board member since 1997 and is an independent trustee. JSOF ¶ 68. She spends less than 60 days annually working for AXA. T4453:23-25 (Edwards Dep. Read-In). In her deposition, Edwards testified that she did not understand some of the specifics or technicalities of the cost allocation method, including net technical margin, and DAC capitalization. T4472:6-14; T4473:17-4474:3 (Edwards Dep. Read-In). She spoke about the Board's annual meeting to

determine fees and its review of a 14,000 page "board doc." T4456:11-17 (Edwards Dep. Read-In).

Jennings is a 30(b)(6) witness and has been an employee at PricewaterhouseCoopers ("PwC") since 1981. T4508:3-11 (Jennings Dep. Read-In). He currently holds the position of "engagement partner on the AXA funds." T4508:19-20 (Jennings Dep. Read-In). Jennings is a Certified Public Accountant. T4508:19-20 (Jennings Dep. Read-In). His deposition read-in concerned cost allocation methodologies and profitability. T4509:1-8 (Jennings Dep. Read-In).

Rosenthal is an independent trustee of the EQAT Board who meets in-person with the Board four times a year, and over the phone roughly ten times. T4526:5-7; T4527:24-4528:2 (Rosenthal Dep. Read-In). In his deposition, Rosenthal testified that the fees for the EQAT are made up of variable and direct expenses. T4523:16-17 (Rosenthal Dep. Read-In). He also testified that the Board does not review the six *Gartenberg* factors, though the Board overall viewed fees that "others charge for similar services." T4530:15-24; T4557:6-13 (Rosenthal Dep. Read-In). Rosenthal acknowledged that he had never seen an actual sub-administrator agreement until preparing for his deposition. T4536:17-18; T4540:1-2 (Rosenthal Dep. Read-In).

In addition to his testimony at trial, Plaintiffs introduced a portion of Schpero's deposition. In his deposition, Schpero discussed the "day-to-day" management of a portfolio (T4574:20-4575:25), as well as the Board's review of fee allocation methods. T4568-4569 (Schpero Dep. Read-In). Schpero also evaluated the Board's treatment of fallout benefits. T4580:8-4581:14 (Schpero Dep. Read-In).

21

Warren is an employee of JP Morgan Chase ("JP Morgan"). T4599:20-22 (Warren Dep.

Read-In). He testified to the services JP Morgan has performed for AXA since 2010. T4604:20-

4642:21 (Warren Dep. Read-In).

Rosen is the global head of fund accounting at JP Morgan. T4643:4-10 (Rosen Dep.

Read-In). He testified to the services and pricing that JP Morgan provides. T4643:12-651:21

(Rosen Dep. Read-In).

## Credibility Assessments

With respect to the witnesses appearing at trial, the Court heard all of their testimony and

observed their demeanors. Having done so, the Court has made certain credibility

determinations, as well as determinations relating to the appropriate weight to accord their

testimony. In its role as the trier of fact, the Court is the sole judge of the credibility of the

witnesses. Model Jury Charge 1.7. Credibility refers to whether a witness is worthy of belief.

*Id.* In order to assess credibility, the Court applied the following factors:

> (1) The opportunity and ability of the witness to see or hear or know
> the things about which the witness testified;
>
> (2) The quality of the witness's knowledge, understanding, and
> memory;
>
> (3) The witness's appearance, behavior, and manner while testifying;
>
> (4) Whether the witness has an interest in the outcome of the case or
> any motive, bias, or prejudice;
>
> (5) Any relation the witness may have with a party in the case and any
> effect the verdict may have on the witness;
>
> (6) Whether the witness said or wrote anything before trial that was
> different from the witness's testimony in court;
>
> (7) Whether the witness's testimony was consistent or inconsistent
> with other evidence that the Court believes; and

22

(8) Any other factors that bear on whether the witness should be
believed.

*Id.*

Notably, the testimony of the FMG employees, aside from Joenk and Louie, mainly
concerned the services FMG provides and the roles of its employees. However, this testimony
did little to determine whether the Board breached its fiduciary duty. The same is true of the
deposition read-ins. Although the read-ins augmented other information about the Board
members and the Board's process, the testimony by itself was of little assistance in assessing the
merits of the case. As such, the credibility of the other witnesses, particularly Plaintiffs' experts,
had a significant impact on the outcome of the case. Those credibility determinations are
discussed below.

### A.    *Joenk's Credibility*

Joenk testified as a witness for several days and was directly examined by both parties.
His testimony was credible and substantive. However, the Court notes that because of his
position at FMG, his answers may be biased or skewed.

Joenk is a businessman and President and CEO of FMG. T177:13-19 (Joenk). As such,
Joenk is not an independent trustee because he is employed by the investment adviser, FMG.
The Court finds that, based on his employment, he is biased as to the profits of FMG and AXA.
T178:15-16 (Joenk). Even Schpero indicated that he "know[s] that [Joenk] has a goal [for
fees.]" T3872:25-3873:1 (Schpero). However, Schpero said, "that is [Joenk's] goal, not ours."
T3873:1-2 (Schpero). Therefore, Joenk is motivated to obtain higher fees from the Funds on
behalf of FMG, not what is best for investors, and his testimony must be analyzed from that
perspective.

Joenk also serves as Chairman of the Board. T3385:10-15 (Schpero). As such, he is responsible for presenting pertinent materials relating to the Funds to the Board, including presentations regarding the *Gartenberg* factors. Those presentations often included a description of some of the factors, as well as an analysis on the company's compliance with them. T444:3-10 (Joenk). For example, Joenk spoke about P-128, which he defined as "two different sections from the Board materials . . . from the meeting in July of 2013." T443:16-18 (Joenk). Joenk stated that one section is a copy of "the agenda pages, and the other is a presentation that I would review with the Board." T443:20-22 (Joenk). According to Joenk, the purpose of the document was to "lay out what [they were] going to discuss throughout the process; put in some context about the litigation environment, what the *Gartenberg* factors are and things like that, and where those materials would appear." T444:6-10 (Joenk). Sometimes Joenk makes the presentations to the Board, while sometimes Louie does. T444:17 (Joenk).

On a number of occasions during his testimony, Joenk noted he was aware of the *Gartenberg* factors and how they related to FMG's business. First, Joenk stated he was "aware that profitability is one of the *Gartenberg* factors," and that "margin was one of the profitability factors." T602:1-7 (Joenk). Joenk also stated he was aware fallout benefits "are one of the *Gartenberg* factors," and that FMG reports those fallout benefits to the Board. T657:8-12 (Joenk). Joenk explained that these benefits would be laid out for the Board "in the 15(c) memo relating to contract renewal, and a list of potential fallout benefits is included." T657:13-18 (Joenk).

In reviewing Joenk's testimony, the Court finds that Joenk is motivated to ensure that FMG receives higher fees because he serves as the CEO, rather than to protect the interest of investors. This calls into question whether he made accurate statements and presentations to the

24

Board regarding the *Gartenberg* factors. This potential bias requires careful evaluation of the accuracy and quality of the information that Joenk relayed to the Board.

**B.      *Barrett's Credibility***

Although Barrett, based on his experience and education, was proffered as an expert to demonstrate inappropriate accounting methods utilized by FMG, his testimony was often inconsistent with his earlier deposition, and his answers were evasive. The Court gives his testimony little weight. Presented below are examples of his inconsistent statements.

- Barrett was asked whether he would look to "custom and practice as a sort of starting point" to determine how to allocate costs. T1589:24-1599:2 (Barrett). Barrett said, he does not "think he necessarily would," but that he would instead look at the specific circumstances. T1599:3–7 (Barrett). However, during his deposition, Barrett was asked the same question, and he answered "sure." T1599:11-17 (Barrett).

- On cross, Barrett was questioned about the cost of a disaster recovery program. T1616: 21–23 (Barrett). Barrett stated that he "would [say] it's relatively inexpensive . . . in terms of the percentage of overall AXA expenses." T1617:8–10 (Barrett). However, in his deposition, Barrett responded that he "would assume that it's relatively expensive," but the cost would then get spread across "an organization with thousands of employees." T1618:12–15 (Barrett).

- On cross, Barrett was asked if he was aware of the insurance cost for an investment adviser managing mutual funds. T1623:7–11 (Barrett). Barrett replied that he "[knows] it's typically a very small portion of the total expenses." T1623:18–21 (Barrett). At his deposition, he answered the same question by replying "no." T1623:24-1624:4 (Barrett).

- On cross, Barrett was presented with a list (P-210) regarding management and administration of the funds, and asked: "there's nothing on this list that you believe . . . is unrelated to that management or administration of the funds, correct?" T1624:9-12 (Barrett). Barrett equivocated by noting that relatedness "depends on how [one] interprets some of the items [on the list.]" T1624:13-18 (Barrett). At his deposition, Barrett responded "no" to the same question. T1625:11-12 (Barrett).

- Moreover, the Court finds that Barrett's testimony regarding the split of services between FMG and sub-advisers is suspect because he never had any "day-to-day responsibilities" for mutual funds, and he never served on a mutual fund board. T1654:16-22 (Barrett). Moreover, Barrett conceded that his testimony was based on the agreements, but then he added that he "would not characterize himself as an expert in contract interpretation." T1660:1-16 (Barrett).

It is difficult to assess what is true, half-true, or not true from his various inconsistent statements. As such, the Court gives Barrett's testimony little weight.

## C.    *Pomerantz's Credibility*

In assessing the credibility of Pomerantz, the Court gives little weight to his testimony due to inconsistencies, oversimplifications, and his sarcastic demeanor.

Pomerantz was at times unprofessional and sarcastic during testimony before the Court and in his deposition. Regarding FMG's practices for hiring new managers, Pomerantz said in his deposition that, "it seems like they just open up the Sunday business section of the *New York Times* basically and identify well-known managers." T1991:9-17 (Pomerantz). Pomerantz also mocked the services that FMG contributes to the sub-advisers and sub-administrators during his deposition, sarcastically accusing FMG of "not really doing anything" beyond providing sub-

advisers with "some office space and some coffee cups." T1987:8-24 (Pomerantz). In both

instances, Pomerantz later contradicted himself during testimony by claiming that there are

"plenty of other things that they [FMG] do as part of their due diligence" beyond reading the

Sunday Times (T1991:2-6), and he admitted that FMG is "responsible for printing a prospectus,"

a service that he did not mention in his deposition. T1987:23 (Pomerantz). However, his

sarcasm about providing "some coffee cups" and reading the Sunday Times demonstrates a

negative bias, rather than an objective professional opinion.

Another inconsistency involved Pomerantz's description of his own experience.

Pomerantz testified that he has "certainly been involved in compliance." T1813:20-24

(Pomerantz). He continued in detail:

> I mean, if I'm managing assets I have to . . . act in accordance with
> the guidelines of the portfolios; I have to deal with general counsel
> who might approach me about the assets that are being held in
> portfolios.

T1813:24-1814:4. Pomerantz conditioned the above by testifying that he did not know how

defense counsel was "defining compliance." T1814:3-4 (Pomerantz). Confronted by his

deposition in the *Hartford*[9] case, wherein he indicated that he had "no" experience in

compliance, Pomerantz then changed his testimony from "certain involvement" in compliance to

"no" involvement in "compliance work that is pursuant to a legal responsibility." T1814:7-15;

T1815:8-12 (Pomerantz).

Pomerantz also provided conflicting testimony regarding sub-administrator JP Morgan

and AXA's pricing of securities. Pomerantz explained during his testimony that JP Morgan, as

---

[9] Barrett, Pomerantz, and Goldstein all served as Plaintiffs' experts in a separate case in this District, *Kasilag, et al. v. Hartford Investment Financial Services, LLC, et al*, 11-cv-1083 and 14-cv-1611. Moreover, both Plaintiffs' and Defendants' counsel in this case represent the Plaintiffs and Defendants, respectively, in the *Hartford* matter. Therefore, throughout the trial, the parties utilized deposition transcripts and videos from *Hartford* for impeachment purposes.

the sub-administrator, performs "a lot of compliance – responsibilities," but cautioned that "there are other items that fall under the rubric of compliance." T2000:20-2001:1 (Pomerantz). In fact, he would not testify that "all compliance for the fund is done by JP Morgan" without having defense counsel define what "compliance" meant. T2001:4-5 (Pomerantz). Yet when asked during his deposition whether his "understanding is that JP Morgan is providing all of the compliance service," he responded "yes" without any hesitation or a request for clarification. T2002:12-17 (Pomerantz). Similarly, Pomerantz contradicted himself when questioned about AXA's role in pricing securities. He testified that he did not think that any employees at AXA were capable of pricing securities, but during his deposition he acknowledged that AXA knows how to price a security that is "difficult to price." T1995:16-1996:2 (Pomerantz).

Pomerantz earned a Doctorate in Mathematics from the renowned institution of the University of California, Berkeley. Despite same, he made mathematical errors in his calculations related to fees and damages. His calculations of administrative fee damages owed by FMG "exceed the amount of administrative fees" that FMG was even paid. ECF No. 276, PRDFOF, ¶ 499. For example, in his damages calculations, Pomerantz found that Plaintiffs were entitled to $4,851,516 in damages from the Common Stock Index Portfolio based on a 39 percent profit margin – which "excludes sub-advisory fees as an expense." P-151j; T2031:10-11 (Pomerantz). Yet, when calculating the "amount of the admin fee retained" Pomerantz found that FMG was only paid $4.478 million in administrative fees from the Common Stock Index Portfolio. T2032:2-4 (Pomerantz). In other words, Pomerantz calculated negative damages that would result in FMG returning more money than it received. T2034:3-17 (Pomerantz). Pomerantz testified that he "would have to check the calculations that [he] did, it would appear that there's something wrong." T2032:14-23 (Pomerantz). From the Court's perspective, the

28

mathematical error showed a lack of proper prior preparation on a critical point in this case. It undermines his credibility on all issues.

### D. Goldstein's Credibility

Goldstein testified as an expert on mutual fund governance. He lacked credibility on a number of pertinent issues such as sub-advisers, mutual fund performance, and profitability, among others. Some examples are illustrated below.

Most notably, Goldstein half-heartedly prepared his opinion. For example, Goldstein did not thoroughly review documents presented to the Board to analyze if the Board acted conscientiously. Goldstein acknowledged that he "took a very cursory look at them, but . . . didn't review them in any significant detail." T2128:8-12 (Goldstein). More specifically, when questioned about Board minutes, Goldstein admitted he did not examine them carefully. He stated, "I took a quick glance at the board minutes . . . I determined that it was not productive to review board minutes." T2145:1-3 (Goldstein). Not only did Goldstein fail to review pertinent information, he also failed to consider in-depth deposition testimony of the Board members. He perused or "skimmed" the testimony of only three trustees. T2186:5-25 (Goldstein). Goldstein further acknowledged, "I wouldn't say I read everything because, you know, I'm a pretty good skimmer." T2186:20-25 (Goldstein).

In addition to not reading the testimony, Goldstein was also "not aware" of FMG's cost allocation methodology, which was the subject of much testimony in this case. T2202:8-11 (Goldstein). Another issue involved analysis of the investment management agreements and the administration contracts, which Goldstein "did not bother reviewing." T2146:17-18 (Goldstein). Finally, when asked exactly what documents he did review, Goldstein replied, "I don't recall the actual documents, I think there were -- there were reports provided to the board that I looked at."

29

T2167:22-24 (Goldstein). Tellingly, Goldstein admits he did nothing to assess or review the performance of the twelve at-issue Funds. T2197:24-2198:1 (Goldstein).

Although he has approximately twenty years of experience in the mutual fund business, including sitting on various mutual fund boards, he does not have experience with open-end funds, which are the types of fund at issue here. T2099:17-2101:10 (Goldstein). Furthermore, he has limited involvement as a director with mutual funds that employ a sub-advisory structure, which are at issue here. T2115:2-25 (Goldstein). For these reasons, the Court gives Goldstein's testimony very little weight.

### E.   *Kopcke's Credibility*

Kopcke was honest in his conclusions, but his testimony deserves little weight due to his lack of direct experience managing mutual funds and his reliance on broad principles and limited facts, rather than specific methodologies, when reaching his opinions. Kopcke was hired to evaluate the written agreements themselves, as opposed to the everyday responsibilities of FMG. T2381:1-10 (Kopcke). In reaching his conclusions, he relied exclusively on the Management Agreement, the Administration Agreement, and Warren's deposition testimony. T2380-2381 (Kopcke). Kopcke was not familiar with the daily activities of FMG and he did not review any of the deposition testimony of any FMG employee. T2383:16-2384:21 (Kopcke). He further admitted that he did not conduct an actual investigation. T2389:4-12 (Kopcke).

In the Court's opinion, it was difficult to accept Kopcke's opinions when he did not thoroughly review the underlying facts. For example, he opined that "JP Morgan and the sub-advisors do the day-to-day work, and FMG retained a lot of the supervisory and . . . the oversight responsibility. . . " and found FMG to be "well paid." T2383:4-10 (Kopcke). However, he offered no evidence showing that he considered the broader scope of FMG's duties beyond the

contracts, and did not indicate whether FMG's broader responsibilities would affect his "well paid" opinion. T2357:21-23 (Kopcke).

In another instance, Kopcke compared FMG's received fees and the sub-adviser fees, and noted that, "the discrepancy in the ratios for the division of fees is extraordinary." T2357:13-14 (Kopcke). He concluded that, "FMG's received fee, either in dollars or in basis points, either way, is sixteen and a half times its reported direct expenses." T2357:21-23 (Kopcke). Kopcke explained that this means "FMG was extraordinarily well paid for its work." T2357:25-2358:1 (Kopcke). He then compared FMG's fees to other companies "like Xerox, IBM, Microsoft, Apple Computer when they were young . . ." T2361:11-4 (Kopcke). However, these comparisons have little merit because FMG is more appropriately compared to other investment advisers that are in the mutual fund management industry.

Kopcke's economies of scale analysis also fell short. Kopcke did not conduct an independent investigation and relied upon conclusory evidence regarding the amount of savings FMG realized and where economies of scale were actually achieved. T2371-2372 (Kopcke). Kopcke had no formula or methodology to determine whether the fees were exorbitant, and he did not quantify, with a total number, the savings achieved through economies. T2426:21-2427:1 (Kopcke).

Lastly, Kopcke excluded sub-advisory and sub-administrative fees as costs and only listed "direct expenses." T2415-2416 (Kopcke). For example, Kopcke testified, "FMG's received fee of 21.32 [basis points] is quite large compared to the FMG's direct expenses[] that is reported for providing . . . management services to the Equity 500 Index Fund." T2347:23-2348:1 (Kopcke). Because Kopcke analyzed an under-inclusive set of expenses on behalf of

FMG, his testimony on this subject should be given little weight. *See* T2415:18-2416:18 (Kopcke).

The Court finds Kopcke to be credible, but gives his testimony less weight than Defendants' experts because he was not familiar with the everyday facts surrounding FMG's activities, and he failed to utilize reliable methodologies in reaching his conclusions.

## *F.    Schpero's Credibility*

Schpero testified for several days, and the Court finds that Schpero is a credible witness. His testimony was generally consistent, thorough, and accurate.

Plaintiffs attempted to undermine Schpero's credibility by pointing out contradictions in his testimony. Plaintiffs allege Schpero was ambivalent regarding a comparison between fees of small funds with few investors to the fees of much larger funds. ECF No. 285-2, DCRPFOF ¶ 782. Plaintiffs point to Schpero's testimony, where he stated that it was not helpful to simply compare the fees of a fund with large assets to a fund that has much smaller assets: "If you're just going to look at a fund at what its rate is at 68 million versus a fund that's 7 billion alone, I would certainly agree that is not sufficient information to do an analysis." T3796:8-11 (Schpero).

Schpero was reluctant to answer the question of whether the comparison between fees of small and much larger funds is unreasonable because "statistical analysis" is not an area in which he claimed to have any expertise. T3784:15-3786:5 (Schpero). Although he later testified that such a comparison between funds "is not helpful," this does not present a direct contradiction as Plaintiffs suggest. T3796:1-2 (Schpero). His conclusion that the comparison provides an insufficient analysis is a far cry from describing his testimony as "inappropriate, misleading, and

32

irresponsible," (ECF No. 285-2, DCRPFOF, ¶ 318) as Plaintiffs would have it. T3784:15-22

(Schpero).

Plaintiffs also allege Schpero offered conflicting testimony regarding his concerns over

the sub-advisers' ability to pay a judgment if a fund needs to be made whole. ECF No. 276,

DRPFOF ¶ 783; T3578:4-8; T3579:6-24 (Schpero). Schpero said that "in many cases the sub-

advisors do not have the financial viability" to make a fund whole. T3578:4-8 (Schpero). He

further explained:

> . . . So if there's a significant problem and you can have a fund that
> grows significantly in assets, conceptually the sub-advisor may be
> on the hook, but if there's an inability to pay it the Board is going to
> be looking to FMG; and reputationally [sic] it's going to be AXA
> and FMG's name which is going to be everywhere. And I would
> argue the regulators are going to look to FMG, because that's the
> party that has the direct contract relationship, and that's where the
> significant money's going to be.

T3579:16-24 (Schpero). Here, Plaintiffs frame Schpero's testimony as concern over the sub-

advisers' ability to pay a judgment; however, Schpero is only stating that the Board will first

look to AXA and/or FMG for liability. He does not imply the sub-advisers should be more

solvent than they already are, or that the investors are at significant risk. He merely states the

Board's first action would be against FMG and AXA.

Moreover, Plaintiffs assert Schpero's credibility is undermined by his inaccurate answers.

For instance, Plaintiffs assert Schpero "does not believe that FMG delegates day-to-day

investment management services of the funds to the sub-advisors." T3571:15-3572:7 (Schpero);

ECF No. 247, PFOF, ¶ 211. Plaintiffs' witness Goldstein asserted the Board – including Schpero

– "exhibited a fundamental misunderstanding of FMG's role" because "substantially all of

FMG's services are performed by sub-advisor firms." T3572:8-11 (Schpero). As will be

explained in upcoming sections, FMG has far greater duties than those described in the contracts.

33

Schpero also provided credible testimony regarding the Board's composition, training, and decision-making process in analyzing FMG's fees. The Board annually reviews and approves the sub-advisory agreements and approves the fees to be paid by the Funds' sub-advisers. T3572:14-21 (Schpero). Thanks to Schpero's own efforts, he and the Board directly receive "information regarding the amount of the management fee that's retained by FMG after payment of the sub-advisors" using the "Gary[10] Charts."[11] T3753:19-25 (Schpero). Contrary to Plaintiffs' allegations, Schpero was proactive about tracking FMG's and the sub-advisers' respective services and the fees they each retain in return:

> —I early on in joining the board had thought it was important that
> we would receive information very specific to the amount of fee that
> FMG was retaining, and so those charts have evolved over the years,
> but this was generated quite – quite a long time ago.

T3528:9-13 (Schpero). In sum, the Court finds that Schpero's testimony was credible and reliable. Moreover, Schpero was the only Board Member to testify, and provided the most significant information regarding the Board's contract and fee approval process.

### G.   *Plaintiffs' Credibility*

Aside from Sanchez, no other Plaintiffs testified or attended the trial. The Court finds that this lack of attendance demonstrates that Plaintiffs had little interest in the trial or its impact upon them. Conversely, Joenk, the CEO of FMG, attended the trial nearly all twenty-five days of its duration. Louie also attended the trial regularly. In the Court's view, this juxtaposition between the parties' respective attendance demonstrates that Plaintiffs may not have had a significant issue at stake.

---

[10] Schpero's first name is Gary.

[11] This too serves as another example of improvements made to the Board process after the filing of the Complaint.

34

### H.    All Other Witnesses' Credibility

The Court finds the remainder of the witnesses to be credible, including Defendants' experts, James, Wermers, and Holder.

Although Plaintiffs criticized James for not quantifying risk to assess FMG's management duties, James explained that industry practice for evaluating board activities was qualitative rather than quantitative, and that he did not think that the EQAT Board's activities differed from industry standards. T4219:5-4220:9 (James). Plaintiffs further questioned the reliability of the EQ Common Stock Index Portfolio because it was not compared to all non-variable annuity funds. However, James explained that he included all multi-cap core funds and used variable annuity funds in his analysis. T4170:10-4171:5 (James).

The Court finds that Wermers provided thorough descriptions of the individual funds, and that he effectively explained the difference between active, pactive, and index (passive) funds. T4345-4360 (Wermers). Wermers also pointed out flaws in the testimony provided by Plaintiffs' expert Pomerantz. Thanks to Wermers, the Court found that Pomerantz's findings suffered from incorrect dates, untimely benchmarks, and calculation errors. T4361-4380 (Wermers).

Holder was also a reliable and credible witness. After presenting his findings on the eight indicator factors for gross revenue reporting, Holder persuasively argued that sub-advisory and sub-administrative fees should be categorized as expenses rather than reductions in revenue. T3941:20-25; 3942:1-6 (Holder). Although Plaintiffs attempted to undermine Holder's credibility on the issue of whether the authority relied upon was applicable to investment companies, this attempt fell short. T4026:19-4033:22 (Holder). Specifically, Holder indicated that he also reviewed "the investment company's accounting and auditing guide, and . . . the

35

insurance company's accounting and audit guide . . . and [he] did not find guidance for this kind of transaction in those guides." T4033:13-22. Therefore, Holder relied upon other reliable authorities as guidance for whether it is appropriate to treat sub-advisory fees as expenses. Holder also thoroughly explained his analysis of FMG's three-step cost allocation methodology. T3951:20-3957:18 (Holder). The Court finds that Plaintiffs' attempts to impeach Holder for his role in compiling his expert report were unsuccessful. T3970-3987 (Holder).[12]

The Court finds Defendants' experts to be credible, in that they provided direct answers, and relied on comprehensive and reliable materials in reaching their conclusions.

### The EQAT Fund

The EQAT is a Delaware statutory trust, registered as an investment company under the ICA, and its shares are registered with the SEC under the Securities Act of 1933. JSOF ¶ 5. The EQAT is comprised of a number of mutual funds or portfolios. As of May 1, 2010, the EQAT had 65 distinct portfolios, and as of May 1, 2015, EQAT had 86 portfolios. JSOF ¶ 6. Each Fund is a portfolio of EQAT. JSOF ¶ 7.

A mutual fund is a "professionally managed pool of stocks, bonds, or other investments." JSOF ¶ 3. Mutual funds are "very highly regulated." T2627:22-23 (Joenk). In terms of managing a mutual fund, it is a "very common" practice to use sub-advisers in the variable annuity space. T2638:2-4 (Joenk). This delegation of management duties is often referred to as the "manager of managers" structure. T2639:45 (Joenk). The manager of managers structure is a "way to offer different styles of management through an insurance product . . . not only a different asset class offering, but you can hire experts in those asset classes to provide that

---

[12] The Court notes that even if Holder lacked credibility, it is Plaintiffs' burden to demonstrate that Defendants failed to utilize the appropriate accounting methods. Plaintiffs did not meet their burden in demonstrating this point.

service in – those portfolios." T2638:8-12 (Joenk). The structure also offers "different brands through insurance products that may not be available." T2638:12-14 (Joenk).

As of May 2015, investors had placed about $800 billion in sub-advised funds used in variable annuities industry-wide. T2637:16-2638:1 (Joenk). In this case, Plaintiffs' twelve Funds fall into three general categories: four index funds or passive funds, three actively managed funds, and five hybrid ("pactive") funds. ECF No. 285-2, DCRPFOF, ¶ 6.

## A.    *Active Funds*

Three of the twelve funds – EQ/GAMCO Small Company Value Portfolio, EQ/PIMCO Ultra Short Bond Portfolio, and EQ/T.Rowe Price Growth Stock Portfolio – are actively managed funds. ECF No. 285-2, DCRPFOF, ¶ 10. Active funds use benchmarks, "hypothetical [indexes] of securities, whether it's stocks in the case of a stock fund, bonds in the case of a bond fund." T4326:12-14 (Wermers). A benchmark is used to measure a fund's returns. T4326:10-16 (Wermers). Although an actively managed fund may have a benchmark, "it's not attempting to match the returns of the benchmark; instead it's trying to take bets away from the benchmark in an effort to beat the returns of the benchmark." T4326:6-9 (Wermers). The manager of an actively managed fund seeks to outperform a benchmark in the fund's prospectus "by exercising investment discretion about what securities to buy, hold, and sell within the Fund's investment objective." ECF No. 276, PRDFOF, ¶ 28.

## B.    *Index Funds*

Four of the funds – EQ/Common Stock Index Portfolio, EQ/Core Bond Index Portfolio, EQ/Equity 500 Index Portfolio, and EQ/Intermediate Government Bond Index Portfolio – are index funds. T885:25-886:3 (Chan). An index is a "basket of securities that an index provider

basically come[s] up with to represent the specific segment of the market." T974:16-18 (Poutas). Index providers include Standard & Poor's, NSCI, and Russell. T974:19-21 (Poutas).

Unlike actively managed funds, index funds "do not seek to outperform their benchmarks." ECF No. 276, PRDFOF, ¶ 24. Rather, index funds "attempt to match their benchmark as closely as possible, they don't take bets away from it." T4327:2-8 (Wermers). Wermers indicated that if he saw any four of these index funds "consistently outperforming its benchmark either on a net or gross of fee basis," (T4356:5-6 (Wermers)) he would sell the index fund, "because that means the index fund is not trying to track the index, it's trying to take risks away from the index; I would say that it's a poor index fund." T4356:7-10 (Wermers).  All of the index funds in this case "have [a] state[d] investment objective . . . in that they seek to match a benchmark – before expenses." T4328:8-12 (Wermers).  For example, the EQ/Common Stock Index Portfolio "seeks to achieve a total return before expenses that approximates the total performance of – the Russell 3000, including reinvestment of dividends, at a risk level consistent with that of the [Russell] 3000 index." T4327:20-24 (Wermers).

Prior to December 2008, three of the four index funds at issue in this lawsuit (Common Stock Index Portfolio, Core Bond Index Portfolio, and Intermediate Government Bond Index Portfolio) "had been actively managed." ECF No. 276, PPRDFOF, ¶ 26.  However, these Funds were converted by FMG from actively-managed to index funds in late-2008 and early-2009 "as a response to the financial crisis," in which "the Board, working with FMG, approved many changes to the funds." T3543:17-25 (Schpero).

Plaintiffs characterize index funds as "passively managed funds." ECF No. 285-2, DCRPFOF, ¶ 9.  However, FMG provides passively managed index funds with as many services

as actively managed funds. T2747:6-14 (Joenk). Furthermore, sub-advisers have "far less work to do in a passive fund." T2747:15-20 (Joenk).

## C. *Pactive Funds*

There are five pactive funds – the EQ/Global Bond PLUS Portfolio, the Equity Growth PLUS Portfolio, the Global Multi-Sector Equity, the Large Cap Value PLUS Portfolio, and the Mid Cap Value PLUS Portfolio. T975:20-24 (Poutas). Prior to 2007, all of the pactive Funds at issue in this lawsuit were purely actively managed funds. ECF No. 276, PRDFOF, ¶ 30. Pactive funds are a hybrid of active and passive (index) funds.

In response to the financial crisis, FMG converted these funds to a hybrid structure between 2007 and 2009, remaking them with "active portfolio and index managed portfolios." T3543:18-25 (Schpero). An active fund that "would have been in place in 2008 or 2009" might look very different because "FMG . . . might have proposed . . . that the fund be restructured by perhaps – replacing the active manager." T3544:11-16 (Schpero). At the very least, restructuring an actively managed fund involves "entering into new sub-advisory agreements with other parties[,] where typically in hybrid structures it would change, so that 60 or 70 percent of the fund would be passive[ly] managed . . . to match the index." T3544:16-20 (Schpero). That would leave twenty percent of the fund "as an active portfolio," creating a pactive fund's hybrid structure. T3544:20-23 (Schpero).

## The *Gartenberg* Factors

## A. *The Board's Independence and Conscientiousness*

Plaintiffs disputed the impartiality, diversity, care, and conscientiousness of the EQAT's Board of Trustees. This claim relates to the *Gartenberg* factor that requires the Court to consider the independence and conscientiousness of the Board. Plaintiffs primarily raised three issues relating to the Board: (1) Joenk's potential conflict as both CEO of FMG and Chairman of the

39

Board; (2) a lack of diversity of Trustees, in that all are "Wall Street" types; and (3) FMG as the furnisher of information to the Board, and the Board's failure to corroborate this information through third-party, independent consultants. This section first discusses the enumerated, chief concerns about the Board's independence and diversity. It then explains the Board's general processes, including meetings, preparation, and compensation.

The EQAT Board is comprised of "a supermajority of Independent Trustees." ECF No. 276, PRDFOF, ¶ 111. All but one of the Trustees, Joenk, is by statutory definition, independent of FMG and AXA. *Id.* Schpero testified that "there are nine trustees on the Board, there's one insider and that's Mr. Joenk, who is the chairman of the Board." T3385:13-15 (Schpero). Therefore, the Board's composition complies with the ICA's requirement that 60 percent of the Board be unaffiliated with FMG. 15 U.S.C. § 80a-10(a); § 80a-2(a)(19).

Plaintiff's own expert, Goldstein, agreed in his deposition that the independent trustees "are highly qualified and experienced," and that "the trust's board is overwhelmingly independent." T2191:12-2191:16 (Goldstein). The Board has "extensive experience" in accounting, financial services, and investment advisory business. ECF No. 276, PRDFOF, ¶ 113.

### 1. Joenk as Chairman

However, despite FMG's compliance with the letter of the law, the Court inquired about Joenk's role as both CEO of FMG and Chairman of the Board. The Court was particularly concerned because Joenk gives presentations to the Board on the *Gartenberg* factors, and generally controls the information contained in the presentations.

Schpero admitted that it was fair for Plaintiffs and the Court to question why Joenk was the Chairman of the Board when "the relationship between FMG and the Board should be at arm's length." T3664:5-6 (Court). Initially, Schpero indicated that "there's two ways you

address it; you either have a lead independent trustee, which we do, and others have an independent chair. Both of those I think the regulators clearly consider perfectly appropriate and best practice approaches." T3664:11-15 (Schpero). Schpero went on to state, "I don't mean to demean in any way Mr. Joenk, because he plays an important role, but in my mind his role is as . . . FMG. I mean there's a reason for the last two days [of testimony] that I told you that when I talk about the Board, I'm not really talking about Mr. Joenk." T3664:16-20 (Schpero).

Although Schpero noted that Joenk, as chairman, "sits there and runs the meeting[,]" this is because "it's FMG that needs to provide all the information" that the Board must consider in the 15(c) meeting. T3664:24-25 (Schpero). Schpero clarified that, although Joenk provides the information, it is the independent trustees that:

> . . . run this Board. There is nothing that happens at the Board session that's [sic] we don't bless; we without hesitation say we don't want certain people, we want to change things. On night one[,] before day two [of a meeting,] I could call Mr. Joenk and tell him, you know, we're changing half of the next day; the calendar is only run on the basis of what we decide at the end of the . . . day.

T3665:2-8 (Schpero). Schpero added, "[i]t is not a cozy relationship . . . It is an arm's-length relationship, it is a professional relationship." T3662:23-3663:2 (Schpero).

The Court finds that Schpero's credible testimony adequately addresses any potential conflict posed by Joenk serving as both Chairman of the Board and CEO of FMG.

### 2. Diversity of the Board

The Court also inquired about the diversity of the Trustees. Their qualifications and experience are as follows:

Gary Schpero, the Lead Independent Trustee since 2011, is a former partner of Simpson, Thacher & Bartlett LLP (Managing Partner of Investment Management and Investment

41

Company Practice Group) and a current Trustee of three Blackstone funds. ECF No. 276, PRDFOF, ¶ 114; DX-2064.

David Fox, Lead Independent Trustee until September 2011, is a former CEO of the Northern Trust Company, former Chairman of the Chicago Stock Exchange, former Director of Miami Corp, and former Director of USG Corp. *Id.*

Theodossios Athanassiades formerly served as Vice Chairman, President and COO of Metropolitan Life Insurance Company, as well as Director of Atlantic Bank of New York. *Id.*

Thomas Brock is former CEO of Salomon Brothers Asset Management and Former CEO of Stone Harbor Investment Partners. *Id.*

Jettie M. Edwards is a former partner and consultant of the business and marketing consulting firm Syrus Associates and former director of Old Mutual Funds. *Id.*

Donald E. Foley is former Chairman of the Board and CEO of Wilmington Trust Corp. and former Treasurer and Director of Tax of ITT Corp. *Id.*

William M. Kearns is President of W.M. Kearns & Co., Inc., a private investment company, as well as chairman of Keefe Ventures, LLC. He formerly served as Vice Chairman of Keefe Managers, Inc., a money management firm. *Id.*

Christopher P.A. Komisarjevsky is former CEO and president of public relations firm Burson-Marsteller Worldwide and Burson-Marsteller USA, as well as former Senior Counselor for communications consulting firm APCO Worldwide. *Id.*

Harvey Rosenthal is former president and COO of Melville Corp., former CEO of the CVS Division of Melville Corp. and former Director of LoJack Corp. *Id.*

42

H. Thomas McMeekin is former CIO of SunAmerica Financial Group and United Guaranty Financial Group, former senior managing director of AIG Asset Management, and former managing director of Prudential Investment Management, Inc. *Id.*

Kenneth L. Walker is former president of a subsidiary of investment advisory firm T. Rowe Price Associates and former partner of investment advisory firm Capital Management Corp. *Id.*

Caroline L. Williams is former Managing Director of investment bank Donaldson, Lufkin & Jenrette, former CFO and CIO of Nathan Cummings Foundation, former director of Hearst-Argyle Television, former Director of Playcore, Inc., and former Director of Morse Shoe, Inc. *Id.*

The Court questioned Schpero regarding the Board's diversity, indicating that "[the Court] didn't see any . . . person that was a regulator type person; someone that would have overseen the industry and know the requirements that government mandates. Do you have such a person?" T3657:22-25 (Court). Schpero stated that he is that Board member because he "spent 22 years working with the SEC weekly . . . [T]he nature of my practice was working with SEC examiners, working with the person who headed the division of investment management, representing investment managers in this industry." T3658:1-9 (Schpero). The Court finds that Schpero overstates the similarities between government-based regulatory work, and being an attorney who complied with SEC regulations. Nonetheless, the Court finds that Schpero was honest in his answers. Moreover, Schpero stated that the Board also has independent counsel, "who similarly has that kind of [regulatory] experience." T3659:3-4 (Schpero).

The Court also inquired as to the Wall Street leanings of the Board: "all [the Trustees] come from the same kind of perspective. And do you think that adequately represents . . . a fair

43

deal for the investors who live all over the country?" T3659:12-19 (Court). Schpero indicated

that:

> I do think it's a pretty diversified Board. I look at somebody like
> Mr. Komisarjevsky, who's the head of our governance committee;
> he's not a Wall Street person at all. He[] . . . was the head of a large
> public relations firm, but he really has no background in the
> financial world. And in fact, it's interesting that [the Court] raise[s]
> it from that perspective, because I've always thought that Chris was
> in many ways one of the more helpful trustees, because he does look
> at things from a very different perspective.

T3660:9-19 (Schpero). Schpero added, "Ms. Edwards is about as far from a Wall Street person

as you can get. Her background . . . she worked with [a] consulting firm, I don't think any of

them were in New York . . . So I think that's another person who plays kind of a different role."

T3660:23-3661:8 (Schpero). Although Schpero conceded that the Board lacks the perspective of

an activist, like Goldstein, Schpero concluded:

> I can only represent to you what I see, and what I see are eight men
> and women who I have lived with for a long time, and who none of
> them need to do this; this isn't their living, this is something they do
> that they find interesting, that they bring different areas of expertise
> in. And I see tremendous integrity. I see only an interest in looking
> out for the investors. I see only people who are interested in an arm's-
> length relationship; none of these are people who are socializing with
> FMG and AXA . . . [T]his is a very professional relationship, it's
> always been that way. And it's a demanding Board. I mean there
> have been times where we've had difficult relationships with FMG
> because it is so demanding, because we are so demanding. And there
> have been good years and bad years from that perspective. And I
> think that's reflective of the Board and I think it's reflective of me
> quite frankly; I don't need to do this . . . do something where I'm
> basically just trying to get in bed with managers. There's no reason
> I would do that. I have only one interest, and that is having spent
> many years learning this industry and understanding the fiduciary
> duties of the Board, I saw this as a great opportunity to be an
> independent trustee, and to be as good an independent trustee as I
> thought I could be. And I think I've done that.

T3661:16-3662:16 (Schpero).

### 3.    FMG as Furnisher of Information to the Board

Schpero also pushed against the notion that he and the Board placed too much faith in the information provided by FMG, explaining that the Board receives "direct information quite frequently from our counsel." T3718:15 (Schpero).  Schpero personally receives direct mailings and e-mails from the Investment Company Institute and the Independent Directors Council – "two of the periodicals that cover on a daily basis or weekly basis the industry." T3718:10-19 (Schpero).  Schpero also takes part in the Board's general education sessions, heeding the advice of "outside experts who can discuss with the Board developments in the industry, and further review with the Board areas that were of particular interest." T3402:23-25.  Schpero continued:

> . . . usually each winter we would over several Board meetings discuss with our counsel what are the developments in the industry, what are the areas that we think are raising particular issues in the fund complex, where we would benefit from going beyond just listening to the people at FMG, and just listening to our immediate advisors and, you know, and what can we do in terms of getting outside consultants and experts who could come in and discuss it with us.

T3402:20-3403:13 (Schpero).

Schpero noted that:

> [I]t's important that we look to outside consultants where it's our judgment that could be helpful . . . I've worked with Lipper for many years, and as I testified earlier . . . I do believe they are the premiere provider of analysis of fee type information, and that they are extraordinarily independent.  I have seen any number of investment managers try respectfully to convince Lipper to present things differently, and they won't do it.

T3669:20-3670:5 (Schpero).  Moreover, Schpero indicated that the Investment Company Institute is "a major provider of information" (T3670:14) and the Independent Directors Council is "a tremendous service to independent directors and trustees, with constant flows of

information." T3670:18-19 (Schpero). In sum, Schpero testified that the Board supplements the materials it received from FMG, and also confers with counsel on important issues.

### 4.    EQAT Board Meetings

In addition to these chief concerns regarding the Board's independence, there was also substantial testimony and evidence regarding the regular practices and procedures of the Board. Up until 2016, the full Board met five times a year, with two-day meetings for each session; however, the June and July meetings often stretched to three days. T4526:20-4527:6 (Rosenthal Dep. Read-in). Rosenthal explained that the trustees are "physically present at meetings" about 12 to 15 days a year, and hold "several telephonic Board meetings in the course of a year." T4527:8-11; T4527:18-19 (Rosenthal Dep. Read-in). According to Schpero, there has been nearly one-hundred percent trustee attendance at these full meetings. T3437:7-3438:1 (Schpero). He provided one anecdote where one member "came to the meeting notwithstanding a serious illness in his family." T3437:15-17 (Schpero).

However, the Board maintains a policy that "really substantive new type issues" should not be handled at a single meeting, and rather should be dealt with in a special telephone meeting between the trustees. T3435:12-14 (Schpero). Schpero provided an example in his testimony:

> If . . . FMG is going to propose a new fund or they're going to propose merging a fund or liquidating a portion of a fund, the Board's view is that's not something we're prepared to do at a single meeting; we would want notice and discussion.

T3435:8-23 (Schpero). The Board also has a "pre-Board telephonic meeting of the Board" and the Board's counsel about a month before each quarterly Board meeting. T4527:18-23 (Schpero). The trustees participate in a total of about ten telephonic meetings per year, lasting for one and a half to two hours each. T4527:18-4528:4 (Schpero).

46

Compliance is an important aspect of full Board meetings.  The trustees discuss "any compliance issues that came up during the quarter." T3434:16-17 (Schpero).  Schpero discussed the Board's compliance considerations in detail:

> . . . there's always a full report and extensive discussion of all of the issues surrounding valuation and trading of all of the funds; there's always a report at every meeting from FMG's administrative team on accounting and financial developments and budgetary developments; there's a review of all of the different conflict[s] associated with procedures . . . there's reports on code of ethics violations that might have occurred at different sub-advisors.

T3434:19-3435:3 (Schpero).  In preparation for these meetings, the Board consults a "special review list" prepared by FMG, which allows the Board to "identify funds that have particular issues that are considered problematic." T3556:5-7 (Schpero); DX-138.10, Tab 20.  These issues are not limited to the performance of individual funds, but may also extend to personnel changes affecting the funds – "it could be an investment manager where there has been a significant announcement with respect to their operations; where there's been major news about major personnel leaving." T3556:5-11 (Schpero).  In past responses to special review lists, the Board has directed FMG to add funds that "were not on here" and "should be on here." T3556:2-3 (Schpero).

### 5.    Board Committees

The Board is further divided into several committees on which the trustees themselves serve – an audit committee, a governance committee, and two investment committees.  *See* DX-503.  All Independent Trustees are members of the audit committee and the governance committee, and one of the two investment committees. T3436:8-12 (Schpero).

The audit committee, which meets three times a year, is responsible for "supervising the financials of the funds, of the investment companies, and for reviewing the audited financials, as

47

well as the semi-annual report, and maintaining the important relationship with the independent public accountant, [PwC]." T3438:4-9 (Schpero).

The investment committees were designed with the intent to split the Board in half for each Board meeting so that the Trustees could work effectively in smaller groups and meet with more sub-advisers, which is important for approving the Board's sub-advisory contracts and for "approving FMG and its role . . . with respect to managing sub-advisors." T3420:21-3421:2; 3421:12-3422:3; 3422:12-13 (Schpero).

The governance committee, which meets twice a year, is chaired by Komisarjevsky and "handles the nomination and recommendation to the full Board, of all the members of the Board, but in particular the independent trustees." T3440:25; T3440:20-23 (Schpero). The governance committee also governs the Board's self-evaluation process, "continually reviews governance matters in terms of setting up new committees," (T3440:8-16 (Schpero)), reviews the independence of the Board's independent counsel, and reviews the Independent Trustees' and COO's compensation. T3440:8-1 (Schpero); ECF 276, PRDFOF, ¶ 133.

### 6.   Trustee Compensation

Komisarjevsky determines independent trustee compensation by taking data from the Investment Company Institute and Management Practice. T3430:11-25 (Schpero). The Investment Company Institute does a "very extensive annual study of compensation of independent trustees," and Management Practice provides Komisarjevsky with data documentation. T3430:19-21 (Schpero). According to Schpero, Komisarjevsky reviews the data from these sources and generally makes sure that trustee compensation is "somewhere in the 50th to 75th percentile" of trustee compensation in the industry. T3431:1-4 (Schpero). Komisarjevsky then works with Morgan Lewis, the Board's independent counsel, to produce a memorandum outlining trustee responsibilities and other considerations that are compiled in a

48

presentation of recommendations. T3431:4-11 (Schpero). Each independent trustee receives these recommendations prior to governance committee meetings and votes on the recommendations themselves. T3431:7-15 (Schpero).

Schpero justified trustee compensation at the industry's 50th to 75th percentiles by emphasizing the importance of retaining talent on the Board. T3431:1-4 (Schpero). When scouting for new independent trustees, the Board looks at the "same people who typically Fortune 500 companies are looking at [to] serve on the boards." T3432:9-10 (Schpero). For example, the Board recently went through a "major search where one of our top choices" was "lost to another complex." T3432:19-21 (Schpero).

Schpero's compensation from the Board is $325,000, which is three times the amount he earns as a trustee for the Blackstone funds. T3732:20-25 (Schpero); ECF 285-2, DRPFOF, ¶ 779. Plaintiffs argue that Schpero derives "a pecuniary incentive to acquiesce to FMG's point of view" from his annual compensation. *Id.* In addition to scrutinizing the dollar amount that Schpero annually receives, Plaintiffs characterized Schpero's efforts as "part time work" and ignored the totality of Schpero's personal efforts to manage the Trust beyond attending the Board's six full annual meetings. *Id.* Schpero assists with the Board's comprehensive training regimen for Board newcomers. T3406:7-17 (Schpero). Schpero also personally assists with "mini sessions." T3410:11-20 (Schpero). Schpero sets up additional meetings between the new trustees, the Board's counsel, and relevant personnel at FMG in order to answer the newcomers' questions following the Board's formal training session. T3410:7-24 (Schpero). Schpero contributes to this process in order to move the new trustees "further up the curve," which ultimately benefits the Trust and its investors. T3410:20-24 (Schpero). Therefore, Plaintiffs'

claim that Schpero's work is part-time is unfounded, as the credible evidence demonstrates that Schpero performs extensive work for the compensation he receives as Lead Trustee.

### 7.    Trustee Selection & Training

The Board's Governance Committee retained an executive search firm to identify candidates. T3441:19-3442:24 (Schpero). The process of "identifying, vetting and ultimately electing" new trustees to the Board is overseen by Komisarjevsky, and "in each case he has retained an outside firm Higdon [Partners] which is a firm that specializes in the recruitment of independent trustees in particular." T3441:19-3442:13 (Schpero). Schpero described the process as the trustees "hiring their own replacements" because the Board goes through an interview process in which the current trustees identify the final candidates whom they wish to hire. T414:20-23 (Joenk). The Board is required to "do a shareholder vote to elect the new trustees." T415:3-6 (Joenk). Following selection by the governance committee and before officially joining the Board as trustees, new Independent Trustees work for the Board as consultants for a year "so that they just sit through the Board meetings, learn how things operate before they have authority on the Board." T414:24-415:2 (Joenk).

While the addition of new trustees to the Board is infrequent (two pairs have been added in the last four years), the Board has a comprehensive training regimen for newcomers. T3406:7-3407:25 (Schpero). Schpero called it a "full day series of presentations that run from A to Z covering all aspects of the mutual fund world, and obviously the specific EQAT complex." T3406:15-17 (Schpero). The new trustees received "an overview of the industry itself that was produced by Mr. Alexander from K&L Gates." T3407:9-10 (Schpero). Ms. Copenhefer from Morgan Lewis provides "an overview of kind of the nature of the board dynamics." T3407:8-15 (Schpero). Louie provides a presentation on the 15(c) process "in terms of the approval of . . . the investment management contract and related contracts, as well as relevant historical and

50

ongoing litigation," in addition to a presentation on the Trust, various portfolios, "and other key arrangements, including the code of ethics obligations." T3407:15-25 (Schpero). The incoming trustees also meet with FMG's Chief Compliance Officer, Mr. Paolo, for an overview of the "due diligence that FMG engages in, with respect to various sub-advisors," as well as a presentation from FMG on the "relationship between the fund and those who are marketing the fund and the kind of information that's delivered in that process." T3409:6-19 (Schpero).

Trustees are provided with a hard-copy reference manual, which is "to allow each trustee to have at home in hard copy all of the essential documents that are related to the . . . Trust." T3411:11-16 (Schpero). The manual contains general trust documents, samples of the annual questionnaires the Board uses to ensure independence, and "key charters from the major committees." T3412:12-17 (Schpero). The manual also includes, in a second book, the "actual forms of sub-advisory agreements for the other sub-advisers, the memorandum that is delivered periodically from K&L Gates about the trustees' fiduciary responsibilities . . . the distribution agreements," and "all of the procedures that are SEC mandated under the Investment Company Act." T3412:18-3413:3 (Schpero).

The Board also enables new trustees, who "naturally have additional questions" after attending a few meetings, to engage the Board's counsel and "relevant personnel at FMG" in "mini sessions." T3410:21-23 (Schpero). As noted earlier, Schpero intends these meetings to bring the new trustees "further up the curve." T3410:9-24 (Schpero).

### 8.     The Board's External Education & Self-Evaluation

For its external education program for the trustees, the Board uses general education sessions to "bring in outside experts who can discuss with the Board developments in the industry and further review with the Board areas that were of particular interest." T3402:20-25

51

(Schpero). These sessions are a chance for the Board to receive and consider input from sources in the industry other than FMG. T3403:1-13 (Schpero).

Schpero cited a presentation delivered by Mr. Donahue, then head of the SEC's division of Investment Management, who was "responsible for the regulatory regime for investment companies." T3403:20-21 (Schpero). Hosting a speaker like Donahue was a big deal for the Board because "some boards . . . have been reluctant to have the SEC come in." T3403:22-23 (Schpero). The Board had an "open, frank discussion" with Donahue regarding the "SEC's expectations of what boards do" and the Board's particular responsibilities. T3403:25-3404:2 (Schpero).

The general education sessions are part of the Board's overarching process of information gathering and self-evaluation. T3419:8-3420:1 (Schpero). The Board's yearly self-evaluation is done on a formal basis mandated by the SEC, but the Board further uses the process to "do a full overview of all aspects of the governance process to ensure that there aren't things that require . . . . either evaluation or change." T3419:15-25 (Schpero). According to Schpero, the overview includes a close look at the way the Board runs the governance process, the relationship between the Board and FMG, the relationships among the trustees, the relationship with the Board's counsel, the Board's committee structure, the number of funds that the Board governs, and the type of information received by the Board. T3419:15-3420:1 (Schpero).

### 9.    Board's Relationship with Counsel and the 15(c) Process

K&L Gates, as counsel to EQAT, handles "day-to-day matters" of the Funds. T3425:2 (Schpero). K&L Gates "interact[s] daily with FMG" and are "heavily involved in drafting the [Fund's] registration statement and [for updating] . . . the document." T3425:5-7 (Schpero). Moreover, K&L Gates carries the "[heavy] load alongside of FMG's in-house counsel"

52

regarding compliance issues. T3425:6-9 (Schpero). According to Schpero, K&L Gates is representing the Trust while "also having a relationship with FMG, and [he believes] with AXA." T3425:18-22 (Schpero).

To guard against the potential "inherent conflicts" that these relationships may create, the Board retains Ms. Copenhefer of Morgan Lewis as its own independent counsel. T3425:14-25 (Schpero). In choosing Copenhefer for the role, Schpero selected about twelve or fifteen lawyers at major firms with representations in the industry, narrowed the pool down to about four or five, and conducted "many conflict checks and other issues to make sure . . . not only the experience was there, but there wouldn't be conflict issues." T3415:9-11 (Schpero). Using Schpero's recommendation, the Board chose Copenhefer out of the final field of four. T3414:17-3416:18 (Schpero). In its role as the Board's independent counsel, Morgan Lewis (through Copenhefer) attends every Board meeting, participates in all of the Board's executive sessions, engages in the 15(c) process, and reviews investment management and administrative contracts. T3417:8-21 (Schpero).

The independent trustees, in a year-round process, "evaluate and approve [the Trust's] management and administrative fees." T3445:12-17 (Schpero). Their contract review meeting is in July, and then the 15(c) process begins as early as August each year, when Schpero does an "annual call with each of the trustees . . . separate from each of them . . . to give them an opportunity to discuss lots of aspects of the funds." T3445:19-23 (Schpero). During its September meeting, the Board holds "an executive session" where it begins "the discussion of the next year's review" and brings Joenk into the discussion. T3446:13-15 (Schpero). Soon after the Board's September meeting, Joenk "brings in one or two of his colleagues to again have a discussion of what's just taken place in June and July, and talk about what changes and

improvements [the Board] might make in the year going forward looking to the next July."

T3445:12-3446:10 (Schpero). During the following spring, the Board authorizes Morgan Lewis

to prepare a 15(c) memo for FMG, which "schedules all of the documentation that we are going

to require for . . . that July's contract approval process." T3446:23-3447:3 (Schpero). The

Board reviews that memo and then, at the March meeting, identifies the funds that it thinks "have

one or more issues associated with [them], whether it's performance or compliance or specific

fee issues, or [their] assets have grown significantly," and then begins identifying those issues.

T3447:7-17 (Schpero). The Independent Trustees make final considerations and vote on the

Trust's contractual arrangements in July – a year after initiating the contract approval process.

T3446:18-3447:25 (Schpero).

Schpero testified that the Board is "extremely focused on the ultimate goal here, which is

to make sure the fee is fair and reasonable, and in the exercise of our business judgment . . . is

going to be satisfactory to the investor." T3574:23-3575:1 (Schpero). However, it is not the

Board's goal to ensure a fee that is also fair and reasonable to FMG. T3715:22-23 (Schpero).

### 10.    Goldstein on the Board

Goldstein also testified on this topic. However, Goldstein did not review the Board

materials thoroughly. Goldstein indicated that he "took a very cursory look at them, but [he]

didn't . . . review them in any significant detail." T2190:11-12 (Goldstein). Goldstein indicated

that he "took a quick glance at the Board minutes" but ultimately "determined that it was not

productive to review Board minutes." T2145:1-3 (Goldstein). Moreover, Goldstein testified that

he only reviewed three out of the eleven trustee depositions. T2190:9-11 (Goldstein). In fact,

Goldstein stated that "I've read the – let me see; get the names. The – Schpero, I – I couldn't say

I read everything because, you know, I – I'm a pretty good skimmer; Jettie Edwards, Rosenthal,

those are the primary ones. A part of Joenk – is that how you pronounce the name?" T2186:20-

54

25 (Goldstein).  For the reasons already stated in the "Credibility" portion of the Opinion, *supra* at p. 22, the Court gives Goldstein's testimony very little weight.

### 11.    Conclusion on the Independence and Conscientiousness of the Board

The Court finds that the Board's makeup is sufficiently diverse and independent, and the procedures it followed demonstrates that the Board robustly reviewed FMG's compensation. Although the Board is comprised mainly of individuals with backgrounds in financial services, and Joenk chairs the Board, the Board is "independent" of FMG and takes care to provide quality services to shareholders of the EQAT.  Defendants adequately addressed Joenk's role as Chairman of the Board, and dispelled any indication that he undermines the Board's obligation to act independently.[13]  Schpero's testimony was very credible on the issue of Joenk's role as Chairman, and the Board's independent efforts to ensure that they are receiving the most comprehensive and accurate materials.  Although Plaintiffs contend that these materials were inaccurate, they do not dispute that the Board received materials generally, either from Joenk or external entities.  Moreover, Plaintiffs' challenges to the Board materials were unsubstantiated at trial.  Thus, the Court finds that the Board was impartial, diverse, and independent based on the testimony of Schpero.  Hence, FMG complied with the letter of the law to ensure the Board was not affiliated with FMG.  The Board was also careful and conscientious in performing its duties, as outlined *supra*.  Therefore, the Plaintiffs failed to meet their burden in proving that the Board lacked independence, and was not careful and conscientious in executing its duties to the EQAT Fund.

---

[13] The fact that Joenk, an insider of FMG, acts as Chair presents a transparency issue; but when reviewing the fact, the Board acts professional and independently to counteract this issue.

**B.**   *The Nature and Quality of the Service Provided by FMG*

Because EQAT is not an operating company and has no employees in the traditional

sense, it relies on third-party service providers to invest fund assets and carry out many other

activities required to operate a mutual fund.  T4276:24-4277:18 (Louie); DX-142.2 at Bates

4113.  In this case, EQAT entered into several service contracts with FMG or its affiliates, two of

which are the subject of this litigation: (1) Investment Management Agreements between EQAT

and FMG (the "Management Agreements") (*e.g.* J-3 and J-4); and (2) the Mutual Funds Service

Agreement between EQAT and FMG (the "Administrative Agreement") (*e.g.* P405).  The Board

of Trustees approved these contracts as part of the 15(c) meeting each July.

Both the Management and Administrative Agreements contemplate FMG's retention of

sub-advisers and sub-administrators to assist in performing the relevant services under each

agreement. J-4 at Bates 4028-29; P-405 at Bates 9852.  The thrust of Plaintiffs' allegations is that

FMG delegated all of its duties to these sub-advisers and sub-administrators, yet retained an

exorbitant fee.

Plaintiffs contend that the plain language of the agreements controls.  Specifically,

Plaintiffs assert that when comparing the Investment Management Agreement to the Sub-

Advisory Agreement, and the Administrative Agreement to the Sub-Administrative Agreement,

the language is identical, which demonstrates that FMG delegated all of its duties to the subs.

Defendants counter that, while the agreements are accurate in outlining the duties of FMG and its

sub-advisers and sub-administrators, FMG performs a host of other services to the Funds beyond

those expressly enumerated in the contracts.  Defendants assert that to rely solely on the wording

of the contracts "elevates form over substance" and overlooks crucial evidence demonstrating

that FMG retained a substantial amount of work for the Funds.  ECF No. 285, DCRPFOF, ¶ 349.

In this section, the Court first outlines and analyzes the contract language of the agreements at issue. Thereafter, the services provided by FMG and AXA in carrying out their contractual duties are explained.

### 1.   The Investment Management Agreements

Prior to May 1, 2011, AXA had two Investment Management Agreements with EQAT relating to the Funds. JSOF ¶ 19. One of the AXA Investment Management Agreements applied to three of the Funds[14] and the other AXA Investment Management Agreement applied to the remaining nine Funds.[15] JSOF ¶ 19.

Since May 1, 2011, FMG has had two Investment Management Agreements (as amended) with EQAT pertaining to the Funds at issue ("Investment Management Agreements"). JSOF ¶ 18. One such Investment Management Agreement applies to three of the Funds[16] and the other Investment Management Agreement applies to the other nine funds.[17] JSOF ¶ 18.

The Investment Management Agreement gives FMG "overall supervisory responsibility." J-4, 2(B). As such, FMG will have "full discretion to select new or additional [sub-]Advisers for each portfolio." J-4, 2(B)(ii). FMG has "full discretion to terminate and replace any [sub-]adviser." J-4,2(B)(iv). FMG has "full investment discretion to make all determinations with respect to the investment of a Portfolio's assets . . ." J-4, B(v).

---

[14] EQ/GAMCO Small Company Value, EQ/PIMCO Ultra Short Bond, and EQ/T.Rowe Price Growth Stock Portfolios.
[15] EQ/Common Stock Index, EQ/Core Bond Index, EQ/Equity 500 Index, EQ/Equity Growth PLUS, EQ/Global Bond PLUS, EQ/Global Multi-Sector Equity, EQ/Intermediate Government Bond Index, EQ/Large Cap Value PLUS and EQ/Mid Cap Value PLUS Portfolios.
[16] EQ/GAMCO Small Company Value, EQ/PIMCO Ultra Short Bond, and EQ/T.Rowe Price Growth Stock Portfolios.
[17] EQ/Common Stock Index, EQ/Core Bond Index, EQ/Equity 500 Index, EQ/Equity Growth PLUS, EQ/Global Bond PLUS, EQ/Global Multi-Sector Equity, EQ/Intermediate Government Bond Index, EQ/Large Cap Value PLUS and EQ/Mid Cap Value PLUS Portfolios.

In connection with these responsibilities, FMG "will assess each Portfolio's investment focus and will seek to implement decisions with respect to the allocation and reallocation of each Portfolio's assets among one or more current or additional advisers . . . as [FMG] deems appropriate." J-4, 2(B).  FMG must "monitor compliance of each [sub-]Adviser with the investment objectives, policies and restriction of any Portfolio . . ." *Id.*  FMG will "furnish, or cause the appropriate [sub-]Adviser(s) to furnish . . . such statistical information, with respect to the investments that a Portfolio . . . may hold or contemplate purchasing . . ." *Id.*  FMG will "apprise, or cause the appropriate [sub-]Adviser(s) to apprise . . . important developments materially affecting each Portfolio . . . " *Id.*  Furthermore, FMG will "furnish . . .to the Trustees of the Trust such periodic and special reports as the Trustees of the Treat may reasonably request." *Id.*  FMG "agrees to cause the appropriate [sub-]Adviser to furnish to third-party data reporting services all currently available standardized performance information and other customary data." *Id.*

The Agreement also provides that FMG will furnish to the Trust office space and personal necessary for the performance of clerical and other office functions.  J-4, 2(C)(i)-(ii).  FMG will "provide other information and services . . .required in connection with the preparation of all registration statements and [p]rospectuses, prospectus supplements, SAIs, all annual, semi-annual, and periodic reports to shareholders of the Trust, regulatory authorities, or others . . ."J-4, 2(C)(iii).

### 2.      Sub-Advisory Agreements

For all years at issue in this action, Defendants contracted with third parties called sub-advisers.  JSOF ¶ 21.  For ease of comparison, the May 2011 sub-advisory Agreement between FMG and BlackRock Investment Management LLC (J-16) will act as a stand-in for all of the

sub-advisory agreements to compare with the main Investment Management Agreement between FMG and the EQAT.

In examining the contract language of the sub-advisory agreement, the majority of FMG's duties are delegated to the sub-advisers. For instance, the sub-advisers assume FMG's duty to "formulate and implement a continuous investment program for the Portfolio." J-16, 3(B)(ii). Moreover, the sub-adviser must "take whatever steps are necessary to implement the investment program . . . by arranging for the purchase and sale of securities and other investments." J-16, 3(B)(iii). The sub-advisers must also provide statistical information regarding the portfolio's performance. J-16, 3(B)(i).

FMG delegates its duty to apprise the Trust of important developments affecting each portfolio and "furnish to third-party data reporting services all currently available standardized performance information and other customary data." J-16, 3(B)(iv). The sub-adviser must also file all required forms with the SEC. J-16, 3(I).

Another of FMG's duties delegated to the sub-advisers involves calculating "the net asset value per share of each Portfolio, including the cost of any equipment or services to obtain price quotations." J-16, 3(B)(v).

### 3.    Comparing the Investment Management and Sub-Advisory Agreements

The Investment Management and sub-advisory contracts speak broadly in terms of the services contemplated within the agreements. As such, based solely on the wording of the Agreements, Plaintiffs' assertion that the agreements are the same, on their faces, is essentially correct. The only non-managerial duties retained by FMG, and not delegated to sub-advisers, relate to filing the EQAT's taxes, providing the Trust with office space and office personnel, and giving the Trust various reports. See J-4, 2(A), 2(C)(i)-(iii) and J-4, 3.

59

However, the Investment Management Agreement gives FMG "overall supervisory responsibility," and sole discretion over the sub-advisers. J-4, 2(B). Accordingly, FMG must "monitor compliance of each Adviser with the investment objectives, policies and restrictions of any Portfolio or Portfolios" and then report to the Board on the performance of each sub-adviser. J-4, 2(A).

For instance, FMG performs the managerial task of assessing each portfolio's investment focus and allocating portfolio assets among the sub-advisers. J-4, 2(B)(5). The sub-advisers are then tasked with forming and carrying out those investment programs, as well as arranging for the purchase and sale of securities and negotiating with brokers and dealers. J-16, 3(B)(ii); 3(B)(iii)); 3(F). However, the sub-advisers must then provide statistical information regarding the Portfolio's performance to FMG. J-16, 3(B)(i)).

Moreover, FMG must prepare "registration statements, [p]rospectuses, prospectus supplements, SAIs, all annual, semi-annual and periodic reports[,]" which are sent to shareholders and filed with regulatory authorities. J-4, 2(C)(iii). The sub-advisers develop the performance information to create those documents, and further file the required forms with the SEC. J-16, 3(B)(vi); 3(I).

Therefore, while the language of the agreements may suggest that the sub-advisers perform a majority of the investment management services on behalf of FMG, FMG must continuously coordinate with the sub-advisers, and is responsible for overall supervision.

### 4.    Administrative Agreement

From May 1, 2000 to May 1, 2011, AXA had a Mutual Funds Service Agreement with EQAT relating to the Funds (the "Administrative Agreement"). JSOF ¶ 36. The Administrative

Agreement between the EQAT and FMG outlines administrative duties to be performed by FMG in relation to the Trust's Funds.  P-405.

On and after May 1, 2011, FMG had a Mutual Funds Service Agreement ("FMG Administrative Agreement") with EQAT relating to the Funds.  The FMG Administrative Agreement was amended and restated as of April 1, 2015.  JSOF ¶ 35.

The Administrative Agreement holds FMG responsible for the oversight of the Trust's administrative operations.  P-405, 4(a).  FMG must provide the Trust with facilities, equipment, and personnel required with respect to the services under the Agreement.  P-405, 4(b)(i)(iii)(iv).  FMG must also provide individuals to serve as officers of the Trust.  P-405, 4(b)(ii).

The remaining obligations under the Administrative Agreement may be broken into three main categories: administration (Schedule B), compliance (Schedule B), and accounting (Schedule C).

### *Administration*

Generally, FMG must coordinate and manage the work relationships among all service providers to the Trust.  P-405, Schedule B(I)(A).  FMG must also manage and monitor the performance of the vendors who provide services for the Trust.  P-405, Schedule B(I)(A)(B). FMG must propose and carry out policies in the area of operational problem-inquiry and resolution, such as compliance violations, valuation of complex securities or those trading in problematic markets, and Trust share valuation errors.  P-405, Schedule B(I)(C).  FMG is further required to arrange for and monitor the payment of the Trust's and each Portfolio's expenses.  P-405, Schedule B(V)(D).

### *Compliance*

FMG must monitor each Portfolio's compliance with investment restrictions listed in the prospectus and SAI, the requirements of the Internal Revenue Code, and other applicable Treasury Regulations or Board Directives.  P-405, Schedule B(III)(A)(B)(C).  Further, FMG must "prepare, distribute, and utilize in compliance training sessions, comprehensive compliance materials, including compliance manuals and checklists . . . and develop or assist in developing guidelines and procedures to improve overall compliance . . ."  P-405, Schedule B(III)(F).  FMG must also prepare, review and file amendments to the Trust's registration statement and supplements as needed.  P-405, Schedule B(IV)(A).

FMG must provide consultation on regulatory matters relating to portfolio management, Trust operations, and any potential changes in each portfolio's investment policies, operations or structure.  P-405, Schedule B(IV)(L).  FMG must provide support for regulatory examinations or investigations, and work closely with the Trust's legal counsel in response to non-routine regulatory matters.  P-405, Schedule B(IV)(I).  Moreover, FMG shall maintain awareness of regulatory and legislative developments which may affect each Portfolio, and update the Board accordingly.  P-405, Schedule B(IV)(M).  FMG has the responsibility for preparing and updating charter documents, by-laws, and foreign qualification filings.  P-405, Schedule B(IV).

FMG is also required to maintain a corporate calendar and provide assistance with planning both Board and shareholder meetings.  P-405, Schedule B(IV)(J)-(K).  FMG must prepare and file proxy materials, as well as prepare agendas and distribute all materials needed for the meetings.  P-405, Schedule B(IV)(B)(C).  Additionally, FMG must prepare minutes, make reports and recommendations regarding the performance of the investment advisers and other service providers, and follow up on matters raised during Board meetings.  P-405,

Schedule B(IV)(D)(E).  FMG is required to "review and monitor the fidelity bond and errors and omissions insurance coverage and the submission of any related regulatory filings."  P-405, Schedule B(IV)(G).

FMG is responsible for financial and tax reporting.  P-405, Schedule B(II).  FMG must prepare financial information for the Trust's reports, proxy statements and other communications sent to shareholders, and arrange for the printing and mailing of such reports.  P-405, Schedule B(II)(I).

### *Accounting*

Under Schedule C, FMG is responsible for "maintenance of the books and records for the Trust's assets, including records of all securities transactions."  P-405, Schedule C(I).  FMG is also required to transmit each Portfolio's or class' net asset value to NASDAQ and other entities in accordance with the Trust's prospectus.  P-405, Schedule C(I)(B).  FMG accounts for dividends and interest received, coordinates with the Trust's auditors, and consults with the Trust's officers, and independent public accounts.  P-405, Schedule C(I)(C)(D)(E).

### 5.    Sub-Administrative Agreements

Like the Investment Management Agreement, the Administrative Agreement contemplated a Sub-Administration Agreement.  P-405, 4(c).  There were two such contracts, one signed with Chase Global Funds Services Company ("Chase") in 2000 and the other signed in 2011 with JPMorgan Chase Bank N.A. ("JP Morgan").  J-26 and J-27.  Each Agreement is substantially similar in terms of services provided.  For ease of comparison, the latter contract (J-27) will be used to compare with the main Administrative Agreement between FMG and the EQAT.

Like the main Administrative Agreement, the obligations under the Sub-Administration Agreements are broken into the same three categories.

### *Administration*

Generally, the Sub-Administration Agreement provides that, "subject to the control, direction, and supervision of FMG . . . J.P. Morgan will provide" sub-administration, compliance, and trust accounting. J-27, 4(a). Although FMG retains some general administration duties for itself, it also delegates duties to the sub-administrator. FMG delegates to the sub-administrator its duty to "prepare Trust, Funds or class expense projections, establish accruals . . . including expenses based on a percentage of average daily net assets . . . and expenses based on actual charges annualized and accrued daily." J-27, Schedule B(IV)(A). For any new Portfolios and classes, FMG requires the sub-administrator to obtain Employer or Taxpayer Identification Numbers, estimate organizational costs, and monitor against actual disbursements. J-27, Schedule B(IV)(B). Moreover, FMG delegates the duty to coordinate all communications and data collection with regard to any regulatory examinations and yearly audits by independent accountants. J-27, Schedule B(IV)(C).

### *Compliance*

The sub-administrator is given the duty to "assist with monitoring and periodically testing each Fund's compliance with investment restrictions . . . listed in the current prospectuses and Statement(s) of Additional Information, although the primary responsibility for such compliance shall remain with the Trust's investment advisers or FMG LLC." J-27, Schedule B(II)(A). The sub-administrator "assists with monitoring and periodically testing" certain Treasury regulations. J-27, Schedule B(II)(B)(C). Moreover, the sub-adviser is responsible for mailing quarterly

requests for "Securities Transaction Reports" to the Trustees and other "access persons" under SEC regulations. J-27, Schedule B(II)(E).

The sub-administrator must also provide support regarding collection of quarterly materials for Board meetings and routine regulatory examinations or investigations of the Trust. J-27, Schedule B(III)(A)(B). JP Morgan must also prepare Rule 24f-2 Notices and file same with the SEC, and prepare and distribute updates to the Trust's compliance manual. J-27, Schedule B(III)(C)(D).

### *Accounting*

The sub-administrator is responsible for: (1) maintenance of the books and records for the Trust's assets, including records of all securities transactions (J-27, Schedule C(I)(A)); (2) calculation of each Fund's net asset value in accordance with the Trust's Prospectus (J-27, Schedule C(I)(B)); (3) accounting for dividends and interest received and distributions made by the Trust (J-27, Schedule C(I)(C)); and (4) coordinating with the Trust's independent auditors with respect to the annual audit (J-27, Schedule C(I)(D)).

### 6.    Comparing the Administrative and Sub-Administrative Agreements

The Administration Agreements are much more explicit in terms of services to be performed than the Investment Management Agreement. As such, it is easier to determine, when examining the language of the agreements, that FMG retains significant administrative duties.

As an initial matter, like the Investment Management and Sub-Advisory agreements, FMG retains supervision over the sub-administrator. The sub-administrator only assists with monitoring for compliance with the various investment restrictions listed in the prospectus, the Internal Revenue Code and other applicable Treasury Regulations or Board Directives. P-405, Schedule B(III)(A)-(D); J-27, Schedule B(A)-(D). Further, while the sub-administrator prepares

and distributes updates to the Trust's compliance manual, FMG must "prepare, distribute, and utilize in compliance training sessions, comprehensive compliance materials, including compliance manuals and checklists . . . and develop or assist in developing guidelines and procedures to improve overall compliance . . . " P-405, Schedule B(III)(F); J-27, Schedule B(III). FMG retains primary responsibility for such compliance issues.

Moreover, FMG retains the duty to propose and enact policies, particularly in the area of operational problem inquiry and resolution, which includes compliance violations, valuation of complex securities or those trading in problematic markets, and Trust share valuation errors. P-405, Schedule B(I)(A)-(C).

FMG, not the sub-administrator, performs the duty to update the Board on regulatory and legislative developments, which may affect each Portfolio. P-405, Schedule B(IV)(M). Additionally, the responsibility for preparing and updating charter documents, by-laws, and foreign qualification filings remains with FMG. P-405, Schedule B(IV)(H).

FMG also retains many duties pertaining to Board materials. For example, FMG must maintain a corporate calendar and assist with planning both Board and shareholder meetings. P-405, Schedule B(IV)(J)-(K). FMG prepares and files proxy materials, prepares agendas, collects information, and prepares and distributes all materials needed for the meetings. P-405, Schedule B(IV)). Further, FMG must prepare minutes, make reports and recommendations regarding the performance of the investment advisers and other service providers, and follow up on matters raised during Board meetings. P-405, Schedule B(IV). The sub-administrators merely assist with the collection of quarterly materials for Board meetings. J-27, Schedule B(III). All other duties related to the Board meetings remain with FMG.

FMG retains a number of tax and accounting duties for itself. FMG prepares financial information for the Trust's semi-annual and annual reports, provides proxy statement and other communications required or sent to shareholders, and arranges for the printing and mailing of such reports and communications. P-405, Schedule B(II)(I). Additionally, although the sub-administrator must calculate each Fund's net asset value, FMG is required to transmit each Portfolio's or class's net asset value ("NAV") to NASDAQ and other entities in accordance with the Trust's prospectus. P-405, Schedule C(I); J-27, Schedule C(I). Finally, FMG retains the duty to consult with the Trust's independent auditors regarding the annual audit. P-405, Schedule C(I)(E).

### 7.    Conclusion Regarding the Contract Language

Plaintiffs' assertion that essentially all investment management duties are delegated to sub-advisers is correct, when examining only the contract language. However, in reviewing the administrative contracts, it is clear that FMG retains many of these obligations. Moreover, the trial testimony demonstrated that both FMG and AXA perform a number of services beyond those expressly outlined in the agreements. Therefore, the Court is unpersuaded by Plaintiffs' insistence that the contract language itself controls. In disputing the services that FMG and AXA perform, Plaintiffs simply point to contract provisions from the various agreements. However, to adopt Plaintiffs' position would ignore voluminous testimony of credible witnesses, which explained the duties that FMG undertakes related to the Funds. Therefore, to the extent Plaintiffs dispute FMG's services based on contractual language, the Court finds that the analysis must consider all duties, whether enumerated in a contract or undertaken in a manner to carry out the contractual duties.[18]

---

[18] There is one other, unrelated contract, the Shared Services Agreement, which is discussed in the "Profitability" section, *infra* at p.99. It is an intercompany agreement between FMG and AXA for services provided by AXA in

### 8.     Fees Under the Agreements

The fee schedules for all the above agreements are listed in the parties' Joint Statement of Facts, and are provided in the Appendix to this Opinion. *See* Appendix; JSOF ¶¶ 20, 37, 41, 54. However, these fee schedules do not provide a dollar amount paid to FMG for its investment management and administrative services. Instead, the fee schedules list percentages to be paid based on the assets under management in a given portfolio. Moreover, Plaintiffs failed to admit into evidence a comprehensive breakdown of the fees that FMG retained compared to those paid to the sub-advisers and sub-administrators. At trial, Plaintiffs offered the testimony of Pomerantz on this issue. Pomerantz prepared P-151a, which purports to compare the investment management fees retained by FMG with those paid to the sub-advisers on a fund-by-fund basis for 2012. Pomerantz also prepared P-151e, which provides the same comparison for the administrative fees retained by FMG with those paid to the sub-administrators in 2012. Plaintiffs did not admit additional exhibits for any other year besides 2012.

In their post-trial findings of fact, Plaintiffs submitted a number of tables (*e.g.* Tables 1, 2, 3, 10 and 12), purporting to compare the fees retained by FMG to those paid to sub-advisers and sub-administrators. These tables, however, differ from P-151a and P-151e. For example, Chart 2 in the Post-trial Findings of Fact (ECF No. 285-2, DCRPFOF, ¶ 37) supposedly contains "FMG's Retained Investment Management Fees, Sub-Advisory Fees, and the Fee Ratio," allegedly the same information as P-151a. However, pursuant to Table 2, in 2012 for the EQ/Common Stock Index, FMG retained $8,082,177 and the sub-adviser was paid $2,390,873. Conversely, in P-151a, for the same Fund in the same year, FMG was paid $14,261,272.31 and the sub-adviser was paid $2,390,872.60. P-151a notes that the difference between

---

supporting FMG for the benefit of the Funds. It is not provided to the Board for approval as part of the 15(c) process, nor does it require the Board's approval as the Investment Management and Administrative agreements do.

$14,261,272.31 and $2,390,772.60 is $11,870,399.71. Even if the Court were to accept that the "difference," i.e. the approximately $11.8 million, is the fee retained to FMG, this amount differs from the approximately $8 million figure contained in Table 2. The only number that remains the same is the amount paid to the sub-adviser, which was stipulated between the parties in in the Joint Statement of Facts. JSOF ¶ 42. This is just one[19] example of the inconsistencies between Plaintiffs' post-trial calculations and those that were admitted at trial. It is also important to note that both P-151a and Table 2 claim to use P-52b as the source document in reaching these calculations. *See* T1845:2-4 (Pomerantz). Despite using the same source for the calculations in Table 2 and P-151a, Pomerantz reached different results.

Moreover, Pomerantz failed to provide calculations for the amount of fees retained by FMG for all of the other years in question—2010, 2011, 2013, and 2014. Therefore, the Court cannot even cross-reference these new, post-trial calculations against any information admitted into evidence. Most importantly, no witnesses testified as to these post-trial submissions, and Defendants were deprived of the opportunity to cross-examine any witness on the accuracy of same.[20]

Defendants admitted the "Gary Charts" (DX-144.18), which set forth a breakdown of the fees retained by FMG on a fund-by-fund basis.[21] However, these charts are difficult to follow without a foundational understanding of the Funds and working knowledge of the financial industry. Therefore, although the Court was deprived of a clear and reliable breakdown of the

---

[19] In fact, for all twelve at-issue funds for 2012, the numbers contained in Chart 2 differ from P-151a as to the amounts purportedly retained by FMG. Put another way, the fees supposedly retained by FMG for each fund in 2012 differ depending upon which of Plaintiffs' calculations—P-151a or Table 2—is accepted.

[20] To Plaintiffs' credit, P-151e and Chart 3 align in terms of the amount of administrative fees retained by FMG and those fees paid to the sub-advisers. However, Plaintiffs only offered one year of calculations into evidence—2012. Therefore, Defendants were similarly deprived of the right to cross-examine witnesses on the administrative fee calculations for 2010, 2011, 2013, and 2014.

[21]       As previously noted, these charts were only given to the Board after this suit was filed.

fees paid to the sub-advisers and retained by FMG, it is clear that the Board received information regarding the amount FMG was paid, despite its use of sub-advisers and sub-administrators. Moreover, the Board would likely possess the foundational understanding that the Court lacks in deciphering these charts.

Therefore, the only reliable information regarding the amount of fees paid in this case are those numbers to which the parties stipulated—the fees paid to sub-advisers and sub-administrators. The table below provides a comprehensive and easy to understand chart of the sub-advisory and sub-administrative fees paid for each fund for the entire damages period—2010 until 2014. However, the Court notes that while it is clear how much the subs were paid for all years in question, it remains unknown how much FMG retained in fees. This makes the Court's ultimate decision in this case nearly impossible. Without competent evidence demonstrating how much FMG was paid, it cannot be determined whether the fee "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining." *Gartenberg*, 694 F.2d at 928.

*Fees Paid to Sub-Advisers and Sub-Administrators per the JSOF*

| Fund | | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Common Stock Index | Advisory Fees | $2,421,062 | $2,449,890 | $2,390,873 | $2,625,765 | $2,832,443 |
| | Administrative Fees | $415,018 | $416,791 | $405,492 | $439,049 | $468,276 |
| Core Bond Index Portfolio | Advisory Fees | $921,872 | $1,125,066 | $1,060,703 | $1,194,221 | $1,355,503 |
| | Administrative Fees | $466,801 | $573,526 | $536,341 | $601,994 | $682,325 |
| Equity 500 Index Portfolio | Advisory Fees | $1,028,713 | $1,076,679 | $1,109,128 | $1,275,835 | $1,438,523 |
| | Administrative Fees | $245,347 | $256,658 | $264,299 | $306,131 | $346,674 |
| Equity Growth PLUS Portfolio | Advisory Fees | $2,385,935 | $2,405,695 | $2,150,730 | $1,485,340 | $356,852 |
| | Administrative Fees | $199,876 | $194,455 | $181,200 | $141,463 | $45,687 |
| GAMCO Small Company Value | Advisory Fees | $5,925,175 | $7,225,765 | $7,480,437 | $9,196,650 | $10,028,593 |
| | Administrative Fees | $153,899 | $188,057 | $194,142 | $237,986 | $258,164 |
| Global Bond PLUS | Advisory Fees | $956,144 | $992,944 | $637,460 | $463,539 | $372,513 |
| | Administrative Fees | $158,936 | $163,813 | $115,672 | $94,840 | $77,340 |
| Global Multi-Sector Equity | Advisory Fees | $5,016,325 | $5,078,750 | $4,675,472 | $5,200,176 | $5,514,057 |
| | Administrative Fees | $274,546 | $268,694 | $246,385 | $272,800 | $292,546 |
| Intermediate Government Bond | Advisory Fees | $364,906 | $426,437 | $1,202,720 | $1,247,383 | $1,280,777 |
| | Administrative Fees | $168,857 | $197,862 | $612,627 | $630,419 | $642,921 |
| Large Cap Value PLUS | Advisory Fees | $4,816,204 | $4,542,377 | $4,124,604 | $5,756,966 | $9,082,261 |
| | Administrative Fees | $347,237 | $322,431 | $292,308 | $397,702 | $569,825 |
| Mid Cap Value PLUS | Advisory Fees | $2,841,598 | $3,230,044 | $2,978,533 | $3,690,923 | $4,112,725 |
| | Administrative Fees | $233,506 | $227,900 | $212,177 | $252,512 | $288,753 |
| PIMCO Ultra Short Bond | Advisory Fees | $4,218,396 | $5,232,548 | $4,963,499 | $4,094,348 | $3,080,987 |
| | Administrative Fees | $249,451 | $302,548 | $286,771 | $237,980 | $182,553 |
| T.Rowe Price Growth Stock | Advisory Fees | $2,361,687 | $2,806,118 | $3,136,555 | $2,647,404 | $2,242,946 |
| | Administrative Fees | $70,829 | $81,292 | $90,808 | $81,439 | $71,801 |

JSOF ¶¶ 42-53; 55-66.

### 9.    Services Provided by FMG to the Funds

The Court finds that Plaintiffs' position that the contract language delegated all of FMG's duties to the subs is unsubstantiated. Instead, the Investment Management Agreement gives FMG overall supervisory and management powers over the sub-advisers. Although this authority under the contracts is broad and vague, the trial testimony demonstrated that FMG performs a variety of services to the Funds in order to carry out their contractual duties under the Investment Management and Administrative Agreements. These services are explained below.

### *FMG's Supervision and Management of Sub-Advisers*

Initially, FMG researches, selects, interviews, and hires the sub-advisers. T869:4-10, 870:16-21 (Chan); T2620:21-2621:12 (Joenk); T2376:12-17 (Kopcke) (admitting FMG selects sub-advisers); T1816:11-13 (Pomerantz); T1663:20-23 (Barrett); DX-142.2 at Bates 4382; ECF No. 276, PRDFOF, ¶ 223. FMG's sub-adviser selection process is designed to identify sub-advisers that will be capable of adding value to the Funds. DX-142.2 at Bates 4118; ECF No. 276, PRDFOF, ¶ 224. Once a potential sub-adviser has been identified, FMG examines the sub-adviser's organization, performance history, and reputation. DX-142.2 at Bates 4118; ECF No. 276, PRDFOF, ¶ 224. FMG will investigate the potential sub-adviser's track record of consistent performance for the asset class being considered, as well as its reputation for quality in operations, compliance, and ethical matters. DX-142.2 at Bates 4118; ECF No. 276, PRDFOF, ¶ 224. Additionally, FMG will send fifty page questionnaires covering compliance, operational, and legal matters to the sub-advisers. T938:19-939:10 (Chan); ECF No. 276, PRDFOF, ¶ 225. FMG will also conduct performance and risk analyses on the potential sub-advisers over time to evaluate whether the sub-adviser has the potential to improve Fund performance. T3059:7-20 (Joenk); ECF No. 276, PRDFOF, ¶ 255.

After hiring a sub-adviser, FMG monitors them to: (a) confirm their compliance with investment strategies and policies; (b) track their performance in carrying out their portfolio management responsibilities; (c) ensure adherence to legal and compliance procedures; (d) determine whether there have been any organizational changes at the sub-adviser that could impact the sub-adviser's overall business continuity; (e) check for any litigation, enforcement, or regulatory matters relating to the sub-adviser; and (f) evaluate the sub-adviser's brokerage practices and trade execution quality. DX-142.2 at Bates 4119-20, 4383-86; T2625:24-2626:15 (Joenk); T870:16-21 (Chan); T2376:12-17, 2377:6-12 (Kopcke); T1663:20-23 (Barrett); ECF No. 276, PRDFOF, ¶ 229. FMG monitors reports and information about the sub-advisers on a daily, monthly, and quarterly basis. DX 142.2 at Bates 4120; ECF No. 276, PRDFOF, ¶ 234.

Additionally, FMG performs periodic on site due-diligence meetings with the sub-advisers. P-373 at Bates 8151; T945:2-7 (Chan); T2376:21-2377:5 (Kopcke); T1190:23-1991:6 (Pomerantz); ECF No. 276, PRDFOF, ¶ 30. FMG also runs monthly performance attribution analyses on the Funds, analyzes other performance data, and evaluates market data relating to the sub-advisers. T879:14-24 (Chan); T943:6-944:17 (Chan); ECF No. 276, PRDFOF, ¶ 232.

FMG monitors the performance of the sub-advisers in order to make strategic decisions about whether to retain or replace a sub-adviser, with the goal of replacing sub-advisers if needed. T3055:4-3059:6 (Joenk); ECF No. 276, PRDFOF, ¶ 235. FMG evaluates whether the sub-advisers have performance or other issues that warrant placing the adviser on a "watch list" provided to the Board. T916:9-20, 917:20-922:2 (Chan). Where necessary, FMG will also manage the transition process when sub-advisers are hired, terminated or replaced. DX 142.2 at Bates 4382; T2377:6-12 (Kopcke); ECF No. 276, PRDFOF, ¶ 237.

### *FMG Portfolio Investment Services*

In addition to its supervisory and management duties pertaining to the sub-advisers, FMG provides a number of portfolio investment services, ranging from risk management to fund creation. Defendants assert that those services are predominantly handled by FMG, with the sub-advisers and sub-administrators "merely assist[ing]." ECF No. 285-1, DFOF ¶¶ 367-368. Plaintiffs contend that the services detailed by the Defendants are not actually rendered by FMG, but are delegated to sub-advisers and sub-administrators, while FMG still collects a large fee. A comprehensive chart discussing all of FMG's portfolio investment services was provided to the Board during the July 8-9, 2013, Board Meeting in Book 1 Section 15(c). DX-142.2 at Bates 4380-87.

### *Construction and Restructuring of Portfolios*

In the Board Meeting Book 1, under the heading "Reorganization and Restructuring of Existing Portfolios," it states that FMG is responsible for, "continually assess[ing] existing portfolios for continued viability and propos[ing] substitution, reorganization or restructuring, as appropriate." DX-142.2 at Bates 4381. Under the "sub-advisers" heading, there are no such responsibilities listed in regards to construction and restructuring. DX-142.2 at Bates 4381. As such, this task was retained by FMG.[22]

### *Setting Benchmarks*

It is undisputed that FMG selects the Funds' benchmarks "[w]ithin which the Sub-advisers may select and trade securities, including the Funds' risk parameters." T2622:5-12 (Joenk). Barrett conceded that FMG does develop investment guidelines (i.e. benchmarks) for

---

[22] However, the Board did not receive this chart until after the lawsuit was filed.

the Funds and further admitted that this was an "important" service with regards to Fund

performance.  T1662:22-1663:6 (Barrett).

Furthermore, Chan testified about benchmarks in relation to FMG's responsibilities.

Chan described what benchmarks are and how they are chosen in the following testimony:

> [T]he information that we basically think it's – it's a good fit for this
> portfolio and is being bandied about in discussion with the Board,
> and we basically put a rationale behind picking out this benchmark,
> and the Board has to basically get comfortable with this benchmark.

T892:9-14 (Chan).  He further indicated that FMG is responsible for "proposing" the

benchmarks and the Board must approve them, though Chan himself does not take a leading role

when selecting benchmarks within FMG.  T892:15-893:24 (Chan).

### *Structural Changes to EQAT Funds*

Defendants assert that FMG continuously evaluates the structure of the EQAT funds and

has restructured them when necessary.  ECF No. 276, PRDFOF ¶ 208.  On direct examination,

Joenk testified, ". . . the services under this rubric [DX-2055][23] would include construction and

building of a portfolio, including restructuring, if necessary. . . ."  T2620:22-25 (Joenk).  Joenk

further testified to an example of restructuring that FMG undertakes:

> Well, one of the at-issue funds is Core Bond Index . . . [it] was an
> actively managed portfolio, and the active manger was
> underperforming tremendously, so we terminated the manager,
> restructured the portfolio, converted it to an index fund, lower[ed]
> the fees and hired a sub-advisor to execute an index strategy.
> Another type of restructuring would be creating a volatility overlay,
> for instance, which is in a number of the at-issue portfolios, which
> reduces volatility of the funds in periods of high volatility.

---

[23] DX-2055 is "a graphic of the services that are provided to the EQAT funds, not by organization, but more by type
of service."  T2620:15-17 (Joenk).

T2621:17-2622:4 (Joenk). On cross-examination, Joenk testified again about restructuring and indicated that two ways that FMG can restructure a fund is by terminating the sub-adviser or merging the fund. T3203:24-3204:1-4 (Joenk). Plaintiffs assert that JP Morgan, as the sub-administrator, predominantly handles restructuring. ECF No. 276, PRDFOF ¶¶ 208-209. However, Joenk clarified the roles of FMG and JP Morgan in this process, and stated that, ". . . when we restructure a portfolio depending on the size of the portfolio, we may hire a transition manager to move the assets . . . JP Morgan as custodian has got to be involved with it because they are custodian for the assets." T3204:5-14 (Joenk). Plaintiffs established through Joenk's testimony that, "JP Morgan is solely accountable for all aspects of the transition." *Id.* However, the Court finds that FMG retains some responsibility for the initial decision to undertake a restructuring and JP Morgan assists in the transition. As such, FMG has not delegated this duty entirely.

Defendants assert that FMG also restructured certain Funds by converting them from active to hybrid (pactive) funds, and by adding a "volatility overlay" (*i.e.* the ATM Strategy, discussed *infra* at p. 79) to some of the Funds' investment strategies. ECF No. 276, PRDFOF, ¶ 209. Joenk testified, "[a]nother type of restructuring would be creating a volatility overlay, for instance, which is in a number of the at-issue portfolios, which reduces volatility of the funds in periods of high volatility." T2621:25-2322:3 (Joenk).

Plaintiffs contend the restructuring of five at-issue Funds from "active" to "hybrid" occurred between 2007 and 2009, which is outside the relevant time period for this case. ECF No. 276, PRDFOF, ¶ 209. Nonetheless, the Court finds that this is an ongoing duty that, when required, FMG performs, as opposed to the sub-adviser.

*Formulating Investment Strategy*

FMG is responsible for "[d]evelop[ing] and implement[ing] investment strateg[ies] for each Portfolio, or allocated portions of a Portfolio." DX-142.2 at Bates 4381. The different strategies discussed in this section include the Traditional Strategies (*i.e.*, active, passive, equity, fixed income), the Hybrid Strategies (*e.g.*, combination of active and passive), Allocation Portfolios (*e.g.*, funds-of-funds), and Unique Strategies (*e.g.*, volatility managed). DX-142.2 at Bates 4381.

FMG performs research in selecting and monitoring appropriate sub-advisers for existing and new portfolios. DX-142.2 at Bates 4382. On the sub-adviser side, their delegated responsibilities include "[c]oordinat[ing] investment and reinvestment of allocated assets in conformity with designated investment strateg[ies] prescribed by the investment manager (i.e. FMG)." DX-142.2 at Bates 4382. FMG also manages the investment "operations and composition of each Portfolio, or allocated portion of a Portfolio[,]" whereas the sub-advisers will "research individual companies or industries, the securities of which are included in the Portfolio." DX-142.2 at Bates 4382. FMG further performs the "overall supervisory responsibility for the general management and investment of each Portfolio's assets" while the sub-advisers "communicate with the Investment Manager (and Board, as appropriate) material information relating to the investment of the Portfolio's assets." DX-142.2 at Bates 4382.

Kopcke testified to this service and indicated that determining the Funds' investment strategies is a "[v]ery important" service provided by FMG. T2376:6-11 (Kopcke). Plaintiffs assert that an expert witness like Kopcke cannot testify to establish facts. ECF No. 276. PRDFOF ¶ 205. In this case, Kopcke was merely testifying to a standard in the industry that

formulating investment strategies are typically important services rendered by investment managers.

The Court finds that the sub-advisers carry out the investment strategy that FMG first determined. As the creator of the Funds themselves, FMG set the investment strategy, and subsequently hired the sub-advisers to implement same.

### Managing ETF Strategy

Plaintiffs assert that FMG delegated the responsibility to manage the ETF[24] to the sub-adviser. Specifically, the Investment Management Agreement provides that FMG:

> contract[ed] with one or more investment advisers [i.e. sub-advisers] to manager the investment operations and composition of each and every Portfolio of the Trust and render investment advice for each and every Portfolio, including the purchase, retention, and disposition of the investments, securities and cash contained in each Portfolio . . .

J-4 at Bates 4028-29. Defendants counter that FMG provides direct portfolio management services to the Funds, including managing ETFs for certain Funds. ECF No. 276, PRDFOF, ¶ 211. However, it is undisputed that FMG purchased and managed ETFs in small amounts for two of the Funds: the EQ/Mid Cap Value PLUS Portfolio and the EQ/Large Cap Value PLUS Portfolio. T977:17-978:10 (Poutas). The services that FMG provides for these particular Funds include: "determining the strategy for the sleeves, selecting and trading the ETFs, analyzing the performance of the sleeves, and reporting to the Board on the sleeves." T977:6-10 (Poutas).

Furthermore, FMG uses the ETF sleeves to "obtain exposure" and to "diversify" the Funds' investments. T985:16-23 (Poutas). Poutas testified to the meaning of exposure and diversification:

---

[24] ETF stands for Exchange Traded Funds. T48:19 (Plaintiff's Opening).

> So, exposure meaning access to a particular segment of the market, and there are plenty of ETFs that . . . are basically tracking a specific segment of the market, meaning large cap, mid cap or by style; and diversification is a risk management technique basically combin[ing] several type of assets on to one portfolio in order to reduce the risk.

T985:18-23 (Poutas). Plaintiffs dispute this characterization of the services provided through the ETF sleeves because, in addition to the two ETF funds, FMG's approximately 68 employees service nearly 123 other funds. ECF No. 276 PRDFOF ¶ 212; T180:24-181:2 (Joenk); T184:20-185:7 (Joenk). Plaintiffs assert that because there are so few employees for so many funds, FMG could not have performed "a host of services" to the at-issue Funds. ECF No. 276, PRDFOF ¶ 212. There is no proof to support that contention.

The Court finds that FMG provided investment management services regarding the ETF sleeves. The testimony demonstrates that this management service was retained by FMG and was not passed along to the sub-advisers.

### Fund ATM Strategy

The Fund ATM strategy[25] is disputed by the parties because Plaintiffs assert that this strategy only applies to four out of the twelve at-issue Funds. ECF No. 276, PRDFOF, ¶ 217. Defendants assert that FMG manages the ATM strategy generally in regards to the "Fund" (i.e. all of the Funds). ECF No. 276, PRDFOF, ¶ 217.

The ATM strategy was created by FMG and is a "patented volatility management strategy that is designed to reduce a Fund's equity exposure to markets in periods of high volatility, in order to produce better risk-adjusted returns for investors." T978:24-979:6 (Poutas). Poutas testified that the day-to-day management of the ATM strategy involves

---

[25] "ATM" stands for AXA Tactical Manager. T757:13 (Joenk).

monitoring "[t]he volatility level, for the various asset classes on a daily basis, so we do that for large cap, mid cap and international." T980:5-9 (Poutas).

The Court finds that this service was performed by FMG, and not sub-advisers. Again, although Plaintiffs do not classify the service as being "extensive," it is undisputed that FMG performed the service.

Moreover, Defendants contend that in managing the ATM strategy, FMG monitors prices for various asset classes on a daily basis to determine whether volatility (price fluctuations in the market) has exceeded thresholds that FMG has established for each asset class. ECF No. 276, PRDFOF, ¶ 218; T979:19-20 (Poutas). Defendants assert that if a certain price threshold is met, it is FMG that determines whether and to what extent a Fund should be "de-equitized," and then FMG instructs the sub-advisers to de-equitize. ECF No. 276, PRDFOF, ¶ 218. Mainly, Defendants maintain that FMG closely manages the sub-advisers during this process. *Id.* Defendants assert that the only involvement of the sub-advisers in the price monitoring within the ATM strategy is that the sub-advisers execute the trades as instructed by FMG. However, the sub-advisers do not manage the strategy. *Id.* at ¶ 219.

Plaintiffs do not dispute that FMG both monitors the prices for the Funds and determines the extent to which the Funds should be "de-equitized." ECF No. 276, PRDFOF, ¶ 218.

Poutas noted that FMG monitors the ATM strategy, and that four of the Funds at issue in this case have had an ATM strategy associated with them. T978:25-979:25 (Poutas). Specifically, he stated that: "[i]f volatility exceeds certain threshold[s] we [FMG] will then instruct – we would come up with basically what we call beta, which is the level of investment for each of the various strategy . . . We're looking for volatility level that would exceed the threshold that we set for each of those various asset classes." T979:10-980:25 (Poutas). In

80

relation to price monitoring, if a threshold is met, Poutas explained that "we're [FMG] going to decide how much exposure we would be effectively taking out, for the various strategies that are impact[ed]," which is referred to as "de-equitizing." T981:2-4 (Poutas).

The "de-equitizing" is achieved through the use of futures trades. T982:3 (Poutas). Poutas concluded: "And at that point once we reach that decision we will instruct the sub-advisor to implement the trade, and there will be a series of communication between the sub-advisers and ourselves." T979:13-16 (Poutas). Poutas also said the sub-adviser is instructed by FMG as to when and how much to "de-equitize." T982:8-13 (Poutas).

In addition, Wermers also added that FMG "totally run[s]" the ATM strategy. T4334:18-19 (Wermers).

Therefore, the credible testimony demonstrates that FMG, not sub-advisers, perform this task.

### *Asset Allocation/Rebalancing*

Defendants assert that for Funds with multiple sub-advisers, FMG determines what percentage of the Funds' assets should be allocated to each individual sub-adviser and rebalances those allocations based on the sub-advisers' respective performance. ECF No. 276, PRDFOF, ¶ 221. This service involves FMG "[h]iring [a] sub-advisor, monitoring a sub-advisor's performance, [to determine if] . . . they doing what they're hired to do, which is done through this portfolio analytics service that we provide where we'll analyze . . . the performance . . ." T2620:25-2621:4 (Joenk).

Plaintiffs admit that for Funds with multiple sub-advisers, FMG determines what percentage of assets should be allocated to each sub-adviser. However, only five of the twelve Funds at issue in this case have multiple sub-advisers. ECF No. 276, PRDFOF, ¶ 221. Those

81

Funds are: the EQ/Equity Growth PLUS Portfolio; the Global Multi-Sector Equity Portfolio; the

Mid Cap Value PLUS Portfolio; the Large Cap Value PLUS Portfolio; and the Global Bond

PLUS Fund.  JSOF ¶¶ 23-34.  Although Plaintiff disputes that FMG's services are extensive in

this area, the Court finds that asset allocation and rebalancing is a service that FMG retains.

*Valuation of Disputed Securities*

Plaintiffs assert that the bulk of the valuation services are performed by the sub-

administrator.  However, the credible testimony demonstrates that, while the sub-administrator,

JP Morgan, performs certain valuation services, FMG also retains some of this responsibility.

The Board has established a Valuation Committee, which determines the fair values of

the Fund's securities for which market quotations are not readily available.  T2624:9-13 (Joenk);

T3540:6-8 (Schpero); DX-142.2 at Bates 4121, ECF No. 276, ¶ 261.  The valuation committee

meets once a day and is responsible for valuing hard-to-value securities held by the Funds.

T816:24-25 – T817:1, T817:2-5, T2624:8-13 (Joenk); T1078:11-21 (Walsh).  "The valuation

committee is responsible for coming up with that price, whether they use input from a sub-

adviser or multiple sub-advisers because they can have conflicting input or other pricing sources

or Bloomberg, the valuation committee takes that information and then makes a valuation

decision." T819:1-6 (Joenk).   The committee also meets regularly "to go over the

determinations and all the reports . . . and just kind of go over any stale prices, any fair value

prices that have been fair valued for a while." T1079:23-1080:1-5 (Walsh).   FMG also prepares

Valuation Committee minutes and the Board reviews and ratifies them.  ECF 276, PRDFOF ¶

265.

Joenk also discussed the valuation of hard-to-value securities.  Sometimes "there are

stocks and securities that are thinly traded."  T2626:23-25 (Joenk).  When there are problems, "it

82

goes to the valuation committee and compliance is represented on the valuation committee, actually the secretary for the valuation committee." T2627:3-5 (Joenk). There were times when sub-advisers would disagree about a price, and therefore "it is FMG[ ], in that case[,] the valuation committee's responsibility to determine the method and which security price will be used . . . for valuing all of those securities." T2627:11-14 (Joenk).

Plaintiffs experts confirmed that certain valuation functions are retained by FMG. According to Pomerantz, pricing of securities is mainly an administrative task, but if there were conflicts or difficult securities, FMG would ultimately be responsible. T1993:22-1994:2 (Pomerantz). According to Barrett, "the pricing is done by the sub-administrator, except in cases where there's an issue or if someone needs to sort of take a special look at something that's unusual." T1690:1-4 (Barrett). Moreover, Barrett indicated that the pricing process was a significant effort. T1691:7-9 (Barrett). Some securities are more difficult to price because "[p]ublicly traded securities are usually sort of automated in terms of getting the values, but most portfolios would also have some private placements or other things that would be relatively more difficult to value." T1692:17-21 (Barrett).

Therefore, the Court finds that the pricing of securities is a task undertaken by both the sub-administrator and FMG. As such, Plaintiffs did not meet their burden in demonstrating that this task was delegated in its entirety to the subs.

### *FMG's Risk*

Defendants contend that FMG faces substantial risk as the Fund's investment manager and administrator, which is costly and, in part, justifies the fees charged to investors. *See* ECF No. 276, PRDFOF, n.23. Plaintiffs assert that, pursuant to the language of the investment management and administrative agreements, FMG did not bear any risk, and even if it did, the

Board breached its fiduciary duty in approving the fees under these agreements because FMG

did not quantify the risk. *Id.* As such, Plaintiffs contend there was no basis to approve fees for

FMG's assumption of risk without allocating a specific cost to that risk. *Id.*

### *Types of Risk*

James gave an overview of the risks that fund and asset managers face. James noted that,

generally, FMG faces business risk and market risk. Market risks involve the "volatility in the

marketplace," and the market's effects on the company's earnings. T4107:3-7 (James).

Business risks, also referred to as "operational risks," are the "risks associated with potential

losses due to . . . operational errors or mistakes; issues regarding litigation or regulatory risks" as

well as litigation, reputational, and entrepreneurial risks. T4107:8-25 (James). James gave an

example of a business and operational risk in his testimony. He explained:

> One example is if there's an error in the computation of the net asset
> value of a fund, net asset is the price which a fund holder . . . holder
> can buy or sell on a particular day, it's based on the value of the
> underlying securities in a mutual fund; that's calculated every day,
> and to the extent that there's an error in the calculation, which
> sometimes occurs, that can lead to . . . significant costs because what
> typically happens in those circumstances is that anybody that bought
> at a NAV that is not the NAV as reflected in the underlying
> portfolio, is going to be made whole typically through the fund
> manager.

T4110:21-4111:10 (James).

Schpero described entrepreneurial risk that an entity encounters when "starting up the

fund and in sponsoring the funds." T3576:24-25 (Schpero). Schpero explained that the risk that

companies face in starting funds are the costs involved, the uncertainty of the successfulness of

the fund, and the "expense caps" that need to be put in place to make the fund "viable at an early

stage." T3577:1-7 (Schpero). According to Schpero, business and operational risks include

"compliance and reputational problems[,]" financial issues with the funds themselves, viability

84

of the funds in the market, and the vulnerability and risk to the advisers and sub-advisers to the fund in the event of a problem. T3577:8-14 (Schpero). Schpero noted that "if there is a problem with [the Funds], contract or no contract, the party that [he is] going to look to make the fund whole will be FMG." T3577: 15-18 (Schpero).

Joenk discussed the risks involved in creating funds, and how those risks are communicated to the Board. Joenk stated that the various teams would report to him, among other things, the risk profile and risk parameters involved with starting the new fund. T364:18-25 (Joenk); T365:1-20 (Joenk). Joenk explained that he and the leaders of those teams would then present to the Board the financials, issues, and risks involved with creating the fund, as well as a profitability and expense analysis of the proposed fund. T364:18-25 (Joenk); T365:1-20 (Joenk).

Litigation and regulatory risks "essentially address the possibility of FMG being sued or having regulatory issues." T4149:3-5 (James). James explained that the litigation risk concerns the "frequency with which there's litigation" and the "amount of the litigation" in the mutual fund industry. T4149:9-18 (James). The regulatory risks include governmental and agency stipulations and regulations that may affect the performance or behavior of the funds.

James gave an example of litigation and regulatory risks. He stated that "there was . . . litigation regarding market timing in the fund . . . [a]nd I think [the fund] paid a hundred million dollars in a fair fund settlement, which was out of the fund manager's pocket for the rapid trading in the funds." T4109:6-11 (James). James also mentioned that there is a "Litigation Tracker" that keeps track of the litigation in the mutual fund industry. T4109:12-18 (James).

Both Schpero and James testified as to the risks that FMG specifically encounters. On cross-examination, Schpero was asked if he "associate[s] any entrepreneurial risk with any of the existing funds." T3800:7-8 (Schpero). Schpero responded "no . . . I think at this point if they're

85

15 years old, I don't see significant entrepreneurial risk." T3800:10-11 (Schpero). However, he did testify that FMG encounters some of the enterprise risks described above. T3800:12-18 (Schpero). Schpero noted that none of the entrepreneurial risks, if there were any, would be passed on to the sub-advisers. However, he noted that enterprise risks would affect the sub-advisers. T3579:2-10 (Schpero). He stated that if the sub-advisers could not pay for the adverse effects of the enterprise (business) risks, the "Board is then going to be looking to FMG" to pay, which would likely come from the Funds. T3579:6-24 (Schpero). When asked if there is a way the Board could secure this risk, Schpero stated: "I don't think as a practical matter there's a way to secure it . . . " T3580:2-6 (Schpero).

Next, the Court asked James to explain the risks that FMG bears, noting that he had given examples and definition of the risks, but had not specifically mentioned the types that FMG faces. T4112:3-6 (James). James stated that FMG is definitely facing "litigation and reputational risks" associated with managing mutual funds, as well as operational and business risks associated with volatility and the market. T4112:7-25; T4113:1-3 (James). Therefore, James agreed with Schpero that FMG faces a high amount of "enterprise risk" as manager of the Funds. When the Court asked James if FMG encounters entrepreneurial risk, he stated that because the Funds have been around for twenty years, there is most likely not any entrepreneurial risk, but that there might be some particular aspects of entrepreneurial risk that may surface even though the funds are relatively old. T4114:2-8 (James).

The Court finds that the testimony of Schpero and James demonstrate that FMG faces little to no entrepreneurial risk, but does encounter a large amount of enterprise risk. This enterprise risk emanates from litigation and reputational risks, operational and business risks, and the risk that FMG and the Funds may have to pay the sub-advisers in the event of legal action.

The Court finds that FMG bears some risk that would justify a portion of the fees charged to investors.

### Risk Management Techniques

Barrett was questioned regarding a presentation given to the EQAT Board regarding risk management techniques. P-105-A at Bates 0735. Barrett discussed the risk management techniques that protect investors in the Accumulator product, which is an FMG product that contains a number of the Funds at issue. He explained that:

> . . . the Accumulator product contains some features that basically say if the money that's put into the mutual funds, [and] if those mutual funds perform really badly [and] the market tanks . . AXA agrees that they will make up some of that for the policy holder [and] they will contribute additional money to the policy holder, [to make it] it as though the market hadn't tanked so badly.

T1502:17-1503:1 (Barrett). Barrett refers to the technique as a "secondary guaranty," and notes that it is a technique designed to "hedge the risks." *Id.* Barrett further explained that AXA's possible liability for that "secondary guaranty" changes with the volatility in the stock market.

Because AXA is subject to that volatility, Barrett explained that AXA makes a number of investments in "derivative hedges" in order to "hedge the risks." T1503:6-8 (Barrett). Barrett noted that risk hedging protects AXA, because "if the market goes [in] one direction, and that causes a big increase in AXA's liability which would be part of the results of the wrapper . . . [then] the derivative hedges are designed to produce a gain when the market behaves that way." T1503:8-13 (Barrett). As a result, the gain from the hedges will offset the loss on the product. T1503:13-14 (Barrett). Barrett explained that this hedging method is an essential part of the way that AXA manages its exposure. T1503:15-16 (Barrett).

Joenk was also asked about the hedging method. Joenk was questioned regarding how hedging relates to the product wrapper[26] fees, and asked to explain how the Accumulator product is hedged. He explained, "if the company loses money on its hedge, that reduces not so much the wrapper fee, but it reduces the net technical margin, which is the other component of the wrapper fee." T3046:12-19 (Joenk). Joenk further noted that AXA hedges to protect itself, but that it can either gain or lose on the hedges, and those gains and losses are "part of the product wrapper." T3047:2-10 (Joenk). Therefore, the Court finds that FMG undertook certain measures to manage the risk it faces, which, in part, justifies its fee.

### *Quantifying Risk*

Plaintiffs claim that it was necessary to quantify the risk in order to justify FMG's fees. The Court finds that the Board nonetheless considered the risk that FMG faces, even though there was no specific cost assigned to it. Schpero noted that the EQAT Board did not seek to quantify the risks posed to FMG, but "certainly discussed the concept." T3801:2-3 (Schpero). He said there had not been any "specific quantification," and he was not sure how the risk would actually be quantified. T3801:3-4 (Schpero). He noted that there are a number of ways to mitigate risk, including purchasing insurance and keeping sufficient capital. T3802:1-2; T3803:1 (Schpero). Schpero stated that he specifically knows of only one type of insurance FMG holds: "D&O and E&O insurance . . . that jointly covers the [F]unds and FMG." T3802:9 (Schpero). However, Schpero further noted that he was not aware of any specific amount or quantity of capital or insurance that was kept or used. T3803:4-20 (Schpero). Also, Schpero stated that he believed it was not necessary for the Board to know the specifics of the insurance or amount of sufficient capital. T3804:8-12 (Schpero).

---

[26] Product wrappers were not adequately explained during the trial. *See* "Fall-Out Benefits," *infra*, p. 121.

James also testified as to quantifying risk.  He explained that he would "have the ability to quantify the risk incurred by an investment manager such as FMG," but he did not do so because he was not specifically asked to quantify the risks as they pertain to FMG or AXA. T4146:12-16; T4147:9-12 (James).  James testified, similar to Schpero, that the EQAT Board was aware of and discussed quantifying the risks, but there was never an actual quantification. T4147:18-24 (James).  James also noted that he did not see any specifics regarding sufficient capital, insurance, or quantification of the risks, but only saw discussion about those topics. T4148:7-19 (James).

James testified that the risks faced by FMG should be considered in evaluating the fees that FMG charges to the Funds as a cost. T4111:11-19 (James).  However, James did not quantify the risks that he found important to consider:

> Q.   And you view risk as a crucial component of the assessment of whether or not a fee is reasonable; is that correct?
> A.   I think it's an important component.
> Q.   And you devoted a large part of your expert report to the issue of risk; correct?
> A.   Yes.
> Q.   And you have not quantified or made any effort to quantify the risk; is that correct?
> A.   That is correct, I wasn't asked to specifically quantify the risks as it pertains to FMG or AXA.
> Q.   Did you propose at any point that that be done?
> A.   No.

T4147:1-14 (James).

However, after being asked by the Court if it was necessary to quantify the risks to assess FMG's management, James explained:

> I don't think the EQAT Board activities are different than what I've observed in the industry, in that we're just now at the stage where people are thinking about quantifying these risks in a way to get a hard number for what potential risk exposure is and adequacy of the

> capital. Up until now it's really been focused primarily on
> qualitative assessment . . . I think most firms in the industry, asset
> management firms that I've seen[] . . . are not engaging in that
> activity.

T4219:5-4220:9 (James).

Because the Court finds James' testimony to be credible, the Court concludes that FMG

was not required to quantify the risk in order to justify a portion of its fee. As noted earlier, the

Court gives more weight to James than to Barrett. Barrett's testimony was that hedging

decreases risk to a point that it is of minimal concern. Moreover, risk is only one of many

factors contributing to FMG's fee, and the failure to quantify same is insufficient, in and of itself,

to determine that the Board breached its fiduciary duty. The testimony demonstrates that the

Board considered risk, among other factors, in approving the fees at issue.

### *Contract Language & Risk*

Plaintiffs assert that FMG faces little risk because the EQAT has largely released FMG

from any liability and agreed to indemnify FMG for any liability FMG may incur. PFOF ¶ 568;

J-4 at Bates 4030; J-5 at Bates 9821. Specifically, the Investment Management Agreement

requires FMG to "exercise its best judgment in rendering its services to the Trust." J-3, 2(D).

But while it is required to use its best judgment, FMG is not held liable for any "error of

judgment or mistake of law or for any loss suffered" by the Trust in connection with the

Agreement. *Id.* FMG will only be liable for "willful misconduct, bad faith, gross negligence,

reckless disregard of its duties or its failure to exercise due care in rendering its services to the

Trust . . . " *Id.* The Administrative Agreement provides that FMG will not be responsible for

losses or expenses, except when caused by, resulting from or attributable to "willful misfeasance,

bad faith or negligence" by FMG or its subcontractors or from reckless disregard by FMG or its

subcontractors of its duties or refusal or failure to comply with the terms of the Agreement. P-

405, 6(a). Further, FMG and its subcontractors will not be held liable for any indirect, incidental, special or consequential losses or damages whatsoever, even if FMG was advised of the likelihood of such loss or damage and regardless of the form of action. *Id.*

Plaintiffs, once again, rely on contract language in determining FMG's risk. However, the credible testimony demonstrates that FMG confronts risk in a number of ways that cannot be mitigated through these contractual provisions. Initially, entrepreneurial and reputational risks are not covered by the contracts. T3578:19-24; 3579:20-21 (Schpero). Moreover, Schpero indicated that, notwithstanding the contract language, which is standard in the industry, both the Board and regulators would ultimately hold FMG liable for any issues that impact the Funds or investors.[27] T3849:18-3855:12 (Schpero). James also indicated that even if FMG had a legal right to seek recourse or indemnification under these contractual provisions, FMG would still bear the cost of defending any litigation or regulatory action. T4149:19-4150:14 (James). Because the Court finds the testimony of Schpero, Joenk, and James to be credible, and finds Plaintiffs' sole reliance on the contractual language to be overstated, the Court concludes that the language of the agreements may mitigate the risk encountered by FMG, but does not eliminate it.

### *FMG's Compliance and Legal Services*

Plaintiffs contend that all compliance duties were delegated to JP Morgan as the sub-administrator. However, it is undisputed that FMG's compliance group facilitates and participates in examinations by the SEC and inquiries, external audits, and AXA internal audits, as needed. DX-165 at Bates 5634, 5662; DX-142.2 at Bates 4121, 4386. Although JP Morgan provides support for such examinations, the ultimate responsibility falls on FMG.

---

[27] The Court notes that, while Schpero's testimony was honest and credible on this issue, the Plaintiffs nonetheless raised a valid issue regarding the contract language and Defendants' risk. Although the Board may insist that FMG must be held liable for negligence, a Court may find otherwise based on the contract language. The Board should re-negotiate the terms of this contract.

FMG performs certain legal duties for the Funds. FMG retains and manages outside counsel regarding litigation matters related to the Funds. DX-142.2 at Bates 4386. Moreover, FMG coordinates with counsel to the Funds and the Independent Trustees' Counsel, Morgan Lewis, as necessary and appropriate. DX-142.2 at Bates 4387. FMG's legal services to the Board are part of FMG's responsibility to keep the Board apprised of all developments, despite the fact that both the Board and the Funds have their own independent counsel. T1125:8-19 (Louie).

### FMG's Board Governance Services

Plaintiffs do not dispute that FMG provides numerous and important Board governance services to the Funds, including preparing certain materials for Board and Committee meetings, maintaining the books and records for Board meetings, and handling Board meeting logistics. ECF No. 276, PRDFOF ¶ 250; T1096:2-23 (Louie); T2627:21-2628:3 (Joenk). FMG prepares the annual 15(c) response to the Board. T439:3-8 (Joenk). These materials are subject to SEC review, and in fact, the 15(c) materials from 2012 were requested by the SEC. T4252:1-13 (Louie). FMG, with assistance from the Funds' outside counsel, also prepares the package of orientation materials for new trustees who join the Board. DX-142.2 at Bates 4380. FMG annually prepares and sends out questionnaires to each of the sub-advisers, which must be completed and submitted in order to have the sub-adviser's contract reviewed and renewed by the EQAT Board for an additional year. T1202:8-21 (Louie). FMG also handles the annual and *ad hoc* independence questionnaires that must be submitted to the Trustees. DX-142.2 at Bates 4380.

### *Conclusion on FMG's Services to the Funds*

Plaintiffs have failed to meet their burden in demonstrating that FMG delegated all of its duties. The Court finds that FMG continued to perform significant administrative and investment management duties, despite the fact that some duties were delegated to subs. The managerial role that FMG plays in coordinating with sub-advisers and sub-administrators is extensive. This is especially true as it pertains to organizing materials to be submitted to the EQAT Board. Without FMG's oversight, organization, and compilation of the raw information provided by the subs, the EQAT Board would not have access to the materials upon which it relies in the 15(c) process. Moreover, the full services of FMG, beyond those explicitly outlined in the written contracts, warrants compensation through a fee. The duties performed by FMG are far more extensive than Plaintiffs' contention that FMG delegated all of its work to the subs.

It is also important to note that much of the contract language is generic and broad, and could easily be interpreted differently. It's clear from the trial testimony that FMG performed a host of duties that may not have been explicitly enumerated in the contracts. It is not uncommon for sophisticated business entities to come to a more specific understanding of their relationship, and undertake tasks throughout the course of business that may not have been explicitly outlined in a fairly boilerplate agreement. To adopt Plaintiffs' position that the contract language alone controls would be, in Defendants' words, elevating "form over substance." ECF No. 285-2, DCRPFOF, ¶ 349. It would be unreasonable for the Court to ignore the testimony of FMG employees, especially Joenk, who has first-hand knowledge of the inner-workings of FMG, in favor of Plaintiffs' theory that the contracts alone define the scope of the parties' relationship. There was substantial testimony demonstrating all of the duties that FMG retains. Plaintiffs' insistence that the contracts control is insufficient to demonstrate that FMG delegated all of its

duties. There were duties and responsibilities beyond the contracts. These included, *inter alia*, overall supervision and management of sub-advisers and sub-administrators; a number of portfolio investment services, including construction and restructuring of portfolios, setting benchmarks, structural changes to Funds, fund conversion, and formulating investment strategy; legal and compliance work; and Board governance services.

Plaintiffs have not met their burden of proof because they failed to consider these other services, beyond the contracts, which FMG performs.

### 10.   Services Provided by AXA in Support of FMG and the Funds

The credible testimony also demonstrated that AXA performs a host of services for FMG in supporting the Funds, including legal services, disaster recovery, call centers, and infrastructure and support services. A description of these services is discussed below. The costs associated with these services are discussed in the "Profitability" section, *infra*, p. 99.

#### *AXA's Legal Services*

AXA provides a number of legal services to the Funds, including handling various bankruptcy matters that involve securities held by the Funds, and litigation involving the Funds. T4264:6-11 (Louie). AXA also handles compliance with anti-money laundering laws, and monitors for violations of these laws by screening deposits by investors and checking shareholder identities. T4259:5-4260:8 (Louie). If AXA discovers suspicious activity, it prepares and files a report documenting same. T4259:5-4260:8 (Louie). AXA also conducts the annual audit of the Funds' anti-money laundering program. T4259:18-21 (Louie). No FMG employee performs this service. T:2848:2-20 (Joenk).

AXA also handles a number of regulatory filings. For example, AXA is responsible for filing with each State's insurance department the mandatory "plan[s] of operation" for the Funds, as well as periodic amendments. T4262:15-4263:9 (Louie). Moreover, AXA performs certain

94

1934 Act filings relating to the ownership of the Funds' securities. T4264:1-5 (Louie). AXA assists with any state filings related to the organization of FMG or the Funds. T4264:1-5 (Louie). AXA also aids in inquiries from state-level insurance and securities regulators. T4263:21-4264:5 (Louie). Although there was no in-depth description of the precise matters or cases that were managed by AXA on behalf of the Funds, the Court finds that this service is performed by AXA in support of FMG and the Funds.

### *AXA's Disaster Recovery Services*

Although Plaintiffs maintain that the cost of AXA's Disaster Recovery Services should be covered by the costs associated with the Shared Services Agreement, Joenk's credible testimony indicated that the Shared Services Agreement applies only to "dual-hatted" employees, who are on loan from AXA to FMG. Pursuant to the Shared Services Agreement, "AXA Equitable will maintain back up records, which will be available to FMG in the event of a disaster. The AXA Equitable disaster recovery site, which it maintains, will be available to FMG as required. AXA Equitable shall promptly transfer all such records, books and files to . . . FMG upon termination of this Agreement." P-273 at ¶ 7. Joenk explained, "disaster recovery is required under the regulations" and FMG is required "to have a business continuity program that is tested on a periodic basis and is well documented." T2629:2-4 (Joenk). Disaster recovery requirements are specific to mutual funds. T2629:7-9 (Joenk). According to Joenk, if the systems go down, shareholders still need to be able to call in and make trades. T2629:10-11 (Joenk). He expounded, "[a]nd if you're unable to execute those trades, when you [later] can execute those trades[,] you have to go back and re-process what should have occurred on the days when you weren't able to [do so]." T2629:12-15 (Joenk). Joenk was asked, "[a]nd who's

going to pick up the tab if there's a discrepancy?" T2629:16-17 (Joenk). Joenk replied, "[w]ell, up to date it's been . . . AXA Equitable or whoever caused the issue." T2629:18-19 (Joenk).

The Court finds that this a service provided by AXA, the cost of which is not explicitly provided for under the Shared Services Agreement. Moreover, Plaintiffs only disputed the cost associated with this service (*i.e.* that it should have been subsumed by the costs of the Shared Services Agreement), not whether AXA performs this task. Therefore, the Court finds that AXA performs this service to support the Funds.

### *AXA's Call Centers*

Joenk explained service centers as "the interface group between the transfer agent and the shareholder activity systems" or "call centers." T2625:15-23 (Joenk). FMG uses call centers for "interacting with clients" in order to address client questions and requests regarding their insurance policies with AXA. T352:15-17 (Joenk). There are three call centers, located in Charlotte, North Carolina, Syracuse, New York, and Harmon Meadows, New Jersey (T554:21-24 (Joenk)) employing roughly one thousand people total. T2839:25 (Joenk). All employees of the call centers are employees of AXA, not FMG. T2859:1-2 (Joenk).

The call centers provide services beyond "any support that might be offered with respect to investment management services or administrative services provided by FMG." T555:1-3 (Joenk). The call centers neither employ registered salespeople nor make outgoing sales calls T2836:1-14 (Joenk). They usually answer questions only after a contract has been purchased – "[t]hey do answer questions if an agent or a broker . . . has a client that has a question on a contract, but they're not the sales desk." T555:5-10 (Joenk).

Joenk does not receive reports that indicate whether the calls are made with respect to an existing contract, as opposed to a contract that AXA is trying to sell. T555:14-18 (Joenk).

However, the centers typically address a limited set of client questions and concerns, such as "what are my balances; can you change my address; can I move money from one fund to another fund; what is my benefit base up to; can I get a copy of the annual report; can I get another copy of my statement; I don't understand this can you explain it to me; things like that." T2836:15-20 (Joenk). The 300,000 unlabeled calls in DX-73.3[28] were not actual transactions – "some of the others might be [asking for a] fund's annual report or prospectus [to be] mailed . . .[or] a performance number; those are all things that don't . . . create confirms back to a client or a shareholder." T3241:13-16 (Joenk).

Joenk decided to "allocate the service centers to the distribution fees as opposed to the fees that Plaintiff pays to FMG" (i.e. investment management and administration fees) in the profitability analysis that he gives to the Board. T561:12-16 (Joenk). The only revenue included in distribution profitability is the 12b-1 fee revenue, which is "paid to the distributors for . . . marketing support and distribution of service . . ." T2829:25-2830:7 (Joenk). In other words, Joenk does not include the cost of maintaining the call centers in his calculation of FMG's profitability. Joenk discussed with the Board that he believed this to be "a conservative allocation," and agreed that if he had "moved those expenses into management or administration, it would decrease the profitability." T2839:21-23 (Joenk). In terms of the magnitude of change in profitability that would occur if the call center costs were placed under management/administrative costs, the $308 million in allocated expenses in P-52a would move by "a sizeable number." T2840:1-3 (Joenk).

Joenk cited the Harmon Meadows call center as a pertinent example because "the EQAT Funds are part of the servicing that gets done" (T3236:16-17 (Joenk)) at the location's

---

[28] This exhibit is a copy of the presentation to the EQAT Board given by a representative of the Harmon Meadows call center.

97

"retirement service center." T3236:17 (Joenk). That particular center fielded 769,000 calls in 2010, which were "calls from shareholders directly to the call center." T2861:1-4 (Joenk); *see* DX 73.3. Of those 769,000 calls, 96,000 were client requests to move money from one Fund to another, which Joenk considers "shareholder activity." T2861:9-14 (Joenk). Shareholder activity is considered an allocated cost, and therefore is considered in Joenk's analysis of FMG's profitability. Fund transfers and re-allocations processed are examples of shareholder activity. However, the other 769,000 calls were not transfers, but rather for other services such as "information requests, for documents to be sent to them, or for performance requests or balance requests or address changes." T2861:22-25 (Joenk). Joenk categorizes all of these as distribution costs.

According to Joenk, the "front end" of a call (the "reception of a call") is considered a distribution expense, "including all the employees that pick up the phone" who get the transfer process going. T2862:25-2863:3 (Joenk). However, once the call goes into the system and it gets processed, any expenses incurred are included "in the 49 million" in allocated costs, discussed *infra*, p. 107. T2862:25-2683:7 (Joenk).[29] Regardless of the accounting, the Court finds that this is a service provided by AXA in support of the Funds.

### *AXA's Infrastructure and Support Services to FMG*

AXA also provides infrastructure and support services to FMG, including human resources ("HR") treasury, and account payable functions. T2845:9-15 (Joenk); T2485:20-25

---

[29] Although Plaintiffs contend in their post-trial findings of fact that Defendants were attempting to utilize transfer agency services as the "primary basis for the [$49] million in annual AXA allocated expenses," Joenk's testimony is to the contrary. ECF No. 285-2, DCRPFOF ¶ 760. As stated, the front end of the call is considered a distribution expense, and only if the call is processed in the system does it become part of the $49 million in allocated costs. T2862:25-2863:7 (Joenk). Therefore, Plaintiffs' contention that transfer agency became a central component of the trial in order to justify $49 million in allocated costs is without merit. Although Joenk was questioned at length regarding transfer agency, the Court did not find this testimony pertinent. As such, to the extent that transfer agency arose in the trial, the Court finds that it had little bearing on whether the fees under the investment management and administrative contracts were excessive.

(Joenk). For example, AXA's HR department handles pension, health and other benefits for FMG employees. T2852:7-8 (Joenk); T340:22-341:11 (Joenk). AXA's treasury department deals with FMG's cash management, including bill payment and seed capital loans. T339:18-340:7 (Joenk); T2851:12-21 (Joenk). Therefore, this is another service provided by AXA in support of FMG.

### Conclusion Regarding AXA's Services

Regardless of the accounting associated with these services, the credible testimony demonstrated that AXA performed a number of services in supporting both FMG and the Funds.

### C.   Profitability

In addition to claims about the nature and quality of the services FMG and AXA provide, and about the Board's independence and conscientiousness, Plaintiffs assert that FMG's profitability is far higher than reported to the Board. This allegedly occurred because the methodology used to determine profitability, an accounting procedure utilized by FMG, improperly excluded certain expenses, which artificially lowered FMG's profitability numbers that were presented to the Board. The expenses that Plaintiffs challenge are: (1) FMG's accounting treatment of sub-advisory and sub-administration expenses; and (2) approximately $50 million in so-called "Allocated Expenses" charged by AXA to FMG for services rendered in supporting the Funds. Plaintiffs claim that FMG should have excluded both of these expenses from its profitability calculations, and if it had done so, its profit margins would have been exorbitant. Each is discussed below.

### 1.   Defining Profitability

The crux of the case concerns FMG's "profitability" and the accounting underlying same. Generally speaking, profit is the summation of gross sales/revenues/earnings less expenses and

taxes, which equates to net income/profit. *Gartenberg*, 694 F.2d at 931 n.4.  This is presented in financial documents, specifically the income statement.  T571:16-23 (Plaintiffs' Opening).

In order to estimate its profitability for the Board, FMG uses a process in which it apportions joint and common costs to its function of operating the Funds.  T3610:1-12 (Schpero). The costs are broken down into: (1) "direct expenses" that are incurred directly by FMG as the investment manager and administrator of the EQAT Funds; and (2) "allocated expenses" billed by AXA to FMG for services provided to FMG in support of FMG's responsibility to act as manager/administrator to the Funds.  T2841:11-2844:9 (Joenk); T609:25-610:12 (Joenk); P-210 at Bates 6732-75; P-52a at Bates 4137.  Overall, these expenses are:

| Category of Expense | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| FMG Direct Expenses | $7,195,000 | $11,464,000 | $12,267,000 | $11,419,000 | $15,915,000 |
| AXA Expenses Allocated to EQAT Funds | $48,881,000 | $52,041,000 | $46,864,000 | $49,454,000 | $61,872,000 |

DX-2051.  Plaintiffs dispute FMG's direct expenses and AXA's allocated expenses.  More specifically, Plaintiffs dispute the direct expenses because they include sub-adviser and sub-administrator costs in breach of accounting rules.  Plaintiffs dispute the allocated expenses for because the allocation method is allegedly in violation of accounting standards because it uses revenue as a cost driver, and/or should be limited to the costs associated with the Shared Services Agreement.  Generally, Plaintiffs contend that if Defendants had properly calculated their profitability by excluding sub-advisory and sub-administration fees from direct costs, and reworked the allocated cost methodology or limited those expenses under the Shared Services

100

Agreement, FMG's profitability margins would rise dramatically and exceed 90 percent, far above industry norms.  T2361:2-9 (Kopcke).

### 2.    FMG's Treatment of Sub-Advisory and Sub-Administration Fees as Expenses

FMG classified payments made to sub-advisers and the sub-administrator as "an expense to FMG" on its profitability reports to the Board.  ECF No. 285-2, DRPPFOF, ¶ 287. Plaintiffs argue that the classification as expenses is improper and should be excluded from the calculation because the sub-advisers and sub-administrators are paid directly from the EQAT's bank account, not FMG's.  The wire transfers to the subs do not originate from FMG's bank account, but are sent from "another bank account, associated with the EQAT Fund." T377:2-3 (Joenk); T376:14-377:3 (Joenk).  By including the subs' expenses as an FMG expense within the profitability analysis, FMG is significantly lowering its profit margin by the total amount of the wire transfer.

Joenk justified the fees as an expense to FMG because FMG has the responsibility to pay those subs and supervise their work.  Joenk noted:

> You know, when we terminate a sub-advisor part of their contract is that they get 30 or 60 days of termination pay.  So if we terminate a sub-advisor and they're no longer managing the portfolio, FMG pays that termination fee.

T2934:11-16 (Joenk).  Joenk furthered that payment directly to the subs from EQAT was for "operational efficiency[,]" so that the wire transfer only occurred once, rather than a two-step process—one transfer from EQAT to FMG and another from FMG to the subs.  T2933:23-2934:7 (Joenk).

Schpero explained that industry accounting practice did not require that these expenses be noted as a reduction in revenue, which he verified through discussions with the Board's

101

independent counsel. T3605:18-3606:2 (Schpero).  Furthermore, he testified that the Board's two independent accounting firms did not require that the fees be considered a reduction in revenue. T3605:18-3606:5 (Schpero).

Plaintiffs offered Barrett's testimony on this issue.  However, Barrett lacked credibility because his testimony was inconsistent on whether sub-advisory fees should be properly treated as an expense to FMG.  First, Barrett opined that the sub-adviser and sub-administrator fees should not be considered expenses because the amount of these fees was never subtracted or paid from FMG's account. T1377:3-1379:14 (Barrett).  However, on cross examination, Barrett admitted that treatment of these fees as expenses was consistent with the industry and specifically with cases in which he had worked. T1597:15-1598:9 (Barrett).  Hence, his testimony was muddled, and as mentioned earlier (see pages 25-26, supra), the Court gives his opinion little weight.

Moreover, Holder testified that "the classification as expenses . . . was perfectly appropriate." T3925:22-23 (Holder).  Holder also testified that treating sub-adviser and sub-administrator fees as expenses, which was done on FMG's financial statements, is appropriate because "those financial statements were audited by PricewaterhouseCoopers . . . I take comfort from and influence by the accounting treatment that was attributed there, and PwC's unqualified or clean opinion on those ... financial statements." T3938:10-15 (Holder).  Holder concluded that under principles of managerial accounting, it was appropriate for FMG to classify sub-advisory and sub-administrative fees as expenses. T3940:14-17 (Holder).

The Court finds that reporting sub-adviser and sub-administrator fees as expenses is within ordinary accounting principles.  The Court finds Holder's testimony to be more credible than Barrett's testimony.

### 3. AXA's Allocated Costs to FMG and FMG's Subsequent Allocation to the Funds

The allocated cost issue is more complex than the one previously mentioned above. In broad terms, Plaintiffs contend that the cost allocation methodology ("CAM") of FMG is inconsistent with accounting standards; and alternatively, if found to be consistent with accounting standards, then these "allocated costs" should be limited to those costs associated with the Shared Services Agreement between AXA and FMG. The CAM is presented first, and subsequently the Shared Services Agreement is discussed.

Barrett defined cost allocation as "assigning costs to certain things; it could be certain activities, it could be different companies, it's the process of splitting up costs based on some objective." T1398:20-25 (Barrett). According to Barrett, common costs are allocated based on cost drivers. Barrett testified that when allocating costs "you have to use some basis for the allocation, something logical . . . something that has a cause and effect relationship." T1455:8-11 (Barrett). For example, when allocating costs for facilities, a logical cost driver would be the cost per square foot of those facilities. T1715:22-1716:2 (Barrett). Barrett testified that such a methodology has a "fair and reasonable basis" for allocating costs. T1385:22 (Barrett).

FMG chose revenue as its cost-driver. FMG determined that 97 percent of its revenues are derived from three sources—investment portfolios, general account spread, and wrapper fees. FMG then determined the percentage of revenue from each of those three sources.[30] Barrett opined that the cost allocation method based on revenue is contrary to accounting principles. Barrett testified that FMG's allocation of its expenses based on revenue is unreasonable because

---

[30] AXA's Cost Allocation Method ("AXA CAM") and the subsequent allocation by FMG ("FMG CAM") has a three-step process (A, B, and C), as seen in chart P-210 in the Appendix to this Opinion. P-210 was often referred to during trial as an easy depiction of how the AXA CAM and FMG CAM operated. To non-accountants, like the Court, it is difficult to follow. Due to its frequent use at trial, it is described in the Appendix.

revenue is not an appropriate cost driver, as it does not relate the allocated amount to the behavior of the expenses. T1465:11-24 (Barrett). He characterized using revenue as a cost-driver as a "self-fulfilling prophesy" because "the more revenue—the higher rate [FMG] charge[s] . . . the more expenses they allocate." T1466:15-18 (Barrett). In short, there is no nexus (no rational cost driver) between this allocated amount and the actual expenses. Barrett contends that since this allocation methodology is in error, the profitability is also incorrect.

In reaching his opinion, Barrett relies upon the cost allocation methodology used by AXA (AXA-CAM) as a good example of how to allocate costs. Barrett testified that "AXA CAM is actually quite a robust, relatively sophisticated methodology . . . I believe they have costs broken down into about 1,500 cost centers, and within each cost center they have identified cost drivers that allow them to allocate each cost center's cost to various cost objects, products, or departments or something like that." T1440:7-13 (Barrett). To Barrett, when allocation is based on sensible cost drivers, it is an appropriate allocation. Although Barrett did not know the precise cost-drivers used within the AXA CAM, he was satisfied that due to the large number of cost centers (1,500), that the AXA CAM had appropriate precision.

Barrett's testimony was inconsistent. On cross-examination, Barrett stated that it was "absolutely not" reasonable and it was "completely inappropriate" to use revenue as a method to allocate expenses. T1534:13–20 (Barrett). Thereafter, Barrett admitted that in his rebuttal report, he wrote that allocating costs based on revenues is "a generally accepted cost accounting measure [where] circumstances [show] specific cost records [are] not available." T1536:7–12 (Barrett). Barrett tried to minimize this inconsistency by noting that using revenues to allocate costs is an appropriate measure "under extraordinary circumstances." T1536:16–18 (Barrett).

Barrett indicated that accountants would not look to Generally Accepted Accounting Principles ("GAAP") for guidance in preparing profitability reports. T1558:11–14 (Barrett). Yet, when confronted with his video deposition, he acknowledged that accountants "might" look to GAAP in the situation to see what it would require. T1558:22-25 (Barrett). Due to this inconsistency, Barrett said that he "perhaps ... mistook" the previous question and changed his earlier response to say "you might look to [GAAP] as one consideration." T1558; T1559:3-11 (Barrett).

Barrett was asked if "it is correct that cost accountants allocate costs based on revenue when they don't have something better available, almost as a fall-back." T1537:10-12. Barrett responded that this is "not correct." T1537:13-14 (Barrett). However, his deposition testimony differed, where he noted that cost allocation methodology based on revenues is appropriate if you "don't have something better." T1538:9-10 (Barrett).

Holder disagreed with Barrett's conclusion that using revenue is arbitrary and irrational. Holded stated that:

> . . . I don't think it's either [arbitrary or irrational.] I certainly understand that in this instant case cost drivers were really not available to make this allocation. Again, if the overarching desire is to estimate the costs that are incurred in generating in this case these revenue streams, that some process of allocation of those costs to those revenue streams is going to be necessary.

T3958:10-16 (Holder).

Joenk also testified as to FMG's cost allocation methodology. Joenk stated that FMG asked PwC to "help us figure out a profitability mechanism so that we can evaluate the profitability of the management and administrative contracts to the manager." T610:9-12. (Joenk). He stated that "Pricewaterhouse was hired to help develop this methodology, back in

2000, since it was the first year we were doing profitability." T609:5-7 (Joenk). Joenk testified that FMG uses revenue as a cost allocation driver, explaining:

> Allocation is an art so there are many ways you can do it. We use revenue under the theory that I spoke about that evidence is spent where the greatest return is. So if the wrapper has a bigger revenue contribution than the funds, most people will spend their time focusing on the insurance product or the wrapper.

T2796:17-24 (Joenk). Joenk also testified that FMG has employed the same cost allocation method every year so that it could be tracked year to year and identify changes. T2821:7-16 (Joenk).

Lastly, Barrett did not opine as to a different cost driver that could be used. Barrett was asked what other methodology FMG should have used to allocate expenses. T1540:11-14 (Barrett). Although Barrett did not specifically identify a method, he testified that "it's not that difficult to do[,]" but he could not do so without FMG's expenses. T1540:25 (Barrett). Previously, Barrett posited differently. He stated that it would be "very difficult," and "that's why they used revenue[s]" here. T1541:10-15 (Barrett). Moreover, Ernst & Young and PwC were involved in creating FMG's methodology for allocating expenses based on revenue. T1546:12-15 (Barrett). Barrett did not locate any documentation suggesting that either Ernst & Young or PwC thought cost allocation based on revenue was unreasonable. T1546: 20-14 (Barrett).

In conclusion, the Court gives more weight to the testimony of Holder and Joenk over that of Barrett. As such, the Court finds that the cost allocation method based on revenue is consistent with accounting principles.

### 4.   $49 Million in Allocated Costs & the Shared Services Agreement

Barrett testified that $49.42 million of allocated costs for AXA services to FMG is extraordinary in light of the terms of the Shared Services Agreement. As a preliminary matter, the Shared Services Agreement is an intercompany agreement between AXA and FMG, and sets forth the services AXA provides to FMG. P-273. The Agreement was created in 2011, around the time FMG became a separate legal entity from AXA. T2913:16-20 (Joenk); T1324:4-5 (Barrett). The Agreement was signed by Richard Dziadzio, Executive Vice President of AXA, and Joenk. P-273 ¶ 4; T177:6-178:12 (Joenk). It was created for legal reporting purposes under state insurance rules, and AXA has approximately forty or forty-five of these types of agreements currently in use. T2911:22-25-2912:1-7 (Joenk). Joenk also stated that the document has been approved and vetted by the New York Department of Financial Services, which is New York State's banking and insurance agency. T2912:15-17 (Joenk).

Joenk testified that the Shared Services Agreement is a "standard agreement" AXA uses to cover the expenses associated with the services of the approximately fifty AXA employees on loan to FMG, which Joenk refers to as the "business unit." T2914:12-24 (Joenk). The Shared Services Agreement, according to Joenk, primarily covers the compensation, office space, and office supplies, such as telephones and computers, used by FMG's employees. T2919:24-2920:1-10 (Joenk). Joenk, however, stated that the Shared Services Agreement does not cover, for instance, other services provided strictly by AXA's employees who are not part of FMG. These services include legal services, bankruptcy work, anti-money laundering consulting, or phone and service centers. T2920:11-25 (Joenk). These services were discussed *infra* at page 94.

107

According to the Shared Services Agreement, AXA is to provide FMG with the

following:

> . . . the personnel, property and services reasonably necessary to
> perform [FMG's] management, administrative and other non-
> insurance related functions. The services to be furnished may
> include, without limitation, management, corporate finance,
> strategic planning, administration, office and general supplies,
> financial, treasury and cash management, printing, actuarial,
> accounting, tax, auditing, legal and regulatory, human resources,
> corporate and financial communications, public relations,
> advertising, marketing, risk management, technology and corporate
> secretarial services.

P-273 at Bates 9910; T189:15 to 190:7; 614:11-16 (Joenk). In consideration for AXA's

provision of these services, Section 4 of the Shared Services Agreement requires that:

> FMG shall pay the actual costs (direct and indirect) and expenses
> incurred by AXA Equitable in furnishing personnel, property and
> services pursuant to this Agreement. Such actual costs and expenses
> shall include all direct and indirect expenditures related to the
> furnishing of such personnel, property and services, including
> related wages, office space and overhead, as appropriate.

P-273 at Bates 9911; T614:11-16 (Joenk). At the end of each year, AXA calculates the amount

of "direct" and "indirect" expenses that FMG owes and FMG makes a payment in that amount.

T193:4-12 (Joenk); ECF No. 285-2, DCRPFOF, ¶ 504. The total expenses charged to FMG

under the Shared Services Agreement are as follows:

| 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|
| $13.5 million | $13.6 million | $30.1 million | $27.1 million. |

P-88 at Bates 4459; P-89 at Bates 7291; and P-90 at Bates 2042; ECF No. 285-2, ¶ 508.

Barrett testified that the expenses under the Shared Services Agreement should cover all

the costs to AXA in supporting FMG. Although Barrett did not dispute the direct costs

108

associated with the Shared Services Agreement,[31] he stated that if there was another $49 million worth of expenses, he "[could not] imagine why it wouldn't have been charged under the [Shared Services Agreement], if in fact, the true expenses are $49 million higher than the cost of the [Shared Services Agreement]." T1484:19-22 (Barrett).

Barrett stated that P-210 was a chart of services provided by AXA outside of the 51 employees of FMG. T1605:18-21 (Barrett). Of the services listed, Barrett testified that he was unaware if these services would be in the $49 million of allocated expenses or included under the direct expenses. T1605:22-25 (Barrett). For example, Barrett did not know whether FMG or AXA's legal department would handle a bankruptcy case, and therefore did not know whether this expense would be included as a direct or allocated expense. T1606:12-1608:7 (Barrett).

Barrett also stated that he does not "see anything on [P-210] that reasonably would amount to money of any real significance," (T1485:1-4 (Barrett)); however, he stated that he has "no basis to say that these [services] aren't already [accounted for] in the [$]14 million" except for "deposition testimony in this matter that . . . basically says that these are expenses that aren't in the [$]14 million." T1485:4-8 (Barrett). When questioned why these services would not have been included in the direct expenses, Barrett responded that the "only logical reason I can think of is that they were so remote in their relationship to FMG, which would be consistent with their description here, and they were so small, that maybe it just [was not] worth bothering with." T1485:12-15. Barrett concluded that the $49 million in allocated expenses is "ridiculous" when considering the Shared Services Agreement and the inappropriate cost allocation method utilized by FMG. T1484:2-18 (Barrett).

---

[31] As depicted, the direct costs associated with the Shared Services Agreement ranged from $13.5 million in 2011 to $27.1 million in 2014.

109

Goldstein stated that he was aware of the Shared Services Agreement with FMG, but stated that he believes the Shared Services Agreement is a more accurate representation of the "true expenses" that FMG incurred in managing the EQAT Funds. T2176:23-2177:5-7 (Goldstein). Goldstein also testified that he did not read the Shared Services Agreement, but he reviewed it and has seen it. T2177:11-13 (Goldstein). Goldstein stated that he was unsure whether the Agreement was provided to the Board. T2177:14-16 (Goldstein). Because Goldstein did not read the Shared Services Agreement, nor did he provide a basis for his conclusion that it represents the "true" expenses, the Court gives his testimony very little weight.

Defendants countered Plaintiffs' testimony on the $49 million in allocated costs. Initially, Joenk indicated that the Shared Services Agreement has no impact in the preparation of profitability statements for the Board, and does not affect the general services provided to the Funds at issue in this case. T2917:13-19 (Joenk). Moreover, Joenk testified that the Shared Services Agreement bears no impact on the fees paid by the Funds to FMG. T2917:20-22 (Joenk). He further stated that costs were allocated from AXA to FMG for a number of years prior to the existence of the Shared Services Agreement. T2918:4-6 (Joenk); *see also* DX-2051. He also stated that the Shared Services Agreement does not impact how costs are allocated for the profitability statements given to the EQAT Board. T2917:13-16 (Joenk). Ernst & Young also helped develop the cost allocation methodology, and FMG relied on that advice. T2792:11-13 (Joenk).

Joenk testified that the Board did not receive the Shared Services Agreement when it first became effective in 2011. Joenk believed it was "irrelevant," because after the Agreement was created, there were no changes in services to the Board, no change in fees, and FMG was not planning to use the Agreement for any purpose related to the EQAT. T2928:10-13 (Joenk). He

also stated that although the Board was not initially provided a hard copy of the Services

Agreement, the Board was informed that the Agreement existed. T2927:21-25 (Joenk). The

Board was not provided physical copy of the Shared Services Agreement until 2013, sometime

after Joenk was deposed for this case. T615:10-19 (Joenk). After being provided the

Agreement, Joenk testified that the Board approved the administrative services and management

contracts. T2929:14-18 (Joenk).

Although Barrett characterized the $49 million in allocated expenses as "ridiculous"

Joenk countered that $49 million amounts to only 2.15 percent of AXA's total expenses that get

allocated to the EQAT Funds' management and administration. T2801:12-2802:4 (Joenk).

Joenk also testified to the "Shared Services Slide" (P-210 at Bates 6734), which was presented to

the Board in 2013 and included it in its cost allocation presentation. The right-hand box below

provides a non-exhaustive list of the services provided by AXA to support FMG and the Funds.

T1184:2-6 (Louie); T3369:3-11 (Joenk).



P-210 at Bates 6734.

Joenk contends that these non-exhaustive services justify the $49 million in allocated costs. Plaintiffs take issue with this chart on several grounds. Firstly, it was only provided to the Board in 2013, after the filing of the Complaint in this matter. Secondly, Plaintiffs insist that it outlines the same services that are covered by the Shared Services Agreement between FMG and AXA. As such, Plaintiffs contend that it cannot justify $49 million in allocated costs.

Holder indicated that the language of the Shared Services agreement is "permissive" and describes services that may be provided by AXA, not services that are required to be performed. T4017:5-6 (Holder). Moreover, Holder stated that this permissive language indicates to him "as an accountant that not all of the costs necessary to the operation of these funds may be provided through the operation of this particular agreement." T3960:16-3962:10 (Holder). The Court finds Holder's "permissive" analysis suspect because he is an accountant rather than an attorney. The Court agrees that there are other costs, such as ancillary support on legal matters and call centers. However, Defendants never quantified the costs of these services, beyond stating that they amount to $49 million.

The Court finds that Barrett raised a valid point that the $49 million in allocated expenses is not adequately accounted for, but Plaintiffs failed to offer any credible evidence demonstrating that these costs were duplicated with those under the Shared Services Agreement. Although Barrett said it was "ridiculous" to suggest that AXA could have incurred anywhere near $49 million in expenses to support FMG's provision of investment management and administrative services to the Funds, Barrett failed to substantiate same in his testimony. T1484:6 (Barrett). Barrett did not, for example, indicate what these support services would typically cost an insurance or mutual fund company, or provide any concrete basis for his characterization that $49 million was "ridiculous." Similarly, Defendants failed to illustrate how these costs would

112

amount to $49 million. Therefore, the Court has no reliable evidence to determine whether these costs are truly "ridiculous," as Barrett indicated.

On the other hand, $49 million represents only 2.15 percent of AXA's costs. T2807:25 (Joenk). This small percentage demonstrates that AXA's support services to FMG, listed in P-210, could be reasonably justified. The Court also finds Joenk's testimony credible because: (1) the Allocated Costs represented the costs of AXA's services to the Funds prior to the existence of the Shared Services Agreement (T2922:5-8 (Joenk)); and (2) the Shared Services Agreement came into existence in 2011, the same year that FMG became a separate entity from AXA, demonstrating that the Deparment of Insurance required same. In short, although the scope of the costs and services under the Shared Serivces Agreement is ambiguous and it appears to have been drafted in a haphazard manner, there is no substantive proof of any incorrect costs being assessed.[32]

### 5.    Conclusion on Profitability

Plaintiffs have failed to demonstrate that the accounting methodologies used by FMG and AXA were improper. As an initial matter, Barrett served as Plaintiffs' expert in this area, and he lacked credibility. His conclusions regarding FMG's treatment of certain expenses fell short of establishing that the Board received misleading or improper information on FMG's profitability. Plaintiffs failed to establish that it was improper for FMG to treat sub-advisory and sub-administration fees as an expense when reporting profitability to the Board. The same is true of using revenue to allocate costs. Barrett conceded that allocating costs based on revenues is "a generally accepted cost accounting measure [where] circumstances [show] specific cost records [are] not available." T1536:7–12 (Barrett). Barrett also failed to opine as to a different method

---

[32] In the Court's opinion, this is an issue the Board should review.

for FMG to allocate costs. As such, Plaintiffs failed to show that FMG's accounting was improper. Plaintiffs also failed to meet their burden as to the $49 million in allocated costs. Joenk's credible testimony explained the Shared Services Agreement and its relationship to the $49 million in allocated costs. Even if the Court were to discredit Joenk's testimony due to his bias, it is Plaintiff's burden to prove that FMG's profitability numbers were inaccurate due to faulty accounting. Here, there were some services provided, and *Jones* makes clear that the burden of proof under the ICA for breach of fiduciary duty remains with the Plaintiffs at all times.

For these reasons, Plaintiffs failed to meet their burden as to profitability.

### D.    *Economies of Scale*

Generally speaking, economies of scale is a condition where the average per-unit cost of manufacturing a product declines as the total output increases. ECF No. 285-1, DCFOF, ¶ 442. In the mutual fund industry, output is the amount of assets under management. T4114:19-4115:14 (James). For example, when a fund increases in size from $2 billion to $4 billion under management, the overall costs might go up, but the per-unit cost should decrease, benefitting the fund overall. T4115:21-25 (James). Economies of scale present two questions that must be addressed: (1) whether there are economies of scale and (2) to what extent savings resulting from economies of scale are shared. T4128:6-9 (James). "Those are two different concepts from an economic perspective." T4128:6-9 (James).  The most common way in which savings resulting from economies of scale are shared with investors is through breakpoints. In this case, breakpoints are shown in the fee schedules (*see* Appendix), which provide that the fees charged to investors decrease as the assets in the Fund increase. T93:20-25.

Here, it is undisputed that from 2010 to 2014, the assets under management ("AUM") in the EQAT as a whole increased from $72.2 billion to $116.9 billion. ECF No. 285-2, DCRPFOF

114

¶ 664. Furthermore, from 2010 to 2014, the AUM in the Plaintiff's Funds increased in aggregate assets. ECF No. 285-2, DCRPFOF at ¶ 675. All of the at-issue Funds in this case have breakpoints in their fee schedules. For example, the EQ/Common Stock Index Portfolio had a fee schedule of 0.350% on the first $4 billion of assets, 0.340% on next $4 billion of assets, and 0.330% thereafter. *See* Appendix. This decrease in percentage shows that the fees decrease as the assets increase. Moreover, it is further undisputed that both FMG and the sub-advisers have breakpoints in their fee schedules. T739:14-16 (Joenk). However, many of the sub-advisers breakpoints occur before FMG's breakpoints, and when that occurs, the savings achieved are not to the investors, but to FMG. T739:14-22 (Joenk).

Plaintiffs presented Barrett, Kopcke, and Pomerantz on the issue of economies of scale; but none of the Plaintiffs' experts satisfactorily quantified a dollar amount for FMG's savings achieved by economies of scale, nor how much should have been shared with investors. ECF No. 276, PRDPFOF, ¶ 449.

Pomerantz, utilizing FMG's direct expenses only, concluded that FMG's costs have been fairly constant over time. T1910:25-1911:6 (Pomerantz). This is inconsistent with economies of scale because costs should decrease as assets increase. Pomerantz also found that the Fund saved $33.2 million due to breakpoints. T1915:2-6 (Pomerantz). However, Pomerantz concluded that $33.2 million was marginal because half of this savings comes from breakpoints in the sub-adviser's fee schedule, thereby benefitting FMG, rather than investors. T1916:6-1917:5 (Pomerantz). Additionally, he found that FMG only shared $17 million of the total $33.2 million in savings, representing 2.4 percent of FMG's total revenue of $600 million (excluding 2015). T1916:6-14 (Pomerantz). Conversely, the savings shared by the sub-advisers through breakpoints was about 8.5 percent of their revenue. T1916:6-1918:8 (Pomerantz). Therefore,

Pomerantz concluded that FMG did not share the savings achieved by economies of scale with investors, but instead FMG received benefits from the sub-advisers' breakpoints schedule.

Kopcke analyzed economies of scale by examining the amount of the fee FMG retained as Fund assets increased. T2317:12-15 (Kopcke). Kopcke said that, "while the assets increased, the direct costs that [FMG] reported for their management and admin services totaled about 11, 12 million." T2373:21-23 (Kopcke). Kopcke concluded that FMG's retained fee schedule slightly declined and in some cases actually increased. T2317:19-20 (Kopcke). The fee schedule shows that the costs of providing services increased as assets increased. T2371:11-20 (Kopcke). Like Pomerantz's analysis, this is inconsistent with economies of scale. Although Kopcke stated that the fee schedule did not reflect economies of scale and concluded that FMG does not share economies of scale with investors, he did not provide adequate support for his conclusion. T2372:4-23 (Kopcke).

Defendants presented James on the issue of whether any savings from economies of scale were passed on to investors. James analyzed how the breakpoints for the various Funds result in savings for investors. T4128:6-13 (James). James concluded that the cumulative management and administrative fee breakpoint savings that shareholders received for the at-issue Funds was $68.8 million. T4129:15-25 (James). James disagreed with Pomerantz's testimony that FMG's costs are fairly constant. Rather, James concluded that Pomerantz incorrectly evaluated FMG's economies of scale because he only looked at direct costs, whereas he should have used total costs, which include allocated costs from AXA and variable costs such as sub-advisory fees. T4120:21-4121:16 (James); ECF No. 276, DPFOF ¶ 445. James also testified that Kopcke's and Pomerantz's conclusions were unreliable because they did not measure unit costs, which are the key markers of economies of scale. T4124:22-25 (James); T4121:4-4122:4 (James). James

116

criticized Kopcke's findings because Kopcke compared the management fee that FMG received to hypothetical assets under management, rather than to the true amount of assets under management. T4125:3-25 (James). Furthermore, James noted that Kopcke did not demonstrate how FMG shares savings with investors resulting from economies of scale because he did not show how assets under management are affected by breakpoints. T4126:4-15 (James).

Moreover, extensive evidence demonstrated that the Board received information regarding economies of scale to prepare it for fee negotiation, and established how FMG shared potential benefits it received from economies of scale. Initially, Joenk testified that all twelve Funds have breakpoints at the management and administration fee levels. T2968:14-17 (Joenk). Joenk also said that breakpoints are frequently discussed by the Board, and that he is responsible for adding breakpoints into the fee schedule when the Board tells him to do so. T2969:24-2970:5 (Joenk); DX-269 at Bates 4140; DX-242 at Bates 2269. Moreover, Joenk informed the Board every year on economies of scale, explaining the ways that FMG shares savings achieved by economies of scale with fund shareholders. T733:24-734:13, 2968:3-11 (Joenk). Schpero noted that the Board, acting as watchdogs for investors, evaluates whether economies of scale are achieved, and seeks to ensure that FMG shares the benefits from economies of scale with investors through breakpoints and fee reductions. T3583:25-3584:3 (Schpero). FMG has provided Schpero and the Board with extensive information to guide their decision-making process, including: data concerning breakpoints for each Fund, information on the effective fee levels, comparative data to evaluate breakpoints and effective fees for other Funds, expense cap information and expense limitations, industry discussions on economies of scale, and added services that FMG provides over time. T3627:2-22 (Schpero).

117

Defendants admitted into evidence a slideshow presentation on economies of scale that the Board received. DX-44.16. The slideshow included information regarding: (1) different ways economies of scale can be shared by investment managers with the Fund; (2) breakpoints; and (3) comparative data on expense ratios. T3628:4-21 (Schpero). DX-152 shows an index of the material that the Board received in preparation for approving management fees. DX-152; T3465:1-3566:9 (Schpero). For economies of scale, the index shows that the Board received the fee schedule, relevant breakpoints, the long sheets, and legal analysis of judicial considerations on economies of scale. T3468:20-3469:1 (Schpero). The Court finds that James' testimony and his methodology is more credible than Kopcke's and Pomerantz's testimony. Moreover, Schpero's credible testimony indicates that the Board conscientiously reviewed economies of scale. As such, Plaintiffs have failed to meet their burden on proving economies of scale.

### 1.    Additional Cost-Saving Methodologies

FMG used several other cost-saving methodologies in addition to breakpoints in order to pass on savings to investors. These cost-saving methods were overlooked by Plaintiffs' experts. Those cost-saving measures include product cap reimbursements, expense limitation agreements, pricing to scale, and directed brokerage.

Product cap reimbursements function as waivers, "not at the [F]und level for all shareholders, [but] . . . at the contractual level for only certain people that bought a certain type of contract." T2711:21-23 (Joenk). FMG's product cap reimbursements directly impact the Common Stock Index,[33] for which there is an agreement that "expenses can't go above a certain level for that fund." T2712:2-14 (Joenk). If expenses eclipse the predetermined product reimbursement cap, then the client is reimbursed accordingly. For example, the product cap on

---

[33] This is the only Fund at issue that is impacted by product cap reimbursements. T2714:5-11 (Joenk).

the Common Stock was $9 million—had that number been reached through expenses from management and administrative fees, then the amount of expenses above "$9 million of the fees paid would have been [reimbursed] to shareholders" in one year. T2713:3-10 (Joenk). Over the last five years, the product cap reimbursement has saved shareholders in the Common Stock Index Fund about $22.5 million. T3367:7-11 (Joenk). Pomerantz admitted that he did not include product cap reimbursements in his calculations. Pomerantz claimed that he did not know what product cap reimbursements were, testifying that they "might be reimbursements." T2028:22-23 (Pomerantz).

FMG also offered expense limitation agreements, which function as fee waivers, but differ from product cap reimbursements. T3001:6-10 (Joenk). Those are agreements between the EQAT and FMG (T3001:21-24), which reduce fees for the Equity Growth PLUS, Global Bond PLUS, AXA Large Cap Managed Volatility, AXA Mid Cap Value Managed Volatility, EQ/PIMCO Ultra Short and EQ/T.Rowe Price. T3002:5-12 (Joenk).

Similarly, FMG engaged in pricing to scale, which occurs at a fund's inception and seeks to save investors money before the fund achieves economies of scale. For example, when a fund is started and its assets under management are low, the expenses associated with managing that fund "might be very high." T4192:1-4. Rather than charging investors the high cost of operating a small fund, FMG anticipates the economies of scale the fund will eventually achieve as its assets under management grow. By doing so, investors save money because the fees are as if the fund were already operating at scale. DX 214.11 at Bates 2178. Accordingly, the adviser loses money in the initial stages of the fund's existence, while the shareholders receive the benefits of economies of scale. *Id.* Joenk indicated that it "is a very important way to share economies, by essentially pre-sharing them before the assets grow." T2975:4-13 (Joenk). Joenk gave an

example of how FMG has used pricing to scale with funds that are already in existence to achieve a similar result:

> Well, for instance, the T.Rowe Fund, you know, we lowered the expense cap on that fund, to make it more competitive; that's a comparable thing because it was a smaller fund. So not only do we do it on new funds but we also do it on funds that are shrinking for some reason, to make them and to allow them to remain competitive.

T2983:7-12 (Joenk).

Advisers can also share benefits with investors by making investments in improved services, "such as by creating an enhanced shareholder website or adding headcount or other resources to the portfolio management team." DX 214.11 at Bates 2178. Examples of reinvestment in services includes directed brokerage and securities lending. *Id.*

"Directed brokerage is a program to drive down trading costs." T2900:15-17 (Joenk). Joenk explained that a directed brokerage program was implemented for "all of the funds a number of years ago[,] instructing the sub-advisors to trade through certain brokers in order to reduce the cost of those trades." T2900:18-23 (Joenk). Ultimately, this program saved FMG's Funds between $89 and $90 million during its time of operation. T2900:25-2901:4 (Joenk), while driving down trading costs from five cents per share to the current cost of just over one penny per share. T2904:1-7 (Joenk). FMG's directed brokerage program was shut down about "two years ago" (T2900:18-2901:4 (Joenk)) because the trading costs were driven down so low that it was no longer effective. T2903:13-21 (Joenk). However, of the $89 million in benefits from the directed brokerage program, FMG derived no monetary benefit, all of which went "straight to the funds through lower trading costs." T2902:11-14 (Joenk).

Similarly, FMG used securities lending to cut down costs, engaging with the lending agent in a process "that would essentially lend out securities of the portfolio to others who wanted to use them for shorting or dividend recapture or other mechanisms." T2904:19-23

(Joenk).  Joenk testified that this program amounted to $150 million in savings to the Funds.
T2908:9-12 (Joenk).

In conclusion, both James and Joenk were credible witnesses, and their analyses on
breakpoints and other saving methodologies were superior to those of Pomerantz and Kopcke.
In addition, there were other cost saving methodologies employed by FMG, which Plaintiff
largely ignored.  Overall, Plaintiff did not meet its burden of proof to show that FMG failed to
adequately employ breakpoints and other cost saving devices.

### E.      *Fall-Out Benefits*

Plaintiffs contend that the Board did not receive appropriate or accurate information as to
fall-out benefits that FMG receives from its relationship with the mutual funds.  Fall-out benefits
are another *Gartenberg* factor.

As an initial matter, the parties dispute the proper legal standard to be applied in
assessing fall-out benefits.  Defendants assert that a "but for" test must be applied, which was
enunciated in *Krinsk v. Fund Asset Management*, 715 F. Supp. 472, 474 (S.D.N.Y. 1988).[34]
Defendants define fall-out benefits as ancillary or indirect profits that an investment adviser to a
mutual fund would be unable to generate "but for" the existence of that fund; in other words, the
profits would not exist if the fund did not exist.  T3008:21-3009:15, T3032:9-3034:1 (Joenk).

Plaintiffs assert that the appropriate test is as follows: "Fall-out benefits are those, which
accrue to the mutual fund adviser as a result of its work on behalf of the mutual fund." *See
Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540, n. 30 (S.D.N.Y. 2008) (citations omitted). *Jones*

---

[34] The standard to determine fall-out benefits may be different in this case than in *Krinsk*.  In *Krinsk*, the court was
dealing with a company solely engaged in mutual funds.  Here, the investors are purchasing a mutual fund, plus an
annuity.  A fall-out benefits may be one that is inextricably related to both products.  This is a decision the Court did
not reach.

defines fall-out benefits as "collateral benefits that accrue to the adviser because of its relationship with the mutual fund." 559 U.S. at 344.

Plaintiffs contend that product wrapper fees, the general account spread, and fees paid to Alliance Bernstein are all fall-out benefits and therefore should be reported to the Board as such. ECF No. 276, PRDFOF, ¶¶ 479, 480, 481, 490.

At trial, Joenk was asked how the fall-out benefits are reported and described to the Board. He stated that fall-out benefits are described differently—"depends on the type of fallout benefit; some are ascribed with dollar amounts, some are ascribed with the impact, and some are just listed as potential fallout benefits." T658:20-22 (Joenk).

Joenk uses the "but-for" test to determine what constitutes a fall-out benefit. T3017:10-17 (Joenk). Joenk indicated that, "in our view[,] in order for a benefit to be a fallout benefit[,] it has to pass the but-for test; so but for the funds, the [benefit] would not exist." T3017:10-12 (Joenk). Joenk believes the appropriate inquiry is "would we get these [benefits] if EQAT didn't exist essentially." T3017:14-17 (Joenk). In sum, Joenk defines a fall-out benefit in the following terms: "A fallout benefit disappears if the fund disappears[. This] is the simple way I think of it." T3033:24-3034:1 (Joenk). When asked about the types of fall-out benefits reported to the Board in the most recent 15(c) process, Joenk stated:

> From memory, dividends received deduction, foreign tax credits; I believe distribution was mentioned as a fallout benefit; affiliated transactions associated with Bernstein as a broker were listed; separate account fees [product wrapper fees] were listed as a conceivable fallout benefit.

T659:5-9 (Joenk).

Schpero also testified as to fall-out benefits and how they are reported to the Board. T4581:10-12 (Schpero). He indicated that the information regarding fall-out

122

benefits comes from FMG. T4581:10-12 (Schpero). Schpero explained his understanding

of the subject:

> They are other benefits that are received by the manager or its
> affiliates in connection with managing the fund. I think usually
> there's a – as it's been explained to us by our counsel, there's a but-
> for test . . . [B]enefits that would not be received but for the
> manager's relationship to the fund.

T3636:17-22 (Schpero).

Plaintiffs offered Barrett, Pomerantz, and Goldstein on the issue of fall-out benefits.

Ultimately, the Court precluded Pomerantz from testifying about fall-out benefits because he had

no specialized knowledge qualifying him to testify on the subject. T1808:6-15 (Pomerantz).

Goldstein also conceded that he was not an expert in fall-out benefits, noting: "I don't even know

what an expert in fallout benefits is?" T2132:14-24 (Goldstein).

The following sections address product wrapper fees, general account spread, and fees

paid to Alliance Bernstein, which Plaintiffs contend are fall-out benefits.

### 1. Product Wrapper Fees

Plaintiffs contend that product wrapper fees should have been reported to the Board as

fall-out benefits. As an initial matter, the term product wrapper fee came up numerous times at

trial, but was never adequately defined. After the post-trial submissions (findings of fact and

conclusions of law) failed to adequately define the term, the Court requested that both parties

submit letters defining product wrapper fees, with citations to the transcript. Neither party found

a precise definition in the transcript. ECF No. 294; ECF No. 295. Generally speaking, product

wrappers are contract level fees that investors pay once they enter a variable annuity contract.[35]

---

[35] In the role of the Court section, it was noted that the Court would not consider rumors or testimony heard outside of the court. One rumor was about surrender fees. At trial, Sanchez discussed a surrender fee of $10,000 to terminate the contract. No other testimony was submitted. It occurred to the Court that such a fee could be a fall-out benefit. Without any testimony or briefing, the Court did not reach the issue.

123

*Id.* Throughout the trial, "product wrapper fees" was used interchangeably with the term "separate account fees." T661:7-9 (Joenk); but there is no explanation of "separate account fees" either.

According to Plaintiffs, from 2000 to 2005, FMG reported to the Board that product wrapper fees were fall-out benefits. T661:13-24 (Joenk). Joenk acknowledged that product wrapper fees were "no longer included in this presentation" (T674:19-20 (Joenk)); but he said that "the [product wrapper fees] have been listed as a conceivable fallout benefit in the [Board] memo for I believe almost the whole time." T679:2-4 (Joenk). Joenk explained that:

> not all . . . wrappers are fallout benefits. A wrapper could conceivably be a fallout benefit if someone is coming to the Trust to buy a particular fund and the only way to get that fund is to buy an insurance product; that would be a but-for type of fallout benefit.

T684:9-14 (Joenk).

However, Joenk stated that he did not think anyone "comes to buy a fund or so desires a fund [so much] that they buy an insurance product [just] to own that fund." T685:4-6 (Joenk). The Court asked Joenk why he did not consider product wrapper fees to be a fall-out benefit. T669:13-23 (Joenk). He explained his reasoning by referring to the testimony of Sanchez:

> . . . he bought the contract specifically for the guaranteed six percent roll-up; that has nothing to do with the funds. So he paid his wrapper fees to get that six percent roll-up unrelated to the funds completely. In fact, he could have no funds in there and he would still be paying the wrapper fees.

T670:11-16 (Joenk). He further qualified his reasoning:

> . . . [T]here are any number of portfolios that are not EQAT based that are in the product. So they could be some outside fund companies, it could be my other trusts; these numbers I believe represent the wrapper for all of the variable products. So the reason we don't believe these are fallout benefits is it's not a but-for

124

> scenario; I can eliminate all the funds, these revenues would still
> exist.

T670:17-23 (Joenk).

Joenk further explained his take on product wrappers within the context of fall-out

benefits:

> Well, there are two ways to look at product wrapper fees; one, that
> we do discuss with the Board is it could be a fallout benefit if
> someone were to buy a particular fund that we are the only ones that
> have. If they really love my volatility overlay and they want to own
> a piece of the volatility overlay they would come and buy a fund;
> the wrapper on the product that they bought to get that fund would
> be considered a fallout benefit. T3012:1-8 (Joenk). The regular
> [product wrappers] on all of the products we sell, we don't consider
> them to be fallout benefits because if I were to – to close EQAT,
> close every fund, AXA would still collect those wrapper fees; in fact
> they were collecting those wrapper fees even before EQAT existed.

T3012:9-13 (Joenk).

Joenk testified that the consensus regarding product wrappers within FMG and the Board

is that no one believes these fees to be fall-out benefits. T687:9-18 (Joenk). Product wrapper

fees could be considered a "conceivable" fallout benefit if an investor came to FMG and

indicated that "the only way they could [buy a Fund within the EQAT] is to buy a variable

annuity." T3012:14-19 (Joenk). However, there was no evidence at trial of Plaintiffs, or any

investor, purchasing insurance products for the express purpose of obtaining the underlying

mutual fund in the EQAT.

Schpero testified as to his understanding of wrapper fees and whether or not they should

qualify as fall-out benefits:

> So those are the fees that AXA . . . receives at the insurance level
> for . . . selling and marketing and making available the annuities and
> various insurance products that are at the upper level before the
> funding is received for these particular . . . mutual fund complex.

125

> T3637:20-3638:1 (Schpero). We've discussed that subject with our counsel, I think there's been some discussion of that in some of the memorandums we receive or references to it. I don't believe that . . . the wrapper fees meet the but-for test. And I believe that view based on discussions with counsel is consistent with the industry.

T3638:4-9 (Schpero).

Barrett also testified on product wrapper fees. T1516:17-19 (Barrett). Barrett said that he understands product wrappers to be fall-out benefits. T1517:3-9 (Barrett). Barrett further testified that it was his "understanding that in earlier years I think – in earlier years that FMG included those fallout benefits in its presentation to the Board." T1517:10-12 (Barrett). The Court allowed Barrett to testify on a methodology for how one could go about calculating fall-out benefits, however this was done under the assumption that Plaintiffs would put on a another expert who could opine as to what constituted a fall-out benefit. T1964:21-1965:13 (Pomerantz); T1528:21-22 (Barrett). However, this never occurred. Barrett testified that the fall-out benefits for 2011 and 2012 were about one billion dollars per year. T1528:11-18 (Barrett). On cross-examination Barrett conceded that he was not an expert on fall-out benefits. T1703:16-17 (Barrett). He further indicated that he was not offering an expert opinion as to what did or did not constitute a fall-out benefit. T1703:18-20 (Barrett).

The Court finds that Plaintiffs failed to meet their burden of proof. There was no credible testimony defining and explaining product wrapper fees in order for the Court to determine what wrapper fees are. Based on the general discussion, the wrapper fees appear to be associated with the amount paid to obtain an annuity. More particularly, Plaintiffs did not submit proofs defining product wrapper fee, nor did they calculate the amount of this fall-out benefit. As such, Plaintiffs have failed to meet their burden of proof in demonstrating that product wrapper fees constitute fall-out benefits.

126

## 2.      General Account Spread[36]

Plaintiffs' expert, Barrett, stated that the general account spread is a fall-out benefit. T1519:1-14 (Barrett).  The general account is an investment option that guarantees a fixed interest every year.  T667:6-8 (Joenk).  The "general account spread is the difference between what gets paid to the client if they're [invested] in one of those, and what the general account would earn."  T667:9-11 (Joenk).  For example, if FMG earns five percent on the general account, but pays investors three percent, the two percent that FMG keeps is the general account spread.  Plaintiffs assert that the two percent difference retained by FMG is the hypothetical fall-out benefit.

Barrett stated that Exhibit P-300 at Bates 1121 listed "general account spread" as a fall-out benefit. T1519:4-14 (Barrett).  Despite this, Barrett testified that the general account "was within the mutual fund product [as] an investment alternative [to mutual funds.]" T1704:21-25 (Barrett).  He also agreed that the general account and mutual funds "have nothing to do with each other" other than the fact that they are both investment alternatives in the same insurance product.  T1705:1-6 (Barrett).

Joenk's testimony was different.  Joenk noted:

> A number of the products will have a guaranteed interest fund or a general account option or a fixed interest option that are liability of AXA, they're not funds, they're part of the general account.  So the general account spread is the different between what gets paid to the client if they're in one of those, and what the general account would earn.

T667:6-11 (Joenk).  Joenk testified that "general account spread is only available on fixed interest options, none of which are funds." T669:21-23 (Joenk).  He further explained:

---

[36] The General Account spread is different from separate account fees, which is a synonym for product wrapper fees.

> So you could have an Accumulator contract, put all your money in
> a fixed income, a fixed option, and have none of the EQAT
> portfolios. So therefore we don't believe that that's a fallout benefit
> at all. Because if your money is in one of the EQAT Funds, you do
> not get the general account spread.

T669:25-670:5 (Joenk).

Joenk was asked to testify about P-130 and why the general account was not listed as a fall-out benefit. T687:3-6 (Joenk). He indicated that neither he, nor anyone else within FMG, the Board, or Board Counsel believed the general account spread could even be considered a conceivable fall-out benefit. T687:5-10 (Joenk). When asked whether or not the general account spread was included in the materials provided to the Board, Joenk testified that they were not. T3019:19-21 (Joenk). His reasoning was, ". . . I think they're mutually exclusive; if you're in the general account you're not in a mutual fund . . . you don't earn a mutual fund fee off of the general account." T3019:23-3020:1 (Joenk). Joenk further stated that "if you have . . . $100, you can only put $100 in either the general account or the [mutual fund], or $50 and $50 [in each], but you can't put $100 in both." T3020:6-9 (Joenk).

Schpero agreed that the general account spread does not constitute a fall-out benefit because it does not meet the but-for test. T3639:9-14 (Schpero).

The Court finds, based on Joenk and Schpero's testimony, that the general account spread is not a fall-out benefit. The Court gives little weight to Barrett's testimony, which relied on one page of a presentation. Moreover, Barrett acknowledged that the general account and the mutual funds "have nothing to do with each other." T1705:1-6 (Barrett).

### 3.    Alliance Bernstein Fees

Plaintiffs contend that Alliance Bernstein fees should be reported as a fall-out benefit, rather than being reported under profitability. T592:4-T593:2 (Joenk). Alliance Bernstein is

128

affiliated with AXA. Defendants do not disagree, except to note that the Board considered these fees in the evaluation of FMG's compensation under the investment management and administrative agreements.

Joenk testified that fees paid to Alliance Bernstein "could [be] consider[ed] a fallout benefit." T593:2 (Joenk). He also indicated that Alliance Bernstein is a sub-adviser and that the cost of hiring them is reported as a "potential fallout benefit." T2977:15-18 (Joenk). Joenk further testified that the "cleanest example" of a fall-out benefit would be the "brokerage commissions for trades through Alliance Bernstein's brokerage affiliate Bernstein." T3009:2-6 (Joenk). In Joenk's opinion, Alliance Bernstein fees counted as a fall-out benefit because:

> AXA owns Alliance Bernstein; if business from sub-advisors or from trading is done through an affiliate, meaning the subsidiary of Alliance Bernstein, there is some benefit to Alliance Bernstein of those trades going through that broker . . . If the funds did not exist or did not trade with Bernstein, that fallout benefit would not exist. T3009:8-12; T3009:13-15 (Joenk).

Joenk further stated that Alliance Bernstein fall-out benefit information is provided to the Board. T3009:16-18 (Joenk). It is clear from Joenk's testimony that FMG concedes that the fees paid Alliance Bernstein are a fall-out benefit, and Joenk reports this to the Board: "The affiliated commissions, the sub-advisory fees to Alliance Bernstein, we explicitly disclosed that, that is a fallout benefit." T3033:11-13 (Joenk).

Schpero testified that "the fees that Alliance Bernstein receives under the sub-advisory contract" are considered fall-out benefits. T4580:10-20 (Schpero). Therefore, the credible testimony demonstrates that the Board was apprised that the fees paid to Alliance Bernstein constitute fall-out benefits. Plaintiffs failed to demonstrate that the Board breached its fiduciary duty on the issue of fall-out benefits because the evidence shows that the Board considered these fees in approving the investment management and administrative contracts.

### 4.    Conclusion on Fall-Out Benefits

For the reasons stated, Plaintiffs have failed to show that wrapper fees, general account spread, or Alliance Bernstein fees constitute fall-out benefits, or that the Board failed to consider these fees in the 15(c) process.

### *F.    Comparative Fees*

Another *Gartenberg* factor focuses on the comparative fees charged to others in the mutual fund industry. Courts may consider fee comparisons but must give them the weight they merit in light of the similarities and differences in the services provided. *Jones,* 559 U.S. at 349-50. The Supreme Court has cautioned, however, that "[i]f the services rendered [by separate investment advisers] are sufficiently different that a comparison is not probative, then courts must reject such a comparison." *Id.* at 350 (citations omitted).

The California District Court noted "evidence of comparative fee structures, though certainly relevant, is of limited probative value in a Section 36(b) inquiry 'because of the potentially incestuous relationships between many advisers and their funds.'" *In re American Mut. Funds Fee Litig.*, 2009 WL 5215755 at \*52 (C.D. Cal. 2009) (citing *Gartenberg,* 694 F.2d at 929-30). Moreover, in that case, Defendants cited Lipper and Morningstar data to conclude that fees were lower than industry average. *Id.* at \*53.

Plaintiffs do not dispute that the Board received information on comparative fees, but instead contend that the information they received was unreliable. Specifically, Plaintiffs assert that Lipper data utilized by Defendants is not independent, objective, or authoritative. Moreover, Plaintiffs assert that the Lipper data compared dissimilar funds, such as comparing index and pactive funds to actively managed funds. ECF No. 247, PFOF, ¶¶ 327-334. Plaintiffs contend that if Defendants had performed the proper fee comparisons, using reliable and sound data, the

130

fees for all of the at-issue Funds would be in excess of the fees reported by the Investment Company Institute.

The Board received comparative fee data that is developed by Lipper, which compares FMG's fees to others charged in the mutual fund industry. For example, DX-87.1 is the 2012 Lipper report prepared for the EQAT Board. T2693:12-20 (Joenk). Every year, a similar report is submitted that includes comparisons of the expense ratios and expense components for different classes of funds. T2693:12-20 (Joenk). Joenk provides Lipper with the expense ratios and components of the EQAT Funds and then Lipper selects the funds against which Plaintiff's Funds will be compared. T2693:12-2694:12 (Joenk). Joenk acknowledged that there is "noise in the data" but he is not aware of better sources of information, so the EQAT Board uses multiple sources including Lipper and Strategic Insight. T2759:12-21 (Joenk). Schpero stated that, with the exception of the S&P 500, Lipper compared index or hybrid funds to active funds. T3793:10-13 (Schpero). However, Schpero explained that, in response, the Board asks for a break out of index funds alone for its comparison. T3793:19-3794:12 (Schpero).

At trial, Plaintiffs presented Pomerantz and Kopcke on the issue of comparative fees. Pomerantz used the Investment Company Institute fact book, which is widely used in the industry, to conclude that the industry average for index fund management fees is 11-13 basis points. T1863:6-24 (Pomerantz). However, Pomerantz explained that FMG's comparative fees are far greater in basis points for index funds than the industry average. Specifically, the management fees in basis points for the index funds at issue in this case are as follows: 47 basis points for the Common Stock; 46.5 basis points for the Core Bond Index; 37.4 basis points for the Equity 500; and 46.7 basis points for the Intermediate Government Bond. T1864:11-15 (Pomerantz).

Pomerantz and Kopcke both offered testimony that attempted to undermine the Lipper data that the Board relied upon when assessing comparative fees. Kopcke criticized Lipper data, stating that it was opaque, not replicable, and subjective. T2364:15-2366:2. (Kopcke). He stated that Lipper ignores market demand for funds. T2366:3-17 (Kopcke). However, Kopcke said that he uses Lipper data when creating his own comparison and admitted that it is almost always quite difficult to find a comparison group. T2364:15-2365:12 (Kopcke). Furthermore, Pomerantz stated that Lipper was widely used by mutual fund boards, and considered to be an independent and authoritative source for data. T2026:13-15; 2026:22-2027:4 (Pomerantz).

Defendants presented James on the issue of comparative fees. James analyzed the expense ratios of the Funds at issue, excluding 12b-1 fees (distribution), and compared them to the Lipper group. T4139:8-11 (James). James found that the fees are at about the median, or midpoint, in the industry. T4139:22-23 (James). James also compared at-issue Funds with the comparable Lipper Group using asset weighted averages and found that most are at the midpoint in the distribution or the middle of the industry. T4139:22-4140:3 (James).

James also testified that Lipper is the leading source of fee information in the industry and considered credible and independent. T4141:9-16 (James). James stated that Lipper is used by academics, practitioners and regulatory agencies. T4141:9-16 (James).

In their post-trial findings of fact, Plaintiffs set forth a number of tables that were not admitted into evidence or testified to at trial. For example, Tables 21, 22, 23, 24, 25, and 26, among others, were never admitted into evidence. There is no testimony supporting these Fund comparisons that Plaintiffs compiled, and as such, the Court did not utilize those tables in assessing the facts.

The Court finds, in light of the inconsistent testimony of Pomerantz and Kopcke, and the credible testimony of James, the Board compared the fees on each Fund against reliable sources, and determined they were reasonable in the industry. Moreover, even if the Court were to accept Plaintiffs' position that Lipper data is unreliable, Schpero stated that the EQAT Board was aware that Lipper compared index funds to active funds, and in response, asked for a break out of index funds alone for their comparison. T3793:10-3794:12 (Schpero). The Board conscientiously recognized that the Lipper Index was not an exact comparison, but in light of same, there is little proof that the Board did not act conscientiously. Therefore, Plaintiffs have failed to meet their burden to demonstrate that the fees for the at-issue Funds were excessive when compared to similar funds in the industry.

### Fund Performance

Although not a *Gartenberg* factor, Plaintiffs contend that the Funds at issue performed poorly, demonstrating that the nature and quality of services provided by FMG were inadequate. Plaintiffs offered the testimony of Pomerantz and Goldstein in support of their claim that the at-issue Funds performed poorly.

Pomerantz testified that he "made observations regarding the investment performance of the subject funds as compared to . . . peer groups, which are other mutual funds that have the same investment objective, or objective benchmarks that are defined for each of the funds." T1878:11-15 (Pomerantz). Pomerantz created P-151-i, which contains "the results of a calculation that [he] performed that tried to identify the difference in wealth that is achieved by investors in the subject funds . . . as opposed to the investment return of either the benchmark or peer group that has been identified for those funds." T1878:23-1879:3. Pomerantz indicated that the Funds performed poorly. T1883:2-12 (Pomerantz).

133

Goldstein also testified on this issue. Goldstein was asked what information led him to conclude that, in general, the Funds' performance relative to peers was poor. T2167:19-21 (Goldstein). Goldstein stated, "I don't recall what actual documents, I think there were . . . reports provided to the Board that I looked at." T2167:22-24 (Goldstein). Goldstein was then asked by the Court, "[s]o when you indicate that the general performance of the funds was poor, what funds are you talking about?" T2167:25-2168:1 (Goldstein). Goldstein replied, "[w]ell, I didn't – that's why I said generally . . . some of them were . . . okay. I'd have to look at them on a one-by-one basis, but generally they were subpar compared to the peers." T2168:3-6 (Goldstein). However, Goldstein acknowledged he "didn't go into fund by fund comparison" (T2168:20 (Goldstein)) and could not recall the specific data on any fund. T2168:21-22 (Goldstein). On cross, Goldstein was questioned about any analysis he did on the twelve Funds at issue, and Goldstein responded, "I didn't do anything to assess the performance." T2198:1-2 (Goldstein).

To counter Plaintiffs' claims, Wermers evaluated the performance of the Funds at issue in this case. Relying upon DX-2030A, Wermers illustrated "the difference in monthly returns between each of the at-issue funds, and their benchmarks for two periods of time." T4336:21-24 (Wermers). Wermers developed DX 2030-A with source data from the prospectus of the Funds and Lipper Data. T4337:7-9 (Wermers).

## 1.    Active Fund Performance

### *GAMCO*

Wermers found that GAMCO achieved its investment goal. Wermers noted that "[a]n actively managed fund's goal is to beat its benchmark of net fees, and this fund did do so and by

quite a margin actually." T4345:17-19 (Wermers). Wermers supported his testimony and findings with statistical analysis and P-value significance findings. T4346-4347 (Wermers).

### *PIMCO*

Wermers said that the PIMCO fund had ". . . outperformed its benchmark by 5 basis points." T4348:3-24 (Wermers). As a result, Wermers stated that it "certainly" achieved its goal T4349:1 (Wermers). Again, Wermers supported his testimony and findings with P-value confidence levels and statistics. Wermers opined that the GAMCO and PIMCO funds are "good or very good funds," and that "FMG was successful [in choosing sub-advisers]" for the funds. T4349:6-13 (Wermers).

### *T.Rowe*

Wermers said that T. Rowe had "outperformed its benchmark by 3 basis points per month," and that it achieved its goal because "an active managed fund tries to outperform its benchmark net of fees and it did so." T4349:19, 22-23 (Wermers).

To conclude his testimony on active funds, Wermers noted that the returns on those funds were impressive. Wermers opined that he is very familiar with the numbers of active funds that exceed benchmark because he reads materials on the subject, and that "roughly 5 to 10 percent of funds over the last 10 or 20 years have been able to outperform their benchmark net of fees." T4350:2-7 (Wermers).

### 2.    Index Fund Performance

With regard to index or passive funds, Wermers explained that the index funds "slightly underperformed their benchmarks on a of net fee basis, between 4 and 6 basis points per month." T4350:17-19 (Wermers). He further stated that on a gross fee basis, the index funds "essentially matched, very very closely, their benchmarks gross of fees." T4350:22-23 (Wermers).

135

Wermers developed the charts DX-2022A and B to demonstrate his findings. T4351:2-5 (Wermers). The charts show that the two measures, gross of fees and net of fees, "actually overlay themselves so clearly and closely that you can see the blue line." T4353:21-25 (Wermers). Wermers described the quality of the Equity 500 Fund as "good or very good," and stated that FMG "succeeded" in its selection of the particular sub-advisers for that Fund. T4354:2-9 (Wermers).

Wermers then reviewed the other passive or index funds using the same analysis as Equity 500 (Common Stock Index Portfolio, the Core Bond Index Portfolio, and the Intermediate Government Bond Index Portfolio), finding that that "the returns gross of fees of all three of these index portfolios match their hypothetical benchmark very[,] very closely, so the answer is yes they succeeded." T4355:19-23 (Wermers). He also added that "FMG succeeded in choosing good sub-advisors." T4355:22-23 (Wermers); Exhibits 2024A-B, 2026A-B, and 2028A-B.

Wermers concluded that the goal of index funds is to meet the benchmark. T4355:19-23 (Wermers). Because the index closely matched its respective benchmark, Wermers concluded that these Funds performed well.

### 3.   Pactive Fund Performance

Wermers explained that "[a]ll five of [the pactive funds] made money over this time period, net of fees . . ." T4357: 17-18 (Wermers). When asked whether the pactive funds achieved their goal of a long-term capital growth or appreciation, Wermers stated that "[t]hey did, and some of them produced a lot of capital appreciation." T4358:2-3 (Wermers). Wermers noted that the best method to evaluate pactive funds is to compare them "to their benchmarks gross of fees." T4358:15-16 (Wermers).

136

Wermers noted that the Global Bond Plus Portfolio outperformed its benchmark gross of fees and net of fees. T4358:17-24 (Wermers). He explained that the other four pactive funds, the Equity funds, are evaluated using the ATM overlay strategy, and that the best way to evaluate a fund with an ATM overlay is to use the "VMI adjusted benchmark to separate out the influence of the volatility overlay." T4359:7-12 (Wermers). Using that strategy, Wermers explained on a gross of fee basis, relative to their VMI indices during the period June 2009 to September 2015, the funds "slightly underperformed their benchmark," and on a net of fee basis, "three out of four [trailed the VMI benchmark]." T4359:13-17 (Wermers); T4359:16-17 (Wermers); T4360:6 (Wermers).

On direct, Wermers was asked if he had examined the reason why three of the four funds had trailed on a net of fee basis, and Wermers explained that "the passive portion of these portfolios were . . . almost the entire reason that these portfolios underperformed significantly . . . on a net of fee basis." T4360:17-21 (Wermers). He further noted that this result did not surprise him "because that's exactly what the passive sleeves were supposed to do . . . [O]nce I explained that these were due to the passive sleeves, I was reassured that these were just fine funds, they had met expectations." T4360:24-4361:2 (Wermers).

### 4.    Wermer's Analysis of Pomerantz's Fund Performance

Reviewing Pomerantz's testimony, Wermers found his methodologies in evaluation Fund performance to be flawed. Wermers noted that Pomerantz's analysis "annualized average five-year returns over the period ending May 31st, 2012, for each at-issue fund[,]" which does not comport with the industry standard. T4362:25-4363:1 (Wermers). Wermers testified that Pomerantz's chart allegedly ended on October 31, 2012 (T4364:23-25 (Wermers)); yet Wermers pulled the data and found that it ended May 31, 2012, and therefore concluded that this mistake

137

renders the chart inaccurate. T4365:2-5 (Wermers). Wermers stated that it was not accurate to use Pomerantz's chart to show actual gains or losses expressed in dollars. T4366:3-4 (Wermers). Wermers explained that adopting Pomerantz's chart would be inaccurate because Pomerantz: (1) used hypothetical numbers, both for the fund and for the benchmark; and (2) does not take into the account the time of flows, and the exact time of returns, and how much money existed in the fund at each particular point in time, versus what the rate of return was for that year. T4366:3-16 (Wermers). Therefore, "for both reasons and other reasons . . . it just doesn't make sense, it doesn't measure losses." T4366:15-16 (Wermers). Wermers further added that he "wouldn't rely on these charts at all because of this timing problem alone." T4367:20-21 (Wermers).

Wermers explained that there are additional errors in Pomerantz calculations in the report, and, in his opinion, Pomerantz did not follow best practices for performance analysis. T4373:8-12 (Wermers). First, Wermers noted that Pomerantz measured "assets under management of the Funds over four different years 2008, 2009, 2010 and 2011, rather than the actual five years that he's presenting the table for." T4370:18-21 (Wermers). He added that because some of the funds were growing rapidly during that time period, "if you don't get the period of time right, you're not going to get this calculation right." T4371:3-9 (Wermers). Wermers stated that using the wrong dates caused Pomerantz to "overstate" his figures in a number of the Funds. T4372:23-24 (Wermers).

Wermers testified about his exhibits and contrasted them against the figures that Pomerantz calculated. Using Exhibits DX-2037 and DX-2036, which displayed the Core Bond Index Fund and the Common Stock Index Fund, respectively, over three and five-year periods, Wermers stated that the Core Bond Index Fund "performed in the bottom quartile consistently," but that does not mean that it was a poor quality index fund. T4377: 2-13 (Wermers). Wermers

138

noted that the Common Stock Index Fund "ended up in either the top...or the second from the top quartile . . . of the Lipper." T4378:18-20 (Wermers). He said that because "the benchmark for the Common Stock Portfolio ends up in a close or exactly equal quartile ranking, it says the fund and the index were both sort of ranked the same among peers, which means the fund was doing the job, it [matched] its index." T4379:2-6 (Wermers).

Finally, Wermers addressed one more flaw in Pomerantz's approach, stating that Pomerantz "used the benchmark that existed at the end of each of [the] periods, rather than going back in time and choosing the benchmark that actually existed or that was actually in the prospectus for each of those funds." T4380:5-15 (Wermers). He notes that these errors caused changes and miscalculations in the PIMCO and Global Bond PLUS Funds. T4380:20-4381:5 (Wermers).

Plaintiffs attempted to impeach Wermers and undermine his testimony through cross-examination in a number of areas, but the impeachment did little to undermine Wermers' credibility. Wermers' testimony was supported by strong facts, evidence, and methods of best practice. The Court finds Wermers' testimony to be reliable, and his analyses are accurate and thorough. The Court gave little weight to Pomerantz and Goldstein's opinions. Their work was less credible and inferior to that of Wermers.

### 5.    Conclusion on Fund Performance

While underperformance of the mutual fund may be considered, it is not a *Gartenberg* factor, and courts have been "wary about attaching too much significance to a fund's financial performance." *Franklin,* 478 F. Supp. 2d at 687. Moreover, "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive." *Amron v. Morgan Stanley Advisors, Inc.,* 464 F.3d 338, 344 (2d Cir. 2006) (quotation omitted). "While

performance may be marginally helpful in evaluating the services which a fund offers . . . [e]ven the most knowledgeable advisers do not always perform up to expectations, and investments themselves involve quite different magnitudes of risk." *Migdal v. Rowe Price–Fleming Intern., Inc.*, 248 F.3d 321, 327-28 (4th Cir. 2001).

Plaintiffs have failed to meet their burden to demonstrate that the Funds performed poorly. Instead, the credible testimony of Wermers indicated that the vast majority of the Funds performed at or above expectations. As such, Plaintiffs did not demonstrate that FMG's services were in any way inadequate based on Fund performance.

### Benefits of the Lawsuit

Although Plaintiffs failed to meet their burden in demonstrating a breach of fiduciary duty, *Jones* requires that courts look beyond the *Gartenberg* factors and "all pertinent facts must be weighed." *Jones*, 559 U.S. 335 at 345 (citing *Gartenberg*, 694 F.2d at 929). Of particular relevance in Plaintiffs' case is that the filing of the initial Complaint in 2011 engendered positive change to the EQAT Board's process. Many of the Board improvements, including changes to the Board composition and Board presentations, did not occur until after suit was filed. These improvements are discussed below.

In October 2011, after the Complaint was filed, Schpero became the lead trustee. T287:19 (Joenk). Edwards, an independent trustee, testified at her deposition regarding Schpero's new focus and leadership. T4483:13-15 (Edwards Dep. Read-In). Edwards stated that eliminating prior expenses of the Board, such as lavish Board dinners, are now a focus of Schpero. T4507:9-19 (Edwards Dep. Read-In). This aligns with Plaintiffs' theory at trial that the lawsuit brought about changes to the Board. Specifically, Plaintiffs pointed to bills from Board dinners in July 2011 and December 2011, with the latter costing $25,000 and billed

directly to the EQAT.[37] T824:4-826:24 (Joenk). Although Joenk indicated that the EQAT had been reimbursed for this cost (T826:23-827:5 (Joenk)), EQAT was only reimbursed two and a half years after the meals occurred. T827:6-12 (Joenk). Joenk stated that the EQAT was refunded because "the Board raised [this] issue to me." T827:15 (Joenk). Plaintiffs questioned Joenk as to whether he knew "if the Board raised that issue because the Plaintiffs raised that issue[.]" T827:16-17 (Joenk). Joenk responded, "I don't know what their motivation was, but I can speculate." T827:18-19 (Joenk).

In reviewing this testimony, it is clear to the Court that Plaintiffs' lawsuit resulted in a more scrupulous and rigorous examination of Board expenses. Moreover, based on Edwards' testimony, Schpero seems to have led this effort to ensure that EQAT investors are not footing the bill for extravagant dinners of the Board. This is a significant benefit to investors that only occurred because of this lawsuit.

Furthermore, Schpero is credited for the development of charts (the "Gary Charts") that analyze the spread – the "portion of the fee that FMG retains after payment . . . to the sub-advisor." T3528:3-4 (Schpero). Schpero testified to the importance of approving FMG's fee and ensuring ". . . that the fee is . . . reflective of services [FMG] provides separate and apart from the services that the sub-advisor provides." T3528:18-20 (Schpero). The Gary Charts gather information "very specific to the amount of fee" that FMG retains. T3528:1-3529:1 (Schpero); DX-144.18, Tab 13. However, this seemingly indispensable breakdown of fees was not provided to the Board until 2013, two years after the suit was filed.

In a similar vein, the organization of the Board materials, specifically the binders, drastically improved in the years following the lawsuit. For example, in 2010, the "Section 15(c)

---

[37] The Fund paying for dinners is a transparency issue. The Board should remediate the issue through adoption of a policy regarding those types of expenses.

Written Response of FMG" (DX-0007, the "Agenda Book") mentioned the importance of the

*Jones v. Harris* decision and "the factors the Board…should consider." DX-0007 at Bates 3015.

The 2010 Agenda Book also provided an "Advisory Contract Renewal" guide, which outlined

the requirements under the ICA. *Id.* at Bates 3516-17. However, the Board materials from 2013

(DX-144) contained a full PowerPoint presentation on the *Gartenberg* factors. DX-144 at Bates

0630-37. Moreover, the 2013 Board Book contained an index of materials and related each to

the relevant *Gartenberg* factors. *Id.* at Bates 0648. Therefore, even at the most superficial level,

it is irrefutable that the Board received more comprehensive information after the lawsuit was

filed.

Schpero testified that many of the changes that occurred after the suit was instituted were

adopted due to the Board's long-term improvement plan. Schpero stated:

> Certainly the basics [of the Board process] have not changed, but I
> will also tell you that I think we would be a bad board if every year
> we didn't change some things . . . [F]or example, I became the lead
> trustee in September/October of 2011; I had not been the lead trustee
> for 10 years. I've spent a lot of time in the industry, I had my own
> views and thoughts on things.   If I thought they were really
> important, I got them in place.  So there were certain things over the
> years, like the Gary chart . . . [W]hen I became the lead trustee I
> certainly did things differently . . . [But] I don't think there's been
> any arbitrary cutoff where suddenly the Board at some point became
> more activist or things changed.  I do think every year we try to do
> more and we try to get better, and lawsuit or no lawsuit that's what
> a good board does.

T3668:1-3669:2. The Court finds this portion of Schpero's testimony hard to believe.  It seems

that the improvements were made immediately after the lawsuit was filed.  This shake-up in

management has led to better decision-making for the Board.  Although the substance of this

lawsuit showed little proof, the filing of the suit brought about positive changes to the Board's

composition and process.

### Damages

Plaintiffs have failed to meet their burden in proving breach of fiduciary duty, and the Court need not reach damages; however, the requirement to show "actual damages" is an element Plaintiffs have not proven, and by itself, this prevents any recovery by Plaintiffs. As previously stated (*see* "Damages Period", *supra* at p. 14), the damages period for Plaintiffs' excessive fee claim is limited to the one-year limitation in Section 26(b), 15 U.S.C. 35(b)(3). There are two damage claims, one for administrative fees (ECF No. 285-2 DCRPFOP ¶ 830) and one for management fees (ECF No. 285-2 DCRPFOP ¶ 828). The damage period for Plaintiffs' management fees damages claim for the original eight funds starts on July 21, 2010 (the *Sivolella* Complaint), while the period for the other four funds begins on January 15, 2012 (the *Sanford* Complaint). ECF No. 285-2 DCRPFOP ¶ 827. The damage period for administrative fee (the *Amended* Complaint) damages begins on April 15, 2012. ECF No. 285-2 DCRPFOP ¶ 827.

Sivolella's claim is limited to the management fees charged to the eight original funds after June 20, 2010 (*i.e.* one year prior to the *Sivolella* Complaint). T2910:24-2911:6 (Joenk). In the post-trial submissions, Plaintiffs submitted charts to depict damages. These charts were never disclosed at trial or prior to trial in the parties' pre-trial order.

The Court finds that Plaintiffs' post-trial charts submitted in their proposed findings of fact should not be considered because they were not admitted during trial. Moreover, even if the Court were to accept them at this stage in the litigation, the Court would give them little weight because there is little or no proof to link the charts to the testimony.

A party cannot cure flaws or inaccuracies in its trial presentation through post-trial submissions by simply submitting new charts and updated calculations. If the Court were to allow this, Defendants would be deprived of their right to cross-examine Plaintiffs' witnesses, or offer their own testimony or evidence in rebuttal. The right to cross-examine and test the

soundness of the calculations is particularly important here in light of the large number of errors, methodological shortcomings, and basic mistakes demonstrated by Plaintiffs' experts at trial.

Many of the new, post-trial charts attempt to cure defects in Plaintiffs' presentation of their case. Initially, Damage Model 1 calls for complete disgorgement of FMG's entire fee. However, there is nothing in the record to demonstrate that FMG performed no duties, and therefore would not be entitled to any fee. Looking to the language of the statute itself, the Court in *Kasilag* determined the proper measure of damages should be limited to the actual damages resulting from the breach of fiduciary duty. 15 U.S.C. § 80a-35(b)(3). *Kasilag*, 2016 WL 1394347, at *3. Actual damages would be the difference between the fee paid and a fee that would have been "fair"—i.e., a fee that could have been negotiated at arm's length. *Krasner v. Dreyfus Corp.*, 500 F. Supp. 36, 42 (S.D.N.Y. 1980) ("actual damages" means the "amount by which the . . . fee [level] exceeded a fair fee."); *accord In re Evangelist*, 760 F.2d 27, 29 (1st Cir. 1985) ("the remedy Congress created" under Section 36(b) was the "payment of any excess fee to the company"). The Plaintiffs presented no evidence to suggest that it would be "fair" for FMG to be paid nothing for its services to the funds.

Damage Model 4 similarly fails because, as the Court understands it, it compares FMG's fees to those of low-cost funds, like Vanguard. Although Vanguard is known in the industry as a mutual fund with low fees, the Plaintiffs presented no credible evidence demonstrating that FMG's services are appropriately comparable to those performed by Vanguard. [38] Moreover,

---

[38] Courts have acknowledged that Vanguard is a low-cost option and give limited weight to fee comparisons between traditional managers and Vanguard. *See Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion under this [*Gartenberg* ] factor."); *Reso v. Artison Partners*, Civ. No. 11-873, 2011 WL 5826034, *8 (E.D. Wis. Nov. 18, 2011) (noting that "extremely limited comparisons" such as plaintiff's comparison to the Vanguard funds are of "little value"); *Kalish v. Franklin Advisers, Inc.*, 742 F.Supp. 1222, 1231 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991), *cert. den'd*, 502 U.S. 818 (1991) (finding "some

144

Plaintiffs assert that this model is based on the fees paid to managers of index funds only. Here, however, it is undisputed that FMG served as investment manager for active, pactive, and index funds. As such, this model also fails.

Damage Models 2 and 3 are potentially viable models in this action. However: (1) they were not disclosed or admitted into evidence; (2) Pomerantz was Plaintiffs' only expert witness who testified regarding damages at trial, and his testimony was not credible because his reports contained arithmetic errors (ECF No. 178, Joint Final Proposed Order, pp. 55-56; T1968:20-25; T1969:1-2 (Pomerantz)); and (3) Pomerantz's findings were incomplete because he failed to calculate damages for the whole damages period. That is, the *Sivolella* Complaint was filed on July 21, 2011 with eight original funds, but Pomerantz's damage calculations included all twelve at-issue Funds in his 2010 damage calculations. However, Plaintiffs did not add the four additional Funds until 2012. Therefore, Pomerantz should have limited his 2010 damage calculations to the original eight Funds, rather than including all twelve. Moreover, Pomerantz did not testify to damages for 2013 and 2014, and no damages were specified for those years until post-trial findings of fact. ECF No. 247, PFOF ¶¶ 814-864.

At trial, Pomerantz calculated Plaintiffs' damages for three years, from the beginning of 2010 to the end of 2012 in an exhibit (P-151-j) based on a 39 percent profit margin for FMG in his calculations. T1968:24-1969:5 (Pomerantz). Profit margins, or profitability ratios, is the "ratio of dollar of profit divided by the dollars of revenue." T1356:12-13 (Barrett). Pomerantz explained that he used a 39 percent profit margin because both Lipper and Strategic Insights conducted surveys that aggregate the information available from public mutual fund companies,

---

basis" for comparison of defendant's fund with Vanguard, but noting "significant differences in structure, peculiar to the Vanguard family of funds, which lessen the value of the comparison").

which found that 39 percent was the average profit margin for the group of mutual funds as a whole. T1969:6-12 (Pomerantz). The 39 percent represents the alleged profit FMG should be making for its investment management and administrative services. The difference between what FMG actually makes and the 39 percent figure, less any sub-advisory expense (T1975:17-19 (Pomerantz)), is Plaintiffs' proposed damages. However, there is no evidence that FMG's profit should have been 39 percent. Instead, the credible evidence demonstrated that sub-advisory and sub-administration fees are properly treated as expenses. The same is true of the $49 million in allocated costs. Plaintiffs failed to meet their burden in demonstrating that it was inappropriate to treat these costs as expenses. Therefore, Plaintiffs failed show that the 39 percent profit margin used by Pomerantz is appropriate in calculating damages.

### Conclusion

For all of the foregoing reasons, Plaintiffs have failed to meet their burden in demonstrating a breach of fiduciary duty in violation of § 36(b) of the Investment Company Act. An appropriate Order shall follow.


PETER G. SHERIDAN, U.S.D.J.


Dated: August 25, 2016

146

## Appendix

*Investment Management Fee Schedules (JSOF ¶ 20):*

1. EQ/Common Stock Index Portfolio

| EQ/Common Stock Index Portfolio<br>Fee Schedule Under Investment Management Agreements |
|---|
| **2010 – 8/31/2011**<br>0.350% (fee on all assets) |
| **9/1/2011 – 8/31/2012**<br>0.350% on first $4 billion of assets<br>0.340% thereafter |
| **9/1/2012 – 8/31/2013**<br>0.350% on first $4 billion of assets<br>0.340% on next $4 billion of assets<br>0.330% thereafter |
| **9/1/2013 – 8/31/2015**<br>0.350% on first $4 billion of assets<br>0.340% on next $4 billion of assets<br>0.330% on next $2 billion of assets<br>0.320% thereafter |
| **9/1/2015**<br>0.350% on first $2 billion of assets<br>0.340% on next $4 billion of assets<br>0.320% on next $3 billion of assets<br>0.310% on next $2 billion of assets<br>0.300% thereafter |

2. EQ/Core Bond Index Portfolio

| **EQ/Core Bond Index Portfolio** |
| --- |
| **Fee Schedule Under Investment Management Agreements** |
| **2010 – 8/31/2011** |
| 0.350% (fee on all assets) |
| **9/1/2011 – 8/31/2012** |
| 0.350% on first $4 billion of assets |
| 0.340% thereafter |
| **9/1/2012 – 8/31/2013** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% thereafter |
| **9/1/2013 – 8/31/2015** |
| 0.350% on first $4 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.330% on next $2 billion of assets |
| 0.320% thereafter |
| **9/1/2015** |
| 0.350% on first $2 billion of assets |
| 0.340% on next $4 billion of assets |
| 0.320% on next $3 billion of assets |
| 0.310% on next $2 billion of assets |
| 0.300% thereafter |

3. EQ/Equity 500 Index Portfolio

| **EQ/Equity 500 Index Portfolio** |
| --- |

148

| Fee Schedule Under Investment Management Agreements |
| --- |
| **2010 – 8/31/2011** |
| 0.250% (fee on all assets) |
| **9/1/2011 – 8/31/2012** |
| 0.250% on first $4 billion of assets |
| 0.240% thereafter |
| **9/1/2012 – 8/31/2013** |
| 0.250% on first $4 billion of assets |
| 0.240% on next $4 billion of assets |
| 0.230% thereafter |
| **9/1/2013 – 8/31/2015** |
| 0.250% on first $4 billion of assets |
| 0.240% on next $4 billion of assets |
| 0.230% on next $2 billion of assets |
| 0.220% thereafter |
| **9/1/2015** |
| 0.250% on first $2 billion of assets |
| 0.240% on next $4 billion of assets |
| 0.220% on next $3 billion of assets |
| 0.210% on next $2 billion of assets |
| 0.200% thereafter |

4.  EQ/Equity Growth PLUS Portfolio

| EQ/Equity Growth PLUS Portfolio |
| --- |
| **Fee Schedule Under Investment Management Agreements** |
| **2010 – 2014** |

0.500% on first $2 billion of assets

0.450% on next $1 billion of assets

0.425% on next $3 billion of assets

0.400% on next $5 billion of assets

0.375% thereafter

5.  EQ/GAMCO Small Company Value Portfolio

**EQ/GAMCO Small Company Value Portfolio**

**Fee Schedule Under Investment Management Agreements**

**2010 – 8/31/2012**

0.800% on first $400 million of assets

0.750% on next $400 million of assets

0.700% thereafter

**9/1/2012 – 2015**

0.750% on first $1 billion of assets

0.700% on next $1 billion of assets

0.675% on next $3 billion of assets

0.650% on next $5 billion of assets

0.625% thereafter

6.  EQ/Global Bond PLUS Portfolio

**EQ/Global Bond PLUS Portfolio**

**Fee Schedule Under Investment Management Agreements**

**2010 – 8/31/2015**

0.550% on first $4 billion of assets

0.530% on next $4 billion of assets

| 0.510% thereafter |
| --- |
| **9/1/2015** |
| 0.550% on first $2 billion of assets |
| 0.530% on next $4 billion of assets |
| 0.510% on next $3 billion of assets |
| 0.490% on next $2 billion of assets |
| 0.480% thereafter |

7. EQ/Global Multi-Sector Equity Portfolio

| **EQ/Global Multi-Sector Equity Portfolio** **Fee Schedule Under Investment Management Agreements** |
| --- |
| **2010 – 2015** |
| 0.750% on first $1 billion of assets |
| 0.700% on next $1 billion of assets |
| 0.675% on next $3 billion of assets |
| 0.650% on next $5 billion of assets |
| 0.625% thereafter |

8. EQ/Intermediate Government Bond Index Portfolio

| **EQ/Intermediate Government Bond Index Portfolio** **Fee Schedule Under Investment Management Agreements** |
| --- |
| **2010 – 8/31/2011** |
| 0.350% (fee on all assets) |
| **9/1/2011 – 8/31/2012** |
| 0.350% on first $4 billion of assets |
| 0.340% thereafter |
| **9/1/2012 – 8/31/2013** |

151

0.350% on first $4 billion of assets

0.340% on next $4 billion of assets

0.330% thereafter

**9/1/2013 – 8/31/2015**

0.350% on first $4 billion of assets

0.340% on next $4 billion of assets

0.330% on next $2 billion of assets

0.320% thereafter

**9/1/2015**

0.350% on first $2 billion of assets

0.340% on next $4 billion of assets

0.320% on next $3 billion of assets

0.310% on next $2 billion of assets

0.300% thereafter

9.  EQ/Large Cap Value PLUS Portfolio

**EQ/Large Cap Value PLUS Portfolio**

**Fee Schedule Under Investment Management Agreements**

**2010 – 2015**

0.500% on first $2 billion of assets

0.450% on next $1 billion of assets

0.425% on next $3 billion of assets

0.400% on next $5 billion of assets

0.375% thereafter

10. EQ/Mid Cap Value PLUS Portfolio

| EQ/Mid Cap Value PLUS Portfolio |
| :-- |
| **Fee Schedule Under Investment Management Agreements** |
| **2010 – 2015** |
| 0.550% on first $2 billion of assets |
| 0.500% on next $1 billion of assets |
| 0.475% on next $3 billion of assets |
| 0.450% on next $5 billion of assets |
| 0.425% thereafter |

11. EQ/PIMCO Ultra Short Bond Portfolio

| EQ/PIMCO Ultra Short Bond Portfolio |
| :-- |
| **Fee Schedule Under Investment Management Agreements** |
| **2010 – 2015** |
| 0.500% on first $750 million of assets |
| 0.475% on next $750 million of assets |
| 0.450% on next $1 billion of assets |
| 0.430% on next $2.5 billion of assets |
| 0.420% thereafter |

12. EQ/T. Rowe Price Growth Stock Portfolio

| EQ/T. Rowe Price Growth Stock Portfolio |
| :-- |
| **Fee Schedule Under Investment Management Agreements** |
| **2010 – 8/31/2012** |

153

0.800% on first $400 million of assets

0.750% on next $400 million of assets

0.700% thereafter

**9/1/2012 – 2015**

0.750% on first $1 billion of assets

0.700% on next $1 billion of assets

0.675% on next $3 billion of assets

0.650% on next $5 billion of assets

0.625% thereafter

*Administrative Fee Schedule (JSOF ¶ 37):*

1. For the Single-Advised Portfolios (EQ/Common Stock Index Portfolio, EQ/Core Bond Index Portfolio, EQ/Equity 500 Index Portfolio, EQ/GAMCO Small Company Value Portfolio, EQ/Intermediate Government Bond Index Portfolio, EQ/PIMCO Ultra Short Bond Portfolio, EQ/T. Rowe Price Growth Stock Portfolio)

| **Single-Advised Portfolios** |
|---|
| **Fee Schedule Under Administrative Agreement** |
| **2010 – 8/31/2013** |
| 0.120% on first $3 billion of assets |
| 0.110% on next $3 billion of assets |
| 0.105% on next $4 billion of assets |
| 0.100% on the next $20 billion of assets |
| 0.0975% thereafter based on aggregate average daily net assets of the Portfolios |
| Plus $30,000 per Portfolio |

| 9/1/2013 – 8/31/2014 |
|---|

0.120% on first $3 billion of assets

0.110% on next $3 billion of assets

0.105% on next $4 billion of assets

0.100% on the next $20 billion of assets

0.0975% thereafter based on aggregate average daily net assets of the Single-Advised Portfolios

Plus $30,000 for each Portfolio with average net assets of less than $5 billion.

| 9/1/2014 – 2015 |
|---|

Greater of $30,000 per Portfolio or,

0.120% of first $3 billion of assets

0.110% of next $3 billion of assets

0.105% of next $4 billion of assets

0.100% of next $20 billion of assets

0.0975% of next $10 billion of assets

0.0950% thereafter based on aggregate average daily net assets of the Single-Advised Portfolios

2. For the Multi-Subadvised/Hybrid Portfolios (EQ/Equity Growth PLUS Portfolio, EQ/Global Bond PLUS Portfolio, EQ/Global Multi-Sector Equity Portfolio, EQ/Large Cap Value PLUS Portfolio, EQ/Mid Cap Value PLUS Portfolio)

| Multi-Subadvised/"Hybrid" Portfolios |
|---|
| Fee Schedule Under Administrative Agreement |

| 5/1/2009 – 7/31/2010 |
|---|

0.150% of each Portfolio's average daily net assets

Plus $35,000 per Portfolio

Plus $35,000 for each allocated portion of the Portfolio

| 8/1/2010 – 8/31/2013 |
|---|

0.150% on first $20 billion of assets

0.125% on next $5 billion of assets

0.100% thereafter based on aggregate average daily net assets of the Hybrid Portfolios

Plus $32,500 per Portfolio

Plus $32,500 for each allocated portion of the Portfolio[39]

**9/1/2013 – 8/31/2014**

0.150% on first $20 billion of assets

0.110% on next $5 billion of assets

0.100% thereafter based on aggregate average daily net assets of the Hybrid Portfolios

Plus $32,500 for each Portfolio with average net assets of less than $5 billion

**9/1/2014 – 8/31/2015**

Greater of $32,500 per Portfolio or,

0.150% on first $15 billion of assets

0.110% of next $5 billion of assets

0.100% thereafter based on aggregate average daily net assets of the Hybrid Portfolios

**9/1/2015**

Greater of $32,500 per Portfolio or,

0.150% on first $14 billion of assets

0.110% on next $6 billion of assets

0.100% on next $5 billion of assets

0.0975% thereafter based on aggregate average daily net assets of the Hybrid Portfolios

---

[39] From September 1, 2012 to August 31, 2013, the $32,500 fee for each allocated portion of the Portfolios only applied to Portfolios for which separate custodial services were provided.

### *Cost Allocation Method*

## Expense Allocation - 2012



P-210 at Bates 6745.

Each step is explained below:

- Step A:  This first step is known as AXA CAM, and is depicted as letter "A" above. Everything to the left of $\boxed{A}$ is within this step.  This is AXA's parent-level cost allocation method.  Plaintiffs do not dispute Step A of the process.  As the Court understands it, AXA Equitable's Allocated Expenses are $2,275.7 million.  AXA allocated those expenses to "different AXA Equitable Product Codes or expenses buckets." P-210 at Bates 6749.  There are 204 different expense buckets used. *Id.* at Bates 6750.  Of the 204 expense buckets, 83 of them were associated with EQAT, the

157

one subject to this lawsuit, and VIP,[40] and the expenses related thereto were $1,319.7 million. P-210 at Bates 6731-6750. Barrett thought this process was satisfactory. Barrett testified that "AXA CAM is actually quite a robust, relatively sophisticated methodology as I understand it. I believe they have costs broken down into about 1,500 cost centers, and within each cost center they have identified cost drivers that allow them to allocate each cost center's cost to various cost objects, products, or departments or something like that." T1440:7-13 (Barrett). To Barrett, when allocation is based on sensible cost drivers, it is an appropriate allocation. For example, if rent for office space is being allocated on cost per square foot basis, it is a reasonable methodology. Although Barrett did not know the precise cost-drivers used within the AXA CAM, he was satisfied that the large number of them (1,500) had appropriate precision. Hence, Step A is not in issue.

- Step B: FMG allocates those expenses associated with AXA's variable insurance products (Equivest Column). The six products listed in the Equivest Column account for 97 percent of all revenue. P-210 at Bates 6756. The allocation is based on revenue contribution between the three revenue-generating components of those products: (1) the product wrapper; (2) general account; and (3) investment portfolios. T2795:24-2798:8 (Joenk); P-210 at Bates 6756-64. Based on the said revenue percentages, the expenses allocated to each of the revenue producing categories are:

  - Wrapper: $735.9 million
  - General Account: $174.9 million
  - Investment Portfolios: $408.9 million

---

[40] The VIP is another mutual fund complex, but is not subject to this litigation.

Barrett opined that the allocation based on revenue is contrary to accounting

principles. Barrett testified that FMG's allocation of its expenses based on revenue is

unreasonable because revenue is not an appropriate cost driver, as it does not relate to

the behavior of the expenses.  T1465:11-24 (Barrett).  He described using revenue as

a cost driver as a "self-fulfilling prophesy [sic]" because "the more revenue – the

higher rate they charge[,] the more revenue they take in, the more expenses they

allocate."  T1466:15-18 (Barrett).

- Step C:  FMG then allocates the expenses associated with the Funds to the functions

  of managing and distributing the individual portfolios within EQAT, resulting in

  "Allocated Expenses" to EQAT underlying portfolios of $309.2 million.  P-210 at

  Bates 6765; ECF No. 276, PRDFOF, ¶ 430.  FMG allocates expenses associated with

  the management of the EQAT funds on the basis of assets under management in each

  Fund.  *Id.*  In this case, distribution costs were not at issue.  Plaintiffs complain about

  the allocated cost of $49,454,000 in 2012.  That cost is within the $309.2 million as

  set forth in Step C.  Joenk indicated that, "[i]t's not actually on this page [P-210]. . .

  but embedded in that [$]309 [million] are two numbers, one is the distribution

  number, and then the 49 million that would be ascribed as management."  T2794:21-

  25.  Therefore, "out of the $2.275 billion [from Step A], [the] [$]49 [million that]

  comes out is [sic] allocated to the EQAT portfolios."  T2794:25-2795:1.